UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| MATTHEW BISSONNETTE,<br><br>Plaintiff,<br><br>-against-<br><br>KEVIN PODLASKI and<br>CARSON BOXBERGER, LLP,<br><br>Defendants. | Civil Action No.: 1:15-cv-00334<br><br>SECOND AMENDED<br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Matthew Bissonnette, through his attorneys, brings this Complaint against Kevin Podlaski and Carson Boxberger, LLP. Except as otherwise indicated, Bissonnette alleges upon information and belief as follows:

### Nature of the Action

1.    This legal malpractice case arises from Defendants' representation of Bissonnette in connection with his best-selling book, *No Easy Day: The Firsthand Account of the Mission That Killed Osama Bin Laden* (2012) (the Book). Defendants' representation of Bissonnette included:

- The duty of advising Bissonnette on his contract with the publisher; and

- The duty of ensuring Bissonnette's compliance with his contract with the
publisher and with his contractual and fiduciary obligations to the United States Government to preserve certain confidential, classified, or otherwise sensitive information he learned as a Navy SEAL.

1

2.     The legal representation Defendants contracted to provide is not unique. But it is specialized. Attorneys who routinely advise authors about confidentiality obligations to the Government and guide them through the prepublication review process establish the standard of care applicable to all attorneys who represent authors under similar circumstances.

3.     Among other acts of negligence, Defendants advised Bissonnette that he could—and should—forego a prepublication review of the Book by the Department of Defense and other governmental agencies, and that Defendants could review the Book to remove all classified or otherwise sensitive information so that Bissonnette could publish the Book without civil or criminal liability. Bissonnette followed Defendants' erroneous advice. As a direct and proximate result, he has suffered and will suffer significant damages and financial losses.

4.     Bissonnette will offer the testimony of an expert witness who routinely represents authors with contractual and fiduciary confidentiality obligations to the Government. This expert witness is familiar with and has advised clients on their contractual and fiduciary obligations concerning classified and otherwise sensitive information, and the prepublication review requirements that must be considered when writing a book. This expert witness will testify that Defendants breached the standard of care to which attorneys under these

EXHIBIT A

4

circumstances are held, and this breach proximately caused the damages claimed by Bissonnette in this lawsuit.

## Parties

5.      Bissonnette Matthew Bissonnette is a citizen of Texas. He is not now and never has been a citizen of Indiana. He published *No Easy Day* under the pseudonym Mark Owen.

6.      Defendant Kevin Podlaski is a lawyer formerly with the law firm of Carson Boxberger, LLP and currently with the firm of Beers Mallers Backs & Salin. He is licensed to practice law in Indiana and New Jersey. He is a citizen of Indiana.

7.      Defendant Carson Boxberger, LLP is a limited liability partnership practicing law in Indiana. It has two offices: one satellite office in Bloomington Indiana and its principal office in Fort Wayne Indiana. It has no offices outside the State of Indiana. The following are all partners of Defendant Boxberger, and all of them are citizens of Indiana (except James Federoff and Howard Sander, both of whom are citizens of Florida):

- Larry L. Barnard
- Andrew D. Boxberger
- Bruce O. Boxberger
- Jon A. Bragalone
- Jeremy M. Dilts
- James A. Federoff

- Scott M. Federoff
- Angela G. Garcia
- J. Blake Hike
- Douglas A. Hoffman
- Jason M. Kuchmay
- Edward J. Liptak
- Grant A. Liston
- Cal S. Miller
- Robert L. Nicholson
- Timothy M. Pape
- Richard P. Samek
- Howard B. Sander
- Jeremy V. Senk
- Karl J. Veracco
- Jacque R Wilson

None of the partners are a citizen of the State of Texas and, therefore, Carson Boxberger is not a citizen of the State of Texas.

8. Defendant Podlaski was at all times relevant to this dispute an attorney practicing law with Carson Boxberger. All acts of Podlaski in the representation of Bissonnette are alleged to be the acts of Carson Boxberger.

## Jurisdiction and Venue

9. This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of costs and interest, exceeds $75,000.

10. Venue is proper in this district under 28 U.S.C. § 1391(2) because a substantial part of the events and omissions that give rise to the claims asserted occurred within the territorial limits of the Northern District of Indiana.

## Factual Background

11. Bissonnette is a decorated, retired Navy SEAL who served 13 consecutive combat deployments alongside his fellow SEALs in the service of our country. During Bissonnette's military service, he participated in the mission resulting in the rescue of Captain Richard Phillips from Somali pirates in 2009, and the mission resulting in the death of Osama Bin Laden in 2011. Both missions became the subject of successful books and films that made millions of dollars (for someone) by telling the stories (not always accurately) of highly skilled SEALs. But these books and movies failed to tell the stories from the perspective of the SEALs who bravely carried out the missions, and no profits from the books and movies were directed toward the families of fallen SEALs.

12. After observing that these missions—particularly the Bin Laden mission—were being written about and discussed inaccurately by people who did not know the facts and, even worse, were exploiting them to advance personal and financial agendas rather than to highlight the skill and sacrifice of the SEALs, Bissonnette decided to write his own book. *No Easy Day* tells the story of these missions from the perspective of the Navy SEALs.

5

13.     Bissonnette did not seek personal recognition; he used a pseudonym to remain anonymous while describing the valor of his fellow SEALs. But his identity now has become public.  Bissonnette announced in the Book that he would donate a major portion of its sale proceeds to designated charitable organizations devoted to caring for the families of fallen SEALs. Bissonnette encouraged his readers to donate as well. Many did.

14.     Bissonnette retained Elyse Cheney as his literary agent. Bissonnette, Cheney, and his publisher, Dutton, a division of Penguin Group (USA) Inc. knew that Bissonnette had acquired sensitive information during his naval career, and that he had a personal commitment and contractual obligations not to disclose that information. Bissonnette knew that if the Book inadvertently disclosed sensitive information:

- it could put SEALs in harm's way;

- it could be used by America's enemies to place the nation and its soldiers at risk;

- it could result in the Government pursuing Bissonnette for civil liabilities and criminal penalties; and

- it could result in Bissonnette being sued by Dutton for breach of contract.

15.   To insure Bissonnette satisfied his obligations of confidentiality, Cheney (acting for Bissonnette) began searching for legal representation. Cheney learned that Podlaski had worked with another military author and had special expertise in dealing with military confidentiality, military law, and special operations issues.

16.   Podlaski claimed to possess a high level of security clearance, said he had vetted other books for retired military personnel, and said he could advise Bissonnette on legal issues relating to the Book—including compliance with confidentiality obligations.

17.   A copy of Defendants' engagement letter is attached as Exhibit 1. Under the engagement letter, Defendants' first task was to provide legal representation and advice with respect to:

> Contracting with Dutton, … for the publication of your manuscript about your career as a member of the U.S. Navy SEALS, . . . .

Defendants reviewed the Dutton contract and suggested revisions for Bissonnette's benefit, including a proposed modification concerning Bissonnette's rights to tell the story and his obligations under agreements with the U.S. government. Podlaski proposed adding himself into the Dutton contract by suggesting that the following language be added:

> Recognizing that the legal right to publish the Author's manuscript and timely delivery of the manuscript by the

7

> Author to the Publisher are essential terms of this Agreement . . . the parties agree to obtain a review of the manuscript by Kevin P. Podlaski, Esq., an Attorney who possesses the proper military background, experience, education, and training . . . .

18.     The Dutton contract required Bissonnette to insure that his manuscript contained no classified or otherwise sensitive information that might compromise the defense of the United States. Because Defendants advised Bissonnette that he had no obligation to submit his manuscript to the Government for prepublication review, Defendants failed to include key provisions in the Dutton contract that would have protected Bissonnette concerning the prepublication review process. These missing provisions would have been acceptable to Dutton and would have protected Bissonnette in the event of a prepublication review.

19.     Once Defendants concluded their assistance with the Dutton contract and it had been signed, the engagement letter next obligated Defendants to:

> Review the publishable manuscript of [Bissonnette's] career to ensure [his] compliance with [his] obligations under any agreements [he] may have signed with the U.S. Government not to release classified or classifiable information or otherwise compromise the national security interests of the United States, as those terms are used, intended or understood in Standard Form 312, Confidential Information Non-Disclosure Agreement (CINA"), or any other such agreements.

20.     In his "Author's Note," Bissonnette explained his efforts to comply with his confidentiality obligations and his hiring of Defendants:

8

> Although I am writing this book in an effort to accurately describe real-world events as they occurred, it is important to me that no classified information is released. With the assistance of my publisher, **I hired a former Special Operations attorney to review the manuscript to ensure that it was free from mention of forbidden topics** and that it cannot be used by sophisticated enemies as a source of sensitive information to compromise or harm the United States. I am confident that the team that has worked with me on this book has both maintained and promoted the security interests of the United States. (Emphasis added.)[1]

21.    Defendant Podlaski is the attorney referred to in this Author's Note. In fact, Podlaski personally drafted a version of this portion of the Author's Note, touting his own expertise and his role in the publication of the Book.

22.    Defendants knew or should have known that Bissonnette signed numerous secrecy agreements as a SEAL. Defendants knew or should have known that some or all of these agreements required Bissonnette to submit the Book to the Government for prepublication review. Defendants did not ask and did not know when Bissonnette officially left the Navy, and did not ask and did not know that Bissonnette was on terminal leave when some of the Book preparations were performed. These facts were relevant to determining Bissonnette's obligations to the United States.

---

[1] The "assistance" was primarily advancing funds to pay the legal fees related to such review.

11

23.     Defendants gave Bissonnette unqualified legal advice that he had no obligation to submit the Book to any other agency for prepublication review. Defendants in fact affirmatively advised Bissonnette ***not*** to submit the Book for prepublication review.

24.     Defendants further represented that, through their review of the manuscript, Bissonnette could satisfy his obligation not to disclose sensitive material.  Podlaski stated that he had the knowledge, skill, and security clearance necessary to review the manuscript and screen it for classified or otherwise sensitive information.

25.     Defendants failed to appreciate or explain the difference between (1) having a security clearance that could allow an individual to be determined by an agency of the U.S. Government to have a "need to know" classified or otherwise sensitive information and view a document, and (2) having actually received permission to view a potentially classified or otherwise sensitive document. Whatever security clearance Podlaski held, he had no permission from the requisite United States agencies to read the manuscript and thereby learn the classified or otherwise sensitive information within the Book. Podlaski likewise had no legal right to substitute his judgment for that of agencies of the United States as to what classified or otherwise sensitive information the Book might contain.

26.     Podlaski reviewed the manuscript, making nominal edits, adding a proposed forward (that touted his own role in the Book), and including citations to the public record. Upon completion of his review and editing, Podlaski forwarded a copy of the revised manuscript to Cheney with his assurance that, with his suggested changes, the manuscript would contain no classified or otherwise sensitive information, would not breach Bissonnette's personal, contractual, or fiduciary obligations, and would not result in civil or criminal exposure.  Podlaski repeated this same advice through the middle of 2013.

27.     At no time did Defendants inform Bissonnette adequately of the risks and probable consequences if they were wrong about Bissonnette's obligation to submit the Book to a prepublication review. At no time did Defendants adequately inform Bissonnette of the risks and probable consequences if Defendants were wrong about having cleansed the Book of classified or otherwise sensitive information. Not only did Defendants fail to inform Bissonnette adequately so he could make an informed decision about submitting the Book to prepublication review, Defendants actually downplayed the risk and consequences of following their strategy and advice— affirmatively recommending that Bissonnette forego a prepublication review and instead rely on them to review and cleanse the Book of classified information.

11

28.    As a result of Defendants' failure to inform Bissonnette adequately, and Defendants' absolute and unqualified advice, Bissonnette never made an informed decision on these matters. Bissonnette relied upon the faulty advice of Defendants and did not submit the Book for a prepublication review, relying instead on Defendants to remove anything that might be in violation of his secrecy obligations. Bissonnette would not have relied on Defendants' advice had they not assured him that he could do so without risk. He would not have relied on Defendants' advice if they had qualified it or adequately informed Bissonnette of the risks he was assuming by following it.

29.    In the days and weeks leading up to the publication of *No Easy Day*, publicity surrounding the Book began to build. One business day before the scheduled release, Jeh Johnson, Department of Defense General Counsel, wrote Bissonnette—using his pseudonym, Mark Owen—in care of Dutton to say that the Book violated Bissonnette's obligations because he had not submitted the Book for a prepublication review and because it contained sensitive information.

30.    Cheney forward Johnson's letter to Podlaski, who dismissed it as an attempt at intimidation and said: "We should not worry." Podlaski even suggested that everyone embrace the accusations against Bissonnette because it would result in greater book sales.

14

31.     At the time of the Jeh Johnson letter, tens of thousands of copies of the Book had already been printed—with Podlaski's edits—and distributed across the country in anticipation of the release date, at a cost of millions of dollars. Bissonnette had no power to stop the distribution at this late date. Had release of the Book been abandoned at this late date, Bissonnette would have been in material breach of his contract with Dutton and subject to suit by Dutton. Bissonnette had no choice at this late date but to hope Podlaski was right.

32.     Following the Book's publication, and as a direct and proximate cause of the acts of Defendants previously described, the Government claimed that Bissonnette violated his obligations to submit his manuscript for a classification prepublication review and preserve certain information as confidential. The Department of Defense threatened a civil lawsuit seeking forfeiture of all income from the Book. The Department of Justice began an investigation to determine whether Bissonnette violated any criminal laws by publishing the Book.

33.     Because Bissonnette did not receive proper legal advice from Defendants, he had to retain new counsel to represent him on the Government's threats of civil and criminal liability. Defendants encouraged Bissonnette's new counsel to continue to insist upon and defend their faulty advice; in assessing the Department of Defense's position that prepublication was required, Podlaski wrote: "It's bullshit." By continuing to advance their untenable position,

Defendants delayed a resolution of these threats and increased the cost of resolution.

34.    Defendants' continued to represent Bissonnette, making certain Freedom of Information Act requests on his behalf on November 13, 2012, and emailing about the status of these requests as late as May 9, 2013.  Defendants never formally terminated their attorney-client relationship with Bissonnette.

35.    Bissonnette's new counsel recognized that by relying upon the advice of Podlaski, Bissonnette unintentionally breached his contractual obligations to the country for which he repeatedly risked his life. Bissonnette admitted his error and entered into negotiations with the Department of Defense to resolve the threatened civil forfeiture lawsuit. Bissonnette anticipates the forfeiture claim will be resolved by settlement before the trial of this case. That settlement will require him to forfeit all income he has received or will receive from the Book. This loss exceeds the minimum jurisdictional limits of this court.

36.    Bissonnette's new counsel told the Department of Justice that he was innocent of wrongdoing and had reasonably relied upon the advice of his attorney. Bissonnette waived his attorney-client privilege with Defendants and promised to produce his entire file with Podlaski to show that Podlaski advised him not to submit the manuscript for prepublication review. Bissonnette sent Defendants a request for his entire file. In violation of their ethical and fiduciary obligations,

14

however, Defendants refused to produce the file for months, making it impossible for Bissonnette to produce the file to the Government and, in the process, further damaging Bissonnette's relationship with the Government representatives investigating the matter.

37.     After repeated requests and months of delay, Defendants finally forwarded Bissonnette some—though still not all—of his file. Bissonnette again demanded his entire file. After even more delay, Defendants sent a second production of documents and then represented they had produced Bissonnette's entire file. Bissonnette produced the file to the Government, conveying Defendants' representation that this was his entire file. It wasn't.

38.     Bissonnette asked Podlaski to meet with the Department of Justice and answer all their questions.  At this meeting, Podlaski produced to Government representatives additional documents never produced to Bissonnette, even though these documents are clearly a part of Bissonnette's file. This further damaged Bissonnette's relationship with Government officials. Defendants still have not produced to Bissonnette his entire file.

### First Cause of Action
### *Professional Negligence/Malpractice*

39.     As previously alleged, Bissonnette had an attorney-client relationship with the Defendants. As a result, Defendants owed Bissonnette the duty act on his

behalf as a reasonable and prudent attorney would act under the same or similar circumstances.

40.     Defendants held themselves out as experts in connection with Bissonnette's secrecy, non-disclosure agreements, and book publication obligations. They committed to him that their representation would be not just at the level of a reasonably prudent attorney but instead would be up to the highest legal and ethical standards. In doing so, Defendants voluntarily assumed (and then breached) an even higher standard of care.

41.     The above-described acts of Defendants constitute a breach of the standard of care they owed to Bissonnette. In addition, these acts constitute a breach of the higher standard of care Defendants voluntarily assumed when they committed in the engagement letter that their representation of Bissonnette would be "to the highest legal and ethical standards."

42.     By their negligence, Defendants committed Bissonnette to a conflict with the U.S. Government that he could not win. As a direct and proximate result of Defendant's negligence, Bissonnette suffered the losses described in this Complaint.

43.     It has become necessary for Bissonnette to retain the undersigned counsel to prosecute these claims on his behalf and Bissonnette seeks an award of reasonable attorney's fees, if and as allowed by law.

## Second Cause of Action
### *Breach of Fiduciary Duty*

44.    Defendants' actions breached the fiduciary duty they owed to Bissonnette as their client and their former client. The actions constituting this breach of fiduciary duty include the following:

- continuing to insist upon the correctness of their flawed advice to protect themselves at Bissonnette's expense;

- delaying the production of Bissonnette's file to protect themselves at the expense of Bissonnette, their former client;

- refusing to produce to Bissonnette his entire file;

- producing documents to the Department of Justice which have never been produced to Bissonnette, to protect themselves at his expense; and

- generally engaging in a cover-up of their negligence in an effort to protect themselves at Bissonnette's expense.

45.    By these breaches of their fiduciary duty, Defendants unnecessarily complicated and delayed the resolution of the conflicts created by their flawed legal advice, thereby unnecessarily adding to Bissonnette's costs and attorney's fees in resolving these matters and the damages incurred as a result of these conflicts.

17

## Damages

### A.    Government Settlement

46.    Had Bissonnette received the proper legal advice concerning his contract with Dutton, his obligation to submit the Book to a prepublication review, and the risks of not submitting the Book for such review, he would have tendered the manuscript for Government review and been able to keep all the income from the Book. If the review process resulted in a request to remove some information, Bissonnette would have removed the information as requested and then published the Book free from any risk of civil or criminal liability. This review process would not have materially altered the Book or affected its marketability. This classification prepublication review process does not prevent an author from publishing and marketing a book, as evidenced by the publication of other books that have undergone a prepublication review, including but not limited to the following:

- Bissonnette's second book, *No Hero*;

- Chris Kyle's book, *American Sniper*; and

- Marcus Latrell's book, *Lone Survivor: The Eyewitness Account of Operation Redwing and the Lost Heroes of SEAL Team 10.*

43.    Bissonnette has recognized that by relying upon the advice of Podlaski, he unintentionally breached his contractual/fiduciary obligations to the country for

which he repeatedly risked his life. Bissonnette has admitted his error and entered into negotiations with the Department of Defense to resolve the threatened civil forfeiture lawsuit. Bissonnette anticipates that the Government's forfeiture claim will be resolved by a settlement before the trial of this case that will require him to forfeit all past and future income from the Book. If Defendants had advised Bissonnette properly, he would not have been required to forfeit his income from the Book. Bissonnette's losses exceed the minimum jurisdictional limits of this Court.

## B.    Attorney's Fees

47.    All attorneys' fees incurred during this cleanup process are damages proximately caused by the previously described acts of Defendants.

48.    Bissonnette was forced to retain new counsel to represent him on the Government's threat of civil and criminal liability against him. Bissonnette has paid a significant amount of money for the services of his new counsel and their services and fees are continuing at this time. Bissonnette's obligation to pay attorney's fees will continue into the future until the mess created by Defendants' negligence has been cleaned up and the threats of civil and criminal lawsuits concluded.

49.    Defendants insisted that Bissonnette's new counsel defend their advice of no obligation to submit for a prepublication review and that the Book

contained no confidential, classified, or otherwise sensitive information. New counsel initially did that, until such time as new counsel could conduct their own research and reach their own conclusions. As a result of this continuation of their prior negligent advice, Defendants delayed a resolution of these threats and increased the cost of resolving the disputes.

## C.    Damage to Reputation, Loss of Income

50.    As a direct and proximate cause of Defendants' faulty legal advice, Bissonnette's reputation and his exemplary military record have been tarnished by false accusations and Bissonnette will lose his security clearance. Bissonnette has lost a significant amount of income he otherwise would have received following his retirement from the military by way of consulting jobs, speaking engagements, and future employment. This loss of income will continue into the future for years and exceeds the minimum jurisdictional limits of this court.

51.    All these elements of Bissonnette's damage were proximately caused by the negligent acts of Defendants. All Bissonnette's damages were foreseeable from the negligent acts of Defendants described herein. But for the negligence of Defendants described herein, Bissonnette would not have suffered these injuries loss and financial losses.

## Affirmative Pleadings Responsive to Defenses

52.     In connection with any limitations defense, Bissonnette affirmatively pleads and relies upon the discovery rule. Bissonnette did not discover, and could not in the exercise of ordinary diligence have discovered, Defendant's negligence until several months after retaining new counsel. *See Silvers v. Brodeur*, 682 N.E.2d 811, 813 (Ind. Ct. App. 1997).

53.     In connection with any limitations defense, Bissonnette affirmatively pleads and relies upon Indiana's "Journey's Account Statute." IND. CODE § 34-11-8-1.  Bissonnette filed suit against Defendants in the United States District Court for the Southern District of New York on November 5, 2014. That suit was dismissed for lack of personal jurisdiction on October 9, 2015. This statute revives actions where a case is dismissed for lack of jurisdiction.  *Eads v. Community Hospital*, 932 N.E.2d 1239 (Ind. 2010).  Indiana courts have applied the statute specifically to a federal lawsuit dismissed on jurisdictional grounds. *Eves v. Ford Motor Co.*, 281 N.E.2d 826 (Ind. 1972). Under the statute, limitations on this lawsuit does not run until October 9, 2018.

54.     In connection with any limitations defense, Bissonnette affirmatively pleads and relies upon Indiana's common law tolling rule, which tolls limitations of state claims during pendency of a federal action between the same parties. *Torres v. Parkview Foods*, 468 N.E.2d 580 (Ind. Ct. App. 1984). Thus limitations was tolled from November 5, 2014 to October 9, 2015.

55.     In connection with any limitations defense, Bissonnette affirmatively pleads and relies upon the tolling agreement executed between the parties, tolling limitations on the claims asserted herein.  This agreement tolled limitations from August 26, 2014 through November 30, 2014.

56.     In connection with any limitations defense, Bissonnette affirmatively pleads and relies upon Indiana's continuous representation rule, extending the accrual of a cause of action for legal malpractice to the conclusion of the attorney's representation. *See Biomet, Inc. v. Barne & Thornburg*, 791 N.E.2d 760, 765 (Ind. Ct. App. 2003), *trans. denied*. Defendants continued to represent Bissonnette until at least May 9, 2013, but certainly to a point within two years of the filing of Bissonnette's lawsuit in the Southern District of New York (and believed to be less than two years from the filing of this lawsuit).

57.     Bissonnette pleads legal and equitable estoppel to bar Defendants' claim that Bissonnette cannot meet his burden of proof on proximate cause and damages because Bissonnette must but cannot—without breaching his obligations to the Government—reveal the specific confidential, classified, or otherwise sensitive information Defendants wrongfully left in his Book, in violation of their duty to ensure that the Book satisfied Bissonnette's obligations to the Government. By this defense, Defendants essentially plead their own negligence as a defense to their negligence.

22

24

58.     Bissonnette pleads an exception to the "but for" component of proximate cause and damages because Bissonnette cannot—without breaching his obligations to the Government—reveal the specific acts of negligence of Defendants in connection with the confidential, classified, or otherwise sensitive information Defendants wrongfully left in his Book, in violation of their duty to ensure that the Book satisfied Bissonnette's obligations to the U.S. Government. Defendants essentially plead and rely on their own negligence as a defense to their negligence.

**Prayer for Relief**

Based on the allegations in this Complaint, Bissonnette prays for the following relief:

- Compensatory damages in an amount to be proven at trial;

- Forfeiture of all fees, income and other benefit Defendants received as a remedy for their breach of their fiduciary duty; and

- Such other and further relief as this Court deems just and proper, together with all costs and expenses and fees as allowed by law, pre and post judgment interest at the maximum rates allowed by law, and disbursements relating to this proceeding and such other relief, legal and equitable, as Bissonnette may show himself to be justly entitled.

25

## Demand for Trial by Jury

59.   Bissonnette demands a trial by jury for all issues so triable as a matter

of right.


Dated: December 2, 2015
Dallas, Texas

**Johnston Tobey Baruch, P.C.**

By:   /s/ Randy Johnston
　　　Coyt Randal Johnston

3308 Oak Grove Avenue
Dallas, Texas 75204
Telephone: (214) 741-6260
Facsimile: (214) 741-6248
randy@jtlaw.com

And

James Groves
Lee Groves & Zalas
205 West Jefferson Boulevard, Suite 502
South Bend, IN  46601
Telephone: (574) 232-5923
Facsimile: (574) 232-5942
Jimfgroves@aol.com

**Attorneys for Plaintiff**

## Certificate of Service

On this 2nd day of December 2015, a copy of the foregoing was served on counsel of record through the e-filing system.

/s/ Randy Johnston_____
Coyt Randal Johnston



**Carson Boxberger**
Attorneys

1400 ONE SUMMIT SQUARE
FORT WAYNE, IN 46802
CARSONBOXBERGER.COM

Kevin P. Podlaski, Esq.
podlaski@carsonboxberger.com

January 17, 2012

**ATTORNEY—CLIENT**
**PRIVILEGED MATERIAL**
**Sent Via Email**

MATT BISSONNETTE
(Printed Name of Client)

c/o Elyse Cheney
Elyse Cheney Literary Associates, LLC
78 Fifth Avenue, Third Floor
New York, NY 10011

Re:   Engagement/Representation Letter

Dear Sir:

We are pleased that you have selected our firm to provide legal services to you. You asked me to assist you with the legal issues you may encounter in:

- Contracting with Dutton, a division of Penguin Group (USA) Inc., 375 Hudson Street, New York, New York 10014 ("Publisher"), for the publication of your manuscript about your career as a member of the U.S. Navy SEALS; and

- Reviewing the publishable manuscript of your career to ensure your compliance with your obligations under any agreements you may have signed with the U.S. Government not to release classified or classifiable information or otherwise compromise the national security interests of the United States, as those terms are used, intended or understood in Standard Form 312, Confidential Information Non-Disclosure Agreement (CINA"), or any other such agreements.

The following confirms and details our agreement and describes the scope of my representation, the fees and expenses, and the conclusion of our representation. This is the contract between you and my law firm for the payment of legal fees you will incur for my legal

**EXHIBIT 1**

KP00001

representation of you. Please thoroughly review it, and if you are in agreement with the terms, sign it and return the original to me via the FED EX. If there is anything you disagree with or don't understand, please let me know before you sign it.

Scope of Representation. As discussed, I am the attorney in charge of these legal matters and I will be responsible for the day-to-day management of your interests as defined above. By signing below, you are specifically acknowledging that no promises have been made by me as to what result we can or will achieve for you. My acceptance of this engagement does not involve an undertaking to represent you or your interests in any other matter. We both recognize that you have not asked me for legal advice or consultation beyond the specific requests that I represent you in the matters stated above. I will, of course, be happy to discuss and provide such additional legal services you may request from time to time and I will provide you with written confirmation of any such additional engagements for which you retain me.

Communication; Copies of Documents. I will try to keep you informed at all times as to the status of all matters I am handling for you and the course of action begin followed or recommended by me. If, however, you are unsure as to the status of any matter, it is also your responsibility to contact me and inquire. At your request, I will send you copies of any written materials sent or received by me pertaining to your matters, at your expense. Because you have e-mail, I will send certain correspondence and documents to you via e-mail rather than through the U.S. Post Office. As you know, this is a quicker and more efficient way of communicating. Of course, copies of any documents not generated in this office, along with correspondence from any Court or opposing counsel, will be sent to you via regular mail.

Fees and Expenses. I will bill you monthly for the legal services we provide to you. Unless you direct otherwise, I will send the monthly billing/invoices to you, care of Elyse Cheney, at Elise Cheney Literary Associates, LLC, at this address: 78 Fifth Avenue, Third Floor, New York, NY 10011.

Our charges for professional services are based on the type of work and the amount of time required for the work. We bill for our services in $1/10^{th}$ an hour increments. The fees are based on time actually spent in your representation (including court waiting time and travel, if applicable) according to our standard hourly rate. The fees that I charge are billed at the hourly rate in effect during the month services are performed. My current hourly rate is $300.00.

You may pay your bill/invoice using a Master Card or Visa credit card. If you choose this method of payment, please include your name as it appears on the card, the account/card number, expiration date, and three or four digit security code from the back of the card. No amounts will be charged until you authorize the amount. Accordingly, miscellaneous expenses, if any, are to be billed directly to you unless you authorize miscellaneous bills to be charged to the card after receiving our miscellaneous billing statement. You may instead, make arrangements with our Billing Department Manager, Connie Schnelker, for paying these fees.

I will be primarily responsible for these matters. However, some aspects of these matters may be referred to other attorneys in this office when appropriate and in the interest of

29

KP00002

USDC IN/ND case 1:15-cv-00034-RL-SLC document 142 filed 12/02/15 page 28 of 30

January 17, 2012
Page 3

effectiveness and efficiency. The hourly rate for other Partners is $250, and Associates is $200 an hour. Also, some of our professional staff may assist me with your matters. Our paralegal current hourly rate is $150. It is obviously to your economic advantage to have these professionals assist me whenever prudent. Nonetheless, prior to being submitted to you all work is reviewed by me as your attorney.

Our monthly invoices will include separate charges for disbursements made and internal charges incurred on your behalf. These may include such items as travel expenses, postage and delivery service fees, charges for long distance telephone calls and faxes, and duplicating charges associated with our representation of you in this matter. We will bill you at cost for charges paid to third parties, and charges for internal services will be billed at our usual and customary rates for such services. You will receive monthly statements showing the status of your account. Payment of any balance due is expected within 15 days of the billing date. In the event this account has a balance due for a period in excess of 30 days, interest will be charged on that amount.

One reason for monthly billing is to give you an opportunity to bring any problems to my attention. You should carefully and immediately review your bills upon receipt. Bring any objections you might have to my attention within 15 days of the date of the statement. Otherwise, all objections to the charges will be deemed waived. If, for some reason, you do not pay our invoices in a timely manner, we may be forced to withdraw our representation. In addition to the fees, expenses and any interest that may be imposed on past-due accounts, you will also be responsible for costs and expenses (including legal fees) of collection. Further, we reserve the right to assert a retaining lien over all documents or property in our possession, as contemplated and allowed under the Rules of Professional Responsibility for Attorneys, Rule 1.16d and the common law. If it is necessary for us to institute a legal action to collect our fees and expenses from you, then by signing below you also agree and consent to jurisdiction of the matter in the Allen County, Indiana court system, under Indiana law.

From time to time, it may be necessary to incur certain expenses on your behalf. However, I will not incur any expenses in excess of $500.00 without your consent. Fees generally are not paid by us, but are instead, directly billed to you unless other arrangements are made by and agreed to between us.

Client Responsibilities. You agree to pay us for the performance of the legal services described above, in accordance with the terms of this letter agreement. You also agree to cooperate fully with us and to provide us with all information known by or available to you that may be relevant to your matters or that may aid us in representing you in these matters.

Conflicts. We agree not to accept, without prior approval from you, any engagement known by us to be in direct conflict with your interests in matters we are handling for you. We may represent new and existing clients in any matter that is not substantially related to your work for you even if the interest of such clients may be adverse to you but we will not knowingly give any other client the benefit of non-public information we received from you to your detriment. We begin our work for you relying on the fact that neither of you nor we know of any conflicting

30

KP00003

interests, or any likely future conflicting interests, among your management or owners, or between your company and any other client of our firm.

Conclusion of Representation. Either you or I may terminate the engagement at any time for any reason by written notice. My termination of work for you must be in strict accordance with my professional obligations to you under the Rules of Professional Responsibilities for Attorneys. Unless previously terminated, my representation of you will terminate upon completion of the services for the matters described above. And, unless you engage us after termination of these matters, we will have no continuing obligation to advise you with respect to future legal developments, such as changes in the applicable laws or regulations which could have an impact on your future rights and liabilities.

Confidentially. Our relationship with you is confidential, and we will keep confidential all sensitive, proprietary, or otherwise confidential information relating to you and your matters. Following the conclusion of our representation, we will keep confidential any non-public information you have supplied to us which we will retain in accordance with Rules of Professional Responsibility for Attorneys. At your request, we will return your papers and property to you promptly upon receipt of payment for outstanding fees and costs. The firm will retain its own files pertaining to the matter in accordance with the firm's records retention program. For various reasons, including the minimization of unnecessary storage expenses, we reserve the right to destroy or otherwise dispose of any such documents or other materials after a reasonable time following the termination of the engagement.

Press Releases and Publicity. After your case is concluded, we may publish on our firm's website or in promotional materials, our representation of you. Of course, we will not disclose your identity or name. And our release of information will be in strict compliance with the Rules of Professional Responsibility for Attorneys. By signing below you authorize Carson Boxberger LLP to list the general nature of this representation in our various promotional materials.

Outcome of Representation. Although I cannot guarantee a certain outcome, I am confident that my experience and tenacity will afford you a satisfactory conclusion of these matters as I use my reasonable best efforts in representing you. Above all, I will make every effort to handle your case efficiently and according to the highest legal and ethical standards.

If you do not understand any aspect of this Agreement, please discuss it with me so you have a full understanding. Your acknowledgment of all of the terms of this contract induces me to accept your case and act as your lawyer. I do not anticipate disputes concerning legal fees, as I have rarely had them. We must have a true meeting of the minds, and by achieving that, we will have a professional relationship of the highest quality.

If the foregoing reflects your understanding of our agreement and representation, please sign this Agreement and return it to me via FED EX at the address indicated above. I encourage you to keep a personal file of all documents from me. I will send you a copy of any document filed with the court or forwarded to opposing counsel or any other third party hired in this case.

KP00004

I look forward to representing you and will keep you informed of all progress in this matter. It is my practice to attempt to return every telephone call made to me during a given day. However, sometimes that is impossible, as I may be in trial or involved in other matters. If you call and I am not available, you may leave a message or discuss your question with my legal assistant. Once again, I am pleased to have this opportunity to represent and assist you.

Sincerely,

CARSON BOXBERGER LLP


Kevin P. Podlaski

KPP/kjw


Acknowledged and Agreed to by:

Dated: _1/18/2012_


MATTHEW BISSONNETTE / █████ █████
(Printed Name of Client) (Social Security Number)

(Signature of Client)

KP00005