UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MATTHEW BISSONNETTE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 1:15-cv-00334-SLC |
| | ) |
| KEVIN PODLASKI, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court is a motion to dismiss and a supporting memorandum, together with several exhibits, filed by Defendants Kevin Podlaski ("Podlaski") and Carson Boxberger, LLP ("Carson Boxberger") (together, "Defendants"), seeking to dismiss Plaintiff Matthew Bissonnette's second amended complaint (DE 14) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(c).[1]  (DE 43 to DE 45).  Bissonnette timely filed a response brief, also submitting several exhibits.  (DE 53; DE 54).  The motion is now fully briefed, including the filing of a sur-response and a sur-reply (DE 58; DE 63-1; DE 71), and is ripe for adjudication.[2]  For the reasons set forth below, Defendants' motion to dismiss will be DENIED.

## I. LEGAL STANDARD

For purposes of a motion to dismiss under both Rules 12(b)(1) and 12(c), the court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences

---

[1] Federal question jurisdiction exists under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.  (DE 29).

[2] Also pending before the Court are Defendants' motion to preclude Bissonnette's expert (DE 76), which is fully briefed, and Defendants' motion for summary judgment (DE 99), which is not yet ripe (DE 122).  The Court will address these motions in separate orders.

in the plaintiff's favor. *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012); *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 879 (7th Cir. 2012). A motion to dismiss pursuant to Rule 12(b)(1) tests the jurisdictional sufficiency of the complaint. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). That is, the plaintiff bears the burden of establishing that the court has subject matter jurisdiction over its claims. *Id.*; *see Sumner v. Town of Converse, Ind.*, No. 3:07-CV-1 RM, 2007 WL 1435535, at *1 (N.D. Ind. May 11, 2007) ("A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction and should be granted if the court lacks the statutory or constitutional power to adjudicate the case."). "The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (citations omitted).

A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint and not the merits of the suit. *McReynolds*, 694 F.3d at 878. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)); *see also Ray v. City of Chicago*, 629 F.3d 660, 662-63 (7th Cir. 2011) ("While the federal pleading standard is quite forgiving, . . . the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (citation and internal quotation marks omitted)). A

2

plaintiff is required to include allegations in the complaint that "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads [himself] out of court." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 554). Thus, "a plaintiff must do better than putting a few words on paper that, in the hands of an imaginative reader, *might* suggest that something has happened to [him] that *might* be redressed by the law." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 403 (7th Cir. 2010) (citation omitted).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts Alleged in the Second Amended Complaint

The following is a summary of Bissonnette's allegations in his second amended complaint: Bissonnette is a retired Navy SEAL who participated in the mission entitled Operation Neptune Spear that resulted in the death of Osama Bin Laden in 2011. (DE 14 ¶ 11; DE 71 at 2). Bissonnette (using the pseudonym Mark Owen) wrote a book about the mission, which he entitled, *No Easy Day: The Firsthand Account of the Mission That Killed Osama Bin Laden* (the "Book"). (DE 14 ¶¶ 12, 13; DE 53 at 6). To assist him in that process, Bissonnette retained a literary agent, Elyse Cheney, and a publisher, Dutton, a division of Penguin Group (USA) Inc. ("Dutton"). (DE 14 ¶ 14).

Bissonnette, Cheney, and Dutton knew that Bissonnette had acquired sensitive information during his naval career and that he had "a personal commitment and contractual obligations" not to disclose that information. (DE 14 ¶ 14). Cheney learned that Podlaski, an attorney, had worked with another military author and had special expertise in dealing with military confidentiality, military law, and special operations issues. (DE 14 ¶ 15). Podlaski

3

claimed to possess a high level of security clearance; stated that he had vetted other books for retired military personnel; and represented that he could advise Bissonnette on legal issues relating to the Book, including compliance with confidentiality obligations. (DE 14 ¶ 16).

Bissonnette retained Podlaski and his law firm, Carson Boxberger, to represent Bissonnette with respect to the Book and his contract with Dutton. (DE 14 ¶ 17, Ex. 1). Defendants' engagement letter stated, among other things, that Defendants would review Bissonnette's manuscript to "ensure [his] compliance with [his] obligations under any agreements [he] may have signed with the U.S. Government not to release classified or classifiable information or otherwise compromise the national security interests of the United States . . . ." (DE 14 ¶ 19). Bissonnette's contract with Dutton required that he ensure that his manuscript contained no classified or otherwise sensitive information that might compromise the defense of the United States. (DE 14 ¶ 18).

Podlaski advised Bissonnette that he had no obligation to—and in fact, should not—submit the Book to the Government for prepublication review. (DE 14 ¶ 23). Podlaski represented that he had the knowledge, skill, and security clearance necessary to review the manuscript and screen it for classified or otherwise sensitive information. (DE 14 ¶ 24). Because he advised Bissonnette not to undergo the prepublication review process, Podlaski did not incorporate provisions in the Dutton contract that may have protected Bissonnette with respect to the prepublication review process. (DE 14 ¶ 18).

Podlaski reviewed the manuscript, made nominal edits, and added citations and a proposed forward. (DE 14 ¶ 26). Podlaski then forwarded the revised manuscript to Cheney, assuring her that it contained no classified or otherwise sensitive information; that it would not

breach Bissonnette's personal, contractual, or fiduciary obligations; and that it would not result in civil or criminal exposure. (DE 14 ¶ 26).

One business day before the Book's scheduled release—after tens of thousands of copies of the Book had already been printed and distributed across the country in anticipation of the release date—Bissonnette received a letter (addressed to his pseudonym Mark Owen in care of Dutton) from Jeh Johnson, the general counsel for the Department of Defense ("DoD"). (DE 14 ¶ 29). In the letter, Johnson stated that the Book violated Bissonnette's obligations because he had not submitted the Book for prepublication review and because it contained sensitive information. (DE 14 ¶ 29). Cheney forwarded the letter to Podlaski, who dismissed the letter and said not to worry, adding that the accusations may increase the Book's sales. (DE 14 ¶ 30). Therefore, the Book was released as scheduled. (DE 14 ¶ 31).

After the Book's release, the Government claimed that Bissonnette violated his obligations to submit his manuscript for a classification prepublication review and to preserve certain information as confidential. (DE 14 ¶ 32). The DoD threatened Bissonnette with a civil lawsuit seeking forfeiture of all his income from the Book. (DE 14 ¶ 32). Additionally, the Department of Justice ("DoJ") began an investigation to determine whether Bissonnette violated any criminal laws by publishing the Book. (DE 14 ¶ 32).

Bissonnette retained new counsel to represent him concerning the Government's threats of civil and criminal liability. (DE 14 ¶ 33). Defendants encouraged new counsel to defend Podlaski's view that prepublication review of the Book was not required. (DE 14 ¶ 33). New counsel, however, advised Bissonnette to admit that he unintentionally breached his contractual obligations to the Government by failing to submit the Book for prepublication review, and to

5

enter into negotiations with the DoD to resolve the threatened civil forfeiture lawsuit. (DE 14 ¶ 35).

Upon advice of his new counsel, Bissonnette waived his attorney-client privilege with Defendants and promised the DoJ that he would produce his entire file with Defendants to show that Podlaski advised him not to submit the manuscript for prepublication review. (DE 14 ¶ 36). Bissonnette sent Defendants a request for his entire file, but Defendants failed to produce the file for months, preventing Bissonnette from producing it to the DoJ. (DE 14 ¶ 36). Eventually, Defendants produced to Bissonnette what they claimed was his entire file; in turn, Bissonnette produced the file to the Government, representing that it was his entire file. (DE 14 ¶ 37). Podlaski, however, later produced additional documents to the Government that he had not produced to Bissonnette, which further damaged Bissonnette's relationship with Government officials. (DE 14 ¶ 38).

### B. Procedural Background of This Case

On November 5, 2014, Bissonnette filed suit against Defendants in the United States District Court for the Southern District of New York. (DE 14 ¶ 53). That suit, however, was dismissed on October 9, 2015, for lack of personal jurisdiction. (DE 14 ¶ 53).

On November 9, 2015, Bissonnette filed the instant suit against Defendants, advancing claims of legal malpractice associated with their advice not to tender the Book for prepublication review, and breach of fiduciary duty in failing to turn over his entire file as requested.[3] (DE 1). The following month, Bissonnette filed the second amended complaint (DE 14), which remains

---

[3] Bissonnette does *not* claim that Podlaski was negligent in vetting the manuscript and in leaving confidential information in the Book. (DE 53 at 6).

the operative complaint of record.

On February 3, 2016, the Court held a preliminary pretrial conference, establishing the following deadlines:  November 14, 2016, for the completion of all discovery; December 15, 2016, for Bissonnette's disclosure of experts; January 16, 2017, for Defendants' disclosure of experts; August 15, 2016, to seek leave to amend the pleadings; and March 28, 2017, to file dispositive motions.  (DE 27; DE 28).  These deadlines were subsequently extended to January 31, 2017, for the completion of all discovery; January 17, 2017, for Bissonnette's disclosure of experts; February 16, 2017, for Defendants' disclosure of experts; and May 12, 2017, to file dispositive motions.  (DE 59; DE 60; DE 88).  On September 21, 2016, Defendants filed the instant motion to dismiss, which was fully-briefed on December 7, 2016.  (DE 43 to DE 45; DE 53; DE 54; DE 58; DE 63-1; DE 71).

### *C.  Facts Subsequent to the Second Amended Complaint*

On August 19, 2016, the Government terminated its criminal investigation of Bissonnette, and Bissonnette and the Government entered into a Consent Decree, which resolved all of the Government's claims against him in connection with the failure to submit the Book for prepublication review.  (DE 44 at 11; DE 45-2).  The Consent Decree memorialized the terms of a settlement agreement of all claims set forth in a complaint filed by the Government that same date in *United States v. Bissonnette*, No. 1:16-cv-1070 (E.D. Va. Aug. 19, 2016) ("the Virginia case"), asserting claims of breach of contract and breach of fiduciary duty.  (DE 44 at 11; DE 45-3).  In the Consent Decree, Bissonnette agreed to issue a public statement acknowledging that he was required to seek prepublication review of the Book and that he made a mistake by failing to do so.  (DE 45-2 at 2).  He also agreed to pay to the Government all of the proceeds that he had

received from the Book—an amount in excess of six million dollars—and the proceeds that he would be entitled to receive in the future. (DE 45-2 at 2-4). In turn, the Government agreed to release and discharge Bissonnette from all claims for civil liability related to the publication of the Book. (DE 45-2 at 4).

### III. THE ADDITIONAL EVIDENCE SUBMITTED BY THE PARTIES

Before turning to the parties' arguments on the substance of the motion to dismiss, the Court must confront a threshold matter. Both parties filed several exhibits with their briefs on the motion to dismiss. Defendants filed: (1) their engagement letter with Bissonnette (DE 45-1 at 26-30); (2) the Consent Decree (DE 45-2); (3) the complaint in the Virginia case (DE 45-3); and (4) DoD Instruction No. 5230.29 dated January 8, 2009 (DE 45-4). Bissonnette filed the same first three documents (DE 54-1 at 1-19), together with a series of e-mail strings (DE 54-1 at 20-51).

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Thus, pursuant to Rule 12(d), the court "may (1) 'convert the 12[(c)] motion into a motion for summary judgment under Rule 56 and proceed in accordance with the latter rule,' or (2) 'exclude the documents attached to the motion [for judgment on the pleadings] and continue under Rule 12.'" *Tradewinds Glob. Logistics, LLC v. Garrett's Transp., LLC*, No. 115CV00608RLYDKL, 2015 WL 8362401, at *2 (S.D. Ind. Dec. 8, 2015) (alterations in original) (quoting *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)). The court has discretion in determining which option to choose. *Id.* (citing *Levenstein*, 164 F.3d at 347; *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009)).

8

However, when considering a Rule 12(b)(1) motion asserting lack of subject matter jurisdiction, the Court may consider documents outside the pleadings.  "The law is clear that when considering a motion that launches a factual attack against jurisdiction, [t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."  *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (alteration in original) (citations and internal quotation marks omitted); *see also Capitol Leasing Co. v. Fed. Deposit Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993).  "[T]he district court's ability to consider evidence beyond the pleadings derives from the importance of limiting federal jurisdiction."  *Apex Digital, Inc.*, 572 F.3d at 444.  "Because such jurisdiction cannot be conferred by consent of the parties, if the facts place the district court on notice that the jurisdictional allegation probably is false, the court is duty-bound to demand proof of its truth."  *Id.* (citation and internal quotation marks omitted).

Here, Defendants' engagement letter is attached to Bissonnette's complaint.  (DE 14 at 26-30).  "When a contract is attached to the pleadings, we may look beyond the pleadings and look at that contract to determined whether the motion to dismiss was properly granted."  *Kennedy v. Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999) (citation omitted).  Therefore, the engagement letter will be considered.

With respect to the Consent Decree and the complaint in the Virginia case, "courts . . . have crafted a narrow exception to [Rule 12(d)] to permit a district court to take judicial notice of matters of public record without converting a motion for failure to state a claim into a motion for summary judgment."  *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074,

1080 (7th Cir. 1997) (collecting cases). "This exception has allowed courts to avoid unnecessary proceedings when an undisputed fact in the public record establishes that the plaintiff cannot satisfy the 12(b)(6) standard." *Id.*; *see 520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1138 n.14 (7th Cir. 2008) (stating that it is proper to take judicial notice of such things as historical documents, documents contained in the public record, and reports of administrative bodies, and state court decisions). The parties submit the Consent Decree and the complaint in the Virginia case simply to show their existence, rather than "for the truth of their content." *United States v. City of Rock Island, Ill.*, 182 F. Supp. 2d 690, 695 (C.D. Ill. Apr. 23, 2001). Therefore, the Court will take judicial notice of these documents.

The DoD Instruction and the email strings are not documents that were attached to the pleadings. The email strings are certainly not the type of documents of which the Court may take judicial notice, and thus, the email strings cannot be considered for purposes of Rule 12(b)(6). *See, e.g.*, *Trs. of Teamsters Union Local No. 142 Pension Tr. Fund v. Cathie's Cartage, Inc.*, No. 2:11-CV-374-PRC, 2013 WL 2402990, at *3-4 (N.D. Ind. May 31, 2013) (excluding documents that were neither attached to the pleading nor incorporated by reference, deemed integral to a claim, or a public record). It is less clear whether the Court can take judicial notice of the DoD Instruction. Defendants' attorney attests that the Instruction is "a public document available online"; however, he does not identify the online source, and thus the Court cannot assess the source's accuracy. (DE 45 ¶ 6); *see* Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). In any event, this inquiry is ultimately immaterial, as the Court would reach the same conclusion in this

Opinion and Order regardless of whether it considered the DoD Instruction and the email strings. Having disposed of this threshold matter, the Court will now proceed to the substance of the parties' arguments concerning Defendants' motion to dismiss.

## IV.  DISCUSSION

Defendants summarize Bissonnette's theory of the case as follows:  But for Podlaski's allegedly negligent advice, Bissonnette would have submitted the Book for prepublication review, the DoD would have timely reviewed the Book and permitted it to be published as written, and he would have retained his royalties and not incurred the attorney's fees and costs attributable to the DoD and DoJ investigations.  Based on that description of Bissonnette's legal theory, Defendants contend that his claims must be dismissed because the "but-for" proximate causation element of his legal malpractice claim is dependent upon a non-justiciable political question that cannot be adjudicated by this Court—that is, would the DoD have permitted the publication of the Book had it been properly submitted for prepublication review, and if so, in what form?  Defendants argue that the answer to this question is solely within the judgment of the Executive Branch of the U.S. Government, specifically, the DoD, and that as such, this Court lacks authority to adjudicate Bissonnette's claims.

### A.  *The Political-Question Doctrine*

Indeed, if a case presents "an issue that falls within the scope of [the political-question] doctrine, then [the court] lack[s] authority to adjudicate it."  *Judge v. Quinn*, 624 F.3d 352, 357-58 (7th Cir. 2010) (citing *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007)).  The political-question doctrine:

> identifies a class of questions that either are not amenable to judicial resolution because the relevant considerations are beyond

11

>the courts' capacity to gather and weigh, . . . or have been committed by the Constitution to the exclusive, unreviewable discretion of the executive and/or legislative—the so-called 'political'—branches of the federal government.

*Id.* (citation omitted).  Stated another say, "[t]he political-question doctrine bars the federal courts from adjudicating disputes that the Constitution has been interpreted to entrust to other branches of the federal government." *In re African-Am. Slave Descendants Litig.*, 471 F.3d 754, 758 (7th Cir. 2006).  "The non-justiciability of a political question is based primarily on the constitutional principle of separation of powers inherent in the text of the Constitution and the policy of self-restraint." *In re African-Am. Slave Descendants Litig.*, 304 F. Supp. 2d 1027, 1054 (N.D. Ill. 2004) (collecting cases).

The Supreme Court has identified several factors that, if present, suggest that a political question exists:

>[1] [a] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Judge*, 624 F.3d at 358 (quoting *Baker v. Karr*, 369 U.S. 186, 217 (1962)).  "A case is not barred by the political question doctrine '[u]nless one of these formulations is inextricable from the case.'"  *Brokaw v. Boeing Co.*, 137 F.3d 1082, 1102 (N.D. Ill. 2015) (alteration in original) (quoting *Baker*, 369 U.S. at 217).  Defendants argue that the first, third, and fourth factors of the six formulations articulated above are present in this case.

12

### B. *The Political-Question Doctrine Does Not Bar Bissonnette's Claims, But It May Bar Recovery of Some of His Alleged Damages*

"In a typical legal malpractice case, the plaintiff must show that the outcome of the underlying litigation would have been more favorable but for the attorney's negligence." *McGrath v. Everest Nat'l Ins. Co.*, No. 2:07 cv 34, 2010 WL 567301, at *7 (N.D. Ind. Feb. 11, 2010) (citing *Hedrick v. Tabbert*, 722 N.E.2d 1269, 1272-73 (Ind. Ct. App. 2000)). "Causation and the extent of the harm are commonly demonstrated by a 'trial within a trial.'" *Id.* (citation omitted). "Generally, the plaintiff in a legal malpractice case must prove that 'as a result of the lawyer's incompetence . . . the client . . . lost his case or paid a larger judgment than would have been awarded had the defendant performed competently.'" *Id.* (alterations in original) (quoting *Transcraft v. Galvin, Stalmack, Kirschner & Clark*, 39 F.3d 812, 815 (7th Cir. 1994)).

In their motion to dismiss, Defendants characterize Bissonnette's claims as being inexplicably intertwined with political questions in that the Court would have to determine what the DoD would have done had the Book been submitted for prepublication review. Defendants contend that the DoD is the sole governmental authority—in the role of Commander in Chief, under the Constitution and Executive Order 13526, and pursuant to DoD Instruction No. 5230.29—authorized to review and approve materials proposed for public release. (DE 58 at 7; DE 44 at 15). As such, Defendants argue that resolution of Bissonnette's claims is outside the scope of the judiciary and solely within the purview and discretion of the DoD, as adjudication of the claims require a determination whether the Book contained classified information (which Defendants contend is an issue constitutionally reserved to the DoD); whether the DoD would have required substantial redactions and revisions to the Book; or whether the DoD would have allowed the Book to be published at all.

13

The Court disagrees with Defendants' characterization of the task before it when considering Bissonnette's claims. The legal inquiry that the Court will have to make is whether Podlaski committed legal malpractice when he purportedly advised Bissonnette that he had no obligation to submit the manuscript to the DoD for prepublication review. This inquiry turns on whether Bissonnette's outcome relating to the Book "would have been more favorable but for" Podlaski's purportedly negligent advice to forego the prepublication review. *McGrath*, 2010 WL 567301, at *7. Contrary to Defendants' assertions, the Court can make this determination without running afoul of the political-question doctrine.

To illustrate this point, it is helpful to review Bissonnette's pleading, in relevant part:

> 22. Defendants knew or should have known that Bissonnette signed numerous secrecy agreements as a SEAL. Defendants knew or should have known that some or all of these agreements required Bissonnette to submit the Book to the Government for prepublication review. . . .
>
> 23. Defendants gave Bissonnette unqualified legal advice that he had no obligation to submit the Book to any other agency for prepublication review. Defendants in fact affirmatively advised Bissonnette ***not*** to submit the Book for prepublication review.
>
> . . . .
>
> 32. Following the Book's publication, . . . the Government claimed that Bissonnette violated his obligations to submit his manuscript for a classification prepublication review and preserve certain information as confidential. The Department of Defense threatened a civil lawsuit seeking forfeiture of all income from the Book. The Department of Justice began an investigation to determine whether Bissonnette violated any criminal laws by publishing the Book.
>
> . . . .
>
> 48. Bissonnette was forced to retain new counsel to represent

14

>>him on the Government's threat of civil and criminal liability against him. Bissonnette has paid a significant amount of money for the services of his new counsel and their services and fees are continuing at this time. . . .

>. . . .

>>50. As a direct and proximate cause of Defendants' faulty legal advice, Bissonnette's reputation and his exemplary military record have been tarnished by false accusations and Bissonnette will lose his security clearance. Bissonnette has lost a significant amount of income he otherwise would have received following his retirement from the military by way of consulting jobs, speaking engagements, and future employment.

(DE 14 ¶¶ 22, 23, 32, 48, 50).

Thus, Bissonnette alleges that *even if* the DoD had refused to publish the Book, his outcome would have been more favorable had he submitted the Book for prepublication review. More pointedly, Bissonnette alleges that by following Podlaski's alleged advice and foregoing prepublication review, Bissonnette experienced harm in that the DoD threatened a civil lawsuit seeking forfeiture of all income from the Book and the DoJ began a criminal investigation concerning his actions relating to the Book. This allegedly caused Bissonnette to have to retain new counsel and incur additional legal fees—one million dollars worth of legal fees (DE 53 at 17)—to represent him in these actions. It also allegedly resulted in his "tarnished" reputation; the loss of his security clearance; and lost income in the form of consulting jobs, speaking engagements, and future employment, totaling at least another million dollars in damages. (DE 14 ¶ 50; DE 53 at 18). Bissonnette also argues that had the Book been submitted for prepublication review, he would not have had to forfeit the advance from Dutton, which is another million dollars. (DE 53 at 18). These inquiries—reflecting a total of three million

15

dollars in alleged damages—do not require the Court to speculate about what the DoD would have done; rather, Bissonnette alleges that these purported damages stem from what DoD purportedly did, in fact, do.

To reiterate, Bissonnette alleges that the DoD sent a letter to him (under his pseudonym Mark Owens, in care of Dutton) the day before the Book's scheduled release, stating that he had violated his obligations "because he had not submitted the Book for a prepublication review and because it contained sensitive information." (DE 14 ¶ 29). The DoD threatened a civil lawsuit seeking forfeiture of all income from the Book, and the DoJ began to investigate whether Bissonnette violated any criminal laws by publishing the Book. (DE 14 ¶ 32). In the face of these allegations, Bissonnette, upon advice of his new counsel, entered into the Consent Decree to settle all of the Government's claims against him, forfeiting the advance he received from Dutton, together with his past and future royalties from the Book.

Therefore, a significant portion of the purported harm that Bissonnette alleges in his complaint—amounting to at least three million dollars in alleged damages—does not require a determination of what the DoD *would* have done had Bissonnette submitted the Book for prepublication review. *See Price Waicukauski & Riley, LLC v. Murray*, 47 F. Supp. 3d 810, 823 (S.D. Ind. 2014) (finding in a legal malpractice action that regardless of the fact that the plaintiffs may be unable to prove that they would have been successful in the underlying litigation, the plaintiffs had to pay more money in unnecessary legal fees, which may be sufficient to satisfy the element of proximate cause). Rather, it rests on what allegations about what the DoD actually did do as a result of Bissonnette's failure to submit the Book for prepublication review.

16

Consequently, as the Court sees it, the purported political-question at issue does not bar Bissonnette's legal malpractice claim. While the Court may need to reach the parties' arguments concerning the political-question doctrine when considering the types of damages that Bissonnette may recover—more pointedly, whether Bissonnette can recover the portion of his damages attributable to the amount of the Book's sales and royalties—that motion is not before the Court. Instead, Defendants seek to dismiss Bissonnette's claims *in their entirety* based on the political-question doctrine. Accordingly, the motion to dismiss must be denied to the extent it is premised on the political-question doctrine, as the political-question doctrine does not bar Bissonnette's claims in their entirety.[4] *See Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 475 (3d Cir. 2013) ("[W]hen the request for one type of remedy is foreclosed by the political-question doctrine, plaintiffs may proceed if they are seeking other damages that do not implicate the doctrine.").

### C. Bissonnette's Claims Will Not Be Dismissed as Speculative

Defendants alternatively argue that Bissonnette's claims should be dismissed because they are "premised on wholly speculative, unsubstantiated assumptions that [he] cannot prove with any reasonable degree of certainty." (DE 44 at 6). Defendants assert that: (1) Bissonnette

---

[4] Nor does the state secrets privilege bar Bissonnette's claims. "The states secrets privilege is a common law evidentiary privilege that allows *the government* to block discovery of any information that, if disclosed, would adversely affect national security." *Terkel v. AT & T Corp.*, 441 F. Supp. 2d 899, 908 (N.D. Ill. 2006) (emphasis added) (citation and internal quotation marks omitted); *see Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1080 (9th Cir. 2012) ("The [state secrets] privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953))). As private parties, Defendants cannot assert the privilege. While the DoD could assert the privilege in the event it is served with a subpoena to testify about what it would have done had the Book been submitted for prepublication review, the state secrets privilege, like the political-question doctrine, would come into play only with respect to a portion of Bissonnette's claimed damages.

17

has no credible evidence to support his allegations that the Book would have been published if it was submitted for prepublication review and that it would have achieved the same amount of sales; and (2) any expert testimony that Bissonnette may offer will be speculative because no expert is authorized or qualified to speak on behalf of the DoD.  (DE 44 at 6-7, 16).

Defendants' arguments, however, focus entirely on what evidence they believe Bissonnette may attempt to produce in the future to support the merits of his claims.  As such, these arguments are premature.  "At the motion to dismiss stage, . . . the Court only tests the adequacy of the complaint, namely whether it puts the defendant on notice and plausibly states a claim for relief; the Court does not evaluate the merits of the claim."  *Fed. Deposit Ins. Corp. v. Parzygnat*, No. 10 C 7038, 2011 WL 3704731, at *8 n.1 (N.D. Ill. Aug. 23, 2011) (citing *Gibson v. City of Chicago*, 910 F.2d 1510, 1521 (7th Cir. 1990)); *see Iqbal*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 550 U.S. at 570)); *Taleyarkhan v. Purdue Univ.*, 837 F. Supp. 2d 965, 969 (N.D. Ind. 2011) ("The court's duty in evaluating a motion to dismiss is to evaluate the sufficiency of the complaint . . . ." (citations omitted)).

Bissonnette has sufficiently alleged plausible claims for legal malpractice and breach of fiduciary duty in his second amended complaint.  "Whether these allegations will be supported by sufficient evidence on summary judgment [or at a trial] is an entirely different matter."  *Titus v. Ill. Dep't of Transp.*, 828 F. Supp. 2d 957, 971 (N.D. Ill. 2011); *see Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672 (7th Cir. 2001) ("The reason why judges accept a complaint's factual allegations when ruling on motions to dismiss under Rule 12(b)(6) is that a motion to dismiss tests the legal sufficiency of a pleading.  Its *factual* sufficiency will be tested later—by a motion for summary judgment under Rule 56, and if necessary by trial.").  That question, however, is reserved for another day.  At this point, Bissonnette has pled enough to survive the Defendants'

motion to dismiss his claims.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (DE 43) is DENIED.

SO ORDERED.

Entered this 21st day of August 2017.

                                              /s/ Susan Collins
                                              Susan Collins
                                              United States Magistrate Judge