# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF INDIANA
 2

 3

 4   MATTHEW BISSONNETTE,           )
                                    )
 5           Plaintiff,             )
                                    )
 6      -v-                         )  CAUSE NO.
                                    )  1:15-CV-00334
 7   KEVIN PODLASKI and CARSON      )
     BOXBERGER, LLP,                )
 8                                  )
                                    )
 9           Defendants.            )
10

11

12        The deposition upon oral examination of
13   MATTHEW BISSONNETTE, a witness produced and sworn
14   before me, Julie A. Nicholson, RPR, CRR, Notary Public
15   in and for the County of Hamilton, State of Indiana,
16   taken on behalf of the Defendants at the offices of
17   Kightlinger & Gray, LLP, One Indiana Square,
18   Suite 300, Indianapolis, Indiana, on November 16,
19   2016, at 9:25 a.m., pursuant to the Federal Rules of
20   Civil Procedure.
21

22

                STEWART RICHARDSON & ASSOCIATES
23           Registered Professional Reporters
                One Indiana Square, Suite 2425
24                 Indianapolis, IN  46204
                       (317)237-3773
25
```

Page 2

```
 1                    APPEARANCES
 2   FOR THE PLAINTIFF:
 3        Randal Johnston, Esq.
          Coyt Randal Johnston, Esq.
 4        JOHNSTON TOBEY BARUCH, P.C.
          3308 Oak Grove Avenue
 5        Dallas, TX  75204
 6
     FOR THE DEFENDANTS:
 7
          A. Michael Furman, Esq.
 8        Izabell Lemkhen, Esq.
          FURMAN KORNFELD & BRENNAN, LLP
 9        61 Broadway, 26th Floor
          New York, NY  10006
10
          Michael E. Brown, Esq.
11        KIGHTLINGER & GRAY, LLP
          One Indiana Square, Suite 300
12        Indianapolis, IN  46204
13
     ALSO PRESENT:  Kevin Podlaski
14

15
                INDEX OF EXAMINATION
16
                                            PAGE
17   DIRECT EXAMINATION
18        Questions By Mr. Furman:           5
19   CROSS-EXAMINATION
20        Questions By Randal Johnston:     332
21

22

23

24

25
```

Page 3

INDEX OF EXHIBITS

| NUM. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Letter dated August 30, 2012, with Attachments | 6 |
| Exhibit 2 | Two E-mails dated August 30, 2012 | 32 |
| Exhibit 3 | Second Amended Complaint | 35 |
| Exhibit 4 | E-mail - Subject:  Couple things | 109 |
| Exhibit 5 | E-mail - Subject:  It's Me | 110 |
| Exhibit 6 | E-mail - Subject:  It's Me.... My new email address | 113 |
| Exhibit 7 | E-mail chain - Subject:  Author selection | 125 |
| Exhibit 8 | E-mail - Subject:  ZDT - technical advisor | 128 |
| Exhibit 9 | E-mail - Subject:  Schedule | 134 |
| Exhibit 10 | E-mail - Subject:  Tech Advisor | 137 |
| Exhibit 11 | E-mail - Subject:  Author selection | 152 |
| Exhibit 12 | E-mail Chain - Subject:  Kevin. Maurer cowriting assignment - deal memo | 154 |
| Exhibit 13 | E-mail chain - Subject:  Title | 161 |
| Exhibit 14 | E-mail chain - Subject:  Update | 163 |
| Exhibit 15 | E-mail chain - Subject - fyi | 174 |
| Exhibit 16 | E-mail chain - Subjects:  Call with Fox; Reply from Bowden; Even more from Bowden | 179 |
| Exhibit 17 | E-mail chain - Subject:  Hey | 187 |

Page 4

INDEX OF EXHIBITS (CONTINUED)

| NUM. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 18 | E-mail - Subject:  E3 | 190 |
| Exhibit 19 | E-mail - Subject:  Confirmed | 194 |
| Exhibit 20 | E-mail - Subjects:  MOHW DLC; Mark Owen E-mail | 197 |
| Exhibit 21 | E-mail chain - Manuscript schedule | 206 |
| Exhibit 22 | E-mail - Subject:  MOHW Consulting LOI | 207 |
| Exhibit 23 | E-mail chain - Subject:  Where is | 209 |
| Exhibit 24 | E-mail - Subject:  Future guidance | 210 |
| Exhibit 25 | E-mail chain - Subject:  Mark Bissonette {SIC} | 216 |
| Exhibit 26 | E-mail - Subject:  Navy SEAL foundation | 222 |
| Exhibit 27 | E-mail chain - Subject:  No Easy Day | 224 |
| Exhibit 28 | E-mail - Subject:  Mark, as reporters begin to focus on the Bowden book | 233 |
| Exhibit 29 | E-mail chain - Subject:  Mark Bowden's book | 238 |
| Exhibit 30 | Plaintiff's Responses to Defendants' First Set of Requests for Production | 307 |

Page 5

MATTHEW BISSONNETTE

1    MATTHEW BISSONNETTE
2    having been first duly sworn to tell the truth, the
3    whole truth, and nothing but the truth took the stand
4    and testified as follows:
5    DIRECT EXAMINATION
6    BY MR. FURMAN:
7    Q   Mr. Bissonnette, what address do you use as your
8        home address?
9    A   I'd have to look it up.  I have different
10       addresses, but it's an address in Colorado.
11   Q   Okay.  Can you put that on the record?
12   A   Yeah.  I'd literally have to look it up on my
13       phone.
14   Q   Well, where do you live?
15   A   In Lakewood, Colorado.
16   Q   Okay.  You don't know the address?
17   A   No, because I use -- I use P.O. boxes to get mail
18       and stuff like that.  So I typically try not to
19       disclose my home address.  Obviously if you need
20       it, I can produce that.  But that's the reason I
21       don't know it off the top of my head.
22   Q   Okay.  At the time of this lawsuit that was -- the
23       second amended complaint that was filed in Indiana,
24       where did you live?  This was filed on December 2
25       of 2015.

Page 6

1    A   2015 would have been North Carolina.
2    Q   Okay.  And how long have you lived in Colorado?
3    A   Less than a year.
4            (Exhibit 1 was marked for identification.)
5    Q   I've shown you what's been marked as Exhibit No. 1.
6        It's in front of you.
7    A   Yeah.
8    Q   Do you recognize that document?
9    A   It appears to be the letter that I got from the
10       DoD.
11   Q   Okay.  And that was on August 30 of 2012?
12   A   Yes.
13   Q   How did you get it?
14   A   I don't exactly recall.  It would have -- it came
15       from the DoD.  When and how I first got it, I'm not
16       sure.
17   Q   Did you get it on that day?
18   A   I'm guessing.  I don't know.  I can't remember.
19   Q   You don't have a recollection as to whether you got
20       this letter on August 30 of 2012?
21   A   I'm assuming that I did, but I don't remember
22       specifically.  It's...
23   Q   And there were several attachments to the letter
24       from Mr. Johnson.  Those attachments included a
25       personal attestation.  There was a Classified

Page 7

1    Information Nondisclosure Agreement, otherwise
2    known as a CINA, C-I-N-A.  There was a Sensitive
3    Compartmented Information Nondisclosure Statement,
4    otherwise known as an SCI, that was dated on
5    January 7 of 2000 -- I'm sorry, January 24 of 2007.
6    There was also a Sensitive Compartmented
7    Information Indoctrination Memoranda that was also
8    dated January 24 of 2007.  And then finally, there
9    was a Sensitive Compartmented Information
10   Debriefing Memoranda that was dated April 20 of
11   2012.  And that was all attached to that August 30,
12   2012, letter; correct?
13   A   It appears to be.
14   Q   Well, when you got the letter, did you --
15           RANDAL JOHNSTON:  May I --
16           MR. FURMAN:  Sure.
17           RANDAL JOHNSTON:  May I interrupt just for a
18   minute because I -- we've had this problem with a
19   couple of attorneys.  There's a -- I think there are
20   two occasions on the exhibit where his Social
21   Security number is revealed.  And for purposes of
22   preservation of his personal information, I would
23   ask that that be obliterated on the document.
24           MR. FURMAN:  That's not a problem.  And we
25   could do that during one of the breaks.  We can

Page 8

1    redact the exhibit.
2    Q   Mr. Bissonnette, when you received the August 30 of
3        2012 letter, were those documents attached to it as
4        well?
5    A   I believe so.
6    Q   Did you read the letter when you got it?
7    A   Yes.
8    Q   And it's a significant letter; right?
9    A   Absolutely.
10   Q   It's from the General Counsel of the Department of
11       Defense; correct?
12   A   Yes.
13   Q   And, you know, I typically do this at the beginning
14       of depositions.  I didn't feel I needed to, but
15       I'll just do it just for the sake of good order.
16       You've been -- you've had your testimony taken
17       under oath before; correct?
18   A   Yes.
19   Q   And you understand that there's a reporter here
20       that is going to take the information down;
21       correct?
22   A   Yep.
23   Q   I'll be asking you questions, and I'll do so
24       verbally.  And once the question is asked, I'll
25       need you to respond.

Pages 9..12

Page 9

1  A  Okay.

2  Q  And so that even though we may get familiar over

3     the next seven hours or so, we still need to

4     communicate verbally on the record.

5  A  Absolutely.

6  Q  Is that understood?

7  A  Yeah.

8  Q  And if there's any question that I ask that you

9     don't understand --

10  A  I'll ask to repeat it.

11  Q  -- just ask me to repeat it.

12  A  You got it.

13  Q  And I'll do it in a better accent.

14  A  Deal.

15  Q  Okay.  Do you recall where you were when you got

16     this letter?

17  A  North Carolina, Raleigh.

18  Q  And who did you speak to once you received it?

19  A  I'm assuming I would have called Elyse.  Usually

20     Elyse was kind of my first -- Elyse Cheney,

21     literary agent was probably one of my first calls

22     to say, Okay, whoa.  You know, what's going on?

23     What do we do?

24  Q  And did you speak to Ben Sevier?

25  A  I'm sure he was involved in some of those

Page 10

1     conversations.

2        MR. FURMAN:  And it's S-I-E-V -- no?

3        MS. LEMKHEN:  S-E-V-I-E-R.

4        MR. FURMAN:  S-E-V-I-E-R.  And Elyse is

5     E-L-Y-S-E.

6        THE COURT REPORTER:  Thanks.

7  Q  Now, at the time, the publishing date for No Easy

8     Day was set for September 11 of 2012; correct?

9  A  I believe so.

10  Q  And so the receipt of this letter was a significant

11     event in terms of the publication of the book;

12     correct?

13  A  Yeah, yeah.  I mean, it was the first -- the first

14     thing we heard back from the government saying,

15     Hey, whoa.  We got issues here.

16  Q  Now, I want to ask you about the SCI that was dated

17     January 24 of 2007.  Do you recall signing it?

18  A  No.

19  Q  Do you recall the process of when and how you would

20     have signed it?

21  A  I'm assuming it would have been when I checked in

22     at the command.  Actually, not even at the command

23     because I checked in before '07.  So at some

24     point -- it wouldn't have been my -- I checked in

25     in '04.  So it would have been obviously after

Page 11

1     that.  Beyond that, no.

2  Q  Now, on the sixth page of the document, that's your

3     signature on there, I believe; correct?  No.  Flip

4     forward to the sixth page.  And that's the second

5     page of the SEI DD 1847.  That's your signature in

6     the middle?

7  A  Yes, sir.

8  Q  And the date is January 24 of 2007?

9  A  Yes, sir.

10  Q  And there's an individual named Tenika, I think

11     that is, Ortiz?

12  A  Okay.  Yeah.

13  Q  Who is Tenika Ortiz?

14  A  Tenika Ortiz was, like, one of the people at the

15     command who handled all the -- the -- a lot of our

16     intel-type paperwork stuff, classification stuff, I

17     believe.  I know she -- I know she did a lot of

18     things, but I remember she helped me with my --

19     my security package, your clearance paperwork.

20  Q  Now, obviously in your position with the Navy --

21     let me go back to that first just so it's clear.

22     You were with the Navy for how many years?

23  A  Just under 14.

24  Q  And how long were you with the DEVGRU, D-E-V-G-R-U?

25  A  From -- I started selection and training in 2004.

Page 12

1     I graduated the end of that year.  And then I

2     left -- when I left the Navy, I separated from that

3     unit.

4  Q  And what does DEVGRU stand for?  What is that?

5  A  A Development Group.

6  Q  And is otherwise known as the SEALs?

7  A  Sure, yeah.  You have to -- you don't have to be a

8     SEAL to be stationed there, but it is a SEAL unit.

9  Q  And at the time that you signed this SCI, the one

10     that's before you, do you know the purpose of it?

11  A  To make sure that we did all the proper

12     in-processing paperwork.  I mean, I signed tons of

13     paperwork as I checked into the command so I'm sure

14     this -- I don't know why this would have been in

15     '07 rather than in '04 when I first checked into

16     the command, but obviously this was in keeping up

17     with whatever qualifications they needed me to keep

18     up with.

19  Q  And this deals with nondisclosure.  Do you

20     understand that?

21  A  Yes.

22  Q  And this specific DD 1847 is not specific to any

23     particular mission, is it?

24  A  Not that I know of.  I...

25  Q  And were you on any particular missions or sent to

Page 13

1  any particular missions around the time that this
2  document was signed in January of 2007?
3 A Not that I recall specifically.  We did a lot of
4  missions.  I don't remember this being attached to
5  anything specific at all.
6 Q Were you given the opportunity to read this
7  document at the time that you signed it?
8 A Sure.
9 Q And did you understand that when you signed it, you
10  were bound to that agreement?
11 A Yes.
12 Q And among other things, did you understand that at
13  paragraph three of this document -- so you can flip
14  back to the first paragraph -- I'm sorry, the -- it
15  would be now the fourth page of the document.  So
16  one, two, three, four -- fifth page.  Forgive me.
17  One more.  Yeah.
18 A Number three?
19 Q Yeah.  And paragraph three, the third paragraph --
20  the third sentence, rather, states that, quote, I
21  understand that it is my responsibility to consult
22  with appropriate management authorities in the
23  department or agency that last authorized my access
24  to SCI whether or not I am still employed by or
25  associated with that department or agency or a

Page 14

1  contractor thereof in order to ensure that I know
2  whether information or material within my knowledge
3  or control that I have reason to believe might be
4  SCI related or derived from SCI is considered by
5  such department or agency to be SCI.  Did you
6  understand that that was part of your obligation?
7 A Yes, but no.  I mean, did I read this in detail
8  when I signed it?  No.  I signed thousands of
9  pieces of paper through my career.  And did I read
10  the fine print and certainly, you know, very
11  detailed legal-ish docs?  No.  Did I pay attention
12  to these at the level I should have?  No.
13 Q Well, do you appreciate the fact that if you signed
14  it means that you're bound by it?
15 A Yeah.
16 Q In the fourth paragraph, the second sentence reads,
17  I hereby agree to submit for security review by the
18  department or agency that last authorized my access
19  to such information or material any writing or
20  other preparation in any form, including a work of
21  fiction, that contained or purports to contain SCI
22  or description of activities that produce or relate
23  to SCI or that I have reason to believe are derived
24  from SCI that I contemplate disclosing to any
25  person not authorized to have access to SCI or that

Page 15

1  I have prepared for public disclosure.  Did you see
2  that?
3 A I can see it now.  Do I remember signing this and
4  reading this?  No.  Had I remembered all this
5  clearly, I don't think we'd be in the position we
6  are today.
7 Q Well, do you understand what that means?
8 A Yes, sir.  Now reading it, of course.
9 Q And was Operation Neptune Spear a special access
10  program?
11 A I do not believe so.
12 Q Why don't you believe so?
13 A From my understanding, a special access program,
14  there's additional paperwork signed, and that's a
15  whole different ball game, my understanding.  And
16  I -- I don't believe that we signed anything for
17  that.
18 Q Was the CIA involved in Operation Neptune Spear?
19 A Yes.
20 Q Who did you get your instructions from in
21  connection with Operation Neptune Spear?
22 A What type of directions?  I get a lot of
23  instructions from different folks, but --
24 Q Well, when did you first learn about it?
25 A Several weeks before the mission.

Page 16

1 Q And who did you learn it from?
2 A My head shed, my officer in charge of my squadron.
3 Q You said head chef?
4 A The leadership of my SEAL squadron.
5 Q Okay.  And who was that?
6 A At the time -- I don't want --
7     RANDAL JOHNSTON:  I'm going to --
8 A -- to name names.
9     RANDAL JOHNSTON:  Yeah.  I'm going to caution
10  you to not reveal anything you're obligated not to
11  reveal about who is or isn't a SEAL, who is or
12  isn't in command, et cetera.
13 A We would have first heard about it from our -- the
14  commander of our squadron, the head shed, those in
15  charge.  We traveled a short distance away and were
16  briefed, and that's when the -- all the planning
17  started.
18 Q Is there a particular reason why you can't name
19  names in this deposition?
20 A I've been through so much stuff in the past four
21  years.  I'm very -- I don't want to have to name
22  names if I -- if I don't absolutely have to.  And
23  the way I've been treated by the government through
24  this whole thing, I would like to -- less is more
25  certainly when it comes to names, locations, stuff

Page 17

1    like that.  It's important for me not to violate
2    any type of rule that -- that I've rogered up not
3    to break.
4    Q  Okay.  Well, getting back to a rule that you signed
5       in 2007 --
6    A  Okay.
7    Q  -- which is in front of you -- and I'm referring
8       now to paragraph four --
9    A  Okay.
10   Q  -- the -- did Operation Neptune Spear in your mind
11      involve something that -- an operation that would
12      be classified?
13   A  In my mind, did I know it would be classified?
14      There was -- that I could remember, there was
15      nothing additional that was involved that said,
16      Hey, look, we're taking this to additional level of
17      classification.  Nobody ever came in and said, Hey,
18      look, sign this extra paperwork to do this.  Not
19      that I can remember.  So in my mind, that would
20      have fallen in the same category as any other
21      operation I'd been involved with.
22   Q  Now, I want to ask you if I have this right.  There
23      are three levels of classification.  It's either
24      confidential, secret, and top secret.  Is that how
25      you understand the classifications of --

Page 18

1    A  From my understanding, sure.
2    Q  And how do you have that understanding?
3    A  It's three different levels, three different -- the
4       priority at which that information should be
5       protected.
6    Q  And when did you learn that there are three levels
7       of classification?
8    A  I couldn't tell you.  Sometime during my career, I
9       would have been -- had some sort of brief like this
10      where it would have been explained to me at that
11      level.  Did we ever have a sit-down class on it?
12      Not that I can remember.
13   Q  Now, before you learned about Operation Neptune
14      Spear, you understood that Osama bin Laden was the
15      most wanted man in the world.  Is that your
16      understanding?
17   A  Sure.
18   Q  And did you learn information in the course of
19      Operation Neptune Spear where the location of the
20      world's most wanted man was or believed to be?
21   A  I missed you.  Sorry.
22   Q  In other words, when you first learned about
23      Operation Neptune Spear --
24   A  Uh-huh.
25   Q  -- did you learn that there was reason to believe

Page 19

1    that Osama bin Laden was in Pakistan?
2    A  Yes.  We'd been briefed he was at a possible
3       location, and we planned against that location.
4    Q  When you received that information, did you believe
5       that information was top secret, secret, or
6       confidential?
7    A  I don't think I ever thought of any of them.  I
8       just thought, okay, we don't talk about that
9       because that's obviously -- in my -- did I apply a
10      classification to it?  No, not in my mind.  I
11      assumed that, okay, hey, look, we didn't even tell
12      people -- we kept that very quiet.  Right.  That
13      was amongst the team that was doing the training or
14      the planning for it.
15   Q  Well, if I was a reporter for the Washington
16      Post --
17   A  Right.
18   Q  -- and I called you and said, Do you know where
19      bin Laden is on that day that you learned --
20   A  Right.
21   Q  -- he was in Pakistan, would you have revealed
22      that?
23   A  No.
24   Q  Why would you not have revealed it?
25   A  Because that was a mission that was -- that we were

Page 20

1    planning for.  Right.  Had that information been
2    released, it could have been detrimental to our op.
3    Q  And in your mind, would that have meant that
4       Operation Neptune Spear was an SCI?
5    A  I don't know in my mind that I would have put SCI
6       anywhere other than, okay, hey, we need to protect
7       this.  What level of classification it got to --
8       you know, the Ortiz lady, she might have gotten
9       into all that, but at my level, I didn't think that
10      way.
11   Q  But at the very least, would it have been a
12      question in your mind as to whether Operation
13      Neptune Spear was -- the information about Neptune
14      Spear was something that would fall within an SCI?
15   A  Again, I wouldn't have classified it in my head SCI
16      anything other than, hey, this is information that
17      I needed to protect.  Never once did I think of
18      levels of information and think, well, that's this
19      category, this category, that category.  To me, it
20      was always, okay, look, we're -- we got this
21      mission coming up.  This is a very high-profile
22      mission.  Obviously we're not talking about it.
23      But did anybody ever come in and brief us
24      accordingly and say, This was this, this was this,
25      this was this, not that I recall at all.

Pages 21..24

Page 21

1 Q  And when you were briefed on Operation Neptune
2    Spear, did it involve members from the Central
3    Intelligence Agency?
4 A  Yes.
5 Q  Any other agency involved?
6 A  I'm sure, but they didn't all introduce themselves.
7    There was a lot of people in the room.
8 Q  When you say "a lot of people," are you in a
9    position to name names of those people?
10 A  I wouldn't remember them.  I know our squadron,
11    right, our guys, the handful of us that were
12    selected.  Those are the guys that I knew.  I had
13    no relationships with anybody else in the room that
14    showed up and were part of the training and
15    planning and any of that.
16 Q  Where did that meeting take place?
17 A  The first one?  I mean, we had lots of those
18    meetings.  We had two weeks of rehearsals, bouncing
19    all over the country.  In every location, there was
20    more people.
21 Q  Where was the first meeting?
22 A  North Carolina.
23 Q  And do you recall how many people were at that
24    meeting?
25 A  No.  I mean, 24 of us, tack on another 15, 20

Page 22

1    maybe.
2 Q  And at the time that -- was it at that meeting in
3    North Carolina that you first learned that there
4    was reason to believe that Osama bin Laden was in
5    Pakistan?  Yes?  Was it at that meeting for the
6    first time --
7 A  Yes.
8 Q  -- that you learned --
9 A  Yes.
10 Q  -- that Osama bin Laden was in Pakistan?
11 A  They believed he was there, yes.
12 Q  And did anyone at that meeting mention that this
13    was highly classified, top secret information?
14 A  No, not that I can remember.  I drove down the next
15    morning.  I had some medical family issues going
16    on.  So the first day that the guys drove down to
17    have their first round of meetings with the agency
18    folks and all of that, I was not there.  I drove
19    down the following morning.  I'm not sure if they
20    would have covered any of that the day prior.  But
21    when I showed up the next morning, the planning was
22    up and running.  Those same people were there, and
23    that's where we did most of our planning.
24 Q  Now, I want to focus your attention to the next
25    page of the SCI that you signed on January 24 of

Page 23

1    2007.  Paragraph nine, it says, quote, Unless and
2    until I am released in writing by an authorized
3    representative of the department or agency that
4    last provided me with access to SCI, comma, I
5    understand that all the conditions and obligations
6    imposed upon me by this agreement apply during the
7    time I am granted access to SCI and at all times
8    thereafter.  Do you see that?
9 A  Yep.
10 Q  And at the time that you signed this document, were
11    you agreeing to be bound by that?
12 A  Yeah.  Do I remember reading that?  No.
13        RANDAL JOHNSTON:  Object; nonresponsive to
14    everything after "yeah."
15        MR. FURMAN:  That's fine.
16 Q  You understand that you were obligated based on
17    your signature to that paragraph; correct?
18 A  Yes.
19 Q  And paragraph 12 says that you've read this
20    agreement carefully and any -- and my questions, if
21    any, have been answered to my satisfaction.  Do you
22    see that, that paragraph 12?
23 A  Yes, sir.
24 Q  Did you have any questions at the time?
25 A  No.

Page 24

1 Q  And in paragraph 13, it states that, I hereby
2    assign to the United States government all rights,
3    title and interest, and all royalties,
4    remunerations, and emoluments -- I think I passed
5    that -- that have resulted, comma, will result, or
6    may result from any disclosure, publication, or
7    revelation not consistent with the terms of this
8    agreement.  Do you see that?
9 A  Yep.
10 Q  What did you understand that to mean?
11 A  Are you asking me now or are you asking me when I
12    signed this --
13 Q  I'm asking you now.
14 A  Now when I read it, it means that if I violate
15    these, the government has the right to do X, Y, and
16    Z.
17 Q  And at the time that you read this document, would
18    your understanding be different than it is today?
19        RANDAL JOHNSTON:  I'm going to object to the
20    form of the question in terms of the time frame.
21    At the time he read the document?
22 Q  At the time that you read the document.
23 A  To be perfectly honest, I didn't read every word of
24    this.  I -- I don't even know when in '07 this
25    would have happened.  But again, I signed a million

1   pieces of paper while I was there.  And did I read
2   this document in detail then?  No, I didn't.
3 Q Do you appreciate, though, that on the day that you
4   signed it, you were bound by all the paragraphs in
5   that, including paragraph 13?
6 A Yes.
7 Q On the next page of Exhibit No. 1, it's entitled,
8   Sensitive Compartmented Information Indoctrination
9   Memoranda.  And below that title, it states, This
10   memorandum records the fact that I was briefed on
11   listed date below and to the following Sensitive
12   Compartmented Information, parentheses, SCI, closed
13   parenthesis, special access programs.  And then it
14   says, Use unclassified indicators only.  And it has
15   some writing there.  Do you recognize that writing?
16 A No.
17 Q In typewritten form, it appears to have the
18   initials SI/TK.  Does that mean anything to you?
19 A No.
20 Q Below that, there's handwritten notations that I --
21   I can't make out.  And I'm -- I offer you my
22   magnifying glass if you want to take a look at it
23   and see if it helps you.  Do you know what that is?
24 A No.
25 Q And I may have asked you this before and forgive me

1   if I ask you again.  Do you recall the purpose of
2   signing this particular document because it's your
3   signature on this document --
4 A Right.
5 Q -- that is before you, which we're discussing at
6   the moment?
7 A Yeah.  The purpose was to talk about how I've been
8   briefed on certain sensitive SCI-type programs.
9 Q And do you recall which programs you were being
10   briefed on?
11 A No.
12 Q Below the handwritten at the top of the document --
13   below the handwritten notations that we could not
14   decipher, it says, Authority optional, colon, and
15   the letters DONCAF/JPAS RPT of 661114.  Do you know
16   what that means?
17 A Absolutely not.
18 Q Do you know why that information would be there?
19 A No clue.
20 Q Now, lastly, there on the very last page of the
21   document, Exhibit No. 1 -- you can flip to the last
22   page now -- is what's titled a Sensitive
23   Compartmented Information Debriefing Memoranda.
24   And the date of it is April 20 of 2012.  What is
25   the significance of this particular document?

1 A Appears to be a debriefing memorandum.
2 Q And what does that mean?
3 A Some form of debrief out of the -- debriefing you
4   about your classification stuff, intel stuff.
5 Q That's your signature that appears on this
6   document?
7 A Yes, sir.
8 Q And above your signature, it states, I was reminded
9   of the need for special protection of SCI material,
10   of the fact that access to this material is
11   governed by the terms of the SCI nondisclosure
12   agreements that I previously signed, and of my
13   continuing obligation to comply with the terms of
14   that agreement.  Do you see that?
15 A Yes, sir.
16 Q And your signature is an indication that you agree
17   with that statement above?
18 A Yes, sir.
19 Q Now, above your signature, at the very top of the
20   document, it states that, This memorandum records
21   the fact that I was debriefed on this date on the
22   following Sensitive Compartmented Information
23   special access programs, and has the indicators
24   ST/PK/G/HCS.  Do you know what that means?
25 A No.

1 Q Did you ask what it meant?
2 A No.
3 Q And just below that, it says, And no others.  Do
4   you know what that means?
5 A No.
6 Q What's the significance of April 20 of 2012?
7 A Couldn't tell you.
8 Q Well, when were you discharged from the Navy?
9 A June -- June 28, I believe.
10 Q Of what year?
11 A '12.
12 Q And how were you discharged?  In what form?  A
13   letter, in person?
14 A You go in, turn in your badge, sign some paperwork,
15   and you're done.
16 Q And where did that take place?
17 A At the command.
18 Q At the command in Virginia Beach?
19 A Yeah.
20 Q Turning to this document that we're referring to
21   now, which was signed on April 20 of 2012, where
22   were you when you signed this document?
23 A This would have been in -- at the command in
24   Virginia Beach.
25 Q And were you debriefed on that day?

Page 29

1 A  I don't remember any type of long debriefing.  I
2     remember signing a whole bunch of paperwork.
3 Q  Well, how about a short debriefing?
4 A  I don't even remember that.  I remember a
5     checklist, and I walked around the command and had
6     different departments sign it, bottom line it, turn
7     in your stuff, and you're out.  When you're on your
8     way out the door, it's turn in -- I had already
9     turned in most of my stuff anyway.  It was
10    literally the last bit of admin out-processing.
11 Q  Well, how did you know to show up at the command on
12    April 20 of 2012?
13 A  I probably scheduled it and said, Okay, I'm going
14    to come in that day and out-process.
15 Q  And who did you talk to when you out-processed?
16        RANDAL JOHNSTON:  Again, I caution you not to
17    use names.
18 A  A ton of people.  Right.  You get a check-out sheet
19    and you get -- you follow the check-out sheet
20    around the command, and you get each department
21    head to sign off on it that says, Okay, you've
22    taken care of this.  You've taken care of it.
23 Q  How about as it relates to information that you
24    learned during the 14 years you were in the Navy,
25    in particular with DEVGRU?

Page 30

1 A  Right.
2 Q  Did you get any instruction on the handling of
3     information after you left?
4 A  No.
5 Q  No one talked to you about the handling of
6     classified information?
7 A  No.  This would have been the closest thing that I
8     can remember, right, that -- that I would have
9     signed that would have pertained to that.  And
10    again, I probably signed 200 sheets of paper that
11    day going around to different departments; supply
12    department, air department, diving department,
13    intel, whatever it was.  You run around the
14    command, get your signatures, and then I was out.
15 Q  Now, you've been involved in several operations, at
16    least that I know of, based on public disclosures.
17    For example, the Captain Phillips raid.  When you
18    were preparing for the Captain Phillips raid, did
19    you receive classified information that you used to
20    conduct the operation?
21 A  I don't know that we -- I don't know that -- what
22    level or what term any of that would be considered
23    classified.  Right.  We all knew there was three
24    pirates on a life raft.  Right.  That was on Fox
25    News and everywhere else for three days leading up

Page 31

1     to it.  So to say that we got briefed with some
2     sort of top secret material for that op, I wouldn't
3     agree to that.
4 Q  Okay.  And just turning to the bin Laden raid in
5     Pakistan, would you have considered that to -- that
6     your briefing on that -- that very first day in
7     North Carolina, would you consider that to have
8     been top secret information?
9 A  Yeah, I would have considered it pretty sensitive.
10    Again, I wasn't there the first day.  I showed up
11    the second day and was never sat down, was never
12    talked to, was never told anything specific about
13    classifications at any level.
14 Q  Well, did you have an understanding that it was top
15    secret?
16 A  I assumed that it was information that should be
17    protected.
18 Q  Well --
19 A  Again, applying a classification level to it, I've
20    never done that my whole career.  It was, okay,
21    hey, look, this is some stuff we need to keep
22    quiet.  We're going to go sneak in his house in a
23    couple weeks.  That probably shouldn't get out.
24 Q  Did you tell anyone about the raid before it
25    happened outside of the Navy SEAL community?

Page 32

1 A  No.
2 Q  Family members?
3 A  No.
4 Q  Friends?
5 A  No.
6        (Exhibit 2 was marked for identification.)
7 Q  Mr. Bissonnette, I've shown you what's been marked
8     as Exhibit No. 2.
9 A  Okay.
10 Q  This is an e-mail from you listed as MO, which is
11    your pseudonym, Mark Owen.  And it's to Ben Sevier,
12    Kevin Podlaski, Elyse Cheney, Kevin Maurer, and
13    Christine Ball.  And the subject is, Fax from DoD.
14    And it's dated April 30 of 2012.  And the time is
15    11:35 p.m., which I'm assuming is Eastern Time.  Do
16    you see that document?
17 A  Yes, sir.
18 Q  Now, the first indication or the first line in that
19    e-mail is, I'm in for the meeting.  What is that a
20    reference to?
21 A  I couldn't tell you.  I'm guessing it's some sort
22    of in-person meeting.
23 Q  And what did that meeting relate to?
24 A  I couldn't tell you.
25 Q  Now, in the e-mail, it says, Kevin P.  And I'm

**Page 33**

1    assuming you're addressing Mr. Podlaski there?

2  A  Yep.

3  Q  From the looks of the docs, apparently I did sign

4    some sort of SAP program docs.  Do you see that?

5  A  Yes.

6  Q  Up until that time on August 30 of 2012, did you

7    tell Kevin Podlaski that you had signed a DD 1847,

8    nondisclosure agreement?

9  A  I don't remember quoting any exact documents that I

10    signed.  That was part of it as, Hey, I had signed

11    a ton of paperwork.  Do I remember, you know,

12    nomenclature of what form was what?  I had no clue.

13  Q  And in the e-mail, you write, quote, I honestly

14    don't remember signing anything in 2007.  And the

15    form I signed out of the command was one of at

16    least 200 pieces of paper that I signed to leave

17    the command.  Do you see that?

18  A  Yes, sir.

19  Q  And was the DD 1847-1 that was signed on January 24

20    of 2007, was that a form that you signed out of the

21    command?

22  A  I couldn't tell you.  I don't know the

23    nomenclature.  We could go back and look at the --

24    I don't know the nomenclatures.

25  Q  Now, that document that the -- which was referred

**Page 34**

1    to in Jeh Johnson's letter, which was Exhibit

2    No. 1, the DD 1847 that was signed on January 24 of

3    2007, if you needed to get it, would you have been

4    able to have access to it?

5  A  I'm guessing so, yeah.

6  Q  And how would you have gone about doing that?

7  A  I would have gone to the command, found somebody in

8    our security office, and said, I need this type of

9    form.

10  Q  At any point in time before August 30 of 2012, did

11    you make that request?

12  A  No.

13  Q  You could have, but you didn't.  Is that my

14    understanding?

15  A  Yeah, yeah, absolutely.

16  Q  And the debriefing memoranda that was signed on

17    April 20 of 2012, if you wanted it, could you have

18    had access to it?

19  A  I'm sure I could have done the same thing, gone

20    back into the command and said, Hey, I need

21    whatever paperwork.  I wouldn't have known the

22    nomenclature again, but it -- if somebody said,

23    Look, I have to see this, this, and this, I could

24    have -- I'm guessing I could have gone back and

25    asked for copies of it.

**Page 35**

1  Q  Did you do that?

2  A  No.

3  Q  This will be -- the next exhibit will be the Second

4    Amended Complaint.

5        (Exhibit 3 was marked for identification.)

6  Q  Mr. Bissonnette, do you recall reviewing this

7    complaint before it was filed?

8  A  I'm guessing I did, but could I tell you what day

9    or --

10  Q  No, I didn't ask you what day.

11  A  -- details --

12  Q  I just want to know if you reviewed it before it

13    was filed.

14  A  I'm assuming I did.

15  Q  And I'm not going to ask you for your conversations

16    with your lawyer, but before this lawsuit was filed

17    in Indiana, did you go over the pleadings so that

18    you had looked it over before it was filed?

19  A  So did we look over this before it was filed?

20  Q  Correct.

21  A  I'm assuming so.

22  Q  Okay.

23  A  I don't remember specifically, but --

24  Q  Well, I want to explore that because I want to make

25    sure that I understand it.  I don't want to rely on

**Page 36**

1    an assumption.  When the case was dismissed in New

2    York --

3  A  Okay.

4  Q  -- do you recall that it was refiled in Indiana?

5  A  Yes.

6  Q  We're here in the great state of Indiana; right?

7  A  Right.

8  Q  And --

9  A  I do remember that.

10  Q  Yeah.  I remember getting here, too.  Before the

11    lawsuit was initiated in Indiana --

12  A  Okay.

13  Q  -- did you go over the pleadings, the complaint

14    that was being filed against Mr. Podlaski and his

15    law firm?

16  A  When it was moved from New York to Indiana, did I

17    rereview it at that point?

18  Q  Correct.

19  A  I don't know that I would have, to be perfectly

20    honest.

21  Q  Okay.  Well, I want to refer you to a few

22    paragraphs in the complaint.  And I want to ask you

23    if you agree to them.  First, I want to turn your

24    attention to paragraph 25.  And the second

25    sentence -- there's some long sentences, but the

Page 37

1  second sentence starts, quote, Whatever security
2  clearance Podlaski held, he had no permission from
3  the requisite United States agencies to read the
4  manuscript and thereby learn the classified or
5  otherwise sensitive information within the book,
6  period.  Podlaski likewise had no legal right to
7  substitute his judgment for that of agencies of the
8  United States as to what classified or otherwise
9  sensitive information the book might contain.  Do
10  you see that?
11 A  Yes, sir.
12 Q  Do you agree with that statement?
13 A  Yes.
14 Q  Now, in paragraph 29 of the complaint -- I'll
15  paraphrase some of it just so it's easier for all
16  of us -- it states that Jeh Johnson, who was then
17  the Department of Defense General Counsel, wrote to
18  you to say that, quote, The book violated
19  Bissonnette's legal -- Bissonnette's obligations
20  because he had not submitted the book for a
21  prepublication review and because it contained
22  sensitive information.  Do you see that?
23 A  Yes, sir.
24 Q  And do you agree with that, that that was what
25  Mr. Johnson was telling you in his August 30 of

Page 38

1  2012 letter?
2 A  Yes.
3 Q  Now, I want to turn your attention to paragraph 31
4  of this complaint.  And paragraph 31 of the
5  complaint, it states that, At the time of the Jeh
6  Johnson letter, tens of thousands of copies of the
7  book had already been printed with Podlaski's edits
8  and distributed across the country in anticipation
9  of the release date at a cost of millions of
10  dollars.  Do you see that?
11 A  Yes, sir.
12 Q  And you agree with that statement; right?
13 A  That they had books already --
14 Q  Printed.
15 A  -- printed and mapped out across the states?
16  That's what I was told, yes.
17 Q  In fact, just turning to the timetable for the
18  book, by August, all the books had already been
19  bound and shipped to the different warehouses to
20  the best of your knowledge; correct?
21 A  I have no idea dates or publishing stuff.  Yeah, I
22  assumed how that goes, but I -- I have no knowledge
23  of it, no knowledge of what dates and how that
24  process worked.
25 Q  Now, that paragraph goes on to say that,

Page 39

1  Bissonnette had no power to stop the distribution
2  at this late date.  Do you believe that to be a
3  true statement?
4 A  Yeah.  This was a discussion that we had.  Right.
5  We had gotten the letter, sat down.  I remember
6  talking with Kevin.  They told the whole team and
7  saying, Okay, look, what do we do here?  Publisher
8  came back, from my recollection, said, Look, we've
9  already got these books already out in these
10  locations so physically there's no way to
11  physically stop this, right, to turn this off
12  because there could be already books already in
13  these warehouses and they're out there.
14  The other thing I remember hearing from
15  Mr. Podlaski was, Look, the sooner this gets out
16  there, the sooner people read it, the sooner
17  they'll see there's nothing classified in it and
18  you'll be fine.  And so based off that, that's what
19  I remember about this, I guess.
20 Q  Well, do you believe that you had any contractual
21  obligation at that point that would have prevented
22  you from stopping the release of the book?
23 A  Say that one more.
24 Q  Yeah.  Let me rephrase it because I think I asked a
25  double negative.

Page 40

1  To the best of your knowledge, on that day, on
2  August 30 of 2012 when you got the letter from Jeh
3  Johnson --
4 A  Okay.
5 Q  -- was there any reason that you understood
6  contractually with -- that would have prevented you
7  from saying, Hey, stop, we need to submit this book
8  for a prepublication review?
9 A  I don't know.  I'd have to get into the weeds and
10  go back through that.  I don't recall exactly
11  what -- how my contract read.  I was still relying
12  on Mr. Podlaski's assurance that what we were doing
13  was fine and that the sooner we got these out, the
14  sooner they'd see there was nothing classified and
15  it would go away.
16  Based off the fact that the books were already
17  out and there was no way to pull them back, that
18  kind of null and voided in a lot of our minds any
19  other moves because no matter what, the books were
20  already there.  And again, what I was hearing from
21  my counsel was, look, the sooner the better.
22  They'll read it.  They'll see there's nothing in
23  there and you're fine.
24 Q  Now, the last -- the next to the last statement in
25  this paragraph says, Had release of the book been

Page 41

1   abandoned at this late date, Bissonnette would have
2   been in material breach with his contract to Dutton
3   and subject to suit by Dutton.  Do you see that?
4 A Yeah.
5 Q Did anyone at Dutton threaten you with a lawsuit?
6 A No.
7 Q Why do you think that you would have been sued by
8   Dutton?
9 A I'm guessing there's some sort of legal --
10          RANDAL JOHNSTON:  Object; lack of foundation.
11 Q Well, do you know why Dutton would have sued you?
12          RANDAL JOHNSTON:  Object; lack of foundation.
13 Q Do you know whether Dutton would have sued you?
14 A I don't know.  I don't.
15 Q Do you know any reason why Dutton could have sued
16   you?  Are you aware of any reason why Dutton could
17   have sued you had you --
18 A I signed a contract with them --
19          RANDAL JOHNSTON:  I'm going to object.  You're
20   interrupting him.
21          THE WITNESS:  Okay.
22          MR. FURMAN:  That's okay.
23          RANDAL JOHNSTON:  Let him finish before you
24   jump in.
25          MR. FURMAN:  We're getting familiar --

Page 42

1          RANDAL JOHNSTON:  She'll be mad at everybody.
2          MR. FURMAN:  That's for sure.
3 BY MR. FURMAN:
4 Q One at a time, as he said.  It's not like the
5   English parliament.  Let me rephrase the question.
6          RANDAL JOHNSTON:  Or presidential debates.
7          MR. FURMAN:  Well, yeah, that's true.  If you
8   say "wrong" at any point in time, I'm going to
9   reach out and slug you.
10          RANDAL JOHNSTON:  I would accept that as being
11   well deserved.
12 Q The question is -- in paragraph 31 of the
13   complaint, it states that, Had the release of the
14   book been abandoned at this late date, Bissonnette
15   would have been in material breach of his contract
16   with Dutton and subject to suit by Dutton.  My
17   question to you is, what's the basis for that
18   statement to the best of your knowledge?
19 A My guess is I'd have to go back through the Dutton
20   contract, but there was probably some language in
21   there that said that if I withdraw or didn't
22   produce a manuscript in accordance with their
23   timeline, then they could sue me or come back after
24   me for the book.
25 Q And without having to go back to the contract at

Page 43

1   the moment, do you recall whether the contract did
2   say that?
3 A I'd have to reread it.
4 Q At the time -- other than Mr. Podlaski, did you --
5   and when I'm saying at the time is August 30 of
6   2012 -- did you speak to Mr. Luskin about your
7   contractual rights with Dutton had you decided to
8   submit the book for a review on August 30 of 2012?
9 A Did I speak to Luskin on that Friday about the --
10   about my rights for publishing the book or not?
11 Q Not just on that day.  At any point thereafter.
12   From August 30 onward, did you speak to Mr. Luskin
13   about your rights to submit the book for a
14   prepublication review and how that would have
15   impacted your obligations under the Dutton
16   contract?
17          RANDAL JOHNSTON:  Let me interpose an
18   objection.  I think the Court has limited the
19   waiver of the privilege through December 31 if I'm
20   remembering correctly.  And so to the extent that
21   your question encompasses that time frame, I have
22   no objection.  But any discussion they had after
23   December 31, I object on the grounds of
24   attorney-client privilege.
25          MR. FURMAN:  Okay.  We'll check the order.

Page 44

1 Q But for the purpose of this question right now, the
2   time frame of August 30 through December 31 of 2012
3   is fine.
4 A I don't recall any specific conversations.  When I
5   brought Luskin in, it was to handle the -- these
6   new claims of criminal stuff.  That was Luskin's
7   specialty.  I was very much still relying on the
8   team and my current representation to kind of help
9   me move through this.  So I don't -- nothing jumps
10   out in my mind where I would have had a
11   conversation with Mr. Luskin about this issue.  The
12   reason I brought Luskin in was to handle the issue
13   that had now -- the new issue that had seemed to
14   have materialized.
15 Q And the new issue was the letter from Jeh Johnson;
16   correct?
17 A Right, and the threat of criminal prosecution.
18 Q And just going back to Exhibit No. 1, the --
19   Mr. Johnson's letter to you states in the second
20   paragraph, last line, quote, Further public
21   dissemination of your book will aggravate your
22   breach and violation of your agreements, period,
23   closed quote.  Was that something that you would
24   have discussed with Mr. Luskin?
25 A I don't remember discussing it with Luskin.  I

**Page 45**

1   absolutely remember discussing it with the team,
2   and that's where we kept coming back to the fact
3   that, A, the books were already -- we passed the
4   point of no return because the books had already
5   been shipped.  That was coming from the publisher
6   and then to me; that was a big deal.  Right.
7   Second thing I kept hearing from my counsel was
8   that, Hey, look, sooner is not a bad thing.  Let's
9   get it out.  They'll see there's nothing classified
10  in it.  You're fine.
11 Q   Now, did you ask Mr. Podlaski to respond to Jeh
12  Johnson?
13 A   I don't believe so.
14 Q   And did you rely on Mr. Luskin to respond to Jeh
15  Johnson?
16 A   Yes.
17 Q   And in his letter, was Jeh Johnson not telling you
18  that further dissemination of your book would
19  aggravate and breach -- your breach and violation
20  of your agreements?
21 A   Say that one more time.
22 Q   Yeah.  Just so I understand it, you were relying on
23  Mr. Luskin, not Mr. Podlaski, to respond to Jeh
24  Johnson; correct?
25 A   I was -- it was a team, right, whole bunch of

**Page 46**

1   people.  I've operated in SEAL teams.  Everybody's
2   got their specialties, your snipers, your
3   breachers, your air guys, whatever.  All I saw this
4   was the same thing, was putting another capability
5   on the team and this -- Luskin's capability was to
6   deal with Washington and the threat of criminal
7   stuff.  And I was still very highly relying on the
8   previous counsel that I've had up to this point,
9   along with Dutton and everybody else to help
10  formulate the best plan.
11 Q   So your reliance would have included Dutton at that
12  point, too, on the best --
13 A   Sure.  It was a team, yeah.  And, right, I didn't
14  know the books had already been shipped to these
15  locations.  Dutton informed us of that, said, Hey,
16  look, we've got a stockpile, but there's also a
17  part of that stockpile that's already been shipped.
18 Q   I'm going to ask you about --
19 A   I had to rely on that information.
20 Q   I'm going to ask you about that in a second.  I
21  just want to focus on who was in charge of
22  responding to Jeh Johnson.
23 A   Okay.
24 Q   Did you ask Kevin Podlaski to respond to Jeh
25  Johnson?

**Page 47**

1 A   I don't believe so.
2 Q   Do you know if Kevin Podlaski ever responded to Jeh
3  Johnson?
4 A   I don't know.
5 Q   In --
6 A   I know he and Luskin had spoke initially.
7 Q   Okay.
8 A   Right.  Again, everybody -- I wanted everybody
9  talking, everybody coming up with the best course
10  of action because we had just gotten this letter.
11  This was a big, whoa.  Let -- we need to be very
12  cautious about what we're doing and let's get the
13  team together and come up with the best decision.
14 Q   All right.  Well, let -- I just want to stick with
15  the team concept for a moment.  Who was part of the
16  team at that point?  I'm talking about August 30 of
17  2012.
18 A   I mean, off the top of my head, it would have been
19  Mr. Podlaski, myself, Elyse Cheney, Ben Sevier,
20  Dutton, Christine Ball.  She's at Dutton, is one of
21  their marketing PR folks.  And that probably would
22  have been it at that point.
23 Q   And would that team have included Luskin?
24 A   Once we hired him, yes.
25 Q   Okay.  And you would have hired him in response to

**Page 48**

1   this August 30, 2012, letter?
2 A   Sure.
3 Q   Did you know Mr. Luskin before you hired him?
4 A   No.
5 Q   Who hired him on your behalf?
6 A   Well, I would have hired -- nobody hired him on my
7  behalf.  I hired him.
8 Q   I'm sorry.  That was a poorly phrased question.
9  How did you -- who introduced you to Mr. Luskin?
10 A   I don't even remember.
11 Q   Was it someone on that team?
12 A   Yeah.  It had to have been.  I wouldn't have --
13  yeah.  It was somebody in there.  I don't know if
14  it was Elyse, Ben.  Somebody had some sort of -- I
15  don't know.  Maybe it was Kevin Maurer, co-writer.
16  I don't remember where we got the first -- hey,
17  call this guy.  He's out of D.C.  He's -- you know,
18  he knows the kind of white collar criminal stuff
19  and he's -- and he's well known in the D.C. area,
20  might be helpful for the team, especially if you're
21  getting letters from Jeh Johnson out of D.C.
22 Q   Okay.  And just so I know who's on the team, where
23  does Mark Fabiani fit in this team?  Is he on the
24  team or is he, you know, sort of on the periphery?
25 A   I would say on the periphery.

Page 49

1  Q  And how about Peter Ragone?

2  A  Same thing.

3  Q  Okay.  And those are PR guys; right?

4  A  Yeah, that I believe were hired by Dutton.

5  Q  Who's quarterbacking the team?

6  A  I don't know.

7  Q  Well, every team has a leader; right?

8  A  Yeah.  I mean, I would say inevitably it's my book

9     so I could have run off and done whatever I wanted

10    to, but I relied heavily on the advice I was

11    getting from a team.  I was absolutely in a space

12    that I had never operated before in my life, right.

13 Q  Understood.  All teams will have people that have

14    different skills, but who did everyone report to?

15    Who was leading the team?

16 A  I don't think there was one -- I don't think there

17    was a line in the chart diagram, a typical military

18    structure.  Everybody knew that it was me as the

19    author, right, and everybody knew their different

20    positions.  And we all kind of cross-talked and

21    worked together.  I don't -- I don't believe there

22    was ever an e-mail or a conversation sent that was,

23    Hey, everybody needs to report in to me.  It's --

24    the way I operated before was, Hey, look, we got a

25    lot of talented people.  We trust everybody.  Let's

Page 50

1     come up with the best decision as a group and run

2     with it.

3  Q  And among the issues that you had to grapple with

4     on August 30 and the days that followed was dealing

5     with Jeh Johnson's admonition that further

6     publication or further dissemination of the book

7     would aggravate your breach and violation of the

8     agreements.  Is that something that was on

9     everyone's radar?

10 A  Absolutely.

11 Q  And who did you expect to handle that?

12 A  I'd expect the team to come up with the best

13    solution.  Again, I kept hearing from Dutton

14    saying, We can't get the books back.  Right.  Those

15    are shipped.  Kept hearing from Mr. Podlaski that,

16    Hey, the sooner people saw it, the sooner people --

17    this would go away because they'd see that there's

18    nothing classified in the book and you're fine.  So

19    based off of that input and the fact that, okay,

20    there was -- there was no way to...

21 Q  I want to go back.  I mentioned earlier -- I want

22    to go back to the dissemination of the book before

23    August 30 of 2012.  Were you aware that advanced

24    copies of the book were sent to various agencies?

25 A  Yes.  At some point, I knew there was going to --

Page 51

1     we had sent -- and I think it was once the --

2     somebody caught wind of it at some point that,

3     okay, this was happening.  And we sent advanced

4     copies, I think, to SOCOM and the agency.

5  Q  What's SOCOM?

6  A  Special Operations Command.

7  Q  And what other agency?

8  A  The CIA.

9  Q  And who did that on your behalf?

10 A  I don't exactly recall who mailed them and dropped

11    them in the mail, but I know they got sent.  I

12    think Kevin Maurer might have sent one to SOCOM,

13    but I -- don't quote me on that.

14 Q  What was the purpose of sending advanced copies of

15    the book to SOCOM and the CIA?

16 A  It was, again, in line with the -- Hey, look, let

17    them read it.  They'll see that there's nothing in

18    it.  You're fine.  This will go away as soon as

19    they have a chance to read it.  And again, that was

20    advice I was getting from Mr. Podlaski.

21 Q  So are you saying that Mr. Podlaski advised you to

22    send the book to the CIA and to SOCOM?

23 A  I don't remember that exact conversation, but that

24    was the piece that I was hearing, is the team's

25    coming together to solve this problem based off the

Page 52

1     letter.  The piece we kept hearing was from

2     Mr. Podlaski was, Okay, look, there's nothing to

3     it.  The sooner they read it, the sooner they'll

4     see and they'll see that we're fine.

5  Q  And I now just want to make sure that you and I are

6     on the same page.  I'm referring to before

7     August 30 of 2012, before Jeh Johnson's letter to

8     you.

9  A  Okay.

10 Q  In the summer of 2012, advanced copies of the book

11    were sent to various agencies.  Are you aware of

12    that?

13 A  Yes, but I don't know the date in which that

14    happened.  I know -- my understanding is it

15    happened right before the Jeh Johnson letter and as

16    all this is starting to blow up.

17 Q  So was it within days, weeks, or months of the Jeh

18    Johnson letter where the advanced copies were sent?

19 A  I can't quote for sure, but I would assume weeks --

20 Q  And why --

21 A  -- if that.

22 Q  Why was the book sent to SOCOM and the CIA before

23    the publication?

24        RANDAL JOHNSTON:  Objection; asked and

25    answered.

Page 53

1      You can answer.
2      THE WITNESS:  Okay.
3  A  Why were they sent to --
4  Q  Yes.
5  A  -- them?  I believe we sent, again, to show those
6      agencies, give them a chance to read it and say,
7      Hey, look, there's nothing it.  You know, mellow
8      out.
9  Q  And you testified --
10 A  There's nothing to be afraid of.
11 Q  You testified earlier that someone had gotten wind
12     of it.  Can you amplify that because I'm not sure I
13     understand what you mean?
14 A  I don't remember exactly.  I thought the rumor mill
15     was maybe somebody at SOCOM or somebody had heard
16     about this book and started asking questions.  And
17     I don't -- I don't recall exactly how that went
18     down.
19 Q  Well, did you tell anyone that you were writing the
20     book?
21 A  No.
22 Q  Well, obviously you told Elyse Cheney.
23 A  Okay.  Yes, correct.
24 Q  So other --
25 A  Nobody outside that direct team that I've quoted

Page 54

1      earlier, right.
2  Q  And I want to make sure that I know the team.  It's
3      Elyse Cheney, Ben Sevier, Christine Ball --
4  A  Yep.
5  Q  -- Kevin Podlaski.  And then after August 30, it
6      would have been Robert Luskin.  But I'm focused on
7      before August 30.
8  A  Before Kevin Maurer, I'm sure Kevin Maurer's agent.
9      You know, I'd say that's about it.
10 Q  And so when someone -- when you -- sorry.  Rephrase
11     all that.  Strike all that.
12     The rumor mill, how did you learn about the
13     rumor mill about your book?
14 A  I don't even remember.  I don't know if it came
15     through Kevin Maurer or Mr. Podlaski.  I don't know
16     where that came from.  But if my memory serves me
17     correctly, somebody had said, Hey, caught wind of
18     this.  And that's when it was determined, okay,
19     well, let's send them these books so they can read
20     it and see that there's nothing in there.
21 Q  I'm going to ask you more questions about certain
22     things involving Electronic Arts, EA, as it's
23     known, Medal of Honor, and Zero Dark Thirty.  But
24     just in general, before we get into the specifics
25     of those activities and some others, before

Page 55

1  August 30 of 2012, did you ever tell Kevin Podlaski
2      about your involvement with Electronic Arts,
3      otherwise known as EA?
4  A  I don't believe so.
5  Q  At any point in time before August 30 of 2012, did
6      you tell Kevin Podlaski about your work in
7      connection with the video game that -- called Medal
8      of Honor?
9  A  No, I don't believe so.
10 Q  And you were compensated for the work that you did
11     for those efforts for the video game, Medal of
12     Honor; correct?
13 A  Yes.
14 Q  And that included some filming in Alabama in front
15     of a green screen?
16 A  Yeah.  I mean, we -- all over the states, but yeah.
17 Q  And so that would have been some performance by
18     you, consulting, and also some voiceovers --
19 A  Yes.
20 Q  -- for the game itself?
21 A  Sure.
22 Q  And that all took place before August 30 of 2012?
23 A  No, not before.  Before and after.
24 Q  Before and after.  Okay.
25 A  Yeah.

Page 56

1  Q  But did you tell Kevin Podlaski at all about any of
2      your involvement with Electronic Arts?
3  A  Not that I remember.
4  Q  How about your involvement with the producers of
5      Zero Dark Thirty?
6  A  Not that I remember.
7  Q  My question is, did you ask -- I'm sorry.  Did you
8      tell Kevin Podlaski about that?
9  A  Not that I can remember.
10 Q  And the Element Group as another issue, did you
11     ever tell Kevin Podlaski about your involvement
12     with the Element Group prior to August 30 of 2012?
13 A  No, not specifically.  I don't remember.
14 Q  And did you tell Kevin Podlaski about meetings that
15     you had with Spielberg, DreamWorks, HBO, et cetera,
16     before August 30 of 2012?
17 A  Not that I believe -- not that I remember.
18 Q  And is it fair to say that in one form or another,
19     all of the pictures that I just mentioned involved
20     some aspects of your career as a Navy SEAL in one
21     form or another?
22 A  Did it involve some aspects of my career?
23 Q  Yeah.
24 A  Sure.
25 Q  Well, in other words, Medal of Honor had to do with

Page 57

1 the military and your involvement and your
2 experience as a Navy SEAL; correct?
3 A Sure.
4 Q And your discussions with HBO and Spielberg all
5 would have involved military-related ventures that
6 would have drawn on your experience as a Navy SEAL;
7 correct?
8 A Sure.
9 Q And what am I forgetting? Your involvement with
10 Chief Consulting and also with the Element Group
11 all would have drawn upon your experience as a Navy
12 SEAL; correct?
13 A Sure.
14 Q And you didn't tell that -- any of those activities
15 to Kevin Podlaski?
16 A Not that I remember.
17 Q And in fact, when you interacted with Kevin
18 Podlaski, you didn't tell him your name; correct?
19 A I don't remember that. We knew who, we, who I
20 was. So, of course, we had to talk real name.
21 I -- we spent a lot of time talking about my
22 security issues that I wanted to abide by. So to
23 say that I didn't tell him my real name, I -- that
24 seems farfetched.
25 Q Okay. Well, at what point in time did -- because

Page 58

1 when you first -- let me just rephrase that again.
2 Sorry.
3     When you first were introduced to
4 Mr. Podlaski, you used a pseudonym, correct, Mark
5 Owen?
6 A I don't remember, when we were first introduced,
7 what name I used. But because he was going to be
8 in the position he was, he absolutely would have
9 had access to my real name. And whether I shared
10 that -- I'm assuming I would have shared that with
11 him.
12 Q Do you know when you revealed your name to
13 Mr. Podlaski?
14 A It had to have been very early on.
15 Q Do you recall the method in which you did that?
16 Was it by phone, e-mail?
17 A No.
18 Q If it was by e-mail, would that have been strange?
19 A Maybe. I guess. I don't know why I would have
20 used a fake name with somebody who was trying to
21 help me set up LLCs in order to protect my real
22 name. My understanding was he helped me a lot in
23 trying to hide my identity. To hide your identity,
24 you have to disclose your identity. So to say that
25 I didn't share my identity with him doesn't make

Page 59

1 sense to me. Do I remember any specific dates or
2 times or phone calls? No.
3 Q Okay. I understand. Now, at any point in time
4 from the time that you engaged Mr. Podlaski and up
5 and through August 30 of 2012, did you produce to
6 Mr. Podlaski the forms that were attached to Jeh
7 Johnson's letter, the forms that you signed, the
8 nondisclosure signs?
9 A At any point did I give those to Podlaski?
10 Q Yes.
11 A No.
12 Q Do you think it would have been significant or
13 important -- let me rephrase that.
14     Did you think it was important for
15 Mr. Podlaski to know all of your disclosure
16 obligations with the Navy and other agencies?
17 A Sure. And if at any point he would have said,
18 Look, I have to see this, this, and this, I would
19 have gladly gone back and said, Look, I need to see
20 this, this, and this. But quite simply, those
21 questions were never asked. We talked a lot about
22 classification and what was signed and what -- and
23 "I don't remember" is a lot of it. I'm not a
24 numbers/details/dates guy. I'm not. I never have
25 been. And so had he said, Look, I need this

Page 60

1 document, this number I can't give you sound
2 advice, I would have very easily gone and got that.
3 Q Your rank at the time that you discharged was --
4 was it command master chief; is that correct?
5 A Senior chief.
6 Q Senior chief. And is that the highest rank that an
7 enlisted SEAL can achieve?
8 A The next rank higher, the E-8 master -- or E-9
9 master chief. I was an E-8 senior chief.
10 Q So you were just below the top. And --
11     RANDAL JOHNSTON: You have to answer out loud.
12 A Oh. Yes. Sorry.
13 Q And on Operation Neptune Spear, you had a command
14 position; correct?
15 A I was -- well, I was one of the team leaders, yes.
16 Q So not to be -- I can understand being
17 self-deprecating or being modest, but wouldn't that
18 position require you to be a very detailed person?
19 A Sure.
20 Q And wouldn't your fellow SEALs that are under your
21 command rely on that trait of being a detailed
22 operator?
23 A I don't think they rely on my details. Right. If
24 I'm missing something, they can -- I've worked for
25 plenty of leaders that were not the best in certain

## Page 61

1   areas.  And again, you get the team and you help
2   fill in the holes for other guys.  Were they
3   reliant on my ability to remember details?  I
4   wouldn't say reliant.  Was that an important part
5   of the team?  Sure.  Everybody should have that.
6   Q   Now, in Exhibit No. 3, as an attachment, there is a
7       retainer agreement.  Do you see that?
8   A   What page?  Is it at the end?
9   Q   It's at the very end, yeah, signed with Carson
10      Boxberger.
11  A   Yes.
12  Q   And that's dated January 17 of 2012?
13  A   Yes, sir.
14  Q   Now, this retainer agreement was signed under seal.
15      Do you recall that?
16  A   Yes.
17  Q   Of course, it has your name on the very first page.
18      I want to refer you to page 3 of the retainer
19      agreement.  And it says, Client responsibilities.
20      Do you see that?  It's towards the bottom of the
21      page.
22  A   Yep.
23  Q   And before you signed the agreement, you would have
24      read it; correct?
25  A   Sure.

## Page 62

1   Q   And just to -- you know, in general terms, in
2       connection with this retainer, the nondisclosure
3       agreements you signed, and other documents you may
4       have signed, do you appreciate that when you sign
5       something, that you're bound to what's written in
6       the contract?
7   A   Yes.
8   Q   Whether it's legal or not is one thing, but in
9       terms of just the contract itself and what you're
10      signing, you understand that your signature means
11      that you've read and understand the document to the
12      best of your knowledge?
13  A   Yes.
14  Q   And the January 17, 2012, retainer on page 3 under
15      Client Responsibilities states in the second
16      sentence, quote, You also agree to cooperate fully
17      with us and to provide us with all information
18      known by or available to you that may be relevant
19      to your matters or that may aid in us -- may aid us
20      in representing you in these matters, closed quote.
21      Do you see that?
22  A   Yes.
23  Q   Do you believe that the nondisclosure agreements
24      that you signed with the Navy that were attached to
25      the Jeh Johnson letter in Exhibit 1 was relevant to

## Page 63

1       Mr. Podlaski's representation of you?
2   A   Yes.  And again, at any point --
3   Q   I'm just asking you if you think it was relevant.
4   A   Sure.
5   Q   And you appreciate that it was relevant; correct?
6   A   Yeah.
7   Q   And did you provide Mr. Podlaski with those
8       documents?  Yes or no?
9   A   No.
10  Q   Okay.  We touched on Operation Neptune Spear, and I
11      want to go back to it.  What was your rank at the
12      time of Operation Neptune Spear?
13  A   I don't know if I was an E-7 or an E-8 at that
14      point, but --
15  Q   What does that mean?
16  A   Chief or senior chief.  I -- I made E-8 right
17      before I got out so I wasn't even getting paid for
18      it.  So in a lot -- if my -- if you look at my
19      DD 214, it says I got out as a chief, not an E-7,
20      not an E-8.  I had made E-8, but I wasn't getting
21      paid for it yet.  The Navy has these weird terms of
22      when they pay you and when you're actually put on
23      the next rank.  So yeah, E-7, E-8.
24  Q   For Operation Neptune Spear, were you paid by the
25      Navy or the CIA?

## Page 64

1   A   My paycheck my whole career was from the Navy.
2   Q   Okay.  And was there anyone at the CIA that you had
3       to report to?
4   A   Me?  No.
5   Q   With respect to Operation Neptune Spear.
6   A   Me?  Absolutely not.  I worked with my team.
7   Q   And who did you report to in connection with
8       Operation Neptune Spear?
9   A   My master chief.
10  Q   Okay.  And are you in a position to tell me who
11      that is?
12          RANDAL JOHNSTON:  No.
13  A   I'd rather not name names.
14          MR. FURMAN:  I'll leave a space for that.  I
15      don't know that, you know, we'll need to fill that
16      in.  I have to think that through.  So just leave a
17      space there.
18  Q   Was that master chief -- was he stateside, or was
19      he on the helicopters into Pakistan?
20  A   He was my squadron master chief before the mission,
21      had been for the past year, year-ish, and would be
22      my master chief after the mission --
23  Q   Okay.
24  A   -- and deployed with us.
25  Q   So he was deployed with you?

Page 65

1  A  Yeah, yeah, the whole way.  And I'm not sure if we
2     can take a two-minute --
3  Q  Let's do it.
4  A  -- bathroom break --
5  Q  Sure.
6  A  I'll be quick.
7        (A brief recess was taken.)
8        RANDAL JOHNSTON:  I've looked at Exhibit 1,
9     and I will ask that in all the copies of these
10    documents that you likewise make the same -- not
11    corrections but deletions or mark-outs to ensure
12    the confidentiality of Mr. Bissonnette.  And the
13    places I see his Social Security number is on the
14    top of page 2 of the exhibit, the top of page 3 of
15    the exhibit, the middle of page 6, and the middle
16    of page 7, and the middle of page 8 of the exhibit.
17    And I have with the black Sharpie provided by the
18    court reporter marked out all of those on the
19    official copy.
20        MR. FURMAN:  Okay.  Yeah, that's fine.  No
21    objection whatsoever.
22 BY MR. FURMAN:
23 Q  Mr. Bissonnette, I want to ask you questions that
24    relate to the handling of classified information.
25    I'm going to be asking you these questions in the

Page 66

1     way that a layperson would ask them because I'm a
2     layperson when it comes to this.  So if for
3     whatever reason the way that I ask these questions
4     you don't understand, just let me know.
5  A  Okay.
6  Q  But in your career as a Navy SEAL, would you have
7     had access to classified information?
8  A  Sure.
9  Q  And how would you receive that information?  In
10    other words, what would be the process?  Would it
11    be a meeting in a classroom?
12 A  Yeah, most of the time.  The way I handled it -- I
13    didn't deal with a lot of paperwork stuff.  It was
14    more -- you know, more tactical level information.
15    And that would have been in more of a briefing
16    setting.
17 Q  Did you at any point in your career receive
18    training on the handling of classified information?
19 A  I'm sure I would have.
20 Q  And what did that consist of?
21 A  I don't remember specifically.  Probably some sort
22    of online training piece.
23 Q  Meaning at home, you would just watch a movie?
24 A  No.  At the command on the computers, right, they
25    turn off your e-mail if you didn't do the monthly

Page 67

1     training modules, Hispanic awareness month
2     training, you know, whatever it is.  There's
3     hundreds of them that they cycle through.  And so
4     I'm guessing there's some sort of -- they would
5     have put it in there if there was some sort -- if
6     there was nontactical training to be conducted, it
7     was conducted through that little portal-type
8     thing.
9  Q  And when would that portal be?  Would it be at the
10    command center?
11 A  I don't know.  It was on my computer at work.
12 Q  So at work?
13 A  Yeah, yeah.
14 Q  So you wouldn't do this at home --
15 A  No.
16 Q  -- over a cup of coffee?  You would be at the
17    command center in Virginia Beach presumably before
18    a computer screen reviewing whatever is the subject
19    of the day?
20 A  That's it.
21 Q  And do you recall the handling of classified
22    information being a subject that you had to be
23    trained on?
24 A  I don't recall specifically a training module, but
25    I'm sure that's where they would have put it had

Page 68

1     they had one.
2  Q  And what was your understanding of how you in your
3     role as a SEAL would have been responsible for the
4     handling of classified information?  Did you
5     receive any instruction on that?  Let me break it
6     down.  Let me break it down.
7        And forgive me if I am naive enough not to
8     know the answer to this, but is it proper to use
9     the term SEAL Team 6 as opposed to DEVGRU?
10 A  Guys around the command use Team 6 all the time.
11 Q  Okay.  And SEAL Team 6, is that different from any
12    other aspect of the Navy?
13 A  It's a different unit.  It's just like Team 5 or
14    Team 4 or Team 3.  They're all different units.
15 Q  What's the difference between Team 5 and Team 6?
16 A  Different focus, little bit different focus.
17 Q  All right.  What's the difference in the focus?
18 A  I believe a lot of that is classified.  And I
19    wouldn't want to say anything out of bounds.
20 Q  Okay.  Well, how do you know it's classified?
21 A  Because through my dealings with the government,
22    they've nitpicked the hell out of a lot of little
23    things and even referring to that type of stuff
24    could be considered sensitive.  And I'd rather not
25    discuss that if at all possible.

Page 69

1  Q  Okay. But before August 30 of 2012, did you know
2     that there was a difference between Team 5 and
3     Team 6?
4  A  Sure.
5  Q  And did you understand that -- all right.
6        And I take it that your response if I asked
7     you as of August 30 of 2012 would be the same. If
8     I asked you the difference between Team 5 and
9     Team 6, you're not in a position to tell me?
10 A  Correct.
11 Q  Okay. Now, with Operation Neptune Spear, in what
12    form did you receive the briefings about the
13    operation itself, how it was going to be conducted,
14    location of Osama bin Laden in Abbottabad,
15    et cetera? Was it verbal? Was it --
16 A  Every brief I got was verbal. Now, again, the
17    first day that the command -- the -- our group of
18    guys went down to North Carolina and got the big
19    brief from whoever -- the CIA folks who said, Hey,
20    look, here's the target, here's what's going on, I
21    was not there that day. I showed up the next day.
22    Every brief I had following that was all verbal.
23 Q  And was it your understanding that the information
24    you were receiving was top secret?
25 A  Again, as I said earlier, I never really

Page 70

1     classified -- yeah, I would say, yes, this is
2     important stuff to keep quiet. Did I put a
3     classification level next to it? No. I don't
4     think I ever did that for my whole career.
5  Q  Was there an understanding among the members of
6     SEAL Team 6 that you were not to discuss your
7     activities with people outside of the team?
8  A  Well, what type of activities?
9  Q  Well, your operational activities.
10 A  I wouldn't say there was an understanding that we
11    never talked about anything, no.
12 Q  For example, after the Captain Phillips raid which
13    was in the news, was there an understanding that
14    you were not to discuss that operation with press,
15    family, friends?
16 A  Nobody ever said, Do not brief, do not say any --
17    never briefed in that way whatsoever.
18 Q  Well, how about your own sense of your duties as a
19    member of the SEAL Team 6?
20 A  Sure.
21 Q  After the Captain Phillips raid, did you feel,
22    again, based on your own sense of your obligations,
23    that you were at liberty to discuss it, the
24    operation itself, say, with me?
25 A  To a certain degree, yeah. I would think there's a

Page 71

1     level that we could have that conversation.
2  Q  And how about turning to Operation Neptune Spear.
3     In the days that you returned after May 2 of 2012,
4     what was your understanding of your ability to
5     speak about the details of that raid with someone
6     outside of the SEAL community, for example, me?
7     Would you have been allowed to discuss it with me
8     on May 3?
9  A  You brought up details. Right. There's a
10    difference between sharing specific details and,
11    you know -- my family, through me being gone, me
12    coming home, knew that I was involved in it. So
13    could they say, Hey, were you involved in that?
14    Yeah, absolutely, I was involved in it. But
15    getting into specific details, it was probably
16    understood that -- yeah.
17 Q  Understood what?
18 A  That, yeah, you don't talk about a lot of the
19    details.
20 Q  And where did you get that understanding from?
21 A  It's very confusing because you see a lot of the
22    higher-ups and different people disclosing
23    different things. But at our level, it's in your
24    own head because, again, nobody's briefed you on
25    exactly what you can and can't say. So it's kind

Page 72

1     of -- it's how I go about business today. Right.
2     I've briefed. I have access to this classified
3     information. I don't just say it. I use my
4     opinion to share that information as I see fit to
5     some degree.
6  Q  So it's your judgment on what level of detail you
7     could reveal about Operation Neptune Spear. Is
8     that what you're saying?
9  A  No. I'm just saying I was never briefed on
10    specific areas what we could and could not talk
11    about.
12 Q  So, for example, a week after May 2 -- let's call
13    it May 9, 2012. And if I were to ask you who shot
14    Osama bin Laden -- I just met you on the street --
15    would you have been in a position to tell me that?
16 A  Again, nobody ever told us what we could or could
17    not say. Now, I would tell you I'm not going to
18    tell you who shot him because that's not important.
19    And I know that individual, and he wouldn't want
20    his name out there.
21 Q  And that would be the reason why you wouldn't tell
22    me because -- is that the only reason you wouldn't
23    tell me?
24 A  No. Again, we were never briefed, so you have to
25    use your best judgment. Right. We never -- we

Page 73

1    were never briefed of, Hey, do -- say this. You
2    can't say this.  You -- nobody ever said any of
3    that to us.
4  Q  So I understand what you're saying, is it your
5    testimony that you never had any official
6    instruction on the handling of classified
7    information either before or after an operation?
8  A  Are you talking specifically for the bin Laden
9    mission?
10  Q  Well, let's -- we can refer specifically to
11    bin Laden.
12  A  I don't think I've ever been on a mission where
13    they gave us some sort of security brief ahead of
14    time or afterwards saying what we could or could
15    not say.
16  Q  All right.  So I want to be clear because you had
17    prefaced your answer just on bin Laden, but then
18    you referenced other programs.  Let's just deal
19    with bin Laden first.  Let's deal with Operation
20    Neptune Spear.  Is it your testimony that you
21    received no official instruction on the handling of
22    classified information that relates to Operation
23    Neptune Spear before and after the operation was
24    conducted?
25  A  No specific additional intel briefs or

Page 74

1    classification briefs before or after that mission.
2  Q  And I'm not asking just about briefs.  I'm asking
3    about instructions from anyone at -- from the
4    Department of Defense, the Central Intelligence
5    Agency.
6  A  Well, couldn't you say these briefs here are
7    instructions?
8  Q  Well, do you believe that they are?  And you're
9    referring to the DD 1847.
10  A  Right, right, the nondisclosures.
11  Q  Nondisclosure agreements.
12  A  Yeah.  If you're asking if that's training, yeah,
13    I'm sure plenty of people could argue that that is
14    training and a briefing on dos and don'ts.
15    Obviously I said I don't remember all the details
16    of all of those.  But if you're talking specific
17    additional briefs outside of the NDAs, no, I don't
18    remember ever -- and that was -- a lot of the
19    conversation back and forth was, Hey, do you
20    remember signing this?  Do you remember signing
21    that?  No, I don't.
22  Q  And when you refer to these, we're referring to the
23    DD 1847 that was signed in January of -- on
24    January 24 of 2007.  Was that the only instruction
25    that you would have received about the handling of

Page 75

1    classified information?
2  A  These forms here?
3  Q  Yes.
4  A  That I can remember.
5  Q  And is it your understanding that the documents not
6    only speak about classified information but any
7    disclosure that relates to or otherwise involves
8    classified information?  Do you understand that?
9  A  Can you say that again?  I'm sorry.
10  Q  Yeah.  And I want to be specific, so we're talking
11    about a very specific document.  So let's refer
12    back to Exhibit 1 and the DD 1847 that was signed
13    on January 24 of 2007.  So I'm showing you the
14    document itself.
15  A  Okay.
16  Q  At paragraph three -- we went through it before,
17    but I'll read it again.  Quote, in the middle of
18    the paragraph, I understand that it is -- that it
19    is my responsibility to consult with appropriate
20    management authorities in the department or agency
21    that last authorized my access to SCI whether or
22    not I am still employed by or associated with that
23    department or agency or a contractor thereof in
24    order to ensure that I know whether information or
25    material within my knowledge or control that I have

Page 76

1    reason to believe might be SCI or related to or
2    derived from SCI is considered by such department
3    or agency to be SCI.  Do you see that?
4  A  Yes.
5  Q  And you see that the reference there is that -- and
6    I'm paraphrasing now -- is that you were
7    responsible to consult with anyone within
8    management, either within the Department of Defense
9    or the CIA, that relates to the disclosure of SCI,
10    whether or not it's SCI or relates to -- or is it
11    derived from SCI?  Do you understand that?
12  A  Yes.
13  Q  So it's broader than simply just whether it's
14    classified information.  It's whether it's derived
15    from or relates to classified information; correct?
16  A  Right.
17  Q  Correct?
18  A  Yes.
19  Q  And No Easy Day, the title is, A Firsthand Account
20    of the Raid on Osama bin Laden.  I think that --
21    I'm paraphrasing a bit, but essentially the cover
22    of the book is describing the operation that led to
23    the assassination and killing of Osama bin Laden;
24    correct?
25  A  I wouldn't call it an assassination, but okay.

1  Q  The killing.

2  A  Sure.

3  Q  And you're right.  And I'm glad you corrected me.

4     Did you understand that the book itself in

5     describing the activities that led to the killing

6     of Osama bin Laden would have related to

7     information that would fall within an SCI or a

8     special access program?

9  A  I didn't know where it would fall.  I knew it

10    was -- it was information that could be connected

11    to a lot of different places.  So it was very

12    important to me to make sure we did it the right

13    way.

14 Q  So you appreciated at the time that you were

15    preparing the book that it would have related to a

16    very sensitive operation that could very well have

17    been a special access program; correct?

18 A  Yes.

19 Q  And I might have asked you this.

20       MR. FURMAN:  And Randy, I know you'll object.

21 Q  But do you know whether or not Operation Neptune

22    Spear was a special access program?

23 A  I don't know.

24 Q  And to this day, do you know whether it is or not?

25 A  I don't believe it was.

1  Q  And what makes you say that?

2  A  Because when I sat down with the folks at the DoD,

3     they've shown me the same paperwork you've shown me

4     and not some extra special piece of paper that

5     says, Hey, look, this was some sort of extra

6     special category.  So yeah.  No, I don't believe we

7     did.

8  Q  Now, after Operation Neptune Spear, were you

9     debriefed by anyone at the military, the Navy, the

10    CIA about what took place in the operation?

11 A  Debriefed?

12 Q  Debriefed, yes.

13 A  The agency came down to the command and showed us

14    footage of the helo crash, talked some big picture

15    stuff.  But would I call it an in-depth debrief?

16    No.  We did our debrief overseas, sent that up.

17    And that was about it.

18 Q  Now, the -- and that took place stateside; correct?

19 A  Which debrief?

20 Q  The big picture debrief.

21 A  Yeah.  Where the agency was involved?  Stateside.

22 Q  And that was in North Carolina or was that in --

23 A  Virginia -- our base.

24 Q  In Virginia.  Okay.  And how long after Operation

25    Neptune Spear?

1  A  Couple weeks maybe.

2  Q  And did you receive any instructions from anyone

3     about the handling of information that you obtained

4     during Operation Neptune Spear?

5  A  Not that I remember.

6  Q  Well, how about your camera, for example?

7  A  What about my camera?

8  Q  Well, I understand that you took -- you took or you

9     had possession of a camera that took pictures of

10    Osama bin Laden's body after he was killed --

11 A  Yeah.

12 Q  -- is that correct?

13       Yes?

14 A  Yeah.

15 Q  And did you turn over that material to the CIA or

16    the military?

17 A  Yep.

18 Q  And were you given any instructions on the handling

19    of that information thereafter?

20 A  No.

21 Q  Did you understand that a photograph of the corpse

22    of Osama bin Laden is a classified piece of

23    information?

24 A  I didn't know that it would be classified that, but

25    I assumed that that was something that was --

1     needed to be pretty well protected, yeah.

2  Q  Well, aside from well protected -- I'm sorry if I'm

3     interrupting you.  Mr. Bissonnette, would you have

4     considered it -- the photograph of the body of

5     Osama bin Laden after he was killed -- to have been

6     something that would be classified, top secret

7     information?

8  A  I don't know what category it would have been, but

9     yeah, I would assume that the government -- I knew

10    the government wasn't releasing it.  And I did

11    not -- when we got back, I didn't know I still had

12    the photo.  Right.  So you get done with the

13    mission.  You turn in your camera.  The CIA takes

14    your camera.  They download all the photos.  They

15    delete the photos.  They hand you back your camera.

16    I put my camera back in the gear.  Months later

17    after I'm out of the Navy -- the Navy doesn't take

18    my camera back.  I open my camera and it's got

19    photos on it.

20 Q  Now, in other operations that you've conducted,

21    were you also the cameraman on all those as well?

22 A  Yeah.  Everybody carries a camera, every single

23    person.

24 Q  And is that the standard approach, that you would

25    turn over your camera to --

Page 81

1   A   Standard operating procedure is you return from the
2       raid.  You hand your camera over.  The camera guy
3       downloads all the photos, deletes your stuff, hands
4       you back all your cameras.  You put them back in
5       your gear, and you go about your business.
6   Q   Is what happened here in Operation Neptune Spear
7       that the photograph of the corpse of Osama bin
8       Laden was not deleted from your camera?  Is that
9       what happened?
10  A   That's it.
11  Q   The answer was that --
12  A   Yes.
13  Q   And did anybody -- and it doesn't have to be anyone
14      that is your boss.  It could have been any of your
15      colleagues -- have any discussions about Operation
16      Neptune Spear about how to handle the information
17      that you learned during the raid and how to keep it
18      confidential?
19  A   Not that I recall.
20  Q   After the bin Laden raid and before, say, December
21      of 2011, were you involved in any other military
22      operations?
23  A   Training only, training only.
24  Q   When did you first learn that Kathryn Bigelow and
25      Mark Boal were working on a movie that related to

Page 82

1       the Operation Neptune Spear?
2   A   Within three to four weeks of the raid.
3   Q   How did you learn that?
4   A   The female CIA officer -- well, actually, no.  Back
5       up.  She mentioned -- I don't know if maybe
6       afterwards -- there was a whole bunch of guys that went
7       to Leon Panetta's retirement ceremony.  He's
8       leaving the CIA, going over to SecDef.  We just got
9       bin Laden.  A whole bunch of SEALs were there from
10      the raid.  He gives his great retirement speech.
11  Q   And you were there?
12  A   I was not.  My commanding officer was there.  SEAL
13      Team 6 commander was there, whole bunch of guys who
14      were on the raid.  My -- the enlisted -- the worker
15      bees were out training already.  Head shed was
16      there.  Immediately following his speech --
17  Q   Head shed; right?
18  A   The commander of SEAL Team 6.
19  Q   Got you.
20  A   Commander of our squadron, master chief of our
21      squadron, trip chief of our squadron.  There was
22      some other operators there.  I didn't make it,
23      along with a handful of us, because we were
24      training.  They come back and they say, You won't
25      believe what just happened.  Panetta gets off the

Page 83

1       stage.  Hey, sir, meeting the commanding officer of
2       Team 6.  I've got to introduce you to a couple
3       people.  Goes, gets Kathryn Bigelow, Mark Boal,
4       brings them back over.  Hey, they're going to make
5       a movie about you guys right there at Langley.
6       They came back.  We're obviously upset about that.
7       I kept in contact with the female CIA officer
8       and --
9   Q   Who's she?
10          RANDAL JOHNSTON:  Don't answer that.
11  A   I'm not saying names there.  Sorry.
12  Q   But it's a female CIA operative?
13  A   That -- the movie's about.  The reason the movie
14      was about her was because Panetta had authorized
15      her to sit down and talk with the producers.
16  Q   Okay.  We'll leave a line, and we'll deal with her
17      identity at another date.  Let's call her Ms. X for
18      now.
19  A   Sure.
20  Q   Was Ms. X at the meeting in North Carolina when you
21      first learned about the bin Laden raid?
22  A   I wasn't there the first day so I can't speak for
23      her.
24  Q   Second day.
25  A   She was there the whole -- most of the planning

Page 84

1       portion.
2   Q   Okay.  And did she ever tell you about the
3       classification level of the operation itself?
4   A   No.
5   Q   Okay.  Now I'm fast forwarding to Leon Panetta's
6       retirement party.  And you learned from who that
7       the source of the information was Ms. X for the
8       movie?
9   A   We knew he -- the Panetta piece and then we all
10      became friends with the female and several of the
11      other people we had worked together on this.  We
12      worked together for, what, close to a month.  And
13      she had said, Yeah, I'm being authorized along with
14      the interpreter who was on the mission to go out
15      and talk with producers.
16  Q   Now, she told you that she was authorized?
17  A   Uh-huh.
18  Q   And she received that authorization from the
19      military?
20  A   From the CIA.
21  Q   And how did you feel about that?
22  A   Par for course.
23  Q   In what sense is it par for the course?
24  A   We saw it on the Captain Phillips rescue.  Right.
25      You see the politicians and people at certain

**Page 85**

1  levels taking advantage of whatever they want for
2  their gain.
3  Q  And what you mean by "their gain" is that the
4  politicians will use exploits by operators like you
5  and use it for their political advantage.  Is that
6  what you mean?
7  A  Sure.
8  Q  And was it a concern of yours when you learned that
9  Kathryn Bigelow and Mark Boal were talking to Ms. X
10  that the politicians were going to take credit for
11  Operation Neptune Spear?
12  A  I think it wasn't a direct concern.  I just knew it
13  was coming.  I mean, we had laughed and joked about
14  it as a team beforehand saying, Hey, if we pull
15  this off, you know they'll make movies.  You know
16  they'll do all this stuff about it.
17  Q  And when they do all the stuff and they make
18  movies, they're making money off of it; right?
19  A  Sometimes, yeah; sometimes, no.
20  Q  Did Kathryn Bigelow and Mark Boal get in touch with
21  you?
22  A  Uh-huh.
23      RANDAL JOHNSTON:  Yes or no?
24  A  Yes.  Sorry.
25  Q  When did they first get in touch with you?

**Page 86**

1  A  I don't remember the exact dates.  It was after I
2  knew the female had gone out, Mrs. X had gone out
3  and talked to them.
4  Q  And how did they reach out to you?
5  A  Cell phone, I think.
6  Q  How did they have your cell phone number?
7  A  Probably through Mrs. X.
8  Q  So Mrs. X had your phone number, cell phone number.
9  And who was it that got in touch with you?  Was it
10  Mark Boal or Kathryn Bigelow?
11  A  Mark.
12  Q  And what did you talk about with Mark?
13  A  He wanted to see -- there in -- somewhere in that
14  time line is when I decided to leave the Navy.  He
15  was wondering if I'd be curious of consulting on
16  the movie.
17  Q  When was that so I get a date?
18  A  November, December, January, in there.  I don't
19  even remember.
20  Q  It was after the summer of 2011?
21  A  Yeah.
22  Q  When did you decide to -- that you wanted to leave
23  the military?
24  A  December-ish, somewhere in there.  I went to
25  New York City.  Never been to New York before.

**Page 87**

1  Ground Zero.  And knew I was getting a divorce at
2  that point and knew it was time to hang up the
3  guns.
4  Q  And was there anything, you know, that triggered
5  that desire to, as you say, hang up the guns?
6  A  I had talked about it my last deployment while we
7  were overseas.  My guys all knew I was done with my
8  team leader time.  I would be moving into different
9  positions throughout my career.  I joined to be the
10  guy on the ground, and that's what I've done my
11  whole career.  And I was having family issues at
12  home.  That was not going well.  So I had done 13
13  straight deployments and just seemed like it was
14  time to get out.
15  Q  Mark Boal had contacted you before that, though,
16  before your trip to New York; right?
17  A  I don't remember the exact timing of it.
18  Q  When was your trip to New York?
19  A  I don't remember off the top of my head.
20  Q  Was it before or after Christmas?
21  A  I want to say before, but I -- I know we had a
22  trip -- we had a jump trip for our squadron in
23  December, and that's where I told my head shed that
24  I was getting out.  So I don't know where the
25  New York piece fell, before or after that, but

**Page 88**

1  that -- I informed them in December that I was --
2  my intent of finishing my enlistment and getting
3  out.
4  Q  Now, so I want to use your terminology.  And I want
5  to make sure it's right.  Head shed so it's one
6  word; right?
7  A  Sure.
8      MR. FURMAN:  You got that; right?
9  Q  And where was the jump training session?  Where was
10  it?
11  A  Arizona.
12  Q  And was there, you know, anything that triggered
13  your decision in Arizona to inform your head shed
14  that you were leaving?
15  A  My enlistment was up.  I was either going to have
16  to reenlist here very soon within the next several
17  weeks or transition out.
18  Q  How did your head shed take that news?
19  A  Sat him down, told him, Look, I had a great career.
20  My time is up.  And I'm going to move on and out.
21  Q  And by that time, you had already known that Ms. X
22  was speaking to Kathryn Bigelow; correct?
23  A  I believe so.
24  Q  And had you already spoken to Mark Boal or Kathryn
25  Bigelow about being involved as a technical advisor

Pages 89..92

Page 89

1    to Zero Dark Thirty?
2  A  I don't know the exact timeline of that, but I
3     would say it was somewhere in there close.
4  Q  So it was around the time of the December training
5     session in Arizona that you were reaching an
6     agreement with Mark Boal?
7  A  I never reached any agreements with Mark Boal.
8  Q  Was it around the time -- well, let me -- I just
9     want to pin this down so I know the before and
10    after.  The jump training session in Arizona when
11    you told your head shed you were leaving, do you
12    know if it was before or after Christmas?
13 A  Before.
14 Q  Okay.  And was it sometime before or after
15    Thanksgiving?
16 A  I don't know.  Those get mushy.
17 Q  Well, do you remember where you were for
18    Thanksgiving --
19 A  No.
20 Q  -- in 2000 -- well, do you know where you were for
21    Christmas of that year?
22 A  I would have been in Virginia Beach maybe.  I don't
23    know.  I could have flown to the {REDACTED} to see
24    my {REDACTED}.  I honestly don't remember.
25 Q  Where was home at the time?

Page 90

1  A  Virginia Beach.
2  Q  Okay.  And {REDACTED} in {REDACTED}, you're
3     referring to your {REDACTED} -- I don't -- I'm not
4     asking -- I just want to get a sense of it.
5        MR. FURMAN:  You want to take a break, Randy?
6     Is that what it is or --
7        RANDAL JOHNSTON:  Yeah.  Let me ask that there
8     not be any identification of the state or part of
9     the country where his {REDACTED} live.  I don't
10    care for you to --
11       MR. FURMAN:  I get that.  I just wanted to get
12    a sense, when he referred to {REDACTED}, you're
13    talking about your side of the {REDACTED}.
14       THE WITNESS:  Yeah.
15       RANDAL JOHNSTON:  Yeah.  And Miss Reporter, if
16    you will -- where he talked about --
17       MR. FURMAN:  Take out {REDACTED}.  That's
18    fine.
19       RANDAL JOHNSTON:  -- where he went to visit
20    his {REDACTED} and the reference to the state,
21    delete that.  Just put a blank in there.
22       MR. FURMAN:  Yeah, I understand.
23       RANDAL JOHNSTON:  Thank you.
24       MR. FURMAN:  No objection.  I agree.
25       RANDAL JOHNSTON:  That's an easy mistake to

Page 91

1     do.  It's easy to lose track of that.  I know.
2        MR. FURMAN:  Yeah.  I'm just --
3        RANDAL JOHNSTON:  I take no offense at your
4     having asked.
5        MR. FURMAN:  No, that's okay.  I want to pin
6     down the dates.
7  BY MR. FURMAN:
8  Q  So your contact from Mr. Boal, was it before or
9     after the training session in Arizona?
10 A  I don't remember exactly.
11 Q  Okay.  I'm going to run by some names, and I want
12    to ask you who they are and so forth.  Howard
13    Sanders, Howie Sanders, do you know who that is?
14 A  No.  Oh, Howie -- is that a representative at UTA?
15 Q  Yes.
16 A  Okay.  Yeah, I know that name.
17 Q  He's an agent at UTA.
18 A  Yeah.
19 Q  How did you first get in contact with him?
20 A  Through Elyse Cheney.
21 Q  And do you know when that contact first took place?
22 A  No.
23 Q  How about Jonathan Leven?
24 A  I know the name, but I'm not placing it.
25 Q  If I were to tell you it's a contact through which

Page 92

1     you would get to Kathryn Bigelow, does that ring a
2     bell with you?
3  A  No.
4  Q  Did you have direct contact with Kathryn Bigelow at
5     any point in time?
6  A  Uh-huh.
7  Q  Was it by e-mail or by phone?
8  A  In person.
9  Q  And when did that take place?
10 A  I couldn't even place the month.  After Christmas.
11 Q  It was after Christmas of 2011?
12 A  Yeah.
13 Q  And Elyse Cheney, when did you first meet her?
14 A  Before Christmas.
15 Q  How did you get in touch with her?
16 A  Some SEAL friends of mine who had written a book
17    knew of her and said, Hey, you know, if you're ever
18    in New York, you ought to look her up.
19 Q  So when you came to New York in December of 2011,
20    did you meet with Elyse Cheney in person?
21 A  In -- yeah, yeah.  That would have been December
22    when I was up there for the -- to go see 9/11
23    memorial, the whole 9 yards.
24 Q  Okay.  And who was the SEAL Team 6 member that
25    wrote the book?

Page 93

1   A   It wasn't --
2          MR. FURMAN:  Is that also something you want
3   to leave a blank?  I -- I'm fine with that.
4          RANDAL JOHNSTON:  Yeah.  Number one, I'm not
5   sure it was a SEAL Team 6 member.
6          THE WITNESS:  It's not.
7          RANDAL JOHNSTON:  And he just said some SEAL
8   friends who wrote a book.
9          MR. FURMAN:  Oh, got you.  Okay.  All right.
10  So --
11  A   I couldn't even place their names, no.  They were
12  guys that I knew from Team 5 years ago, had gotten
13  out.  I think they're firefighters now.
14  Q   And they wrote books about their involvement as --
15  A   I've never read their books.  I don't know.  I know
16  they were involved in that industry.  They helped
17  write some video games.  They were involved in a
18  whole bunch of different stuff.  But could I give
19  you the list of what they were involved with?  No.
20  I don't know.
21  Q   Now, Ms. X, I want to turn your attention back to
22  her.  I'm not sure if I have a date on this.  The
23  Panetta retirement dinner where he was leaving the
24  CIA and going to DoD, when did that take place?
25  And that was at Langley Air Force Base; right?

Page 94

1   A   Within three weeks of the raid.
2   Q   So it was at some point in the spring or early
3   summer of 2011?
4   A   I'm sure you could look up public domain and see
5   when his retirement was.
6   Q   Yeah.  And you understood at -- was it at that time
7   that Ms. X got authority to speak to Kathryn
8   Bigelow and Mark Boal?
9   A   I wouldn't say right then, but within the next
10  month or so, yeah, sure.
11  Q   Mark Bowden, you know who he is; right?
12  A   Uh-huh.
13  Q   Yes?
14  A   Yes.  Sorry.  Sorry.
15  Q   That's fine.  And he's an author that wrote several
16  books, including a book called The Finish that was
17  written after your book or published after your
18  book.  But he also wrote several other bestselling
19  books that involved military operations; correct?
20  A   Yes.
21  Q   Okay.  When did Mark Bowden first get in touch with
22  you?
23  A   I don't remember the exact date.  He -- mutual
24  friend of ours connected us.
25  Q   And was that before December of 2011?

Page 95

1   A   I don't believe so.
2   Q   Was it after you decided that -- well, when you
3   told your boss you were retiring?
4   A   Was it after I had gotten out of the Navy?  Yes.
5   Q   Well, when did you get out of the Navy?
6   A   My final day on paper was June 28.
7   Q   And that was 2012?
8   A   Yes.
9   Q   And what does that mean, final day on paper?  I'm
10  not sure if I understand that.
11  A   I finished my terminal leave.
12  Q   And what does terminal leave mean?
13  A   It's the amount of leave you accrue over your
14  career that you tack on to the end of your -- you
15  can either take vacation time with it or you can
16  tack it on the end of your career and terminal.
17  Right.  You -- there's no coming back from it.
18  You're done.
19  Q   So when did your terminal leave start?
20  A   I believe it started January 1, but it might have
21  been predated through Christmas.  I don't remember
22  exactly.
23  Q   Of --
24  A   Because I would have taken leave for Christmas,
25  right.  I'm guessing.  I don't remember exactly,

Page 96

1   but I would have taken leave for Christmas, and
2   then I would have just -- I never came back after
3   that.
4   Q   And until June 28 of 2012, were your obligations to
5   the Navy the same as if you were on active duty?
6   A   No.
7   Q   How were they different?
8   A   I didn't have to show up at work, no uniform.  I
9   turned my guns in.  I turned my gear in.  I didn't
10  show back up at the command other than to sign my
11  out-processing paperwork and be done.
12  Q   How about in terms of your nondisclosure
13  agreements?  Would they have changed from the time
14  that you gave notice that you were resigning up and
15  through June 28 of 2012?
16  A   I don't know the specifics of how they change, but
17  I would assume they -- now, right, looking back,
18  seeing all this, yeah, they stayed the same no
19  matter if you're a civilian, in terminal leave,
20  out.  Across the board, it's all the same.  If you
21  would have asked me then if I knew, no.
22  Q   Well, did you ask anyone at the time?
23  A   No.
24  Q   When did you -- let me ask you some other names and
25  I'm going to turn to No Easy Day.  Tyler Gray, who

Page 97

1   is he?
2  A  I know him.
3  Q  Is he a SEAL?
4  A  No.
5  Q  How do you know him?
6  A  He's a former Delta Force guy, wounded in Iraq
7     years ago.
8  Q  Did he write a book?
9  A  I don't think he's written a book.  I just watched
10    a -- a big article on him on -- not a book, like, a
11    TV show but a special on him and several other
12    vets.  That just was recently --
13 Q  Did you have any business dealings with him?
14 A  No.
15 Q  Did you have any indirect business dealings with
16    him, say, through Electronic Arts or --
17 A  I believe he did some work for EA.
18 Q  And how about Nate Brown?
19 A  Nate Brown is the one who introduced me to Elyse
20    Cheney.
21 Q  Okay.
22 A  He's the former SEAL.
23 Q  And was -- wow.  Small world.  Was Nate Brown also
24    involved with EA?
25 A  Not when I was there.

Page 98

1  Q  Did you have any business dealings with Nate Brown?
2  A  No.
3  Q  How about Kevin Vance?
4  A  Same thing.
5  Q  Same thing in what sense?
6  A  Him and Brown were both -- that's how I met them,
7     was at Team 5 years ago.  And I believe they worked
8     together.  They both might be firemen.  So that --
9     that's how I would know one.  I'd know the other.
10 Q  Did you have any business dealings with him?
11 A  No.
12 Q  How about Dave Cooper?
13 A  No.
14 Q  Any business dealings with him at all?
15 A  No.
16 Q  When did you first get an idea that you were going
17    to write a book about the Osama bin Laden raid?
18 A  I couldn't tell you when it first popped into my
19    mind.
20 Q  You're not sure of when that idea first came into
21    mind?
22 A  No, not exactly.
23 Q  Did it come into your mind before or after Leon
24    Panetta's retirement?
25 A  After.

Page 99

1  Q  And why was it after?
2  A  Because I hadn't thought about it before then.
3  Q  Well, was there anything about Leon Panetta's
4     retirement and the introduction of Kathryn Bigelow
5     and Mark Boal through Ms. X that made you --
6     prompted you to think about writing a book?
7  A  We dealt with that -- as I mentioned earlier, there
8     was the Captain Phillips thing, right, and we saw
9     higher-ups take advantage of that.  My thought here
10    again was the exact same thing.  Okay.  Par for
11    course.  It is what it is.  They did it before.
12    They'll do it again.  Okay.  I don't think I really
13    started thinking about a book idea until I had
14    actually met Elyse.
15 Q  And that -- well, Elyse Cheney is a literary agent;
16    right?
17 A  Yes.
18 Q  So literary agent means a book; right?
19 A  Uh-huh.
20 Q  Yes?
21 A  Yes, sir.  Sorry.  Sorry.
22 Q  So when Nate Brown introduced you to Elyse Cheney,
23    it wasn't to, you know, meet a friend in New York.
24    It was essentially to write a book; right?
25 A  No.  It was a friend that he knew in New York and

Page 100

1     goes, Hey, if you're ever in New York and you want
2     to sit down and talk with somebody I at least know
3     and trust, they'll be able to answer your questions
4     about the process.
5  Q  Okay.  So you were talking to Nate Brown about the
6     process of writing a book at that point?
7  A  This is something that he brought up to me.  Said,
8     Hey, look, if this is something -- it's not a long
9     conversation.  Hey, look, if you're ever in New
10    York, he'd -- he referenced, Hey, you want somebody
11    to talk to about it, you ever want to think about
12    it, hey, meet this lady.  She'll at least answer
13    some of your questions.
14 Q  So did you have a conversation with Nate Brown
15    about the potential for writing a book?
16 A  Not an in-depth one that I can remember.  It was
17    more of a, Hey, look, if you're ever going to do
18    this, I'll introduce you to somebody.  You want
19    somebody to talk to, bounce ideas out, get some
20    straight answers from, I trust her.
21 Q  Well, did you meet with anyone else in New York
22    when you came to New York?
23 A  I think I was up -- I think when I met her -- and I
24    don't remember exactly what was the same week I was
25    in New York with my buddies seeing the sights and

Page 101

1   ground zero.  So we did that type of thing, and I
2   believe it was before I left town at the end of the
3   trip where I swung by her office.
4 Q And other than meeting with Elyse Cheney of the
5   8 million or so people that live in New York,
6   including two people that are looking at you right
7   now, did you meet with anyone else?
8       RANDAL JOHNSTON:  Object to the predicate to
9   the question.
10 Q You can answer.
11 A No.
12 Q So is it fair to say that the purpose of the
13   meeting with Elyse Cheney was to discuss a book of
14   some sort?
15 A Yeah, sure.
16 Q And is it fair to say that you were introduced to
17   Elyse Cheney through Nate Brown?
18 A Sure.
19 Q When did you have your conversation with Nate
20   Brown?
21 A No clue.
22 Q Okay.  It was somewhere between Leon Panetta's
23   retirement and December of 2011; right?
24 A Sure.
25 Q And --

Page 102

1 A Yes.
2 Q -- you don't recall if it happened in the summer,
3   the fall, the spring?
4 A No.
5 Q And was it during a phone call or was it over
6   e-mails?  How did you have that conversation with
7   Nate Brown?
8 A I can't remember because I hadn't seen Nate in
9   years.  I don't know that he would have even had my
10   cell phone number.  So where I -- where would I
11   have run into him?  I don't know.  I don't know if
12   it was a training trip to the west coast that we
13   ran into him.  I don't remember.  I don't remember
14   how that would have taken place.  It seems
15   unrealistic to me that he would have had my cell
16   phone.
17 Q And was the discussion with Nate Brown about
18   writing a book about Operation Neptune Spear?
19 A No.  Nate Brown did reach out to me.  He was in the
20   fire academy or something.  And he -- so he did
21   track me down somehow.  Must have been through cell
22   phone because I remember him sending me a flag from
23   his fire station that I -- that I carried on some
24   jump trips.  I remember that.
25 Q And so he contacted you.  How did he know that you

Page 103

1   wanted to meet with Elyse Cheney or meet with an
2   agent?
3 A I have no idea.  I don't think that was the reason
4   for the call.
5 Q Well, how did it come about that he introduced you
6   to Elyse Cheney?
7       RANDAL JOHNSTON:  Objection; asked and
8   answered.
9 A He gave me her name and number.
10 Q And did you ask for a name of an agent?
11 A Not that I recall.  He had reached out for me to
12   send me this flag.  I've got some great photos of
13   it.
14 Q So I just want to understand this --
15 A So how that came up in the phone call, I have no
16   idea.
17 Q So the conversation with Nate Brown went from him
18   sending you a flag to him giving you the name of a
19   literary agent in New York?
20 A Right.
21 Q And you don't know how the flag went to --
22 A I'm sure we had a catch-up conversation.  How you
23   doing?  What you been up to?  Hey.  Oh, maybe it
24   was something along -- I heard you were on the
25   raid.  I don't know how that conversation went.  I

Page 104

1   can't remember.  But I'm sure it was two buddies
2   who hadn't seen each other in years catching up,
3   seeing what's going on.  Hey, I don't know.  I'm
4   thinking about getting out.  Oh, well, hey, you
5   ever get -- I have no idea how that conversation
6   progressed.  But I could see that absolutely
7   happening.
8 Q Then did the conversation progress to, I'm
9   interested in writing a book, because how else
10   would --
11 A Oh, I don't remember.
12 Q How else would you get in touch with Elyse Cheney?
13 A He gave me her number.
14 Q Because I think I -- you know, maybe I'm just not
15   asking good questions, but I'm trying to understand
16   how you went from a discussion out of the blue with
17   Nate Brown to getting the name and the contact
18   details for a literary agent, a high-powered one at
19   that --
20 A Right.
21 Q -- in New York City to a place that you've never
22   been to.
23 A Could have been two guys catching up who hadn't
24   seen each other in years.  I had just been on
25   the -- a very large high-profile mission.  He knew

Pages 105..108

Page 105

1  that. We're catching up. He knew -- who knows
2  what else we discussed? I have no idea. Maybe we
3  talked about the hypocrisy. Maybe we -- who knows
4  what we talked about. I don't remember. But that
5  conversation very easily could have led into, Well,
6  hey, if you're getting out, hey, you're ever in
7  New York, I'll introduce you to somebody. You want
8  some good advice, there's somebody there. That's
9  the best -- that's the best idea in my mind I can
10 give you. And I hope -- I'm not trying to avoid
11 anything here. I'm just trying to answer it for
12 you.
13 Q  That's okay. My job is just to ask questions.
14 A  Okay.
15 Q  And the hypocrisy, you're referring to the -- well,
16    what are you referring to? Let me ask you that.
17 A  The hypocrisy?
18 Q  Yeah.
19 A  My personal belief is there's a lot of hypocrisy
20    that goes on between our politicians and the rest
21    of the world.
22 Q  Okay. Well, that's very broad. But when it
23    relates to Operation Neptune Spear, what hypocrisy
24    are you referring to?
25 A  I didn't say there was specific hypocrisy to

Page 106

1  Neptune Spear. I just said there's a whole lot of
2  hypocrisy at the highest levels of our government.
3  And that's what I refer to when I mean hypocrisy.
4  Q  Yeah. Well, the reason I'm asking you about that
5     is because you were referencing your discussion
6     with Nate Brown and about this high-profile
7     operation. And you mentioned the term "hypocrisy."
8     So I want to understand the connection between this
9     high-profile operation and your use of the term
10    "hypocrisy."
11 A  Any number of things. Right. The Captain Phillips
12    rescue. The government political figures take
13    advantage of that for their own self-serving
14    interest. That could happen on many different
15    levels in many different ways. So that's what I
16    mean by hypocrisy.
17 Q  Now, did you believe that there was hypocrisy
18    involved with Ms. X speaking to the producers of a
19    film about the bin Laden raid?
20 A  I wouldn't classify it as hypocrisy. I would
21    classify it as par for course for allowing -- the
22    government allowing her to do that.
23 Q  And so you don't consider that to be hypocrisy, but
24    you consider the --
25 A  No, because she -- in her position --

Page 107

1  Q  I'm sorry. Let me rephrase it because I'm asking
2     it awkwardly. You believe that with Captain
3     Phillips there was hypocrisy involved in
4     politicians taking advantage of that operation.
5     And is it that you don't see hypocrisy with
6     Operation Neptune Spear?
7  A  You asked if Mrs. X -- I saw hypocrisy with Mrs. X
8     talking to them. No, Mrs. X did not come up with
9     that. Mrs. X was allowed to do it by Leon Panetta.
10    So I would say the hypocrisy lies at Leon Panetta,
11    not at Mrs. X.
12 Q  Got you. Now I understand. So the hypocrisy of
13    Leon Panetta allowing Ms. X to speak about
14    Operation Neptune Spear, did you believe that to be
15    something that was wrong?
16 A  Wrong in what context?
17 Q  Hypocrisy.
18 A  I believed it was hypocrisy, yes.
19 Q  Other than Nate Brown, did you speak to anyone else
20    other than Elyse Cheney about the idea of writing a
21    book, about No Easy Day -- that led to No Easy Day?
22       RANDAL JOHNSTON:  Can we have a time frame?
23       MR. FURMAN:  From the time of Leon Panetta's
24    retirement up and through December of 2011.
25 A  I talked to my ex-wife about it.

Page 108

1  Q  Anyone else?
2  A  Not that -- not that I can remember.
3  Q  When did you first have any conversation with your
4     ex-wife about that?
5  A  First real conversation I had would have had to
6     have been after I met Elyse and at least had talked
7     with somebody who kind of knew the concept and flow
8     of what this would -- might look like and how -- I
9     had never written a book before. I didn't know how
10    any of it worked. And so I would guess that I had
11    the first conversation with my ex after that.
12 Q  And that was after speaking to Elyse Cheney?
13 A  After Elyse Cheney, yes.
14 Q  Okay. And up until that time when you met with
15    Elyse Cheney, were you aware of Mark Bowden writing
16    a book?
17 A  I don't believe so.
18       RANDAL JOHNSTON:  Well, then you don't know
19    Mark Bowden very well.
20       MR. FURMAN:  I'm sorry?
21       RANDAL JOHNSTON:  Well, then you don't know
22    Mark Bowden very well.
23 A  If you're pulling this stuff, can I run and take --
24 Q  Yeah, sure.
25       (A brief recess was taken.)

Page 109

```
 1              (Exhibit 4 was marked for identification.)
 2    Q   Mr. Bissonnette, I've shown you what's been marked
 3        as Exhibit No. 4.  Exhibit No. 4 is an e-mail from
 4        Ben Sevier to Elyse Cheney.  You're not copied on
 5        it.  I'm going to be showing it to Ms. Cheney at
 6        her deposition, but I want to ask you just about
 7        the contents of this document.  The last line in
 8        the e-mail -- and the e-mail is dated December 20
 9        at 8:15 from Mr. Sevier to Elyse Cheney.  It says,
10        Today was awesome.  Thanks for making it happen.
11        Do you see that?
12    A   Yep.
13    Q   Is he referring to a meeting that you had with Ben
14        Sevier and Elyse Cheney?
15    A   I don't know.
16    Q   Did you ever meet with Ben Sevier?
17    A   Yeah.
18    Q   Was that in December of 2011?
19    A   I honestly could not remember when I met him.
20    Q   Now, the reference in the e-mail where it says,
21        Updates, and the e-mail goes on at the beginning to
22        say, Contract underway to you first week of
23        January.  Do you know what he's referring to?  Was
24        there a contract discussion?
25    A   There must have been.
```

Page 110

```
 1    Q   Did it involve you?
 2    A   I'm guessing it involved -- I mean, I haven't read
 3        this e-mail before, but I'm guessing this involved
 4        the contract that we were going to put in place for
 5        me writing the book.
 6    Q   So when you met with Elyse Cheney in December, did
 7        you have a plan to write a book about the Operation
 8        Neptune Spear?
 9    A   No.  As I said a minute ago, I met with her, tried
10        to get the low-down of how it all worked.  And then
11        the plan evolved from there.
12              (Exhibit 5 was marked for identification.)
13    Q   All right.  This is a Christmas Eve e-mail,
14        Christmas Eve 2011 at 6:30 p.m.  So it's getting
15        close to Santa.  And the e-mail subject says, It's
16        me.  And it's written to Jonathan Leven.  And the
17        e-mail says, Please pass the word that this is my
18        new e-mail address and name.  And it says, Mark
19        Owen.  And then it says, Thanks, buddy.  You can
20        delete all old info for me.
21    A   I think I got a different e-mail than you did.
22              RANDAL JOHNSTON:  I have a different one as
23        well.
24              (A discussion was held off the record.)
25    Q   So we've got the new number five.
```

Page 111

```
 1              MR. FURMAN:  Do you have that, Randy?
 2              RANDAL JOHNSTON:  I don't.
 3              MR. FURMAN:  Okay.
 4              RANDAL JOHNSTON:  Thank you.
 5    BY MR. FURMAN:
 6    Q   And the Number 5 should be a December 24, 2011,
 7        6:31 p.m. e-mail.
 8    A   Yes.
 9    Q   And it's from you at a new address.  It's a Mark
10        Owen e-mail address.
11    A   Right.
12    Q   And it's to Jonathan Leven, L-E-V-A-N {VERBATIM}.
13        And it says, Jonathan, please pass the word that
14        this is my new e-mail address and name.  Mark Owen.
15        It has a phone number.  And then it has the Mark
16        Owen Gmail account e-mail address.  And then it
17        says, Thanks, buddy.  And you can delete all old
18        info for me.
19              A few questions about this e-mail.  First, who
20        is Jonathan Leven?
21    A   The name's not -- I didn't deal with him a lot so
22        the name's not ringing a bell.  Is he tied in
23        with --
24    Q   Kathryn Bigelow?
25    A   I was going to say Bigelow or --
```

Page 112

```
 1    Q   Mark Boal?
 2    A   No, no, the agent.  Is he -- well, one of the two.
 3        Could be assistant for -- you mentioned his name
 4        earlier.  He's --
 5    Q   Howard Sanders?
 6    A   Yes.  Is he tied in with Sanders or is he tied in
 7        with Boal?  I don't know.  Could have been either.
 8    Q   Well, you're referring to him as a buddy, so I can
 9        only assume that you know him better than I would.
10    A   I refer to everybody as buddy.
11    Q   All right.  Well, you also refer in this e-mail
12        that you can delete all the old info for him -- for
13        you, that he should delete it.  So what old
14        information are you referring to?
15    A   I'm guessing my old e-mail address.
16    Q   Okay.  And why would you have been in contact with
17        Mr. Leven?  And let's assume for a moment that he's
18        not military and he's involved to some degree with
19        media.  Why were you in touch with him?
20    A   I don't know.  Could -- do we know if Leven was
21        tied in with Bigelow or Leven was tied in with --
22        his name keeps escaping me -- the agent that Elyse
23        introduced me to.
24    Q   Howard Sanders?
25    A   Howie, Howie.
```

Page 113

1  Q  Well, I think we're going to get to it.  I just
2     want to right now probe what you know.
3  A  Okay.
4  Q  So do you have any recollection as to who Jonathan
5     Leven is?
6  A  It was one -- he worked for one of the two.
7  Q  Okay.
8         (Exhibit 6 was marked for identification.)
9  Q  I'm referring to, Mr. Bissonnette, to what's been
10    marked Exhibit No. 6.
11 A  Okay.
12 Q  On December 24, now really close to Christmas Eve
13    on December 24 at 9-- I'm sorry.  I take it back.
14    It was in the morning of Christmas Eve.  You wrote
15    to Ben Sevier, Elyse Cheney, and Howard Sanders at
16    United Talent stating that, This will be my new
17    e-mail address.  Do you see that?
18 A  Yeah.
19 Q  Now, had you been corresponding with those three
20    people before that date?
21 A  I mean, I must have because I -- they had a
22    previous e-mail address for me, I'm guessing.
23 Q  And what would be the purpose of -- what would have
24    been the purpose of contacting Howard Sanders at
25    United Talent?

Page 114

1  A  Elyse was a literary agent.  She had worked with
2     Howie before.  Howie was the guy who took literary
3     works and represented turning them into movies, TV
4     shows, and that type of stuff.
5  Q  Was it your plan as of December 24 to upload your
6     project -- not just simply to write a book but also
7     to make a movie?
8  A  I wouldn't say it was a plan, but I absolutely was
9     going to explore other options.  And if Elyse was
10    introducing me to somebody else, I was going to
11    meet them and get to know them.
12 Q  And what were you trying to explore at that point?
13    I just want to understand what your ideas were.
14 A  I didn't know what I didn't know.  I had been in
15    the military for 14 years.  I didn't know how any
16    of this worked.  So if Elyse is somebody I'm
17    involved with as saying, Hey, here's a guy you
18    should meet, okay.  I'll get to know him.
19 Q  Okay.  But he's a guy that helps authors turn their
20    books into film.
21 A  Yeah.
22 Q  You understand that; right?
23 A  Yeah.
24 Q  Elyse Cheney told you that; right?
25 A  Yes.

Page 115

1  Q  And you wanted to keep contact with that person;
2     correct?
3  A  Sure.
4  Q  So you gave him a new e-mail address with your
5     pseudonym; correct?
6  A  Right.  And it was very important to me to not be
7     using my real name.  And so as this continued,
8     okay, I was going to switch everything over to
9     my -- to, you know, my pseudonym e-mail.
10 Q  Why didn't you want to use your real name?
11 A  Because from the beginning in this project, I
12    haven't wanted to take any personal credit for it.
13 Q  Was there any concern about disclosure of your real
14    name?
15 A  Sure, of course.  Security issues, you name it.
16 Q  Now, at that point in time, at least in your mind,
17    you didn't have the nuts and bolts, but you were at
18    least formulating ideas about a book and a movie;
19    correct?
20 A  I would say so.
21 Q  And formulating ideas about a book and a movie that
22    related to Operation Neptune Spear.  Is that safe
23    to say?
24 A  At least the book.  Movie, I don't know
25    specifically.

Page 116

1  Q  At that point in time, you knew that Ms. X had
2     authority to speak with Kathryn Bigelow and Mark
3     Boal; correct?
4  A  I don't know where that fell in, but yeah, I knew
5     she was authorized to -- yeah.  It would have been
6     before this that she had had authorization to sit
7     down with them.
8  Q  Did you consider seeking that same authority --
9  A  No.
10 Q  -- in December of 2011?
11 A  No.
12 Q  Why not?
13 A  That was from Panetta directly to her.  I don't
14    have direct ties to Panetta at all.
15 Q  Would it only have been through Panetta that you
16    could have gotten the authority to at that point in
17    time in December of 2011 to write a book or perhaps
18    make a movie about Operation Neptune Spear?
19 A  I didn't understand all of the technicalities of
20    what needed to happen to get there.  So I think we
21    slowly kind of figured that out through the
22    process.  But to say I knew what was -- yeah.
23 Q  Now, in your discussion with Elyse Cheney, I'm
24    presuming it took place at some point in
25    December 2011; right?  Is that a safe assumption?

Page 117

1  A  Yes.
2  Q  And did a meeting also take place with Ben Sevier
3     around that time?
4  A  I'm guessing so, yeah.
5  Q  How long did that meeting take place?
6  A  No idea.
7  Q  Where did it take place?
8  A  In New York.
9  Q  Well, New York's a big place.  Dutton?  Elyse
10    Cheney?
11 A  It would have been Elyse's office.  I didn't go
12    into Dutton until much later.
13 Q  And was Ben Sevier at Elyse's office?
14 A  Not the first time we met.
15 Q  Just trying to follow you here.  Did you meet with
16    Ben Sevier in December 2011?
17 A  I think so, but I -- exact dates, no.  And it
18    wasn't the trip that I went up there and met Elyse.
19 Q  Okay.  So there was two trips to New York in
20    December of 2011?
21 A  I don't remember.
22 Q  Well, is there a way for you to find that out, for
23    example, your -- how did you pay for those trips?
24    Is there any credit card?
25 A  My ex-wife would have handled all that.  I don't

Page 118

1     know.  I'm sure.  There's got to be some way.  I
2     don't know.
3  Q  If I leave a space in the transcript, if it's
4     possible for you to fill that out, whether it was
5     one trip or two trips to New York in 2011.
6  A  Okay.
7  Q  The meeting where Ben Sevier was present, was it in
8     his office at Penguin or was it at Elizabeth
9     Cheney -- Elyse Cheney's office?
10 A  I'm guessing it was at Elyse Cheney's office.  It
11    wouldn't have been at Dutton.
12 Q  And Elyse Cheney's office is lower Fifth Avenue?
13    Do you know the location?
14 A  I'd have to look it up.
15 Q  Okay.  And in the meeting with Elyse Cheney, did
16    you describe Operation Neptune Spear to her?
17 A  In minor detail, yeah.
18 Q  Okay.  And did you ask for permission -- let me
19    just take it back.
20       First, Elyse Cheney has no security clearance;
21    correct?
22 A  Correct.
23 Q  And she's not a lawyer; correct?
24 A  No, not that I know of.
25 Q  So your communication with her to the best of your

Page 119

1     knowledge wasn't protected by any kind of privilege
2     that you're aware of; right?
3  A  Right.
4  Q  And so if she wanted to talk to anyone else about
5     her conversation with you, she was at liberty to do
6     that.  There's no -- to the best of your knowledge;
7     right?
8  A  Say the question again.
9  Q  Well, let me ask you a different way.  Did she sign
10    an agreement with you to keep the information you
11    told her about Operation Neptune Spear secret or
12    confidential?
13 A  I don't know, but she might have because I know we
14    made Kevin Maurer sign some sort of agreement that
15    he wasn't going to run around and say anything.  I
16    believe so.  And I don't remember all the details
17    of it, but I -- I know that we tried to keep it
18    somewhat controlled of who could say what and who
19    knew what.
20 Q  Did you tell anyone in the military or the CIA or
21    anyone in the government that you were discussing
22    aspects of Operation Neptune Spear to a literary
23    agent in December 2011?
24 A  No.
25 Q  Did you think that was wrong?

Page 120

1  A  No.
2  Q  Did you think it was right?
3  A  I didn't think it was wrong.
4  Q  Well, I'm asking you, do you think it was right?
5  A  Yeah.
6  Q  And why?
7  A  Because we didn't get into any type of crazy
8     details.
9  Q  Was it because --
10 A  I wasn't discussing technology.  I wasn't
11    discussing tactics, techniques, or procedures.  I
12    was merely regurgitating big picture facts of what
13    pretty much everybody already knew.  I mean, there
14    was multiple articles that had already been written
15    and the big picture, who went where, what, and how
16    was already out.  So I wasn't speaking in any
17    deeper detail than that and certainly getting into
18    any of the what I would consider specific
19    classified things.
20 Q  Did you tell your boss that you were meeting with
21    Elyse Cheney?
22 A  Nope.
23 Q  Did you tell any of your colleagues at DEVGRU?
24 A  No.
25 Q  Why didn't you tell them?

Page 121

1  A  I didn't want to.
2  Q  Why not?
3  A  In the SEAL community, in the spec ops communities,
4     there's folks who don't like people who write
5     books.  I was a kid who grew up reading books, and
6     that's why I joined the military.  Some people
7     don't see it that way.  They say, Hey, if you write
8     a book, you're persona non grata.  You shouldn't be
9     part of the club.  I didn't want to have to deal
10    with that.
11 Q  So you had a concern when you met with Elyse Cheney
12    that if the word got out to at least the special
13    operations community, that you may be PNG'ed, which
14    is persona non grata.  Was that a concern of yours?
15 A  When I met Elyse Cheney?
16 Q  Yeah.
17 A  Not necessarily when I met Elyse Cheney that I
18    would be PNG'ed, no.
19 Q  Did you think that you would have been PNG'ed if
20    word had gotten out that you were contemplating
21    writing a book?
22 A  No.  I was much more worried about that when the
23    book actually itself came out.
24 Q  Now, during this meeting with Elyse Cheney, what
25    was your objective?

Page 122

1  A  Learn of what the publishing process is.  How does
2     it work?  What does it -- I've never done anything
3     remotely like it before in my life.  So give me a
4     brief rundown.  How does this work?
5  Q  And what were you telling her about what
6     information you had that would be worthy of a book?
7  A  That I was on the raid and, hey, I was curious.
8     What does this look like?  How does this process
9     work?
10 Q  Well, did you understand that the fact that you
11    were on the raid in and of itself was something
12    that was of public interest?  Did you believe that?
13 A  That I was -- public interest that I was on the
14    raid?
15 Q  Yeah.  The information that you had, being a
16    firsthand operator on the raid to capture the most
17    wanted man in the world, did you think that that
18    was of public interest?
19 A  Sure.
20 Q  And did you think that Elyse Cheney thought that
21    would be public interest?
22 A  I think so.
23 Q  And did you think that that topic was worthy of a
24    book that would sell a lot of books?
25 A  Sure.

Page 123

1  Q  And were you interested in trying to pursue that as
2     an objective?
3  A  In that meeting?  No.
4  Q  Then what was your objective?
5  A  In the meeting was to figure out how this process
6     worked.  Right.  Due to my -- what does it take?
7     How does this process work?  I don't think I had
8     even talked to my ex-wife yet.
9  Q  What information about Operation Neptune Spear did
10    you tell Elyse Cheney?
11 A  Very little because it wasn't about that.  It was
12    more of -- I was trying to get information out of
13    her, not her information out of me.
14 Q  Well, what did you tell her?
15 A  That I was on the mission.  I was on the helo that
16    crashed, big picture stuff like that.
17 Q  What else?
18 A  I can't recall every detail.
19 Q  And other than the helo crash, the fact that you
20    were on the raid itself, what else did you tell
21    Elyse Cheney during that first meeting?
22 A  I don't remember specifics.  I'm sure we would have
23    talked through the basic flow, who I was, proof
24    that I was there, that I'm not lying to her.  But
25    again, the first meeting was not about me

Page 124

1     regurgitating all these great stories to tell this
2     literary agent that I had just met.  The first
3     meeting was for me to get to know her and figure
4     out, okay, how does this work?  What does this look
5     like?  I need to understand that process.
6  Q  And we'll take a break in a second.  I just have a
7     follow-up question.  What information did you give
8     her to prove to her that you were not lying?
9  A  As much as I could give her that she could vet.
10 Q  Like what?
11 A  Well, there isn't much.  What do I say to a
12    literary agent that sits in New York City and has
13    no real way of vetting my stories?
14 Q  Well, how could you -- how else would -- how did
15    you to the best of your knowledge establish that
16    you were who you were?
17 A  I don't remember that I ever had to do anything big
18    for Elyse Cheney specifically.  I know Mr. Podlaski
19    had asked about vetting me out.  I know when I did
20    60 Minutes, they had to vet me out.  And I think
21    the only way I was able to do -- maybe I showed
22    Elyse.  I have a photo of me meeting the President,
23    getting an award.  I think that was probably the
24    best proof that I had.
25       MR. FURMAN:  Okay.  All right.  So we're at

Page 125

1      ten after 12 so we'll be reconvene at 12:40.
2              RANDAL JOHNSTON:  Okay.
3              (The deposition recessed from 12:12 p.m. to
4      12:47 p.m. for lunch.)
5              (Exhibit 7 was marked for identification.)
6   Q  Mr. Bissonnette, this has been marked as Exhibit
7      No. 7.  It's an e-mail dated January 2 of 2012.
8      It's from you to Elyse Cheney and Ben Sevier.  And
9      it -- the title is, Author selection.  And in the
10     second paragraph of the e-mail, it states, I've
11     started doing an outline from Alaska to present day
12     so I hope it will jar my memory when talking
13     about -- or talking with the writer.
14             The reason I'm asking you to read that e-mail
15     and I draw your attention to that particular
16     sentence is that I wanted to know when you first
17     started putting pen to paper on No Easy Day.
18  A  I'd say somewhere right around in here.
19  Q  Well, January 2 is the Monday after New Year's Eve
20     so when do you -- physically, when did you start
21     actually start putting pen to paper on what became
22     No Easy Day?
23  A  I couldn't tell you the exact dates.
24  Q  What was the process?  Did you use a computer,
25     notes, postcards?  How did you --

Page 126

1   A  Computer.  And honestly, I might have said this,
2      but I probably didn't do any of the real writing
3      until I met with Kevin.
4   Q  And in terms of an outline -- well, let me just
5      back up.  Are you saying that's not true, that you
6      didn't start an outline on January 2?
7   A  I don't remember specifically working on an
8      outline, no.
9              RANDAL JOHNSTON:  Can I interrupt you just for
10     a second?
11             MR. FURMAN:  Sure.
12             RANDAL JOHNSTON:  Should have done this before
13     we got started with the questions, but just so
14     we're clear on the record, when you are -- so far,
15     all of the e-mails I have seen have on the subject
16     line an addition, Aid4Mail Trial Tag and a number.
17     My assumption is your firm has added that as a part
18     of indexing.  That wasn't a part of the original
19     e-mail.
20             MR. FURMAN:  Yeah.
21             RANDAL JOHNSTON:  Do you know?
22             MR. FURMAN:  You know, actually, that's a good
23     point, Randy.  I don't know the answer to that.  I
24     do know that that appears in all of the subject
25     lines.  And I also note that at the very top of all

Page 127

1      the exhibits, it has one of our legal assistant's
2      names, Julia.
3              RANDAL JOHNSTON:  Right.
4              MR. FURMAN:  And the way that these documents
5      were produced to us, they were produced on a
6      platform that it would only allow us to print them
7      off using Microsoft Outlook.  And I think that
8      Microsoft Outlook includes the printer's name,
9      Julia, in this instance.  And also --
10             COTY JOHNSTON:  It's a PST file.
11             MR. FURMAN:  Yeah.  And that must be -- you're
12     talking language I really don't understand.
13             RANDAL JOHNSTON:  You act like you know what
14     he just said.
15             MR. FURMAN:  Yeah.  I just nodded, but I just
16     admitted my -- I don't know anything of what you
17     just said.  But that must be what happened.  But
18     that's not, you know -- you want to put that on the
19     record?
20             RANDAL JOHNSTON:  Yeah.  I just -- if and when
21     we're talking about them in front of the jury, I
22     mean, you've shown him documents and asked him
23     about them, and I believe those -- the Julia
24     Bienenstein obviously and I think also the addition
25     on the subject line of the trial tag number has

Page 128

1      been added as a part of our production of documents
2      and is not a part of the original e-mails.
3              MR. FURMAN:  I think that's correct.  And what
4      we could do at trial is we could blank out Julia's
5      name and we could blank out that addition on the
6      subject line and --
7              RANDAL JOHNSTON:  I'm fine with that.
8              MR. FURMAN:  And I think that would make
9      sense.
10  BY MR. FURMAN:
11  Q  So Mr. Bissonnette, going back to the question I
12     was asking about, this January 2, 2012, e-mail, the
13     outline that you were referring to, do you believe
14     that was already in place on January 2 or you
15     believe it was not?
16  A  No.  I believe I was just starting to do some sort
17     of soul searching and reflecting back on Alaska to
18     present and hopefully that would prep me for moving
19     forward.
20  Q  Okay.  Then next is January 2 also.
21             (Exhibit 8 was marked for identification.)
22  Q  Exhibit No. 8 is an e-mail, again, a chain that
23     ends on January 2, 2012.  I want to draw your
24     attention to the middle of this document, the first
25     page of this document.  It's an e-mail from Mark

Page 129

1    Boal, who is a Hollywood producer.  The subject is,
2    ZDT, which I believe is Zero Dark Thirty, dash,
3    technical advisor.  And it's to an e-mail address
4    for Red Frog.  Do you see that?
5  A  Yep.
6  Q  Is Red Frog you?
7  A  Yes.
8  Q  Okay.  And what was the purpose of the Red Frog
9    e-mail address?
10  A  It's just another e-mail account that I use.
11  Q  Mark Boal in this e-mail was sending you a contract
12    that presumably was to serve as a technical advisor
13    on the film that became Zero Dark Thirty.  Is that
14    accurate?
15  A  Yes.
16  Q  And in that e-mail, Mr. Boal is -- states, New
17    contract.  It clarifies you are clear to write a
18    book.  Do you see that line?
19  A  Say that again.  I'm sorry.  I coughed right when
20    you were talking.
21  Q  That's okay.  I'm referring now to the Mark Boal
22    e-mail dated January 2, 2012 --
23  A  Okay.
24  Q  -- at 5:35 p.m --
25  A  Yes.

Page 130

1  Q  -- to you at Red Frog.  And the e-mail states,
2    quote, New contract.  It clarifies you are clear to
3    write a book, parentheses, the old didn't prohibit
4    it, comma, it turns out, comma, but this makes it
5    clear and explicit, closed parentheses.
6  A  Right.
7  Q  Couple questions about that.  First, what is
8    Mr. Boal referencing when he states, It clarifies
9    you are clear to write a book?
10  A  I believe the old contract -- the initial one they
11    sent me had some sort of verbiage in there that
12    said -- that limited my ability to go out and write
13    a book outside of helping them as a tech advisor.
14    And that was something we wanted changed.
15  Q  When did Mr. Boal approach you to be a tech advisor
16    on Zero Dark Thirty?
17  A  When?
18  Q  Yeah.
19  A  I don't remember the exact date.  It would have
20    been after I was introduced to him through Mrs. Z
21    or whatever -- X, whatever we're calling her.
22  Q  And it presumably was sometime in 2011?
23  A  Yes.
24  Q  Now, the attached deal memoranda that was sent
25    over, the top of it says, As of December 2011.  Do

Page 131

1    you see that?
2  A  Yes, sir.
3  Q  Did you go over this contract with anyone other
4    than yourself?
5  A  Yeah.  I would have probably sent it to Elyse and
6    probably Richard Heller.
7  Q  Was Richard Heller your lawyer?
8  A  I would assume so, yes.
9  Q  Did you retain Richard to represent you?
10  A  As far as I know, yeah.
11  Q  When did you retain Richard?
12  A  No clue.
13  Q  Richard is with a law firm called Frankfurt Kurnit.
14       MR. FURMAN:  That's Frankfurt like a
15    Frankfurter and Kurnit is K-U-R-N-I-T.
16  Q  He's a lawyer in New York; correct?
17  A  Yes, sir.
18  Q  Who introduced you to Richard Heller?
19  A  I believe Elyse.
20  Q  And did you sign a retainer with Mr. Heller?
21  A  I think so.  I'm not sure.  I assume so.
22  Q  Did you pay him a retainer or any legal fees?
23  A  Yeah, I'm sure I did.
24  Q  Do you know when you started paying him?
25  A  I would guess January time frame going forward.  I

Page 132

1    don't know.
2  Q  What was Mr. Heller's role?
3  A  He helped with the -- I had him look over the EA
4    Sports stuff.  He helped with -- I'm assuming he
5    looked at this as well.  I don't remember exactly,
6    but I'm guessing he did.  Yeah, he focused on this
7    type of business-type stuff.
8  Q  And when did he look over the EA material?
9  A  Multiple times throughout that whole -- the whole
10    process of working with EA.
11  Q  And when did that start?
12  A  I don't remember exact dates.
13  Q  Do you remember what year it started?
14  A  2012.
15       MR. FURMAN:  I'm going to call for -- at the
16    end of the transcript, we'll have a list of these
17    things that I call for the production of, but I'd
18    call for the production of the retainer agreement
19    with Mr. Heller.
20  Q  Did you tell Mr. Boal that you had an attorney
21    representing you at the time that you were
22    negotiating a contract as a technical advisor on
23    Zero Dark Thirty?
24  A  I don't recall if I ever told him that or not.
25  Q  Now, on that same day, you forwarded Mark Boal's

Page 133

1    e-mail and the attachment of the new contract over
2    to Elyse Cheney.  And in your e-mail to Elyse
3    Cheney, you wrote, quote, New contract, exclamation
4    point.  You can see what they pulled from the old
5    one and all the new verbiage.  I'm trying to get
6    ahold of Howie so he can look it over before I
7    sign.  And then you have your initial, M.  Who is
8    Howie?
9  A  Howie Sanders at UTA.
10  Q  Why were you asking Howie to review that?
11  A  This was a space that I felt that he had dealt
12    with; books, movies, that business.  And so I --
13    yeah.  I figured he would be somebody who could
14    help me look over this.
15  Q  Now, in your discussions with Mark Boal, which was
16    at some point in 2011 originally --
17  A  Right.
18  Q  -- to be as a technical advisor on Zero Dark
19    Thirty.  Did you discuss with Mr. Boal any
20    requirement that you get clearance from your
21    employers and from the government before you can
22    serve as an advisor?
23  A  No, not that I remember.
24  Q  Was that a concern of yours?
25  A  Tech advising, no.  Quite honestly, there's tons of

Page 134

1    SEALs in Hollywood acting as tech advisors.  When I
2    pulled off of this project, another SEAL Team 6
3    friend of mine acted as the tech advisor for the
4    movie and he was from Team 6.  So no, that wasn't
5    a...
6  Q  So that was not a concern?
7  A  No.
8         (Exhibit 9 was marked for identification.)
9  Q  Mr. Bissonnette, I'm showing you an e-mail that is
10    between Ben Sevier and Elyse Cheney on January 3 of
11    2012.  In this e-mail, which you were not copied
12    on, there's a discussion of what's referred to in
13    the first line as an intensive five-month writing
14    schedule.  Do you see that in the first line?
15  A  Yes, sir.
16  Q  Were you aware that as early as January 3 of 2012,
17    there was a discussion of having a five-month
18    writing schedule to complete No Easy Day?
19  A  I don't know what day I was made aware of the
20    timeline restrictions, but I know we definitely
21    talked about it.
22  Q  What was motivating the timeline restrictions?
23  A  To try and get a book out as early as possible.
24  Q  And why?  Why was it important to get a book out as
25    early as possible?

Page 135

1  A  Because it would be a great book, be the first one
2    out.  It would be -- yeah.  We just wanted to --
3    Ben wanted it out as soon as possible so, okay,
4    we're going to do everything we could to get it
5    out.
6  Q  And when you say "first one out," I'm not sure what
7    you mean.  What are you referring to?
8  A  We wanted to -- we wanted to have the manuscript
9    published as soon as possible to make it the best
10    selling book that we could make it.
11  Q  But when you said "first one out," are you saying
12    that you wanted to be the first one to be able to
13    have a firsthand account of the Operation Neptune
14    Spear?
15  A  No.  We wanted to have the best product we could
16    out as quickly as we could.  Now, what that meant
17    in the business side of things, there was a -- more
18    up to Ben.  He wanted it as soon as he could.
19    Right.  So okay.  Sure.  We'll see what we can do.
20  Q  Were you aware of any other operators that
21    participated in Operation Neptune Spear who were
22    considering writing books?
23  A  Not that I know of.
24  Q  Did you tell anyone in SEAL Team 6 that you were
25    considering writing a book that would be a

Page 136

1    firsthand account of Operation Neptune Spear?
2  A  No.
3  Q  And why didn't you?
4  A  As we covered earlier, I didn't want -- I didn't
5    want to have to deal with the backlash from folks
6    who didn't like the idea of SEALs writing books.
7  Q  What would the backlash consist of in your mind?
8  A  I had seen -- I had seen different SEALs write
9    books in the past that were ostracized for writing
10    books; yet, I had seen other books supported by
11    other SEALs and not ostracized.  It's -- the
12    community -- the community's an interesting one.
13    Right.  Some people don't -- just don't like folks
14    that write and talk about their experiences.
15  Q  Were you concerned that a book written about
16    Operation Neptune Spear would cause you to be
17    ostracized?
18  A  A little bit.
19  Q  Why?
20  A  Because there's some people out there that wouldn't
21    like any SEAL writing a book, period, about
22    anything.
23  Q  Was there anything about Operation Neptune Spear in
24    particular that made you concerned that you would
25    be ostracized within the SEAL community?

Page 137

1   A   No.

2   　　　　(Exhibit 10 was marked for identification.)

3   Q   Now, Exhibit 10 is an e-mail exchange between you

4   　　 and Mark Boal where in substance you are basically

5   　　 telling Mark Boal and Kathryn Bigelow that you're

6   　　 not going to be participating as a technical

7   　　 advisor on Zero Dark Thirty.  Do you see that?

8   A   Yes.

9   Q   Why did you decide not to participate as a

10  　　 technical advisor?

11  A   I think I had seen the political back and forth of

12  　　 access and the idea of the story, and I just

13  　　 decided, hey, look, if I'm going to move forward

14  　　 with writing a book, then I don't think I need to

15  　　 be connected over here with helping on the movie as

16  　　 well.  I think it's kind of one or the other.  I

17  　　 don't need to do both.

18  Q   Was it your understanding that the movie was being

19  　　 made with the authority of the Obama

20  　　 Administration?

21  A   I would say, yeah, I -- I felt that way.

22  Q   And was it your belief or at least your feeling

23  　　 that Zero Dark Thirty, the movie, was a vehicle for

24  　　 the Obama Administration to use in the upcoming

25  　　 election 2012?

Page 138

1   A   I'm sure that would have been a thought that

2   　　 crossed my mind.

3   Q   When did that thought cross your mind?

4   A   I have no idea.

5   Q   In the book No Easy Day, you referred to not being

6   　　 a fan of President Obama.  Is that fair to say?

7   A   Sure.

8   Q   And were you not a fan of his in May of 2011,

9   　　 around the time of --

10  A   I've never been a huge fan of his.

11  Q   Okay.  And was it your understanding now, fast

12  　　 forwarding to January 8, 2012, that working with

13  　　 Mark Boal and Kathryn Bigelow would have been

14  　　 essentially supporting the Obama Administration's

15  　　 publicity in the run-up to the election in 2012?

16  A   I didn't see it that way.  I just saw it as

17  　　 something I didn't want to be involved with

18  　　 anymore.

19  Q   Now, I asked you earlier about Jonathan Leven --

20  　　 and referring you to Exhibit 5.  And it was a

21  　　 December 24 e-mail where you asked Mr. Leven to

22  　　 delete prior information.  Now, I want you to take

23  　　 a look at Exhibit No. 10.  And you'll see that the

24  　　 e-mail exchange on January 8, 2012, between

25  　　 yourself and Mark Owen also included a carbon copy

Page 139

1   　　 to Mr. Leven.

2   A   Okay.  I knew it was somebody's assistant.

3   Q   Okay.  So does that refresh your recollection as to

4   　　 who Mr. Leven is?

5   A   He was one of Mark's assistants.

6   Q   Okay.  And in that prior e-mail back in December of

7   　　 2011 when you asked Mr. Leven to delete the old

8   　　 information about you, is that how you corresponded

9   　　 with Mark Boal, through Mr. Leven?

10  A   I think maybe just initially.

11  Q   And have you spoken to Mr. Leven at any point in

12  　　 time since 2012?

13  A   No.

14  Q   Do you know where he is?

15  A   No clue.

16  Q   Now, in the e-mail from Mark Boal, that was after

17  　　 he received the news from you at 6:00 p.m. or

18  　　 6:16 p.m. on Sunday, January 8, he writes, quote,

19  　　 That is disappointing.  Keep me abreast of what you

20  　　 hear.  And in the fullness of time, I hope and

21  　　 expect that this will seem like a blip on the

22  　　 screen.  I happen to know for a fact that we are

23  　　 supported within DoD.

24  　　 　　Do you know what he is referring to there when

25  　　 he says that he knows that Zero Dark Thirty is

Page 140

1   　　 supported by -- or supported within DoD?

2   A   Other than what he had said of having full support

3   　　 within the DoD.  Now, what did that mean?  He

4   　　 didn't describe it.  But I took that as somebody

5   　　 somewhere in the DoD system had blessed.

6   Q   Blessed the movie with the details about the

7   　　 operation itself?

8   A   I don't know.

9   Q   Okay.

10  A   I'm -- that's my assumption.

11  Q   Now, you wrote a fairly long e-mail to Mark and to

12  　　 Kathryn Bigelow on Sunday, January 8.  And that was

13  　　 roughly 6:00 p.m. on that day, 1800 hours on that

14  　　 day.  In your e-mail -- and I'm referring now to

15  　　 the third sentence in your first paragraph -- it

16  　　 states, quote, No matter how quiet we keep this or

17  　　 whether they are only looking for senior people

18  　　 within the agency and DoD, if word ever got out,

19  　　 parentheses, I'm convinced it would have -- it

20  　　 eventually would, closed parentheses, I will be

21  　　 held accountable.  Do you see that?

22  A   Yep.

23  Q   What do you mean by being held accountable?  I'm

24  　　 not sure if I understand.

25  A   That they would know I was tied in with helping out

Page 141

1  the movie, and I didn't want to have to deal with
2  any of it.
3  Q  Well, what would "it" be when you say "deal with
4  any of it"?
5  A  Public judgment.  You name it.
6  Q  Now, you used the word "accountable."  In what
7  sense would you be held accountable?
8  A  They'd say publicly, Hey, you know, Matt
9  Bissonnette helped out on this movie, you know,
10  connecting me to the movie.
11  Q  And why would you be held accountable for that?
12  You mentioned earlier that other SEALs had advised
13  on films.
14  A  Right.  I --
15  Q  Why is this different?
16  A  I just simply didn't want to be attached to it.  I
17  wanted to focus on the book and not the movie.
18  Q  But is there anything about accountability that
19  made you write those words?  In other words,
20  accountable to whom?
21  A  Well, nothing special, just that -- I didn't want
22  to be associated with the movie.
23  Q  Were you concerned about the fact that being
24  involved with the movie at that point, you would be
25  held accountable for releasing information that

Page 142

1  otherwise should not be disclosed?
2  A  Repeat that one more time.
3  MR. FURMAN:  Can you read that back?  Thank
4  you.
5  (The requested material was read back by the
6  reporter.)
7  A  No.
8  Q  Now, in the next sentence, you wrote, We all know
9  that none of us have done anything wrong and you
10  both have completely respected that any, quote,
11  classification, closed quote, issues in the court
12  of public opinion, we would all be guilty.  Can you
13  explain what that means?
14  A  That means the court of public opinion can go any
15  number of ways.  And I simply didn't want to be
16  attached to the film because any number of people
17  could read into it any number of ways.  And I
18  simply wanted to distance myself from it.
19  Q  And in what ways would it be read negatively?
20  A  I don't know.  That's up to whoever reads it
21  negatively.
22  Q  Well, but you said it can go any number of ways,
23  and I don't understand what you mean.
24  A  Right.  I can think it's just fine because I know
25  I'm not sharing anything in depth and truly

Page 143

1  classified where other people might say, Well, no,
2  we're going to nitpick you and say this portion is
3  classified.  This portion is classified.  And it
4  goes into the court of public opinion.  And I
5  simply wanted to remove myself from that to avoid
6  that nitpicking.
7  Q  Now, if there was a concern and you were to go
8  forward and be a technical advisor, to resolve that
9  concern, wouldn't one way to do that would be to
10  ask your commanders at the Department of Defense or
11  the CIA for permission?
12  A  I'm sure there's many ways you can do that.  I
13  chose to simply remove myself from the equation.
14  As I said earlier, other SEALs took that position
15  with my exact same background, exact same
16  everything, and nobody said a word about it.  I
17  wanted to avoid the fact that I was on the raid and
18  also helping out with the movie.  So I separated
19  myself from it.
20  Q  Now, in the second paragraph of this e-mail, you
21  offered an alternative.  Do you see that?
22  A  Yep.
23  Q  And in the alternative, you mentioned other friends
24  that operate a small movie consulting business.
25  And then you put in parentheses, They have me on

Page 144

1  speed dial if there are any questions, and then you
2  put in all caps, wink, wink.  Were you meaning that
3  if they, meaning Mark and Kathryn, really needed
4  information, that they could go through your
5  friends and then they could contact you and you
6  could relay the information?
7  A  I don't know what I meant by that other than, hey,
8  if they had some questions, I could help out.
9  Q  Well --
10  A  I might be able to help provide them some
11  background to help them get their job done.
12  Q  What does wink, wink mean other than it means what
13  it means?
14  A  Hey, if they had some additional questions, they
15  could contact me.
16  Q  Okay.  And so that what you were essentially saying
17  is that I'm going to disassociate from Zero Dark
18  Thirty --
19  A  Right.
20  Q  -- but through my friends, you could still get
21  ahold of me.  Basically you're saying that?
22  A  That they could ask -- that my friends could ask me
23  questions and if I could help provide some
24  background and any type of loose help, I'd love to.
25  Q  And that was the wink, wink connotation that you

Page 145

1   referenced in your e-mail?
2 A I'm not going to read into what I meant by wink,
3   wink.  I don't know what I was thinking at the time
4   that I wrote that.  But what I would say is they
5   had the ability to contact me if they had follow-on
6   questions that I could help out with.
7 Q Well, the reason that I'm asking you about that --
8 A Okay.
9 Q -- is because I can't read into it, but I'm asking
10   the person who wrote, Wink, wink --
11 A Right.
12 Q -- what he meant.  So what did you mean?
13 A I don't know.
14       RANDAL JOHNSTON:  Objection; asked and
15   answered.
16 Q You don't know what you meant?
17 A No.
18 Q You also wrote, I'd also be willing -- and it's --
19   quote, I'd also be willing to entertain the
20   possibility of coming over in May after I'm
21   completely separated from the Navy if you needed
22   some help with the last portion of the movie,
23   period, closed quote.  Do you see that?
24 A Yeah.
25 Q What did you mean by that?

Page 146

1 A A lot of the work they wanted me to do was right
2   away and be leaving the area, going over to help
3   with the movie, wherever they were filming it.  And
4   I didn't -- again, didn't want to do that.  And so
5   I guess my thought here was -- is, hey, down the
6   road, if there's something else and the situation
7   and terrain changes, then if there's a chance to be
8   involved and we can do it the right way, I'd love
9   to be involved.
10 Q And doing it the right way, what do you mean by
11   that?
12 A If we could do it in a way that made everybody feel
13   comfortable and the way that we could do every --
14   that everybody felt comfortable.
15 Q Who's everybody that --
16 A I didn't feel comfortable at that point so, again,
17   why I chose to back away from it.
18 Q Now, in January, you had already announced your
19   retirement, and essentially you were on terminal
20   leave so you were basically on vacation time;
21   right?
22 A Yep.
23 Q And your time is yours; right?
24 A Yep.
25 Q So if you wanted to go to Hollywood, no one could

Page 147

1   stop you; right?
2 A Right.
3 Q You wanted to go to New York, no one could stop
4   you?
5 A Right.
6 Q But you referenced in your e-mail that you wanted
7   to wait until you were completely separated from
8   the Navy.  Do you see that?
9 A Yep.
10 Q And you wrote those words; right?
11 A Yep.
12 Q Is the significance that you were prohibited from
13   being an advisor or were concerned about being
14   prohibited from being an advisor until you were
15   fully separated from the Navy?
16 A No.  I just simply didn't want to be involved until
17   I had no strings attached in any way whatsoever.
18   Down the road, hey, look, tons of former SEALs work
19   in Hollywood.  Tons of former SEALs work in all
20   sorts of different industries to include consulting
21   on action movies.  So hey, if down the road there
22   was a chance for me to get involved, I'd love to.
23   But I simply did not want to do that right now.
24 Q So it's fair to say that at that time on January 8,
25   up until tentatively June 18 or --

Page 148

1 A 28th.
2 Q June 28 of 2012, you were not a former SEAL;
3   correct?
4 A You can consider it whatever you want.
5 Q I'm asking you.
6 A Did I -- I don't consider myself a former SEAL now.
7   Right.  Once a Marine, always a Marine.  I was a
8   SEAL.  I am a SEAL.
9 Q You mentioned plenty of former SEALs -- that is
10   your word --
11 A Okay.
12 Q -- are working in Hollywood.  Why did you use the
13   term "former SEAL" when referring to other people?
14 A I don't know.
15 Q But here, up and through June 28 of 2012, although
16   you were still -- you were on terminal leave, you
17   were still in the military; correct?
18 A On terminal leave, yes.
19 Q Now, on the last sentence of that paragraph, you
20   wrote, quote, Also, any business would be going
21   through my friend's company so it wouldn't have any
22   direct ties to me, closed quote.  Do you see that?
23 A Yep.
24 Q So there was a concern on your part that there be
25   no ties to you.

Page 149

1  A  Again, with the security concerns and everything I
2     was dealing with, I didn't want my name out there.
3     I certainly didn't want my business out there.  I
4     wanted to remain as hands off as possible for my
5     security concerns.
6  Q  So it was only security concerns that were driving
7     you at that point?
8  A  They drove a lot of my decisions.
9  Q  Was there anything else that was driving your
10    decisions at that point in terms of waiting until
11    May before potentially being directly involved with
12    Zero Dark Thirty?
13 A  Still living in Virginia Beach.  I knew I had
14    issues with my ex-wife.  We had a lot going on
15    internally at home.  So I -- I didn't feel that I
16    needed to be off running around the globe doing
17    other things.  I just simply wanted to be away from
18    this.
19 Q  In the next to last sentence, you wrote, This would
20    obviously be based on how big of a deal has been
21    made of the investigations at that time, period,
22    closed quote.  What investigations are you
23    referring to?
24 A  And I don't even know if they were true
25    investigations, but the stuff I was reading in the

Page 150

1     press.
2  Q  What stuff were you reading?
3  A  About the President and Panetta and these type of
4     folks giving information to movie makers, that type
5     of thing.  There was a whole bunch of back and
6     forth.  And I simply didn't want to be involved in
7     it.
8  Q  You were aware that, among others, Representative
9     Peter King of New York was leading an investigation
10    through the House of the leaks between the White
11    House and the CIA to the producers of Zero Dark
12    Thirty; correct?
13 A  I don't know what level he was doing it at, but I
14    had heard and through the press that he was looking
15    into it.
16 Q  And at that point in time, were you concerned about
17    your obligations, Matthew Bissonnette's obligations
18    as it relates to working with Dutton and with Elyse
19    Cheney in terms of writing a book?
20 A  Was I concerned about my obligations with -- I
21    was -- with the book piece, I was much more in
22    control of that.  Right.  With the movie piece,
23    there was a whole bunch of people involved, a big
24    mess I wanted nothing to do with it.  At least with
25    the book piece, I knew that I controlled it.  I

Page 151

1     knew that when I went in there and sat with Ben or
2     Elyse or anybody else, I wasn't just giving them
3     every little tidbit of information from the story,
4     classified.  No.  I could control exactly what
5     information I told them, and I felt that that was
6     much more in my interest than to be involved with a
7     whole bunch of other folks.
8  Q  You used one pseudonym, which was Mark Owen.
9  A  Right.
10 Q  The story goes that it was a shortened version of
11    Mark Bowden's name.
12 A  I think Bowden would love to think that.
13 Q  Where did you come up with the name?
14 A  Out of my ass.
15 Q  That's an amazing pull.
16 A  My real name's much too long to sign, and I figured
17    if we were going to do a book, let's stick with a
18    shorter name.
19 Q  Where did you get the name Warren West?  Where did
20    that come from?
21 A  Same thing.
22 Q  Pulled it out of --
23 A  Just dreamt it up.
24 Q  And what was the point of Warren West?
25 A  I was trying -- due to my reasons for security

Page 152

1     concerns, I figured the more of those names and the
2     different people I dealt with, the better.  Keep
3     them guessing.
4  Q  Thank you.
5  A  Yep.
6        (Exhibit 11 was marked for identification.)
7  Q  Mr. Bissonnette, I'm showing you what's been marked
8     as Exhibit No. 11.  It's an e-mail exchange on
9     January 8 of 2012.  It's between you and Elyse
10    Cheney.  In the beginning of the e-mail chain,
11    referring you to the middle of the first page,
12    you're writing at 9:30 a.m. to Ben Sevier and
13    copying Elyse Cheney saying that you've been
14    working on very, very, very rough outline, which I
15    take it was a very rough outline.  And it looked as
16    if your plan was to give it to Ben and to Elyse in
17    Washington, D.C., the week after.
18 A  Okay.
19 Q  Did that meeting take place?
20 A  Yep.
21 Q  And what did you produce to them on that day?
22 A  Nothing.  We met with -- I believe we met with
23    Kevin up there and Ben.
24 Q  Kevin Maurer?
25 A  Kevin Maurer and Ben.

Page 153

1  Q  And did you produce a written outline?

2  A  No.  That's why it was so very, very, very rough.
3     It hadn't been done.

4  Q  So as of January 3 of 2012, you hadn't put pen to
5     paper yet?

6  A  Not that I can remember.

7  Q  Okay.  And when I say "pen to paper," that
8     includes --

9  A  And if it was, maybe some scribbled notes or
10    something.  I don't know.  Nothing detailed.

11 Q  And I'm sorry.  We talked over each other.  But
12    what I meant was when you say -- when I say "pen to
13    paper," nothing electronically, nothing on a
14    notepad anywhere else?

15 A  Not that I can think of.

16 Q  And in the e-mail that you sent later that evening
17    to Elyse Cheney, you asked her to remind you to
18    talk about the Pfarrer book and -- who's an ex-SEAL
19    who wrote a book and it wasn't censored.  And you
20    were -- in the next paragraph, you wrote, quote,
21    Also, if this book hits speed bumps in regards to
22    censor issues, dot, dot, dot, since there is a
23    Captain Phillips movie coming out, what if we
24    worked on the book specifically related to that
25    topic and released it with the movie?  Just a

Page 154

1     thought.

2        Can you explain what you mean by that?

3  A  I don't know.  Sounds like I had the idea if there
4     was a Captain Phillips book coming -- or a movie
5     coming out, maybe we could write something that was
6     timed with the same release, just a thought.

7  Q  Well, the reference to censor issues, is that a
8     concern that the government was not going to permit
9     you to write the book?

10 A  No.  And Pfarrer -- I don't know.  I haven't read
11    his book.  I just know he's kind of a nut job
12    that's come up with a whole bunch of different
13    things.  His book wasn't censored so his book
14    didn't -- I don't know.  I don't know what I meant.

15 Q  I would agree with the nut job part of that.

16        (Exhibit 12 was marked for identification.)

17        RANDAL JOHNSTON:  Am I on 12 now?

18        MR. FURMAN:  Yeah.

19 Q  Now, this is January 10 of 2012.  And I'm referring
20    you to an e-mail from Scott Miller who, I believe,
21    is an agent for Kevin Maurer.  And he's writing to
22    Elyse Cheney about Kevin Maurer's assignment, his
23    deal.  But at the end of the e-mail, it says that
24    the attorney who assisted Dalton Fury is Kevin
25    Podlaski.  And Elyse forwards you that e-mail

Page 155

1     within minutes at 4:00 -- 4:07 that day.  Is that
2     the first time you ever learned who Kevin Podlaski
3     was?

4  A  I believe so.

5  Q  And up until the time of this lawsuit, had you ever
6     met Kevin personally?

7  A  No.

8  Q  So it was all by phone?

9  A  Yep.

10 Q  And by e-mails?

11 A  Yes.

12 Q  Did you do any vetting on your own to -- about
13    Podlaski?

14 A  Not that I remember specifically other than asking
15    around.  I talked to Kevin about him, Kevin Maurer.
16    Yeah, I may have had conversations with Elyse and
17    Ben, but I don't recall specifics.

18 Q  Was there any thought of using Richard Heller to
19    represent you in connection with the book?

20 A  No.  I had -- I had come from -- my team analogies.
21    Right.  Always work as a team and everybody's got
22    their specialists.  I never thought Heller was a
23    guy with the background and credibility to handle
24    this.  This wasn't his specialty, just like Luskin
25    wasn't a specialty in book reviews.  Everything I

Page 156

1     had heard about Mr. Podlaski's background was a
2     former SOCOM JAG, had represented other authors
3     with my -- you know, very similar backgrounds.  So
4     that to me trumped everybody else in regards to
5     this being the guy with the right amount of
6     information that we need to do this.

7        MR. FURMAN:  And just a reference to -- and
8     I'll spell it because it's a particular name, the
9     guy that was referred to as a nut job.
10    P-F-A-R-R-E-R.

11 Q  Mr. Pfarrer was at one point in his life a Navy
12    SEAL; correct?

13 A  I guess so.

14 Q  From what you know?

15 A  From what I know.

16 Q  You never worked with him?

17 A  No.

18 Q  And he's written several books and is kind of out
19    there in the public?

20 A  Sure.

21 Q  And he writes military based books, fiction or
22    nonfiction or something in between?

23 A  Yes.

24 Q  And to the best of your knowledge, has he ever run
25    into any resistance from the Department of Defense?

Page 157

1   A   Not that I know of.

2   Q   Or from the CIA?

3   A   Not that I know of.

4   Q   And do you know whether or not Ms. X received

5       permission from the Department of Defense or the

6       CIA to speak about Operation Neptune to Mark Boal

7       and Kathryn Bigelow?

8   A   Yes.  Ms. X got permission directly from Leon

9       Panetta.

10  Q   And in connection with No Easy Day, did you

11      consider asking for that same permission?

12  A   No.

13  Q   Why not?

14  A   I didn't think -- I saw everybody else kind of

15      doing their thing.  We knew we wanted to move

16      forward with a book.  We had made that decision.

17      We put the team together.  And then based off the

18      advice that I got, it didn't sound like we needed

19      to go back and get that approval or ask.

20  Q   Well, in your first meetings with Elyse Cheney in

21      and around the time that you had turned down Mark

22      Boal, could you have asked Leon Panetta for

23      permission or --

24  A   Sure, but I hadn't agreed to write the book at that

25      point either.  I just said, Hey, look, we are

Page 158

1       definitely moving down the road.  Hey, let's look

2       at this.  Let's do our intel study.  Let's figure

3       out what we need to do.  Okay.  There's an issue

4       here where we need to make sure we're getting the

5       right legal advice from the right type of person

6       who has this type of background.  Brought them into

7       the team and then moved forward from there.  So

8       again -- yeah.

9   Q   And when you spoke to Elyse Cheney and Ben Sevier

10      and described the outline of what became No Easy

11      Day, did you seek permission from anyone at the

12      Department of Defense or the CIA before you

13      discussed it with those individuals?

14  A   No, because those meetings weren't me sitting down

15      regurgitating everything I knew.  Those initial

16      meetings were, Elyse, talk to me.  Ben, talk to me.

17      How does this work?  Talk big picture stuff.  Not,

18      Hey, guys, let's sit down and let me tell you the

19      whole story.  That wasn't it at all.  We needed to

20      get to the right point before we really started

21      getting into the weeds and putting pen to paper and

22      really going through those motions and even signing

23      the contract.

24  Q   Well, did you at least tell Elyse Cheney and Ben

25      Sevier when you met with him in December of 2011,

Page 159

1       January of 2012 that you were an operator and had

2       first account information about the operation

3       itself?

4   A   Sure.

5   Q   And did you tell them what your position was in

6       that operation?

7   A   That I was on the mission, yeah.  I think that was

8       pretty understood that I was there.

9   Q   Did you tell them that you were in the house, for

10      example?

11  A   Yes.

12  Q   Did you tell them that you went up the stairs into

13      the house?

14  A   Any of those first meetings, we did not get into

15      details.  As I said a minute ago, it was much more

16      initial meetings or, look, just like -- put it in

17      an operation analogy.  Right.  If we're going to go

18      assault the target, we're going to get all the

19      people together.  We're going to figure out what we

20      need to get to that target, and then we're going to

21      execute it slowly.  This was not me going up there

22      running to tell them all the details of the story.

23          Those initial meetings were absolutely about

24      me trying to understand the process and the concept

25      of how all this worked.  And we slowly moved

Page 160

1       forward.  At no point did just me meeting Elyse or

2       sitting down with her -- was that in my mind

3       saying, okay, this is going to happen.  No

4       questions asked.  We're doing a book.

5   Q   Well, I'm more interested in asking you what you

6       told them.

7   A   It was much more on the -- Hey, what does it take

8       to do a book?  How does this work?  What does this

9       look like?  How does the process work?  This was

10      much more of a fact-finding mission than it was me

11      sitting down giving them a whole bunch of

12      inner-working details.

13  Q   Well, did they ask you any questions about your

14      role in the operation?

15  A   I'm sure they would have.  I'm sure they did.

16  Q   And what did you tell them?

17  A   That I was -- that I was on the mission, gave them

18      the vague overview rundown and went from there.

19  Q   What was the vague overview rundown?

20  A   That I was on the mission, that I was on the

21      helicopter that crashed.  I had been in the

22      military 14 years.  I had done a whole bunch of

23      deployments.  I had done this, this, this.  This

24      is -- you know, it's an overview.  Nothing

25      different than what I would tell my neighbor or

Page 161

1  anybody else.
2  Q  Other than the fact that you were on the helicopter
3     that crashed, anything else about your involvement
4     in that operation inside the compound?
5  A  I don't remember any specifics.
6     (Exhibit 13 was marked for identification.)
7  Q  This will be Exhibit No. 13.  On January 10, this
8     is an e-mail from you to Elyse Cheney.  On that
9     date, Ben Sevier is e-mailing you and there was a
10    discussion of a title idea called All In.  And
11    Mr. Sevier learned that General Petraeus,
12    P-E-T-R-A-E-U-S, has a memoir using that title.
13    And then the question from Elyse Cheney is, when is
14    his book publishing?  And you wrote, Let's beat him
15    to the punch.  Do you see that?
16 A  Yep.
17 Q  What do you mean by "beat him to the punch"?  What
18    does that mean?
19 A  I don't know.  Let's get our book out in front of
20    him.  Let's get -- let's snag the title before him.
21    I don't know.  I've always liked the title All In.
22    I don't know.
23 Q  Were you concerned about beating him to the punch
24    in the sense of releasing a book before his?
25 A  I don't see why that would be a big rush because

Page 162

1     Petraeus -- there's plenty of generals that get out
2     and write books.
3  Q  When did you sign the contract with Dutton?
4  A  I don't know the exact day.
5  Q  And did you discuss what the advance was going to
6     be?
7  A  Yeah.
8  Q  And that was a million-dollar advance?
9  A  Yes.
10 Q  And did you discuss the amount of that advance
11    before you hired Kevin Podlaski?
12 A  I don't remember.
13 Q  Well, did Kevin Podlaski negotiate the
14    million-dollar advance for you?
15 A  I don't -- no, I don't think so because I think
16    that number was produced through Elyse and Ben.  So
17    no, I don't think so.
18 Q  So the million dollars, once the contract was
19    signed, that was going to be sent over to you;
20    right?
21 A  In installments.
22 Q  Well, what information did you give Ben Sevier and
23    Elyse Cheney that led them to pay you a million
24    dollars in advance?  What information did you tell
25    them?

Page 163

1  A  I told them I would write a book and they said,
2     Okay.  Here -- they knew I'd been on the raid.  The
3     book was going to be about the raid and my
4     upbringing in the SEAL community, and I think
5     that's about how they came up with those numbers.
6  Q  And what about the raid did you tell them?
7  A  Very little.
8  Q  So based on you telling them very little, they
9     offered to pay you a million dollars in advance?
10 A  Apparently.
11    (Exhibit 14 was marked for identification.)
12 Q  On January 12 -- I'm referring now to the middle of
13    this document, the first page of this document --
14    there's an e-mail at 12:18 p.m. from Elyse Cheney.
15    And it states, Hi there.  I hope you're having a
16    blast in CR.  Here's the scoop.  You may not even
17    need to respond until you're back.  Well, first,
18    were you in Costa Rica?
19 A  I'm sorry.  Where are you at?  I'm sorry.
20 Q  In the middle.  Just out of my own curiosity,
21    what's CR?
22 A  CR?  I don't know.
23 Q  Well, you're having a blast somewhere.  Do you
24    recall where you were having a blast in January of
25    2012?

Page 164

1  A  CR?  Doesn't ring a bell.
2     RANDAL JOHNSTON:  Object to the form of the
3     question.
4     MR. FURMAN:  Okay.  That's all right.  It
5     won't ever get anywhere, that question.
6  Q  The number two below, there's a number of points
7     that Elyse is making.  But number two, it states,
8     We have a different lawyer now in terms of military
9     stuff.  It's a guy actually in Indiana who is a
10    specialist -- special forces guy himself and an
11    attorney there and who knows the agreements that
12    anyone enlisted signs.  The key is that this lawyer
13    be hired by Penguin eventually to vet the
14    manuscript and make sure essentially that Mark is
15    not revealing, quote, operational tactics,
16    technique, and procedures, closed quote.  Do you
17    see that?
18 A  Yeah.
19 Q  And was the idea that Mr. Podlaski would be hired
20    by Penguin?
21 A  No.  He'd be hired by me to represent me on the
22    book.
23 Q  Did you speak to Mr. Podlaski before this e-mail?
24 A  I don't believe so.
25 Q  And did you look for any other lawyers?

Page 165

1  A  No.
2  Q  So was it basically this introduction, and that's
3     the means by which you retained Mr. Podlaski?
4  A  I don't know that it was this alone.  If you're
5     referring to this e-mail alone, I don't know that
6     it was just that.  But yeah, this is obviously part
7     of it.  And she's making the introduction.  This
8     was part of assembling the team to make sure we
9     tried to do this the right way.  We knew there
10    would be -- right.  We had seen the oversight with
11    the movie and everything else.  We wanted to make
12    sure we were doing things the right way.
13 Q  Did you tell Kevin Podlaski that you were in any
14    way involved with having a discussion with
15    producers of Zero Dark Thirty?
16 A  No.
17         MR. FURMAN:  Just off the record for a moment.
18         (A brief recess was taken.)
19 BY MR. FURMAN:
20 Q  So on Document Number 14, it appears as if the
21    e-mail exchange was with Richard Heller and Elyse
22    Cheney.  So the reference to having a blast in CR
23    obviously was not directed to Mr. Bissonnette.  And
24    the reference to it obviously was a reference to
25    Mr. Heller.  The -- though I will ask a question

Page 166

1     about this document.  This e-mail chain obviously,
2     Exhibit No. 14, is between Richard Heller and Elyse
3     Cheney.  I misstated.  I thought you were involved
4     in it.  But was it around this time that you first
5     learned about Kevin Podlaski?
6  A  Yes.
7  Q  And did there come a time when eventually you
8     signed a contract with Dutton on February 10 of
9     2012?
10 A  I don't remember the dates, but yeah.  I eventually
11    signed a contract, yes.
12 Q  Okay.  And did Mr. Podlaski assist in the
13    negotiation of that contract?
14 A  Yes.
15 Q  Did you provide Mr. Podlaski with any of the
16    nondisclosure agreements that you executed
17    previously in January of 2007?
18 A  I was asked about them but never asked to provide.
19 Q  So Mr. Podlaski asked you about them?
20 A  Yeah.  Talked about what nondisclosures I may or
21    may not have signed.
22 Q  And did Mr. Podlaski ask you to get them?
23 A  No.
24 Q  Did he tell you not to get them?
25 A  No.

Page 167

1  Q  And you knew how to get them?
2  A  Yeah, I knew the right office to go to.  I could
3     have -- could have started asking around to the
4     right people, yeah.
5  Q  So if I understand you correctly, Mr. Podlaski --
6     he didn't tell you not to get them; right?  Is that
7     what you're saying?
8  A  He never asked me to get them.  He never said --
9     had he asked me, Go get this agreement and show it
10    to me, I would have gone and gotten it.
11 Q  And did you tell Mr. Podlaski that you signed these
12    nondisclosure agreements that were in Exhibit
13    No. 1?
14 A  I didn't know what I had signed.  I knew I had
15    signed some documents throughout my 14-year career.
16    I knew I had signed a lot of documents.  I knew
17    they ranged a ton of different topics, so --
18 Q  And --
19 A  So no, I did not know what specific documents that
20    I had signed.
21 Q  At the time that you were discussing this matter
22    with Mr. Podlaski, is it fair to say that you knew
23    at least at that point in time that you did, in
24    fact, sign, as you described, a lot of different
25    documents over the course of your 14-year career?

Page 168

1  A  Is it safe to assume that --
2  Q  You signed a lot of documents over the course of
3     your --
4  A  Absolutely.
5  Q  -- 14-year career?
6         And some of those documents would have
7     included the handling of classified information;
8     correct?
9  A  Yes.
10 Q  And you knew that when you retained Mr. Podlaski;
11    correct?
12 A  Right.
13 Q  And you didn't go get them from the Navy?
14 A  I was never asked to go get them.  I was never
15    told, Please produce these exact documents X, Y,
16    and Z.
17 Q  Did Mr. Podlaski ask you if Operation Neptune Spear
18    was a special access program?
19 A  I believe so.  We had a lot of discussions about
20    what was classified at what levels.
21 Q  And what did you tell Mr. Podlaski?
22 A  That I didn't remember what had been signed and
23    what level and again, back to the documents, what I
24    had signed over my career.
25 Q  And did you authorize Mr. Podlaski to get that

Page 169

1    information on your behalf?
2  A  He didn't ask to be authorized to seek it on my
3    behalf.
4  Q  Did you at that point want anyone in the military
5    to know you were writing a book?
6  A  No.  And I'm reading here in this e-mail.  It
7    sounds like even from Podlaski, he was recommending
8    that we not reference writing a book to anybody
9    else.  So the advice, again, we were getting was
10   let's maybe not tell anybody about this.  And then
11   I was never asked to produce any of the documents.
12 Q  Well, up until the time that you met Mr. Podlaski,
13   you -- let me take that back.
14        At the time that you met Mr. Podlaski, you had
15   fully intended to write the book; correct?
16 A  We were -- was the book going to happen no matter
17   what?  No.
18 Q  No, no.  I didn't ask that.
19 A  Had I decided that I wanted to move forward with
20   the idea of writing a book?  Yes.
21 Q  Yeah.  So I'll go back to what the deposition is --
22   I know you want to answer the questions you want to
23   answer.
24 A  Sorry.  My bad.  My bad.
25 Q  That's okay.  No, that's all right.  Because they

Page 170

1    do that in debates.  This is not a debate.  I ask a
2    question.  You have to answer it.  And, of course,
3    Mr. Johnston is not a potted plant.  He can object.
4        So my question is, by the time that you had
5    contacted Mr. Podlaski and signed a retainer with
6    him, was it already a deal in place with Dutton and
7    with Elyse Cheney's help to write a book that would
8    eventually become No Easy Day?
9  A  I do not believe there was a deal in place, no.
10 Q  Was there an idea to do that?
11 A  Sure.
12 Q  And was the idea advanced to the point where you
13   knew the amount, for example, of the advanced
14   payment from Penguin?
15 A  I believe so.
16 Q  So by the time that you had met Mr. Podlaski, you
17   knew that there was a million-dollar advance
18   waiting for you once you agreed to write the book;
19   correct?
20 A  Yes.
21 Q  And up until that point in time, did you tell
22   anyone in the Navy that you were writing a book?
23 A  No.
24 Q  Why not?
25 A  As I answered several times already, there's no

Page 171

1    upside to running around telling people that you're
2    writing a book.  People can judge a million
3    different ways.  And I chose to not disclose that.
4  Q  Aside from the judging, were you concerned that you
5    would have been prohibited from writing a book?
6  A  No, not at that time.
7  Q  And after you signed the agreement with Dutton, did
8    you tell anyone in the military that you were
9    writing the book?
10 A  No, because by the time we'd signed the agreements
11   and made it official, I had received the advice I
12   had received from Mr. Podlaski, which was, you
13   know, you don't need to get it -- he could vet the
14   book and that we should keep this as quiet as we
15   could.
16 Q  Now, at that point in time, did you tell
17   Mr. Podlaski that you were on terminal leave?
18 A  I forget how I defined my -- what current status
19   that I was on.
20 Q  Well, did you tell Mr. Podlaski whether you were
21   discharged or not?
22 A  I don't know what verbiage I used to describe my
23   status.  I don't remember.
24 Q  So do you remember -- this is a simple question.
25   Do you remember whether or not you told him you

Page 172

1    were discharged or not from the military?
2  A  I don't remember because there's a difference
3    between terminal leave, discharge.  I don't
4    remember.  I would have said -- I don't -- I don't
5    remember.
6  Q  But you were discharged on June 28 of 2012?
7  A  Right.
8  Q  Did you tell Mr. Podlaski on that day that you were
9    officially discharged?
10 A  I don't believe so.
11 Q  I skipped an e-mail that I just had one question
12   about.  Did you have a meeting at some point with
13   Robert De Niro?
14 A  Uh-huh.
15 Q  When did that take place?
16 A  In New York.  Had nothing to do with business.  It
17   was when we went up there for New York with a whole
18   bunch of us who had never been in New York City
19   before.  We -- a mutual friend of ours knew him and
20   invited him to a -- to our gathering to introduce
21   him and have us get a chance to meet De Niro.
22 Q  And did you discuss any business opportunities with
23   Mr. De Niro?
24 A  Afterwards, he had approached me to do some
25   possible work with him.  And they have a TV,

Page 173

```
 1    something or other, show, network, whatever they've
 2    got going on up in New York.  I had a couple -- I
 3    don't know that I ever met De Niro again.  But then
 4    backed away from it.
 5  Q And he's got a film company that has the term
 6    "Tribeca" in it.
 7  A Tribeca.
 8  Q And I think it's called Tribeca Film Productions.
 9    When did those meetings take place?
10  A I don't know.  I wouldn't even classify them as
11    real business meetings.  We had met him once, and
12    there was a whole group of us there.  One of my
13    friends has become good friends with De Niro and is
14    good friends with him to this day.  So I wouldn't
15    call it any real business meetings, but I met him
16    the -- once when we were up there.
17  Q And the opportunity that he discussed with you
18    about -- you mentioned a TV show.
19  A In theory.
20  Q In theory?
21  A The idea of, hey, maybe we could all work together
22    and do something.  I don't even know that that
23    was -- again, I don't recall the exact
24    conversation.
25  Q And would that involve your military career
```

Page 174

```
 1    obviously?
 2  A I don't know.  It never even got to that level.
 3  Q So it was just no subject matter, just talk about
 4    making a movie together?
 5  A Whole bunch of guys getting out of the military
 6    saying, Hey, what could we do next?  Do you need
 7    help with any -- what can we do?  What can we do?
 8    It never progressed further than that on my level.
 9         (Exhibit 15 was marked for identification.)
10  Q Document 15 is an e-mail exchange that's dated
11    April 6 of 2012.  It's between Richard Heller and
12    Elyse Cheney.  In the e-mail that is from Elyse
13    Cheney to Richard Heller dated April 6, 2012, it
14    states, Hi, finally talked with Mark yesterday.
15    He's on board with everything.  My being producer
16    and us tag-teaming on stuff with me kind of
17    orchestrating -- orchestra leading all the
18    different platforms that I hope we can pursue.
19    He's going to send an e-mail to Jay and Adam
20    telling me he wants me at the Spielberg meeting -
21    the pitch one - today.  Do you see that?
22  A Okay.
23  Q Now, do you remember having a discussion with Elyse
24    Cheney about her being a producer along with the
25    various ventures you were interested in pursuing?
```

Page 175

```
 1  A Yeah.
 2  Q And what were the different platforms that she was
 3    referencing?
 4  A I don't think that we really got into details.  The
 5    conversation I remember having via phone, and she
 6    was very interested in helping me evolve any of my
 7    different business ventures and wanted to be a part
 8    of that.
 9  Q Now, the various business ventures, they all in one
10    form or another related to your military service?
11  A No.
12  Q Were they military based?
13  A No.  Could be any type of business venture that we
14    could tag-team.
15  Q Well, the different platforms that were described
16    in this e-mail, what did they involve?
17  A Probably writing, media.  I don't know any other --
18    plenty of other platforms; instructional, corporate
19    speaking, kids books, toys, games, you name it,
20    anything that we could create she wanted to be a
21    part of.
22  Q And when you say we can create, what would it be
23    based on?
24  A It could be anything, any opportunity we had that
25    we could create something together and create a
```

Page 176

```
 1    business out of.  She wanted to be a part of it.
 2  Q Well, the Spielberg movie, that was a pitch that
 3    related to a military type of movie; correct?
 4  A Yep.
 5  Q And it was based on your experiences -- your
 6    military experiences; correct?
 7  A Not mine specifically.
 8  Q But you were going to --
 9  A The SEAL community.
10  Q The SEAL community.  Okay.  So it would be -- you
11    would be the creative end of it in terms of
12    providing information about the SEAL community that
13    would eventually be part of this pitch to
14    Spielberg; correct?
15  A That would be the concept.
16  Q Did you run that by Kevin in terms of whether --
17    Kevin Podlaski, whether that would have been
18    appropriate to do based on your military status?
19  A Not that I remember.
20  Q Did you speak to anyone as to whether doing that
21    kind of thing, for example, speaking to Spielberg
22    and people at DreamWorks about a military
23    SEAL-based production, whether that would have
24    violated any disclosure agreements you have?
25  A Those type of meetings -- again, former SEALs get
```

Page 177

1    out and work in Hollywood all the time.  I had no
2    reason to believe I was doing anything outside of
3    the bounds of what had been done for years.
4  Q  Did you seek legal advice on that?
5  A  No, not at this point.
6  Q  And did you eventually have that pitch meeting with
7    DreamWorks and Spielberg representatives?
8  A  Yes.
9  Q  And where did that take place?
10 A  California.
11 Q  And what was the outcome of that?
12 A  They said they were interested.  They would -- we'd
13   start seeing what we could develop.
14 Q  And what happened after that?
15 A  It ended up going away.  We worked on it for a
16   while and then HBO had teamed up with DreamWorks
17   and then HBO pulled out of the deal.
18 Q  Did you tell Kevin Podlaski about any of that?
19 A  Not that I remember.
20 Q  Why not?
21 A  Didn't see that -- him -- that being his specialty.
22   A team of people involved and...
23 Q  And did you tell Kevin Podlaski about any other
24   ventures that you were engaged in other than the
25   writing of the book No Easy Day?

Page 178

1  A  I don't think so.
2  Q  For example, did Mr. Podlaski know of your
3    involvement with EA?
4  A  I don't know.  I don't know that I ever -- I don't
5    remember addressing it with him, but I -- there was
6    certainly lots of communication back and forth with
7    Elyse and Heller and different folks.  I don't --
8    maybe he got wind of that.  I don't know.
9  Q  I'm not asking you about whether you think he got
10   wind of it.  I'm asking you if you ever consulted
11   with Mr. Podlaski --
12 A  Not that I remember.
13 Q  -- about your involvement with Electronic Arts?
14 A  Not that I remember.
15 Q  And how about with Element Group?
16 A  Not that I remember.
17 Q  How about with speaking engagements that you were
18   trying to line up?
19 A  Not that I remember.
20 Q  How about with the Fortis Group, which I think was
21   a vehicle through which you --
22 A  No.
23 Q  -- gave speeches?
24 A  No.
25 Q  So you didn't involve Mr. Podlaski in any of those?

Page 179

1  A  No.
2  Q  And you didn't provide him with any information
3    about those opportunities or those business
4    ventures that you were trying to get into?
5  A  No, not that I remember.
6  Q  This next one will be 16.
7      (Exhibit 16 was marked for identification.)
8  Q  After you signed the contract with Dutton, did you
9    have an understanding of when the book would be
10   published?
11 A  After I signed the contract with Dutton, did I have
12   an -- yes.  I believe it was -- it might have even
13   been in the contract of delivery dates.
14 Q  And what was your understanding?
15 A  I don't remember the dates off the top of my head.
16 Q  Was it before or after the election?
17 A  It was -- I know it had to have been somewhere in
18   there close because I had wanted to do September 11
19   as the release date.
20 Q  Why did you want to use September 11 as the release
21   date?
22 A  We knew there was -- it was an election year.  And
23   we knew the politics being what they are, that
24   people could try and politicize this book where I
25   was trying very hard not to politicize this book

Page 180

1    and make it very apolitical.  So I felt that
2    September 11, certainly with the history of
3    bin Laden and that date, would be an appropriate
4    date to release it on.
5  Q  So in other words, to maximize the interest in the
6    book and, of course, the sales that would go along
7    with it, releasing it by September 11 was the date
8    that you had in mind?
9  A  I liked the idea of September 11 because of the
10   reasons I just described.
11 Q  And was part of that formula an interest in trying
12   to have the book reach the maximum amount of
13   exposure in terms of publicity?
14 A  Sure.  I don't think that I was the one who dreamt
15   that up.  I think that came more from Ben and the
16   publishing house.  They were the ones who kind of
17   set out the overall schedule.  I think wherever
18   that schedule fell out was pretty close to
19   September, November time frame.  And that's why I
20   picked the -- or I asked for the 11th.
21 Q  At that point in time -- and I'm referring you now
22   to the date of the contract with Dutton,
23   February 10 of 2012 -- were you aware of anyone
24   else writing a book about the raid on Pakistan that
25   was Operation Neptune Spear?

Page 181

1  A  We -- when we signed the contract?

2  Q  Yes.

3  A  No.

4  Q  There was a long article in the New Yorker Magazine

5     written by -- gosh, I should know his name --

6     Schmidle --

7  A  Eric Schmidle?

8        MR. FURMAN:  Good luck, Julie.  I think it's

9     S-C-H-M-I-D-L-E.

10 Q  Were you one of the sources for that publication?

11 A  No.

12 Q  Did you read it?

13 A  Yes.

14 Q  What was your impression when you read it?

15 A  It was pretty accurate.

16 Q  Did you ask who the source was for that

17    information?

18 A  There was plenty of rumor mill going around, but

19    nothing ever confirmed.

20 Q  And who was rumored to be the source?

21 A  I won't name names, but it -- but a high-ranking

22    captain, SEAL captain who was involved in planning,

23    executing the raid, and was a liaison with the

24    agency.

25 Q  Was it Admiral McRaven?

Page 182

1  A  No.

2  Q  And were you aware or were there any rumors of

3     anyone writing a book about the raid itself?

4  A  Not that I had heard.

5  Q  All right.  I've shown you what's been marked as

6     Exhibit No. 16.  I know you've had an opportunity

7     to glance at it.  On the first page of the e-mail

8     came from you to Elyse Cheney.  The date of it is

9     May 22, 2012, at 5:11 p.m.  The subject is, Reply

10    from Bowden.  And it states, I hope to finish

11    writing by the end of July, Matt.  My publisher is

12    eager to put out in the fall, but I'm not sure it

13    will make it out prior to Election Day.  Does it

14    matter to you, question mark?  M.B.  Is that an

15    e-mail that you received from the author, Mark

16    Bowden?

17 A  Yes.

18 Q  And what caused Mr. Bowden to write that to you?

19 A  We had been connected through a mutual friend, and

20    he knew that I was one of the ground forces on the

21    raid and wanted to talk to me about doing an

22    interview for his book.

23 Q  Who's the mutual friend?

24 A  I'm not naming names.  Former SEAL, former SEAL

25    officer that's gotten out and started a business.

Page 183

1  Q  Okay.  We'll leave a blank in the record.  I'm not

2     interested at all frankly, just really not

3     interested, in gossip or finding out people's

4     information, and I don't want also frankly to ruin

5     anyone's career.  But to the extent that it's

6     relevant, I want to leave a blank in the transcript

7     just so in case that we need to follow through on

8     this, if we need to follow up with any questions,

9     we'll do so.  That's why I'm doing that.

10       When did you get that contact from that mutual

11    friend?

12 A  I don't remember.

13 Q  Was it after you signed the contract with Dutton?

14 A  I would say it was right -- I don't know.  I'm

15    guessing that it's somewhere near this time frame

16    when we reached out via e-mail.

17 Q  Now, Elyse Cheney writes to you at 6:22 p.m.,

18    quote, I would just say -- another quote -- just

19    curious as to whether it was coming out pre or post

20    election, closed quote.  Why was Elyse Cheney

21    writing that to you?

22 A  No idea.

23       RANDAL JOHNSTON:  Objection; foundation.

24 Q  Did Elyse Cheney write that to you?

25 A  Appears so.

Page 184

1  Q  Okay.  Did you ask her to formulate a response to

2     Mr. Bowden?

3  A  Not that I remember.

4  Q  At the top of this e-mail chain, it's dated May 22,

5     2012, at 6:34 p.m.  And the subject is, Even more

6     from Bowden.  And it states here, If interviewing

7     you is an option, Matt, I will -- and I have to

8     wait, comma, I would wait -- let me -- I'll say it

9     again.  If interviewing you is an option, comma,

10    Matt, comma, and I have to wait, comma, I would

11    wait.  M.B.  Do you see that?

12 A  Yes.

13 Q  Is that what Mark Bowden wrote to you?

14 A  I believe so.

15 Q  And he was interested in interviewing you and

16    getting you to have an input in his book that

17    eventually became the book, quote, The Finish --

18 A  Yes.

19 Q  -- by Mark Bowden, that he was willing to wait to

20    publish it until he had a chance to talk to you.

21 A  Apparently.

22 Q  And you forwarded that to Elyse Cheney, that

23    information?

24 A  Yes.

25 Q  Why?

Page 185

1  A  She was my literary agent.  We're writing a book.
2     I felt that that would be something that she'd be
3     interested in.
4  Q  But at that point, were you competing with
5     Mr. Bowden to have the first book out on the raid
6     itself?
7  A  No.  I think this was the first time we heard there
8     might be another book coming out that was a similar
9     topic.  So it's probably why I forwarded it to
10    Elyse.
11  Q  Did you tell Mr. Bowden that you were writing a
12    book?
13  A  No.
14  Q  Did you tell Mr. Bowden by this time you had signed
15    a contract to write a book?
16  A  No.
17  Q  Why not?
18  A  I didn't feel like he needed to know it.
19  Q  But you also knew at the time he was asking you to
20    be a source for his book?
21  A  Right.  He had explained to me that he had already
22    talked to the President of the United States and
23    interviewed Obama.  He explained to me he had
24    already interviewed Admiral McRaven.  I was his
25    third piece to put it in his book.  And you saw the

Page 186

1     e-mail chain.
2  Q  And why wouldn't you just tell him, I'm writing my
3     own book?
4  A  Didn't feel like he needed to know it.
5  Q  And that's the only reason you didn't tell him?
6  A  Well, what's the -- why do I need to tell him?
7  Q  Because you were writing a book of your own.
8  A  Of the advice I had been getting from Mr. Podlaski
9     was, Hey, we need to keep this quiet, keep this
10    under wraps.  Certainly Dutton didn't want it
11    getting out to other publishers that we were
12    writing another book, so there was no reason for me
13    to tell him.
14  Q  Was Mr. Podlaski the only person telling you to
15    keep it under wraps?
16  A  From one perspective, yes.  And then from Ben's
17    perspective, he obviously didn't want it getting
18    out into the publishing world.
19  Q  Because that would diminish the book sales;
20    correct?
21  A  I'm not going to guess what that meant from
22    different perspectives.  Yeah.
23  Q  How about from Elyse Cheney's perspective?  What
24    did she tell you about revealing the fact that you
25    were writing a book to Mark Bowden?

Page 187

1  A  I don't remember what she told me specifically
2     about it.
3        (Exhibit 17 was marked for identification.)
4  Q  Before we focus on Document Number 17, I just want
5     to talk about Mark Bowden just for a moment.
6     You're aware that he was interviewed by The
7     Atlantic after your book was released and he talked
8     about conversations with you; correct?
9  A  No.  I'm assuming he's done interviews, but I don't
10    read his interviews.
11  Q  Are you friendly with Mark Bowden?
12  A  I've talked to him, the -- what, twice on the phone
13    maybe.
14  Q  So you had no relationship with him?
15  A  No, zero.
16  Q  There was an article online in -- it's actually
17    available on Yahoo called, How Navy SEAL Matt
18    Bissonnette won the bin Laden book competition.
19    Have you seen that --
20  A  No.
21  Q  -- article?
22  A  Huh-uh.
23  Q  You mean --
24  A  Is this the one where he says that I stole his
25    name?

Page 188

1  Q  Yeah.
2  A  Oh, okay.  Then maybe I have read it.
3  Q  I was just going to ask you, you mean to tell me
4     you don't Google your name?
5  A  I try not to.  First advice I got.
6  Q  Well, the second best was never to admit to it.
7        And do you recall that in that article, if you
8     do recall reading it, that Mark Bowden had reached
9     out to you and -- I'm sorry, take it back; that
10    Mark Bowden said that you reached out to him to
11    find out when his book was being published.  Do you
12    recall that?
13  A  No.
14  Q  Do you recall ever reaching out to Mark Bowden and
15    asking him when he planned to have his book
16    published?
17  A  I know we spoke several times and we've -- we
18    talked about when his book was coming out or -- I
19    don't know.  I remember speaking several times.
20    The topics of those discussions, I don't remember
21    every point of it.
22  Q  And just so I'm clear, the pseudonym Mark Owen has
23    no relation to Mark Bowden?
24  A  Absolutely zero.  I was used to signing M. Mark,
25    it's short.  Owen, it's short.  It had nothing to

Page 189

1 do with Mark Bowden. If he appreciates that, then
2 great. He can appreciate that. But zero to do
3 with him. When I chose that pseudonym, I had never
4 met or -- I probably read Black Hawk Down but never
5 connected the two names.
6 Q Document Number 17, there's an e-mail chain that
7 you are the recipient of on June 6, 2012. But it
8 begins on that day towards the beginning at
9 9:53 a.m. And it's between Elyse Cheney and Ben
10 Sevier. The subject is, Hey, H-E-Y. And it states
11 in the second sentence, I want to update you on
12 some major news regarding Owen project that might
13 factor into pub date decision. Do you see that?
14 A Yeah. At the bottom; correct?
15 Q Yeah, at the bottom.
16 A Yep.
17 Q And eventually you receive that e-mail. Do you
18 know what the big news was?
19 A I don't know.
20 Q Well, the -- your response -- I'm sorry. I take it
21 back. Elyse Cheney's response to you eventually
22 later that day was, All good. But in between, the
23 exchange between Ben Sevier and Elyse Cheney is
24 some excitement about information about news. Do
25 you know what that was?

Page 190

1 A I don't recall. Apparently I was only hit at the
2 end.
3 Q Yeah, correct.
4 A So I don't recall.
5 Q Have you ever met an individual whose name is Ophir
6 Lupu?
7 MR. FURMAN: And I'll spell that. That's
8 going to be a hard one. That's O-P-H-I-R, L-U-P-U.
9 A You've got to give me some context on this. Not
10 that it rings a bell.
11 Q All right. So I'll give you some context.
12 (Exhibit 18 was marked for identification.)
13 Q All right. Now, Document Number 18, you're being
14 introduced to Mr. Lupu through another agent at
15 United Talent called Adam Biren, B-I-R-E-N. Do you
16 see that?
17 A Yes.
18 Q Who's Adam Biren, first?
19 A Adam Biren --
20 Q Biren.
21 A -- is an agent at UTA or was an agent at UTA.
22 Ophir -- and I don't know how to pronounce his last
23 name either -- I believe he was their video game
24 agent, agent that just does video game stuff.
25 Q Yeah. And he's actually a very big player in the

Page 191

1 gaming world, correct --
2 A I don't know how --
3 Q -- to your knowledge?
4 A I knew nothing about him until I was introduced. I
5 know he's an agent, and he represents video game
6 folks.
7 Q And before then, had you been involved in any video
8 game pursuits?
9 A No, not -- when I was brand new at SEAL Team 5, the
10 SEAL community, SOCOM community sponsored a video
11 game called SOCOM Navy SEALs. And my platoon and
12 my team was ordered to go out into our training
13 area and let these video game folks come in and
14 record grenades going off and machine gunfire and
15 that type of stuff, but that was years ago when I
16 was brand new and no business --
17 Q There was no business attached to that?
18 A No business ties, no.
19 Q Now, was your introduction in June of 2012 to
20 Electronic Arts?
21 A This was -- this was an -- this e-mail seems to be
22 an introduction of me meeting Ophir.
23 Q And did you have discussions with Ophir?
24 A I met him maybe once or twice.
25 Q And did you do any business with him?

Page 192

1 A No.
2 Q How did you eventually link up with Electronic
3 Arts, EA, to do work with them?
4 A The -- I had a former Delta Force buddy who has a
5 TV show, and his production company had done some
6 work with EA. And as I was getting out, I met the
7 production company, and that's how I got tied in
8 with EA.
9 Q And the production company is Silent R?
10 A Yes.
11 Q And what was your position with Silent R?
12 A Consultant.
13 Q And who was your buddy that was at Silent R?
14 A Eric -- well, Eric Sherertz is the owner -- the
15 main guy at Silent R. Larry Vickers is the former
16 Delta -- he's the personality on the TAC-TV show.
17 Q And in connection with Electronic Arts, you did
18 some voiceovers for some commercials that related
19 to a video game?
20 A Through Silent R -- through silent R had the
21 contract with EA to do the videos.
22 Q Okay. And that was the Medal of Honor game?
23 A Yes, sir.
24 Q And in that game, what operations were discussed in
25 the voiceovers?

Page 193

1  A  In the game?

2  Q  Yeah.

3  A  None, no specific operations.  They wanted me to.

4  Q  And what was your role?

5  A  Just as a consultant to -- and an operator in the

6     video.

7  Q  And did it involve military tactics?

8  A  It involved us simulating scenarios in the game.

9  Q  And the game involved military maneuvers of some

10    sort?

11 A  It's a video game.

12 Q  Well, it's a video game involving military -- in

13    other words, it's not Donald Duck in there.  It's

14    military operators in the video game?

15 A  It's a military figure in a game that's driven by

16    the person on the console.

17 Q  Okay.  Did you discuss that with Kevin Podlaski?

18 A  Not that I remember.

19 Q  Did you ask for permission to do that from the

20    Navy, the Department of Defense, the CIA?

21 A  No.

22 Q  At that point in time when you were performing that

23    work, were you discharged from the Navy?

24 A  It was after I was out of the Navy when I was doing

25    all that --

Page 194

1  Q  Did you sign --

2  A  -- if my timelines are correct.

3  Q  Did you sign contracts with -- through Silent R

4     with the video game producers before or after you

5     were discharged from the Navy?

6  A  I don't remember.

7         (Exhibit 19 was marked for identification.)

8  Q  Exhibit 19 is an e-mail from you on June 8 of 2012

9     to Ben Sevier and Elyse Cheney.  Do you see that?

10 A  Yes.

11 Q  And in there -- and by the way, there's no one else

12    e-mail -- you didn't include Mr. Podlaski in this

13    e-mail; correct?

14 A  Not according to the e-mail.

15 Q  And did you include Mr. Podlaski in any discussions

16    that related to Mark Bowden's book at all to the

17    best of your knowledge?

18 A  I don't recall.

19 Q  Did you discuss Mark Bowden's book with

20    Mr. Podlaski at any point in time?

21 A  I don't recall.

22 Q  And in the e-mail, you wrote, quote, Just confirmed

23    Bowden has none of the shooters from the raid, only

24    the higher-ups.  Just talked to my buddy who

25    introduced Bowden to me, and he said it was only

Page 195

1     me.  Do you see that?

2  A  Yeah.

3  Q  What is that referring to?

4  A  It refers to my comment earlier that he had spoken

5     to higher-ups, right, and gotten his information

6     from them.  But from a shooter perspective,

7     apparently he hadn't talked to anybody else at my

8     level who was actually a shooter on the raid.

9  Q  Why was it important for you to tell Elyse Cheney

10    and Ben Sevier this information?

11 A  Give context of the book that Bowden was writing.

12 Q  Why did they need to know about Bowden's book?

13 A  I don't know.  Just thought it might be

14    interesting.

15 Q  And that's the only reason you sent it to them

16    because you thought it would be interesting?

17 A  Yeah.

18 Q  Did it relate to your book at all?

19 A  Sure.  I would have -- well, I'm guessing here.

20    Right.  I'm inferring that, yeah, had he had

21    another operator on the raid, that his book might

22    have been a little more in line with what we were

23    trying to write.  But that's just me inferring.

24 Q  Well, you're the writer so no one needs to infer.

25    I want to know why you were telling Elyse Cheney

Page 196

1     and Ben Sevier about the sources for Mark Bowden's

2     book.

3  A  I had e-mailed multiple e-mails, as we saw earlier,

4     anything revolving around that.  I felt that that

5     was important for the team to know so I forwarded

6     it along.

7  Q  And was it driven by the fact that up until that

8     point in time, for all you knew, you were the only

9     shooter, using the term that you've used here, that

10    was writing a book about Operation Neptune Spear?

11 A  Was it driven by?

12 Q  Yeah.

13 A  I'm sorry.

14 Q  Let me rephrase it.  You wrote that Bowden has none

15    of the shooters from the raid.  And then you wanted

16    to say that your buddy introduced Bowden to me and

17    he said it was only me.

18 A  Right.

19 Q  So from what you understood, Bowden had none of the

20    shooters.  I'm using the term "shooters" the way

21    that you --

22 A  Operators, shooters, sure.

23 Q  Yeah, loosely.  Was that a concern of yours, that

24    you would be the first author that would be

25    essentially an operator/shooter that would write

Page 197

1    about Operation Neptune Spear?  Was that something
2    that was driving you?
3  A  Vaguely, a little bit at this point, I think, sure.
4    We wanted to be the -- I was the only one that I
5    knew of that had been on the raid who was doing
6    this.  Right.  Bowden had other people.  He had the
7    higher-ups, but he didn't have a shooter.  So I
8    thought that was information that I should share
9    with the team.
10  Q  And in carving out space, you know, for publicity's
11    sake and for marketing a book, the fact that you
12    were the first of the operators/shooters to write a
13    book about Operation Neptune Spear, that had
14    significance; right?
15  A  I'm not a marketing guy.  I'm not a PR guy.
16  Q  I'm asking you.  I'm not asking you if you're a
17    marketing guy.  Did you think it had significance?
18  A  I'm guessing it would.
19    (Exhibit 20 was marked for identification.)
20  Q  Now, earlier I had asked you what your connection
21    with Silent R and the video game, and it was
22    through Eric Shereritz; right?
23  A  Yes.
24  Q  And is Greg Goodrich connected with Silent R?
25  A  No.  Greg Goodrich was the video game producer.  So

Page 198

1    he was, like, the main guy at EA that handled
2    everything revolved around that video game.
3  Q  Now, what I handed you as Exhibit No. 20 is a
4    multiple-page e-mail chain.  I want you to go back
5    to the beginning of it because it's dated -- it
6    starts with the date of June the 7th and carries
7    through to June 10.
8  A  Okay.
9  Q  And the first e-mail is from Eric Shereritz, who was
10    writing to Craig.  And it states there, Talked to
11    Biss about that compound download.  What is he
12    referring to there?
13  A  They were trying to get me at the beginning to do
14    a -- they wanted to see if I'd be interested in
15    doing a portion of the video game that had the
16    compound in it and you could actually play that
17    raid.
18  Q  And it would be playing the raid of -- that was
19    Operation Neptune?
20  A  It would have -- not the raid.  It would involve
21    the compound.
22  Q  And it would be the compound at Abbottabad in
23    Pakistan; correct?
24  A  Yes.
25  Q  And that was where Mr. Osama bin Laden was before

Page 199

1    he was killed?
2  A  Yes.
3  Q  And did you help produce a version of the compound?
4  A  No.
5  Q  Did you see a version of the compound?
6  A  No.
7  Q  Did you discuss with Kevin Podlaski the fact that
8    you were having a discussion with video game
9    producers about the compound in Abbottabad?
10  A  No, because I didn't agree to any of it.  What
11    we agreed to do at the end was just help with their
12    marketing videos.
13  Q  And the discussion was between you and Eric
14    Shereritz?
15  A  What discussion?
16  Q  About the compound.
17  A  EA wanted it.  Right.  So I don't know that Greg
18    Goodrich was pushing it.  I see this Craig Owens
19    name.  He -- I remember him being a huge driving
20    force to try and get us to do some sort of
21    compound-type piece.  And we repeatedly said no.  I
22    don't remember Eric Shereritz pressuring me.  You
23    know, he wanted to.  He was playing the middleman.
24    He had the better relationship with Greg Goodrich,
25    but --

Page 200

1  Q  And just so I'm clear, Greg Goodrich is -- who's he
2    connected to?
3  A  EA.
4  Q  EA?
5  A  Yeah.
6  Q  And Craig Owens?
7  A  EA.
8  Q  Owens, EA.
9    Now, in the second page from the back of this
10    document, Exhibit Number 20, there is an e-mail
11    that's dated January 7 at 8:14 p.m. from you.  And
12    it's to Craig Owens, Eric Shereritz, Greg Goodrich,
13    and then now includes Elyse Cheney.
14    Do you see that?
15  A  Yes.
16  Q  And the subject is -- it looks like Medal of Honor
17    W -- and I don't know what the W stands for.
18  A  Warfighter.
19  Q  I'm not a game person so I don't really --
20  A  Neither am I.
21  Q  So it's MOHW DLC.  What does DLC stand for?
22  A  I don't know.
23  Q  So the discussion is about a video game called
24    Medal of Honor:  Warfighter.  And your salutation
25    is, Hey, guys.  I've included Elyse in on the

Page 201

1   e-mail as well.  You also wrote -- there was talk
2   of some meeting, but you also wrote, quote, Also on
3   a side note, I've kind of been thinking of this
4   whole thing as two different products that are tied
5   very close together.  One would be the Silent R
6   Productions side with the promo videos, et cetera.
7   The second side is the Mark Owen book/Medal of
8   Honor promotion piece.  Both are big marketing
9   pieces, but I was seeing these two as separate.  Do
10  you see that?
11 A Yep.
12 Q So I know you've referenced before you're not a
13  marketer, but what were your concerns here about
14  marketing?
15 A Elyse brought up this idea.  She said, Look, if
16  you're -- we're doing this book.  We're well down
17  the way of doing the book.  Now you've got this
18  other opportunity to do a video game piece.  Okay.
19  We've negotiated out of the bin Laden stuff in the
20  video, but, hey, you're still going to be attached
21  to a very large video game that's going to be
22  released, and they're -- you know, they're going to
23  be marketing it.  And Elyse brought it up, Hey,
24  maybe there's a way to kind of co-promote the two.
25 Q Was the idea to cut out the bin Laden piece of it

Page 202

1   because you wanted the bin Laden side of things to
2   be a Mark Owen piece as opposed to a Silent R
3   piece?
4 A I never thought of it that way.  I just simply
5   didn't think it was appropriate to play that level
6   in a video game.
7 Q And did you run any of these discussions -- again,
8   I've asked you this before -- through Kevin
9   Podlaski?
10 A Not that I remember.
11 Q Now, on the next --
12 A Richard Heller was my -- was the main legal counsel
13  on a lot of the video game stuff.
14 Q On June 8 of 2012, Elyse Cheney is writing to Craig
15  Owens, to you, and copying Sherertz and Goodrich.
16  Again, the subject is, Medal of Honor:  Warfighter.
17  And in there, Elyse is saying -- and I'll just
18  quote a segment of the e-mail -- Even though we
19  know that your business is a million times more
20  lucrative than publishing, the publisher still has
21  to put down a lot of money in this book, and they
22  want to be the ones, along with Mark and I, to
23  control how Mark's persona is framed out and laid
24  out for the media.  Do you see that?
25 A Yes.

Page 203

1 Q Now, I've referenced earlier -- I asked you whether
2   you were trying to carve out Mark Owen versus a
3   video game part of your marketing strategy.  Is
4   that consistent with what you described earlier?
5 A I think this is Elyse getting involved, trying to
6   connect a whole bunch of dots and play her little
7   role as the -- right.  We've -- I think we've
8   already talked about her coming together with me
9   and us creating this stuff.  And she was much
10  smarter at all this than I was, and so I think I
11  see her trying to carve out where it's -- hey,
12  look, we want some marketing on this.  We want
13  this.  You know, that's her taking the lead on
14  that.
15 Q Okay.  Now, the next page over leading to the
16  front, I'm referring you to a June 9, 2012, e-mail
17  that you wrote.  And it's a discussion of what you
18  termed, quote, the name game.  Do you see that?
19 A Okay.
20 Q And in this e-mail -- and I'm not sure if I know
21  who you're writing to.  Yeah, I can see it.  You're
22  writing to -- on that day to Goodrich; to Owens,
23  Craig Owens; Eric Sherertz.  And I don't see Elyse
24  Cheney on this e-mail.  But in any event, your
25  discussion is dealing with this name issue --

Page 204

1 A Okay.
2 Q -- that Elyse Cheney had raised the day before.
3   And you wrote, In the end, the only people I really
4   trust with my real name is the people in this
5   e-mail.  Did you see that?
6 A Yeah.
7 Q So you didn't include Elyse on that.  Is there a
8   plan reason why you didn't or --
9 A I think it was -- obviously I trusted Elyse at this
10  point with my real name.  This was an e-mail more
11  focused on the EA side of the house.  Right.  Eric
12  Sherertz was the main guy dealing with EA.  Greg
13  Goodrich and Owens, both definitely EA.  I'm just
14  getting to know them.  And again, back to my safety
15  and security piece, I wanted to make sure these
16  guys knew that I was serious about the fake name.
17 Q And you also at the end -- I think everyone is on
18  board with the September 11 publishing date so once
19  that is in stone, hopefully this next week, we can
20  link up on a conference call and start necking down
21  all the details.  Do you see that?
22 A Yes.
23 Q What details are you referring to?
24 A I'm guessing that's reflecting back to some of the
25  ideas that Elyse had said, Hey, the co-promoting

Page 205

1   launch of all of this.
2 Q And was it the idea that you would release the book
3   and then the video game would be released on the
4   same day, on September 11?
5 A I don't believe so.  I don't remember their exact
6   launch date.  I just think Elyse was trying to get
7   some sort of promotion out of them to help us, and
8   then we would somehow promote them when they
9   launched their video game.  I don't remember the
10  day their game was launched.
11 Q Did you have any concerns that focusing on
12  September 11 as a marketing date, you know, would
13  have an adverse effect?
14 A No, because the other option was to get it thrown
15  in the pot with all the crazy political stuff
16  that's going on on election day.  We just saw it
17  again; right?  The last thing I wanted to do was
18  touch that.  And again, based off the book and the
19  topic that I was writing about, I couldn't think of
20  a better time to release it than September 11.
21 Q But, you know, Labor Day, end of August.
22 A I have no idea when Labor Day is.
23 Q September 11 has a -- it's a day obviously
24  connected to tragedy in New York and a terrorist
25  attack.  Was the driving force at least in 2012 to

Page 206

1   use that date as a way to maximize profit?
2 A No.  I don't think I ever said, Okay, let's do it
3   on the 11th to maximize profit.  I think -- again,
4   Ben was driving the overall big picture timeline
5   and when we -- whatever it was, six months later
6   that we had to have something out in that window
7   where I had the ability to say, Hey, look, guys,
8   I'd like to do it on this date.  That was my two
9   cents to try and do it on September 11, and that
10  had absolutely nothing to do with capitalizing
11  monetarily on that day.  That had to do with that
12  story resting on that day.
13 Q This will be Number 21.
14      (Exhibit 21 was marked for identification.)
15 Q Now, the next day after the exchange of e-mails
16  that we discussed on Exhibit 20, the next day on
17  June 11, you were in an e-mail exchange with Ben
18  Sevier, Kevin Maurer, and Elyse Cheney about the
19  schedule and to publish on 9/11.  Do you see that?
20 A Okay.  Yes.
21 Q And the e-mail chain starts off with an e-mail from
22  Ben Sevier saying on Monday, June 11, Hello all,
23  including you, Mr. Maurer, and Elyse Cheney, that
24  we're, quote, charging ahead on the schedule to
25  publish 9/11 which means the book's editing,

Page 207

1   revision, and production will need to happen on the
2   below timeline.  Do you see that?
3 A Yes.
4 Q And was that -- and what follows is a -- on the
5   next page after that is a fairly detailed schedule
6   for the book and that the bound copies of the book
7   were due on August 3 of 2012.  Do you see that?
8 A Yep.
9 Q Was that a schedule that you had discussed with
10  Mr. Sevier in advance?
11 A A loose schedule.  I don't remember specifics.
12  This is obviously a new one with much more
13  specifics as we were getting closer.
14 Q And during this time, were you actively involved
15  with Mr. Maurer to write the various pieces of the
16  book?
17 A I believe so.
18 Q And did you discuss this schedule at any point in
19  time with Mr. Podlaski?
20 A I don't remember.  I'd have to go through e-mails.
21      (Exhibit 22 was marked for identification.)
22 Q Mr. Bissonnette, I've shown you Exhibit No. 22.
23  This is an e-mail the very next day on June 12
24  where you are receiving a memorandum of
25  understanding about your consulting with Medal of

Page 208

1   Honor:  Warfighter.  And the e-mail from
2   Mr. Owens -- and he copies a few people, yourself
3   at two different e-mails, Greg Goodrich, and Joe
4   Cademartori.  It's C-A-D-E-M-A-R-T-O-R-I.  Do you
5   see that?
6 A Yes.
7 Q Who is Joe Cademartori?
8 A No idea.  Guessing their legal counsel.
9 Q Okay.
10 A Guessing.  I don't know.
11 Q And Mr. Goodrich we know and, of course, Mr. Owens
12  we know.  And in the e-mail, Mr. Owens is saying,
13  Mark, thanks for speaking with Greg and I on this
14  exciting opportunity.  As discussed, attached is
15  the letter of intent on the consulting agreement
16  for Medal of Honor:  Warfighter.  Please let me
17  know if you have any questions.  And did you
18  eventually sign this agreement?
19 A I don't believe we did.
20 Q Did you -- at the time that you were at least in
21  discussions with this, you were still not retired
22  from the Navy officially; correct?
23 A June 12.  No.
24 Q Did you discuss this with Mr. Podlaski?
25 A No.

Page 209

1  Q  Was there a reason why you didn't?
2  A  I was using Richard Heller as my legal counsel for
3     the video game stuff.
4        (Exhibit 23 was marked for identification.)
5  Q  So number 23, this is an e-mail from Elyse Cheney
6     to you and along with it is an exchange between
7     Elyse Cheney and Alex Jacobs.  Do you know who Alex
8     Jacobs is?
9  A  He worked for Elyse.
10 Q  And within this e-mail, there's an announcement
11    that in October, Mr. Bowden was going to publish
12    his book called The Finish:  The Killing of Osama
13    Bin Laden.  Do you see that?
14 A  Yes.
15 Q  Did you have a discussion with Elyse Cheney about
16    this information?
17 A  Not that I recall specifically.
18 Q  Do you know why she was sending you this
19    information?
20 A  Of interest just like when I shared her -- the
21    information from Bowden.
22 Q  And was it a concern of yours that you were
23    interested in having your book released before
24    Mr. Bowden's?
25 A  Of course.  You're going to kill me.  Can I have

Page 210

1     two minutes?
2  Q  Sure.
3        (A brief recess was taken.)
4        (Exhibit 24 was marked for identification.)
5  BY MR. FURMAN:
6  Q  So we're fast-forwarding to August 17 of 2012.  And
7     this is an e-mail, Mr. Bissonnette, from you to
8     Elyse Cheney.  And the subject is, Future guidance.
9     And the reference is to team.  And I'm not sure if
10    this e-mail was meant for you to send to Elyse to
11    then distribute to other people within her company.
12    The reference also in the beginning of the e-mail
13    is, Okay, guys.  So I'm assuming that this e-mail
14    was meant for not just Elyse Cheney; is that
15    correct?
16 A  I would assume so.
17 Q  Who else was it meant to include?
18 A  Anybody else who was in on the Mark Owen name game,
19    anybody else who -- I don't know.  Certainly
20    anybody else who knew the name difference, right,
21    anybody who was on the team.
22 Q  Well, the team being that it was Matthew
23    Bissonnette writing a book under the pen name Mark
24    Owen; correct?
25 A  What is that --

Page 211

1  Q  Was the team being related only to No Easy Day?
2  A  I don't know how I classified it in my mind when I
3     wrote it, but I would assume anybody I was involved
4     with on some sort of business level had been
5     involved -- anybody that I'd been involved with up
6     until this point.
7  Q  And did you expect Elyse Cheney to then forward
8     this e-mail out to other people?
9  A  If I did, I'm guessing I probably would have said,
10    Please forward.
11 Q  Okay.  The reason I'm asking you this question is
12    because the salutation is to team.
13 A  Right.
14 Q  And it says, Okay, guys.
15 A  Right.
16 Q  And you're only writing to one person.
17 A  Right.
18 Q  So I want to understand who you meant this audience
19    to be.
20 A  If I would have wrote team and guys, plural, that
21    would have been going out to everybody.  Why it
22    only went to Elyse, I don't know.  I don't know if
23    the same e-mail was e-mailed singularly to each
24    person.  I don't know why.  I don't know why I
25    didn't put them all on the same chain.  I don't

Page 212

1     know.
2  Q  Did you include Kevin Podlaski in this e-mail?
3  A  According to this e-mail, I only sent it to Elyse.
4  Q  Would Kevin Podlaski be considered part of this
5     team?
6  A  Sure.
7  Q  Did you expect Mr. Podlaski to receive this e-mail?
8  A  I don't know.  Obviously if I'm referring to the
9     team, I would refer to the whole team, not just
10    Elyse.  So I'm not sure why that happened.
11 Q  Well, at any point in time, did you ever tell
12    Mr. Podlaski about your pseudonym Warren West?
13 A  Not that I can think of.
14 Q  So when you say that you would have expected
15    Mr. Podlaski to be part of this team, would it be
16    through this e-mail that you would be introducing
17    the Warren West concept?
18 A  No, quite obviously not because I didn't e-mail
19    this to him.  In the To line, it only goes to
20    Elyse.
21 Q  So is it fair to say that you didn't expect
22    Mr. Podlaski to see this?
23 A  I would have had zero issues had he, you know.  Had
24    I briefed him on the name Warren West?  No, I don't
25    think I had at this point.

Page 213

1 Q Now, in this e-mail, you are saying, I want to --
2   quote, I wanted to put out a quick e-mail so that
3   everyone was singing off the same sheet of music,
4   closed quote. So, you know, we talked about team
5   and the concept of teams, but in this sense, you
6   are the quarterback here; right?
7 A Yep.
8 Q And it states that, With the September 11
9   publishing date -- I'm assuming it's publishing
10   date, PUD -- quickly approaching, I wanted to make
11   sure everyone knew what my intentions were in
12   regards to any new Mark Owen business
13   opportunities. Do you see that?
14 A Yep.
15 Q So in this e-mail, you're linking September 11 to
16   Mark Owen business opportunities. Is that fair to
17   say?
18 A No. I'm referring to September 11 as the launch
19   date of the book and then anything post the launch
20   of the book.
21 Q In the next sentence, you wrote, I'm expecting a
22   fair amount of attention on and after September 11,
23   and I want to make sure we reply with a common
24   theme. And the -- there's a quote. Mark Owen
25   appreciates your interest and as of right now, he

Page 214

1   is focusing on every opportunity to raise money for
2   the charity organizations he discusses in his book.
3   We will get back to you if and when Mr. -- if and
4   when Mark Owen is interested, closed quote. Do you
5   see that?
6 A Yes.
7 Q Is that what you wanted people to say in the wake
8   of the publishing of the book on September 11?
9 A I wouldn't say it verbatim that's what I wanted
10   because I followed up by saying, you know, I hope
11   everybody gets the point. The point I was trying
12   to make -- and it goes back to my reasons for using
13   the pseudonym and not showing my face -- is, look,
14   I didn't want to be the one guy out there saying,
15   Hey, look at me. I've done all this. I wanted the
16   focus to be on -- certainly in regards to the book,
17   the charity aspect, and the sacrifice of all those
18   who have served. So I think that my intentions
19   there were to keep the focus on that and not me as
20   an individual.
21 Q And you wrote, The perception -- the words, The
22   perception needs to be that Mark Owen is not
23   chasing down selling his book to the first people
24   that came along and that Mark Owen is not running
25   around Hollywood trying to capitalize on any of

Page 215

1   this. Do you see that?
2 A Right.
3 Q So is that what you wanted, is that you wanted the
4   perception to be that you were not trying to
5   capitalize on the book and the killing of bin
6   Laden?
7 A It was important to me to never be the primary
8   focus of it. I came from an organization that
9   worked as a team. I wasn't the only guy on that
10   mission. And it was important to me to make sure
11   that everybody got that credit. I knew there would
12   be a ton of people out there second guessing and
13   wanting to point fingers, but I always wanted it to
14   go back, reflect credit on the team, not me as
15   trying to stand out and be somebody special.
16 Q Well, at the same time you said that Mark Owen is
17   not running around Hollywood, you also had a
18   pseudonym named Warren West who was actually doing
19   that, right, running around Hollywood.
20 A Right. I was, but I wasn't capitalizing on the
21   raid. I had turned down the video game guys to do
22   a raid specific thing. I had turned down the movie
23   to be involved at that level. I wanted to do the
24   book and let that be as it may.
25 Q Isn't it fair to say that you wouldn't have gotten

Page 216

1   any introductions through Hollywood if it wasn't
2   for the fact that you were involved in the raid?
3 A No, I don't think that's a safe assessment.
4 Q Why not?
5 A Plenty of people go out to Hollywood and make a
6   name for themselves no matter where they came from.
7   And certainly anybody with just plain SEAL
8   credentials -- I don't care if you were on the raid
9   or not -- have very successful careers in Hollywood
10   based off the SEAL background alone.
11 Q It was eventual we'd talk about Mark Hosenball.
12 A Whoever that is.
13      (Exhibit 25 was marked for identification.)
14 Q I'm showing you what's been marked as Exhibit
15   No. 25. It's an e-mail chain that is on August 23
16   of 2012. Do you remember that day learning that a
17   journalist from Reuters had found out that -- and
18   I'm presuming it was through Fox News that you were
19   writing a book called No Easy Day?
20 A Yeah. I remember the name -- I remember the day my
21   name was released, yes.
22 Q And do you know how it came about that your name
23   was released?
24 A No.
25 Q At that point in time, August 23 of 2012, had you

Page 217

1    told anyone in the SEAL community that you were
2    writing a book?
3  A  I don't remember the exact timeline. I know once
4    everything went public, one of my master chiefs
5    from the command reached out, knew it was me, and
6    said, Hey, did you write a book? And I -- we had a
7    phone call. But nothing -- and I don't remember
8    the dates of that. But it had to have been after
9    my name was out.
10 Q  And in this e-mail, Mr. Hosenball, this reporter
11   from Reuters, is contacting Elyse Cheney, your
12   agent, and saying that no one at SOCOM or the Navy
13   SEALs were asked to vet the book or approve it and
14   that the publishing of the book was unauthorized.
15   Do you remember receiving news about this?
16 A  Vaguely, yes.
17 Q  Now, did you speak to Kevin Podlaski about this?
18 A  I don't remember who I spoke to about this.
19 Q  At the very end of the e-mail exchange on August 23
20   at 6:00 p.m., after the news is being exchanged
21   about this reporter's interest in the story and
22   also the revealing of your name and there was a
23   flurry of e-mail exchanges between Peter Ragone, a
24   publicist on behalf of Dutton; Christine Ball;
25   Elyse Cheney; and yourself. You wrote to Elyse

Page 218

1    Cheney, Maybe hit up Kevin and Nate. Are you
2    referring to Kevin Vance and Nate Brown?
3  A  Yeah, but I don't know why.
4  Q  Well, I think the reason for that -- and I'll ask
5    you if this prompts your memory -- is Elyse wrote
6    at 2:58 p.m., I have a SEAL who's ready to be
7    quoted about this. He's F'ing furious. I'm going
8    to call you guys, and we'll conference him in. Do
9    you know who she's referring to?
10 A  No. Maybe Kevin and Nate. I don't know how many
11   other SEALs Elyse would know.
12 Q  Are Kevin and Nate supporters of yours in the sense
13   that they're not upset that you wrote the book?
14 A  Yeah. They're friends.
15 Q  And --
16 A  Or supporters. I wouldn't call -- I can't remember
17   the last time I talked to them. They're --
18 Q  And I'm using the term, you know, loosely so
19   that -- and if you have trouble with it, let me
20   know. Is it fair to say that within the SEAL
21   community, there are people who are your supporters
22   in the sense that they are not angry that you wrote
23   the book No Easy Day, and then there's a set of
24   people in the SEAL community who are angry and
25   non-supporters?

Page 219

1  A  Yes.
2  Q  There's a term called PNG'ed. Is that of
3    significance in the SEAL community?
4  A  If you buy into it.
5  Q  Let's assume I buy into it. What does it mean?
6  A  It means you're out of the club.
7  Q  And the club meaning that you no longer have a
8    friendship of -- what does it mean to --
9  A  No. It doesn't mean anything about friendship.
10   Right. I've got plenty of SEAL friends still
11   serving, still in, some of my best friends. All
12   right. Nothing changes no matter if you're PNG'ed
13   or not. PNG'ed is something that the head shed,
14   right, the HQ loves to use. And if they don't like
15   you, they can PNG you, and you're now out of the
16   club and we don't want you around anymore.
17 Q  And what --
18 A  It's a label, I would say.
19 Q  It's a label. Okay. And does it exist anywhere?
20   For example, I've read, although I know I wanted to
21   ask you about it, that there's a rock in Virginia
22   Beach that has the names of certain SEALs who are
23   PNG'ed; is that true?
24 A  I have no idea.
25 Q  Have you ever seen it?

Page 220

1  A  No. There wasn't one there when I was there and
2    the friends I've asked said they've never seen it
3    either.
4  Q  Have you heard about that, though, that there's a
5    rock?
6  A  I've read about it online, but I don't believe
7    everything I see -- read online either.
8  Q  No, I agree with that. So that's why I'm asking
9    you personally. Are you aware that it exists?
10 A  I have friends still at the command who have never
11   seen this rock or PNG, whatever -- they've never
12   seen anything like it.
13 Q  And so you have no firsthand knowledge about the
14   existence of such a thing?
15 A  No.
16 Q  A captain's mast, do you know what that is?
17 A  Yes.
18 Q  Can you describe what a captain's mast is?
19 A  It's -- I believe it's a form of nonjudicial
20   punishment where instead of going outside the
21   command, your captain is allowed to place
22   punishment on top of you, punish you for certain
23   things.
24 Q  Were you the subject of captain's mast?
25 A  Never.

Page 221

1  Q  As a result of the release of No Easy Day, was
2     anyone subject to a captain's mast that you're
3     aware?
4  A  No.
5  Q  As a result of other activities that you were
6     involved in while you were a Navy SEAL, the Element
7     Group, various business ventures, electronic games,
8     was anyone subject to a captain's mast that you're
9     aware?
10 A  While I was a SEAL, no.
11 Q  After you were a SEAL.
12 A  Yes.
13 Q  Who were they?
14 A  The other SEALs that helped with the video games.
15 Q  And what are their names?
16 A  I'm not going to --
17 Q  That's okay.
18 A  I don't want to list -- these guys are still active
19    duty. A lot are. Some aren't. So I'd rather not
20    list them.
21 Q  The reason -- again, I would just make a record
22    that we want to leave a blank in there. Just --
23    they may or may not be witnesses that we would want
24    to seek in this case. So I respect your response,
25    but I just wanted to leave it blank in case we need

Page 222

1     to chase that down.
2         Now, on the -- I want to refer back -- on
3     August 17 in your e-mail, you wrote that you wanted
4     the team, as it were, to say that you appreciate --
5     Mark Owen appreciates your interest in the book but
6     is now focusing on raising money for charity
7     organizations. That's in anticipation of
8     August 11, the publishing date of No Easy Day.
9  A  September 11.
10 Q  I'm sorry, September 11. Do you recall when you
11    received word from the Navy SEAL Foundation that
12    they were not interested in receiving any proceeds
13    related to the book?
14 A  No.
15     (Exhibit 26 was marked for identification.)
16 Q  Now, this is August 25 of 2012. This is Document
17    Number 26. An e-mail from you to Christine Ball,
18    Ben Sevier, Elyse Cheney, and Kevin Maurer.
19    Mr. Podlaski is not included in this e-mail. You
20    wrote that you had just gotten word that SEAL
21    Foundation, S-E-A-L, Foundation, is already
22    refusing to accept proceeds related to the book.
23    You wrote, I don't think we need to make that
24    public, but I've already reached out to another
25    foundation that if given the chance to list the

Page 223

1     charities, we can simply slide them into the mix.
2     No issues, no drama other than the NSF being
3     completely petty and judgmental without even
4     reading the book. Hope you guys have a great
5     weekend. How did you first find out about the Navy
6     SEAL Foundation's decision?
7  A  Somewhere in the media, I'm guessing. I don't
8     remember. Nobody called me. Nobody e-mailed me.
9  Q  Well, your links to the media would have been --
10    I'm presuming would have been Elyse Cheney and her
11    team; correct? They're your agents.
12 A  I'm sure there were -- I don't know if there were
13    articles coming out at this point by the 25th or
14    not. I'm guessing if the SEAL Foundation's already
15    said it and made some sort of statement, then
16    that's relatively public. It's not like they were
17    calling me to let me know that personally. So I'm
18    guessing that was relatively open source for
19    anybody.
20 Q  But as you sit here today, do you know the source
21    of the information that you were giving to
22    Christine Ball, Ben Sevier, Elyse Cheney, and Kevin
23    Maurer about the Navy SEAL Foundation's decision?
24 A  As I'm sitting here today, do I know the source of
25    where I heard that?

Page 224

1  Q  Yeah. How did you find out?
2  A  I have no clue. Probably media.
3  Q  And was media contacting you directly or was it
4     just --
5  A  No, just Google headline news on Google Alerts,
6     whatever you want.
7  Q  Now, we went through the August 30 letter. It
8     might seem like days ago, but we did that this
9     morning. That was the Jeh Johnson letter. I'm
10    going to show you -- we'll have this marked as the
11    next exhibit.
12     (Exhibit 27 was marked for identification.)
13 Q  On the Sunday after Jeh Johnson's letter -- this is
14    September 2 -- you wrote an e-mail to Robert
15    Luskin. And the people that you included were
16    Christine Ball, Ben Sevier, Peter Ragone, Alex
17    Gigante, Elyse Cheney, Mark Fabiani, and Kevin
18    Maurer. You didn't include Kevin Podlaski; is that
19    correct?
20 A  Not on this e-mail.
21 Q  And the subject is, No Easy Day. Now, the e-mail
22    chain begins with an e-mail from a military writer
23    called James Dao, D-A-O. Do you know who James Dao
24    is?
25 A  No.

**Page 225**

1  Q  He writes for The New York Times.  Have you ever
2     spoken to him?
3  A  No.
4  Q  He wrote to Mr. Luskin about an E-book that was a
5     response from certain members of the SEAL community
6     about your book No Easy Day.  Did you ever read
7     that book, by the way, the E-book?
8  A  No.
9  Q  And it was essentially -- were you told what the
10    book was about, the E-book?
11 A  The title said enough.
12 Q  Well, did anyone ever go over it with you and tell
13    you who wrote it?
14 A  Oh, I know who wrote it.
15 Q  Who wrote it?
16 A  Brandon Webb.
17 Q  And do you know why Brandon Webb wrote the book?
18 A  Probably to sell a ton of copies.
19 Q  And it's fair to say he's not a supporter of yours?
20 A  No.
21 Q  And Mr. Luskin responded to Mr. Dao.  Did
22    Mr. Luskin call you before he responded to Mr. Dao?
23 A  I don't remember.
24 Q  Would you have authorized Mr. Luskin to respond to
25    a reporter about your book without Mr. Luskin

**Page 226**

1     speaking to you?
2  A  I don't know.  At this moment in time, I'm sure
3     there was tons of press coming in with all sorts of
4     stuff being hit in different directions.  So was
5     every bit of communication coming through me before
6     going out?  I doubt it.
7  Q  Well, my question to you is, did you authorize
8     Mr. Luskin to speak on your behalf about running it
9     by you first?
10 A  I don't know that I had that conversation with him
11    that clearly spelled that out.
12 Q  On that day, Mr. Luskin responds to the reporter
13    and then he forwards the -- his response to you and
14    others, including Elyse Cheney, Christine Ball, Ben
15    Sevier, Mr. Ragone, Mr. Gigante, Mr. Fabiani,
16    Mr. Maurer.  But he doesn't include Mr. Podlaski.
17    Do you see that?
18 A  Yes.
19 Q  And you eventually responded; correct?
20 A  Yes.
21 Q  And in that response, you wrote, When I decided to
22    get out of the Navy and told my boss in December,
23    they did send me home from the trip and pretty much
24    treated me like S-H-I-T.  What did you mean by
25    that?  In what manner did they treat you?

**Page 227**

1  A  We were -- we were on a jump trip in Arizona, as I
2     mentioned earlier.  I pulled my head shed aside
3     towards the end of the trip.  I think we had two
4     days left.  And I explained to them my intentions
5     of getting out of the Navy.  The next day, they
6     said, Okay.  Get a ticket.  You're flying home.
7  Q  And you refer to it as being treated poorly.
8  A  Sure.
9  Q  I want to use your language.  Being sent home is
10    being treated poorly?
11 A  Sure.  I'm on a training trip with my team, my
12    squadron, my troop, my whole group of guys.  They
13    asked -- as soon as I told the head shed, they
14    asked me to catch a flight the next day.  We had
15    two more days of training to go.  They didn't allow
16    me time to sit down and even tell my team why I was
17    leaving.  They just sent me home.  I don't think
18    that's the proper way you treat anybody who's done
19    14 years of service.
20 Q  And other than that, other than sending you home,
21    was there any other treatment that you felt was
22    where you were treated poorly?
23 A  No.  Sorry.  Verbal.
24 Q  Now, in the second paragraph of the e-mail, it
25    states, I spoke with multiple friends at work

**Page 228**

1     before I started this book project, and every one
2     of them knew I was doing it for the right reasons
3     and knew I would also do it the right way,
4     parentheses, not taking all the credit, closed
5     parentheses.  You had earlier testified that you
6     didn't tell anyone about the writing of the book,
7     but your e-mail is inconsistent with your sworn
8     testimony.
9  A  Yeah.  I don't think I really ran around and talked
10    to a whole bunch of people.  I had friends there
11    that I discussed loosely -- Hey, you know, what do
12    you think of this?  What do you think of that?
13    What do you think of the idea of writing a book
14    about this?  You know, trying to get their
15    general -- but did I ever come to them and say,
16    Hey, guys, I'm doing this, this, this, step one,
17    two, three, no, I didn't do that.
18 Q  So if I understand what you just told me, you told
19    certain friends loosely that you're thinking about
20    writing a book?
21 A  I probably -- I don't know how I exactly phrased
22    it, but it wasn't, Hey, guys, I'm writing a book.
23    It's, Hey, if I was going -- or if somebody were
24    going to write one, don't you think it should be
25    done in the right way?  Don't you think that --

Page 229

```
 1      those type of -- that type of way.
 2   Q  Well, who were those friends?
 3   A  Guys that I was on the squadron with.
 4   Q  What are their names?  And I think those are the
 5      names I do want.
 6   A  I don't remember specifically who exactly I spoke
 7      to.
 8   Q  And the reason I'm asking you these questions is
 9      because earlier when you testified, you testified
10      that you only told your wife and the first person
11      you spoke to about writing the book was Elyse
12      Cheney in December.
13   A  Right.
14   Q  But in your e-mail to your lawyer, Mr. Luskin,
15      you're telling him that you spoke with multiple
16      friends at work before I started this book project,
17      and every one of them knew I was doing it for the
18      right reasons.  So --
19   A  I think I --
20   Q  I don't think I understand your testimony now.
21   A  No.  My testimony is correct.  I'm probably
22      inflating this a little bit where -- saying they
23      knew.  Okay.  Did they exactly know I was writing a
24      book?  No.  The concept of writing a book?  There
25      was a friend of mine, Adam Brown, who had been
```

Page 230

```
 1      killed several years prior.  Right.  A whole bunch
 2      of guys around the command all gave interviews for
 3      a book for Adam Brown, Fearless.  Read it.  It's a
 4      phenomenal book.
 5          So when I say -- when I'm referring to talking
 6      to my friends, it's, Hey -- in the theory of, hey,
 7      supporting another book in those terms.  Did I say
 8      to any of them, Hey, guys, I'm writing a book next
 9      week and this is -- blah, blah, blah?  No.
10   Q  So are you saying that you were -- what do you mean
11      by inflating?  What do you mean that you were
12      inflating?
13   A  Inflating what?
14   Q  Can I have the last answer read back?
15          (The requested material was read back by the
16      reporter.)
17          MR. FURMAN:  Okay.  Thanks.
18   Q  You testified that you were inflating this.  And I
19      want to know what you're inflating.
20          RANDAL JOHNSTON:  Object to the
21      characterization of his testimony.
22          MR. FURMAN:  I'm quoting it.
23          RANDAL JOHNSTON:  No, you're not.  He said,
24      I'm probably inflating, I think.
25          MR. FURMAN:  Okay.
```

Page 231

```
 1   A  The word "knew."  To say that everyone knew that I
 2      was going to do this, this, and this and -- no.
 3      Did they know any specifics?  No.  Could I have
 4      talked in generalities with several of my friends,
 5      guys on the team talking about books, talking about
 6      movies, talking about all of this type of stuff
 7      going public?  Yeah.  I talk to a lot of guys.  And
 8      none of them seemed to think that writing about it
 9      was bad.  Right.  None of them thought writing
10      about -- again, a whole bunch of them had just
11      given interviews for a book about a SEAL that was
12      at SEAL Team 6.  So the idea that anybody gave
13      interviews or whatnot was instantly PNG'ed and this
14      bad person, no.  There was a lot of people in the
15      command who supported the idea of writing books.
16   Q  And when you say writing about -- you're referring
17      obviously to Operation Neptune Spear; correct?
18   A  Yeah.
19   Q  And at the time that you're writing this e-mail to
20      Mr. Luskin, this was within two days of receiving a
21      letter from the General Counsel of the Department
22      of Defense, which was Exhibit No. 1.  It's
23      basically saying that you're in violation of your
24      nondisclosure agreements and you're going to be
25      held accountable; correct?
```

Page 232

```
 1   A  Okay.
 2   Q  So at that point, do you think that this was
 3      serious stuff?
 4   A  Sure, absolutely.
 5   Q  And Mr. Luskin was an attorney who was retained to
 6      respond to the Department of Defense; correct?
 7   A  Yes.
 8   Q  And you didn't know Mr. Luskin personally before
 9      then; right?
10   A  No.
11   Q  You knew he was a serious lawyer; right?
12   A  Yeah.
13   Q  And you wanted to be accurate when you spoke to
14      him, right, about --
15   A  Okay.
16   Q  -- what you knew and what you didn't?
17   A  Okay.
18   Q  And isn't it fair -- is that true?  You wanted to
19      be accurate?
20   A  Sure.
21   Q  Okay.  And so after a flurry of e-mails about the
22      reasons that you wrote the book, you told
23      Mr. Luskin in an e-mail that you typed with your
24      own hands that you spoke with multiple friends at
25      work before you started the book project and every
```

Page 233

1   one of them knew that I was doing it for the right
2   reasons.  You wrote that; right?
3 A   Yep.
4 Q   And you wrote the words, I was doing it, meaning
5   you're writing the book; correct?
6 A   I wrote those words, yeah.
7 Q   And so that you told multiple friends before you
8   even gave word that you were retiring while you
9   were on active duty, multiple friends that you were
10   planning to write a book about Operation Neptune
11   Spear.  Isn't that a fact?
12 A   No.  The fact is that I talked to some friends in
13   generalities about writing books, certainly about
14   the -- writing a book about the bin Laden mission.
15   Hey, what do you think?  That type of stuff.  Did I
16   say I was doing it and doing X, Y, and Z?  No.
17       I would also like to state that I'm a little
18   worked up.  My name's leaked.  There's tons going
19   on.  I'm dropping curse words in this same e-mail
20   to the same e-mail to this big time, you know, D.C.
21   attorney.  And I'm obviously a little worked up in
22   this e-mail.
23       (Exhibit 28 was marked for identification.)
24 Q   This is an e-mail exchange that took place on
25   September 25 of 2012.  This is almost a month after

Page 234

1   the Jeh Johnson letter.  On the second page at
2   1:05 p.m. on September 25, Mark Fabiani, who is a
3   press agent for you, I believe, wrote, What, if
4   anything, are we comfortable saying on background
5   only, parentheses, from a source familiar with the
6   situation, closed parentheses, about what Bowden
7   said to you, comma, what information he asked you
8   for, comma, and in particular what he said about
9   his access to the President, et cetera?  And then
10   Mr. Fabiani writes, And, of course, if you have any
11   e-mails from him or any documentary evidence, we
12   should at least take a look at it to see what might
13   be helpful.  Thanks.  Mark.  Do you remember
14   receiving that e-mail?
15 A   I don't remember it, but --
16 Q   Now that you see it, is it fair to say you received
17   that e-mail on that day?
18 A   Yes, yes.
19 Q   And the timing seems to be off, and it could be
20   because Fabiani's in a different time zone.  But
21   your response on September 25 reads, quote, I don't
22   have -- I don't really have many e-mail from him.
23   Most of our discussions were via phone.  I saved
24   one voice mail, but it's not the one where he
25   referenced, quote, talking with the President and

Page 235

1   McRaven -- that's M-C-R-A-V-E-N -- period, closed
2   quote.  And then you go on to say, I feel
3   completely comfortable talking to whoever you want,
4   although wouldn't it be easier just to continue to
5   ask the White House as well as SOCOM for a confirm
6   or deny answer that they were interviewed for this
7   book?  They can't no comment forever, can they?  Do
8   you remember that e-mail exchange with Mr. Ragone?
9 A   I do after reading it.
10 Q   Okay.  And you have e-mail chains of some sort with
11   Bowden, but you didn't produce them to Mr. Fabiani
12   for some reason.  Why didn't you?
13 A   Nobody ever asked.  I guess I mention it in here.
14 Q   Well, he asked you.  He asked you -- Mr. Fabiani --
15   quote, Of course, if you have any e-mails from him
16   or any documentary evidence, we should at least
17   take a look at it.
18 A   Okay.
19 Q   And did you provide those e-mails to Mr. Fabiani?
20 A   I have no idea.  If I had them, I'm assuming that I
21   did.
22 Q   Now, in the middle of the first page of the e-mail,
23   you wrote -- and I think it's only to
24   Mr. Fabiani -- well, let me start at the bottom of
25   the page.  Forgive me.  On September 25, 2012,

Page 236

1   11:49 a.m., you wrote, Yes, that definitely -- yes,
2   that was definitely one of the things he was
3   telling me.  I interviewed the President and
4   McRaven and would love a boots-on-the-ground feel.
5       And then from Mark Fabiani, he responded to
6   you and included Elyse Cheney and Peter Ragone.
7   The subject was entitled, Mark, as reporters begin
8   to focus on the Bowden book.  And his question was
9   to you, And why did you decide not to cooperate?
10   You see above that, Elyse wrote, Because he was
11   doing his own book.  Do you see that?
12 A   Yep.
13 Q   And then you responded, I never told him I was
14   doing my own book.  I simply said I wasn't sure
15   about it.  Is that what you told Mr. Bowden, that
16   you weren't sure if you were writing a book?
17 A   Appears to be.
18 Q   Now, do you recall specifically that you told Mark
19   Bowden that?
20 A   I don't remember the specific conversation, but
21   this seems to be a pretty clear recollection of
22   what I said.
23 Q   Okay.  And finally -- and we'll move off this
24   topic -- you then stated in another e-mail, not
25   including Mr. Podlaski, but it's to Mr. Fabiani,

Page 237

1  Cheney, and Ragone that, quote, Initial calls
2  were -- when I was still in the Navy but on
3  terminal leave roughly around early April. He then
4  called me in May because he knew I was officially
5  out of the Navy at that point. Do you see that you
6  wrote that?
7  A  Yep.
8  Q  Did you tell Mr. Bowden when you'd be officially
9  out of the Navy?
10 A  I don't remember when I -- what dates or what
11    status I gave him. I -- this was my intent to just
12    kind of slow roll him and be like, Hey, I'm not
13    interested. You know, kind of push him off. He
14    came back around again, had a follow-up
15    conversation, and that was about it, I guess.
16 Q  Did you tell Mr. Bowden that you could not talk to
17    him when he first started calling you because you
18    were still on terminal leave?
19 A  I don't remember what I told him.
20 Q  You wrote the words, Initial calls were when I was
21    still in the Navy but on terminal leave.
22 A  Right. That's when he would have called me.
23 Q  And why did you refer to your terminal leave as a
24    reason for not talking to Mr. Bowden?
25 A  I don't think I told Mr. Bowden I was on terminal

Page 238

1  leave and couldn't talk to him. I think I'm
2  referring to his call happened for me to remember
3  timelines, I'm trying to think of big events.
4  Okay. I'm on terminal leave time frame. That's,
5  you know, January through whatever. Okay. Then he
6  called again. Once I was officially out, you know,
7  I don't know. I don't remember telling him status
8  or getting into any type of details. This was me
9  more just saying, Hey, you know, I'm not
10   interested, kind of keep at arm's length.
11       (Exhibit 29 was marked for identification.)
12 Q  This is a September 28, 2012, e-mail from you to
13    Mark Fabiani, Elyse Cheney, Peter Ragone, and
14    Robert Luskin. Mr. Podlaski is not part of this
15    e-mail exchange. Do you see that?
16 A  Yes.
17 Q  And Mr. Fabiani is writing to you. Mark, tell me
18    more about why the drone and power cut are so
19    sensitive.
20       And you wrote, I can't get into it for real,
21    dot, dot, dot --
22 A  Wait. Where are you -- I'm sorry. Where are
23    you --
24 Q  Oh, I'm in the middle of the first page. And on
25    September 28 --

Page 239

1  A  Oh, there we are. Okay. Sorry.
2  Q  -- at 5:53 p.m., Mark Fabiani writes, Tell me more
3    about why the drone and power cut are so sensitive.
4    And you responded back at the top of the page, I
5    can't get into it for real, but all I can say
6    are -- is -- all I can say is both of those
7    programs weren't known until after the raid. Those
8    would have been examples of programs that would be
9    considered NSAP or special access program. What do
10   you mean by that?
11 A  Some sort of higher level deal.
12 Q  What do you mean by deal?
13 A  There's technology and programs that we didn't want
14   to talk about.
15 Q  And when you say, We didn't want to talk about, you
16   mean in No Easy Day?
17 A  That I didn't want to talk about. I stay away from
18   helicopters and technology. I'm simply not going
19   to go there. I'm not going to entertain going
20   where they're going here.
21 Q  Okay. And both the drone and the power cut were
22   operations that related to Operation Neptune Spear;
23   correct?
24       RANDAL JOHNSTON: I'm going to object to that.
25   I will permit him to say they're described in Mark

Page 240

1  Bowden's book as being related to Operation Neptune
2  Spear as the page 2 of the document reflects.
3  A  I don't believe I talked about that in the book,
4    and that's stuff that I don't feel comfortable
5    talking about now.
6  Q  You mentioned that both the drone and the power cut
7    and I'm presuming it's the power cut in the town of
8    Abbottabad, that those are SAPs; correct?
9  A  I'm not going to confirm or deny what type of
10   special programs there are out there. That would
11   be something in my mind that is something at a
12   level that we don't need to discuss unless the
13   government's here allowing me to discuss them.
14 Q  Well, you testified earlier that you didn't believe
15   that Operation Neptune Spear was a special access
16   program.
17 A  I don't believe it was.
18 Q  Were the drone and the power cut into Abbottabad
19   part of Operation Neptune Spear?
20 A  Sure.
21       RANDAL JOHNSTON: Objection. Don't answer
22   that.
23       MR. FURMAN: No. You can't -- I'm insisting
24   on an answer.
25 A  There are plenty of programs that were involved in

Page 241

1  that mission that I didn't talk about, just like
2  the -- where I chose not to release information
3  that was very clearly coming out in open source.  I
4  did not want to discuss it.  I didn't want to talk
5  about it.  That's part of me being a responsible
6  SEAL who's operated for years, and I didn't want to
7  talk about programs that could put people in
8  jeopardy.  Never once was I briefed on any of
9  those, anything being SAP or a special program,
10 whether it being the power issues or helicopters or
11 anything else.  And I've simply not talked about
12 it.
13 Q  These programs that you referred to, they related
14    to Operation Neptune; correct?
15 A  I don't know that they were even programs.  They
16    were a part of the mission, and I chose not to talk
17    about those specific parts of the mission because
18    in my mind, that would be something that would be
19    useful to our enemy.  And I wasn't even going to go
20    there.
21 Q  Now, so is it fair to say that there were parts of
22    Operation Neptune Spear that you felt uncomfortable
23    talking about for the reasons that you described
24    because they were --
25 A  Yes.

Page 242

1  Q  -- highly classified; correct?
2  A  I don't know what their classification status was
3     nor was I ever briefed on it.  In my own opinion as
4     an operator who's operated for years and knew the
5     complexities of the mission, whether A to Z, right,
6     who goes in a room and goes left and right is way
7     different than special technology.  And I simply
8     wasn't going to talk about the special technology
9     no matter -- and I'm not saying at any point there
10    was any classification attached to any of that
11    because it never was.  I just chose to simply not
12    talk about it because that's -- that's way
13    different than who went left and who went right.
14 Q  Did you discuss with Mr. Podlaski any aspects of
15    the drone or power cut in Abbottabad?
16 A  Not that I believe.
17 Q  Did you discuss with Mr. Podlaski that there were
18    aspects of Operation Neptune Spear that you believe
19    were classified and were at such a high level of
20    classification that you could not discuss them?
21 A  I don't think we had the discussion.  We talked
22    about how my -- when we would do our best, my
23    personal best, to scrub it as I wrote it to make
24    sure we didn't cross any type of lines, and then he
25    had committed to us that he could be able to scrub

Page 243

1  the rest to make sure we didn't cross any lines.
2  Q  But in terms of deciding whether or not certain
3     aspects of Operation Neptune Spear were, in fact,
4     too classified for you to write about, why didn't
5     you ask your superiors?
6  A  We were never briefed about any specific piece that
7     we could or could not talk about.  I chose to use
8     my best judgment to do it the way I did and not
9     talk about those programs because in my best
10    judgment, we didn't even -- it doesn't add to the
11    story to talk about it.
12 Q  And just so I can understand what your best
13    judgment is, do you recall any training that you
14    received in your military service that would have
15    assisted you to exercise that judgment about what
16    could be disseminated to the public and what can't
17    be?
18 A  Any training that I received?
19 Q  Yeah.
20 A  No in-person training.
21 Q  So when you say that you exercised your best
22    judgment, what are you basing that on?
23 A  I'm basing that off of 14 years of experience and
24    knowing that, hey, there's certain pieces of
25    information that if I give out there -- anybody

Page 244

1  with a security clearance has to use their best
2  judgment.  Right.  I had the clearance.  I wanted
3  to use my best judgment.  I erred not to even get
4  into any of those things because I didn't even want
5  to go there.  I wanted to stay away from that.  I
6  was -- when we even turned the manuscript over to
7  Mr. Podlaski, he said, Hey, great job.  There's not
8  much even in here.  So when he did the scrub, he
9  didn't think that it -- we had crossed the line in
10 any way.
11 Q  I'm more concerned about what was in your mind --
12 A  Okay.
13 Q  -- because I think your counsel's going to ask
14    Mr. Podlaski some questions, but I'm more
15    interested in what's going on there.
16 A  All right.
17 Q  In this e-mail, you also wrote that, quote, Prior
18    to the raid, these would be perfect examples of
19    sensitive or classified programs.  Do you see that?
20 A  Uh-huh.
21 Q  How would you know that they were perfect examples
22    of sensitive or classified programs?
23 A  Just in my mind.  Right.  In my experience, in my
24    14 years, nobody runs around talking about special
25    technology and tools that we used to target people

Page 245

1   at that level.  Those type of things that I
2   purposely chose to avoid that have been written in
3   other books, that's a perfect example of me showing
4   that, look, I was very concerned about not
5   disclosing classified information, and I chose to
6   keep it much more at a tighter level.  When people
7   talk about these other programs, yeah, that's --
8   I'm using nomen- -- sensitive programs -- there's
9   no exact program assigned to it that I know.  I
10  just chose to say, Hey, look, I'm not going to talk
11  about that.
12 Q  But based on your 14 years of experience, making
13     the decision and using the judgment as to what
14     should be sensitive or classified information and
15     not to be disclosed in the public, isn't that
16     something that should be vetted through a process
17     as opposed to being decided by an operator?
18 A  I didn't know the fine line -- I didn't know all
19     the nuances of all the paperwork that I signed,
20     which is exactly why I hired an attorney who's a
21     former SOCOM JAG who should have understood those
22     things and been able to guide me in the right
23     direction.
24 Q  And in this e-mail, you mention that Bowden's book
25     obviously does mention these programs.  And he

Page 246

1   scored interviews with the President and McRaven,
2   hence the double standard.  You wrote that --
3 A  Yeah.
4 Q  -- correct?
5     And at the time, did you think that there was
6     a double standard being applied against you?
7 A  Well, sure.
8 Q  Did you discuss that with Mr. Podlaski at any point
9     in time, that this -- these special access
10    programs?
11 A  I don't think we discussed special access programs.
12    I didn't talk about it in the book.  Why would I
13    discuss special access programs with anybody?  Did
14    we discuss the double standard?  Absolutely.
15    MR. FURMAN:  Let's take a -- I need a bathroom
16    break.
17    RANDAL JOHNSTON:  Sure.
18    (A brief recess was taken.)
19 BY MR. FURMAN:
20 Q  So I want to focus now on Kevin Podlaski.  I take
21    it you've never met him before this lawsuit.
22 A  Agree, yes.
23 Q  And you agree conversations with him were via cell
24    phone?
25 A  Uh-huh, yes.  I'll finish this in two seconds.

Page 247

1 Q  That's okay.  I got you.  And e-mails; right?
2 A  Yes.
3 Q  What do you recall specifically telling Kevin
4     Podlaski about your intentions in terms of writing
5     the book?
6 A  I remember talking at length about our -- my
7     security concerns.  Right.  I -- I had no
8     intentions of writing this book wanting to be
9     identified.  I wanted to remain as anonymous as I
10    could.  But a lot of discussions about that.  We
11    talked about the process and what it would look
12    like.  The -- there was discussions back and forth
13    about what nondisclosures I'd sign.
14        I didn't remember, as I still don't,
15    nomenclature and times and dates.  I remember
16    asking him more than anything, Look, whatever we're
17    doing has to be legal.  Right.  My biggest concern
18    was that this was some sort of gray area, fast --
19    whatever.  This was -- I wanted it to be legal and
20    legit.  Otherwise, it didn't do me any good.
21 Q  Did you tell Mr. Podlaski any details about
22    Operation Neptune Spear?
23 A  Sure.  He got to read the manuscript.
24 Q  When you first engaged him.
25 A  I'm sure we talked at some level, sure.

Page 248

1 Q  And did you tell him what you knew about what level
2     of classification of -- that -- what level of
3     classification that Operation Neptune involved?
4 A  My understanding of what was -- what
5     classifications were involved, I tried to explain
6     that as best I knew.
7 Q  And what did you tell him?
8 A  That I didn't -- he kept asking if this was a
9     special -- if we had done anything special for this
10    mission, and I don't remember signing anything
11    special for this mission.  I kept going back to,
12    well, I remember signing paperwork, you know, when
13    you join the Navy or get into the SEAL teams.
14 Q  And did you produce those documents to
15    Mr. Podlaski?
16 A  I was never asked to produce the documents.
17 Q  Did you think it was important to give him those
18    documents?
19 A  Not when my attorney with all the experience that I
20    knew he had is not asking me for them, no.  I
21    didn't think I should run around and collect up a
22    whole bunch of extra stuff.  I gave him everything
23    he asked for.
24 Q  Now, and then he worked with you in terms of
25    dealing with Dutton and the book itself?

Page 249

1  A  Yes.
2  Q  And he suggested some changes, and you agreed with
3     them; correct?
4  A  Yes.
5  Q  And do you remember what those changes were?
6  A  Not specifically.  I know they weren't big
7     meaningful substantial changes.
8  Q  And did you tell him what your military status was
9     at the time that you spoke to him?
10 A  I answered whatever questions he had.  I don't
11    remember when we had those conversations or what we
12    said.  But any question he asked about my status I
13    answered.
14 Q  Did you tell him that you were on terminal leave up
15    and through June 28 of 2012?
16 A  I don't remember exact conversations where we got
17    into specifics.  I don't know.
18 Q  The date that you signed the debriefing memorandum
19    that was part of Document Number 1, Exhibit No. 1,
20    which was dated April 20 of 2012, did you tell
21    Mr. Podlaski about that event?
22 A  I don't think so.
23 Q  And the document that you signed was termed a
24    debriefing memorandum about -- regarding SCI
25    material; correct?  I can show it to you.  We -- I

Page 250

1     just want to make sure that you --
2  A  Yeah, I remember the document.
3  Q  And it pertained to the handling of classified
4     information by you after you leave the military;
5     correct?
6  A  Yes.
7  Q  Did you tell Mr. Podlaski about the fact that you
8     signed that document?
9  A  No, not that I recall.
10 Q  Why didn't you?
11 A  I signed no less than a thousand other sheets of
12    paper that day.  I didn't see one any different
13    than the other.  And at this point, we had already
14    received the advice from Mr. Podlaski that he was
15    able to vet the manuscript.  I remember which one
16    you're talking about.
17 Q  So do I, but I want to make sure it exists.  On
18    April 20, you went down to Virginia to sign that
19    document?
20 A  Yeah.  All that -- everything I would have done
21    that day would have been on the base.
22 Q  And do you remember also on April 20 actually
23    having a meeting at DreamWorks on that day?
24 A  On the same day?
25 Q  Yeah.

Page 251

1  A  No.  If I was signing out of the command on the
2     same day, there's -- that's impossible.
3  Q  You were confirming a meeting actually.  Did you
4     recall on that very day, the day that you signed
5     out, that you signed that memorandum dealing with
6     confidential information -- do you remember that
7     day that you exchanged a series of e-mails with
8     Adam Biren about having a meeting at DreamWorks?
9  A  No.
10 Q  Did you ever tell Kevin Podlaski about the fact
11    that you were having a meeting at DreamWorks on
12    that day?
13 A  I don't believe so.
14 Q  And just so I'm clear, the document that we're
15    referring to is called a Sensitive Compartmented
16    Information Debriefing Memoranda.  And it was dated
17    April 20 of 2012.  You're saying that you signed
18    multiple documents on that day?
19 A  Probably hundreds.
20 Q  Hundreds of documents?
21 A  Probably, yes.
22 Q  Did you tell Kevin Podlaski that you signed
23    hundreds of documents on that day that related to
24    your service?
25 A  No, I don't think so.

Page 252

1  Q  You were asking Mr. Podlaski to protect you in
2     respect of nondisclosure agreements.  You signed
3     one on April 20 and you didn't tell him about it?
4  A  No.  I apparently didn't, along with the hundreds
5     of other documents.  I didn't think it was an
6     issue.
7  Q  Well, did you even tell him that you signed a
8     hundred other documents?
9  A  No.
10 Q  Do you think it would have been important for him
11    to know that?
12 A  That I signed out of the supply warehouse?  No.
13 Q  Do you think it would have been important for him
14    to know that you signed the document that was
15    attached to Jeh Johnson's letter on April 20 of
16    2012 that dealt with the handling of Sensitive
17    Compartmented Information?
18 A  At this point in time, I was already under the
19    impression that Podlaski knew exactly what he was
20    talking about and had a firm grasp on the way we
21    were moving forward.  And so no, I did not think
22    one document out of the hundreds that I signed that
23    day or any other of the documents would have been
24    important.  Every document that he asked for I did
25    my best to get.

Page 253

1 Q Now, fast-forwarding to the date that you received
2   Jeh Johnson's letter, again, Exhibit No. 1 --
3 A Okay.
4 Q -- you retained Robert Luskin; correct?
5 A I don't believe it was on that day, but shortly
6   thereafter, yes.
7 Q It was within hours or days that this letter --
8   Luskin was responding on your behalf.
9 A Yeah.  It was over the end of the weekend, I think.
10   I think there was a holiday weekend.  I don't
11   remember.  I just remember -- I think there was a
12   holiday weekend.  And by Monday or Tuesday, we had
13   hired Luskin.
14 Q And Mr. Luskin at some point thereafter to the best
15   of your knowledge conferred with Mr. Podlaski?
16 A I believe so.
17 Q When did that stop?
18 A When did they stop communicating?
19 Q Yeah.
20 A I have no idea.
21 Q When did you stop communicating with Mr. Podlaski?
22 A Again, I don't remember dates.  I can remember some
23   of the last interactions we had were asking about
24   the FOIA requests that he had submitted for us to
25   figure out what other manuscripts had been -- had

Page 254

1   been submitted and published without any type of
2   review.  And we discussed that.
3 Q Well, after the Jeh Johnson letter, there came a
4   point in time when -- let me rephrase that.
5       Do you remember a conversation -- or you were
6   told about a conversation that Mr. Luskin had with
7   a professor named Jack Goldsmith?
8 A Not specifically.
9 Q And did Mr. Luskin advise you about his
10   interactions with the Department of Defense?
11 A Initially?  That day?  From then until now?  What
12   are we talking --
13 Q From then until now.
14 A Yes.  Of course, I got updates from Bob in regards
15   to what was going on.
16 Q Okay.  So every time Mr. Luskin or Bob, as you
17   referred to him, would interact with the Department
18   of Defense or any investigator, he would clue him
19   in and update you on what took place?
20 A Not every time, no.
21 Q Did there come a point in time when Mr. Luskin told
22   you that the advice that you received from
23   Mr. Podlaski was wrong?
24 A Not that I can distinctly remember.
25 Q Did he ever tell you that?

Page 255

1 A No.  I think I started hearing that more from Alan
2   Enslen, my new attorney, when I was dealing with
3   No Hero.  I mean, the -- I don't think we -- I
4   thought the hope was this -- was that, hey, we were
5   going to be able to get through this and this
6   wasn't going to be an all-out showstopper until we
7   were running through the review process with Alan
8   and No Hero.  And that's when it became a little
9   more apparent like, okay, no, there's something
10   wrong here.  We got bad advice.
11 Q When did you start writing No Hero?
12 A I don't remember the dates.  I'd have to look at
13   the contract.
14 Q Was it after you received the Jeh Johnson letter?
15 A Yeah.
16 Q And why didn't you hire Kevin Podlaski to represent
17   you?
18 A I was already dealing with legal drama.  Right.
19   Something -- not sure what, but some fuses had
20   gotten crossed, and we're now having legal issues.
21   I've hired -- we've put on the team Mr. Luskin so
22   he can focus on the criminal side of things.
23   Mr. Podlaski was still working on his side on the
24   team to secure FOIA requests and answer some of
25   those mail -- or those answers.  When I decided to

Page 256

1   write another book, why would I use the same
2   attorney that -- no.  I'm going to seek a third
3   party and use them to focus on that one task.
4 Q What was the last thing you asked Mr. Podlaski to
5   do for you?
6 A I don't know that I asked him to do -- we -- the
7   last discussion I remember having was about the
8   FOIA requests and how he would get those back to me
9   once he heard.
10 Q Did you ask him for the FOIA requests?
11 A We certainly discussed it throughout the case,
12   yeah.
13 Q And what did the FOIA requests pertain to?
14 A Other books -- my understanding is other books that
15   have been published with or without governmental
16   review.
17 Q So after August 30 of 2012, when did you speak to
18   Mr. Podlaski next?
19 A I don't recall.
20 Q Did he send you any bills?
21 A I don't recall.
22 Q Did you ask him to update you on anything in
23   particular?
24 A FOIA requests was definitely one of them.
25 Q When was that?

Page 257

1  A  I don't remember.

2  Q  And are you saying that you prompted that request?

3  A  No.  We talked about the FOIA requests and all the

4     books that have been published when the drama first

5     hit.  And it was his idea to go out and -- hey,

6     look, let's do these FOIA requests so we can prove

7     that there's other books out here that have done

8     similar things and -- okay.  Great idea.  Let's run

9     those around.  That could give something for the --

10    give us something to use.

11 Q  And when did you discuss that FOIA request issue?

12 A  I don't remember.

13 Q  And was it by e-mail or by telephone?

14 A  E-mail.

15 Q  And who was included on those e-mails?

16 A  I don't remember.

17 Q  And did you ask Mr. Podlaski to do that on your

18    behalf?

19 A  Well, I don't know what other behalf I would be

20    asking him to do it for.

21 Q  Okay.

22 A  He was my attorney.  He had represented me up until

23    that point.  I don't see anybody else he would be

24    representing at that point.

25 Q  Well, I mean, at the time that you received the

Page 258

1     FOIA requests information from Mr. Podlaski, did

2     Mr. Luskin already tell you that the advice you got

3     from Mr. Podlaski was incorrect, that it relates to

4     No Easy Day?

5  A  No.  We were still waiting for the FOIA -- because

6     we never got those answers.  We never got an answer

7     on the FOIA request.

8  Q  And did Mr. Luskin ever tell you that the advice

9     you got from Mr. Podlaski was incorrect?

10 A  Certainly not until I started looking into it with

11    Alan.  But the whole way I ended up finding Randy

12    was through a coworker of Alan's.  So it certainly

13    didn't come through Mr. Luskin referring me or

14    saying, Hey, look, you've been screwed in any way.

15    No, I don't remember seeing that at all.

16 Q  When did you hire Mr. Enslen?

17 A  Dates again, I don't know.  I'd have to go back and

18    look.

19 Q  Was it in 2012?

20 A  You're going to kill me on dates here.  I don't

21    know.

22 Q  Well, if we leave a space in the record, could you

23    fill us in on that?

24 A  Absolutely, absolutely.

25 Q  And did you discuss Mr. Podlaski with Mr. Enslen?

Page 259

1  A  I don't know that I discussed Mr. Podlaski in

2     personal terms, but he certain -- Alan --

3     Mr. Enslen obviously knew at that point what I had

4     been dealing with.  My main concern was making sure

5     we do it the right way and wanting Alan to help.

6  Q  And Mr. Enslen, I take it, billed you for services;

7     correct?

8  A  Yes, sir.

9  Q  And Mr. Luskin, I take it, billed you for his

10    services?

11 A  Yes, sir.

12 Q  When was the last time you received a bill from

13    Mr. Podlaski?

14 A  I don't remember.

15 Q  And if someone does work for you, lawyer, gardener,

16    barber, you'd expect them to bill you for their

17    services; right?

18 A  Yep.

19 Q  After September 30 of 2012, did you ever get a bill

20    for services from Mr. Podlaski?

21 A  I don't know the dates, but we definitely discussed

22    billing.  And he said he would bill me after he got

23    the FOIA requests back.

24 Q  Did you ever get a bill from Mr. Podlaski after the

25    FOIA requests?

Page 260

1  A  Not that I remember.  And I've had so many bills

2     from lawyers over the past four years, I wouldn't

3     remember if I got one from this guy.  No offense to

4     any lawyers in the room.

5        RANDAL JOHNSTON:  A little taken.

6  Q  In the retainer agreement that you signed with

7     Mr. Podlaski, did it include any services that

8     would have been involved after the book was

9     published?

10 A  I don't know what that means.

11 Q  Well, let's turn to it.  It's Exhibit No. 3.  And

12    this is the retainer.  I tore it apart, but we'll

13    put it back together.  And it states that, You

14    asked me to assist you with the legal issues you

15    may encounter in contracting with Dutton.  And

16    there's the publisher about your -- for the

17    publication of the manuscript.  And it says,

18    Reviewing the publishable manuscript that -- to

19    ensure your compliance with obligations under any

20    agreements that you may sign with the U.S.

21    Government.

22        Did you expect Mr. Podlaski to continue to

23    work for you after the contract with Dutton was

24    completed and after his review of the manuscript?

25 A  Yeah.

Page 261

1  Q  Why?  Why did you expect that?
2  A  He was -- when I signed on with him, it was to help
3     me through the whole process of the book No Easy
4     Day.  It didn't end in my mind with just the --
5     just the Dutton contract and he was done or just
6     the reviewing the manuscript.  No.  Until this
7     whole thing's complete, you're part of the team.
8     That's the way I looked at it.
9  Q  But is it fair to say that when you hire someone
10    and there's a retainer agreement, that their
11    relationship with you is governed by the document;
12    right?
13            RANDAL JOHNSTON:  Object to the form of the
14    question.  It's calling for a legal conclusion.
15 Q  So you can answer.
16 A  Can you restate the question or --
17 Q  Yeah.  Is it fair to say that your relationship
18    with Kevin was governed by this retainer agreement?
19            RANDAL JOHNSTON:  Same objection.
20            THE WITNESS:  Do I answer or no?
21            RANDAL JOHNSTON:  You can answer.
22 A  Yeah, sure.
23 Q  And you read and you signed it before you sent it
24    back to him?
25 A  Yeah.

Page 262

1  Q  And you didn't expect him to do a real estate
2     closing for you, right, obviously?
3  A  No.  He's not a real estate attorney.
4  Q  You had Richard Heller deal with other aspects of
5     your business venture; right?
6  A  Yep.
7  Q  And in terms of dealing with the fallout from the
8     book, you hired Mr. Luskin; right?
9  A  The criminal fallout, yes.
10 Q  It was also -- there was a civil fallout, too,
11    because there was a civil procedure that was
12    involved?
13 A  Everybody's got their specialty.  I wanted to keep
14    everybody on the team with their individual
15    specialties and hopefully we can fix the problem.
16 Q  And Mr. Luskin, it wasn't just a criminal -- so I
17    understand correctly, Mr. Luskin was retained to
18    represent you not only with any criminal
19    investigations that took place, which we're going
20    to get to in a moment, but also the civil
21    forfeiture action that was taking place as well?
22 A  He handled the DoD and whatever came out of it.  We
23    didn't know what would come out of it at the
24    beginning.
25 Q  Okay.

Page 263

1  A  So --
2  Q  And you didn't expect Kevin Podlaski to be involved
3     in that, did you?
4  A  He was part of the team.  He was one of the
5     first -- he was the first attorney that we brought
6     in so my mind is that that team doesn't go away
7     certainly months and months later when he's --
8     we're still talking about FOIA requests and being a
9     part of the team and applying answers and solutions
10    back into the center of the team so we can
11    hopefully fix this problem.  No, I did not see --
12 Q  So the retainer relates to the contract with
13    Dutton.  And there were no issues with the contract
14    with Dutton; correct?
15 A  No.
16 Q  And that was --
17 A  Huh-uh.
18 Q  -- done; right?
19            And there was a review of the manuscript to
20    ensure compliance with obligations of any
21    agreements you may have signed.  You see that in
22    the retainer; right?
23 A  Yep.
24 Q  And we discussed it, but you didn't give him the
25    nondisclosure agreements and also the debriefing

Page 264

1     memo that you signed in 2012?
2  A  I gave him every bit of information he asked for.
3  Q  But beyond that, after the review of the
4     manuscript, was there anything else in the retainer
5     agreement that you're aware of that would have
6     required Mr. Podlaski to continue to represent you?
7  A  No, not in that agreement that I can see.  If --
8     just like with Mr. Luskin, right, we started off
9     with one thing and that trailed into four other
10    things, and he represented me through all of that.
11    My understanding is when I sign on with an
12    attorney -- he just bails at one minute?  No.
13    We're -- it's still the same problem.  Right.  No
14    Easy Day.  We're still working the same issue.
15            And at no point in my mind was it, okay, no,
16    he's off the team, not until much, much later when
17    I'm dealing with Alan and seeing that there's
18    obviously bigger issues and the issue with the
19    government's not going away at this point.
20 Q  When did Alan refer you to this honorable gentleman
21    to your left?
22 A  I don't know the exact date.
23 Q  And was it in 2012, 2013?
24 A  It would have been right as we even contemplated
25    writing a second book.

Page 265

1  Q  It was around that time?
2  A  Yeah.  It would have been when we were going to
3     start writing another one.  Okay.  Well, let's
4     track down Alan.
5  Q  But what I'm asking is, when did Alan refer you or
6     introduce you or someone through Alan's office
7     introduced you to Mr. Johnston?
8  A  I don't remember the dates.  At the beginning of
9     the relationship with Alan and I.
10 Q  So towards the -- at some point in the beginning of
11    your relationship with Alan when you were -- when
12    you hired Alan to represent you with -- in
13    connection with No Easy Day -- with No Hero --
14 A  Yeah.
15 Q  -- he or someone in his office referred you to
16    Mr. Johnston to investigate a lawsuit against
17    Mr. Podlaski; correct?
18 A  Yes.
19 Q  And do you recall when that took place?
20 A  I don't.
21 Q  Okay.  Who was the person from Mr. Enslen's office
22    that referred you to Mr. Johnston?
23 A  I believe it was an individual by the name of Drew
24    Kitchen.
25 Q  Drew Kitchen?

Page 266

1  A  An attorney at the firm.
2  Q  Is it spelled like -- you know, like a kitchen?
3  A  Yes.
4  Q  Okay.  And was that referral made by e-mail or in
5     person or by telephone communication?
6  A  I couldn't tell you.  Probably both.
7  Q  Let me just take one second.
8  A  Yeah.
9  A  I just need a minute.
10        (A brief recess was taken.)
11        MR. FURMAN:  We can go on the record.
12 A  Yes.
13 A  On the dates of when I hired Randy, I was off on
14    that.  The -- and we've got the engagement letters
15    and whatnot to prove the dates, but we did not hire
16    Randy until the end of the publication of No Hero.
17    So it was towards the -- we had gone through
18    writing it and Alan had represented me that whole
19    time.  We went through the -- we were going through
20    the review process of No Hero.  Somewhere in there
21    before the publication is when we hired Randy.  So
22    it was much, much further to the right.  And I
23    apologize for that.
24 Q  No, that's okay.  My question to you is different.
25    My question is, when did Mr. Kitchen refer you to

Page 267

1     Mr. Johnston, not when you hired him?
2  A  It would have been right at the same time.
3  Q  Going back to the date of the Jeh Johnson letter on
4     August 30, who was the first person you called?
5     Did you call Kevin Podlaski?
6  A  I don't remember who the first person I called was.
7     I was a little bit in shock.
8  Q  Okay.  Did you have any individual phone calls with
9     Mr. Podlaski at any point thereafter?
10 A  A few here and there.  And even after -- much, much
11    further down the road, we had a few.  He called,
12    text, whatever it was.  I don't remember the
13    specifics.  A few short conversations, nothing
14    crazy that I remember.  But I know we spoke a few
15    times.
16 Q  Did he provide you with legal advice?
17 A  I'm sure that's why we were talking.  I know one of
18    the exchanges -- and it might have been via
19    e-mail -- he had found some pictures of bin Laden
20    online and was asking me if they were real or not.
21 Q  Other than that, other than that one instance about
22    the picture of bin Laden, what other conversations
23    did you have with Mr. Podlaski?
24 A  I don't remember specific conversations.
25 Q  And how about the legal advice that he gave you?

Page 268

1     What did it deal with?
2  A  The majority -- the legal advice dealt with -- we
3     were just trying to wrap our head around what was
4     going on with the government.  It was questions of,
5     Hey, what nondisclosures -- what was your status?
6     What did you sign?  Were you still in the Navy?
7     Were you out of the Navy?  Those type of questions.
8  Q  When did those conversations take place?
9  A  Pretty much throughout our whole relationship.
10 Q  Well, when was the last conversation you had with
11    him about that?
12 A  I'd have to go back and look at the e-mail.
13 Q  And it would have been documented through e-mails?
14 A  Sure.  We had very few phone conversations.  Most
15    everything was e-mail or -- would be via e-mail, I
16    believe.
17 Q  Do you recall Mr. Luskin ever telling you not to
18    talk to Mr. Podlaski?
19 A  Never.
20 Q  Did Mr. Luskin ever tell you not to talk to
21    Mr. Podlaski?
22 A  Never.
23 Q  Did Mr. Enslen ever tell you not to talk to
24    Mr. Podlaski?
25 A  Not that I remember.

Page 269

1  Q  Did you ever tell Mr. Podlaski, I can't talk to you
2     for any particular reason?
3  A  No.
4  Q  What legal advice did you ask of Mr. Podlaski after
5     August 30 of 2012?
6  A  We continued to talk about the -- what I call the
7     hypocrisy, right, the -- hey, let's get these FOIA
8     requests.  Let's figure out what other people out
9     there had gone through what channels, what review
10    processes, and try and firm up that end of the
11    defense like, hey, look, there are other people out
12    there doing this type of thing and that the advice
13    he had given me was correct.
14 Q  Did --
15 A  Luskin focused more on dealing with repercussions
16    of it.
17 Q  Now, Mr. Luskin was dealing with responding to the
18    letter, right, to Mr. Johnson's letter and the
19    government's charges against you?
20 A  Yeah.  I wouldn't say he responded just to the
21    letter, but he was hired to handle the criminal
22    side.
23 Q  And that investigation, you reference it as
24    criminal, but it involves a civil forfeiture --
25 A  Yeah.

Page 270

1  Q  -- aspect as well.  It deals with the release of No
2     Easy Day; correct?
3  A  What are you talking about?  The --
4  Q  Well, I'll refer specifically to Mr. Johnson's
5     letter.  The Department of Defense -- in this
6     letter, it states that the Department of Defense
7     has obtained and reviewed an advanced copy of the
8     book entitled, No Easy Day, authored by you.  As
9     you understand it, this book is due to be released
10    next week, though copies of the book have
11    apparently been -- already been released.  In the
12    judgment of the Department of Defense, you are in
13    material breach and violation of the nondisclosure
14    agreements you signed.  Further dissemination of
15    your book will aggravate your breach and violation
16    of your agreements.  Do you see that?
17 A  Yep.
18 Q  And Mr. Johnson was handling that aspect on your
19    behalf -- I'm sorry, Mr. Luskin was representing
20    you as to that aspect of the government's claims
21    against you?
22 A  Yeah.  He was hired to handle -- to go back to Jeh
23    Johnson and start figuring out what a solution to
24    this might be.
25 Q  Okay.  And did you expect Mr. Podlaski to do that

Page 271

1     for you, to interface and respond to the
2     government?
3  A  No.  I wanted to hire a specialist who was in D.C.
4     who could -- who was co-located in D.C. and came
5     with a reputation.
6  Q  Okay.  Did you discuss with Mr. Luskin whether or
7     not you should delay or simply not disseminate,
8     further disseminate No Easy Day?
9  A  I think that was a whole team discussion back to
10    what we talked about earlier.  Right.  We had input
11    from --
12 Q  I'm asking you about your conversation with
13    Mr. Luskin.
14 A  I don't remember a specific one-on-one discussion
15    with Mr. Luskin where we determined what we were
16    going to do with the book.  That was absolutely a
17    discussion that everybody had a say in and that we
18    formulated the best decision we could based off of
19    the team's input.
20 Q  And who made the final decision?
21 A  I would have loved to have put the brakes on this
22    and done something different, but the fact of the
23    matter was we couldn't.  Right.  So there wasn't
24    really anybody to stand up and make a huge decision
25    and say, No, recall the book.  Stop it.  We

Page 272

1     couldn't.  It was already out.
2        So inevitably I'm sure you could say it would
3     be my responsibility to do that, quarterback it,
4     whatever you want to call it.  But based off the
5     circumstances we were working under, we had very
6     little ability to even make that decision.  It had
7     almost been made for us because the books had
8     already been shipped.
9  Q  August 30 is the date that the -- of the letter,
10    and the publication date was September 11 of
11    2012 --
12 A  Yeah.
13 Q  -- correct?
14       So that's 11 days at least, right, to not
15    release the book?
16 A  Books were already shipped.  They were prestaged at
17    locations.  That was not my doing.  I didn't -- I
18    was told they were already shipped, and there was
19    no way to recall them.  That helped drive that
20    situation -- that decision massively.
21 Q  Did you --
22 A  Plus we were hearing from Mr. Podlaski that the
23    sooner we got it out, the sooner they could read it
24    and see there's nothing classified in it and all of
25    this would go away.

Page 273

1  Q  Did Mr. Luskin agree with that advice?

2  A  There wasn't much to disagree with because of the

3     fact that the books were already published. I

4     think a lot of people would have wished we were

5     sitting in a different position at that time, but

6     we weren't. We were sitting in the position we

7     were, which meant the books had already been

8     shipped, and that limited any decision making. It

9     limited our options.

10 Q  Well, why couldn't you simply just tell Dutton

11    that, I don't want to release the book?

12 A  Because -- okay. We could have gone through that

13    whole piece, but the fact of the matter is the

14    books were already prelocated. People know this is

15    out. According to Ben and the publishing industry,

16    right, once you send these to these bookstores,

17    it's up to the bookstore to keep them in the back

18    until publication day. Now, when this comes out,

19    there's no guarantee that some knucklehead at

20    the -- you know, their home bookstore is not going

21    to take the box out and put it on sale. We had no

22    way of controlling that.

23 Q  And who's telling you that? Mr. Sevier?

24 A  Yes.

25 Q  So are you saying that Mr. Sevier told you that you

Page 274

1     have no alternative, that you have to proceed with

2     the book?

3  A  I'm not saying he said we had no alternative. I'm

4     saying as part of the team, he briefed us on his

5     portion, which was, Hey, guys, look, as you guys

6     make your decision, I need to inform you that,

7     look, these books are out there. We can't call

8     them back. That's got to weigh in on your

9     decision-making.

10 Q  And your decision-making was impacted by that, I

11    presume?

12 A  Absolutely.

13 Q  But just so I understand it, are you saying it was

14    impossible to simply just not publish the book

15    until the government had an opportunity to review

16    it?

17 A  From what I was being told, yes, because the books

18    were already shipped to the locations, and there

19    was no way to confirm that one of those books

20    didn't get out. As soon as one book gets out, we

21    could go back, hold the book, go through the review

22    process, redo the book if there's one still out

23    there. Now all of a sudden if there is anything

24    classified in there, you've got two different

25    versions. That doesn't work for the government or

Page 275

1     anybody else. And so again, based off the fact

2     that we could not control those books, that drove

3     that decision.

4  Q  And who told you that, that because there would

5     have been two versions of the book presumably,

6     assuming that there was any changes by the

7     government, that you still would have been in

8     violation of your nondisclosure agreements?

9  A  I don't remember who told me that specifically.

10    That was a discussion the whole team had about the

11    right decision to make in this situation. Again,

12    the advice I'm getting from the attorney I've had

13    the whole time was, Hey, look, let's just get it

14    out there. As soon as they see it, they'll know

15    there's nothing classified in it, and this will go

16    away.

17 Q  And did Mr. Luskin disagree with that?

18 A  I don't think there was much to disagree with

19    because, again, we were pushed into this situation

20    with not being able to pull the books back.

21 Q  There came a point in time when the position

22    changed, correct, and that you took the position

23    with the government that you relied on erroneous

24    advice from Mr. Podlaski; correct?

25 A  Yeah.

Page 276

1  Q  When did that take place?

2  A  When I sat down with the government and dealt with

3     them through this whole mess.

4  Q  There came a point in time when Mr. Luskin was

5     negotiating with Mr. Johnson, Jeh Johnson, a

6     resolution of the government's dispute with you

7     writing the book. Do you recall that?

8  A  There was a point --

9  Q  When Mr. Luskin was negotiating with Jeh Johnson.

10 A  Sure. He's been doing that for years.

11 Q  When did the negotiations first start?

12 A  I'm sure when he replied to his e-mail.

13 Q  And was Mr. Podlaski involved in any of those

14    negotiations?

15 A  No, not that I know of. I mean, I'm sure --

16 Q  Did you ask Mr. Podlaski to be involved in those

17    negotiations?

18 A  That's not why we hired him.

19 Q  And was there any point in time when Mr. Luskin had

20    negotiated a different percentage of the

21    forfeiture; in other words, that you would keep

22    60 percent, the government would keep 40 percent or

23    something along those lines?

24 A  Yeah. There was a point -- I don't remember. It

25    was -- timeline-wise.

Page 277

1  Q  Was it in September of 2012?
2  A  I don't remember the dates, but I know they had --
3     they had -- at least the initial negotiations with
4     Jeh had landed some sort of percentage split, and
5     then as that drug on and drug on, then they said,
6     Hey, before we even do this, we want to make sure
7     we run a criminal investigation, and then that
8     started.
9  Q  And the criminal investigation, Mr. Luskin
10    represented you in that respect as well; right?
11 A  Yep.
12 Q  Let me just flip back to August 30.  You mentioned
13    the team; right?  Who organized the team meetings?
14 A  Whoever needed to.
15 Q  When did they take place?
16 A  As often as any -- we weren't co-located.  Most
17    people weren't co-located so everything was via
18    e-mail.  So there wasn't really a directive of
19    saying, Okay, guys, we're only going to talk every
20    Friday at noon.  It was, Hey, look -- I grew up on
21    teams where everybody talked as often as they need
22    to accomplish a common goal.  All right.  Everybody
23    was working on the team.  I didn't care how much or
24    how little they talked.  I assumed that everybody
25    on the team was talking to come up with the best

Page 278

1     outcome for me.
2  Q  Was there any group discussions or any telephone
3     calls you're aware of?
4  A  Plenty of group e-mails.  I'm sure there was group
5     conference calls, all sorts of communication going
6     back and forth trying to figure out a solution.
7  Q  Well, you said that you're sure, but did you
8     participate in any of those?
9  A  Sure, some.
10 Q  Was Mr. Podlaski on any of those calls?
11 A  I don't remember who was on the calls.
12 Q  Well, can you tell me one instance where
13    Mr. Podlaski was on a group call with you and
14    Mr. Luskin?
15 A  I can't.  I know Elyse handled a lot of stuff for
16    me.  No, I don't know.  I don't remember specific
17    calls, times, dates, who was on the calls.
18 Q  Do you recall having calls with Mr. Luskin after he
19    was hired?
20 A  A few, yeah.
21 Q  Do you recall any conversations where Mr. Luskin
22    and Mr. Podlaski were on the call together?
23 A  No.  I knew they were speaking.  I knew they had
24    talked.  Great.  I didn't need to get between them.
25    It's a team.  Again, everybody has their little

Page 279

1     specialty.  I understood everybody was working
2     their specialty trying to come up with the best
3     outcome.
4  Q  The book actually was released before September 11;
5     correct?
6  A  Yep.
7  Q  So in some sense, there was a bit of doubling down
8     because the original date was September 11;
9     correct?
10 A  Yes.
11 Q  So the reaction to Jeh Johnson's letter wasn't to
12    stop the book from being published.  The reaction
13    was to accelerate the book's publication.
14 A  Yes.
15 Q  Who made that decision?
16 A  It was part of the team decision.  Again, we
17    couldn't recall it, and the advice we were getting
18    from Mr. Podlaski was, Hey, get this thing out as
19    soon as possible.  They'll read it.  They'll know
20    there's nothing classified in it and you'll be
21    fine.  The heat will die off.
22 Q  Did Mr. Podlaski tell you that verbally?
23 A  I'm sure there's e-mails somewhere.
24 Q  Do you recall him telling you that?
25 A  On a phone call?

Page 280

1  Q  Yeah.
2  A  No.  We had very few phone calls.
3  Q  And did Mr. Podlaski give you specific advice to
4     accelerate and move up the date of the publication?
5  A  I don't remember the exact nuances of how that
6     exact decision was made, but I took input from
7     everybody on the team and heard repeatedly that,
8     Hey, look, the sooner we get this out, the better.
9     It will calm them down a little bit once they can
10    read it and see there's nothing crazy in it.
11 Q  And was it your decision ultimately to accelerate
12    the date?
13 A  I can stand responsible for that, yeah.  Not that I
14    had much control over it, but in the end, it's my
15    book, so...
16 Q  At some point in time, you did admit that it was an
17    error to not submit the book for a prepublication
18    review; correct?
19 A  Yeah, absolutely.
20 Q  And did Mr. Luskin advise you in that negotiation
21    with the government to make that admission?
22 A  I don't think anybody needed to advise me at that
23    point.  Once we had gone through years of this and
24    they had come after me repeatedly and showed me all
25    the documents that I signed that very clearly state

Page 281

1  what they state, there's no arguing with that.  I
2  wasn't going to continue to argue.  I wasn't going
3  to continue to argue a losing battle.
4  Q  And you believe that the documents were clearly
5     drafted, the nondisclosure agreements, that you had
6     no chance to fight back against the government?
7  A  Yeah.  When you're sitting there with the
8     government and they're showing you the same
9     documents you've showed me in detail, yeah.  I
10    don't think there's any way around that.  And
11    certainly going through the review process with
12    No Hero, it exposed me to a whole -- exposed me to
13    the exact process, and I got to kind of see the
14    ying and the yang.
15 Q  If you did submit the book, do you know whether it
16    would have been allowed to be published?
17 A  Yeah.
18 Q  How do you know?
19 A  Because when I sat down with the government and
20    they pointed out anything they had issues with, it
21    was all a whole bunch of little minute stuff that
22    they spun up to make a big deal out of.
23 Q  And who at the government would have made the final
24    decision on whether the book could have been
25    published or not if you had submitted the book for

Page 282

1  a review?
2  A  There's multiple reviewing agencies, and each one
3     that has their own opinions.
4  Q  And do you know the opinions of all those agencies?
5  A  No.
6  Q  So do you have any way of knowing whether or not
7     the book would have been --
8  A  I sat down with the government agency who had
9     already talked with every single agency and every
10    single agency had marked what they thought might
11    have been classified or sensitive or what they
12    wouldn't have wanted in the book.  And I got to sit
13    down with the feds, and they got to go through each
14    one of those little things with me.  And I'm not
15    going to get into specifics because I'm obviously
16    not -- but names, locations, some photos of some
17    technologies, some very minor stuff.
18 Q  What were the different agencies that would have
19    had to review the book?
20 A  CIA, DO -- Department of the Navy, SOCOM.  I don't
21    know who else is, but I know there's a couple
22    others.
23 Q  So there are multiple agencies that would have had
24    to review your book No Easy Day for it to have been
25    published and authorized; correct?

Page 283

1  A  Yeah.
2  Q  So it would not have been just the Department of
3     Defense.  It would have included the CIA?
4  A  Yeah.
5  Q  It would have included SOCOM?
6  A  Yeah.
7  Q  And it may have included other agencies?
8  A  I don't know what other agencies.  Those are the
9     big ones.  Right.  CIA, Department of the Navy,
10    SOCOM.  Those are the three that would focus on me.
11    I guess if I worked in a different department,
12    maybe there would be a different reviewing
13    department above that.
14 Q  And what makes you believe that all those agencies
15    would have permitted an operator to write a book
16    about the killing of bin Laden and would have
17    allowed it to be published before the election of
18    2012?  What makes you believe that?
19 A  I believe they would have allowed it to be
20    published.  Now, giving it a time frame, I don't
21    know when they would have allowed the time frame of
22    it.  That's -- I think that's a different question.
23    Allowing it?  Yeah.  These same heads of these
24    departments were authorizing movies and doing their
25    own thing anyway.  So do I think they had an issue

Page 284

1  with talking about it?  No.  I think we've seen
2  they've had no issue with talking about it at the
3  government level for their own advantages.
4     Why do I think it would have been published?
5  Because I sat there after every single agency got
6  to review No Easy Day, and I sat there with a
7  single point of contact who went through every
8  single issue that every single department had and
9  there wasn't anything that we couldn't have written
10 around very easily or simply deleted the photo out
11 of the picture -- or out of the book.
12 Q  Now, advanced copies were sent to various agencies;
13    correct?
14 A  Yeah.
15 Q  And this was in August; right?
16 A  I don't remember when the advanced copies were
17    sent, but --
18 Q  But well before Jeh Johnson's letter; right?
19 A  I believe so.
20 Q  And so the various agencies saw your book and Jeh
21    Johnson wrote a letter on August 30 saying this
22    book is not allowed; correct?
23 A  Correct.
24    RANDAL JOHNSTON:  Object to the
25    characterization of the letter.  It speaks for

**Page 285**

1    itself.

2  Q  In essence, Jeh Johnson's letter was saying this
3     book is not authorized?

4        RANDAL JOHNSTON:  Same objection.

5  A  My understanding is the letter says you failed to
6     go through your review process.  I've gone through
7     four years of craziness with the government and
8     here I am four years later, and the only thing
9     they've said is, You failed to seek prepublication
10    review.

11 Q  And the decision on prepublication review, that's
12    discretionary up to the agency; correct?

13 A  No.  According to the documents we've looked at
14    today, it's not discretionary.

15 Q  So it's your belief that there's no discretion that
16    the various agencies have as to whether they would
17    allow an operator to write a book about Operation
18    Neptune Spear.  Is that your testimony?

19 A  Repeat the question.

20       (The requested material was read back by the
21    reporter.)

22 A  Read it one more time, please.  I'm sorry.

23       (The requested material was read back by the
24    reporter.)

25 A  So the key is there's no discretion?  Is that --

**Page 286**

1  Q  Yeah.  Are you saying there's no discretion, that
2     the government must allow you to write a book if
3     you submit it for a prepublication review?

4  A  I think there's -- there's -- they can -- there's
5     discretion they can use on what I print or what
6     words that I use, but do I have the freedom of
7     speech?  Yeah, I have the ability to go out and
8     write a book, but I have to run it through the
9     proper channels.

10 Q  But a book about Operation Neptune Spear.

11 A  Right.

12 Q  Do you believe that the government has discretion
13    as to whether to allow an operator like yourself to
14    write a book about that operation?

15 A  I think I could -- I get the right to write a book
16    that I want.  Now, they can go in and they can try
17    and say, You can't say this word and you can't say
18    this and you can't show this picture of this
19    technology.  Sure, absolutely.  They have the right
20    to review that to make sure there's no material in
21    there that they deem inappropriate.

22 Q  When -- and I'm sorry.  That's your understanding
23    of how the review process works?

24 A  I believe so.

25 Q  Okay.  Why did the negotiation through Luskin go

**Page 287**

1     from 40 percent of the royalties to ultimately
2     100 percent?  What happened?

3  A  They -- they then said, Okay, I'll stop.  We want
4     to do a criminal investigation to see if I violated
5     the Espionage Act or -- they had a whole list of
6     things.  And we sat down there and, what, spent
7     another year and a half with them, something like
8     that.  Maybe not quite that long, but we spent some
9     time going through that.  And at the end, the deal
10    was what it was.  I mean, that's when it changed.

11 Q  Did that criminal investigation entail your
12    activities while you were on duty with the Element
13    Group?

14 A  The criminal investigation looked into every aspect
15    of my life and every business venture, every
16    consulting gig, everything I've done.  And after,
17    what, almost four years, they declined across the
18    board.

19 Q  Okay.  Well, after four years, you signed an
20    agreement where you forfeited 100 percent of your
21    royalties; correct?

22 A  Yes.

23 Q  So the government got something out of you, didn't
24    they?

25 A  Sure.

**Page 288**

1  Q  The criminal investigation also looked into your
2     activities with Medal of Honor:  Warfighter;
3     correct?

4  A  Sure.

5  Q  And that's something that you didn't tell
6     Mr. Podlaski about; right?

7        The criminal investigation involved your
8     activities with the Element Group; correct?

9  A  Uh-huh.

10 Q  That's something you didn't tell Mr. Podlaski
11    about; right?

12       The criminal investigation also involved your
13    retention -- alleged retention of information and
14    artifacts from the raid itself, including a picture
15    of the corpse and some other items; correct?

16 A  Yep.

17 Q  Mr. Luskin represented you in connection with that;
18    right?

19 A  Yep.

20 Q  You didn't tell Mr. Podlaski about this aspect;
21    right?

22 A  No.  That wasn't his specialty.

23 Q  Well, you never told Mr. Podlaski that, for
24    example, you had certain artifacts from the raid
25    itself?

Page 289

1   A   I didn't get into any of those details when I hired
2       Luskin.  We got there through the course of the
3       investigation.  So did I feel the need to tell
4       Mr. Podlaski about consulting work that I did when
5       I was in?  No, just like I didn't tell Luskin when
6       I first hired him.
7   Q   And so the investigation that took years, that
8       encompassed the Eastern District of Virginia later
9       on; right?
10  A   Yeah.
11  Q   And initially started in San Diego.  Was that
12      through SOCOM?
13  A   I don't know who it was through.
14  Q   But it was the Navy Criminal -- the NCIS, I think
15      it's called, or --
16  A   There was a rep in the room, but it was a Justice
17      Department...
18  Q   Okay.  There came a point in time when you asked
19      Mr. Podlaski to produce his file on your behalf.
20      And there was some delay.  Is that --
21  A   Yeah.
22  Q   -- accurate?
23  A   I believe so.  I know Luskin, I think, was handling
24      a lot of that.  I don't know how all the timeline
25      of that --

Page 290

1   Q   Do you know why there was a delay, if there was one
2       at all?
3   A   I have no idea.
4   Q   Well, in the complaint -- let me refer you to the
5       complaint.  Here, I'll show you paragraph 37.  It
6       states that, After repeated requests and months of
7       delay, defendants finally forwarded Bissonnette
8       some, though still not all, of his file.
9       Bissonnette again demanded their entire file.  Even
10      after more delay, defense sent a second production
11      of documents and then represented they produced
12      Bissonnette's entire file.  Bissonnette's --
13      Bissonnette produced the file to the government
14      conveying defendant's representation that this was
15      his entire file.  It wasn't.  Do you know what that
16      refers to?
17  A   I'm not savvy with all the admin legal talk, but I
18      know when I sat down with the government, I said,
19      Look, I'm more than willing to give up my
20      attorney-client privilege.  Look, we'll get all the
21      documents we can.  We'll show them to you.  I've
22      got nothing to hide.  This was not me trying to go
23      around my legal obligations.  Look, I hired an
24      attorney with great experience through SOCOM.
25      Okay.  Here, look.  Give us your file.  We'll give

Page 291

1       it to the government.  And I know there was some
2       back and forth there.  I know when we were sitting
3       there with the Department of Justice folks, they
4       had stuff that we didn't have.  And I know Luskin
5       kind of went back and forth with them on missing
6       information.  Do I know the specifics of that?  No.
7   Q   Well, do you know what information was missing?
8   A   I'm sure we could find out or I could ask Bob.
9   Q   Well, it's in the complaint.  And I want to know
10      why you're alleging that against my client, that he
11      didn't produce all the documents.
12  A   Well, I can get with Mr. Luskin because there was
13      very much some heated debate between the Department
14      of Justice and the facts and paperwork that they
15      had and what we had told we had been supplied from
16      your client.
17  Q   Well, do you know what documents my client did not
18      produce?
19  A   No.  I'm not --
20  Q   And who would know that?
21  A   I would guess Mr. Luskin would.
22  Q   And you're guessing that?
23  A   I'm sure Mr. Luskin would.
24  Q   So Mr. Luskin would be the source of the
25      information that pertains to your claim that my

Page 292

1       clients failed to produce your file to the
2       government.  That's a claim that you're alleging,
3       that they breached their fiduciary duty.
4   A   Yeah.
5   Q   I want to understand how you can claim that.
6   A   Because I sat there in a meeting with the
7       Department of Justice who had information that we
8       didn't have that they said they received from
9       Mr. Podlaski, and we did not have that same
10      information.  So I don't know what that is.  I
11      don't know what it means.  But I know when the
12      justice guy is sitting there saying, Well, what
13      about this, and Luskin's saying, I don't know what
14      you're talking about -- he's like, Well, we got
15      this from Podlaski.  And we don't have matching
16      paperwork.  I'm guessing there's issues.  Beyond
17      that, I'm not a lawyer.  I couldn't talk to you in
18      specifics.
19  Q   But I'm not asking you -- I know you're not a
20      lawyer.  But I know that you're a plaintiff and
21      you're suing my clients.  And you're alleging that
22      he breached his fiduciary duty by failing to
23      provide documents to the government.  I'm asking
24      you very simply, what documents are you talking
25      about?

**Page 293**

1       RANDAL JOHNSTON:  And he's answered that.
2   Q  And is your answer only Mr. Luskin knows this?
3   A  I'm sure we can track those down for you and get
4      further information if that's what you're looking
5      for.  Do I have that information for you right now?
6      No.
7   Q  And did you ever have that information?
8   A  Specific information?  No.  I don't know what the
9      specific stuff was.
10  Q  And you don't know if it's one page, 10,000 pages.
11     You have no idea?
12  A  No.  I know it was significant enough for the
13     Department of Justice to accuse us of not providing
14     certain things and we had no idea what was going
15     on.  So it --
16  Q  And when you say the government was alleging you
17     failed to provide certain things, what certain
18     things are you referring to?
19  A  Paperwork.  We didn't have paperwork that they
20     seemed to have.  And they had issues with that.
21  Q  What paperwork are you referring to?
22  A  I don't know.
23  Q  Did the government do any investigation on the
24     criminal side of your activities in relation to
25     Zero Dark Thirty to the extent that they --

**Page 294**

1   A  As I said, they looked into every aspect of my
2      life.
3   Q  Did they look into your involvement with Zero Dark
4      Thirty?
5   A  Yes, sir.
6   Q  And Mr. Luskin represented you in connection with
7      that?
8   A  Yes, sir.
9   Q  Did he also -- and you didn't tell Mr. Podlaski
10     about your involvement with Zero Dark Thirty?
11  A  No.
12  Q  And how about Chief Consulting?  Was that a part of
13     the investigation by the government?
14  A  Yep.
15  Q  And any point in time did you ever tell
16     Mr. Podlaski about your involvement with Chief
17     Consulting?
18  A  No, nor did I Mr. Luskin until we got there in the
19     investigation.
20  Q  The investigations into these other matters that
21     had no relation to No Easy Day, did that have an
22     impact to the best of your knowledge on the
23     negotiation with the government over the civil
24     forfeiture of the royalties of No Easy Day?
25  A  No.

**Page 295**

1   Q  Are you saying those two were separate?
2   A  Yep.
3   Q  Why do you say that?
4   A  Because they were two different matters.  One was
5      investigating the publication of No Easy Day
6      without seeking prepublication review, and the
7      other had to do with consulting for a movie,
8      consulting tech -- all the other stuff that they
9      looked into.
10  Q  But at one point in time Mr. Luskin had a deal that
11     was negotiated, perhaps a 60/40 or 70/30 split on
12     the royalties.  And then that stopped.  Why?
13  A  I think I mentioned --
14        RANDAL JOHNSTON:  Objection to the predicate
15     of the question.
16  A  I don't know why it stopped other than I know that
17     they wanted to launch a criminal investigation to
18     make sure there was nothing criminal going on
19     before they made some sort of settlement.
20  Q  Let me just relate back to the question about
21     Mr. Podlaski's alleged failure to produce the file
22     that you referred to.  And it's the breach of
23     fiduciary claim.  How were you damaged by that?
24  A  I don't know how to articulate that.
25  Q  Well, are you damaged by that?

**Page 296**

1   A  Yeah.
2   Q  How?
3   A  I felt damaged as they were sitting there
4      threatening us because we hadn't produced all the
5      documents when we thought we had.
6   Q  Okay.  And other than that, any other damage other
7      than the threat?
8   A  Not that I know of at this time.
9   Q  Well, when would you know it?
10  A  When I --
11  Q  It's 2016.
12  A  Well, maybe I could sit down with the rest of my
13     attorneys and have it better described to me
14     exactly how that lack of fiduciary duty and lack of
15     presenting those documents have affected us.  Did I
16     get into the weeds of how that really affected us?
17     No, I haven't.  But I certainly could get smart on
18     it.
19  Q  Well, you've been involved in this lawsuit with
20     Mr. Podlaski now for a solid three years; right?
21  A  Sure.
22  Q  And it could even be longer for all I know.  In the
23     three-year period of time, you can't tell me how
24     you've been damaged by this claim that Mr. Podlaski
25     failed to produce the file?

Page 297

1 A  I try very hard not to think about Mr. Podlaski or
2    any of this when I go to sleep at night.
3 Q  We'll follow up with a demand for an itemized list
4    of your damages that relate to this alleged failure
5    to --
6 A  Perfect.
7 Q  -- produce the file.  And we'll simply just have to
8    reserve the right to ask you more questions about
9    that.
10 A  Perfect.  I'll get smart on it.
11 Q  Now, in terms of the other matters that Mr. Luskin
12    represented you on, at the current moment, how much
13    in terms of attorneys' fees have you paid?
14 A  Close to 800,000.
15 Q  800,000?
16 A  I believe so -- ish.  I'd have to look at the
17    latest bills.
18 Q  And of the 800,000-ish in terms of legal fees, how
19    much of that related to Mr. Luskin's representation
20    of you in the criminal investigation that
21    related to matters outside of No Easy Day?
22 A  I would say none of this would have happened --
23    none of these follow-on issues ever would have
24    happened had we not published No Easy Day without
25    prepublication review.

Page 298

1 Q  How do you know that?
2 A  My -- because my consulting services that I did
3    when I was in that they came after me for, the
4    command approved.  I saw it.  The JAG approved my
5    doing that.  Right.  No Easy Day comes out, they
6    clear me of all wrong-doing on No Easy Day.  They
7    then launch another investigation back into my
8    Chief Consulting that they knew I had did and I had
9    sought JAG approval when I did it.
10         So to say that those are separate matters, I
11    don't believe.  I don't believe that they all of a
12    sudden out of the blue decided to come after me
13    over these little things if it weren't for the fact
14    that I had pissed them off with the publication of
15    No Easy Day and not seeking the review.
16 Q  Earlier you said that -- the fact that the civil
17    forfeiture resulted in 100 percent of the royalties
18    being surrendered to the government had nothing to
19    do with the other investigations; correct?
20 A  Right.
21 Q  So now you're saying that they're intertwined?
22 A  No.
23         RANDAL JOHNSTON:  Object to the
24    characterization.
25 A  I'm saying the legal defenses might have been

Page 299

1    separate.  Right.  The matters at which they were
2    investigating and looking into were totally
3    separate.  But these -- the consulting and the
4    chief stuff, Element Group, would not have had
5    happened without the lack of prepublication review
6    for No Easy Day.
7 Q  In terms of Mr. Luskin's bills in raw percentages,
8    how much of it would you say is attributable simply
9    just to the negotiation of the civil forfeiture
10    action as it relates to No Easy Day?
11 A  The No Easy Day portion of all of his bills?
12 Q  Correct.
13 A  70 percent, 80 percent.
14 Q  80 percent of it.  And so that 20 or 30 percent of
15    the investigation dealt with matters that related
16    to Chief Consulting?
17 A  The secondary investigation that was launched and
18    Chief Consulting and whatnot.  And I may be off on
19    those percentages.  I'd have to go back and look at
20    the bills.
21 Q  So after $800,000 worth of legal fees, you paid
22    100 percent of your royalties?
23 A  Sure did.
24 Q  Why didn't you simply just surrender your royalties
25    in 2012?  Why did you continue to fight the civil

Page 300

1    forfeiture for all those years?
2 A  I don't think I fought the civil forfeiture.
3    Right.  We were still negotiating a civil
4    settlement.  Then they launched the criminal piece,
5    and the criminal piece lasted from A till the end.
6    So -- so look, when -- there was no upside to
7    continue to fight, zero.
8 Q  Was the resolution of the civil forfeiture
9    completely contingent on the resolution of the
10    criminal investigation related to the other aspects
11    of your naval career?
12 A  Not that I know of.
13 Q  So why couldn't you simply just resolve the civil
14    forfeiture in 2012 and continue to deal with the
15    government on the other --
16 A  You'd have to ask the DOJ on that one.
17 Q  -- investigations?
18 A  You'd have to ask DOJ on that.
19 Q  Okay.  Only the DOJ would know that?  Is that what
20    you're telling me?
21 A  That's the first place I'd start.
22         (A brief recess was taken.)
23 Q  Before we took a quick break, I just have a quick
24    question for you that relates to Mr. Luskin.  Since
25    August of 2016, did you pay any additional fees to

**Page 301**

1    Mr. Luskin?  The reason I ask is that as -- in your
2    response to interrogatories that was dated
3    August 2016, you -- we asked you how much you spent
4    and paid Mr. Luskin, and the reference was
5    $782,425.  Have you paid any additional fees beyond
6    that?
7  A Sure.  I've paid legal fees since then.  I don't
8    know what the number's at, but I've -- every month
9    I get a bill.
10 Q And what do they relate to?
11 A I'd have to go back and look.  Through the closure
12   of this whole thing.  I haven't got a bill since we
13   finalized this thing.  So I'd have to go back
14   and -- if you need me to recalculate the total
15   legal --
16 Q Okay.
17 A -- bills, I can.
18 Q And was that all Mr. Luskin's firm --
19 A Yeah.
20 Q -- not Mr. Enslen?
21 A No, just Mr. Luskin.
22      MR. FURMAN:  Okay.  We'll take a quick break.
23      (A brief recess was taken.)
24 Q Mr. Bissonnette, do you recall the date that you
25   first appeared on 60 Minutes?  Do you remember the

**Page 302**

1    date?
2  A I don't.
3  Q Was Mr. Luskin representing you at that time?
4  A Yes.
5  Q Was Mr. Podlaski representing you at that time?
6  A Yeah.
7  Q During that first 60 Minutes interview, you blamed
8    Mr. Podlaski for giving you bad advice essentially.
9  A In the first interview?
10      MR. FURMAN:  Was it the first interview?  It
11   was the second.
12 Q Second.
13      MS. LEMKHEN:  Second interview.
14 Q Well, yeah.  Let me ask you about the first
15   interview first.  Now, you wore a disguise, I
16   believe --
17 A Yes.
18 Q -- for that interview.  Did you seek permission
19   from anyone before you appeared on 60 Minutes?
20 A No.
21 Q Did you ask for permission?
22 A No.  I was operating under the same guidelines that
23   I had operated under from Mr. Podlaski.
24 Q And during that 60 Minutes interview, you used a
25   model and a diagram, and you went through the raid

**Page 303**

1    itself.
2  A Yep.
3  Q Did Mr. Luskin advise you that you can go ahead and
4    give that kind of information publicly?
5  A No.
6  Q Who did you rely on?
7  A Mr. Podlaski and then -- and the information that
8    we'd been operating on the -- to that point.
9  Q Did you specifically ask Mr. Podlaski whether it
10   would be appropriate for you to appear on 60
11   Minutes?
12 A No.  But based off his background and other authors
13   he had represented who had been on 60 Minutes
14   following books, he never told me not to.  I assume
15   that there was no issues.
16 Q Did you tell Mr. Podlaski that you were preparing
17   to appear on 60 Minutes on November 2, 2014?
18 A I don't remember when I relayed that information
19   or -- but I'm sure everybody on the team knew I was
20   going to be on 60 Minutes.
21 Q Well, I'm asking you what you and Mr. Podlaski --
22   did you have a conversation with him directly and
23   advise him that you were going to appear on
24   60 Minutes on November 2, 2014?
25 A I don't recall a specific conversation.

**Page 304**

1  Q Oh, I'm sorry.  And I made a mistake.  On
2    September 24, 2012.  That was the first --
3  A First one.
4  Q The first one.  And let me just ask a clean set of
5    questions.  You appeared for the first interview on
6    60 Minutes on September 24 of 2012; correct?
7  A If that's the date you looked up, yes.
8  Q Yeah.  And that was when you wore a disguise and
9    you did a diagram of the compound where you found
10   Osama bin Laden; correct?
11 A Yes.
12 Q Did you ask Mr. Podlaski for advice as it related
13   to your appearance on 60 Minutes?
14 A I don't think I got into any specific, Hey, tell me
15   what to do here and here and here.  No, I don't
16   think -- I don't recall having a conversation like
17   that.
18 Q Did Mr. Podlaski come with you to appear on 60
19   Minutes?
20 A No.
21 Q Did Mr. Luskin appear with you?
22 A Yes.
23 Q So you had a lawyer there when you appeared at the
24   studios for 60 Minutes?
25 A Yes.

Page 305

1  Q  And that was Mr. Luskin; right?
2  A  Yes.
3  Q  Did you ask Mr. Luskin to confer with Mr. Podlaski
4     about the 60 Minutes interview?
5  A  No.
6  Q  You appeared for a second interview with 60 Minutes
7     on November 2 of 2014.  Do you recall that?
8  A  I recall the interview, not specifically on the
9     date.  But if you're telling me that's the date,
10    sure.
11 Q  Okay.  Did you wear a disguise on that day as well?
12 A  Yeah, both.
13 Q  Okay.  During that second interview, did you blame
14    Mr. Podlaski for the advice he gave you?
15 A  I did not blame Mr. Podlaski about the advice he
16    gave me.
17 Q  Did you say during that interview that you got
18    erroneous advice about whether you were allowed to
19    publish the book?
20 A  Yes.  I said I got bad advice.
21 Q  And when did you first come to the conclusion that
22    you got bad advice?  I presume it was before
23    November 2 of 2014.  When did you?
24 A  I don't remember a specific date or time where I
25    said, Hey, look, I am now in this mess because I

Page 306

1     got bad advice.  I could have drawn that conclusion
2     at any point.  I don't know.
3  Q  Well, at what point did you draw that conclusion?
4  A  I don't remember.  Somewhere along the line.
5  Q  Did any lawyer tell you that you got bad advice?
6  A  We didn't get into any talking with other lawyers
7     about the bad advice and the process and how --
8     what had happened that -- those discussions were
9     much further along when -- through the process with
10    Alan and No Hero.
11 Q  During the first interview with 60 Minutes, were
12    you asked whether you were authorized to present
13    this information on live television?
14 A  I don't think they asked me that.
15 Q  Did anyone --
16 A  I don't remember them asking me that.
17 Q  Did anyone from 60 Minutes, any of the producers
18    ask whether you had authority to speak about the
19    bin Laden raid before you appeared for that
20    interview?
21 A  No.
22        RANDAL JOHNSTON:  You're talking about the
23    first interview?
24        MR. FURMAN:  The first one.
25        RANDAL JOHNSTON:  Thank you.

Page 307

1  A  No -- nobody asked me that, not that I remember.
2  Q  Did you ask Mr. Luskin whether it was appropriate
3     for you to give that interview on September 24 of
4     2012?
5  A  I don't think I ever asked Luskin that.
6  Q  Do you think that your appearance on 60 Minutes on
7     September 24 of 2012 caused the government to take
8     more action against you?
9  A  No.
10 Q  You think it had no impact on the government's
11    decision to investigate or otherwise seek complete
12    forfeiture of the royalties of your book?
13 A  No.  I'd classify that in along the lines with all
14    the other stuff they came after me for.  In the
15    end, what were they most pissed about?  The fact
16    that I did not seek prepublication review.  And I
17    think that's telling in the end of our agreement
18    that we finally reached is that's the single piece
19    that they're most mad about.  So I would say I
20    don't think the extra 60 Minutes interview caused
21    any significant heartache.
22        (Exhibit 30 was marked for identification.)
23 Q  Before you, what's been marked as Exhibit 30,
24    Exhibit 30 is responses to interrogatories that
25    were drafted in connection with this case.  Do you

Page 308

1     recall whether or not you reviewed these before
2     they were sent out?
3  A  Yeah, I'm sure I would have reviewed them.
4  Q  And these are responses to specific questions that
5     were being asked that you relate to your case
6     against Mr. Podlaski and his law firm; correct?
7        RANDAL JOHNSTON:  Can I --
8  A  I'm seeing a whole bunch of e-mails.
9        RANDAL JOHNSTON:  -- stop you for a minute?
10       MR. FURMAN:  Sure.
11       RANDAL JOHNSTON:  I'm looking back at the
12    question you asked, and it referenced
13    interrogatories.  And what I have as Exhibit 30 is
14    Plaintiff's Response to First Set of Requests for
15    Production.
16       MR. FURMAN:  You're absolutely right.  I
17    misspoke.  It's response to request for production.
18    You're absolutely right.
19 Q  So Exhibit 30 is your response to request for
20    production of certain documents.
21 A  Okay.
22 Q  And I apologize for misspeaking.
23 A  That's all right.
24 Q  Did you review this document with your lawyer?
25 A  Yeah.  We've gone over it.

**Page 309**

1  Q  Now, question 29 asked you for all documents
2     reflecting loss of income incurred as a result of
3     your military reputation being tarnished as alleged
4     in paragraph 50 of the complaint.  And request
5     number 30 asks for all documents concerning
6     consulting jobs and speaking engagements you have
7     had from August 2012 through the present day.  And
8     I want to refer you to a document that is a
9     spreadsheet that -- the numbers are -- the docs
10    aren't numbered.  I'm going to show it to you.  It
11    starts off with several dates, the first date being
12    January 21 of 2013.
13 A  Okay.
14 Q  And the location is Austin, Texas.  And there's
15    $15,000 listed there.
16 A  Okay.
17 Q  What does that reflect?  I'm not sure if I
18    understand what this spreadsheet is.
19 A  It's income from speaking events.
20 Q  And that's income to you?
21 A  Yes, or to my company.
22 Q  Okay.  Which company is that?
23 A  Front Sight Focus.
24 Q  Okay.  And through Front Sight Focus, you would
25    have derived 100 percent of those fees?  In other

**Page 310**

1     words, $15,000 would have been --
2  A  The company would have made that.  I have some
3     employees I pay and overhead for travel and
4     whatnot.  But that is the -- that's the, what,
5     gross.
6  Q  How many employees does Front Sight have?
7  A  It's fluctuated.  I've brought different people on
8     for different things.
9  Q  How many?
10 A  Three, two, one, kind of depends on what we're
11    doing.
12 Q  So never more than three at a time?
13 A  No, other than for short events.
14 Q  And in 2013, what was the overhead for salaries
15    other than yours?
16 A  I don't know off the top of my head.
17 Q  Was it more than $100,000?
18 A  No.
19 Q  It would have been less than that?
20 A  They're very similar -- very close but not -- not
21    much more than that, I don't think.
22 Q  Who were the three employees for Front Sight?
23 A  Right now is -- I'm -- I have one, Tamera, Tamera
24    Watt, and then I had James Smith hired.  And then
25    depending upon the different events, I'd hire

**Page 311**

1     different folks on a contract basis.
2  Q  How much does Tamera make on a yearly salary?
3  A  I'd have to look it up.  I don't know.
4  Q  Is it less than $50,000?
5  A  Probably a little above that.
6  Q  And what does she do?
7  A  She handles all the admin side of things.
8  Q  So it's somewhere in the range of $50,000 she
9     makes?
10 A  I'm guessing.  I'd have to go look in the books.  I
11    don't know.
12 Q  How many employees do you have other than Tamera
13    and James?
14 A  That's it.
15 Q  You don't know their salaries?
16 A  I don't keep track of all that stuff, no.
17 Q  So all these years that Tamera and James have
18    worked for you, you don't know how much you pay
19    them?
20 A  If -- I know Tamera's on a -- on salary.  James was
21    on for a little while and then he -- actually he
22    was on a contract basis most of the time.  And
23    his -- his rates fluctuated depending upon what we
24    were doing.
25 Q  He was paid by the hour?

**Page 312**

1  A  No, by the event.
2  Q  How much in 2013 did you pay James?
3  A  I'd have to go back and pull his W-9.
4  Q  And what was his job?
5  A  He'd help me come up with content.  He'd help me
6     with different events depending on who we were
7     talking to.  He had an athletic background so if we
8     spoke to athletic organizations -- if we were going
9     in to talk to the Houston Texans, he'd get a
10    portion of that, you know, up to $10,000 of the fee
11    to come in and co-present with me.
12 Q  In 2013, these various speaking engagements, you
13    earned $517,000; correct?
14 A  That's what that says, yes.
15 Q  Who prepared this spreadsheet, by the way?
16 A  Tamera.
17 Q  And Austin, for example, what was that?
18 A  How much was it for?
19 Q  $15,000.
20 A  I'd say that was -- they're all speaking events.
21    I'd say Austin at 15- was probably an event for a
22    YPO organization.
23 Q  And there was -- I'm just being -- picking them
24    out --
25 A  Right.

Page 313

1 Q  -- just out of a hat here.  In La Jolla on
2    September 12 of 2013, $25,000, what was that?
3 A  Speaking event.  I couldn't tell you who it was
4    for.  They're all for different -- I've done
5    athletic events.  I've -- the YPO organization.
6    I've done corporations.  I've done Toyota, Lexus,
7    Sea World.  You name it.  They all pay different
8    rates.  Some want me to spend an hour there.
9    Others want me to spend the day there.  So that's
10   why they probably all fluctuate.
11 Q  And 2014, you had a busy year speaking.  And you --
12   when I say you, Front Sight Focus earned
13   $1.264 million for speaking engagements.
14 A  Okay.
15 Q  So you had virtually an over 100 percent increase
16   in your speaking engagements from 2013 to 2014?
17 A  Right.
18 Q  And what was your overhead in 2014 for Front Sight?
19 A  Employees, any business expenses, travel expenses,
20   meals while traveling.
21 Q  In a ballpark, how much would that have been?
22 A  I don't know.  I'd have to look at it.  And I know
23   we probably spent 500,000 in travel.
24 Q  $500,000 in travel?
25 A  I'll bet you you did.

Page 314

1 Q  In 2014?  Do you fly on private jets?
2 A  No.
3 Q  Then do you fly commercial flights?
4 A  Commercial.
5 Q  So who would be the source of that information?
6    How would I know how much was earned?
7 A  I could pull the -- I could pull the books and
8    provide it to you if you need and let you know what
9    we spent on travel, sure.
10 Q  Would Tamera be a source of that information?
11 A  She could pull it up.
12 Q  And there are books and records that relate to
13   Front Sight Focus?
14 A  Yeah.
15 Q  So we'll leave a space and we'll call for the
16   production of that.  How much has Front Sight Focus
17   earned in 2015?
18 A  2015?  We're way down.  We're 500,000 range.
19 Q  And Tamera would be the source of that information?
20 A  Are there 2015 numbers in there or is it just --
21 Q  Yeah.  The 2015 numbers, they're not totaled.  I
22   suppose I could total them and maybe I should have
23   before this deposition, but when you say that
24   they're way down, are you sure of that?
25 A  From -- I'd have to look at the dates again, but I

Page 315

1    know -- I know this year we're definitely down.
2 Q  Well, this is 2016.
3 A  Right.
4 Q  And this is now four years after your book was
5    written and --
6 A  The first book.
7 Q  The first book.  Fair to say that time goes on,
8    celebrities get elected President, Cleveland wins
9    the NBA championship, and the Cubs win the World
10   Series?  So time moves on.  Is that fair to say?
11 A  Sure.
12 Q  And the notoriety that you earned through the
13   release of No Easy Day, that's now going to be five
14   years; correct?
15 A  Yep.
16 Q  And is it your belief that the interest in the
17   Osama bin Laden raid would continue to grow
18   exponentially?
19 A  No.
20 Q  Is it fair to say that the interest in an event
21   like that or any event in history would start to
22   subside over time?
23 A  Sure.  The bigger the event, the longer it lasts.
24 Q  Okay.  Unless it's surpassed by other bigger
25   events; correct?

Page 316

1 A  Sure.
2 Q  It's fair to say we live in a world where events
3    happen quite often and news travels pretty fast
4    nowadays; right?
5 A  September 11 has not happened again.
6 Q  Right.  Well, that's right.  It hasn't.  The World
7    Trade Center no longer exists.
8 A  Yeah.
9 Q  Would Tamera be able to tell me how much was earned
10   in 2016?
11 A  Yeah.  We could pull those up.
12 Q  So we would call for the production of all Front
13   Sight Focus books and records from 2011 to the
14   present time.
15 A  Sure.
16 Q  During these speaking engagements, what do you talk
17   about?
18 A  My career as a SEAL.  I talk about the lessons that
19   I've learned and how they can relate to the
20   audience.
21 Q  And are these business folks that you speak to?
22 A  All sorts of people.
23 Q  Now, in what sense is your reputation tarnished?  I
24   want to understand that.
25 A  The sense that I'm labeled as the guy -- I have

Page 317

1   plenty of other friends who have written books.
2   Not one of them has taken the heat that I have.  I
3   compare that to Marcus Luttrell, Chris Kyle, even
4   the Chuck Pfarrer guy who's full of it and comes up
5   with crazy stuff has never been labeled and drug
6   through the mud like I have.  So yeah, I do believe
7   that I worked very hard to build my reputation, and
8   my reputation is nowhere near where it was the day
9   that I got out of the Navy.
10  Q   Well, a few years after you got out of the Navy,
11      just on one part of your life, you earned 1.265 --
12      your company earned $1.265 million.
13  A   Right.
14  Q   Is that how you view your --
15  A   That's financial.  That has nothing to do with the
16      reputation.
17  Q   Okay.  Well, I understand that.  But a reputation
18      as far as on the street or reputation within the
19      SEAL company are you referring to?
20  A   My reputation as an accredited SEAL who served his
21      country, served his country at the highest level
22      and would hold a value to -- in the corporate
23      world, right, bringing that person in to speak.
24      Right.  There's a loss of value there when
25      Corporate America deems me to not be -- oh, wow,

Page 318

1   he's not worth the big dollars to bring in and pay
2   him to come speak at the event because of these
3   things.
4   Q   So that's a financial fallout that you've received?
5   A   Yeah.  I think that's why we're saying there's
6       damages.
7   Q   Well, can you tell me one company that has for one
8       reason or another told you that they don't want to
9       hire you as a speaker because of the work that my
10      client did?  Can you name one?
11  A   I've -- we've provided as many e-mails as we can.
12      Nobody puts this stuff in writing.  Right.  When
13      they're saying, Hey, we don't want you because of
14      your public status, they don't shoot you an e-mail
15      saying, Hey, look, you're not invited back.
16          One example, I did five events for a big firm
17      in New York called BlackRock.  I'm sure you've
18      heard of it.  Loved it.  Phenomenal feedback.
19      Said, Hey, look, we want to bring you back.
20      Everything goes cold.  They don't call us again.
21          Hey, what's going on?  You want us back?  And
22      couldn't get a reply.  Totally blew us off.  Called
23      some contacts we had there and said, Hey, look,
24      what's going on?  Everything goes to zero.
25          And he said, Look, you know, I shouldn't even

Page 319

1   be sharing this with you.  They told us we can't
2   touch you for another 12 months.
3   Q   Who's that person?
4   A   Kayle Watson.  And I don't even know if he's still
5       at the firm.
6   Q   And if we're in a courtroom and I asked you the
7       question, what's your proof that you've been denied
8       speaking engagements because of Mr. Podlaski, what
9       would be your response?
10  A   Because of the fact that I've been labeled the guy
11      who wrote the bin Laden book and got in a whole
12      bunch of heat from the government.  Hey, we don't
13      want him to come in and speak.  So that then
14      doesn't make me as marketable as, say, Rob O'Neill,
15      right, who also claims to have been on the mission
16      and is running around doing speaking events as
17      well.
18  Q   Other than you testifying to that, could you call
19      any witnesses that would support that?
20  A   Support --
21  Q   Your claim that you've lost speaking engagements
22      because of the work that my client did.
23          RANDAL JOHNSTON:  Object to the form of the
24      question.
25          MR. FURMAN:  That's okay.

Page 320

1           RANDAL JOHNSTON:  Lack of foundation.  But I
2   don't mind answering.
3   A   I'm sure we'd have to try and get these guys on the
4       stand, track down this guy at BlackRock and say,
5       Hey, will you do it?  He probably won't because he
6       risks getting fired.  Again, same thing there -- we
7       put an example in there with an armor company that
8       wanted me to work with them.  Setting up all the
9       documents.  Then all of a sudden they go cold feet
10      when they said, Hey, their number one supplier
11      won't do business with them if they're doing
12      business with me.
13  Q   Is there anyone else other than Tamera and this
14      armor guy that you can tell me --
15  A   Tamera wouldn't know anything about this.
16  Q   Because I'd like to talk to those people.
17  A   Kayle Watson.  And I don't even know that he's
18      still at BlackRock.  The Gladiator guys.  I'd have
19      to pull names for you.  I have the e-mails.  But
20      yeah.  We'll see what they'll tell you.  I don't
21      think -- the reason they don't put it in the e-mail
22      is because they don't want to be fired or
23      retaliated against.
24  Q   The Gladiator guys, you're referring to the show
25      the Gladiators?

Page 321

1  A  No, Gladiator Armor, bulletproof plates, armor.
2  Q  This is a world I don't really know much about.  On
3     February 10 of 2016, Tamera, the person you
4     referred to -- and you can take a look at it.  It's
5     in the document in front of you.  It is after --
6     it's not page numbered.  But in fact, if I flip it
7     for you, I'll find it quicker, Mr. Bissonnette,
8     than you would.  On February 10 of 2016, Monique
9     from BlackRock -- you know who that person is?
10 A  I don't think I know her.
11 Q  Monique Le, L-E, wrote, Hi, Tamera.  I sincerely
12    apologize for the massive delay in the response.
13    It's been a challenge finalizing the agenda for our
14    conference and confirming the logistics.
15    Unfortunately, given the recent market volatility,
16    we've had to change a few items around, including
17    costs.  And we will no longer be able to host Mark
18    in Miami this year.  Do you see that?
19 A  Yep.
20 Q  So the reference here as to why they would not
21    bring you back had to do with market volatility and
22    costs.  Do you see that?
23 A  Yep.
24 Q  So there's no reference there to my client's work
25    on your behalf.

Page 322

1  A  Of course not.
2  Q  So you're saying that your proof is on an
3     assumption that Monique is not going to tell the
4     truth as to why they're not hiring you?
5  A  Yeah, yeah.  She's not going to come back and be
6     direct and say, Hey, look, we were told to avoid
7     you.  That's where we had to make some phone calls
8     to some people we knew and say, Hey, you know, can
9     you give us some background?
10 Q  And let me just swing your attention back to the
11    consent decree.  There's a requirement that you pay
12    a certain amount of money towards legal fees.  And
13    I forget the date.
14       MR. FURMAN:  Do you have that date?
15 Q  Did you pay Mr. Luskin any -- I'm sorry.  You were
16    supposed to pay the government a certain portion of
17    money by a certain date.  I think that date has
18    either come up or is coming up.  And I just wanted
19    to know if you made a payment to the government.
20 A  Yes, I have.
21 Q  The first payment was $2.761 million.
22 A  Paid.
23 Q  And that money was paid from where?  What account?
24 A  Every dollar that came in to -- through the book
25    came into us -- an account and sat there and -- and

Page 323

1     we cleared those accounts and paid it back.  That's
2     the 2 million -- or whatever the numbers are.
3  Q  Okay.  And within 48 months, you're required to pay
4     $1.379 million and change.
5  A  Next step would be is to go back and redo all my
6     taxes over the past -- since the beginning of the
7     book.  Any tax income I get back, then pay that
8     back to the government and then what will be left
9     will be the remaining -- whatever that is.  And
10    that I have 48 months to pay back to the
11    government.
12 Q  And that would entirely resolve the forfeiture;
13    correct?
14 A  That would be -- every penny made from No Easy Day
15    would be returned to the government.
16 Q  And when is your amended tax return -- when is that
17    going to be finalized?
18 A  Hopefully any day now.
19 Q  So McGladrey is your accountants and they're
20    working on that?
21 A  Who?
22 Q  McGladrey.  Who are your accountants?
23 A  A firm out of Denver.
24 Q  Okay.  And they're working on that actively as we
25    speak?

Page 324

1  A  Yeah.  I believe the -- it might even give us a
2     timeline requirement to get it done.  So they've
3     got to go through four years of returns so they're
4     doing that.  Once that's done, once I receive the
5     refund, I think I have 30 days -- don't quote me on
6     that.  I don't know what's in the decree.  But I
7     have a timeline that I have to then return that to
8     the government.
9  Q  And is there any -- and we're going to call for the
10    production of that amended tax return.  And we'll
11    serve a demand.  Just leave a space at the end of
12    the transcript for that.  In terms of legal fees,
13    have you completed your payments of Mr. Luskin's
14    fees?
15 A  Yeah.  I have -- I haven't got a bill from him in
16    several months.
17 Q  Okay.  And presumably since the decree was in
18    August of 2016, he's doing no more legal work for
19    you; correct?
20 A  That's the hope.
21 Q  Okay.  On the last page of that document
22    production, there is an e-mail from Matt George
23    regarding the USO Charlotte.
24 A  Okay.
25 Q  And it states, Well, this is so stupid.  The USO

Page 325

1 pulled out of event because of that article. We
2 have one last shot. Antonio is meeting with
3 Andretti people to see if they're interested. He
4 had said that you met with him and you know what
5 he's talking about. I will keep you posted. This
6 has been five months of this. What is that
7 referring to? This is an e-mail dated January 28
8 of 2016.
9 A Matt George is a friend we know. We've done
10 several speaking events kind of through him. He
11 connected us to a USO rep down in North Carolina
12 who was interested in hosting me at a Purple
13 Heart/USO event where I'd be a keynote speaker for
14 him. Went and met with him, talked about my
15 presentation, what I could bring to the table,
16 said, Okay, great. And then a short time later
17 they said, Hey, no, we're out. Again, my
18 conclusion would be is they're not interested
19 because of the articles that had come out.
20 Q Okay. Did Mr. Luskin give you any reduction or any
21 refund of legal fees he charged?
22 A I paid his bills as he sent them. I don't know if
23 they were reduced or whole charges or what, but --
24 Q In connection with the forfeited funds, did any of
25 the forfeited funds go to charity?

Page 326

1 A No. The government wanted it back.
2 Q And of the --
3 A I would have been happy to write it to charity
4 rather than the government, but they wanted it
5 back.
6 Q Of the several million dollars that you've earned
7 in the speaking engagements through Front Sight
8 Focus --
9 A Uh-huh.
10 Q -- how much of that have you donated to charity?
11 A I do a ton of charity work outside of Front Sight
12 Focus. I've been involved in --
13 Q That's not answering my question. My question is
14 of fees -- you've earned --
15 A Right.
16 Q -- several million through Front Sight Focus in
17 speaking engagements. What portion of those moneys
18 have you donated to charity?
19 A Probably 50,000. But my charity -- I do my charity
20 in other ways. I don't necessarily write checks
21 out of my pocket. I help host events, bring people
22 in, raise money, and then all those funds go back
23 to charity. I'm very proud to have raised --
24 helped raise well over $2 million that all go back
25 directly to veterans charities.

Page 327

1 Q And what events -- if I were to look that up, how
2 would I find out about that?
3 A I'll give you a list of names to call. Look up the
4 Remington Great America Shoot. It's raised over a
5 million dollars the last three years running. I
6 was the top fundraiser for the event the first two
7 years. I brought my neck doctor in who operated on
8 me for free. He's now the biggest fundraiser, and
9 we host a team every year. It raises over seven
10 figures for charity once a year. That's just one
11 of the events that I participate in. I'm very
12 proud of my charitable service.
13 MR. FURMAN: I think we're almost at the end.
14 I'm just going to ask my team just for a second.
15 Thank you.
16 THE WITNESS: Yep.
17 (A brief recess was taken.)
18 MR. FURMAN: Mr. Bissonnette, I've got a
19 question for you.
20 RANDAL JOHNSTON: And let me just say right
21 now --
22 MR. FURMAN: That's okay. You can object to
23 it.
24 RANDAL JOHNSTON: Well, I'm not going to
25 object, but I will put on the record a personal

Page 328

1 aggravation that we extend courtesies that don't
2 get returned like the timing issue. We're going to
3 continue to cooperate and be professional about
4 this, but -- including letting you go -- exceed
5 your seven hours by some small amount --
6 MR. FURMAN: And I will tell you --
7 RANDAL JOHNSTON: -- but it is a matter of
8 importance to me at some point.
9 MR. FURMAN: Yeah. And Mr. Johnston, I
10 understand it and I -- and I know where you're
11 coming from.
12 RANDAL JOHNSTON: Thank you, sir.
13 BY MR. FURMAN:
14 Q Okay. So Mr. Bissonnette, I want to refer you back
15 to Exhibit No. 1. And this is the DD 1847 that we
16 reviewed together. I'm going to just put it
17 together for you. I know it's hard to read.
18 Earlier you testified that to the best of your
19 knowledge, Operation Neptune Spear was not an SAP;
20 correct?
21 A Yes.
22 Q The nondisclosure agreement that Jeh Johnson sent
23 over to you was dated January 24 of 2007; correct?
24 A Okay.
25 Q And that was well before, I believe, anyone knew

Page 329

1   where Osama bin Laden was.  That's my assumption.
2   Why did you forfeit 100 percent of the royalties if
3   Operation Neptune Spear was not an SAP?
4 A There was no way I was going to continue to fight
5   this battle when they would show me documents like
6   this that clearly show that I had to get a
7   prepublication review no matter SAP, not SAP,
8   whatever it was.  I was shown documents where it
9   clearly states that I had to seek prepublication
10  review.  When I didn't -- we all know we did not.
11  What's the upside to continuing to fight?
12  Certainly when in my second book I chose to follow
13  different counsel and get that book reviewed, why
14  would I continue going back and fighting this issue
15  when I've shown I've learned from my mistake and
16  I'm trying to move on.
17 Q Did you get legal advice from anyone that the
18  DD 1847 that you signed in 2007 required you to
19  forfeit the royalties to No Easy Day?
20 A Did I get legal advice that said --
21 Q That you were required to forfeit 100 percent of
22  the royalties.
23 A No.  That was the agreement we ended up with with
24  the Department of Justice.
25 Q And I guess, you know, the way I'm asking is that

Page 330

1   under paragraph 13 of DD 1847, again, dated
2   January 24 of 2007, it states that you hereby
3   assign to the United States Government all rights,
4   title, and interest in all royalties,
5   remunerations, and emoluments that have resulted or
6   will result or may result from any disclosure,
7   publication, or revelation not consistent with the
8   terms of this agreement; right?
9 A Okay.
10 Q And is it your understanding that this agreement
11  applies to Operation Neptune Spear?
12 A Yeah.
13 Q Okay.
14 A And I would say that we didn't -- the agreement
15  with the government wasn't even 100 percent of
16  the -- Elyse Cheney got to keep her royalties and
17  Kevin Maurer got to keep the amount that he had
18  been paid to write the book.  So to some degree,
19  hey, it could have even been worse.  I'm just
20  looking to finish this and be done with the
21  government.
22 Q And just one last question.  In No Easy Day, you
23  reference that you plan to donate a substantial
24  amount of the proceeds to charity.  What was the
25  percentage of the amount of contribution from the

Page 331

1   royalties that you anticipated giving to charity?
2 A I could have -- I could have given 100 percent.
3 Q Well, did you have an idea of what you planned to
4   do?
5 A We never got there.
6 Q So it could have been 100 percent?
7 A Absolutely.
8 Q And do you stand by that?  Would you have given
9   100 percent of the royalties from No Easy Day?
10 A I'm not going to come up with a hypothetical.  We
11  never got there.  I never -- we just never got
12  there.
13 Q Well, on the date that the book was released, did
14  you have a plan as to the percentage of how much
15  you were going to give to charity?
16 A No, because the date the book released, we already
17  knew we had a letter from Jeh Johnson which meant
18  there was issues.  So my mind was never thinking,
19  hey, let's hurry up and think of what percentage
20  I'm going to give to charity.  I can remember
21  saying, Hey, look, if the government wants it back,
22  if they want me to donate it, what -- I got zero
23  issues donating every penny to charity.
24 Q Did you propose that to the government?  Instead of
25  forfeiting to the government, you --

Page 332

1 A I don't know that that was ever officially
2   presented.
3 Q Did you ask your lawyer to present that?
4 A I don't know that I asked him to present it at any
5   time, but it was certainly something that I like to
6   throw out there as, hey, look, this was never about
7   the money.  This was about me trying to do the
8   right thing.
9       MR. FURMAN:  All right.  I have no further
10  questions.  Thank you very much.  Thank you for the
11  extra time.
12      RANDAL JOHNSTON:  You bet.  I just have a
13  couple extra questions.  I'll go through them as
14  fast as I can here.
15 CROSS-EXAMINATION
16 BY RANDAL JOHNSTON:
17 Q Mr. Bissonnette, at the time you hired
18  Mr. Podlaski, did you have copies of documents you
19  had signed?
20 A No.
21 Q Did he ever ask you for anything that you didn't
22  give him?
23 A No.
24 Q Did he ask you to go get copies of the documents
25  that you did not have copies of?

Page 333

1  A  Never.
2  Q  Did he ever say to you that from his military
3     experience, he knew the form of the documents you
4     would have signed as an operator in the SEAL team
5     with your experience?
6  A  Say that one again.
7  Q  Did he ever say to you that he knew the forms you
8     would have signed as an operator in SEAL Team 6?
9  A  I don't know that he ever came out and said he knew
10    what forms.  He was certainly quoting a lot of
11    different nomenclature to forms that -- I'm
12    obviously not a nomenclature guy.  So I --
13 Q  Let me stop you and just try to make this short.
14    Did he indicate to you that he had a familiarity
15    with the kinds of nondisclosure and prepublication
16    documents military personnel routinely sign?
17 A  Yes.
18 Q  And in particular, military personnel who are SOCOM
19    operators in whatever branch of service?
20 A  Yes.
21 Q  You went over this, but let me just ask really
22    quickly.  In your forfeiture with the government,
23    did the government give you credit for the portion
24    of the royalties that went to Elyse Cheney as the
25    literary agent?

Page 334

1  A  Yeah.
2  Q  So you didn't have to forfeit that.  You didn't
3     have to pay her and then forfeit it back to the
4     government also?
5  A  Agree, yes.
6  Q  And then same thing with Kevin Maurer?
7  A  Yes.
8  Q  Let me ask you this:  Mr. -- well, let me ask first
9     one more question that I got from Mr. Furman's
10    question.  He was asking you about if you knew what
11    documents Mr. Podlaski would have given the
12    Department of Justice that had not been given to
13    you as a part of the document production.  Can you
14    think of anyone else who could tell Mr. Furman and
15    us what documents Mr. Podlaski gave the Department
16    of Justice?
17 A  I would think the only person who could do that
18    would be Mr. Podlaski.
19 Q  Mr. Furman was asking you about your -- the premise
20    in your book of donating a major portion of the
21    proceeds of the book to charity.  Let me just ask
22    you, under -- forget what really happened.  Under
23    what circumstances would you have donated
24    100 percent of the proceeds to charity?  What would
25    have had to have happened for you to do that?

Page 335

1  A  Had the book been published with no issues and no
2     drama, had I not been -- my name not been disclosed
3     and I could continue to kind of fly under the radar
4     and not have to worry about the safety and security
5     of my family, I could have very easily done
6     100 percent.
7  Q  Was there any level of income that you would have
8     to have had before you would donate 100 percent?
9     Was it --
10 A  No.
11 Q  -- contingent on the number of book sales or
12    royalties?
13 A  No, no.
14    RANDAL JOHNSTON:  That's all I had to ask.
15    THE COURT REPORTER:  Do you want to reserve
16 signature?
17    RANDAL JOHNSTON:  Yes, please.
18    THE COURT REPORTER:  Do you want it sent to
19 you or directly to the witness?
20    RANDAL JOHNSTON:  Send it to me.
21    THE COURT REPORTER:  Did you want to order a
22 copy?
23    RANDAL JOHNSTON:  Yes, please.
24    THE COURT REPORTER:  What would you like?
25    RANDAL JOHNSTON:  Coyt?

Page 336

1     COYT JOHNSTON:  I definitely want it in TXT.
2  Maybe a PDF as well but definitely TXT.  TXT is my
3  preferred one.
4     THE COURT REPORTER:  Are you okay with
5  electronic exhibits?
6     COYT JOHNSTON:  Electronic is fine.
7     THE COURT REPORTER:  Do you know what kind of
8  transcript you want?  Full size, condensed,
9  electronic?
10    MS. LEMKHEN:  Both condensed and full size and
11 definitely electronic as well.
12    (The deposition was concluded at 6:03 p.m.)

Page 337

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF INDIANA
 2
 3
 4   MATTHEW BISSONNETTE,           )
                                    )
 5              Plaintiff,          )
                                    )
 6       -v-                        )  CAUSE NO.
                                    )  1:15-CV-00334
 7   KEVIN PODLASKI and CARSON      )
     BOXBERGER, LLP,                )
 8                                  )
                                    )
 9              Defendants.         )
10
11              Job No. 114764
12
13       I, MATTHEW BISSONNETTE, state that I have read
     the foregoing transcript of the testimony given by me
14   at my deposition on November 16, 2016, and that said
     transcript constitutes a true and correct record of
15   the testimony given by me at said deposition except as
     I have so indicated on the errata sheets provided
16   herein.
17
                 _____
                 MATTHEW BISSONNETTE
18
19
20
21
22
             STEWART RICHARDSON & ASSOCIATES
23             Registered Professional Reporters
               One Indiana Square, Suite 2425
24                Indianapolis, IN  46204
                     (317)237-3773
25
```

Page 338

```
 1   STATE OF INDIANA
 2   COUNTY OF HAMILTON
 3
 4       I, Julie A. Nicholson, RPR, CRR, a Notary
 5   Public in and for said county and state, do hereby
 6   certify that the deponent herein was by me first duly
 7   sworn to tell the truth, the whole truth, and nothing
 8   but the truth in the aforementioned matter;
 9       That the foregoing deposition was taken on
10   behalf of the Defendants; that said deposition was
11   taken at the time and place heretofore mentioned
12   between 9:25 a.m. and 6:03 p.m.;
13       That said deposition was taken down in
14   stenograph notes and afterwards reduced to typewriting
15   under my direction; and that the typewritten
16   transcript is a true record of the testimony given by
17   said deponent;
18       And thereafter presented to said witness for
19   signature; that this certificate does not purport to
20   acknowledge or verify the signature hereto of the
21   deponent.
22       I do further certify that I am a disinterested
23   person in this cause of action; that I am not a
24   relative of the attorneys for any of the parties.
25       IN WITNESS WHEREOF, I have hereunto set my
```

Page 339

```
 1   hand and affixed my notarial seal this 29th day of
 2   November, 2016.
 3
 4
 5
 6
 7
 8
 9
10
11   My commission expires:
     September 1, 2022
12
     Job No. 114764
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 340

```
 1   A. Michael Furman, Esq. (Originating Party)
     FURMAN KORNFELD & BRENNAN, LLP
 2   61 Broadway, 26th Floor
     New York, NY  10006
 3
 4       NOTICE OF DEPOSITION SUBMISSION
               JOB NO. 114764
 5
     In the United States District Court,
 6   Northern District of Indiana
     Cause No. 1:15-CV-00334
 7   MATTHEW BISSONNETTE, Plaintiff,
                 v.
 8   KEVIN PODLASKI and CARSON BOXBERGER, LLP, Defendants.
 9
10       In compliance with all applicable rules, you
     are notified the signed original deposition of
11   MATTHEW BISSONNETTE has been sealed and submitted
     to the originating party.
12
13
14   _____
     (Date of submission or mailing by certified mail)
15
16   cc:  Coyt Randal Johnston, Esq.
17
18
19
20
21
22
             STEWART RICHARDSON & ASSOCIATES
23             Registered Professional Reporters
               One Indiana Square, Suite 2425
24                Indianapolis, IN  46204
                     (317)237-3773
25
```

PLEASE DO NOT MARK ON DEPOSITION PAGES.  MAKE ALL CORRECTIONS ON THIS FORM.



**Stewart Richardson**
DEPOSITION SERVICES
*Uniting the Power of People and Technology*

One Indiana Square
Suite 2425
Indianapolis, IN 46204
317.237.3773
Fax: 317.237.3767

RE:  Indiana Rules of Procedure, Trial 30(E) and/or Federal rules of Civil Procedure

After having read my deposition, I wish to make the following changes:

PAGE _313_    LINE _23_
CHANGE _$500,000_
TO _$150,162.33_
REASON FOR CHANGE _I was just giving my best estimate in my deposition and I was way off.  I now know the exact figure._

PAGE _____    LINE _____
CHANGE _____
TO _____
REASON FOR CHANGE _____

PAGE _____    LINE _____
CHANGE _____
TO _____
REASON FOR CHANGE _____

PAGE _____    LINE _____
CHANGE _____
TO _____
REASON FOR CHANGE _____

PAGE _____    LINE _____
CHANGE _____
TO _____
REASON FOR CHANGE _____

PAGE _____    LINE _____
CHANGE _____
TO _____
REASON FOR CHANGE _____

I am, therefore, signing my deposition conditioned on the fact the above noted shall be entered upon the deposition by the notary public.

☐  Please check for no changes

_(Signature of deponent)_