# EXHIBIT B

CONDENSED

## In the Matter Of:

## BISSONNETTE vs PODLASKI

1:15-CV-334-SLC

## BENJAMIN SEVIER

*January 06, 2017*



800.211.DEPO (3376)
EsquireSolutions.com

**Page 1**

1                    Sevier
2   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF INDIANA, FORT WAYNE
3   ---------------------------------x
    MATTHEW BISSONNETTE,
4
                Plaintiff,
5
        v.    Civil Action No. 1:15-CV-334-SLC
6
    KEVIN PODLASKI and CARSON BOXBERGER, LLP
7
                Defendants.
8   ---------------------------------x
9
10          BENJAMIN PATRICK SEVIER
11            New York, New York
12          Friday, January 6, 2017
13
14
15
16
17
18
19
20
21   Reported by:  Steven Neil Cohen, RPR
22   Job No. J0498551
23
24
25

**Page 2**

1                    Sevier
2            January 6, 2017
3               9:47 a.m.
4
5         Deposition of BENJAMIN PATRICK
6   SEVIER, taken by Defendants, pursuant to
7   notice, at the offices of Davis Wright
8   Tremaine, LLP, 1251 Avenue of the Americas,
9   New York, New York before Steven Neil Cohen,
10  a Registered Professional Reporter and
11  Notary Public of the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1                    Sevier
2                 APPEARANCES
3
4   FURMAN KORNPELD & BRENNAN, LLP
5   61 Broadway
6   New York, New York 10006
7           Attorneys for Defendants
8   BY:   A. MICHAEL FURMAN, ESQ.
9         IZABELL LEMKHEN, ESQ.
10
11  JOHNSTON TOBEY BARUCH, ESQS.
12  3308 Oak Grove Avenue
13  Dallas, Texas 75204
14          Attorneys for Plaintiff
15  BY:   RANDY JOHNSTON, ESQ.
16
17  PENGUIN RANDOM HOUSE
18  1745 Broadway
19  New York, New York 10019
20          Attorney for Benjamin Sevier
21  BY:   CAROLYN K. FOLEY, ESQ.
22        YUKI A. HIROSE, ESQ.
23
24
25

**Page 4**

1                    Sevier
2           IT IS HEREBY STIPULATED AND
3   AGREED, by and between counsel for the
4   respective parties hereto, that the sealing
5   and filing of the within deposition be
6   waived; that such deposition may be signed
7   and sworn to before any officer authorized
8   to administer an oath; that all objections,
9   except as to form are reserved to the time
10  of trial.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 5

```
 1                    Sevier
 2    BENJAMIN PATRICK SEVIER, called as a
 3    witness by the Defendants, having been
 4    duly sworn, testified as follows:
 5    EXAMINATION
 6    BY MR. FURMAN:
 7        Q.   Mr. Sevier, good morning.
 8        A.   Good morning.
 9        Q.   Thank you for being here today.
10            But before we begin your counsel
11    would like to just make an understanding on
12    the record that we have agreed to off the
13    record.
14            MS. FOLEY:  Just I want to state
15        for the record my name is Carolyn
16        Foley, I work for Penguin Random House
17        and I am appearing here on behalf and
18        representing the witness.
19            The counsel have all agreed that
20        the transcript of this deposition will
21        be used for purposes of this
22        litigation only.
23            MR. FURMAN:  That is agreed to
24    by all parties; is that correct?
25            MR. JOHNSTON:  Yes.
```

Page 6

```
 1                    Sevier
 2        I am sorry.  It is.
 3    BY MR. FURMAN:
 4        Q.   Mr. Sevier, good morning.
 5            We are here today in connection
 6    with a litigation of Matthew Bissonnette
 7    against Kevin Podlaski and others including
 8    his law firm.
 9            Are you aware of that litigation?
10        A.   Yes.
11        Q.   We had sent a subpoena to you
12    through the Davis Wright Tremaine firm and
13    you received a copy of that subpoena?
14            MS. FOLEY:  I will just state
15        for the record I have a copy -- I
16        accepted service of that subpoena.
17    BY MR. FURMAN:
18        Q.   Okay.  So you understand that you
19    are here pursuant to a subpoena to give
20    testimony in relation to this particular
21    case?
22        A.   Yes.
23        Q.   Okay.  Now previously in this
24    litigation documents were produced from
25    Dutton and I just want to show them and have
```

Page 7

```
 1                    Sevier
 2    them marked as an exhibit.
 3            MR. FURMAN:  This will be
 4        Exhibit Number 108.
 5            (Document Bates numbered PRH1
 6        through 90 was marked Exhibit 108 for
 7        identification)
 8            MR. FURMAN:  These are, so I can
 9        identify them, they are listed as
10        Bates numbers PRH1 through 90.
11    BY MR. FURMAN:
12        Q.   Have you seen this before, this
13    exhibit, these documents that are listed 1
14    through 90?
15            MS. FOLEY:  You are asking if he
16        has seen them as a package?
17            MR. FURMAN:  As a package.
18            THE WITNESS:  No.
19    BY MR. FURMAN:
20        Q.   Okay.  Did you participate in the
21    gathering of documents that were related to
22    this litigation?
23        A.   Yes.
24        Q.   Can you describe the manner in
25    which that took place?
```

Page 8

```
 1                    Sevier
 2        A.   I made my computer available to my
 3    attorneys.
 4        Q.   Did you yourself do anything
 5    beyond that, in other words, search for
 6    documents, search e-mails or search through
 7    a file?
 8        A.   No.
 9        Q.   Before the documents were produced
10    in this litigation and I will represent to
11    you that these are the documents that were
12    produced from Dutton in this litigation, did
13    you --
14            MS. FOLEY:  I am going to stop
15        you actually.
16            We did not produce these
17        documents in the course of this
18        litigation.
19            I believe these documents were
20        produced in the course of a previous
21        litigation brought in New York.
22            MR. FURMAN:  When I say "this
23        litigation," I am speaking broadly of
24        the Bissonnette versus Podlaski, et
25        al. case which originated in New York
```



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
9–12

Page 9

1             Sevier
2   and was restarted in Indiana so --
3       MS. FOLEY: I guess the point is
4   we didn't produce these documents in
5   the course of this litigation. We
6   didn't make that production.
7       MR. FURMAN: Okay. And when I
8   say -- in the course of the New York
9   litigation were these documents
10   gathered and produced.
11       MS. FOLEY: Yes.
12       MR. FURMAN: That's correct.
13 BY MR. FURMAN:
14   Q.   Okay. So Mr. Sevier, did you
15   participate in that, in that process in the
16   gathering of documents in the New York
17   litigation?
18   A.   Yes.
19   Q.   Have you seen them before? After
20   they were gathered and the e-mails were
21   taken off of your computer were they shown
22   to you?
23   A.   Not in this, not as a packet, not
24   in total. I haven't seen this before.
25       MS. FOLEY: And actually may I

Page 10

1             Sevier
2   just talk to the witness for one
3   minute?
4       MR. FURMAN: Sure.
5       Off the record.
6       (Discussion off the record)
7       MS. FOLEY: The witness is going
8   to add one more detail of his efforts
9   regarding production of documents.
10 BY MR. FURMAN:
11   Q.   Okay.
12   A.   I also made my physical files
13   available to my attorneys.
14   Q.   Could you take a moment just to
15   thumb through these documents. The reason I
16   am asking you to do that is I want to make
17   sure that these documents were from your
18   file in the ordinary course of your business
19   at Dutton. It is for that purpose I am
20   asking you to thumb through 1 through 90.
21       MS. FOLEY: You want to ask if
22   they are all from his files?
23       MR. FURMAN: Correct.
24       MS. FOLEY: So if you can look
25   through them and if you can tell

Page 11

1             Sevier
2   whether they are from your files you
3   can answer.
4       If you don't know you can answer
5   you don't know.
6       You know, I will let the
7   witness -- the witness can answer the
8   question.
9       I think that it is probably best
10   for you and I to talk off the record
11   and maybe during a break if you want
12   to clarify something during lunch but
13   the witness made his files available
14   but I don't know that he is capable of
15   saying where any document came from.
16       It is probably best if we talk
17   about the production.
18       MR. FURMAN: Okay. The question
19   I am asking of the witness really
20   isn't all that complicated because the
21   entire production -- virtually the
22   entire production involves e-mails and
23   there are some letters that are
24   attached at the end so what I am
25   asking him to do is to come through

Page 12

1             Sevier
2   these e-mails and it is largely
3   repetitive and I just want to make
4   sure that they were e-mails that were
5   produced in the ordinary course of
6   Mr. Sevier's business.
7       MS. FOLEY: Here is the problem.
8   If you look at the -- if you look at
9   the first one the e-mail is from Alex
10   Gigante so while the documents were --
11   we searched Mr. Sevier's documents for
12   sure, he was not the only person so
13   whether or not these were in his files
14   is hard to answer. They may or may
15   not have been.
16       MR. FURMAN: Right.
17       MS. FOLEY: So that is my
18   concern. He is not always the author
19   of all of these documents.
20       MR. FURMAN: Yes, I understand.
21       MS. HIROSE: Nor is he copied on
22   all of these.
23       MR. FURMAN: Right. Understood.
24       THE WITNESS: I have looked
25   through them.



Page 13

1          Sevier
2          Can you repeat the question?
3    BY MR. FURMAN:
4    Q.   Yes, the question is, now that you
5    have had the opportunity to thumb through
6    these documents do they appear to you to be
7    documents that are from Dutton and were
8    produced, these documents, e-mails, even the
9    ones that for example number 1 which is from
10   Alex Gigante to Kevin Podlaski, are these
11   documents in your mind in the ordinary
12   course of Dutton's business?
13   A.   Yes.
14        MS. FOLEY:  Objection.
15   Foundation.
16   BY MR. FURMAN:
17   Q.   We will get back to individual
18   questions about number 1.  I just wanted to
19   ask that general question.
20        Let me ask you some questions
21   about your background and then we will come
22   back to the documents.
23        How long have you been in the
24   publishing industry?
25   A.   About 18 years.

Page 14

1          Sevier
2    Q.   What is just a thumbnail sketch of
3    your educational background?
4    A.   I graduated with a Bachelor's
5    Degree from UCLA.
6    Q.   Did you attend graduate school?
7    A.   No.
8    Q.   How long have you been at Dutton?
9    A.   Ten years.
10   Q.   What is your current position?
11   A.   Vice president and publisher of
12   Dutton.
13   Q.   How long have you had that
14   position?
15   A.   I have been publisher for about
16   two years.
17        I have been vice president for
18   about four years.
19   Q.   What other positions have you had
20   at Dutton?
21   A.   I started ten years ago as a
22   senior editor and then I became an executive
23   editor and then I became editor in chief and
24   then I became vice president and then I
25   became vice president and publisher.

Page 15

1          Sevier
2    Q.   What years were you editor in
3    chief?
4    A.   From 2011 until 2000 and -- the
5    end of 2014, beginning of 2015, somewhere in
6    there.
7    Q.   During the time that No Easy Day
8    was in production and through its release
9    were you the editor in chief of Dutton?
10   A.   Yes.
11   Q.   Does Dutton go by a different name
12   or affiliation called Penguin?
13   A.   Dutton is a part of Penguin.
14   Q.   Does Dutton have any affiliates --
15   let me ask -- strike that.  Let me ask a
16   better question.
17        What is the relationship between
18   Penguin and Dutton so I can understand how
19   it is generally?
20   A.   Dutton is one of perhaps a dozen
21   imprints underneath the Penguin umbrella.
22   Q.   Is Dutton a separately comprised
23   organization, in other words, is it a
24   subsidiary of Penguin or is Dutton a
25   corporation on its own right?

Page 16

1          Sevier
2        MS. FOLEY:  Objection.  Lack of
3    foundation.
4        If you know you can answer.
5        THE WITNESS:  I don't really
6    know.
7    BY MR. FURMAN:
8    Q.   Did you work at St. Martin's Press
9    prior to working at Dutton?
10   A.   Yes.
11   Q.   How long did you work there?
12   A.   Approx --
13   Q.   You can give me an estimate.
14   A.   Approximately eight years.
15   Q.   Okay.  What was your duties at
16   St. Martin's?
17   A.   I was an editor.
18   Q.   Now, in the course of your career
19   as an editor and that includes your time at
20   St. Martin's have you ever had any kind of
21   security clearance from the U.S. Government?
22   A.   No.
23   Q.   Do you know what that is?
24   A.   Generally.
25   Q.   Tell me in general what you



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
17–20

Page 17

1                   Sevier
2  believe that to be.
3      A.   As far as I know it is a
4  designation from the government for
5  individuals who are given access to
6  different levels of information.  That is
7  about all I know about it.
8      Q.   Prior to No Easy Day have you been
9  involved either as an editor or in any way
10  in your employment through St. Martin's and
11  Dutton with a military author other than
12  obviously Mr. Bissonnette?
13      A.   Can you repeat the question?
14      Q.   Sure.  Let me preface this.  I am
15  going to use Mr. Bissonnette's real name and
16  the reason I am doing that in this
17  particular case is because he is the
18  plaintiff and has been named using his name.
19          I appreciate and understand that
20  when the book was written Mr. Bissonnette
21  was using a pen name, Mark Owen and so --
22  and it is understood in this litigation
23  throughout that we have used
24  Mr. Bissonnette's name, it is not because we
25  are divulging anything that is not going to

Page 18

1                   Sevier
2  the public but I understand that when you
3  had worked on this, Mr. Bissonnette was
4  known as Mark Owen but I am going to use
5  that name so it is just easier for the
6  record that we use his name consistently
7  throughout.  Other than -- so let me ask my
8  question.
9          Other than Mr. Bissonnette have
10  you in your career worked with other
11  military authors?
12      MS. FOLEY:  By "military
13  authors," you mean people who worked
14  in the military?
15      MR. FURMAN:  Yes, I do mean
16  that.
17      THE WITNESS:  Yes.
18  BY MR. FURMAN:
19      Q.   Who are they?
20      A.   Brad Taylor, T. Mark McCurley,
21  Clinton Romeshea.  That is who I can
22  remember.
23      Q.   Let me start off with Brad Taylor.
24  Strike that.
25          Let me ask the first question.

Page 19

1                   Sevier
2  Are all of the names that you described,
3  Mr. Taylor, Mr. McCurley and Mr. Romeshea,
4  are those their actual names as opposed to
5  pen names?
6      A.   Those are their actual names.
7      Q.   Let's start with Mr. Taylor.  What
8  kind of book was that?
9      A.   Military thriller, fiction.
10      Q.   Do you remember the name of the
11  book?
12      A.   The first book we did together was
13  called One Rough Man.
14      Q.   One Rough?
15      A.   Man.
16      Q.   Man.  Okay.
17          Any other books?
18      A.   We are about to publish his 11th
19  and I am afraid I am not going to remember
20  the titles of all 11.
21      Q.   He has 11 books, right?
22      A.   That's right.
23      Q.   We don't need to go through the
24  history of 11 books but in the course of
25  being the editor for any one of those 11

Page 20

1                   Sevier
2  books did you discuss with Mr. Taylor the
3  need for obtaining any kind of security
4  clearance for his work?
5      MS. FOLEY:  Objection to form.
6      THE WITNESS:  I don't recall any
7  specific conversations.
8  BY MR. FURMAN:
9      Q.   What was Mr. -- to the best of
10  your knowledge what was Mr. Taylor's
11  military background?
12      A.   He was an army -- he was in the
13  army and at various points in his career he
14  was an Army Ranger and he was in the unit
15  commonly known as Delta Force.
16      Q.   Are you aware of whether or not
17  Mr. Taylor was involved in any classified
18  missions during the course of his military
19  career?
20      MS. FOLEY:  Objection.  I mean,
21  I am going to direct the witness to
22  answer anything that is public
23  knowledge but going beyond that we are
24  here to talk about Mr. Bissonnette and
25  we are not here to talk about



BENJAMIN SEVIER                                              January 06, 2017
BISSONNETTE vs PODLASKI                                              21–24

Page 21

1              Sevier
2   confidential information that may have
3   been shared between Mr. Sevier and his
4   authors.
5          So limiting your answer to what
6   is public knowledge about him.
7          Repeat your question.
8          MR. FURMAN:  I don't know if I
9   can accept your limitation because I
10  am asking the witness what he knows,
11  not what is public.
12         MS. FOLEY:  I am just telling
13  you that is my direction to the
14  witness.  I take your point.
15         We will take this one step at a
16  time.
17  BY MR. FURMAN:
18     Q.   So I want the record to be clear.
19  If we need to raise this with the court, I
20  am asking you, Mr. Sevier, if you are aware
21  of whether or not Mr. Taylor was involved in
22  any classified missions in the course of his
23  military career?
24         MS. FOLEY:  I am directing you
25  to answer that to the extent that

Page 22

1              Sevier
2   knowledge is public knowledge versus
3   something that he has told you that is
4   not publicly known about the author.
5          THE WITNESS:  No.
6   BY MR. FURMAN:
7      Q.   We will let the question stand and
8   your limitation and if there is any issue
9   that we need to raise with the court we
10  will.
11         Let's move on to Mr. McCurley.
12  What was Mr. McCurley's military background?
13     A.   He was in the Air Force.
14     Q.   Do you know what level he was in
15  the Air Force?  Was an officer?
16     A.   He was an officer.
17     Q.   What kind of book did he write,
18  fiction, nonfiction?
19     A.   Nonfiction.
20     Q.   How many books did he write?
21     A.   One.
22     Q.   Do you remember the title of the
23  book?
24     A.   Yes.
25     Q.   What was the title of that book?

Page 23

1              Sevier
2      A.   Hunter Killer.
3      Q.   Did you discuss with Mr. McCurley
4   whether any of his experience that he was
5   relating in the book had to do with any kind
6   of classified information?
7          MS. FOLEY:  I am going to object
8   to that question and I am going to
9   direct you to answer that to the
10  extent there was public knowledge of
11  whether or not he was involved in any
12  classified -- what was your phrasing
13  of it, classified?
14         MR. FURMAN:  I forget.
15         MS. FOLEY:  Do you want to read
16  back the question?
17         (Record read)
18         MS. FOLEY:  So then the
19  limitation is was there discussion
20  publicly that any of the material
21  related in the book had to do with
22  classified information -- experiences
23  related in the book had to do with
24  classified information.
25         THE WITNESS:  I am sorry.  I am

Page 24

1              Sevier
2   completely confused.  I will need
3   somebody to repeat the question.
4          MR. FURMAN:  I am distracted by
5   the objections.  I am going to have to
6   ask the reporter to read back the
7   question.
8          MS. FOLEY:  Do you want to go
9   off the record and let me discuss with
10  the witness?
11         MR. FURMAN:  Yes.  I don't mind
12  at all.
13  BY MR. FURMAN:
14     Q.   Mr. McCurley's book was
15  nonfiction, correct?
16     A.   Yes.
17     Q.   Okay.  And I think you mentioned
18  it was called Hunter Killer.
19         To the best of your knowledge did
20  that book involve any information that
21  would -- was classified in any particular
22  way by the U.S. Government?
23     A.   If you are asking whether the book
24  we published contained any classified
25  information, my answer is, no.



Page 25

1                    Sevier
2       Q.   Did you make any effort in the
3    course of editing the book that culminated
4    in Hunter Killer to ascertain whether or not
5    the book contained classified information?
6       A.   I had a conversation with the
7    author prior to setting out to write the
8    book -- his setting out to write the book
9    and we agreed the book would contain no
10   classified information and neither of us
11   wanted it to contain any classified
12   information and since I have no idea what is
13   or is not classified, I said to him, it is
14   your responsibility to make sure there is no
15   classified information in this book.
16      Q.   Okay.  So is it fair to say you
17   relied on Mr. McCurley to carve out any
18   classified information that would ultimately
19   wind up in the book that was Hunter Killer?
20      MS. FOLEY:  Objection to the
21      form.  "Carve out any information that
22      would ultimately end up in the book"
23      sort of contradicts itself.
24   BY MR. FURMAN:
25      Q.   Let me ask a better question then.

Page 26

1                    Sevier
2    I will strike that.
3          Did you rely on Mr. McCurley to
4    avoid including any classified information
5    in the book that culminated in Hunter
6    Killer?
7       A.   Yes, I did.
8       Q.   When was that book published?  You
9    can just give me an estimate.
10      A.   A couple of years ago.
11      Q.   Clinton Romeshea, was it a fiction
12   book or nonfiction book?
13      A.   Nonfiction.
14      Q.   Was that a first account story?
15      A.   I am not sure what you mean.
16      Q.   What was the name of the book?
17      A.   Red Platoon.
18      Q.   What generally was Red Platoon
19   about?
20      A.   It was about the events at a
21   military base on a particular day in
22   Afghanistan during the war there.
23      MR. JOHNSTON:  I apologize for
24      interrupting.  I did not get the
25      author's name.

Page 27

1                    Sevier
2       MR. FURMAN:  His name is Clinton
3    Romeshea.
4       THE WITNESS:  It is pronounced
5    Romeshea and it is spelled
6    R-O-M-E-S-H-E-A.
7       MR. JOHNSTON:  Thank you.
8    BY MR. FURMAN:
9       Q.   When was that book published?
10      A.   Last year.
11      Q.   The book was published after No
12   Easy Day?
13      A.   Yes.
14      Q.   What was Mr. Romeshea's highest
15   position in the military to the best of your
16   knowledge?
17      A.   I don't recall his specific rank
18   but he was an enlisted army guy.
19      Q.   Was Red Platoon a firsthand
20   account of the events that took place in
21   Afghanistan that he wrote about?
22      A.   Yes.
23      Q.   Did you discuss -- well, I will
24   not ask that question.
25          Did you consider whether or not

Page 28

1                    Sevier
2    classified information would be included in
3    the book that became Red Platoon?
4       MS. FOLEY:  Object to the form
5      of the question.
6       THE WITNESS:  I had the same
7      conversation with him that I described
8      earlier as having with Mr. McCurley.
9    BY MR. FURMAN:
10      Q.   Beyond having the discussion with
11   Mr. Romeshea did you take any efforts to
12   make sure that no classified information
13   would be released in the book Red Platoon?
14      A.   No.  I relied on the author.
15      Q.   After Red Platoon was published
16   did -- were you aware of whether or not any
17   governmental agency inquired about the
18   release of con -- classified information in
19   the book Red Platoon?
20      MS. FOLEY:  Object to the form.
21      THE WITNESS:  I don't know of
22      any.
23   BY MR. FURMAN:
24      Q.   Do you know whether or not
25   Mr. Romeshea had signed any nondisclosure



BENJAMIN SEVIER                                   January 06, 2017
BISSONNETTE vs PODLASKI                                       29-32

Page 29

1              Sevier
2     agreements with the government?
3        A.   I don't know that.
4        Q.   Did you ask?
5           MS. FOLEY:  If you remember.
6           THE WITNESS:  I don't remember
7     specifically whether or not I asked
8     that question.
9     BY MR. FURMAN:
10       Q.   Including Messrs. Taylor, McCurley
11    and Romeshea and any other authors that you
12    have been involved with in your career have
13    any of those authors in your experience have
14    signed nondisclosure agreements with the
15    government that you are aware of?  Obviously
16    Mr. Bissonnette has.  You are aware of that.
17    I am asking any other authors.
18          MS. FOLEY:  Objection to the
19    form of the question.
20          THE WITNESS:  So you are asking
21    other than the three you just listed
22    or including the three --
23    BY MR. FURMAN:
24       Q.   Including the three.
25       A.   -- you just listed?

Page 30

1              Sevier
2        Q.   Yes.
3           We know that Mr. Bissonnette had
4     signed a nondisclosure agreement so I am
5     asking about any other author including
6     those three if you are aware that any of
7     them had signed a nondisclosure agreement of
8     some sort with the U.S. Government?
9        A.   I have no specific knowledge of
10    what any of those three authors or any other
11    that I can think of signed or didn't sign.
12       Q.   I am now going to just turn the
13    topic to people that work at Dutton. I will
14    ask you some questions about them.
15          Who is Christine Ball?
16       A.   She is the currently the deputy
17    publisher for Putnam, Dutton and Berkeley
18    which are three imprints of Penguin.
19       Q.   What involvement did Christine
20    Ball have with the book No Easy Day?
21       A.   At that time she was the associate
22    publisher for Dutton in charge of publicity
23    and marketing.
24       Q.   Was Ms. Ball involved in the
25    publicity and marketing of No Easy Day?

Page 31

1              Sevier
2        A.   Yes.
3        Q.   When did she first become involved
4     with the production of that book to the best
5     of your knowledge?
6        A.   She wasn't involved in what I
7     would call the production of the book.
8        Q.   When did she get involved in the
9     publicity and marketing of No Easy Day?
10       A.   I couldn't give you a specific
11    date but it would have been -- it was
12    sometime in the first quarter of 2012.
13       Q.   Was it after the first draft the
14    book was produced?
15       A.   No.
16       Q.   What efforts did she undertake to
17    publicize and market the book?
18          MS. FOLEY:  Object to the form.
19          THE WITNESS:  She helped lay out
20    the publicity and marketing strategy
21    and then it was her job to execute
22    that strategy.
23          She also participated in
24    conversations about when the book
25    would be published inasmuch as that

Page 32

1              Sevier
2     was important to the media and
3     publicity plan.
4     BY MR. FURMAN:
5        Q.   Let me just follow up on that.
6     First let me take on the media and publicity
7     strategy.
8           When did she first lay out that
9     that media and publicity strategy to the
10    best of your knowledge?  Obviously not a
11    specific date but just generally.
12       A.   We began talking about it as I
13    said in the first quarter, sometime in the
14    first quarter of 2012 and those discussions
15    and strategies would have been a moving
16    target up to and in fact just after the
17    publication of the book in September.
18       Q.   Could you describe to me what that
19    strategy was initially?
20       A.   In the book business we want to
21    get as much attention for a book as
22    possible.  So with any book publication we
23    are looking to get our author in front of as
24    many eyeballs in this country as possible
25    that means targeting the biggest possible



Page 33

1          Sevier
2   television programs that do interviews with
3   authors, the biggest print publications, the
4   radio stations and radio programs that can
5   reach lots of listeners so we with this
6   project had our sights set on the absolute
7   top outlets across all media.
8       Q.   What was the hook as it relates to
9   Mr. Bissonnette?  What was going to get
10  eyeballs on him and the book itself?
11      A.   He had a unique story to tell.  He
12  is an American hero who had a long career
13  fighting for this country.
14          He participated in one of the most
15  historic military operations that I can
16  remember and he in this book was going to
17  give a firsthand account of that mission and
18  that we felt was going to be something
19  everybody in the country would want to talk
20  to him about.
21      Q.   What do you recall Christine Ball
22  telling you about what the strategy would
23  have been at least initially?  You mentioned
24  getting eyeballs.
25      A.   Beyond what I just described?

Page 34

1          Sevier
2       Q.   Beyond what you described.
3       A.   I am going to need you to be more
4   specific.
5       Q.   How -- what was the plan to
6   execute that vision of getting as many
7   eyeballs on Mr. Bissonnette as possible?
8       MS. FOLEY:  Object.  Asked and
9   answered.
10          THE WITNESS:  I feel like that
11      is what I just said.
12          Do you want me to clarify or do
13      you have a specific question?
14  BY MR. FURMAN:
15      Q.   Yes.  You mentioned you wanted to
16  get eyeballs.  How would you do that?
17      A.   We would make Mark available --
18  excuse me, Matt available to the media
19  outlets I just described and as many of them
20  as possible to tell his story firsthand and
21  make the public aware that the complete
22  story was available in our book.
23      Q.   When did that first take place,
24  when was Matt first made available to the
25  media outlets?

Page 35

1          Sevier
2       MS. HIROSE:  Objection.  Do you
3       mean the book?
4   BY MR. FURMAN:
5       Q.   No.  I am talking about Matt.
6       A.   I am not sure what you mean.  Can
7   you clarify?
8       Q.   I am going to ask the court
9   reporter to read back your answer.  I was
10  following up on your answer.
11          (Record read)
12          MR. FURMAN:  What was my last
13      question?
14          (Record read)
15          THE WITNESS:  Our hope was that
16      those interviews would take place at
17      publication on the day of our
18      publication and in the weeks and
19      months following.
20  BY MR. FURMAN:
21      Q.   Was there a strategy to publicize
22  the book before that date in place?
23      A.   No.
24      Q.   Did Dutton take any efforts to
25  publicize No Easy Day before the book was

Page 36

1          Sevier
2   actually published?
3       A.   I don't know what you mean
4   exactly.  If what you are asking is were we
5   strategizing for a publicity plan that we
6   hoped to start on the day of publication or
7   around the day of publication and were we
8   taking steps to enact and execute that
9   strategy, yes.
10          If you are asking whether we
11  publicized the book or in other words caused
12  Matt to take any of the actions I described
13  in the media before the publication of the
14  book, then I have a different answer.
15      Q.   What is the different answer then?
16      A.   We were trying to set up
17  interviews and in some cases the kind of
18  media outlets I described earlier need time
19  to produce an interview, edit an interview
20  and get it together so that it can air,
21  i.e., become public around the time we
22  wanted it to which was at publication.
23          So some steps were taken during
24  the summer of 2012.
25      Q.   What steps were -- what were those

BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
37—40

Page 37

1　　　　　Sevier
2　steps?
3　　A.　We spoke with one media outlet
4　that I can recall to make them aware that we
5　would be publishing this book and to offer
6　them an opportunity to interview Matt.
7　　Q.　What media outlet was that?
8　　A.　60 Minutes, television show on
9　CBS.
10　　Q.　Did you describe the contents of
11　the book to 60 Minutes?
12　　MS. FOLEY:　Objection to form.
13　　　　Were you part of the contact
14　　　with 60 Minutes?
15　　THE WITNESS:　Yes.
16　BY MR. FURMAN:
17　　Q.　I am assuming it was a producer at
18　60 Minutes that you spoke to?
19　　A.　It was a producer and an on air
20　interviewer.
21　　Q.　What were their names?
22　　A.　I don't recall the producer's
23　name.
24　　　　The interviewer we met with was
25　named Scott Pelley.

Page 38

1　　　　　Sevier
2　　Q.　What did you tell them about the
3　book?
4　　A.　I don't recall specifically what I
5　told them.
6　　Q.　What generally was described in
7　that conversation?
8　　A.　That Matt's book was going to be
9　the first eyewitness account of the Osama
10　bin Laden raid.
11　　Q.　When did that conversation take
12　place?
13　　A.　I don't recall specifically. I
14　suspect it was in the early summer of 2012.
15　　Q.　Earlier you said that there was --
16　that Christine Ball was involved in the
17　marketing, media and publicity strategizing
18　effort and also in discussions about when
19　the book would be published.　Correct?
20　　A.　Yes.
21　　Q.　I want to focus on when the book
22　would be published.　What was the strategy
23　in terms of that date?
24　　A.　Which date are you referring to?
25　　Q.　Publication of No Easy day.

Page 39

1　　　　　Sevier
2　　A.　You book publishers trying to pick
3　an advantageous date when they think can get
4　the kind of media coverage that I described
5　earlier.
6　　　　There are many other factors that
7　go into choosing a publication date
8　including when the manuscript is ready, how
9　long the production process takes, how many
10　copies you are shipping and how long it is
11　going to take to print and distribute the
12　book; numerous other factors that I can't
13　recall at the moment so all of those would
14　have gone into our thinking.
15　　Q.　What was your thing as it relates
16　to No Easy day about the publication date?
17　You described what you do generally?
18　　A.　Yes.
19　　Q.　Now I am talking about No Easy
20　Day.
21　　A.　Well, we wanted the book to be
22　published in the fall season because that is
23　the time when lots of people are buying
24　books.　70 percent of books I have heard are
25　sold in the U.S. during the fall season and

Page 40

1　　　　　Sevier
2　it will lead up to Christmas.　So we felt
3　this was a big book and we wanted it in the
4　biggest selling season.
5　　　　September date that we initially
6　selected seemed advantageous from a media
7　publicity standpoint and from competition in
8　the marketplace as far as we could tell.
9　　Q.　Why?
10　　A.　You look at the publicly available
11　knowledge of what other books are being
12　published and we try to pick a date on which
13　there is not direct competition from a book
14　exactly like the one we are publishing or
15　another huge book that is going to suck up
16　the media attention that we are hoping to
17　get for our book.
18　　Q.　You were aware that another author
19　was planning a book about the operation
20　Neptune and the killing of bin Laden at the
21　same time, correct?
22　　A.　We knew there was a journalist
23　writing a journalist account.
24　　Q.　Mark Bowden?
25　　A.　Mark Bowden.



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
41—44

Page 41

1              Sevier
2      Q.   You were aware that Mark Bowden
3   was shooting to publish a book in the fall,
4   correct?  I have e-mails to that effect so I
5   think it is common knowledge.
6      MS. FOLEY:  Object to the form.
7      And do you recall --
8        THE WITNESS:  I am trying to
9      remember if I knew when -- exactly
10      when that one was being published.  I
11      don't really recall what we knew about
12      the pub date but I knew the book was
13      coming.
14  BY MR. FURMAN:
15      Q.   Okay.  And so the direct
16   competition that you described earlier was
17   Mark Bowden's book that ultimately became
18   the book called The Finish?
19      MS. FOLEY:  Object to the form.
20        THE WITNESS:  No.  What I was
21      describing earlier was generally
22      speaking when you think you have the
23      biggest book of the year you don't
24      want to put it on sale on the same
25      date as another publisher's book that

Page 42

1              Sevier
2   they think is going to be the biggest
3   book of the year so that is what I was
4   referring to earlier.
5        If you are asking me about Mark
6   Bowden, yes, I was aware that Bowden's
7   book was coming out, it was a
8   journalistic account based on
9   interviews.
10        It would have been advantageous
11   to us to be out in front of it if we
12   could be.
13  BY MR. FURMAN:
14      Q.   Obviously it would have been
15   advantageous to be -- for No Easy Day to be
16   published before Mark Bowden's book The
17   Finish, fair to say?
18      A.   I don't know that it was a
19   significant factor but it was in our
20   thinking.
21      Q.   Anything else about the publishing
22   date that went into the strategy of
23   releasing the book in September?
24        You referenced being ahead of
25   competition and you also referenced the book

Page 43

1              Sevier
2   sales, the high season for book sales.
3      A.   Right.
4      Q.   Any other reason why September
5   would have been advantageous for you and the
6   author to publish the book in September?
7      A.   We were trying to ensure that his
8   book would be the first eyewitness account
9   of the raid because that was a selling point
10   for us.
11      Q.   If it was the first -- let me just
12   ask you about that answer.
13        If it was the first eyewitness
14   account, it had more value than it would
15   have had if it was a second or third or
16   fourth eyewitness account, fair to say?
17      A.   Yes.  It was the first book that
18   was an eyewitness account describing the
19   mission that we felt we would have a better
20   opportunity to get the kind of media
21   attention we described earlier, I described
22   earlier than if it had been, yes, a second,
23   third or fourth to use your words.
24      Q.   The media attention has a
25   correlation with book sales, right?  You get

Page 44

1              Sevier
2   media attention in order to drive book
3   sales, fair to say?
4      A.   Generally speaking, yes.
5      Q.   Okay.  And is there any magic
6   about September other than what you
7   described in terms of releasing the book,
8   the fact that it is the high season and also
9   the need to be -- the first book that
10   describes the raid that culminated in the
11   killing of Bin Laden?
12      A.   I can't think of any other magic
13   about September to use your words.
14      Q.   I use the term "magic," you know,
15   not for any purpose other than drawing
16   attention to the month itself.
17        For example, September 11 is a
18   very sad anniversary but it is the
19   anniversary of the terrorist attack on the
20   Twin Towers in New York and the Pentagon and
21   also the deaths of hundreds of people on a
22   plane in Pennsylvania.
23        Was there any interest on the part
24   of Dutton to publish the book around the
25   time of September 11th in order to gain



Page 45

1           Sevier
2   media publicity?
3       A.   That was not a significant factor
4   in our thinking.
5       Q.   Was it a factor at all in your
6   thinking?
7       A.   Ultimately we looked at various
8   publication dates for the book as we do with
9   any book and ultimately September 11th was
10  selected at the request of the author.
11      Q.   Did you have one opinion -- I am
12  sorry.  Strike.
13          Did you have an opinion one way or
14  another about the fact that the author
15  wanted the book published on September 11 of
16  2012, on the anniversary of the attack on
17  America?
18      A.   Not particularly.  What I can
19  remember is that I wanted the book to be out
20  in September if possible for the reasons I
21  described earlier.
22          Matt was most comfortable on
23  September 11 which happens to be a Tuesday
24  and books are always released on Tuesday and
25  only typically released on Tuesday for

Page 46

1           Sevier
2   operations reasons so as I said it was not a
3   significant factor in my thinking.
4       Q.   So in the fall of 2012 there was
5   the Presidential election too as you recall,
6   correct?
7       A.   Yes.
8       Q.   And unlike the one that we just
9   had, up at that point in time that was a
10  hotly contested Presidential election to the
11  best of your knowledge, correct?
12      A.   Sure.  I don't really remember
13  what -- yes, I remember the election.  It
14  was hotly contested.  Frankly after all we
15  have just been through in this country it
16  seems like a long time ago.
17      Q.   Yes.  That is why I prefaced the
18  question the way I did.
19          But if we could somehow forget
20  that 2016 happened, putting yourself back
21  into 2012 was there -- did the Presidential
22  election factor into the decision to publish
23  the book in September?
24      A.   Inasmuch as in any election year
25  publishers tend to stay away from the

Page 47

1           Sevier
2   immediate run up to the election day because
3   the media tends to be very focused on the
4   election in the two to four weeks in a
5   typical election year before an election
6   we -- that would have been a factor in why
7   we scheduled the book earlier in the fall as
8   opposed to later in the fall and closer to
9   Christmas.
10          That is a generally accepted kind
11  of strategy in any election year from
12  publishers.
13      Q.   Did you think that No Easy Day had
14  any political interest that would have
15  coincided with the election?
16      A.   I don't remember that being a
17  significant factor in my mind.
18      Q.   Let me go back to some -- I am
19  kind of shifting around and I appreciate
20  that you are following along with the
21  questions.
22          Who is Alex Gigante?
23      A.   He was Penguin counsel, in-house
24  counsel at that time.
25      Q.   Did he have any involvement with

Page 48

1           Sevier
2   No Easy Day?
3       A.   Yes.
4       Q.   Let me -- I just want to -- off
5   the record.
6           (Discussion off the record)
7   BY MR. FURMAN:
8       Q.   I might have asked you this
9   question.  I forget the answer.  If I asked
10  it already your lawyers can yell at me.
11          What was Mr. Gigante's role in the
12  book No Easy Day?
13      A.   He was the in-house counsel for
14  Penguin at that time.
15      Q.   Did he take any active
16  participation in the publication of No Easy
17  Day?
18          MS. FOLEY:  I am going to object
19  at this point and I am going to direct
20  the witness not to reveal
21  conversations or information imparted
22  to him by counsel.
23          THE WITNESS:  Can you repeat the
24  question?
25          MR. FURMAN:  I will have it read



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
49—52

Page 49

1    Sevier
2  back.  I don't think I can remember
3  it.
4      (Record read)
5      MS. FOLEY:  If you can't answer
6  that without revealing conversations
7  with your attorney that's your answer.
8      THE WITNESS:  Then, yes.
9  BY MR. FURMAN:
10    Q.   He did take active participation?
11      MS. FOLEY:  Are you saying you
12  can't answer it in response without
13  revealing conversations with your
14  attorney?
15      THE WITNESS:  I am saying I
16  can't answer it without talking --
17  yes, I don't know that I can answer
18  that question.  We can talk about
19  that --
20      MS. FOLEY:  Why don't I take a
21  minute?  Go off the record.
22      (Discussion off the record)
23      MR. FURMAN:  All right.  We had
24  a break.
25      Do you want to add anything to

Page 50

1    Sevier
2  the record based on the conversation
3  you just had with your client?  Is
4  there anything that needs to be
5  clarified?
6      MS. FOLEY:  No.  I mean do you
7  want to -- is there an outstanding
8  question pending?
9      MR. FURMAN:  Yes.
10      Can I just have the last
11  question read back?
12      (Record read)
13      MS. FOLEY:  I am directing the
14  witness in terms of attorney-client
15  privilege not to discuss conversations
16  he had with his attorney, with
17  Dutton's attorney, about production of
18  the book.
19  BY MR. FURMAN:
20    Q.   Okay.  I would like to know what
21  you know about what Mr. Gigante did.
22      MS. FOLEY:  If Mr. Gigante told
23  him what he did that is going into
24  privileged information.  That is the
25  problem when you asked that question

Page 51

1    Sevier
2  you are asking him what did
3  Mr. Gigante tell him that he did.
4      MR. FURMAN:  All right.  So let
5  me try it a different way.  I am not
6  trying to obtain confidential
7  information.
8  BY MR. FURMAN:
9    Q.   Let me ask it a different way.
10      Prior to the publication of No
11  Easy Day to the best of your knowledge did
12  Dutton have any procedures in place to
13  ensure that authors didn't violate
14  nondisclosure agreements of any kind?
15      MS. FOLEY:  Object to the form
16  of the question.
17      I think you can ask him that
18  question as far as what the editorial
19  process was.
20      MR. FURMAN:  I am asking in his
21  role.
22      MS. FOLEY:  In the editorial
23  process --
24      MR. FURMAN:  That is understood.
25      MS. FOLEY:  Not consultation

Page 52

1    Sevier
2  with attorneys.  And you are trying to
3  get -- you keep going into what did
4  you ask your attorney.
5      MR. FURMAN:  No.  I am not
6  asking that.  You have to forgive me.
7  I am pretty relaxed about
8  conversations on the record.  You have
9  seen that so far but I am taking a
10  deposition.  I feel that now you may
11  be intruding a bit.
12      MS. FOLEY:  Well, no, I mean --
13      MR. FURMAN:  So what I am asking
14  because I am asking the questions is
15  that I am asking Mr. Sevier's
16  knowledge about whether Dutton has in
17  place any procedures or policies to
18  ensure that authors don't violate
19  nondisclosure agreements.  I am simply
20  asking that question.
21      MS. FOLEY:  I am directing the
22  witness it to answer that to the
23  extent he can based on policies and
24  procedures set up by the editorial
25  group.



Page 53

Sevier

1
2     MR. FURMAN:  Okay.
3  BY MR. FURMAN:
4     Q.   You can answer that question.
5     A.   No.
6     Q.   Did Dutton prior to the
7  publication of No Easy Day consult legal
8  counsel, whether in-house or outside, in
9  connection with the publication of a
10  military book to ensure that there were no
11  violations of nondisclosure agreements?
12     MS. FOLEY:  I am going to
13  object.  That calls for privileged
14  information.
15     I am going to direct the witness
16  not to answer that question.
17     MR. FURMAN:  I am not asking for
18  privileged information.  I am asking
19  if they consulted.
20     MS. FOLEY:  On the topic.
21     MR. FURMAN:  On the topic.
22     MS. FOLEY:  You have asked a
23  specific to make sure that it doesn't
24  contain classified information if I
25  heard the question so you have gone

Page 54

Sevier

1
2  into the contents of the
3  communication.
4     MR. FURMAN:  I really have to
5  respectfully disagree with what you
6  are saying.  I am not asking for the
7  conversation.  I am asking whether or
8  not --
9     MS. FOLEY:  You are asking the
10  topic of the conversation.
11     And I am going to direct the
12  witness not to answer and maybe to
13  avoid conversations on the record you
14  and I can talk about this later.
15     MR. FURMAN:  Yes.  I mean I --
16  let's do this because I am -- you
17  know, I am mindful of the time that I
18  have to take this deposition and
19  speaking objections just generally are
20  not permissible.  You can object.  You
21  can direct the witness not to answer
22  and then we will mark it for a ruling.
23  I think that is the probably the best
24  way to do it.
25     MS. FOLEY:  I agree.  I agree.

Page 55

Sevier

1
2  I had said to you if we want to talk
3  off the record let's do that.
4     MR. FURMAN:  I don't see the
5  benefit of that.
6     What I am really would like to
7  do because we are here to do that is I
8  would like to ask questions that
9  relate to this case and move on.  So I
10  like to try to do that.
11     I appreciate your role and your
12  concerns and I -- so I would say that
13  in -- with respectful of that, of your
14  role.
15  BY MR. FURMAN:
16     Q.   Did Dutton retain outside legal
17  counsel in connection with the publication
18  of No Easy Day?
19     MS. FOLEY:  I am going to object
20  and direct the witness not to answer.
21  BY MR. FURMAN:
22     Q.   Did you obtain legal advice, I
23  don't want to know what that advice was, did
24  Dutton obtain legal advice with respect to
25  the publication of No Easy Day?

Page 56

Sevier

1
2     MS. FOLEY:  You can answer that
3  question.
4     THE WITNESS:  Yes.
5  BY MR. FURMAN:
6     Q.   Okay.  From where?
7     MS. FOLEY:  To the extent you
8  know you can answer that question.
9     THE WITNESS:  From our in-house
10  legal counsel.
11  BY MR. FURMAN:
12     Q.   Mr. Gigante?
13     A.   Yes.
14     Q.   Did you consider, you, not asking
15  whether you discussed it with anyone else,
16  did you consider whether or not you needed
17  security clearance in order to discuss the
18  contents of the book No Easy Day?
19     A.   No.
20     Q.   Did you discuss that with anyone?
21     A.   No.
22     MS. FOLEY:  Excluding counsel.
23  BY MR. FURMAN:
24     Q.   In connection with any book
25  including Red Platoon or any other military

Page 57

1              Sevier
2    book, did any book that you work on ever go
3    through a prepublication review process with
4    the U.S. Government?
5        A.   Yes.
6        Q.   Which books?
7        A.   The second book by Mark Owen which
8    is the pen name for Matt Bissonnette as you
9    know, pseudonym for Matt, went through a
10   legal -- security review.
11           And Hunter Killer by T. Mark
12   McCurley went through a security review.
13       Q.   Hunter Killer, that was published
14   after No Easy Day?
15       A.   That's right.
16       Q.   Who assisted you if anyone in --
17   let me take it back.
18           Who assisted the author to the
19   best of your knowledge with the
20   prepublication review process for Hunter
21   Killer?
22           MS. FOLEY:  To the extent you
23   know.
24           THE WITNESS:  He had an attorney
25   and that is -- as far as I know that

Page 58

1              Sevier
2    is my answer.  That is all I can
3    remember.
4    BY MR. FURMAN:
5        Q.   We used the term "prepublication
6    review process," and I want to understand
7    what my knowledge of that is.  What do you
8    understand that to be?
9        A.   It can mean different things for
10   different authors.  It has to do with where
11   they served, if we are talking about a
12   military author or someone who has worked
13   for any sensitive branch of the U.S.
14   Government.  Generic term security review
15   the way I heard it used typically can mean
16   any one of a number of government agencies
17   who review manuscripts before publication
18   for the former employees.
19       Q.   In connection with the book No
20   Easy Day did you separate and apart from any
21   conversation you had with anyone else, just
22   want to know what you thought, did you
23   consider whether the book needed to go
24   through a prepublication review process?
25       A.   Yes.  I considered the question.

Page 59

1              Sevier
2        Q.   When did you first consider that
3    question?
4        A.   From the beginning.  The moment I
5    heard about the possibility of the book from
6    the literary agent.
7        Q.   I want to follow through on that
8    but I want to go chronologically on that.
9            When did you first learn about the
10   book No Easy Day or the idea of the book
11   that became No Easy Day?
12       A.   I think it was late November of
13   2011.
14       Q.   How did you first learn about it?
15       A.   I received a phone call from a
16   literary agent named Elise Cheney.
17       Q.   Did you know Elise Cheney before
18   she contacted you?
19       A.   Yes, I did.
20       Q.   How?
21       A.   She is a literary agent and I am
22   an editor and publisher so I bought books
23   from her in the past.  We had done business
24   together.
25       Q.   How did she contact you?

Page 60

1              Sevier
2        A.   I believe she called me.
3        Q.   What did she tell you when she
4    called you?
5        A.   I don't remember her specific
6    words but generally she said she had met
7    with one of the Navy Seals who had been on
8    the bin Laden raid and he was considering
9    writing a book about it and I think that
10   was a good idea she asked me.
11       Q.   What did you respond?
12       A.   I said I think that would be a big
13   book.
14       Q.   Anything else about the
15   conversation that you recall?
16       A.   Not really.
17       Q.   Did you set up any meetings or any
18   other action points after that discussion?
19       A.   I am sure I said I would call her
20   back, that I was very interested in the --
21   talking further about that book.
22       Q.   Is that your entire recollection
23   of the conversation?
24       A.   Yes.  Yes.
25       Q.   What was the next time you spoke



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
61–64

Page 61

1                    Sevier
2   to Elise Cheney about this topic?
3       A.   I don't remember specifically but
4   it was very soon after.  It could have been
5   the same day, it could have been the next
6   day.
7       Q.   You contacted her?
8       A.   Yes.
9       Q.   In what form, call, text, e-mail?
10      A.   I don't remember.
11      Q.   Would you text message with her at
12  all?  Did you have her phone number and text
13  message with her?
14      A.   No.  I would not have done that
15  day, I would not have texted her.
16      Q.   Okay.  To this day do you have her
17  phone number and text message with her?
18      A.   I have her phone number.  I can't
19  recall if I have ever text messaged with
20  her.
21      Q.   You obviously e-mailed with her
22  over the course of time?
23      A.   Yes.
24      Q.   Just going back to the present
25  time when was the last time you spoke to

Page 62

1                    Sevier
2   Ms. Cheney?
3       A.   Sometime in the fall of last year.
4       Q.   You haven't spoken to Elise Cheney
5   from the fall of last year up until the
6   present time?
7       A.   No.  I mean that is the last two
8   weeks.  I haven't spoken to her in 2017.
9            I didn't speak to her while I was
10  on Christmas break for the last two weeks of
11  December.  So sometime before December 16th
12  of last year.
13      Q.   Did you talk about -- about this
14  case with her?
15      A.   In our last conversation?
16      Q.   Sure.
17      A.   No.
18      Q.   When was the last time you spoke
19  to her about this case.  When I say "this
20  case," Matthew Bissonnette's lawsuit against
21  lawyers, that includes the New York case and
22  this case in Indiana?
23      A.   It may have come up briefly at
24  some point in the second half of last year.
25      Q.   What did you discuss?

Page 63

1                    Sevier
2       A.   She called to -- because she had
3   heard -- can we step out about this briefly?
4       Q.   No.
5       A.   It is a privileged question, I
6   think.  I actually don't know.
7            MS. FOLEY:  He wants to consult
8   for privilege.  We will consult
9   briefly.
10           THE WITNESS:  It will take 30
11  seconds.
12  BY MR. FURMAN:
13      Q.   I think I need to know a little
14  bit more about what you are saying and why
15  you are here and --
16      A.   I think I can do it.
17           She had a -- she called with a
18  question for me about the -- about this
19  testimony and the status -- what I would
20  be -- how I would be called here, what the
21  label.
22           MS. FOLEY:  What you recall?
23           THE WITNESS:  What I would be
24  called as I was testifying.
25

Page 64

1                    Sevier
2   BY MR. FURMAN:
3       Q.   Let me just say that your
4   conversation with Elise Cheney, she is not a
5   lawyer, is she?
6       A.   Not to my knowledge.
7       Q.   So and you are not a lawyer I take
8   it?
9       A.   No.
10      Q.   So I will be asking you questions
11  about your conversations with Elise Cheney.
12      A.   Yes.
13      Q.   What in that discussion in the
14  fall of 2016 about this case, can you tell
15  me what that conversation was?
16      A.   She wanted -- she had heard
17  that -- really don't know how to answer this
18  without talking about a conversation I had
19  with my attorney but I will try.
20           MS. FOLEY:  Stick to
21  information.
22  BY MR. FURMAN:
23      Q.   What she said is not privileged.
24      A.   She said you should be appearing
25  as an expert witness at this deposition and



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
65–68

Page 65

Sevier
1
2  I don't understand why you are not.
3     Q.   Did she explain why you should be
4  an expert witness in this case?
5     A.   Not really.  I didn't particularly
6  understand the term even and I am not sure
7  she did.
8     Q.   What would you be testifying as an
9  expert in?
10    A.   I don't know.
11    Q.   When was the last time -- let me
12  go back in time.  I will ask a general
13  question.
14        It is fair to say you had several
15  conversations with Elise Cheney about this
16  case over the past several years?
17    A.   Yes.  That is fair to say.
18    Q.   Have you spoken to anyone from
19  Mr. Johnston's law firm about this case?
20    A.   Yes.
21    Q.   When was the last time you had a
22  discussion with Mr. Johnston's law firm?
23    A.   Yesterday.
24    Q.   Was it in person, on the phone,
25  how did that take place?

Page 66

Sevier
1
2     A.   I met Mr. Johnston for the first
3  time yesterday.
4     Q.   Before you met with Mr. Johnston
5  had you spoken to him on the phone?
6     A.   Not that I can recall.
7     Q.   Had you spoken to him prior to
8  yesterday?  Did I just ask that question?
9     A.   Yesterday was the first time I can
10  recall speaking to him in person or on the
11  phone.
12    Q.   What did you discuss?
13    A.   We said hello, nice to meet you.
14  We discussed generally what to expect today
15  in terms of how a deposition works.  Things
16  like that.
17    Q.   Is that -- how long did that
18  conversation take place?
19    A.   We were together for half an hour
20  maybe.
21    Q.   So in that half an hour what did
22  you discuss because you just related 20
23  seconds of the conversation to me?
24    A.   To be honest I didn't say much.  I
25  sat in a room and had a sandwich and these

Page 67

Sevier
1
2  guys talked to these guys.
3     Q.   What do you recall Mr. Johnston
4  telling you or saying out loud?
5     A.   He talked about his style in the
6  deposition, a little bit about his
7  impressions of what your style were.
8     Q.   What did he say?  I am so curious.
9     A.   About you, is that what you were
10  asking?
11    Q.   I hope he said I am a nice guy.
12    A.   He did.  He said he is a polite
13  guy, he is not a fist pounder.
14        MS. FOLEY:  He said he is good
15  looking.
16        MR. FURMAN:  I appreciate that.
17        There is only one good looking
18  guy here.  That is this guy right
19  here.
20        Thank you.  Gees, I am
21  flattered.  Thank you for putting it
22  on the record.
23  BY MR. FURMAN:
24    Q.   Other than Mr. Johnston's
25  blindness, was there anything else that he

Page 68

Sevier
1
2  discussed about the case?
3     A.   Not that I can recall
4  particularly.  At least not directed to me.
5     Q.   If you can just tell me a rough
6  number because I would imagine it would be a
7  numerous conversation, how many
8  conversations have you had with Liz Cheney
9  about the lawsuit that Matthew Bissonnette
10  has against his lawyers?
11    A.   It is hard to put a number on
12  that.  If I had to guess I would say a
13  dozen.  It has come up in maybe a dozen
14  conversations over the last few years.
15    Q.   So in dozens of conversations
16  in -- I take it that they were at least 10
17  or 15 minutes long conversations?  I am
18  trying to get a sense of it.
19    A.   I don't remember how long the
20  conversations were.  I just want to clarify,
21  I said about a dozen.
22    Q.   So I am wrong.  I appreciate your
23  correction.
24        In the dozen or so conversations
25  what do you recall about them, what was the



Page 69

```
1              Sevier
2   conversation about?
3      A.   Just the general idea that Matt
4   felt he had gotten bad legal advice and he
5   was going to kind of sue his attorney, sort
6   of general, that is frankly what she was
7   mostly talking about.
8         She expressed a fair amount of
9   outrage over the last few years about the
10  advice that Matt had gotten from his
11  attorney, Podlaski, on those calls. I can't
12  be more specific than that.
13     Q.   Fair to say that Ms. Cheney has a
14  view that Matthew Bissonnette was wronged in
15  some manner by my client?
16     A.   She expressed to me that she feels
17  he got -- Matt got bad legal advice from
18  Podlaski.
19     Q.   Okay. And what was your response
20  to that?
21     A.   To Elise on those phone calls?
22     Q.   Right.
23     A.   I can't really recall. General
24  support probably.
25     Q.   Do you have an opinion one way or
```

Page 70

```
1              Sevier
2   another about the legal advice that
3   Mr. Bissonnette got in particular to the
4   publication of No Easy Day?
5         MS. FOLEY: Object to form.
6   Lacks foundation.
7         THE WITNESS: I am not a legal
8   expert. I don't know with all the
9   phone calls and conversations they had
10  so I don't really know how to answer
11  that.
12  BY MR. FURMAN:
13     Q.   So you obviously were not in an
14  attorney-client relationship with
15  Mr. Podlaski, correct?
16     A.   I think that is right. This is
17  the first time I have done this and I don't
18  understand privilege.
19     Q.   There is a first time for
20  everything but it is not the first time you
21  are answering questions. If you are married
22  you have answered questions.
23        The question I am asking you is do
24  you have an opinion one way or another, I am
25  not asking for a legal opinion. You are
```

Page 71

```
1              Sevier
2   obviously not a lawyer.
3      Q.   Do you have an opinion one way or
4   the other about Mr. Podlaski's advice to and
5   his legal work on behalf of Mr. Bissonnette?
6         MS. FOLEY: Objection. Again,
7   lacks foundation.
8         THE WITNESS: Well, yes. Given
9   that Podlaski was Mark's adviser --
10  Matt's adviser and he got to a
11  point -- Matt got to a point where he
12  had to sign away all the proceeds of
13  his book it sounds like he got bad
14  advice.
15  BY MR. FURMAN:
16     Q.   Beyond that, beyond what you just
17  described do you have any other opinion
18  about Mr. Podlaski and his representation of
19  Mr. Bissonnette?
20     A.   Any other opinion? Not that comes
21  to mind. If you want to be more specific.
22     Q.   It doesn't have to be opinion, any
23  thoughts, any observations?
24     A.   No.
25     Q.   The reason I am asking that is
```

Page 72

```
1              Sevier
2   because it is a deposition and there may be
3   a trial and what I would like to know at
4   trial if you have any views one way or
5   other about the legal services that were
6   provided by Mr. Podlaski so I don't want to
7   be surprised at trial so I want to ask you
8   if you have any?
9      A.   Yes. As I said I think he was
10  supposed to steer Matt through this process
11  in a way that would avoid the kind of
12  problems that Matt ultimately ran into and
13  that we all had to deal with around
14  publication of this book and given the way
15  it has gone for Matt over the last few years
16  I think Podlaski screwed up.
17     Q.   Can you tell me how you believe
18  "Mr. Podlaski screwed up" as you describe?
19        MS. FOLEY: Object to the form
20  of the question.
21        THE WITNESS: Matt asked him
22  whether he had to submit the
23  manuscript for security review and
24  Podlaski's advice was that no, he did
25  not. That seems to not having been
```



BENJAMIN SEVIER                                    January 06, 2017
BISSONNETTE vs PODLASKI                                    73—76

Page 73

1              Sevier
2      correct and that got Matt in a fair
3      amount of hot water.
4 BY MR. FURMAN:
5      Q.   Is there anything else?
6      A.   Not that comes to mind.
7      Q.   Do you know one way or the other
8 whether Matt asked Mr. Podlaski if he had to
9 submit the book for prepublication review?
10     A.   Yes.  He asked him.
11     Q.   How do you know that?
12     A.   Matt told me.
13     Q.   Other than Matt telling you do you
14 have any other knowledge about that?
15     A.   It was a part of all the
16 conversations that we were having with Matt
17 around the planning of the publication of
18 the book so it was a topic we covered more
19 than once but -- and I guess that is my
20 answer.
21     Q.   Did you ever ask Mr. Podlaski
22 whether the book needed to be submitted for
23 a prepublication review?
24     A.   Did I ever ask him directly?  I
25 don't remember.  I can't recall

Page 74

1              Sevier
2 specifically.  It is possible.
3      Q.   Let's go back in time to November
4 of 2011.
5      A.   Okay.
6      Q.   You got a call from Elise Cheney.
7 She tells you about Mark Owen.  I take it
8 you didn't know who Matt Bissonnette was at
9 the time?
10     A.   We didn't talk about any names
11 there including Matt Bissonnette.
12     Q.   You said you called either that
13 day or shortly after you called Elise Cheney
14 back.  What happened next?
15     A.   I made an offer for the rights to
16 publish the book at some point.  I can't say
17 on which phone call that happened except I
18 know it wasn't the first phone call we had
19 and we negotiated a little bit, she made a
20 counteroffer I think or at least she told me
21 that my first offer was not sufficient so I
22 made another offer, we made an agreement.
23     Q.   Was that agreement formulated in
24 writing?
25     A.   Ultimately in a contract.

Page 75

1              Sevier
2      Q.   Verbally you had an arrangement of
3 some sort, you made an offer, she made a
4 counteroffer?
5      A.   And then we made an agreement.
6      Q.   What was -- tell me what the
7 numbers were and what the terms were.
8      A.   My memory is that my first offer
9 was $800,000 for world rights which means
10 the ability to publish the book in all
11 languages all over the world.
12          Her response was certainly that
13 the first offer was not sufficient to secure
14 the rights.
15          I honestly can't remember if she
16 put a number on what would be sufficient or
17 if I just came back with a better offer but
18 the second offer was a million dollars for
19 the world rights to publish the book which
20 she and Matt accepted.
21     Q.   When did that million dollar offer
22 and acceptance take place generally?
23     A.   Generally it was within a couple
24 days of that phone call, that first phone
25 call.

Page 76

1              Sevier
2      Q.   So it was before or after
3 Thanksgiving of 2011?
4      A.   I can't recall.  My memory is it
5 was after but I can't be certain of that.
6      Q.   Was it in December of 2011?
7      A.   Again I can't be certain that it
8 wasn't the first week of December.
9      Q.   Was the offer and acceptance in
10 exchange by e-mail or correspondence or
11 anything that was documented?
12     A.   I can't recall.
13     Q.   Did you take notes on that?
14     A.   I can't recall.
15     Q.   How do you know it was a million
16 dollars?
17     A.   Because I remember what I pay for
18 books typically.
19     Q.   How do you know the first offer
20 was $800,000?
21     A.   Because again I remember
22 especially when we are talking about a
23 significant investment like this it is part
24 of my general business practice to remember
25 these things.



BENJAMIN SEVIER                                       January 06, 2017
BISSONNETTE vs PODLASKI                                        77–80

Page 77

Sevier

2     Q.   Do you formalize or document
3   offers that are made?
4     A.   Sometimes.
5     Q.   Did you in this case?
6     A.   I can't recall.
7     Q.   If before you make an offer do you
8   have to get authority from someone at Dutton
9   to make that kind of substantial financial
10  offer?
11    A.   Yes.
12    Q.   What information did you have
13  about No Easy Day that -- at the time you
14  made the offer?
15    A.   Essentially what I said earlier,
16  that there was a former Navy Seal who had
17  been on the raid to -- that killed bin Laden
18  and he was going to write a first person
19  account of the raid.
20    Q.   This was a verbal communication to
21  you from Elise Cheney?
22    A.   Yes.
23    Q.   Did you do any due diligence to
24  verify that this is accurate?
25    A.   At any time?

Page 78

Sevier

2     Q.   At the time that you made an offer
3   of $800,000 this could have been a quack off
4   the street, right?
5     A.   Believe me, I thought of that, but
6   no, I accepted Elise at her word.
7     Q.   So based on a working relationship
8   with Elise Cheney that you believe that this
9   was a legitimate person claiming that he was
10  on the raid?
11    A.   Exactly, yes.  Elise and I had a
12  long history together and I believed she was
13  telling me the truth.
14    Q.   Was the offer contingent on any
15  kind of verification of the author's bona
16  fides?
17    A.   I can't recall whether I would
18  have communicated any contingencies in this
19  specific case but I know that I wanted to
20  meet Matt and that that meeting would likely
21  take place before any contract was
22  formalized and signed and in fact the
23  meeting did take place before the contract
24  so that was the bona fides essentially.
25    MS. FOLEY:  When you finish this

Page 79

Sevier

2   line of questioning or at a breaking
3   point I would like a comfort break.
4     MR. FURMAN:  Of course.  Do you
5   want to do it now?
6     MS. FOLEY:  Sure.  I don't want
7   to interrupt your line.
8     MR. FURMAN:  No. No.
9     MS. FOLEY:  Okay.
10    MR. FURMAN:  I am easily
11  interrupted as you know.  Let's take a
12  break.
13    (Recess)
14    MR. FURMAN:  I forget the last
15  question.
16    (Record read)
17  BY MR. FURMAN:
18    Q.   When did that meeting with
19  Mr. Bissonnette take place?
20    A.   It was sometime in the last week
21  or two before the Christmas break of 2011.
22    Q.   So it was in the first half of the
23  month?
24    A.   First three weeks.  I really can't
25  remember exactly.

Page 80

Sevier

2     Q.   Before December 25th?
3     A.   Yes.  Before Christmas.
4     Q.   Where did the meeting take place?
5     A.   At the Penguin offices.
6     Q.   Who was at the meeting?
7     A.   Matt and Elise came in and Matt
8   first with me in my office and then I
9   introduced Matt to my publisher, Brian Tart
10  and to our associate publisher Christine
11  Ball and we had a conversation in Brian's
12  office and then they left.
13    Q.   How long did the meetings with
14  Mr. Bissonnette take place from start to
15  finish?
16    A.   My estimate would be two hours,
17  maybe less.
18    Q.   What was discussed during those
19  two hours?
20    A.   General introductions, what to
21  expect from the publication process, sort of
22  educating Matt on what a book publication
23  looks like and how it would work, who we
24  were, what we were planning to do a little
25  bit.



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
81–84

Page 81

Sevier

1
2     Matt telling his story who he was,
3  what he wanted to write about, et cetera.
4     Q.   What did Matt tell you what he
5  wanted to write about?
6     A.   He told us -- He told me that he
7  wanted to write the true story of what
8  happened on the bin Laden raid from the
9  point of view of the guys on the ground.
10    Q.   Did he tell you why he wanted to
11  tell the "true story"?
12    A.   I think he mentioned in that
13  meeting that he was frustrated, some of
14  those guys were frustrated that the -- I
15  don't remember how he characterized it
16  exactly but I remember it being like the
17  politicians and the President and the
18  commanders who didn't put themselves at risk
19  were the ones who were telling the story and
20  that bugged a lot of the guys and so he
21  wanted to tell it from his point of view and
22  their point of view.
23    Q.   Did Mr. Bissonnette say that it
24  frustrated or as you described bugged him
25  that politicians, the President, others were

Page 82

Sevier

1
2  taking credit for the raid on -- that
3  culminated the killing of bin Laden?
4     A.   Yes.  Right.  Yes.  That is what I
5  am saying.  Yes.
6     Q.   Was it that -- did he express that
7  he wanted the operators, when I say the term
8  "operators," the people on the ground to get
9  the credit for the successful mission?
10    A.   I don't know that he ever used the
11  term "credit."  I am really -- I am not sure
12  that is how I would characterize it.
13       I think he was frustrated that the
14  guys that sacrificed, that was the word he
15  used a lot, so much and put their lives on
16  the line, sacrificed throughout their
17  careers were not the ones telling the story
18  of this historic moment.
19    Q.   Did you have any concern, you
20  individually about learning information that
21  was potentially classified about the raid
22  that ultimately resulted in killing of bin
23  Laden?
24       MS. FOLEY:  Can you read back
25    the question please?

Page 83

Sevier

1
2     (Record read)
3       THE WITNESS:  No.  I didn't have
4    any concern about that.
5  BY MR. FURMAN:
6     Q.   I am going to use the term
7  Operation Neptune Spear because I just don't
8  like using that terrorist's name.  Is that
9  okay?
10    A.   Fine with me.
11    Q.   Did you have any discussion with
12  Mr. Bissonnette at this meeting in December
13  of 2011 about nondisclosure agreements that
14  he may have signed?
15    A.   I don't recall if it came up in
16  those meetings.
17    Q.   Did you have any discussion with
18  him about the CIA's involvement in Operation
19  Neptune Spear?
20    A.   I don't remember if that came up
21  in the meeting -- in those meetings.
22    Q.   Did you have a discussion with
23  Mr. Bissonnette about Catherine Bigelow and
24  Mark Boal, B-O-A-L?
25    A.   At that meeting?

Page 84

Sevier

1
2     Q.   Yes.
3     A.   I do not recall talking to them
4  about either of those people.
5     Q.   There came point in time when you
6  did discuss with Mr. Bissonnette Catherine
7  Bigelow and Mark Boal, correct?
8     A.   Yes.
9     Q.   They were the producers of the
10  movie that became Zero Dark Thirty?
11    A.   That is my memory.
12    Q.   Did you have a discussion with
13  Mr. Bissonnette about Ms. Bigelow and
14  Mr. Boal being present at Leon Panetta's
15  retirement party?
16    A.   I remember having those
17  conversations with Matt but I don't remember
18  when they happened and I couldn't say it was
19  at the meeting you are asking me about now.
20    Q.   I am now asking generally.  I want
21  to focus on the meeting again in a moment.
22  I am now asking generally.
23    A.   Yes.
24    Q.   Did Mr. Bissonnette express to you
25  any frustration with the fact that the

BENJAMIN SEVIER                                    January 06, 2017
BISSONNETTE vs PODLASKI                                      85—88

Page 85

1                    Sevier
2    producers of Zero Dark Thirty were present
3    at a function for the outgoing head of the
4    CIA?
5        A.    Yes.
6        Q.    What did he tell you about that?
7        A.    I remember him telling me he
8    thought it was silly.  My word.  My
9    impression of his feeling was that he
10   thought they shouldn't have been there.
11   That Panetta's involvement with those guys
12   and the government's involvement with those
13   guys was inconsistent with the way -- with
14   their posturing around his book and with
15   their behavior around him.
16       Q.    Did Mr. -- well, let me just
17   unpack that a bit.
18            Did Mr. Bissonnette express to you
19   any opinions or views on the fact that the
20   CIA was allowing Mark Boal and Catherine
21   Bigelow access to information about
22   operation Neptune Spear?
23       A.    At any point?
24       Q.    At any point.
25       A.    Yes.  We had conversations about

Page 86

1                    Sevier
2    it.  I can't remember the specifics of what
3    he said about it except that I remember him
4    holding it up as an example of inconsistent
5    positions from the U.S. Government on who
6    was allowed to talk about this raid.
7        Q.    When you say "inconsistent
8    positions" I want to understand what you
9    mean by that.  Meaning that certain people
10   could talk about the raid and certain people
11   couldn't?
12       A.    Right.
13       Q.    We are talking about firsthand
14   accounts of what took place, is that what
15   you are describing?
16       A.    No.  Not necessarily.  Details
17   of -- the details of the raid.
18       Q.    Details of Operation Neptune
19   Spear, when we talk about the raid I want to
20   make sure we define it correctly.  You mean
21   details of Operation Neptune Spear?
22       A.    I don't know what Operation
23   Neptune Spear refers to in total so I have a
24   hard time answering that.  I know what the
25   raid is.  I know the raid was at least a

Page 87

1                    Sevier
2    part of operation Neptune Spear.  But I don't
3    know -- I know that the hunt for the
4    terrorists whose name you don't want to use
5    and I won't use --
6        Q.    That is fair.
7        A.    -- took many years.  And I don't
8    actually sitting here today, was that all
9    called Operation Neptune Spear, I don't
10   know.
11       Q.    That is a very fair point.  So
12   let's call it the raid.
13       A.    Okay.
14       Q.    We can refer to it as the
15   Operation Neptune Spear raid.
16       A.    Okay.
17       Q.    We will call it the raid.  And if
18   there is any confusion about it you let me
19   know.  We are all talking about the raid
20   that ended in the culmination of the killing
21   of Osama bin Laden in Abbottabad and I think
22   in 2010, when was that?
23            In any event, was the
24   inconsistency about the information that was
25   being divulged to the public about the raid

Page 88

1                    Sevier
2    from the politicians versus the operations
3    on the ground, was that the tension and the
4    issue that Mr. Bissonnette was describing to
5    you?
6        A.    Yes.  I can remember him
7    expressing those kinds of feelings.
8        Q.    Now, going back now to the
9    December meeting was there any discussion
10   about whether it was appropriate in one way
11   or another for Mr. Bissonnette to tell the
12   story and divulge details about the raid?
13       A.    No.  We didn't discuss whether it
14   was appropriate.
15       Q.    Did you have any concern or
16   thoughts about whether it would be
17   appropriate for an operator such as Matthew
18   Bissonnette to write a book about the raid?
19       A.    Can you explain your use of the
20   word "appropriate"?
21       Q.    I am using it in the most general
22   terms.  Whether the government could make
23   any objection in any form about
24   Mr. Bissonnette writing a book about the
25   raid?



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
89–92

Page 89

1                    Sevier
2       A.   I was concerned from the beginning
3  about whether he had the legal right to tell
4  the story but not whether it was more
5  generally appropriate for him to be telling
6  the story.
7       Q.   Okay.  So when I use the word
8  "appropriate" I don't mean it in sort of
9  the, you know, Good Housekeeping Seal of
10  Approval.  And whether it is okay in Peoria.
11      What I mean is whether it is
12  appropriate from any kind of governmental
13  perspective.  I mean that very generally,
14  governmental perspective, whether it would
15  be appropriate for a military operator to
16  write a book about a raid that he took place
17  in -- that he took part in.
18      You mentioned that you were
19  concerned about whether he had some legal
20  issues with that, is that -- do I understand
21  your testimony?
22      MS. FOLEY:  Object to the form
23      of the question.  Mischaracterizes it.
24  BY MR. FURMAN:
25      Q.   What was your concern so I can ask

Page 90

1                    Sevier
2  the better question?
3       A.   My concern was whether he was
4  legally allowed to write the book that he
5  was offering us.
6       Q.   What did you do about that
7  concern?
8       A.   I asked him and his
9  representatives whether he did have that
10  right.
11      Q.   What did they tell you?
12      A.   That he thought he did.  He wasn't
13  sure and he would need advice on that
14  question.
15      Q.   From a publisher's perspective did
16  you do anything to address that concern you
17  had other than rely on Mr. Bissonnette to
18  obtain legal advice?
19      A.   Yes.  We required him to hire an
20  attorney to advise him.  We wanted to make
21  sure he was asking for that advice he said
22  he needed.
23      Q.   At the time that you met with
24  Mr. Bissonnette in December what details did
25  he tell you and Mr. Tart and Ms. Ball about

Page 91

1                    Sevier
2  the raid?
3       A.   He gave us a description of what
4  he did on that day and sort of generally the
5  highlights of the raid.
6       Q.   Did he -- did Mr. Bissonnette say
7  that what I am going to tell you is
8  confidential or did he express any need for
9  confidentiality or secrecy in terms of what
10  he was telling you at the time?
11      A.   I don't remember anything he might
12  have said to that effect to us.
13      Q.   Did Mr. Bissonnette tell you that
14  he was concerned about his name being used
15  or the need -- and/or the need for secrecy
16  involving his participation in the book?
17      A.   Again, I can't remember if it was
18  at that meeting but, yes, around that time
19  we were having conversations with Matt and
20  with Elise about the fact that his identity
21  would need to be kept completely
22  confidential throughout the publication
23  process.
24      Q.   I asked you earlier, I know you
25  had met with Mr. Johnston yesterday but in

Page 92

1                    Sevier
2  getting ready for today's deposition did you
3  review e-mails and other documents that
4  related to the book No Easy Day?
5       A.   Yes.
6       Q.   When did you do that?
7       A.   In preparing for today?
8       Q.   Yes.
9       A.   Really over the last two days.
10      Q.   How many hours did you spend doing
11  that?
12      A.   In total maybe three, four.
13      Q.   Do you recall an e-mail exchange
14  with Elise Cheney about your initial meeting
15  with Mr. Bissonnette?
16      MS. FOLEY:  Are you asking does
17      he recall it now?
18  BY MR. FURMAN:
19      Q.   Do you recall it?
20      A.   Not specifically.
21      Q.   I am going to show you what has
22  been previously marked as Exhibit 4 in
23  Mr. Bissonnette's deposition.
24      We will give copies to everybody.
25  This has already been previously marked.



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
93—96

Page 93

Sevier

2    So have you had a chance to review
3 that Exhibit 4?
4    A.   Yes.
5    Q.   Never mind that the name up on top
6 of -- the name on top is just one of my
7 legal assistants when we print out e-mails
8 on Outlook it has the name of the user on
9 top.
10    A.   Understood.
11    Q.   Julie has absolutely no
12 involvement whatsoever in this case of the
13 printing.
14        Does this refresh your
15 recollection as to when that meeting took
16 place?
17    A.   Yes.  It looks like it must have
18 been on or before December 20.
19    Q.   Who was preparing the contract
20 that was referenced?
21    A.   The Penguin contracts department.
22    Q.   Before -- let me just ask you.
23 What prompted you to send this e-mail?
24    A.   I can't remember specifically.
25    Q.   Normally when -- normally, in the

Page 94

Sevier

2 ordinary course of publishing a book when do
3 you first start to tell the media about the
4 book itself?  What is the general process?
5 Is it before the --
6    A.   For a typical book, conversations
7 with the media begin, let's say, six months
8 before the publication date.  Generally.
9    Q.   When did you first start having
10 conversations with the media about No Easy
11 Day?
12    A.   The first conversation that I ever
13 had with the media was to my knowledge or my
14 memory anyway is with the 60 Minutes team
15 that I mentioned earlier at their offices
16 which I think was sort of around the
17 beginning of the summer.
18    Q.   That is not six months before the
19 publication so why was this book handled
20 differently?
21    A.   Because we wanted to control what
22 we thought was going to be a big story and
23 we didn't want the media knowing about it
24 before it was advantageous to us to tell
25 them.

Page 95

Sevier

2    Q.   So is it fair to say that the
3 production of the book was being kept quiet
4 or confidential or secret in order to avoid
5 public knowledge about Mr. Bissonnette's
6 involvement in the book?
7    A.   Yes.  That is fair to say.  I
8 would say it was just about the book's
9 publication in general.
10    Q.   Was there, other than -- a new
11 question.
12        Did Mr. Bissonnette describe to
13 you any need for secrecy about his
14 involvement in the book at any point in
15 time?
16    A.   As I think I said earlier, he was
17 concerned about his name being kept
18 confidential.
19    Q.   Was he concerned about any
20 government officials or military supervisors
21 or commanders being made aware that he was
22 writing a book?
23    A.   I don't know what he was concerned
24 about.
25    Q.   Did he express it to you is what I

Page 96

Sevier

2 am asking.
3    A.   Yes, I don't.  I can't remember a
4 specific instance where he expressed that
5 concern.
6    Q.   Did you meet with Matt Bissonnette
7 again after that December meeting?
8    A.   Yes.
9    Q.   When?
10    A.   The next time I think was in
11 January of 2012.
12    Q.   Was that in New York?
13    A.   No.
14    Q.   Where was that?
15    A.   Washington, D.C.
16    Q.   How did that meeting take place?
17 How did it come about?
18    A.   We scheduled it so that we could
19 talk further about what would be in the
20 book, about how the book would be structured
21 and put together.
22    Q.   Did Elise Cheney arrange the
23 meeting?
24    A.   She was a part of arranging the
25 meeting.  I don't recall who took the lead.

BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
97–100

Page 97

1                   Sevier
2      Q.   Who took the lead?
3      A.   I just said I don't recall.
4      Q.   Oh, you don't recall.  Who was at
5  the meeting?
6      A.   I was there, Elise was there, Matt
7  was there and Kevin Mauer was there.
8      Q.   How did Kevin Mauer come into the
9  picture?
10     A.   He was hired as Matt's co-writer
11 on the book.
12     Q.   Who made that decision to hire
13 Kevin Mauer?
14     A.   Ultimately Matt selected him.
15     Q.   Were you involved in that
16 decision-making process?
17     A.   Yes.
18     Q.   How?
19     A.   Elise and I researched and found a
20 handful of candidates.  I think it was
21 three, who we thought would be appropriate
22 and worth introducing to Matt as possible
23 co-writers and Kevin was one of them.
24     Q.   Did Kevin Mauer have prior
25 experience in writing military books?

Page 98

1                   Sevier
2      A.   Yes, he did.
3      Q.   Did you have a discussion with
4  Kevin Mauer before he was retained to be the
5  co-author?  This is apart from the meeting
6  in Washington.
7      A.   Right.
8          Before -- did I speak with him --
9  sorry.
10         Is the question did I speak with
11 him before the meeting?
12     Q.   Correct.  Yes.
13     A.   Yes.
14     Q.   What was that discussion?
15     A.   I -- my memory is that I described
16 to him what the job was that he was being
17 considered for before he met with Matt so
18 that Matt could interview him.
19     Q.   What did you describe?  What was
20 the description of what he would be doing?
21     A.   You know working with Matt to put
22 his memories down on paper and doing a
23 traditional job that a co-writer does with
24 someone like Matt who has never written a
25 book before so we talked about the mechanics

Page 99

1                   Sevier
2  of what the job would entail, what kind of a
3  guy Matt was, inasmuch as that was important
4  for him to know about whether he wanted the
5  job, what -- you know, what our goals were
6  for what the book would be.
7      Q.   Did you discuss with Mr. Mauer any
8  of the potential objections that the
9  government would have to the book being
10 published?
11     A.   I don't remember discussing that
12 with him.
13     Q.   Did you discuss with Mr. Mauer
14 whether he had any kind of security
15 clearance that would have allowed him to
16 obtain information that related to the raid?
17     A.   No.
18     Q.   Did Mr. Mauer express to you any
19 concern about governmental clearance?
20     A.   Not that I remember.
21     Q.   Did discussion come up with
22 Mr. Mauer about any need for a
23 prepublication review of the book before it
24 is published?
25     A.   I just don't remember.

Page 100

1                   Sevier
2      Q.   To the best of your knowledge up
3  until that point there was no firsthand
4  account published about the raid, correct?
5      A.   Right.
6      Q.   And the information in the media
7  about the Operation Neptune raid was all
8  secondhand accounts through authors or
9  writers, correct?
10     A.   Journalists, talking heads on TV,
11 et cetera.
12     Q.   You are aware that there was a
13 very lengthy account of the raid that was
14 published through The New Yorker?
15     A.   Yes.  I am aware of that.
16     Q.   Did you read that before meeting
17 with Mr. Bissonnette in December of 2011?
18     A.   I read that when it was published
19 or around the time it was published but
20 honestly sitting here today I can't remember
21 when that was, whether it was before or
22 after I met Matt.
23     Q.   Did you have any concerns about
24 whether the CIA or the White House or any
25 governmental agency would object to



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
101–104

Page 101

1          Sevier
2    Mr. Bissonnette writing the book at any
3    point in time?
4          MS. FOLEY:  Can you just read
5    that back?
6          THE WITNESS:  Can I take a
7    comfort break?
8          MR. FURMAN:  Yes.
9          (Recess)
10         MR. FURMAN:  Let's have the
11   question read back.
12         (Record read)
13         MS. FOLEY:  Object to the
14   question.  Asked and answered.
15         THE WITNESS:  I feel like I have
16   answered that.
17         I was concerned from the
18   beginning that he had -- whether he
19   had the legal right to tell the story.
20   BY MR. FURMAN:
21   Q.   Did Kevin Mauer -- did you discuss
22   that with Kevin Mauer at any point?
23   A.   I might have, I just don't
24   remember.
25   Q.   Let me show you what has been

Page 102

1          Sevier
2    marked previously as Exhibit 9 to -- Exhibit
3    9 in this case.
4          Do you recall this e-mail?
5    A.   I don't specifically recall it but
6    it looks -- but I see what it is.
7    Q.   Is that an aggressive schedule
8    start to finish?
9    A.   Yes.
10   Q.   Why was the schedule so
11   aggressive?
12   A.   Because we wanted the book to be
13   the first eyewitness account of the UBL raid
14   and so we had been thinking of publishing it
15   in that September and in order to publish in
16   September we needed an aggressive schedule
17   like this.
18   Q.   Using this, the date of this
19   e-mail, January 3rd as a marker, did you
20   have your second meeting with
21   Mr. Bissonnette in Washington before or
22   after?
23   A.   After January 3rd.
24   Q.   You described it as a -- I am not
25   sure if you did.  How long was meeting?

Page 103

1          Sevier
2    A.   In Washington, D.C.?
3    Q.   In D.C.
4    A.   Between a half day and a day.  I
5    went up and back on the train in the same
6    day.
7    Q.   So it was a several hour meeting?
8    A.   Yes.
9    Q.   What was discussed during that
10   meeting?
11   A.   The outline for the book which is
12   to say Chapter 1, Chapter 2, Chapter 3 what
13   would be contained in those chapters
14   generally.
15         Maybe a bit about publication
16   although it was primarily focused primarily
17   about the co-writer, Kevin Mauer, Matt,
18   Elise and I agreeing on what would be in the
19   pages of the book, how the book would be
20   laid out, how the story would be told.
21   Q.   The participants in the meeting
22   were you, Mr. Bissonnette, Elise Cheney and
23   Mr. Mauer?
24   A.   That's right.
25   Q.   Where did the meeting take place?

Page 104

1          Sevier
2    A.   In a hotel conference room in
3    Washington, D.C.
4    Q.   Fair to say at least a five-hour
5    meeting or --
6    A.   Yes, approximately five hours
7    between four and eight I would say.  I can't
8    be more specific.
9    Q.   Were the contents of what
10   eventually became the book No Easy Day,
11   were -- was that the topic of discussion?
12   A.   Yes.
13   Q.   During that conversation did
14   Mr. Bissonnette reveal to you details about
15   the bin Laden raid?
16   A.   On that day in that conference
17   room I can't remember what details came up.
18   As I said it was really about outlining
19   which is to say Chapter 1 we will talk about
20   Matt's birth and high school years and in
21   Chapter 20 we want to get to the raid.  How
22   are we going to fill all those other
23   chapters.  So it was a high level editorial
24   conversation for the most part.  We could
25   have gotten in the detail but I don't recall



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
105–108

Page 105

1                    Sevier
2   it now.
3       Q.   Just in terms of describing it so
4   I understand what the meeting -- what
5   happened at the meeting, it was an outline
6   of what would eventually contain the content
7   of the book, is that fair to say?
8       A.   Yes.
9       Q.   At what point in time were you
10  satisfied that Mr. Bissonnette was the real
11  deal, that he was actually not -- he wasn't
12  pretending that he was a Navy Seal and was
13  involved in the raid?
14      A.   I was satisfied with that in the
15  meeting we had in Penguin's offices in
16  late -- mid to late December that we talked
17  about earlier.
18      Q.   What about -- what did
19  Mr. Bissonnette say or do that convinced
20  you?
21      A.   It was just a feeling the way he
22  talked, the stories he told.  It was clear
23  he came from that world and, you know, you
24  get a gut feeling about someone.
25      Q.   Did he tell you any details about

Page 107

1                    Sevier
2   any photographs, any documents, anything
3   else?
4       A.   Not that I remember.
5       Q.   So it was just a hat that he
6   showed you?
7       A.   In that December 20th meeting or
8   whatever the date of that meeting was the
9   only thing I remember is that hat.
10      Q.   Just give me a visual description
11  so I can, you know, somehow understand what
12  that hat looked like.
13      A.   You can see it.  It is on video
14  with bin Laden wearing it or a hat like it.
15  I can't say that it was the hat that bin
16  Laden was wearing.  That is what Matt said
17  and I believed him because he seemed like he
18  was the real deal as I said.
19           But it was like a brown stocking
20  cap with kind of a flat top that is an
21  unusual style at least here but that I think
22  we were familiar with at the time just being
23  the kind of hat that you would see in the
24  Middle East and that bin Laden had been
25  seeing wearing it on some of those videos

Page 106

1                    Sevier
2   the raid itself that made you believe that
3   he participated in the raid?
4       A.   I don't remember any specific
5   details that he told us that were
6   particularly relevant to that question.  It
7   was more a general overall impression of the
8   breadth of his knowledge of it and his world
9   that was convincing.
10      Q.   Did he show you anything?
11      A.   Did he show us anything?  Yes.  He
12  did.
13      Q.   What did he show you?
14      A.   He had a hat.
15      Q.   Okay.
16      A.   That --
17      Q.   I have a hat too.  Tell me about
18  his hat.
19      A.   He said the hat was UBL's that hat
20  he had gotten on the raid.
21      Q.   So he -- Mr. Bissonnette in this
22  December meeting produced a hat and told you
23  that this was Osama bin Laden's hat?
24      A.   Yes.
25      Q.   Anything else.  Did he show you

Page 108

1                    Sevier
2   that used to come out featuring him.
3       Q.   Did Mr. Bissonnette describe to
4   you how he came into possession of the hat?
5       A.   He said he grabbed it on the raid,
6   brought it home with him.
7       Q.   I just want to know your view, did
8   you think it was strange that
9   Mr. Bissonnette would actually have in his
10  possession an article from such an historic
11  raid in his possession?
12      A.   I didn't have any particular
13  opinion about that.  I meet all kinds of
14  people in my line of work.
15      Q.   Do you know whatever happened to
16  that hat?
17      A.   I have no idea.
18      Q.   How about the discussion about
19  proceeds of the book going to a charity?
20  When did that first take place?
21      A.   Very early in the conversations I
22  was having with Matt.
23      Q.   What about that do you recall?
24      A.   He said he was hoping to donate
25  the proceeds to charities that supported



Page 109

1              Sevier
2  veterans interests, that is sort of
3  generally what I remember.
4      Q.   How was that going to take place,
5  what was the process for that to happen?
6      A.   I don't know.  That was his --
7  that would have been his responsibility.
8      Q.   Did Dutton take any interest or
9  any active role in supporting that idea?
10     A.   Not that I can remember beyond
11 printing his words in the book where he said
12 that was his intent.
13     Q.   Did Dutton create a special
14 account for any kind of charitable
15 enterprise that relates to the book?
16     A.   No.  Not that I know of.
17     Q.   To your knowledge has
18 Mr. Bissonnette made any charitable
19 contributions to any causes that you are
20 aware of?
21     A.   In his life or --
22     Q.   In relation to the proceeds of the
23 book or in relation to his role as an
24 operator in the raid.
25     A.   The only thing I know about it is

Page 110

1              Sevier
2  that he gave all his proceeds to the
3  government so I don't think he gave any of
4  them to charity.  I don't think he ever was
5  allowed to.
6      Q.   Do you know if Mr. Bissonnette had
7  expressed to you any plan of how much he was
8  intending to donate to charities?
9      A.   Not any specific plan beyond the
10 proceeds.
11     Q.   Any percentage, any hard number,
12 any goals, anything of that nature?
13     A.   I don't remember him ever putting
14 a hard number percentage on it.
15     Q.   Did you have an understanding of
16 what he intended to do?
17     A.   I think he wanted to give the
18 money to charity.
19     Q.   All of it?
20     A.   I really can't say beyond that he
21 said he wanted to give the proceeds from the
22 book to charity.
23     Q.   I know I am pressing on this but I
24 just want to understand if I have your
25 testimony complete.

Page 111

1              Sevier
2      The proceeds that can be
3  interpreted as 100 percent.  I am not -- did
4  you understand Mr. Bissonnette wanted to
5  donate 100 percent of the proceeds to
6  charity?
7      A.   I mean at various -- that was my
8  general understanding.  That was my general
9  understanding.
10     There might have been some
11 discussion at some point that he incurred
12 expenses related to his work on the book but
13 again that was really all his domain and it
14 had to do with monies paid out to him from
15 Penguin and Dutton and I wouldn't have had
16 any hand in that so I didn't focus too much
17 on that.
18     Q.   I -- we have been doing this so
19 far.  Keep your voice up so the reporter can
20 hear your --
21     A.   I will do my best.
22     Q.   He hasn't mentioned that he hasn't
23 but your voice trails off just a bit and I
24 just wanted to remind you of that.
25     Going to the contract, what -- do

Page 112

1              Sevier
2  you recall when the contract was first sent
3  out to Mr. Bissonnette?
4      A.   I think a draft of the contract
5  was sent around the end of 2011, beginning
6  of 2012 but I don't specifically remember.
7      Q.   I am going to have this next
8  exhibit marked which I believe is a draft
9  and I will show it to you in a second.
10     MR. FURMAN:  It will be number
11 109.
12     (Draft of the contracts for book
13 was marked Exhibit 109 for identification)
14 BY MR. FURMAN:
15     Q.   Mr. Sevier, can you take a look at
16 Exhibit 109?
17     Do you recognize it?
18     A.   It looks like a draft of the
19 contracts for the book.
20     Q.   Did you send it or did someone
21 from your office send it over to Elise
22 Cheney?
23     A.   Someone at Penguin but I can't
24 recall anymore specifically than that would
25 have sent it to her.



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
113–116

Page 113

1              Sevier
2      Q.    In the second page it is listed as
3   in the bottom as ending in numbers 208.
4      A.    Yes.
5      Q.    It describes in the whereas clause
6   there what the subject matter description of
7   what the book was going to be?
8      A.    Yes.
9      Q.    And it states that it would be "a
10  minute-by-minute account of the author's
11  direct experiences leading up to the raid,
12  on the raid and in the aftermath of the raid
13  including the author's observation of the
14  death of bin Laden at which the author
15  hereby represents he was present."
16         Do you see that?
17     A.    I do.
18     Q.    It also goes on to say that, "The
19  work shall include details of the author's
20  personal experiences during the raid that
21  have not previously been reported in the
22  media or otherwise disclosed publicly."
23         Do you see that?
24     A.    I do.
25     Q.    Did -- who prepared that language?

Page 114

1              Sevier
2      A.    That would have been me as the
3   editor in consultation with our contracts
4   departments and as to who actually wrote it
5   I can't recall, but would it have been
6   drafted and passed back and forth for
7   revision.
8      Q.    So ultimately the approval -- you
9   participated in the approval of that
10  description of what the book would have
11  been?
12     A.    Yes.
13     Q.    And did Mr. Bissonnette make the
14  representation that he was present at the
15  death of bin Laden?
16     A.    Yes.
17     Q.    Based on what we described earlier
18  you believed it was accurate among other
19  things he produced the hat, right?
20     A.    I believed him, yes.
21     Q.    He told you enough details about
22  the raid that he convinced you that what he
23  was saying was true?
24     A.    Yes.
25     Q.    Other than obviously your

Page 115

1              Sevier
2   conversations with him did Dutton do any
3   other investigation to ensure that
4   Mr. Bissonnette was actually the person he
5   was saying he was?
6      A.    Not that I can remember now.  Not
7   that I can remember now, no.
8      Q.    At the bottom of the description
9   in the last several sentences there, maybe
10  just one long sentence it states, "The
11  author will not use the real names of any
12  individual United States nationals including
13  his own and the author will not describe or
14  acknowledge the existence of any technology
15  that is classified by the U.S. Government or
16  any other technology where public knowledge
17  of said technology might in the author's
18  opinion compromise future operations in the
19  defense of the United States or of its
20  interests."
21         Do you see that?
22     A.    Yes, I do.
23     Q.    There is a reference there about
24  avoiding divulging information that was
25  classified about technology, fair to say?

Page 116

1              Sevier
2      A.    Yes.
3      Q.    Was there any concern about
4   divulging information that was classified
5   about the operation itself?
6      A.    You mean among the author, the
7   publisher, our team, were we concerned about
8   that?
9      Q.    Yes.
10     A.    Yes.
11     Q.    Before this contract was
12  ultimately signed did you express that in
13  any particular way, that concern?
14         MR. JOHNSTON:  Object to the
15         form of the question to the extent
16         that it asks for what is essentially
17         in a document therefore best evidence.
18         THE WITNESS:  I had
19         conversations with the author and his
20         representatives that nobody wanted any
21         classified information to be in this
22         book.  The author, the publisher, me,
23         the editor, et cetera, the intent was
24         to keep this book free of classified
25         information.



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
117–120

Page 117

1               Sevier
2 BY MR. FURMAN:
3     Q.   Putting aside the issue of
4 classified information, did -- in the
5 formation of the contract did you address
6 any concerns about the author's right
7 legally, legal right, to tell that story?
8          MS. FOLEY:  Object.  Asked and
9     answered.
10         THE WITNESS:  Yes.
11 BY MR. FURMAN:
12    Q.   About the contract?
13    A.   Yes.
14    Q.   In what form?
15    A.   I believe there is a clause in the
16 contract somewhere that where he warrants --
17 the author warrants that he has the legal
18 rights to tell the story.
19    Q.   Now, I am going to show you the
20 next document would be document 110.  This
21 is what I believe to be the signed copy of
22 the contract.
23         (Copy of the publishing contract
24 was marked Exhibit 110 for identification)
25

Page 118

1               Sevier
2 BY MR. FURMAN:
3     Q.   Take a moment, Mr. Sevier, to
4 review Exhibit 109.
5          My question as you review it
6 whether you recognize this document as the
7 final and executed copy of the publishing
8 contract with Mr. Bissonnette.  Exhibit 110.
9 Sorry.
10         MS. FOLEY:  What is the question
11    again?
12         MR. FURMAN:  I will ask the
13    question again.
14 BY MR. FURMAN:
15    Q.   Do you recognize Exhibit 110 as
16 the executed copy of the publishing contract
17 between Dutton/Penguin with Mark Owen who we
18 know is Matthew Bissonnette?
19         MS. FOLEY:  Take a look at it
20    and to the extent you can answer,
21    answer.
22         THE WITNESS:  Without comparing
23    every word it is hard for me to say
24    definitively especially since part of
25    this has been blacked out but the fact

Page 119

1               Sevier
2     that it is signed by some of our
3     employees leads me to believe it
4     probably is.
5 BY MR. FURMAN:
6     Q.   I want to ask you about that
7 portion that is being blacked out.  It is on
8 the third page in to this document.
9          Do you know why it is blacked out?
10    A.   I have no idea.
11    Q.   Do you know or have any
12 recollection when it was executed, the final
13 version of the contract, that the subject
14 matter description of the book was redacted
15 in one form or another?
16    A.   In this specific document?
17    Q.   Yes.
18    A.   Again, I really have no idea.
19    Q.   Does Dutton have a copy of -- the
20 executed copy of, their own copy of this
21 contract?
22    A.   I am sure we do.  We keep all of
23 our contracts.
24    Q.   Okay.  What I will do is we will
25 follow up with, I guess we will have to do

Page 120

1               Sevier
2 it through subpoena unless provided by
3 agreement,for a copy of the executed version
4 of this contract.  Among other things I
5 would like to know whether it is redacted or
6 not.  I have a copy --
7     A.   Right.
8     Q.   -- and I don't know if the copy
9 that you have is redacted.  I may ask you
10 followup questions to the extent your
11 counsel will allow me to do so.  I can do
12 that simply by interrogatory as to whether
13 if in fact your version is redacted I would
14 like to know why.
15         As you sit here today you have
16 no -- one way or another do you know whether
17 your copy is redacted?
18    A.   I don't.
19         I do have a clarification on an
20 earlier answer if it is okay.
21         MS. HIROSE:  You want to clarify
22    an earlier answer?
23         THE WITNESS:  Yes.
24         You asked me if this is the
25    final executed contract and I guess



BENJAMIN SEVIER                                   January 06, 2017
BISSONNETTE vs PODLASKI                               121–124

Page 121

1           Sevier
2    the answer is no because it does not
3    have the author's signature on it.
4           The only final executed contract
5    would have the author's signature on
6    it as I understand it.
7           Is this a photocopy of the same
8    document without his signature on it?
9    Possibly. I can't tell you that. But
10   the final contract would have his
11   signature on it.
12   BY MR. FURMAN:
13   Q.   I think we will be following up
14   with you, we would need it for the trial of
15   the case so we will follow up with a
16   subpoena for that.
17          Again, I may want to ask another
18   question if I could by interrogatory. I
19   will just ask at trial if it is redacted as
20   to why it was.
21          Now, getting back to the
22   exhibit -- time line. Exhibit 9, an e-mail
23   that is in front of you that is dated
24   January 3rd. It has the time line on it.
25   A.   Got it.

Page 122

1           Sevier
2    Q.   What were the next steps that you
3    recall after this e-mail was sent, what do
4    you recall happening? I am trying to get a
5    sense of what was taking place.
6    A.   This was -- so right after this we
7    would have been finalizing our list of three
8    candidates for co-writer, the three best
9    options that Elise and I had come up with to
10   introduce to Matt.
11          And then as this refers to I spoke
12   with those three people to give them a sense
13   of what they would be interviewed about.
14          I believe that all three of them
15   met with Matt subsequent to this and then we
16   selected the co-writer. That would have
17   been the next step after this e-mail.
18   Q.   Now, on -- in terms of publishing
19   the book, the contract and you have seen a
20   draft and at least a version of a signed
21   copy of the contract, Exhibit 110. I want
22   to refer you to it for a moment with the
23   understanding that this is, you know, not
24   the final signed copy. I appreciate that,
25   your addition to your answer. With that

Page 123

1           Sevier
2    knowledge if you can look at Exhibit 110.
3    MR. JOHNSTON:   Let me for the
4    record object to the extent that you
5    are characterizing the document.
6           I recognize your reservation of
7    his answer but I want to be sure that
8    objection is on the record.
9    MR. FURMAN:   Yes, understood it.
10   I am virtually positive we are dealing
11   with the final copy. We will only
12   know when we get it.
13   BY MR. FURMAN:
14   Q.   But I am going to refer you to
15   Exhibit 110 just for the moment and
16   paragraph 4B.
17   A.   Paragraph 4B?
18   Q.   Yes. 4B.
19          4B, I will paraphrase it, says
20   that the book needs to be published within
21   12 months. That is in --
22   MS. FOLEY:   What language are
23   you reading?
24   MR. FURMAN:   4B, and it is the
25   last -- it is the second to last line

Page 124

1           Sevier
2    of 4B. I may be wrong on that.
3    Sorry. I have got someone smarter
4    than me correct me.
5    BY MR. FURMAN:
6    Q.   Paragraphs 4A and B read in
7    conjunction require that the book -- that
8    "The publisher will within 18 months of
9    acceptance of the work publish or cause the
10   publication of the work to be published."
11          Do you see that?
12   A.   I do.
13   Q.   How did that 18-month deadline
14   come into play?
15   A.   I don't remember specifically for
16   this contract why 18 months was chosen. It
17   looks to me like it is a revision to what
18   our standard boilerplate is.
19   Q.   What is the standard boilerplate?
20   A.   I think that it is -- actually I
21   am not sure what the stand boilerplate is.
22   I know that there is a range of date we use
23   and it is a negotiation point on each
24   project.
25   Q.   In 4B it states that the failure



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
125–128

Page 125

Sevier
1
2  of the publisher to publish the book within
3  the time frame set forth in 4A, which is 18
4  months, I am paraphrasing here, means that,
5  it -- the contract will not be deemed a
6  violation if the failure to publish is
7  caused by a restriction of -- by the
8  government.
9        And I will refer you just so that
10  you can understand why I am paraphrasing, it
11  is in paragraph 4B.
12        MS. FOLEY:  Just to clarify your
13        question, make sure it is fully
14        accurate as to what the contract says
15        when it says that publisher will
16        within 18 months after acceptance of
17        the work publish or cause publication
18        of the work.  So it is 18 months from
19        acceptance of the work.
20        MR. FURMAN:  I think I said that
21        but you are right to point that out
22        regardless, whether I said it or not,
23        that is accurate.
24  BY MR. FURMAN:
25        Q.  And what I am asking is -- now I

Page 126

Sevier
1
2  am referring to the first three lines of 4B
3  and what I am asking you is if you recall
4  that the contract includes a clause that
5  allows the failure of the publisher to
6  publish a book beyond 18 months or not to do
7  it within 18 months if the failure to
8  publish is caused by restrictions of
9  government agencies.
10        Do you see that?
11        A.  Which -- you are referring to two
12  different clauses here.  The one you are
13  talking about now is 4B.
14        Q.  Read the first three lines of 4B
15  to yourself and then I will ask you
16  questions about it.  That is the best way to
17  do it.
18        If you need a magnifying glass I
19  have one.
20        MS. FOLEY:  Do you?
21        THE WITNESS:  I don't need a
22        magnifying glass.  Thank you.
23  BY MR. FURMAN:
24        Q.  I got one for the nondisclosure
25  agreement.

Page 127

Sevier
1
2        A.  I am sorry, guys.  I need silence
3  if I am going to understand this paragraph.
4  Can we just all -- thank you.
5        Okay.  I have read it.
6        Q.  Let me walk you through some dates
7  so that we are all on the same page.
8        At the very top of that page
9  "Delivery of Manuscript," it says that the
10  proprietor, that would be Mr. Bissonnette,
11  shall deliver to the publisher on or before
12  June 1st of 2012 essentially the book.
13        A.  Yes.
14        Q.  That is the date that is reflected
15  in that time line that we discussed in that
16  e-mail?
17        A.  Right.
18        Q.  And then if you take that June 1st
19  date -- from that June 1st date the
20  publisher has 18 months based on 4A, 4B to
21  publish the book?
22        MS. FOLEY:  Object to the form
23        of the question.
24        The contract says "from
25        acceptance."

Page 128

Sevier
1
2        MR. FURMAN:  "From acceptance."
3        MS. FOLEY:  "Acceptance" is not
4        the same as "delivery."
5        MR. FURMAN:  Correct.  You are
6        right.
7  BY MR. FURMAN:
8        Q.  So from acceptance of the work.
9  Let's assume because it happened that the
10  book is accepted by June 1st.  Let's say it
11  is accepted by.
12        MS. FOLEY:  You are saying
13        hypothetically.
14        MR. FURMAN:  It was accepted by
15        June 1st.
16        MS. FOLEY:  Okay.
17        THE WITNESS:  I want to clarify
18        that is not actually what happened.
19        For the purposes of this hypothetical
20        it is June 1st.
21  BY MR. FURMAN:
22        Q.  I am wondering whether it is even
23  worth asking the question but I am going to
24  try.
25        For the purpose of just this



Page 129

Sevier

1      Sevier
2   hypothetical, if the work is accepted by
3   June 1st, right, 18 months then would have
4   been December 1st, I think of 2013?
5      A.   That sounds right.
6      Q.   I will represent to you that
7   someone next to me calculated that so it is
8   accurate.
9      A.   Okay.
10     Q.   Could then -- again making that
11  assumption that the book would have been
12  accepted by June 1st, the book could have
13  been published at any point in time before
14  December 1st of 2013 as per the contract?
15     A.   I mean I don't think that the way
16  I interpret these paragraphs and our
17  contract generally, it is not that there is
18  a limitation of when we can publish but the
19  paragraphs protect both the author and
20  publisher from the circumstance where the
21  book doesn't get published or can't be
22  published even though it has been accepted.
23     Q.   Okay.  The book obviously was
24  published in September of 2012.  My point
25  and what I am driving at is that the book

Page 131

Sevier

1      Sevier
2      MS. FOLEY:  I am going to object
3   to the form of the question noting
4   that you are asking a lay person to
5   interpret the legal obligations of a
6   party in a contract.
7   BY MR. FURMAN:
8      Q.   You can answer.
9      A.   Yes.  That is my general
10  understanding.
11     If any of these conditions listed
12  here, the reason for the failure to publish
13  then the author can't seek remedy under the
14  contract, keep the money and not having it
15  published.  That is the way I think of it.
16     Q.   So hypothetically if Matthew
17  Bissonnette submitted the book for a
18  prepublication review and the government
19  decided to delay the process of reviewing
20  the book for any number of months and it
21  would have gone past the December 1st, 2013
22  date, is it fair to say there would have
23  been no violation on the part of Dutton and
24  no violation on the part of the author to
25  wait for that process to complete?

Page 130

Sevier

1      Sevier
2   could have been published November --
3   October, November, December of 2013 without
4   any violation on the part of either yourself
5   or the author under the terms of this
6   contract?
7      A.   Yes.  That is my understanding.
8   That is consistent with my understanding.
9      Q.   Okay.  And in addition beyond that
10  in 4B if in fact there was an objection or a
11  restriction as the word is used in the
12  contract by a governmental agency there
13  would be no violation on the part of Dutton
14  if they had failed to publish the book by
15  December 1st or whatever that date would
16  have been?
17     MR. JOHNSTON:  Object to the use
18  of the word "objection" but I agree
19  with the word "restriction."  That is
20  the word in the contract.
21     THE WITNESS:  I am sorry.  What
22  is the question?
23     MR. FURMAN:  I will have to ask
24  the reporter to read it back.
25     (Record read)

Page 132

Sevier

1      Sevier
2      MS. FOLEY:  Object to the form
3   of the question.
4      MR. JOHNSTON:  Object to the
5   form of the question.
6      MS. FOLEY:  Do you want to read
7   the question back?
8      THE WITNESS:  I am having a hard
9   time parsing the question and these
10  paragraphs to be honest.  I would love
11  to answer.
12     (Record read)
13     THE WITNESS:  I am not sure that
14  these paragraphs apply to that
15  circumstance because the work, the way
16  I understood it, could not be accepted
17  in the legal sense until after any
18  such review happened so that is where
19  my problem is here.
20     I am not -- I do not think that
21  these paragraphs are necessarily
22  applicable to the situation you are
23  describing.
24  BY MR. FURMAN:
25     Q.   Okay.  And so let's focus on the



Page 133

Sevier
1
2  acceptance part of it because that would
3  have been the June 1st date and that is
4  referenced in 3A of the contract.  That
5  is --
6        MS. FOLEY:  Let me just clarify.
7        The delivery is referenced in
8  3A.
9  BY MR. FURMAN:
10      Q.   Give me a moment just to find the
11  section of the acceptance.
12        What I would suggest and I don't
13  mind doing this while a question is pending
14  is, I probably have about another hour or
15  so, hour-and-a-half, 90 minutes to go so if
16  you want to break for lunch now this is a
17  fine time to do it and we will resume.  I
18  don't need a long lunch break but it is
19  entirely up to you.
20        MS. FOLEY:  Let's say 1:45.
21        (Luncheon recess: 12:46 p.m.)
22
23
24
25

Page 134

Sevier
1
2        AFTERNOON SESSION
3           1:44 p.m.
4  BY MR. FURMAN:
5      Q.   Mr. Sevier, 3A of the contract,
6  Exhibit 110, that we were looking at before
7  the break, there is a reference there that
8  the author should deliver to the publisher
9  before June 1st of 2012 the work in a form
10  that is satisfactory to the publisher.  Is
11  that -- I paraphrased it obviously but is
12  that what you understand the contract to
13  say?
14      A.   Yes.
15      Q.   Did that take place?  Did -- was
16  the work delivered in this -- as far as No
17  Easy Day was concerned was it delivered to
18  the publisher by June 1st in a form that was
19  satisfactory to the publisher?
20      A.   My memory is that we were delayed
21  about a month and it was closer to July 4th,
22  around there that we actually had the
23  complete manuscript.
24      Q.   All right.
25        From say that July 4th period of

Page 135

Sevier
1
2  time is it fair to say that once the
3  publisher was in possession of the work that
4  was in a form that was satisfactory to the
5  publisher that then as per 4A and B of the
6  contract then the publisher had 18 months
7  from which to publish the book?
8      A.   Yes.  Under -- that is my
9  understanding without holding myself up as a
10  contract expert or a lawyer who would need
11  to parse this language more carefully, that
12  sounds right to me.
13      Q.   We are going to get the details of
14  this but there came a point in time when
15  there was an objection to the publication of
16  the book from the government in August --
17  the end of August 2012, correct?
18      A.   Yes.
19      Q.   Did the publisher make a decision
20  one way or the other whether to submit the
21  book for a prepublication review?
22      A.   No.
23      Q.   At any point in time before
24  August 30, 2012, that is the date of the Jeh
25  Johnson letter.  You know what I am

Page 136

Sevier
1
2  referring to when I say the August 30th Jeh
3  Johnson letter?
4      A.   Yes.
5      Q.   Before the August 30, Jeh Johnson
6  letter did Dutton take any steps to submit
7  the book for a prepublication review by the
8  U.S. Government?
9      A.   No.
10      Q.   Did -- now hypothetically if
11  Dutton chose to do so after August 30, 2012
12  letter from Jeh Johnson could Dutton have
13  done so and have been protected pursuant to
14  the contract to the best of your knowledge,
15  I am not asking as a lawyer but to the best
16  of your knowledge under 4B of the contract?
17        MS. FOLEY:  Object to the form
18    of the question.
19        THE WITNESS:  I am not totally
20    following.
21        You are asking me if we had
22    submitted for review after
23    August 30th, 2012?
24  BY MR. FURMAN:
25      Q.   Sure.  At any point in time after



BENJAMIN SEVIER                                    January 06, 2017
BISSONNETTE vs PODLASKI                                   137–140

Page 137

1              Sevier
2  August 30, 2012.
3       Let's say on September 1st of 2012
4  Dutton decided that they would submit the
5  book for a prepublication review to the U.S.
6  Government.
7       Let's say that that process took
8  two years.
9       Under the terms of the contract
10  there would be no penalty to Dutton for
11  that?
12       MS. FOLEY:  I am going to object
13  to the form of the question to clarify
14  that Dutton had no obligation to
15  submit to the government for review
16  and would not have been a party to
17  submit to the government for a review.
18       MR. FURMAN:  You are doing
19  speaking objections now.  I don't mind
20  if you object.  Obviously you have a
21  right to, but all of your objections
22  have been so far speaking objections.
23  And since this is probably my third or
24  fourth deposition in my career I
25  appreciate that when lawyers give

Page 138

1              Sevier
2  speaking objections they are in one
3  form or another signaling to their
4  client how to answer.  So I would like
5  it if you could to avoid speaking
6  objections.
7       MS. FOLEY:  I understand your
8  position.  My objections are
9  appropriate.
10       MR. FURMAN:  But they are
11  speaking objections.
12       MS. FOLEY:  We don't need to
13  fight about the form of your question.
14       I understand your point and I
15  have it in mind and I am confident in
16  what I am doing.
17       MR. FURMAN:  I am not
18  challenging your competence.
19       I am just -- you know, I am
20  protecting my client's rights and my
21  client's rights are --
22       MS. FOLEY:  I understand that
23  you have to make that statement.  We
24  each have to have our own positions on
25  this.

Page 139

1              Sevier
2       MR. FURMAN:  I would like you to
3  refrain from speaking objections.  All
4  I can do is ask you.
5       All right.  Can I have my last
6  question read back.
7       All I can do is ask and, you
8  know, nothing I can do beyond that.
9       (Record read)
10       MS. FOLEY:  I will state for the
11  record my objection has nothing to do
12  would how to answer the question.  It
13  has to do with the form of the
14  question.
15       MR. FURMAN:  Okay.
16       THE WITNESS:  By September 1st,
17  2012 we had a half million copies of
18  this book in the marketplace.
19       I am not sure how we could have
20  asked about applying for a security
21  review at that point so I am not sure
22  how to answer the question.
23  BY MR. FURMAN:
24       Q.   Is that your answer to the
25  question?

Page 140

1              Sevier
2       A.   I guess it is.  You tell me.  Does
3  it answer your question?
4       Q.   I don't think so.  Because I am
5  not asking you about the fact that there
6  were books printed or otherwise.
7       What I am asking you is if on
8  September 1st of 2012 if Dutton decided to
9  submit the book for a prepublication review
10  there would have been -- that would have
11  protected them from any violation of the
12  contract to publish within 18 months of
13  acceptance, is that fair to say?
14       MR. JOHNSTON:  Object to the
15  extent that it mischaracterizes the
16  contract.
17       THE WITNESS:  My answer is that
18  by September 1st, 2012 the book was
19  for all intents and purposes
20  published.
21       The books were in the
22  marketplace so it would have been
23  impossible to ask for a prepublication
24  review in my opinion.
25



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
141–144

Page 141

1              Sevier
2  BY MR. FURMAN:
3      Q.   Let me ask you what that word
4  "publish" means.  Does the word "publish"
5  mean that books are in bookstores?
6          MS. FOLEY:  Are you asking for
7    his opinion?
8          MR. FURMAN:  No.  I want to know
9    what it means.
10 BY MR. FURMAN:
11     Q.    In the context of No Easy Day when
12  was the book published, what date?
13     A.   The publication date was
14  September 4th, 2012.
15     Q.   September 4th, 2012?
16     A.   That is my memory.
17     Q.   On September 3rd of 2012 could
18  Dutton have submitted the book for a
19  prepublication review, yes or no?
20          MS. FOLEY:  Asked and answered.
21          THE WITNESS:  I don't see how.
22    I don't see how.  Typically in my
23    experience it is not the publisher's
24    job to do that.
25          I wouldn't know who to call, I

Page 142

1              Sevier
2    wouldn't know where to submit it.
3  BY MR. FURMAN:
4      Q.   On September 3rd of 2012 do I have
5  an understanding that the book was published
6  on September 4th of 2012, is that what I
7  understand you are saying?
8      A.   Yes.  Colloquially that makes
9  sense, yes, that is accurate.  The
10  publication date, the book was published on
11  September 4th, 2012.  That is accurate.
12     Q.   I can only ask you the publisher.
13  So your job with No Easy Day was to publish
14  the book, right?
15     A.   Right.
16     Q.   So when I ask -- if I am going to
17  ask anyone in the universe I going to ask
18  you, Ben Sevier, when that book was
19  published, right?
20     A.   I hear what you are saying.  I
21  understand the question now.
22     Q.   Okay.
23     A.   But to me there is a difference
24  between published and printed.
25          I mean, we -- what you have to

Page 143

1              Sevier
2  understand about our business especially in
3  a huge country like the United States is
4  that when you are printing many hundreds of
5  thousands of copies of a book to go to
6  thousands of bookstore locations and other
7  retailers around the country, you have to
8  print those books many weeks before the
9  publication date to get them on trucks and
10  get them shipped to distributors around the
11  country so --
12     Q.   I am not asking about the process.
13  I can understand that printing and delivery
14  and UPS and it sounds like a whole army of
15  people involved but I am not asking you
16  about the process of getting the book to the
17  bookshelves.
18          I am asking you about a
19  publication date.  So I will ask you again.
20  Out of all the people in the world I am here
21  to ask you this question.  When was No Easy
22  Day published?
23          MR. JOHNSTON:  Objection.  Asked
24    and answered.
25          MS. FOLEY:  Objection to the

Page 144

1              Sevier
2    form of the question.
3          THE WITNESS:  I think I said
4    that numerous times.  The publication
5    date was 9/4/12.
6          MS. FOLEY:  I am also going to
7    object to the extent you are asking
8    the witness a question about what
9    publication means for legal purposes.
10 BY MR. FURMAN:
11     Q.   Now on September 30th --
12          MS. FOLEY:  September 30?
13 BY MR. FURMAN:
14     Q.   No, I am sorry, forgive me,
15  August 30th of 2012 when the Jeh Johnson
16  letter was received that was before
17  September 4th of 2012, right?
18     A.   Yes.
19     Q.   And so that -- following your
20  testimony that was several days before the
21  publication of the book of No Easy Day,
22  correct?
23          MS. FOLEY:  Object.
24          THE WITNESS:  Yes.
25



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
145–148

Page 145

1             Sevier
2 BY MR. FURMAN:
3     Q.    And on that day or the next day
4 did anyone, you, Elise Cheney, anyone
5 involved including the author submit the
6 book for a prepublication review?
7     A.    Not to my knowledge.
8     Q.    Did you have a discussion with
9 anyone about whether to submit the book for
10 a prepublication review on August -- after
11 receipt of Jeh Johnson's letter of August
12 30th, 2012?
13     A.    Not that I can recall.
14     Q.    Did you think it was worth
15 exploring or considering?
16     A.    No.  Not as far as I remember.
17     Q.    Let me switch to ask you some
18 questions just about the payments and you
19 may not have the answers and if you don't
20 that is fine.  I just want to know how to
21 get the answers.
22         So, first question, I am asking
23 about the advances and royalties.
24     A.    Okay.
25     Q.    How is the advance paid to

Page 146

1             Sevier
2 Mr. Bissonnette?
3     A.    Typically by contract structure in
4 a series of payments.  It happens at various
5 milestones in the production and publication
6 process so this contract my memory is it was
7 a million dollar advance.  There were four
8 payments outlined in the contract.
9         One that was due on signing of the
10 contract, one that would have been due on
11 delivery and acceptance of the contract.
12 One that would have been due upon
13 publication and one that would have been due
14 I suspect although I can't remember
15 specifically on paperback publication.
16         MR. JOHNSTON: I am sorry.  What
17 was that last?
18         THE WITNESS:  On paperback
19 publication.
20 BY MR. FURMAN:
21     Q.    How did the money get delivered,
22 just the mechanics, was it wired, check?
23     A.    I don't know.
24     Q.    Who handles that for Dutton?  Is
25 it --

Page 147

1             Sevier
2     A.    Our accounts payable department.
3     Q.    If you needed to find out that
4 the -- how the royalties were paid how would
5 you do that?  You obviously don't know,
6 would you call someone in the accounting
7 department, they would tell you how it was
8 done, by wire, by check, et cetera?
9     A.    Yes.  That's right.
10     Q.    So we may follow up with some -- a
11 subpoena for some information that relates
12 to that.
13         How were the royalties calculated,
14 the payments that were to be sent to the
15 author?
16     A.    Well, typically once an advance
17 has been earned out the author will be
18 eligible to receive royalties I think what
19 you are referring to as royalties --
20     Q.    Yes.
21     A.    -- which are the payments that
22 come out after the advance has been earned
23 out and that would happen typically in a
24 six-month schedule.
25         Any monies that come in to the

Page 148

1             Sevier
2 publisher related to the sales of the book
3 or subsidiary rights licensing the book or
4 any other kind of earnings around that book
5 are held in royalty accounts for the author
6 and paid out every six months.
7     Q.    What is the arithmetic that is
8 attached to that?  In other words, how --
9 how is the royalty number decided.  For
10 example, if you, Dutton receives $100,000
11 worth of book sales from around the country
12 and the world related to No Easy Day it goes
13 into a Dutton account.  How then is the
14 royalty number calculated?
15         MS. FOLEY:  Objection.  Lack of
16 foundation.
17         THE WITNESS:  It is laid out in
18 the contract as a percentage of either
19 the list price of the book or the net
20 receipts to the publisher, I believe.
21 Those are the two primary ways.
22         There may be others that I am
23 not thinking of.
24         It has -- it has to do with the
25 kind of sale that is happening, like



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
149–152

Page 149

Sevier
1
2    hardcover -- for instance, there is a
3    hardcover royalty which might be
4    different from the royalty paid on a
5    paperback copy which might be
6    different from the royalty paid on an
7    electronic copy which might be
8    different from any payments associated
9    with foreign publishers to whom we
10   have licensed the rights so that would
11   be -- so all of that is calculated in
12   the royalty accounting department.
13 BY MR. FURMAN:
14   Q.   So the gross receipt numbers are
15   then -- you take that number, you apply
16   percentages that are outlined in the
17   contract and then you have the number that
18   is the royalty amount for the author.  I am
19   saying that in a very general way.  I just
20   want to know --
21   A.   That is essentially right.  That
22   sounds right to me.
23   Q.   For No Easy Day does it have
24   records that they maintain that indicate the
25   amount of gross receipts for the various

Page 150

Sevier
1
2    versions of the book, paperback, hard copy,
3    et cetera, on a rolling basis from the time
4    that it was first published on September 4th
5    of 2012 to the current -- to today, do you
6    have accounts for that?
7    A.   Yes.  Penguin's royalty accounting
8    department has those records as far as I
9    know.  They certainly do for every other
10   book I published.
11   Q.   Okay.  We would like to have
12   access to that.  Whether we will get it we
13   will see.
14       I am trying to understand who I
15   would be asking for that information.
16       MS. FOLEY:  Let me point you to
17   the paragraph -- the rider to
18   paragraph 27 in the contract which
19   spells out how payments are made.
20       It is page 12 on your exhibit.
21       MS. HIROSE:  Exhibit 110.
22 BY MR. FURMAN:
23   Q.   The process -- I wanted to know
24   just where the records are because we would
25   like to issue a subpoena to the appropriate

Page 151

Sevier
1
2    person to be able to get the records so that
3    we understand how much has come into Penguin
4    based on No Easy Day in gross figures from
5    the time of publication in September --
6    September 4th of 2012 until the present day.
7    That is --
8        MS. FOLEY:  If you look the
9    royalty payments are sent to the
10   agent, literary agent.
11       The royalty statements are going
12   to have the information you are
13   asking.
14       MR. FURMAN:  I see.  Is that why
15   you are pointing it out?  Thank you
16   very much.  You are not completely an
17   obstructionist all the time.
18       Thank you.  We will be trying to
19   get that from Elise Cheney.  I am sure
20   she will be very happy for me to ask
21   that question.
22 BY MR. FURMAN:
23   Q.   By the way, I probably should have
24   asked you, did you read Mr. Bissonnette's
25   deposition transcript before today?

Page 152

Sevier
1
2    A.   No.  I have not seen it.
3    Q.   Were you advised by anyone what he
4    testified to?
5    A.   No.
6    Q.   I don't know if you know this but
7    I will ask it.  As of today how much has
8    been paid in royalties to Mr. Bissonnette?
9    A.   I don't have that figure in front
10   of mind.
11   Q.   Just so I know how to get the best
12   source of that information it would be Elise
13   Cheney would have that information?
14   A.   Are you asking me?
15   Q.   I am asking your lawyer but she
16   just nodded.
17       MS. FOLEY:  Well, I didn't know
18   you were.  I am not supposed to be
19   testifying.
20       MR. FURMAN:  We are talking
21   about --
22       MS. FOLEY:  The royalty
23   statements will say how much have been
24   attributed to the author.
25       MR. FURMAN:  Got it.  Okay.



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
153–156

Page 153

1              Sevier
2   BY MR. FURMAN:
3       Q.   Now let me ask you about No Hero.
4   That's a different book.
5            I don't have the contract but is
6   it generally the same format in terms of
7   having a contract and the royalties being
8   distributed based pursuant to a contract
9   agreement with literary agent, the same
10  mechanics apply for payment?
11      A.   The same mechanics but I will
12  point out that the agreement is with the
13  author and the accounting goes through the
14  agent in most cases, yes.  It is essentially
15  the same.
16      Q.   With No Hero if we were to seek
17  information relating to the book sales of
18  that particular book, would the -- would
19  that information be available through the
20  literary agent as well as it is with No Easy
21  Day?
22      A.   As far as I know.  It should be
23  the same.
24      Q.   Let me ask you about Kevin
25  Podlaski.  Did you ever meet him?

Page 154

1              Sevier
2       A.   No.
3       Q.   Do you know when he was hired?
4       A.   I don't specifically know.
5       Q.   Do you know -- strike that.
6            Were you involved in the hiring of
7   Kevin Podlaski in any way?
8       A.   No.  Not really.
9       Q.   To the best of your knowledge who
10  made the decision to hire him?
11      A.   To the best of my knowledge it was
12  the author.
13      Q.   To the best of your knowledge who
14  was Kevin Podlaski representing?
15      A.   Matt Bissonnette.
16      Q.   Anyone else?
17      A.   No.  Not as far as I know.
18      Q.   In one of the e-mails I will refer
19  you to Exhibit 108, if you could turn to
20  page 78 there is an e-mail from you dated
21  June 28th of 2012.
22           MS. FOLEY:  On page 78?
23           MR. FURMAN:  Yes, number 78.
24           THE WITNESS:  An e-mail from me?
25  BY MR. FURMAN:

Page 155

1              Sevier
2       Q.   Yes.  From you dated June 28th,
3   2012.
4       A.   I got it, yes.
5       Q.   At 11:04 and you are e-mailing
6   Kevin Mauer, Elise Cheney, Mr. Bissonnette
7   and Alex Jacobs.
8            It says -- the subject is "Lawyer
9   Edits."
10           In the body of the e-mail you are
11  referring to edits that I am presuming
12  Mr. Podlaski had made and that you thought
13  the lawyer had made a significant
14  contribution.  What did you mean by that?
15      A.   I frankly don't really remember.
16      Q.   Who is Alex Jacobs?
17      A.   He worked in Elise Cheney's
18  office.  I am not sure what his title was.
19      Q.   Did you receive during the course
20  of the various edits to the book, did you
21  receive copies of the evolving manuscript of
22  No Easy Day from Kevin Mauer or from
23  Mr. Bissonnette directly in 2012?
24      A.   Yes.
25      Q.   Did you -- I am mumbling.  Cut my

Page 156

1              Sevier
2   mumbles, right?
3            Those various manuscripts
4   contained the details of the raid, correct?
5       A.   Parts of them, yes.
6       Q.   Did you undertake any effort to
7   maintain the confidentiality and the -- for
8   lack of a better way of describing it the
9   secrecy of that information on your computer
10  or your server at Dutton?
11      A.   Not particularly.
12      Q.   Was that ever a consideration of
13  yours?
14      A.   Inasmuch as I didn't send it to
15  anyone other than the core group here who
16  were involved in the producing of the book,
17  yes, but beyond that I don't recall making
18  any other special efforts.
19      Q.   Let me ask you about No Hero for a
20  moment as a benchmark.  Do you know what the
21  gross sales were of No Hero?
22      A.   Not off the top of my head.
23      Q.   That information I can get from
24  Elise Cheney?
25      A.   She should have it.



BENJAMIN SEVIER                                    January 06, 2017
BISSONNETTE vs PODLASKI                                    157–160

Page 157

Sevier

1    Q.   On the same document, 108 if you
2 could turn to page 12.
3    A.   Okay.
4    Q.   There is an e-mail from you dated
5 August 25th, 2012.  And it is not clear to
6 me who you are writing to.  But I am
7 assuming it includes Kevin Mauer, Kevin
8 Podlaski, Elise Cheney, someone whose last
9 name is Lehane, Peter Ragone and Christine
10 Ball.
11    Your e-mail at 12:06 states, "I
12 think me, Mauer and Podlaski should review
13 that call Christine and Mark have media
14 training, let's divide and conquer.  Kevin
15 P. can you will call me and I will
16 conference in Kevin."
17    Do you see that?
18    A.   I do.
19    Q.   In response to Kevin Mauer's
20 e-mail of that day where he is in a
21 different time zone presuming, he is saying
22 "I had a much longer talk with JSOC about
23 concerns.  If you guys want to set up a call
24 to review or if you want me to just call

Page 158

Sevier

1
2 Kevin.  I have spoken to MO about it.  Let
3 me know."
4    Do you see that?
5    A.   Yes.
6    Q.   What is the -- what was Kevin
7 Mauer talking about, what is "JSOC"?
8    A.   JSOC stands for Joint Special
9 Operations Command.
10    Q.   What concerns did Kevin Mauer
11 address with you?
12    A.   I don't remember if I ever knew.
13 I guess I must have if we had this call but
14 I don't recall.
15    Q.   You don't remember any of the
16 details of the call?
17    A.   Kevin's call with JSOC I obviously
18 wasn't on it.  The call that we had after
19 that it is referred to in the 1206 e-mail?
20    Q.   Yes.
21    A.   I can't recall specifically what
22 their concerns with on August 25th.
23    Q.   It had presumably something to do
24 with the book?
25    A.   I think that is fair.

Page 159

Sevier

1
2    Q.   And at this moment you don't
3 recall what Kevin Mauer told you about his
4 conversations with someone at JSOC?
5    A.   Not specifically.  He was talking
6 to a contact there who he knew and had known
7 for some years who must have told him
8 something that they were talking about or
9 thinking about or wanted to communicate to
10 Matt and to us but sitting here now I can't
11 recall what that was.
12    Q.   Before August 25th of 2012 did
13 anyone, Dutton or Elise Cheney, or the
14 author, release copies, advanced copies of
15 the book to various media agencies and
16 government officials?
17    A.   Prior to 8/25?
18    Q.   Yes.
19    A.   Yes.
20    Q.   Do you know when that took place?
21    A.   Not specifically except that prior
22 to the end of August we were in conversation
23 with and had proceeded down the path with 60
24 Minutes towards the interview that
25 eventually aired with Matt and as a part of

Page 160

Sevier

1
2 that at some point they signed a
3 nondisclosure agreement and received a copy
4 of the manuscript.
5    Q.   Was that before or after
6 August 1st of 2012?
7    A.   I can't say for sure.
8    Q.   Was it before -- I am just using
9 benchmarks as a way to remember, before or
10 after July 4th of 2012?
11    A.   It would have been after July 4th,
12 2012.
13    Q.   So at some point during that
14 summer, after the July 4th weekend let's
15 call it of 2012 and at some point before
16 August 25th of 2012 you had released a copy
17 of the manuscript to 60 Minutes pursuant to
18 a nondisclosure agreement?
19    A.   That is my memory.
20    Q.   Why a nondisclosure agreement?
21    A.   We did not want them to report on
22 the book before a date that we mutually
23 agreed on.
24    Q.   Why?
25    A.   Because we wanted the publicity



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
161–164

Page 161

1        Sevier
2  around this book and the story about this
3  book that happened in the media, whatever it
4  was to happen at the same time as the
5  publication of the book.
6      Q.   So you wanted to control the story
7  and control the timing of the release of the
8  book essentially?
9      A.   That's right.
10     Q.   Obviously it is for commercial
11  reasons, correct?
12     A.   Right.
13     Q.   The book was released to various
14  government agencies as you are aware,
15  correct?
16     A.   I am aware of it being passed by
17  the author through the co-author, Kevin
18  Mauer, to one contact in the government.
19     Q.   Who was that contact?
20     A.   I don't know his name or if I did
21  know it I have forgotten it.
22          It was somebody who Kevin Mauer,
23  the co-writer, had worked with in a public
24  affairs office in one of the branches of the
25  military.

Page 162

1        Sevier
2      Q.   So it was just one contact person
3  that received a copy, an advanced copy of
4  the book through Kevin Mauer?
5      A.   As far as I can remember.
6      Q.   Was this part of a strategy that
7  was devised by Dutton along with Christine
8  Ball to release advanced copies of the book?
9          MS. FOLEY:  By "this" you mean
10          the release to the contact in the
11          government --
12          MR. FURMAN:  Right, yes.
13          MS. FOLEY:  -- was it part of
14          the Dutton media strategy?
15          MR. FURMAN:  Correct.
16          THE WITNESS:  No.
17  BY MR. FURMAN:
18     Q.   Was this something that was just
19  done by Kevin Mauer without your knowledge?
20     A.   No.  We knew it was going to
21  happen.
22     Q.   Did you object to it in any form
23  or another?
24     A.   Ultimately, no.  I can't recall
25  what the discussions were before the

Page 163

1        Sevier
2  decision was made.
3      Q.   This is obviously several weeks
4  before the publication date of
5  September 4th, 2012, right?
6      A.   Right.
7      Q.   Why was the book released at least
8  in this one form to Kevin Mauer's contact
9  who worked in public affairs for some
10  undescribed government agency?
11     A.   It was at the author, Matt's,
12  request as I recall.
13     Q.   Do you know why Mr. Bissonnette
14  asked for this?
15          MS. FOLEY:  Object to the form.
16          THE WITNESS:  I think it was
17          because he wanted to give his former
18          colleagues a heads-up as to what was
19          coming.
20  BY MR. FURMAN:
21     Q.   Why -- to your knowledge why was
22  that necessary, why was a heads-up
23  necessary?
24     A.   As far as I know it was just Matt
25  wanting to play it straight with his former

Page 164

1        Sevier
2  unit and not ambush them or surprise them.
3      Q.   Did Matt tell you that publishing
4  the book without a heads-up was some sort of
5  ambush to his colleagues?
6      A.   He didn't.  Those are my words,
7  not his.
8          I don't recall his specific words
9  but the way I understood it then, he had
10  relationships, basic human relationships
11  with former colleagues and friends who were
12  in that community and he thought he was
13  doing the decent thing by giving them a
14  heads-up.
15     Q.   So I want to understand why that
16  is a decent thing to do.
17          What was the concern that you
18  understood from Matt Bissonnette's
19  perspective as to the publication of a story
20  about the killing of bin Laden?
21          MS. FOLEY:  Object to the form
22          of the question.  And asked and
23          answered.
24          THE WITNESS:  There are some
25          people in my experience in that



Page 165
1              Sevier
2     community of special operators who
3     don't think it is the right thing to
4     do, to write books about your past war
5     experiences.
6          There are many others who do
7     just that and there are countless
8     dozens, hundreds even, maybe thousands
9     of books by former special operators
10    of various kinds and the tension
11    between those two groups of people
12    within that community is something
13    that I think Matt was aware of and
14    wanted to manage for his own personal
15    reasons.
16         You would have to ask him for
17    any detail beyond that, I think.
18  BY MR. FURMAN:
19    Q.   Are you aware that various
20    branches of the government eventually
21    received advanced copies of No Easy Day
22    before the publication date of
23    September 4th, 2012?
24         MS. FOLEY:  Object to the form
25    of the question.

Page 166
1              Sevier
2         THE WITNESS:  I saw that written
3     in media.  I have no reason to believe
4     it was true or not true.
5          I am aware that the Department
6     of Justice or whoever it is that Jeh
7     Johnson represented at that time seems
8     to have been in receipt of a copy of
9     it since you referenced it I think in
10    that letter that was sent on
11    August 30th.
12         Beyond that I don't have any
13    specific memory or knowledge that I
14    can think of other government agencies
15    having it before publication.
16  BY MR. FURMAN:
17    Q.   Now, if you could turn to page 45
18    of Exhibit 108, in your e-mail dated
19    August 28th of 2012 it is addressed to Kevin
20    Podlaski, it contains what was shared and I
21    believe it was shared with the media, I am
22    assuming that -- actually rather than me
23    assuming, why don't you let me know what
24    happened here.
25    A.   Well, I think it is exactly what

Page 167
1              Sevier
2     it looks like and what it spells out in the
3     document.  We made a publishing decision at
4     some point before this release was written
5     to change the publication date from the 11th
6     to the 4th and we put out a statement to
7     that effect.
8     Q.   Who -- this is -- was -- sorry.
9          Was this Christine Ball's
10    responsibility to deal with the media?
11    A.   Yes.
12    Q.   Would she have sought your
13    approval before any information is released
14    about the book?
15    A.   She would have sought my input is
16    the way I would put it, yes.
17    Q.   I appreciate the fact that your
18    approval may not have been necessary.  You
19    would have had knowledge of it before it
20    went out?
21    A.   Yes.
22    Q.   There is a reference at the very
23    end of the statement that says, "Since it
24    was announced on August 22nd No Easy Day has
25    skyrocketed to number 1 at Amazon and Barnes

Page 168
1              Sevier
2     & Noble and garnered increased orders from
3     accounts across the country."
4          Do you see that?
5     A.   I do.
6     Q.   What announcement was made and how
7     was that done on August 22nd?
8     A.   My memory is that Dutton worked
9     with a reporter at the New York Times, the
10    media reporter at the New York Times, to
11    announce the book.  That is my memory.
12    Q.   Was there push back after the book
13    was announced that you are aware of?
14         MS. FOLEY:  Object to the form.
15         THE WITNESS:  From who?  What do
16    you mean by "push back"?
17  BY MR. FURMAN:
18    Q.   So let me explain what I mean by
19    "push back."
20         Were you aware that there were
21    some indications from media sources that the
22    government was unhappy with the fact that
23    Mr. Bissonnette was writing a book about the
24    killing of bin Laden?
25    A.   I saw it reported in the media



BENJAMIN SEVIER                                    January 06, 2017
BISSONNETTE vs PODLASKI                                   169–172

Page 169

1              Sevier
2    that certain members of the government in
3    many cases as I recall unnamed sources had
4    questions and were unhappy about it
5    generally.  I think that is a fair
6    statement.
7        Q.   That was in the days that led up
8    to the August 30th letter from Jeh Johnson,
9    correct?
10       A.   I think that is right.
11       MS. FOLEY:  Object to the form
12   of the question.
13   BY MR. FURMAN:
14       Q.   To the best of your memory I
15   suppose or knowledge when did the first
16   indication come in that there was going to
17   be some unhappiness with -- from the
18   government with Mr. Bissonnette's book No
19   Easy Day?
20       A.   I am sorry.  Is the question when
21   was the first indication?
22       Q.   What was the first indication you
23   had?
24       A.   I think it was e-mails from
25   journalists around that time.

Page 170

1              Sevier
2        Q.   There was a journalist called Mark
3    Hosenball.  Do you remember him?
4        A.   I do.
5        Q.   Do you know Mr. Hosenball?
6        A.   I do not.
7        Q.   How do you know of him?
8        A.   I became aware of him at that time
9    when he started e-mailing us with questions
10   about this breaking news story.
11       Q.   Who does he work for or what did
12   he work for at the time?
13       A.   It was one of the wire services.
14   I can't remember if it was Associated Press
15   or one of the other ones.
16       Q.   Do you recall that in the e-mails
17   that Mr. Hosenball had sent to various
18   people that were connected with Dutton, I
19   think Mr. Ragone might have been on some of
20   them, you may have been at some point
21   receiving them, either forwarded or
22   directly, do you recall that Mr. Hosenball
23   was commenting that the Department of
24   Defense was unhappy that Mr. Bissonnette was
25   writing a book and that he was violating his

Page 171

1              Sevier
2    obligations to the government?
3        A.   I remember it generally as being
4    whatever government officials he was
5    speaking to.  I can't recall if it was the
6    Department of Defense but, yes, the nature
7    of his e-mails were citing those kinds of
8    conversations that he was having.
9        Q.   If you could turn to page 51 of
10   Exhibit 108, I am referring now to the
11   e-mail at the bottom, it is your e-mail to
12   Mr. Podlaski dated August 29th of, 2012.
13       The subject is "NED," all caps,
14   "NED Developments 8/29."
15       There is -- there is three bullet
16   points on this e-mail.
17       The first bullet point says "We
18   learned off the record from an AP reporter
19   last night that they had it from a DOD
20   source that DOD would not seek an
21   injunction."
22       Can you tell me who that source
23   was?
24       A.   No.
25       Q.   Do you recall how you learned that

Page 172

1              Sevier
2    information?
3        A.   Not specifically.
4        Q.   There is a reference to the royal
5    "we" so was it you or was it someone on your
6    team that learned this information?
7        A.   It was most likely someone else on
8    my team who would have conveyed it to me.
9        Q.   Why were you telling Mr. Podlaski
10   that?
11       A.   It looks to me like these bullet
12   points in my e-mail were about legal reports
13   or the reports in the media about our
14   author's legal exposure which is Kevin
15   Podlaski's area of interest in this team so
16   it looks to me like I was just reporting on
17   what I knew.
18       And then it also looks like I had
19   a question at the bottom.
20       Q.   Now the second bullet point says
21   that, "The book was the lead news item on
22   the Today Show."  And that the reporter
23   whose last name I won't try to pronounce
24   "Reported that the DOD confirms that there
25   is no classified information in the book."



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
173–176

Page 173

Sevier
1  Sevier
2  But that there may be some Navy Seal tactics
3  described."
4      Do you see that?
5      A.  I do.
6      Q.  How did you learn that
7  information?
8      A.  By watching The Today Show.
9      Q.  So you saw Jim M. speak on this?
10     A.  Mikleshevski, yes, I did.
11     Q.  You must know the guy.
12     A.  He is the Pentagon reporter at NBC
13  for years.
14     Q.  So you basically watched it like
15  our current President-elect watches the news
16  and talks about it?
17     A.  Exactly.  We are very similar.
18     Q.  I am very up front I do recognize.
19         The third bullet point, "The book
20  has now been purchased at a bookstore in
21  defiance of our strict on sale date and
22  media embargo."
23         Do you see that?
24     A.  Yes.
25     Q.  Can you tell me what the "strict

Page 174

1  Sevier
2  on sale date and media embargo" means?
3      A.  There are historically two
4  different kind of on sale dates that
5  publishers use.
6         One is referred to often as a soft
7  lay down or simply an on sale date as
8  opposed to a strict on sale date.  And that
9  means by agreement with our customers,
10  bookstores and retailers that once they
11  receive the books they are permitted to put
12  them out on the shelves on their schedule.
13         A strict on sale date is the
14  opposite of that.  What it sounds like.  By
15  agreement our customers, the retailers, are
16  not allowed per our agreement to put the
17  book out until the on sale date.
18     Q.  What was the strict on sale date
19  for No Easy Day?
20     A.  By Wednesday, August 29th it was 9
21  to 4 -- by Wednesday, August 29th, it was
22  September 4th.
23     Q.  How did you communicate that
24  strict on sale date?
25     A.  Well, in the press release that

Page 175

1  Sevier
2  you referred to earlier and then it would
3  have been communicated to our customers by
4  the sales reps who work in the offices.
5      Q.  There was an original September 11
6  on sale date, correct?
7      A.  That's right.
8      Q.  When -- who devised the
9  September 11 on sale date?
10         MS. FOLEY:  Asked and answered.
11         MR. FURMAN:  We never used the
12     word "on sale date" so I have to tell
13     you you are wrong.
14         I don't mind your objection but
15     you are wrong.  You got to give me a
16     break here.
17         MR. JOHNSTON:  I will take the
18     matter under advisement.
19         MS. FOLEY:  Let me clarify for
20     the record.
21         Do you use the term "publication
22     date" and "on sale date" synonymously?
23         THE WITNESS:  Yes, I do.
24         MR. FURMAN:  Well, I didn't know
25     that.  So give me a break.  All right.

Page 176

1  Sevier
2  BY MR. FURMAN:
3      Q.  Okay.  So let's move on from all
4  the lawyer hijinks and I need an answer.
5         MS. FOLEY:  What is the
6     question?
7         THE WITNESS:  What is the
8     question?
9         (Record read)
10         THE WITNESS:  All of us on the
11     publication team in consultation with
12     the author and his representatives.
13  BY MR. FURMAN:
14     Q.  So I want to make sure that we are
15  all on the same page here.
16         When you refer to "publication
17  date," that is synonymous in your mind with
18  "on sale date"?
19     A.  Yes.  I am trying to think of a
20  circumstance in which they don't mean the
21  same thing and nothing comes to mind right
22  now.
23     Q.  There came a point in time when
24  the September 11 date then moved to
25  September 4, right?



BENJAMIN SEVIER                                    January 06, 2017
BISSONNETTE vs PODLASKI                                    177–180

Page 177

1              Sevier
2     A.    Right.
3     Q.    Who made that decision?
4     A.    The same group of people in the
5   same consultation with the author and his
6   representatives.
7     Q.    When was that decision made?
8     A.    I believe it was either Friday or
9   Monday just prior to these e-mails that you
10  are pointing out to me so that without a
11  calendar in front of me I -- I think it was
12  either -- actually, let me think.
13        Yes.  I think it was either the
14  very end of the week or the very beginning
15  of the following week right around here so
16  that would have been the 27th or the 24th.
17  I can't recall specifically.
18    Q.    Why was the publication or on sale
19  date changed to September 4?
20    A.    Because news of the book had
21  broken that media moment that we referred to
22  earlier that we were hoping to control was
23  now happening whatever this is about two
24  weeks, two-and-a-half weeks before the
25  planned publication date and since media

Page 178

1              Sevier
2   publicity and exposure are really
3   significant factors, in fact, the most
4   significant factors in selling a book like
5   this we needed the book to be on sale as
6   close to the media moment as possible.
7     Q.    So when you effectuate the change
8   in the publication/on sale date, you would
9   communicate that change in the date to the
10  sales reps at Dutton?
11    A.    Right.  The Penguin sales reps.
12    Q.    The Penguin sales reps.  How many
13  are there?
14    A.    Embarrassingly I am not sure I can
15  even ballpark that.  Off the top of my head,
16  50 people who would have been notified.
17    Q.    How did you communicate that
18  directive?  Was it a phone call, was it an
19  e-mail?
20    A.    I wouldn't have been the one to
21  communicate it so I don't know exactly.
22    Q.    Who would have communicated that
23  directive?
24    A.    It would have been the leadership
25  in the sales department at Penguin.

Page 179

1              Sevier
2     Q.    Is there a person that was in
3   charge of that at Penguin during this time
4   in August of 2012?
5     A.    Our sales director at that time
6   was a man named Dick Heffernan.
7     Q.    Dick Heffernan.  Mr. -- is
8   Mr. Heffernan still at Penguin?
9     A.    No.
10    Q.    Do you know when he left?
11    A.    Within the last few years.  He has
12  been gone, I don't know, two or three years,
13  he retired.
14    Q.    Do you recall who on the team that
15  was involved with No Easy Day communicated
16  to Mr. Heffernan the change in the
17  publication/on sale date?
18    A.    He would have been involved in the
19  decision so it would have been -- I am not
20  sure how to answer that question other than
21  he was on the team who was thinking about
22  whether this was a good idea and would have
23  helped make the decision.
24    Q.    To the best of your knowledge how
25  would Mr. Heffernan communicate that change

Page 180

1              Sevier
2   in that audible to the sales rep to change
3   the publication/on sale date from
4   September 11 to September 4?
5     A.    I don't know what the regular
6   practices were for how they do that.
7     Q.    If I needed to find that out who
8   would I ask?
9     A.    I guess you could ask Dick.
10    Q.    Do you know where Dick is?  It
11  sounds like he is retired.
12    A.    That is pretty much all I know.
13    Q.    He is on a beach somewhere in
14  Miami?
15    A.    Let's hope.
16    Q.    Who is now in charge of the media
17  department, who has taken Dick's place at
18  Penguin?
19    A.    That is a tough question because
20  we merged with another company in the
21  interim and the structure of the sales
22  department is completely different.
23        I am not sure there is an exactly
24  equivalent position to Dick's.  He was the
25  hardcover sales director at that time.  We



BENJAMIN SEVIER                                January 06, 2017
BISSONNETTE vs PODLASKI                             181–184

Page 181

1              Sevier
2  don't have any such position now.
3     Q.   The reason I am asking these
4  questions is I would like to get if it
5  exists a copy of Mr. Heffernan's e-mails if
6  he has them that relate to the change in the
7  on sale/publication date from September 11
8  to September 4 and how he communicated that
9  to his sales reps.  That is what I would
10 like.  But you can't always get what you
11 would like, you know.
12            So I want to know how I can do
13 that if it is possible and do you know how I
14 would do that?
15    A.   I guess you would have to consult
16 the documentary record or talk to someone
17 who was involved in that process.
18    Q.   How would I find that out who was
19 involved in that process other than Dick
20 Heffernan?
21    A.   You would have to do some
22 research, talk to someone perhaps who is in
23 that department now and ask them to figure
24 out if there is any record of that.
25            I can't think of any other easy

Page 182

1              Sevier
2  way to do it.
3     Q.   We will -- that is a homework
4  assignment for us.  I appreciate that.
5            But to the best of your knowledge
6  Mr. Heffernan communicated to the sales reps
7  the change in the publication/on sale -- on
8  sale date to the sales reps?
9        MS. FOLEY:  Object to the form
10       of the question.
11 BY MR. FURMAN:
12    Q.   In one form or another the message
13 was communicated to the sales reps that the
14 date of publication and on sale date
15 changed -- had changed to September 4th?
16    A.   Yes.  That had to have happened.
17    Q.   Okay.  And you are aware that it
18 did, correct?
19    A.   Yes.
20    Q.   Do you know how the sales reps
21 communicate that to the various retailers?
22    A.   Not specifically beyond that it is
23 through however whatever means they usually
24 speak with their counterparts at the
25 retailers, telephone, e-mail, I have no

Page 183

1              Sevier
2  idea.
3     Q.   Okay.  And on -- you pointed this
4  out to me so I will ask the question.
5            You had asked Mr. Podlaski to
6  comment on Navy Seal tactics from an NBC
7  comment.
8            Do you see that?
9     A.   I do.
10    Q.   Did you read his response?
11    A.   I am sure I did then.  I will read
12 it again now.
13            Okay.
14    Q.   In your response after having read
15 that was it you didn't think it would amount
16 to much, you said that in your e-mail
17 response to him on that day?
18    A.   It looks like it, yes.
19    Q.   Do you feel that way today?
20    A.   Yes.  I am no expert but that is
21 my -- that is how I feel.
22    Q.   Just getting back to
23 Mr. Heffernan, do you know who he reported
24 to, who his supervisors were at the time in
25 2012?

Page 184

1              Sevier
2     A.   I don't really remember.  He may
3  have reported to David Shanks who was our
4  CEO.
5     Q.   I don't know if I have a copy of
6  it here but it is certainly a letter you
7  received.
8            I will refer you to the Jeh
9  Johnson letter dated August 30th of 2012.  I
10 think I have a copy of it here.  If I
11 don't -- here we are.  Great memories for
12 everyone.
13            It is Exhibit Number 1 of all
14 things.  Right here it is.  Everyone's
15 favorite letter.
16       MS. HIROSE:  Thanks.
17 BY MR. FURMAN:
18    Q.   Do you remember the day that you
19 received the letter?
20    A.   Yes.
21    Q.   How did you get it?  Was it by
22 fax, someone delivered it to your office,
23 how did you get the letter?
24       MS. FOLEY:  Object to the form
25       of the question.



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
185–188

Page 185

1                    Sevier
2        THE WITNESS:  The first time I
3    saw a copy of it was that evening of
4    August 30th after I had gotten home
5    from work someone called me, I forget
6    at this point who it was to say that a
7    letter had appeared in the media that
8    was addressed to our author.
9            So the first time I saw it I
10    think was online on a news report that
11    evening.
12  BY MR. FURMAN:
13        Q.   What did you do after you saw it
14    online?
15        A.   I don't remember exactly.  But I
16    know I spoke with my publisher and with
17    Christine Ball, our associate publisher, and
18    with Elise Cheney, essentially spoke with
19    the team to try to make heads or tails of
20    this letter.
21        Q.   At a point in time a lawyer named
22    Robert Luskin came into the picture.  You
23    know who Robert Luskin is?
24        A.   Yes.
25        Q.   You met him, correct?

Page 186

1                    Sevier
2        A.   I don't know that I ever met him
3    in person that I can recall.
4        Q.   I assume you did.
5            You corresponded with him
6    obviously by e-mail.  I certainly have seen
7    that.
8        A.   Yes.
9        Q.   Did you ever talk to him on the
10    phone?
11        A.   I was on conference calls that he
12    was on.
13        Q.   When did he first come into the
14    picture?
15        A.   I believe it was, the morning
16    after this letter so that would have been if
17    my memory serves Friday morning,
18    August 31st.
19        Q.   How did he come into the picture
20    to your knowledge?
21        A.   He was hired by the author.
22        Q.   Do you know how the author found
23    him?
24        A.   I think that he was referred by
25    either Elise Cheney or the -- Peter Ragone.

Page 187

1                    Sevier
2    I think it was one of the two of them but I
3    don't know for sure.
4        Q.   Peter Ragone is a publicist,
5    correct?
6        A.   I think he is a lawyer.
7        Q.   Who does he work for?
8        A.   The last I heard he worked for the
9    DiBlasio administration.
10        Q.   Who did he work for in August of
11    2012?
12        A.   I don't know who -- he was
13    associated with a PR firm, a firm that
14    included a guy named Mark Fabiani and a guy
15    named Lehane, I forget Mr. Lehane's first
16    name.  I think that firm was called Fabiani
17    & Lehane or something like that but I am not
18    sure.
19        Q.   Who hired Fabiani & Lehane?
20        A.   I think it was Dutton.
21        Q.   Did Fabiani, Lehane and Mr. Ragone
22    all work together on No Easy Day?
23        MS. FOLEY:  Object to the form
24    of the question.
25        THE WITNESS:  What I recall is

Page 188

1                    Sevier
2    Fabiani being involved and Ragone
3    being involved.  I don't recall Lehane
4    being involved.
5  BY MR. FURMAN:
6        Q.   What did Fabiani and Ragone do for
7    Dutton?
8        A.   They advised us on how to deal
9    with the media and they advised the author
10    on something.
11        Q.   Is Mr. Fabiani a lawyer?
12        A.   I think so but I don't -- you
13    would have to confirm that.
14        Q.   You testified that Mr. Ragone is a
15    lawyer?
16        A.   That is my understanding.
17        Q.   Were they providing legal advice
18    to Dutton?
19        MS. FOLEY:  Object to the form
20    of the question.  Lack of foundation.
21        THE WITNESS:  Sorry.  Can you
22    ask the question again?
23  BY MR. FURMAN:
24        Q.   Did Fabiani and Ragone provide
25    legal services to Dutton in connection with



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
189–192

Page 189

```
 1            Sevier
 2  No Easy Day?
 3       MS. FOLEY:  To the extent you
 4  know.
 5       THE WITNESS:  To the extent that
 6  I know?
 7       MS. FOLEY:  To the extent you
 8  know you can answer.
 9       THE WITNESS:  I don't.  I don't
10  think so.
11  BY MR. FURMAN:
12     Q.   Assume that every question I ask
13  you today is to the extent that you know.
14  That is a safe assumption because if you
15  don't know something you will tell me you
16  don't know, right?
17     A.   Yes.
18     Q.   So he understands that.  I think
19  we all understand.  I am asking you
20  questions.  You will tell me if you know.
21       Have -- who at Dutton hired
22  Fabiani and Ragone?
23     A.   I don't know the answer to that
24  question in terms of who.
25     Q.   Did you do it?
```

Page 190

```
 1            Sevier
 2     A.   No.
 3     Q.   Would Christine Ball know the
 4  answer to that question?
 5     A.   She might.  I don't know.  You
 6  would have to ask her.
 7     Q.   Who did Fabiani and Ragone report
 8  to?
 9     A.   My memory is -- my understanding
10  is that we paid their bills.  But they were
11  providing services to this entire team of
12  us, the author, all of us at Dutton in terms
13  of how to handle this media firestorm.
14     Q.   So were Fabiani and Ragone brought
15  in in response to what you just described as
16  a firestorm?
17     A.   Yes.
18     Q.   The firestorm that you are
19  referring to is the issues that related to
20  the publication, sorry.  Strike that.
21       The firestorm -- let me start
22  again.
23       The firestorm you are referring to
24  relates to the government's reaction to the
25  impending publication of No Easy Day, is
```

Page 191

```
 1            Sevier
 2  that fair to say?
 3       MR. JOHNSTON:  Object to the
 4  form of the question.
 5       THE WITNESS:  What I meant by
 6  "firestorm" was all of the questions
 7  we were getting from the media about
 8  all aspects of the announcement of
 9  this publication and Matt having
10  written the book.
11  BY MR. FURMAN:
12     Q.   What about Matt having written the
13  book was as you described it a firestorm?
14     A.   Sorry?
15     Q.   What about Matt's writing of the
16  book leads you to describe it as a
17  firestorm?
18     A.   I described the media, the media
19  sort of response as a firestorm.  What I
20  mean by that is beyond the typical response
21  from media to a book publication.
22       There were questions coming from
23  Mark Hosenball, the journalist who you
24  referred to earlier, and others, relating to
25  our author's legal exposure and, frankly, it
```

Page 192

```
 1            Sevier
 2  was outside of our areas of expertise as
 3  book publishers so we brought them on to
 4  help.
 5     Q.   Who found Fabiani Lehane?
 6     A.   They were referred by Elise
 7  Cheney.
 8     Q.   What specifically, what
 9  services -- not the type of services, I
10  asked you that.  But what specifically did
11  they do Fabiani and Mr. Ragone?
12     A.   They provided advice on how to
13  deal with the media, respond to the media
14  inquiries that were coming across our desks.
15     Q.   Through -- as you described
16  through Elise Cheney or Mr. Ragone,
17  Mr. Luskin appeared on the scene, correct?
18     A.   I am sorry.
19     Q.   It was either through Elise Cheney
20  or Mr. Ragone that Mr. Luskin appeared on
21  the scene?
22     A.   My understanding is one of these
23  teams -- one of these people, somebody in
24  the core team referred our author, Matt
25  Bissonnette, to Mr. Luskin.
```



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
193–196

Page 193

Sevier

2    Q.   Did Dutton pay any of Mr. Luskin's
3   legal fees at any point in time?
4    A.   Not to my knowledge.
5    Q.   Did anyone at Penguin or anyone
6   affiliated with Dutton in any way pay
7   Mr. Luskin's fees at any point in time?
8    A.   Not that I can remember, no.
9    Q.   To the best of your knowledge
10   because I am asking you about something you
11   may not know are you aware whether or not
12   Elise Cheney paid for Mr. Luskin's legal
13   fees at any point in time?
14    A.   I have no idea.
15    Q.   What did you understand Mr. Luskin
16   to be doing when he was brought in to this
17   situation?
18    A.   Advise Matt on how to deal with
19   these questions about his actions since
20   they -- the response conflicted with the
21   legal advice he had gotten up to that point.
22    Q.   Mr. Luskin was brought in several
23   days before the on sale/publication date,
24   correct?
25    A.   Yes.  That is my memory.

Page 194

Sevier

2    Q.   Did anyone at Dutton have separate
3   conversations with Mr. Luskin to the best of
4   your knowledge including you or anyone else
5   that you worked with?
6    A.   I don't remember.
7    Q.   At any point in time have you had
8   separate discussions with Mr. Luskin
9   including today.  At any point in time have
10   you ever had a conversation with Mr. Luskin?
11    A.   When you say a "separate"
12   conversation you mean me and Luskin and no
13   one else on the telephone?  What do you mean
14   by "separate"?
15    Q.   What I mean by "separate" is
16   separate from the team.  In other words,
17   separate from the team as you described it,
18   Elise Cheney, Kevin Mauer, Kevin Podlaski,
19   Matt Owen -- I am sorry, Matthew
20   Bissonnette, other than that core of people,
21   sometimes that would include I understand
22   Ragone and Fabiani but aside from that core
23   of people have you had discussions with
24   Mr. Luskin that included only you and maybe
25   some other people from Dutton?

Page 195

Sevier

2    A.   Not that I can remember.
3    Q.   Have you ever spoken to him
4   individually?
5    A.   Not that I can remember.
6    Q.   Did Dutton retain any outside
7   legal counsel after as you described the
8   firestorm other than Fabiani and Ragone?
9       MS. FOLEY:  Objection.  I am
10      going to direct the witness not to
11      answer unless you know from a source
12      independent from conversations with
13      counsel.
14      MR. FURMAN:  Let me add to -- I
15      appreciate objections because I do
16      them all the time but the retention of
17      a lawyer is not privileged.
18      MS. FOLEY:  Right.  The
19      question -- right, you can ask him did
20      he retain a lawyer for Dutton but --
21      MR. FURMAN:  I am.
22      MS. FOLEY:  I am asking him to
23      exclude conversations he had with
24      Dutton's attorney so if he himself
25      retained an attorney he can tell you

Page 196

Sevier

2   he retained an attorney.
3       If he only knows it because --
4   if he only knows information yes or no
5   because of conversations with an
6   attorney --
7       MR. FURMAN:  That is not my
8   question.  My question is whether
9   Dutton, not just, you know --
10      MS. FOLEY:  If you know from
11   anyone besides talking to an attorney
12   at Dutton, if you are able to answer
13   the question of whether or not Dutton
14   retained any outside counsel in
15   relation to I guess the Jeh Johnson
16   letter or the publication of No Easy
17   Day you can answer.
18      THE WITNESS:  I am not going to
19   answer then.
20      MS. FOLEY:  Okay.
21  BY MR. FURMAN:
22    Q.   Did -- were you aware of any
23   lawyers acting for Dutton at any point in
24   time in relation to No Easy Day from
25   August 30th up and through say November 30th



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
197–200

Page 197

Sevier
1
2  of 2012?
3      MS. FOLEY:  Same direction.
4      MR. FURMAN:  The existence of a
5  lawyer is not privileged.  I don't
6  want to fight you on it but, you know,
7  we are -- you have to tell me how the
8  existence of a lawyer is privileged.
9      MS. FOLEY:  If you are asking
10  him to tell you information that he
11  learned from counsel for Dutton you
12  are asking him to talk about
13  privileged conversations.
14      MR. FURMAN:  I am not asking
15  that.  I am asking what he knows.  If
16  you tell me that he doesn't know that
17  lawyers were --
18      MS. FOLEY:  I am telling -- I am
19  just directing him to answer the
20  question if he can based on
21  information he learned not from
22  talking to a lawyer for Dutton.
23      So the first question he said he
24  can't answer.
25      MR. FURMAN:  But a lawyer for

Page 198

Sevier
1
2  Dutton includes a lawyer who is
3  hired -- if Winston & Strawn is hired
4  to deal with this, right, he is a
5  lawyer for Dutton so your blanket
6  objection and direction to the witness
7  is palpably improper.
8      If you are saying that this
9  witness can only have learned that a
10  lawyer was retained through -- an
11  outside lawyer through a general
12  counsel of some sort, in-house to
13  Dutton, and then never had a separate
14  conversation, never learned the
15  identity of that person, that is
16  ridiculous.  It is an absurd
17  objection.
18      I am just asking for the
19  existence of something.  I don't know
20  why I am fighting for this.  You know,
21  I am not talking about -- this is not
22  difficult stuff.
23  BY MR. FURMAN:
24      Q.  I am just asking whether you know
25  if Dutton retained outside counsel to deal

Page 199

Sevier
1
2  with the firestorm as it were as you
3  described it in connection with No Easy Day.
4  I am not asking for communications.  I don't
5  want to know that.
6      I just want to know other than
7  Mr. Luskin if any other lawyers were
8  involved.
9      MS. FOLEY:  I am going to object
10  and instruct the witness not to answer
11  if the only source of information he
12  has is from conversations with
13  counsel.
14      THE WITNESS:  Then I am not
15  going to answer.
16  BY MR. FURMAN:
17      Q.  Did you ever meet with any lawyers
18  who were not employees of Dutton that
19  related to No Easy Day?
20      A.  Can you repeat the question?
21      MR. FURMAN:  Would you mind?
22      (Record read)
23      MS. FOLEY:  Did you ever meet
24  with who were representing Dutton?
25      MR. FURMAN:  Yes.

Page 200

Sevier
1
2      MS. FOLEY:  You can answer that
3  question.
4      THE WITNESS:  I had a phone
5  call.
6  BY MR. FURMAN:
7      Q.  What law firm is that?
8      A.  I don't remember.
9      Q.  What is the name of that lawyer?
10      A.  My vague memory is that the first
11  name -- there were two attorneys, and that
12  their first names were Dean and Susan.  I
13  couldn't swear to that.
14      Q.  Let's use Dean and Susan for now.
15  We can always fill in the blanks later.
16      Is there a way that you could
17  search your files and get the real name of
18  Dean and Susan?
19      A.  I can certainly search the file.
20  I don't know if it would be in my files.
21      Q.  Were Dean and Susan involved in
22  any conference calls with people other than
23  Dutton employees to the best of your
24  knowledge?  Were you involved in any
25  meetings or telephone conferences with Dean



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
201–204

Page 201

1          Sevier
2    and Susan that involved people outside of
3    Dutton?
4        A.   I have no idea.  I don't know.
5        Q.   Do you know whether or not Dean
6    and Susan and their law firm communicated in
7    any way with Mr. Luskin?
8        A.   I don't know.
9        Q.   Were Dean and Susan part of
10   Mr. Luskin's firm, do you know?
11       A.   I don't think they were.
12       Q.   Going back to Exhibit 108.
13       A.   Can we take a two-minute comfort
14   break?
15           MR. FURMAN:  Sure.
16           (Recess)
17   BY MR. FURMAN:
18       Q.   So in 108, if you can take a look
19   at page 60.
20       A.   Okay.
21       Q.   This is after the Jeh Johnson
22   letter, Matt Bissonnette wrote to you,
23   copied several others and he was saying he
24   was in for a meeting and then he referring
25   to Kevin Podlaski said, "From the looks of

Page 202

1          Sevier
2    the documents apparently I did sign some
3    sort of SAP program documents."
4        Do you see that?
5        A.   Yes.
6        Q.   Did you know what he was referring
7    to?
8        A.   He is referring to the documents
9    that are -- were attached to Jeh Johnson's
10   letter.
11       Q.   Once you learned that there were
12   some agreements that were signed by
13   Mr. Bissonnette that related to his
14   obligations to the government did you have a
15   discussion about what to do next with
16   anyone?
17       A.   Yes.  We had many discussions.
18       Q.   Who did you speak with?
19       A.   I spoke with Brian Tart, my
20   publisher, with Christine Ball, with the
21   whole team.  We all talked about it.
22       Q.   The question was whether -- what
23   was the question?  What was the decision
24   tree at that point?
25       A.   The first question was could this

Page 203

1          Sevier
2    possibly be true because it was in direct
3    opposition to what we had believed and
4    what -- the legal advice that Matt got that
5    led us to so we were trying to figure out if
6    it was right.
7        Q.   Based on the e-mail that I
8    referred you to is it fair to say that
9    Mr. Bissonnette is telling Kevin Podlaski
10   for the first time that he signed some
11   documents?  This is from the first.
12           MS. FOLEY:  Object to the form
13   of the question.
14   BY MR. FURMAN:
15       Q.   From the first sentence.
16           MR. JOHNSTON:  Objection.
17   Foundation.
18           MS. FOLEY:  Objection.
19   BY MR. FURMAN:
20       Q.   I will establish a foundation.
21           Do you know whether or not
22   Mr. Bissonnette signed any nondisclosure
23   agreements with the government?
24           MS. FOLEY:  Object to the form
25   of the question.  Lack of foundation.

Page 204

1          Sevier
2           MR. JOHNSTON:  Object.  Lack of
3    foundation.
4           THE WITNESS:  Do I know that
5    today?  Yes.
6    BY MR. FURMAN:
7        Q.   Because you got the Jeh Johnson
8    letter, right?
9        A.   For various reasons I know that
10   now.
11       Q.   Okay.  But the Jeh Johnson is one
12   sure fire way you would know it, right?
13       A.   Well, no, I don't know what these
14   documents mean.  Some of them were actually
15   written as I recall with classified symbols
16   of things that aren't even in the English
17   language so.
18           No.  This means nothing to me but
19   I have come to learn in the month and year
20   since this all happened that apparently Matt
21   did sign agreements since they took all of
22   his money away.
23       Q.   I will use the term agreements,
24   not disclosure agreements just so that I can
25   ask you questions.  I appreciate that you



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
205—208

Page 205

1              Sevier
2    know fine points of what that means.
3      A.    Right.
4      Q.    But were you aware before
5    August 30th of 2012 that Matt Bissonnette
6    had signed any nondisclosure agreements with
7    the government?
8      A.    I knew only what Matt told me
9    which as I recall was, I am not sure what I
10   signed, I signed documents when I joined the
11   military, he made statements of that nature
12   to me and not being an expert on what one
13   signs joining the military or any other
14   point I didn't know nor did I have any
15   reason to know what those agreements would
16   have been.
17     Q.    All right.
18           Now, I asked you about a decision
19   tree.  What decisions, if any, did Dutton
20   have to make at that point in time on
21   receipt of the August 30th letter?
22     A.    We had to decide whether to
23   proceed with our meticulously planned and
24   very robust media schedule for the book's
25   publication and if we were going to alter it

Page 206

1              Sevier
2    in what way we were going to alter it to
3    protect our author.
4            We were very concerned at that
5    time about Matt's security, so we were
6    making decisions about paying for personal
7    security for him and I think if I remember
8    right for his family.
9            There were lots of decisions being
10   made.
11     Q.    In the letter, Exhibit 1, if you
12   could turn to it, I want to focus your
13   attention, it is right in front of you, to
14   the second full paragraph and --
15           MR. JOHNSTON:  I apologize.  I
16   missed the reference.  Where are we?
17           MR. FURMAN:  We are on Exhibit
18   Number 1, Jeh Johnson's letter.
19           MR. JOHNSTON:  Sorry.
20           MR. FURMAN:  It is okay.  I am
21   trying to deceive you like
22   intentionally.
23   BY MR. FURMAN:
24     Q.    We are in the second paragraph and
25   we are at the last sentence of the second

Page 207

1              Sevier
2    paragraph.
3            It states, "Further public
4    dissemination of your book will aggravate
5    your breach in violation of your
6    agreements."
7            Do you see that?
8      A.    Yes, I do.
9      Q.    Now was part of the decision for
10   Dutton whether or not on August 30th to
11   change the on sale and publication date
12   based on this letter?
13     A.    No.  That decision had been made
14   before we got this letter.
15     Q.    Now you -- previously Dutton had
16   made the decision to change the on sale and
17   publication date from September 11th to
18   September 4th, correct?
19     A.    That's right.
20     Q.    Upon receipt of this August 30th,
21   2012 letter did Dutton consider changing the
22   on sale and publication date to a point in
23   time after September 4th of 2012 given this
24   letter from Jeh Johnson?
25     A.    I don't remember that being a

Page 208

1              Sevier
2    conversation at all because it was
3    impossible at that point to make such a
4    decision as far as we were concerned.
5      Q.    I want to talk about impossibility
6    because you said as far as Dutton was
7    concerned it was impossible, is that --
8      A.    Yes.  The books were out,
9    reporters had legally or against our embargo
10   obtained copies in bookstores I believe at
11   this point.  The book was published.  I
12   mean, yes, it had not adhered to our
13   publication date and our on sale date, even
14   the revised 9/4, but, as I said before, a
15   half million copies what ultimately became,
16   you know, the biggest book of the moment
17   were already out there in the world.  People
18   had their hands on them.
19           The government appears by this
20   letter to have bought a copy of his book or
21   otherwise found a copy of the actual book so
22   the book was published, it was out.
23     Q.    Mr. Johnson's letter says in
24   fairly plain language in that sentence I
25   referred you to, he used the term "further



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
209–212

Page 209

Sevier
1
2  public dissemination."
3    Do you see that?
4    A.   Yes, I do.
5    Q.   Could Dutton at that point in time
6  changed its instruction to the various
7  retailers through its sales rep, through
8  Mr. Heffernan to change the publication and
9  on sale date to a future date at that point
10  in time, yes or no?
11    A.   Practically speaking?
12    Q.   I am not asking you practically.
13  Whether they could do it, yes or no?
14    A.   Whether they could have asked --
15  they could have said, sorry, it is not on
16  sale 9/4.  Instead the publication date is
17  some other date.
18    I suppose hypothetically I don't
19  see why they couldn't make that request.
20    Q.   The way that Dutton executes its
21  on sale date and publication date is by
22  communicating to its retailers the date that
23  it wishes to do it and in your terms it was
24  a strict date.  Correct?
25    A.   That's right.

Page 210

Sevier
1
2    Q.   And there was nothing preventing
3  other than commercial aspects which we will
4  get into but there was nothing preventing
5  Dutton from making a decision to change the
6  date from September 4th of 2012 to change
7  the communication at least to the retailers
8  to a later date for its publication and on
9  sale date given Mr. Johnson's letter,
10  correct?
11    MS. FOLEY:  Object to the form
12  of the question.  Asked and answered.
13    THE WITNESS:  The horse had left
14  the barn is the only way I can put
15  it.
16    By Friday morning which is one
17  half business day before the book's on
18  sale date on Tuesday, the 4th, which
19  the day after the holiday weekend and
20  the early close by Penguin on Friday,
21  the 31st, a decision like that would
22  have had to have been made in the
23  three, three-and-a-half hours we were
24  open for business on Friday and then
25  communicated in some way to many

Page 211

Sevier
1
2  thousands of retailers across the
3  country who would then have to ingest
4  that information, discuss it with the
5  many probably tens of thousands of
6  book sellers who would have been in
7  charge of putting the books out over
8  the weekend so they were there for
9  that sale date on Tuesday morning when
10  they opened.
11    That is what I mean when I say I
12  don't think practically we could have
13  so I don't recall after this letter
14  came that we had any discussions about
15  it.
16  BY MR. FURMAN:
17    Q.   I appreciate that you are
18  providing me with the -- some practical
19  considerations that you believe would have
20  happened and I am not asking you about that
21  so I am going to move to strike your answer
22  as not responsive to my question.
23    My question to you is upon receipt
24  of this letter and you can answer this
25  simply just yes or no whether or not Dutton

Page 212

Sevier
1
2  could have changed the on sale and
3  publication date?
4    MS. FOLEY:  Object to the
5  question.  Asked and answered.
6    THE WITNESS:  No is my answer.
7  BY MR. FURMAN:
8    Q.   Your answer is that it would have
9  been impossible for Mr. Heffernan to
10  communicate -- let me backtrack and let me
11  just ask a different question.
12    The communications by 50 sales
13  reps, they would either take place either by
14  phone call or e-mail to the best of your
15  knowledge?
16    A.   Most likely that is right, yes.
17    Q.   Are you saying that that
18  communication couldn't happen in one single
19  day?
20    MS. FOLEY:  Objection to the
21  form of the question.
22  BY MR. FURMAN:
23    Q.   I am talking about the
24  communication.  I am not talking about the
25  practical aspects of it.  That's -- you don't



BENJAMIN SEVIER                                          January 06, 2017
BISSONNETTE vs PODLASKI                                       213–216

Page 213

1              Sevier
2   know, you are not a retailer, right?
3       A.   No, I am not although I have
4   worked in bookstores.
5       Q.   So if you are -- you have no
6   knowledge of what Barnes & Noble in Union
7   Square would have done on September 4th at
8   4:59 p.m. if they got the communication from
9   Dutton stop the presses, don't release the
10  book.  You don't know what they would have
11  done, right?
12      A.   No.  I have two decades of
13  experience in thinking about issues and how
14  these things work but, no, I don't know how
15  they would have done it or what they would
16  have done or what they are capable of.
17      Q.   When I take that one bookstore,
18  which is the one I know, and I then apply
19  that same question to every bookstore that
20  would have been receiving copies of this
21  book, you don't know one way or another, do
22  you, whether they could have followed,
23  adhered to a directive from Dutton, correct?
24  You are speculating but you don't know?
25          MS. FOLEY:  Object to the form

Page 214

1              Sevier
2   of the question.
3          THE WITNESS:  In my opinion
4   based on my experience --
5   BY MR. FURMAN:
6       Q.   I am not asking your opinion
7   because you have to answer my questions.
8       A.   Can you repeat the question?
9       Q.   I am asking whether you know.
10      A.   Can you repeat the question
11  please?
12      Q.   Sure.
13          Take what I just asked you about
14  Union Square at 3:59 p.m. on August 30th,
15  2012 whether every single bookstore
16  throughout the country and throughout the
17  world received the same directive from
18  Penguin/Dutton, stop, don't sell the book,
19  you don't know whether or not they could
20  have followed through on that directive, yes
21  or no?
22      A.   No.
23      Q.   If at -- I keep changing the time
24  but I am just trying to make a point here.
25          At 2:59 p.m. on August 30th of

Page 215

1              Sevier
2   2012 --
3       A.   Can I just point out that you are
4   talking about a time before we received the
5   Jeh Johnson letter so do you actually mean
6   August 31st or do you mean August 30th
7   before we received this letter?
8       Q.   Yes.  That is a fair point, Mr.
9   Sevier.
10          So maybe I should ask you this.
11  Do you know when this fax, if it was
12  received by fax, was received by Mr. Gigante
13  at Penguin?
14      A.   I know exactly when the first
15  Penguin employee received this fax because
16  it was me.
17      Q.   When was that?
18      A.   It was the evening after hours on
19  August 30th sometime after 8:00 p.m. after
20  we read it in the media and saw that it was
21  addressed to our author, in care of Alex
22  Gigante.  I took a cab back to the office
23  and found the fax.
24      Q.   So you got to the office pretty
25  late on August 30th and saw the fax sitting

Page 216

1              Sevier
2   there on the fax machine?
3       A.   That's right.
4       Q.   10:00 at night that evening.
5          I appreciate that Dutton can't
6   tell Barnes & Noble on Union Square what to
7   do, a sales clerk can do whatever they like.
8   But as far as Dutton's ability to control
9   its own destiny, at that moment when you
10  received that fax as the editor in chief of
11  Dutton could you have then effectuated a --
12  an order that would have directed the
13  stopping and altering of the September 4th,
14  2012 on sale publication date?
15      A.   No.  I did not have that power.
16      Q.   Who had that power?
17      A.   My feeling is that the only person
18  who would have been empowered to make a
19  decision like that would have been our CEO,
20  David Shanks.
21      Q.   Were you able to communicate with
22  Mr. Shanks?
23          Can you spell that?
24      A.   S-H-A-N-K-S.
25      Q.   I am assuming you didn't



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
217-220

Page 217

Sevier
1
2  communicate with Mr. Shanks that evening,
3  did you?
4      A.   I don't remember speaking with
5  David that evening, no.
6      Q.   Did you speak to David at any
7  point in time before September 4th, 2012?
8      A.   I don't have any recollection of a
9  conversation with him.
10     Q.   Could you have reached out to
11 Mr. Shanks at any point in time from
12 September 30th that evening up until
13 September 4th, 2012 if you wanted to?
14     A.   August 30th.
15     Q.   August 30th of 2012 to
16 September 4th, 2012?
17     A.   I would have been going outside
18 the chain of command.  He was three -- at
19 least three levels above me.  It would have
20 been highly unusual.
21          Am I capable of making a phone
22 call, yes.
23     Q.   Let's take the chain of command.
24          You said you are incapable of
25 making that decision.

Page 218

Sevier
1
2          Who in the chain of command at
3  Dutton would you have spoken to?  Who would
4  you have spoken to to comply with
5  Mr. Johnson's letter of August 30, 2012?
6      A.   Well, my boss, the publisher,
7  Brian Tart would have been my first phone
8  call.
9      Q.   Did you speak with Mr. Tart about
10 complying with the August 30th, 2012 letter
11 from Jeh Johnson?
12     A.   I am not sure what you mean by
13 "comply."
14     Q.   I am talking about the language
15 that says, "Further dissemination of the
16 book will aggravate your breach in violation
17 of your agreements."
18     A.   The letter is addressed to Mark
19 Owen, not to Penguin, first of all, but
20 setting that aside did I have a conversation
21 with Brian about finding some way to get
22 around as I have said the impossible,
23 practical considerations to somehow stop
24 publication of book that was essentially
25 already published, I have no specific memory

Page 219

Sevier
1
2  of that.
3          If it were to come up in that
4  circumstance I am telling you practically
5  speaking it would have been dismissed
6  immediately as impossible.
7      Q.   Now what if Mark Owen -- Matthew
8  Bissonnette, on August 30th that evening,
9  said to you "Hey, Ben, stop publication of
10 the book," what would have happened?
11          MS. FOLEY:  Objection.  Calls
12 for speculation.
13          MR. FURMAN:  Obviously.
14          THE WITNESS:  I suppose I would
15 have relayed that communication to the
16 chain of command I referred to
17 earlier.
18 BY MR. FURMAN:
19     Q.   And what if at any point in time
20 before September 4th of 2012 Mr. Luskin had
21 advised Mr. Owen/Mr. Bissonnette that the
22 book should not be published what you would
23 have been able to do?
24          MS. FOLEY:  Objection.  Calls
25 for speculation.

Page 220

Sevier
1
2          THE WITNESS:  I feel I have
3  answered that question already.  It
4  wouldn't have been any different from
5  what I said previously.
6  BY MR. FURMAN:
7      Q.   Did anyone tell you not to publish
8  the book?
9      A.   Not that I recall.
10     Q.   Did Mr. Bissonnette say stop
11 publication of the book?
12     A.   Not that I recall.
13     Q.   Did Mr. Podlaski say don't publish
14 the book?
15     A.   No, he did not.
16     Q.   Did Mr. Luskin say don't publish
17 the book?
18     A.   Not that I recall.
19     Q.   Did either Mr. Fabiani or
20 Mr. Ragone say don't publish this book?
21     A.   Not that I recall.
22     Q.   So the book was published on
23 September 4th of 2012 pursuant to the on
24 sale and publication date, correct?
25          MS. FOLEY:  Object to the form



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
221–224

Page 221

1               Sevier
2     of the question.  Mischaracterizes the
3     testimony.
4          MR. JOHNSTON:  Or alternative
5     objection, asked and answered.
6          THE WITNESS:  The book was on
7     sale on September 4th, 2012.
8 BY MR. FURMAN:
9     Q.   Whose decision was it to proceed
10 with the publication and on sale date of
11 September 4th after the September 30th, 2012
12 letter?
13     A.   The August 30th, 2012 letter as I
14 have said, we didn't make that decision.
15 The book was essentially already published
16 before we received this letter.
17     Q.   If -- in Exhibit 108 turn to page
18 87.  I am referring to an August 31st e-mail
19 at 12:00 p.m.  That is the Friday.
20        You were working on that day,
21 correct?
22     A.   Yes, I was.
23     Q.   I take it to the best of your
24 knowledge Mr. Heffernan was working on that
25 day?

Page 222

1               Sevier
2     A.   I actually have no idea.  It would
3 be fairly typical of Dick to have taken that
4 day off for the holiday.
5     Q.   The sales force people were there?
6     A.   Some, others would have been away
7 for the holiday weekend.
8     Q.   Your e-mail of that day at 12:00
9 p.m. says "The publisher's priority is to
10 get that strong letter out as soon as
11 possible."
12        Do you see that?
13     A.   I do.
14     Q.   And the "strong letter" I am just
15 going to refer you to page 89 of Exhibit
16 108.
17     A.   Okay.
18     Q.   Is that the strong letter you are
19 referring to in your e-mail?
20     A.   I believe it is.
21     Q.   Exhibit -- page 89 of Exhibit 108,
22 the letter written by Mr. Luskin, did you
23 review it before it was sent out to
24 Mr. Johnson?
25     A.   I think we did.  I think I did but

Page 223

1               Sevier
2 I don't have a specific memory of it right
3 now.
4     Q.   Since the letter as you described
5 it, the August 30th letter by Mr. Johnson
6 was directed to the author and not to Dutton
7 why were you included in the response in the
8 formulation of the responsive letter?
9     A.   I guess it would have been at the
10 author's request as we looked at a previous
11 e-mail that I was gathering this team
12 including the lawyers for a call at 10:00
13 a.m. this morning where I believe we
14 discussed this letter at Matt's request.
15     Q.   In your e-mail referring to the
16 letter you wrote that it was the publisher's
17 priority to get that letter out.  Why was it
18 a priority of Dutton?
19     A.   Because we were very concerned for
20 our author.  And we wanted -- we still
21 believed at this point that we were in the
22 right and that Matt had done nothing wrong
23 per Podlaski's advice and his continuing
24 advice and we thought we were correcting the
25 record by getting a letter like this out

Page 224

1               Sevier
2 that said, sorry, Mr. Johnson, you have your
3 facts wrong.
4     Q.   I understand that you mentioned
5 that you were concerned for the author but
6 your relationship with the author was based
7 on a contract, correct?
8     A.   That was one of the aspects of our
9 relationship.
10     Q.   As it relates to the book other
11 than your personal relationship with
12 Mr. Bissonnette, putting that aside, I am
13 talking about your -- Dutton's commercial
14 relationship with Mr. Bissonnette was via a
15 contract, right?
16     A.   Yes, but the contract in the
17 publishing business does not always control
18 our actions.  It is a business full of human
19 beings.  I mean we cared a lot about our
20 author.
21     Q.   So is it fair to say that at least
22 from a commercial perspective that the
23 publisher has an interest in the book being
24 published, right?  You wanted to make money?
25     A.   That is fair.



Page 225

1              Sevier
2     Q.   Okay.  And so when you talk about
3   the priority is it only because of your
4   concern for Mr. Bissonnette's well being or
5   is it also because of the publisher's
6   priority as it relates to its commercial
7   success?
8          MS. FOLEY:  Asked and answered.
9   BY MR. FURMAN:
10     Q.   I didn't ask him that.
11         You can answer it.  Mr. Sevier,
12   you can answer it.
13     A.   I am fairly sure I already
14   answered that question.
15     Q.   Like having a battle over nothing.
16         You can answer the question.
17         MS. FOLEY:  You can answer the
18   question.
19         THE WITNESS:  Can you repeat the
20   question then, I have forgotten it.
21         (Record read)
22         THE WITNESS:  This letter as far
23   as I can tell is in response to a
24   letter from Jeh Johnson, the U.S.
25   Government to Mark Owen about his

Page 226

1              Sevier
2   personal legal liability.
3         Nobody at this point had
4   addressed Penguin officially in any
5   way.
6         We had no communication from the
7   government asking us to take any
8   action and so I say -- in the e-mail
9   where I say the priority is to get
10   that letter out is about our
11   relationship with Matt and wanting him
12   to be protected by his high power
13   attorney who has come on board hours
14   earlier.
15   BY MR. FURMAN:
16     Q.   In that e-mail of August 30, 31st
17   at 12:00 p.m. you wrote that we have --
18     A.   Which e-mail?
19     Q.   Of course.  Page 87.
20     A.   Okay.
21     Q.   You write, "We have no further
22   updates except to execute the strategy we
23   agreed on this morning."
24         What strategy are you discussing?
25     A.   I think it was getting the letter

Page 227

1              Sevier
2   out.
3     Q.   What is the strategy behind
4   getting the letter out.  What is the purpose
5   of it?
6     A.   To correct the misinformation that
7   we felt and were being told by Kevin
8   Podlaski was out there in the media reports
9   and in Jeh Johnson's letter.
10     Q.   Mr. Luskin wrote that letter,
11   correct, the responsive letter which you are
12   referring to as on page 89 and 90?
13     A.   His name is at the bottom of it.
14     Q.   To the best of your knowledge
15   Mr. Luskin was representing Matt
16   Bissonnette, correct?
17     A.   Absolutely.
18     Q.   To the extent that you know it
19   understood Mr. Luskin had full access to his
20   client, right?
21     A.   Yes.
22     Q.   So the information and the
23   response to Mr. Johnson's letter of
24   August 31st of 2012, this is Mr. Luskin's
25   work isn't it, fair to say?

Page 228

1              Sevier
2         MR. JOHNSTON:  Object to lack of
3   foundation.
4         THE WITNESS:  I don't know who
5   he might have had help him draft it
6   but it is on his letterhead and it has
7   his name at the bottom of it.
8   BY MR. FURMAN:
9     Q.   If you could turn to page 66 of
10   the document 108.
11         There is an e-mail dated
12   September 7th of 2012 at 10:49 p.m. and it
13   is from -- 10:49 a.m., excuse me.  It is
14   from Mr. Luskin and addressed to several
15   people including you.
16         And it states, "Agreed with
17   Kevin"-- "Agree with Kevin the ball is very
18   conspicuously in DOD's court in their
19   silence in response to our invitation for
20   evidence that Mark signed an SCI
21   applicable," it is misspelled but he meant
22   to say "applicable to Neptune is truly
23   deafening.  I think we are just fine with
24   the status quo.  If this is the best they
25   can come up with and they are circulating it



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
229–232

Page 229

Sevier

1
2  publicly rather than as a response to us
3  directly we are doing just fine."
4      Do you see that?
5    A.  Yes, I do.
6    Q.  Is this advice that Mr. Luskin is
7  giving you?
8    A.  I would have to read the chain of
9  e-mail in the context around it so to really
10  answer that question.
11    Q.  Feel free to do that.
12    A.  Okay.  This looks like a piece of
13  advice to the whole team working on Matt's
14  behalf.
15    Q.  The reason I am asking that
16  question is because the e-mail that precedes
17  it on page 66 at 10:41 a.m. is from you and
18  you correct an e-mail address so that
19  Mr. Luskin is involved and that is why I am
20  asking you since you -- you were the only
21  person that -- of the group who wanted
22  Mr. Luskin's involvement apparently I want
23  to know why that is.
24      MR. JOHNSTON:  Object to the
25    form of the question.

Page 230

Sevier

1
2      THE WITNESS:  I disagree with
3    that contention completely.
4  BY MR. FURMAN:
5    Q.  Okay.  So explain to me.  Maybe I
6  am misinterpreting.
7    A.  The way I see it I think he had
8  misspelled Mr. Luskin's name in a previous
9  e-mail and so I was -- I noticed that.  As
10  an editor I look for things like
11  misspellings and so I corrected it because
12  he had intended Luskin to be on it.
13    Q.  Why?  So is that the reason why
14  because of a misspelling?
15    A.  As far as I know.  I can't see the
16  misspelling now but that happens frequently
17  in group e-mail chains and that is typically
18  what I do.
19    Q.  That is a good spot because I
20  think you are right, there is a missing G.
21    A.  There you go.
22    Q.  I can't believe it.
23      MR. JOHNSTON:  I am going to
24    miss my flight over that.
25      MR. FURMAN:  I thought I had

Page 231

Sevier

1
2    something there.  I really did.
3  BY MR. FURMAN:
4    Q.  Was there -- Mr. Sevier, was there
5  anything in the contract that governed your
6  relationship between Dutton and the author
7  that would have prevented you from changing
8  the publication date from September 4th of
9  2012 to a later date in view of the
10  August 30th, 2012 letter?
11    A.  Nothing comes to mind.  I would
12  have to read the whole contract to answer
13  that definitively.
14      Sometimes authors have approval
15  over a publication date.  I don't know if
16  that is true in this case.  So in that case
17  we would have had to consult with the author
18  and get his okay.  Other than that, I can't
19  think of a contractual reason that we would
20  not have been able to make a decision on
21  that.
22    Q.  Are you aware whether or not a
23  clause was proposed in the contract, not
24  accepted but proposed, that would have
25  protected the author if the publisher chose

Page 232

Sevier

1
2  to submit the book for a prepublication
3  review?
4    A.  I am sorry.  Can you repeat the
5  question?
6    Q.  Sure.
7      Are you aware of whether or not
8  there was a proposal that emanated through
9  Mr. Podlaski through the contract that would
10  have protected the author if the publisher
11  had chosen to submit the book for a
12  prepublication review?
13    A.  I have no memory of that.
14    Q.  If I told you that that was
15  proposed would that -- is it that one way or
16  another would that surprise you?
17    A.  It wouldn't be particularly
18  surprising, no.
19    Q.  Do you have any recollection of
20  rejecting that proposal?
21    A.  I don't.
22    Q.  I am going ask you some questions,
23  you may not have the answer to them but I
24  would like to know if you don't have the
25  answer and for the purposes of saving some



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
233–236

Page 233

1           Sevier
2   time let me know the best source for finding
3   this information.
4        Are sales of No Easy Day
5   continuing as of today?
6   A.   Yes.
7        Q.   How is that being tracked so I
8   know the source of finding that information.
9   Is that through Elise Cheney so if a sale
10  took place over the Christmas holiday Elise
11  Cheney would know that information?
12  A.   Well, Elise Cheney's royalty
13  statements would be behind real time sales
14  by as much as six months depending on where
15  today falls in her royalty cycle.
16       I don't have that information but
17  she would have royalty statements complete
18  through the last cycle which is up to six
19  months ago.
20       Q.   Have you had any projections made
21  for any future book sales of No Easy Day?
22  A.   Have I had any made?
23  Q.   Yes.
24  A.   I would say, no to that.
25  Q.   Would that even be possible to do?

Page 234

1           Sevier
2   A.   I mean you can model sales and you
3   can come up with estimates and --
4        Q.   How would you do that?
5   A.   You take into account the current
6   rate of sale, rates of sale of other books
7   that are either similar or for the same
8   audience over time and then you make a
9   judgment based on whatever knowledge you
10  have, belief you have about book publishing
11  and the retail environment and the interest
12  of the American public and you come up with
13  an estimate.
14       Q.   And so it would not be based on
15  hard information. It would be based on some
16  experience level and some guesswork in terms
17  of trying to determine what interest would
18  be in the future in a particular book that
19  has been out on the shelves for several
20  years?
21       MR. JOHNSTON:  Object to the
22  form of the question.
23       THE WITNESS:  I wouldn't use the
24  word "guesswork."
25       I would say you can make

Page 235

1           Sevier
2   educated judgments about what you
3   think a book will sell. In fact we do
4   that everyday in our business because
5   it is our job to keep enough books in
6   stock at retailers in order to meet
7   demand. And so that is something that
8   we do all the time.
9   BY MR. FURMAN:
10       Q.   Has that been done for No Easy
11  Day?
12  A.   Sure. I guess in that respect we
13  have the book modeled at various retailers
14  to make sure that it is in stock and
15  available to buy when people want it.
16       Q.   How would I get a copy of that
17  modeling or information about that modeling?
18  A.   I actually do not know the answer
19  to that question. Some computer system has
20  that I suppose.
21       Q.   I am sorry?
22  A.   Some computer system would have
23  that I suppose but I don't have access to it
24  as far as I know.
25       Q.   We know that computers are

Page 236

1           Sevier
2   complicated things but who at Dutton would
3   know where on the computer system I would
4   find that if I were to ask for it?
5   A.   Our sales department is in charge
6   all of that kind of stuff so the Penguin
7   sales department would be the ones who are
8   controlling those models.
9        Q.   If you wanted to find that out who
10  would you call at the sales department?
11  A.   I would start with one of our in
12  print sales directors.
13       Q.   Who would you call?
14  A.   Probably a guy named Dandy Dudley.
15       Q.   Dandy?
16  A.   Andy Dudley.
17       Q.   Dudley, D-U-D-L-E-Y?
18  A.   Yes.
19       Q.   Anyone else? If Andy is on
20  vacation who else would you call?
21  A.   I guess I would call his boss, the
22  group sales director. His name is Loren
23  Monaco.
24       Q.   They work for Penguin?
25  A.   That's right.



Page 237

Sevier

1
2    Q.    So their employer is Penguin, not
3  Dutton?
4    A.    Right.  Penguin Random House if
5  you really want to get specific.
6    Q.    And so if I were to ask them for
7  any modeling that they have for projected
8  future sales of No Easy Day, if you were me
9  you would call them?
10   A.    That is my best guess.  I can't
11  promise they can deliver it for you but that
12  is who I would start with if it were me and
13  I were trying to accomplish that.
14   Q.    Are you aware in one way or
15  another than learning it through
16  lawyers whether Mr. Bissonnette forfeited
17  any of the royalties from No Easy Day to the
18  government?
19   A.    Yes.  He told me.
20   Q.    When did he tell you this?
21   A.    You know that settlement was in
22  progress for so long that I can't even
23  recall when the final word came down about
24  that.
25   Q.    Did the government, I don't need

Page 238

Sevier

1
2  to know -- go into details about any
3  attorney-client information but do you know
4  one way or another if the government
5  investigated Dutton in connection with the
6  release of No Easy Day?
7    A.    I don't know.  I have never seen
8  any evidence or heard that they did.
9    Q.    Did Dutton forfeit any profits or
10  make any settlement with the government in
11  connection with the release of No Easy Day?
12   A.    No.
13   Q.    Is Dutton still selling and
14  earning income based on No Easy Day?
15   A.    Yes.
16   Q.    Do you know any round number for
17  the last year, 2016?
18   A.    I would have to look it up.  I
19  don't know the number.
20       MR. FURMAN:  I think I am done.
21  I just want to step outside with
22  Izabell and ask her a few questions.
23       (Recess)
24  BY MR. FURMAN:
25   Q.    Just a few more questions on one

Page 239

Sevier

1
2  area.
3    Q.    Did there come a point in time
4  after August 30th, 2012 when you or anyone
5  at Dutton came to the determination that the
6  book should have been submitted for
7  prepublication review?
8    A.    I wouldn't say anybody came to a
9  determination about that, no.
10   Q.    If the book was submitted for a
11  prepublication review do you know one way or
12  another what would have happened?
13   A.    In what sense?
14   Q.    What the government would have
15  decided.
16   A.    No.
17       MR. FURMAN:  All right.  I have
18  no further questions.
19       We are going to follow up with
20  some -- we will talk with your lawyers
21  for some of the information we were
22  looking for in terms of book sales and
23  other things that were on the record
24  but I want to thank you, Mr. Sevier,
25  for your time and your patience with

Page 240

Sevier

1
2  us in this deposition.  Thank you.
3       THE WITNESS:  You are welcome.
4           EXAMINATION
5  BY MR. JOHNSTON:
6    Q.    Mr. Sevier, there are a few
7  subjects that I want to ask you, kind of
8  isolated questions on some, probably be
9  jumping around a little bit.
10   A.    Okay.
11   Q.    With regard to the contract with
12  Mr. Bissonnette my understanding is that
13  through you -- through the contract
14  negotiations Dutton agreed to pay a million
15  dollar advance for this book, correct?
16   A.    That's right.
17   Q.    At the time that you agreed to pay
18  that million dollar advance did you know
19  whether or not the book would be submitted
20  to a prepublication review?
21   A.    No, we did not.
22   Q.    Did you pay that advance with the
23  understanding that it might be submitted to
24  a prepublication review and the delay
25  intendant to such a review?



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
241–244

Page 241

1            Sevier
2        MS. FOLEY: Objection to the
3    form of the question.
4        THE WITNESS: I would say we
5    entered into the agreement knowing
6    that it might have to go through
7    review.
8    BY MR. JOHNSTON:
9        Q.   Ultimately a paperback version of
10   the book was also published, correct?
11       A.   Yes.
12       Q.   My understanding is that the
13   paperback version came out later than is
14   normal, is that understanding accurate?
15       A.   Yes. It came out later than a
16   typical book's public reprint -- a paperback
17   reprint would have come out. Yes, that's
18   right.
19       Q.   Why is that?
20       A.   That determination would have been
21   made by the sales department based upon
22   factors like the rate of sale of hardcover,
23   I think that is the best answer I can
24   give you.
25       Q.   Okay. Let me ask this. Is the

Page 242

1            Sevier
2    fact that the paperback version was
3    published later than is normal, is that some
4    evidence of the fact that the hard copy was
5    still selling well?
6        A.   Yes.
7        Q.   There has been some discussion
8    today about a prepublication review and the
9    fact that that would have impacted and
10   perhaps delayed the publication date of the
11   book. And that that would have therefore
12   have impacted sales. I want to talk about
13   that subject generally with you.
14       If you accept that a
15   prepublication review would have delayed the
16   publication and had a negative impact on
17   sales let me ask you would Mr. Bissonnette
18   being able to promote the book unencumbered
19   have had a positive effect on book sales?
20       A.   Yes.
21       Q.   Would him be able -- him being
22   able to promote the paper book have had a
23   positive impact on paper book sales?
24       A.   Yes.
25       Q.   If it had occurred that movie

Page 243

1            Sevier
2    rights for the book had resulted in the
3    preparation of a movie, would that have had
4    an impact on book sales?
5        MR. FURMAN: Objection.
6        THE WITNESS: Yes.
7    BY MR. JOHNSTON:
8        Q.   If he had been able to promote the
9    book No Easy Day in connection with the
10   publication of his second book No Hero would
11   that have likewise had an impact on book
12   sales?
13       A.   Yes.
14       Q.   And with regard to all of those I
15   should ask, would the impact on book sales
16   have been positive, that is more book sales?
17       A.   Yes.
18       Q.   If someone were -- I want to
19   change subjects on you for a minute.
20       If someone were to suggest at the
21   trial of this case that Dutton moved the
22   publication date in response to the Jeh
23   Johnson letter what would you say?
24       A.   That is factually incorrect.
25       Q.   Is it accurate to say that the

Page 244

1            Sevier
2    publication date was moved from the 11th of
3    September to the 4th of September before the
4    Jeh Johnson letter had even been received?
5        A.   Yes.
6        Q.   What were the reasons for the
7    change of the publication date?
8        A.   The news story had broken two
9    weeks earlier than we expected.
10       As I testified earlier today the
11   exposure that we got from media, from the
12   book's media moment is the crucial part of a
13   book's sales life.
14       Q.   Did it have anything to do with
15   Mr. Bissonnette's name being disclosed. Do
16   you recall if that was a factor at all?
17       A.   I wouldn't say that was a factor
18   in the decision to change the publication
19   date.
20       Q.   Okay. Was the change of the
21   publication date made known Mr. Podlaski in
22   advance of it being implemented?
23       A.   Yes.
24       Q.   Did he ever voice any opposition
25   to the publication date being changed from



BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
245–248

Page 245

Sever

1 the 11th to the 4th?
2
3     A.   No.  Not that I remember.
4     Q.   Do you still have Exhibit 110 in
5 front of you there, sir, that is the Dutton
6 contract?
7     A.   Yes.
8     Q.   You were asked some questions
9 about paragraph 4B which is on page numbered
10 3 of the contract.  Do you have that there
11 in front of you?
12     A.   Yes.
13     Q.   Let me just ask you, sir, is that
14 language that was inserted for
15 Mr. Bissonnette or alternatively is that a
16 part of the boilerplate of your contract?
17         MS. FOLEY:  You are talking
18     about the whole paragraph?
19         MR. JOHNSTON:  The whole
20     paragraph.
21         THE WITNESS:  Paragraph 4B is
22     part of our boilerplate.  It is in
23     every contract I think as far as I
24     know.
25 BY MR. JOHNSTON:

Page 246

Sever

1
2     Q.   Specifically the language about,
3 "If a failure to publish is caused by
4 restrictions by governmental agencies," is
5 that boilerplate that is in all of your
6 contracts?
7     A.   Yes.  To my knowledge it is.
8     Q.   Did you ever hear that
9 Mr. Bissonnette had terminated Mr. Podlaski?
10     A.   If I did I don't remember it.
11     Q.   Did you follow Mr. Podlaski's
12 advice on -- following his vetting of the
13 manuscript of the book?
14     A.   Yes.
15     Q.   Did you consider that he did a
16 good job with regard to that vetting and the
17 references to the public record?
18     A.   As far as I could tell, yes, he
19 did.
20     Q.   Did you ever at any time suggest
21 to Mr. Bissonnette that he should not submit
22 the book to a prepublication review?
23     A.   No.
24     Q.   Let me exclude Mr. Podlaski for
25 the moment.  I will ask about him

Page 247

Sever

1
2 separately.
3         Setting him aside do you know of
4 anyone who recommended to Mr. Bissonnette
5 that he not submit the book to a
6 prepublication review?
7     A.   I don't know of anyone other than
8 Mr. Podlaski who gave him any advice on
9 that.
10     Q.   Are you aware of whether
11 Mr. Podlaski affirmatively recommended that
12 he not submit the book to a prepublication
13 review?
14     A.   Yes.  That was what I was told by
15 the author before the contract was even
16 signed.
17     Q.   Did Mr. Bissonnette ever
18 misrepresent anything to you?
19     A.   No.
20     Q.   As you sit here today do you have
21 an opinion as to his character and
22 reputation for truthfulness and honesty and
23 veracity?
24         MR. FURMAN:  Objection.
25         THE WITNESS:  Matt is one of the

Page 248

Sever

1
2     most honest, straightforward straight
3     shooters I have ever worked with.
4 BY MR. JOHNSTON:
5     Q.   Let me jump to this time frame of
6 around August 31 of 2012.  You were asked
7 whether you recommended or considered
8 submitting the book to a prepublication
9 review at around that time and you indicated
10 that -- well, I won't try to rephrase your
11 answer.
12         Let me just say during that period
13 of time did you have discussions, e-mails
14 and other communications with Mr. Podlaski?
15     A.   Yes.
16     Q.   Did he ever recommend a
17 prepublication review before or after the
18 receipt of the Jeh Johnson letter?
19     A.   No.  He did not.
20     Q.   Can you tell me in at least in a
21 general way who would have had copies of the
22 book on August 31, I don't mean every person
23 by name but -- let me go through some
24 examples.
25         Was the book sent out to reviewers



Page 249

1            Sevier
2    already or do you know?
3        A.   Gosh, I don't remember.
4        Q.   Would that be normal before a
5    publication review to have copies sent to
6    reviewers?
7        A.   Yes.  Oh, I am sorry.  Can you
8    repeat the question?
9        Q.   Yes.
10           Would it be normal to send copies
11   of the book to book reviewers before the
12   publication date?
13       A.   Yes.
14       Q.    This may be repetitious in which
15   case I apologize if it is.
16           MR. FURMAN:  Objection.
17           MR. JOHNSTON:  Sustained.
18   BY MR. JOHNSTON:
19       Q.    Did Mr. Podlaski ever change his
20   advice with regard to whether
21   Mr. Bissonnette was under an obligation to
22   submit the book to a prepublication review?
23       A.    Not that I ever saw.
24           MR. JOHNSTON:  Pass the witness.
25           MR. FURMAN:  Are you done?

Page 250

1            Sevier
2        MR. JOHNSTON:  Yes, sir.
3        MR. FURMAN:  "Pass the witness"
4    is so Texas.
5        MS. FOLEY:  Mike, I want to just
6    maybe on the record we can resolve --
7        MR. JOHNSTON:  On the record?
8        MS. FOLEY:  Yes, on the record.
9    I wanted to potentially resolve with
10   everyone in the room what additional
11   information you thought you needed.
12   Can we do that?
13       I have taken notes I think you
14   wanted the fully executed version of
15   the contract?
16       MR. FURMAN:  Yes.  Fully
17   executed version of the contract.
18       MS. FOLEY:  Authentication
19   affidavit.
20       MR. FURMAN:  Right.
21       MS. FOLEY:  And would that -- do
22   you object to that?
23       MR. JOHNSTON:  No, not at all.
24       MS. FOLEY:  All right.  So --
25       MR. JOHNSTON:  I mean at one

Page 251

1            Sevier
2    point I would have because of the
3    identity issue but that ship won't set
4    sail thanks to Fox News.
5        MS. FOLEY:  So then you have
6    the royalty statements.  You at least
7    will have them but we can collect
8    those as well.
9        MR. JOHNSTON:  I thought I had
10   produced those to you because I
11   thought I asked for those from Elise
12   already.
13       MS. LEMKHEN:  I don't think we
14   have the universe of what is out
15   there.  We have some of them.
16       MR. JOHNSTON:  You sure should.
17   If you tell me what you don't have, I
18   will work with you.
19       MS. FOLEY:  Okay.  Then the
20   last -- my last notes have to do with
21   Andy Dudley and whether or not he has
22   any modeling for No Easy Day.
23       MR. FURMAN:  Right.  For future
24   sales.
25       MS. FOLEY:  If there is any

Page 252

1            Sevier
2    document that will show some kind of
3    modeling for future sales.  That is on
4    the record.  I will call you -- I
5    understand the request.  I will call
6    you and let you know if there is
7    anything.
8        MR. FURMAN:  The other item that
9    I think if you can help me resolve it,
10   obviously Dick Heffernan is no longer
11   at Dutton.  If you have his last known
12   address somewhere hopefully in a nice
13   warm place.
14           (Continued on next page)



BENJAMIN SEVIER                                                    January 06, 2017
BISSONNETTE vs PODLASKI                                                  253–256

**Page 253**

```
1               Sevier
2        MS. FOLEY:  Or you want someone
3   who can speak to communication.
4        MR. FURMAN:  With the sales
5   force, yes.
6        MS. HIROSE:  He is in Scarsdale.
7        MR. FURMAN:  Thank you.
8        (Time noted: 4:12 p.m.)
9
10
11
12   BENJAMIN PATRICK SEVIER
13
        Subscribed and sworn to
14      before me this    day
        of      2017.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 254**

```
1                  Sevier
2                 CERTIFICATE
3   STATE OF NEW YORK )
                     :  Ss
4   COUNTY OF NEW YORK)
5        I, Steven Neil Cohen, a Registered
6   Professional Reporter and Notary Public
7   within and for the State of New York, do
8   hereby certify:  That BENJAMIN PATRICK
9   SEVIER, the witness whose deposition is
10  herein before set forth, was duly sworn by
11  me and that such deposition is a true record
12  of the testimony given by such witness.
13       I further certify that I am not
14  related to any of the parties to this action
15  by blood or marriage and that I am in no way
16  interested in the outcome of this matter.
17       I further certify that neither the
18  deponent nor a party requested a review of
19  the transcript pursuant to Federal Rule of
20  Civil Procedure 30(e) before the deposition
21  was completed.
22       In witness whereof, I have
23  hereunto set my hand this 12th day of
24  January 2017.
25
               STEVEN NEIL COHEN, RPR
```

**Page 255**

```
1                  Sevier
2
3            INDEX OF EXAMINATION
4   WITNESS                          PAGE
5   BENJAMIN PATRICK SEVIER            5
6   By Mr. Furman                     5
7   By Mr. Johnston                 240
8
9               EXHIBITS
10  EXHIBIT NO.                    MARKED
11   108 Document Bates numbered     7
12      PRH1 through 90
13
14   109 Draft of the contracts    112
15      for book
16
17   110 Copy of the publishing    117
18      contract
19
20
21
22
23
24
25
```

**Page 256**

```
1                  Sevier
2            DEPOSITION ERRATA SHEET
3   Assignment No.  J0498551
4   Case Caption:  Matthew Bissonnette vs.
5               Kevin Podlaski and Carson
6               Boxberger, LLP
7      DECLARATION UNDER PENALTY OF PERJURY
8        I declare under PENALTY OF PERJURY
9   that I have read the entire transcript of
10  my Deposition taken in the captioned
11  matter or the same has been read to me,
12  and the same is true and accurate, save if
13  any, as indicated by me on the DEPOSITION
14  ERRATA SHEET hereof, with the
15  understanding that I offer these changes
16  as if still under oath.
17
18      BENJAMIN PATRICK SEVIER
19  Subscribed and sworn to on the _____ day
    of _____, 2017 before me,
20
21
22  Notary Public,
    in and for the State of _____.
23
24
25
```



```
1                      Sevier
2              DEPOSITION ERRATA SHEET
3    Assignment No.   J0498551
4    Case Caption:   Matthew Bissonnette vs.
5                     Kevin Podlaski and Carson
6                     Boxberger, LLP
7       DECLARATION UNDER PENALTY OF PERJURY
8       I declare under PENALTY OF PERJURY
9    that I have read the entire transcript of
10   my Deposition taken in the captioned
11   matter or the same has been read to me,
12   and the same is true and accurate, save if
13   any, as indicated by me on the DEPOSITION
14   ERRATA SHEET hereof, with the
15   understanding that I offer these changes
16   as if still under oath.
17   _____
18             BENJAMIN PATRICK SEVIER
19   Subscribed and sworn to on the  27ᵗʰ  day
20   of  January  , 2017 before me,
21   _____
22   Notary Public,
     in and for the State of  New York   .
23
24
25
```

AURORA M. LaVEGLIA
Notary Public, State of New York
No. 24-4878599
Qualified in Rockland County
Commission Expires November 24, 2018

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

*No changes.* 

BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
257

```
 1                        Sevier
 2             DEPOSITION ERRATA SHEET
 3   Page No. _____Line No. _____Change to:____
 4   _____
 5   Reason for change:_____
 6   Page No. _____Line No. _____Change to:____
 7   _____
 8   Reason for change:_____
 9   Page No. _____Line No. _____Change to:____
10   _____
11   Reason for change:_____
12   Page No. _____Line No. _____Change to:____
13   _____
14   Reason for change:_____
15   Page No. _____Line No. _____Change to:____
16   _____
17   Reason for change:_____
18   Page No. _____Line No. _____Change to:____
19   _____
20   Reason for change:_____
21   Page No. _____Line No. _____Change to:____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25          BENJAMIN PATRICK SEVIER
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

*No Changes* BPS

BENJAMIN SEVIER
BISSONNETTE vs PODLASKI

January 06, 2017
258

```
 1                        Sevier
 2              DEPOSITION ERRATA SHEET
 3     Page No. _____ Line No. _____ Change to: ____
 4     _____
 5     Reason for change: _____
 6     Page No. _____ Line No. _____ Change to: ____
 7     _____
 8     Reason for change: _____
 9     Page No. _____ Line No. _____ Change to: ____
10     _____
11     Reason for change: _____
12     Page No. _____ Line No. _____ Change to: ____
13     _____
14     Reason for change: _____
15     Page No. _____ Line No. _____ Change to: ____
16     _____
17     Reason for change: _____
18     Page No. _____ Line No. _____ Change to: ____
19     _____
20     Reason for change: _____
21     Page No. _____ Line No. _____ Change to: ____
22     _____
23     Reason for change: _____
24     SIGNATURE: _____ DATE: _____
25              BENJAMIN PATRICK SEVIER
```

