EXHIBIT C

## In the Matter Of:

## BISSONNETTE vs PODLASKI

1:15-cv-00334

## ELYSE FAITH CHENEY

*January 27, 2017*



800.211.DEPO (3376)
EsquireSolutions.com

**Page 1**

```
1    UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF INDIANA
3    -----------------------------------------x
     MATTHEW BISSONNETTE,
4                    Plaintiff,
5
6         -against-        Index No:
                           1:15-cv-00334
7
8    KEVIN PODLASKI and CARSON BOXBERGER, LLP,
9                    Defendants.
10   -----------------------------------------x
11              EXAMINATION BEFORE TRIAL of a
12   Non-Party Witness, ELYSE FAITH CHENEY, by the
13   Defendant, pursuant to Subpoena, held at the
14   offices of Young, Conaway, Stargatt & Taylor,
15   LLP, 1270 6th Avenue, Suite 2210, New York, New
16   York 10020, on January 27, 2017, at 10:10 a.m.,
17   before a Notary Public of the State of New
18   York.
19   *************************************************
20
21
22
23
24
25
```

**Page 2**

```
1    A P P E A R A N C E S :
2
3    JOHNSTON, TOBEY & BARUCH
4         Attorney for Plaintiff
5         3308 Oak Grove Avenue
          Dallas, Texas 75204
6    BY:   RANDY JOHNSTON, ESQ.
7
8
9
     FURMAN, KORNFELD, & BRENNAN, LLP
10        Attorney for Defendants
          61 Broadway, 26th Floor
11        New York, New York 10006
12   BY:   A. MICHAEL FURMAN, ESQ.
13
14
15   YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
          Attorneys for Non-Party Witness
16        1000 North King Street
          Wilmington, Delaware 19801
17   BY:   ELENA NORMAN, ESQ.
18
19
20
21
22
23
24
25
```

**Page 3**

```
1        S T I P U L A T I O N S
2
3        IT IS HEREBY STIPULATED AND AGREED by
4    and between the attorneys for the respective
5    parties herein, that filing, sealing and
6    certification be and the same are hereby
7    waived.
8        IT IS FURTHER STIPULATED AND AGREED
9    that all objections, except as to the form of
10   the question shall be reserved to the time of
11   the trial.
12       IT IS FURTHER STIPULATED AND AGREED
13   that the within deposition may be signed and
14   sworn to before any officer authorized to
15   administer an oath, with the same force and
16   effect as if signed and sworn to before the
17   Court and that a copy of this examination shall
18   be furnished without charge to the attorney
19   representing the witness testifying herein.
20
21
22
23
24
25
```

**Page 4**

```
1
2    E L Y S E   F A I T H   C H E N E Y, the
3    witness herein, having been first duly sworn by
4    a Notary Public of the State of New York, was
5    examined and testified as follows:
6    EXAMINATION BY
7    MR. FURMAN:
8    Q.    State your name for the record, please.
9    A.    Elyse Faith Cheney.
10   Q.    State your address for the record,
11   please.
12   A.    62 Montague Street, Apartment 9A,
13   Brooklyn, New York 11201.
14   Q.    Ms. Cheney, good morning.
15         MS. NORMAN:  Excuse me.  I'm
16   sorry to interrupt.  My name is Elena
17   Norman; I'm a partner of the firm,
18   Young, Conaway, Stargatt & Taylor; I'm
19   here on behalf of the witness who is a
20   non-party in this proceeding.
21   Q.    Ms. Cheney, good morning.  A couple of
22   ground rules for today.  Everything that we're
23   doing is on the record so the reporter can only
24   take us down one at a time, so this isn't a
25   normal conversation where we can talk over one
```



Page 5

1            E. CHENEY
2  another.  We have to wait, stop, and then,
3  after I ask a question, you would answer.  Do
4  you understand?
5  A.    Yes.
6  Q.    Another important feature is that all of
7  your answers have to be verbal, so you can't
8  nod or, as you would in conversation, say
9  Uh-huh; you would have to say yes, no, or just
10 answer.
11         MS. NORMAN:  You can nod, but
12 you have to do the other thing too.
13         THE WITNESS:  Yes, right.
14         MR. JOHNSTON:  Can I also have
15 an agreement?  This we haven't talked
16 about before; our position is that in
17 some respects, for some period of time,
18 certainly, we've viewed Ms. Cheney as
19 Matt's agent and that communications
20 with Matt's lawyers would be privileged
21 because she is his agent.  What I will
22 request, is that if I make no objection
23 and allow her to answer questions to the
24 extent that might arguably be
25 privileged, I have waived the privilege

Page 6

1            E. CHENEY
2  on that question, but that will not be
3  used to argue for a broader waiver of
4  the privilege.
5         MR. FURMAN:  I'm not sure if I
6  understand it, but I think I guess my
7  response would be let's take it as it
8  comes and, depending on what the issue
9  is, the question and the answer,
10 whatever you're objection is, if we have
11 an issue about it, we can always bring
12 it to Judge Collins.  So I don't have
13 any problem with any objections that you
14 make on the record.
15         MR. JOHNSTON:  Let me be clear
16 that I am fine -- I will consider that
17 if I don't say "objection, privilege,"
18 if that conversation had been
19 privileged, I have waived the privilege
20 by not objecting.  If there is something
21 I really want to assert the privilege
22 on, I will affirmatively so state.  What
23 I hope you will agree to with me,
24 however, is on those questions where I
25 don't object, the fact that I have

Page 7

1            E. CHENEY
2  waived the privilege on that question,
3  will not be used to argue that I can't
4  assert it on some other question later,
5  that it's a limited waiver and a limited
6  assertion.
7         MR. FURMAN:  I think I
8  understand.  I just don't know whether
9  there's a legal basis for a limited
10 waiver versus a general waiver.  I don't
11 know that we'll have the time to argue
12 that point, so your objections are
13 preserved; I think our rights are all
14 preserved as well.  Again, you can
15 always rehash this with the judge.
16 These are legal questions that don't
17 have anything to do with Ms. Cheney.
18         MR. JOHNSTON:  My point is, the
19 agreement allows me to let her answer
20 questions where I otherwise would object
21 and assert the privilege.  If you want
22 me to simply to object and prevent
23 answers on things that I don't care
24 about, but might be key to open the door
25 to other things, I'll do it.

Page 8

1            E. CHENEY
2         MR. FURMAN:  No, I'm not asking
3  you to do that because it would then
4  require Ms. Cheney to come back another
5  time.
6         MR. JOHNSTON:  Exactly.
7         MR. FURMAN:  So we don't need to
8  do that.
9         MS. NORMAN:  And to be clear,
10 Ms. Cheney is not coming back another
11 time; you have her time with her; we're
12 here today.
13         MR. FURMAN:  I mean, this is all
14 pursuant to a subpoena, so I can't agree
15 to that because that would be a court
16 who would intervene if this deposition,
17 for one reason or another, were
18 destructed.  I'm not waiving a right; so
19 I hear what you're saying.  I take it on
20 board, but I'm not waiving any rights;
21 I'll take it as comes.
22         MS. NORMAN:  I'm just stating
23 for the record, Ms. Cheney's position
24 that today is your day with her and so
25 if you have questions that you're not

Page 9

E. CHENEY

2 asking today because you may want to
3 save them for another time, my only
4 purpose in stating this is to make sure
5 that you're on notice from our
6 perspective, this is your day with her.
7 Sure, you may have other reasons that
8 you go to the court and seek something
9 to be continued, based on something you
10 don't know now, but what I'm saying is,
11 our understanding and expectation is
12 that today is your day with Ms. Cheney.
13     MR. FURMAN:  Thank you very
14 much.  Thank you everyone for outlining
15 your positions.
16 Q.   Ms. Cheney, good morning.  In addition
17 to the other instructions, keeping your answers
18 verbal, waiting until I ask the question.  I
19 also ask that if you don't understand a
20 question I ask, that you let me know, and I
21 will rephrase it or have it repeated back to
22 you.  Is that understood?
23 A.   Yep.
24 Q.   One last question, is there anything
25 that is preventing you today from answering

Page 10

E. CHENEY

2 your questions completely and truthfully?
3 A.   No.
4 Q.   What did you do to prepare for today's
5 deposition?  What activity?
6 A.   As I was -- Elena -- we just went
7 through the documents that -- the e-mails that
8 had transpired between Podlaski and Matt and
9 myself, and we just discussed how this kind of
10 thing operates.
11 Q.   How long was that process?
12 A.   Two hours -- three hours, maybe.
13 Q.   Where did you get the e-mails that you
14 reviewed?
15 A.   From my inbox.
16 Q.   So you didn't have a paper file that you
17 reviewed?  You looked in your own e-mail?
18 A.   No, inbox and printed out the e-mails.
19 Q.   Did you meet with Mr. Johnston?
20 A.   No.
21 Q.   At any point in the past several years
22 now, have you met with Mr. Johnston?
23 A.   No, this is first time I'm meeting him.
24 Q.   Have you spoke to him on the phone?
25 A.   Yes.

Page 11

E. CHENEY

2 Q.   On how many occasions?
3 A.   I don't know.  I mean, I have no idea.
4 Q.   More than once?
5 A.   More than once.
6 Q.   Was it five times?
7 A.   Yeah, maybe between five and ten; I'm
8 not really sure, to be honest.
9 Q.   Did you discuss this particular case?
10 The case against my clients?
11 A.   Yes.
12 Q.   You know who I represent; correct?
13 A.   Yep.
14 Q.   I represent Carson Boxberger and Kevin
15 Podlaski?
16 A.   Yes.
17 Q.   What did you discuss with Mr. Johnston?
18     MS. NORMAN:  I instruct the
19 witness to pause; I don't know if this
20 is an area where Counsel --
21     MR. JOHNSTON:  No, it is.
22     MS. NORMAN:  -- wants to
23 instruct the witness or wants to
24 instruct the witness not to answer and
25 also -- or if there is a limited way in

Page 12

E. CHENEY

2 which she can list the topics, as you
3 would, on the privilege log, and then we
4 would leave it at that.
5     MR. JOHNSTON:  Yes, as the
6 question is asked, with regard to
7 everything she discussed and every
8 period of time, I think there clearly
9 was a period of time where she was, and
10 may even to this day be,
11 Mr. Bissonnette's agent with regard to
12 the preparation and filing of this
13 lawsuit and assisting him in that
14 regard, and my communications with her
15 would be privileged as she would be the
16 agent for the plaintiff. And so as that
17 question is asked, I would, on behalf of
18 Mr. Bissonnette, request that she refuse
19 to answer.
20     MS. NORMAN:  Well, so I would
21 instruct the witness not to answer -- to
22 go into the substance of the
23 conversations, but you can list at a
24 high level just what, you know, what
25 were the topics, like, the lawsuit, the



Page 13

1          E. CHENEY
2    complaints.
3          MR. JOHNSTON:  I agree with
4    that.  I would not direct her -- I
5    believe she can discuss the general
6    topics of what was discussed; I agree
7    with that.
8          MS. NORMAN:  At a very high
9    level.
10   A.    I get it.  He just took me through what
11   the procedures are for this kind of case.
12   Q.    Was that discussion before the lawsuit
13   was filed in New York?
14   A.    Yes.
15   Q.    Have you ever entered into a retainer
16   agreement with Mr. Johnston or his law firm?
17   A.    No.
18   Q.    Did you ever enter into any kind of
19   written agreement with Mr. Johnston and his law
20   firm with respect to Mr. Bissonnette?
21   A.    No.
22   Q.    Have you participated in phone calls or
23   conference calls with Mr. Bissonnette and
24   Mr. Johnston or any members of Mr. Johnston's
25   firm?

Page 14

1          E. CHENEY
2    A.    No.
3    Q.    Do you have an understanding that
4    Mr. Johnston represented you in any way?
5          MS. NORMAN:  Objection.
6          MR. FURMAN:  I'm just asking
7    her, her understanding.  I'm asking just
8    her understanding.
9          MS. NORMAN:  One way or another,
10   you're not --
11         MR. FURMAN:  Yes.
12         MS. NORMAN:  So the question is
13   just, do you think Mr. Johnston --
14   Q.    My question was as I stated it.  Do you
15   have an understanding, one way or another, as
16   to whether Mr. Johnston has ever represented
17   you?
18         MS. NORMAN:  As a lawyer.
19   A.    Only in so far as I represent Matt.
20         MR. JOHNSTON:  Rather than spend
21   time outlining all the questions I would
22   ask about the specific conversations
23   that Ms. Cheney had with Mr. Johnston,
24   I'm going to mark this for a ruling.
25   We'll ask Judge Collins as to whether I

Page 15

1          E. CHENEY
2    would be permitted to ask those
3    questions based on the objection and the
4    instruction not to answer.  So I'll just
5    park that just so you're aware I would
6    be asking very specific questions about
7    the conversations that took place
8    between Ms. Cheney and Mr. Johnston;
9    when they were, what the substance of
10   those conversations were, and what
11   information you gave to Mr. Johnston,
12   what information Mr. Johnston gave you.
13   Rather than spend two hours asking those
14   questions, I'm simply just going to
15   outline that would be the subject area.
16   I understand the instruction by
17   Mr. Johnston; I also understand the
18   instruction by your lawyer so I respect
19   that; we will leave it for the court to
20   ultimately decide that.
21         MR. JOHNSTON:  Let me put on the
22   record my offer as stated previously
23   and, maybe, this is a slight alteration
24   of that.  If we can agree that the
25   privilege is not waived, I will permit

Page 16

1          E. CHENEY
2    her to answer all of those questions so
3    long as our right to assert the
4    privilege and prevent their use at trial
5    is preserved, so that will prevent her
6    from ever having to come back for a
7    second deposition.  You can ask your
8    questions; get your answers.  If and
9    when there is an attempt to use them at
10   trial, we will assert the privilege at
11   that time, and the court will rule upon
12   it.
13         MR. FURMAN:  Okay.  That's fair
14   enough.
15         MR. JOHNSTON:  As long as our
16   privilege is preserved, I'm fine with
17   her answering the question.
18         MR. FURMAN:  Sure.
19   Q.    So then, we've decided, if you've
20   followed along, that we could ask the
21   questions.  So the questions are when was the
22   first time that you met Mr. Johnston?
23   A.    Well, I just met him this morning.  You
24   mean by phone?
25   Q.    Yes, by phone?



Page 17

E. CHENEY

1
2  A.    I don't know the date.
3  Q.    Was it before or after this lawsuit was
4  filed in New York?
5  A.    Before.
6  Q.    Was it several months before?  Weeks
7  before?  Days before?
8  A.    Probably months.
9  Q.    Do you recall whether it was the summer?
10  Fall?  Spring?
11  A.    No.
12  Q.    You don't recall the year, as you're
13  sitting here today?
14  A.    I don't actually.
15  Q.    I understand.  I'm just asking if you
16  did remember that?
17  A.    No.
18  Q.    What was the conversation?  What did you
19  discuss?
20  A.    He explained that he was going to be the
21  lawyer for Matt in a malpractice suit against
22  Kevin Podlaski.  I think he just asked me to
23  take him through the facts of the case as I
24  understood them.  He asked me to send any
25  e-mails that had gone back and forth between me

Page 18

E. CHENEY

1
2  and Podlaski; he asked -- I'm trying to
3  remember -- so, you know, I sent him a package
4  of the e-mails; I'm trying to remember,
5  honestly -- we talked about the outlines of the
6  publishing industry, how it works, and what my
7  role is in representing Matt.  I'm trying to
8  remember, you know, what my understanding of
9  the situation was; how I perceived it.
10  Q.    Let's start with the last thing.
11  A.    Sure.
12  Q.    What did you tell Mr. Johnston about the
13  situation and how you perceived it?
14  A.    In terms of Podlaski's role in this?
15  Q.    Yes.  I want to know what you told
16  Mr. Johnston?
17  A.    Yeah, I get it.  I told him how I met
18  Podlaski.
19  Q.    What did you tell him about that?
20  A.    -- another agent at a different firm
21  who represents Kevin Maurer, who's the writer
22  on the project, suggested Kevin Podlaski as a
23  possible lawyer for Matt.
24  Q.    What else did you tell Mr. Johnston?
25  A.    I spoke to Podlaski and I spoke to

Page 19

E. CHENEY

1
2  another lawyer as well, in advance of my
3  introducing both of them to Matt.  And Podlaski
4  told me that he was a special prosecuting
5  attorney for JAG for twenty-five years and that
6  he had security clearance and could vet the
7  manuscript himself; the manuscript that Matt
8  was intending to write about the bin Laden
9  raid.
10  Q.    Who is the other lawyer that you spoke
11  to?
12  A.    He was named Randy Moss.
13  Q.    What did Randy Moss tell you?
14  A.    Randy Moss didn't -- actually, let me
15  just continue on Podlaski -- Podlaski said that
16  he -- that if Matt -- Matt did not have an
17  obligation to show the manuscript to the
18  government for prepublication review because he
19  was retired or retiring and, therefore, it was
20  optional for him to show the manuscript.  And
21  that he suggested that it didn't make sense to
22  show the manuscript to the government because
23  they would just take a very long time to get
24  back to Matt and, you know, were not that easy
25  to deal with and that he could then -- what

Page 20

E. CHENEY

1
2  would be better, would be for him to vet the
3  manuscript -- that he had done so for another
4  client of the other literary agent, a guy named
5  Dalton Fury, who I believe had written a book.
6  I think that Dalton is a Delta Force guy; he's
7  another Special Forces guy and that he was
8  qualified to do that.  Randy said, the other
9  lawyer, that he actually never dealt with this
10  before; he didn't know the answers to this; he
11  was going to talk to a colleague who, then,
12  also didn't know the answers, and that he was
13  considering then, potentially, he should just
14  call the government to find out what to do
15  about it.
16  Q.    Now, that's in substance what you told
17  Mr. Johnston about how you met Mr. Podlaski?
18  A.    Yeah, what happened, yeah.
19  Q.    Can you describe for me what you told
20  Mr. Johnston about what you described as the
21  back and forth between yourself and
22  Mr. Podlaski?
23  A.    I mean, I don't remember specifically
24  what I told to him, but if you're wanting to
25  know if --



Page 21

1              E. CHENEY
2   Q.    I just want an overview of what you told
3   Mr. Johnston.  I'm going to get into the
4   details of all that later today.
5   A.    Yeah, okay.
6          MS. NORMAN:  Are you still
7       talking about the first conversation?
8          MR. FURMAN:  Yes.
9   A.    I'm not sure if this was first
10  conversation, but over many times that I talked
11  to him, this is what it could be.  You know, I
12  think that we -- I'm trying to think what else
13  we talked about with regards to Mr. Podlaski.
14  I -- I -- I'm not sure, but then he -- we
15  talked about where publishing was set, you
16  know, was the business in New York primarily, I
17  said yes, I believe that he must have taken --
18  actually, I don't know, through the sequence of
19  events of my interactions with Podlaski.  Did I
20  -- did Matt speak to him, you know?  Did Matt
21  decide himself to hire Podlaski?  What was my
22  involvement in that decision?  Where did the
23  retainer -- did I have a copy of the retainer
24  or who -- who -- how -- what was the path
25  through which Podlaski and I, how often did I

Page 22

1              E. CHENEY
2   talk to him?  How involved was I in, like, all
3   this communication between Podlaski and Matt?
4   And what Matt's legal obligations were?
5   Q.    At the time that you had the
6   conversation with Mr. Johnston, had you, you
7   yourself come to any view about whether
8   Mr. Podlaski did anything wrong?
9   A.    Yes.
10  Q.    What was your view?
11  A.    My view is that he -- I don't know if he
12  broke the law, but that he did not tell the
13  truth.
14  Q.    In what sense?
15  A.    Either he did not tell the truth or he's
16  incredibly ignorant because he -- it turns out,
17  from what I understand, that in fact, he had
18  no business saying that he can vet a manuscript
19  for a person from Special Forces; that the
20  issue of whether or not Matt was retired was
21  irrelevant; that it was not optional for Matt
22  to show -- he had to show whatever he writes, a
23  manuscript to the government before
24  publication, so --
25  Q.    Did you come to those conclusions before

Page 23

1              E. CHENEY
2   you had spoken to Mr. Johnston?
3   A.    Yes.
4   Q.    Where did you get that notion from?
5   A.    Where do you think?  I got the notion
6   from the fact that Matt received a letter from
7   the government stating that that was the case.
8   Q.    Did you arrive at that notion around the
9   time that the letter from Mr.Johnson came down
10  on August 30th of 2012?
11  A.    No, it took me a long time to understand
12  exactly what was going on.
13  Q.    Well, who helped you understand what was
14  going on in that sense?
15         MS. NORMAN:  Objection to form.
16         THE WITNESS:  What does that
17     mean?
18         MS. NORMAN:  You have to answer;
19     it's just for the record that I think
20     the question is assuming that people
21     told you things as opposed to you
22     forming an opinion yourself.
23         MR. FURMAN:  I'm going to
24     rephrase it; you're absolutely right.
25         MS. NORMAN:  Of course, I'm

Page 24

1              E. CHENEY
2   right.
3          MR. FURMAN:  Well, I'll give you
4       that one right now.
5          MS. NORMAN:  That's why I'm
6       here.
7          MR. FURMAN:  I feel like you and
8       I are going to have some disagreements,
9       but I'm definitely going to give you
10      that one.
11  Q.    So I'll rephrase the question.  I'm
12  going back to where you had testified that you
13  had a notion that Mr. Podlaski had done
14  something wrong, was either untruthful or, as
15  you described, "ignorant," and I want to
16  explore how you arrived at that conclusion.  So
17  let me ask you just in a general sense, how did
18  you arrive at that conclusion when you first
19  met with Mr. Johnson?
20         MR. JOHNSTON:  Objection to
21     form.
22         MS. NORMAN:  Objection to form.
23     Question implies that she arrived at
24     that conclusion when she first met with
25     Mr. Johnson.



Page 25

1          E. CHENEY
2     MR. FURMAN:  She testified that
3  she had that conclusion at the time that
4  she had met Mr. Johnson.
5     MS. NORMAN:  Right, she came to
6  this having already reached that
7  conclusion.
8     MR. FURMAN:  Right, I just want
9  to know how she reached that conclusion.
10     MS. NORMAN:  I just want to be
11  clear that the way you phrased it just
12  now made it seem like she reached that
13  conclusion in connection with her
14  discussions with Mr. Johnston so.
15     MR. JOHNSTON:  That's what I
16  thought too.
17     MR. FURMAN:  Why don't we do
18  this; it's going to be struggle for me;
19  I'm not nearly intelligent enough to
20  follow all of your objections and, just
21  as a practical matter, under federal
22  rules, speaking objections are
23  permitted; so if you have an objection
24  to form, just say it; I'll live with the
25  consequences of asking an awful

Page 26

1  question.
2     MS. NORMAN:  That's fine.  I
3  think -- you know, look, I have no
4  interest in making objections for the
5  sake of it.  I prefer that this
6  deposition happens and be done, but I
7  also have an obligation to my client to
8  make sure the record is clear.  I will,
9  you know, keep my objections to form, to
10  the extent possible, but I would ask,
11  perhaps if you could just focus on
12  making your questions a little tighter,
13  that might move this along.
14     MR. FURMAN:  I appreciate that.
15  And if I were to search right now how
16  many words have been spoken on the
17  record, I would imagine that the
18  majority of it is lawyers and not Ms.
19  Cheney.  I rather the majority, from now
20  on, be Ms. Cheney so we can do this
21  quicker; so thank you for your
22  assistance, and now we're back to what
23  we're here for.
24
25  Q.     Let me just lay the foundation.  When

Page 27

1          E. CHENEY
2  you met with Mr. Johnston, you had already
3  arrived at a notion that Mr. Podlaski had done
4  something wrong; is that fair to say?
5  A.     I think we just said that; right?  Yeah.
6  Q.     I want to know how it came about that
7  you arrived at that notion?
8  A.     It's varying -- lots of input of
9  information from a variety of people over, kind
10  of, a long period of time because it was so
11  hard to believe, to be honest.
12  Q.     Let's take some of the players, and I'll
13  ask you specifically.  Mr. Luskin told you that
14  Mr. Podlaski had given incorrect or wrongful
15  advice?
16     MS. NORMAN:  Objection to form.
17     THE WITNESS:  What am I supposed
18     to do?
19     MS. NORMAN:  Just answer it.
20  A.     It took a while, from what I remember,
21  for Luskin to figure out exactly what was going
22  on, and I'm sure that he did tell me that at
23  some point, yeah.
24  Q.     Do you know when he told you that?
25  A.     No, I don't know when.

Page 28

1          E. CHENEY
2  Q.     You referenced it took him a while.  Can
3  you describe for me what that period was?
4  A.     He had to look into it; he had to talk
5  to people in the government; he got other
6  opinions about it, to figure out exactly what
7  was right; he didn't have all the documentation
8  I think that he needed to determine what Matt's
9  obligations were.
10  Q.     Did you have a discussion with
11  Mr. Luskin where he told you that he believed
12  that Mr. Podlaski had done something wrong?
13  A.     At some point, yeah.
14  Q.     Was it a meeting or was it a phone call?
15  A.     No, call.
16  Q.     Did you ever meet with Mr. Luskin?
17  A.     Not -- it took a while before I met with
18  him and that was, like, just general; it wasn't
19  -- when I met with him at the lunch, and that
20  wasn't nothing to do with the case.
21  Q.     Did Mr. Bissonnette tell you, at any
22  point in time, that he believed that
23  Mr. Podlaski had done something wrong?
24  A.     I think -- I think -- I'm sure, at some
25  point, we discussed that it didn't look like



Page 29

E. CHENEY

1
2 Podlaski had any -- had done the right thing.
3 Q.    Was that before --
4 A.    But Matt didn't know, I mean, he really
5 did not -- he was confused; as confused as I
6 was.
7 Q.    Was that discussion with Mr. Bissonnette
8 before or after your discussion with Mr. Luskin
9 regarding Mr. Podlaski's work?
10       MS. NORMAN:  Objection to form.
11 A.    I would assume probably after.
12 Q.    Is there any other information other
13 than a discussion with Mr. Bissonnette, a
14 discussion with Mr. Luskin that helped you form
15 a conclusion that Mr. Podlaski had done
16 something wrong?
17 A.    You know, it sort of gradually came
18 together as various reporters were asking and
19 it just suddenly -- not suddenly -- just
20 started slowly to seem, maybe Matt did have
21 obligations to the government that we didn't
22 know about.
23 Q.    Did you assist Mr. Johnston in preparing
24 Mr. Bissonnette for his deposition?
25 A.    No.

Page 30

E. CHENEY

1
2 Q.    Have you participated in any conference
3 calls or meetings with Mr. Johnston where
4 Mr. Bissonnette was either present physically
5 or on the phone?
6 A.    I don't think so.
7 Q.    A couple of more questions about
8 background and then we'll get into some of your
9 background.  I used the word background twice,
10 forgive me.  Have you ever testified in a
11 deposition before?
12 A.    No.
13 Q.    Have you ever been a party to a lawsuit,
14 one way or the other?
15 A.    Yes.
16 Q.    I don't need to know details of that; I
17 just want know what those cases were and when
18 they were?
19 A.    Sure.  I believe it's in 2000 I had to
20 sue a client for nonpayment.
21 Q.    Did you testify either at a trial or a
22 hearing in the matter?
23 A.    No, it settled quickly.
24 Q.    Anything else?
25 A.    Any other --

Page 31

E. CHENEY

1
2 Q.    Lawsuits or litigation?
3 A.    No, no.
4 Q.    I'm going to ask you about your career.
5 You're a literary agent?
6 A.    Yes.
7 Q.    How long have you been doing that?
8 A.    I'm pretty sure I started about 1996,
9 you know, becoming a real literary agent, so
10 twenty years.
11 Q.    Because we're all, except for, maybe,
12 one or two people here, people of a certain
13 age, I'm going to ask you some backgrounds and
14 some dates.  When did you graduate college?
15 A.    1989.
16 Q.    What college?
17 A.    University of Pennsylvania.
18 Q.    What was your major?
19 A.    Well, I did English Literature
20 primarily, yes, that was my major.
21 Q.    Did you go to grad school after that?
22 A.    No.
23 Q.    If you could describe -- before you
24 started your own agency, could you give me a
25 brief description of your professional career?

Page 32

E. CHENEY

1
2 A.    In publishing?
3 Q.    Yes.
4 A.    Well, I got a job -- I'm really not --
5 probably in, like, '94 working at a literary
6 agency part-time, reading manuscripts and, you
7 know, doing some writing for this literary
8 agent, and then I started to get some clients
9 because the literary agent I was working with
10 was quite old, and so there was a lot of
11 projects coming in so I just started taking
12 some people on, then, I think, it was in '96
13 that I moved to another company called Sanford
14 Greenburger Associates, which is a midsize
15 literary agency, and I got a job as a literary
16 agent and I was there for eight years, and then
17 about eleven years ago -- I mean, I'm not sure
18 the exact -- but basically eight years I was
19 there, and then eleven years ago, I started my
20 own agency.
21 Q.    What is the name of your agency?
22 A.    Elyse Cheney Literary Associates, LLC.
23 Q.    How many employees do you have?
24 A.    I have four employees.
25 Q.    Where is your office located?



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
33–36

Page 33

1                 E. CHENEY
2  A.    78 Fifth Avenue, 3rd floor; it's 10011,
3  I think.
4            MR. JOHNSTON:  Off the record.
5            (Whereupon, a discussion was
6      held off the record.)
7            MR. FURMAN:  Back on the record.
8  Q.    Is there any kind of professional
9  license that you need to have in order to
10  become a literary agent?
11  A.    No.
12  Q.    Is there any specific kind of training
13  that you would need?
14  A.    Yeah, I would say, yeah.
15  Q.    What would you describe?
16  A.    Specific learning curve and education you
17  need.  You need to understand what books a
18  publisher might be interested in and what books
19  the general population might be interested in,
20  so you need to understand the marketplace.  You
21  need to understand who the players are; who the
22  publishers are, and who is interested in what
23  topics.  You need to have -- you need to have a
24  lot of relationships, deep relationships,
25  really, with publishes across the board; every

Page 34

1                 E. CHENEY
2  publisher.  You need to understand how
3  contracts work; you need to understand how
4  negotiations happen, how authors get paid.  You
5  need to understand the foreign markets and
6  whether or not a book, potentially, could sell
7  in foreign markets.  You need to understand the
8  film business or have relationships with agents
9  in the film business in order to help sell your
10  -- the ancillary rights to the book project
11  that you represent.  You need to be, in my
12  opinion, be able to add it.  You need really
13  good communication skills in order to be able
14  to articulate what the book is about and why
15  it's important.  You need to have a background
16  in literature.
17  Q.    Are there any professional associations
18  that you're a member of in relation to your
19  profession as a literary agent?
20  A.    No.
21  Q.    Do any exist?
22  A.    Yes, but I don't know.  I never -- yes,
23  they do exist; I'm just not a member.
24  Q.    What is the name of that --
25  A.    Association of Author Representatives.

Page 35

1                 E. CHENEY
2  Q.    Do they have meetings that you're aware
3  of?
4  A.    I don't know.
5  Q.    Have you ever given any lectures or
6  spoken on any topics relating to your
7  profession?
8  A.    Yes.
9  Q.    Can you tell me when and where?
10  A.    I've done a lot of that.  I've spoken at
11  various colleges to writing students about how
12  publishing works.  I've, you know, what the
13  process is for the book getting taken on by an
14  agent and getting published.  I've spoken at
15  conferences where writers gather, you know,
16  with the same kinds of questions.  I've been on
17  panels, kind of, all over the country.
18  Q.    Can you tell me the last five colleges
19  you've spoken at?
20  A.    I've spoken at NYU; I've spoken at the
21  New School; I've spoken at Iowa -- the
22  University of Iowa; Iowa Writers' Workshop;
23  University of Michigan, Squaw Valley Writers
24  Workshop; that's not university associated,
25  though.

Page 36

1                 E. CHENEY
2  Q.    Iowa is kind of random?
3  A.    Well, it's not because Iowa Writers'
4  Workshop is the best writers' workshop in the
5  country.
6  Q.    Good to know that.  When did you speak
7  in Iowa?
8  A.    It's not been for a while.  I've spoken
9  there several times, but now, usually, I just
10  send other agents in my office there to speak,
11  so one just went last year; I've spoken,
12  probably, there, six years ago; seven or eight.
13  Q.    Those are also marketing opportunities
14  that you market your agency to potential
15  writers; is that fair to say?
16  A.    Yeah.
17  Q.    At NYU, when was the last time you spoke
18  there?
19  A.    That was in the last -- I, actually,
20  sometimes get confused with NYU and the New
21  School, but I'm pretty sure that was in the
22  last year and a half, and I got asked to speak
23  at CUNY also, but I haven't been able to find
24  the time.
25  Q.    The times that you spoke at either NYU



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
37–40

Page 37

1              E. CHENEY
2   or the New School, were they also in your mind,
3   marketing opportunities for your agency?
4   A.    I mean, it's usually as a favor,
5   honestly, because I don't necessary -- a lot of
6   these places I don't think I'm actually going
7   to find clients at, but, you know, you're often
8   asked by a prominent writer, and you just want
9   to help.
10  Q.    You mentioned writers' conferences.
11  Where was the last writers' conference that you
12  spoke at?
13  A.    Actually, you know, I did another thing
14  at the -- for the Yale -- I went to a dinner
15  for kids who were undergrads at Yale studying
16  writing and that wasn't a place where I thought
17  I'm going get a client because they're
18  undergrads, but the woman who organizes it is a
19  wonderful writer and so I went to that; that
20  was a dinner that was in the last year.
21  Q.    I'll ask you to turn your attention to
22  the conferences.  Can you tell me what the last
23  conference was?
24  A.    The -- well, it depends if you
25  consider -- for example, if you consider a book

Page 38

1              E. CHENEY
2   fair, international book fair, as a conference,
3   I've gone to those.
4   Q.    I think what I'm asking is, did you
5   speak there?
6   A.    Yeah.
7   Q.    Was your name on a brochure?
8   A.    Yeah, I think one of them was AWP; I
9   think I did that in Boston several years go.
10  Squaw Valley Writers' Workshop, I've done
11  several years ago; that's kind of a conference.
12  I'm trying to think of other ones; yeah, those.
13  Q.    Have you ever been asked to give an
14  "expert" opinion, in one way or another, as it
15  relates to your role as a literary agent?
16          MS. NORMAN:  Objection to form.
17  A.    From a legal perspective, I don't
18  understand the question.
19  Q.    In any perspective?
20  A.    I mean, are you thinking about me as an
21  expert as in, like, an expert witness or an
22  expert, as in, can I give my professional
23  judgment about something?
24  Q.    Yes.  I mean, I like to keep it very
25  broad.  I can narrow it down, but I just want

Page 39

1              E. CHENEY
2   to know if you have ever been asked to speak as
3   an expert in your particular professional field
4   in any capacity?
5   A.    Not in a legal capacity, but everyday as
6   a literary agent, yes, every day I'm asked to
7   give my opinion.
8   Q.    Let me narrow it down then.  Other than
9   individuals calling you up for your opinion on
10  a particular matter, have you spoken in a
11  conference or in public, before any public
12  body, the government, or in any capacity, have
13  you spoken to an audience about your role?
14  A.    Yes.
15  Q.    As a literary agent?
16  A.    Yes, I've spoken about my role as a
17  literary agent in a public setting.
18  Q.    Where?
19  A.    Again, I think it's the New School or
20  NYU, I've spoken there on a panel about -- I
21  don't remember the topic; it was some kind of
22  topic around publishing.
23  Q.    Is there a brochure that you may have in
24  your office that you could share that would
25  help me understand what you spoke about and

Page 40

1              E. CHENEY
2   what the topic was?
3   A.    I mean, it's usually -- I don't have a
4   brochure; I could look, but no, I don't have a
5   brochure, but I -- but usually what they ask
6   is: What do you do?  What's happening in
7   publishing right now?  What does the market
8   look like?  Are people still interested in
9   novels?  Is it very hard to get a novel
10  published?  What kind of nonfiction do you
11  handle?
12  Q.    That panel discussion, when did it take
13  place?
14  A.    It's in the last year and a half, that
15  one; there were two in the last year I've done.
16  I think one was at, I believe NYU, and one was
17  New School.
18  Q.    Have you written any articles about your
19  profession?
20  A.    No.
21  Q.    Could you just give me, sort of, a
22  thumbnail sketch of how your job works?
23  A.    Sure.  So clients are referred to me or
24  I see a writer in a magazine doing something
25  interesting and I write to them and if I'm



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
41–44

Page 41

E. CHENEY
1
2   interested in their work, I have to read the
3   work and then I ask them to come in and say --
4   I might send them a letter, or if they're
5   coming to me, which is more often the case at
6   this point, then I say, let's have a meeting
7   and we talk about their work and what their
8   aspiration are, and I discuss their careers
9   with them and whether they would like to write
10  a book, you know.  And, then, if they're
11  interested in writing a book, we might discuss
12  what is their book idea.  I handle a lot of
13  nonfiction, so we talk about what is their
14  story.
15      If it's a memoir, we talk about, you
16  know, what is their expertise and how can they
17  put that expertise onto the page and what does
18  the book look like, what's the process by which
19  a book gets published.  We'll talk about --
20  I'll get really inside of their ideas, then
21  either help formulate for them, or they'll have
22  a book idea, then I'll react to what they're
23  saying and say, "well, that's interesting, but
24  this is more interesting" or, you know, give
25  them feedback as to what they're talking about,

Page 42

E. CHENEY
1
2   then they'll go and write something or they'll
3   have had something written and I'll react to
4   that, generally, and then put together a
5   proposal for a publisher and I will give them
6   guidelines as to what a proposal looks like,
7   and I'll give them feedback as they write the
8   proposal to say, no, that's not really what I
9   need here; I need this; I need that; tell us
10  more about this, tell us more about that; or I
11  might say this book is already in the market,
12  you know -- I don't know -- give me something a
13  little different here and then, once we have a
14  proposal that I think is adequate, I call
15  publishers, different publishers.
16      There's a editor -- there's editors at
17  each publishing house and they acquire on
18  behalf of the house and so there are several --
19  now, there are several big companies,
20  conglomerates, that have individual imprints
21  than those conglomerates, and I know all the
22  people at these different places, then I'll
23  say, oh, so and so at Random House is very
24  interested in X topic, so I'm going to call
25  them, tell them about this author and this

Page 43

E. CHENEY
1
2   project.
3      The same day I'll call all people that
4   are interested -- that I think are potentially
5   interested in this project; I will pitch the
6   book to them and explain why it's so great and
7   why they need to publish it.  I will send over
8   the project with a cover letter -- this is
9   generally; it doesn't happen in every case --
10  with a cover letter; they will read it and they
11  will call me, whether or not they're
12  interested.  If they're interested, then I will
13  bring the author in, generally, for meetings
14  and will meet with publishers and then I'll
15  conduct, hopefully, an auction and negotiate
16  the terms of the agreement for them.  Then they
17  will go back, then the contract will come to my
18  office; I'll look at the contract, look it
19  over, the author signs the contract.  They go
20  and write the book, and then once the book is
21  written, I get involved again on the marketing
22  end of things usually, if they need help, and
23  then the book gets published.  I'm generally
24  either their liaison with the publisher or the
25  advocate.

Page 44

E. CHENEY
1
2   Q.    How do you get paid for that service?
3   How does that work?
4   A.    They get an advance, which is -- as long
5   as they deliver an adequate manuscript,
6   nonreturnable, and then we take fifteen percent
7   of the advance and any royalties that would
8   come from the book and any derivative rights to
9   the book.
10  Q.    Is that fifteen percent fee a standard
11  fee?
12  A.    Yes, standard.
13  Q.    Is that standard with other literary
14  agents?
15  A.    It's pretty standard;
16  ninety-nine percent of literary agents take
17  fifteen percent.
18  Q.    And the fifteen percent --
19  A.    For the domestic sale of the book.
20  Q.    Is there a fee for the foreign sale of
21  the book?
22  A.    The foreign sale -- the general rule is
23  twenty percent; ten percent goes to the
24  subagent in a territory who sells the book, and
25  then ten percent comes to our agency.





ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
45–48

Page 45

E. CHENEY

1
2  Q.    The fifteen percent figure, that cuts
3  across royalties, the advances, and any other
4  aspects of the author's income derived out of
5  the book; is that fair?
6  A.    Basically, yeah, yeah.
7  Q.    So would that also include book signings
8  and appearance fees and other things like that?
9  A.    No, no, I don't take any money from
10  that; that's not my business.
11  Q.    Do you help arrange book signings and
12  appearances and things like that?
13  A.    No, that's the publisher.
14  Q.    Is it fair to say that you and your
15  company make more money if the sales, the
16  royalties, and the other income that is derived
17  of the book increases?
18  A.    The more a book sells, the more money we
19  make, yes.
20  Q.    So your interest, of course, is on
21  behalf of your client, but your financial
22  interest is making that endeavor a success so
23  that both you and your client both equally make
24  more money?
25        MS. NORMAN:  Objection to form.

Page 46

E. CHENEY

1
2  Q.    Is that fair to say?
3  A.    I would say, my first interest is in
4  achieving whatever the goals of the client are
5  and a financial interest is, yes, if the book
6  does better, then I do better and the client
7  does better.  But you can't always go by that
8  because sometimes, let's say you have an
9  advance -- you have several publishers
10  interested in a book and one publisher might
11  spend -- offer $100,000 and another might offer
12  $75,000; I may not advise them -- I mean, it's
13  always up to the author who they want to sign
14  with, but I might not advise them to go with
15  the $100 because I may say that might not be a
16  good experience for you; go with the $75.
17  Q.    You've mentioned that you do a lot of
18  work in the nonfiction field?
19  A.    Yes.
20  Q.    Have you worked with writers who were
21  public officials?
22  A.    Yes.
23  Q.    Could you just give me a roster of those
24  individuals?
25  A.    Public Officials?  Can you just define

Page 47

E. CHENEY

1
2  that?
3  Q.    Government officials, people who were
4  either elected officials or appointed official?
5  A.    I work with Lieutenant Governor Gavin
6  Newsom.  Do you mean anybody who has ever
7  worked for the government?
8  Q.    Yes, in other words, I think what I'm
9  after is -- let me find a better way to ask the
10  question.  Have you worked as an agent for any
11  former or current government official, either
12  in an elected capacity or an appointed
13  capacity, who wrote a memoir on their
14  experiences?
15        MS. NORMAN:  Objection to form.
16  A.    Elected or appointed?  I mean, like, for
17  example, I represent now an astronaut; would
18  you consider that an elected or appointed
19  person?
20  Q.    No.  I'll get --
21  A.    Because he works for the government,
22  obviously; he works for NASA.
23  Q.    I'm going to drill down.  I'm just now
24  asking -- just to make you appreciate what I'm
25  asking, I'm thinking of, you know, say,

Page 48

E. CHENEY

1
2  President Obama's memoir or say Leon Panetta's
3  book, I know you didn't work on that --
4  A.    No, I didn't work on it.
5  Q.    -- but I'm thinking along the lines of
6  someone who left office and then either --
7  A.    Yeah, Newsom would be the person that I
8  have worked with in the past.
9  Q.    I'm going to drill down.  Now, I'm
10  turning to government officials, people who
11  work in the public sector and, in that sense,
12  Mr. Bissonnette qualifies.
13  A.    I see; right.
14  Q.    I'm asking for people who wrote books
15  about their endeavors, working on behalf of the
16  public, either a firefighter or astronaut, as
17  you mentioned, or a police officer, a navy
18  seal, anything in that capacity?
19  A.    Now, I represent an astronaut, two
20  astronauts, but I haven't represented them at
21  the time.  I represented Valerie Plame --
22  sorry, I don't want to say the name, but, yeah,
23  she's a former CIA.
24        MS. NORMAN:  Do you want --- is
25        that public, or is that something that



Page 49

1        E. CHENEY
2    needs to be protected, that you
3    represented her?
4        THE WITNESS:  I think the fact
5    of my representing her is probably
6    public; it's not a secret.
7        MS. NORMAN:  By the way, is this
8    transcript under seal?
9        MR. FURMAN:  No, it's not under
10   seal, but there's -- I could tell you my
11   clients have no interest whatsoever in
12   publicizing this case any more than we
13   need to file documents in court; we
14   would like nothing better than to have
15   this all deemed confidential.
16       MS. NORMAN:  Is there any
17   objection to just treating this as
18   confidential, under whatever protective
19   order, at least provisionally, until --
20   at least mark it that way today, and
21   then we can address with the witness
22   whether there's anything she deems to be
23   sensitive.
24       MR. FURMAN:  I have no interest
25   other than trying to protect my client,

Page 50

1        E. CHENEY
2    and I don't have any interest in
3    revealing anything about what your
4    client is saying today, other than in an
5    effort to protect my clients in this
6    lawsuit in Indiana, so there's no
7    protective order that is in place, but I
8    could represent to you that I -- unless
9    there's a specific reason to do it,
10   other than letting the court know, by
11   way of motions and by sharing this
12   transcript with my clients and
13   potentially experts, I don't see any
14   other rationale for disseminating Ms.
15   Cheney's testimony beyond that sphere.
16       MS. NORMAN:  I understand what
17   you're saying.  So what you're telling
18   me is that there is not a protective
19   order in the case?
20       MR. FURMAN:  No.
21       MS. NORMAN:  At all?
22       MR. FURMAN:  No, it's a publicly
23   filed case.
24       MS. NORMAN:  I never had a case
25   that didn't have a protective order.

Page 51

1        E. CHENEY
2        MR. FURMAN:  We can go off the
3    record for a second.  I don't want to
4    clog the record.
5        (Whereupon, a discussion was
6        held off the record.)
7   Q.    You mentioned the Valerie Plame book;
8    was there anyone else that comes to mind?  You
9    mentioned the astronaut; any other person who
10   wrote a nonfiction book about their experiences
11   working for the government?
12       MS. NORMAN:  Objection to form.
13  A.    Not that's coming to my head right now.
14  Q.    How about military authors?  Other than
15   Mr. Bissonnette, have you represented any other
16   military authors?
17  A.    No, not in any official capacity for
18   books.
19  Q.    In connection with the representation of
20   Ms. Plame, did you go through a prepublication
21   review process?
22  A.    Yes.
23  Q.    Did that take place before the
24   publication of No Easy Day?
25  A.    Yes.

Page 52

1        E. CHENEY
2   Q.    Were there lawyers involved in that
3    process?
4   A.    Yes.
5   Q.    Do you know the names of the lawyers
6    involved?
7   A.    I don't want to give the name, actually;
8    if you don't mind, if I don't have to.
9   Q.    Well, if you're uncomfortable, that's
10   fine.  I'll leave a space in the record; if
11   it's necessary, we can ask for it.
12       THE WITNESS:  Can we go off the
13       record for a second?
14       MS. NORMAN:  Yes, sure.  Should
15       we just continue and then at a break, we
16       can talk about it?
17       THE WITNESS:  Okay.
18       MS. NORMAN:  I'll make a list.
19       So the question is, were lawyers
20       involved in the Valerie
21       Plame prepublication?
22  Q.    I take it that you don't want to answer
23   that question and we can leave a space, and
24   then we can discuss during the break -- you
25   will fill in that space.



Page 53

E. CHENEY

1
2    A.    Yeah.
3    (INSERT)_____.
4    Q.    In connection with that process, did you
5    come to learn that there was a mechanism by
6    which the government would review a former
7    government employee's book in order to see
8    whether it would be permitted to be published?
9          MS. NORMAN:  Objection to form.
10   A.    That was specifically for the CIA.  I
11   saw that the CIA -- anybody who had been a CIA
12   like person, would need to go through a
13   prepublication review.
14   Q.    Could you describe, just in general
15   terms, what that process was like?  What
16   happened?
17         MS. NORMAN:  Objection to form.
18   A.    Basically, she had to deliver -- she had
19   to deliver the manuscript to the publication
20   review board and then wait until they got back
21   with their comments of what they thought was
22   potentially classified.
23   Q.    A lawyer was involved in that process of
24   submitting the book for review by the CIA?
25   A.    I don't know if the lawyer was involved

Page 54

E. CHENEY

1
2    in the actual submission; no, I don't think,
3    no.
4    Q.    Were you directly involved in that
5    process?
6    A.    No.
7    Q.    How did you learn about the process?
8    Through the author or --
9    A.    The author says I have to show this to
10   the publication review board.
11   Q.    So your information about that process
12   came through the author?
13   A.    In that case, yes.
14   Q.    In any other experience other than
15   dealing with No Easy Day, did you have an
16   experience dealing with a prepublication review
17   process?
18   A.    No.
19   Q.    Do you have any knowledge about the
20   prepublication review process before the
21   publication of No Easy Day?
22   A.    Only for the CIA.
23   Q.    Were you aware of any prepublication
24   review process for members of the military?
25         MS. NORMAN:  Objection to form.

Page 55

E. CHENEY

1
2    A.    Only for the CIA is what I was aware of;
3    I didn't know what the military situation was.
4    Q.    You might have answered the question
5    already in connection with a different topic,
6    but other than Mr. Bissonnette, have you
7    represented any other military authors?
8    A.    No.
9    Q.    Is there anyone in your agency
10   representing any military authors other than
11   Mr. Bissonnette?
12   A.    No.
13   Q.    Have you represented any authors other
14   than Mr. Bissonnette who had signed
15   nondisclosure agreements?
16         MS. NORMAN:  Objection to form.
17   A.    I mean, like I said, no, not other than
18   what I'm saying for the CIA; I assume she
19   signed a nondisclosure agreement; I don't know
20   how they handle it.
21   Q.    Now, I believe that in connection with
22   this case, you're designated as both a mixed
23   fact and expert witness.  Are you aware of
24   that?
25         MS. NORMAN:  Are you aware of

Page 56

E. CHENEY

1
2    that?
3    A.    Yes.
4    Q.    How are you aware of that?  Who told you
5    that?
6    A.    When I --
7          THE WITNESS:  Did you get the --
8          MS. NORMAN:  The form.
9    A.    Yes, the form said I was a non-retained
10   fact witness and a non-retained person.
11   Q.    Unfortunately, I only have one copy, but
12   I'll mark it.
13   A.    Okay.
14         (Whereupon, Rule 26-A2 Expert
15         Disclosure was marked as Exhibit 135,
16         for identification, as of this date.)
17   Q.    Ms. Cheney, I'm going to show you the
18   marked copy.  This is Exhibit 135.  Have you
19   seen this before?
20   A.    Yes.
21   Q.    Did you see it drafted before it was
22   finalized?
23   A.    No.
24   Q.    Did you work with anyone to amend or
25   change the text that begins on page 4, as it



Page 57

1           E. CHENEY
2   relates to you?
3   A.    No, no.
4           MS. NORMAN:  Just let him
5       finish.
6   A.    Sorry.
7   Q.    I understand.  Did you approve this
8   language?
9   A.    No.
10  Q.    Well, I want to ask if you agree with
11  it; it states that on page 4, in the third
12  sentence of the first paragraph, that you
13  "represented plaintiff on both his books and
14  has represented numerous bestselling authors
15  and has first-hand experience with the income
16  authors receive from bestselling books; the
17  nature and patterns of the book sales, what
18  will increase or decrease book sales, the
19  process of marketing a bestselling book for a
20  movie, and the income authors receive when
21  bestselling books are optioned for and become
22  movies."  Is it an accurate statement?
23  A.    Yes.
24  Q.    What bestselling book have you worked on
25  that became a movie?

Page 58

1           E. CHENEY
2   A.    Well, I think just to specify, it says
3   the process of marketing a bestselling book for
4   a movie, so Fair Game became a movie; that was
5   Valerie Plame's book.  I'm actually not sure if
6   it hit the bestseller list; I'm trying to
7   think, but generally what my job is, is the
8   marketing of the book to become a movie; I
9   think that's what he's trying to say here.
10  Q.    Have you ever --
11  A.    Which I've done several times.
12  Q.    Have you ever had a book that you worked
13  on as a literary agent for the author become a
14  movie?
15  A.    Valerie Plame's Fair Game.
16  Q.    Any other book that you worked on that
17  has become a movie?  Any others?
18  A.    Concussion, that was just -- with Will
19  Smith.
20  Q.    Who is the author of Concussion?
21  A.    Jeanna Marie Laskas, L-A-S-K-A-S.
22  Q.    When was that book written?
23  A.    About a year and a half ago, I think.
24  Q.    That was after No Easy Day; correct?
25  A.    Yes.

Page 59

1           E. CHENEY
2   Q.    Were there any books that you worked on
3   that became movies before your work on No Easy
4   Day?
5   A.    Fair Game.
6   Q.    And no others?
7   A.    They didn't become movies, no.
8   Q.    Other than Fair Game and Concussion,
9   have any books that you've worked on as a
10  literary agent become movies?
11  A.    No.
12  Q.    The second paragraph states that "you
13  may testify to the amounts of money that
14  plaintiff has lost as a result of book sales
15  that never occurred because of the actions of
16  defendants."  Do you see that?
17  A.    Yes.
18  Q.    Do you agree with that?
19          MS. NORMAN:  Objection.  She
20      testified she didn't write this; this is
21      a legal document in the case; I don't
22      think she --
23          MR. FURMAN:  I'm just asking if
24      she agrees that she --
25  A.    Well, I wrote something --

Page 60

1           E. CHENEY
2           MR. FURMAN:  -- could testify
3       to.
4   A.    -- which I believe you have, which does
5   that.
6   Q.    So you've thought about the income that
7   Mr. Bissonnette may have lost as a result of
8   book sales?
9   A.    Yes.
10  Q.    We have some document that you prepared
11  in contemplation of that issue?
12  A.    Yes, I think you have -- I don't know
13  what you have; I just know that Randy has it,
14  and Elena has it; right?
15  Q.    When did you prepare that document?
16  A.    It would probably say on the document; I
17  think it's dated.
18  Q.    I don't know what you're mentioning so
19  it's new to me, so I just want to explore what
20  you're referring to because I haven't seen it,
21  so can you give me your best estimate as to
22  when you prepared it?
23  A.    Probably 2014.
24  Q.    Is it a document that you have available
25  to you, if you need to look it up in your



Page 61

1          E. CHENEY
2    office?
3          MS. NORMAN:  Do you have it in
4       your office?
5    A.    Yes.
6    Q.    What does the document consist of?
7          MS. NORMAN:  You can answer.  I
8       mean, just a minute; just answer
9       questions about the document, to the
10      best of your recollection.
11   A.    Sorry; tell me the question again.
12   Q.    I'm asking about the amount of money
13   that Mr. Bissonnette lost as a result of book
14   sales that never occurred because of the
15   actions that are claimed against my clients.
16   A.    Right.
17   Q.    You've testified that you have prepared
18   a document to that effect in 2014?
19   A.    Yes, I believe it's '14.
20   Q.    And I asked you if you have that
21   document and you said you do have it in your
22   office?
23   A.    Yes.
24   Q.    I'm going to make a request for the
25   production of that document, and we'll handle

Page 62

1          E. CHENEY
2    that request through your lawyer and
3    Mr. Johnston.
4    A.    Sure.
5    Q.    Could you describe for me what that
6    document says?
7    A.    It gives an estimate of what potential
8    income losses were, in my professional
9    judgment, for Matt Bissonnette because of
10   Podlaski's failure to advise him of the proper
11   legal way in which he's supposed to pursue
12   publication of any books that he writes.
13   Q.    What was it based on?  Book sales only
14   or anything else?
15   A.    It was based on potential book sales.
16   Other income, are you asking about?  Is that
17   what you mean?
18   Q.    I just want to know what's in your
19   document?
20   A.    Oh, yeah.  So it's based on research
21   that I did to determine what kind of sales the
22   book might have -- how many copies the book
23   might have sold, had it gone through the proper
24   channels, what potential film deals it might
25   have garnered, if it had gone through the

Page 63

1          E. CHENEY
2    proper channels, and what book sales resulted
3    in a potential movie that might have been made,
4    if it had gone through the proper channels.
5    Q.    Can you tell me what that research was?
6    What did it consist of?
7    A.    We have proprietary software called
8    Nielsen BookScan that tells us sales, track
9    records for other books similar to No Easy Day,
10   and I did -- I used that to determine
11   comparable sales for No Easy Day, had it gone
12   through the proper channels.
13   Q.    Can you spell the name of that software?
14   A.    Sure.  Nielsen; like the TV, you know,
15   Nielsen does ratings for television,
16   N-I-E-L-S-E-N BookScan.
17   Q.    What comparable books did you compare No
18   Easy Day to?
19   A.    I believe, I know I compared it to
20   Marcus Luttrell's book; I actually don't
21   remember the name of his book right now.  I
22   know that was one the books that I compared to;
23   there may have been a couple of others,
24   actually.
25   Q.    Who is Marcus Luttrell?

Page 64

1          E. CHENEY
2    A.    He was a Navy Seal.
3    Q.    What did his book involve?
4    A.    It was an expedition called Lone
5    Survivor; it was an expedition that he went on
6    in which, I think, most of the men were killed
7    on his expedition.
8    Q.    Could you tell me --
9    A.    He survived.
10   Q.    Lone Survivor was a book of Mr. Lutrell
11   that ultimately became a movie?
12   A.    Yes.
13   Q.    You mentioned a couple of other books.
14   What books are those?
15   A.    I'm actually not sure; I would have to
16   look at the document.  I think I looked at --
17   I'm sure I looked at other military titles, but
18   I think in the document I mention maybe one or
19   two others.
20   Q.    Can you tell me generally what this
21   Nielsen BookScan software does?
22   A.    It gives you the sales track records,
23   which approximately is eighty percent of sales
24   of a book title since about 2001, so it's the
25   last fifteen -- sixteen years of book sales for



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI
January 27, 2017
65–68

Page 65

E. CHENEY
1
2   every book published.
3   Q.    How is the data in the Nielsen software,
4   how is that populated?  Who provides the
5   information?  Is it the Nielsen Company?
6   A.    Yeah, I assume so.  I mean, they get
7   sales tracks from Amazon; they get it from
8   Barnes & Noble; they get it from the
9   independent book sellers; they get it from
10  Costco.  So all the major book sellers report
11  to Nielsen BookScan.
12          MR. FURMAN:  Let's mark this
13      next document.
14          (Whereupon, Projected Sales were
15      marked as Exhibit 136, for
16      identification, as of this date.)
17  Q.    Ms. Cheney, I'm going to show you what
18  was marked, and I'll show you the actual
19  exhibit, Exhibit 136.  Do you know what this
20  is?
21  A.    Yes.
22  Q.    What is it?
23  A.    It was projections that I put together
24  for potential -- actually, let me just see if
25  it was projections.  I believe these are

Page 66

E. CHENEY
1
2   projections based on sales as to what -- let me
3   just see, hold on.  Yeah, these are projected
4   sales for No Easy Day over a ten year period
5   that I prepared.
6   Q.    When did you prepare this projection?
7   A.    I'm actually not sure.
8   Q.    Was it in the year 2013?
9   A.    I don't know; I'm not sure the exact
10  date, but that's possible.
11  Q.    Do you know whether you prepared it in
12  2016?  2015?
13  A.    2013 sounds very possible, like, a
14  reasonable guess.
15  Q.    Who asked you to prepare it?
16  A.    That's what I'm trying to remember, to
17  be honest; I'm not sure if it was Bob Luskin or
18  -- I think it was Bob Luskin, but I'm not
19  positive, to be honest.  I really don't know.
20  Q.    Do you know why Mr. Luskin asked you to
21  prepare it?
22  A.    No, I don't remember.
23  Q.    Was it prepared in connection with a
24  lawsuit against Mr. Podlaski?
25  A.    I'm really not sure.

Page 67

E. CHENEY
1
2   Q.    Do you know why --
3   A.    It makes sense what you're saying.
4   Q.    I'm asking specifics questions.  Why did
5   you prepare this?
6   A.    Oh, here, 2014.  Hold on.  Because we
7   were looking at what's the potential sales of
8   No Easy Day over a ten-year period, so it had
9   to do with something -- to do with what losses
10  Matt might have had; I think it's Luskin, but
11  I'm not sure.
12  Q.    You testified earlier about using the
13  Nielsen BookScan; is this the same projection
14  that you were describing earlier?
15  A.    You mean is this sheet different than
16  the other one?  Is that what you're asking?  Is
17  this the same software?
18  Q.    Let me rephrase the question and I'll
19  start again.  Before I showed you Exhibit 136,
20  I was asking you about the projections, and you
21  had testified that you had done one in
22  accordance with something called the Nielsen
23  Rating BookScan?
24  A.    Right, that was one piece of the
25  research that I use to project the income.

Page 68

E. CHENEY
1
2   Q.    Is that research reflected in the
3   document that's before you, Document 136?
4   A.    I think it was for a separate document,
5   to be honest, but clearly, since I'm referring
6   to Nielsen BookScan here I use as well, that's
7   the first place I would go besides talking to
8   publishers about their thoughts, but yeah,
9   yeah.
10  Q.    Earlier when I had mentioned that I
11  would be calling for the production of the
12  document --
13  A.    Yeah.
14  Q.    -- that I had not seen, that is
15  something different than what is in front of
16  you?
17  A.    Yeah.
18          MR. JOHNSTON:  Object to the
19      form of the question.
20  Q.    What I'm getting at is, there's another
21  document out there that contains your research
22  and has your comparison to Marcus Luttrell's
23  book and some other books?
24  A.    Yes, I mean this was done at a different
25  time and so it's possible that these numbers



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
69–72

Page 69

E. CHENEY

1
2  are different than the numbers on this other
3  document because sales -- because I would have
4  more information later on.
5  Q.    So I'm repeating myself, but I had asked
6  for the production of the other document?
7  A.    Yes.
8  Q.    I'm struggling to define it, but I would
9  define it as the comparison of future book
10  sales based on Marcus Luttrell's book and other
11  books; I'm calling for the production of that
12  particular document; I'll deal with it through
13  the lawyers.
14  A.    Right.
15  Q.    Just so I'm clear, it is separate from
16  Document 136?
17  A.    Separate, yes.
18  Q.    In general terms, what is Document 136
19  telling me or trying to tell me?
20         MS. NORMAN:  Objection to form.
21  A.    Different scenarios -- and what Matt's
22  profits would have been based on -- different
23  sales scenarios.
24  Q.    Where are the different sale scenarios
25  listed?

Page 70

E. CHENEY

1
2  A.    Well, net to author No. 1; net to author
3  No. 2; net to author No. 3; net to author No.
4  4; those are all different sales patterns.
5  Q.    Where can I find information about those
6  specific patterns that you used to calculate
7  the numbers that are set forth there?
8  A.    I don't understand the question.
9  Q.    I'll break it down.  At the very top of
10  the document, there's something called SRP?
11  A.    Right.
12  Q.    What does that mean?
13  A.    I'm trying to remember.  Sales -- I
14  don't know; I don't remember what that's
15  supposed to be, but what it is, is what -- so
16  in other words, SRP the price of the book of No
17  Easy Day was $26.95; right?  If you go to
18  price.  Net to author, so this would be based
19  on one -- if the book had netted -- had gotten
20  $4 million in sales -- oh, I know; I'm
21  explaining -- this is the retail price, SRP,
22  $26.95 and then what the net to -- I think I
23  need a calculator, but --
24  Q.    For example, I asked you what SRP meant
25  and you mentioned that looks to be the retail

Page 71

E. CHENEY

1
2  price of the book, $26.95?
3  A.    What it looks to me like is -- you know
4  what?  Let me look at this; I need to go
5  through this again because I haven't seen this
6  in a while, so I see it -- to go through this
7  again to see what I was really doing here.
8  Q.    Let's put that down for the moment; I'll
9  come back to it; just so we can keep moving.
10  A.    I need to look at it more carefully.
11  Q.    That's fair enough.  So we'll get back
12  to that.
13  A.    Sure.
14         MS. NORMAN:  Can I confer with
15  Mr. Johnston for a second?  This will
16  take two minutes.
17         MR. FURMAN:  Sure.  We'll mark
18  this.
19         (Whereupon, Document Subpoena
20  was marked as Exhibit 137, for
21  identification, as of this date.)
22         MR. JOHNSTON:  Let me say on the
23  record, I think -- well, I think the
24  document Mr. Furman is requesting -- is
25  questioning Ms. Cheney about is a

Page 72

E. CHENEY

1
2  document that she assisted us in the
3  preparation for purposes of damage
4  calculations that document, which I know
5  exists, was attached as Exhibit 5 to a
6  settlement offer that was sent to the
7  defendants before suit was ever filed
8  and has been in the possession of
9  defendants and their counsel since
10  before November of 2014.  Now, in
11  fairness, the counsel for the defendants
12  at that time was not Mr. Furman, it was
13  another law firm.  I'm checking on
14  whether that document was produced a
15  second time as a part of disclosures.
16  I'm not sure of that; I'll know shortly,
17  but I know it was sent to the defendants
18  with that letter, and I'm happy to
19  produce it again; we'll be happy to do
20  so.
21         MR. FURMAN:  Elena, is there
22  anything you wanted to put on the
23  record?
24         MS. NORMAN:  No, I just wanted
25  to make it clear that my understanding



Page 73

1        E. CHENEY
2  is that counsel for Mr. Podlaski has the
3  document that Ms. Cheney is talking
4  about.
5        MR. FURMAN:  I hate cluttering
6  the record this way.  The only response,
7  it doesn't require a response in return,
8  is that I can only deal with in
9  litigation, the documents that are
10 produced pursuant to demands or
11 subpoena.  I don't believe that the
12 document that I'm requesting was
13 produced pursuant to a demand for
14 production of documents or a subpoena.
15 For that reason, I'm calling for the
16 production of it, and we'll reserve the
17 right to question Ms. Cheney further on
18 it, if necessary.  I don't know that,
19 and I'm just reserving the right to do
20 so.  I understand all the objections to
21 them.
22       MR. JOHNSTON:  Let me just say,
23 they have e-mailed it to me; I will try
24 to figure out a way to get it from my
25 phone into Ms. Lemkhen's phone in the

Page 74

1        E. CHENEY
2  next few minutes.
3        MR. FURMAN:  I mean, having it
4  on the phone while I'm questioning the
5  witness and not having an opportunity to
6  read and prepare for the questioning is
7  not something I would want to do to
8  another lawyer.
9        MS. NORMAN:  Look, look, look,
10 here's what we're going to do.  We're
11 going to produce it to you at the
12 beginning of the lunch break.  You can
13 look at it, and you can ask Ms. Cheney
14 any questions about it that you want
15 today, but the deposition is not going
16 to be continued based on that document.
17       MR. FURMAN:  Thank you.  I
18 understand.
19       MS. NORMAN:  Please don't cut me
20 off.  I'm entitled to speak on the
21 record, as are you.  The deposition is
22 not going to be continued based on
23 whether or not you knew you had that
24 document coming here today.  Will you
25 agree to that?  If you won't, then

Page 75

1        E. CHENEY
2  there's no reason for me to produce it
3  to you at lunch.
4        MR. FURMAN:  I'm not going to
5  agree to it; I don't even know what it
6  is; I'm sorry.  I'm going to ask
7  questions and I'll continue.  I really
8  don't want lawyer talk part of the
9  record.
10       MS. NORMAN:  Lawyer talk is as
11 much part of the record as your
12 questions to the witness; you know that.
13       MR. FURMAN:  Thank you very
14 much.
15       MS. NORMAN:  So look, what I'm
16 telling you is, in my mind, it's your
17 obligation to look at every document you
18 have and to make your deposition outline
19 and if you didn't see something that's
20 not something that is an issue of our
21 creating; however, in order to try to
22 streamline this, we're happy to give you
23 the document at the beginning of the
24 lunch break; we'll even print it out for
25 you, and you can ask whatever questions

Page 76

1        E. CHENEY
2        you want.
3        MR. FURMAN:  Thank you.
4  Q.    Ms. Cheney, I'll show you what's been
5  marked as Exhibit 137.  Do you recall receiving
6  that document?
7  A.    Yes.
8  Q.    When did you receive it?
9  A.    I don't know.
10 Q.    When did you receive it?
11 A.    I said, I don't know.
12 Q.    Sorry.  What did you do in reaction to
13 receiving it?
14 A.    Whatever I was supposed to do; I don't
15 know.
16 Q.    Well, I wouldn't know unless you tell
17 me.
18 A.    Honestly, what it's requiring me to --
19 subpoena for all documents -- I sent the
20 documents, I assume, to whoever I was supposed
21 to send them to.
22 Q.    Can you describe for me the process by
23 which you collected documents in response to
24 the subpoena?
25 A.    Sure.  I had a folder; I took the



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
77–80

Page 77

E. CHENEY

1
2  folder, I think I sent them to Randy; right,
3  and then whatever, you know, notes I had in
4  that folder, and then I went through all my
5  e-mails, printed them. I believe I sent that
6  to Randy, and also sent -- forwarded whatever
7  e-mails I had that involved Podlaski.
8  Q.    The folder you described, where was it
9  kept first? Let me ask you that.
10  A.    In my office.
11  Q.    How is it segregated from other
12  documents?
13  A.    It just said "Mark Owen" and things get
14  shoved in there, basically; I'm not the most
15  organized.
16  Q.    So everything that's paper related to
17  Mr. Bissonnette would have been in that folder?
18  A.    Primarily, but then the actual contract
19  with the publisher, we put that into a separate
20  folder and, like, if a check comes in we put
21  that in a separate folder, and we do a Xerox of
22  the check.
23      MS. NORMAN: I don't think they
24      say Xerox anymore.
25  A.    Or whatever; I don't do the Xeroxing, if

Page 78

E. CHENEY

1
2  it -- the copying, and then we have a money
3  processing thing that gets sent.
4  Q.    You took that entire folder and you sent
5  it over to Mr. Johnston?
6  A.    I think so.
7  Q.    Did you have it copied, or was it the
8  original that you sent over?
9  A.    I think he could probably answer that
10  better than I could. I don't know, actually
11  Q.    Well, I just want to know how you gave
12  it to Mr. Johnston?
13  A.    I either copied it -- I think I probably
14  copied it; I kept the copy for myself and sent
15  him the actual, but I'm not sure.
16  Q.    Did you review the documents in that
17  folder before you sent it over to Mr. Johnston?
18  A.    I mean, I looked at it, but I basically
19  just took the whole thing and sent it.
20  Q.    How big or small was it? Physically
21  describe it for me?
22  A.    It was, like, this thick (indicating),
23  maybe, like, an inch and a half.
24  Q.    Consisting of paper, I take it?
25  A.    Yes, paper.

Page 79

E. CHENEY

1
2  Q.    Now, the e-mails, how do you organize
3  your e-mails in your office? Are they on
4  Outlook?
5  A.    Yes.
6  Q.    Do you organize them by author?
7  A.    I have a list of file folders for the
8  author; however, I never move them into the
9  file so, although -- I think I set up an
10  automatic thing where they generally go into
11  the file, so yeah, I just keep them all -- I
12  have them all, so if I'm looking for something,
13  I just put in Mark Owen, then they all come up.
14  I also have a side folder, which probably has
15  most of them.
16  Q.    Do you have a network at the office, or
17  does everyone have a PC?
18  A.    We each have our own PCs, yeah, personal
19  computers.
20  Q.    Are all the agents connected by a
21  specific network?
22  A.    We had a server; now, I think we use the
23  Cloud.
24  Q.    The filing system that you would use,
25  and you had mentioned sometimes that you don't

Page 80

E. CHENEY

1
2  use it, is that a Microsoft Word filing system?
3  A.    No, no, on an e-mail.
4      MS. NORMAN: Objection to form.
5      Misstates the witness's testimony; you
6      can answer the question.
7  A.    When I use a file; it's a file on the
8  e-mail that, you know -- so if an e-mail comes
9  in, I think it should route -- if it has his
10  name on it, route to his e-mail file, if that's
11  what you're referring to.
12  Q.    No, what I'm asking is, do you have a
13  specific software that is a document retention
14  software?
15  A.    Oh, yes, yes.
16  Q.    What's it called?
17  A.    I think it's Outlook or Microsoft Word,
18  yeah.
19  Q.    Did you create a separate folder for
20  Mark Owen/Matt Bissonnette?
21  A.    Yes.
22      MS. NORMAN: So, as I mentioned
23      before, I have a call at noon and it is
24      a five to 12:00. Could we break after
25      one or two more questions on this?



Page 81

1           E. CHENEY
2           MR. FURMAN:  Sure.
3   Q.      The e-mails that relate to
4   Mr. Bissonnette, can you describe how you
5   searched for them?
6   A.      I put in Mark Owen and then it comes --
7   every e-mail that comes under the Mark Owen
8   e-mail, comes up; I mean how else do you
9   search?
10  Q.      Well, what I'm asking for is, how did
11  you organize the e-mails so that you then could
12  produce them to Mr. Johnston?
13  A.      I put in all of Matt's e-mails and they
14  came up and then we printed all of them and I
15  also forwarded them to him, you know, I think
16  -- let me just look at what else they're
17  supposed to do.  So then, I would of put in
18  similarly any -- Ben Sevier from Penguin,
19  e-mails from him, if they related to Matt; I
20  would of done the same thing, but put Ben
21  Sevier's name into Microsoft -- I mean, to the
22  e-mail, search, forward, print.
23  Q.      I think your counsel needs to take a
24  break.  I want to continue to ask some
25  questions about this process, and we'll take a

Page 82

1           E. CHENEY
2   break now.
3   A.      Sure.
4           MR. FURMAN:  How much time do
5   you need?
6           MS. NORMAN:  Well, did you want
7   a lunch break or do you want to keep
8   working?
9           MR. FURMAN:  I would like to
10  keep working.
11          MS. NORMAN:  Do you not want to
12  have a lunch break at all?  All I'm
13  saying, to the extent that we're going
14  to have one anyway, it makes sense to do
15  one now because I have to take a break.
16  So the witness may want to eat lunch
17  today.  I think that if people are going
18  to eat, it should happen now.
19          MR. FURMAN:  That's fine; I'd
20  like to just keep it short.
21          MS. NORMAN:  I'm thinking maybe
22  -- I have a call for twenty minutes or
23  something, so why don't you just bring
24  the sandwiches from the other room in
25  here.

Page 83

1           E. CHENEY
2           MR. FURMAN:  Can we reconvene at
3   12:30?
4           MS. NORMAN:  I can't guarantee
5   what time my call is going to be over;
6   I'll do the best I can.
7           MR. FURMAN:  We spent a lot of
8   time dealing with things that don't
9   relate to getting testimony from the
10  witness.  I'm concerned about the time
11  that we're losing so I would like to
12  start it as promptly as possible.
13          MS. NORMAN:  I would, too, and
14  as I told you first thing when we
15  started this morning, and you guys were
16  late, by the way.
17          MR. FURMAN:  We were late by, I
18  think, maybe eight minutes.
19          MS. NORMAN:  Right, but you were
20  late and so I told you first thing that
21  I needed to break at 12:00, and I'm
22  going to.
23          MR. FURMAN:  That's fair enough.
24  If I do a word count, I can almost
25  guarantee that most of the words are

Page 84

1           E. CHENEY
2   coming from you and not the witness, and
3   that bothers me.
4           MS. NORMAN:  So what?  So what?
5   I'm entitled to make a record.  I mean,
6   that's irrelevant and you might not like
7   it.
8           MR. FURMAN:  I don't like it.
9   You've done a very good job of getting
10  under my skin, so I salute you for that.
11          MS. NORMAN:  Good, good.
12          MR. FURMAN:  It happens very
13  rarely.
14          MS. NORMAN:  I don't do it
15  deliberately, but foremost, I would like
16  a record that is accurate and that can
17  be used in the ways that it can be used.
18          MR. FURMAN:  Kudos for you.
19          MR. JOHNSTON:  Let me confirm,
20  on the record, that I have sent to
21  Izabell, via e-mail, a memo on Elyse
22  Cheney Literary Associates letterhead to
23  me, dated September 17, 2014, that was
24  attached as Exhibit 5 to the settlement
25  offer that was sent to Mr. Shannon, who



Page 85

1          E. CHENEY
2  was counsel at that time; we can print
3  out a copy of that, somehow here I'm
4  sure.  Right now, all you have is that
5  electronic copy of the document.
6          MR. FURMAN:  Fair enough.  I
7  would say that, Randy, just so the
8  record is clear, this, unless I'm wrong,
9  wasn't produced in response to
10  discovery.  I've only prepared for Ms.
11  Cheney's testimony today, in response to
12  documents that were produced in
13  discovery.  I asked for, in my document
14  demands, Ms. Cheney's work product and
15  anything that relates to profits or
16  anything that she would testify to.  I
17  would naturally expect to give you the
18  opportunity to prepare adequately.  I
19  know that you would obviously give me
20  that opportunity.
21          MR. JOHNSTON:  Absolutely.
22          MR. FURMAN:  So all I'm saying
23  is that I'm now seeing a document that
24  relates to Ms. Cheney's potential
25  testimony for the first time, so I'm

Page 86

1          E. CHENEY
2  going to reserve the right to ask the
3  court for more time with Ms. Cheney;
4  that's all I can do.
5          MR. JOHNSTON:  So that the
6  record is clear, I'm having my office
7  check to see if the document was
8  produced as part of our document
9  production.  You may be right that we
10  inadvertently did not produce it and,
11  for which, my profound apologies.  I
12  absolutely recognize your right to
13  question the witness on a document and
14  the preparation issue, I understand.  I
15  will tell you, to my knowledge, and I
16  would ask you to confirm this during the
17  break, the damages described in that
18  letter are not even damages we are
19  currently seeking, so I don't know that
20  it matters, but -- and that may be why
21  it didn't get produced.  I'll ask
22  Robert.  I understand you reserving your
23  rights; you're absolutely on firm ground
24  in doing so.  I don't think it matters
25  to either one of us, but you now have

Page 87

1          E. CHENEY
2  the document; you can look at it and
3  decide.
4          MR. FURMAN:  We'll let the
5  reporter rest.  We created a molehill
6  out of an ant.
7          MS. NORMAN:  Since I do not want
8  to be a part of the word count; I'll now
9  stop.
10          (Whereupon, a recess was taken
11  at this time.)
12          MR. JOHNSTON:  I received
13  confirmation from my partner, Robert
14  Toby, that Mr. Furman is correct, that
15  the September 2014 document of Ms.
16  Cheney was not produced in the document
17  production.  Without arguing his
18  reasoning, he said he did not think it
19  was within the scope of the subpoena for
20  her file, in part, because it was
21  produced in contemplation of litigation
22  and not, therefore, business records and
23  could not qualify as a business record
24  and was prepared as part of a settlement
25  demand, whether he's right or wrong

Page 88

1          E. CHENEY
2  about that.  We have produced the
3  document to Mr. Furman and Ms. Lemkhen
4  at this time electronically and the hard
5  copies and recognize Mr. Furman had
6  limited time to review it.  I will
7  further, say my belief is and thanks to
8  the loss of my iPad, I can't confirm it,
9  but my belief is that the expert report,
10  submitted in accordance with our expert
11  deadline from Mr. Slottje, does not
12  incorporate or rely on Ms. Cheney's
13  opinions any way, and I think that's all
14  I have to say about the document.
15          THE WITNESS:  Can I talk?
16          MS. NORMAN:  Yes.
17  A.   This Document 136 that you gave me, I
18  now understand it because it was given to me
19  and stapled in the wrong order which, I think,
20  you would have known; I don't know cause it
21  would have printed out that way so I'm not sure
22  why it was given to me in an order that would
23  make it confusing.  Again, it was produced for
24  Luskin.
25          MS. NORMAN:  Prepared for



Page 89

1          E. CHENEY
2      Luskin.
3   A.    It was prepared for Luskin, yeah, and it
4   shows my projections from the publication from
5   2012 -- the end of 2012 to -- for a ten year
6   period as to what No Easy Day, I believe, might
7   have sold or might sell.
8   Q.    The way it was stapled was the way that
9   we received it.
10  A.    Okay.
11  Q.    I just want to explain to you why you
12  were handed the document in the fashion, the
13  way it was presented to you.
14  A.    Do you want me to give you the right
15  order?
16  Q.    Would you mind?  I think it may be
17  easier for us to follow along.
18  A.    Sure.  So the first page says, No Easy
19  Day Projected Income Report:
20       MS. NORMAN:  So that's the one
21       that is now the last page?
22  A.    Yes, that's page 1.  You'll see it takes
23  you through page 1 -- that's not the first page
24  -- sorry; that is the first page sorry; I
25  couldn't see it from here.  So that's page 1;

Page 90

1          E. CHENEY
2   that takes what projected potential sales are
3   in year one and year two and then page 2 goes
4   on and says, "year three," "year four," "year
5   five."  Page 3 is years six to ten.  Now, the
6   next part basically starts with the numbers;
7   SRP is Suggested Retail Price.
8   Q.    Okay.
9   A.    Net is what a publisher would take home,
10  so suggested retail price of the book price is
11  $26.95.
12       MS. NORMAN:  Have you already
13       finished saying how --
14  A.    How they're organized.  The first page
15  has a $4,600,011 number on it, and I believe
16  then it would go -- the second page would look
17  just, like, starting with the $4,000,000, but
18  this one starts at $150,000.
19  Q.    I see it.
20  A.    Then the last pages here of the
21  different scenarios.
22  Q.    $150,000?
23  A.    Yeah.
24  Q.    Great, so now I have the order.  What
25  information did you use to base these

Page 91

1          E. CHENEY
2   projections on?
3   A.    BookScan and most likely a conversation
4   with the publisher as well.
5   Q.    Did the publisher send you information
6   that you then would have entered into the
7   Nielsen BookScan?
8   A.    No, it would have been communicated
9   verbally.
10  Q.    The person that gave you this
11  information was Ben Sevier?
12  A.    Yeah, but this was based mostly on
13  BookScan largely, but I might have vetted some
14  of it with Ben Sevier.
15  Q.    I want to get back to that and also the
16  document that Mr. Johnston referred to; we'll
17  put that aside for now, and we'll back to
18  it.
19  A.    Sure.
20       MS. NORMAN:  Just for the record
21       to be clear, when you say the document
22       that Mr. Johnston referred to before the
23       break, we were talking about a report
24       that Elyse Cheney was talking about that
25       she remembers having prepared some

Page 92

1          E. CHENEY
2   calculations.
3       MR. FURMAN:  That's the document
4       we're talking about.
5       MS. NORMAN:  Right, so I just
6       wanted to make it clear that you now
7       have it.
8       MR. FURMAN:  Yes, I have it.
9   Q.    Going back to the production of
10  documents.  Before the break, you mentioned
11  that you did a search of your e-mails that
12  involve Mr. Bissonnette?
13  A.    Mm-hmm.
14  Q.    Did you have e-mail exchanges with
15  Mr. Podlaski as well during the course of the
16  year that Mr. Podlaski was involved?
17  A.    Yes.
18  Q.    Did you also retrieve those and produce
19  them to Mr. Johnston?
20  A.    Yes, I retrieved everything connected to
21  this case and sent them to Randy.
22  Q.    Did you have e-mail exchanges with
23  Mr. Luskin that did not involve Mr. Podlaski?
24       MS. NORMAN:  Object to form.
25  A.    I assume so; I don't know if -- yeah,



ELYSE FAITH CHENEY                                    January 27, 2017
BISSONNETTE vs PODLASKI                                        93—96

Page 93

1              E. CHENEY
2    yeah -- yes, I would have e-mails with just
3    Luskin and not with Podlaski.
4    Q.    Did you produce those to Mr. Johnston?
5    A.    Yes, anything in connection to the case,
6    I did my best effort to produce.
7    Q.    What I'm looking for is any
8    correspondence you had with Mr. Luskin and
9    others that did not involve Mr. Podlaski.  When
10   I say involved, including him on the e-mail
11   from August 30th of 2012 and up through, say,
12   December of 2012?
13   A.    If I thought that's what I was supposed
14   to do it, then I did it.
15   Q.    I'll leave a space in the record; I'll
16   deal with this, or I'll make a request for this
17   at the end of the transcript and deal with your
18   lawyer on this issue, but I would call for the
19   production of any e-mail exchanges you had with
20   Mr. Luskin from August 30th of 2012 through
21   December 31st of 2012.  I'll include in that
22   request any communication you had with
23   Mr. Luskin that related to the book, No Easy
24   Day, and what we could just --
25   A.    Sure.

Page 94

1              E. CHENEY
2        MS. NORMAN:  Just to make sure
3    we understand the basis of your request.
4    What is your basis -- I don't know if
5    those already have been produced or not.
6    Based on the testimony, it sounds like
7    they would have been produced, but can
8    you articulate for the record what the
9    basis of your entitlement to those is.
10       MR. FURMAN:  Sure.  The reason
11   is that we've had a court order that
12   permits us to have discovery that
13   relates to Mr. Luskin from August 30th,
14   and I believe it is at some point in
15   December.  I don't know if it's
16   December 31st; it might be some other
17   date in December of 2012 that relates to
18   defenses in this case; these are part of
19   the court order, and I would be happy to
20   send you a copy of the court order.
21       MS. NORMAN:  So it's August 2012
22   through September 2012?
23       MR. FURMAN:  No, it would be
24   August 30th of 2012 up and through some
25   period of time in December of 2012.  I

Page 95

1              E. CHENEY
2    don't know if it's the 31st or somewhere
3    before that.  I know it's the month of
4    December.
5        MR. JOHNSTON:  I will notify you
6    both if there were any e-mails withheld,
7    based upon the claim of attorney client
8    privilege, which the court has since
9    said is waived as of that date so that
10   you'll know if they were withheld.
11       MR. FURMAN:  Understand.
12       MS. NORMAN:  Just for the
13   record, this isn't a witness issue in
14   the sense that before the witness
15   retained her own counsel, Mr. Johnston
16   and his firm were handling document
17   production on behalf of the witness; she
18   gave as she testified; my understanding
19   is she provided to Mr. Johnston
20   everything she had that, in any way,
21   related to No Easy Day.  They then made
22   the decision about what to produce and
23   what to withhold based on privilege and
24   whatever, so your follow-up request, as
25   Mr. Johnston noted, is probably an issue

Page 96

1              E. CHENEY
2    for Bissonnette's counsel as opposed to
3    Ms. Cheney herself.
4    Q.    How did you first learn about
5    Mr. Bissonnette?
6    A.    Someone I knew called me and said there
7    was a guy who was on the raid who was trying to
8    decide what he would be doing going forward,
9    and would I like to meet him.
10   Q.    Who was that person that you knew?
11   A.    Kevin Vance was his name.
12   Q.    Who is Kevin Vance?
13   A.    He's a Delta Force guy, yeah.
14   Q.    How do you know him?
15   A.    He was introduced to me several years
16   prior by a video game designer, and he was
17   interested in putting together a video game and
18   potentially making that into -- using that
19   story for a book, so that's how.
20   Q.    Kevin Vance, do you know him?  Do you
21   know whether or not he was a Navy Seal?
22   A.    I'm not sure; I'm pretty sure he was
23   Delta Force.
24   Q.    Do you know how Mr. Bissonnette came
25   into contact with Mr. Vance?



Page 97

E. CHENEY

1
2   A.    I assume it's just a common community of
3   people.
4   Q.    Other than that assumption, you don't
5   know how they got together?
6   A.    No.
7   Q.    Do you know whether it could have been
8   through this video game concept?
9   A.    No, it wasn't; that was way before --
10  years before anything to do with Matt.
11  Q.    What did Mr. Vance tell you?
12        MS. NORMAN:  Objection to form.
13        Go ahead.
14  A.    He said that there was a guy who was on
15  the raid and was considering his options; would
16  I like to meet him?
17  Q.    What did you tell Mr. Vance?
18  A.    Sure.
19  Q.    What happened next?
20  A.    What happened next is I did some
21  research; I called -- I happened to talk to Ben
22  Sevier and said, "there's a guy from the raid
23  coming to my office, what do you know about
24  this?"  This is something of interest and he --
25  his interest was peaked, and I said, "I don't

Page 98

E. CHENEY

1
2   know anythIng about this world; tell me
3   something about it," and then he just happened
4   to call -- I just happened to be on phone with
5   him because he wanted to make a lunch date, and
6   then Matt came to my office and we had a
7   meeting.
8   Q.    Matt came to your office in 78 5th
9   Avenue?
10  A.    Yes, yes.
11  Q.    Who arranged the meeting?  Mr. Vance?
12  A.    Vance must of gave Bissonnette my
13  e-mail.  Bissonnette e-mailed me, and that's
14  how he came to my office.
15  Q.    How long was that meeting?  That first
16  meeting?
17  A.    I think it was about two hours.
18  Q.    Was it in December of 2011?
19  A.    Yes, I think so.
20  Q.    Was it before or after Christmas?  Do
21  you know?
22  A.    Before Christmas.
23  Q.    Was it earlier in December or mid
24  December?
25  A.    Probably mid.

Page 99

E. CHENEY

1
2   Q.    Was it before or after Mr. Bissonnette
3   was dismissed by a superior from some kind of
4   training mission he was on?
5   A.    I don't know what you're talking about.
6   Q.    Were you aware that, around that time,
7   Mr. Bissonnette was on a training mission and
8   he was told to go home, and there was some
9   friction as a result of that?
10        MR. JOHNSTON:  I object to the
11        form of the question.
12  A.    No.
13  Q.    So what I just mentioned, you've never
14  heard of before?
15  A.    No.
16  Q.    What did Mr. Bissonnette tell you when
17  he met with you?
18        MS. NORMAN:  Objection to form.
19  A.    I asked him what a Navy Seal was; what
20  -- tell me about that world; how long have you
21  been in it; how did he get to be on the raid;
22  what was his role in the raid; just tell me his
23  story, you know.
24  Q.    Did you make any efforts to determine
25  whether he was telling the truth or not?  If he

Page 100

E. CHENEY

1
2   was the real deal, in other words?
3   A.    Well, in asking specific questions and
4   you're trying to evaluate the person just based
5   on your judgment, that's an attempt to figure
6   out whether he's telling the truth or not.
7   Q.    Did Mr. Bissonnette show you any
8   artifacts or anything from the raid to confirm
9   that he actually had been on the raid itself?
10  A.    I'm not sure if it was in that meeting,
11  but he had told Kevin, and I believe he told
12  me, that he had a hat from the raid.
13  Q.    The Kevin you just referred to --
14  A.    He may have brought it, but I don't
15  actually remember -- Kevin Vance.
16  Q.    So, again, Kevin Vance told you when he
17  contacted you that --
18  A.    He said, "I think he may have a hat from
19  the raid."
20  Q.    When Mr. Bissonnette met with you in New
21  York in December of 2011, that may have been
22  the time that he showed you the hat that he
23  got?
24  A.    May have; may have; I'm actually not
25  sure.



Page 101

E. CHENEY

1
2   Q.    Just so it's clear --
3   A.    He may not.
4   Q.    When we refer to the hat, and we'll just
5   have to be a little better in the afternoon now
6   -- speaking one at time.
7   A.    Sorry.
8   Q.    That we're referring to the hat that bin
9   Laden had worn when he was killed in the raid?
10  A.    I don't know that he was wearing the
11  hat, but it was billed as bin Laden's hat.
12  Q.    When you met with Mr. Bissonnette, did
13  he express to you that he was concerned about
14  his identity being known?
15  A.    Well, we weren't really talking about --
16  he was not even sure whether he wanted to do a
17  book or not, so I don't even know if it got to
18  the point; it was too premature.
19  Q.    Did he mention that he wanted to not
20  reveal his name or his details?
21  A.    Certainly, as soon as the book was being
22  contemplated, he said he did not want to reveal
23  his name.
24  Q.    When he first met with you in December
25  2011, did he use his actual name?

Page 102

E. CHENEY

1
2   A.    Yes.
3   Q.    Did you discuss with Mr. Bissonnette
4   during that meeting any secrecy or other
5   requirements regarding confidentiality attached
6   to his work as a Navy Seal?
7   A.    I'm sure I did; I'm sure I would have
8   asked him that, but I don't recall specifics;
9   I'm sure I would of said, can -- I don't know
10  how much you can say about what you did, but I
11  don't -- honestly, it was five years ago.
12  Q.    Do you recall what he might have said
13  about that topic about the secrecy or
14  confidentiality attached to the raid?
15  A.    I believe -- I don't know if he said
16  this at the time of that meeting or not, but he
17  expressed to me at some point shortly
18  thereafter that he -- there were certain things
19  about the raid that he was not allowed to speak
20  about -- that he had signed an agreement about.
21  Q.    He told you about that, at that point in
22  time, at that meeting?
23  A.    I'm not sure if it was at that meeting
24  or not. He said there was not a
25  confidentiality -- a separate confidentiality

Page 103

E. CHENEY

1
2   agreement for that raid; he was not allowed to
3   talk about locations and he was not allowed to
4   talk about certain technologies; that he signed
5   something to do with that.
6   Q.    Do you recall the context in which he
7   told you that? Was it, in other words, in
8   response to a question of yours or a question
9   by a third person?
10  A.    A third person? No, it was just me and
11  him in the meeting.
12  Q.    Do you know why that topic came up?
13  A.    I mean, I'm sure that I would have
14  asked, you know, what can you say and what
15  can't you say.
16  Q.    That's when you --
17  A.    His memory was that he had signed a
18  document and he was not allowed to talk about
19  technology -- certain technologies, and he was
20  not allowed to talk about location. Further,
21  he -- Leon Panetta had introduced him and, I
22  believe, a couple of other Seals to Kathryn
23  Bigelow, who was working on a movie about the
24  raid at the time, and they had -- Panetta had
25  allowed them to talk about to sort of consult

Page 104

E. CHENEY

1
2   on that movie to help her, I guess, have some,
3   you know, verse to the film, so clearly it
4   seemed like if he was talking to her and
5   Panetta had introduced him to her, then why
6   wouldn't he also be able to talk to me and
7   other Navy Seals who were also working on that
8   film, which also did go to the point of, was he
9   on the raid or was he not on the raid. Well,
10  if Panetta had introduced him to Bigelow, I
11  don't know; I doubt he's a fake, so --
12  Q.    Did he separately speak to either
13  Kathryn Bigelow or Mark Boal or anyone that
14  works for them?
15  A.    Yes, I spoke to Boal briefly.
16  Q.    What did you talk to Boal about?
17  A.    I spoke -- what I remember talking to
18  Boal about was that Boal -- after the book was
19  sold, Boal wanted Matt to do publicity, I
20  believe, for the movie and Matt did not want to
21  be involved in that at all and Boal then -- he
22  just was pressuring Matt to, sort of, be
23  involved -- to have Matt continue to be
24  involved in the movie, and Matt did not want
25  any involvement in that.



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
105—108

Page 105

E. CHENEY

1
2  Q.    Did you represent Matt in any capacity
3  in respect to Zero Dark Thirty?
4  A.    No.
5  Q.    In any relation to Zero Dark Thirty?
6  A.    No.
7         MR. FURMAN:  Mark the next
8         exhibit.
9         (Whereupon, December 22nd E-mail
10        Exchange was marked as Exhibit 138, for
11        identification, as of this date.)
12 Q.    Ms. Cheney, you mentioned there was a
13 detail that you wanted to add to your prior
14 answer?
15 A.    Yeah, I believe that Kathryn Bigelow is
16 the one who suggested to Matt that he do a
17 book.  And what I remember also about the
18 meeting was that he wanted to know that if he
19 did a book, what would that involve; what kind
20 of money would that potentially bring; that
21 kind of thing.
22 Q.    What did you tell them?
23 A.    I think I said, I really don't know,
24 honestly, but I, sort of, remember saying
25 something about $500,000; suggesting it could

Page 106

E. CHENEY

1
2  be $500,000.
3  Q.    Was the fact that Mr. Bissonnette was
4  actually on the ground in that historic raid,
5  was that a significant factor in the interest
6  in the book?
7  A.    Yes.
8  Q.    Was it also a significant factor that he
9  would have been one the first ones to tell that
10 story from the ground?
11 A.    That if -- if there had been another
12 Navy Seal who told the story before him, who
13 was on the raid, that probably would have been
14 an issue, yeah.
15 Q.    It would have been an issue because --
16 A.    I mean that it would have detracted
17 from, potentially, sales of Bissonnette's book.
18 Q.    So being the first to tell the story is
19 important; fair to say?
20 A.    No, I would say very carefully that the
21 point is -- what was most important was that it
22 was a first-hand account, so if somebody else
23 who was right next to him gave that first-hand
24 account, there would be too much similarity
25 there; that was the key.

Page 107

E. CHENEY

1
2  Q.    Earlier in the year, there was a story
3  in the New Yorker which was quite famous.
4  A.    Right; right.
5  Q.    Written by Nicholas Schmiddle,
6  S-C-H-M-I-D-D-L-E, that was a very detailed
7  narrative of the raid in Pakistan that we're
8  referring to, from both the White House and
9  also the ground perspective.  Do you recall
10 that article?
11 A.    Yes.
12 Q.    Did you read it?
13 A.    Yes.
14 Q.    About at the time it was publicized?
15 A.    I don't know exactly when I read it, but
16 I read it.
17 Q.    Were you aware of it when you were
18 meeting with Mr. Bissonnette about some of the
19 details that were in that article?
20 A.    To be honest, I'm not sure if I -- if it
21 -- I thought it came out after I met Matt, not
22 before, but I'm not sure what the sequence was.
23 Q.    Did Mr. Bissonnette express to you in
24 that meeting any frustration with the fact that
25 information about the raid was being marched

Page 108

E. CHENEY

1
2  out into the public by the politicians and
3  credit wasn't being given to the actual members
4  who risked their lives to complete the raid?
5         MS. NORMAN:  Objection to form.
6  A.    I would separate those two; the last
7  part of what you said, the credit part, I would
8  say that he was not frustrated that the credit
9  was not given to the Navy Seals; he did not
10 want -- he was frustrated that the politicians
11 had leaked anything -- that even had anything
12 to do with the Navy Seal.
13 Q.    Just so I understand, when you say
14 "leaked," it's because what Navy Seals do is
15 traditionally secret; is that why you use the
16 word "leak"?
17         MS. NORMAN:  Objection.
18 A.    Because -- yeah -- you're using the word
19 leak -- yes, it's traditionally a secret, yes,
20 I think.
21 Q.    The frustration, if I understand it, and
22 you let me know if you agree, was that
23 President Obama, Vice President Biden were
24 touting the killing of bin Laden as a political
25 victory as opposed to a victory by the



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
109–112

Page 109

1              E. CHENEY
2  military?
3  A.    No, that's not correct; it's not as
4  opposed to; it's specifically, he was upset
5  that they had credited the Navy Seals and
6  that -- that they had talked about it at all,
7  really; the Navy Seals were not supposed to be
8  part it -- of anything that Obama said.
9  Q.    I'll just rephrase the question so I
10 understand whether this was a frustration
11 expressed to you by Mr. Bissonnette, that he
12 was frustrated that the politicians were
13 talking about the raid for political purposes?
14        MS. NORMAN:  Objection to form.
15 A.    Yes.
16 Q.    Now, I'm going to show you what's been
17 marked as Exhibit 138; it's an e-mail exchange
18 that you were a part of that is around the time
19 of December 22, 2011?
20 A.    Right.
21 Q.    I'd like you to take a moment to read
22 and then I'll ask you some questions about it.
23 A.    Okay.  Can I take the thing out so I can
24 see?
25 Q.    The staple?

Page 110

1              E. CHENEY
2  A.    Yeah.
3  Q.    Sure.
4  A.    Okay.
5  Q.    Do you recall having any e-mail exchange
6  with Mr. Sevier about an overview of what
7  Mr. Bissonnette would have been discussing in
8  his book, perspective book?
9  A.    Yes.
10 Q.    Was the meeting with Mr. Bissonnette at
11 some time before December 22nd of 2011?
12 A.    Yeah.
13 Q.    Who prepared the outline that's
14 attached?
15 A.    It looks like Sevier prepared it; I
16 didn't write it.
17 Q.    Do you know when Mr. Sevier prepared
18 this outline?
19 A.    Only based on the dates that are
20 presented in this document -- in this exhibit;
21 it looks like it was around December 22nd,
22 since the e-mail is referring to the outline.
23 Q.    Was there a separate second meeting that
24 Mr. Bissonnette had with you and Mr. Sevier
25 together?

Page 111

1              E. CHENEY
2  A.    It wasn't a second meeting; we had a
3  meeting with Ben, Matt, and myself.
4  Q.    Was that the very first --
5  A.    That was the second time I met him.
6  Q.    The second time you met Mr. Bissonnette?
7  A.    Right.
8  Q.    So the first meeting you described
9  earlier was the first meeting in your office on
10 Fifth Avenue?
11 A.    Correct.
12 Q.    A week or several days after, you had
13 another meeting with Mr. Sevier and
14 Mr. Bissonnette?
15 A.    Yes.
16 Q.    Who arranged that meeting?
17 A.    It would have been me.
18 Q.    How long was that meeting?
19 A.    An hour; I'm not sure.
20 Q.    Do you recall whether or not that was
21 the moment Mr. Bissonnette produced the hat
22 that was an artifact from the raid?
23 A.    I'm not sure; yeah, I don't know.
24 Q.    Did Mr. Bissonnette produce anything in
25 writing other than simply himself and telling

Page 112

1              E. CHENEY
2  his story?
3  A.    Just himself.
4  Q.    Did Mr. Bissonnette express any concern
5  about secrecy or confidentiality attaching to
6  his account?
7  A.    Yes.
8  Q.    What did he tell you about that?
9  A.    He did not want his name to be used for
10 the book because he did not want it to be about
11 him; he wanted it to be for the historical
12 record.  He -- as far as he knew, going back to
13 this issue of what he was allowed to say, he
14 was not -- he wasn't allowed to say anything
15 that was classified and that -- which in terms
16 of what he had signed of those two documents,
17 there was two things that he was not allowed to
18 talk about because he had signed
19 confidentiality agreements; one had to do with
20 technology and one had to do -- or technology
21 they had developed for the raid specifically,
22 and one had to do with the location.
23 Q.    In the second meeting, were financial
24 issues discussed in relating to the book?
25 A.    No.



Page 113

E. CHENEY

1
2  Q.    Was there any discussion of an advance
3  or projections of royalties or anything like
4  that?
5  A.    No, in that meeting, no.
6  Q.    Did Mr. Sevier explain the publishing
7  process to Mr. Bissonnette?
8  A.    I think so, yes.
9  Q.    On the second page, there's a reference
10  that Mr. Sevier states; I think it's the 12/14
11  e-mail of December 2nd, "he made me nervous
12  with that talk about encrypting."  Do you
13  recall any discussions about encrypting?
14  A.    Not specifically about encrypting, but
15  the issue for him, in terms of secrecy also,
16  just had to do with not exposing himself or any
17  of his seal colleagues to any danger.  So there
18  were threats against the Navy Seals after Obama
19  announced that the raid had happened and that
20  bin Laden was killed and he -- it was very
21  important to keep this as secret as possible in
22  terms of, you know, his name, because he could
23  be in danger or his friends could be in danger
24  and he would never want to put his friends in
25  danger.

Page 114

E. CHENEY

1
2  Q.    At the time that you had the two
3  meetings in December of 2011, were you aware of
4  whether Mr. Bissonnette was still on active
5  duty or not?
6  A.    I don't believe he was on active duty;
7  he was processing out from what I remember.
8  Q.    Did Mr. Bissonnette tell you when he was
9  processing out?
10  A.    He was processing out, I think, around
11  at that time, yeah.
12  Q.    Did he describe the mechanism by which
13  he would process out?
14  A.    It was just he had talked to people at
15  the office -- at the command.
16  Q.    What was the next step that was taken in
17  connection with this book after this
18  December 22, 2011, meeting?
19  A.    Again, I'm not exactly sure on
20  sequencing, in terms of day-to-day, but we had
21  a verbal agreement with Ben that if we could
22  come to terms on a contract, that they would
23  pay him -- he would get a $1,000,000 advance
24  for the book.
25  Q.    Did you have any discussions with

Page 115

E. CHENEY

1
2  Mr. Bissonnette about whether you, Elyse
3  Cheney, needed to have any security clearance
4  in order to hear the details of the raid?
5  A.    You know, I don't know; I don't know.
6  Q.    Did you have any reservations about that
7  issue, about whether you were in a position to
8  hear those details?
9  A.    I don't remember.
10  Q.    Did you seek legal advice on that point
11  for yourself?
12  A.    For myself?  No.
13  Q.    That topic, the topic being whether it
14  was appropriate to hear the details of the
15  raid, was that something that you discussed
16  with Mr. Sevier?
17  A.    I don't know, but I would say that the
18  general protocol in the publishing industry is
19  that there, as you know, many, many public
20  officials write memoirs and, generally, my
21  understanding is that the agent and the
22  co-writer is -- cause, invariably, they use a
23  co-writer to hear the story, then they write it
24  down -- the writer writes it down, then at that
25  point, you have to give it to the PRB, if

Page 116

E. CHENEY

1
2  you're in the CIA, for example.  So, in other
3  words, it's almost impossible for people in
4  publishing not to be privy to that story before
5  the publication review would happen.  It's --
6  it would be unusual for a person in the
7  military, for example, who's not a writer, to
8  write an entire book, something they never done
9  it before, show it to the government for
10  review, and then get an agent.  So, in other
11  words, I highly doubt, for example, Stanley
12  McChrystal didn't tell his agent or lawyer and
13  show his writer, whoever that was, their -- his
14  manuscript before whoever reviewed his
15  manuscript saw it.  So, as a practical matter,
16  we would never be able to publish books if we
17  had to -- if everything was kept from the
18  agent; you just couldn't record the story; it
19  just wouldn't happen.
20  Q.    Let me backtrack.  Did you and
21  Mr. Sevier have a separate discussion about
22  what to do next after the outline was presented
23  on December 22nd of 2011?
24  A.    Yes, he needed to get a writer, so we
25  talked about who could be a potential writer



Page 117

E. CHENEY

1
2  for the book, and after that, we interviewed --
3  Ben referred me to that guy Scott Miller, the
4  literary agent and Scott put forward Kevin
5  Maurer as a potential candidate to write the
6  book, and then I got two other names from
7  people as other potential candidates to write
8  the book, then we met -- Matt and I met in D.C.
9  with the three potential candidates to write
10  the book, including one of whom was Kevin
11  Maurer and then we talked to Ben, and the three
12  of us decided that Kevin Maurer would be the
13  best candidate to write the book.
14  Q.    When you spoke to Scott Miller, did you
15  tell him that you had a potential author who
16  would be telling a first-hand account of the
17  bin Laden raid?
18  A.    I'm sure I -- I -- yeah, yeah, no more
19  details than that.
20  Q.    When you told Mr. Miller that, did you
21  ask him to keep it confidential or private in
22  any particular way?
23  A.    Yes.
24  Q.    What was the reason for that?
25  A.    Because it's a private project and we

Page 118

E. CHENEY

1
2  were going -- number one, we weren't announcing
3  the book; I think we were also just deciding on
4  -- trying to understand what the process was
5  for Matt to fulfill his legal obligations to
6  the government, so we were looking for a lawyer
7  at the same time to help us determine what that
8  process would be, and it's nobody's else's
9  business in general, so even if it were not a
10  sensitive project, I still would want
11  confidentiality just because I don't like to
12  advertise my clients' business.
13  Q.    Mr. Miller eventually got you in touch
14  with Mr. Maurer?  Is that how it worked?
15  A.    Yes.
16  Q.    When did you first speak with Kevin
17  Maurer?
18  A.    The first time that -- I think I
19  probably spoke to him on the phone prior to our
20  meeting, but it was at this D.C. meeting that I
21  met Kevin Maurer.
22  Q.    That meeting, was it some point after
23  New Year's of 2012?
24  A.    I would say so; I would guess that, yes;
25  that would be accurate.

Page 119

E. CHENEY

1
2  Q.    You took a train down to D.C. and met
3  with Mr. Maurer at some hotel; I think it was
4  with Mr. Sevier?
5  A.    Yes, yes; Sevier was not there.
6  Q.    It was just you and Maurer?
7  A.    Matt -- me, Mr. Bissonnette, and Maurer
8  and we met two other candidates as well.
9  Q.    Did you meet Mr. Bissonnette in D.C.?
10  Is that how it happened?
11  A.    Yes.
12  Q.    Did you meet with him before the lunch
13  meeting with Maurer or after, or how did that
14  work out?
15  A.    He picked me up at the train -- I may
16  have taken a flight; I'm not sure.  I think I
17  did take a flight, and then he picked me up at
18  the airport; we went together to the the hotel
19  where we were going to meet the candidates.
20  Q.    What information did Mr. Bissonnette
21  give to the candidates?
22  A.    Just the outlines of who he was, and the
23  story that he wanted to tell; it was more about
24  us asking them questions than them asking us
25  questions.

Page 120

E. CHENEY

1
2  Q.    Did you ask these authors, Mr. Maurer
3  and the others, to sign any confidentiality
4  agreements or any kind of other understanding
5  that issues they discussed would be
6  confidential?
7  A.    The NDA; they signed NDAs.
8  Q.    Do you have a copy of those NDAs?
9  A.    No.
10  Q.    If they signed NDAs, who would have kept
11  a copy of them?
12  A.    I would have a copy; I don't know if I
13  produced that or not.  To be honest, I don't
14  remember if we had them sign NDAs.
15  Q.    That's why I asked the question, if.  If
16  NDAs were signed, would copies of those
17  agreements be in that file that you described
18  is an inch and a half thick?
19  A.    No, it would be on my computer, if there
20  was anything signed.
21  Q.    In other words, a PDF version of the
22  document would be saved and you would destroy
23  the original?  Is that how it would work?
24        MS. NORMAN:  Objection to form.
25  A.    Honestly, we never really took NDAs that



ESQUIRE
DEPOSITION SOLUTIONS

Page 121

E. CHENEY
1
2  seriously because I've always been told that
3  they're not enforceable.  So, like I said, I
4  might not of even had them sign NDAs, but I
5  think I did, but I don't usually -- I probably
6  scanned it in to -- or had my assistant scan it
7  in and put it in his contract file, but it's
8  possible I didn't do it as well.
9  Q.     I'm going to serve a demand on
10  Mr. Johnston for the production of the NDAs, if
11  they exist; they may not.  I never received
12  them.
13  A.     Sure.
14  Q.     Thank you.  Whose decision was it to
15  retain Mr. Maurer?
16  A.     That was the decision -- ultimately,
17  that's Matt's decision -- Bissonnette, but Ben
18  Sevier and myself also give our opinions as to
19  who we think might do the best job.
20  Q.     Do you know whether or not Mr. Maurer
21  sought clearance from the government in order
22  to hear the details of the raid?
23  A.     No, but I don't think he did, but also,
24  he has done work with many military authors
25  where he's written their stories.  So, like, it

Page 122

E. CHENEY
1
2  goes back to what I was saying before, there's
3  many people in the military who work with
4  writers on their projects before they show it
5  to the publishing review board, and Maurer --
6  Kevin had done several books on military
7  matters, so I doubt he sought security
8  clearance.  An ordinary citizen I don't think
9  can just go and ask for security clearance.
10  Q.     Do you think that the bin Laden raid
11  stood out as a source for a book that was
12  different and more compelling than, say, other
13  military operations that had been written
14  about?
15  A.     Can you repeat that question, please.
16  Q.     I'll ask the reporter to read it back
17  because I don't know if I can rephrase it so
18  eloquently as I just did.
19  A.     Sure.
20        (Whereupon, the record was read
21  by the reporter.)
22        MR. JOHNSTON:  Object to the
23  form of the question, compound.
24  A.     I think it was a very compelling story.
25  Q.     Let me rephrase it.  Do you think that

Page 123

E. CHENEY
1
2  the story of the bin Laden raid was different,
3  in any particular sense, than any other book
4  that was written about a military operation?
5  A.     I mean, I was not that versed on
6  military literature so I don't know that I
7  would be the one -- I wasn't thinking about it
8  that way, no.
9  Q.     How did Kevin Podlaski come into the
10  picture?
11  A.     We were looking for a lawyer so that --
12  to help Matt follow whatever his legal
13  obligations were in regards to the publication
14  and, so then, I asked around and Scott Miller,
15  Kevin Maurer's lawyer suggested this guy, Kevin
16  Podlaski, as somebody who was familiar with
17  this process.
18  Q.     Did Mr. Podlaski's name come to you
19  first, or Mr. Bissonnette, first, or do you
20  even know?  In other words, the identity of --
21  A.     Come to me first.
22  Q.     Then you passed on Mr. Podlaski's
23  details to Mr. Bissonnette?  Is that how it
24  worked?
25  A.     Yes.

Page 124

E. CHENEY
1
2  Q.     Did you or Mr. Bissonnette vet
3  Mr. Podlaski's background to know whether he
4  was the appropriate person for the job?
5  A.     If you mean -- if by vetting, you mean,
6  did we interview him, ask him questions, look
7  at his website to see what he has done before?
8  Q.     Yes.
9  A.     That's what we did, yes; that was the
10  process.
11  Q.     Were you satisfied that he would be able
12  to handle this particular piece of work as
13  opposed to Mr. Moss?
14  A.     Yes, he seemed to know more about it.
15  He had been a military man himself; he had
16  vetted this Dalton Fury manuscript that was
17  confirmed by Scott Miller, so yeah, he, you
18  know --
19  Q.     I'm going to show you what's been marked
20  previously in a prior deposition as Exhibit No.
21  9.  Exhibit No. 9 is an e-mail that is from
22  Mr. Sevier to you, dated January 3rd of 2012,
23  and it sets forth a writing schedule.  Do you
24  see that?
25  A.     Yes.



Page 125

1             E. CHENEY
2  Q.    Do you recall receiving this?
3  A.    I mean, I don't recall it specifically,
4  but I see it and I got --
5  Q.    Now, I'm trying to put dates in
6  reference. Was Mr. Podlaski chosen as the
7  lawyer before or some time after this e-mail
8  exchange?
9  A.    This was done on January 3rd, it's
10 possible that we chose him afterwards, but I'm
11 not sure.
12 Q.    There's a description of an intensive
13 five month writing schedule in this e-mail;
14 it's the first line of the e-mail. Why was
15 such an intense schedule contemplated?
16 A.    I feel like they wanted to publish
17 around the September 11th date, and so we
18 decided it was important to get it done quickly
19 and -- yeah.
20 Q.    The idea of having the book published by
21 September 11th, was it because there would be
22 more interest in the book around the time of
23 the anniversary of the 9/11 attack?
24 A.    Yeah, that's the idea; more potential
25 for publicity.

Page 126

1             E. CHENEY
2  Q.    I'm going to show you what's been marked
3  as Exhibit 11, which is also an e-mail exchange
4  around that same time of early January
5  involving Mr. Bissonnette. Now, the e-mail at
6  the bottom, I think that the order of this goes
7  from the bottom; is that -- Mr. Bissonnette is
8  writing to Mr. Sevier and copying you about the
9  author selection?
10 A.    Right; you're talking about on the first
11 page?
12 Q.    Yes.
13 A.    Yes, the "I'll see what I can do"
14 e-mail?
15 Q.    Yes. And after that, on the 5th, you
16 sent to Mr. Bissonnette something that was on
17 the Huffington Post website about a bin Laden
18 movie, and you wrote, "this is what I mean."
19 Do you recall having sent that to
20 Mr. Bissonnette?
21 A.    Hold on; where is my e-mail that you're
22 talking about?
23 Q.    It's in the middle of the first page of
24 Exhibit 11. On January 5th at 2:25 p.m., it
25 appears that you sent an e-mail and wrote,

Page 127

1             E. CHENEY
2  "this is what I mean," and there's an
3  attachment to a Huffington Post article, which
4  is also attached to this exhibit, and the
5  Huffington Post article deals with a probe led
6  by Congressman Peter King into the leaking of
7  classified information relating to the bin
8  Laden raid?
9  A.    I see the article; I just don't see the
10 e-mail from it.
11 Q.    I'll show you. In the middle of
12 Exhibit 11, there's an e-mail right there.
13 A.    Oh, I see, okay.
14 Q.    It's a very small e-mail; there's not
15 much to it; it's one sentence, "this is what I
16 mean"?
17 A.    Yeah.
18 Q.    Do you recall sending that?
19 A.    No.
20 Q.    Do you recall why that article
21 discussing Congressman King's probe into the
22 leaking of classified information about the bin
23 Laden raid was something that you would have
24 sent to Mr. Bissonnette?
25 A.    Why would I have sent that?

Page 128

1  Q.    Yes.
2  A.    So he was aware of what was going on
3  with relation to that movie. I think it had to
4  do with, like, he should stay away from that
5  movie because these people may be the -- maybe
6  Panetta shouldn't have introduced those people
7  to the CIA to help on the movie, so yeah, we
8  discussed his just staying completely clear of
9  it.
10 Q.    Before you sent Mr. Bissonnette the
11 article, I'm presuming you would have read the
12 article; correct?
13 A.    Yes.
14 Q.    In the article, and I'm now asking you
15 to take a look at what -- it's listed as
16 page 12, the very top of it.
17 A.    Got it.
18 Q.    In the 6th paragraph in that article, it
19 states -- it's a long sentence and I'll just
20 repeat it, "he sought information on talks
21 among the White House, the Pentagon, and the
22 CIA about providing Hollywood executives with
23 access to covert military operators and asks
24 whether the film would be submitted to the



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
129-132

Page 129

E. CHENEY

1
2  military and the CIA for prepublication
3  review." Do you see that?
4  A.    Mm-hmm.
5  Q.    Did it occur to you, as you write that
6  article, that there was an issue as to whether
7  Mr. Bissonnette needed to submit the book for a
8  prepublication review?
9  A.    No, because I've been told -- first of
10  all, this is all related to the CIA.  Again, I
11  was going on the good faith that what
12  Mr. Podlaski told us, which is the fact that
13  Matt was retired, meant that he had an optional
14  -- an option whether or not he wanted to show
15  it to the government.  Podlaski also said that
16  while the CIA has a clear process for this,
17  everybody knows there's a PRB, Publication
18  Review Board; everyone knows you have to submit
19  it.  The Navy didn't have anything clear, and
20  that the guidelines weren't clear so, you know,
21  it was different;  they didn't have, like, a
22  publication review board.
23  Q.    What I'm asking is, I think I understood
24  your testimony was that by this time, this is
25  now January 5th, that you're saying this

Page 130

E. CHENEY

1
2  e-mail --
3  A.    Mm-hmm.
4  Q.    -- that Mr. Podlaski had not yet been
5  retained?
6  A.    I'm actually not sure when we retained
7  Podlaski or when I first started talking to
8  him.  It would have been very quickly because
9  we were concerned with doing whatever he was
10  supposed to do; there was no way we were going
11  to do something that he wasn't supposed to do.
12  Q.    At the time you sent this e-mail on
13  January 5th of 2012 and sent a copy of this
14  Huffington Post article, had you already spoken
15  to Mr. Podlaski and obtained the information
16  that you just testified that he gave you about
17  the review process?
18  A.    I'm not sure of the sequence of date,
19  you know, from day-to-day.
20  Q.    Do you know one way or the other, as
21  you're testifying today, whether you had spoken
22  to Mr. Podlaski before January 5th of 2012?
23  A.    I'm sure there's a record; I don't know
24  exactly.  Like I just said, I don't know what
25  my first date of contact with Podlaski was.

Page 131

E. CHENEY

1
2  Q.    On Sunday, January 8th, Mr. Bissonnette
3  replies to your e-mail.  Do you see that?  It's
4  the very top of Exhibit 11.
5  A.    Yes.
6  Q.    In the body of his e-mail, if you could
7  just read it to yourself; I'll just ask you
8  some questions about his response to you.
9  A.    Yeah, I see it.
10  Q.    At the very bottom, you obviously flew
11  down because he's meeting you at the airport;
12  correct?
13  A.    Right, right.
14  Q.    As you testified earlier, he picked you
15  up --
16  A.    Right.
17  Q.    -- so that's consistent with what you
18  just testified to.  In the paragraph that
19  starts off with the book.  Also,
20  Mr. Bissonnette wrote "if the book hits bumps
21  in regards to sensor issues since there is a
22  Captain Phillips movie coming out, what if we
23  worked on a book specifically related to that
24  topic and released it with the movie question
25  mark, exclamation.  Just a thought, question

Page 132

E. CHENEY

1
2  mark, exclamation." Do you recall that?
3  A.    I see it.
4  Q.    Did you discuss with Mr. Bissonnette the
5  possibility of writing a book about the Captain
6  Phillips raid to coincide with the Tom Hanks
7  movie about the same subject?
8  A.    I don't remember discussing a book to
9  coincide with the film, no.  I remember we
10  talked about his potentially doing something
11  short about that raid, whatever that's called,
12  yeah, but not to coincide with that film.
13  Q.    The idea about writing about the Captain
14  Phillips raid or operation or however we can
15  describe it, was that Mr. Bissonnette's idea,
16  or was this something you had already been
17  discussing by January 8th of 2012?
18  A.    This whole idea about Phillips?
19  Q.    Yes.
20  A.    He had said that he was on the Phillips
21  raid, but I don't think we -- I didn't take
22  seriously of the idea of doing a book on the
23  Phillips raid, if that's what you're asking.
24  Q.    Now, in the e-mail, there's a discussion
25  about the book being censored, did you discuss



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

Page 133

E. CHENEY

1
2 that topic with Mr. Bissonnette?
3 A.    Yeah.
4 Q.    How was it discussed?
5 A.    We needed to find out what your
6 obligations are; and he needs to find out -- he
7 wants to know what he's supposed to do; he
8 doesn't remember signing anything except for
9 the document that I told you may be the
10 technology and the location confidential, so he
11 wanted to know what he was supposed to do and
12 we were going to need to find that out. He's
13 very conscientious about wanting -- he
14 certainly wanted to do what he was supposed to
15 do.
16 Q.    Did you receive a copy of the first
17 draft of the contract before or after
18 Mr. Podlaski was retained?
19 A.    It would of very likely been that I
20 would have gotten the publishing contract after
21 Podlaski was retained.  Podlaski worked and
22 consulted on the collaboration agreement
23 between Kevin Maurer and Mark Owen -- Matt
24 Bissonnette, and I believe that Podlaski also
25 looked at the publishing agreement with

Page 134

E. CHENEY

1
2 Penguin.
3 Q.    Once Mr. Podlaski was selected to be the
4 lawyer for Mr. Bissonnette in connection with
5 No Easy Day, what was your involvement?
6 A.    Often -- because I knew more about the
7 publishing process, I would talk to Podlaski,
8 you know, myself and then report back to Matt,
9 but then Matt would sometimes talk directly to
10 Podlaski himself, you know; he wanted to hear
11 from Podlaski what the process was; what his
12 obligations were specifically; he wanted to vet
13 him as well and make sure this was someone he
14 can work with.
15 Q.    In connection with Mr. Bissonnette's
16 obligations as a Navy Seal, those were
17 conversations that Mr. Bissonnette would have
18 had with Mr. Podlaski, separately and apart
19 from you?
20 A.    Yeah.
21 Q.    Were you part of any phone conferences
22 about that topic with Mr. Podlaski and
23 Mr. Bissonnette?
24 A.    I don't know if we -- we may have had
25 phone conferences, but basically, what I said

Page 135

E. CHENEY

1
2 to you, Podlaski told me what he thought Matt's
3 obligations were; he also -- I don't know what
4 transpired between Podlaski and Matt, but they
5 talked also very specifically about what he was
6 supposed to do.  At one point, all three -- we
7 may have talked about it, but I don't know.
8 Podlaski made it clear that he -- Matt could
9 work on the manuscript with Kevin, and then, at
10 that point, he would show the manuscript to
11 Podlaski, and Podlaski had security clearance
12 and could vet it.
13 Q.    Are you aware or not as to whether
14 Mr. Bissonnette and Mr. Podlaski had separate
15 telephone conversations about that topic
16 without your involvement?
17 A.    I'm sure they did.
18 Q.    You don't know, one way or the other,
19 what they said, do you?
20 A.    I know that Matt talked to Podlaski and
21 had a similar conversation; there may have been
22 more in the conversation that I had with him
23 about what his obligations were.  Podlaski said
24 the same thing to him that he said to me; I
25 know that.

Page 136

E. CHENEY

1
2 Q.    How do you know that?
3 A.    Because we talked after -- I talked to
4 Podlaski then Matt talked separately to
5 Podlaski.  Podlaski had questions for Matt, and
6 then Matt and I convened and said what do you
7 think of Podlaski, and Matt said, "you know,
8 he's a military guy;" he connected with him,
9 and so that was it; should we use Podlaski,
10 yes.
11 Q.    Did you have an understanding of
12 Podlaski, one way or the other, that
13 Mr. Bissonnette was supposed to obtain his
14 disclosure agreements with the Navy Seals or
15 the Navy itself?
16 A.    That was between Matt and Podlaski.
17 Q.    The retainer agreement between
18 Mr. Podlaski and Mr. Bissonnette, did you have
19 an involvement in that process?
20 A.    I think he forwarded it to me, and I
21 forwarded it to Matt; I'm sure I looked at it
22 and then forward it to Matt.
23 Q.    Was there a specific process by which
24 that retainer was handled to ensure of Mr.
25 Bissonnette's personal safety?



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
137–140

Page 137

E. CHENEY

1
2   A.    I don't remember.
3   Q.    Do you recall whether or not there was
4   any kind of sealed envelope system to protect
5   Mr. Bissonnette's identity in connection with
6   the signing of the retainer agreement?
7   A.    Not in the signing of a retainer
8   agreement, from what I remember; it's possible,
9   but I don't know.
10  Q.    Do you recall any advice by Mr. Podlaski
11  to protect Mr. Bissonnette's private
12  information, that he should create some kind of
13  double blind corporation system?
14  A.    Yes, yes, I do recall that, yes.
15  Q.    Do you know why that was created?
16  A.    I don't think they created it, but
17  Podlaski would call and come up with different
18  schemes that he had about how Matt could
19  protect his identity.
20  Q.    Did you have a role beyond, obviously,
21  your role as a literary agent for Matt
22  Bissonnette, but a role as a conduit of
23  information between Mr. Bissonnette and
24  Mr. Podlaski?
25  A.    Sometimes, yes.

Page 138

E. CHENEY

1
2   Q.    Can you describe that for me?
3   A.    Well, you know, with any client,
4   sometimes you end up talking to the lawyer and
5   sometimes the client talks to the lawyer; it,
6   sort of, just depends, so, yeah, that's how it
7   was.
8   Q.    Do you recall what topics or information
9   you would have had an involvement with as it
10  relates to Mr. Podlaski's representation of
11  Mr. Bissonnette?
12  A.    Sure.  Well, Podlaski -- we talked about
13  security, making sure Matt's name was not
14  public.  I talked to Podlaski about the
15  collaboration agreement with Kevin Maurer and
16  making sure that Kevin Maurer would keep the
17  whole story confidential and Matt's identity
18  and all that confidential.  Podlaski came up
19  with some ideas for insurance -- that he wanted
20  some kind of insurance account or something
21  that, if Matt -- if Kevin had not obeyed the
22  rules of confidentiality of the agreement, that
23  he could be liable for.  Podlaski talked -- I
24  think he looked at a search in Virginia for
25  Bissonnette's name to see if it came up in the

Page 139

E. CHENEY

1
2   public record in order to protect his identity.
3   Q.    Beyond that, do you recall any other
4   involvement that you had as it relates to Mr.
5   Podlaski's representation of Mr. Bissonnette?
6   A.    Just in general, through the whole
7   process, you mean?
8   Q.    I just want to know the nature of your
9   involvement.  In other words, if you were a
10  conduit of information; if you yourself relied
11  on anything that Mr. Podlaski had said?
12  A.    Oh, I mean, I absolutely relied on what
13  Mr. Podlaski has said.  I want -- not only do I
14  not want my clients to break the rules, but I
15  don't want to break them either, so Podlaski --
16  when Podlaski said that's what Matt had to do,
17  I wanted to make sure that it's done the way
18  it's supposed be done.  I relied a lot on
19  Podlaski throughout the entire process.
20  Q.    Did you consider Mr. Podlaski your
21  lawyer in any sense?
22  A.    No.
23  Q.    The legal bills, though, were sent to
24  you?
25  A.    Right.

Page 140

E. CHENEY

1
2   Q.    Why is that?
3   A.    Clients just depend on you, so you get
4   everything -- not you get everything, but
5   Podlaski probably -- frankly, I don't know; I
6   have no idea why they were sent to him.
7   Q.    What you just described to me sounds
8   like something a diva would ask for, but I
9   don't see Mr. Bissonnette being a diva?
10  A.    No, no, Podlaski took it upon himself to
11  send it to me.
12  Q.    So it wasn't your idea to have the legal
13  bills sent to Mr. Bissonnette; it was
14  Mr. Podlaski's idea to send them to you?
15  A.    Podlaski just sent them to me.
16  Q.    You didn't ask for that arrangement?
17  A.    I don't recall.
18  Q.    Let me know if you want to take a break,
19  if you're tired.
20  A.    Yeah, I'll take a break.
21        (Whereupon, a recess was taken
22  at this time.)
23        (Whereupon, Publishing Contract
24  was marked as Exhibit 139, for
25  identification, as of this date.)



Page 141

1          E. CHENEY
2   Q.   Ms. Cheney, I've showed you what has
3   been marked as Exhibit 139.  It is the executed
4   publishing contract that relates to No Easy
5   Day.  Do you recall having seen this before?
6   A.   Yes.
7   Q.   I just want to point out certain terms
8   in the contract to you.  On the first page of
9   the contract --
10         MS. NORMAN:  Is this it right
11      here?
12         MR. FURMAN:  Yes.
13   Q.   The first paragraph where is says,
14   "tentative title."  Do you see that?
15   A.   Yep.
16   Q.   I'll read it so that it's on the record.
17   It describes the book as "the work shall be an
18   account of the author's career as a member of
19   the Navy Seals including, but not limited to, a
20   complete and detailed account of the Special
21   Forces Operation to apprehend the target,
22   popularly known as Osama bin Laden, on or about
23   May 2, 2011, in Pakistan.  The work shall
24   include a minute by minute account of the
25   author's direct experiences leading up to the

Page 142

1          E. CHENEY
2   raid, on the raid, and in the aftermath of the
3   raid, including the author's observation of the
4   death of bin Laden, at which, the author hereby
5   represented he was present.  The work shall
6   also detail the author's personal experiences
7   during the raid that have not previously been
8   reported in the media or otherwise disclosed
9   publicity."  Do you see that?
10   A.   Do I?  Yes.
11   Q.   Based on that, was it your understanding
12   that Mr. Bissonnette was actually present at
13   the time that bin Laden was killed?
14         MS. NORMAN:  Objection to form.
15   A.   Can you repeat the question.
16   Q.   I'll repeat the question because there
17   was an objection at the end.  Who wrote this
18   description?
19   A.   The publisher.
20   Q.   Did you approve it on behalf of Mr. --
21   A.   Did I approve it?  I mean, I --
22   apparently he signed the agreement.
23   Q.   Is that description accurate?
24   A.   It's always accurate what they say they
25   want at the time of doing the contract.  How

Page 143

1          E. CHENEY
2   the book actually then looks is not always
3   exactly what is described in the description of
4   the book.
5   Q.   In the portion of that paragraph that I
6   just read into the record, did that raise any
7   concerns for you as to whether Mr. Bissonnette
8   was allowed to permit these details to be
9   published in a book about government approval?
10         MS. NORMAN:  Did the contract
11      raise concerns for her?
12         MR. FURMAN:  No, did that
13      description of the work --
14   A.   All I know is that we just wanted to do
15   what he was supposed to do.  When they say
16   minute by minute account, that doesn't
17   necessarily mean, like, every single minute; it
18   means everything that he's allowed to say on
19   the -- it means having a fly on the wall
20   experience and so -- but if there are things
21   that he's not allowed to say, then both -- he
22   would know what's classified and the manuscript
23   would be vetted by -- it would go through the
24   appropriate channels, so no, I wasn't worried.
25   No, I didn't think we were doing -- that we

Page 144

1          E. CHENEY
2   would do anything wrong.
3   Q.   At the time of that subject matter
4   description on the front page, I'll paraphrase
5   it, it states that "the author will not reveal
6   any technology that is classified or reveal any
7   technology that would otherwise compromise
8   future operations of the defense of the United
9   States."  Is that something that Mr.
10   Bissonnette told you that he wanted to include
11   or be weary of in connection with the book?
12   A.   Well, I told you already he signed.  In
13   his memory, he had signed an agreement that
14   said he was not allowed to speak about any
15   proprietary technology created by the Navy for
16   the raid.
17   Q.   I may or may not go back to this,
18   probably not, so we can put that contract down
19   for now.  I'm going to show you what's been
20   marked previously as Exhibit 17 in this
21   deposition.  Now, this is fast forwarding to
22   June of 2012; this is an e-mail exchange that
23   you were involved in.  I want to start by just
24   -- at the very bottom of that page, there's an
25   e-mail on June 6th of 2012, at 9:53 a.m., that



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
145—148

---

Page 145

1            E. CHENEY
2  you sent to Ben Sevier where the subject matter
3  is "hey."
4  A.    You want me to look at this one at the
5  bottom, you're saying?
6  Q.    Yes.
7  A.    Sure. I'll read it. Yeah.
8  Q.    What was the major news that you wanted
9  to update Mr. Sevier about?
10  A.    I knew you were going to ask the
11  question. I just don't know, at that time on
12  June 6th, what the major news could have been;
13  I don't know.
14  Q.    Based on the e-mail exchange, you can
15  read it as it goes up; it goes up
16  chronologically in time.
17  A.    It starts from the bottom then goes up?
18  Q.    It starts from the bottom.
19  A.    I don't know who "they" is; "they really
20  want to help here;" I don't know who "they"
21  are.
22  Q.    Do you recall whether or not it had to
23  do with Mark Bowden's book, B-O-W-D-E-N --
24  Bowden's book, called The Finish, which also
25  related to the bin Laden raid?

---

Page 146

1            E. CHENEY
2  A.    I don't think so because I think they're
3  talking about something here about how -- "I'll
4  pitch this as they really want to here," so my
5  guess is that this might have to do with
6  Bigelow and Boal.
7  Q.    Was there any concern about the book,
8  The Finish, that was being written by
9  Mr. Bowden that had any impact on No Easy Day?
10  A.    We wanted to -- we preferred that Matt
11  not cooperate with Bowden on his book -- on
12  Bowden's book so that, you know, he would be
13  able to keep his own story to himself, and we
14  didn't want -- we preferred to be the first --
15  we preferred to come out before Bowden, if we
16  could.
17  Q.    The preference to come out before Bowden
18  so that the book, No Easy Day, would be
19  published first and get more attention than,
20  say, The Finish would? Is that fair to say?
21  A.    I think either way the book would have
22  gotten huge attention, but publishers always
23  get these things into their head so --
24  Q.    What was in your head?
25  A.    Well, honesty, I don't think I cared

---

Page 147

1            E. CHENEY
2  that much about it; it was more Dutton that
3  cared about the publication time.
4  Q.    Let me show what's been marked
5  previously as Exhibit No. 16. If you could
6  just take a moment to read to yourself, and
7  I'll ask you some questions about it.
8  A.    Sure. Did you say a specific e-mail
9  you're talking about or the whole thing?
10  Q.    If you can read the whole thing, there's
11  not a lot to it.
12  A.    Sure. Starting at the bottom and coming
13  back way up?
14  Q.    I think that's the way it works.
15  A.    Okay.
16  Q.    There are two topics on Exhibit 16.
17  First, there's "a call with Fox" and then
18  there's at the end at the top of the exhibit,
19  there's an e-mail exchange with Mr. Bowden.
20  First, as it relates to Fox, what did this
21  involve? What was being discussed at that
22  time? This is around May 21st of 2012.
23  A.    Matt knew a couple of people at Fox, and
24  I believe the person he's referring to is Bill
25  Shine, and I think Fox had expressed interest

---

Page 148

1            E. CHENEY
2  if he were to do a book and having Matt on to
3  be interviewed or, you know, to do something
4  around the publication of the book, and so Matt
5  is saying should he reach out directly to Fox
6  to discuss that possibility.
7  Q.    In your e-mail on May 21st at 4:00 or
8  5:00 p.m., it's at the top of the last page, it
9  states that you wanted Mark to do the reaching
10  out since there was personal connection, I'm
11  assuming, with Mr. Shine?
12  A.    Yeah, either Shine or there's another
13  guy there who's on air and -- I actually don't
14  remember his name, who Matt knew. Brian
15  Kilmeade.
16  Q.    When you refer to the publishing date,
17  what is PUB day, I'm assuming that --
18  A.    Yeah, PUB date.
19  Q.    Where you state that, "if we wait too
20  long, we won't be able to set a publishing
21  date," can you explain what that means?
22  A.    I'm trying to figure that out myself.
23  "Here's the thing; if we wait too long, we
24  won't be able to set a PUB date." I honestly
25  don't know what I'm talking about there.

---



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
149–152

Page 149

E. CHENEY

1
2 Q.    At the top of Exhibit 16, the topic
3 switches on this e-mail chain from "call with
4 Fox," and then the e-mail chain comes "reply
5 from Bowden," so I'm looking at the middle of
6 the first page of Exhibit 16, there's an e-mail
7 on Tuesday, May 22nd at 5:11 p.m., from
8 Mr. Bissonnette to you and the subject is
9 "Reply from Bowden" and Mr. Bissonnette is
10 writing, "I hope to finish writing by the end
11 of July --
12 A.    That's Mark Bowden writing, M.B.
13 Q.    So what it looks like is that from this
14 e-mail that Mr. Bissonnette copied and cut and
15 pasted Mr. Bowden's e-mail to him?
16 A.    That's what it looks like.
17 Q.    So Mr. Bowden is writing he's hoping to
18 finish writing his book by the end of July?
19 A.    Mm-hmm.
20 Q.    That he's eager to put the book out in
21 the fall, but he's not sure if it would be out
22 before election day, does it matter to you, and
23 Mr. Bissonnette forwards that e-mail over to
24 you?
25 A.    Yes.

Page 150

E. CHENEY

1
2 Q.    You wrote back, "I would just say, just
3 curious as to whether it was coming out pre or
4 post election."  Do you see your response
5 there?
6 A.    Yes.
7 Q.    Why did it matter whether the book was
8 coming out pre or post election?
9        MR. JOHNSTON:  Object to the
10 form.
11 A.    My guess is that the publisher wanted it
12 to come out prior to the election, although I
13 don't know why, so what I'm thinking is that
14 we're trying to ascertain basically when
15 Bowden's book is coming out.
16 Q.    Did you have discussions with the
17 publisher about trying to get the book
18 published around September 11th and before the
19 election because the bin Laden raid was being
20 discussed throughout the campaign for the
21 presidential campaign during that time in 2012?
22 A.    I don't remember too much about the
23 campaign.  The main thing was that they like
24 that anniversary date of the 11th as sort of a
25 symbolic kind of thing, you know, where media

Page 151

E. CHENEY

1
2 would be especially interested in the topic.
3 Q.    Did you have a phone call with
4 Mr. Bissonnette about Mr. Mark Bowden's book at
5 all?  About the timing of it?
6 A.    Yeah, I believe the publisher wanted
7 Matt Bissonnette's book to come out before Mark
8 Bowden's and I said that to Matt Bissonnette,
9 and then also, I think that they did not want
10 Matt Bissonnette -- the publisher didn't want
11 Matt Bissonnette to cooperate with Bowden on
12 Bowden's book.
13 Q.    Just sort of a housekeeping note.  I'm
14 listening to every word you say, but I'm also
15 multitasking at the same time so I don't want
16 you to think that I'm being rude by not looking
17 at you while you're speaking.  I'm multitasking
18 to make it all happen quickly.
19 A.    Okay.
20 Q.    But I am listening to everything you're
21 saying.
22 A.    Good.
23 Q.    I want to show you what has been marked
24 as Exhibit 13 in this case.  Mostly, I'm asking
25 questions that are obviously dealing with

Page 152

E. CHENEY

1
2 timing of the book, so the reason I'm showing
3 you this e-mail is there's a question about
4 whether General Petraeus is writing a memoir
5 and this e-mail -- I'm going back in time now,
6 this is January of 2012, January 10, Mr. Sevier
7 is writing to you and Mr. Bissonnette and he
8 states that "Mark, I know we had tossed around
9 ALL IN as a title idea at breakfast, but I just
10 learned that Petraeus has a memoir coming out
11 with that title; I'm sure we'll come up with
12 something even better, and we'll have plenty of
13 time."  Do you see that?
14 A.    I read the whole page.
15 Q.    Does that refresh your recollection, one
16 way or the other, as to whether the book No
17 Easy Day was originally meant to be titled All
18 In?
19 A.    That was one of the titles we were
20 considering.
21 Q.    In Mr. Bissonnette's response to that
22 e-mail, he writes, "Yes, let's beat him to the
23 punch," which follows your question, which was,
24 "When is the book publishing?"  Do you see
25 that?



ELYSE FAITH CHENEY                    January 27, 2017
BISSONNETTE vs PODLASKI                      153–156

Page 153

1                E. CHENEY
2   A.    Mm-hmm.
3   Q.    Was it a concern that you would want to
4   have Mr. Bissonnette's book published even
5   before General Petraeus's book?
6          MS. NORMAN:  Objection to form.
7   A.    It's only about the title; it's only
8   about, well, if we want to use the title and
9   his came out first, but it's really only about
10  the title.
11  Q.    You were not in competition with General
12  Petraeus's book is what I'm asking?
13  A.    No, no.
14  Q.    Now, going back to the contract; I'm
15  sorry, if I'm leaking back to something that is
16  hard to read, but you have the contract
17  Exhibit 139?
18  A.    Yes.
19  Q.    In paragraph 4, specifically 4A.
20  A.    Yes.
21  Q.    I'm paraphrasing, but essentially what
22  it says is the book has to be published within
23  eighteen months after the acceptance of the
24  manuscript.  Do you know when the manuscript
25  was accepted?

Page 154

1                E. CHENEY
2   A.    The manuscript, the way you can find
3   that out is to see when he was paid so I'm not
4   sure exactly -- the manuscript, I don't believe
5   gets accepted until after the Publication
6   Review Board has looked at it because that's --
7   whatever the publication -- sorry; not the
8   publication review; after Podlaski reviewed it
9   and they've looked at it for confidential
10  information and all that stuff, then it would
11  go to Ben as the editor and then he would
12  consider whether or not it was ready to be
13  published; that's when he would get paid.
14  Q.    Whatever date that was, I'm presuming it
15  was some time in 2012?
16  A.    Right.
17  Q.    Then the publisher had eighteen months
18  then to publish the book?
19  A.    Yes.
20  Q.    So, it would have been some point in
21  time, either in 2013 and just depending on the
22  timing of it, could even have been in 2014?
23  A.    Mm-hmm.
24  Q.    Yes?
25  A.    Yes, yes; sorry.  So if it was

Page 155

1                E. CHENEY
2   fourteen months from -- I mean eighteen months
3   from delivery and acceptance; this is a
4   standard clause in every agreement in
5   publishing.
6   Q.    Now, in 4B, though, I don't know if that
7   is standard; I want to ask you about that
8   because 4D says, in substance, "that the
9   failure to publish the book within
10  eighteen months, that it won't be deemed a
11  violation if the failure to publish is caused
12  by restriction of governmental agencies."  Do
13  you see that?
14  A.    Mm-hmm.
15  Q.    Is that something that's standard, or is
16  that something that is specific to No Easy Day?
17  A.    It's standard.  Anything that's specific
18  to No Easy Day or is generally in italics or
19  bold, which this is not; Basically, what
20  they're saying here is, unless it's a force
21  majeure, you know, a situation totally outside
22  of the publisher's control, like a earthquake,
23  then they're not going to be held to that
24  eighteen months to publish.
25  Q.    Would Jeh Johnson's letter of August 30,

Page 156

1                E. CHENEY
2   2012 constitute a force majeure?
3          MS. NORMAN:  Objection to the
4          form of the question.
5   A.    I don't know if that's a force majeure
6   or not.
7   Q.    I want to fast forward now into that
8   time period when Jeh Johnson's letter was sent,
9   and that was an event that you recall when the
10  government first stepped in?
11  A.    Yes, yes.
12  Q.    But leading up to that, there were
13  copies of No Easy Day that were sent as
14  advanced copies to various governmental
15  agencies; is that accurate?
16  A.    I don't know how many; I think it was
17  just the Department of Defense, but yes,
18  advanced copies were sent.
19  Q.    Do you know how many copies?
20  A.    No.
21  Q.    Do you know if it was just the
22  Department of Defense, or was it also sent to
23  the CIA?
24  A.    I don't know.
25  Q.    Do you know if any other agencies



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI
January 27, 2017
157–160

Page 157

1              E. CHENEY
2   received a copy of it?
3   A.   I don't know; I wasn't involved with
4   that.  I know it was sent in advance, but I
5   don't know which departments got it or how many
6   were sent.
7   Q.   Who made the decision to send advanced
8   copies out?
9   A.   I mean --
10          MS. NORMAN:  Objection to the
11      form.
12  A.   There's nobody who made one decision.  I
13  don't think there's one specific person who
14  made the decision.  I think it was just
15  everybody thought it was a good idea.
16  Q.   Were you involved in that process in
17  deciding to send out advance copies of the book
18  to various agencies?
19  A.   I was probably involved in discussing
20  that, and I think it was explained to me why
21  that was a smart thing to do.
22  Q.   Who explained it to you?
23  A.   The discussion was between or among
24  Kevin Maurer, who had relationships within the
25  government and the public affairs officer --

Page 158

1              E. CHENEY
2   with a public affairs officer at the Department
3   of Defense; Dutton, myself, and Matt, so
4   whoever said what, I'm not exactly sure, but
5   the point was rather than them be blindsided,
6   give them a heads up to give them a chance to
7   look at it.
8   Q.   What do you mean by blindsided?  What
9   about the book was blindsiding?
10  A.   We just wanted to let them know that the
11  book was going to be coming.
12  Q.   Why?
13  A.   Because when media would come, they
14  would certainly be asked questions about it;
15  probably, that's why, and it was a courtesy
16  and, like I said, we thought that's all we had
17  to do is send it to them as a courtesy because
18  Podlaski vetted the manuscript and said there
19  was no classified information in it.  It was --
20  sorry.
21  Q.   Is your answer complete?
22  A.   Yes.
23  Q.   I'm showing you what has been marked at
24  Exhibit 34 in this case.  These are the legal
25  fees that were sent by Carson Boxberger to

Page 159

1              E. CHENEY
2   Mr. Bissonnette?
3   A.   Right.
4   Q.   They were sent to your attention.  Did
5   you pay those fees, or were they paid any
6   anyone else?
7   A.   Bissonnette paid them, but I -- probably
8   what happened is we would -- if money was
9   coming into us, we may have -- for Bissonnette,
10  we may have taken that money and paid from
11  Bissonnette.  In other words, if money comes in
12  from the publisher, it goes into a client
13  escrow account, and as soon as it clears, we
14  distribute it to the client, 85 percent, and
15  then sometimes if there's a lawyer involved or
16  another agent.  For example, in this case,
17  Kevin Maurer had an agent;  we would -- as long
18  as the author agreed, we would pay the lawyer
19  directly from that amount rather than the money
20  coming -- the 85 percent coming from us, going
21  to Bissonnette to Podlaski or from us to
22  Bissonnette to Maurer.  Instead, we paid -- I
23  believe what we did was we paid Maurer's agent
24  his portion; we paid Podlaski his fees, and the
25  rest -- we took our fees and then the rest went

Page 160

1              E. CHENEY
2   to Bissonnette; I believe that's what happened.
3   Q.   Other than sending the legal invoices to
4   you, did Mr. Podlaski ever come to New York or
5   meet with you or discuss the matter with you in
6   person?
7   A.   No, he didn't come to New York.
8   Q.   The fee bills range in time from
9   January 16th of 2012 up and through, looks
10  like, September 27th of 2012 is the last time
11  entering.  Do you see that?
12  A.   Yeah, I see it, September 26, 2012 to
13  27th.
14  Q.   When the bills come in, did you review
15  them on behalf of Mr. Bissonnette?
16  A.   Yes.
17  Q.   For what purpose did you review them?
18  A.   Because Bissonnette barely had ever
19  spoken to a lawyer before and just really, you
20  know, was a new person to the world and so I
21  just wanted to make sure, especially because I
22  had had conversations with Podlaski, that
23  Podlaski was sending a fair bill.
24  Q.   Were there any aspects of the bill that
25  you disagree with or have any dispute with on



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
161–164

Page 161

E. CHENEY

1
2  behalf of Mr. Bissonnette?
3  A.    Yeah, I think I had Podlaski cut some of
4  the bills down because he was doing things that
5  nobody asked him to do.
6  Q.    So that if he did something that no one
7  asked him to do that --
8  A.    Seemed irrelevant and unhelpful.
9  Q.    And you're saying that Mr. Bissonnette
10  shouldn't pay for that?
11  A.    Yeah.
12  Q.    Is fair to say that a lawyer shouldn't
13  be paid for work unless it's relevant?
14         MS. NORMAN:  Objection to form.
15         MR. FURMAN:  Can I have that
16      last question and answer read back.
17         (Whereupon, the record was read
18      by the reporter.)
19         MR. FURMAN:  Strike that last
20      question among other things; it didn't
21      make sense.
22  Q.    Let me go back in time.  January 16th of
23  2012, the entry there is for a conference with
24  you regarding the contract review formulation
25  of a limited liability company and publication

Page 162

E. CHENEY

1
2  of events of official history by the United
3  States -- U.S. Special Operations Command.  Do
4  you see that?
5  A.    Mm-hmm.
6  Q.    Was that the time that you first spoke
7  with Mr. Podlaski?  Is that --
8  A.    I'm not sure if that was the first call.
9  I think it was probably earlier because usually
10  if you are going to hire someone, you have a
11  conversation with them that's not going to be
12  billed so I believe it was earlier than that.
13  Q.    Okay.  Every time a bill would come in,
14  you would review it for its accuracy, and if
15  there were disputes with the work that Mr.
16  Podlaski did, you would raise an objection; is
17  that fair to say?
18  A.    Generally, not always, but generally, if
19  it looked like he was padding the bills, I
20  would raise it.
21  Q.    Is that something you would do for other
22  clients, or is this the first time you've done
23  it?
24  A.    I think I've done it for other clients
25  as well.

Page 163

E. CHENEY

1
2  Q.    The last entry, just going back to the
3  end, it's September 27, 2012, and you paid that
4  bill?
5         MS. NORMAN:  Objection to form.
6  A.    Again, I don't pay the bill.
7  Q.    I'm sorry; you received that bill?
8  A.    I mean, if it says -- if the bill came
9  to my office, then I received it.
10  Q.    Did your office receive any further
11  billing from Mr. Podlaski after that last entry
12  for work that was done on September 27th of
13  2012?
14  A.    I don't believe that we received any
15  further billing; it's possible, but I don't
16  know.
17  Q.    Do you know of any legal work that
18  Mr. Podlaski did on behalf of Mr. Bissonnette
19  after September 27th of 2012?
20  A.    Well, if you see here, he was requesting
21  FOIA documents, and I think he was waiting for
22  those FOIA documents to come, and I believe
23  there were further questions of him here and
24  thereof, you know, the same nature as we asked
25  him throughout his advice about what Matt's

Page 164

E. CHENEY

1
2  obligations were, how to handle publicity
3  regarding Matt's obligations.
4  Q.    Do you know when that was?
5         MS. NORMAN:  Objection to form.
6  A.    When what was?
7  Q.    What you just described?
8  A.    It was just ongoing so I don't know the
9  exact last time that we asked him that, but
10  that was, sort of, an ongoing thing where we
11  would call him and say the government -- the
12  media saying is this, is that true; what should
13  we say in return -- in response.
14  Q.    I'm trying to now center on what
15  conversations, if any, you recall with
16  Mr. Podlaski after September 27th of 2012.
17  Could you let me know who initiated those
18  conversations?
19  A.    I believe there was a conversation about
20  other -- other Navy Seals or Special Forces
21  Operators who had done books and whether or not
22  they had been vetted and I believe that's what
23  Podlaski put a FOIA request in for, so that was
24  generally the topic of discussion.
25  Q.    Do you know when Mr. Podlaski put that



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
165–168

Page 165

E. CHENEY

1
2 FOIA request in?
3 A. I don't know, but there's something that
4 says here that he put it in, but he was waiting
5 to get a response back and I believe he pursued
6 it several times, so I'm not sure exactly; he
7 says here, on 9/24, he prepared letter to
8 client regarding FOIA request and on 25 he
9 called the Freedom of Information Act office
10 and I believe he pursued it after that as well.
11 Q. What is your basis for saying that you
12 believe he pursued it?
13 A. Because I think I talked to him on the
14 phone and he said that he was waiting for the
15 FOIA documents.
16 Q. How many times did you talk to him on
17 the phone after September 27th of 2012?
18 A. I don't know, I mean it's four years
19 ago.
20 Q. There came a point in time when you
21 stopped talking to Mr. Podlaski; is that fair
22 to say?
23 A. Yeah.
24 Q. When was the last time you had a
25 conversation with him?

Page 166

E. CHENEY

1
2 A. I mean, I don't know exactly.
3 Q. What was the topic of conversation when
4 you spoke to him for the last time?
5 A. I think that the last topic was, sort of
6 -- what other books had been published -- did
7 he know of other books that had been published
8 by special forces operators and what the
9 vetting process was for those books.
10 Q. Do you know whether that discussion took
11 place in October of 2012? Did it happen in --
12 A. It was some time between the, you know
13 -- it was some time probably before Christmas
14 of 2012.
15 Q. Do you know whether it happened before
16 or after Thanksgiving, as a benchmark?
17 A. I don't know.
18 Q. Do you know if it happened before or
19 after Halloween, if that makes a difference?
20 A. I don't know.
21 Q. It's a big event for me.
22 A. I don't know.
23 MS. NORMAN: Halloween or the
24 conversation?
25 MR. FURMAN: Halloween; it's the

Page 167

E. CHENEY

1
2 best parade in New York City.
3 Q. So you don't know one way or the other
4 if that discussion occurred in September?
5 October?
6 A. It was the fall, but I'm not sure
7 exactly what date it was.
8 Q. I just want to make the record clear.
9 So you're not sure if that conversation took
10 place either at the very end of September --
11 A. I'm pretty sure after 9/27.
12 Q. I just want to get the question out.
13 A. Sorry.
14 Q. The first rule of this is we have to
15 wait to speak; that's really because the
16 reporter is doing her best to get everything
17 down. It's just like saying that the first
18 rule of fight club is there is no fight club.
19 You don't have a memory one way or the other as
20 to whether that conversation, the last
21 conversation you had with Mr. Podlaski was
22 either at the very end of September, at some
23 point in October, or at some point in November?
24 Is that fair to say?
25 A. My guess is that it's either October or

Page 168

E. CHENEY

1
2 November. I feel like, maybe, more November,
3 and I don't know why I have this in my head,
4 but that's, sort of, what I'm thinking, but,
5 like I said, I don't have a record of a phone
6 conversation, so I don't know.
7 Q. What's the basis for saying that you
8 believe it's some time in November?
9 A. I just remember that after things were
10 unfolding, that still had -- we were still,
11 sort of, trying to determine whether there were
12 other special operators who had done books and
13 what their vetting process had been, and I
14 believe that was why Podlaski and I were
15 talking about it.
16 Q. Why do you think it was November as
17 opposed to say October?
18 A. I mean, I just, kind of, remember it
19 being later in the fall, but, like I said, I'm
20 not positive; I really don't -- I can't --
21 that's as much as I could tell you.
22 Q. Do you have any means of trying to
23 pinpoint that date of your last conversation
24 with Mr. Podlaski, either by some e-mail
25 exchange, maybe some note that you have in the



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
169—172

Page 169

E. CHENEY

1
2  office, or any other kind of recording of the
3  event?
4  A.    No, not any -- whatever recording would
5  have been in the work that I gave to Randy
6  Johnston.
7  Q.    What you've just told me about that, is
8  your best recollection about that event?
9  A.    Of talking to Podlaski?
10 Q.    Yes.
11 A.    Yes.
12 Q.    The FOIA request, do you know when that
13 information was delivered and who it was
14 delivered to?
15 A.    In other words, the response to the FOIA
16 request or the FOIA request itself?
17 Q.    No, the responses to the FOIA request?
18 A.    I don't know; I really don't know.  I
19 mean, if it was delivered to anyone, I assume
20 it would be delivered to Podlaski because he
21 was the one who asked for it.
22 Q.    After Mr. Luskin came on the scene, was
23 he essentially the lawyer that took over the
24 interfacing with the government?
25 A.    Podlaski was still involved, but he

Page 170

E. CHENEY

1
2  wasn't interfacing with the government.
3  Q.    I'm going to ask you to use a team
4  concept because it seems to be that there were
5  a number of people on various e-mails after
6  Mr. Johnson's letter, and at various points in
7  time, they would include Mr. Luskin, almost
8  invariably Mr. Luskin and then you would have
9  people like Mr. Fabiani involved, Mr. Rangone,
10 Mr. Sevier, a lawyer from Kaye Lawrence at
11 times would be involved at least on some
12 e-mails, Mr. Podlaski, and yourself; was there
13 anyone else part of for a lack of a better way
14 of describing the crisis management team that
15 was responding to Jeh Johnson's letter?
16       MS. NORMAN:  Objection to form.
17 A.    That's sounds pretty comprehensive.
18 Q.    When I describe it as sort of a crisis
19 management team, do you understand what I mean
20 by that?
21 A.    Yes.
22 Q.    Responding to Jeh Johnson's letter on
23 behalf of Mr. Bissonnette?
24 A.    The crisis management team started
25 before the Jeh Johnson letter came, from what I

Page 171

E. CHENEY

1
2  remember.
3  Q.    Was that because there were indications
4  from various writers including a write named
5  Mark Hosenbal, H-O-S-E-N-B-A-L, that indicated
6  that there was displeasure by the government in
7  connection with the publication of No Easy Day?
8  A.    Yes.
9       MS. NORMAN:  Objection to form.
10 Q.    How did you come to learn that?
11 A.    From Hosenbal?
12 Q.    The government's displeasure with the
13 book?
14 A.    Well, we just got a lot of media
15 calling, saying that had the book been vetted;
16 was he allowed to write this?  What was the
17 process by which we were vetting it?  And so we
18 were so deluged with media, so we brought on
19 Peter Pagano and Mark Fabiani to help with
20 publicity and publicity management because we
21 were really overwhelmed.
22 Q.    This media attention started in the
23 latter half of August of 2012?
24 A.    It started after -- I believe after the
25 government saw the book or after Dutton

Page 172

E. CHENEY

1
2  announced -- they made an announcement of the
3  book; I'm not sure; it's all happening within
4  the same week.
5  Q.    I'll show you what's been marked as
6  Exhibit 25.  This is mainly to help you capture
7  the time period that we're dealing with.
8  A.    Okay.
9  Q.    Now, at the very top of Exhibit 25,
10 where Matthew Bissonnette is e-mailing you and
11 copying in Mr. Rangone, Mr. Lahene, Christine
12 Ball, which says, "maybe, hit up Kevin and
13 Nate;" is he referring to Kevin Vance there?
14 A.    Looks like it.
15 Q.    What's that in relation to?  Why could
16 Kevin Vance be involved?
17 A.    I need to read this whole correspondence
18 to answer that question.
19 Q.    Take as long as you'd like.
20 A.    It starts from the back?
21 Q.    It's hard to tell, but I think that's
22 right; it goes chronologically backwards.
23 A.    Yeah, it looks like it.  Okay.  Got it.
24 Q.    So I just want to set the stage
25 chronologically.  At this point in time, around



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
173–176

Page 173

1          E. CHENEY
2  August 23rd of 2012, the book had not yet been
3  published; correct?
4  A.    Yes.
5  Q.    The publication date was, I think, at
6  that point in time, it was September 11th?
7  A.    Correct.
8  Q.    There came a point in time when the
9  publication date then was moved up to September
10  4th?
11  A.    Mm-hmm.
12  Q.    Why was that?
13  A.    I believe -- I don't know exactly why; I
14  think maybe because of all this pressure from
15  all this media; I'm not sure exactly why they
16  moved it up; that's a question for the
17  publisher.
18  Q.    Was there a discussion about doubling
19  down on the fact that there was this
20  controversy over the book, that it was better
21  to move the date up as opposed to delaying the
22  publication date any further?
23          MS. NORMAN: Objection to form.
24  A.    What do you mean by doubling down? What
25  does that mean?

Page 174

1          E. CHENEY
2  Q.    In other words, there was indication
3  from the government that the book was
4  controversial; fair to say?
5  A.    Yes -- well, not from the government; it
6  was an indication from these reporters.
7  Q.    The indication from the government came
8  in the form of the letter from Jeh Johnson that
9  came on a week after this?
10  A.    Yeah, that was later, yeah.
11  Q.    When was the decision made to move up
12  the date from September 11th to September 4th?
13  Was it before or after the Jeh Johnson letter?
14          MS. NORMAN: Objection to form.
15          She testified she wasn't involved in it.
16  A.    That's the publisher who made that
17  decision.
18  Q.    So you had no involvement in that?
19  A.    I'm sure they told me and I might of
20  given my opinion about it, but basically it's
21  their decision as to when the book is
22  published.
23  Q.    I understand. Did your client have any
24  say in that?
25  A.    Again, they would tell him, but the

Page 175

1          E. CHENEY
2  books had already arrived in the book stores by
3  that point. So if you say a book is being
4  publish on September 11th, stores generally
5  have the book a month in advance of that, so
6  the stores had the book already. At least
7  250,000 copies had already been distributed
8  across the country so whether they open the
9  boxes on September 4th and put them on the
10  shelves or whether, you know, on the 4th or the
11  11th is, I guess, what we're talking about
12  here; I, kind of, got off on my own thing; I
13  don't know what I was trying to answer.
14  Q.    I'm not sure what you were answering. I
15  didn't ask you about that. I asked you about
16  --
17          MR. JOHNSTON: Objection for
18      asking the wrong question.
19          MR. FURMAN: Objection for
20      answering a question I didn't ask.
21  Q.    Let me ask a different question. Let me
22  go back to this chain of e-mails on
23  August 23rd. There was a reference by
24  Mr. Hosenbal that other members of the seal
25  team were indicating that they felt betrayed by

Page 176

1          E. CHENEY
2  Mr. Bissonnette's book; did you see that?
3  A.    Yes, I saw that.
4          MS. NORMAN: Do you mean, did
5      she see it now or did she see --
6  A.    I just saw it in this e-mail that I just
7  read.
8  Q.    Do you recall it? Do you recall it
9  happening? Receiving that information?
10  A.    Yes.
11  Q.    What did you think of it at the time?
12  A.    You know, the reason now that he's
13  saying call Kevin and Nate, is Kevin Vance's
14  friend get them -- I think what we were looking
15  at is some seals were angry and some seals felt
16  like it was the right thing to do. The media
17  has one agenda and whether that's the truth or
18  not is another story as we've all come to know,
19  so just because media is hounding us like this
20  doesn't mean what they're saying is true or
21  not. So based on Matt's feedback, some people
22  were angry and some people weren't angry; I
23  think that's why he's suggesting to ask Kevin
24  and Nate, either for other names of people and
25  what they're -- who could speak to the issue of



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

Page 177

E. CHENEY

1
2  who was angry and who wasn't angry.
3  Q.    Now, I want to just ask you about the
4  assembling of this response team.
5  A.    Sure.
6  Q.    Who retained Mr. Fabiani on to get
7  involved?
8  A.    What happened was when the PR started to
9  get crazy like this, I called my friend Peter
10  Ragone, who I had worked with in relation to
11  Gavin Newsom and also I believe he had worked a
12  little bit with me on Morgan Spurlock and he
13  does crisis PR.  I said, "Peter, what do you
14  think," and I had heard separately about
15  Fabiani from a colleague and it turned out that
16  Pete and Fabiani work together often and so
17  that's how Peter and Fabiani and Lehane got
18  involved.
19  Q.    Is Fabiani a lawyer; is this correct?
20  A.    Yes.
21  Q.    Do you know what his practice covers?
22  A.    He was -- well, Lehane was a press
23  secretary under Gore when they were -- during
24  the campaign.  All three of them worked in the
25  Clinton White House and I don't know if Fabiani

Page 178

E. CHENEY

1
2  -- I just know that he went to Harvard Law
3  School; he generally practices sometimes in a
4  legal capacity, I believe, and then sometimes,
5  you know, he deals with this -- his
6  consultation on crisis.
7  Q.    Was Fabiani offering legal advice in
8  connection with his involvement in No Easy Day?
9        MS. NORMAN:  Objection to form.
10  A.    Was he offering legal advice?
11  Q.    Was he providing any legal services?
12  A.    I mean, I didn't -- we didn't send him a
13  retainer saying you're going to be our lawyer,
14  but he was a lawyer so he had a more informed
15  opinion about the law.
16  Q.    Who retained Fabiani and Lehane?
17        MS. NORMAN:  Objection to form.
18  Q.    Was it Bissonnette?  Was it the
19  publisher?  Was it you?
20  A.    Publisher.
21  Q.    So Fabiani's role was to represent the
22  publisher?
23  A.    No, so Fabiani and Rangone were brought
24  in to do crisis PR, then Jeh Johnson sends the
25  letter and so the crisis is now escalated and,

Page 179

E. CHENEY

1
2  you know, Fabiani -- so Fabiani has some legal
3  background, so sometimes we were talking to him
4  about, you know, legal issues.  He's not an
5  expert in this area; he doesn't know whether
6  something should be vetted or not vetted.
7  Q.    After the Jeh Johnson letter, who made
8  the decision to bring Mark Luskin in?
9  A.    Fabiani had worked with Luskin on
10  another case and he suggested we talk to Luskin
11  because we then also needed to work with a
12  criminal lawyer in addition to the advice we
13  were getting from Podlaski.
14  Q.    When did you speak to Mr. Luskin?
15  A.    After we got the letter.
16  Q.    It was at some point on August 30th of
17  2012?
18  A.    The letter came at the very end of the
19  day, in fact, at night, I believe, so I don't
20  know if we actually were able to get Luskin on
21  the phone that night or whether we talked to
22  him the next day, but within twenty-four to
23  forty-eight hours of getting that letter.
24  Q.    Who was on the call when you first spoke
25  to Luskin?

Page 180

E. CHENEY

1
2  A.    I'm pretty sure if Fabiani called Luskin
3  first, and they talked, and then Fabiani,
4  myself, Luskin and, I believe, Matt were on the
5  call, but I don't know exactly.
6  Q.    Was Mr. Podlaski on that call?
7  A.    He was on some of the calls.  I don't
8  know if he was on the very first call; he
9  wasn't on the very first call.
10  Q.    What was discussed during that very
11  first call?
12  A.    We sent the letter over to Luskin; we
13  asked him -- I mean, I wanted to get a sense of
14  what Luskin's background was.  We just tried to
15  give him the details of the case, and then we
16  let Luskin, kind of, be like the spokesperson
17  with the media.
18  Q.    Earlier I had said I want to ask you if
19  you could give me an idea of the team concept.
20  Who was the leader of the team?
21        MS. NORMAN:  Objection to form.
22  A.    It was really a collective effort;
23  everybody had different roles.
24  Q.    What was Luskin's role?
25  A.    Luskin was criminal defense.



Page 181

1              E. CHENEY
2         MR. FURMAN:  Off the record for
3     a moment.
4              (Whereupon, a discussion was
5         held off the record.)
6    Q.    I'm going to show you something that's
7    not marked, but this is a better copy of the
8    first page of Exhibit 1, which is Jeh Johnson's
9    letter, dated August 30, 2012.
10        MS. NORMAN:  Thank you.
11   Q.    Now, you mentioned that Mr. Luskin was
12   retained.  Was he retained to respond to this
13   letter that was received?
14   A.    Yes.
15   Q.    Part of what the letter indicates is
16   that, in addition to potential violations of
17   federal criminal law, there is a reference to
18   forfeiture of royalties.  Do you see that?
19   A.    Yes.
20   Q.    It's at the very end of the first
21   paragraph?
22   A.    Yes.
23   Q.    Was Mr. Luskin also engaged to handle
24   that aspect as well?
25        MS. NORMAN:  Objection to form.

Page 182

1              E. CHENEY
2    A.    He was engaged to handle this letter and
3    all the elements in the letter, as far as I
4    know.
5    Q.    Mr. Luskin wrote a letter in response
6    very shortly after.  Do you recall that taking
7    place?
8    A.    Now that you bring it up, yes.
9    Q.    Do you know if Mr. Podlaski had any role
10   in preparing that letter?
11   A.    I don't know.
12   Q.    Do you know if Mr. Podlaski gave any
13   advice to Mr. Luskin in connection with that
14   response?
15   A.    I believe Luskin talked to Podlaski, but
16   I don't know if he was an advisor or not; I
17   don't know what that conversation transpired.
18   Q.    You don't know the details of that
19   conversation?
20   A.    No, I think there were several
21   conversations, but I don't know.
22   Q.    Were you involved in conversations
23   between Mr. Podlaski and Mr. Luskin?
24   A.    Well, there were conference calls that
25   both Podlaski and Luskin were on.

Page 183

1              E. CHENEY
2    Q.    When were those conference calls?
3    A.    I don't know.
4    Q.    Was it shortly after the letter from Jeh
5    Johnson?
6    A.    Certainly, there were definitely then.
7    Q.    Do you recall anything specific about
8    what Mr. Podlaski said during those conference
9    calls?
10   A.    No.
11   Q.    Do you have any recollection of what
12   Mr. Luskin said during those conference calls?
13   A.    I think a bunch of times it had to do
14   with how we were going to respond to the media
15   and potential response to the letter, yeah.
16   Q.    After the August 30, 2012, letter from
17   Jeh Johnson, did you have any separate
18   discussions with Kevin Podlaski?
19   A.    I'm sure I did.
20   Q.    Do you recall what they consisted of?
21   What happened during those calls?
22   A.    I think basically was, like, "what the
23   fuck are you doing -- have you done?  Why are
24   you telling me this and why am I getting this?
25   Why did you tell us one thing, and now we're

Page 184

1              E. CHENEY
2    getting this?"
3    Q.    How did he respond?
4    A.    I don't remember; I mean, he would of
5    said what his office said, which was --
6    actually, I don't know.  Did he sign this
7    agreement -- then he sort of spouted a lot of
8    legalese so I don't know exactly what he said,
9    though.  One thing was that I think he said he
10   didn't have a copy of these agreements that
11   Matt had signed and I think you thought -- I
12   may have said to him, why wouldn't you have a
13   copy of that agreement; why wouldn't you do
14   your due diligence and get whatever agreements
15   were signed if Matt -- Matt had been in active
16   combat for thirteen years so what he may have
17   signed, then also, if you are -- so yeah.
18   Q.    Is that the best that you can recall
19   about those conversations?  Was there anything
20   else that you could think of?
21        MS. NORMAN:  Objection to form.
22        You can answer.
23   A.    We talked about -- I know there was more
24   discussion on response to the government than
25   there was discussions about, you know, what --



Page 185

E. CHENEY

1  how the government might deal with the
2  situation and whether politics had any role to
3  play in it and, you know, Kevin was asked his
4  opinion about his process, and we would ask him
5  what do you think is going to happen?  Do you
6  think he did anything wrong?  Where did you get
7  your information from?
8  Q.   I want to just ask you about your
9  questions to or your conversations rather, with
10  Mr. Podlaski about his due diligence.  What
11  specifically do you recall about that
12  conversation?
13        MS. NORMAN:  Objection to form.
14  A.   Well, I don't think I actually --
15        MS. NORMAN:  Objection to form.
16        In your question, embedded was in
17        reference to conversations plural and
18        also a conversation.
19        MR. FURMAN:  I'll make it a
20        cleaner question.
21  Q.   You referenced asking Mr. Podlaski about
22  what due diligence he did.  I just want to
23  explore that.
24  A.   I'm pretty sure that I said, well,

Page 186

E. CHENEY

1  wouldn't you have gotten agreements that he
2  would need?  Wouldn't you do that before you
3  give your opinion?
4  Q.   Do you recall Mr. Podlaski's response?
5  A.   You know, I don't know; this may --
6  honestly I -- I don't remember -- I know that
7  this is what I was thinking; I'm pretty sure I
8  said it, but I'm not 100 percent.  I don't
9  remember all the calls that I had with
10  Podlaski; there were many of them.
11  Q.   Well, let me ask you what you were
12  thinking.
13  A.   Yeah.
14  Q.   And let me set the stage.
15  Mr. Bissonnette hires a lawyer?
16  A.   Mm-hmm.
17  Q.   And to vet the book and then on
18  August 30th, there's this letter that comes in
19  from the government saying this book is not
20  permissible?
21  A.   Mm-hmm.
22  Q.   What's your reaction?
23        MR. JOHNSTON:  Object to the
24        form of the question.

Page 187

E. CHENEY

1        THE WITNESS:  What does this all
2        mean?  Object to the form of the
3        question?
4        MS. NORMAN:  It just means we
5        preserved it for the record and it
6        doesn't mean anything for your
7        answering.
8  A.   What's my reaction?  I'm livid; I'm just
9  angry.  Why are we in this situation?  Matt has
10  tried his best; I've tried my best to the abide
11  by the law; why are we getting this letter?
12  Q.   You're livid at who?
13  A.   The world; I'm like -- I mean, I don't
14  understand this; I'm upset that Kevin Podlaski
15  -- I don't understand why we're getting this
16  letter if Podlaski said what he said.
17  Q.   Did you tell Podlaski that?  That you
18  were upset?
19  A.   Yes, I said why are we getting this
20  letter?  What's the deal?
21  Q.   I don't mean to use salty language, and
22  I was born and raised in the City so you can't
23  offend me, but what kind of language did you
24  use when you had that conversation with him?

Page 188

E. CHENEY

1  A.   What did you do here?  What's the deal?
2  Why is he getting this letter, you know?
3  Q.   What was his response to that?
4  A.   I mean, I don't know, you know -- you
5  know, I don't know; he's -- he said -- he
6  continued to stay by his party line; if Matt
7  was retired -- there's even an e-mail in which
8  it says something like, oh, the government has
9  this on their website, but it's not true
10  actually.  If Matt was retired, he didn't need
11  to show this to them.  If the operation was,
12  you know, a sensitive compartmentalized that --
13  there's a phrase sensitive compartmentalized
14  something, then he couldn't have talked about
15  it, but Matt did not sign a sensitive
16  compartmentalized such and such and, therefore,
17  Matt could talk about whatever he talked about
18  in the book, and he continued to insist that
19  the book had no classified information and that
20  the government, you know, that this was a load
21  of bullshit.
22  Q.   After the Jeh Johnson letter, and as you
23  described your reaction, did you have a
24  separate conversation with Mr. Bissonnette



ELYSE FAITH CHENEY                                    January 27, 2017
BISSONNETTE vs PODLASKI                                       189–192

Page 189

E. CHENEY

1
2    about this?
3    A.    I'm sure.
4    Q.    Do you recall what you discussed with
5    him?
6    A.    I mean, I had so many conversations with
7    him; I can't really say.
8    Q.    Did you have any specific conversations
9    after the Jeh Johnson letter about Podlaski's
10   advice?
11   A.    I'm sure I said what's going on?  Both
12   of us were, like, this -- why are we in this
13   situation?  Are they bullshitting us, the
14   government?  Was Podlaski bullshitting us?
15   Who's right here?
16   Q.    At that point in time, did you share
17   with Mr. Bissonnette a concern as to whether
18   Mr. Podlaski's advice was correct?
19   A.    Yes.
20   Q.    What did Mr. Bissonnette tell you about
21   that?  How did he react to that subject?
22   A.    He was concerned as well; we both had
23   the same concerns.
24   Q.    The concern was basically whether
25   Mr. Podlaski's advice was correct or not?

Page 190

E. CHENEY

1
2    A.    Yes.
3    Q.    Did you express that to Mr. Luskin?
4    A.    Yes.
5    Q.    What did Mr. Luskin say about that?
6    A.    Luskin had to do some research about it,
7    so it took a while for him to come back with an
8    answer.
9    Q.    Did there come a time when Luskin did
10   the research and there was a determination that
11   the advice was incorrect?
12   A.    Yes.
13   Q.    Who told you that, that Mr. Podlaski's
14   advice was incorrect?
15   A.    Luskin.
16   Q.    When did he tell you that?
17   A.    I don't know.
18   Q.    I just need a two minute break.  I just
19   want to talk to Izabell and move on to another
20   topic; is that okay?
21   A.    Sure.
22         (Whereupon, a recess was taken
23         at this time.)
24         (Whereupon, August 12, 2012
25         E-mail was marked as Exhibit 140, for

Page 191

E. CHENEY

1
2         identification, as of this date.)
3    Q.    I've shown you what's been marked as
4    Exhibit 140.  This is an e-mail, dated
5    August 12th of 2012, from Mr. Bissonnette to
6    you, and it's entitled "follow-up notes."  Do
7    you recall receiving that?
8    A.    Yes.
9    Q.    Do you recall that, that among other
10   things, Mr. Bissonnette was interested in a
11   multiple book series, a coffee table seal book,
12   and a leadership book?  He references that in
13   the fourth paragraph of the e-mail.
14   A.    Well, I just want to read the e-mail.
15   Yeah.
16   Q.    In some sense I can appreciate this is,
17   sort of, intrusive questions about the
18   relationship you have with your clients; I
19   understand and respect that.  In the e-mail
20   exchange, among other things, there's a
21   reference to a multiple book series, a coffee
22   table seal book, and a leadership book, some
23   fictional books, a motion picture, a possible
24   video game business, a tactical gear
25   development business and, I take it, all

Page 192

E. CHENEY

1
2    relating from No Easy Day or his publicity from
3    No Easy Day; is that fair to say?
4    A.    No, no, I don't think he's separating
5    things out; tactical, Aerosoft, all these
6    things have nothing to do with No Easy Day.
7    Q.    Were you working with Mr. Bissonnette to
8    capitalize on the back of the publication to No
9    Easy Day into other ventures?
10        MS. NORMAN:  Objection to form.
11   A.    The other ventures that he was thinking
12   about on his own of doing so -- and that he
13   would just discuss with me because I was the
14   person who was talking to him a lot at that
15   time.
16   Q.    There is a reference to a dinner with
17   someone called Pleppler, P-L-E-P-P-L-E-R and,
18   again, this is why I mentioned I apologize for
19   asking you questions about your relationship
20   with Mr. Bissonnette; there seems at some point
21   to be a disconnect between the two of you about
22   who was being invited to a dinner.  I just want
23   to know if it's relevant, so can you explain to
24   me what was happening there?
25   A.    Yeah.  A guy named Richard Pleppler



ELYSE FAITH CHENEY                                            January 27, 2017
BISSONNETTE vs PODLASKI                                              193–196

Page 193
E. CHENEY
1
2  wanted to throw a dinner for Matt, I think, on
3  publication night and I did not think that was
4  a very good idea because Pleppler is a media
5  person and I thought that Matt probably is not
6  used to dealing with the media and the media
7  didn't necessarily have his best interests at
8  heart and so I was recommending against it; he
9  wanted to do what he wanted to do, and so my
10  second course of action was to suggest that I
11  attend the dinner with him so that I could,
12  kind of, be there to play defense -- and
13  obviously it would also be helpful to me to be
14  there just for my own career as I say in this
15  note -- and he wanted to go solo is what he is
16  saying; he thought he could handle it himself.
17  Q.     The timing of the ideas that
18  Mr. Bissonnette had about the coffee table
19  book, the fictional book series, all of those
20  things would have happened after the
21  publication of No Easy Day; correct?
22  A.     Yeah.
23  Q.     Was there any reason to hold back on
24  those ideas before the publication of No Easy
25  Day?

Page 194
E. CHENEY
1
2  A.     I don't think he was holding back on
3  them; no, I think he already had discussions --
4  I mean the coffee table book, yes, but the
5  other things, I think they may have already
6  been in -- he had discussions independently of
7  me; it had nothing to do with me.
8  Q.     These were all essentially marketing
9  plans and business opportunities that he was
10  exploring through not just notoriety through
11  the book No Easy Day but also through his
12  experiences as a Navy Seal?
13  A.     Yeah, not to do with No Easy Day at all.
14  Q.     There was a part of No Easy Day that
15  referenced Mr. Bissonnette's interest in
16  donating a share of the proceeds to charities
17  that relate to Navy Seals.  Do you know what
18  the percentage of the proceeds were to be
19  donated?
20  A.     I think all of it; he wanted to donate
21  almost everything.
22  Q.     What charities have agreed to accept
23  that money, to the best of your knowledge?
24  A.     I don't know which ones he was working
25  with; I don't know the names.  He's talked to a

Page 195
E. CHENEY
1
2  lot of charities.
3  Q.     Are you aware that the Navy Seal
4  Foundation turned down Mr. Bissonnette when he
5  approached them about receiving proceeds from
6  the book?
7          MR. JOHNSTON:  Object to the
8      form of the question.
9  A.     Yes.
10  Q.     Do you know why the Navy Seal Foundation
11  turned Mr. Bissonnette down?
12          MR. JOHNSTON:  Object to the
13      form of the question.
14  A.     I think it was because he came to them
15  after the controversy, and they didn't want to
16  be associated with the controversy.
17  Q.     Did you speak to anyone from the Navy
18  Seal Foundation as to why they rejected any
19  proceeds from Mr. Bissonnette's book?
20  A.     No.
21          MR. FURMAN:  Let's mark the next
22      two exhibits.
23          (Whereupon, September 17, 2014
24      Cheney Letter was marked as Exhibit 141,
25      for identification, as of this date.)

Page 196
E. CHENEY
1
2          (Whereupon, Attachment to
3      September 17, 2014 Cheney Letter was
4      marked as Exhibit 142, for
5      identification, as of this date.)
6  Q.     I'm going to show you what's been marked
7  as Exhibits 141 and 142.
8  A.     Okay.
9          MR. JOHNSTON:  Which one is 141?
10          MR. FURMAN:  The letter is 141
11      and the attachment is 142.
12  Q.     Ms. Cheney, do you recall preparing
13  what's been marked as Exhibit 141?
14  A.     Yes.
15  Q.     At whose request did you prepare it?
16  A.     Randy.
17  Q.     Did you draft it yourself?
18  A.     Yeah, yes.
19  Q.     Did anyone assist you in the preparation
20  of this letter?
21  A.     Assist me in the preparation?  I had a
22  lawyer look at it to make sure I was, you know,
23  doing whatever I was supposed to be doing; a
24  different lawyer.
25  Q.     A lawyer that you retained?



Page 197

E. CHENEY

1
2  A.    Mm-hmm.
3  Q.    I'm not going to ask you about the
4  advice; I just want to know who that lawyer is?
5  A.    His name is Drew Kitchen, from Maynard
6  Cooper something, something.
7  Q.    Mr. Kitchen is a partner of Mr. Enslen;
8  correct?
9  A.    Yes.
10  Q.    How did you come into contact with
11  Mr. Kitchen?
12  A.    I met him through a client.
13  Q.    Eventually through Mr. Kitchen, that is
14  how Mr. Bissonnette was able to find Mr. Enslen
15  for his work on No Easy Day?
16  A.    Yes.
17  Q.    I just want to complete the circle on
18  that.  So referring to Exhibit 141, the first
19  paragraph, it states that No Easy Day sold
20  approximately 1.4 million hard cover books
21  since publication; approximately 30,000 audio
22  books; 75,000 digital audio books, and 55,000
23  paperback books as well as hundreds of
24  thousands of books in territories around the
25  world.  Do you see that?

Page 198

E. CHENEY

1
2  A.    Yes.
3  Q.    Where did you get that information from?
4  A.    That would come from royalty statements,
5  the publisher.
6  Q.    If I wanted to get the source from that
7  information from you, how would I get it?
8  A.    It's the publisher.
9  Q.    The publisher?
10  A.    Yeah.
11  Q.    The numbers are rounded figures
12  obviously, so does the publisher have the
13  actual numbers in detail?
14  A.    Yes.
15  Q.    Who rounded down the numbers?
16  A.    Clearly I do cause I wrote approximately
17  because the numbers, you know, this is 2014,
18  they might sell many more the week later so you
19  can't -- I don't know as of this exact date; I
20  rounded the numbers.
21  Q.    I'm now focused on paragraph 2.  Did you
22  speak to anyone in the film industry that had
23  an interest in making a movie out of the book
24  No Easy Day?
25        MS. NORMAN:  Objection to form.

Page 199

E. CHENEY

1
2  A.    Well, we hired a film agent, United
3  Talent Agency, as I said here, to handle the
4  film rights, potential film rights to the book.
5  Q.    Would you deal directly with a movie
6  house or any kind of film producer?
7  A.    Generally we go through -- if I deal
8  directly with them, it's because UTA introduced
9  me to them.
10  Q.    Who would UTA have handle this
11  particular matter?
12  A.    There were a couple of people who were
13  the primary people; one was Howard Sanders; the
14  other was Jay Sures, S-U-R-E-S.
15  Q.    Now, the information that's in
16  paragraph 2, is that based on information that
17  you received from Mr. Sanders and Mr. Sures?
18  A.    From Mr. Sanders.
19  Q.    Do you have any independent information
20  that would be the source for paragraph 2 other
21  than Mr. Sanders?
22  A.    No other independent information except
23  experience of selling an experience in the
24  market place.
25  Q.    For example, the price of $175,000 for

Page 200

E. CHENEY

1
2  the option to purchase the movie applicable
3  against the purchase price of $1,000,000, where
4  did you get that number from?
5  A.    Mr. Sanders.
6  Q.    Do you know where Mr. Sanders got that
7  figure from?
8  A.    Mr. Sanders does about 200 deals a year
9  for sales of book to film for options like this
10  and so he has a pretty solid idea of what
11  things are going to sell for; he's been doing
12  it for, like, thirty years.
13  Q.    Other than your reliance on Mr. Sanders,
14  do you have any basis for the numbers $175,000
15  for the option and a $1,000,000 for the
16  purchase price?
17  A.    Similar to Mr. Sanders; I've been doing
18  it for a long time so I have a sense of what
19  the range of what a project might go for; it
20  sort of contributes to this number.
21  Q.    Can you tell me what project that you
22  worked on that you were able to obtain anything
23  that is in the neighborhood of $175,000 for an
24  option and $1,000,000 for movie rights?
25  A.    Sure.  Let's see, I recently sold a book



ELYSE FAITH CHENEY
BISSONNETTE vs PODLASKI

January 27, 2017
201–204

Page 201

1             E. CHENEY
2    about a group of woman soldiers who went out
3    with cultural support teams who went out with
4    the Army Rangers into the field during the war,
5    and I sold that for -- I used UTA, a cultural
6    agent at UTA, and they sold that to Fox for
7    $500,000 purchase price against, I believe,
8    $1,000,000, so that's actually larger than the
9    $175,000. I've sold books for -- Howie Sanders
10   also sold a book for me about a team of soccer
11   -- a soccer team full of kids from war torn
12   countries who landed in an all white town in
13   Alabama and won against a wealthy other team;
14   we sold that right for $2,000,000. I sold
15   Joshua Foer's memoir, Moonwalking With
16   Einstein, first for, like, $250,000
17   against somewhere between $750,000 and
18   $1,000,000, and then we optioned it again, I
19   think for $175,000, maybe.
20   Q.     What was the subject matter of that?
21   A.     That was about memory. The one that I
22   most recently sold was about the military; the
23   one I just told you about; it's called Ashley's
24   War.
25   Q.     Of the three books that movie rights

Page 202

1             E. CHENEY
2    were sold to that you referenced about the
3    female military personnel, the soccer team,
4    international soccer team, and the memory book,
5    were they before or after your letter of
6    September 17, 2014?
7    A.     The military one, I believe, is after
8    the letter; the other two are before.
9    Q.     The soccer team and the memory books,
10   they were negotiated through Mr. Sanders; is
11   that --
12   A.     Yes.
13   Q.     Do you know one way or the other whether
14   a movie house or a film producer would have
15   been interested in No Easy Day?
16   A.     Well, they were also talking about
17   television, so it's not clear; it could of been
18   an option for a movie or a TV series; we
19   assumed there would be interest, but, you know,
20   you never know; it wasn't 100 percent because
21   Zero Dark Thirty had also come out so --
22   Q.     Was there any actual purchaser that was
23   identified for the movie rights or film rights
24   or television rights to No Easy Day?
25   A.     What happened was, as soon as Jeh

Page 203

1             E. CHENEY
2    Johnson sent that letter and Bob Luskin then
3    went into communication with Johnson, Luskin
4    immediately said we won't -- the government
5    said we don't want you to pursue any other
6    publicity or sell any other ancillary rights to
7    the project, so we did not pursue it after
8    that.
9    Q.     Now, in paragraph 3, there's a reference
10   to Marcus Luttrell, M-A-R-C-U-S, Luttrell is,
11   L-U-T-T-R-E-L-L and that is the book that deals
12   with the film, Lone Survivor; I don't know if
13   the book is the same tile?
14          MR. JOHNSTON: It is.
15   Q.     It is?
16   A.     Yes.
17   Q.     Sorry; I only read Springstein
18   biographies. The forecast that's indicated in
19   paragraphs 3A through 3D, are they based solely
20   on a comparison to Mr. Luttrell's book?
21   A.     It was based on Lutrell's book and also
22   just a general conversation with Ben Sevier
23   about what he thought if they might publish if
24   a movie had been made.
25   Q.     When did you have that general

Page 204

1             E. CHENEY
2    discussion with Mr. Sevier?
3    A.     When I was preparing this.
4    Q.     So, again, I just want to make sure I
5    know the answer. In connection with the
6    forecast that is set forth in paragraphs 3A
7    through 3D of Exhibit 141, you based it on the
8    information relating to Mr. Luttrell's book in
9    what you described as a general conversation
10   with Mr. Sevier?
11   A.     Yes.
12   Q.     Where did you get the information about
13   Mr. Luttrell's book?
14   A.     I believe I got that from BookScan, but
15   I don't know for sure. I might have gotten it
16   from Ben himself.
17   Q.     I just want to talk about or ask you
18   questions, rather about No Hero, the second
19   book. When was the decision made to work on a
20   second book by Mr. Bissonnette?
21          MS. NORMAN: Objection to form.
22   A.     I don't know exactly; it was a long time
23   after the publication of No Easy Day.
24   Q.     Was it your idea or his idea?
25   A.     I don't believe it was my idea; again,



ELYSE FAITH CHENEY
January 27, 2017
BISSONNETTE vs PODLASKI
205–208

Page 205

E. CHENEY

1
2  it was a team effort.  I think it was
3  discussion with Ben, myself, Matt, and Kevin
4  Maurer as to what they wanted to do.
5  Q.    What is No Hero about?
6  A.    I think the subtitle is an autobiography
7  of a Navy Seal; so it's lessons learned -- it's
8  about lessons learned during the military --
9  while he was in the military.
10  Q.    Is it about any particular mission or
11  any specific operation that Mr. Bissonnette was
12  involved in?
13  A.    I think it goes through several
14  operations that Bissonnette was involved in.
15  Q.    Now, there's a reference in paragraph 5
16  to a delay; it indicates here that you believe
17  that there was some kind of financial impact on
18  sales of No Hero as a result of the delay in
19  reviewing -- the delay caused by the
20  government.  Do you know how that delay by the
21  government in reviewing No Hero is related to
22  the issues that Mr. Bissonnette had in
23  connection with No Easy Day?
24  A.    Can you tell me that question, again.
25  Q.    Sure.  I'll rephrase it.  After the

Page 206

E. CHENEY

1
2  controversy erupted following Mr. Johnson's
3  August 30, 2012 letter, are you aware that the
4  government began to investigate other aspects
5  of Mr. Bissonnette's career?
6  A.    Yes, I was aware.
7  Q.    Those aspects included some of his
8  private business opportunities that he was
9  exploring regarding tactical gear and other
10  things.  Are you aware of that?
11  A.    Yeah, I'm not sure when I became aware
12  of that, but I am aware of that now.
13  Q.    To the best of your knowledge, that had
14  nothing to do with the book No Easy Day;
15  correct?
16  A.    Yeah, I mean, I wasn't apart of that.
17  Q.    The investigation of the government into
18  some of the artifacts that Mr. Bissonnette may
19  have kept following the bin Laden raid,
20  including photographs of the corpse of bin
21  Laden, bin Laden's hat, other aspects from the
22  raid; are you aware of that investigation?
23      MR. JOHNSTON:  Object to the
24      form of the question.
25  A.    I wasn't aware of that investigation,

Page 207

E. CHENEY

1
2  no, so I didn't really know what the details
3  were; I didn't know about any photographs; the
4  only thing I knew about was what I said, the
5  hat.
6  Q.    Do you know, one way or the other,
7  whether the government's inspection of No Hero
8  was colored by any of those investigations that
9  were conducted?
10      MS. NORMAN:  Objection to form.
11  A.    I don't know.
12  Q.    In paragraph 8 there's a reference to
13  Terry Gross's show, did you speak to Ms. Gross
14  about having Mr. Bissonnette on the show?
15  A.    No.
16  Q.    How is it that you say that Mr.
17  Bissonnette lost an opportunity to be
18  interviewed on Fresh Air?
19  A.    There's a publicity plan in commitments
20  laid out by the publisher once they've
21  solidified the commitment and so I'm privy to
22  that plan and once Luskin had spoken to Jeh
23  Johnson and said that we would seize any
24  promotional activities; that was one of the
25  things that had to go.

Page 208

E. CHENEY

1
2  Q.    Do you have any direct Information, one
3  way or the other, as to whether Mr. Bissonnette
4  was going to be on the show with Terry Gross on
5  MPR?
6  A.    I mean -- yeah.
7  Q.    You wrote it down, but I want to know
8  what your basis is for saying that?
9  A.    Yeah, because Christine Ball is the
10  publicist and she says we've booked X, Y, and
11  Z.
12  Q.    So the source of the information from
13  paragraph 8 is Christine Ball?
14  A.    Mm-hmm.
15  Q.    The appearance on the Today Show, that
16  is also Christine Ball as the source of that
17  information?
18  A.    Yes.
19  Q.    You don't any have firsthand information
20  about that?
21  A.    Not -- no, that's conversations.
22  Q.    The national radio tour, that also was
23  information you received from Ms. Ball?
24  A.    Yes.
25  Q.    You don't have any firsthand information



Page 209

1              E. CHENEY
2   on that?
3   A.    That's all conversations; we had several
4   conversations; what is the publicity plan;
5   what's he going to go on.
6          MR. FURMAN:  I think I just need
7      a few minutes just to go through my
8      notes to make sure I didn't miss
9      anything, I'm sure I did, so I need a
10     five minute break.  Is that okay?
11         MS. NORMAN:  Yes, of course.
12         (Whereupon, a recess was taken
13     at this time.)
14  Q.    Ms. Cheney, I showed you what's been
15  marked previously as Exhibit 14.  Do you recall
16  having an e-mail exchange with Richard Heller
17  around January 12th of 2012?
18  A.    Yep.
19  Q.    Who is Richard Heller?
20  A.    He was a lawyer we hired to review the
21  publishing agreement for Matt.
22  Q.    Did Mr. Heller have any involvement with
23  issues that relate to Mr. Bissonnette's ability
24  to tell the story about the bin Laden raid?
25  A.    Can I just read this for a second?

Page 210

1              E. CHENEY
2   Q.    Sure.
3   A.    Okay.  Thank you.
4   Q.    Mr. Heller, what was his involvement?
5   A.    Heller reviewed the publishing agreement
6   for Matt; that was one thing that he did.
7   Q.    In paragraph 2 below, there's a
8   January 12, 2012 e-mail at 12:18 p.m., and it
9   says that you wrote the following.  Do you see
10  that in the middle of the page?
11  A.    Mm-hmm.
12  Q.    Are you writing to Richard is that the
13  person --
14  A.    Mm-hmm.
15  Q.    There's a number of paragraphs that are
16  numbered and in paragraph 2, it starts off "we
17  have a different lawyer now in terms of the
18  military review stuff."  Do you see that
19  reference?
20  A.    Yes.
21  Q.    Was there anyone else that was handling
22  the military review stuff before?
23         MS. NORMAN:  Objection to form.
24  Q.    The reason I'm asking you is that you
25  said "we have a different lawyer now."  I want

Page 211

1              E. CHENEY
2   to know if there was someone else in place?
3   A.    No, there wasn't someone else in place.
4   I'm not sure if this was referring -- is trying
5   to tell Heller that he -- no, it can't be that,
6   so maybe this is shedding light on the fact
7   that we had talked to two different -- I think
8   I had told him that I had talked to this guy,
9   Randy Moss, and then I wanted to talk to a
10  couple of different people and that then I
11  think Heller was in Sierra, Costa Rica and I
12  think while he was in Costa Rica, I met -- you
13  know, I had a referral to Podlaski and so I was
14  updating him that because Podlaski, as you can
15  see here, was a Special Forces guy himself and
16  he knew these agreements, that we were going to
17  work with Podlaski on helping Matt to adhere to
18  whatever legal obligations he had.
19  Q.    In paragraph 2 the four lines down, you
20  wrote that "Mark seems to have a very clear
21  understanding of what this lawyer is saying.
22  He is going to get his papers from the command
23  office and then show those papers to this
24  Indian lawyer."  Do you see that?
25  A.    Yes.

Page 212

1              E. CHENEY
2   Q.    Where did you get that information that
3   Mr. Bissonnette was going to get his papers
4   from the command office?  Who told you that?
5   A.    I think Mark told me that -- I mean
6   Matt; we called him Mark.
7   Q.    So it was Mr. Bissonnette who told you
8   that he was going to get his papers from that
9   command office and then show those papers to --
10  A.    It's possible that Podlaski told me
11  that.  It's either Podlaski told me that or
12  Matt told me that; I'm not sure.
13  Q.    But either way, your source for the
14  information that's contained in that sentence
15  that Mr. Bissonnette was going to get his
16  papers from the command office and show them to
17  Mr. Podlaski, that either came from Mr.
18  Bissonnette himself or Mr. Podlaski?
19  A.    Correct; I'm guessing it's Bissonnette,
20  and it's referring to any legal documents that
21  might be relevant to this situation.
22  Q.    Now, I'm going to fast forward in time.
23  This was January and now to August of 2012.
24  After the Jeh Johnson letter was received, was
25  there any discussion about stopping the



Page 213

1        E. CHENEY
2  publication of the book?
3  A.    Yes, I think the Jeh Johnson letter
4  asked -- well, I'm not sure actually if we have
5  the Jeh Johnson letter.
6  Q.    It's right there and you can refer to
7  it.  The Jeh Johnson letter says that, "further
8  dissemination of the book would aggravate the
9  violations that were listed in the letter"?
10 A.    Right.
11 Q.    Was there a discussion about preventing
12 further dissemination of the book?
13 A.    Yes, but the book had already been
14 disseminated; 250,000 copies were already at
15 book stores nationwide, so basically that was
16 impossible and I believe, as he states here in
17 the letter, that some of the books had already
18 been divulged to the public or had already been
19 released because what happens is the books are
20 sent to the -- let's say to Barnes & Noble
21 because they'll get $40 bucks and it's signed
22 and it says don't open until X date, but many
23 people open them anyway and put them on the
24 shelves even though they're not to supposed to.
25 Q.    Now, just a couple of follow-up

Page 214

1        E. CHENEY
2  questions based on what your answer was.  The
3  book eventually, and when I say "the book," No
4  Easy Day, sold far more than 250,000 copies;
5  correct?
6  A.    Correct.
7  Q.    Just generally, how many copies were
8  sold?
9  A.    The book sold over 2,000,000 copies.
10 Q.    So as of the August 30th letter, only
11 250,000 books were in the book shelves or in
12 the book stores; correct?
13 A.    I believe so, yes.
14 Q.    After that and this is rounded off just
15 to make it easier, the 1.75 million additional
16 books were disseminated after Mr. Johnson's
17 August 30th of 2012 letter; correct?
18 A.    Yep.
19 Q.    Why?
20 A.    Ask the government.  If they were so
21 concerned about classified information, I
22 assume they would have been able to get an
23 injunctive relief and had the book stopped, but
24 they didn't do that.
25 Q.    If Jeh Johnson, in his letter, was

Page 215

1        E. CHENEY
2  saying further dissemination of the book would
3  aggravate the violations that were listed in
4  the letter, why would another 1.75 million
5  copies of the book then be sold?
6        MS. NORMAN:  Objection to form.
7  A.    Again, this is -- after this was
8  received, Luskin called Jeh Johnson.  Jeh
9  Johnson, I don't believe said stop publication
10 of the book.  So if the government doesn't say
11 stop the publication of the book, why would
12 Penguin stop publication of the book, and I
13 don't think at this point it's really -- yeah,
14 I mean why would they stop.
15 Q.    Going back in time when there were a
16 series of conference calls about what to do in
17 response to Jeh Johnson's letter, was there any
18 discussions saying, look, we know the books are
19 out into the book stores, but let's send out a
20 message to all the book stores that we have to
21 wait until this issue is resolved with the
22 government before the book can be sold?
23        MS. NORMAN:  Objection to form.
24 A.    I don't know if that's really possible
25 at this point.  I wasn't also clear that the

Page 216

1        E. CHENEY
2  government was right.  I mean, I think that,
3  you know, there is a -- potentially the
4  government was doing this for political reasons
5  and not necessarily -- they didn't necessarily
6  have legal grounds to stand on so -- and like I
7  said, the process was already underway; the
8  books were already in the stores and I believe
9  that the government had also said they didn't
10 think there was any classified information in
11 it, that it was just the fact of the review, so
12 by that point, if the issue is that if the book
13 had not been reviewed -- not that if it didn't
14 have classified information in it, then why
15 wouldn't you continue with the publication.
16 Q.    Is that what you just expressed
17 something that was told to you, or was it a
18 consensus agreement amongst the various people
19 involved on the Matt Bissonnette team?
20        MS. NORMAN:  Objection to form.
21 Q.    Do you understand what I mean "the
22 team"?
23 A.    What was told to me.
24 Q.    What you just described as the view that
25 the government may be wrong and that there was



ELYSE FAITH CHENEY                                  January 27, 2017
BISSONNETTE vs PODLASKI                                    217–220

Page 217

          E. CHENEY
1
2   no classified information in the book, was that
3   a conclusion that you arrived at, or did
4   someone else tell you that?
5          MS. NORMAN:  Objection to form.
6   A.    Podlaski is the one who suggested that
7   the government was not right, and they were
8   just trying scare tactics.
9   Q.    Did Mr. Luskin agree with that?
10         MS. NORMAN:  Objection to form.
11  A.    I don't remember what Luskin said about
12  it; he wasn't sure; he was new to the
13  situation.
14         MR. FURMAN:  I am passing the
15     witness.  Thank you, Ms. Cheney.
16         THE WITNESS:  Thank you.
17  EXAMINATION BY
18  MR. JOHNSTON:
19  Q.    Ms. Cheney, Mr. Podlaski has indicated
20  that he did not recommend against a
21  prepublication review; is that true?
22  A.    That's not true.
23  Q.    Did he affirm or did he recommend that
24  No Easy Day not undergo a prepublication
25  review?

Page 218

          E. CHENEY
1
2   A.    Yes, he affirmed -- I believe he
3   recommended that.
4   Q.    Even after Jeh Johnson's letter arrived,
5   did he ever recommend a republication review be
6   conducted?
7   A.    Well, the book was already published so
8   he continued to stand by his opinion that the
9   book did not require a republication review.
10  Q.    Mr. Podlaski has indicated that
11  Mr. Luskin fired him after Mr. Luskin was
12  hired; is that consistent with what you know
13  about the relationship between Mr. Podlaski and
14  Mr. Bissonnette?
15  A.    No, Luskin would have no authority to
16  fire Podlaski; that's not true.
17  Q.    Were all of your talks with Mr. Podlaski
18  concerning No Easy Day as an agent for
19  Mr. Bissonnette?
20  A.    You mean was the content of my talks
21  with Podlaski generally about No Easy Day and
22  the publication of the book?
23  Q.    And serving in your role as the literary
24  agent for Matt?
25  A.    Yes.

Page 219

          E. CHENEY
1
2   Q.    Did you ever pressure Mr. Bissonnette
3   not to do a republication review or suggest he
4   should not?
5   A.    I would never pressure him to do that;
6   we took Polaski's advice and went with it.
7   Q.    Are you aware of Dutton ever suggesting
8   that Mr. Bissonnette not do a prepublication
9   review?
10  A.    No, they would never do that.
11  Q.    Were you in the phone calls where
12  Mr. Maurer reported on his conversations with
13  SOCOM and the Pentagon after the journalistic
14  storm hit?
15  A.    Yes.
16  Q.    What did Mr. Maurer report that he had
17  heard from his sources at SOCOM and the
18  Pentagon about the book?
19  A.    They had said there was nothing they
20  could tell that was classified, but they were
21  pissed that he hadn't gotten that
22  prepublication review.
23  Q.    Did you ever hear from anyone that the
24  government would have permitted a review of the
25  book after the August 30th letter from Jeh

Page 220

          E. CHENEY
1
2   Johnson under any circumstances like stop the
3   sale of the book and submit it even at that
4   late date?
5   A.    It was too late.
6   Q.    I understand that.  My question is, did
7   anyone from the government ever suggest they
8   would have permitted such a review?
9   A.    You mean at that point?
10  Q.    Right.
11  A.    No.
12  Q.    Let me direct your attention first to
13  the subject which is Mr. Podlaski's service as
14  attorney for Mr. Bissonnette in connection with
15  Freedom of Information Act requests.  Do you
16  remember being asked some questions about that
17  earlier?
18  A.    Yes.
19  Q.    Let me show you what's previously been
20  marked as Exhibit 101, which reflects an e-mail
21  from Mr. Podlaski to the FOIPA -- referencing
22  FOIPA requests to the Records Information
23  Dissemination Section containing a request for
24  Freedom of Information Act information, and
25  then there's an attached link to the letter



Page 221

E. CHENEY

1
2  similar to the one sent in September.  Does
3  that refresh your memory on whether or not he
4  was still pursuing new Freedom of Information
5  Act requests as late as November 2012?
6  A.    That must of been where I got the
7  November date from.
8  Q.    Let me now show you what's previously
9  marked as Exhibit 103 and ask you first off,
10  who is Alex Jacobs?
11  A.    He's one of my employees.
12  Q.    103 is an e-mail from him to Mr.
13  Podlaski, dated May the 8th of 2013, requesting
14  the reply; were you aware on or about May 8th
15  of 2013 that Mr. Jacobs was corresponding with
16  Mr. Podlaski still about the Freedom of
17  Information Act request?
18  A.    Yes.
19  Q.    Then there is a reply and there's some
20  communication in Exhibit 107 between Mr. Owen
21  and Mr. Podlaski, dated the following day,
22  May 9th; I don't see you copied on these,
23  although Alex was copied on some of them.  Were
24  you aware that Mr. Bissonnette was
25  communicating directly with Mr. Podlaski as

Page 222

E. CHENEY

1
2  late as May 9th about the Freedom of
3  Information Act request?
4  A.    I don't remember.
5  Q.    You said something about the billing and
6  well, I'm not sure I can demonstrate who that
7  one is from, so let me just stop.
8        MR. JOHNSTON:  That's all the
9  questions I have at this time.  We'll
10  reserve the remainder of our questions
11  until the time of trial.  I do want to
12  put on the record for you that there was
13  a discussion of e-mails between
14  Ms. Cheney and Mr. Luskin earlier and I
15  have checked with Robert and Robert has
16  checked with Mr. Luskin's attorney; they
17  each confirmed for me that there are no
18  e-mails that were withheld under the
19  basis of privilege between the dates of
20  August and December 31st such that your
21  request for those would generate any.
22        MR. FURMAN:  Okay.  Thank you.
23  I appreciate that.
24        MS. NORMAN:  I have about one or
25  two questions.

Page 223

E. CHENEY

1
2        MR. FURMAN:  Sure, why not.
3  EXAMINATION BY
4  MS. NORMAN:
5  Q.    Ms. Cheney, you testified about
6  collecting certain documents in connection with
7  the subpoena that you were served in this case?
8  A.    Yes.
9  Q.    Do you remember that?
10  A.    Yes.
11  Q.    You testified that you produced a folder
12  of documents to Mr. Johnston; right?
13  A.    Yes.
14  Q.    You produced documents from your e-mails
15  to Mr. Johnston?
16  A.    Yes.
17  Q.    Was it your understanding that
18  Mr. Johnston would be producing those documents
19  to the other side in connection with your
20  discovery obligations?
21  A.    Yes.
22  Q.    Based on what you described that you
23  did, what's was your level of confidence that
24  what you produced to Mr. Johnston was
25  everything in your possession or custody

Page 224

E. CHENEY

1
2  relating to Matt Bissonnette and this
3  engagement as his agent?
4  A.    I'm confident that I gave them whatever
5  I had regarding the case.
6        MS. NORMAN:  Great.  Thank you.
7  That was my only question.
8        MR. JOHNSTON:  Let me put on the
9  record, if there was anything that was
10  not produced then the overwhelming
11  probability is that, that's on our
12  office because Ms. Cheney sent them to
13  us, and we do have the one document that
14  we produced today, which did not get
15  produced.
16        MR. FURMAN:  Thank you.
17        THE WITNESS:  Thank you.
18        (Time Noted:  4:05 p.m.)
19  _____
20             ELYSE FAITH CHENEY
21
22  Subscribed and sworn to before me
23  this ____ day of _____, 2017.
24  _____
25  Notary Public



ELYSE FAITH CHENEY
January 27, 2017
BISSONNETTE vs PODLASKI
225—227

Page 225

```
 1                I N D E X
 2   WITNESS      EXAMINATION BY        PAGE
 3   Elyse F. Cheney   Mr. Furman         4
 4                     Mr. Johnston      217
 5                     Ms. Norman        223
 6
 7               E X H I B I T S
 8   DEFENDANT'S       DESCRIPTION       PAGE
 9   135      Rule 26A2 Expert Disclosure  56
10   136          Projected Sales        65
11   137          Document Subpoena       71
12   138     December 22nd E-mail        105
13   139        Publishing Contract      140
14   140        August 12th E-mail       190
15   141        9/17/2014 Cheney Letter  195
16   142     Attachment to 9/17/14 Letter  196
17
18          REQUESTS FOR PRODUCTION
19   DESCRIPTION                         PAGE
20   September 2014 document with projected   61
21   sales, potential income loss, projected
22   sales for the book, and projected sales
23   of the book from the movie rights
24
25   (CONTINUED...)
```

Page 226

```
 1                I N D E X
 2          REQUESTS FOR PRODUCTION
 3   DESCRIPTION                         PAGE
 4   Comparison of future book sales to    69
 5   Marcus Luttrell's book
 6   Non-disclosure Agreements           121
 7
 8                I N S E R T S
 9   DESCRIPTION                         PAGE
10   Name of Attorney in the Prepublication   53
11   Review
12
13                R U L I N G S
14   PAGE    LINE    QUESTIONING ATTORNEY
15    14      24          Mr. Furman
16
17
18
19
20
21
22
23
24
25
```

Page 227

```
 1             C E R T I F I C A T E
 2
 3        I, CHRISTINE BAFFI, hereby certify that
 4   the Examination Before Trial of ELYSE FAITH
 5   CHENEY was held before me on the 27th day of
 6   January, 2017; that said witness was duly sworn
 7   before the commencement of her testimony; that
 8   the testimony was taken stenographically by
 9   myself and then transcribed by myself; that the
10   party was represented by counsel as appears
11   herein;
12        That the within transcript is a true
13   record of the Examination Before Trial of said
14   witness;
15        That I am not connected by blood or
16   marriage with any of the parties; that I am not
17   interested directly or indirectly in the
18   outcome of this matter; that I am not in the
19   employ of any of the counsel.
20        IN WITNESS WHEREOF, I have hereunto set
21   my hand this 27th day of January, 2017.
22
23
24                  CHRISTINE BAFFI
25
```

