# EXHIBIT D

Kevin Podlaski - November 17, 2016

1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
2
3    MATTHEW BISONNETTE,              )
                                      )
4          Plaintiff                  )
                                      )
5        -against-                    ) Civil Action No.
                                      ) 1:15-cv-00334
6    KEVIN PODLASKI and               )
     CARSON BOXBERGER, LLP,           )
7                                     )
             Defendants               )
8
9
10
11                   DEPOSITION OF KEVIN PODLASKI
12
13        The deposition upon oral examination of KEVIN
14   PODLASKI, a witness produced and sworn before me, Karen K.
15   Keim, CRR, RPR, CSR-IL, CCR-MO, Notary Public, taken at
16   Kightlinger & Gray, LLP, One Indiana Square, Suite 300, 211
17   North Pennsylvania Street, Indianapolis, Indiana, on
18   November 17, 2016, and scheduled to begin at 9:30 a.m.
19
20
21
22
23
24
25

Kevin Podlaski – November 17, 2016

1                              INDEX
  EXAMINATION
2
  Witness Name                                    Page
3 KEVIN PODLASKI
     Direct By Mr. Randy Johnston ................... 8
4
  EXHIBITS
5
  Exhibit     Description                      Identification
6 Exhibit 14  Ends with January 12 email from Elyse 83
              Cheney to Richard Heller (Marked and can
7             be found attached to the deposition of
              Mr. Bissonnette)
8 Exhibit 31  Deposition Notice ............... 9
  Exhibit 32  Deposition Notice ............... 9
9 Exhibit 33  Unsigned copy of Engagement Letter with ....... 10
              Matthew Bissonnette
10 Exhibit 34  Carson Boxberger bills ........... 12
  Exhibit 35  MEMORANDUM FOR RECORD ........... 32
11 Exhibit 36  Email: String ends with January 17, 2012; ..... 37
              Re Retainer Agreement
12 Exhibit 37  Email:  String ends with September 20, ........ 56
              2012, Re: attorney client privileged
13            communciation and attorney work product
  Exhibit 38  Email:  Ends with 1/19/2012 4:25 p.m. 62
14            email from Kevin Podlaski to Elyse
              Cheney; Subject FW: Penguin books/
15 Exhibit 39  Additional page of Memorandum of Record ....... 102
  Exhibit 40  Januay 18, 2012 11:51 a.m. memo from  114
16            Kevin Podlaski to Kevin Podlaski;
              Subject: Penguin Books
17 Exhibit 41  Ends with 1/21/2012 10:48 a.m. email from ..... 117
              Kevin Podlaski to Elyse Cheney
18 Exhibit 42  Ends with 2/6/2012  3:02 p.m.email from ....... 118
              Elyse Cheney to Kevin Podlaski
19 Exhibit 43  Ends with 2/6/2012 5:47 p.m. email from ....... 119
              Elyse Cheney to Kevin Podlaski
20 Exhibit 44  January 16, 2012 5:20 p.m. email from 121
              Elyse Cheney to Kevin Podlaski; Subject:
21            FW: Marc contract
  Exhibit 45  June 23, 2012 1:34 p.m. email from Ben ........ 124
22            Sevier to Kevin Podlaski; Subject: file
  Exhibit 46  June 27, 2012 3:21 p.m. email from Krista ..... 127
23            J. Witmer to Kevin Podlaski
  Exhibit 47  June 28, 2012 9:58 a.m. email from Alex ....... 128
24            Jacobs to Kevin Podlaski and Elyse Cheney
  Exhibit 48  June 29, 2012  4:52 p,m, email from Alex ...... 129
25            Jacobs to Kevin Podlaski

1   EXHIBITS (cont'd.)
2   Exhibit 49   June 29, 2012 6:08 p.m. email from Kevin ...... 135
                 Podlaski to AB: Jacobs Alex
3   Exhibit 50   Ends with 7/3/2012 4:00 p.m. email from ....... 137
                 Ben Sevier to Kevin Podlaski
4   Exhibit 51   Handwritten cover sheet and press release ..... 138
    Exhibit 52   Ends with August 20, 2012 7:19 p.m. email ..... 139
5                from Elyse Cheney to Kevin Podlaski
    Exhibit 53   Ends with August 23, 2012 4:19 p.m. email ..... 139
6                from Elyse Cheney to Christine Ball and
                 others
7   Exhibit 54   Ends with August 23, 2012 5:03 p.m. email ..... 142
                 from Elyse Cheney to Kevin Podlaski
8   Exhibit 55   Ends with August 23, 2012 6:44 p.m. email ..... 145
                 from Elyse Cheney to Kevin Maurer and
9                Kevin Podlaski
    Exhibit 56   Ends with August 25, 2012 10:09 a.m.  145
10               email from Kevin Podlaski to Kevin
                 Podlaski
11  Exhibit 57   Ends with August 26, 2012 9:35 p.m. . 147
                 g-mail from Kevin Podlaski to Mark Owen
12  Exhibit 58   Ends with August 26, 2012 9:14 p.m. email ..... 148
                 from Kevin Podlaski to MO
13  Exhibit 59   Ends with August 27, 2012 11:29 a.m.  149
                 email from Diana Bauer to Kevin Podlaski
14  Exhibit 60   Ends with August 27, 2012 4:17 p.m. email ..... 151
                 from Elyse Cheney to Kevin Podlaski
15  Exhibit 61   Ends with August 27, 2012 5:39 p.m. email ..... 156
                 from Christine Ball to Christine Ball and
16               others
    Exhibit 62   Ends with August 27, 2012 4:32 p.m. email ..... 158
17               from Brian Tart to Elyse Cheney and
                 others
18  Exhibit 63   Ends with August 27, 2012 5:43 p.m. email ..... 161
                 from Kevin Podlaski to Christine Ball and
19               others
    Exhibit 64   Ends with August 28, 2012 3:52 p.m. email ..... 163
20               from Ben Sevier to Kevin Podlaski
    Exhibit 65   Ends with August 28, 2012 11:59 a.m.  165
21               email from Kevin Podlaski to Mark Owen
    Exhibit 66   Ends with August 29, 2012 12:41 p.m.  168
22               email from Mark Owen to Kevin Podlaski
    Exhibit 67   Ends with August 30, 2012 9:49 a,m, email ..... 169
23               from Mark Owen to Kevin Podlaski
    Exhibit 68   Ends with August 30, 2012 10: 59 a.m. 170
24               email from Mark Fabiani to Kevin Podlaski
                 and others
25  Exhibit 69   Ends with August 30, 2012 11:50 p.m email ..... 179

1  EXHIBITS (cont'd.)
2
   Exhibit 70   Ends with August 30, 2012 4:21 email from ..... 181
3               Ben Sevier to Kevin Podlaski
   Exhibit 71   Ends with August 31, 2012 10:45 email 187
4               from Robert Luskin to Kevin Podlaski
   Exhibit 72   Ends with August 31, 2012 10:53 a.m.   190
5               email from Robert Luskin to Kevin
                Podlaski
6  Exhibit 73   Ends with August 31, 2012 11:56 a.m.   191
                email from Ben Sevier to Kevin Podlaski
7               and others
   Exhibit 74   Ends with August 31, 2012 1:47 p.m. email ..... 192
8               from Kevin Podlaski to Robert Luskin
   Exhibit 75   Ends with August 31, 2012 7:52 p.m. email ..... 193
9               from Kevin Podlaski to Elyse Cheney
   Exhibit 76   Ends with August 31, 2012 12:09 p.m.   194
10              email from Robert Luskin to Kevin
                Podlaski
11 Exhibit 77   Ends with August 31, 2012 12:29 p.m.email ..... 195
                from Kevin Podlaski to Mark Owen
12 Exhibit 78   Ends with August 31, 2012 12:37 a.m.   197
                email from Ben Sevier to Mark Owen
13 Exhibit 79   Ends with September 2, 2012 5:57 p.m. 197
                email from Kevin Podlaski to Kevin
14              Podlaski
   Exhibit 80   September 4, 2012 9:46 am email from   198
15              Kevin Podlaski to Mark Owen
   Exhibit 81   Ends with September 4, 2012 4:28 p.m. 199
16              email from Elyse Cheney to Kevin Podlaski
   Exhibit 82   Ends with September 5, 2012 12:13 p.m. ....... 200
17              email from Kevin Podlaski to Kevin
                Podlaski
18 Exhibit 83   September 6, 2012 memorandum to Kevin 202
                Podlaski from Diana C. Bauer
19 Exhibit 84   September 6, 2012 memorandum to FILE from ..... 203
                Kevin Podlaski
20 Exhibit 85   Ends with September 6, 2012 3:51 p.m. 204
                email from Diana Bauer to Kevin Podlaski
21 Exhibit 86   Ends with September 7, 2012 8:53 a.m. 206
                email from Kevin Podlaski to Diana Bauer
22 Exhibit 87   Ends with September 7, 2012 2:16 p.m. 208
                email from Diana Bauer to Kevin Podlaski
23 Exhibit 88   September 7, 2012 letter  from Kevin P. ....... 208
                Podlaski to Department of Defense
24 Exhibit 89   September 18, 2012 letter from Kevin  209
                Podlaski to Susan Cugler
25 Exhibit 90   Document to Susan Aldorfer from Kevin 209

```
1   EXHIBITS (cont'd.)
2
    Exhibit 91  Ends with September 8, 2012 9:46 p.m. 210
3               email from Mark Owen to Kevin Podlaski
    Exhibit 92  Ends with September 11, 2012 10:50 a.m. ....... 212
4               email from Elyse Cheney to Kevin Podlaski
                and others
5   Exhibit 93  Ends with September 11, 2012 4:46 p.m. ........ 214
                email from Robert Luskin to Kevin
6               Podlaski and Mark Fabiani
    Exhibit 94  Ends with September 12, 2012 1:37 p.m. ........ 217
7               email from Kevin Podlaski to Kevin
                Podlaski
8   Exhibit 95  Ends with September 13, 2012 12:04 p.m. ....... 218
                email from Diana Bauer to Kevin Podlaski
9   Exhibit 96  Ends with September 18, 2012 3:53 p.m. ........ 220
                email from Mark Owen to Kevin Podlaski
10              and Elyse Cheney
    Exhibit 97  Ends with September 18, 2012 7:00 p.m. ........ 223
11              email from Kevin Podlaski to Mark Owen
    Exhibit 98  Ends with September 24, 2012 3:34 email ....... 224
12              from Mark Owen to Kevin Podlaski
    Exhibit 99  Ends with September 28, 2012 9:23 a.m. ........ 225
13              email from Robert Luskin to Kevin
                Podlaski
14  Exhibit 100 Ends with October 5, 2012 5"56 p.m. email ..... 226
                from Mark Owen to Kevin Podlaski
15  Exhibit 101 Ends with November 13, 2012 10:49 a.m. ........ 229
                email from David Sobonya to Kevin
16              Podlaski
    Exhibit 102 Ends with January 8, 2013 1:48 p.m. email ..... 231
17              from Kevin Maurer to Kevin Podlaski
    Exhibit 103 Ends with May 8, 2013 2:18 p.m. email 232
18              from Alex Jacobs to Kevin Podlaski
    Exhibit 104 Ends with May 8, 2013 3:41 email from 233
19              Krista J. Witmer to Kevin Podlaski
    Exhibit 105 Ends with May 9, 2013 7:56 a.m. email 234
20              from Donald Nichelson to Kevin Podlaski
    Exhibit 106 Ends with May 9, 2013 10:10 a.m. email ....... 232
21              from Alex Jacobs to Kevin Podlaski
    Exhibit 107 Ends with May 9, 2013 4:21 p.m. email 236
22              from Mark Owen to Kevin Podlaski
23
24
25
```

```
 1                    A P P E A R A N C E S
 2
 3        FOR THE PLAINTIFF:
 4             Mr. Randy Johnston
               Mr. Coyt Johnston
 5             JOHNSTON TOBEY BARUCH, P.C.
               3308 Oak Grove Avenue
 6             Dallas, Texas   75204
               214.741.6260
 7             randy@jtlaw.com
 8
          FOR THE DEFENDANTS:
 9
               Mr. A. Michael Furman
10             Ms. Izabell Lemkhen
               FURMAN KORNFELD & BRENNAN LLP
11             61 Broadway, 26th Floor
               New York, New York   10006
12             212.867.4100
               mfurman@fkblaw.com
13
               Mr. Michael E. Brown
14             KIGHTLINGER & GRAY, LLP
               One Indiana Square, Suite 300
15             211 North Pennsylvania Street
               Indianapolis, Indiana   46204
16             317.968.8119
               mbrown@k-glaw.com
17
18   ALSO PRESENT:
19        Mr. Mark Zaid
20
21
22
23
24
25
```

Kevin Podlaski - November 17, 2016

### 7

1    START TIME: 9:39 A.M.

2

3        MR. JOHNSTON: Mr. Podlaski, welcome this

4    morning, and I never want to fail to thank you for

5    your 20 years of service to this country in the

6    military.

7        Let me be sure, Mr. Furman, that we are on the

8    same page here. I have agreed to give up my right to

9    take a 7-hour deposition of the firm and a 7-hour

10   deposition of Mr. Podlaski separate, with the

11   understanding that we're doing both depositions at the

12   same time basically.

13       Is that consistent with your understanding?

14       MR. FURMAN: Yes.

15       MR. JOHNSTON: Okay. Mr. Podlaski has been

16   designated by the firm as the firm representative

17   under the 30(b)(6) rule?

18       MR. FURMAN: Correct.

19       MR. JOHNSTON: Okay. Thank you. That will save

20   me a lot of time, and I won't have to say does the

21   firm think one thing, do you think something

22   different.

23       MR. FURMAN: That's completely understood.

24       MR. JOHNSTON: Thank you, sir.

25

### 8

1            KEVIN PODLASKI,

2    having been duly sworn to tell the truth, the whole truth,

3    and nothing but the truth relating to said matter, was

4    examined and testified as follows:

5    DIRECT EXAMINATION

6        QUESTIONS BY MR. RANDY JOHNSTON:

7    Q   Mr. Podlaski, can you tell me what you have done to

8        prepare for your role to testify as the representative

9        of the Carson Boxberger firm this morning?

10   A   Just reviewed the responses to Interrogatories; and

11       although I didn't do it today, previously I reviewed

12       some documents that were produced.

13   Q   Okay. And when you say "documents that were

14       produced," you're talking about the document

15       production in the case?

16   A   Correct.

17   Q   Emails, stuff like that?

18   A   Yes.

19   Q   Okay. Let me ask for an agreement with you that

20       confesses my ignorance, first off. I have seen in the

21       documents and learned in the course of this trial that

22       people with military experience are real fond of

23       acronyms and initials and the like, and I may not

24       understand some initials that you might feel free to

25       use, or alternatively, I may use them improperly. If

### 9

1        that comes up, please be sensitive to my ignorance on

2        that subject. I will try to be accurate. If I'm

3        wrong, don't hesitate to correct me in my use of an

4        acronym.

5        And let me just jump into marking a couple of

6        exhibits first to speed things up. Let me show you —

7        oh, I'm sorry. We've already marked the deposition

8        notices as Exhibit 31.

9        MR. FURMAN: Are they over here?

10       (Pause)

11       (Exhibits 31 and 32

12       presented to the witness.)

13   Q   So I've marked as Exhibits 31 and 32 the deposition

14       notices of the firm and of you, Mr. Podlaski. I

15       assume you had a chance to review those or saw those

16       at some point before today.

17   A   I need to talk to Mike for a second, so we need to go

18       off the record.

19       MR. JOHNSTON: Sure.

20       (Discussion held off the record.)

21       MR. FURMAN: Just want to put on the record, the

22       reason we stepped out is in Exhibit 32 — excuse me —

23       Exhibit 31, attached to Exhibit A it states that

24       Carson Boxberger is required to produce a witness that

25       relates, at No. 2, to all occasions prior to Carson

### 10

1        Boxberger's representation of Matthew Bissonnette when

2        it advised or assisted an author in connection with,

3        I'm assuming, other occasions with respect to the

4        pre-publication review process, and I thought we had

5        already discussed that with the Court, and the ruling

6        was that there would be no questions regarding other

7        authors.

8        MR. JOHNSTON: I understand your point and --

9        MR. FURMAN: That was the reason we stepped out.

10       MR. JOHNSTON: I understand. We can get into

11       that. We'll probably step around that line, but I

12       understand your position and the Court's ruling and --

13       MR. FURMAN: Understood. I just wanted to make

14       clear why we stepped out and what we discussed in the

15       hallway.

16       MR. JOHNSTON: Thank you.

17   Q   You have had the chance to review them before today?

18   A   Yes.

19   Q   Okay.

20       (Exhibit 33

21       presented to the witness.)

22   Q   Let me show you what's marked as Exhibit 33. Do you

23       recognize that as an unsigned copy of your Engagement

24       Letter with Mr. Bissonnette?

25   A   That's what it appears to be.

Kevin Podlaski - November 17, 2016

## 11

1  Q   And ultimately Mr. Bissonnette did sign that, correct?
2  A   He signed this or something like it, yes.
3  Q   Okay.  And let me -- this is probably a good time to
4     add this, Mr. Podlaski.  There are a lot of documents
5     in this case floating around, and sometimes there are
6     drafts of documents.  I have what I think are
7     documents that are what they purport to be on their
8     face.  If subsequent to the deposition you determine
9     that I have given you a document that is not what it
10    purports to be, if there is a page missing, or it was
11    an earlier draft, if you will let your counsel know so
12    he can let me know, because it is my intent to rely on
13    these at trial as exhibits, but I don't want to do
14    that if I've somehow, through copying, stuck a wrong
15    page in or something like that.
16       MR. FURMAN:  I think what we can do is take it as
17    it comes, because for us to give a blanket assurance
18    at this point --
19       MR. JOHNSTON:  I'm not asking a blanket assurance
20    of anything other than you'll let me know later if you
21    discover I don't have an accurate document.
22       MR. FURMAN:  Well, we'll do our best.
23       MR. JOHNSTON:  In fact -- well, I won't take the
24    time to do it now, but I will point up that Exhibit
25    No. 3, which Mr. Furman marked yesterday in the

## 12

1     deposition, has as an attachment the same letter with
2     the signature, and you can compare them later.  I
3     simply didn't produce a signed one for purposes of
4     this deposition today.
5         (Exhibit 34
6         marked for identification.)
7       MR. JOHNSTON:  And now let me mark as Exhibit 34
8     what I believe to be a copy of all of the Carson
9     Boxberger bills in this matter, and we will be
10    referring to them.  We'll ask for the same
11    understanding.  I'm not asking you to ratify here
12    today that that's every bill or that every bill is
13    accurate, but if there are some problems that come up
14    where you don't believe that's what they are, let me
15    know.
16       MR. FURMAN:  Will do.
17  BY MR. JOHNSTON:
18  Q   Mr. Podlaski, as you sit here today, is it your
19    contention that there is classified or confidential
20    information contained in the published version of "No
21    Easy Day"?
22  A   It's my opinion that the information contained within
23    "No Easy Day" contains no classified information that
24    is of concern to the United States with regard to its
25    national security.

## 13

1  Q   Are you reserving out something that my question
2     includes when you give me that longer answer?
3  A   There is differing opinions about whether some of the
4     assertions in the book are -- were classified, as your
5     client testified to yesterday.
6  Q   All right.  When did you first discover that there was
7     any information in the book that other people would
8     consider classified?
9  A   I'm pausing to answer that, because the August 30th
10    letter from Jeh Johnson indicates the first formal
11    notice that anyone believed the materials in the book
12    contained classified information.
13  Q   Prior to that letter, did you have any concern about
14    the book containing information in violation of
15    Mr. Bissonnette's obligations to the Government?
16  A   That's a pretty broad question.
17  Q   Yes, sir.
18  A   But specifically, as I told Mr. Bissonnette one of the
19    first times I spoke with him, that based on my
20    experience I could review material for tactics,
21    techniques, procedures, technical devices or -- and/or
22    related to communications, but I don't know what I
23    don't know.  And there's something called
24    "classification by compilation" that would enable
25    foreign agents, persons who are schooled in

## 14

1     intelligence gathering, to be able to take what
2     appears to be innocuous information and piece it
3     together, not only from his book but from other books
4     or from open sources, and derive what would be
5     operative -- excuse me -- would be operational
6     intelligence.
7         So as I told him from one of the first
8     meetings -- or first telephone calls we had, "Your
9     safest course is to submit the book for review,
10    because you don't know what you don't know.  I don't
11    know what I don't know."
12  Q   And in your Answers to Interrogatories, you indicated
13    you had a telephone call -- the first telephone call
14    with him, I believe, if I'm remembering correctly, on
15    January 18?
16  A   That's what I recall as well.
17  Q   Is it your belief that this conversation took place in
18    that first phone call?
19  A   I think the first phone call we just generally talked
20    about his military status, we talked about his
21    concerns for security, we talked about his wanting to
22    maintain anonymity, we talked about his contract with
23    Dutton, and we talked about my background.  That's
24    what I recall.
25  Q   So is it your belief then that this telephone call

Kevin Podlaski - November 17, 2016

---

**15**

1  about compilation would have taken place in the second
2  phone call that's referenced, which I believe you
3  indicated was on January 25?
4  A  I believe so. I think the first phone call was
5  between myself and Elyse Cheney and Matthew
6  Bissonnette; and the second phone call was -- and that
7  was on a land line, I'm pretty sure. And the second
8  call was with Matt, and it was a cell phone call.
9  Q  Did you promise or represent to Mr. Bissonnette that
10 you would review the book to ensure that it didn't
11 contain classified or sensitive information?
12 A  No. I think the Engagement Letter says that I would
13 review it to ensure his compliance with his
14 obligations under the agreement that he might have
15 signed with the US Government concerning classified or
16 classifiable information.
17 Q  And did you perform that task to the best of your
18 ability?
19 A  I believe that I did.
20 Q  And as you sit here today, do you believe that you
21 failed to find anything in the book that should have
22 been removed to ensure his compliance with agreements
23 he signed?
24    MR. FURMAN: Could I have that last question read
25 back? I'm not sure I understood it.

---

**16**

1    (Court Reporter read back.)
2  A  Well, here's the point. In the Government's review
3  process, they could review it, and they don't care if
4  it's already in the public domain. If you're writing
5  a book about information the Government is concerned
6  about, they don't want you to confirm what may be in
7  the public domain. But some things, such as what your
8  client testified to yesterday even, the terminology
9  "SEAL Team 6" is supposed to be sensitive, and yet
10 it's so saturated the public domain that it is common
11 parlance.
12   So, I can't really answer your question without
13 that footnote that whereas I believe that anything
14 that's in the book is either not classified or has
15 been so saturated in the public domain that it is no
16 longer a -- I wouldn't say a threat, but it is of no
17 longer of any concern to the Government about the
18 topic.
19 Q  Okay. Did you ever tell Mr. Bissonnette, after you
20 had completed your review, that there might still be
21 this information in there that is already in the
22 public domain and should not be a concern but the
23 Government might still get upset over it?
24 A  Yeah. There were quite a few issues. I suggested to
25 him, his literary agent, and the publisher that they

---

**17**

1  footnote as much as possible the factual assertions
2  that he was making by citing public source
3  information, and I went so far as to research that and
4  provide that information, and there were some things
5  that I just couldn't find in the public domain. I
6  recall that the co-writer, Kevin Maurer, also he
7  agreed and found other foot -- other information to
8  footnote that I couldn't find. But that was flatly
9  rejected by the publisher. Initially they wanted to
10 just make those endnotes instead of footnotes, and
11 then they decided further to just make it a list of
12 references cited in the book.
13   So to answer your question, I had concerns that
14 there was information in the book that could be
15 construed by the Government to be sensitive, if not
16 classified. At whatever level, I don't know.
17 Q  Is it your belief that if the footnotes had been
18 added, the Government would not have had those
19 concerns?
20 A  I can't tell, and I have no way of knowing that; but
21 based on my experience, it was something that assists
22 the author in getting the book past review when you
23 can cite a legitimate public source as the source of
24 the information.
25 Q  But at the time you were making these changes, you

---

**18**

1  already knew this book was not going to be reviewed,
2  correct?
3  A  I would not say that I knew it was not going to be
4  reviewed, because I had initial conversation with Matt
5  about getting the book reviewed, and I told him my
6  experiences with getting the book reviewed. I told
7  him that the time for review could be anywhere from
8  two weeks to two years or never come. I also told him
9  that the book may be reviewed and come back as, "Do
10 not publish." It could come back as "You must revise
11 it." It could come back as "You must redact these
12 things." And then your publisher has the opportunity
13 to decide with you, as the author, whether to publish
14 the redacted, blacked-out words and paragraphs or
15 to -- and then put in a summary, a non-classified
16 summary of what those redacted notes were about, or to
17 rewrite the book so that it contained no redactions.
18   And once I explained this to your client, he was
19 adamant that he did not want to submit the book for
20 review if it was going to take longer than he had been
21 given by the publisher to get the book to them in
22 publishable format. He said that --
23 Q  Let me stop you just for a second, because we want to
24 put this in context.
25 A  Sure.

---

Kevin Podlaski - November 17, 2016

19

1    MR. FURMAN:  Did you finish your answer to the
2    question?
3        THE WITNESS:  No, I didn't but --
4        MR. FURMAN:  Well, I think my client would like
5    to finish his answer, if it's possible.
6        MR. JOHNSTON:  And he will be allowed to.
7    Q   But my question is, are you talking about a January 25
8        telephone call when you had this discussion?
9    A   There were a couple of different discussions.  One was
10       January 25, and then there was another once he got the
11       manuscript to me.
12           The last thing I was going to say was that he
13       wanted -- what he told me was that the book -- he had
14       to meet the deadline.  They had already given him an
15       advance, and this was -- I think this was probably
16       close to June when I first -- when I got the
17       manuscript, this conversation, and that there was no
18       way they could submit the book at that time because
19       they needed to get the book published before the
20       competition; and the competition, according to him,
21       from what I recall, was that he referenced "Zero Dark
22       30".  The movie was to come out, and I believe at that
23       time he also mentioned that there were other members
24       in the Command who were writing books, higher-ranking
25       officers.

20

1    Q   And that conversation took place in June, as you
2        recall?
3    A   I believe it was in June when I got the manuscript.
4    Q   I don't see a reference to that conversation in the
5        Answers to Interrogatories that you swore to.  Is
6        there a reason why it isn't in there?
7    A   It must have slipped my mind.  I think I did recall in
8        the Interrogatories -- I talked about some phone calls
9        in February, but, yeah, there was definitely a phone
10       call in June -- at least one phone call, if not more.
11       I think there were more than one in June.
12           One of the phone calls was with Matt Bissonnette
13       and also Kevin Maurer when we were talking about the
14       footnoted issues.  But the conversation with regard to
15       submitting the book, again, was just Matt and I.  He
16       called me, and he was getting cold feet about
17       submitting the book -- about publishing the book
18       without it being submitted.
19    Q   Is that phone call reflected -- was that a long phone
20       call?
21    A   As I sit here today, I don't recall.  15 minutes
22       maybe.
23    Q   So all of that was discussed, you believe, in
24       something approaching a 15-minute phone call?
25    A   15, 20 minutes, something like that.  I don't recall

21

1        exactly how long.
2    Q   Did you bill for that call?
3    A   I don't know if I did or not.
4    Q   If that phone call is not in your bill for June, would
5        that indicate to you that that call did not take place
6        in June?
7    A   Not at all.  I often times wouldn't bill a client for
8        telephone conversations.  If it was a matter that was
9        necessary because the client made -- gave me direction
10       about something, then I would memorialize it and send
11       him a letter saying, "Hey, this is what we talked
12       about."
13           But that was not the relationship I had with
14       Matt.  When Matt first came to me, he was very, very
15       concerned about security.  He and his literary agent,
16       Elyse Cheney, were hyper-concerned about keeping his
17       name out of the public view, security for his family
18       and himself.
19    Q   Well, you weren't hesitant about emailing him or
20       Ms. Cheney in connection with the discharge of your
21       services, were you?
22       MR. FURMAN:  Objection to the form of the
23       question.
24       MR. JOHNSTON:  What's the objection?
25       MR. FURMAN:  Well, you're assuming that there was

22

1    any hesitancy.  That's -- I'm objecting to the form of
2    the question.
3        He can answer.
4    Q   You may answer.
5    A   I'm sorry.  Could you repeat the question?
6        Can you read it back?
7        MR. FURMAN:  Also lacks foundation.
8        The client can answer the question.
9        (Court Reporter read back.)
10   A   I think that my email with him was respectful of the
11       anonymity that he wanted to convey.  Also, we didn't
12       discuss the materials that he was going to include in
13       the book in any emails or billing.  So I don't think I
14       would call it hesitancy, but I think I would call it
15       respecting what his wishes were.
16   Q   It is a true statement, is it not, that you routinely
17       emailed Ms. Cheney about the discharge of your
18       services in accordance with your Engagement Letter?
19   A   Yeah, I think you need to explain to me what you mean
20       by the discharge of my services, because we emailed
21       about the contract, we emailed about -- when the
22       manuscript was going to get to me and how long I would
23       have to review it.  So I don't know specifically what
24       you mean.
25   Q   Well, let me ask you to look there at Exhibit 33, the

Kevin Podlaski - November 17, 2016

23

1 Engagement Letter.
2 A  Okay.
3 Q  And I'll use the language of your Engagement Letter.
4 You emailed Ms. Cheney about you assisting
5 Mr. Bissonnette with legal issues that he might
6 encounter in contracting with Dutton, correct?
7 A  Correct.
8 Q  And you emailed him in connection with reviewing the
9 publishable manuscript of his career to ensure his
10 compliance with his obligations under any agreements
11 he may have signed with the US Government not to
12 release classified or classifiable information or
13 otherwise compromise the national security interests
14 of the United States, correct?
15 A  That's correct.
16 Q  And yet — and you tell me if I am incorrect.  In my
17 review of the file, I have found no email or letter
18 that references the discussion you say you had with
19 Mr. Bissonnette in June.  Is there such a document
20 that I haven't seen?
21 A  I don't know.
22 Q  And it's not in your Interrogatory Answers, correct?
23 A  I believe that's correct.
24 Q  And it's not referenced in your bills to
25 Mr. Bissonnette?

24

1 A  I have not looked through all of my bills, but I'll --
2 if that's what you're representing, then I guess that
3 must be true.
4 Q  Let me ask you to -- well, let me move to another
5 subject here for a minute here, and we may be able to
6 discharge this quickly.  We'll see.
7 Did you have any role in connection with my
8 request on behalf of Mr. Bissonnette for the
9 production of his attorney-client file?
10 A  I did.  I had the hard paper file, which did not have
11 that many documents in it, and I produced immediately
12 the paper file that I had, to then-attorney Robert
13 Shannon.
14 Q  Let me ask you, how long was it before you produced
15 the file to Mr. Shannon that you had?
16 A  Within 24 hours.
17 Q  Okay.  And I gather by your comments that you did not
18 have the digital file?
19 A  No.
20 Q  Okay.  And that remained at Carson Boxberger?
21 A  Correct.
22 Q  Did Carson Boxberger also have a hard copy file, to
23 your knowledge?
24 A  I do not believe they did.
25 Q  Do you know when the file was produced to me after

25

1 that request?
2 A  I do not know.
3 Q  There was a second request and then a second
4 production by Mr. Shannon.  Did you have any role in
5 that?
6 A  No, I don't think that I did.  What I recall is that
7 the information -- I gave Mr. Shannon what I had, and
8 he was dealing directly with Carson Boxberger for
9 their digital information.  I know at some point that
10 Carson Boxberger had a senior attorney assigned to
11 oversee the production of the digital information to
12 make sure that everything was produced.  There was a
13 list of -- and they asked me to review it, and I
14 did -- a list of search terms that they used, which
15 was very comprehensive, and then they -- that attorney
16 did some kind of certification of his search and
17 submitted that.
18 Q  Was that at the first request or the second request,
19 or do you know?
20 A  I don't know, but I believe it was the second request.
21 Q  Okay.  Do you know why that wasn't done in response to
22 the first request?
23 A  I don't know.  What I think was happening was that
24 Mr. Shannon had reached out to the Department of
25 Justice, and they said -- I think it had something to

26

1 do with copies of the manuscript that they said were
2 not -- you know, they believed them to be classified
3 and no one is to read them and words to that effect.
4 I'm just trying to recall what Mr. Shannon said to me.
5 But I think that was the only issue, really, was the
6 copies of the manuscript.
7 But then I know that the attorney from Carson
8 Boxberger was directly told by the Department of
9 Justice's Assistant US Attorney, Mr. Peak, that they
10 were to produce everything to them immediately, and
11 that's what they did.
12 Q  They were to produce everything to --
13 A  -- the Department of Justice.
14 Q  Okay.  So is it your understanding that Carson
15 Boxberger produced the entire file to the Department
16 of Justice before it was produced to me, or as a part
17 of the production to me?
18 A  I don't know the answer to that question.  That's --
19 Mr. Shannon would have to answer that question.  I
20 believe that Carson Boxberger gave everything that
21 they had to Mr. Shannon, as I did, and then they went
22 back and they searched again for the Department of
23 Justice, per their directive, per their subpoena, and
24 produced everything they had again.
25 So I was really not involved directly, and I

Kevin Podlaski - November 17, 2016

27

1  don't think Carson Boxberger was involved directly
2  with producing to your firm the documents, but my
3  understanding is on both occasions they produced
4  everything that they had; first to Mr. Shannon, and
5  then Mr. Shannon withdrew, and then it was produced
6  directly to the Department of Justice, if memory
7  serves me correctly.
8  Q   Is it your -- first off, let me have the name of the
9  attorney who certified it, certified the search
10  results.
11  A   Calvert Miller.
12  Q   First name is spelled --
13  A   -- Calvert, C-a-l-v-e-r-t, Miller.  He's a partner
14  there.
15  Q   Thank you, sir.  Is it your testimony that Carson
16  Boxberger received a subpoena from the Department of
17  Justice for the file at or about the same time I
18  requested it?
19  A   I don't know the answer to that question.
20  Q   So you don't know the chronology of those events?
21  A   I do not.
22  Q   All right.  There -- I understand that if I ask you
23  questions about what you told the Department of
24  Justice -- let me ask this.
25        How many times were you interviewed by the

28

1  Department of Justice in connection with
2  Mr. Bissonnette?
3  A   Once in person and once on the phone.
4  Q   Okay.
5  A   And in that order.
6  Q   Okay.  And on the occasion you were interviewed in
7  person, you were represented by counsel at the
8  meeting?
9  A   Correct.
10 Q   And that counsel was who?
11 A   Jim Lassart.
12 Q   And when the telephone conversation took place, was
13 Mr. Lassart on the phone with you?
14 A   Yes.
15 Q   Okay.  Can you tell me how long after the in-person
16 meeting the phone call was?
17 A   I think the in-person was in December of 2015 -- no,
18 '14, I think, and the phone call was six, seven months
19 later.
20 Q   Okay.
21 A   Maybe less.
22 Q   And I understand if I ask you -- you're aware that the
23 Court has ordered you to tell me what you told them,
24 correct?
25 A   I understand that, but we have requested relief --

29

1  Q   Let me continue.  I'll take this --
2  A   You asked me the question, so I'm trying to answer.
3  Q   You understand that the Court has ordered you to tell
4  me what you told them, number one, correct?
5  A   Yes.
6  Q   And you have filed a Motion for Reconsideration, which
7  is still pending?
8  A   That's correct.
9  Q   And if I ask you what you told them, you're going to
10 stand on the Motion for Reconsideration and wait for
11 the Judge's ruling?
12 A   Yes, sir.
13 Q   Okay.  And if I ask you what documents you gave them,
14 would you likewise not tell me and stand on the Motion
15 for Reconsideration?
16    MR. FURMAN:  I think we -- Mr. Podlaski already
17 testified his understanding is that the firm produced
18 the entire file to the Government.  I don't know that
19 that's -- there's anything more beyond that.
20    MR. JOHNSTON:  Right now I'm speaking only about
21 him, not the firm.
22    MR. FURMAN:  All right.  That's fair.
23 Q   Let me ask you this.  Did you individually, at your
24 meeting or via some other transmission, give documents
25 to the Department of Justice?

30

1  A   They received -- the documents that I had in the hard
2  file we put on pdf and those were given to
3  Mr. Shannon.  Those same documents were given to the
4  Department of Justice, no more, no less.
5  Q   By Mr. Shannon?
6  A   Which?
7  Q   I'm sorry.  That's fair confusion.  I apologize.
8       When you say those documents that you had in a
9  hard copy were given to Mr. Shannon --
10 A   -- in pdf form.
11 Q   -- in pdf form, is it your testimony that Mr. Shannon
12 then gave them to the Department of Justice?
13 A   I don't know.
14 Q   You just know that the Department of Justice got them
15 somehow?
16 A   No, I know that the Department of Justice asked me for
17 them specifically.  They wanted a copy of my hard
18 file, and I sent them the same pdf, because it was
19 a --
20 Q   Okay.
21 A   Let me finish, please.  Because it was a complete pdf
22 of the hard copies that I had, and I sent it to them.
23      I also had to fill out an affidavit saying that I
24 gave them everything I had.
25 Q   All right.  Now I think I understand.  So you gave

Kevin Podlaski - November 17, 2016

---

31

1       your more limited, small file to Mr. Shannon
2       immediately after my request?
3    A  Yes, sir.
4    Q  And sometime thereafter, you likewise gave that same
5       file to the Department of Justice?
6    A  Right.  And I did it through -- I say I directly gave
7       it to them.  Well, I did it with my attorney, Jim
8       Lassart.
9    Q  Okay.  Do you recall whether you delivered that at
10      your meeting or whether it was sent in advance of your
11      meeting?
12   A  It was sent in advance.
13   Q  All right.  And you still have a record of whatever
14      you sent, I assume.
15   A  I have the pdf and the hard copy, yes.
16   Q  Okay.  If -- well, do you know from your personal
17      experience what Carson Boxberger gave the Department
18      of Justice, separate and apart from your file?  Just
19      yes or no?
20   A  Well, I can't answer that.
21   Q  Okay.
22   A  I know that they gave them documents.  I believe they
23      gave me a CD of the -- a CD copy of what they gave,
24      but I don't know all the documents that are in there.
25   Q  Okay.  Do you know whether Carson Boxberger gave the

---

32

1       Department of Justice any documents that it did not
2       produce through Mr. Shannon to me?
3    A  I do not know to certainty, but from my conversations
4       with both Attorney Miller and Attorney Pape, I believe
5       that they gave the same documents but with the caveat
6       that there was a search done by Calvert Miller with
7       search terms that were very broad in the second
8       production.  So --
9    Q  Do you know how many productions Carson Boxberger gave
10      to the Department of Justice?
11   A  I believe just one.
12   Q  Okay.  Let me ask you to look at a document.
13               (Exhibit 35
14           marked for identification.)
15   Q  Let me ask you to look at a document marked 35 that at
16      the top is entitled in all capital letters "MEMORANDUM
17      FOR RECORD".  Are you the author of this document?
18   A  Just one moment.
19   Q  Certainly.
20               (Pause)
21   A  Yes, it appears to be the memorandum that I prepared.
22   Q  Now, I didn't bring it, but I will tell you I have
23      more than one version of this document where dates
24      changed.  Do I have both copies there?  Oh, yes,
25      there's at least a second page 1 attached.

---

33

1    A  This last page appears to be not connected to --
2       KP02192 doesn't appear to be connected.
3    Q  I don't even have that page.  May I see what you have
4       sir?
5    A  Sure.
6    Q  We may have stapled a page that doesn't belong on the
7       document.
8               (Pause)
9    Q  No, you are correct.  That one doesn't belong there.
10      That's a different document.
11          MR. FURMAN:  So we are taking out the one ending
12      in 92?
13          MR. JOHNSTON:  Yes, sir.
14   Q  So do you now have a three-page document?
15   A  I do.
16   Q  And the first page says "MEMORANDUM FOR RECORD" and it
17      has Paragraphs 1 through 8?
18   A  Right.
19   Q  With a Bates number of 116 at the bottom?
20   A  Correct.
21   Q  And then second page is Bates numbered 117 and has
22      Paragraphs 9 and 10?
23   A  Correct.
24   Q  And then page 3 has Bates number 340 on it.
25   A  Correct.

---

34

1    Q  And let me just ask you to compare the third page and
2       the first page, because they are not identical with
3       regard to dates.  Do you know why there would be two
4       versions of this memorandum with the different dates?
5    A  Yeah.  I think, first off, I created one of them and
6       then I couldn't find it, and then created the other
7       one.  So -- but why there would be different dates?
8       One of them I wrote earlier, like in the spring of
9       2012; and then the other one I wrote later, I think in
10      July of 2012, July or August.
11   Q  Which one did you write in the spring of 2012?
12   A  I think the 340.
13   Q  Okay.  And is it your belief that the 340 document
14      ends with Paragraph 8?
15   A  I don't recall.
16   Q  Because I -- if you look at the last sentence, I think
17      I may have left off a second page of it.
18   A  Yeah, I don't recall.
19   Q  Okay.
20   A  You're right.  It seems like there's more.
21   Q  And if there is more to the document numbered 348
22      (sic) that matches the second page --
23          MR. FURMAN:  You mean 340.
24   Q  Yes, sir.  Thank you for that correction.  If there is
25      more to 348 (sic) that matches in substance what is

---

Kevin Podlaski - November 17, 2016

---

35

1    numbered 117, would you agree with me that you did not
2    draft 340 in the spring of 2012, because it references
3    events occurring in June?
4    A   Yeah, that's a fair estimation.  Yeah, also if you
5    look at 340, it's internally inconsistent.  So I think
6    I roughed one of these out, because it says "February"
7    in Paragraph 1, and in Paragraph 2 it says "January".
8    But in any event --
9        MR. FURMAN:  I just want to make sure I heard it
10   and the record is clear.  You say "roughed it out"?
11   A   Yeah.  I mean, I just -- I think it was this 340 that
12   I kind of threw together based on -- I have a pad next
13   to my phone and I scribble down things, and then I
14   would, you know, typed it up and threw the notes away.
15   But I don't recall.
16   Q   Can we agree then that with regard to the documents,
17   they were done after June of 2012?
18   A   I wouldn't agree that both of them were done after
19   June of 2012.  I don't know.  I don't recall.
20   Q   Okay.  Why did you do this memorandum?
21   A   Just my habit of recording issues or recording events
22   either for my memory or for -- just because -- I think
23   in this case it was because Mark -- or Matt -- had
24   said from the very beginning how he wanted to maintain
25   anonymity, and I didn't include things in billing

---

36

1    statements because of that.  So I wanted to just have
2    an internal record.
3    Q   Did you -- is it possible that you did this after Jeh
4    Johnson's letter?
5    A   I don't recall that.  So no, I don't think it was.  I
6    think it was in July or early August.
7        I don't know as I sit here, but I don't believe
8    so.
9    Q   During 2012, you knew Mr. Bissonnette had attorneys
10   representing him other than you, correct?
11   A   When?
12   Q   From the moment you first began representing him.
13   A   No, I didn't know he had any other attorneys
14   representing him on anything until August 30th when
15   Robert Luskin called me up and said that he was
16   recently hired by Matthew Bissonnette, and that I was
17   to have no further communication with his client
18   except if he was present.
19   Q   So you didn't know he was represented by Mr. Heller?
20   A   No idea.
21   Q   So when there are emails -- if there are emails from
22   you confirming Mr. Heller's representation, you
23   wouldn't be able to explain that today?
24   A   I don't recall that.
25   Q   Let me show you what we'll mark as Exhibit 36.

---

37

1        (Exhibit 36
2        marked for identification.)
3    Q   Let me just ask you to look in the chain there.
4        There's -- the second email down on page 1 is an email
5        from you to Elyse Cheney, correct?
6    A   Okay.  Where are you referring to?  At the top?
7    Q   Right here, sir (indicating).
8    A   Okay.  All right.
9    Q   Dated January 17; do you see that?
10   A   Yeah.
11   Q   The final sentence there is, "Did Mark sign an
12       Engagement Letter with Rich's firm?"
13       Does that refresh your memory as to whether you
14       knew Rich Heller was representing him?
15   A   No.  Can I please read this?  Because I don't recall
16       this document.
17       (Pause)
18   A   This 2417 doesn't appear to be a complete document,
19       because it just -- she's referring to, "How should we
20       sign this?"
21       I don't know what this is referencing, because it
22       doesn't provide any background.
23   Q   Well, isn't the subject of Ms. Cheney's email to you
24       "Retainer Agreement"?
25   A   That's true.

---

38

1    Q   And then it says, "How should we sign this?  Mark's
2        wife could sign it or else I could."
3    A   That's true, but it doesn't necessarily answer the
4        whether or not there's -- there were other
5        information -- there were other emails exchanged on
6        this topic.
7    Q   I'm sure there were others, but then you replied to
8        that moments later and said, "Can't have his wife or
9        you sign."  And then you cite Rules of Professional
10       Responsibility, correct?
11   A   Nonetheless -- yes, that's correct.  But nonetheless,
12       it doesn't mean that there wasn't previous emails
13       exchanged on the topic.
14   Q   And then there's an email from Elyse back to you, same
15       date.  "I was thinking if I signed it I could be the
16       client, but I guess that would mean you couldn't set
17       up two LLC's."
18       And then you reply to that as well.
19   A   Okay.  I still haven't finished reviewing it, and you
20       asked me a question; so if I could finish reviewing
21       it, then I'll be able to answer your question.
22       (Pause)
23   A   Okay.  Having read this document, in answer to your
24       previous question, I believe that at the time, I was
25       aware that he had -- according to what Elyse Cheney

---

Kevin Podlaski - November 17, 2016

---

**39**

1    said, he, being Matt Bissonnette, had an Engagement
2    Letter with Mr. Heller for -- as an entertainment
3    lawyer, but I didn't have any other interface with him
4    that I know of.
5  Q    And my question was, so in 2012 from the moment you
6    began representing him, you knew he had other lawyers
7    representing him also, correct?
8  A    I knew apparently that he had signed an Engagement
9    Letter with Richard Heller.
10  Q    And is it your testimony here today that that's all
11    you knew about Mr. Heller?
12  A    As far as I recall, yes; and then in August 30th, I
13    knew that he had retained Mr. Luskin.
14  Q    Did you have any communications with Mr. Heller?
15  A    Not that I recall. I'm sorry to interrupt you.
16  Q    That's all right.
17        When do you contend that your representation of
18    Mr. Bissonnette ended?
19  A    When Mr. Luskin said, "Don't have any further contact
20    with my client without my being present."
21  Q    And when was that?
22  A    I believe it was on or before August 30th, 2012.
23  Q    Do you know from the documents we've produced when
24    Mr. Luskin was retained?
25  A    No, I do not.

---

**40**

1  Q    Did you continue to have conversations with
2    Mr. Bissonnette, notwithstanding these directions from
3    Mr. Luskin?
4  A    I think the conversations might have been through
5    email with other persons being present; and if they
6    weren't, they were likely on matters that were not
7    directly related to the issues concerning the book
8    review by the Department of Defense.
9  Q    Mr. Podlaski, did you, after your conversation with
10    Mr. Luskin, have discussions with Mr. Bissonnette
11    about your -- the book and your representation of him?
12  A    I already answered your question.
13  Q    Is the answer then yes, you did?
14  A    No. You're mischaracterizing my answer. What I said
15    was if I did, I had discussions with him through email
16    channels or email exchanges, or they were matters that
17    were not related directly to the DoD's issues with the
18    book, that I recall.
19  Q    When you make a point of saying you had email
20    discussions with him, are you suggesting that
21    Mr. Luskin -- Mr. Luskin's directions to you permitted
22    you to have email discussions or -- I'm not sure why
23    you're saying "I had email discussions."
24  A    Well, it was group discussions.
25        MR. FURMAN: Objection.

---

**41**

1        THE WITNESS: I'm sorry, go ahead.
2        MR. FURMAN: There were two questions, and I
3    wasn't sure which one you want my client to answer.
4  Q    The question is there some reason you are
5    highlighting the fact that the discussions were email
6    discussions?
7  A    No, just other than the fact that they were group
8    exchanges.
9  Q    Okay. So is it your testimony then that the only
10    contact you would have had with Mr. Bissonnette after
11    the telephone call with Mr. Luskin was either group
12    email exchanges or matters unrelated to the book?
13  A    I believe that to be true, yes.
14  Q    In the group email exchanges, was Mr. Luskin involved?
15  A    I don't recall if on every email exchange he was, but
16    I believe that he was.
17  Q    Did he ever in -- did he ever complain to you about
18    the fact that you were continuing to have contact with
19    Mr. Bissonnette contrary to his directions to you of
20    August 30 or before?
21  A    No, because I didn't give him any reason to complain.
22  Q    Did you bill for any of your work after this phone
23    call?
24  A    I don't recall as I sit here, but I suspect I did. I
25    did some work at the direction of Mr. Luskin.

---

**42**

1  Q    Would that be an indication that your representation
2    hadn't ended, if you continued to work and bill for
3    your work at the request of Mr. Luskin?
4  A    I believe that I was assisting, but I was -- no longer
5    had a direct one-on-one relationship with
6    Mr. Bissonnette, and I was assisting Mr. Luskin in his
7    primary representation of Mr. Bissonnette.
8  Q    And in what capacity were you assisting Mr. Luskin?
9  A    Well, I assisted Mr. Luskin with regard to matters
10    concerning process and handling of classified
11    information.
12  Q    As an attorney for Mr. Bissonnette?
13  A    Yeah. He was the only one who I had an Engagement
14    Letter with.
15        MR. FURMAN: Randy, could we take a very quick
16    break?
17        MR. JOHNSTON: Certainly.
18        (Recess)
19  BY MR. JOHNSTON:
20  Q    Mr. Podlaski, did you ever tell Mr. Bissonnette that
21    you were not his attorney?
22  A    No, I don't believe so.
23  Q    Did you ever tell him that he could not or should not
24    rely on your advice?
25  A    No, I did not.

---

16 (Pages 43 to 46)

Kevin Podlaski - November 17, 2016

43

1  Q   Did you send Freedom of Information Act requests for
2      Mr. Bissonnette in September and November of 2012?
3  A   I believe September.  I don't recall sending any in
4      November, but I believe it was September; yes, I did.
5  Q   And did you in May of 2013 report on the status of
6      those requests to Mr. Bissonnette and to an individual
7      employed in Elyse Cheney's office?
8  A   Well, I recall that an individual from Elyse Cheney's
9      office called me up, which I thought very odd since I
10     had not heard from anyone in months.  I was believing
11     our relationship had died on the vine.  So believing
12     that I may have still had an obligation to close the
13     loop on that, I think I provided whatever the status
14     was to Mr. Jacobs, I believe his name was.
15 Q   Yes, that's correct.  In connection with that, did you
16     also have a telephone or email exchange with
17     Mr. Bissonnette personally about it?
18 A   You know, I don't recall.
19 Q   At any point in time, did you have any concern about
20     communicating with Mr. Bissonnette because he was
21     represented by other counsel on this matter?
22 A   Yeah, after August 30th, 2012, as I already said.
23 Q   So did you hesitate to communicate with him after that
24     point in time?
25 A   I did not communicate with him directly, one-on-one

44

1      after that time, because I was told not to by
2      Mr. Luskin, who clearly now was the primary counsel on
3      handling matters related to the book.  I had complied
4      essentially with what I was required to do under the
5      Engagement Letter and was, in my mind, being kept on
6      to assist just because of the knowledge that I had and
7      experience with regard to classified information
8      processing.
9  Q   Did Mr. Bissonnette ever tell you that he was
10     terminating the attorney-client relationship with you?
11 A   No, I don't believe he did.
12 Q   Did you ever tell him you were terminating the
13     relationship with him?
14 A   No, I don't believe that I did.
15 Q   Would it be reasonable for Mr. Bissonnette to believe
16     you continued to represent him in November of 2012 if
17     in November of 2012 you, in fact, did send Freedom of
18     Information Act requests on his behalf?
19     MR. FURMAN:  Objection.
20     You can answer.
21 A   I would be speculating.
22 Q   Can you think of any reason you would have sent
23     Freedom of Information Act requests related to other
24     authors and their pre-publication review status, other
25     than to be of assistance to Mr. Bissonnette?

45

1  A   Well, Mr. Luskin asked me to do so as well, and if you
2      look at the Engagement Letter, I was just -- as far as
3      I was concerned, my obligations under the Engagement
4      Letter had been met.  And so I reviewed the
5      publication, I helped with the contract.  So at this
6      point, I was rendering assistance, and Mr. Luskin
7      asked me to do certain things, and I did them.
8  Q   And is that the reason you sent the Freedom of
9      Information Act requests in November of 2012?
10 A   I'm not sure that I sent one in 2012, as I said
11     previously.
12 Q   You did say that.
13 A   If I did, then yeah.  I didn't do it out of any
14     prurient interest.
15 Q   So if you did, you did it to benefit Mr. Bissonnette?
16 A   Indirectly you could say that, but I was assisting
17     Mr. Luskin in -- by doing what he asked me to.
18 Q   Whose idea was it to send Freedom of Information Act
19     requests?
20 A   I think it was actually my idea when we had a group
21     telephone call, either -- sometime early September.
22     And someone had raised the question of why are they
23     doing this, why are they singling us out, and in my
24     experience, there were authors who had not submitted
25     their books for review and there was not -- in other

46

1      words, there was precedence for not submitting your
2      book for review, and if you wanted to use that as part
3      of your contention with the Government, that's what
4      Mr. Luskin wanted to do.
5  Q   Did Mr. Luskin in this phone call on August 30 or
6      before that you earlier referenced tell you that the
7      attorney-client relationship with Mr. Bissonnette was
8      being terminated?
9  A   I think he did in so many words, as I explained
10     previously.
11 Q   I'm not interested for the moment in so many words.
12     Did he say, in effect, "Your relationship" -- "Your
13     attorney-client relationship with Mr. Bissonnette is
14     hereby terminated"?
15 A   No, he didn't say those words, but that was the
16     message I got.
17 Q   Did he say, "You are not to talk to Mr. Bissonnette"?
18 A   He said, "Don't talk to him unless I am present."
19 Q   Okay.
20 A   Meaning that he was involved in a telephone
21     conversation.  We had never had a face-to-face
22     meeting, any of us, so I knew he couldn't be referring
23     to that.
24 Q   Do you agree with me that it is entirely possible to
25     have a continuing attorney-client relationship with

Kevin Podlaski - November 17, 2016

47

1    Mr. Bissonnette even though Mr. Luskin wants to be
2    present on every phone call you have with him?
3        MR. FURMAN:  Objection.
4    A  You're asking me to answer a hypothetical and
5    speculate.
6    Q  Are you able to answer that question whether or not
7    it's possible to have — for you to have an ongoing
8    attorney-client relationship with Mr. Bissonnette
9    notwithstanding Mr. Luskin's directions to you that he
10   wanted to be a part of any conversations you had with
11   him?
12       MR. FURMAN:  Objection.
13   A  You're still asking me to speculate.  Based on what
14   Mr. Luskin told me, I believe that I was effectively
15   fired as Mr. Bissonnette's primary counsel and was
16   only being asked to assist Mr. Luskin in his
17   responding to Department of Defense.
18   Q  But being fired as primary counsel is not the same as
19   being fired as counsel, is it?  It's a demotion.
20   A  If that's what you want to contend, fine, but that's
21   your opinion.
22   Q  In connection with Mr. -- the billing of
23   Mr. Bissonnette, did you write off any time?
24   A  I did.
25   Q  Are there records at Carson Boxberger that would

48

1    reflect time that was written off?
2    A  I don't know.  I know that I had submitted a bill to
3    Elyse Cheney, and then she nickel and dimed it, and I
4    revised it, but I think that was only in the very
5    beginning.
6    Q  Let me put that aside.  I know what you're talking
7    about there.  I'm talking about you unilaterally
8    recording time, and then at the time the bill is
9    prepared, deciding "I'm not going to bill that."
10   A  Oh, I misunderstood your question.
11   Q  That's my fault.
12   A  No, I just didn't write down the time — like
13   telephone calls and things of that nature I didn't
14   write down.  Like I said, Mr. Bissonnette wanted to be
15   circumspect about things that were recorded and
16   written down, and I did not write down all of my time.
17   Q  Did Mr. Bissonnette at any point act contrary to your
18   advice?
19   A  What do you mean?
20   Q  Have you ever handled any -- you may not have,
21   Mr. Podlaski -- any medical malpractice cases in your
22   professional career?
23   A  No, I'm not a medical malpractice attorney.
24   Q  Okay.  Here's what I'm getting at, if you'll allow me
25   to explain it.  Doctors routinely have what they call

49

1    an AMA memo or entry "Against Medical Advice".  They
2    tell the patient, "You need this surgery;" the patient
3    says, "I don't want it."  "You need chemo;" "I'm not
4    going to take chemo."  "You need to take a pill every
5    day;" "I'm not going to take a pill every day."  And
6    they make an entry, "Patient is acting against medical
7    advice."
8        I'm asking kind of within that kind of concept in
9    a legal framework.  Did Mr. Bissonnette ever act
10   against your legal advice?
11       MR. FURMAN:  Objection.
12   A  I would say no.  What we did was he asked me for
13   advice on matters.  I presented to him the options.  I
14   presented to him the ramifications for each of the
15   courses of action, and he made a decision.
16       And specifically what I'm referring to is when we
17   first had a telephone conversation, he asked about
18   submitting -- whether the book had to be submitted and
19   the process involved with submitting, and I explained
20   that to him.  And then we went over Standard Form 312
21   and my interpretation of that.  In particular,
22   Paragraph 3 of it says if you're uncertain as to
23   whether or not your writing or public speech contains
24   classified information, then you should check with the
25   agency; as opposed to the DD Form 1847-1, which

50

1    unequivocally requires one to submit the document to
2    review if it is in any way, shape, or form derived
3    from a Special Access Program.  And I also explained
4    to him the ramifications of those decisions.
5        "You could do anything -- you could be subjected
6    to anything from forfeiture, to criminal prosecution,
7    and that could be under either of those forms."  Never
8    represented to him that the Government had the same
9    position I did with regard to 312, although the
10   document speaks for itself about whether you have a
11   question or not.  So it seems to be some discretion.
12       Mr. Bissonnette's concern was not going to jail.
13   That's what he constantly during our conversation -- I
14   don't mean constantly -- well, he said it a couple of
15   times.  I don't want to be too hyperbolic on it, but
16   he said a couple times, "I just don't want to go to
17   jail here."  So I had researched and reviewed through
18   ECF and -- the Electronic Filing System -- and also
19   researched some case law and found that the military
20   had not prosecuted anyone criminally for writing a
21   book that was marginally violative of the Classified
22   Information Non-disclosure Agreement, but certainly
23   had done many forfeitures.  And Mr. Bissonnette's
24   response was didn't really care about the money, was
25   going to donate it to charity, he just didn't want to

Kevin Podlaski - November 17, 2016

### Page 51

1   go to jail.
2   Q   Object to everything after "I would say no" as
3       nonresponsive.
4           If he had acted contrary to your advice, would it
5       have been your practice to have put something either
6       in your file or sent him an indication to memorialize
7       that?
8   A   You're asking me to speculate on something that didn't
9       happen.
10  Q   Let me rephrase it then.
11          Is it your practice as a lawyer to memorialize
12      occasions when clients act contrary to your advice or
13      not in their own best interests in your opinion?
14  A   It depends on whether it was a major decision or not.
15          If it was a minor issue, I might make a
16      memorandum for record for myself.  If it was a major
17      issue, it might be a client relationship ending issue,
18      so I would terminate the relationship.
19          And sometimes there's decisions that are neither
20      severe nor minor, that it's entirely within the
21      purview of the client to make a decision and the
22      decision is theirs, and it's -- often times we'll call
23      it a business decision about what they want to do.
24  Q   I find in your file no memo or letter or email or
25      other communication to Mr. Bissonnette that outlines

### Page 52

1       the options and the risks associated with publishing
2       the book without a Governmental review.  Is there such
3       a document in existence that I haven't seen?
4           MR. FURMAN:  Objection.
5       You can answer.
6           THE WITNESS:  No, no.
7           MR. FURMAN:  I just placed an objection, because
8       I'm not sure that the way the question is posed, it's
9       referring to Mr. Johnston's -- his -- I'm trying to
10      find the right word -- representation of what's
11      contained in the file.
12          With that objection, you can answer.
13          THE WITNESS:  I'm really sorry.  Can you repeat
14      the question, after that long-winded objection?
15          (Court Reporter read back.)
16  A   I don't believe so.
17  Q   Is it your expectation at the trial of this case to
18      testify as an expert witness on anything?
19          MR. FURMAN:  Objection.
20  A   Not at the present time.
21  Q   Okay.  And to be clear with you, do you anticipate
22      testifying as to the standard of care for lawyers who
23      represent authors with confidentiality obligations
24      growing out of Government services of some type?
25          MR. FURMAN:  Objection.  Whether we decide to do

### Page 53

1       that or not is not something for this witness to
2       answer.  It's really subject to the Court's discretion
3       if we make that application to do so.  So I don't know
4       that Mr. Podlaski would be in a position to comment on
5       that.  He's a party, a witness, and that decision,
6       whether we contemplate it or not, is for the lawyers
7       and ultimately for the Court's approval.
8           MR. JOHNSTON:  And if he's going to testify as an
9       expert witness, then I'm permitted to ask about his
10      qualifications, and I -- I recognize he may not
11      have his opinions formalized.  If he anticipates
12      testifying as an expert, I want to know it.
13          MR. FURMAN:  Under the Court's order as I
14      understand it, the time to name experts hasn't --
15          MR. JOHNSTON:  The deadline has not passed.
16          MR. FURMAN:  -- has not passed.
17          MR. JOHNSTON:  But it's not a Court order that
18      says you must disclose them no earlier than this date.
19      You can disclose them later.
20          My question is, sitting here today, does the
21      witness have an expectation that he will testify as an
22      expert?
23          MR. FURMAN:  I don't think we know one way or the
24      other.
25          MR. JOHNSTON:  He has an expectation.  You may

### Page 54

1       not, but he does.
2           MR. FURMAN:  I don't know his answer to that
3       question, but --
4           MR. JOHNSTON:  We never will know it if you and I
5       both don't stop talking.
6   A   Not at the present time.
7   Q   Do you agree with me that your duty as attorney for
8       Mr. Bissonnette included the duty to advise him on
9       whether he had a pre-publication review obligation?
10  A   Yes.
11  Q   Did you advise him that he had no such obligation?
12  A   I advised him that by explaining what the forms
13      required, by explaining the type of information that
14      he was exposed to.  You sign a document -- normally,
15      the correct way to do it, you sign a document that
16      would be associated with the level of the information
17      that's provided.
18          So, if you're on a mission that is not a
19      compartmented or Special Access Program, the Standard
20      Form 312 that you sign when you come into Special
21      Operations would cover that.  And then the issue in
22      Paragraph 3 is whether or not you have a question or
23      you are uncertain as to whether information is
24      classified or not.
25          So, my answer is the documents and the

Kevin Podlaski - November 17, 2016

55

1     information that you are exposed to drive your
2     obligation.
3   Q   So did you advise him he did have an obligation; did
4     you advise him he did not have an obligation; did you
5     advise him you didn't know if he did or did not?
6   A   I advised him, as I just explained, about the
7     requirements and explained to him that Standard Form
8     312 appears to be discretionary in that it says if you
9     are uncertain that the information you're going to use
10    is classified.  Mr. Bissonnette had no uncertainty,
11    and he also told me that he did not recall signing any
12    Special Access Program documents, and he did not
13    recall receiving a briefing telling him that the
14    information in connection with Operation Neptune Spear
15    was a Special Access or compartmentation program.
16        So based upon that, the only document that he
17    recalled signing was Standard Form 312, and then it
18    was at his discretion and his decision as to whether
19    or not he had an obligation.
20  Q   Did you recommend that he not submit the book to a
21    pre-publication review?
22  A   I explained to you just now what our conversation
23    consisted of, and it was his decision to make.
24  Q   Of course it's his decision.  My question is did you
25    recommend that he not submit to a pre-publication

56

1     review?
2   A   I don't think it was that simple.  It was more of,
3     "The best thing to do is to submit the book and then
4     you have no worries," but he was driven by a timeline
5     and -- apparently imposed by his publisher, and so he
6     said that he could not submit the book -- and as a
7     matter of fact, I had even tried to revisit the issue
8     with him and his literary agent by proposing language
9     to change the contract with Dutton, and they both
10    struck that proposed paragraph and said they didn't
11    have time for the publisher -- excuse me -- they
12    didn't have time for the review of the publication.
13        So the recommendation I made was, "Submit the
14    book," and the decision was his to make.  And then
15    once he made the decision, said that "It's a plausible
16    way to go based upon what you're telling me; that is,
17    that you only signed the 312, you didn't sign any
18    Special Access Program documents and you were not
19    exposed to any Special Access Programs."
20        (Exhibit 37
21        marked for identification.)
22  Q   Let me show you what I have marked as Exhibit 37,
23    which appears to be an email exchange between you and
24    Mr. Luskin, and I am going to direct your attention
25    specifically to the email from you to Mr. Luskin here

57

1     in the middle of page 1 --
2   A   Um-hum.
3   Q   -- of the document.  And down in the last paragraph of
4     your email to Mr. Luskin on which you copied
5     Mr. Owen -- well, just read that paragraph for me,
6     please.
7   A   This is the one that's dated September 20th, 2012?
8   Q   Yes, sir.
9   A   So this was after the book was written.
10  Q   Yes, sir.  And after Mr. Luskin's telephone call with
11    you that you discussed earlier.
12  A   Right.  And so you see this is to Mr. Luskin and copy
13    furnished to Mark Owen.
14  Q   And read the last paragraph aloud, please.
15  A   Okay.  "Having been in Special Operations over 12
16    years, Mark was very confident that he was not going
17    to address or describe any classified or classifiable
18    information in the manuscript, and with my
19    recommendation, Mark decided not to send the
20    manuscript to USSOCOM or Office of Security Policy
21    Review, OSPR".
22  Q   Does that refresh your recollection as to whether or
23    not you recommended he not send the manuscript for
24    review?
25  A   There's a comma after the word "recommendation".  My

58

1     recommendation was as I explained to it to you.  I showed
2     him the options, explained to him what the
3     ramifications were of either submitting the book and
4     suffering either the delay, do not publish
5     recommendation for -- order from the Department of
6     Defense, or not submitting the book and the potential
7     consequences.
8        So, that is not necessarily, as you put it, my
9     recommendation was not to submit the book.  Mark
10    decided not to submit the manuscript.  My
11    recommendation was as I explained to you.  I told him
12    what the options were, and it was his decision.
13  Q   So is it your testimony today that when you wrote this
14    email to Mr. Luskin with a copy to your client,
15    Mr. Owen, and said, "With my recommendation, Mark
16    decided not to submit the manuscript," you did not
17    intend to say that his decision was consistent with
18    your recommendation?
19  A   When I said "and with my recommendation," comma, "Mark
20    decided not to send the manuscript to USSOCOM or
21    OSPR."  My recommendation was, as I said, an analysis
22    of what the ramifications were for not submitting it
23    and the potential penalties that he would suffer and,
24    as well, a decision by him about whether the book
25    contained classified information or not.  I certainly

Kevin Podlaski - November 17, 2016

59

1  assisted him with helping to glean the book from
2  classified information, but as I said, I don't know
3  what I don't know, explained that to him, and told him
4  it was his decision. And it was a business decision.
5  Q  So did you make -- and I understand you keep --
6  respectfully, you keep wanting to tell me the basis of
7  what you told him, the things he should consider. But
8  then in the end, after considering all of that and
9  after you analyzing it, did you make a recommendation,
10  "I recommend you submit it," "I recommend you not
11  submit it," or did you simply, in the alternative,
12  download the information and leave it entirely up to
13  him?
14  A  Based on what he told me, that he had only signed a
15  special -- a Standard Form 312, that he was out of the
16  Navy as of February 1st, that he had no further
17  obligation to the military, that he was -- did not
18  receive Special Access Program information on
19  Operation Neptune Spear, that he did not sign any DD
20  Form 1847-1, knowing what I knew, part of our -- and
21  after reviewing with him the ramifications of the
22  decisions -- the decision that was his to make, as I
23  said, after he made the decision, I believe that to be
24  a perfectly plausible decision, knowing what I knew at
25  the time.

60

1  Q  Are you able to tell me whether you recommended a
2  review or recommended against a review to your client,
3  who was relying on you to make this -- to help him
4  make this decision?
5  A  Oh, I definitely --
6      MR. FURMAN:  Objection, just the last part of
7  that question. You added the reference that the
8  client was relying, and I think that that's the part
9  of the question I'm objecting to.
10  A  As I said earlier, I told him and recommended the
11  safest course is to submit the book. I even proposed
12  language in the contract that would relieve him of the
13  obligation to meet the publisher's timeline. This was
14  a business decision that he made, that they wanted to
15  get the book out, they had a short time to do it, they
16  needed to beat the competition. Someone in his chain
17  of Command was writing a book -- turned out to be
18  Admiral Nick Raven and Mr. Bowden -- and also that
19  they wanted to meet "Zero Dark 30".
20      So yeah, I recommended that the book should be
21  submitted. We revisited the issue in June when he
22  gave me the manuscript.
23      You know, here's the sense of urgency that was
24  going on there. They did not do a galley copy, and a
25  galley copy -- if you know anything about the

61

1  publication industry, a galley copy is where it's a
2  soft cover of the final draft that they send around to
3  the copyright editor. They send it to anyone else who
4  would have an interest in vetting the book. They went
5  right to final form. So it went from his manuscript
6  to final form. Why? Because they wanted to meet the
7  deadline, and that seemed to be very driven by the
8  publisher. The publisher was effectively -- what I
9  was getting -- the sense I was getting from
10  Bissonnette and Cheney was that the engine driving the
11  train here was the publisher pushing for this thing to
12  get done, and there was a looming threat of the
13  advance money being forfeited if they didn't get it
14  done on time.
15      So that was the restraints he was operating
16  under, and as I said, having reviewed with him the
17  ramifications, as well as the potential penalties for
18  not submitting the book, it was his decision to make.
19  That was a monumentous decision for him to make.
20  Q  Is your recommendation that he submit the book to a
21  Governmental review to be safe documented anywhere?
22  A  Yeah, it's in that email that I sent to Ms. Cheney and
23  to Bissonnette, advising them that the -- that they
24  should include this or they should consider --
25  reconsider submitting the book to Governmental review

62

1  and proposed a clause to be included, which they
2  struck.
3  Q  And do you remember what the clause was that you
4  recommended be included?
5  A  Yeah, that -- as I sit here, to the best of my
6  recollection, it was that -- first off, that contract
7  that the publisher has is hopelessly amended, edited.
8  It looks like it was originally typed on a 1950 Smith
9  Corona and constantly added to; so there are addendums
10  and references and revisions to the thing, and it
11  seems to be internally inconsistent.
12      But to answer your question directly, I
13  recommended that the clause read, submit the book to
14  the Government relieving, Mr. Bissonnette of the
15  obligation under whatever paragraph it was to have the
16  manuscript produced by a certain date, because it
17  would be effectively out of his hands once it's
18  submitted for Government review.
19          (Exhibit 38
20          presented to the witness.)
21  Q  Mr. Podlaski, I've handed you what is marked as
22  Exhibit 38, which appears to be an email from you to
23  Elyse Cheney, dated January 19, 2012 at 4:25 p.m., and
24  ask you if that is the Amendment you were talking
25  about that you proposed to the contract that they

Kevin Podlaski - November 17, 2016

---

63

1   rejected.
2   A   Just one moment.
3          (Pause)
4   A   This document doesn't appear to have a Bates stamp.
5   Is it --
6   Q   Mine has a Bates stamp of KP319, but the copy you
7   have --
8   A   It appears to be different.
9   Q   -- we got from another source.
10         (Pause)
11         MR. FURMAN:  Randy, can I see yours?
12         MR. JOHNSTON:  You bet.
13         MR. FURMAN:  Is it just that the copy is missing
14   the Bates stamp?
15         MR. JOHNSTON:  My belief is that the ones you
16   have, I like you did yesterday, my legal
17   assistant printed out.  This is the copy we either got
18   from Mr. Podlaski in the file production (indicating)
19   or from Elyse.  Because it has the KP, my belief is --
20         MR. FURMAN:  The only --
21         THE WITNESS:  This is a different date/time group
22   --
23         MR. FURMAN:  Yeah, the documents seem different.
24   Just so I can make the record clear, I'm comparing
25   what is noted as KP00319 to 0320.  It's a two-page

---

64

1   document.  And that has an email from Mr. Podlaski,
2   dated January 19th at -- 2012 at 4:25 p.m. to Elyse
3   Cheney with a copy to Kevin Podlaski.
4          And the document that's marked as Exhibit 38 is
5   also an email from Mr. Podlaski, dated January 19th.
6   It doesn't have the day listed, as is on document
7   ending in 19-20, and has a different time.  Exhibit 38
8   is listed at 3:25 p.m., whereas the document that
9   Mr. Johnston provided me, which is KP0319-20 has 4:25
10   p.m.
11         It looks as if they're the same, and we could
12   review them together.  I don't want to make any
13   assumptions, but could it have been simply just the
14   process of printing out?
15         MR. JOHNSTON:  It may very well be.  We can mark
16   as the official exhibit my copy, which has the Bates
17   number.
18         THE WITNESS:  Why don't we do that.
19         MR. FURMAN:  Yeah, that's fair enough.  And it
20   simply might have just been the matter of printing off
21   of Microsoft Outlook, and I understand your office is
22   one behind Eastern time, and that could be the
23   difference in terms of the time.  I'm just making the
24   assumption, pretending to have better knowledge than
25   anyone else in this room that might know.

---

65

1          (Pause)
2   BY MR. JOHNSTON:
3   Q   All right.
4   A   To answer your question, that appears to be the
5   paragraph that I sent along with the other paragraphs
6   to Elyse and Mark Owen.
7   Q   So when you're talking about you proposed language to
8   the contract to protect Mr. Owen in connection with
9   the timing of a pre-publication review, the language
10   in red on the front of that page is the language
11   you're talking about?
12   A   I'll admit that I proposed this language in an effort
13   to protect Mr. Owen from not -- well, from the
14   publisher's requirement for the deadline.  By
15   submitting it to the Government, it would be out of
16   his hands as to when or if the manuscript could be
17   delivered.
18   Q   So what that -- what your proposed language protects
19   him from is Dutton wanting to do a pre-publication
20   review of the book?
21   A   No, that's not it at all.
22   Q   Well, read with me your proposal.  "Although the
23   author has no legal obligation to submit the
24   manuscript to any agency of the U.S. Government for
25   review or approval, at the publisher's option the

---

66

1   publisher may direct the author to submit the
2   manuscript for a review.  The parties recognize that
3   the author has no control over a review, and therefore
4   the author may not prescribe or impose a deadline by
5   which the review -- the agency must perform the
6   review."  And I've paraphrased there.
7          Those are your words paraphrased, correct?
8   A   That's correct.
9   Q   And do you disagree with me that everything -- well,
10   let me continue.  The next sentence, "Accordingly, if
11   the publisher chooses to direct the author to submit,
12   the author shall be relieved of the requirement to
13   deliver the manuscript by June 1."
14         Your words, correct?
15   A   That's right.
16   Q   There's nothing in here about Matt deciding to submit
17   it to a pre-pub review, is there?
18   A   Because of the context in which not only we -- Matt
19   and Elyse and I -- were discussing the publication
20   contract, but also posturing it -- to my mind,
21   posturing it in a more palatable manner to the
22   publisher, giving them the decision to do so.
23         The context was that Elyse didn't think that they
24   were going to accept any changes to their contract,
25   that if they did, they would be all hard fought and

---

Kevin Podlaski - November 17, 2016

67

1    that the decision about the contract's change really
2    was in the publisher's ball -- I mean, it was in their
3    park, and they were really the ones who decided
4    whether they would accept these things or not.
5        So I was attempting to posture this in a language
6    that the publisher would buy in to, because it gave
7    the publisher the opportunity to submit the book.
8    Q    And you started off your posturing with your proposed
9    change on January the 19th by saying, "The author has
10   no legal obligation to submit the manuscript to any
11   agency for review or approval."
12   A    Right. And that comes as the result of the
13   conversation with Matt Bissonnette and Elizabeth --
14   well, with Matt Bissonnette about what he signed and
15   what he didn't sign and about what his obligations
16   were.
17   Q    Do you remember the date of your Engagement Letter?
18   A    I believe it's January 18th, isn't it?
19   Q    It says January 17 here. This is the unsigned one.
20   If the signed one matches that --
21   A    It was about that time.
22   Q    So within a day or two of the signing of the
23   Engagement Letter, you were already proposing an
24   insert into the Dutton contract that confirms that
25   Mr. Bissonnette had no legal obligation to submit for

68

1    a review, correct?
2    A    Once again, based on my conversations with him.
3    Q    That's the basis, but the fact is you made that
4    proposed change, correct?
5    A    I made this proposed change apparently on the date
6    that the email indicates.
7    Q    And the protection you were seeking to give
8    Mr. Bissonnette in this proposed change is protecting
9    him from the June 1 deadline obligation if the
10   publisher decided to submit independent of
11   Mr. Bissonnette, correct?
12   A    No. As I said, you have to consider the context of
13   it, and it was a way to posture it so that the
14   publisher would buy in to the idea. We had -- Matt
15   and I had discussed that the safest course was to
16   submit the book for review, and this was my effort to
17   get the book to the Government for a review and it was
18   putting the decision to relieve Matt of the timeline
19   imposed by the publisher onto the publisher.
20   Q    Can you explain to me why you are telling Ms. Cheney,
21   your client Mr. Bissonnette, on January 19 that he has
22   no legal obligation to submit the manuscript for
23   review, when, according to your earlier testimony,
24   everything you relied upon to make that decision
25   occurred in a phone call on January 25, six days after

69

1    this email?
2    A    Yeah, I might be wrong about the dates, but, I mean,
3    obviously, I wouldn't have written that if we hadn't
4    had a discussion; so I might be wrong about the dates
5    of that discussion. It was in early January.
6    Q    So that would then mean your sworn Answers to
7    Interrogatories are also wrong again, correct?
8    A    Well, I don't know about the --
9        MR. FURMAN: Objection.
10   A    -- "again" part of your comment.
11   Q    Let me address that, because I don't want to be unfair
12   to you. You told me that there were phone calls that
13   took place in June that are not in the Answers to
14   Interrogatories, correct?
15   A    That's correct.
16   Q    So that would be a mistake, an error in the Answers to
17   Interrogatories?
18       MR. FURMAN: Objection.
19   A    No, it would be an omission that was an innocent
20   omission.
21   Q    I'm not attempting to attach guilt or innocence here,
22   innocence or not. You swore under oath in response to
23   Answers to Interrogatories, on which you had at least
24   30 days to think about it, that you had two phone
25   calls with Mr. Bissonnette, January 19, January 26,

70

1    and a couple in February; and you swore those were the
2    only phone calls you had with him, in your Answers to
3    Interrogatories, correct?
4    A    Well, those were the ones that I recalled when I
5    prepared the Interrogatories.
6    Q    And you took the preparation of Answers to
7    Interrogatories that you are swearing to under oath
8    and as an officer of the Court very seriously,
9    correct?
10   A    When I answered the Interrogatories, I answered them
11   with what I knew and what I recalled at the time.
12   Q    And there is no document that would have refreshed
13   your memory of, "Oh, yeah, there was another phone
14   call in June," correct?
15   A    I don't believe that there is.
16   Q    And if everything you told me about what happened in
17   the January 25 phone call and what you described as
18   having occurred in the January 25 phone call in your
19   Answers to Interrogatories really took place in a
20   phone call on January 19, that would be another error
21   in your sworn Answers to Interrogatories in this case.
22   A    That's your opinion, but it could be January
23   18th that those conversations took place, and so it
24   would just be because a couple years had passed and --
25   you know, I wish I had a photographic memory, but I

23 (Pages 71 to 74)

Kevin Podlaski - November 17, 2016

71

1    don't.  So to the best of my memory and recollection,
2    I both answered the Interrogatories with all of the
3    information that I knew and recalled at the time and
4    my testimony today with all of the information that I
5    recall.
6        And moreover, we've seen that there's a couple
7    different versions of this, so I'm not sure if the
8    dates are even correct on this document.
9    Q   Do you question the dates?
10   A   I do.
11   Q   So you don't believe you sent this email on January
12       19?
13   A   I didn't say that.  I just said I question the dates.
14       There's apparent discrepancies between the two
15       versions that you've produced.
16   Q   Is there a discrepancy on the date?
17   A   There's a discrepancy on the time.
18   Q   Is there a discrepancy on the date?
19   A   There appears not to be, but there's a discrepancy on
20       the time and a discrepancy on other marginal
21       information that leads me to believe that there may be
22       other versions out there.
23   Q   Other than what is reflected on Exhibit 38, did you
24       propose any other changes to the Dutton contract that
25       reflect Mr. Bissonnette's obligation to do a

72

1    pre-publication review?
2    A   As I sit here today, I can't recall if there were any
3        other ones.
4    Q   In connection with your -- let me for a moment go into
5        your military career, sir; and some of this I just
6        need to know for background.
7        When did you begin your military career, year?
8    A   1982.
9    Q   And when -- do you still have your Commission?
10   A   I'm retired.
11   Q   Have you resigned your Commission?
12   A   Well, when one retires, you're still subject to
13       recall, but the further out you are from retirement
14       the less likely.
15   Q   I realize that.
16   A   So answering your question, no, I did not resign my
17       Commission.
18   Q   Okay.  When did you retire from the military?
19   A   2004, I believe it was.
20   Q   And what was the rank at the time you retired?
21   A   Major.
22   Q   Which branch of the service?
23   A   Army.
24   Q   How did you enter the military, with what rank?
25   A   I entered as a Second Lieutenant, ROTC Commission.

73

1    Q   And during your roughly 22 years in the military, were
2        you a JAG Officer that entire time?
3    A   No.
4    Q   When did you become a JAG Officer?
5    A   1991.
6    Q   Did the military pay for your attendance at law
7        school?
8    A   No.
9    Q   So how did you go -- let me ask this.
10       Had you already graduated from law school in '82?
11   A   No.
12   Q   So you went to law school while you were in the
13       military?
14   A   For -- I had a break in service of 22 months.  So I
15       went to law school at night for two of the four years
16       while I was on active duty.
17   Q   All right.  And so you then graduated from law school
18       and passed the Bar -- went to law school, graduated
19       from law school, passed the Bar Exam during the time
20       of your military service?
21   A   On active duty for two of the four years.  Then I was
22       out in the Reserves, and then I got called up during
23       Desert Shield.
24   Q   Okay.  So you had left active duty when you started
25       law -- during part of your law school?

74

1    A   I left active duty after my second year.
2    Q   Okay.  And then you were in the Reserves and were
3        recalled?
4    A   During Desert Shield.
5    Q   And when you were recalled, were you -- had you
6        already passed the Bar and become a lawyer?
7    A   I was a lawyer for about six months before that.
8    Q   Okay.  And did you, upon being recalled, immediately
9        enter the JAG Corps, or was it thereafter?
10   A   I was branch transferred to the JAG Corps prior to
11       being called up.
12   Q   Okay.  During your time in the military, did you have
13       any combat service?
14   A   No.
15   Q   Did you have any time when you were stationed in the
16       Middle East anywhere?
17   A   Wait.  Let me go back.  I'm sorry.  I thought you were
18       talking about the first time I was in the military.
19       I was stationed in Bosnia, so that qualified as
20       combat area.
21   Q   I may have interrupted you.  Anywhere other than
22       Bosnia?
23   A   I was -- the units I was deployed with, we deployed
24       regularly to South America in counternarcotics and
25       counterterrorism.

Kevin Podlaski - November 17, 2016

75

1  Q   And did you personally serve in South America on those
2      assignments?
3  A   Yes.
4  Q   And when did you become associated with SOCOM, the
5      Special Operations Command?
6  A   In 1991 I was assigned to Special Forces Headquarters,
7      and then I believe it was '92 I was assigned as the
8      7th Special Forces Group Judge Advocate, and both of
9      those assignments were at Fort Bragg, North Carolina.
10 Q   And did you have any other changes in assignment
11     involving SOCOM from '92 on?
12 A   Yes. After 7th Special Forces Group, I did a tour
13     with 18th Airborne Corps, again --
14 Q   I'm sorry, with whom?
15 A   18th Airborne Corps.
16 Q   Thank you.
17 A   And then the Army sent me to University of Virginia
18     where the Army has its advanced course for attorneys,
19     and was there for a year, got an LLM, and then was in
20     Germany for four years, and then was assigned as the
21     Staff Judge Advocate for Special Operations Command
22     South.
23 Q   During the time you were in Germany, were you still
24     associated with SOCOM?
25 A   No. I was only -- once I left 7th Group, then I went

76

1      to 18th Airborne Corps. That was the end of my
2      association with SOCOM. My -- SOCOM is a
3      headquarters, a 4-star headquarters that does training
4      and doctrine.
5          So, that's -- to make a long story short, there's
6      Combatant Commands in Special Operations and there's
7      Training and Doctrine Commands in Special Operations.
8      So I was in 7th Group as a Combatant Command, and I
9      was in Special Operations Command South as a Combatant
10     Command. Headquarters Special Forces Command was a
11     Training and Doctrine, which is -- Headquarters
12     Special Forces Command directly falls under USSOCOM,
13     and 7th Special Forces Group falls under Special
14     Forces Command, but not for anything other than
15     Training and Doctrine.
16 Q   When you say "Special Forces," what does that
17     encompass in the Army?
18 A   Well, US Army Special Forces are -- there's Special
19     Forces Green Berets. US Army Special Forces Command
20     has what's known -- publicly known as Green Berets,
21     but associated in support of Special Forces is Special
22     Operations Aviation Regiment, which is helicopter
23     units. And there's people who have Special Operations
24     designation, meaning that they are qualified to work
25     with Special Operations or Special Forces in support

77

1      of the Army Special Forces, but primarily it consists
2      of the Green Berets and it consists of Special
3      Operations Aviation Regiment.
4  Q   In connection with your time in service with SOCOM,
5      did you ever have connection with operations that were
6      a combination of Army Special Forces and SEALS
7      together?
8  A   Yes.
9  Q   How many times?
10 A   With SOCOM, I was -- well, with Special Operations
11     Command South.
12 Q   And to serve in the positions that you served in, did
13     you sign your own non-disclosure agreements?
14 A   Yes.
15 Q   Are you familiar with the non-disclosure agreements
16     that Special Force Operators would have signed?
17 A   Yes.
18 Q   Are those the same forms that Navy SEALS would have
19     signed?
20 A   There is the Standard Form 312 for classified
21     information, non-disclosure agreements we discussed
22     previously, and there's the DD Form 1847-1 for
23     Sensitive Compartmented Information and Special Access
24     Programs. That's the highest level that I've worked
25     at or been exposed to. There may be others.

78

1  Q   My question is are those the same forms for SEALS as
2      for Special Forces Operators in the Army?
3  A   The Department of Defense forms and the standard
4      forms, yes.
5  Q   And when you left the military, are there signs you
6      also -- I'm sorry. Are there also forms you also
7      signed when you were departing your military service?
8  A   Well, when you -- yes, there are. But when you leave
9      a Special Operations Unit, you are debriefed and you
10     are sometimes questioned on your debriefing. There's
11     forms that you have to sign. And then there's always,
12     in my experience, a debriefing officer who is with the
13     Intelligence Section, debriefs you about all of your
14     foreign contacts, about all of the deployments that
15     you've been on; and moreover, if you are in a
16     compartmented program, you sign into that program and
17     upon conclusion of either your need to know or the
18     mission, you sign out and you're debriefed on that
19     particular mission.
20 Q   Is it fair to say that as an attorney in the JAG Corps
21     of the Army with your SOCOM experience, you would have
22     been familiar with the types of documents
23     Mr. Bissonnette would have signed during his career as
24     a Navy SEAL ultimately at the end of his career up
25     into DEVGRU, up into the Development Group?

Kevin Podlaski - November 17, 2016

79

1   A   Well, I think you have to be a little more specific.
2       That's a pretty broad range.  Would I be familiar
3       with the classified information documents that he's --
4   Q   Let's stay with that.  That's what I meant.
5   A   Yeah, I think across the board -- I was in a Joint
6       Unit, and we used DoD forms, and we used standard
7       forms as required, and so I would be familiar with
8       regard to those documents.
9   Q   And specifically with regard to the documents that are
10      attached to the Jeh Johnson letter, which is Exhibit
11      1, are those forms you would have expected
12      Mr. Bissonnette to have signed during the course of
13      his career and upon his exiting the service?
14  A   Well, yes, generally.  Those forms -- for example,
15      the -- there's a copy of the DD Form 1847-1 for 2007,
16      and those forms normally are associated -- there
17      should be a form for every compartmentor or Special
18      Access Program that you're signed into.  There should
19      also be a debriefing form for each program that you're
20      signed into.  Now, you -- I've seen used where a
21      soldier or Airman or Navy SEAL have been involved with
22      more than one compartmentor program and they may be
23      recorded on the same document but separate entries for
24      the dates that they were read on, and then a
25      debriefing form should likewise marry up with each of

80

1       the read-on programs or each of the compartmentor
2       programs they were read on to, read off of.
3   Q   Was it your experience in SOCOM in the JAG Corps that
4       copies of the documents that operators signed were
5       given to them after they signed them?
6   A   Generally those documents were not given to.
7   Q   Did it surprise you then that Mr. Bissonnette did not
8       have copies of documents he had signed during his
9       career?
10  A   It didn't surprise me that he did not have them, but I
11      had asked him specifically if I could contact his
12      former Security Officer at his former unit and request
13      his -- the documents associated with his debriefing.
14      And there's also a form that's used to show the
15      highest level of classification that you have access
16      to.  And he denied my request to do so.
17  Q   I asked you earlier if he ever acted against your
18      advice.  Was that acting against your advice, by
19      denying that request?
20  A   Well, it was one of those things -- and this was
21      pretty early on.  He was very concerned about his
22      security.  He was also concerned about letting anybody
23      know he was writing the book, as he expressed
24      yesterday as well, and so when I -- I did ask him if
25      he had any documents related to his classification

81

1       level.  He said no.  I said -- in addition to not
2       recalling what exactly he did sign, with the exception
3       of the Standard Form 312.  I said, "Well, I could
4       contact your former Unit Security Officer, and this is
5       just a simple document that says what your highest
6       level of access was, and that would enable us to make
7       a better decision."  He said no, he did not want them
8       to know he was writing a book.
9   Q   And is that recorded in any document that you know of?
10  A   No.  No, it's not, because at the time, he was very,
11      very emphatic about not having a great deal of
12      information and paper trails with the information
13      about the book.
14  Q   When did that -- was that a telephone call?
15  A   Yes.
16  Q   When did that discussion take place?
17  A   January 2012.
18  Q   January 19 or 25?
19  A   In there somewhere, yeah.
20  Q   You don't know which one?
21  A   I don't recall as I sit here which one.  It could have
22      been earlier than that.
23  Q   In any of the -- strike that.
24      Is it improper or illegal for someone who has
25      signed forms like the ones attached to Exhibit I to

82

1       write a book while they are on active duty?
2   A   It's not illegal to write a book while you're on
3       active duty, but there are regulations that require
4       you, irrespective of the documents that you've signed,
5       the Classified Information Non-Disclosure
6       Agreements -- there are -- and specifically there's a
7       DoD directive that requires anyone on active duty to
8       submit to the office -- what used to be known as the
9       Office of Security and Policy Review; now I believe
10      it's known as the Office of Pre-Publication and
11      Security Review -- to submit any proposed public
12      speech or published writing for review if there is
13      classified information in it or you're uncertain as to
14      whether there's classified information in it.
15  Q   So -- and the point that -- the distinction that I was
16      trying to make here is these documents do not prohibit
17      someone like Mr. Bissonnette from writing a book while
18      he is on active duty; they deal with his publishing
19      the book, correct?
20  A   Yes, that's correct.
21  Q   So whether he was on active duty or not when he was
22      writing the book is really irrelevant, isn't it?
23  A   It just has to do with his obligation to submit the
24      book.  So you could write a book, you can write
25      memoirs and notes, as long as -- if you're writing

Kevin Podlaski - November 17, 2016

**83**

1  about classified information and it's not secured,
2  you're in violation of the regulation. If you are
3  capturing information from a Special Access Program
4  that mentions tactics, techniques, procedures,
5  communications, equipment, and it's not in a secure --
6  actually what it's called is a SKIF, a Sensitive
7  Compartmented Information Facility, you're violating
8  the regulation. So --
9          (Exhibit 14
10         presented to the witness)
11  Q  Let me show you what has been -- what was marked
12  yesterday as Exhibit 14. And do you have it there?
13      MR. FURMAN: I don't have 14.
14      MR. JOHNSTON: This is one of the ones you marked
15  yesterday, so I only have my copy of it.
16      MR. FURMAN: Okay.
17      MR. JOHNSTON: May I walk around so I can direct
18  you all to what I'm talking about here?
19      MR. FURMAN: Sure.
20          (Pause)
21  Q  And you may look at or ignore my highlighting, because
22  this is my copy, but do you remember seeing this
23  document yesterday, Exhibit No. 14?
24  A  Yeah, I recall seeing this yesterday.
25  Q  Let me direct your attention to the latter half of

**84**

1  page 1. It purports to be an email from Elyse Cheney,
2  dated January 12. You may have to look at the page
3  before to see who it was to, but at the top Richard
4  Heller, right? And let me specifically direct you to
5  the second paragraph there. "We have a different
6  lawyer now in terms of the military review stuff.
7  It's a guy actually in Indiana who was a Special
8  Forces guy himself and then an attorney there and who
9  knows the agreements that anyone enlisted signs."
10      Is that you they're talking about there?
11  A  I have no idea.
12  Q  Okay. "The key is that this lawyer be hired by
13  Penguin eventually to vet the manuscript and make sure
14  essentially that Mark is not revealing operational
15  tactics, techniques, and procedures."
16      Let's talk about that sentence for a minute. You
17  were never hired by Penguin, correct?
18  A  That's correct.
19  Q  But you were hired to make sure that Mark is not
20  revealing operational tactics, techniques, or
21  procedures?
22  A  I'll admit only that I agreed to do what's in the
23  Engagement Letter, and that was -- a part of the
24  review is to review for operational tactics --
25  tactics, techniques, and procedures.

**85**

1  Q  So you will admit that you were hired to review for
2  that?
3  A  As I said, the Engagement Letter says it all. So it
4  says I'm reviewing the publishable manuscript to
5  ensure that he's in compliance with his obligations,
6  and that's part of the review process.
7  Q  The operational tactics, techniques, and procedures
8  are part of the review process?
9  A  That's what you're screening for.
10  Q  And the next sentence, "Mark seems to have a very
11  clear understanding of what this lawyer is saying. He
12  is going to get his papers from the Command Office and
13  then show those papers to this Indiana lawyer."
14      That did not happen, correct?
15  A  That's right.
16  Q  Do you know why it didn't happen?
17  A  As I said, he said he didn't have any and he refused
18  to allowed me to contact his Security Officer to get
19  them.
20  Q  Then the next sentence, "The Indiana lawyer suggested
21  that Mark definitely not tell anyone in the Command
22  Office that he's doing a book."
23      Did you recommend that Mark definitely not tell
24  anyone in the Command Office that he was doing a book?
25  A  I don't believe so.

**86**

1  Q  "That if he did they could potentially try to stop him
2  from leaving the military."
3      Does that sound familiar to you?
4  A  No. And this is from Elyse Cheney, so I can tell you
5  right from the beginning that she did not have a good
6  grasp of much. I mean, the "military review stuff" is
7  what she says here, and saying I was a Special Forces
8  guy myself, never said that. So if this is from her
9  and they are talking about me, it illustrates that she
10  doesn't have a very good grasp and understanding of
11  what the issues were.
12  Q  And I will not attempt to defend her complete
13  understanding of these issues. I see some of the
14  points you're raising. If -- had you spoken to her by
15  January 12?
16  A  Yeah. That's what led me to believe that my dates
17  might be off, because I think I did speak to her early
18  on, and that was the first phone call I got from her,
19  and she was very cryptic at first and very circumspect
20  in not mentioning the person's name nor the mission
21  that the military person wanted to write a book about.
22      So to answer your question directly, I did speak
23  with her earlier in 2000 -- earlier in January of
24  2012. I mean, when I spoke to her, it was clear she
25  didn't really want to be burdened with the details of

Kevin Podlaski - November 17, 2016

87

1 anything having to do with the obligations about
2 classified information or an understanding of it.
3 Q  Do you still have in front of you here, sir, your
4 memorandum to the record, or memorandum of record that
5 you dictated for yourself and the file?
6   MR. FURMAN:  You marked it as Exhibit 35.
7   MR. JOHNSTON:  Thank you.
8 A  Yes.
9 Q  What does that say in your Paragraph 1?
10 A  It says, "On or about January 10th, 2012, I was
11 contacted by a literary agent from New York City or
12 NYC, Elyse Cheney, who asked me to assist a former
13 Navy SEAL who was preparing a manuscript about his
14 military career, and in particular his participation
15 in Operation Neptune Spear, which targeted Osama bin
16 Laden."
17 Q  So would that indicate to you that Ms. Cheney had
18 spoken to you by the time she wrote this January 12
19 email to Mr. Heller?
20 A  It appears to be so.
21 Q  And while she may have gotten some things wrong, would
22 it appear to you that she is trying to report the
23 substance of her conversation with you in part?
24   MR. FURMAN:  Objection.
25 A  Yeah, that would cause me to speculate.  I don't know

88

1 what she was trying to do.
2 Q  Let me ask you this -- and I may have asked this, but
3 to be safe -- did you tell Mr. Bissonnette definitely
4 not to tell anyone in Command he was writing a book?
5 A  I don't believe I ever told him that.
6 Q  The latter half of that sentence says, "If he did,
7 they could potentially stop him from leaving the
8 military."
9   Do you remember saying anything like that?
10 A  We -- like I said, the first phone call was with
11 Elyse, and then there's a phone call with Elyse and
12 Mark.  I remember that distinctly.  We discussed --
13 Q  May I see your exhibit here?
14 A  We discussed several things, and one of the things we
15 discussed was what his current status was, and he told
16 me he was currently on transition or terminal leave
17 and was going to be out of the military February 1st.
18 And so if this conversation was in early July -- so
19 it's plausible we had a discussion concerning his --
20 well, it kind of goes to my point.  It proves my point
21 that we had a discussion about what your obligations
22 are on active duty and reporting and submitting
23 materials.  And so it's plausible that we discussed
24 that if they became aware of the -- him writing a book
25 about the matter, that they may have tried to keep him

89

1 on active duty.  But I seriously doubt that my -- I
2 told him, "Don't tell anyone," because he's the one
3 telling me that he didn't want anyone to know.
4   So it would be the ramifications of what could
5 happen, once again, just trying to give him enough
6 information so he has all of the cards.  In order to
7 be discharged from active duty, you need three things.
8 You need a DD Form 214, you need orders, and you need
9 a Final Pay and Accounting, and we discussed that as
10 well.  And he told me that he was to get that February
11 1st, that he would be getting his discharge paperwork
12 February 1st.
13 Q  Is there anything about his -- the receipt of his
14 actual discharge papers being either in January or
15 February or April or June -- and we've seen all of
16 those dates at various times -- that bears on your
17 advice to him?
18 A  Certainly.  As I said, if he's on active duty and he's
19 writing material that could be considered classified
20 or from a Special Access Program, then he -- you can't
21 put pen to paper unless you have a secure facility to
22 store the paper in.  And so if you're writing a book
23 about classified information -- or containing
24 classified or containing potential classified
25 information, you're in violation of the regulation if

90

1 you're doing so -- if you're doing so while you're on
2 active duty and you don't properly store it.
3 Q  So do you have any indication that he did not properly
4 store whatever writing he did while he was still on
5 active duty?
6 A  Well, that causes me to speculate.  I mean, I just
7 know that he and the ghost writer had prepared drafts,
8 and I saw the final copy.  So I have no idea.
9 Q  So has anyone, to your knowledge, ever complained
10 about the fact -- the Government specifically -- that
11 he was writing while on active duty and failed to
12 secure the writing in a manner that would protect it?
13 A  I can't answer that question.
14 Q  You know nothing about that one way or the other?
15 A  I can't answer that question, because I don't believe
16 it was discussed.  So --
17 Q  So what is an author's obligation with regard to
18 secure storage after he is out of the military?
19 A  Well, I mean, first off, you don't want to be writing
20 about things from a Special Access Program, and this
21 is the things -- these are the things that concern the
22 Government, is information from Special Access
23 Programs getting out into the public without review
24 and control of what it is.  So, I mean, you have to
25 have a plan to take out the trash.  And I don't

Kevin Podlaski - November 17, 2016

---

**91**

1    believe that there was a plan in place. As Matt
2    testified to yesterday and had previously said, he
3    wasn't planning on giving information that was going
4    to harm the United States, and I certainly wouldn't
5    have assisted him, and so -- I mean, he didn't have
6    that many changes. I didn't have that many changes to
7    his book, and I thought that they did do a good job of
8    screening out potentially classified information.
9        But as I said, you don't know what you don't
10   know; and when you write, you write at your own peril
11   for the Government coming back, if you don't submit
12   it, for saying that even if it's in the public domain,
13   you're confirming the fact in the public domain, and
14   they consider that to be a violation of the Classified
15   Information Non-Disclosure Agreement.
16  Q   Objection; nonresponsive.
17        My question may have been unclear, so let me try
18   again. You testified that someone on active duty who
19   is writing a book that might even contain sensitive
20   information has to make certain how they store it to
21   be sure it doesn't get out.
22        Did I understand that correctly?
23  A   That's the concern and yeah, generally, that's what --
24   that's why if you're on active duty, you can't -- they
25   don't want you to release information without it being

---

**92**

1    vetted.
2  Q   I get that. Is it not true that even after you were
3    out of the service, if you're writing a book that
4    might contain sensitive information, you have an
5    obligation to protect that storage of the information
6    the same as if you were on active duty, until it's
7    cleared and clean and can go to the public?
8  A   I can't disagree with you.
9  Q   Okay. Now, did you consider -- let me jump to a
10   couple of predicate questions here.
11        In January of 2012, did you still have -- I'll
12   say still have any form of governmental security
13   clearance?
14  A   In January of 2012, I had what's called a DISCO
15   clearance, which is Defense Industrial Security
16   Clearance Office, which is DoD industry for certain
17   programs that require vendors to be classified. I had
18   been working with a vendor who was involved with both
19   DoD and Department of State contracting, and they
20   wanted me to be cleared so that I could review
21   documents for them. So at the time, I had a DISCO
22   clearance of "Secret". But just because you have
23   clearance doesn't mean you have a need to know.
24  Q   Right.
25  A   And if you're not read on to a program, you still

---

**93**

1    don't have access.
2  Q   Do you still have that DISCO clearance?
3  A   I think it's expired now, but in connection with this
4    book, I think I have a TSSCI, again from the
5    Department of Defense and Department of Justice.
6  Q   What's that?
7  A   Top Secret Sensitive Compartmented Information
8    clearance in connection with this matter.
9  Q   So in connection with your discussions with the
10   Government about the investigation of Mr. Bissonnette?
11  A   Under my obligations, all I'm going to say is the
12   Government requested that I undergo a full background
13   investigation, and then my belief is that I have been
14   assigned a TSSCI in connection with their questioning
15   of me.
16  Q   Is it your belief that you still have that TSSCI, or
17   is it limited to their questioning of you?
18  A   Generally -- well, I'm sorry. When you undergo a
19   background investigation, you don't -- it's usually
20   not for a limited time. It's -- well, no, let me
21   rephrase that. I'm sorry.
22        Generally, background investigations are good for
23   five years, but that doesn't mean you have access. It
24   just means that you are eligible, and if you have a
25   change in your -- anything that would be considered

---

**94**

1    disqualifying -- you get DUI, you file bankruptcy,
2    you're accused of a crime -- then you have an
3    obligation to report to the issuing agency that you
4    have this issue, and then they send your
5    information -- they have you fill out some forms, you
6    fill out your information, and it gets sent to what
7    they call an Adjudication Facility to determine
8    whether you still have access -- whether you still can
9    access classified information at that level you were
10   issued at or not.
11        So in answer to your question, do I still have
12   TSSCI? I believe so, for the remainder of the five
13   years after I was vetted.
14  Q   I'm going to go back to the January time frame for
15   just a minute.
16  A   Of 2012?
17  Q   2012, yes, sir. When you have your recordings on your
18   Memorandum of Record of the phone calls with
19   Mr. Bissonnette -- we're talking about what can and
20   cannot happen when you are on active duty versus when
21   you're out of the service, when you've been
22   discharged, it was your understanding during those
23   January phone calls that he was still on active duty?
24  A   Until February 1st. He told me he was out on February
25   1st.

---

Kevin Podlaski - November 17, 2016

95

1  Q  Okay.  Did you in those phone calls say anything to
2    him about not writing anything until he was out?
3  A  I think there was a discussion about whether he had
4    written anything, and he said no, he had not written
5    anything yet, and that was --
6  Q  So did you tell him not to change that because he's
7    not out?
8  A  Well, I think part of the discussion was when he told
9    me he was going to get with the ghost writer and pour
10    it out to him -- and I think that's the term he
11    used -- what he wanted to put out in the book, and he
12    said that that wasn't going to happen until March or
13    early April.
14  Q  I understand.  Simple question.  Did you give him any
15    advice about what he should not do before he got out?
16  A  I'm sorry.  I didn't tie it in.  So, no, I didn't say
17    to him, "Hey, don't write anything until you get out,"
18    because his words to me indicated that he wasn't going
19    to do so until he was, as far as I knew, out after
20    February 1st.
21  Q  Okay.  In light of what you have told me about
22    security clearance and what I'll call a second issue,
23    which is either need to know or authority, do you
24    believe it was lawful for Mr. Bissonnette to send the
25    unreviewed transcript of his book to you when he did

96

1    in, I think, mid to late June?
2  A  Well, the lawfulness of that is not really my call to
3    make.  It's the Government's call.
4  Q  Did you have any concern about exposing him to any
5    criminal or civil liability when you requested that he
6    send the manuscript to you for vetting?
7  A  Well, it was part of the contract.  So when you say
8    did I have a concern for his civil or criminal
9    liability, at that point I would say no, because
10    that's the standard process, is to prepare the book,
11    submit the book to the Government, and have the
12    Government come back and tell you to issue changes.
13    And they sometimes say, "Come back" -- they come back
14    and say, "You can't publish this.  Destroy everything
15    you have."  Or they come back and say, "You can't
16    publish this as it is.  Here's the redactions we want
17    you to make, and you should delete all previous
18    versions and then send us your affirmation that you've
19    done so."
20    So, I knew that there was a process in place, but
21    once again, hey, look, here's the thing.  Here's this
22    guy who is on a most sensitive mission that the US had
23    had in quite a while, and he did not want to
24    compromise the security of the United States or
25    anybody who had undertaken that mission with him.

97

1    There was not a plan in place to take out the trash,
2    because he had said to me at least once, maybe more,
3    that he was not going to put anything in the book that
4    was going to be controversial.  He was not going to
5    put anything in the book that would compromise
6    anybody, and he was not going to put anything in the
7    book to compromise national security.  I had no reason
8    to doubt it.
9  Q  Do you doubt that as you sit here today?
10  A  No.
11  Q  As you sit here today, knowing everything you have
12    learned since January of 2012, do you believe that he
13    had an obligation to submit the book to a
14    pre-publication review?
15    MR. FURMAN:  Objection.
16    You can answer.
17  A  Knowing what I know now?
18  Q  Yes, sir.
19  A  That decision, once again, is with the client, for the
20    client to make.  We know now that the Government is
21    claiming that he signed a DD Form 1847-1 in 2007.
22    There was no 1847-1 produced in connection with the
23    Operation Neptune Spear in 2011.
24  Q  I understand.
25  A  Well, let me finish.  He did sign an SF Form 312.  In

98

1    Paragraph 3 it says, "If you question"; so if there is
2    a discretion in the author's mind about whether
3    anything he was going to write was classified or not.
4    I believe that the Government's contention is
5    that it was a Special Access Program.  I haven't seen
6    any evidence to connect the Special Access Program
7    with Operation Neptune Spear, but that doesn't mean
8    that he wasn't briefed and told, because as is
9    standard in all of the pre-deployment briefings that
10    I've done and all of the pre-deployment briefings I've
11    witnessed, every briefer comes in and tells you, "I'm
12    about to brief you on this.  This is classified at
13    this level."
14    And I would say that the Special Operations
15    community understands what's called "Big Boy Rules,"
16    that you know what the rules are.  "I don't have to
17    remind you every time I see you.  You're not an E1,
18    you're not a dumb shit, and you understand your
19    obligations are."
20    So if there is -- in this mission, maybe someone
21    from the CI briefed him and said, "I'm about to brief
22    you on this, and this is the classification level, Big
23    Boy Rules apply."  Everybody in the room nods and
24    understands, and if that person comes forward and
25    makes an affidavit to say that it was indeed a Special

Kevin Podlaski - November 17, 2016

99

1  Access Program, I don't know if there is too much you
2  can do about it.
3      I don't know if I answered your question except
4  to deal with the objective facts, and the objective
5  facts as No one has produced that a DD Form 1847-1 in
6  connection with Operation Neptune Spear.
7  Q   And so knowing that no one has produced that -- and
8  let's assume no one can, for argument's sake -- do you
9  believe he -- sitting here today, do you believe he
10  had an obligation to submit the book for a
11  pre-publication review?
12  A   You're asking me for my opinion, and as I said, it's
13  complicated, and my opinion is not determinative, and
14  that's a decision for the Government.
15  Q   So if he came to you even today in November of 2016
16  and asked you, "You now know a lot more than you did
17  in 2012. Do I have an obligation to submit this book
18  for a pre-publication review," you could not tell him?
19      MR. FURMAN: Objection.
20  A   I mean, you're asking me to speculate; but also,
21  benefiting from the experience, I would say to him,
22  "You'd be crazy not to, considering what you've gone
23  through here."
24      So, I mean, whether he had an obligation, maybe
25  in his mind under 312 he does have a question about

100

1  whether it should be submitted; and then, therefore,
2  he would have an obligation. There's been no DD Form
3  1847. Just for further clarification, a Standard Form
4  312 does not have -- it's not mission specific. It's
5  a general form that you sign, and it's a big umbrella,
6  whereas the 1847-1 is a specific -- mission specific
7  form that you sign. And that's why I'm saying he may
8  have an obligation under 312. Knowing what he knows
9  now, I think he'd be foolish not to.
10  Q   And let me be real clear here. I'm not interested
11  in -- and my question probably wasn't clear in this
12  regard. I'm not interested in, "Well, what's the best
13  thing to do, knowing the load of crap you've had to go
14  through for two years," because clearly he could have
15  avoided that by submission.
16      My question is limited to a legal obligation.
17  Let's assume he does not want to if he does not have
18  to; he will if he has to. Could you tell him today
19  whether he has to or not, based upon what you now
20  know?
21      MR. FURMAN: Objection to the form of the
22  question.
23  Q   And I understand you might not be able to give him an
24  answer either way because there may be things you
25  don't know. Could you tell him today whether he has

101

1  an obligation or not?
2      MR. FURMAN: Objection to the form of the
3  question.
4  A   Once again, you're asking me to answer a hypothetical
5  and give an opinion on it; and once again, the opinion
6  is the Government is the only entity that can decide
7  truly whether he is required to submit it. And I'm
8  not saying the Government even agrees with me and my
9  interpretation that 312 is discretionary. I think the
10  Government's position is that it's not discretionary,
11  at least with regard to this matter. You know,
12  there's a lot of things that would come into play.
13      So to answer your question, I think it would take
14  more time and more study and analysis and a
15  determination about what is in the public domain and
16  what is not and what the ramifications of that are and
17  what they are not. The sensitivity of the mission now
18  compared to 11, 12 months after it was executed is a
19  big discriminating factor as well, and I would submit
20  to you that any assets that were in place at the time
21  the book was originally released are long gone from
22  there.
23      It's a very long-winded answer, I understand and
24  I apologize, but it's not a simple question to ask
25  But, you know, the determination ultimately is the

102

1  client's. The recommendation that I would make in
2  this regard is the safest course is always submit.
3  Q   God, there was one question I was going to ask and
4  then take a lunch break.
5  A   You were going to ask me what I wanted for lunch.
6  Q   Probably. And I'll buy the lunch. Let's just break
7  for lunch and I'll remember it. It was kind of a
8  wrap-up-and-forget-about-it question, and I'm not
9  going to be able to wrap up and forget until I
10  remember. So let's break for lunch.
11      MR. FURMAN: Sure.
12      (Lunch recess)
13      (Exhibit 39
14      presented to the witness.)
15  BY MR. JOHNSTON:
16  Q   Mr. Podlaski, I have placed a new deposition Exhibit
17  No. 39 in front of you, and let me explain it. You
18  will recall the prior exhibit I put in front of you
19  that was your Memorandum of Record that had two pages,
20  and then there was a third page that seemed to -- that
21  was not present -- I'm sorry -- there was a third page
22  that seemed to be another version of the Memorandum of
23  Record, but it suggested there was a second page to
24  that other version and it was not attached. Okay. I
25  have found and printed out and marked as Exhibit 39

Kevin Podlaski - November 17, 2016

---

**103**

1    the entire document, just so we will have it, and you
2    can see there was a second page that contains two
3    additional sentences -- or two additional lines, I
4    will say, but the last sentence in that version of the
5    Memorandum of Record, which has Bates stamp 340, says
6    "And with my recommendation Mark decided not to send
7    the manuscript to USSOCOM PROSPR."
8        Those are your words, correct?
9    A   You're talking about KP00341?
10   Q   Yes, sir.
11   A   Yes.
12   Q   Okay. Let me ask you -- I remembered the one question
13   I was going to ask earlier when we were talking about
14   what advice you would give Mr. Podlaski if he came to
15   you today --
16       MR. FURMAN: Mr. Bissonnette.
17       MR. JOHNSTON: Thank you. I will probably do
18   that more than once. That's my first time today, so
19   I'm way ahead of my normal batting average.
20   Q   We were talking about what advice you would give
21   Mr. Bissonnette today based upon things that you have
22   learned since 2012. My question to you now is
23   somewhat related to that but different. Do you, as
24   you sit here today, criticize the settlement that
25   Mr. Bissonnette made with the Government as being

---

**104**

1    unreasonable?
2        MR. FURMAN: Objection.
3        You can answer.
4    A   My opinion is that it's unclear why Mr. Bissonnette
5    settled with the Government and agreed to forfeit his
6    royalties, especially in light of his testimony
7    yesterday where he claimed that it was not an SAP
8    and -- at least in the beginning of his testimony, and
9    then at the end of his testimony asserted that the
10   2007 document 1847-1 applied to Operation Neptune
11   Spear. If you just look at the facts, the only
12   document that they produced -- "they" being the
13   Government produced that was relevant is the Standard
14   Form 312, which is an umbrella document that does not
15   have -- it's not mission specific, whereas the
16   1847-1's are, then I think it's unreasonable for him
17   to have agreed to forfeit all of his royalties when
18   the Government has not produced any document that ties
19   his signing of 1847-1 with Operation Neptune Spear.
20   They could have gotten an affidavit from one of the
21   briefers if they contend that it was a Special Access
22   Program, and then that would have -- if not
23   conclusive, that would have certainly been persuasive.
24       So in light of the facts that are on the table, I
25   believe that it is unreasonable.

---

**105**

1    Q   Okay. Let me ask you, what do the initials "SCI"
2    stand for?
3    A   Sensitive Compartmented Information.
4    Q   And what do the initials "SAP" stand for?
5    A   Special Access Program. It depends on the context, of
6    course; but within what we're talking about here,
7    that's what I believe they mean.
8    Q   And for purposes of the jury that may hear this case
9    who doesn't have the facile handling of these terms
10   that you do, is there a difference between those two
11   terms? Do they relate to each other in some fashion?
12   A   To the extent of my knowledge, I think that generally
13   people who deal with classified information as a
14   profession, they might know of a distinction; but in
15   terminology that we've used and that we've ascribed, I
16   would say that there's not a difference between --
17   well, the only difference would be this, that SCI is a
18   form of a Special Access Program.
19   Q   Okay. You were aware that following the receipt of
20   the Jeh Johnson letter, the decision was made to
21   release the book earlier than its original release
22   date, correct?
23   A   Yes.
24   Q   Were you in agreement with that decision?
25   A   I'm trying to think. That's why I'm pausing.

---

**106**

1        I don't think I necessarily opposed it, but I
2    think I kind of felt like punched in the nose by
3    Mr. Luskin, so I was really kind of taking a back seat
4    at that point, unless I was directly asked a question.
5    And I don't think anybody directly asked me about
6    moving up the date, that I recall. And, you know, the
7    reality is that if the Government wanted to, the
8    Government could have issued a TRO or at least applied
9    for a TRO rather, and the Government could have, you
10   know, purchased all the books, like they've done in
11   previous circumstances, if they didn't want the book
12   released in its current form. You know, if -- I don't
13   think it was going to be an end run of the
14   Government's moving for a TRO if that's what they
15   wanted to do.
16       So to answer your question directly, I don't
17   recall whether I consented to that, but I can -- I'm
18   pretty sure that I did not say -- I did not lead the
19   charge on it, I will say.
20   Q   Are you -- do you recall that on or about August 23rd,
21   Dutton sent out a press release announcing the pending
22   publication of the book?
23   A   I believe so.
24   Q   Did you see that press release before it went out, and
25   approve it?

---

Kevin Podlaski - November 17, 2016

## 107

1  A   I don't recall.  I recall something about the press
2  release coming out.  I think -- yeah, I think I did
3  review it.
4  Q   Did you approve it or have an objection to it in any
5  fashion?
6  A   I think I might have made a suggestion about some
7  language on it, but as I sit here, I really don't
8  remember the details.
9  Q   Okay.  Yesterday Mr. Bissonnette was asked about a
10  reference to drones and power outages that are
11  described in some fashion in Mark Bowden's book.  Do
12  you recall him being questioned about that generally?
13  A   I recall him being questioned about that.
14  Q   He indicated -- well, he didn't indicate a hesitancy.
15  He refused to talk about that.  If I asked you about
16  drones and power outages, would you likewise refuse to
17  talk about that?
18  A   I would have nothing to say because I know nothing
19  about it.
20  Q   All right.  That did shorten those questions.
21      I want to go -- well, let me see if I've got
22  other things to cover here before we jump too deep
23  into the documents.
24      Do you recall when you first received kind of a
25  warning that the Government thought the release of the

## 108

1  book would be illegal or in violation of
2  Mr. Bissonnette's obligations?
3  A   I recall when the advanced copies were put out -- and
4  I think this is where Mr. Bissonnette was confused on
5  the matter.  When the advanced copies were put out,
6  there was some backblow from -- or backlash from --
7  initially from USSOCOM I recall, and that was when
8  they first got the book and the title -- everybody
9  was -- I think Matt Bissonnette called the "three-foot
10  hover" and people were excited and upset.  But then
11  subsequently I recall Kevin Maurer, who had a
12  relationship with Colonel Nye, I think is the guy's
13  name, was from USSOCOM, and there was some
14  communication.  And after they read it, they were
15  like, "Okay, fine, but you should have submitted it to
16  us."
17  Q   Did you seek permission from any Governmental agency
18  to review the manuscript yourself?
19  A   No.
20  Q   Given your understanding of SF 312, do you believe
21  that it was lawful for Mr. Bissonnette to provide you
22  a copy of his raw manuscript for review?
23  A   Well, this kind of goes back to earlier where we were
24  talking about and somebody -- if the Government
25  determines that it is classified and they usually

## 109

1  provide you with direction about what to do with
2  what's on your computer or what's in your trash bin.
3  So, you know, I didn't believe that there was much in
4  the book that was of concern, except as we've
5  previously discussed.
6      So to answer your question directly, no, I wasn't
7  concerned at that time.
8  Q   Based upon your public -- based upon your knowledge of
9  public information about the bin Laden raid and the
10  involvement of the CIA, why do you believe that it --
11  why do you not believe that it was a Special Access
12  Program?
13  A   Well, first off, I don't know what your understanding
14  is of the CIA's involvement, nor do I know what my
15  understanding is.  And as far as public information
16  goes, if you've read Nick Schmidle's New Yorker
17  article, it's a lot more detailed and descriptive than
18  Mr. Bissonnette's book.
19      So that decision is the Government's decision.
20  And about whether it came from a Special Access
21  Program, all I can tell you is all we know is what the
22  facts that are on the table.  The Government has not
23  produced a Special Access Program -- any document,
24  including an 1847-1 -- signed by Mr. Bissonnette in
25  connection with Operation Neptune Spear, that I'm

## 110

1  aware of.
2  Q   And what I'm trying to focus on is, in the absence of
3  the Government producing such a document, the primary
4  fact on which you rely in connection with your belief
5  that it was not a Special Access Program.
6  A   That and Mr. Bissonnette's words to me and his own
7  testimony is that he did not recall receiving any
8  briefing that anyone said this was a Special Access
9  Program or that this was Sensitive Compartmented
10  Information.
11      So, like I said, if you just deal with the facts,
12  I haven't seen facts to convince me that it was a
13  Special Access Program.  But I don't know what I don't
14  know.
15  Q   Okay.  Would you agree with me that when the Jeh
16  Johnson letter arrived on the evening of August 30 --
17  and I guess we don't have the facsimile transmission,
18  but my memory is that it was after normal office hours
19  on that Thursday evening -- that as of the moment
20  Mr. Luskin was hired, you had had more time to
21  consider and wrestle with the problems of the
22  Government objecting to the release of the book than
23  he had had?
24      And by the way, I just found on the second page
25  of Exhibit 1 what appears to be, I guess, a facsimile

Kevin Podlaski - November 17, 2016

### 111

1 transmission August 30, 2012, 19:25. So I'm assuming
2 it was 7:25 in the evening when it was transmitted.
3 A Right. I didn't get it at that time. Apparently that
4 went to the publisher first.
5 Q That's my understanding.
6 A And was filtered out and distributed.
7 To answer your question, I think what you're
8 asking me --
9 MR. FURMAN: Hold on. Can we have the question
10 read back?
11 (Court Reporter read back.)
12 A If you're asking me if I was -- I spent more time on
13 the manuscript than Mr. Luskin, then the answer is
14 yes.
15 Q Well, isn't it true that around August 23, when the
16 press release went out and apparently some advance
17 copies of the book, almost immediately you all were
18 put on notice that the Government was claiming there
19 were violations by Mr. Bissonnette?
20 A I would say that, yeah, we were aware that there was
21 some parts of the Government, some agencies of the
22 Government that had received the book, thought it
23 violated the Non-Disclosure Agreement.
24 Q And let me show you Exhibit 2. We were talking about
25 when you received Exhibit 1. Exhibit 2 appears to be

### 112

1 an email to you from Mr. Owen about midnight of that
2 same day, alerting you to the receipt of it, correct?
3 A That was an email from Mark Owen to Ben Sevier. I was
4 copied on it. And then it looks like an admission --
5 in the first sentence there, Mark says, "It looks like
6 the docs there" -- "apparently I did sign some form of
7 SAP docs." But like I said, the document didn't
8 link -- the 1847-1 from 2007 didn't link it to
9 Operation Neptune Spear.
10 Q Right. My point is simply you knew about the Jeh
11 Johnson letter very quickly, didn't you?
12 A Yeah. I mean, I can pretty much assure you that I was
13 in bed by that time, so I didn't read it until the
14 next morning.
15 Q Okay. So it would be fair to assume that by the next
16 morning, August 31, you would have known about the Jeh
17 Johnson letter?
18 A Yes.
19 Q Okay. And is it also fair to say in connection with
20 Exhibit 2 that that document confirms that even when
21 shown documents he signed, Mr. Bissonnette doesn't
22 really understand them?
23 MR. FURMAN: Objection as to what -- objection.
24 A Yeah, you're asking me to speculate on this.
25 Q Let me be more specific. He described -- he says,

### 113

1 "Apparently I signed an SAP," right?
2 A Yeah, but he doesn't necessarily -- well, he says, "I
3 signed an SAP and I honestly don't remember signing
4 it."
5 MR. FURMAN: Yeah. I just want the record to be
6 clear that what Mr. Bissonnette wrote was, "Apparently
7 I did sign some sort of SAP program documents." It
8 doesn't say that he signed some SAP. An SEI would be
9 an SAP program document. So I think that's the
10 shorthand, and there's some confusion over acronyms,
11 and I just wanted to make that clear.
12 A And moreover, he says he linked it to the one in 2007.
13 He says, "I don't remember signing anything in 2007."
14 Q Well, is the 2007 document an SAP document?
15 A I think it's an 1847-1. And I don't have it in front
16 of me right now.
17 Q Yes, you do (indicating).
18 A Okay. Great. And your question again is is this an
19 SAP document?
20 Q Right.
21 A Well, I believe that this is a document saying that
22 this signer agrees that they're receiving Sensitive
23 Compartmented Information, and Sensitive Compartmented
24 Information are under the umbrella of Special Access
25 Programs.

### 114

1 Q Do you agree with me that Mr. Bissonnette's statement
2 in his email on Exhibit 2 is that he signed some sort
3 of SAP program docs, based upon what you know?
4 A I agree that the document you just showed me indicates
5 his signature on a document from 2007, yes.
6 Q Is that some sort of SAP program doc?
7 A Yeah, I believe an SCI is under the SAP or Special
8 Access Program umbrella; so yes.
9 (Exhibit 40
10 marked for identification.)
11 Q Mr. Podlaski, let me direct your attention to what's
12 marked as Exhibit 40 with Bates number 1705. It is an
13 email from Kevin Podlaski to Kevin Podlaski. Do you
14 know why you would have sent yourself a document?
15 A Yeah. I sometimes do that just to make sure that I
16 remember and don't get distracted by other business,
17 that it's on my current agenda.
18 Q Sure.
19 A So I email myself sometimes.
20 Q Okay. And in this particular instance, it says,
21 "Revision to paragraph 47."
22 Do you believe that to be Paragraph 47 of the
23 Dutton contract, or is that some other Paragraph 47?
24 A As I sit here, I really don't know, because I don't
25 remember.

Kevin Podlaski - November 17, 2016

---

115

1  Q  Okay.  And then what you wrote in the email to
2     yourself for a reminder was, "Although the author has
3     the legal right to tell the story described in the
4     subject matter description above," comma, "he has
5     previously signed one or more agreements with the US
6     Government not to disclose and/or write about
7     classified or classifiable information."
8        On January 18, when you sent that email to
9     yourself, did you believe that to be a true statement?
10 A  I have no idea what I would -- what I remember is
11    these were probably just my notes to myself for things
12    to further analyze or review.
13 Q  So you don't know if what you wrote to yourself as a
14    revision to Paragraph 47 is a statement you believed
15    at the time or not?
16 A  Yeah, no.  No, I'm not going to say that.  I think
17    it's just a draft of wording, trying to effectuate
18    something that either I thought about or the client
19    wanted, and I can't recall as I sit here.
20 Q  And then the second sentence says, "The author has no
21    legal obligation to submit the manuscript for review
22    or approval by any agency of the US Government."
23       On January 18 when you included that sentence in
24    the email to yourself, did you believe that to be a
25    true statement?

---

116

1  A  Yeah, based on what Mr. Bissonnette had provided to me
2     in the way of information.
3  Q  Did you produce these notes as a part of the
4     Bissonnette file in the first production?
5  A  I have no idea.
6  Q  Was it a part of your hard copy of the file that was
7     produced?
8  A  Probably not; but I don't know.
9        MR. FURMAN:  I have, off the record, a quick
10    housekeeping question.
11       MR. JOHNSTON:  Sure.
12       (Discussion held off the record.)
13 Q  I'm hoping I don't have to go through these emails, so
14    let me ask just kind of a global question and see if
15    you remember.
16       Do you remember consulting with Mr. Bissonnette,
17    through Ms. Cheney sometimes, about hiding his
18    identity through the formation of LLC's?
19 A  I do.
20 Q  Okay.  And you gave him advice in connection with
21    that?
22 A  I did.
23 Q  Okay.
24       MR. FURMAN:  Is there something you wanted to add
25    to that in response to the question?

---

117

1        THE WITNESS:  Yeah, I answered the question.
2        MR. FURMAN:  Okay.
3        (Exhibit 41
4        marked for identification.)
5  Q  Mr. Podlaski, I've handed what's marked as Exhibit 41,
6     which is an email chain which includes portions of
7     Exhibit 38, and that's not the part I want to direct
8     your attention to.
9        On the first page of the document, there is an
10    email from you to Elyse.  The first sentence of the
11    paragraph says, "Please don't take offense to this
12    question, however, I was wondering if Mark's story and
13    Mark have been vetted yet."
14       Do you remember initiating that inquiry to
15    Ms. Cheney?
16 A  Yes.
17 Q  And there's no date on this email from you, but the
18    reply from her above is dated January 21.  Does that
19    sound like about the time you would have made that
20    inquiry to her?
21 A  On or before that, yes.
22 Q  Okay.  And then the second paragraph, it says, "It
23    occurs to me that I have been caught up in the
24    excitement" -- with "excitement" in quotes -- "of
25    being among the first to know the inside story that I

---

118

1     have failed to question let alone validate Mark's
2     training, background, and credentials."
3        Is that an accurate statement of your state of
4     mind about this engagement as of the date you sent
5     that email?
6        MR. FURMAN:  Objection.
7        You can answer.
8  A  It says what it says.  My use of the word "excitement"
9     was just, you know, still very noteworthy event that
10    had occurred within the year.
11       (Exhibit 42
12       marked for identification.)
13 Q  Mr. Podlaski, I've handed you Exhibit 42, and again,
14    it is an email string involving some emails that I
15    believe you were not copied on but they are in this
16    email forwarded to you.  I really want to direct your
17    attention only to the very top of the document.  It's
18    dated February 6th, 2012 from Ms. Cheney to you.  And
19    in the in -- towards the end of that document she
20    says, "I'm going to go in and talk to the general
21    counsel, with the other lawyer - Rich Heller - at my
22    side because Heller has a pre-existing relationship
23    with the Penguin's general counsel."
24       I bring that up to see if that refreshes your
25    recollection any further about the fact that Matt had

---

Kevin Podlaski - November 17, 2016

119

1 more than one lawyer representing him during the
2 writing process of the book.
3 A No.
4 Q So do you remember receiving this at all?
5 A No.
6 Q Okay.
7 (Exhibit 43
8 marked for identification.)
9 Q I've handed you what is now marked as Exhibit 43,
10 which is a series of emails between you and
11 Ms. Cheney. Do you remember this exchange of emails?
12 A I'll have to take a look at it.
13 (Pause)
14 A Okay. Sorry. I've read it now.
15 Q Do you recall these communications?
16 A You know, I recall generally these -- the topics, but
17 I don't remember the exact wording that I used here.
18 I mean -- but I recall generally these matters.
19 Q Okay. Let me direct your attention to the first page
20 of this string of emails. At the bottom is an email
21 from you to Ms. Cheney, dated February 6; do you see
22 that?
23 A Yes, the very bottom.
24 MR. FURMAN: Where are we talking about?
25 MR. JOHNSTON: The bottom of the first page.

120

1 THE WITNESS: There's a 4:00 and a 4:17.
2 MR. JOHNSTON: I'm sorry. The one from Ms.
3 Cheney to you.
4 MR. FURMAN: At 4:17 p.m.?
5 MR. JOHNSTON: Yes, yes. And then in that
6 paragraph, if you look down in the middle on the
7 left-hand margin, just start with the word "HOWEVER"
8 in capital letters. She says, "HOWEVER, the problem
9 with that is -- does the fact that an editor has read
10 the manuscript expose Mark legally on the very slim
11 chance that he somehow revealed govt secrets? You see
12 the problem" -- based upon the book is on a fast
13 track, et cetera.
14 Do you recall her asking you that question?
15 A I don't recall the question, but, you know,
16 obviously if this is what it purports to be, then I
17 answered it.
18 Q So above that is your answer where you say, "I'm not
19 so concerned about Mark releasing classified
20 information to the publisher. Mark and I previously
21 discussed this. I am confident that he has been a
22 Special Operator long enough to know at least 75 to 80
23 percent of what is not releasable."
24 Did you believe that when you wrote that to her?
25 A Sure, I guess.

121

1 Q Do you believe it today?
2 A I don't know what I believe today. I don't know.
3 Q Then at the very top Ms. Cheney replies to you and,
4 kind of, in the email of her paragraph says, "If you
5 are saying, as below, that it is okay and that Mark is
6 not exposing himself unnecessarily by showing it
7 simultaneously, then I would like to eliminate the
8 last line."
9 Did you ever reply to that and say, "Yes, it is
10 okay" or "No, it's not okay"?
11 A I honestly don't recall.
12 Q All right.
13 (Exhibit 44
14 marked for identification.)
15 Q Exhibit 44. And you'll notice these are not in
16 chronological order. I apologize, but I don't want
17 you to assume they are.
18 This is a January 16 email to you from Ms. Cheney
19 where she says, "Dear Kevin, Below are my comments.
20 Looking forward to hearing yours. Best Elyse."
21 And then under Description, "Reads fine to the
22 author right now; but we thought we might add language
23 that conforms with the language of his enlisted
24 agreements saying that he will do this without
25 revealing" then in parens, "(whatever the specific

122

1 language is)," closed parens, and then she puts in
2 quotes "tactics, techniques, or procedures."
3 Do you remember her suggesting comments about
4 making it clear he would not be revealing tactics,
5 techniques, or procedures?
6 A I don't have any independent memory of this.
7 Q Is tactics, techniques, or procedures often referred
8 to as the shorthand of TTP?
9 A Yeah, I've heard that before.
10 Q Do you believe that in the book "No Easy Day" as
11 published, Mr. Bissonnette inappropriately reveals
12 TTP?
13 A Not that I'm aware of.
14 Q If he -- if you had seen anything in the book -- if
15 you during your vetting and review of the book had
16 seen anything that you thought was TTP, what would you
17 have done?
18 MR. FURMAN: Objection.
19 A You're asking me to speculate. I would have brought
20 it to his attention and had him make a decision as to
21 whether he wanted to include it or not.
22 Q Would you have done any more active than that in
23 assuring that this retired Navy SEAL did not reveal
24 tactics, techniques, or procedures?
25 MR. FURMAN: Objection.

Kevin Podlaski - November 17, 2016

123

1   A   We -- yeah --
2   Q   Hypothetical.
3   A   You're asking me a hypothetical question. First of
4       all, are we talking about Matt Bissonnette? Because
5       you said retired SEAL. He's not retired, was he?
6   Q   I don't know what "retired SEAL" means, so let me just
7       use his name. One of the things that you did when you
8       reviewed the book was search for anything that you
9       thought was TTP.
10  A   Correct.
11  Q   Because you knew that he was not to reveal TTP?
12  A   Correct.
13  Q   And as a former JAG Officer who served this country
14      long and well and someone who cares about this country
15      and other men serving today, you would not have
16      allowed him to reveal TTP, except over your strenuous
17      objection, correct?
18  A   Well, as I said, we would discuss it; and as a matter
19      of fact, without saying specifically what it is, we
20      did have a discussion about certain items in there,
21      and he decided to include it in there. So --
22  Q   As you sit here today, do you -- I probably asked
23      this. Do you believe there are TTP revealed in the
24      book?
25  A   Not that I am aware of which would compromise national

124

1       security.
2   Q   Thank you.
3               (Exhibit 45
4               marked for identification.)
5   Q   Mr. Podlaski, I've handed you Exhibit 45, which is an
6       email from Ben Sevier to you with a copy to Alex at
7       Elyse Cheney's office and a copy to Ms. Cheney, dated
8       Saturday, June 23rd, Attachments: NO EASY DAY
9       complete third draft with edits June 23.doc.
10              Do you remember receiving this document and the
11      Attachment?
12  A   I don't have an independent recollection of receiving
13      this, but I have no reason to deny that I did receive
14      the final draft.
15  Q   Was this the transmittal of the draft -- the first
16      transmittal of the draft to you for you to do your
17      vetting?
18  A   Huh-uh. This is the third and final draft. I think
19      this is after I had added the footnotes, and then we
20      went around and they took those out and changed them
21      to endnotes, and then I think that this is just the
22      reference-cited one.
23  Q   Okay. Did Ben Sevier receive and/or review the
24      manuscript before you did?
25  A   I don't know.

125

1   Q   Did he receive and review it simultaneously with you?
2   A   I don't know.
3   Q   Did you ever express any concern to Mr. Bissonnette
4       that he should not review it until you had vetted it?
5       MR. FURMAN: I think -- could we have the
6       question read back?
7       MR. JOHNSTON: Did I misspeak?
8       MR. FURMAN: Or maybe I misheard.
9   Q   Let me just try again.
10          Did you ever indicate to Mr. Bissonnette that
11      Mr. Sevier should not review the manuscript until
12      after you had vetted it?
13  A   My recollection is that I suggested that I review it
14      before the editor review it in an effort to do a
15      cleanse -- cleansing review and try to remove anything
16      that would be considered classified or classifiable.
17      And I don't really recall whether I got voted down
18      or -- because that email that you showed me previously
19      from Elyse Cheney seems to indicate that they wanted
20      to do it simultaneously. So, you know --
21  Q   Do you recall objecting to that?
22  A   Well, like I said, I expressed to them that I believed
23      that I should review it first so that we could have a
24      chance to go back and forth; and, of course, when
25      you're dealing with information that's potentially

126

1       classified, you want to have as minimal amount of
2       people review it as possible.
3   Q   Sure.
4   A   As I sit here today, I don't recall -- I don't think
5       it was a big point of contention. I think they either
6       did it or they didn't do it. I forget.
7   Q   Is there -- let me go ahead and hand that to you.
8               (Pause)
9   Q   Before you get lost in it, is there any document that
10      you know of where you expressed to them reservations
11      about Mr. Sevier looking at the document before you
12      had vetted it?
13  A   I don't know -- wait. I'm sorry. I got distracted.
14      Ask the question again.
15  Q   Do you know of any document where you expressed to
16      them any reservation about Mr. Sevier reviewing the
17      manuscript before you had vetted it?
18      MR. FURMAN: And "them" -- we have the same
19      question. Who is "them"?
20  Q   "Them" is Matt, Elyse, Sevier, anybody?
21  A   Yeah, I don't know -- I think there must be something
22      in writing. We talked about me reviewing it first,
23      and you saw Elyse's email kind of capturing some of
24      that. She was saying she didn't think they'd go for
25      it. I believe that's what I just recall reading,

Kevin Podlaski - November 17, 2016

127

1   because they wanted, you know, to fast track it, et
2   cetera. So I don't really remember what the ultimate
3   spillout of the thing was.
4   Q   Do you know of any document other than the ones that
5   we looked at that discuss that subject?
6   A   If there is any other document, it would be part of
7   the email exchange, and there's nothing other --
8   anything independent of that.
9                (Exhibit 46
10               marked for identification.)
11  Q   Okay. Do you have in front of you Exhibit 46?
12  A   Yes.
13  Q   This appears to be an email from Krista Witmer to you,
14  dated June 22, with the subject of "Mark Owens
15  beginning of book". Who is Krista Witmer?
16  A   She was my secretary. I dictated it. She typed it up
17  and sent it to me.
18  Q   Okay. So you would have dictated this and this is
19  simply sending back to you what you had dictated?
20  A   That's correct.
21  Q   Okay.
22  A   She doesn't work at Carson Boxberger anymore. I don't
23  even know where she is.
24  Q   So she didn't follow you to your new firm?
25  A   No, she did not.

128

1   Q   All right. Well, you've answered most of my
2   questions, but to be sure, these words are your words
3   then?
4   A   Those are my words. I offered those to the publisher.
5   They did not want to do that. They wanted it to be --
6   I think the word was used was -- I remember them
7   mentioning something about the "Lions of Kandahar,"
8   which Kevin Maurer ghost wrote with a former SF
9   Officer, and he didn't have any kind of introduction
10  like that. So he just kind of did it like almost a
11  personal memoir, and that's what they wanted to go
12  with. So they said, "Thanks very much, no."
13  Q   Did they use some of the substance of your comments
14  but not in your words?
15  A   Now that you say that, I think they sent me a revised
16  one back. I made further changes to it, and I think
17  that they sent -- their final version was like nothing
18  at all like this. It was very, very simple, and they
19  thought they answered the mail on it, so --
20               (Exhibit 47
21               presented to the witness.)
22  Q   I've handed you Exhibit 47, which is a June 28 email
23  to you and to Ms. Cheney from Alex Jacob, who is in
24  Ms. Cheney's office --
25  A   Um-hum.

129

1   Q   -- where he is thanking you for the quick turnaround.
2   And then below that is an email from you to the two of
3   them where you enclose suggested revisions and
4   alterations and changes to the manuscript that you
5   propose, and then you end that by saying, "I don't
6   think the story is diminished or compromised in any
7   manner by my suggested changes," correct?
8   A   You're asking me if that's what I wrote?
9   Q   Yes, those are your words?
10  A   That appears to be what I wrote, yes.
11  Q   And are the changes that we are talking about here a
12  part of your vetting process to ensure that classified
13  confidential information is not disclosed?
14  A   Yeah, I don't know what -- I mean, this -- the Subject
15  is the third draft, so I think I had already -- well,
16  the first thing, this was like a crapload of
17  grammatical and punctuation errors -- which I was kind
18  of surprised that a ghost writer didn't fix, subject
19  for disagreements and all that, but I also did the
20  footnote work and all of that. So I think this was
21  after -- this is after even this -- yeah, this is
22  after this document (indicating) when they rejected
23  that as well. So this must have been on the -- this
24  might have been happy-to-glad word changes.
25               (Exhibit 48

130

1               presented to the witness.)
2   Q   I've handed you Exhibit 47 which, again, is a
3   series -- should be 48. I misspoke. Thank you.
4   A   Yeah, okay.
5   Q   This one -- if we go back a little bit, this has some
6   of your issues and questions, correct?
7   A   Yeah. Can you just give me a moment to read, please?
8   Q   Sure.
9               (Pause)
10  A   Okay.
11  Q   So if we look at -- start at page 2105 going backwards
12  there's a series of your citations to the manuscript,
13  correct?
14  A   Yeah, I don't know if those are mine or Kevin
15  Maurer's. Like I said earlier, I initially did
16  footnotes, and then there were some I couldn't find
17  citations for and forwarded them to -- and then Kevin
18  Maurer did some, so I didn't closely scrutinize these
19  to see if these are mine or his.
20  Q   I don't know either, but I just know at the bottom of
21  page 105 it says "Lawyer Edits".
22  A   Yeah, I don't know why that would be down there.
23  Well, because it's a Subject, and it looks like this
24  is kind of -- I don't know why that would be in the
25  middle of the page there, because that's the Subject.

Kevin Podlaski – November 17, 2016

### 131

1   Q   Well, let's go up from page 2105, since the email
2       is --
3   A   Forward or backward?
4   Q   The emails proceed, I think, to the front of the
5       document; so we'll start and go up.
6   A   Oh, I see what you're saying.
7   Q   The first one is Kevin Maurer to Ben where he says,
8       "Mark and I talked this morning and completed the
9       lawyer edits, including open source citations." And
10      then he says, "Mark and I are ready to discuss the
11      edits today."
12  A   Yeah.
13  Q   And then there is a --
14  A   Just for the record, I'm not on that discussion,
15      right?
16  Q   Right, correct.  This is just for background.
17  A   Um-hum.
18  Q   And then above that is Ben Sevier to Kevin, Elyse,
19      Mark, and Alex where he says, "I've just reviewed them
20      as well and I think the lawyer has made a significant
21      contribution here.  I'm very happy to have his review.
22      Kevin and Mark and I will get all of his changes
23      incorporated today."
24          That's talking about your changes, correct?
25  A   Right.

### 132

1   Q   And then it says, "I have two questions for him.  Is
2       it necessary to print open sources in the book or can
3       we simply address their existence in the foreword?"
4           And then 2, "I've made some edits to the proposed
5       foreword in the attached document and I would like to
6       know if they are acceptable to the lawyer and Mark."
7   A   One thing we know for sure is Ben can't count.
8   Q   Yeah, I'll give you that.
9           3, "Has he seen the maps that Mark and Travis
10      Rightmeyer prepared?"
11          And then his final paragraph, "Alex, maybe you
12      want to forward this to him.  Maybe we don't need a
13      conference call; his work was excellent, so there's
14      really not that much to discuss, although I'm free all
15      afternoon."
16          And then the next email --
17  A   Gosh, I hope they're talking about me as the lawyer.
18  Q   I can assure you they are.  The next email up is Alex
19      doing what Ben suggested, forwarding that email to
20      you.  "Kevin, the team is hard at work incorporating
21      the changes you suggested, thank you.  Can you take a
22      look at Ben's questions below and also his slight
23      tweak to your foreword?  Happy to set up a call if
24      that's easier."
25          Do you remember getting that email?

### 133

1   A   Independent memory, no.
2   Q   Okay.  And then above that, same day, just, I guess,
3       20 minutes later is you replying to Alex, saying, "I
4       have no problem at all with the changes proposed in
5       the Foreword.  I agree with the reasoning for the
6       changes."  Correct?
7   A   Yeah.  That's the first format, though, the first
8       change.  Ultimately it was further changed.
9   Q   And then you say, "Regarding open source citations:
10      They are not necessary to list as footnotes.  End
11      Notes are fine."
12  A   Yeah, I did say that.
13  Q   And then third paragraph, you would like to review any
14      maps and then you say, "The military has several
15      regulations on photographs depending on who took the
16      photos."
17  A   Um-hum.
18  Q   And then you say, "Finally, may I please see the
19      'uncorrected proof' of the manuscript for a final once
20      over when you get to that stage?"
21  A   Right.  That's the galley copy I was talking about.
22  Q   Okay.  And then the next one above that is another
23      email from you to Alex and Ben, the same day but I
24      guess about three or four hours later, and you say, "I
25      think the pictures are legally okay except for the

### 134

1       NVG's."  And for the benefit of the jury, the NVG's is
2       the night vision goggles?
3   A   Correct.
4   Q   And then you say, "This is out of my lane, but I'm not
5       sure you need all the maps.  No legal issues with
6       them, it just occurs to me if you have 8 Maps, you
7       don't really need to read the book."
8           Then over on to the other page you continue to
9       say, "The maps and diagrams were created by a mapmaker
10      from" -- I'm sorry.  That's Alex's email.  So that was
11      all of your email.
12          And then one more above it.  There is another
13      email from you the following day, June 29, with lawyer
14      edits as the issue, and you say, "Out of an abundance
15      of caution a question.  I reached out but did not find
16      the type of NVG's that are displayed.  I was wondering
17      whether they were military specification or not?  If
18      they are military specification I would recommend -- I
19      would not recommend including a picture."
20          Do you remember focusing on the NVG's and making
21      that recommendation?
22  A   Now I do.
23  Q   And then at the top of the page, the last email that's
24      a part of this exhibit is Alex back to you where he
25      says, "Mark says they're simply panoramic night vision

Kevin Podlaski - November 17, 2016

135

1    goggles, not secret military technology, which are
2    searchable on Google. They're also featured in Medal
3    of Honor video games. If you think there are other
4    outstanding issues, I think it might be fastest to
5    communicate with Mark directly."
6        Did that satisfy your concern about the night
7    vision goggles?
8    A   No. Mark and I had a conversation.
9    Q   Okay. And --
10   A   In that conversation, he directed me to the website
11   where they were commercially available, and so —
12   Q   Your memory is excellent on that. Let me show you
13   Exhibit 49.
14           (Exhibit 49
15        presented to the witness.)
16   A   I know you're on a roll here, but I need to give you a
17   warning. I need to go to the bathroom shortly.
18   Q   Let's finish this and you can do that.
19       Exhibit 49 is an email from you to AB. Is that
20   an acronym for Matt Bissonnette?
21   A   Where's this?
22   Q   At the very top of the page. From you to AB, Jacobs
23   Alex?
24   A   I don't know. I believe that he might have used that,
25   but I don't know for sure.

136

1        MR. FURMAN: That's not an acronym. I think
2    that's the way that his -- Mr. Bissonnette's email
3    address would appear.
4    Q   That's what I meant. My -- I simply meant if "AB" is
5    there, do you agree with me that means it was sent to
6    Mr. Bissonnette?
7    A   Yeah, if that's, in fact, him. And I believe -- I
8    think it might be him. Then yes, it was sent to him.
9    Q   Okay. So starting at the bottom again and reading up,
10   we have on June 29 at 5:00 p.m. Mr. Podlaski writing,
11   "I was wondering whether the NVG's that you have are
12   military specification?"
13       And then -- that was at like 5:11. And at 5:32
14   Mark Owen replies, "GPNVG's Gross panoramic NVG's.
15   They ate all over the internet." I assume he means
16   "they are all over the internet" -- "and video games.
17   Been out for 7 years."
18       And then the email at the top of the page is you
19   back to him and Alex saying, "Okay. Then the pictures
20   are fine."
21   A   Right, but we had a telephone discussion as well and
22   talked about several things including the NVG's,
23   because the issue was one of those confirmation of use
24   of technology things, that you're using technology
25   that's out there. It tells somebody what your

137

1    capabilities are. Because it was saturated in public
2    domain at that point, it was -- I think my
3    recommendation was that it would be fine.
4    Q   So you didn't change your recommendation for what is
5    reflected on Exhibit 49, the pictures are fine?
6    A   That's correct, yeah.
7    Q   And this telephone call you're talking about in June,
8    this is another telephone call?
9    A   No, this is one of the two that I had with him after I
10   got the manuscript.
11   Q   Okay.
12   A   I had one conversation with him and Kevin Maurer and
13   then one just with him, that I recall.
14   Q   Let's take a break.
15           (Recess)
16       (Exhibit 50
17       marked for identification.)
18   BY MR. JOHNSTON:
19   Q   I've handed you Exhibit 50, and I want to direct your
20   attention to the email at the bottom of the page
21   numbered 2421, the email from Mr. Sevier to you. Do
22   you see that?
23   A   Tuesday, July 3rd, the 2:59 p.m. one?
24   Q   Correct.
25   A   Okay. I see it.

138

1    Q   It says, "Hi, Kevin. Mark and I, in consultation with
2    Penguin's lawyer Alex Gigante, and my publisher Brian
3    Tart, have put together the attached revision of the
4    author's note -- you'll see that it folds in your
5    stuff (streamlined by us and by Mark) into the
6    Author's note that already existed. We want to start
7    the book with Mark's voice, rather than with lawyerly
8    language, just so the readers get the right tone from
9    the opening paragraphs."
10       Do you recall receiving that email or that
11   communication from Mr. Sevier?
12   A   I do.
13   Q   And then you replied the same day about an hour and a
14   half later or so, half hour -- no, 45 minutes later.
15   You said, "I agree. Your solution is a smart call. I
16   have no problem with the changes." Correct?
17   A   Yeah, that's what's written there.
18   Q   Now, let me hand you what's marked as Exhibit 51.
19       (Exhibit 51
20       marked for identification.)
21   Q   Exhibit 51's page 1 appears to be a handwritten cover
22   page for a facsimile transmission. Is that what that
23   is?
24   A   I can't disagree with you. I don't know.
25   Q   Okay. And then -- and it's from Ms. Cheney to you?

Kevin Podlaski - November 17, 2016

139

1  A  That's what it appears to be.
2  Q  And it's dated August 15 of 2012, correct?
3  A  It's -- that's what the fax line appears to be.
4  Q  And then the second page appears to be the Dutton
5     press release announcing the soon-to-be published "No
6     Easy Day," correct?
7  A  That's what it says, yeah.
8  Q  And do you remember seeing this press release before
9     it went out?
10 A  Vaguely, yeah.
11 Q  Did you have any objection to it?
12 A  I don't recall if I did.
13 Q  Let me show you what's marked as Exhibit 52.
14                (Exhibit 52
15            marked for identification.)
16 Q  It has on August 20 an email from you to Ms. Cheney,
17    under the Subject: URGENT approval needed.  And you
18    say to her, "I like it."
19        Do you know if that is talking about the press
20    release?
21 A  As I sit here, I really honestly don't know.  It seems
22    to be -- well, I don't know.
23 Q  Let me show you Exhibit 53.
24                (Exhibit 53
25            marked for identification.)

140

1  Q  Let me just ask you this before we go to 53.  Without
2     regard to your memory of Exhibit 52, when you saw the
3     press release that Dutton was proposing, did you like
4     it?
5        MR. FURMAN:  Objection.  Objection to the form of
6     the question as to whether he liked it.  Enough said.
7  A  You know, I don't recall what I thought at the time,
8     but as I look at it, the thing I think I should have
9     taken issue with is "and many previously unreported
10    missions," but I don't -- taken out of context, it
11    doesn't mean anything.
12 Q  Do you recall at the time that you reviewed it
13    expressing any concerns or reservation about the press
14    release?
15 A  No.  As I said, I don't recall.
16 Q  Do you have Exhibit 53 in front of you?
17 A  Yes.
18 Q  Exhibit 53 is a series of emails.  I will tell you
19    are included only on the very last one at the top of
20    the first page.
21 A  Right.
22 Q  Do you remember this series of emails that began with
23    Mr. Mark Hosenball from Thomson Reuters emailing with
24    Ms. Cheney about Mr. Bissonnette and the book?
25 A  Yes, I recall.  I recall generally, yes.

141

1  Q  This is where the -- would I be accurate in saying
2     this is where the trouble started with the book?
3  A  I don't know if you'd be accurate in saying this.  I
4     mean, this is just one guy's opinion.
5  Q  I agree with that.
6  A  And he's a newspaper --
7  Q  No, I get it.
8  A  -- correspondent.
9  Q  Is this the first notice that anyone had -- whether
10    reliable or not -- from a source that said the
11    Government had problems with the book?
12 A  I don't know.  I mean, I wasn't the pivot person for
13    receiving and channeling responses.  From what I
14    recall, Kevin Maurer was kind of spearheading the
15    release -- the advance copy placement and receiving of
16    info on that -- on those books.
17 Q  The email from Ms. Cheney to you and others, to you
18    and Ms. Ball and Mr. Ragone -- I'm not sure how --
19 A  Ragone, yeah.
20 Q  Okay.  Her email says, "Can someone give this guy a
21    statement of the truth?  He had no obligation to show
22    it to them."
23        Do you know why Ms. Cheney was of the opinion
24    that Mr. Bissonnette had no obligation to show the
25    book to the Government for a pre-publication review.

142

1  A  I don't know why Ms. Cheney did anything.
2  Q  Would it be true that the reason she had that belief
3     is because that's what you had told her?
4  A  You're asking me to speculate.  I don't know the
5     answer to that question.
6  Q  Let me show you what's marked as Exhibit 54.
7                (Exhibit 54
8            marked for identification.)
9  Q  It is a continuation of that email chain, and there's
10    three or four of these, because people would reply and
11    start new chains, but I think the first reference to
12    you is -- well, yeah, on page 2, the 2248, down at the
13    bottom there is Ms. Cheney's email to you and the
14    others, "Can someone give this guy a statement of the
15    truth?"
16        And then there's -- a Christine Ball replied,
17    "Peter and I spoke and we don't think anyone should be
18    responding to him."
19        And then Ragone replies, "I'll call you in a
20    second."
21        And then you reply, and your reply starts on page
22    1 and goes over to the top of page 2.  And is it a
23    fair statement that in your reply of August 23 to
24    Elyse and Mark and the others, you repeat and defend
25    your recommendation that he had no obligation to

Kevin Podlaski - November 17, 2016

143

1  submit to a pre-publication review?
2  A   That's what's written there, yes.
3  Q   And then on the second page of the document, which is
4      a continuation of your email, you say, "As discussed
5      from the beginning, all this is hand wringing prior to
6      anybody reading the book.  The book reveals nothing
7      new except Mark's personal observations."
8  A   This correspondent didn't receive an advanced copy of
9      the book.  He did, by this time, see the press
10     release, and so he's doing a knee jerk reaction to the
11     pre-release without ever reading -- ever breaking
12     the book cover.  And he might have spoken with someone
13     at one of the places where the book was released, but
14     they were still reviewing it.  And I seriously doubt
15     they were telling this guy anything other than the
16     party line which was, you know, until it's reviewed,
17     you know, everything is suspect.
18 Q   Right.
19 A   So Hosenball, he was doing what he's supposed to do as
20     an investigative reporter, trying to dig up some stuff
21     and making news headlines.
22 Q   Sure.  And you said in the next to the last paragraph,
23     "While I'm not anyone's attorney but Mark Owens, my
24     general advice is ignore Mr. Hosenball and neither
25     confirm or deny the author's name."

144

1  A   Yeah, because this guy was wanting to release Matt's
2      name, and it had not been released by the publisher or
3      anyone.  I think what happened is someone from his
4      former unit had talked to somebody at Fox and had
5      slipped his name out that way.
6          By this time, I knew Matt's real name, because
7      that was in connection with forming the double-blind
8      LLC, that he said his attorney in Virginia had formed
9      a company for him, and that's where he was going to
10     send his receipts, his royalties from the book.  And I
11     said, "Well, if you want to maintain anonymity, you've
12     got to make sure that it's done properly.  Can I
13     check?  What's the name of your business?"  And I
14     think he said "Chief Consulting," and it wasn't 20
15     minutes later that I knew his name, his wife's name
16     and where they lived.  And so he agreed to allow us to
17     set up a double-blind LLC for him.
18 Q   And then the last thing you say is, "Once the book is
19     read, all of this will blow over."
20 A   Meaning once the book was published and people read
21     it, they would see there was more in Nick Schmidle's
22     article than there is in that book as far as detail
23     and information goes.  It's just his perspective from
24     an Operator.
25 Q   Let me show you what is marked as Exhibit No. 55.  And

145

1      I will tell you it has number 28 up at the top, and
2      that is my writing that was not on the original
3      document.
4          (Exhibit 55
5          marked for identification.)
6  Q   Do you remember Exhibit No. 55?
7  A   I do, because I think the first sentence captures
8      Elyse Cheney's personality just about as good as you
9      can.  Hyper, over the top, emergency, urgency.  It's
10     the -- I think literally her voicemail was, "We're
11     fighting for our survival" or words to that effect.
12     And it was only a reaction to some news reporter's
13     statement that -- yeah, this Julie Boseman's statement
14     that the Pentagon spokesman said they believed the
15     book violated Department regulations.
16 Q   And that spokesman said it should have been reviewed
17     prior to release?
18 A   I think that's what it says here.  I haven't read it
19     fully.
20         (Exhibit 56
21         marked for identification.)
22 Q   I've handed you an email string marked as Exhibit 56,
23     two-page document.  Second page just has a portion of
24     your address, but there is an email from you where you
25     say, "Did Kevin Maurer deliver the books to JS*C" and

146

1      some other shorthand, and that's dated August 25.  Do
2      you remember sending that email asking if Kevin Maurer
3      had delivered books?
4  A   I don't have any independent recollection of it.
5  Q   And then there is an email reply from Mark at 8:45.
6      Yours is 6:28 a.m., so presumably his is 8:45 a.m.,
7      although it doesn't say so.  And he replies, "Sure
8      did!  They have all received and are reading it at
9      this time.  One book went to CIA.  We're hoping to
10     hear from them at some point today.
11         "I'll keep you posted.  Obviously we are hoping
12     for zero issues and to simply be left alone.  Thanks
13     again for the hard work and help."
14         Do you recall getting that from Mr. Bissonnette?
15 A   I don't have an independent memory of that.
16 Q   And then there's a reply from you to him where you
17     say, "Good call to give the agency a copy."
18         Why did you think it was a good call to give the
19     agency a copy?
20 A   As I sit here, I don't recall why I said that.
21 Q   Then you continue, "I am pretty confident that once
22     they read it everyone will calm down.  I still think
23     it's a good call for us not to have submitted the book
24     to them.  They probably would have told you none of it
25     was classified."

Kevin Podlaski - November 17, 2016

147

1      And then there's an email above that,
2  "Correction: probably would have told you all of it
3  was classified and then if you wanted to publish it
4  could be a bigger pot of trouble."
5      Did you send those emails to your client,
6  Mr. Bissonnette?
7  A   Yeah, I don't have an independent recollection of it,
8  but that's what the document says.
9  Q   And on August the 25, was it still your opinion that
10  it was a good call not to have submitted the book to
11  them?
12  A   That's what the document says.
13  Q   I know.  I'm asking if that accurately described your
14  state of mind on that occasion.
15  A   As I sit here, I don't have any independent
16  recollection of that.
17           (Exhibit 57
18           marked for identification.)
19  Q   Exhibit 57 is a copy of a couple of emails, but the
20  one I want to talk to you about is on the first page.
21  It's an email from you to Mark Owen, dated August 26,
22  2012 at 9:35 p.m.  And it says -- and no one else is
23  copied on this but Mark.  It says, "You should say you
24  understood the CINA to prohibit your release of
25  classified or classifiable information including

148

1  tactics, techniques, and procedures."
2      And then it goes on and it says -- I assume you
3  were continuing.  He should say, "The manuscript was
4  vetted by a special operations attorney with over 20
5  years of active duty service.  He has previously
6  assisted other former military special operations
7  authors in vetting their manuscripts.  You understood
8  your duty, understood the CINA and the limits of
9  advance allowed, and took that duty as seriously as
10  you took any mission.  You would never print or say
11  anything to compromise the security of the US or the
12  safety of the men you served with."
13      Do you recall telling Mr. Bissonnette those were
14  things he should say?
15  A   Yeah, you kind of paraphrased it; but, yeah, I
16  recall --
17  Q   I did.
18  A   -- that suggestion.  I think it was in reaction to
19  people wanting some type of press release or wanting
20  him to say something.
21           (Exhibit 58
22           marked for identification.)
23  Q   August 26, 2012, a series of emails marked as Exhibit
24  58 in front of you.  There's an email from you to Mr.
25  Owen, "Can we talk now for two mikes?"

149

1      What is "two mikes"?
2  A   Two minutes.  It's military.
3  Q   Okay.
4  A   Yeah, this appears to be most of the same as 57 with
5  the --
6  Q   Right.
7  A   -- exception of my email at the top.
8           (Exhibit 59
9           marked for identification.)
10  Q   Do you recognize Exhibit 59 as an email from you to
11  Diana Bauer with the Subject of "Mark Owen" and the
12  Importance of "High"?
13  A   I don't remember this particular email, but I do
14  remember asking Diana Bauer to provide some research
15  for me.
16  Q   Do you remember asking her to do that on or around
17  August 27 of 2012?
18  A   Yeah.  I can't be sure of the date, but apparently
19  that's what it was.
20  Q   And the request is to research whether a retired
21  military person has to send documents he intends to
22  publish to be first reviewed by anyone in the
23  Government, correct?
24  A   Yeah, that's what it says.
25  Q   By this time, August 27th, the book had been written

150

1  and fully vetted by you, correct?
2  A   That's right.
3  Q   And, in fact, had been printed and copies distributed?
4  A   Advance copies, yes, sir.
5  Q   Why were you at this date, after the book has already
6  printed, asking for research on whether a retired
7  military person needs to have a book reviewed prior to
8  publication?
9  A   Yeah, as I sit here, what I recall is Cheney
10  mentioning or saying something that he was retired,
11  and I was thinking to myself, "Wait a minute.  That's
12  not what I understood the whole time."  And I think
13  there's a series of emails later about me asking
14  specifically, "What is your military status?"  Because
15  I think Cheney was saying he's retired.  She kept
16  saying he's retired.  And then I realized after this
17  that she just indiscriminately meant retired versus
18  separated versus out of the military.  She didn't
19  know.
20  Q   So did you think she did?
21  A   Did I think she did what?
22  Q   Know.
23  A   I thought she was just generally confused and
24  didn't -- getting bogged down with details.
25  Q   And you wouldn't have relied upon Ms. Cheney to

Kevin Podlaski - November 17, 2016

## 151

1  accurately describe for you Mr. Bissonnette's status
2  with the military, would you?
3  A  No.
4  Q  So again --
5  A  But she did cause some concern for me, and that --
6  Q  That I accept.  But my question again is this could --
7  one could say this is research that should have been
8  done before the advice about whether he was required
9  to submit to a pre-publication review, and it's being
10  done after the book is already printed.
11  A  That's if you didn't know what his status was.  But
12  she brought this up in August, that he was retired, in
13  some cryptic way, and I wanted to cover all the bases.
14  It had nothing to do with my understanding prior to
15  that date.  This is really the first time that I
16  became aware that she was using that terminology, from
17  what I remember.
18         (Exhibit 60
19         marked for identification.)
20  Q  Let me show you Exhibit 60, which is a series of
21  emails, and let's start on the last page of the
22  document and come forward.
23        There's an email, on which you are not copied,
24  from Italie Hillel to Christine Ball that says,
25  "Christine, we're running story on Defense Department

## 152

1  checking book.  Do you guys have comment?"
2        And then the next one is from Ms. Hillel to
3  Christine Ball, "We ran the following this afternoon."
4        And then there is a reference to the story that
5  the AP ran.
6        And then in the middle of that second page, there
7  is an email from Ms. Cheney to Mr. Owen and to you,
8  dated August 27, 3:54 p.m.; do you see that one?
9  A  I'm sorry.  Tell me the date/time group again?
10  Q  August 27, 3:54 p.m., middle of the page.
11  A  All right.
12  Q  Find that?
13  A  Yes, from Cheney?
14  Q  Yes, and do you see that you were one of the
15  recipients of that?
16  A  Yes.
17  Q  And then she says, "See, why can't we give them the
18  actual information so they get it right -- which is
19  that he had an obligation not to publish classified
20  info, but no obligation to go through the vetting
21  process, as he says in point four.  I mean, can't we
22  agree that on background?"
23        And then you replied to that about -- what is it,
24  about 10 minutes later, to Ms. Cheney only, where you
25  say,  "Mark is not in Reserves, right?"

## 153

1        Do you see that?
2  A  Yes.
3  Q  Do you recall asking her whether Mark was in the
4  Reserves?
5  A  Yeah, I wanted to make sure again, since she had sent
6  me off on -- about the retired thing, I wanted to make
7  sure he was not in the Reserves.
8  Q  Is there some reason you did not know whether he was
9  in Reserves as of August 27?
10  A  He never gave me the DD Form 214 that he told me he
11  was going to give me.  He never gave me any of the
12  discharge paperwork; so at that point, I didn't know
13  what his status was.  I started to get a little
14  concerned that he had some Reserve obligation; because
15  if he had a Reserve obligation, then he would fall
16  under the regulations for -- the active duty
17  regulations -- excuse me.  You have to look at the DoD
18  directive, but in there there's an applicability
19  paragraph that says whether or not this regulation
20  pertains to Reserve and National Guard, and likely he
21  would have had some further obligation to submit if he
22  was in the Reserves.
23        And that's why I was asking the question, because
24  Ms. Cheney said a couple of things, and I just wanted
25  to make sure he was not in the Reserves at that point.

## 154

1  Q  Because you didn't know what his actual status was?
2  A  Well, my understanding was that he was off of active
3  duty as of February 1st, 2012, but never got the
4  documents from him and he never provided them to me,
5  so --
6  Q  And without knowing whether he was in the Reserves or
7  not, you advised him he had no pre-publication review
8  obligation?
9  A  Yeah, I don't like your question, because it doesn't
10  fairly encompass the context.
11  Q  Did you know he was not in the Reserves?
12  A  I strongly believed he was not, based on my previous
13  conversations with him; but as I said, he failed to
14  give me the discharge certificate, so I wasn't 100
15  percent sure.
16  Q  And not being 100 percent sure, you advised him he had
17  no pre-publication review obligation?
18        MR. FURMAN:  Objection.
19  A  No, that's not the only reason.
20        MR. FURMAN:  I think it's mischaracterizing the
21  testimony.
22        But you can answer.
23  A  That's not the only reason.
24  Q  I know it's not the only reason, but is it accurate
25  that, number one, you didn't know if he was in the

Kevin Podlaski - November 17, 2016

## 155

1    Reserves; and not knowing, you advised him he had no
2    pre-publication review obligation?
3    A   Not when you put it that way.  You're wrong.  So I
4    already answered your question.
5    Q   On the first page of the document, August 27 at 4:16
6    p.m., you have an email to Ms. Cheney that says at the
7    end of the first paragraph, "If Mark was still in the
8    Reserves it may be a different story if the book
9    contained classified, but it does not.  So, in any
10   event no worries."  Correct?
11   A   That's what it says.
12   Q   And then you say, next paragraph, one sentence, "Mark
13   just texted me back and said he is not in Reserve."
14   Is that when you learned for the first time that Mark
15   was not in the Reserves?
16   A   That's when Mark confirmed he was not in the Reserves.
17   That's not the first time, because, like I said,
18   before that time, my belief was he was not in the
19   Reserves based on our previous conversations.
20   Q   Is it true that your email to Ms. Cheney on page 2
21   where you say, "Mark is NOT in the Reserves, right?"
22   is the first place -- is the first time you attempted
23   to confirm your belief that he was not in the
24   Reserves?
25   A   No.  I previously had done that with Mark when I had a

## 156

1    discussion with him in January about his military
2    status.
3    Q   So in January, you believed he was not going to be in
4    the Reserves after he exited active duty?
5    A   That's correct.  I was under the impression that as of
6    February 1st, he was done, he was separated.  Because
7    I explained to him the different requirements based
8    upon the military status or lack thereof.
9    But Ms. Cheney's uber-excitement and over
10   dramatizations just raised these issues up.
11   MR. JOHNSTON:  Object to the last sentence as
12   nonresponsive.
13   (Exhibit 61
14   marked for identification.)
15   Q   Do you have Exhibit 61?
16   A   I do.
17   Q   The first page of this document appears to be -- it's
18   only the first page I'm concerned with, I'll tell
19   you -- appears to be an email from Christine Ball to
20   you and others, Subject:  Resending DRAFT STATEMENT,
21   dated August 27.
22   Do you recall receiving this email?
23   A   I don't have any independent recollection of this.
24   Q   The email that is resent says in the first paragraph,
25   "Peter and I have spoken since our call and we really

## 157

1    do think we should give Kevin's name in conjunction
2    with this."
3    Were you in agreement with them giving your name
4    out?
5    A   I don't have any independent recollection of this
6    email.
7    Q   Second paragraph, "The premise for any potential
8    concern of Government agencies over the book is the
9    supposition that the book contains classified
10   information or any facts that might put any of his
11   fellow personnel in any jeopardy.  The author was very
12   mindful of this when working on the book and we are
13   very confident that we were successful.
14   "As the author" -- let me back up.  They are
15   saying, "Can everyone look at the below that Peter
16   drafted, especially Kevin" -- and I think that's Kevin
17   Podlaski, because I don't see Kevin Maurer copied --
18   oh, Kevin Maurer is also copied.  "Especially Kevin
19   and let me know if you think it's okay".
20   And then they say, "The premise is it contains
21   confidential information.  The author was mindful of
22   this.  As the author of No Easy Day was discharged
23   from the military at the time he wrote the manuscript,
24   he was not required or compelled by any US law to
25   submit it to any military or government agency before

## 158

1    publishing."
2    Did you agree with that statement in this
3    proposed statement that Ms. Ball wanted to release?
4    A   As I said, I don't have any independent recollection
5    of this email.
6    Q   As you sit here today, do you agree with it?
7    A   I don't know.
8    (Exhibit 62
9    marked for identification.)
10   Q   I've handed you 62.  The second email on the top page
11   is from Ms. Cheney to a bunch of people, people like
12   Mr. Bissonnette would describe as his team, I guess,
13   but it includes you.  Do you see that there?
14   A   I do.
15   MR. FURMAN:  The top of the email is from Brian
16   Tart.
17   MR. JOHNSTON:  Correct.
18   MR. FURMAN:  Is that what you're referring to?
19   MR. JOHNSTON:  I'm referring to the one below
20   that.
21   MR. FURMAN:  And that's from Elyse Cheney?
22   MR. JOHNSTON:  Correct, in which Mr. Podlaski is
23   one of the recipients.
24   MR. FURMAN:  Okay.
25   Q   And Ms. Cheney says, "Guys, this misinformation has

Kevin Podlaski - November 17, 2016

**159**

1  got to stop.  Mark" parens "and I" closed parens "are
2  really upset about this.  We are sick to death of
3  reading all of this stuff that says he's done
4  something wrong.  Can someone just print the actual
5  policy and stop the madness?  Mark has everyone
6  calling him and his family saying he's going to jail
7  and he has done nothing wrong, which he has not -- and
8  he has done something wrong which he has not done.
9  Can we leak the statement from the lawyer Podlaski?
10  Really this is horrible for Mark because he's being
11  pilloried even in his own community."
12      Do you remember receiving that email from
13  Ms. Cheney?
14  A  I don't.
15  Q  And by the way, let me just ask globally for a minute,
16  Mr. Podlaski.  On these emails where you've said you
17  don't recall receiving them, has there been any of
18  them where you would dispute receiving them, or are
19  you just saying you don't remember one way or the
20  other?
21  A  I don't remember one way or the other, and I don't
22  have any reason to doubt that they were exchanged.  I
23  mean, they were part of discovery.  They must have
24  been part of the record.
25  Q  I understand.

**160**

1  A  I just don't have any independent recollection of it.
2  Q  Thank you.
3      Do you agree with Ms. Cheney's characterization
4  that Mark was being pilloried even in his own
5  community?
6      MR. FURMAN:  Objection.
7  A  I have no idea.
8  Q  So you were not aware of -- do you know what the word
9  "pilloried" means?
10  A  Does it mean burned at the stake?
11  Q  That's close probably.  I think of it as meaning
12  people are saying bad things about you.  If that's
13  what it means --
14  A  Okay.
15  Q  -- would you agree that people were saying bad things
16  about Mr. Bissonnette?
17      MR. FURMAN:  Objection.
18      You can answer.
19  A  I had no knowledge other than what the very dramatic
20  Elaine (sic) Cheney --
21      MR. FURMAN:  You meant to say Elyse Cheney.
22  A  Oh, I'm sorry.  Elyse Cheney was conveying.
23  Q  Okay.  So you didn't have -- you had not personally
24  read anything in the media or on the internet where
25  people were saying bad things about Mark Owen or

**161**

1  Mr. Bissonnette?
2  A  You know, when it first started breaking after the
3  news release, I read a couple.  But then, you know, it
4  was just AP Wire picking up stories from other places
5  and no new information; it was all the same, in my
6  mind, garbage.  Anybody who's commenting, they hadn't
7  even read the book, and they were just commenting on a
8  book being released without review and they thought
9  that was newsworthy.  So I really just stopped
10  engaging on those, except where I was specifically
11  asked to, you know, do something.
12  Q  I'm confident you probably answered my question in
13  there, but let me be sure.
14      Do you agree then that there were people saying
15  bad things about Mr. Bissonnette/Mark Owen at or about
16  this time?
17      MR. FURMAN:  Objection.
18  A  Yeah, I mean to further refine your question, if
19  you're asking me if people were saying he should have
20  released the book and didn't, yeah, there were people
21  saying that.  As far as saying bad things, I don't
22  know.
23  Q  Okay.
24      (Exhibit 63
25      marked for identification.)

**162**

1  Q  Exhibit 63 is an email from you, dated August 27 at
2  5:43 p.m., replying back, and it says, "Again, I would
3  rather not have my name published."
4      Does that refresh your recollection as to whether
5  you wanted your name released as being in support of
6  Mr. Bissonnette's not having done a pre-publication
7  review?
8  A  I recall writing this email.
9  Q  Why did you not want your name to be associated with
10  the advice he had received not to submit to a
11  pre-publication review?
12  A  I think the answer to that question is in the second
13  sentence, which is that the attention should not be
14  shifted into a legal cat fight.
15  Q  Okay.  And it was your opinion that if you came out
16  publicly as an attorney who advised him on this issue,
17  it was your belief it would be shifted into a legal
18  cat fight, to use your words?
19  A  Right.  And moreover, it was not going to be my call.
20  It was going to be Mark's call and the publisher's
21  call.  But they asked me whether I -- what I thought
22  about it, and that's what my opinion was at the time
23  apparently, is that you want it to be about the book
24  and the book sales, not about the legal cat fight.
25  Q  And then the last sentence you say that you would add,

Kevin Podlaski - November 17, 2016

163

1    "Because the book contained no classified
2    information."  Is it a true statement that on the date
3    of this email, it continued to be your opinion that
4    the book contained no classified information?
5    A   Yes.
6    Q   And subject only to the small or minor issues that
7    Mr. Bissonnette talked about, that continues to be
8    your belief today?
9    A   Asked and answered.
10   Q   Agreed.  Sustained.
11           (Exhibit 64
12           marked for identification.)
13   Q   This is a continuation of the email string that is
14   marked as -- I'm sorry.  Let me rephrase.
15       Exhibit 64 is a continuation of the email string
16   that was marked as 63, where you said you would rather
17   not have your name published.  If you look on page 2,
18   above your email is a reply from Ben Sevier where he
19   says, "Our attorneys are not comfortable with us
20   issuing any statement regarding legal issues without
21   their approval, and they need time to consider and
22   approve the release.  Kevin Podlaski, in the interest
23   of making that happen as soon as possible, I'd like to
24   get you on the phone with Alex Gigante, our in-house
25   counsel with whom you have spoken in the past, and two

164

1    attorneys with whom he is working with."
2       Did that phone call take place?
3    A   Yes.
4    Q   Okay.  There's a reply from you, "Okay Ben.  I'll be
5    on the road tomorrow.  Call my cell," and you give the
6    cell phone, correct?
7    A   Correct.
8    Q   And then there's a reply from Mr. Sevier to you that
9    starts on page 1 and goes on to page 2, talking about
10   who you'll be talking with, and it says, "They've
11   joined our team late, so need background.  I've shared
12   your email yesterday giving them a baseline."
13       And then above that there's an email from you
14   following the phone call, correct?
15   A   Correct.
16   Q   Where you say, "I spoke with Dean and Susan.  I
17   understand they've written a mutually agreeable public
18   statement.  If possible, I would like a copy of it."
19       And then the rest of it, of the email on page 1, is
20   from Mr. Sevier to you, "Here's what we shared.  The
21   story is live on NYT."
22       Is that New York Times?
23   A   I have no idea.
24   Q   Okay.  "Right now."  And then there is the statement
25   that they proposed releasing, correct?

165

1    A   Um-hum.
2    Q   Did you voice any objection or propose any
3    modifications to the statement after receipt of this
4    email?
5    A   I'm sorry.  I don't recall.
6    Q   Just so you appreciate my concern for your time, I
7    want you to know I've not marked an email from
8    Ms. Cheney to you that consists of "WTF".
9    A   With three exclamation points behind it?
10   Q   I didn't notice, but maybe.
11   A   That does capture the essence of her personality.
12           (Exhibit 65
13           marked for identification.)
14   Q   Mr. Podlaski, I've handed you what I've marked as
15   Exhibit 65, which is a three-page document.  If we go
16   back to the second page, there is at the bottom of the
17   second page an email from you to Mr. Podlaski where
18   you said, "Mark, Elyse sent me the article by Justin
19   Fishel."  And there's the reference to, "As you
20   predicted, SOCOM 3 ft hover."  What does a "3 ft
21   hover" mean?
22   A   It means that people are so excited that they, you
23   know, lift themselves off the ground and put their
24   hands over their head and scream.  So it's just a
25   figure of speech, of course.

166

1    Q   Okay.  And then you say to him, "As you also
2    predicted, once the book is out and they read it,
3    everyone will calm down."
4       And then you quote Tom Petty, correct?
5    A   That's correct.
6    Q   And then he replies, "Thanks brother.  Appreciate all
7    the help."
8       And then the next email is another one from you
9    where you report, "In a three way phone call with
10   Elyse, me, and Kevin Maurer 50 minutes ago, Maurer
11   said he gave my name to USSOCOM."
12       And then you say, "Number 1, if I talk to them
13   they will have to call me.  I'm not calling them.
14   "2, if they call I'm only going to say I vetted
15   the manuscript.  Minimal changes were required.  That
16   is, there was no mention of sensitive matters."
17       And that's what you were prepared to say if SOCOM
18   called you, correct?
19   A   Correct.
20   Q   And did they call?
21   A   They never called.
22   Q   And then above that is an email from you to Mr. Owen?
23   A   Yeah.
24   Q   It's another one where it's an email from you to you
25   with a copy to him, presumably so you could preserve

Kevin Podlaski - November 17, 2016

## 167

1    it for yourself somehow.  But you say, "Need to know
2    whether op Neptune was a compartmentalized operation.
3    If so, did you sign a sensitive compartmented
4    information non-disclosure agreement before that op?"
5         Why are you asking him on August the 28th whether
6    Operation Neptune Spear was a compartmented operation?
7  A  Once again, Elizabeth Cheney -- excuse me, Elyse
8    Cheney -- I've called her everything but her real name
9    now.  Elyse Cheney was just freaking out, and I just
10   wanted to nail down all the possibilities one more
11   time once -- and I think something in -- it wasn't
12   Hosenball, but it was a guy from -- another National
13   Security Correspondent made mention of the sensitive
14   nature of the compartment -- excuse me -- of the
15   operation, and that just -- wanted to make sure one
16   more time with Mark that there was -- that he had not
17   signed any document and it was not SAP.
18        Don't forget now, we just had advanced copies put
19   out, and so the people who you would give to the
20   Office of Security and Policy Review, they would send
21   it to these people anyway, and here they've got copies
22   of the book.  So before the national release, these
23   people have a copy of these books.
24        So, effectively there was a vetting done by these
25   people before it was made national and released

## 168

1    nationally, but, you know, this would represent the
2    last clear chance to put the brakes on and submit the
3    book, had Mark said, "Yeah, it was an SEI Special
4    Access mission."  And at that point I would have said,
5    "Whoa, we need to submit the book formally."  Even
6    though everybody who would have gotten the book
7    already got the book, you still have to check that
8    block and do it their way.  But I don't even know if
9    he ever answered this.
10  Q  Let me show you Exhibit 66.
11        (Exhibit 66
12        marked for identification.)
13  Q  In the middle of the first page of this is an email
14   from you to Mr. Bissonnette and then a reply from him,
15   and then another reply from him, correct?
16  A  Let's see.  It appears that there is at least two,
17   maybe three, emails in here.  I think there's three
18   emails in here.
19  Q  Correct.  So the first one in time --
20  A  There's four, yeah.  Go ahead.  I'm sorry.
21  Q  That's okay.  The first one in time from you, August
22   29, 2012 at 10:25 a.m., you wrote him and asked
23   whether he was going to make a movie from the book,
24   correct?
25  A  Um-hum.

## 169

1  Q  And indicated a desire to help him if he was?
2  A  Right.  That's because I came across this -- you can
3    see the hyperlink in there, that Spielberg talks to
4    ex-Navy SEAL, and that indicated that he was in talks
5    with Spielberg about releasing the movie -- or making
6    a movie from his book.
7  Q  So is this hyperlink on Spielberg is Spielberg talks
8    to Matthew Bissonnette?
9  A  I don't know if it said Matthew Bissonnette.  I don't
10   recall.  It just said a Navy SEAL.
11  Q  Okay.  And you assumed it was him?
12  A  Yeah, that's what I did.  And then he responded, "Not
13   selling!"  And then he kind of put that to rest with
14   "SS" -- whoever that is, I don't know who that is --
15   "should have put out a statement saying that was false
16   as well."
17        MR. JOHNSTON:  Okay.  Let's take a 5 or 10-minute
18   break and let me organize the rest of these documents
19   and see how fast we can go through them.
20        THE WITNESS:  Yes, sir.
21        (Recess)
22        (Exhibit 67
23        marked for identification.)
24  BY MR. JOHNSTON:
25  Q  Mr. Podlaski, I've handed you what's marked as Exhibit

## 170

1    67, which appears to be an email exchange between you
2    and Mr. Bissonnette, dated August 30, concerning the
3    60 Minutes interview.  Do you remember this exchange?
4  A  I don't have any independent recollection of it.  I'm
5    sorry.
6  Q  Do you remember being involved in the discussion of
7    the 60 Minutes interview on the "No Easy Day"?
8  A  You know, I think there was something circulated about
9    it, but I really can't recall how much.
10        (Exhibit 68
11        marked for identification.)
12  Q  Let me show you what's marked as Exhibit 68, another
13   email exchange, dated August 30.  And if you go back
14   to the next to the last page, there's an email from
15   Christine Ball saying, "The AP article just ran."
16        And then Mark Fabiani replied, saying, "Awesome
17   read!!!  Perfect.  Great work."
18        And then another one from Elyse Cheney -- well,
19   Mr. Ragone has one, "Great work on all."
20        And then Elyse Cheney, "Guys, how can we get Joby
21   Warrick's article in which he said Mike had no
22   obligation to send the manuscript to DoD out there in
23   a big way?  Joby is highly respected journalist."
24        And then Mark Fabiani replies, "We're getting
25   serious push back from Government.  They all say, at

Kevin Podlaski - November 17, 2016

171

1   least according to Hosenball, that Mark had signed a
2   contract that obligated him to do pre-clear even after
3   retired."
4        And then there's an Elyse Cheney email to you.
5   "Kevin, can you chime in here? Fabiani, do you think
6   we should deploy Kevin P on background so he can quote
7   our argument?"
8        Mark Fabiani, "I think the story has moved past
9   the pre-clearance issue at this point so it might not
10  make sense."
11       Do you remember getting -- being involved in this
12  string of emails discussing this?
13  A   I don't have any independent recollection of it.
14  Q   Okay. Then on August 30th, page 1, there's an email
15  from you, replying to the group. "If you want to
16  respond to Hosenball I recommend only asking him what
17  is the authority for his position. That is,
18  specifically; what Govt form, statute, Executive
19  Order, or regulation is he referring when he claims
20  author signed a contract obligating him to pre-clear."
21       Do you remember advising the group that if they
22  were going to respond, it should be limited to that
23  type of response?
24  A   No, but this "even after retired," that language
25  apparently was to Hosenball. Maybe that was why Elyse

172

1   Cheney was talking to me about retired things; I don't
2   know. But in any event, no, I don't have an
3   independent recollection of any of this, except I knew
4   that Hosenball -- I felt he was a blind rhinoceros
5   running around trying to trample people.
6   Q   Let me ask you the question that you proposed they ask
7   Hosenball with regard to your conclusion that there
8   was no obligation to do a pre-publication review of
9   the book. What is the authority in the form of
10  statute or Executive Order or DoD regulation on which
11  you relied to reach the conclusion that there was no
12  pre-publication review obligation?
13  A   We've addressed this several times.
14  Q   Yeah, and let me modify my question, because we've
15  talked about the factual stuff, and I don't -- you
16  don't need to tell me factually, "Mark said this, I
17  heard that."
18  A   Okay.
19  Q   Et cetera. Is there any legal research that you did
20  prior to advising Mr. Bissonnette that he did not have
21  a pre-publication review obligation?
22  A   Well, first off, you're coming to that conclusion, and
23  I'm not going to necessarily adopt your conclusion
24  that I advised him he didn't have to have a
25  pre-publication review. I told him what the options

173

1   were, based on what I have said previously, based on
2   my experience, based on my review of Standard Form
3   312, based on my review of DD Form 1847-1, which he
4   said he never signed and didn't recall being briefed
5   on. So, you know, you're trying to turn this thing on
6   its head.
7        But my thing to Hosenball was, "Hey, you tell me,
8   Mr. Hosenball, why you think he had an obligation."
9   And if he would have said he signed a DD Form 1847-1
10  in connection with Operation Neptune Spear, I would
11  have said, "Show me."
12       And if he would have showed me, then I would have
13  said, "By golly, you're right."
14       If he would have shown me that he was still on
15  active duty then, I would have said "that DoD
16  regulation applies and, therefore, you're right, when
17  he wrote the book or had it in some form prior to
18  being released from active duty -- had it in some
19  written form prior to being released from active
20  duty."
21  Q   And I get it. I don't care about Mr. Hosenball at
22  all. My question was, did you do any legal research
23  prior to your advice to Mr. Bissonnette with regard to
24  whether he had a pre-publication review obligation?
25  A   Yes.

174

1   Q   And is that reflected in legal memoranda or copies of
2   cases or anything? Because I have not seen anything
3   out of your file before the August 27 request for a
4   memo that we marked earlier.
5   A   Right, and as I said to you previously, I spoke with
6   Mark Owen and --
7   Q   Not legal research. I'm only asking about legal
8   research.
9   A   Do you want me to answer your question or not? I'm
10  trying to answer your question.
11  Q   If it's legal research, I want to hear about it. You
12  don't have to repeat what you've told me before.
13  A   Well, with everything that I've said as precedence,
14  let me tell you that the legal research I did I have
15  done in previous matters and in connection with
16  Mr. Bissonnette's book. Is there a writing to that
17  effect? No.
18  Q   Okay. Are you telling me that in connection with your
19  advice to Mr. Bissonnette and your analysis of his
20  situation, you relied on legal research you had done
21  for other authors on other occasions?
22  A   I will say that I relied on legal research I had done
23  previously.
24  Q   Okay. Did you do any research specifically on his
25  situation?

Kevin Podlaski - November 17, 2016

---

175

1      MR. FURMAN:  When you say "research," I'm not
2    sure if I understand what you mean.
3  Q    Legal research.
4  A    What do you mean by "his situation"?
5  Q    I mean from -- I'll give you a time frame.  From
6    January 1, 2012 to the end of February 2012, did you
7    do any legal research with regard to Mr. Bissonnette's
8    need to know whether he had a pre-publication review?
9  A    What legal research are you referring to?
10  Q    Respectfully, sir, you're a lawyer.  You know what
11    legal research is, looking at statutes, looking at
12    cases, looking at regulations, Westlaw searches,
13    asking associates to do it for you, anything like
14    that.
15      MR. FURMAN:  Does that also include drawing upon
16    your own experience?
17  Q    I just said from January 1 to February 30.  No, it
18    doesn't include things you knew before January 1.  Did
19    you do anything new from January 1 to the end of
20    February -- not 30 -- in connection with the retention
21    by Mr. Bissonnette?
22  A    Yes.  I believe that I printed out Standard Form 312
23    and I printed out DD Form 1847-1, reviewed them and
24    discussed them with Mr. Bissonnette.
25  Q    Okay.  Anything else?

---

176

1  A    No, not that I can recall.
2  Q    Let me show you what's marked as Exhibit -- do you
3    have 68 in front of you still?
4      MR. FURMAN:  We do.
5  Q    I'm going too fast here.  On page 1 at the middle --
6    well, towards the bottom of the page, there's an email
7    from you dated August 30.  Do you see that, where you
8    say, "I recommend the questions to Mr. Hosenball," the
9    one we just talked about?
10      MR. FURMAN:  It's dated August 30th at 6:49 a.m.?
11      MR. JOHNSTON:  Correct.
12  A    Okay.
13  Q    And then above that, there is a reply by Mr. Fabiani,
14    saying, "He's claiming for what it's worth his
15    Government sources tell him" blah, blah, blah.  And
16    then above that is another email from you, dated
17    August 30 at 7:06 a.m.  Do you see that?
18  A    Yes.
19  Q    And then you say, "He is referring to a Non-Disclosure
20    Agreement.  However, importantly, there are several
21    types of Non-Disclosure Agreements published by the
22    government and there are important distinctions in
23    each."
24      And then the next paragraph, "We have every
25    reason to believe that the Non-Disclosure Agreement

---

177

1    signed by the author" -- and then capital letters --
2    "DID NOT require him to first send the book to the
3    Govt for review/vetting UNLESS" -- capital letters --
4    "he thought classified information was contained in
5    the writing.  Since we were and are sure it did
6    not" -- let me stop you there.
7      What do you mean by "sure it did not"?  Does that
8    mean since we are sure and were sure that the book did
9    not contain classified information?
10  A    That's what I think it was referring to, yes.
11  Q    "There was no obligation to let the Govt review it
12    before it was published."
13  A    That's right, and that should be referring to Standard
14    Form 312, because that's the only document that he
15    could recall signing, and he would not let me contact
16    his security officer to get his current security
17    status or his debriefing status.
18  Q    Now, having just read that language, let me ask you,
19    because maybe I paraphrased it wrong earlier.  Are you
20    disputing that you told Mr. Bissonnette there was no
21    obligation to let the Government review the book
22    before it was published?
23  A    I've --
24      MR. FURMAN:  That is asked and answered.
25  A    I mean, read the transcript back for the answer.  You

---

178

1    keep asking me the same question.  I'm not going to
2    change my response.
3  Q    The only reason I'm asking the same question is
4    because I sense you changing your answer.  I asked
5    earlier about what research you did in connection with
6    your advice that there was no obligation to submit to
7    a pre-publication review, and you said, I thought,
8    "Mr. Johnston, respectfully, I'm not going to adopt
9    your version of my advice."  So now I'm reading your
10    words.  "Since we were and are sure it did not, there
11    was no obligation to let the Govt review it before it
12    was published."
13  A    So within the context that I believe this to be a
14    Standard Form 312, and if Mr. Bissonnette -- not "if,"
15    because Mr. Bissonnette told me that that is the only
16    document he signed, the Standard Form 312, and told me
17    he was not on active duty when he wrote it, and told
18    me that he was not told he was being given information
19    from a Special Access Program and told me he did not
20    sign a Special Access Program Non-Disclosure
21    Agreement, then that is an accurate statement.
22  Q    And in the course of your representation, you told him
23    that there was no obligation to let the Government
24    review it before it was published?
25  A    Asked and answered.

---

Kevin Podlaski - November 17, 2016

---

179

1           (Exhibit 69
2           marked for identification.)
3   Q   Exhibit 69 is a couple of emails dated August 30,
4       late, which deal with the Jeh Johnson letter, the
5       bottom one. Ben Sevier is saying that he is putting
6       in a drop box the 9-page fax from DoD, correct?
7   A   That's what it appears to be.
8   Q   And then the next one is from Mr. Bissonnette, saying,
9       "Kevin P, from the looks of the docs, I apparently did
10      sign some sort of SAP program docs."
11          Do you see that one as well?
12  A   Yeah, that's an email we examined previously.
13  Q   Correct. And then there's an email from you up above,
14      dated 11:43 p.m., just before midnight. You email him
15      and say, "In the book you mention 'white robe'.
16      Wasn't that a SAP?"
17          MR. FURMAN:  Is this marked as an exhibit?
18          (Pause)
19  A   That's what it says there.
20  Q   And then he replies, "And I wasn't on deployment in
21      January that I can remember."
22  A   Yeah, I don't have any idea what that means. It
23      doesn't seem to be responsive.
24  Q   It doesn't, but let me ask you this.
25          Is there some reason that on August 30 at some 17

---

180

1       minutes before midnight, you were asking for the first
2       time whether "white robe" was an SAP?
3   A   No. That's your assessment, is for the first time.
4       We had discussions, Mark and I, about that and what it
5       meant, while I was reviewing the manuscript.
6           So my questioning him about that as an SAP was,
7       once again, generated by the hyperbolic response of
8       Ms. Cheney who was freaking out over Hosenball's
9       questioning.
10          So, once again, just trying to nail down issues.
11  Q   When did you discuss "white robe" with
12      Mr. Bissonnette? Is this in one of the phone calls
13      we've already talked about?
14  A   Yeah, this is in a phone call in June after I got the
15      manuscript and read through it for the first time.
16  Q   Is this one of the same phone calls, the two calls
17      we've already talked about in June, or is there
18      another phone call in June?
19  A   No, that's one of the phone calls in June. And I
20      think this is -- gosh, I don't know. This is the
21      30th, so this must have been after the fax receipt of
22      that letter perhaps.
23  Q   It is.
24  A   Yeah.
25  Q   In fact, if you look at the bottom of the page, it's

---

181

1       the transmittal of the fax.
2   A   Oh, that's right, because he's mentioning it here.
3   Q   And you earlier indicated that you didn't know when
4       you got it. That makes it look like you got it before
5       midnight the day it was sent, doesn't it?
6   A   Yeah, apparently so. I thought it was the next day,
7       but I guess I wasn't sleeping when I got it.
8           (Exhibit 70
9           marked for identification.)
10  Q   Do you have Exhibit 70 there in front of you now?
11  A   Yeah.
12  Q   If you go back to the third page, there is an email
13      from Ben Sevier to you, August 30 at 2:49 p.m.,
14      "latest legal reporting". This would apparently be
15      before the Jeh Johnson letter was received. This
16      says, "I wanted to draw your attention to the
17      following media reports. Less than definitive, but
18      certainly interesting."
19          And then he has two cites, and then he says, "In
20      light of the possibility of a lawsuit of either civil
21      or criminal court, do you think we should be doing
22      anything to prepare? Do you still think the
23      possibility is remote?"
24          And then you send him a lengthy reply that begins
25      on page 1, correct?

---

182

1   A   Yes.
2   Q   And among other things you say in your reply, "The
3       book contains NO classified or classifiable
4       information."
5   A   Yeah, that seems to be what my opinion was at the
6       time.
7   Q   And you say, "It's highly unlikely that Operation
8       Neptune was an SCI program."
9   A   Okay. Don't forget now, this is before Jeh Johnson's
10      letter, and this is based upon everything that
11      Mr. Bissonnette had told me, and that he had not
12      signed a form indicating that it was a DD Form 1847-1
13      that it was an SAP.
14          And then also I speak about here how these people
15      who were mentioned here, The President, Panetta and
16      McRaven, they all have classification authority, they
17      have declassification authority. And by virtue of
18      they're speaking about this on international
19      television, it could potentially declassify a Special
20      Access Program to a lesser-classified program. And
21      that is certainly a defense that was available to
22      Mr. Bissonnette and Mr. Luskin when they were dealing
23      with the Government, the fact that these gentlemen had
24      already declassified it. And if it's not a Special
25      Access Program, then there may not be an obligation to

---

**183**

1    submit it.  Moreover, you have to have an 1847-1
2    signed for the compartmented program that you're
3    working on.  Or you should have.
4    Q   On page 1 of your email and going over to page 2,
5        looking at the Paragraph 2a, you say, "As I told your
6        retained counsel, the only way the book had to be
7        first reviewed was if Operation Neptune had been
8        designated as an SCIA, Sensitive Compartmented
9        Program"--
10   A   No, "Information or a Special Access Program".
11   Q   "Information", thank you.  "Or Special Access
12       Program."  Do you still stand by that statement?
13   A   Well, that statement demands a full explanation, once
14       again, of all of the things that we've already
15       discussed in this matter.  There's no -- the facts on
16       the table are there is no 1847-1 and there's no
17       affidavit linking Operation Neptune Spear to --
18   Q   I'm going to object as non-responsive.  I apologize
19       for interrupting.
20           MR. FURMAN:  No, no.  It's not nonresponsive.
21           MR. JOHNSTON:  I'm asking a yes or no question.
22       I only have two hours left, and I don't want to listen
23       to a lengthy paragraph when I have asked a yes or no
24       question.  I object as non-responsive.  He can say
25       "yes", "no", or "I can't answer".  But the question

**184**

1        asks for "yes" or "no".
2    Q   Do you stand by that statement?
3           MR. FURMAN:  And the only way that Mr. Podlaski
4        can answer that question is by giving you the answer
5        based on his present knowledge.
6           MR. JOHNSTON:  He can say, "Yes, I do"; "no, I
7        don't."
8           MR. FURMAN:  With all respect, I don't think he
9        can do that.  But let's just --
10          MR. JOHNSTON:  I have a finite amount of time.
11       I've asked a simple question.
12   Q   Do you stand by the statement you type, "The only way
13       the book had to be first reviewed by the govt was if
14       Operation Neptune Spear had been designated as a
15       Sensitive Compartmented Information Program or Special
16       Access Program"?
17           Do you agree with that statement?
18   A   I would -- it's not complete.
19   Q   The next sentence says, "All indications are that Op
20       Neptune was NOT an SCI Program -- at least at the
21       operator's level."
22           Do you agree with that statement today?
23           Let me rephrase that.
24           Do you agree that the all indications that you
25       had available to you on August 30, 2012 were that it

**185**

1        was not an SC Program at the operator level?
2    A   As of 4:01 p.m., yes.
3    Q   Okay.  And do you have that -- do you agree that that
4        is true today with the additional knowledge you have
5        acquired since then?
6    A   I -- once again, I have to refer you to what the known
7        facts are.  So that would be an opinion of mine.  And
8        the only opinion that counts is the Government's
9        opinion.
10   Q   Continuing on down to the middle of that second page
11       at subparagraph e.  Do you see that?
12   A   Yes.
13   Q   And you say, "It is highly unlikely" -- with "highly
14       unlikely" underlined -- "that Operation Neptune was an
15       SCI program."
16           And then there's a sentence that follows that.
17       My question is, the sentence that follows it, is that
18       the basis for your statement, "It's unlikely that
19       Operation Neptune was an SCI program?  For example,
20       the President, Panetta and McRaven all talked about
21       it.  That's an indication that it wasn't.  Boale and
22       Bigelow were given access."
23   A   No, sir, those are examples after that first sentence.
24   Q   Okay.  All right.
25   A   Or examples of why it's unlikely; that and also

**186**

1        everything to do with what Mr. Bissonnette told me.
2    Q   And then in Paragraph 3(a), last sentence, you say,
3        "Because the author was retired at the time he wrote
4        the manuscript" --
5    A   Where is that?  3(a)?
6    Q   3(a).
7    A   I thought it was -- 3(a) says "discharged" and then
8        down at the bottom -- yeah, I think that was a
9        mistyped.
10   Q   So you're calling him "retired" as well, aren't you?
11   A   I think that was a mistype, that's all it was.
12   Q   So you were critical of Ms. Cheney saying he was
13       retired and then you did the same thing?
14   A   Well, Ms. Cheney did it multiple times.  I just did it
15       once there.  But the first sentence says he was
16       discharged after 12 years.  You can't be discharged
17       after 12 years unless you're medically retired.
18           So I admit I made a typographical error.
19   Q   And then on the last page of the document, back to
20       the -- the full paragraph is not indented into the
21       sub-paragraph.  You say, "Bottom line:  There is
22       nothing classified in the book and Operation Neptune
23       was simply not an SCI SAP -- at least at the
24       operator's level.  The book reveals nothing new except
25       Mark's personal observations."  Correct?

Kevin Podlaski - November 17, 2016

187

1   A   That's what it says.
2   Q   Did you ever send Mr. Bissonnette an email or letter
3       that disagreed or departed from those conclusions,
4       nothing classified, Operation Neptune was not an SCI
5       or an SAP?
6   A   I don't believe so. I don't recall, but I don't think
7       so.
8   Q   If you had changed your mind about that, would you
9       think it appropriate to tell him?
10  A   I think I would have a duty to tell him.
11  Q   And you have not told him?
12  A   I am no longer retained by Mr. Bissonnette.
13  Q   I'm sorry?
14  A   I'm no longer retained by Mr. Bissonnette.
15  Q   So during the time you were representing him and had
16      that duty, you never told him?
17  A   I think I already said that, yes.
18  Q   Thank you.
19          (Exhibit 71
20          marked for identification)
21  Q   Do you have Exhibit 71?
22  A   Yes.
23  Q   At the bottom of Exhibit 71, on the page 1, is an
24      email from Mr. Bissonnette to you and Ms. Cheney and
25      Mr. Luskin dated, August 31 at 10 a.m., the day after

188

1       the Jeh Johnson letter was received, correct?
2   A   Yeah, that's what it appears to be, yes.
3   Q   When you -- did you get this email?
4   A   Yeah, I recall getting this email.
5   Q   Where it says, "I'd love to get the Mark Owen team
6       together really quick and talk"?
7   A   Yeah.
8   Q   Was this the first time you had heard the name of
9       Mr. Luskin?
10  A   I don't -- I don't recall, as I sit here. I thought
11      it was on the 30th that I heard Luskin's name, that he
12      was hired and that this was going to occur the next
13      day. As a matter of fact, I think he called me on the
14      30th, saying he was just hired.
15  Q   Is that -- is it your testimony that he called you on
16      the 30th and that's when he told you, "Don't talk to
17      my client anymore"?
18  A   I'm pretty sure it was the 30th, yeah. That's what I
19      remember.
20  Q   To be more accurate and fair to you, what you said
21      was, "Don't talk to my client unless I'm there," or
22      something like that?
23  A   "Unless I'm present," yeah.
24  Q   Okay. There is an email from you, replying to
25      Mr. Luskin, saying, "Bob, if there is anything else

189

1       you need just give me a call or shoot me an email."
2       Correct?
3   A   Yeah.
4   Q   And then he replies, "Kevin, here's a draft. I'd like
5       you to take a look before it's circulated to the
6       larger group."
7           Do you know why he wanted you to look at it
8       before it was circulated to the larger group?
9   A   I have no idea.
10  Q   Would that be evidence to you that he was relying on
11      you in some fashion?
12  A   I don't know what he thought.
13  Q   Is it your contention in this lawsuit that he should
14      not have defended your prior conclusions that there
15      was not a pre-publication review obligation?
16          MR. FURMAN: Objection.
17  A   I'm sorry?
18          MR. FURMAN: I'm having trouble with the
19      "contention" aspect of your --
20          MR. JOHNSTON: Do you want me to read the email
21      again where he says there's not a pre-publication
22      review obligation sent two days earlier?
23          MR. FURMAN: I'm noting my objection to the form
24      of the question.
25          MR. JOHNSTON: Fine.

190

1   A   In answer to your question, I think that Mr. Luskin
2       had an obligation and a duty to make his own
3       assessment.
4   Q   Are you critical of him for defending your conclusions
5       and recommendations?
6           MR. FURMAN: Objection.
7   A   I'm neither here nor there on that. I'm critical of
8       him not putting up a fight on tendering the royalties.
9   Q   So your criticism of him is the settlement?
10  A   Well, it appears that they laid down instead of
11      defending what Mr. Luskin clearly believed.
12  Q   I understand. And I'm not trying to take that away
13      from you. I understood that from your earlier
14      testimony. That's your criticism of him?
15  A   Yeah.
16  Q   Okay.
17          (Exhibit 72
18          marked for identification.)
19  Q   I'm going to try to go through some of these fast,
20      because there's only small portions of them that I'm
21      interested in.
22      Exhibit 72, the second email from the top is an
23      email -- well, let's go down. The third one is,
24      "Kevin, here's a draft. I'd like you to take a look
25      at it."

Kevin Podlaski - November 17, 2016

191

1     It's a copy of the other one. And then there's
2  your reply, "Bob, I like it. However instead of
3  saying 'by this undertaking'," in quotes, "I recommend
4  saying," in quotes, "by the Non-Disclosure Agreement
5  you have identified," closed quotes.
6     Do you remember making that recommended change to
7  Mr. Luskin?
8  A  I have no independent recollection of it.
9  Q  And then he says, "Good suggestion. I'll incorporate
10  and circulate." Correct?
11  A  That's what he says.
12  Q  And did he make that change?
13  A  I don't recall.
14         (Exhibit 73
15         marked for identification.)
16  Q  There's not much on here I want to talk about. At the
17  top of the page is an email from Mr. Sevier to
18  everyone conceivably on the team, including you,
19  correct?
20     MR. FURMAN: Objection to the reference to the
21  team. That's --
22  Q  Did you have an understanding of what Mr. Bissonnette
23  meant when he said, "I'd like to get a meeting of the
24  team"?
25  A  Yeah, I think that he meant everybody that was

192

1  involved with the book on both -- including myself and
2  publication people, their marketing people as well,
3  which is obvious from here, the head of the team, Bob
4  Luskin.
5  Q  Okay.
6         (Exhibit 74
7         marked for identification.)
8  Q  74 is an email chain, still dated August 31. I want
9  to direct your attention first to the first page. The
10  very middle is an email from Ben Sevier to the team.
11  Do you see that?
12  A  Yeah.
13  Q  And you're one of the members there, you're one of the
14  persons copied on it.
15  A  I see that.
16  Q  And then he says, "The publisher's priority is to get
17  that strong letter out ASAP. I can join a call if we
18  need to discuss, but we have no further updates except
19  to execute the strategy we agreed on this morning."
20     Do you recall a phone call or meeting where there
21  was a strategy agreed upon the morning of August 31?
22  A  As I sit here, I can't recall. I have no independent
23  recollection.
24  Q  Then at the very top there is an email from you to
25  Mr. Luskin and Mr. Owen where you're saying thank you

193

1  for being faxed a copy of the Johnson reply, correct?
2  A  That's what it says, yes.
3         (Exhibit 75
4         marked for identification.)
5  Q  Exhibit 75 is a series of three short emails, the
6  first one August 31 at 7:11 p.m. from you to
7  Ms. Cheney. Do you see that one?
8  A  Yes.
9  Q  You initiated this inquiry to her, correct, as opposed
10  to her initiating it to you?
11  A  Yes.
12  Q  And you said, "Things calm down?"
13  A  I asked the question.
14  Q  And then her reply, "I haven't heard anything which I
15  guess is a good thing," to which you reply, "Good."
16  A  That's what it says.
17  Q  Would that communication be inconsistent with the
18  directions that you indicated you had received from
19  Mr. Luskin about not contacting his client unless he
20  was there?
21  A  Yeah, but this was to Ms. Cheney.
22  Q  I know, and my question was did you consider that his
23  directions to you in the phone call you've testified
24  about -- which I understand he disputes, but I'll
25  leave that to y'all to work out -- that it did not

194

1  include you communicating with Ms. Cheney? You were
2  still free to do that?
3  A  Yeah, that was my understanding. I mean, since she
4  was the voice piece of the emotional concern, just
5  wanted to see if she had calmed down.
6         (Exhibit 76
7         marked for identification.)
8  Q  In Exhibit (sic) 2174, there is a couple of emails
9  relevant to or referencing the reply to Mr. Johnson,
10  and then on page 1 there is an email from Mr. Luskin,
11  of August 31 at 12:04, where he is replying to the
12  earlier email we talked about from Sevier where he
13  says, "I agree there's not much to talk about. The
14  letter is being prepared now. I'll review the final
15  draft and plan to get it on its way w/in the hour."
16     And then you replied to him and only -- well, him
17  and Mr. Owen but not the whole team, and you just
18  asked, "Major changes?"
19  A  Just to correct you, I just reply to him. I don't
20  think there's --
21  Q  Oh, you're correct. I saw "Subject: Mark Owen".
22  That's not a "cc Mark Owen". You replied just to him,
23  lawyer to lawyer, basically saying were there any
24  major changes made to the letter, correct?
25  A  Correct.

54 (Pages 195 to 198)

Kevin Podlaski – November 17, 2016

195

1   Q   And then he says, "Trivial," and it's being prepared
2       in final, correct?
3   A   Correct.
4   Q   So he was keeping you informed along the way of what
5       he was going to do in response to the Jeh Johnson
6       letter?
7   A   Yeah, he was, as well as other persons were including
8       me in the email chain.
9               (Exhibit 77
10              marked for identification.)
11  Q   Exhibit 77 is a couple of emails again, starting with
12      the one from you August 31, 1221 (sic) at 11:57 a.m.;
13      do you see that one?
14  A   Yes.
15  Q   It says, "I wonder if the reason the DoD is pushing
16      this at the direction of the White House could be in
17      response to the comments about the POTUS and the
18      VEEP".
19              Do you remember sending that email with that
20      musing or inquiry in your mind?
21  A   I don't have any independent recollection.
22  Q   Who is that sent to?
23  A   I don't recall.
24  Q   Who replied to it?
25  A   It's kind of difficult to tell from this, but it

196

1       appears that Mark Owen replied.
2   Q   And then what's the top one that's replying to the
3       Mark Owen reply?
4   A   Well, what do you mean?  It looks like a reply to Mark
5       Owen's response.
6   Q   From you?
7   A   Yeah.
8   Q   And it has a reference subject, "Dalton Fury
9       thoughts."
10  A   Oh, okay.  Yeah, I do recall this.  Yeah, I got an
11      email from a client who -- Dalton Fury, who I passed
12      that along.  That was his comments.
13  Q   So if Mr. Luskin had ordered you not to have
14      discussions with Mr. Bissonnette without his
15      participation, you violated those discussions on two
16      occasions in Exhibit 77, didn't you?
17  A   Yeah, but it appears we were just conveying what
18      another author had said.
19  Q   Well, the first one is not conveying what another
20      author was saying, is it?
21  A   Yeah.  "I wonder if the reason" -- that was from --
22      I'm pretty sure that was from Dalton Fury.
23  Q   So he was wondering and you said you were wondering?
24  A   He said he was wondering and I forwarded it.  It's
25      under -- "Dalton Fury thoughts" is the Subject.

197

1   Q   In any event, it is a communication directly to Mr.
2       Owen from you -- his reply directly to you and your
3       reply directly to him about the subject matter of the
4       Government's treatment of "No Easy Day"?
5   A   Well, that's your characterization of it.
6   Q   Do you disagree with that characterization?
7   A   Like I said, it's my conveying to Mark Owen the
8       thoughts of a fellow military author.
9               (Exhibit 78
10              marked for identification.)
11  A   And moreover, it's not really talking about him in
12      particular.  It's talking about what the impetus for
13      the DoD letter is.  So --
14  Q   I've just handed you Exhibit 78, but I don't remember
15      why, so just set it down and we'll move on.
16  A   I think we've all done that at one point or another.
17  Q   Yeah.
18              (Exhibit 79
19              marked for identification.)
20  Q   I've handed you Exhibit 79.  Do you recognize that as
21      an email dated August 30 to Mark Owen from you?
22  A   No.  This is an email from me to me, Subject: Mark
23      Owen.
24  Q   You know you're right again.  I thought you forwarded
25      it to Mark.  You're correct.

198

1   A   No, this is just a note I made to myself.
2   Q   Yep.  You're right.
3               (Exhibit 80
4               marked for identification.)
5   Q   You have Exhibit 80 in front of you?
6   A   I do.
7   Q   Do you recall sending this email to Mr. Owen?
8   A   I have no independent recollection on it.
9   Q   What is the subject line of the email?
10  A   It says, "Attorney client privileges communication and
11      attorney work product."
12  Q   And it's dated September 4 at 9:46 a.m.?
13  A   Right.
14  Q   And it just has the question, "How are you feeling
15      today," correct?
16  A   Yeah.  I just can't see how that can be
17      attorney-client protected but okay.  I don't know.
18      That's what it says.
19  Q   And this is, again, you communicating directly with
20      Mr. Owen after you say Mr. Luskin told you not to talk
21      to Mr. Owen unless he was present?
22  A   Yeah, I think the implication was about the book, but
23      that doesn't seem to be about the book.
24  Q   Why were you concerned about how he felt -- or
25      interested in how he felt on that day?

Kevin Podlaski - November 17, 2016

199

1  A   Just an attorney inquiring with his client after a
2      rather tumultuous few days of media reaction.
3  Q   So the source of your concern with regard to how he
4      felt is the subject of the representation, the trouble
5      the book was in?
6  A   No, not really.  I just wanted to see how he was
7      handling it at a personal level.  I may be an
8      attorney, but I'm not heartless.
9              (Exhibit 81
10             marked for identification.)
11 Q   Do you have Exhibit 81 in front of you?
12 A   I do.
13 Q   The first page of the exhibit at the top is an email
14     from Elyse Cheney to you, dated September 4; do you
15     see that?
16 A   I do.
17 Q   And her directions to you were, "This is confidential
18     correspondence but it really scares me.  Can't share
19     with Dutton.
20         Do you know why she was worried about sharing the
21     attached correspondence with Dutton?
22 A   No, I don't.  I thought it odd that she sent it to me.
23 Q   Why was it odd that she sent it to you?
24 A   Because I didn't know what it is that she was scared
25     of.

200

1              (Exhibit 82
2              marked for identification.)
3  Q   Do you have Exhibit 82?
4  A   I do.
5  Q   At the very bottom is the email you sent on September
6      4, asking Mr. Owen how he was feeling today.  Do you
7      see that?
8  A   Um-hum.
9  Q   And then he responds the next day saying, "Fingers
10     crossed ..... just want the DoD drama to be over."
11     Correct?
12 A   That's what it says.
13 Q   And then you responded to him six minutes later where
14     you say, "I understand.  As we discussed some time
15     ago, I believe this letter was meant to intimidate,
16     but nothing more.  However don't be surprised
17     if NCIS does an investigation and," open quote,
18     "titles", closed quote, "you. I think however that
19     will be the extent of any criminal prosecution."
20         New paragraph, "As far as the civil side goes
21     they may very well try to have the profits for 50.
22     However, the Government still has to be able to prove
23     that the book contains classified information or that
24     you signed a special access program/sensitive
25     apartment information non-disclosure Agreement in

201

1      connection with operation neptune."
2          Do you remember sending that email to him?
3  A   I don't specifically.  I don't have an independent
4      memory of it.
5  Q   And then the last email you correct the typo.  You
6      said, "not for 50.  I meant forfeited".
7  A   Right.  I sent it from my cell phone, and Siri does
8      all sorts of things with your words.
9  Q   Sure.  So here on September 5 there is another
10     communication from you, directly to Mr. Owen, dealing
11     with legal advice with regard to the Government's
12     threats against him, correct?
13 A   I wouldn't necessarily call that legal advice, but it
14     was observations.
15 Q   Legal analysis?
16 A   It was my observations.
17 Q   Would you not call a statement to a client, "I believe
18     this letter was meant to intimidate but likely nothing
19     more" not to be a legal analysis of the situation?
20 A   It was my opinion, yeah.
21 Q   And so you're giving your legal opinion to Mr. Owen
22     after you claim Mr. Luskin prohibited you from having
23     contact with him that he was not a party to?
24 A   Apparently so.
25 Q   So if Mr. Luskin gave you those directions, you

202

1      violated them?
2  A   I guess he should fire me.
3              (Exhibit 83
4              marked for identification.)
5  Q   Do you recognize Exhibit 83 as a memo from Diane Bauer
6      in your office to you?
7  A   I do.
8  Q   And the date on it is September 6, 2012?
9  A   Yep.
10 Q   Is this the memo she sent in response to your request
11     that we marked earlier, for her to do some urgent
12     research on behalf of Mr. Bissonnette?
13 A   Yeah, I don't know if it's in response to that email
14     or not, because I think I had several emails with her,
15     but she did research and write this at my request.
16 Q   Okay.  And sent it to you on September 6, 2012?
17 A   That's what it's dated, yeah.
18 Q   Is it -- since you don't -- well, I don't know if you
19     remember or not.  Is it your recollection that you got
20     this shortly after you requested it?
21 A   I got it within a reasonable period of time
22     afterwards.
23 Q   I think it's actually the same day, but I may be
24     remembering it wrong.  Would that be consistent with
25     your memory, that it was within a day or two of your

Kevin Podlaski - November 17, 2016

203

1   requesting it?
2   A   If it was the same day, that would not be the Diana
3       Bauer that I know. So I think -- she's very thorough,
4       but she's also not the fastest of researchers; so I
5       don't believe it was within 24 hours of me giving her
6       the assignment.
7   Q   Okay.
8   A   And I think this was done at Mr. Luskin's request.
9   Q   Let me show you what I've marked as Exhibit 84.
10          (Exhibit 84
11          marked for identification.)
12  Q   Do you recognize Exhibit 84?
13  A   It looks like it's the same memo, but --
14  Q   Except this time it's from you to the file, isn't it?
15  A   Right.
16  Q   Does it appear to you that you took her research and
17      her memo and put your name on it and then put it in
18      the file?
19  A   I don't know what it appears.
20  Q   Do you have any other explanation for why you would
21      take Diane Bauer's work product and put your name on
22      it and then put it in the file?
23          MR. FURMAN: Objection. It's a law firm's work
24      product. She works for a law firm.
25  A   Right, and moreover you're presuming that I took her

204

1       work. Clearly there's a difference. There must be a
2       difference, because there were things that I didn't
3       like about what she wrote or I did further research
4       on; so yeah, there's differences in it.
5           So in any event, I don't know -- I don't recall
6       as I sit here why that was done, but I think there's
7       differences, and it's probably because I was doing a
8       revision. Since she did the work for me, I felt that
9       I was entitled to do that.
10          (Exhibit 85
11          marked for identification.)
12  Q   Do you have 85 in front of you?
13  A   I do.
14  Q   If you go back three pages, it has attached the Diane
15      Bauer memo that was marked as Exhibit 83, I believe,
16      correct?
17  A   It looks that way.
18  Q   But attached to the front of that is a series of
19      emails between you and her, correct?
20  A   Yeah. I don't -- well, I see that, but I don't know
21      if it's -- I don't see where -- there it is. That's
22      where she attached it to the email exchange. Got it.
23      Yep, I see that.
24  Q   And if you look down at the bottom of the first page,
25      there is a request from you -- an email from you to

205

1       her is dated September 6 at 5:23 -- September 5 at
2       5:23 p.m.
3   A   Yeah.
4   Q   So in point of fact, she got it back to you almost
5       immediately, didn't she?
6   A   She got it back to me, and it looks like she worked
7       through the night to do it. Wow. I take it back what
8       I said about her.
9   Q   Is there any reason why this research was being done
10      after the book had been written and released, as
11      opposed to before?
12  A   Well, if you look at the first email on the very back,
13      there's an email from Mr. Luskin, requesting
14      information about it.
15  Q   Right.
16  A   So --
17  Q   And if that's the only -- let me -- is it your belief
18      that Mr. Luskin requested this research and your law
19      firm provided it?
20  A   He requested the research in that email. He asked me
21      if I was familiar with royalty procedures; and while I
22      was generally, I wanted to have some specifics,
23      because attorneys tend to want to have exact answers
24      to their exact questions, and that's why the email
25      was -- I'm sorry -- that's why the research was done.

206

1       But prior to this, I had, like I said, from my
2       experience understood the forfeiture process, but I
3       knew there was also cases out there -- recent cases
4       where there were -- the Government had taken various
5       positions on forfeitures, and I wanted to see
6       whether -- rather, confirm my memory that the CIA was
7       much harsher with prosecuting both forfeitures
8       criminally than the DoD was. I mean, if you look at
9       the bottom of page 2, I give her a general overview.
10      And then I knew from my previous readings that these
11      cases were at issue. So I asked her to look at those
12      in particular.
13          (Exhibit 86
14          marked for identification.)
15  Q   Let's continue to follow that thread just for a
16      minute. You have Exhibit 86 in front of you?
17  A   Right.
18  Q   And it has at the bottom of page 1 her September 6
19      memo -- email, attaching her memo, correct?
20  A   Yes, that's correct.
21  Q   And then the next day at 7:48 -- I presume a.m. --
22      she -- I'm sorry. At -- skipping one here.
23          September 6 at 4:51 p.m., you replied to her,
24      "Please do continue to look." Correct?
25  A   Right. In answer to her previous email, I'm still

Kevin Podlaski – November 17, 2016

207

1    looking to see if there are any other materials out
2    there to help us.
3  Q  And then she says, "I will.  Was the memo helpful?"
4       And then you reply on September 7, "Do you think
5    I can make these distinctions between our situation
6    and the situations in this case?"
7  A  "In these cases," correct.
8  Q  "In these cases".  And then you list three
9    distinctions, correct?
10 A  It appears so, yeah; first, second, and third.  Yep.
11 Q  And so prior to asking her to do this research, you
12   were not aware of whether you could make these
13   distinctions between Mr. Owen and the results in the
14   case law that were negative to authors?
15 A  Well, I wouldn't say that I was not aware.  I wanted
16   her to confirm my remembrance and experience, and
17   that's what I asked her to do.
18 Q  Was your remembrance and experience that you could
19   make these distinctions?
20 A  Yes.
21 Q  Okay.  And did her continued research confirm that for
22   you?
23 A  You know, I don't recall.  I think she did do further
24   research, but as I sit here, I don't remember what
25   exactly she came up with.

208

1       (Exhibit 87
2       marked for identification.)
3  Q  And then is the top of Exhibit 87 her reply to you,
4    "Those are certainly distinctions to make.  It sounds
5    like we need to confirm exactly what documents he did
6    or did not sign.  I saw an article online today which
7    said that a charitable organization has turned down
8    his offer to donate money to the organization."
9       Did you get that email from her?
10 A  It appears to be so.
11 Q  Did you get any other follow-up that you recall on
12   whether you could make the three distinctions that
13   your memory told you made to the organization?
14 A  As I sit here today, I don't recall.
15      (Exhibit 88
16      marked for identification.)
17 Q  Let me show you Exhibit No. 88, which purports to be a
18   letter from you to the Department of Defense,
19   requesting information under the Freedom of
20   Information Act, dated September 7.
21      Do you recall sending that letter?
22 A  Yeah, I don't know if this one exactly.  This could
23   have been a draft.  I don't know.  I mean, yeah,
24   generally I recall doing this.
25 Q  Okay.  And was it your idea to send Freedom of

209

1    Information Act requests in the hope of strengthening
2    Mr. Bissonnette's position, vis-a-vis, the Government
3    and the publication of "No Easy Day"?
4  A  I think it was my suggestion and Mr. Luskin's
5    direction to do so, yeah.
6       (Exhibit 89
7       marked for identification.)
8  Q  Do you have Exhibit 89, which it purports to be a
9    letter from you from (sic) Susan Cugler, responding to
10   her letter of September 12, denying your Freedom of
11   Information Act request?
12 A  Right and asking for reconsideration, I think.
13      (Exhibit 90
14      presented to the witness.)
15 Q  And then Exhibit 90 is a document -- and I presume it
16   is an email, but I don't have the heading on it.  But
17   it is addressed to Ms. Andorfer (sic) to you,
18   talking -- telling her that you're writing in response
19   to a September 18 phone call concerning your September
20   7 letter and the requirement of agreeing to incur a
21   minimum of 500 in costs, correct?
22 A  Right.  Susan Aldorfer, and she's with the Office of
23   Security Support, but it's resident in the White
24   House.  I mean, that's what's up there.
25 Q  And all of this is done in furtherance of your efforts

210

1    to get information under the Freedom of Information
2    Act that would be of benefit to Mr. Bissonnette?
3  A  At Mr. Luskin's direction.
4       (Exhibit 91
5       marked for identification.)
6  Q  Do you have Exhibit 91 in front of you?
7  A  I do.
8  Q  It is a series of emails, some of them to multiple
9    people, but I'm interested primarily in the ones on
10   the front page.
11      In the middle of the page is a September 8 email
12   from Mr. Owen, talking about how they are reading his
13   version of the story.  Do you see that?
14 A  Um-hum.
15 Q  And then above it is a September 8 email from you,
16   asking, "Was the mission going after Private Burgdahl
17   a special access program operation?"
18 A  Yeah.
19 Q  And then do you know who that was sent to?
20 A  I presume it was sent to Mark Owen, because that's
21   what the header says.
22 Q  And then he replies "Nope."  Correct?
23 A  Right, but it could have been sent to the group,
24   because as you can see, the email chain earlier is
25   all -- yeah, this is kind of funky in that it looks

Kevin Podlaski - November 17, 2016

211

1    like it's being edited or something. I don't know.
2    But at a minimum, it went to him.
3  Q  And if the others weren't copied on it, then once
4    again, this was you communicating with him in
5    violation of the directives that you indicated you
6    received from Mr. Luskin?
7  A  Yeah, after he wrote to me. Apparently so.
8  Q  And why is it that on September 8, after the book is
9    already out, you were asking for the first time
10   whether the mission involving Private Burgdahl was a
11   Special Access Program?
12  A  Well, that's your characterization of it. It was the
13   first time, in fact, we had discussions about all of
14   that information that was in his book.
15  Q  Okay.
16  A  And I was asking him to confirm.
17  Q  That's a fair question. Let me ask this then.
18      Why were you asking him on September 8 whether
19   the mission going after Burgdahl was an SAP Program?
20  A  Because if you read the foregoing email, it talks
21   about one of those issues. The Burgdahl issue was
22   right there in the email from Mark Owen, and I'm just
23   confirming what he told me previously.
24  Q  And when did he tell you previously whether the
25   Burgdahl mission was a SAP Operation?

212

1  A  No, it was not a SAP Operation.
2  Q  Whether it was.
3  A  Oh, okay. When I reviewed the manuscript, we had a
4    telephone conversation at length. So it was either
5    the first or the second telephone conversation. I
6    think it was the first conversation in June, not the
7    second one, because Kevin Maurer was on the line as
8    well; and the second conversation in June was just
9    Mark Owen and I.
10      (Exhibit 92
11      marked for identification.)
12  Q  Do you have Exhibit 92 in front of you?
13  A  I do.
14  Q  There is an email in more or less the middle of the
15   first page from Mark Owen -- from Mark Owen to a group
16   of people that includes you, saying, "Hey guys, Was
17   just browsing through Amazon checking out all the SEAL
18   or DELTA books and I ran across this one." And then
19   it continues on.
20      Do you remember getting that email around
21   September 6?
22  A  I'm sorry. As I sit here, I have no independent
23   recollection.
24  Q  Then there is a reply from you to the same original
25   recipients where you say, "The Men, the Mission and Me

213

1    was written by Peter Blabber, my client, and no we did
2    not send it for official review by DoD."
3      Did you write that?
4  A  As I sit here today, I don't have any independent
5    recollection of that.
6  Q  Is that a true statement?
7  A  It's not a complete statement.
8  Q  Is it true?
9  A  It's not a complete statement, so therefore it's not
10   true.
11  Q  And then there is a list of three other books:
12      Dick Haney, Inside Delta -- not vetted.
13      Lieutenant Boykin, Never Surrender -- not vetted.
14      Charlie Beckwith, Delta Force -- not vetted.
15      Why did you list these three books and then put
16   "not vetted" beside them?
17  A  Because it was my opinion that what was contained in
18   them was clearly not vetted, because it would not have
19   been in the books.
20  Q  I don't understand. Are you saying in your opinion,
21   these books contained information that if they had
22   been vetted the review process would have removed?
23  A  Yes.
24  Q  Okay. So you're not saying, "These are three authors
25   I represented and they didn't vet the process."

214

1    You're saying, "These are books I have read. I don't
2    think they were vetted because they have information I
3    think should not be in there."
4  A  That's correct.
5  Q  Okay.
6  A  It was speculation on my part.
7  Q  Speculation as to whether they were vetted?
8  A  Yes.
9  Q  Okay.
10      (Exhibit 93
11      marked for identification.)
12  Q  Exhibit 93 is -- starts with an email from Mark
13   Fabiani that forwards a message from Rowan Scarborough
14   III, and then has a reply from you and -- a reply from
15   Fabiani, a reply from you, and then a reply from
16   Luskin. Do you remember this email exchange?
17  A  As I sit here, I don't have an independent
18   recollection of it.
19  Q  Do you remember -- let me ask you this.
20      In the email in the middle of the page dated
21   September 11 at 1:27 p.m. from you, it says, "DoD
22   General Counsel attached a DD Form 1847-1 to his
23   warning letter to MO which lists certain SAP's. The
24   document was signed in 2007 -- 4 years before Op. Nep
25   Spear was conceived and executed."

Kevin Podlaski – November 17, 2016

---

215

1    By that language were you intending to say that
2    the 2007 document Mr. Owen had signed could not apply
3    to Operation Neptune Spear because it preceded the
4    operation by four years?
5  A  I wasn't saying it could not. What I was saying was
6    that -- observing a fact that it was four years before
7    the operation was conceived of and executed, so --
8  Q  What's the relevance of that timing?
9  A  Well, if you would let me finish, I would say it's
10   likely that it was not in connection with it. It
11   wasn't a continuous mission, as far as I know of facts
12   on the table. Operation Neptune Spear was conceived
13   of and executed in 2011, so it doesn't make sense that
14   a document signed in 2007 would have effect over
15   Neptune Spear.
16       The document the Government provided has the
17   compartmented programs on it that he was read on to.
18   It's unusual, unless you are in that operation and
19   it's an ongoing operation for it to extend that many
20   years and, moreover, to cover these two different,
21   separate operations. So that was my conclusion.
22  Q  Okay. And somewhere in there there is a legal premise
23   or legal analysis that I know nothing about, and
24   forgive me if I flounder a little bit here, but when
25   you sign -- when one signs a document like the

---

216

1    document signed by Mr. Bissonnette in 2007 that lists
2    certain SAP programs or operations, does that
3    agreement cover only those listed and would not cover
4    a future SAP program?
5  A  The Standard Form 312 is a generalized confidential
6    Non-Disclosure Agreement, and that is more or less a
7    continued obligation for all matters that are
8    classified. It's not mission specific. By its very
9    nature, Sensitive Compartmented Operation Programs are
10   mission specific. They're compartmented, meaning that
11   not everyone who is involved knows everything about
12   the mission; they know their slice.
13       And because of their sensitive nature, those
14   persons who are signed in and read in to that program,
15   that's documented that they're signed in and they are
16   debriefed. And we have seen in this case both the
17   signing in in 2007 and a debriefing of
18   Mr. Bissonnette.
19       On there, there is two programs that were listed,
20   and he was debriefed on two programs. It was -- both
21   of them were executed in 2007 and no programs were
22   executed in 2011. So that's my conclusion, is that
23   that -- by deductive reasoning, that Operation Neptune
24   Spear was not included on that SCI program. You can
25   amend that SCI Non-Disclosure Agreement and add

---

217

1    additional information on it and list all of the
2    programs that one is read on, but there's nothing
3    listed on that one in 2011.
4       So, by deductive reasoning, the 2011 program is
5    not included in that DD Form 1847-1.
6  Q  All right.
7           (Exhibit 94
8           marked for identification.)
9  Q  Do you have Exhibit 94, sir?
10  A  I do.
11  Q  It is a continuation of the memo that was 93. I
12   didn't read through them, but there was an email from
13   you, said you would defer to Bob on what could be said
14   on background. And then Mr. Luskin says he'll defer
15   to you. But then the next email is the one that I'm
16   interested in, on the first page from you to
17   Mr. Luskin and Mr. Fabiani, dated September 11 at 5:58
18   p.m. where you say, "Wait. That assumes that there
19   was a Bin Laden SCI Program, which MO does not recall
20   being Read On to and which we cannot otherwise
21   confirm."
22       If one wanted to know whether a program was an
23   SCI program, what's the best way to find out?
24  A  Go to the Security Manager for the program. The
25   access programs have code names which are not

---

218

1    classified, and that's -- so Operation Neptune Spear
2    is an unclassified code name for the mission. I don't
3    know what the real mission name was. They don't
4    release that. If it's a Special Access Program, they
5    won't tell you that. But they'll be able to decipher
6    what it is from an inquiry. Whether they answer you
7    or not or have to answer you or not, that's another
8    matter. But normally, if it's in relation to a
9    security clearance matter, you'll get an answer
10   eventually.
11  Q  Would you agree with me that whether something is or
12   is not an SCI program, it's not something someone
13   would want to guess at?
14  A  Yeah, I would agree with you that one should not guess
15   at it. One should allow their attorney to talk to
16   their Security Officer to find out for sure.
17           (Exhibit 95
18           marked for identification.)
19  Q  Do you have Exhibit 95 now?
20  A  I do.
21  Q  This at the top -- and again, there's an attachment to
22   it I'm concerned only about. The top of the first
23   page where you are -- I guess it doesn't say so, but
24   you must be emailing Ms. Bauer here, because she
25   replies on September 10. You say, "Please look for

---

Kevin Podlaski - November 17, 2016

219

1  cases addressing this issue in your research and keep
2  me posted on your progress."
3      And then you quote the concern that was expressed
4  in the email underneath that from you to Mr. Luskin,
5  which says, "I'm a little concerned about the thought
6  that someone from the CIA will sign an affidavit
7  stating they inadvertently failed to review all of the
8  operators sign a CIA non-disclosure but gave them a
9  verbal warning telling them that the actionable
10  intelligence was derived from a SAP. I haven't found
11  any case law on it yet. But if the DoJ wanted to set
12  a precedence and use a lot of MO's royalties on legal
13  fees, that would be the way to do it," closed quotes.
14      And so in this email you were asking Ms. Bauer to
15  do the research on that subject, correct?
16  A  I was asking her to see if she could find case law on
17  anything in connection with that, and that being that
18  there was no formal document signed but somebody came
19  forward with an affidavit and said, "Yea, verily, I
20  have briefed everyone at this level."
21  Q  And prior to this, did you -- you knew Mr. Bissonnette
22  had told you he had not signed anything, correct?
23  A  That's correct.
24  Q  Did you give any concern to whether this fact pattern
25  might have been in existence; that is to say, some CIA

220

1  agent says, "We talked to them even though they didn't
2  sign anything"?
3  A  I asked him specifically if anyone had -- during their
4  briefings when they were in isolation had come in and
5  said to them that this was a Special Access Program or
6  Sensitive Compartment Information Program, and he
7  said, "I don't think so. I don't remember. I don't
8  believe so."
9  Q  And Ms. Bauer tells you on September 13, three days
10  later, she can't find anything on that subject?
11  A  Which is not unusual, because -- well, people either
12  fight it or they don't.
13      (Exhibit 96
14      marked for identification.)
15      (Discussion held off the record.)
16  Q  Do you have Exhibit 96 in front of you?
17  A  I do have it in front of me, yes.
18  Q  The top -- the second email in the two-email string
19  here is dated September 18 from you, apparently to Mr.
20  Owen. Do you remember sending this email?
21  A  I have no independent recollection of it.
22  Q  In this email you say to Mr. Owen, "As you may recall,
23  I sent FOIA requests on your behalf requesting to
24  receive their reviews of 15 or so books."
25  A  I read it.

221

1  Q  Okay. Why would he have recalled this? Had you
2  discussed this with him before you did it?
3  A  Well, this was part of that group telephone call. I
4  believe it was a telephone call, or it could have been
5  a group email. In any event, Mr. Luskin asked me to
6  do this. And this bothers me about this, because it
7  looks like I only emailed it to him, but I'm pretty
8  sure that I always copied other people on this,
9  because they had asked me to do this.
10      But in any event, it appears that in compliance
11  with the request to send the FOIA, I did, and this was
12  the first comeback or the second comeback when they
13  said, "Well, you have to" --
14  Q  I apologize. And wouldn't it be appropriate to have
15  replied only to him since you're asking him for
16  permission to incur the copying expense?
17      MR. FURMAN:  There's a copy to Elyse Cheney, and
18  I don't know from the middle of the email who Kevin
19  Podlaski emailed it. It's not even clear that he
20  emailed Mark Owen.
21  A  That's what I'm saying. I'm not sure I just sent it
22  to him, although I addressed it to him, since he was
23  the client. But, you know, I don't know.
24  Q  Is there any other Mark you would be sending this
25  email to --

222

1  A  No.
2  Q  -- asking for permission to incur the expense?
3  A  No.
4  Q  So you sent it to Mark Owen, right?
5  A  I sent it at least to Mark Owen. I'll say that.
6  Q  And then Mark replies with a copy to Elyse saying,
7  "Yes I agree and thanks again!!"
8  A  Apparently so.
9  Q  And if no one else was copied on your email, then this
10  would be yet one more example of you communicating
11  with Mr. Owen contrary to the directions you say
12  Mr. Luskin gave you?
13  A  No. It's not about the book. It's about the Freedom
14  of Information Act matters.
15  Q  Isn't the Freedom of Information Act about the book?
16  A  No, the Freedom of Information Act is about other
17  authors and whether their books were vetted.
18  Q  Why would Mr. Bissonnette want to pay for copies of
19  information about whether other authors had their
20  books vetted?
21  A  I don't know. You would have to ask him that.
22  Q  But you recommended it?
23  A  As we previously discussed, it was part of the group
24  session, and we were discussing about ways to support
25  Mark Owen's and Mr. Luskin's defense that he was being

Kevin Podlaski - November 17, 2016

---

**223**

1  treated unfairly from -- by the Department of Defense
2  or Department of Justice, from other authors who had
3  written books and had perhaps not submitted their
4  books for vetting and nothing happened to them.  So
5  that's why.
6  Q   Didn't you tell me earlier that this was your idea?
7  A   I suggested it.
8          (Exhibit 97
9          marked for identification.)
10 Q   Let me show you what I've marked as Exhibit 97.
11     There's a September email — September 18 email from
12     Mark Owen to you where he says, "I'd love to call
13     these guys!!!"
14         Do you know what that YouTube video is about?
15 A   I have no idea.  I don't recall, as I sit here.
16 Q   And then you replied to him, "If your publisher
17     doesn't have a problem with it I don't as long as you
18     don't let them record you or take photos of you,"
19     correct?
20 A   That's what it says.
21 Q   And the Subject on your reply is "Unauthorized
22     interview".  Does that refresh your recollection as to
23     what any of this is about?
24 A   No.  I'm sorry.
25         (Discussion held off the record.)

---

**224**

1          (Exhibit 98
2          marked for identification.)
3          (Recess)
4  MR. JOHNSTON:
5  Q   Do you have Exhibit 98, sir?
6  A   Yes.
7  Q   At the bottom of Exhibit 98 on the first page is an
8      email from Donald Nichelson to you, dated September
9      24th.
10         (Pause)
11 Q   Do you remember this email?
12 A   As I sit here, I don't independently recollect this
13     email.
14 Q   Do you remember receiving a response to Freedom of
15     Information Act requests on or about September 24?
16 A   No, I don't have any independent recollection.
17 Q   Then there appears to be an email from you to Mr. Owen
18     apparently, because he replies, and you wrote to him,
19     "The office of Security and Policy Review (OSPR) sent
20     this to me today informing me that the FOIA request we
21     sent to it for documents related to the OSPR's review
22     of books/manuscripts written by former military
23     members is delayed."
24 A   Yeah, I read it.
25 Q   Okay.  As you read, he suggests that you call him and

---

**225**

1      then you say, "With your permission I will call him
2      and find out what he proposes."
3          Mr. Bissonnette then replies the same day just a
4      few minute later, "Good copy!!!!  Go ahead and call
5      see what they have to say."
6          Do you recall asking Mr. Bissonnette for
7      permission to make that call and receiving directions
8      to do so?
9  A   I don't have any independent recollection of that.
10 Q   Did you make that call?
11 A   I don't remember, but I must have.  I don't know.
12         (Exhibit 99
13         marked for identification.)
14 Q   Do you have Exhibit 99 in front of you?
15 A   I do.
16 Q   And the top of that is an email from Mr. Luskin to
17     you, dated September 28 at 9:23 a.m., and it
18     references an attached term sheet.
19         Do you recall receiving this email?
20 A   I don't have any independent recollection of it.
21 Q   Do you recall receiving an email with a term sheet
22     attached?
23 A   I don't recall independently, other than what's in
24     front of me here.
25 Q   His second paragraph says, "Elyse said you had, at

---

**226**

1      some point, prepared a list of former seals/delta
2      force guys who had written books.  Can you share that
3      w/me, please.  Do you know, or does this list reflect,
4      whether any submitted their manuscripts for pre pub
5      review."
6          Do you remember Mr. Luskin asking you for that
7      information in late September?
8  A   No, I don't recall that.
9  Q   Did you provide it to him?
10 A   I don't recall.
11         (Exhibit 100
12         marked for identification.)
13 Q   Do you have Exhibit 100 in front of you?
14 A   I do.
15 Q   And it is an email at the bottom dated October 5 from
16     you to Mr. Bissonnette, saying, "Mark, is anything
17     going on?"  Oh, I'm sorry.  I skipped one.
18         There's one of October 3rd from you to Mr. Owen
19     that says, "Subject:  This is the pinnacle of success.
20     You're up there with Justin Bieber's autobiography and
21     JK Rolling's latest book.  The pinnacle of success!"
22         Do you remember sending that email to Mr. Owen?
23 A   Yeah, I think I was in a Kroger and I saw in a book
24     aisle and there his book was in the middle of the
25     aisle.  So I remember sending him that, yeah.

---

Kevin Podlaski - November 17, 2016

### 227

1  Q  And then two days later you send another one where you
2     say, "Mark, is anything going on?"  Correct?
3  A  I did.
4  Q  And a couple of hours it looks like after -- almost
5     two hours after you sent it, he replies to you, "Not
6     that I know of! DoD is talking back and forth with
7     Luskin but it seems they want to negotiate a
8     reasonable settlement that allows them to back away
9     without looking bad."
10    Do you recall receiving that update on the status
11    of the negotiations from Mr. Owen?
12 A  I don't recall.
13 Q  And then you replied the same day back to him that
14    says, "I know, Bob Luskin sent me the list of demands.
15    I sent you a blind copy of my thoughts on it. Bottom
16    line: I think you should do nothing except apologize
17    and maybe donate some money to charity of DoD's
18    choice! Did you get my photos?"
19    And that email is dated October 5, 2012, correct?
20 A  Yes.
21 Q  When it says, "I sent you a blind copy of my thoughts
22    on it," what does that mean?
23 A  As I sit here today, I don't recall.
24 Q  Does that mean that you sent it to him and not to
25    Luskin?

### 228

1  A  As I sit here today, I don't recall.
2  Q  And then he replies to you still on October 5, "I got
3     the pictures!!! Thank you!!!"
4     Do you know what pictures are being talked about?
5  A  I don't know for sure, but I think it's the pictures
6     of his book in Kroger's.
7  Q  Okay. "As for the demands they are still working
8     through the list but none of them seem too crazy so
9     that's a good thing."
10    Do you recall that communication?
11 A  I don't have an independent recollection, no.
12 Q  This would, again, be communications between you and
13    him about the subject of his books and his Government
14    problems over the book that would be in violation of
15    Mr. Luskin's directions, as you understood them, for
16    you to not discuss the matter with him without
17    Mr. Luskin present, correct? In part?
18 A  Yeah, in part we did discuss the DoD negotiations.
19 Q  And would you agree with me that if your reference to
20    sending him a blind copy of your thoughts means you
21    excluded Mr. Luskin, that would really be in violation
22    of what you say Mr. Luskin told you, correct?
23 A  No, I don't agree with your premise and your
24    presumption. Blind copying normally means that you
25    are talking to one person and you send a person a copy

### 229

1     of that and they may not be in the "cc" block.
2     They're in the "bcc" block, so they receive a copy of
3     your communications. But it doesn't mean that it was
4     sent only to Mr. Owen. I think it means it was sent
5     to both of them, primarily to Mr. Luskin then
6     blind copy to Mr. Owen. That's what I would presume
7     it to be.
8  Q  I understand your point. So your belief is that you
9     sent your observations to Mr. Luskin and blind copied
10    on that transmission Mr. Bissonnette, so he would have
11    received it, but Mr. Luskin would not know that you
12    had sent it to him?
13 A  I don't know that for sure, but that's what blind
14    copying would mean to me.
15 Q  Okay. I understand now. Let me show you Exhibit 101.
16       (Exhibit 101
17       marked for identification.)
18 Q  This is an email dated November 13 to you, with a
19    reference to Freedom of Information ACT request and a
20    number. "Dear Mr. Podlaski, the FBI" and then they
21    respond and say, "Your request will be processed."
22    Do you recall receiving that notification that a
23    Freedom of Information Act request to the FBI would be
24    processed?
25 A  No, I really don't.

### 230

1  Q  Let me ask you to look at the bottom of page 1, and
2     earlier there is a reference to an earlier
3     transmission by minutes from you to FOIPA Request.
4  A  I'm sorry. What are you referring to by minutes?
5  Q  Yeah. Look up at the top of David Sobonya's email to
6     you, November 13, 10:49 a.m., right?
7  A  Correct.
8  Q  Now go down and look at your transmission.
9  A  I see what you're saying.
10 Q  It's November 13, 10:41.
11 A  Yeah, I just didn't understand what you said. I got
12    it.
13 Q  Sure. So it appears you sent it, and eight minutes
14    later he replied and said it's being processed,
15    correct?
16 A  Correct.
17 Q  And so did you on November 13 send the FBI a request
18    for documents under the Freedom of Information Act, as
19    reflected in Exhibit 101?
20 A  It appears to be so.
21 Q  And this is essentially the same request that you sent
22    in September, just to a different entity, correct?
23 A  I would have to compare them, but they appear to be
24    similar.
25 Q  And this was another request that you sent on behalf

Kevin Podlaski - November 17, 2016

231

1 of or for the benefit of Mr. Bissonnette?
2 A  Per the direction of Mr. Luskin, correct.
3       (Exhibit 102
4       marked for identification.)
5 Q  Do you have Exhibit 102 in front of you?
6 A  I do.
7 Q  This appears to be an email exchange between you and
8    Kevin Maurer, the co-writer.  On January 8, 2013 you
9    wrote, "I just finished reading The Lions of
10   Kandahar."
11      What is that book?  What's that book about?
12 A  Oh, it's about a -- I testified earlier that
13   apparently Rusty Bradley, he was a Special Forces
14   ODA -- Operational Detachment Alpha -- Commander for
15   the 5th Special Forces Group, and he was in
16   Afghanistan and wrote a book about his experiences.
17   And actually in that regard, the Command -- I think it
18   was General Mulholland -- asked him to write it.  And
19   it was a pretty good, fast-moving book.
20 Q  And you may have said this, but was Mr. Maurer a
21   co-writer on it?
22 A  Yeah, he was the co-writer.
23 Q  All right.  And then you ask, "How are things going?
24   Haven't heard from MO or Elyse in quite a while.  I
25   presume the storm has calmed down?  Let me know."

232

1 A  I did say that, yeah, as this reflects.
2 Q  Okay.  And do you remember this email exchange?
3 A  I don't have any independent recollection of it, no.
4 Q  All right.
5       (Exhibit 103
6       marked for identification.)
7 Q  And Exhibit 103 is an email from Alex Jacobs to you
8    with the Subject: Mark Owen FOIA, dated May the 8th.
9    Do you remember this communication?
10 A  Yeah, I thought this was odd.  I got this from this
11   guy who only had but one, I think, interface with him,
12   and he was asking me to give him an update on the FOIA
13   information.
14 Q  And he says, "We can't seem to find it in our
15   records."
16      Had you reported the response you had received by
17   that time?
18 A  As I sit here today, I don't have any independent
19   recollection of whether I had received the response or
20   not.  And I also don't know if I ever responded to
21   this.  I probably did.
22 Q  Let me show you what's marked as 106.
23      (Exhibit 106
24      marked for identification.)
25 Q  Does 106 appear to be your reply to Mr. Jacobs on the

233

1 same day, May the 8th, saying, "Alex, please tell me
2 why you need these documents."
3 A  Yeah, it looks like it was my response.
4 Q  And then he replied, "Mark has requested them.  My
5    understanding is that he paid the associated
6    administrative costs (copying, etc.) in advance back
7    in September."
8 A  Yeah.  That's not the way it works.
9 Q  No, it's not.  But why were you asking why Alex needed
10   the documents?
11 A  Because I didn't work for Alex and I didn't work for
12   Elyse.  I worked for Mr. Owen and then was working
13   with Mr. Luskin.
14 Q  Okay.
15      (Exhibit 104
16      marked for identification.)
17 Q  104 is an email from Krista Witmer.  That's the woman
18   who worked at Carson Boxberger for you -- or maybe for
19   others, correct?
20 A  Yeah.
21 Q  And it's dated, again, the same date, Wednesday, May
22   8th, with attachments, and it says, "Mark Owen
23   documents."
24 A  Um-hum.
25 Q  After you received this request from Alex Jacobs for

234

1 the FOIA stuff, did you ask Ms. Witmer to assemble all
2 of those documents for you?
3 A  I did.
4 Q  And then behind it is a series of letters addressed to
5    you.
6 A  Right.
7 Q  Correct?
8 A  Yeah.
9 Q  All dealing with the FOIA requests?
10 A  Yeah.  They took my letter and broke down -- "they"
11   being -- apparently the FBI took my letter and broke
12   down each individual item and prepared a separate
13   response.
14 Q  So they treated it as like 20 requests instead of one
15   request?
16 A  That's my understanding.
17 Q  Okay.  And did you supply this information then to
18   Alex after he told you why he wanted it?
19 A  As I sit here today, I don't know if I did, but I
20   think that would be the reason why I asked her to put
21   these together for me.
22      (Exhibit 105
23      marked for identification.)
24 Q  Let me show you what I've marked as Exhibit 105.  This
25   would be the day after you received the email from

Kevin Podlaski - November 17, 2016

---

**235**

1    Alex. Well, actually it's the same day; at the bottom
2    it's dated May 8th. There is an email from you to
3    Ms. Aldorfer, saying, "I have not received any further
4    correspondence from you with regard to the FOIA
5    request submitted in September, with the exception of
6    the following update."
7  A   That's weird.
8  Q   So after you received Alex's request, did you contact
9    Ms. Aldorfer to follow up on why you had not received
10    a response from the September 12 FOIA requests?
11  A   Apparently so. But this email bothers me in that I
12    would not have sent Mr. Nichelson, as a standard
13    procedure, the email from Ms. Aldorfer, because I
14    don't even think they were in the same organization.
15    Maybe they were. Yeah.
16  Q   Well, it may be that Ms. Aldorfer gave it to him, not
17    you. Because he is the one that replies, correct?
18  A   Yes, he does. He does "cc" her.
19  Q   He says, "I'm the officer on your request. Upon
20    completion of the review, documents will be
21    processed."
22  A   Oh, okay. My bad.
23  Q   So did you ever receive a further response after this
24    May 9 email from Mr. Nichelson?
25  A   As I sit here, I have no independent recollection of

---

**236**

1    that, but the fact that it took months doesn't
2    surprise me. The Government moves at a glacial pace
3    for the most part.
4  Q   Let me show you Exhibit 107.
5        (Exhibit 107
6        marked for identification.)
7  Q   And I will tell you, if you turn to the second page
8    you can see that it is in the chain from your email to
9    Ms. Aldorfer. Mr. Nickels (sic) replied to you, and
10    then there is, on page 1 and going on to page 2, an
11    email from you. It appears to be to Mr. Owen, dated
12    May 9, where you said, "I hope all is well. Contact
13    me at your convenience to discuss the status of your
14    situation."
15        "Alex said you wanted an update on FOIA. I've
16    included below the email exchange. I will shortly
17    send you my request and answer from the FBI for same
18    materials."
19        And then, "For the record, billing for producing
20    materials pursuant to a FOIA request is not sent until
21    the Agency responds with materials. Here, no fees
22    have yet been demanded. This is the status."
23        Did you send that update to Mr. Owen on or about
24    May 9?
25  A   Apparently so, but I don't have any independent

---

**237**

1    recollection of it.
2  Q   And then there is a reply starting in the middle of
3    the page from Mr. Owen to you, copying Alex Jacobs and
4    Tamera Watt, correct?
5  A   Yes.
6  Q   Again, dated May 9, "Thanks for the help. Please feel
7    free to communicate with both Alex and Tamera, both
8    cc'd above in to this situation. They are organizing
9    the pertinent info and taking lead on this. Thanks
10    again! Matt."
11        And then he says, "Our next meeting with DoD is
12    the 16th, is there anyway chance we'll hear back from
13    this enquiry before then?"
14        Still on May 9 you reply, "Not likely. What does
15    DoD want from you?"
16        And his reply on to you with no copies, "100%
17    of book profits."
18        And then a reply from you to him, "Bastards. Are
19    they getting McRaven's/Bowden's profits?"
20        And then the last email in the chain from Mr.
21    Owen to you, "Of course not!!! Had a long talk last
22    night with Leon P at an event I was at, and he didn't
23    even know they were still coming after me. WTF."
24        Do you remember that email exchange with Mr. Owen
25    on or about May 9?

---

**238**

1  A   I honestly do not. I don't have any independent
2    recollection of it other than what's here.
3  Q   Would you disagree with the conclusion that the
4    September, November 2012 and May 2013 communications
5    concerning Freedom of Information Act requests that
6    you sent and then reported on for the benefit of
7    Mr. Bissonnette evidence a continuing attorney-client
8    relationship with him for that period of time and
9    those events?
10  A   I think that I was closing up on a last, lingering
11    issue for a relationship that clearly was over by
12    then, and so I was just doing some finish work of
13    something I had started in September, and that is to
14    get the Freedom of Information Act materials to them.
15  Q   September to DoD and then November to FBI, correct?
16  A   That is correct.
17  Q   Mr. Podlaski, are you proud of your representation of
18    Mr. Bissonnette and the job you did for him?
19  A   I think so. I provided him with the information that
20    he requested of me and provided him with advice based
21    upon the information that he provided to me.
22  Q   Blessed with hindsight, is there anything you would do
23    different?
24  A   You know, hindsight being 20/20 and seeing all of the
25    hassle that all of this has occurred, I would have

---

Kevin Podlaski - November 17, 2016

239

1  told him, "Tell your publisher you can't meet your
2  deadline," and that I would recommend as the safest
3  course and emphasize again to him to submit the book,
4  "Because you are" -- as I told him, "You're taking a
5  chance on not submitting the book, and they can always
6  prosecute you and make you spend a lot of money
7  defending yourself, even if you come out a winner in
8  the end."
9  Q   Longer for me than for you, but both of us were in law
10  school and were graded.  Using a scale of 100, what
11  grade would you give yourself on your representation
12  of Mr. Bissonnette?
13  A   I don't understand the relevance of that question, so
14  I don't -- I'm not going to answer.
15  Q   Would you give yourself a passing grade?
16  A   Same answer.
17      MR. JOHNSTON:  Let's take a break and I may be
18  through.
19      THE WITNESS:  Okay.
20      MR. JOHNSTON:  At least I'm close to through, I
21  know.
22      (Recess)
23  BY MR. JOHNSTON:
24  Q   Mr. Podlaski, do you agree with me that up until the
25  time of the signing of the Consent Decree, the

240

1  situation with the Government could have been fixed
2  for Mr. Bissonnette.
3  A   I don't know what you mean by "fixed".
4  Q   Make the problem go away, not have to forfeit the
5  money, not be sued by them?
6  A   Put in what context?  Could have been fixed by whom,
7  when?
8  Q   By lawyers representing him.
9  A   I don't know -- I guess I need more information than
10  that.  It's a very broad statement.  Specifically,
11  what are you referring to?  Are you saying fixed by
12  me?
13  Q   Well, maybe by you.  I don't know.  Fixed by lawyers
14  representing him dealing with the Government, who
15  could have persuaded the Government that either he
16  didn't have an obligation, if your theories were
17  right, or if he did have an obligation, that it was an
18  innocent mistake made by reliance on a lawyer who
19  relied upon the best information he had available at
20  the time, or any -- or that he was being singled out
21  for disparate treatment as compared to others, or any
22  other theory that the Government might accept?  It
23  could have been, if not resolved totally, ameliorated
24  in some fashion?
25  A   I don't know.  I don't know what the Government's mind

241

1  state is.
2  Q   Let me direct your attention to the Tolling Agreement
3  that was executed in this case back in August of 2014.
4  Did you have any role in the negotiation of the
5  Tolling Agreement?
6  A   No, I just -- I spoke to my then-attorney, Robert
7  Shannon, about it, but I didn't -- wasn't actively
8  involved in that.
9  Q   Did you have any intent with regard to the -- there
10  was put in to the Tolling Agreement a -- what I will
11  call a non-disparagement clause.  Are you aware of
12  that?
13  A   Yes.
14  Q   Okay.  When the document was negotiated, did you have
15  an intent that a violation of the non-disparagement
16  clause would stop tolling as of the date of the
17  violation and terminate the tolling?
18  A   Yeah, I recall now.  I specifically spoke with Robert
19  Shannon about --
20      MR. BROWN:  Wait a minute.  You've got privilege
21  with Mr. Shannon.  I don't know whether you're trying
22  to ask him questions about it.  I assume you're not,
23  but I'm assuming you read the agreement and were
24  familiar with what it said when it was executed.
25      THE WITNESS:  Yeah.

242

1  Q   Was it your understanding -- and I want to get to the
2  60 Minutes interview in a minute.  Was it your
3  understanding that if Mr. Bissonnette violated the
4  Tolling Agreement, tolling would stop on the day of
5  that violation?
6      MR. BROWN:  I'm going to object to the form of
7  the question as the document speaks for itself,
8  subject to legal interpretation.
9      But you can go ahead and answer.
10  A   I'll tell you that was my understanding.
11  Q   Now let me move to the 60 Minutes interview.  Did you
12  watch the 60 Minutes interview when it aired?
13  A   I did.
14  Q   And have you watched it since then?
15  A   I have not.
16  Q   Okay.  So you've watched it only the one time?
17  A   I believe so.
18      MR. BROWN:  For the record, there were two 60
19  Minutes.
20      MR. JOHNSTON:  We're talking only about the 2014
21  one.
22      MR. BROWN:  Okay.
23  Q   Was that your understanding, I was talking only about
24  2014?
25  A   Yeah, I think I understood that was implied in your

Kevin Podlaski - November 17, 2016

---

**243**

1  question.

2  Q   Sure.  In that 60 Minutes interview, did you ever hear

3     your name mentioned?

4  A   No, I did not hear my name mentioned.

5  Q   Or the name of Carson Boxberger?

6  A   No, I did not hear the name of Carson Boxberger.

7     However, Mr. Bissonnette did say and his attorney said

8     that his attorneys gave him bad advice.

9  Q   And – but the attorneys to whom they were referring

10    were not named in the program, were they?

11  A   No, but it was contemporaneous all over the internet

12    that I had represented him by then.

13  Q   Following the airing of the 60 Minutes interview, did

14    anyone call you to say anything about, "Oh, I saw you

15    being talked about on TV last night or last week"?

16  A   Yes.

17  Q   Who did?

18  A   News reporters.

19  Q   After the interview or before?

20  A   After.

21  Q   Okay.  And do you know how they got your name?

22  A   They just went on the internet to see all the

23    different news stories about the matter, and it was

24    within, I'd say, three to five days afterwards that I

25    started getting phone calls.

---

**244**

1  Q   And do you know if Carson Boxberger got any calls, or

2     were they all directed to you?

3  A   I understand from my former partners that they

4     received at least one phone call as well.

5  Q   Okay.  Were you contacted by the – by a producer at

6     60 Minutes prior to the airing?

7  A   Never.

8  Q   Mr. Shannon provided a letter to 60 Minutes that was

9     aired as a part of the program, correct?

10  A   I don't recall that.  I'm sorry.  I just don't

11    remember it.

12  Q   Okay.  Did you ever ratify -- you're going to think

13    this is silly, but I really have a serious purpose.

14       Did you ever confirm or ratify to anyone that you

15    were the lawyer Mr. Bissonnette was talking about from

16    whom he had received bad advice?

17  A   I have never publicly stated that.  I've not made any

18    newspaper -- I've not had anybody interview me, and I

19    haven't confirmed that.

20  Q   And when the press called, you did not confirm for

21    them that you were the lawyer they were talking

22    about -- or one of the lawyers they were talking

23    about?

24  A   That's correct.  I mean, they called me up and a

25    couple of them didn't say who they were at first and,

---

**245**

1     you know, when they got me on the phone, they said

2     something, and I said, "You need to talk to my

3     attorney."  That's all I said.

4  Q   And that was Mr. Shannon at that time?

5  A   I believe it was, yeah, Robert Shannon at the time.

6       MR. JOHNSTON:  All right.  We'll reserve the

7     remainder of our questions until the time of trial.

8

9

10      AND FURTHER THE DEPONENT SAITH NOT.

11

12    _____

13         KEVIN PODLASKI

14

15  END TIME: 5:42 P.M.

16

17

18

19

20

21

22

23

24

25

---

**246**

1  STATE OF INDIANA     )

2  COUNTY OF MARION     )

3

4       I, Karen K. Keim, CRR, RPR, CSR-IL, CCR-MO,

5  Notary Public, do hereby certify that KEVIN PODLASKI,

6  the deponent herein, was first duly sworn to tell the

7  truth, the whole truth, and nothing but the truth in

8  the aforementioned matter;

9       That the foregoing deposition was taken on

10  behalf of the the Plaintiff, at Kightlinger & Gray,

11  LLP, One Indiana Square, Suite 300, 211 North

12  Pennsylvania Street, Indianapolis, Indiana, on

13  November 17, 2016, pursuant to Rule 30 of the Federal

14  Rules of Civil Procedure;

15       That said deposition was taken down in

16  stenograph notes and afterwards reduced to typewriting

17  under my direction, and that the typewritten

18  transcript is a true record of the testimony given by

19  the said deponent; and that signature was reserved by

20  the deponent and all parties present;

21       That the parties were represented by their

22  counsel as aforementioned.

23       I do further certify that I am a

24  disinterested person in this cause of action, that I

25  am not a relative or attorney of either party or

---

Kevin Podlaski - November 17, 2016

247

1   otherwise interested in the event of this action; and

2   that I am not in the employ of the attorneys for any

3   party.

4      IN WITNESS WHEREOF, I have hereunto set my hand

5   this 21st day of November, 2016.

6

7

8        _____

9

10   Karen K. Keim
      Certified Realtime Reporter

11   Illinois CSR No. 84-1577
      Missouri CCR No. 1328

12

13

14

15

16

17

18

19

20

21

22

23

24

25