# EXHIBIT L

ORIGINAL

## In the Matter Of:

## MATTHEW BISSONNETTE V. KEVIN PODLASKI

1:15-CV-00334

## ROBERT D. LUSKIN

*January 18, 2017*



800.211.DEPO (3376)
*EsquireSolutions.com*

1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF INDIANA

3  --------------------------------x

4  MATTHEW BISSONNETTE,                )

5            Plaintiff           )  Case No.:

6            V.                  )  1:15-CV-00334

7  KEVIN PODLASKI and CARSON       )

8  BOXBERGER, LLP,                 )

9            Defendants         )  Page 1-239

10  --------------------------------x

11

12

13

14        DEPOSITION OF ROBERT D. LUSKIN

15        Wednesday, January 18, 2017

16            Washington, DC

17

18

19

20

21  Reported by:  Sherry L. Brooks, CLR

22  Job No.  J0504403



```
 1                          January 18, 2017

 2                             9:30 a.m.

 3

 4

 5   Deposition of Robert D. Luskin was held at:

 6

 7        Paul Hastings, LLP

 8        875 15th Street, NW

 9        Washington, DC  20005

10

11        Pursuant to notice, before Sherry L. Brooks,

12   Certified LiveNote Reporter and Notary Public, in and

13   for the District of Columbia.

14

15

16

17

18

19

20

21

22
```



```
1    ON BEHALF OF THE PLAINTIFF:

2         Robert Tobey, Esquire

3         Johnston Tobey Baruch

4         3308 Oak Grove Avenue

5         Dallas, TX  75204

6         (214) 741-6260

7         E-mail:  Robert@jtlaw.com

8

9    ON BEHALF OF THE DEFENDANTS:

10        A. Michael Furman, Esquire

11        Izabell Lemkhen, Esquire

12        Furman Kornfeld & Brennan, LLP

13        61 Broadway

14        26th Floor

15        New York, NY  10006

16        (212) 867-4100

17        (212) 867-4118 (Fax)

18        E-mail:  Mfurman@fkblaw.com

19        E-mail:  Ilemkhen@fkbllp.com

20

21

22
```



ROBERT D. LUSKIN                                    January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                            4

```
 1   APPEARANCES CONTINUED:

 2

 3   ON BEHALF OF THE WITNESS:

 4        Charles A. Patrizia, Esquire

 5        Paul Hastings, LLP

 6        875 15th Street, NW

 7        Washington, DC  20005

 8        (202) 551-1710

 9        (202) 551-0110 (Fax)

10        E-mail:  Charlespatrizia@paulhastings.com

11

12   ALSO PRESENT:

13        Casey Miller, Associate - Paul Hastings

14

15

16

17

18

19

20

21

22
```



ROBERT D. LUSKIN                                January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                         5

1                        C O N T E N T S

2    EXAMINATION OF ROBERT D. LUSKIN                      PAGE

3    BY MR. FURMAN                             7, 221, 233

4    BY MR. TOBEY                                 188, 230

5

6

7    EXHIBITS                                            PAGE

8    111          Complaint                                19

9    112          Consent Decree                           22

10   113          Letter Dated 8/31/12 to Jeh C. Johnson   25

11   114          Memorandum Dated 8/31/12 to M. Fabiani   40

12   115          Memorandum Dated 8/31/12 to E. Cheney    55

13   116          Memorandum Dated 8/31/12 to Mark Owen    73

14   117          For Professional Services Document       83

15   118          Memorandum Dated 9/4/12 to R. Luskin     99

16   119          Memorandum Dated 9/6/12 to R. Luskin    101

17   120          Lawfare                                 102

18   121          Memorandum Dated 9/20/12 to R. Luskin   132

19   122          Memorandum Dated 11/22/12 to R. Luskin  141

20   123          Memorandum Dated 9/25/14 to Steve Peak  213

21   124          Memorandum Dated 11/3/14 to Steve Peak  213

22   125          Letter Dated 10/28/14 to Steven Peak    213



```
 1    EXHIBITS CONTINUED:

 2

 3    EXHIBITS                                          PAGE

 4    126          Memorandum Dated 11/06/14 - Steve Peak 213

 5    127          Timeline-Kevin Podlaski Representation 213

 6    128          Memorandum Dated 8/23/15 - Ryan Parker 230

 7    129          Sensitive Compartmented Information    230

 8    130          Classified Info-Nondisclosure Agmt.    230

 9    131          Debriefing Memorandum                  230

10

11

12

13          (Exhibits attached to transcript.)

14

15

16

17

18

19

20

21

22
```



```
1                    P R O C E E D I N G S
2           *       *       *       *       *
3               ROBERT D. LUSKIN
4   was called for examination by counsel and, after
5   having been duly sworn by the Notary, was examined
6   and testified as follows:
7           EXAMINATION BY COUNSEL FOR DEFENDANTS
8               BY MR. FURMAN:
9       Q.   Good morning, Mr. Luskin.  Let me
10  introduce myself once again.  My name is Michael
11  Furman, and I represent Kevin Podlaski and the law
12  firm Carson Boxberger in this lawsuit filed by Mr.
13  Bissonnette.
14          Hello.
15      A.   Good morning.
16      Q.   Good morning.  If I ask you any questions
17  that you don't understand, please let me know.  And I
18  have to ask that you verbalize your answers.
19      A.   Thank you.  I will.
20      Q.   Are you familiar with the Bissonnette
21  versus Carson Boxberger lawsuit?
22      A.   Generally speaking, I would say.
```



```
1       Q.   And how are you aware of it?
2       A.   I've had conversations with Robert Tobey
3   and Randy Johnston, who are Mr. Bissonnette's
4   lawyers.  And I think that I've seen the complaint in
5   that matter.  I'm not sure that I've seen any other
6   pleadings.
7       Q.   Have you done any legal work in support of
8   that civil lawsuit?
9       A.   No, not -- not per se.  Randy has called
10  me, from time to time, just to talk through issues.
11  And we talked about those, but I've not done anything
12  -- you know, I've not drafted any pleadings.  I've
13  not reviewed documents.  I've not done any legal
14  research or anything of the sort.
15      Q.   The reason I'm asking you this question is
16  because, if I understand your answer, you're saying
17  that you didn't draft or review any documents?
18      A.   That's correct.
19      Q.   I've had an opportunity to review your
20  billing, and there were several instances when -- and
21  I'll show them to you later in this deposition --
22      A.   Sure.
```

```
1       Q.   -- where Mr. Johnston or Mr. Tobey had
2   sent to you copies of pleadings and various discovery
3   items and --
4       A.   It's certainly possible, Mr. Furman.  I
5   know that I would have seen a draft of the complaint
6   and that was significant to me because I didn't want
7   any factual representations made because that was in
8   a period of time when the matter for which I was
9   principally responsible was still alive and it was
10  important to me that there not be any factual
11  assertions made there that were inconsistent with
12  representations that we had made through the
13  government.
14      Q.   Understood.
15      A.   But I guess in saying reviewing pleadings,
16  I understand that there's been motions practice in
17  this case.  And I've not been involved in that.
18      Q.   Okay.  I'm going to ask you several
19  questions about the book.  And if I reference the
20  book, we're talking about the book, "No Easy Day"?
21      A.   Right.
22      Q.   I'll try to use the term, "No Easy Day."
```

```
1   But if I just reference the book, just so it's
2   understood, I am referencing, "No Easy Day."
3       A.   I understand.
4       Q.   The -- turning to "No Easy Day," if the
5   book had been submitted for a prepublication review,
6   would it have been cleared for publication?
7       A.   Well, based on what the government said to
8   me in the course of Mr. Bissonnette's two interviews
9   with them, there were a number of specific matters
10  that they thought improperly disclosed training
11  tactics and procedures or sensitive or classified
12  information.
13          So it is my sense that the vast majority
14  of what is said in the book would have been cleared,
15  but there would have been specific deletions that
16  would have been made.
17      Q.   Who told you that?
18      A.   I mean, you're asking my judgment.  I
19  guess what I'm saying is that the government went
20  through a list of things that they regarded as
21  potentially sensitive or revealing training tactics
22  and procedures.  The list was not particularly long.
```



1   In answering your question, I'm assuming
2   that had the book been submitted to the Office for
3   Prepublication Security Review (sic) that the same
4   things that the government subsequently identified to
5   me would have been identified in the context of that
6   review, and they would have been redact -- and the
7   government would have required that those references
8   be redacted.  But that's making an assumption.
9       Q.   And I want to explore that assumption.
10      A.   Sure.
11      Q.   Do you know who the book should have been
12  submitted to?
13      A.   It should have been submitted to an entity
14  within DOD, which is known by its acronym, OPSR, the
15  Office of Prepublication and Security Review.
16      Q.   And is there a specific person that was in
17  charge of the OPSR and was there a staff that you're
18  aware of?
19      A.   There certainly was someone in charge and
20  there was a staff.  There's a formal process for
21  submission.
22      Q.   Okay.  And have you ever spoken to anyone



1   at the OPSR?
2       A.   I have.  In March of 2013, I learned that
3   Mr. Bissonnette had started to give paid speeches
4   talking about leadership and his experience in the
5   SEALS.  And I advised him at that time that the slide
6   deck that he was using needed to be submitted for
7   prepublication and review.
8       And so I submitted those slides on his
9   behalf in the middle of March of 2013.  And about a
10  month or a little less than a month later the
11  government approved those slides with minor
12  redactions for disclosure so that he could use them
13  publicly.
14      So in the course of that process I made a
15  submission to the office on his behalf.  Someone
16  contacted me and identified themselves as the
17  individual who was responsible for supervising the
18  review of that matter.
19      And then they have their own internal
20  processes by which they consult with other entities
21  within DOD to get their input on whether or not the
22  particular content of whatever is submitted contains



1   information that would be sensitive or classified.
2       Q.   Do you know what factors the OPSR
3   considers when making a determination as to whether
4   any publication that's submitted by a military
5   employee subject to an SCI agreement, what factors
6   are considered?
7       MR. PATRIZIA:  Object to form.
8       I'll permit the witness to answer.
9       BY MR. FURMAN:
10      Q.   Do you understand the question?
11      A.   I think that I do.  And it's my
12  understanding that the processes objective in the
13  sense that they consult with the relevant entity
14  within DOD to ask the question, is there material in
15  whatever this is, a movie script, a book manuscript,
16  a slide deck, in this instance, that contains
17  sensitive or classified information.
18      And the answer to that question ought to
19  be a relatively objective one, which is to say, there
20  is a process by which the government determines what
21  information is sensitive or classified.  And a
22  particular piece of information either is or it

1   isn't.
2       That process has certainly been criticized
3   by outsiders as being not as objective as it ought to
4   be.  But in theory, it's an objective process.
5       Q.   And I was conscious of the fact that you
6   used the phrase that, "it ought to be objective."
7       Is there potentially a political aspect to
8   that review that you're aware of?
9       MR. PATRIZIA:  Object to form.
10      I'll permit the witness to answer.
11      A.   Again, not in my experience, meaning the
12  slides that we submitted on behalf of Mr. Bissonnette
13  and in other matters that I've been involved in have
14  seemed to me to be relatively straightforward.
15      And -- but I'm aware that the
16  classification process generally is subject to public
17  criticism for potentially being a politically
18  motivated process.
19      I have not had personal experience with
20  evidence of that.
21      BY MR. FURMAN:
22      Q.   The slides that you referenced that you

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                    January 18, 2017
15

1  became aware of in March of 2013, did they involve
2  any information that either directly or indirectly
3  relates to Operation Neptune Spear?
4      A.   My recollection is that they did generally
5  refer to the mission, but not in any specific detail.
6      Q.   Now, in connection with, "No Easy Day," do
7  you know who at the OPSR would have been the
8  decision-maker in terms of deciding whether the book
9  was permissible?
10     A.   No, I don't.
11     Q.   Okay.  And do you know the process, the
12 factors, that the OPSR would have considered had the
13 book been submitted for prepublication review at any
14 point before Mr. Johnson's letter -- Jeh Johnson's
15 letter?
16     A.   Well, I think I've just described it to
17 you.
18          I mean, my understanding is that they then
19 -- that when the OPSR gets a document of some kind
20 submitted for prepublication review it is reviewed by
21 the relevant entity, depending on what the subject
22 matter of it is.



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                    January 18, 2017
16

1          And that entity comes back to OPSR and
2  identifies any specific matters that they think are
3  potentially problematic.
4          There's some process within OPSR by which
5  they make a determination of what they're going to
6  do.  They then come back to the author and indicate
7  what changes they want to see made.
8          And then typically in that process, in my
9  experience, there is frequently some give-and-take.
10 So, for example, not in this matter, but in another
11 matter they identified something that they said was
12 classified.
13          We found a pleading that the government
14 filed in a publicly-filed case in which they
15 specifically discussed the matter that had been
16 identified as classified.  And the government receded
17 and said, well, then that's fine; you can leave that
18 in.
19          In other situations, the government takes
20 the position that even material that has been in the
21 public record if it was classified still remains
22 classified, even if it was leaked.



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                    January 18, 2017
17

1          And so in those instances, what often is
2  done is that, rather than have the individual state
3  that as the product of his own experience or
4  observation, a reference is simply made to a public
5  source.
6          So instead of saying this happened on that
7  day, which would be improper, the OPSR would permit
8  you to say The Washington Post has reported that this
9  happened on that day.
10         And so with that sort of change, things
11 are then permitted.  So there's typically a
12 give-and-take process.  And then the statutes and
13 regulations permit the issues to be adjudicated in
14 court, but that typically doesn't happen.
15     Q.   Okay.  And turning, just for a moment, to
16 operation Neptune Spear.  Did you at some point come
17 to learn that Operation Neptune Spear was a
18 top-secret mission?
19     A.   Yes, I did.
20     Q.   And when did you learn that?
21     A.   I learned that in my first conversations
22 with representatives of the defense department

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                    January 18, 2017
18

1  following Mr. Johnson's letter.
2      Q.   And that was -- and your first
3  conversations -- let me just strike that.
4          We'll be asking several questions about
5  that.
6      A.   Sure.
7      Q.   So I'm going to come back to those
8  conversations.  But let me just ask you because of
9  this -- I want to focus on the top-secret element of
10 Operation Neptune Spear.
11         Those conversations with the government
12 took place around the time of your letter responding
13 to Jeh Johnson shortly after August 31st of 2012,
14 correct?
15     A.   That's correct.
16         MR. PATRIZIA:  Just a note, Jeh Johnson is
17 actually, J-E-H, not, J-A-Y.
18         MR. FURMAN:  Thank you.
19         BY MR. FURMAN:
20     Q.   Now, if the book had been submitted to the
21 OPSR before Jeh Johnson's letter of August 30th,
22 2012, do you have any knowledge, one way or the



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
19

```
 1   other, whether the OPSR then would have submitted the
 2   book to the CIA for review?
 3       A.   I don't think that -- it might have been
 4   submitted to the CIA.  I don't know.  I think it
 5   would certainly in the first instance have been
 6   submitted to the Naval Special Warfare Command, which
 7   carried out the mission.
 8            Whether they would have consulted with the
 9   CIA, I simply don't know.
10       Q.   Okay.  I want to start just marking a few
11   exhibits.
12            MR. FURMAN:  Mr. Tobey, we're at 110.
13            MR. TOBEY:  111 is the new exhibit.
14            MR. FURMAN:  Oh, okay.  Can I have the
15   complaint?
16            (Exhibit Number 111 was marked for
17   identification and was attached to the deposition.)
18            BY MR. FURMAN:
19       Q.   Mr. Luskin, have you seen Exhibit 111
20   prior to today?
21       A.   Yes, I have.
22       Q.   It's a copy of the Eastern District
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
20

```
 1   complaint against Mr. Bissonnette that was filed on
 2   August 20th of 2016.
 3            Were you representing Mr. Bissonnette at
 4   that time?
 5       A.   Yes, I was.
 6       Q.   And were you representing Mr. Bissonnette
 7   in connection with this complaint?
 8       A.   Yes, I was.
 9       Q.   Now, in the complaint, the -- in the
10   factual allegations -- and I'm turning now to
11   paragraphs that start with Number 5 -- it states that
12   Mr. Bissonnette signed four documents:
13            First, a classified information
14   nondisclosure agreement, which is known as a CINA,
15   C-I-N-A; second, that he signed a sensitive
16   compartmented information nondisclosure statement,
17   otherwise known as an SCI; third, that he signed a
18   sensitive compartmented information indoctrination
19   memorandum; and four, that he signed a personal
20   attestation stating that he understood his
21   responsibility to protect clarified and national
22   security information.
```



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
21

```
 1            Do you see that?
 2       A.   Yes, I do.
 3       Q.   Were you aware that Mr. Bissonnette had
 4   signed those documents at the time that you were
 5   writing to Mr. Johnson on August 31st of 2012?
 6       A.   I was certainly aware of 1 and 2 because
 7   those were included as attachments to Mr. Johnson's
 8   letter.  I am not sure whether or not I knew at that
 9   time about item 3, the indoctrination memorandum, or
10   item 4, the personal attestation.
11       Q.   Okay.  Turning to paragraph Number 7 of
12   the complaint, it states that, quote, in signing the
13   SCI nondisclosure statement, Bissonnette expressly
14   agreed to a prepublication requirement.
15            Specifically, he agreed to submit to the
16   government for prepublication security review any
17   writing or other preparation in any form that
18   contains or purports to contain SCI or a description
19   of activities that produce or relate to SCI.
20            Do you see that?
21       A.   Yes, I do.
22       Q.   Were you aware of that requirement at the
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
22

```
 1   time that you wrote the letter to Mr. Johnson on
 2   August 31st of 2012?
 3       A.   Yes, I was.  As I said, I'd seen a copy of
 4   the signed agreement as an attachment to Mr.
 5   Johnson's letter.
 6       Q.   Now, at the time that you sent the letter
 7   to Mr. Johnson, did you undertake any efforts to
 8   determine whether or not the book, "No Easy Day,"
 9   contained information that described activities that
10   either produce or relate to SCI?
11            MR. PATRIZIA:  Object to the form.  You
12   may want to be clear as to what your reference to,
13   "the letter" is.
14            MR. FURMAN:  Yes.  Why don't I mark that
15   as an exhibit so we can use that?  And thank you, Mr.
16   Patrizia.  That's a good idea.
17            Just so that I have a bit of order to
18   things, I'm going to mark the consent decree as the
19   next exhibit and then I'll mark the letter so that we
20   can reference it for ease.  Thank you for that.
21            (Exhibit Number 112 was marked for
22   identification and was attached to the deposition.)
```



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
23

1      BY MR. FURMAN:

2      Q.    Mr. Luskin, I'm showing you what's been

3  marked as Exhibit Number 112, which is the consent

4  decree.

5            Do you recall receiving that consent

6  decree on or about August 19th of 2016?

7      A.    I did.

8      Q.    Did you participate in the --

9      MR. PATRIZIA:  Sorry.  Would you read that

10 back, please?

11           (The reporter read back the requested

12 testimony.)

13     MR. TOBEY:  My question is -- this one is

14 not signed by the judge.  Do we have one that's

15 signed by the judge?

16     MR. FURMAN:  I don't know if I have a copy

17 of that.

18     MR. TOBEY:  I presume it was signed by the

19 judge at some point.

20     A.    Yes, it was.

21     MR. TOBEY:  I think we can proceed on that

22 basis knowing that it was signed.



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
24

1      MR. PATRIZIA:  I have no problem with

2  that.  I know the decree was entered.

3      BY MR. FURMAN:

4      Q.    So just turning to document Number 112,

5  did you participate in the negotiation with the U.S.

6  Government in connection with this consent decree?

7      A.    Yes, I did.

8      Q.    And is that your signature on the last

9  page on behalf of Mr. Bissonnette?

10     A.    It is, indeed.

11     Q.    And that's also Mr. Bissonnette's

12 signature as well?

13     A.    Right, directly above mine.  That's

14 correct.

15     Q.    So we're going to turn to the consent

16 decree and the complaint in -- momentarily.  I just

17 want to show you the Jeh Johnson letter, which has

18 been previously marked as Exhibit 1 in this case.

19     MR. TOBEY:  If you prefer, I think I have

20 a clearer copy.

21     A.    It probably would be nice to have one

22 that's intelligible, just for the hell of it.



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
25

1      MR. FURMAN:  So this will be marked as

2  Exhibit 113.

3            (Exhibit Number 113 was marked for

4  identification and was attached to the deposition.)

5      BY MR. FURMAN:

6      Q.    Mr. Luskin, I'm showing you what's been

7  marked as Exhibit 112.  This is your letter dated

8  August 31st, 2012?

9      A.    The consent decree is 112.  So my letter

10 is 113?

11     MR. FURMAN:  113, yes.

12     MR. PATRIZIA:  And I note the copy I've

13 been provided has several emails on the back, so it's

14 more than just the letter itself.  I don't have a

15 problem with that.  I'm just noting it for the

16 record.

17     MR. FURMAN:  No.  That shouldn't be the

18 case, so I really just want the letter.  So maybe I

19 can just have that exhibit back and then --

20     MR. PATRIZIA:  We can just remove the last

21 two emails.

22     MR. FURMAN:  Thank you.  I appreciate

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
26

1  that.  Thank you, Mr. Patrizia.  You're being so

2  helpful to me.  I might have to split my fee with

3  you.

4      BY MR. FURMAN:

5      Q.    So we're focused now so far on Exhibit

6  Number 113, which is, Mr. Luskin, your letter dated

7  August 31st, of 2012.

8            That letter was in response to Mr. Jeh

9  Johnson's letter to Mark Owen, otherwise known as --

10 who we now know is Matthew Bissonnette, on August

11 30th of 2012, correct?

12     A.    That's correct.

13     Q.    I know you've got four documents in front

14 of you.  I want to start going back now to the

15 complaint.

16           At the time that you had drafted the

17 August 31st letter, which is marked as Exhibit 113,

18 were you aware, as I had previously mentioned in

19 paragraph Number 7 of the consent decree -- I'm sorry

20 -- of the complaint, that Mr. Bissonnette had agreed

21 to submit to the government for a prepublication

22 review any writing that contains or purports to



1  contain SCI or a description of activities that
2  produced or relate to SCI?
3      A.   Well, paragraph 7 is a paraphrase of the
4  SCI agreement.  And I had seen the SCI agreement
5  because it was attached as an exhibit to Exhibit 1,
6  Mr. Johnson's letter.
7      Q.   Right.  Okay.  And were you aware of --
8  and I agree with you that that -- paragraph 7 is
9  paraphrasing the actual wording of the SCI form,
10  which is otherwise known, I think, in the government
11  as Form 1847.
12      A.   Um-hum.
13      Q.   I just want to make sure that you were
14  aware of that requirement before you sent the letter
15  to Jeh Johnson on August 31st of 2012?
16      A.   Yes, I was.
17      Q.   You made a reference earlier -- and I just
18  want to explore that for a moment -- of experience
19  when dealing with the OPSR.
20          I'm certainly not going to ask you any
21  information that's privileged.  Can you just in a
22  general way explain to me what that experience is?



1      A.   I represented probably about a half dozen
2  clients who have had issues involving prepublication
3  review and have also represented publishers who had
4  an interest in manuscripts that were being submitted
5  for prepublication review.
6      Q.   And did those half dozen matters, did they
7  predate August 30th of 2012?
8      A.   Most did and a couple were after,
9  including my specific experience with Mr. Bissonnette
10  in connection with his slide deck.
11      Q.   Is there any kind of specialized training
12  that you're aware of that you -- a lawyer would need
13  in order to represent a client in connection with
14  dealing with the prepublication review process?
15      A.   I'm not aware of any particular training.
16  There are governing statutes and regulations and
17  scant case law that a lawyer would want to
18  familiarize himself or herself with.
19          I'm not aware of any particular training
20  in that area.
21      Q.   In those instances that you represented a
22  client in connection with a matter before the OPSR,



1  was it your experience that there was a give-and-take
2  with the OPSR about what material could be or could
3  not be published?
4      A.   Yes.
5      Q.   And what factors -- without revealing
6  anything that is privileged, what factors are
7  considered in that negotiation with the OPSR?
8          MR. PATRIZIA:  Objection.  Asked and
9  answered.
10          But I'll permit the witness to answer.
11      A.   As I think I said before, the standard is
12  meant to be an objective one, which is, is this
13  information sensitive or classified?
14          And then the negotiation generally centers
15  around the question of whether or not the information
16  has either been declassified or whether the
17  government, for example, has published the
18  information in some other form, even if it hasn't
19  been formally declassified.
20          So in the example I gave you before, we
21  identified a pleading filed by the Federal Government
22  in a public case where they specifically made



1  reference to the issue that -- in that matter the
2  government was claiming was classified.
3          And when we showed them the pleading, OPSR
4  then receded and then said, well, in that case, you
5  can leave that in.
6          BY MR. FURMAN:
7      Q.   In connection with Operation Neptune
8  Spear, were you aware in early 2012 and perhaps even
9  in late 2011 a writer named Nick Schmiddle,
10  S-C-H-M-I-D-D-L-E, wrote a piece for The New Yorker
11  that described in detail Operation Neptune Spear?
12      A.   Yes.  I'm aware of it and had certainly
13  read it at the time it was published.
14      Q.   And did you make any judgments at the time
15  whether or not that it was proper or improper for
16  whatever source or sources provided Mr. Schmiddle
17  with that information, whether that was appropriate?
18      A.   It certainly seemed to me from reading the
19  story that he had obtained information from
20  individuals who were required by law -- including,
21  but not limited to, an SCI agreement, who were
22  required by law to keep that information

1  confidential.

2  And while under the First Amendment Mr.

3  Schmiddle might not be liable for that disclosure,

4  those individuals might be.

5  Q.   Were you aware -- and this is at the time

6  that you read the article and maybe shortly

7  thereafter -- whether any government officials were

8  investigating that disclosure to Mr. Schmiddle?

9  A.   You know, I'm aware throughout that period

10  of time that there were various inquiries about

11  various leaks associated with Operation Neptune

12  Spear, including, but not limited to, Mr. Schmiddle's

13  article.

14  Q.   And I want to know if you recall this, if

15  you recall that Congressman King, from the great

16  State of New York, had led an inquiry into the

17  disclosure of confidential or classified information

18  that related to Operation Neptune Spear at the time

19  of that publication in the New Yorker?

20  A.   You know, I don't recall a specific

21  inquiry by Congressman King.  I might have been at

22  the time.  But as I sit here now, I don't recall it.


1  Q.   When did you first learn that one of the

2  operators on that mission, Operation Neptune Spear,

3  was planning to write a book that would be a

4  firsthand account of that operation?

5  A.   You know, I think it was probably in the

6  days immediately preceding Mr. Johnson's letter,

7  Exhibit 1.  In a week or ten days before then, there

8  were stories in the paper about the impending

9  publication of, "No Easy Day."

10  And there was some discussion in the media

11  about whether that was appropriate.  And I recall

12  having seen them in the various media sources in the

13  days immediately preceding August 30 of 2012.

14  Q.   And in general terms, the appropriateness

15  of whether the book should be published or not, did

16  that center on the same factors that centered on the

17  sources divulging information to Mr. Schmiddle; in

18  other words, giving information about a classified

19  operation?

20  MR. TOBEY:  Objection.  Form.

21  BY MR. FURMAN:

22  Q.   Did you understand the question?


1  A.   I think I did.  And I guess I would say

2  that my recollection, and it's an indistinct one, is

3  that there was discussion about; first, whether or

4  not the book revealed sensitive or classified

5  information; second, there was discussion about

6  whether or not it was appropriate for members of the

7  Special Forces to write about their combat

8  experiences.

9  And third, you know, in the fall of 2012

10  immediately before the election, there was also a

11  general discussion along party lines about whether or

12  not the administration was deliberately leaking

13  information and encouraging the publication of books

14  and articles and movies about the operation in order

15  to help the reelection of President Obama.

16  So the dispute really revolved around a

17  number of different issues.

18  Q.   And in connection with the political

19  aspect of it, at the time that you first learned

20  about the book, "No Easy Day," that was roughly in

21  the summer of 2012?

22  A.   You know, as I said, I recall having read

1  or seen things in the days immediately preceding the

2  letter.  When I first, sort of, heard about, "No Easy

3  Day," or the book, I honestly can't tell you that

4  because it simply wasn't on my radar screen until I

5  got called and was asked to be involved.

6  Q.   When did you first get a call to be

7  involved?

8  A.   It would have been the night of August the

9  30th.

10  Q.   Who called you?

11  A.   Mark Fabiani.

12  Q.   How do you know Mark Fabiani?

13  A.   Mark is a lawyer who was in The White

14  House counsel's office during the Clinton

15  Administration.

16  And during the various Clinton wars in the

17  mid and late '90s, I represented a number of senior

18  officials in The White House and also had agreed to

19  be a sort of surrogate for The White House, kind of

20  going out and talking publicly about some of those

21  things.

22  And I got to know Mark then.  And then



---

```
 1  immediately preceding August of 2012, I had then last
 2  worked with him in connection with my representation
 3  of Lance Armstrong.  So I had known Mark for 20
 4  years.
 5       Q.     And how did he contact you?  Was it via
 6  text message or a call or an email?  How was that?
 7       A.     He called my cell phone.
 8       Q.     What did he tell you?
 9       A.     He told me that he represented Matt
10  Bissonnette; that he had been brought into the matter
11  relatively recently to help Matt and the publisher
12  deal with the emerging controversy over the
13  publication of the book; that they had received a
14  letter from Mr. Johnson, which he was then going to
15  try and send to me; and that the letter raised --
16  made specific threats about litigation and he
17  believed implied threats of potential criminal
18  liability that made he (sic), Mark, believe that Matt
19  needed a lawyer with his skill set.
20              And he asked if I would become involved on
21  Mr. Bissonnette's behalf.
22       Q.     And Mr. Fabiani is an attorney, correct?
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

---

```
 1       A.     He is, indeed.
 2       Q.     And he told you that he represented Mr.
 3  Bissonnette?
 4       A.     That's right.
 5       Q.     Do you know what the scope of Mr.
 6  Fabiani's representation was of Mr. Bissonnette at
 7  that time?
 8       A.     Not precisely.  I knew only what he told
 9  me, which was that he had been brought in to help
10  deal with the public controversy that was surrounding
11  the publication of the book.
12              Mark's expertise coming out of the White
13  House was in crisis management, and so he tended to
14  become involved in cases where he could use his skill
15  set as both a lawyer and as a crisis manager.
16              And that was also the role he played in
17  the Armstrong case.
18       Q.     Do you know whether or not Mr. Fabiani was
19  brought into the matter through Mr. Bissonnette's
20  agent Elyse, E-L-Y-S-E, Cheney, C-H-E-N-E-Y?
21       A.     I don't recall him telling me at the time
22  who precisely had contacted him or how exactly he had
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

---

```
 1  become involved.
 2       Q.     Now, I just want to stagger back to the
 3  complaint, Exhibit 111, because I might forget to ask
 4  a question about that.
 5              If I can turn your attention to paragraph
 6  13 --
 7       A.     Of the complaint?
 8       Q.     Of the complaint, yes -- it states that,
 9  quote, on April 20th, 2012, Bissonnette signed an SCI
10  debriefing memorandum, documenting that he was again
11  reminded of his continuing obligation to comply with
12  the terms of the SCI nondisclosure statement that he
13  signed previously.
14              Do you see that?
15       A.     Yes, I do.
16       Q.     When did you first become aware that Mr.
17  Bissonnette signed an SCI debriefing memorandum?
18       A.     I think that that was in connection with
19  one of the two proffer sessions that Mr. Bissonnette
20  subsequently had with prosecutors from the Department
21  of Justice, so that would have been in the fall of
22  2014.
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

---

```
 1       Q.     Up until that time prior to the fall of
 2  2014, did Mr. Bissonnette tell you that he had signed
 3  a debriefing memorandun on April 20th of 2012?
 4       A.     I don't recall.
 5       Q.     Do you know whether there's any
 6  significance to that particular date, April 20th of
 7  2012?
 8       A.     I think that that date was at or around
 9  the time that he was formally discharged from the
10  Navy.
11       Q.     And he, being Mr. -- of course, Mr.
12  Bissonnette?
13       A.     Mr. Bissonnette, yes.  I'm sorry.
14       Q.     Your job is to answer questions.  My job
15  is to make sure to keep track of the information, and
16  Mr. Patrizia is here to help me.  I'm only kidding
17  about that.  Okay.  So thank you for that.
18              Now, just turning back to the time that
19  you were -- you received the call from Mr. Fabiani,
20  what's the next thing that you did in connection with
21  this matter?
22       A.     You know, there were a series of phone
```

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1 calls that night and the next morning about how to
2 respond and what could reasonably set (sic).
3     Q.    And what -- I'm sorry -- strike that.
4         Did you have a separate conversation with
5 Mr. Bissonnette on August 30th of 2012?
6     A.    I don't know that I had a one-on-one
7 conversation with Mr. Bissonnette on August 30th or
8 August 31st. I don't recall.
9     Q.    Did you have a conversation with him where
10 others were on the call?
11     A.    Yes. There were certainly at least one
12 and maybe more conversations involving him, Mr.
13 Podlaski, and perhaps Mr. Fabiani.
14     Q.    My recollection -- and I'll show you a
15 series of emails so that it will help you with your
16 recollection.
17         But my recollection is that you received
18 the news of the Jeh Johnson letter in the evening of
19 August 30th of --
20     A.    That's correct.
21     Q.    And that was the Thursday before the Labor
22 Day weekend. Is that fair? I'm forgetting.



1     A.    That sounds about right.
2     Q.    It might help to just have some of the
3 emails marked, so let me just get ahold of them.
4         MR. FURMAN: Document 114 will be a series
5 of emails that are in hardcopy form that were
6 produced to us under LUS4519 through 4521.
7         (Exhibit Number 114 was marked for
8 identification and was attached to the deposition.)
9         BY MR. FURMAN:
10     Q.    I wonder, Mr. Luskin, did I give you my
11 copy that has yellow markings on it? Probably not.
12     A.    No. I don't see any markings on this, Mr.
13 Furman.
14     Q.    Sorry. I have it.
15         If you don't mind just to turn your
16 attention to the first page ending in 4519. At the
17 middle of the page, there's an email at 9:13 p.m.
18 dated August 30th of 2012.
19         And it states -- it's from Elyse Cheney
20 stating: "Bob, I thought you should see some of the
21 opinions sent to us by Kevin Podlaski regarding this
22 matter prior to this new development."



1         And the email attaches a previous email
2 dated August 28th of 2012 from Mr. Podlaski to Elyse
3 Cheney and to Mr. Bissonnette?
4         MR. PATRIZIA: I note that the -- we
5 agreed that the CC to Mark Owen is to Mr.
6 Bissonnette. But I just want to have the record
7 clear that the CC is to Mr. Owen and not to Mr.
8 Bissonnette.
9         BY MR. FURMAN:
10     Q.    Do you see that?
11     A.    I do see that.
12     Q.    And I agree with Mr. Patrizia's comment.
13 And just so that the record is clearer, the email
14 address is for Markowen123456@gmail.com.
15         And I will represent to you, Mr. Luskin,
16 that this is one of Mr. Bissonnette's email
17 addresses.
18     A.    And I know that to be the case.
19     Q.    Do you recall receiving that email from
20 Ms. Cheney on August 30th of 2012 at 9:13 p.m.?
21     A.    You know, I don't have a present
22 recollection of it, but I have no reason to doubt

1 that I received it at the time.
2     Q.    Did you speak to Ms. Cheney before
3 receiving that email? The reason I ask is that the
4 email -- it suggests familiarity with you.
5     A.    Right. And so my assumption is that this
6 follows an initial conversation or two or three
7 conversations involving some of the folks who were
8 interested and involved in this matter.
9     Q.    Who would they be, just so I know who
10 those people were?
11     A.    I think the cast of characters would
12 likely be Matt Bissonnette, Mark Fabiani, Elyse
13 Cheney, Alex Gigante, who is general counsel for the
14 publisher, and your client, Mr. Podlaski.
15     Q.    Was a lawyer from Cahill Gordon involved
16 at that point in time?
17     A.    I don't recall anybody from Cahill.
18     Q.    Do you know whether or not Cahill
19 represented Penguin or Dutton in connection with the
20 Jeh Johnson letter?
21     A.    I don't recall having any dealings with
22 Cahill.

```
 1          MR. TOBEY:  Are you referring to Mr.
 2  Ragone?
 3          MR. FURMAN:  No.  No.  I'll get to that.
 4      BY MR. FURMAN:
 5      Q.  In a minute or two maybe after Mr.
 6  Patrizia gets a chance to stretch, I'll show you the
 7  emails that prompted my question to you about that.
 8      A.  Okay.
 9      Q.  In perhaps one or two of the conversations
10  that you mentioned with that cast of characters
11  involved, what do you recall the conversations to be
12  about?
13      A.  Well, the conversations centered around
14  two issues.  One was how and when and in what form a
15  response should be made to Jeh Johnson, and the
16  second was the underlying facts so that such a
17  response could be prepared.
18      Q.  Now, in connection with those two issues,
19  do you recall what Mr. Podlaski said about what the
20  response should be?
21      A.  Yes.
22      Q.  What do you recall him saying?
```



```
 1      A.  Well, I recall Kevin saying two things:
 2  First of all, that he was quite sure that the book
 3  did not contain classified information and that he
 4  had reviewed it carefully for that purpose and that
 5  he was comfortable that the book was clear, if you
 6  will.
 7          And the second was his explanation to me
 8  of why prepublication review was not required.  And
 9  that explanation is reflected in the last full
10  paragraph on the first page of Exhibit 113, the
11  letter back to Mr. Johnson.
12      Q.  Now, the first part of what Mr. Podlaski
13  told you, that he was confident the book contained no
14  classified information, do you know what basis he
15  would have had to say that?
16      A.  He told me that he had reviewed the
17  manuscript for that purpose.
18      Q.  Based on your experience, would you have
19  to have had access to the details of Operation
20  Neptune Spear in order to make an assessment as to
21  whether the book contained classified information or
22  not?
```



```
 1      A.  I think ultimately to make a final
 2  determination, you would.  I mean, at the end of the
 3  day, if you will, an A/B comparison -- you need A to
 4  set it alongside B, if that makes sense.
 5      Q.  Yeah.  And just to expand on that just for
 6  a moment, in order for Mr. Podlaski or anyone to make
 7  a judgment that the book did not contain classified
 8  information, wouldn't they have to have had access to
 9  classified information about Operation Neptune Spear
10  in order to make that determination?
11      A.  I think certainly to make it with 100
12  percent degree of certainty one could certainly
13  review public record sources and where you see
14  particular pieces of information in widespread
15  circulation have a reasonably high degree of
16  confidence that that information is not classified.
17  But I don't think you could make a determination to
18  100 percent degree of certainty.
19      Q.  And in order to protect Mr. Bissonnette,
20  do you think it would have been appropriate to be 100
21  percent certain, of course, that the book did not
22  contain classified information?
```

```
 1      A.  Well, you know, in order to protect Mr.
 2  Bissonnette to a 100 percent degree of certainty, one
 3  would have needed to go through the OPSR process.
 4      Q.  Now, the other aspect of the conversations
 5  that took place with the characters we described
 6  before had to do with the factual background, the
 7  context of what was taking place.
 8          What information do you recall receiving
 9  about the factual background and the context of what
10  was taking place that preceded Mr. Johnson's letter?
11      A.  Well, I had some understanding that there
12  had been some issues -- public issues involved in
13  this.
14          But by factual background there, most of
15  it came through, I think, Elyse Cheney and Mr.
16  Podlaski talking to me about the fact that Mr.
17  Bissonnette had retained Mr. Podlaski in order to get
18  advice about what his obligations were and that Mr.
19  Podlaski had also agreed to review the manuscript to
20  try to ensure that it did not contain classified
21  information.
22          And we talked about when that had taken
```



1  place and what generally had been done and then the
2  specific details of Mr. Podlaski's analysis of the
3  SCI agreement and whether, in this circumstance, it
4  required a submission of the manuscript for
5  prepublication review.
6      Q.   Did you make any judgments at that time
7  whether it was appropriate, one way or the other, for
8  Mr. Podlaski to review the manuscript himself?
9      A.   No, I didn't because my overriding concern
10 at this point, given the tone of Mr. Johnson's letter
11 and the explicit threat at the end of that letter,
12 was to respond as quickly as possible in a way that
13 did not force the government's hand into premature
14 litigation against Mr. Bissonnette or a criminal
15 referral to the Department of Justice.
16     And so it was of primary importance to me
17 that there was substantial evidence that Mr.
18 Bissonnette had been acting in good faith, had sought
19 the advice of counsel, and had received assurances
20 about what the appropriate course had been, and that
21 he was not, if you will, a bomb thrower or someone
22 who was trying to hurt the Special Forces or the



1  interests of the United States.
2      And that seemed to me, above all else, the
3  message that needed to be conveyed back to Mr.
4  Johnson personally and also publicly in order to
5  diffuse the temperature, if you will.
6      Q.   In connection with that, diffusing the
7  temperature, in Mr. Johnson's letter of August 30th
8  that is Exhibit 1 in this matter, the second
9  paragraph of that letter, and specifically the last
10 sentence of that letter -- of that paragraph states:
11 "Further public dissemination of your book will
12 aggravate your breach and violation of your
13 agreements."
14     Do you see that?
15     A.   Yes, I do.
16     Q.   And addressing the need to reduce the
17 temperature, as you've described it, did you consider
18 advising Mr. Bissonnette to halt or comply with Mr.
19 Johnson's request and stop further public
20 dissemination of, "No Easy Day"?
21     A.   You know, I don't think we talked about it
22 at that time.  And I understood from the



1  conversations with the publisher, who participated in
2  these chats on the night of the 30th and during the
3  day on the 31st before my return letter went back
4  that the decision about what to do with the book was
5  really no longer Mr. Bissonnette's, if you will.
6      He had complied with his obligation to
7  submit a manuscript to the publisher.  And at that
8  point the decision about how or whether or when to
9  publish the book was the publisher's decision, not
10 Mr. Bissonnette's.
11     And I don't mean to suggest that their
12 interests were adverse, but I want to be clear that
13 my understanding that evening was that it was not a
14 decision that was unilaterally within his control.
15     Q.   So I understand, in the conversations that
16 you had when you were first engaged in this matter,
17 the conversations included the publisher in those
18 discussions about what to do in response to Jeh
19 Johnson's letter, correct?
20     A.   That's right.
21     Q.   And your responsibility, of course, was to
22 Mr. Bissonnette?

1      A.   That's correct.
2      Q.   And only Mr. Bissonnette, correct?
3      A.   That's correct.
4      Q.   And the general counsel of the Department
5  of Defense was clearly stating that further public
6  dissemination of the book was an aggravation of what
7  they considered to be Mr. Bissonnette's breach and
8  violation of his agreements, correct?
9      A.   That's correct.
10     Q.   And did you consider, irrespective of the
11 publisher's control or decision-making, whether or
12 not Mr. Bissonnette could simply comply with Mr.
13 Johnson's directive and request that the publisher
14 halt the dissemination of the book?
15     A.   I certainly began considering at that time
16 what Mr. Bissonnette could do personally and at the
17 time -- early in the following week when I met
18 personally with Mr. Johnson, made the representation
19 on behalf of Mr. Bissonnette that he would not take
20 any steps to publicize the book, promote its
21 publication, give interviews, or in any other way
22 participate in the circulation of the book.



1    The question of whether to ask the
2  publisher to withdraw the book was certainly on my
3  mind.  But before that decision was finally made,
4  having met with Mr. Johnson early the next week, he
5  made clear at that meeting that, if you will, the
6  genie was out of the bottle.
7    And from the department's perspective, it
8  was too late to pull back the book and mitigate risk
9  to Mr. Bissonnette through that process.
10   Q.    The publication of the book was September
11 4th of 2011 -- 2012.
12   Are you aware of that?
13   A.    You know, I'm not aware of the specific
14 publication date.
15   Q.    Was the discussion about the publication
16 date one of the topics that were discussed in the
17 telephone conferences that you had with the players
18 or the characters you described earlier on August
19 30th and August 31st?
20   A.    It probably was.  And I don't recall it,
21 specifically.
22   Q.    Do you recall whether or not the



1  publication date was moved up from originally
2  September 11th of 2012 to September 4th of 2012?
3    A.    I don't.  I don't.
4    Q.    Did you give an opinion, one way or the
5  other, about whether that was appropriate to move up
6  the publication date?
7    MR. PATRIZIA:  Object to form.
8    I'll permit the witness to answer.
9    A.    You know, I don't recall expressing an
10 opinion on that.  As I said, very shortly thereafter
11 in my first meeting with Mr. Johnson he made clear to
12 me that from their perspective, notwithstanding
13 what's in the letter -- from the department's
14 perspective that issue was moot because
15 prepublication copies of the book were in wide
16 circulation at that point.
17   BY MR. FURMAN:
18   Q.    Do you know what that meant, "wide
19 circulation"?  Do you know how many copies of the
20 book were disseminated?
21   A.    I don't know.  I mean, my understanding
22 was that review copies had been circulated, the



1  department had obtained a copy.  How many that was, I
2  don't know.
3    You know, it came up in the context of
4  asking the specific question:  Was it too late, at
5  this point, to now submit the book for prepublication
6  review and to remedy the breach by going through the
7  process, if you will, now.
8    And Mr. Johnson's response was, not only
9  was it too late, but from the department's
10 perspective, that would be idiotic because there was
11 sufficient numbers of the book circulating at that
12 point in prepublication circulation, if you will,
13 that if the book were then submitted for
14 prepublication review and the government were then to
15 cut out all the bits that they thought were
16 classified, thereafter all someone would have to do
17 would be to hold copy A up against copy B and you
18 could obviously identify everything the government
19 regarded as classified.
20   Q.    Do you know at that point whether or not
21 the book in any form would have been published had it
22 been submitted for a review?

1    MR. PATRIZIA:  Objection.  Asked and
2  answered.
3    I'll permit the witness to answer.
4    A.    And the -- I can't answer the question
5  hypothetically.
6    My understanding as of the first meeting
7  with Mr. Johnson was that the government did not have
8  an objection to a book about the subject matter, but
9  it believed that specific things referenced in the
10 book improperly disclosed training tactics, and
11 procedures are classified information.
12   BY MR. FURMAN:
13   Q.    When did that meeting with Mr. Johnson
14 take place?
15   A.    It would have been very early the
16 following week.
17   Q.    Would it have been before September 4th of
18 2012?
19   A.    You know, I'd have to look at a calendar
20 at that point.  I don't know, but it very likely
21 would have been the Tuesday after labor -- if Monday
22 was Labor Day, then it would have been the Tuesday.



1  I mean, it was the next business day after I sent
2  that letter.
3          MR. FURMAN:  Why don't we take a short
4  break?  It will give me a chance to get some
5  documents in order.
6          MR. PATRIZIA:  Sure.
7          (A break was taken.)
8          (Exhibit Number 115 was marked for
9  identification and was attached to the deposition.)
10         BY MR. FURMAN:
11     Q.   Mr. Luskin, I've shown you what's been
12  marked as Exhibit 115.  It's a series of emails that
13  are contained on documents LUS4512 and 4513.  These
14  are emails on August 31st of 2012.
15         I'm going to just ask you to turn your
16  attention to the first page of this document and to
17  an email at 7:40 a.m. from you to Elyse Cheney and
18  Mark Fabiani.
19         It says:  "Got them.  Not the world's
20  clearest copies, but legible mostly.  I understand we
21  are convening at 10:00."
22         Is that the setup for a conference call



1  with the various people that you were describing
2  earlier?
3      A.   I think it was, yes.
4      Q.   And was this the first of the group or
5  team conference calls regarding this matter?
6      A.   You know, my recollection is that we spoke
7  the evening -- that there were a bunch of folks on
8  the call the evening before as well, that Mark
9  reached out for me first one-on-one.
10         And then there was some sort of group
11  conversation later that evening, the evening of the
12  30th.  So I think this was not the first.
13     Q.   So just turning your attention to the
14  first conversation -- I'd asked you about it earlier.
15  I just want to make sure I close the loop on it.
16         Is it your recollection that Mr. Podlaski
17  was a participant on that phone call in August -- on
18  Thursday night, August 30th of 2012?
19     A.   You know, as I look at these emails, it
20  suggests to me that that's not the case and that I
21  spoke with him the first time on August the 31st.
22     Q.   And the reason I think that you're saying



1  that is the email at 8:14 a.m. on August 31st of
2  2012, an email to Elyse Cheney, Mr. Fabiani, Mr.
3  Lehane, Mr. Ragone, and Mr. Bissonnette states:  "I'd
4  like to have a conversation with Kevin P. as soon as
5  reasonably possible, please."
6          Do you see that?
7      A.   Yes, I do.
8      Q.   And now that you've read that, does that
9  refresh your recollection, one way or the other,
10  whether you spoke to Mr. Podlaski on Thursday, August
11  30th of 2012?
12     A.   You know, it doesn't really refresh my
13  recollection, Mr. Furman.  But as I read this, it
14  certainly indicates to me that I did not speak with
15  him on the 30th and spoke with him for the first time
16  on the 31st.
17     Q.   Now, when you spoke to him on the 31st,
18  what do you recall that conversation being?
19     A.   My recollection is that he generally gave
20  me a briefing about how he had been retained, what he
21  had done, what advice he had given, and his view of
22  the situation and the legal merits of what was raised

1  in Mr. Johnson's letter of August the 30th.
2      Q.   And did you ask Mr. Podlaski whether or
3  not he had seen a copy of the SCI nondisclosure
4  agreement that was provided by Mr. Johnson in his
5  August 30th letter prior to August 30th of 2012?
6      A.   No.  I don't recall that we had a specific
7  conversation about when he had first seen it.  And I
8  don't recall asking him that and I don't recall him
9  saying to me that he had or had not seen it.
10     Q.   Now, there's an email at 9:22 a.m. on
11  Friday, August 31st, again, to Elyse Cheney, Mr.
12  Fabiani, Mr. Lehane, Mr. Ragone, and Mr. Owen -- Mr.
13  Bissonnette, rather and it states that:  "You had
14  spoken to Mr. Podlaski and, quote, are on the same
15  page, close quote."
16         Do you see that?
17     A.   I do see that.
18     Q.   In between 8:40 a.m. and 9:22 a.m., I'm
19  presuming that you had that telephone conversation
20  with Mr. Podlaski on Friday, August 31st of 2012?
21     A.   Right, between 8:14 (sic) and 9:22.  And
22  my assumption is, right, that we had spoken in that

1  intervening hour a little more.
2      Q.   When you stated that you were, "on the
3  same page," what does that mean?
4      A.   I think that I am referring generally to
5  what could be said in response to Mr. Johnson.
6      Q.   Was -- was there a discussion with Mr.
7  Podlaski about whether or not to follow the
8  instruction by Mr. Johnson and take action to prevent
9  further dissemination of the book?
10     A.   I don't recall having such a conversation
11 with him.  I do recall that he was pretty adamant at
12 this point, that there was no legal requirement to
13 have submitted the book for prepublication review.
14          So the issue of whether to try and get the
15 publisher to withdraw the book was not the first
16 thing on our list of priorities.
17     Q.   Now, do you recall the telephone
18 conference call that took place at 10:00 a.m.?
19     A.   Only generally, only that we talked and I
20 thought probably talked more than once during that
21 day.
22     Q.   Who was on that conference call?



1           MR. PATRIZIA:  The one at 10:00 a.m.?
2           MR. FURMAN:  The one at 10:00 a.m.
3      A.   You know, I don't recall specifically, but
4  assume that it would have been from among the group
5  to have included Mark Fabiani, Matt Bissonnette,
6  Elyse Cheney, Alex Gigante, and Kevin Podlaski.
7           BY MR. FURMAN:
8      Q.   Who drafted the letter that's marked as
9  Exhibit 113, the August 31st, 2012 letter?
10     A.   I did.
11     Q.   Did you have anyone at the firm at Patton
12 Boggs work with you on this?
13     A.   Not on this letter, no.
14     Q.   Did you share a draft of this letter with
15 anyone before it was sent to Mr. Johnson?
16     A.   I am almost certain that I shared a draft
17 with both the folks at the publisher and with Kevin
18 Podlaski.
19     Q.   Do you recall whether or not the publisher
20 and/or Mr. Podlaski made any comments to the letter?
21     A.   You know, I think folks did have some
22 comments, but I don't recall specifically what they



1  were.
2      Q.   Were there various drafts of this letter
3  before it was finalized?
4      A.   Entirely possible.
5      Q.   Do you have copies of the original drafts
6  of this letter?
7      A.   I don't.  This would have been done on my
8  home computer, not on an office system.  So I would
9  have overwritten whatever first draft I wrote with
10 the comments that other folks provided.  And so I
11 wouldn't have original versions of it.
12          My general recollection is that the final
13 draft is very close to the initial draft, that there
14 were not major modifications and that this thing did
15 not go through substantial changes.  But I also
16 recall that there were at least some minor changes
17 that were made, but I don't specifically recall what
18 those were.
19     Q.   What research was done in preparation for
20 this particular letter?
21          MR. PATRIZIA:  Object to form.
22          I'll permit the witness to answer.

1      A.   Virtually none.
2           BY MR. FURMAN:
3      Q.   Did you have access to associates or
4  anyone at the firm to assist in researching the
5  issues that were addressed in Jeh Johnson's letter?
6      A.   I did not access any associate resources.
7  At that point in terms of the question of whether or
8  not prepublication review was required, I relied on
9  Mr. Podlaski.
10     Q.   And was that 100 percent reliance?  In
11 other words, you didn't undertake any separate
12 analysis of that issue?
13     A.   Not at that time, no, I did not.
14     Q.   Was there a reason why you didn't?
15     A.   The reason was that I felt that it was
16 imperative that we prepare a response to Mr. Johnson
17 within 24 hours; that this was not so much a legal
18 memorandum as a way of making absolutely clear that
19 Mr. Bissonnette had acted in good faith; and that the
20 time would come when we would all have to drill down
21 further on the particular legal issues, but that
22 given Mr. Bissonnette's needs at this point, it was

1  more important to get this letter out than to conduct
2  further research or to refine the legal analysis.
3      Q.    Did you consider whether or not to respond
4  back to Mr. Johnson by asking for additional time and
5  holding off on publication of the book until you
6  could research the issues adequately?
7          MR. PATRIZIA:  Object to form.
8          I'll permit the witness to answer.
9      A.    Ask for extra time about what?
10         BY MR. FURMAN:
11     Q.    Yeah.  Well, that's fair.  And I think I
12  understand why Mr. Patrizia had an objection to the
13  form, so I'm going to withdraw that question.  Let me
14  ask it a different way.
15         Did you consider advising your client to
16  -- and also the publisher to stop further public
17  dissemination of the book until you had adequate time
18  to research the legal issues that were raised in Mr.
19  Johnson's August 30th of 2012 letter?
20         MR. PATRIZIA:  I'm going to continue to
21  object to form.  I'll also point out that this
22  potentially touches on the privilege between Mr.



1  Luskin and Mr. Bissonnette.
2          But I'll permit the witness to answer, so
3  long as he does not discuss his specific advice to
4  his --
5          MR. TOBEY:  Just to append that, this
6  would fall within the time period that I think the
7  judge has ordered a general waiver of the privilege,
8  August 30th of 2012 through September 4th of 2012.
9          She's ordered a general waiver of the
10  privilege between Mr. Luskin and Mr. Bissonnette.
11         MR. PATRIZIA:  You can agree to that
12  waiver.  My client can't.  So as long as that
13  instruction is clear, I'm fine.
14         MR. TOBEY:  Okay.
15     A.    Let me put it this way.  I think the
16  possibility of -- the question of whether or not to
17  ask the publisher to do something about publication
18  was on the table, but struck me as premature until
19  there was further interaction with Mr. Johnson.
20         And so the primary task was to -- because
21  Mr. Johnson had released this letter publicly and so,
22  to some extent, had painted himself into a bit of a



1  corner and created a great deal of public pressure on
2  my client.
3          And it seemed to me that the primary goals
4  were, first of all, to reassure him that Mr.
5  Bissonnette had been acting in good faith; and
6  secondarily, to do that in a way that was not
7  dogmatic or challenging or adversarial and to invite
8  specific engagement with him, which is why I said in
9  the last paragraph, "If you have additional
10  information that sheds a different light on these
11  matters, we would be happy to discuss it with you,"
12  holding open the possibility that they might have
13  information that would alter our views on what the
14  legal requirements were and that that information
15  might affect a range of decisions to be made,
16  including, but not limited to, the question of
17  whether or when to publish the book.
18         BY MR. FURMAN:
19     Q.    In the paragraph before that invitation,
20  which is the third paragraph of your letter to Mr.
21  Johnson, Exhibit 113 -- and I'll paraphrase it.
22         But you essentially are saying to Mr.

1  Johnson that the 2007 SCI nondisclosure agreement
2  would not apply to Operation Neptune Spear.
3          Is that essentially what you were telling
4  Mr. Johnson?
5      A.    What I was suggesting, which is, again,
6  based on the advice I got from Mr. Podlaski, was that
7  the special access programs that are covered under
8  the SCI agreement, if I'm being clear here, are
9  identified specifically operation by operation, which
10  is what he told me.
11         And therefore, since the special access
12  programs were identified in a memorandum that
13  accompanied the SCI agreement in 2007, as a
14  chronological matter, an operation that was conducted
15  in 2011 couldn't have been covered, that that, if you
16  will, was the argument Mr. Podlaski made to me, and
17  which I then put in this letter.  That's it.
18     Q.    And did you make -- once you heard that
19  argument and once you put it in writing, did you
20  undertake any assessment of whether that's an
21  accurate position to take?
22     A.    The issue came up -- as I said, I met with

1  Mr. Johnson and senior members of his staff very
2  early the following week.
3          And that issue was presented squarely.
4  And at that point, subject to a promise of
5  nondisclosure, they showed me the backup information
6  that -- you know, if you look back at the 2007
7  memorandum, there's an acronym.
8          I mean, there's a bunch of letters or
9  notes that indicated that that was not a specific
10 designation of an operation, but a generic
11 description that pretty well encompassed all of the
12 special operations programs that Mr. Bissonnette was
13 engaged in.
14         So they essentially said this
15 chronological argument you made misunderstands the
16 way in which the programs are identified.  Here is
17 the backup information that makes that clear.
18         There may be arguments that we can make
19 about the equities here, but this particular argument
20 is not valid.
21     Q.    And so I want to make sure I understand
22 it.  The acronyms that were in the 2007 nondisclosure


1  agreement, one of them was broad enough to have
2  included what was essentially the operation that
3  culminated in Operation Neptune Spear?
4      A.    Right.
5          MR. PATRIZIA:  Object to the form.
6          I'll permit the witness to answer.
7      A.    But that's a fair characterization of what
8  they explained to me.
9          BY MR. FURMAN:
10     Q.    And at any point in time before writing
11 the August 31st, 2012 letter, did you go over with
12 Mr. Bissonnette what those various acronyms stood for
13 in the nondisclosure agreement in 2007?
14         MR. TOBEY:  I'll object to the extent the
15 question goes beyond September 4th of 2012 because
16 that would be covered by the privilege.
17     A.    But you're asking prior to the 31st?
18         BY MR. FURMAN:
19     Q.    I am asking prior to the 31st.
20     A.    And prior to the 31st, Mr. Bissonnette
21 said, That's my signature on that SCI agreement; I
22 don't remember signing it; I'm sure I did; I don't


1  recall signing it.
2          And so the conversation about the
3  substance of it and the acronyms, that's a
4  conversation I had with Mr. Podlaski, not with Mr.
5  Bissonnette.  Mr. Bissonnette said he just didn't
6  know.
7      Q.    Did Mr. Podlaski tell you whether he knew,
8  one way or the other, what those acronyms stood for?
9      A.    What he told me was that the way -- based
10 on his experience, the way that these SCI agreements
11 worked was that these acronyms were quite specific
12 and related to very specific operations.
13         And, therefore, whatever they meant, they
14 could not have encompassed something that happened
15 four years later.
16     Q.    Now, before you ever heard of, "No Easy
17 Day," had you ever reviewed or had an opportunity to
18 review an SCI nondisclosure agreement?
19     A.    I'd seen SCI nondisclosure agreements.
20 That's correct.
21     Q.    And the -- in the SCI nondisclosure
22 agreements, they pertained to special access


1  programs, correct?
2      A.    That's correct.
3      Q.    And the -- typically, SAPs or special
4  access programs are identified by code words or
5  letters, acronyms?
6      A.    Yes.
7      Q.    So one would have to know what the
8  acronyms stand for in order to understand the
9  parameters of the nondisclosure agreement.
10         Fair to say?
11     A.    That's fair to say.
12     Q.    And in representing -- in your initial
13 representation of Mr. Bissonnette, did you undertake
14 any independent efforts to appreciate what the
15 acronyms were that were contained in the 2007 SCI
16 nondisclosure agreement prior to writing the letter
17 to Mr. Johnson on August 31st of 2012?
18     A.    No.
19     Q.    Is there any reason why you didn't?
20     A.    Yes.  I think I just told you, that I felt
21 that it was important to get a response back within
22 24 hours and I relied on Mr. Podlaski.

1  Q.   Was there anything that would have
2  prevented you from having the conversation with Mr.
3  Bissonnette to get that information before you wrote
4  the letter on August 31st of 2012?
5       MR. PATRIZIA:   Object to the form.
6       I'll permit the witness to answer.
7  A.   As I told you, I asked him in this time
8  frame about the agreement.  And he said, That's my
9  signature; I have no independent recollection of any
10 of it; and I don't know what those things mean.
11      BY MR. FURMAN:
12 Q.   So just so I understand your answer, you
13 either asked him or he volunteered that he did not
14 understand what those acronyms meant?
15      MR. PATRIZIA:  And the "he" in that
16 question is --
17      MR. FURMAN:  The he is Mr. Bissonnette.
18 A.   That's correct.
19      BY MR. FURMAN:
20 Q.   Knowing that your client didn't know what
21 those acronyms meant, and obviously you would not
22 have known what they meant, were you comfortable with



1  the position that was being taken in the August 31st,
2  2012 letter that the 2007 SCI agreement did not apply
3  to a 2011 operation?
4  A.   I was comfortable enough about it to put
5  it in the letter to indicate that -- in the context
6  of the letter explaining that he had received legal
7  advice, that there appeared to us to be a colorable
8  basis for the book not to have been submitted for
9  prepublication review.
10      And I was uncertain enough that I added
11 the last sentence to the letter, which says:  "If you
12 have any additional information that sheds a
13 different light on these matters, we would be happy
14 to discuss it with you."
15      As I said, I was trying to strike a
16 balance here between making clear to Mr. Johnson that
17 that Mr. Bissonnette had been acting in good faith
18 and not in defiance of his obligations, but also not
19 wishing to be dogmatic or adversarial in the tone of
20 the response and to invite a dialogue with DOD on
21 this issue.
22      MR. FURMAN:  I want to mark the next



1  series of the email exhibits.  They are also set
2  around August 31st of 2012.  That will be marked as
3  Exhibit 116.  And it's documents produced by Mr.
4  Luskin.  It's LUS4475 through 4480.
5       (Exhibit Number 116 was marked for
6  identification and was attached to the deposition.)
7       BY MR. FURMAN:
8  Q.   Now, Mr. Luskin -- thank you -- if you
9  could look at the page which ends in 78.  And these
10 emails were -- you produced them to us, correct, from
11 your --
12      MR. PATRIZIA:  We produced them.  The firm
13 produced them on behalf of Mr. Luskin.
14      MR. FURMAN:  Thank you.
15      BY MR. FURMAN:
16 Q.   And these are emails that you were
17 exchanging while at the Patton Boggs law firm?
18 A.   That's correct.
19 Q.   And I'm referring to the -- there's an
20 email on the bottom of that page from you to a lawyer
21 at Cahill named Dean Ringel.
22      Do you know why Mr. Ringel was involved in

1  this matter?
2  A.   You know, honestly, I have got absolutely
3  no recollection of having dealt with somebody at
4  Cahill.
5  Q.   And that's why I had asked you earlier
6  whether or not you recall Cahill being engaged to
7  represent the publisher in connection with this
8  matter.
9       And do you have a recollection, one way or
10 the other, on that?
11 A.   None whatsoever.  I'm sorry.
12 Q.   And in that email, you're attaching a
13 draft of the letter to Mr. Johnson for comments and
14 suggestions.
15      Do you recall that or see that, rather?
16 A.   I do see that.
17 Q.   Do you have a recollection doing that?
18 A.   Pardon?
19 Q.   Do you have a recollection of sending this
20 draft to Mr. Ringel?
21 A.   No.  Sorry.
22 Q.   And do you have any recollection -- I'm

1  presuming an answer, but I need to ask it anyway.

2          Any recollection of Mr. Ringel responding

3  or commenting, one way or the other, on the draft?

4      A.   No.  As I indicated before, my general

5  recollection is that there were some very minor

6  changes that were suggested in the draft that I

7  circulated, but I don't recall by whom or what

8  specifically they were.

9          But as to what, if anything, Mr. Ringel

10  might have contributed, I can't help you.  I'm sorry.

11         MR. PATRIZIA:  Just for the record, I'll

12  also note that the timestamps are a little odd since

13  the initial email at the bottom of 4478 has a

14  timestamp of 145701 plus 0000.

15         Whereas, the reply from Mr. Ragone seems

16  to be at 11:49 a.m., which would have been

17  approximately three hours earlier if they were in the

18  same time zone.  The timestamps are a little strange.

19     A.   And the email -- well, timestamps are

20  always strange.

21         MR. FURMAN:  And I think that the

22  timestamps -- and, Mr. Patrizia, thank you, for

1  pointing that out, that what you stated is accurate.

2  The only issue is what time zones the various --

3          MR. PATRIZIA:  Yeah, and I have no idea.

4          MR. FURMAN:  -- the recipients were in.

5      A.   And I was in the eastern time zone as

6  well.  And so why the timestamp on mine is later than

7  the succeeding emails, I can't tell you.

8          My recollection is that I got up quite

9  early that morning and, you know, we had this call

10  that you showed me before, 9:30, 10:00.

11         And I had also spoken separately to Mr.

12  Podlaski and at that point immediately sat down and

13  banged out a draft within the next hour or so.

14         And so, you know, having these drafts

15  circulate before noon is consistent with my general

16  recollection of how quickly things moved.

17         BY MR. FURMAN:

18     Q.   And the -- whether or not this is the next

19  sequence, it's not clear.  But there's an email on

20  the 31st at 11:49 a.m. from Mr. Ragone to you, Mr.

21  Sevier at Penguin, another person at Penguin named

22  Christine Ball, Alex Gigante at Penguin, Mr.

1  Bissonnette, Elyse Cheney, Mark Fabiani, Kevin

2  Maurer, who was the ghostwriter -- co writer, and Mr.

3  Ringel.

4          And the email says:  "Mark F. and I are

5  okay with this."

6          The first question -- Mr. Podlaski doesn't

7  seem to be on this email.  Is there a particular

8  reason why?

9      A.   No.  I don't know why.  I mean, I know

10  that I shared my draft with Kevin, and I don't know

11  whether or not I did that separately as I appeared to

12  have done with Mr. Ringel and not on a group email.

13         And it may be -- and I'm speculating a bit

14  here, Mr. Furman.

15         Because these were all new to me, for some

16  of them it was easy to hit, "reply all" and attach a

17  draft.  But I had gotten Mr. Podlaski's contact

18  information separately, so it wouldn't have been so

19  easy to have done so and so I would have sent it

20  separately.

21     Q.   There was an email in response --

22  seemingly in response to Mr. Ragone with the same

1  recipients on the email, excluding Mr. Podlaski.

2  He's not on this email.

3          And your question is:  "Do we have a call

4  at noon?"

5          Do you see that?

6      A.   Um-hum.

7      Q.   Did the call take place?

8      A.   I have no -- I don't recall.

9      Q.   Now, the publisher through Mr. Sevier, who

10  was the Editor-in-chief at Penguin, sent an email

11  shortly after yours at 12 p.m. on August 31st, again,

12  to the same individuals.  But it also included an

13  individual named Brian Tart, who I don't know who he

14  is.

15         And the email states that it's the

16  publisher's priority to get that strong letter out as

17  soon as possible.

18         Do you recall that being the publisher's

19  perspective?

20     A.   I think this note sort of accurately

21  reflects what they were saying at the time.

22     Q.   And Mr. Sevier mentions that he would

```
 1   participate in the call but has no further update
 2   except to execute the strategy agreed on this
 3   morning.
 4          Do you see that he discusses that?
 5      A.   I see that, yes.
 6      Q.   What strategy was agreed on that morning?
 7      A.   Well, the strategy was, as I've been
 8   saying, to get this letter out as quickly as possible
 9   and then as soon as possible to engage face-to-face
10   with senior leadership at DOD.
11      Q.   And do you know, one way or the other,
12   whether Mr. Podlaski was part of the phone call and
13   where that strategy was discussed and agreed?
14      A.   I don't.
15      Q.   On -- at 12:52 p.m. on that day -- and I'm
16   turning your attention to page ending 77 -- your
17   email to the same group states:  "The letter is being
18   faxed to Mr. Johnson now.  A PDF copy is attached."
19          So the letter effectively went out to Mr.
20   Jeh Johnson on August 31st at roughly 1 p.m. on that
21   day?
22      A.   Um-hum.
```



```
 1      Q.   Now, turning your attention to the page
 2   ending in 76, Mr. Bissonnette on Friday afternoon at
 3   2:32 p.m. wrote to you individually.  And he states:
 4   What's the next step once they get the letter?
 5   Thanks again, M."
 6          And you responded shortly thereafter at
 7   2:41 p.m. and stated:  "I think for now we sit tight.
 8   They may respond with more information.  They may
 9   stand pat.  They may reach out for us.  But as we
10   discussed this morning, I don't think there's
11   anything to be gained in the short run by talking
12   with them since they're unlikely to say anything we
13   want to hear."
14          Do you see that?
15      A.   Um-hum.
16      Q.   And that's your advice to Mr. Bissonnette
17   at that point, is to sit tight?
18      A.   It was, although it was very quickly
19   overtaken.
20      Q.   Did you consider whether or not at that
21   point in time to take further action to protect Mr.
22   Bissonnette's interests by reviewing and analyzing
```



```
 1   independent of Mr. Podlaski the position that the
 2   2007 SCI nondisclosure agreement would have applied
 3   to Operation Neptune Spear?
 4      A.   Well, to answer your question, I did
 5   immediately begin consideration of the general
 6   question of what remedies the government might have,
 7   including, but not limited to, the SCI agreement.
 8          And my particular immediate concern was
 9   not so much the SCI agreement, which gave the
10   government a contractual remedy to seek forfeiture of
11   proceeds, but an action by the government under the
12   so-called SNEPP doctrine because my concern was that
13   notwithstanding the fine points of the SCI agreement,
14   it would be a relatively easy matter for the
15   government simply to rely on the SCI agreement as
16   proof that Mr. Bissonnette had a fiduciary
17   relationship with the government and a generalized
18   obligation to protect its confidences.
19          And then regardless of whether or not the
20   technical terms of the SCI agreement were met in the
21   form of a special access program could proceed with
22   an action for constructive trust under SNEPP and
```

```
 1   simply do an end run around the fine points of the
 2   SCI agreement.
 3          So in very short order -- and I can't tell
 4   you exactly what the date was -- I asked one of my
 5   partners to basically look in greater detail at
 6   whether or not there was potential liability for Mr.
 7   Bissonnette under a fiduciary constructive trust
 8   theory.
 9          I had a general understanding of the case
10   and how it worked and the fact that the government
11   had relied on it, but I wanted more detail.
12          And so my first legal research priority
13   really was in that direction because, in my view,
14   that mooted the debate or could moot the debate about
15   the fine points of the SCI agreement.
16      Q.   And there would have been a -- I think
17   it's a partner in your firm at Patton Boggs who --
18      A.   It probably would have been Jamie Gardner,
19   I think, that I called, but I'm not 100 percent
20   certain.
21      Q.   Maybe if I can mark -- I only have two
22   copies of the billing invoices that were provided.
```



```
1    And my own apologies.  It's too much for Izabell to
2    carry.  So I'll have one to mark and then one to
3    share with you, Mr. Patrizia.
4            And Robert, do you have a copy?
5            MR. TOBEY:  I do.
6            (Exhibit Number 117 was marked for
7    identification and was attached to the deposition.)
8            MR. TOBEY:  You've compiled both the
9    Patton Boggs and Paul Hastings invoices?
10           MR. FURMAN:  Correct.
11           MR. TOBEY:  And that includes the last two
12   that we supplied recently?
13           MR. FURMAN:  Correct.  I think we're doing
14   this all on the record, so let's make sure we talk
15   one at a time.  Frankly, I don't know how we received
16   this.  I have to ask Izabell for that.
17           How did we get this, the document
18   production or --
19           MS. LEMKHEN:  I believe it was a dropbox.
20           MR. PATRIZIA:  My understanding, subject
21   to being corrected by Mr. Tobey, is that Mr. Tobey's
22   firm produced an unredacted set of invoices.
```



```
1            We had produced a set of redacted invoices
2    because under California Law, which Paul Hastings as
3    a California firm believes it's covered by, full sets
4    of invoices with descriptions of services are covered
5    by the privilege.
6            So we could not as a firm waive that
7    privilege and produce unredacted copies.
8            My understanding, subject to Mr. Tobey's
9    correction, is that Mr. Tobey produced a set which is
10   unredacted.  And I assume that's where these are
11   drawn from.
12           MR. TOBEY:  We produced a set after the
13   court ordered us to produce an unredacted set.
14   Subsequently, you sent out some additional discovery
15   requests and asked for any additional invoices.
16           There were two.  I want to say they were
17   dated in September and October of this year which
18   had, I think, the final billing for Mr. Luskin.
19           MR. FURMAN:  Okay.  And the reason -- and
20   I thank everyone for jumping in on that.  I just want
21   the record to be clear on how we have these invoices.
22   And the order of these invoices are chronological.
```



```
1            BY MR. FURMAN:
2       Q.   I'm certainly not going to be asking you
3    questions about every entry; otherwise, we'll be here
4    for several weeks and we'll miss the inauguration.
5       A.   Now, it's sounding better.
6            MR. FURMAN:  I had to throw that in.
7            BY MR. FURMAN:
8       Q.   I want to turn your attention, if you
9    will, to the invoice, which is dated October 10th of
10   2012.  It should be towards the top of Exhibit 116.
11      A.   Yes.
12      Q.   There's an acronym, JJD.  Who is that?
13      A.   That would be Jack Deschauer,
14   D-E-S-C-H-A-U-E-R, who was one of my partners and who
15   had formally been the head of policy and planning in
16   the defense department.  He had been a senior
17   official in the DOD.
18      Q.   And the acronym JSG, that refers to Mr.
19   Gardner?
20      A.   Ms. Gardner, yes, Jamie Gardner,
21   J-A-M-I-E, G-A-R-D-N-E-R.
22      Q.   Ms. Gardner, why was she involved in this
```

```
1    matter?
2       A.   I asked Jamie to oversee the research into
3    the SNEPP issues that I talked about earlier.
4       Q.   And there's an acronym for someone listed
5    as DZA.  Who is that?
6       A.   I think that that would be Zach Adams,
7    Z-A-C-K, Adams, A-D-A-M-S.
8       Q.   Now, if you just flip through the invoice,
9    you'll see that considerable time was spent
10   researching the various issues that relate to the
11   potential criminal charges, forfeiture remedies, and
12   possible causes of action.
13           Does that -- is that research that was
14   related to assessing the issues that were first
15   raised in Mr. Johnson's letter of August 30th, 2012?
16           MR. PATRIZIA:  Object to the form.
17           I'll permit the witness to answer.
18      A.   It was really quite a bit broader than
19   that because Mr. Johnson simply referred to the
20   agreements.  And as I said, I wanted further research
21   on equitable remedies.
22           And although one could infer from Mr.
```



1  Johnson's letter that there was a potential risk of
2  criminal prosecution, it didn't overtly threaten it.
3  But, again, that was something that I wanted further
4  research on.
5          And I should add the other person who
6  worked on this file but did not bill his time was my
7  partner, Michael Nardotti, N-A-R-D-O-T-T-I, who is
8  the former Judge Advocate General of the Army.  And
9  General Nardotti simply declined to bill his time on
10 this matter.
11         There may be odd billing entries here.
12 But his view was as a -- he regarded anything that
13 was in the aid of a SEAL with Mr. Bissonnette's
14 record to be a pro bono obligation, and he wouldn't
15 bill his time.  But he's someone else whom I was
16 consulting with in real time.
17     Q.    Now, at the time that you had drafted and
18 sent the August 31st letter, the position that is
19 reflected in the third paragraph of your letter,
20 which in substance states that the 2007 nondisclosure
21 agreement should not apply to the 2011 Operation
22 Neptune Spear, if I understand your testimony, you



1  based that position upon Mr. Podlaski's advice to
2  you?
3      A.    That's correct.
4      Q.    In the time period thereafter -- and I'm
5  looking at the invoice, so I'm just going to
6  calculate the hours that were spent.
7          Without doing the math, it clearly looks
8  to be approximately 100 hours of work that was done
9  by the firm.  Was there an independent review of Mr.
10 Podlaski's advice?
11         MR. PATRIZIA:  Object to the form.
12         I'll permit the witness to answer.
13     A.    As I said, very early on in my first or
14 second interaction -- face-to-face interaction with
15 DOD, they shared with me backup information that
16 indicated that that argument was probably not a
17 winner.
18         And so my focus turned to the question of
19 both potential criminal liability and equitable
20 remedies because, as I said, regardless of whether we
21 could prevail on the relatively narrow technical
22 question about the scope of the SCI agreement, if the



1  government could successfully pursue an equitable
2  remedy, it didn't matter; we still lost.
3          BY MR. FURMAN:
4      Q.    So once you were apprised of the backup
5  information from the Department of Defense, which
6  explained why, in fact, the 2007 SCI nondisclosure
7  agreement would apply to Operation Neptune Spear, did
8  it occur to you then at that point that what Mr.
9  Podlaski had advised to you was incorrect?
10     A.    Yeah.  It certainly seemed to me that that
11 was possible.
12     Q.    And did you discuss that with Mr.
13 Bissonnette, that the advice that Mr. Podlaski had
14 given you that formulated the position that was
15 outlined in the August 31st of 2012 letter was
16 incorrect?
17         MR. TOBEY:  What time period are we
18 talking about?  Is this open-ended?
19         MR. FURMAN:  No.  I'm asking it based on
20 the answer.  The answer was that it -- well, let's
21 have it read back.  That's a lot easier for me to do
22 that.

1          MR. TOBEY:  Because I have a privilege
2  issue, obviously, after September the 4th of 2012.
3          (The reporter read back the requested
4  testimony.)
5          BY MR. FURMAN:
6      Q.    So that I can understand the time frame,
7  the meeting with Mr. Johnson would have been --
8      A.    Early Labor Day week, I believe, Mr.
9  Furman.
10     Q.    And that would have been September 4th,
11 the first business day after Labor Day?
12     A.    Very possibly.
13     Q.    So I'll restate the question.  I think I
14 can restate it.
15         Once you were apprised in that meeting
16 very early in September, possibly September 4th, of
17 the fact that there was backup information that tied
18 the 2007 nondisclosure agreement to Operation Neptune
19 Spear in 2011, did it occur to you that Mr.
20 Podlaski's advice was incorrect?
21         MR. PATRIZIA:  Objection.  Asked and
22 answered.

```
 1             I'll permit the witness to answer.
 2    A.   Yes, it did.
 3             BY MR. FURMAN:
 4    Q.   And did you share that conclusion that Mr.
 5    Podlaski's advice was incorrect to Mr. Bissonnette at
 6    the time that you came to that conclusion?
 7             MR. PATRIZIA:  Objection as to privilege
 8    if it's the period after September 4 when such a
 9    conversation would have occurred.
10             MR. TOBEY:  I would adopt the same
11    objection.
12             MR. FURMAN:  Yeah.  And I would add to
13    that that Justice Collins issued two rulings that
14    pertained to Mr. Luskin's deposition.
15             She -- let me find what she said.  She
16    stated that she granted our motion to compel
17    information and documents from August 30th through
18    September 4th as it pertained to Mr. Luskin.
19             And then with respect to the statute of
20    limitations, she stated that we were permitted to
21    compel information relating to Mr. Bissonnette's --
22    or Mr. Luskin's knowledge of Podlaski's malpractice
```



```
 1    up and through December 31st of 2012.
 2             MR. TOBEY:  I think that's fair.  I will
 3    amend my objection to any discussion after December
 4    31, 2012 on the subject of Mr. Furman's question.
 5             MR. PATRIZIA:  I think it's very important
 6    that we proceed question by question in this area --
 7             MR. TOBEY:  Yes.
 8             MR. PATRIZIA:  -- because of the risk to
 9    the privilege.
10             So if the question were whether between --
11    whether there was any such conversation prior to
12    September 4 and then a question as to the period
13    between September 4 and December 31 of 2012, I think
14    we can rely on the determination of the issue that's
15    in the Justice's order.
16             Post December 31, 2012, we're going to
17    have a different issue.
18             MR. FURMAN:  I understand.  And just so
19    that I can get this all straight -- I'm going to ask
20    a fresh question.
21             MR. PATRIZIA:  No problem.  I just want to
22    -- just so we're clear on what the time periods are.
```



```
 1             MR. FURMAN:  I understand.
 2             BY MR. FURMAN:
 3    Q.   And if I -- if I ask a question I already
 4    asked, I apologize in advance.  I'm just trying to
 5    set the stage once again.
 6             You met with Mr. Johnson, Jeh Johnson, of
 7    the Department of Defense very early on -- it might
 8    have been September 4th, on that day after Labor Day
 9    -- to discuss the issue with Mr. Bissonnette,
10    correct?
11    A.   That's correct.
12    Q.   And at that meeting you were advised that,
13    in fact, there was information and documentation to
14    clearly indicate that the 2007 SCI nondisclosure
15    agreement related to the 2011 Operation Neptune
16    Spear, correct?
17    A.   Well, to be clear, we had a couple of
18    meetings at the Defense (sic) in very short order.
19    And whether this was at the first or the second
20    meeting, I can't be sure.
21             But what I think I can say is, in
22    relatively short order, they had satisfied me that we
```

```
 1    probably did not have a winning argument that the SCI
 2    agreement did not apply.
 3    Q.   And just so I get the timing down, your
 4    meetings with Mr. Johnson would have taken place very
 5    early in September.
 6             Is that fair to say?
 7    A.   That's my recollection, yes, sir.
 8    Q.   And I can find them -- you would have --
 9    sorry for staggering around here -- strike all of
10    that.
11             You would have billed for the time that
12    you spent with Mr. Johnson at the Department of
13    Defense, correct?
14    A.   I would certainly try.  I don't know --
15    Q.   That's a fair answer that every lawyer
16    will give --
17    A.   That's exactly right.
18    Q.   -- especially if you have to report back
19    to your partners.
20    A.   I am not very good about that.  Let me put
21    it that way.
22    Q.   So just give me a moment, if you don't
```

1    mind.  I want to pin those dates down.  I think that
2    they're important to make the record clear.
3        A.    And this suggests, Mr. Furman, that the
4    first meeting wasn't until September the 20th.
5    That's inconsistent with my recollection, but I defer
6    to my billing notes.
7            MR. PATRIZIA:  The invoices speak for
8    themselves, whether that was the first meeting or
9    subsequent meeting --
10       A.    That's the first meeting that's noted in
11   the billing invoices.
12           BY MR. FURMAN:
13       Q.    There is an entry by Mr. Deschauer -- Ms.
14   Deschauer --
15       A.    Mr. Deschauer.
16       Q.    -- Mr. Deschauer on September 12th of
17   2002, in which he spoke to Mr. Johnson at the
18   Department of Defense or an intermediary for him
19   regarding a potential meeting.
20           Do you see that?
21       A.    Yes, I do.
22       Q.    As you review these entries and with that


1    particular entry in mind, is it fair to say that the
2    first face-to-face meeting would have been on
3    September 20th of 2012 with Jeh Johnson?
4        A.    That's certainly what the billing entry
5    suggests.
6        Q.    And on the days preceding, Mr. Deschauer
7    had made various phone calls to the Department of
8    Defense to set up that meeting with Jeh Johnson for
9    you?
10       A.    That's right.
11       Q.    Prior to that meeting, you had an email
12   exchange with Professor Jack Goldsmith, correct?
13       A.    That's correct.
14       Q.    Now, Professor Goldsmith, among other
15   things, is a professor at Harvard Law School, but
16   also has a blog called Law Fare.
17           Are you aware of that?
18       A.    Yes.
19       Q.    And Law Fare is essentially an
20   intelligence/national security blog that Mr.
21   Goldsmith and one other person maintains.
22           Is that your understanding?

1        A.    You know, I don't follow it, but that's my
2    general understanding.
3        Q.    That was my next question, was whether you
4    follow it.
5        A.    No.
6        Q.    Have you written on it or participated?
7        A.    No.
8        Q.    When did you first become aware that
9    Professor Goldsmith had viewed -- taken a view about
10   the issue raised by Mr. Johnson's August 30th of 2012
11   letter?
12       A.    You know, I think that after I wrote the
13   August 31st letter that he reached out for me and
14   asked for a copy of the Jeh Johnson letter.  So he
15   had a copy of my response but not the initial letter.
16           And I think that I shared that with him
17   and then we either had email and/or telephone chats
18   about it because he seemed to me someone whose brain
19   I wanted to pick on these issues.
20       Q.    Do you recall that at least initially
21   Professor Goldsmith agreed with the position that was
22   reflected in your August 31st, 2012 letter, which,

1    among other things, suggested that the language in
2    the SCI agreement was sufficiently vague, that it
3    would not cover a prospective operation like
4    Operation Neptune Spear four years after the signing
5    of a nondisclosure agreement in 2007?
6        A.    You know, what I recall is that he did
7    write on the subject and said some encouraging things
8    and some discouraging things.
9        Q.    What were the discouraging things that you
10   recall?
11       A.    You know, my recollection is that he
12   didn't take as strong a position as we would have
13   liked.  And I remember talking about this issue with
14   Mr. Podlaski and have a general recollection of
15   sharing Goldsmith's article with Mr. Podlaski and his
16   feeling like that he was hoping for something
17   stronger.
18           But that's -- it's just a very general
19   recollection.
20       Q.    And when you say he was looking (sic) for
21   something stronger, are you referring to Mr.
22   Podlaski?

    A.    Yes.
        MR. FURMAN:  I'm going to show you and
have marked as an exhibit emails that were produced
that are designated LUS4440 through 4442.
        And these are emails that are between
yourself, Mr. Luskin, and Mr. -- I'm sorry.  Excuse
me -- Professor Goldsmith that relate to what we were
just discussing.
        (Exhibit Number 118 was marked for
identification and was attached to the deposition.)
        MR. PATRIZIA:  Do you want to take a break
for a few minutes?
        MR. FURMAN:  Yes.
        (A break was taken.)
        BY MR. FURMAN:
    Q.    Mr. Luskin, I'm showing you what's been
marked as Exhibit 118.  Do you recall this being the
time period, September 4th, that you were first in
contact with Mr. Goldsmith about the issue of Jeh
Johnson's letter?
    A.    That's right.
    Q.    Did you have a conversation with Mr.

Goldsmith about it, other than an email exchange?
    A.    I do think we had at least one telephone
conversation.  As I indicated to you, I very much
wanted to pick his brain given his background at OLC
and the Department of Justice.
    Q.    You had mentioned earlier that there were
parts of his view that you thought were good and
parts that were troubling.  I'm not quoting you.  I'm
just paraphrasing what I thought I heard you say.
        Can you tell me what you thought was not
positive or troubling?
    A.    No.  I can't, sitting here now.  I recall
that after our conversations he wrote an entry for
his blog and my recollection is that some of it was
supportive and I think he said some negative things
about how opaque the language of the SCI agreements
were.
        But again, my recollection is that he
didn't expressly support the view about the
chronological impossibility of the Neptune Spear
being a special access program governed by the SCI
agreement.

        And again, I have a general recollection
of sharing those conversations and the blog in real
time with Kevin and our both kind of sharing the view
that it would have been nice if he had been even more
supportive.  But I'm giving you very much an
impressionistic recollection.
    Q.    I'm going to show you an email that is
consistent with what you just described.  This will
be marked as Exhibit 119.
        (Exhibit Number 119 was marked for
identification and was attached to the deposition.)
        BY MR. FURMAN:
    Q.    Now, this is an email exchange that I
received or was produced, rather, through Mr.
Podlaski's firm.  And it's designated by a Bates
number KP ending in 396 through 399.
        MR. PATRIZIA:  Mine ends at 400.
        MR. FURMAN:  It does end at 400.  Thank
you.
        BY MR. FURMAN:
    Q.    Mr. Luskin, do you recall the email
exchanges with Professor Goldsmith that are reflected

in document 119?
    A.    Beyond what I've just told you, I have no
independent recollection of the exchange.
    Q.    Are these -- do these emails -- are they
essentially -- are these the emails that you received
that you mentioned earlier in your discussion about
Mr. Goldsmith's opinion about the issues related to
Mr. Johnson's letter?
    A.    This, as well as the fact that I think
that he published a blog entry as well.  So in
addition to his email to me, I think he published
something for kind of wider circulation.
        MR. FURMAN:  This will be 120.
        (Exhibit Number 120 was marked for
identification and was attached to the deposition.)
        BY MR. FURMAN:
    Q.    Mr. Luskin, I'm showing you what has been
marked as Exhibit 120, which is I believe to be the
blog that you referred to.  I just want to show it to
you and ask you if this is a printed version of that
very blog you've just described?
    A.    This certainly looks like it, Mr. Furman.

1   Q.   Now, the hardcopy that I showed you that's
2   been marked as Exhibit 120, it is dated or has a date
3   line of September 10th of 2012.
4        Is that consistent with your recollection
5   as to the date of the blog?
6   A.   It is generally consistent with the time
7   frame, right.
8   Q.   These pages are not marked.  But if you
9   flip to the third page towards the bottom, there is a
10  sentence that starts off with, "who is right" and
11  there's a reference that -- the language in the SCI
12  has some ambiguity to it in the paragraph that
13  follows.
14       Do you see that?
15  A.   I do.
16  Q.   Now, if I can turn your attention to the
17  paragraph above that, it starts off with the
18  sentence:  "Now for the tricky legal question."
19       And Professor Goldsmith states, quote:
20  "Is it possible that the 2007 SCI nondisclosure
21  agreement that Bissonnette signed imposed
22  nondisclosure and prepublication consultation



1   obligations concerning not just the SCI in the
2   special access programs he was read into in 2007, but
3   in all subsequent SCI" -- "in all subsequent special
4   access programs he was read into as well."
5        Do you see that?
6   A.   Yes, I do.
7   Q.   Now, was that the part of his opinion that
8   you viewed was potentially troubling?
9   A.   No.  I think what was potentially
10  troubling or at least not as supportive as one would
11  have hoped was the discussion after, "who is right?"
12       I mean, the paragraph you're referring to
13  in a way kind of paraphrases the arguments that we
14  made in the August 31st letter to Mr. Johnson.  And I
15  think Professor Goldsmith goes on after "who was
16  right" to discuss his view about the matter.
17       And the other thing is that all of this
18  was conditioned upon our view that it was possible
19  that the Jeh Johnson letter was written somewhat
20  hastily, if you will, in response to the fact that
21  copies of the book were circulating and that DOJ
22  (sic) might have -- DOD -- pardon me -- would have



1   documents that it hadn't yet located or shared that
2   would shed further light on this issue.
3        So I think both Professor Goldsmith and we
4   were being somewhat tentative in expressing our views
5   because of the possibility that we'd stake out a
6   position that would then subsequently be contradicted
7   by a document we had not yet seen.
8   Q.   And that leads me to -- back to -- or
9   forward to the September 20th meeting with Jeh
10  Johnson.  Now that we have an understanding of the
11  date based on --
12  A.   Billing records.
13  Q.   -- the billing records, is that your
14  recollection of the time in which you were then
15  apprised that the acronyms that were in the 2007 SCI
16  nondisclosure agreement encompassed the 2011
17  Operation Neptune Spear?
18  A.   That would have been the time.  That's
19  right.
20  Q.   And was it at that point in time that you
21  appreciated that the advice that you were given and
22  that Mr. Bissonnette was given by Mr. Podlaski was

1   incorrect?
2   A.   You know, what I would say is that in the
3   intervening two-week period we'd also been looking
4   much harder at the SNEPP doctrine.  And by that
5   point, I was very pessimistic about our chances of
6   winning an equitable action regardless of how the
7   more narrow issue of the applicability of the SCI
8   agreement turned out.
9        So I guess I would say that by the 20th of
10  September I was feeling pretty negative about our
11  ability, as a general matter, to prevail on the
12  merits if the government brought a forfeiture action,
13  not just because of concerns about whether we would
14  prevail on the narrow SCI issue, but whether we could
15  also successfully defend an equitable action.
16  Q.   And what you've described as the equitable
17  action that reflects, essentially, a problem with the
18  SNEPP doctrine, correct?
19  A.   That's correct.
20  Q.   And when did you come to that view that
21  you were going to have some issues, putting aside the
22  contractual issues, but dealing with the SNEPP



1  doctrine issue itself?

2      A.    You know, I would say that I was worried

3  about the SNEPP issue really almost from the

4  beginning because it -- I was generally aware of the

5  doctrine and how the government had used it and its

6  potentially quite broad parameters and was very much

7  worried that it could serve -- I hate to use this

8  word -- as a trump card.  I'll try not to say that as

9  a proper name anymore -- to essentially moot the

10  dispute over the SCI issue.

11      And that's why I started looking at the

12  issue myself and then very quickly asked others to

13  start looking at it as well because, you know -- I

14  guess I would say by the end of the week of the 20th

15  I was of the view that it sort of didn't matter, you

16  know, how we came out on the SCI issue because we

17  were sunk on the SNEPP issue.

18      Q.    So at that time period that you just

19  described around September the 20th and shortly

20  thereafter, did you also reach the conclusion that

21  Mr. Podlaski's advice was incorrect because it did

22  not account for the SNEPP doctrine?



1      A.    Well, you know, I don't think I was

2  thinking about it in terms of whether Mr. Podlaski

3  was right or wrong.  I was thinking about it in terms

4  of whether or not we could win a threatened lawsuit.

5      And so I guess from my frame of reference

6  by, you know, the week of September the 20th, I

7  thought that we would probably lose such a lawsuit.

8      Q.    So at that point in time did you in any

9  form, whether it's in writing or via phone call,

10  advise Jeh Johnson that the position that was adopted

11  on September -- sorry -- on August 31st in your

12  responsive letter was retracted or now mooted?

13      A.    No.  I think we moved very quickly from

14  arguing about the merits to arguing -- to talking

15  about a path forward.

16      And it seemed to me by that point not in

17  Mr. Bissonnette's interest to be taking a very

18  adversarial approach to the DOD, not simply because

19  of the merits of a potential civil suit, but also

20  because of the attendant risk that such a continuing

21  public dispute would raise the likelihood that Mr.

22  Bissonnette might be prosecuted.



1      And so Mr. Johnson and I very quickly

2  started a dialogue about what would be a fair

3  resolution of the government's potential claims.

4      Q.    And you were -- just so I understand this,

5  you were now starting to turn your attention toward

6  resolving these issues both on the criminal side and

7  also the civil side because you had come to a landing

8  (sic) on the fact that the government was essentially

9  going to win?

10      A.    I thought -- let me put it another way.

11      I thought the best path forward was

12  talking about a constructive resolution rather than

13  taking an adversarial approach, that that was in Mr.

14  Bissonnette's overall best interest both in terms of

15  where we came out, in terms of a resolution of

16  potential civil claims, but also in terms of what it

17  -- what it entailed for a potential criminal

18  investigation and prosecution.

19      To my knowledge, as of the end of

20  September, DOD had not made a referral to the

21  Department of Justice.  And Mr. Johnson told me that

22  explicitly.

1      And although it is improper for a lawyer

2  to threaten or not threaten a criminal prosecution to

3  reach a civil resolution, he made it very clear to me

4  that reaching such a resolution would increase the

5  likelihood that there was no criminal investigation.

6      Q.    So -- and I understand the ethics involved

7  in that.  Obviously, we all do.

8      But it was essentially an implicit message

9  that Mr. Johnson was advising you that resolving the

10  forfeiture matter amicably would essentially diffuse

11  any more tension that could potentially lead to a

12  criminal prosecution.

13      Is that what you're telling me?

14      A.    I think that's a fair characterization.

15      Q.    And you mentioned that taking an

16  adversarial position was against Mr. Bissonnette's

17  interests.

18      What do you mean by an adversarial

19  position?

20      A.    I mean essentially saying to the

21  government, see you in court; we think your position

22  stinks; and we think we have the right to publish the



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                              January 18, 2017
                                                                        111

1   book without republication review; and if you feel
2   otherwise, try and persuade a judge.
3           Q.    Is it fair to say that once you had a
4   chance to review the SNEPP doctrine and had the
5   opportunity to review the documents that were
6   produced by Mr. Johnson in that September 20th, 2012
7   meeting that you concluded that Mr. Bissonnette
8   should have submitted the book for prepublication
9   review?
10          A.    I think it was clear to me that the --
11  that if we litigated that issue the government would
12  have the better of the argument, yeah.
13          Q.    Did you advise your client of that?
14          MR. PATRIZIA:  At that time?
15          MR. FURMAN:  At that time.
16          MR. PATRIZIA:  So we're between September
17  4 and December 31?
18          MR. FURMAN:  Yeah.
19          BY MR. FURMAN:
20          Q.    We are.  But once you -- just so I get the
21  -- yeah.  Let's just make this general assumption.
22  I'm only going to be asking about up and through


800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                              January 18, 2017
                                                                        112

1   December 31st.  There's no way that I'm going to go
2   past that.
3           MR. PATRIZIA:  That's fine.
4           MR. FURMAN:  Could I have the last
5   question and answer read back, Sherry?
6           (The reporter read back the requested
7   testimony.)
8           BY MR. FURMAN:
9           Q.    And just so I get the time frame down
10  clearly, the SNEPP doctrine reviewed by you and your
11  firm was conducted in September of 2012 prior to the
12  meeting with Mr. Johnson, correct?
13          A.    That's right.
14          Q.    And it was at the September 20th meeting
15  that you actually saw the backup documents which
16  connected the 2007 SCI nondisclosure agreement to
17  Operation Neptune Spear?
18          A.    That's right.
19          Q.    So by September 20th, 2012, it was clear
20  to you, as you described it, that if this matter was
21  contested Mr. Bissonnette would have lost?
22          MR. PATRIZIA:  Object to the form.


800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                              January 18, 2017
                                                                        113

1           I'll permit the witness to answer.
2           MR. TOBEY:  Object to the form.
3           A.    I did not -- let me put it this way:  I
4   did not think that on the merits of a suit that we
5   would have a very strong argument and I thought the
6   government would.
7           And I certainly had reached that
8   conclusion by the end of the week of the 20th.
9           BY MR. FURMAN:
10          Q.    And did you share that opinion with Mr.
11  Bissonnette?
12          MR. PATRIZIA:  At that time?
13          MR. FURMAN:  At that time.
14          A.    Yes.
15          BY MR. FURMAN:
16          Q.    And what did you tell him?
17          A.    We simply talked about the relative merits
18  of the government's position.  My concern as his
19  lawyer was to give him the best advice I could
20  possibly give him about the appropriate strategy
21  going forward.
22          And certainly in the context of talking


800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                              January 18, 2017
                                                                        114

1   with him about moving towards a path of resolution,
2   which, after all, is his choice, not mine, I
3   certainly would have and did share with him my view
4   of the merits of an alternate path of, you know,
5   adversarial legal conflict.
6           I mean, he had a choice to make and, of
7   course, I gave him my advice about the merits of each
8   of those choices.
9           Q.    Was Mr. Podlaski invited to the September
10  20th meeting with Jeh Johnson?
11          A.    No.
12          Q.    Why wasn't he invited?
13          A.    Because -- for a couple of reasons.
14          My view, you know, starting very, very
15  early on was that Kevin was a potential witness in a
16  criminal action or a civil suit because at the heart
17  of either a civil suit or especially a criminal
18  action, Matt Bissonnette's good faith would be a
19  critical issue.
20          And the fact that Matt sought and received
21  and followed legal advice in good faith seemed to me
22  to be absolutely critical to any potential defense.

800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN                                            January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                   115

```
 1   And to that extent, Kevin was an important potential
 2   witness.
 3          And in that context -- and again, putting
 4   that in the specific context of the meeting with Jeh
 5   Johnson, what seemed to me to be relevant to that
 6   meeting was the fact that Matt had sought and
 7   received and followed legal advice and that I wanted
 8   the meeting to focus on what we were going to do
 9   next, and not have it focus on the question of
10   whether or not Kevin's advice was right or wrong
11   because at that point that seemed to me to be
12   completely irrelevant.
13          I mean, you know, the book had circulated.
14   It was too late, according to the government, to
15   submit it for prepublication review.  The question
16   was, was that advice correct or incorrect?
17          We crossed that bridge.  And the really
18   important issue was that Matt was a layperson who
19   went out and hired someone with the credentials to
20   give him the right advice on that subject.
21          And he listened to that advice and he'd
22   followed it.  And that was our mantra.
```



ROBERT D. LUSKIN                                            January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                   116

```
 1          And, you know, having Kevin in that
 2   meeting not only might have affected its viability as
 3   a potential witness in some subsequent proceeding
 4   because if he said anything then, somebody else might
 5   then be called to testify him, but also it put the
 6   focus, from my perspective, on the wrong thing, which
 7   would be what happened historically when I wanted the
 8   focus to be on, what we are going to do next.
 9       Q.   So going into the September 20th meeting,
10   if I understand you correctly, the mantra or the
11   strategy among other things, would have been to
12   express to Jeh Johnson and the Department of Defense
13   that Mr. Bissonnette was acting in good faith and in
14   reliance of advice of his lawyer in his decision not
15   to submit the book for a prepublication review?
16       A.   That's correct.
17       Q.   At that point in time once that decision
18   was made that Kevin Podlaski was significant as a
19   witness, did you tell Mr. Bissonnette at that point
20   that was the strategy that you were going to employ
21   in responding to Jeh Johnson and the Department of
22   Defense's threats of litigation?
```



ROBERT D. LUSKIN                                            January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                   117

```
 1       A.   You know, throughout that period of time
 2   we were talking about these matters.
 3          But the specific question of whether Kevin
 4   would attend that meeting simply didn't come up
 5   because, in my view, we were -- we both represented
 6   Mr. Bissonnette but that my specific role was in
 7   contending with a potential action by DOD or DOJ.
 8          And Kevin's role was, if you will, as a
 9   consulting expert on issues related to prepublication
10   review requirements.  So I didn't need to put him in
11   front of DOD.  And we never discussed that.
12          But we were generally talking about the
13   defense of the case.  And it was -- you know,
14   relatively in this period of time, I think when Kevin
15   said, well, you know, we talked.
16          And one of the things, obviously, on our
17   minds was the fact that the government's approach to
18   some of these prepublication review cases had been,
19   in a word, inconsistent and that there are other
20   folks, including other Special Forces folks, who had
21   published books without submitting them for
22   prepublication review.
```



ROBERT D. LUSKIN                                            January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                   118

```
 1          And so at some point he volunteered to put
 2   together a list of books that he knew about that
 3   didn't -- that hadn't been submitted for review.  And
 4   he came up with the idea of a FOIA request.
 5          So we were talking about these issues, but
 6   the question of whether he would attend that meeting
 7   was never raised.
 8       Q.   But the idea of, among other things, the
 9   defense of Mr. Bissonnette to be centered on the fact
10   that he received in good faith legal advice from Mr.
11   Podlaski, did you tell Mr. Podlaski that that was
12   going to be, among other things, the defense to the
13   Department of Defense?
14       A.   I'm sure we talked about that.
15       Q.   And the fact that he was at that point
16   potentially a witness, at the very least, did you
17   discuss that with Mr. Podlaski, that he would be a
18   witness in support of that defense for Mr.
19   Bissonnette?
20       A.   You know, I don't recall having that
21   conversation because relatively early on we started
22   talking about potential settlements, so I didn't see
```



1 litigation as a viable option.

2     Q.   In any case, but especially so in this

3 particular case, would it have been important for you

4 to identify and lock in certain witnesses that would

5 support your client's defense?

6     A.   Not necessarily, no. You know, for my

7 experience as both a prosecutor and a defense lawyer,

8 there are certain witnesses whom you do need to lock

9 in either by a deposition or putting them in a grand

10 jury and others with whom you have a sufficiently

11 constructive and trusting relationship that you

12 expect they'll be there when you need them.

13     And you not only don't need to lock them

14 in, there are always pitfalls to having somebody's

15 recorded testimony in the grand jury or deposition

16 because that is always fodder for cross-examination.

17     And so the smarter thing to do in those

18 circumstances is not to lock them in.

19     Q.   You mentioned before that one of the

20 various reasons why it would not have been sensible

21 to bring Mr. Podlaski to the meeting is that the

22 potential that he could then be cross examined on



1 inconsistent statements.

2     I'm paraphrasing your -- what you --

3     A.   That's a fair -- two reasons. One of the

4 reasons was, I didn't want the meeting to be about

5 the advice. I wanted it to be about Matt's good

6 faith and how we were going to deal with the problem

7 that we had.

8     And the other was that there was no upside

9 in having Mr. Podlaski in a meeting because if he

10 recalled something and got a date wrong, for example,

11 if he were ever needed as a witness in the future,

12 someone might impeach him with that.

13     Q.   Did you give Mr. Podlaski any instructions

14 about responding to any potential inquiries either

15 from the press or from the Department of Defense or

16 otherwise about his representation of Mr.

17 Bissonnette?

18     A.   No.

19     Q.   Did you ever instruct Mr. Podlaski to not

20 talk to Mr. Bissonnette without your involvement?

21     A.   Very early on I think I said to Mr.

22 Podlaski that I did not want him to talk about any of

1 the historical facts if I wasn't also involved, and

2 that's for two reasons.

3     One is if such a conversation took place,

4 I wanted to hear it first from Mr. Bissonnette; and

5 second, because in my mind, there was at least the

6 possibility that on this issue of good faith Mr.

7 Podlaski would be a witness.

8     I didn't want him to have conversations

9 with Mr. Bissonnette that might subsequently taint

10 either one of their potential testimony. You don't

11 allow witnesses to talk -- potential witnesses to

12 talk to each other.

13     And so for that reason, I basically said,

14 unless I'm involved, I don't want you talking about,

15 you know, historical facts with Matt.

16     Q.   And what was -- how did you deliver that

17 instruction? Was it by an email or a conversation

18 with Mr. Podlaski?

19     A.   You know, I don't recall.

20     Q.   Well, you have a distinct recollection of

21 having given that instruction to Mr. Podlaski?

22     A.   Yes, I do.

1     Q.   And that would have been early on in your

2 representation of Mr. Bissonnette?

3     A.   That's right.

4     Q.   Would it have been before or after the

5 first Jeh Johnson meeting?

6     A.   Couldn't tell you.

7     Q.   Are you aware after your initial

8 involvement whether or not Mr. Podlaski spoke to Mr.

9 Bissonnette without your presence or involvement?

10     A.   I didn't have a problem with them talking.

11 I didn't want them talking about the facts.

12     Q.   And my question was different, though. I

13 appreciate your response.

14     Do you know whether or not they had any

15 conversations about anything after your admonition to

16 Mr. Podlaski that you described early on in your

17 representation?

18     A.   I do not know.

19     Q.   Did Mr. Bissonnette tell you about any

20 conversations he had with Mr. Podlaski outside of

21 your presence after you gave that admonition early in

22 your representation of Mr. Bissonnette?



1     A.    I don't recall any such conversations.

2     Q.    Now, you mentioned that Mr. Podlaski had

3  -- I say sort of because I wasn't clear on

4  understanding what you said -- a consulting role in

5  connection with this matter?

6           MR. PATRIZIA:  Object to the form.

7           I'll permit the witness to answer.

8           BY MR. FURMAN:

9     Q.    And if I misstated what you said, it's my

10 own failing.

11          What role, if any, did Mr. Podlaski have

12 after you began your representation of Mr.

13 Bissonnette?

14    A.    Well, I looked -- first of all, in the

15 early stages, I certainly looked to him for his views

16 on the potential legal claims that the government

17 might make and his advice on those issues.

18          And I recall before going to see Mr.

19 Johnson that I wanted -- you know, I asked him to

20 kind of restate it, if you will, in writing.

21          And it wasn't to lock him in, but I wanted

22 to make sure I really understood what his thinking



---

1  was so that I didn't screw it up in sharing it with

2  folks at the DOD.

3           And I generally consulted with him during

4  that period of time about the path forward.  As I

5  said, it was Kevin's idea to file the FOIA action.

6  You know, that had nothing to do with the initial

7  advice that he had given to Matt and it had nothing

8  to do with the scope of the SCI agreement.

9           These were kind of his ideas and thoughts

10 about what we could do to address the problem that

11 was facing Matt.

12    Q.    Did --

13    A.    So I relied on him as a resource.

14    Q.    Other than what you described in terms of

15 the FOIA request, are you aware of anything else that

16 Mr. Podlaski did in connection with this matter after

17 September 4th of 2012?

18    A.    Well, we certainly talked about the

19 Goldsmith interactions.  And as I said, you know, for

20 a substantial period of time, I was keeping him very

21 closely apprised of what was going on.

22          I would say after those initial meetings



---

1  at DOD less so.

2     Q.    And that initial meeting was September

3  20th of 2012.  So using that as a benchmark, after

4  that and putting aside the FOIA request, could you

5  tell me anything that Mr. Podlaski did in connection

6  with this matter?

7     A.    I can't think of anything concrete, no.

8     Q.    Do you know whether your client asked Mr.

9  Podlaski to do anything on his behalf after September

10 20th of 2012?

11    A.    I don't know.

12    Q.    Was it Mr. Podlaski's idea to make the

13 FOIA request?

14    A.    Yes, it was.

15    Q.    Did you ask him to make the FOIA request?

16    A.    Well, I did in the sense that I said: "

17 Yes, go ahead with that.  That's a good idea."

18    Q.    Did Mr. Bissonnette ask Mr. Podlaski to

19 make that FOIA request or was it you?

20    A.    It was almost certainly me.

21          MR. FURMAN:  Why don't we take a break for

22 lunch?  It's 12:30.

---

1           MR. PATRIZIA:  That's fine.

2           (Whereupon, at 12:30 p.m., a

3           luncheon recess was taken.)

4                    -  -  -

5        A F T E R N O O N   S E S S I O N

6                                    (1:07 p.m.)

7  Whereupon,

8               ROBERT D. LUSKIN

9  was called for continued examination, and having been

10 previously duly sworn was examined and testified

11 further as follows:

12         EXAMINATION BY COUNSEL FOR DEFENDANTS

13         CONTINUED

14         BY MR. FURMAN:

15    Q.    Mr. Luskin, I want to just turn back to

16 the September 20th, 2012 meeting with Jeh Johnson.

17          Did you brief Mr. Bissonnette about what

18 took place at the meeting?

19    A.    I don't have a specific recollection of

20 having done so, but I'm quite sure I did.

21    Q.    Did you share with Mr. Bissonnette at that

22 time your view about the likelihood of success in



1  dealing with the government based on the -- your
2  review of the SNEPP doctrine?
3      A.    Probably either then or before.
4      Q.    And did you share with Mr. Bissonnette
5  after the September 20th, 2012 meeting what you
6  learned in connection with the additional documents
7  that tied the acronym in the 2007 SCI nondisclosure
8  agreement that Mr. Bissonnette signed to Operation
9  Neptune Spear?
10      A.    Probably in some form.  Whether I
11  specifically talked about the documents or simply
12  said, you know, I think the government is going to
13  have the better of that argument, I almost certainly
14  shared the kind of general conclusions.
15      Q.    Did you share with him that information
16  and those conclusions contemporaneously shortly after
17  the September 20th of 2012 meeting?
18      A.    Almost certainly.  As I think I said
19  before, during that period of time, we were
20  consulting regularly.  And certainly one of the
21  things I was talking to him about were our potential
22  options and the best strategy.



1          And in connection with those larger
2  questions, the subsidiary question of how likely a
3  legal defense on the merits would be to a civil suit
4  was certainly part of that analysis.
5      Q.    Did you discuss with the government during
6  that meeting on September 20th of 2012 the issue of
7  segregating Mr. Bissonnette's royalties into a
8  specific account?
9      A.    I did.
10      Q.    And what do you recall about that
11  discussion?
12      A.    Well, what I told them was that while we
13  discussed this matter further as an indicia of good
14  faith, first, that Mr. Bissonnette wouldn't promote
15  the book, wouldn't go on a book tour, wouldn't do any
16  more interviews like the 60 Minutes piece that had
17  been done, I guess, the end of August, and that
18  second that he would not disperse any proceeds.
19          So if there subsequently was either a
20  contested action or a settlement, he would not be
21  taking the position.  You know, he no longer was in a
22  position to satisfy any potential judgment or



1  settlement.
2          And those offers were intended to make it
3  more likely that the government would not feel the
4  need precipitously to file suit and seek injunctive
5  relief while we had further discussions.
6      Q.    Was it then decided that the funds would
7  be segregated in such a way that the government could
8  have some oversight over that?
9      A.    No.  They never had any particular
10  oversight.  We just simply made a representation that
11  he would keep the funds in a discreet account and
12  with the exception of attorney's fees he would not
13  disperse them.  But it was nothing more formal than
14  that.
15      Q.    And was Mr. Bissonnette aware because of
16  this agreement that you had reached with the
17  government that he could not access those funds, that
18  they were at least potentially subject to forfeiture
19  to the government?
20      MR. TOBEY:  Object to form.
21      A.    Well, I think he understood that, for
22  example, he wasn't going to give a portion to his

1  wife, which he assumed -- or then ex-wife, which he
2  had agreed to do.
3          He wasn't going to make any donations to
4  charity.  He did make tax payments from them and
5  continued to do so during the period of time while we
6  were discussing these issues.  And there were a
7  couple of other discreet payments that he made that
8  we had talked about.
9          At that point, he was paying for extra
10  security for his family because his identity had been
11  outed, but he understood that the corpus was to stay
12  intact.
13      BY MR. FURMAN:
14      Q.    And just to follow up on that, he
15  understood that the corpus wasn't -- sorry -- strike
16  that.
17          Mr. Bissonnette understood from that point
18  forward, after your September 20th, 2012 meeting,
19  that he wasn't to touch the corpus of the royalties,
20  other than to pay for taxes and attorney's fees and
21  security issues?
22      A.    That's correct.  But it was never a

1   binding legal agreement with the government.  It was
2   simply an offer that we made in good faith and -- I
3   mean, if we had changed that position, I would have
4   so informed the government.  I would have felt
5   obligated to do that.
6        But it was never reduced to writing.  It
7   was not a formal agreement of any kind.  The
8   government had no oversight over the funds.
9        Q.   Before you made that offer to the
10  government for the September 20th, 2012 meeting, did
11  you discuss it with Mr. Bissonnette so he was on
12  board with that?
13       A.   Yes.
14       Q.   And did you discuss that with Mr. Podlaski
15  in any way?
16       A.   I don't recall having done so.
17       Q.   Just turning to the FOIA request that you
18  had mentioned earlier, are you familiar with the FOIA
19  request?
20       A.   Generally speaking, yeah.
21       Q.   Could anyone in the public make a FOIA
22  request; in other words, you don't have to be a


1   lawyer to do that?
2        A.   That's correct.
3             MR. FURMAN:  Let me mark that.  I'm going
4   to mark as Exhibit Number 121 an email.  The Bates
5   number just seems very strange to me because -- no.
6   I'm sorry.  It's not strange at all.
7             It's just cut off a bit.  It's LUS3054 and
8   3055.
9             (Exhibit Number 121 was marked for
10  identification and was attached to the deposition.)
11            BY MR. FURMAN:
12       Q.   Mr. Luskin, I'm showing you what's been
13  marked as Exhibit 121.
14            Before the break, you had mentioned that
15  you had contacted Mr. Podlaski to ask him the process
16  that he undertook prior to your involvement.
17            Do you see that email?
18       A.   I do.
19       Q.   What prompted -- first of all, what
20  prompted you to send that email?  It's dated
21  September 20th at 3:20 p.m.
22            And it states:  "Talking to Jeh Johnson

1   later today and want to make sure I understand the
2   process so I don't screw anything up."
3        A.   I think it was precipitated exactly as I
4   said it.
5        Q.   Oh, okay.  In other words it, speaks for
6   itself?
7        A.   It speaks for itself.
8        Q.   Okay.  And there was an email that
9   preceded that at 2:33 p.m.  And you wrote:  "Kevin, I
10  want to be sure I understand how you reached your
11  judgment that Matt did not have to submit his
12  manuscript for prepublication review.
13            "Did you have access to any of Matt's
14  signed agreements (either the ones that DOD sent us
15  or others) or were you relying on his recollection of
16  what he may have executed?
17            Do you see that?
18       A.   I do.
19       Q.   What prompted you to ask that question?
20       A.   I think it was the same set of concerns.
21  I simply -- I simply wanted to know what the factual
22  landscape was, and I wanted also to know and I think

1   contemporaneously ask Kevin for his legal analysis so
2   that when I spoke to Mr. Johnson I understood the
3   landscape both factually and in terms of the advice
4   that he was given.
5        Q.   Now, I know we had asked questions before
6   about September -- I'm sorry.  Forgive me -- about
7   the August 31st letter.
8             But at that point in time on August 31st
9   of 2012, would you have had access to Mr.
10  Bissonnette's signed agreements?
11       A.   No.  At that point, I did not.
12       Q.   Did you ask for them?
13       A.   In the context of the meeting with DOD, I
14  asked whether or not this was all -- these were all
15  the agreements that they had.
16            And they basically said subject to other
17  things that were signed in connection with his
18  discharge papers, these were the only applicable
19  agreements.
20       Q.   And after Mr. Podlaski had responded and
21  he responded that same day to you at 4:09 p.m., did
22  you do anything further after receiving Mr.

Podlaski's response, at least in terms of Mr. Podlaski?

A. You know, I simply don't recall whether we also spoke by phone.

Q. Did your meeting with Mr. Johnson take place before or after this email exchange with Mr. Podlaski?

A. I can't tell you.

Q. Would it have been memorable to you or odd in any particular way that you would have had a meeting with Mr. Johnson after 4:00 p.m. on September 20th?

A. No. I don't think that would be unusual. I mean, people meet at all hours here.

Q. Okay. And so if the meeting was, say, 5:00 or 6:00 p.m., that would not have been in any particular way memorable or odd?

A. No, it would not.

Q. Okay. Do you recall, one way or the other, if the meeting took place before or after your receipt of this email at 4:09 p.m.?

MR. PATRIZIA: Objection. Asked and

answered.

I'll permit the witness to answer.

A. Yes. I've got no present recollection of that.

BY MR. FURMAN:

Q. After the September 20th meeting with Jeh Johnson, what was the next legal action, if any, that you undertook to represent Mr. Bissonnette's interests?

MR. PATRIZIA: Objection to form.

I'll permit the witness to answer.

A. There were continuing discussions with DOD in the days and weeks following the September 20th meeting.

BY MR. FURMAN:

Q. And in what form did they take place? Were they phone calls, meetings, or --

A. They were meetings at the Department of Defense. Mr. Johnson and I shared cell phone numbers, and I know we spoke directly by cell phone on a number of occasions.

His principal deputy, a gentleman by the

name of Robert Easton, E-A-S-T-O-N, also had a primary role here. And I spoke with him on a number of occasions.

Q. Were there discussions about resolving the civil side of the matter?

A. Yes. I mean, we very quickly turned to the question of whether or not there was a common ground that we could find to resolve the civil case.

Q. And was the resolution of the civil case, was it centered around the forfeiture of some or all of the proceeds of the royalties?

A. You know, there were both monetary and nonmonetary terms at issue. And I can't tell you, sitting here now, how exactly the issues were presented and kind of ripened.

But there were monetary issues about whether or how much of a forfeiture Mr. Bissonnette would be required to make.

And there were nonmonetary issues that included their desire for an apology, their desire that he surrender his Trident, their desire that he agree to a debriefing and an inventory of electronic

records to make sure that he had no classified information in his possession.

As I said, there was a mix of monetary and nonmonetary terms.

Q. I'm going to focus on the nonmonetary terms in a moment. Just on the monetary terms, was there any discussion of a percentage or an offer made to the government to resolve at least the monetary side of it?

A. You know, for starting at the end of 2012 and for a very long period of time, we went back and forth on those issues. And at some point Mr. Johnson transitioned to Homeland Security, I think, in December, the end of 2012. So he became secretary of Homeland Security. Obviously, exited this dialogue.

And then the dialogue was continued with Mr. Easton and then very quickly thereafter folks from the civil division at the Justice Department became involved in the conversation.

And there were a series of meetings and conversations about what was an appropriate financial penalty. And those continued, I think, until the

1  spring of the following year.  I mean, it didn't move
2  smoothly or quickly.
3      Q.   And I'm focusing up and through December
4  of -- the end of December of 2012 just so that I'm
5  following this court's ruling.
6          So let's just stick with dealing with Jeh
7  Johnson and Mr. Easton.  Was there any offer made in
8  terms of a percentage of the royalties being
9  forfeited?
10     A.   You know, there probably was, and I don't
11 recall when that was first put on the table or what
12 we proposed, but the answer is probably yes.
13     Q.   Was the issue of coming up with a
14 resolution of the forfeiture side of it, the monetary
15 side of it, discussed initially at the September
16 20th, 2012 meeting?
17     A.   No.  I don't think so.
18     Q.   Who made the first offer?
19     A.   Couldn't tell you.  I think either that
20 meeting or in the conversations that followed.  As I
21 said, there were other meetings in Mr. Johnson's
22 office and then there were phone calls, including



1  one-on-one calls between Mr. Johnson and myself.
2          You know, we pretty quickly decided that
3  we would put ourselves on a path towards resolution.
4  But sitting here, I simply can't tell you when or --
5  when was the first time that a sort of percentage was
6  put on the table or by whom.  I just don't recall.
7      Q.   And was Mr. Bissonnette apprised of these
8  discussions about the forfeiture throughout?
9      A.   Yes.  I mean, I would not have made an
10 offer without clearing it with him first.  And if the
11 government had made an offer, I would have related
12 that to him.
13     Q.   And I take it that Mr. Podlaski was not
14 involved in those discussions in any form in terms of
15 the forfeiture either relaying offers or conveying
16 offers by the government?
17     A.   No, he was not.  He was not involved in my
18 communications with the government.  What I don't
19 recall is whether I kept him apprised or not.  I
20 simply don't recall.
21     Q.   And it's not a memory test because I think
22 I can find the email.  But in November of 2012, there



1  was a term sheet that was exchanged with the
2  government about a resolution of the forfeiture side
3  of things.
4          Do you recall that?
5      A.   You know, I mean, it wouldn't surprise me
6  that there was a term sheet exchanged in that time
7  period.  This thing went through so many iterations
8  that I honestly can't tell you what was proposed
9  when.
10     Q.   I'm going to mark it as an exhibit because
11 I want to see if it triggers a memory for you.  This
12 will be Exhibit Number 122.  And it's an email LUS
13 ending 1003.  It's a one-page document.
14         (Exhibit Number 122 was marked for
15 identification and was attached to the deposition.)
16     BY MR. FURMAN:
17     Q.   Document 122 is a copy of an email
18 exchange on -- beginning on November 19th of 2012 and
19 ending on November 22nd, 2012.
20         The email from you, Mr. Luskin, on Monday,
21 November 19th of 2012 at 5:24 p.m. is addressed to
22 Mr. Bissonnette, Mr. Fabiani, and Elyse Cheney.  And

1  in substance, it's describing a term sheet that was
2  received from the Department of Defense.
3          Do you see that?
4      A.   I do.
5      Q.   Does -- if you take a second to read --
6  not a second -- as much time as you need to read the
7  email, would that refresh your recollection as to
8  what the terms were that were proposed by the
9  government?
10     A.   Let me -- give me a minute to read it and
11 then I'll answer your question.
12     Q.   Now, having read this email, does it
13 refresh your recollection, one way or another, as to
14 what offers were made by the government at that time?
15     A.   You know, it doesn't in terms of what the
16 dollars was.  It refreshes my recollection to the
17 extent -- on the monetary terms to the extent that,
18 among the things we were discussing at this time,
19 based on Matt's desire that a significant portion of
20 the proceeds of the book be donated to charities that
21 supported veterans and in particular Special Forces
22 Veterans that we were discussing at this time the

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
143

```
1   possibility of whether it was possible either for
2   Matt to satisfy his obligation to the government by
3   donating money to these charities or to give the
4   government the money with the understanding that it
5   would gift those groups.
6        And there were specific legal concerns
7   under the Appropriation's Act about whether that
8   could be done and whether it would create tax
9   liability and so forth.
10       But -- and this certainly does refresh my
11  recollection that we were wrestling with those issues
12  and talking about a much more complex structure than
13  we finally reached.
14       But in terms of what the value of the
15  dollar proposals were, I'm -- I can't help you.  I'm
16  sorry.
17       Q.   And in the weeks or even the month
18  preceding November 19th of 2012, do you have any
19  recollection, one way or the other, as to what the
20  government was seeking in terms of a resolution of
21  the forfeiture?
22       A.   No, I don't.
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
144

```
1        Q.   Now, the response by Elyse Cheney to your
2   email, which is dated a few days after on November
3   22nd of 2012, references the fact that General
4   Petraeus was writing a book and that Mark Boal, one
5   of the producers of, "Zero Dark Thirty," the film,
6   had sold rights to the screenplay, to a publisher for
7   it to come out in book form.
8        Do you know why that was her response?  Do
9   you know what the context was, why she was responding
10  to you in that fashion?
11       A.   Well, I think -- I think Elyse's reaction
12  was a sort of protective layperson's reaction.
13       And in a somewhat more refined form and
14  argument we made to the government, which is there's
15  all kinds of stuff being published out there, some of
16  it without prepublication review, some of it with the
17  support of the government.
18       Why are you picking on the one person who
19  risked his life to actually kill this guy to try and
20  exact your pound of flesh?
21       And I think Elyse felt like Matt was being
22  screwed and that people higher up the food chain were
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
145

```
1   managing to find a way either in Washington or
2   Hollywood to do just fine, notwithstanding in
3   Petraeus's case his disgrace and in Boal's case that
4   he's a Hollywood screenwriter and that the government
5   was focusing on that.
6        And I think Elyse always felt pretty
7   aggrieved about that.  And, you know, we did, too.
8   And it was a point that we made in our discussions
9   with the government in a somewhat different way, but
10  it was certainly something we wanted to convey.
11       Q.   And that argument, you raised it before.
12  You mentioned in dealing with the OPSR that there are
13  situations where there's information that's already
14  in the public domain and that you could cite to them
15  in dealing with the prepublication process.
16       Was that something that was discussed with
17  Jeh Johnson in terms of, "No Easy Day," the fact that
18  so much of what the details were about Operation
19  Neptune Spear that even in, "No Easy Day" were
20  actually already in the public domain?
21       A.   We talked a lot about both the equities
22  and the optics of their pursuit of Matt.  In various
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
146

```
1   forms, those were points that I certainly made both
2   to Jeh and then subsequently to Bob Easton and to the
3   folks at DOD who joined the conversation.
4        And, you know, I can recall one specific
5   occasion when the DOJ civil folks were there.  And I
6   said:  "Look, you folks are proposing, among other
7   things, if we can't reach an agreement to bring an
8   equitable action."
9        And in an equitable action, one of the
10  things that you will need to prove is the fact that
11  you have clean hands.
12       And so it would be relevant and I think
13  admissible for us to put people on the stand and ask
14  them whether they leaked about Operation Neptune
15  Spear and then make the argument to the court that
16  the government really in seeking a forfeiture from
17  Matt was choosing the speaker, rather than choosing
18  to protect the message.
19       "And we'll start by calling Vice President
20  Biden," I said, "at this meeting," at which point
21  someone from -- one of the DOJ civil folks said,
22  "Well, we don't have any problem with that."
```

1      And my response was: "They don't let you

2  out much, do they?"  Only a bureaucrat in the

3  Department of Justice who doesn't actually have to go

4  to court could possibly have said that.

5      But it was a continuing -- it was a

6  continuing theme for us and something that, you know,

7  tried to use, among other things, as leverage to try

8  and get the most favorable financial settlement that

9  we could for Matt.

10     Q.   It at least sounds to me like a very

11  convincing argument.  Why didn't you pursue it?

12     MR. PATRIZIA:  Object to the form.

13     I'll permit the witness to answer.

14     BY MR. FURMAN:

15     Q.   I know you conveyed it.  But ultimately,

16  there was a settlement for 100 percent of the

17  forfeiture.  So my question is:  Why wasn't that

18  argument used?

19     A.   First, let me jump ahead here to the

20  premise of your question.

21     It wasn't 100 percent of the proceeds

22  because the actual proceeds from that were north of


1  $8 million.  But Elyse Cheney had a contract with

2  Matt that entitled her to 15 percent of whatever he

3  earned.

4      And so there is $1 million 3 or $1 million

5  4 that is topped off of that.  And the agreement that

6  we negotiated is net of Elyse's payment and it also

7  is written in such a way that it is net of the tax

8  payment.

9      And so, again, had the government

10  proceeded in a contested proceeding, they would have

11  gotten a judgment for the entire amount of the

12  proceeds.  And it would have been up to Matt to seek

13  a refund from the IRS and if they declined to refund

14  that money to file an action in tax court to try and

15  get it back.

16     But otherwise, as a legal matter, he's

17  potentially obligated for even the money he's paid

18  over to the Treasury in the form of taxes.

19     And finally, he's permitted to pay out the

20  amount that is due to them, which is about $1

21  million, 3 after the tax issue is resolved at no

22  interest over four years.


1      So on the one hand, it's written as a

2  forfeiture of all of the proceeds.  But in fact, as a

3  financial matter, it's not.

4      Q.   And what is that figure?  Do you know what

5  that figure is?

6      MR. PATRIZIA:  By that figure, you mean --

7      BY MR. FURMAN:

8      Q.   What's the net figure that Mr. Bissonnette

9  paid to the government?

10     A.   Well, he paid about -- and it's in the

11  consent decree.

12     So I'm giving you my recollection of the

13  dollar figures that are recited with precision in the

14  consent decree.  But I think he paid over about $2.7

15  million.  I think he owes about $1.3 over four years.

16     And then the way it is structured is that

17  he has six months in which to file for refunds with

18  the IRS and state tax authorities.

19     If he gets that money back, he has to pay

20  it over to the government.  But if he doesn't, he's

21  not obligated for it.

22     Q.   I see.  And do you know whether or not,


1  one way or the other, to this day whether that has

2  taken place as to whether Mr. --

3      (Whereupon, there was a telephone

4  interruption.)

5      Do you know, one way or the other, whether

6  that has taken place, the tax refund?

7      A.   I think that he has filed for the refunds.

8  He has not gotten anything back at this point.  And I

9  do know that the window for filing an amended return,

10  which is the way in which you apply for a refund, is

11  a three-year window.

12     So for the taxes that were paid on income

13  that he earned in 2012, which would include the

14  advance or prior years, that's time barred.  So

15  they'll be no refund for tax year 2012.

16     And I think he either has or is in the

17  process of filing the refunds for tax years '13, '14,

18  and '15.

19     And he has, I think, under the agreement,

20  six months to do so.  So it would be ripe next month,

21  no later than next month.

22     And that was all by way of really sort of

1  being clear about the premise of your question.
2     Q.   The premise being 100 percent?
3     A.   Right.  And I think my own judgment is
4  that the arguments I outlined to you before about
5  clean hands and so forth have probably got more
6  impact in terms of their optics than they do as a
7  legal matter because the government, I think, has in
8  other cases successfully taken the position that it
9  doesn't really matter who leaks what.
10         Information remains classified until it's
11  unclassified and you're accountable for your own
12  behavior.
13         So it was an argument, I think, that was
14  designed to push them back and to suggest that we
15  weren't completely kind of bootless if we couldn't
16  reach an agreement, but I didn't think it was a
17  winning argument.
18     Q.   And that deals with the equitable
19  argument.  As far as the contractual arguments, the
20  defense, was there any after your review of the SNEPP
21  doctrine and also your access to the additional
22  information that connected the 2007 SCI to Operation



1  Neptune Spear?
2     A.   I mean, I'm not sure I understand your
3  question.
4     Q.   I'll ask it again.  I'll rephrase it
5  maybe.
6         As far as the contractual defenses -- I'm
7  putting aside the equitable arguments that were
8  pushback arguments.
9         But in terms of the contractual defenses
10  to the government's argument that was outlined in Jeh
11  Johnson's letter that advised that Mr. Bissonnette
12  was in default of his contractual obligations, did
13  your subsequent review of the SNEPP doctrine and also
14  your access to information at the Jeh Johnson meeting
15  on September 20th of 2012 where he showed you
16  additional documents that connected the 2007 SCI
17  nondisclosure agreement that Mr. Bissonnette signed
18  to Operation Neptune Spear -- did that change your
19  view about the contractual defenses?
20         MR. PATRIZIA:  Object to the form.
21         MR. FURMAN:  It's a really long question.
22         MR. PATRIZIA:  I take it what you're



1  asking is whether Mr. Luskin had any further view of
2  the viability of a defense to the argument by Mr.
3  Johnson that Mr. Bissonnette had breached his
4  contractual obligations under the Form 1847 --
5         MR. FURMAN:  Correct.
6         MR. PATRIZIA:  -- once Mr. Luskin had seen
7  whatever documentation Mr. Johnson provided
8  concerning the acronyms on the bottom of the 1847
9  form?
10         MR. FURMAN:  As well as his review of the
11  SNEPP doctrine.
12         MR. TOBEY:  I'll object to the form of the
13  recharacterization.
14         MR. PATRIZIA:  If Bob understands the
15  question, I'll permit him to answer.  It's a
16  complicated question.
17     A.   My answer is really in two parts.  My
18  thinking on the contractual side didn't change
19  materially.
20         It seemed to me that we could and still
21  did argue that the SCI agreement was not a model of
22  clarity and that there were ambiguities that, if we

1  needed to, we could attack.  But I did not think then
2  and don't think now that those are very strong
3  arguments.
4         I mean, they're arguments that you can
5  make, but not particularly good ones.  And in any
6  event, the government has had such consistent success
7  using the SNEPP doctrine that it sort of overtook the
8  contractual issue.
9         And in my view, this is part of the reason
10  why the government has not been more scrupulous about
11  revising these agreements in ways that would make
12  them better.
13     Q.   And I want to follow up on something that
14  you had mentioned about Elyse Cheney's layperson
15  perspective and her pointing out General Petraeus's
16  situation in, "Zero Dark Thirty."
17         Was there a view that you tried to express
18  to the government that there was selective
19  prosecution against Mr. Bissonnette?
20     A.   Oh, sure and the view that they were
21  picking on the person at the bottom of the food
22  chain, rather than the top.



1    But particularly in the civil context, the
2  government is certainly free to pick and choose from
3  among the viable potential legal claims that it could
4  make.
5    And there's really no strong doctrine of
6  selective prosecution on the civil side that would be
7  a viable defense.
8    And even on the criminal side, in order to
9  establish a claim of selective prosecution, you have
10 to establish that the selectivity was for a
11 constitutionally impermissible purpose; for example,
12 race.
13   And if there were a criminal prosecution,
14 I am quite sure that we would have tried to raise the
15 objection that the government was impermissibly
16 prosecuting him on the basis of -- for, first --
17 improper First Amendment grounds by trying to select
18 the speaker.
19   That would have been a very hard road to
20 hoe, but it's certainly an argument we would have
21 made in that context.
22   Q.   And this is before September 4th of 2012.



1  Did you discuss with Mr. Bissonnette the potential
2  that the government was reacting to the book, among
3  other -- for among other reasons, the fact that it
4  was critical at certain points in the book of
5  President Obama and Vice President Biden and the
6  Obama Administration?
7    A.   You know, I don't -- it's certainly -- in
8  those very first few days, I don't think that we
9  talked about that issue.  It's possible, but I don't
10 recall that and had never thought, having read the
11 book -- and did not think having read the book --
12   Q.   Having read the book?
13   A.   -- having read the book that the
14 government's reaction was animated by partisan
15 political reasons.
16   Overall, publicity about Operation Neptune
17 Spear was generally helpful to the administration,
18 even when it might have been critical at various
19 points of a few individuals.
20   Q.   I'm turning now to the legal fees.
21   My understanding -- and I want to know if
22 it's accurate -- is that Mr. Bissonnette paid



1  approximately $828,000 for legal services that you
2  rendered both at Patton Boggs and Paul Hastings.
3    Is that accurate?
4    A.   You know, I actually thought it was
5  slightly more than that.  But, you know, I thought it
6  was just over $1 million.  But that certainly is in
7  the ballpark.
8    Q.   Now, I understand that in addition to
9  dealing with the civil forfeiture and potential
10 criminal prosecution that related to the publication
11 of, "No Easy Day" that the government had undertaken
12 additional investigations into Mr. Bissonnette.
13   Is that fair to say?
14   A.   That is correct.
15   Q.   And among other things, there wasn't an
16 investigation over certain artifacts, for lack of a
17 better way of describing it, that Mr. Bissonnette had
18 from the Bin Laden raid, including a photograph of
19 Mr. Bin Laden's body.
20   Do you recall that?
21   A.   Yes.
22   Q.   When did that first take place?

1    A.   It wasn't separate.  So let me see if I
2  can tell you about the criminal investigation.
3    By, I guess, early spring of 2014 we had
4  reached what I would call a handshake agreement to
5  resolve the civil matter.  And it's reflected in a
6  term sheet or memorandum.
7    Q.   Can you say that date again?  I missed
8  that.
9    A.   It was probably March, maybe April of
10 2014.  And there's an exchange of emails between me
11 and Mr. Easton where he sends me a copy of the term
12 sheet and I confirm to him that, in my view, it
13 accurately sets forth our understanding.
14   And he indicates that he would then take
15 responsibility for drafting the documents that would
16 reflect the agreement as a formal legal agreement.
17   And nothing happened for six weeks, eight
18 weeks.  And I kept bugging him.  And then finally, he
19 said: "Well, there's a wrinkle.  It turns out
20 there's a criminal investigation.  And can you attend
21 a meeting at Main Justice?
22   "And by the way, you'll need to get your



ROBERT D. LUSKIN                                          January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                159

```
 1   security clearance reinstated for the purpose of this
 2   meeting."
 3          And I think before this meeting -- it may
 4   have been shortly after the meeting was at a -- but
 5   in connection with that, we had a meeting.
 6          Present were folks from the National
 7   Security Division Counterintelligence section at DOJ
 8   and an assistant U.S. Attorney from the Southern
 9   District of California.
10          And they explained that they were
11   conducting an investigation, a criminal
12   investigation, into the potential wrongful disclosure
13   of classified information in connection with the
14   publication of, "No Easy Day" and that there were
15   also some ancillary matters that they wanted to
16   inquire of, including whether or not he had retained
17   photographs of Bin Laden's body and whether he had
18   any artifacts that he shouldn't have kept.
19          And the government said in the context of
20   this criminal investigation that they wanted Mr.
21   Bissonnette's complete and candid cooperation to
22   include disclosure of all objects he might have that
```


800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN                                          January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                160

```
 1   were relevant, all electronic media, including hard
 2   drives, computers, cell phones, anything like that,
 3   and access to all of his email accounts for the
 4   purpose of conducting this investigation.
 5          And we agreed to those terms.  And at that
 6   point, you know, the civil matter was essentially
 7   suspended while the criminal investigation was
 8   undertaken.
 9          And that process then continues from late
10   spring, early summer of 2014 until on or about August
11   of 2015 when the government says that they have
12   declined to pursue any criminal case against Mr.
13   Bissonnette.
14          And so the primary focus of that criminal
15   investigation was the wrongful disclosure of
16   classified information, but in connection with that,
17   they looked at everything that might be tangentially
18   related to that to include the photographs and any
19   artifacts.
20      Q.   Well, in terms of artifacts, we recently
21   took the deposition of Ben Sevier.  Are you aware
22   that that deposition took place?
```


800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN                                          January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                161

```
 1      A.   No.
 2      Q.   And did you review a transcript of that
 3   deposition or were you told about it in any form?
 4      A.   No.
 5      Q.   In the course of that deposition, Mr.
 6   Sevier described for us a meeting in December of 2011
 7   where he met with Mr. Bissonnette and Elyse Cheney
 8   and Mr. Bissonnette produced a hat that apparently
 9   was Bin Laden's hat, which, I guess, would fall under
10   the category of being an artifact from the Bin Laden
11   raid.
12          Were you aware of that, that Mr.
13   Bissonnette had in his possession Bin Laden's hat?
14      A.   I wasn't aware of it until the government
15   asked in connection with this meeting whether among
16   the things that Mr. Bissonnette would produce were
17   any artifacts.  And Mr. Bissonnette produced the hat
18   and turned it over to the government.  I had not
19   previously been aware of that.
20      Q.   And the reports of their being a
21   photograph of Mr. Bin -- strike that -- there being a
22   photograph of Bin Laden's body, were you aware that
```

800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN                                          January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                162

```
 1   there were media reports about that before your
 2   meeting with the government about this inventory of
 3   items from Mr. Bissonnette?
 4      A.   I had seen countless reports and internet
 5   photographs alleging that they were photographs of
 6   Bin Laden's body.
 7          Until the government raised the issue with
 8   me, I had never heard of any suggestion that any of
 9   these was in any way connected with Mr. Bissonnette,
10   nor subsequently have I ever seen any evidence that
11   those were connected with Mr. Bissonnette.
12      Q.   And are you aware through your
13   conversations with Mr. Bissonnette that his role,
14   among other things, in connection with Operation
15   Neptune Spear was to take photographic images of the
16   operation and bring them back to his superiors?  Were
17   you aware of that?
18      A.   You know, now, we're getting into some
19   difficult territory because once the criminal
20   investigation began, my security clearance was
21   revived.
22          I was then, from the government's
```


800.211.DEPO (3376)
EsquireSolutions.com

1   perspective, free to talk to them and to Mr.
2   Bissonnette about anything, including information
3   that might be classified, with the understanding that
4   I would not further disclose it.
5           And so that encompassed things that the
6   government shared with us in the proffer.  It also
7   encompasses things that Mr. Bissonnette shared with
8   me.
9           So I'm -- we're on perilous ground here in
10  terms of what I'm free to answer consistent with my
11  obligations.
12      Q.   And the reason I'm asking it, just so that
13  -- for your -- obviously, for your benefit and for
14  the benefit of Mr. Patrizia and Mr. Tobey is that you
15  had referenced that it's connected, that it's -- to
16  the inquiry about the publication of the book.
17          And I want to explore that because there
18  is some billing -- substantial amounts of billing --
19  we won't have the time to go line item through it --
20  that deal with issues, for example, dealing with this
21  criminal investigation to the artifacts, the
22  investigation of the Element Group activity, and



1   other activity that Mr. Bissonnette was involved in,
2   including the video game.
3           And so what I'm trying to understand is --
4   I suppose we could do it.
5           But is there a way for me, other than
6   asking you line by line item, what relates to your
7   defense of Mr. Bissonnette in connection with, "No
8   Easy Day" as opposed to other activities?
9       A.   Fair enough.  I understand the question.
10          MR. PATRIZIA:  Subject to Mr. Tobey's
11  agreement and my conversation with Mr. Luskin, my
12  understanding is that the civil settlement with the
13  Department of Justice and Department of Defense and
14  the corresponding declination by the Department of
15  Justice to prosecute Mr. Bissonnette with regard to
16  what I'll call the Espionage Act Investigation and
17  the related issues for which you obtained a security
18  clearance are all related to, "No Easy Day."
19          Separate from that is what I understand to
20  be the investigation of chief consulting.  And I
21  suppose the easiest way to distinguish those are
22  whether it's the Southern District of California



1   investigation or the Eastern District of Virginia
2   investigation.
3       A.   I guess.  But I don't think that's
4   completely correct, so that's why I want to --
5           MR. PATRIZIA:  Please clarify that.
6       A.   As Mr. Furman notes -- and he's correct --
7   the Southern -- the investigation venued in San Diego
8   in which the Main Justice and the U.S. Attorney for
9   San Diego participated was principally an Espionage
10  Act Investigation.  And it primarily concerned the
11  publication of, "No Easy Day."
12          But you are correct that in connection
13  with that we also did work and produced chrons that
14  relate, for example, to his interactions with the
15  producers of, "No Easy Day" --
16          BY MR. FURMAN:
17      Q.   Of Zero Dark Thirty?
18      A.   I'm sorry -- of "Zero Dark Thirty" --
19  you're correct -- and related matters so that
20  included within those billings are some matters that
21  don't directly arise from the publication of, "No
22  Easy Day."

1           And, you know, spending time here going
2   through those time sheets would be hateful.  But
3   there's got to be a better way to do that.
4           MR. PATRIZIA:  Let me make a proposal and
5   see.  I think the basic proffer I would make, subject
6   to counsel's agreement, is we would go through with
7   Mr. Luskin the invoices you have produced as Exhibit
8   117.
9           And we would call out from that those
10  pieces which would relate to the investigation in the
11  Eastern District of Virginia because I understand
12  that, A) those fees aren't being claimed as damages
13  in this proceeding; and B) your testimony, Bob, is
14  that they don't relate to, "No Easy Day" as such --
15      A.   That's right.
16          MR. PATRIZIA:  -- although, there's some
17  leakage between the two, but let's not go there; and
18  second to the degree Mr. Bissonnette's counsel agrees
19  that legal fees related to Mr. Bissonnette's contacts
20  with the producers of "Zero Dark Thirty" or the --
21          MR. FURMAN:  Video game?
22          MR. PATRIZIA:  -- manufacturers at



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
167

```
 1  Electronic Arts of Medal of Honor Warfighter.
 2        And I'm trying to think if there's
 3  anything else in that opinion grouping.  I don't
 4  think so.
 5        But if the agreement is that those are not
 6  being claimed as damages, I will make a proffer that
 7  we will go through Exhibit 117 and identify which of
 8  the line items in 117 are related to those elements
 9  as opposed to the publication of, "No Easy Day" and
10  the Espionage Act Investigation as such.
11        And we'll produce it back to you with some
12  rendition of which items are not and what the fees
13  related to that would have been.
14     A.   Yeah.  And I would add it is going to be a
15  very easy matter to exclude the fees arising from the
16  Eastern District of Virginia because we literally
17  didn't know about that until October of 2016.
18        And so --
19        MR. TOBEY:  '15.
20     A.   '15.  I'm sorry.  I've lost track here.
21  But temporally, it's a pretty easy matter.  Those are
22  a very easy matter to exclude.
```



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
168

```
 1        I also think looking back at the main
 2  criminal investigation it's something that we ought
 3  to be able to separate because the bulk of the fees
 4  that would be attributable, for example, to
 5  Electronic Arts or "Zero Dark Thirty" are going to be
 6  in the form of time from Zach Adams preparing a
 7  chronology and collecting emails, and those should be
 8  fairly easy to segregate.
 9        MR. PATRIZIA:  But I'll make that proffer,
10  subject to counsel's agreement.  And I don't know,
11  Bob, that's probably going to take us a week to do
12  it, just in terms of time.
13        MR. FURMAN:  I don't think that we're
14  desperate for time.  We have a trial date or --
15        MR. TOBEY:  A get-ready --
16        MR. FURMAN:  -- a get-ready-by date,
17  November, I think, 14th of this year.
18        MR. PATRIZIA:  From my days in the
19  government, I would characterize it as a
20  hurry-up-and-wait date.
21        MR. FURMAN:  That's fair to say.  What I'm
22  trying to avoid is probably another three hours of
```



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
169

```
 1  this deposition.
 2        MR. PATRIZIA:  Look, I don't have a
 3  problem saying we'll do it as promptly as we can and
 4  we'll tell you exactly what we think, you know, is
 5  excluded on that basis.
 6        What happens from there, I don't know.
 7  But I'm happy to make the proffer and that we'll
 8  proffer that it would have been what would have come
 9  out of testimony.
10        BY MR. FURMAN:
11     Q.   And just to sort of put a parameter around
12  the time element of it, is it fair to say -- and I'll
13  ask this question to Mr. Luskin so we at least have
14  it on the record -- that as of the conclusion of the
15  consent decree that was in August of 2016 -- it was
16  around that time that at least as far as the
17  publication of, "No Easy Day" was concerned that that
18  was the end of your representation of Mr.
19  Bissonnette, as far as that chapter is concerned?
20     A.   Well, you know, I mean, I certainly still
21  represent him since the consent decree is executory.
22  And so there are certain obligations he still has to
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
170

```
 1  fulfill and I need to protect him in connection with
 2  those.
 3        But the simple answer after that is, I
 4  stopped billing him.  You know, once he turned that
 5  money over, there's no longer corpus from which to
 6  pay legal fees.  And he doesn't have the means to pay
 7  them, and so I just stopped recording my time.
 8        MR. FURMAN:  I just want to throw in a
 9  response to Mr. Patrizia's proffer.  I would agree to
10  that and just -- if we have any questions about it,
11  we could either try to do it by some kind of form of
12  interrogatory or some limited deposition to ask
13  further questions.
14        I certainly appreciate how valuable Mr.
15  Luskin's time is, your time, and Mr. Tobey's time,
16  mine excluded.
17        MR. PATRIZIA:  I think what we could say
18  is we'll produce some form of an accounting rendition
19  identifying the entries which we think are not
20  related to, "No Easy Day" and the Espionage Act
21  Investigation.  So we'll identify those, the time and
22  the amount.
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
171

```
 1          If you then have follow-up questions as to
 2   those, we can try to either work through an amendment
 3   of that proffer or do interrogatories.  And if we
 4   need to have a dep, we'll do a dep.
 5          MR. TOBEY:  You could structure it as it's
 6   an attachment to the deposition so it becomes part of
 7   the sworn testimony.
 8          Our position is that I think we could make
 9   a persuasive argument that all of the collateral
10   issues were caused by the failure to get a
11   prepublication review and the government's
12   disapproval of that.
13          But I think in terms of just the exercise
14   of having that segregation done now, it makes sense.
15   We can always argue about entitlement later, but I
16   understand your argument that it is appropriate to
17   segregate it out.
18          I understand their offer to do it and I'd
19   say let's do it and save the time today so we don't
20   need to go through that.
21          MR. FURMAN:  I understand.  Only because I
22   feel like I want to respond because I think it's
```



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
172

```
 1   funny, I don't think Mr. Podlaski could be
 2   responsible for Mr. Bissonnette taking Bin Laden's
 3   hat.
 4          MR. TOBEY:  Well, and the issue is whether
 5   the government ever would have come after him for
 6   having Mr. Bin Laden's hat.
 7          MR. FURMAN:  That's a dangerous, slippery
 8   slope of Tort Law that Mr. Patrizia and Mr. Luskin
 9   happily don't get themselves involved in very often.
10          MR. PATRIZIA:  It's not my issue.
11     A.   I'm a stranger to that argument.
12          MR. FURMAN:  I just need a five-minute
13   break, if that's okay?
14          MR. PATRIZIA:  Something I want to say
15   before we break is, we will work from Exhibit 117
16   unless someone gives us a different set of invoices
17   to work from.
18          MR. FURMAN:  Fair enough.
19          (A break was taken.)
20     BY MR. FURMAN:
21     Q.   Mr. Luskin, there came a point in time in
22   your dealing with the Eastern District of Virginia --
```



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
173

```
 1   and I think the Assistant U.S. Attorney was Steven
 2   Peak?
 3     A.   No.  Steven Peak is from the Southern
 4   District of California.  He was one of the two folks
 5   who were involved in the original criminal
 6   investigation.  The assistant assigned in the Eastern
 7   District of Virginia is Alan Salsbury.
 8     Q.   Right.  And I got that wrong, and I
 9   apologize.  I meant to say San Diego.  And I am
10   referencing the Southern California investigation by
11   Steven Peak.
12          There became an issue regarding missing
13   documents that were missing in some form or another
14   from Mr. Podlaski's production of his file?
15          MR. PATRIZIA:  Object to the form.  I
16   think the issue was documents that the government had
17   from a production by either Mr. Podlaski or the
18   Carson firm and that Mr. Bissonnette or his counsel
19   did not have.
20          So I don't know that it was documents that
21   were missing from Mr. Podlaski's or Carson's
22   production to Mr. Peak or to the government, but that
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
174

```
 1   were not in the possession of Mr. Bissonnette and his
 2   counsel.
 3          With that clarification, I'm fine.
 4          MR. FURMAN:  I see.  And I might have
 5   misconstrued that.
 6     A.   We'll assume you're asking the question:
 7   Was there a dispute about or an issue or controversy
 8   about documents.  I can happily answer it in those
 9   terms.
10     BY MR. FURMAN:
11     Q.   Yes.  And could you describe that
12   controversy?
13     A.   Sure.  And at the beginning of the
14   criminal investigation, the sort of fundamental
15   operating premise was that we were going to
16   completely undress in the sense that Mr. Bissonnette
17   would turn over access to all of his email accounts,
18   social media, any computers he had, et cetera, et
19   cetera.
20          And all of those materials, his wife's
21   desktop computer, all of these would be turned over
22   and examined by the government, that the government
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
175

```
1   would have a taint team to include potentially
2   privileged information relating to my representation
3   of Mr. Bissonnette subsequent to the publication of,
4   "No Easy Day," but that we would waive privilege.
5           And the government would agree that it
6   would be a limited privilege as to all communications
7   that Mr. Bissonnette had with Mr. Podlaski prior to
8   the publication of the book relating to the issue of
9   whether or not the book needed to be submitted for
10  prepublication review and so forth.
11          And as Mr. Peak kept saying, although I
12  think he was somewhat inaccurate, complete candor
13  from Mr. Bissonnette, including the complete
14  production of all relevant information was his get
15  out of jail free card.
16          I think, in fact, what Mr. Peak meant by
17  that -- although he kept calling it the get out of
18  jail free card -- was that it was a fundamental
19  necessary condition of his cooperation in the
20  criminal investigation, but didn't necessarily mean
21  that if that's all he did and answered all the
22  questions truthfully that the government would
```



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
176

```
1   necessarily decline to prosecute.
2           But the precondition was complete candor
3   and complete cooperation.  And in connection with
4   that, we had a file of documents that Mr. Podlaski
5   and/or Carson Boxberger had produced to Mr. Johnston.
6           And we made a copy of that disk having
7   been advised that this was the file and turned it
8   over to the government and said, "We waive privilege
9   as to these documents.
10          "By the way, we will write you a letter so
11  that you can show it to Carson Boxberger and Mr.
12  Podlaski to confirm that they're free to disclose
13  this information to the government and they're not
14  subject to any privileges that Mr. Bissonnette has"
15  and represented to the government based on what we
16  were told that this was the complete file.
17          At some point during either the first or
18  the second proffer session -- and I can't tell you
19  which -- Mr. Peak produced a document or a couple of
20  documents that he represented that he had gotten from
21  the -- from the law firm and that we had not
22  produced.
```



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
177

```
1           And he very aggressively challenged me
2   about our having breached our duty of candor to him
3   and accused me of having edited the file or cleaned
4   up the file before giving it to the government.
5       Q.  What were those documents?
6       A.  You know, they were letters and emails and
7   things that we had not yet seen.  They didn't seem --
8   in the context of the conversation we were having, I
9   don't even recall what they were.  I mean, they were
10  unexceptional.
11          They didn't contradict any other documents
12  that we had and then produced and weren't
13  inconsistent with anybody's testimony.  It was
14  focused on this issue about whether we had been
15  candid with Mr. Peak about having produced the
16  complete file.
17          And we had a very heated conversation
18  about this.
19      Q.  How many documents?  I just want to get a
20  sense of what we're talking about here.
21      A.  You know, I only saw a handful.  But Mr.
22  Peak represented to me that there was a substantial
```

800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
178

```
1   number.  But he didn't sit down and say, here are all
2   the documents that we have that you didn't produce.
3           He showed me some documents that we hadn't
4   seen before.  And I said:  "We've never seen these."
5   And he represented that there were a substantial
6   number of additional documents that he had
7   subsequently received from the law firm that we had
8   failed to produce.
9       Q.  That dispute over missing documents that
10  you just described has found its way into the
11  complaint against my clients.
12          And what I'm trying to understand and get
13  my arms around is what are we talking about?  What
14  are those documents?  Who has them?  What do they
15  consist of?
16      A.  Well, you know, I'm --
17          MR. PATRIZIA:  Object to the form.
18          MR. TOBEY:  Object to the form.
19          MR. PATRIZIA:  Is there a question
20  pending?
21          MR. FURMAN:  There's four questions
22  pending.
```

800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
179

1        BY MR. FURMAN:

2        Q.    Well, let's break them down, what are

3   they?

4        A.    Having not seen the set of documents that

5   were produced to the government by the law firm and,

6   therefore, not having had an opportunity to compare

7   that set with the set that was given to us on disk by

8   Mr. Johnston and then copied and produced to the

9   government, I can't tell you what they were.

10       I only saw -- as I said, I only saw a

11  handful of these, but Mr. Peak represented to me that

12  the universe of documents was substantially larger.

13       Q.    And if I understand what you -- your

14  testimony is that, to your recollection, the

15  documents didn't contradict or were, otherwise, not

16  inflammatory in any way substantively?

17       A.    Substantively, that's right.

18       Q.    And the only issue was that Mr. Peak

19  believed because of this undefined number of

20  documents that were not produced to him that you in

21  representing Mr. Bissonnette were not acting in full

22  candor?



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
180

1        A.    That's exactly right.  I mean, look, from

2   my perspective in representing Mr. Bissonnette in the

3   criminal matter, this called into question the

4   fundamental basis for our relationship with the

5   government, which was, there was going to be complete

6   candor and full disclosure.

7        And so apart from the fact that the

8   accusation offended me personally and professionally

9   and Mr. Peak and I got into a prolonged screaming

10  match over it because no one has ever accused me of

11  that ever and I've never done it, it was potentially

12  fatal to Mr. Bissonnette, because if the government

13  believed that we had done that and Mr. Bissonnette

14  was responsible, then kind of all bets were off in

15  terms of the implicit promises that they had made

16  that candor would be rewarded by a declination.

17       So it was important because of the process

18  and its significance rather than for the underlying

19  documents themselves.

20       Q.    And other than a shouting match and blood

21  pressure going up on both your end and Mr. Peak's

22  end, did anything come of that, that situation?



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
181

1        A.    You know, I think you will see some

2   prolonged back-and-forth by email about it because,

3   obviously, I then went back to Mr. Johnson and said,

4   "Can you confirm to me that this is the complete set

5   as received from the law firm by you so that I can

6   make sure that I was correct in making that

7   representation to them and that there wasn't either a

8   miscommunication by us or somehow a logistical

9   problem"?

10       And he confirmed that it was.  I went back

11  to the government.  And this issue percolated for a

12  while.  But I believe, you know, in large part

13  because of the result in the case that ultimately it

14  was resolved in our favor because I think if they had

15  felt otherwise I don't think we would have gotten the

16  declination.

17       Q.    Do you know how long that issue

18  percolated?

19       A.    You know, I mean, it percolated for a

20  couple months and then reemerged somewhat later

21  because -- in a slightly different context because we

22  had prepared chrons for the government in order to

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
182

1   assist them in looking into in particular the, "No

2   Easy Day" issue.

3        And they referenced emails that we had

4   gotten from, among other sources, Mr. Bissonnette's

5   email accounts.

6        And then in connection with the

7   investigation, we provided access to the government

8   to all of his email accounts.

9        And the government went back and they said

10  -- with the understanding that if the government

11  found anything on those accounts that they regarded

12  as sensitive or clarified they could delete them, as

13  well as if they found anything on the computer or the

14  hard drive that was sensitive or classified, they

15  could delete that.

16       And some months subsequently Mr. Johnson

17  asked me, "I see a reference on your chron," which we

18  had shared with them, "to an email between Mr.

19  Bissonnette and Mr. Podlaski" -- and I believe it was

20  in May of 2013.  "Can I get a copy of that email?"

21       And I looked through.  And I said:  "We

22  don't have a copy of that email.  We looked at it



1  from Mr. Bissonnette's account.  We referenced it in
2  our chronology.  We don't have a copy.  The
3  government had access.  And when access was restored,
4  that email was missing."
5      So I wrote to Mr. Peak and said:  "You
6  know, you indicated to us that any material that you
7  might have deleted would be archived because we were
8  concerned that things that might be relevant in other
9  proceedings would be destroyed and lost.  Could we
10  have a copy of this email?"
11      And essentially, there follows a
12  back-and-forth over several days in which he keeps
13  reminding me that I hadn't given him all the
14  documents and you should get it from your own files
15  or you should get it from Carson Boxberger and, you
16  know, by the way, why didn't you ever give us all the
17  stuff you were supposed to give him?
18      And I go back and say:  "No.  That isn't
19  what this is about.  This is stuff that you had
20  access to on his email account that has nothing to do
21  with that and had to spend, you know, another week
22  tamping this issue back down again.



1      Q.    And I guess my prefatory remark is that in
2  document-intensive cases things like this happen.
3      But beyond the back-and-forth, do you know
4  whether or not in any way Mr. Bissonnette was damaged
5  by this controversy over documents?
6      MR. TOBEY:  Objection.  Form.
7      A.    Well, you know, what I can say was that he
8  was threatened by it.  But I would be hard put to
9  quantify a damage.
10      BY MR. FURMAN:
11      Q.    Have you been asked to be a witness at the
12  trial of this case, this civil case?
13      A.    No, I have not.
14      Q.    Do you understand that you may be called
15  as a witness in this particular case?
16      A.    Yeah.  I'm sure that's possible.
17      Q.    Do you have an opinion on the services
18  that Mr. Podlaski provided to Mr. Bissonnette?
19      MR. PATRIZIA:  Object to form.
20      I'll permit the witness to answer.
21      A.    Yes, I do.
22      BY MR. FURMAN:



1      Q.    What is that opinion?
2      A.    I think that the advice that he gave him
3  was wrong and that he should not have undertaken or
4  represented that he could review the manuscript to
5  exclude classified information.
6      Q.    Did you form an opinion as to whether the
7  book should have been submitted for a prepublication
8  review?
9      A.    Yes.
10      Q.    And what's your opinion on that?
11      A.    That it should have been.
12      Q.    When did you reach those two opinions, the
13  first one that Mr. Podlaski should not have
14  represented that he could review the book to
15  determine whether it contained classified information
16  and; secondly, that the book should have been
17  submitted for a prepublication review?
18      A.    You know, it would be hard to pinpoint
19  when that was.  But it's certainly -- those opinions
20  formed over time.
21      You know, I mean, I will tell you that
22  certainly throughout the sort of operative phase of

1  this representation whether or not Mr. Podlaski's
2  representation met an appropriate standard really was
3  not of any concern of mine whatsoever.
4      And I didn't spend any time thinking about
5  it, because from my perspective, the important thing,
6  as I said, this morning was that Mr. Bissonnette
7  sought out someone who was qualified to provide
8  advice to him on this subject and he got that advice
9  and he followed it.
10      And beyond that, for the purposes of what
11  I was doing, it didn't really matter.  You know, the
12  narrow question -- the larger question, I believed
13  that we could not successfully defend a lawsuit if
14  the government brought it on that issue.
15      But whether the advice is right or wrong
16  is a very different thing from asking whether the
17  advice was negligent.  You know, we lawyers make
18  judgments all the time.
19      And so my concern at the time was whether
20  it was right or wrong and whether Mr. Bissonnette
21  relied on it, not whether or not it met the
22  appropriate standard of care.

```
1          MR. FURMAN:  I don't think I have any
2    further questions -- famous last words.  But I want
3    to talk to my right hand.
4          MR. PATRIZIA:  Okay.  We'll go off the
5    record.
6          (A break was taken.)
7    BY MR. FURMAN:
8      Q.    Just one last question.  You referenced
9    the negligence part of it.  I just wanted to follow
10   up.
11          In terms of whether the book should have
12   been submitted for prepublication and review, when
13   did you come to the opinion that that's what should
14   have happened?
15     A.    Oh, I think I came to that conclusion
16   probably in the first three to four months.
17     Q.    And what triggered that view for you?
18     A.    Well, I think what triggered that view for
19   me was the risks posed by the SNEPP doctrine which
20   would be obviated if the book had been submitted for
21   review and the information shared with me by folks at
22   DOD.
```

```
1      Q.    And is it fair to say that that your
2    understanding of the SNEPP doctrine and also your
3    access to the information provided by the Department
4    of Defense relating to the nondisclosure agreement
5    connecting 2007 to Operation Neptune Spear that you
6    had that information as of September 20th of 2012?
7      A.    Well, as I said, the information about the
8    SCI agreement might have been in the first or the
9    second meeting with DOD, but certainly relatively
10   early on, I guess, would be a fair statement.
11          MR. FURMAN:  I have no further questions.
12   Thank you.
13          EXAMINATION BY COUNSEL FOR PLAINTIFF
14          BY MR. TOBEY:
15     Q.    Mr. Luskin, my name is Robert Tobey.  Let me ask
16   represent Mr. Bissonnette in our lawsuit.  Let me ask
17   you a few background questions just so we have a
18   little bit of a description of you.
19          Where did you go to college?
20     A.    Harvard College.
21     Q.    And that's the one in Boston?
22     A.    Cambridge, actually.
```

```
1      Q.    And what did you study there?
2      A.    I had a joint major in government and
3    English literature.
4      Q.    And did you go to law school after
5    college?
6      A.    Eventually.
7      Q.    Eventually?
8      A.    Yeah.  I was in graduate school for three
9    years at Oxford University studying English
10   literature and then came back and eventually went to
11   law school, graduated from Harvard Law School in
12   1979.
13     Q.    And did you have a Rhodes Scholarship
14   doctrine (sic)?
15     A.    I did.
16     Q.    And at Harvard, did you obtain any honors
17   as part of your graduation from law school?
18     A.    From college or law school?
19     Q.    Law school.
20     A.    I was on the law review and I graduated
21   magna cum laude.
22     Q.    And after you graduated from Harvard Law,
```

```
1    what did you do next?
2      A.    I clerked for Judge Louis Oberdorfer,
3    O-B-E-R-D-O-R-F-E-R in the United States District
4    Court here in DC and then went to work in the Justice
5    Department where I stayed for about 3 1/2 years.
6      Q.    Did you work on any notable cases at the
7    Justice Department?
8      A.    I worked on -- Abscam was the very first
9    case that I had when I was there.
10     Q.    Well, that's a good way to start.
11          And you left the government, I take it?
12     A.    That's right.
13     Q.    Where did you go from there?
14     A.    Joined a small firm which no longer exists
15   called Onek, Klein & Farr.  I specialized in Supreme
16   Court litigation.  Remained there until about 1990.
17   Very briefly joined Powell, Goldstein, Frazier &
18   Murphy in their Washington office.
19          Left that after about a year and a half.
20   And with two friends, we formed our own law firm and
21   stayed together until 2000 when I joined Patton
22   Boggs.  I remained there until almost exactly two
```

ROBERT D. LUSKIN                                                    January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                           191

```
1   years ago when I joined Paul Hastings.
2        Q.   Great.   And when did you start handling
3   government investigations both civil and criminal?
4        A.   Well, I mean, I guess I started that when
5   I joined the Justice Department and have been
6   involved in those kinds of matters ever since then.
7        Q.   Okay.   And I take it with the Justice
8   Department you were on the prosecution end of the
9   scale?
10       A.   That's right.
11       Q.   And then when you went out and left the
12  Justice Department, you were handling the defense of
13  those matters?
14       A.   That's right.
15       Q.   So you've been handling those for more
16  than 30 years?
17       A.   Yes, I'm afraid so.
18       Q.   And can you tell us some of your notable
19  cases that you've defended?   You mentioned Lance
20  Armstrong.   What did you do for him?
21       A.    Represented Lance in connection with the
22  criminal investigation that was conducted out of the
```



ROBERT D. LUSKIN                                                    January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                           192

```
1   Middle District of California into his alleged PED
2   use.
3            I represented Karl Rove in the special
4   prosecutor investigation into the leak of the
5   identity of a CIA agent.
6            I've represented a number and continue to
7   represent a number of large corporations in
8   high-profile matters.
9            I represented senior officials in The
10  White House during the Clinton years.   I represented
11  a Deputy Attorney General in the Whitewater
12  investigation.
13           I represented a sitting federal judge in a
14  criminal case that went to trial in the Northern
15  District of California and eventually made its way up
16  to the Supreme Court.
17       Q.   Have you argued in front of the Supreme
18  Court?
19       A.   I have.
20       Q.   On how many occasions?
21       A.   Two.
22       Q.   Two, okay.   And have you received honors
```



ROBERT D. LUSKIN                                                    January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                           193

```
1   as a lawyer?
2        A.   Well, I've been a part of the DC Circuit
3   Judicial Conference.   I've received honors in the
4   Justice Department for exceptional service.
5            I've participated -- used to participate
6   in the ABA and was the chairman of the RICO
7   Forfeitures, Restraints, and Alternative Remedies
8   Committee.
9            And then I taught -- from 1990 to about
10  2007, I taught advanced criminal law at the
11  University of Virginia Law School and then starting
12  last year, I teach anticorruption at Georgetown Law
13  School.
14       Q.   So let me ask you now moving on to Mr.
15  Bissonnette:   You started representing him when you
16  were at Patton Boggs?
17           MR. FURMAN:   Can I just interrupt?
18           MR. TOBEY:   Yes.
19           MR. FURMAN:   I want to object to that
20  whole line of questioning on the fact that I'm a mere
21  mortal.
22           MR. TOBEY:   If you're a mere mortal, I'm
```

ROBERT D. LUSKIN                                                    January 18, 2017
MATTHEW BISSONNETTE V. KEVIN PODLASKI                                           194

```
1   not sure what that makes me.   We've got a caste
2   system here, I'm afraid.
3        A.   We can go off the record and I will tell
4   you a story that stopped --
5            (Discussion held off the record.)
6            BY MR. TOBEY:
7        Q.   So you first started representing Mr.
8   Bissonnette while you were at Patton Boggs?
9        A.   That's right.
10       Q.   Alright.   And did you -- I think you
11  identified in some questions from Mr. Furman the
12  nature of the team that you had working on this at
13  Patton Boggs?
14       A.   Yes.
15       Q.   There were several names, Ms. Gardner, Mr.
16  Zach --
17       A.   Deschauer and General Nardotti were the
18  partners who assisted me on it and then Zach Adams
19  was the senior associate who did all the useful work.
20       Q.   Alright.   And you said you moved to Paul
21  Hastings a couple of years ago.   Did you bring at
22  least some members of that team with you to Paul
```



1  Hastings?

2      A.   Jamie Gardner came with me to Paul

3  Hastings.

4      Q.   Mr. Adams didn't come with you?

5      A.   No.

6      Q.   Did Ms. Gardner continue to work on the

7  case at Paul Hastings?

8      A.   Yes, she did.

9      Q.   Okay.   And let me just ask you very

10 generally about Exhibit 117, which is that group of

11 bills that have been put together for both the work

12 at Paul Hastings and the work at Patton Boggs.

13      In your opinion, are the services rendered

14 on behalf of Mr. Bissonnette reasonable and

15 necessary?

16      A.   Yes.

17      Q.   And was the time spent on the -- each

18 service reasonable and necessary, in your opinion?

19      A.   Yes.

20      Q.   And are the hourly rates that are charged

21 that are reflected on the bills reasonable and

22 necessary?



1      A.   Yes.   I think they were fair.

2      Q.   Okay.   And let me turn now to -- I'll skip

3  some of this.

4      Right at the end of his examination of you

5  Mr. Furman asked if you had some opinions about

6  whether Mr. Podlaski should have advised Mr.

7  Bissonnette to submit, "No Easy Day" to a

8  prepublication review.

9      Do you recall that question, generally?

10      A.   Yes, I do.

11      Q.   Let me ask you a follow-up question to

12 that.   And that is:   Do you believe that that advice,

13 which you said, in your opinion, was negligent was a

14 proximate cause of damage to Mr. Bissonnette?

15      MR. PATRIZIA:   Object to the form.

16      I'll permit the witness to answer.

17      A.   Well, I think it resulted in the fact that

18 he was required to forfeit a substantial portion of

19 the proceeds of the book to the government.

20      MR. FURMAN:   And I'll just note my

21 objection to the question.

22      BY MR. TOBEY:



1      Q.   And that was, obviously, a monetary damage

2  to Mr. Bissonnette?

3      A.   That's right.

4      Q.   Okay.   And are there any other damages

5  that you can think of that Mr. Bissonnette has

6  suffered as a result of that advice?

7      A.   Well, I know that Mr. Bissonnette loathed

8  every moment of the process starting on August 31st,

9  2012 until we reached agreement with the government

10 and on at least one occasion told me that he would

11 much rather strap on his gear again and night assault

12 a building full of Taliban than go into a room with

13 another lawyer.

14      Q.   That's a pretty strong statement, isn't

15 it?

16      A.   Yeah.

17      MR. FURMAN:   I wonder if he said that

18 after my deposition of him.   I don't think so.

19      MR. TOBEY:   Well --

20      THE WITNESS:   You're too nice to be a

21 lawyer, Mark.

22      BY MR. TOBEY:

1      Q.   Mr. Furman asked you a number of questions

2  about the settlement that was reached with the

3  government that was confirmed by the consent decree

4  that was entered in August of last year.

5      Do you recall those questions?

6      A.   Yes, I do.

7      Q.   Is it your opinion that that settlement

8  was reasonable and necessary?

9      A.   Yes, it is.

10      Q.   Alright.   At any point in time starting on

11 August the 30th of 2012 when you started your

12 representation of Mr. Bissonnette all the way and

13 through the final settlement in August of 2016, in

14 your opinion, was there a reasonable opportunity to

15 settle both the civil and criminal claims that the

16 government was asserting?

17      A.   Well, let me put it this way:   We settled

18 both cases on the best possible terms that we could

19 achieve at the earliest possible date.

20      Q.   Okay.   And so even though I think Mr.

21 Furman elicited some testimony from you that

22 indicated there were term sheets that may have gone

1  back and forth as early as, say, 2014, there really
2  wasn't an opportunity any earlier than August of 2016
3  to settle everything?
4       A.   That's right.
5       Q.   Okay.  Mr. Furman asked you a series of
6  questions about the prepublication review process.
7  And it sounded like from your answers that before you
8  represented Mr. Bissonnette you had some experience
9  in that area?
10      A.   That's correct.
11      Q.   And you actually had direct experience
12 with Mr. Bissonnette in conjunction with the
13 PowerPoint slides that you told him to submit to the
14 government for approval?
15      A.   That's right.  So that would have been
16 March and April of 2013.
17      Q.   Alright.  And I think you indicated in
18 questions from Mr. Furman that the government at
19 various times told you that they had issues with --
20 let me make sure I quote it right -- tactics and
21 procedures that were in the book.
22           Did I write that down right?


1       A.   That's right.
2       Q.   Okay.  And I take it --
3       A.   And let me qualify that, which is that in
4  the context of the two proffers the government shared
5  a list of things in the book that they thought should
6  not have been included.
7            And so when I answered that -- your
8  question, I am not referring to those because I'm not
9  free to talk about them.
10      Q.   I take it that would be classified
11 information?
12      A.   That's exactly right.
13      Q.   And if you divulge that, all seven people
14 in this room would be in trouble?
15      A.   Well, I would certainly get hit by a bolt
16 of lightning.  That's for sure.
17      Q.   And some of the rest of us might catch
18 some collateral damage.
19      A.   Right.
20      Q.   Alright.  So when you refer to tactics and
21 procedures, that's kind of a generic description.
22 Can you say, without violating that confidentiality,


1  whether or not Mr. Bissonnette and Mr. Maurer, the
2  cowriter, could have written around those issues that
3  were raised by the government?
4            MR. FURMAN:  Objection.
5            BY MR. TOBEY:
6       Q.   You can answer, if you can.
7       A.   I think they could have.
8       Q.   Was there anything in your opinion that
9  would have just made this book unsellable, according
10 to the issues raised by the government?
11           MR. FURMAN:  Objection.
12      A.   No.  But, you know, with the caveat,
13 obviously, that I can't discuss the specifics.
14           BY MR. TOBEY:
15      Q.   I understand, and don't want you to.
16           Now, let me ask you kind of a related
17 question:  In any of your discussions with the
18 government, did they ever say that Mr. Bissonnette
19 was prohibited generally from talking about either
20 the Captain Phillips Mission or the Operation Neptune
21 Spear?
22           MR. PATRIZIA:  Object to the form.


1            I'll permit the witness to answer.
2       A.   Based on the issues that the government
3  raised in the proffer sessions, it was my
4  understanding that their concerns had to do with
5  specific matters rather than generally talking about
6  missions.
7            BY MR. TOBEY:
8       Q.   Okay.  Now, let me ask you this:  In your
9  discussions with the government, did you raise the
10 fact that because Mr. Bissonnette had a fairly long
11 tenure with the Navy, about 12 years that he would
12 have a pretty good idea of what would be sensitive or
13 classified and he was not going to include that in
14 the book as kind of a good faith argument?
15           MR. PATRIZIA:  Object to the form.
16           I'll permit the witness to answer.
17           MR. FURMAN:  Objection.
18      A.   I certainly argued that he behaved in good
19 faith.  I think fairer to say that the way I
20 characterized it was that he would never disclose
21 something that would endanger the people with whom he
22 served.



```
 1        So it had less to do with his -- the
 2  length of his tenure in the Navy and more his loyalty
 3  to his friends and colleagues.
 4        BY MR. TOBBY:
 5     Q.   And in connection with your representation
 6  of Mr. Bissonnette, did you have conversations with
 7  Mr. Maurer, the cowriter?
 8     A.   No.
 9     Q.   No?
10     A.   You know, I see him on some of the email
11  strings from the first day or two.  And so we may
12  have spoken in that initial period of time, but I
13  don't think I ever had an extended conversation with
14  him or a one-on-one.
15     Q.   Okay.  Let me turn to the issue of whether
16  Mr. Podlaski was fired at some point in time.
17        Did you ever fire Mr. Podlaski as Mr.
18  Bissonnette's lawyer?
19     A.   No.  And I don't think that I would have
20  been free to do it.  He was retained by Mr.
21  Bissonnette.  And we worked together, but I had not
22  retained him, and so I never would have thought that
```



```
 1  I would have had the capacity to fire him.
 2     Q.   And to your knowledge, did Mr. Bissonnette
 3  ever fire Mr. Podlaski as his lawyer?
 4     A.   Not to my knowledge.
 5     Q.   Okay.  In this time frame beginning on
 6  August the 30th of 2012 and going through December 31
 7  of 2012, did you ever tell Mr. Bissonnette that he
 8  shouldn't rely on any advice he might receive from
 9  Mr. Podlaski?
10     A.   No, I didn't say that.
11     Q.   And I think you answered this in
12  conjunction with some of Mr. Furman's questions, but
13  I want to make sure it's clear.
14        At the point in time where you decided
15  that the best defense was going to be Mr.
16  Bissonnette's reliance on the advice of his counsel,
17  Mr. Podlaski, was it important to you that you have
18  Mr. Podlaski's help in regard to that defense?
19     A.   Well, yes.  I mean, I did expect that it
20  might be relevant, that he might become a witness.
21  And I certainly wanted from Mr. Podlaski both an
22  understanding of what he was asked to do and what
```



```
 1  advice he gave and to be able to relay that
 2  accurately to the government as necessary.
 3        So sure.  I was counting on his
 4  cooperation.
 5     Q.   And I take it you didn't want to
 6  antagonize him for any reason, if that was avoidable?
 7     A.   No.
 8     Q.   Let me ask you about the Freedom of
 9  Information Act request.  I think you said that when
10  Mr. Podlaski suggested it you thought it was a good
11  idea?
12     A.   I did.
13     Q.   Alright.  And to your knowledge -- and let
14  me ask you:  Did Mr. Podlaski copy you with those
15  requests to the government?
16     A.   You know, I don't recall.  I think that I
17  saw them, but I don't -- I don't remember.
18        I mean, I think that I was aware that he
19  had filed them.  But whether I received copies of the
20  requests themselves, I don't recall.
21     Q.   Alright.  And do you recall generally what
22  the timeline was in terms of when those requests were
```

```
 1  made and when responses were received?
 2     A.   I don't.
 3     Q.   Okay.  And is it fair to say that the
 4  information that he might receive from that freedom
 5  of information request could have been helpful to you
 6  in your defense of Mr. Bissonnette?
 7     A.   It's certainly possible.  I mean, we were
 8  making a -- you know, through the spring of 2014 when
 9  we agreed on a term sheet, which was the point
10  of legal, quasi legal, equitable arguments.
11        And certainly how the government had dealt
12  with other similar matters, which was the point of
13  this FOIA request, was something that was potentially
14  relevant to the kinds of things that we were saying
15  to the government.
16     Q.   Let me ask you:  From August 30, 2012
17  through December 31, 2012, did you ever tell Mr.
18  Bissonnette that Mr. Podlaski had committed
19  malpractice?
20     A.   No, I did not.
21     Q.   Okay.  Do you know -- in that same time
22  frame, August 30, 2012 through December 31, 2012, do
```



1  you know if anyone else told him that Mr. Podlaski
2  had committed legal malpractice?
3       A.   I'm not aware of anyone who shared that
4  view with him.
5       Q.   Do you know of any way, other than perhaps
6  you or someone else telling him that Mr. Podlaski had
7  committed legal malpractice in that time frame, that
8  Mr. Bissonnette could have discovered that fact?
9            MR. FURMAN:   Objection.
10           MR. PATRIZIA:   Object to the form.
11           I'll permit the witness to answer.
12      BY MR. TOBEY:
13      Q.   Do you want me to rephrase it?
14      A.   No.   I mean, I think I know what you're
15  getting at.   I guess the short answer is that my
16  understanding at the time was that Matt was looking
17  to me and also to Kevin for advice on this issue.
18           And I don't know of anyone else who was
19  providing him with legal advice during that period of
20  time.
21      Q.   Okay.   Mr. Furman asked you a lot of
22  questions at the beginning of the deposition about



1  potentially stopping distribution of the book when
2  you were hired on August the 30th.
3            Is there any way you could have done that
4  if you thought that was the right thing to do?
5       A.   I certainly didn't understand that I had
6  authority to do so.   If I thought that that was the
7  right course of action, I certainly could have asked
8  the publishers to withdraw the book.
9            But I didn't have -- Mr. Bissonnette
10  didn't have the authority to stop the publication.
11      Q.   Do you know mechanically if that even
12  could have been done at that late date?
13      A.   I don't know, and I don't know enough
14  about the publishing industry to know whether or not
15  that was possible.   I didn't think that it was in Mr.
16  Bissonnette's interest to do so and so never further
17  explored that possibility.
18      Q.   Would it be fair to say that if Mr.
19  Bissonnette tried to stop publication at that time he
20  would have been exposed to a claim by the publisher?
21           MR. FURMAN:   Objection.
22      A.   I did review Mr. Bissonnette's contract



1  with the publisher.   And the contract called for him
2  to submit a publishable manuscript that met all legal
3  and regulatory requirements.
4            And so my concern was, frankly, in
5  balancing the risks to Mr. Bissonnette that if we
6  proceeded with the publication and the government was
7  able successfully to bring a forfeiture action that
8  his liability would be limited to his share of the
9  proceeds.
10           Whereas, if the book were withdrawn, the
11  government -- the publisher would have had a very
12  strong case for breach of contract against Mr.
13  Bissonnette and might have proceeded against him with
14  a claim for 100 percent of the book's proceeds as
15  opposed to his royalty share of the proceeds.
16           So even leaving aside the risks of
17  forfeiture, in my view, the risks of trying to get
18  the book stopped was, in financial terms,
19  significantly greater to Mr. Bissonnette than the
20  risk of proceeding.
21           BY MR. TOBEY:
22      Q.   Along those lines of your answer, let me

1  ask you something about the settlement.
2            You talked about the reasonableness from a
3  monetary standpoint.   Did the settlement also help
4  Mr. Bissonnette with his reputation, I mean, versus
5  what might have happened if you had tried that case
6  against the government?
7            MR. PATRIZIA:   Object to the form.
8            I'll permit the witness to answer.
9       A.   Well, in the resolution, both the
10  complaint and the consent decree, the government
11  essentially receded from any allegations that he had
12  improperly disclosed classified information or that
13  he had endangered his colleagues and based the legal
14  claim and settlement solely on the failure to seek
15  prepublication review.
16           And obviously from a reputational
17  perspective, that was significantly preferable for
18  Mr. Bissonnette.
19           MR. FURMAN:   Object to the -- it's late in
20  the day.   I'm going to object to the question and
21  also the answer.   There's no foundation to give an
22  opinion, one way or the other, on reputation.

1    I don't normally state my basis for
2 objections.  So the fact I didn't do so on other
3 occasions I've objected doesn't mean I've waived any
4 basis.  I just impulsively felt the need to say that.
5         MR. TOBEY:  Duly noted.
6         BY MR. TOBEY:
7    Q.    In your opinion, did Mr. Bissonnette
8 violate the law by sending the manuscript of, "No
9 Easy Day" to Mr. Podlaski for review?
10        MR. PATRIZIA:  Object to form.
11        I'll permit the witness to answer.
12   A.    I think that in theory, one could make the
13 argument that sharing the manuscript could be deemed
14 to be a publication because he shared it with another
15 person.
16        But I -- at some point it starts to look
17 like a hall of mirrors.  And I would be shocked if
18 the government were to take that position.
19        In other words, if someone shared a
20 manuscript with his counsel for the purpose of
21 getting legal advice, I can't imagine that the
22 government, under those circumstances, would take the

1    view that that itself was an act of publication that
2 breached an underlying agreement.
3         But, you know, in a law school exam, I
4 would expect someone to at least flag that as an
5 issue.
6         BY MR. TOBEY:
7    Q.    Let me switch gears on you and talk about
8 the issue about the files -- the production of the
9 files from the Carson Boxberger firm to the
10 government versus what my law firm produced to you,
11 which you then produced to the government.
12        Did this issue increase your legal costs
13 for Mr. Bissonnette?
14   A.    You know, it -- there were certainly email
15 traffic back and forth about this issue and that time
16 was billed, but it would be difficult for me to
17 quantify how much time was spent pursuing that issue.
18        The underlying issue of candor was really
19 what made that issue significant.
20        MR. TOBEY:  I want to mark these few
21 exhibits and I think I may be done.  Let's take just
22 a minute to do that.

1         (Exhibit Numbers 123 through 127 were
2 marked for identification and were attached to the
3 deposition.)
4         BY MR. TOBEY:
5    Q.    Mr. Luskin, let's talk about these for
6 just a minute.
7         Exhibit 123 looks like an email that you
8 sent to Mr. Peak on September 25, 2014?
9    A.    That's right.
10   Q.    Alright.  And in that email, you're
11 conveying the contents of the file as you understood
12 it from Mr. Podlaski?
13   A.    That's right.
14   Q.    Alright.  Exhibit 124 is an email chain.
15 And if I can call your attention, first, to the
16 fourth page of the exhibit, which appears to be an
17 email from Mr. Peak to you dated October 24, 2014.
18        Do you see that?
19   A.    Yes, I do.
20   Q.    And it says:  "Bob, thanks for sending the
21 second CD.  I have reviewed it and I am wondering
22 whether this is a situation in which Mr. Podlaski is

1    performing a, quote, rolling production, end quote.
2         "I say that because it still appears to me
3 that many kinds of documents one would reasonably
4 expect to find in an attorney's file are missing."
5         He goes on to say:  "The invoices included
6 therein recite billings for the preparation of
7 letters and emails to Mr. Bissonnette and others
8 regarding a myriad of issues relevant to Mr.
9 Podlaski's representation and our investigation, but
10 I do not see those letters or emails in the
11 production."
12        Is this kind of when problems started with
13 Mr. Peak on this issue?
14   A.    That is probably correct.
15   Q.    Okay.  And when did you find out that he
16 had separately gone to the Carson Boxberger firm and
17 gotten production of the file from that source?
18   A.    Well, I mean as you can see from this
19 email string, we had initially prepared a waiver
20 letter so that they could interview and obtain
21 documents from Mr. Podlaski.
22        He asked for revisions of those.  I

1  assumed that the government then shared that letter
2  with Mr. Podlaski.
3      But when we then returned for a furber
4  proffer, this issue surfaced in the form of Mr. Peak
5  indicating that they had a number of documents that
6  they had reviewed that we had not produced.  And
7  that's when he suggested that I had cleaned up the
8  file.
9      Q.   Okay.  Looking at Exhibit 125, is that the
10 revised waiver letter, specifically looking at the
11 second page?
12     A.   Well, he asked for a revision.  So let me
13 look at that.  This looks like it incorporates the
14 change that Mr. Peak had requested.  And given that
15 and the fact that it's signed on or about that date,
16 it seems to me a fair assumption that this is, in
17 fact, the final waiver letter.
18     Q.   Okay.  So would it be your understanding
19 that the government went to the Carson Boxberger firm
20 after October 28th to get production of its file?
21         MR. PATRIZIA:  Object to form.
22         I'll permit the witness to answer.



1      A.   I would assume so.
2          BY MR. TOBEY:
3      Q.   Okay.  Looking at Exhibit 126, which
4  appears to be another email chain, on the third page,
5  which is the first email in the chain, it's dated
6  September 23.  So this chain actually goes over a
7  couple of months, it looks like.
8          You say in the second paragraph of your
9  email to Mr. Peak and to Brian Fleming:  "As I
10 mentioned, we will separately send the electronic
11 copy of the Podlaski file that Matt's malpractice
12 lawyer received from Podlaski and his firm.
13         "We have incorporated information from
14 that file into the chron, but also wanted you to have
15 access to the file in the form that it has been
16 shared with us."
17         So that's when you made the first
18 production?
19     A.   That's correct.
20     Q.   And then on the second page, Mr. Peak
21 writes you back significantly later on November 5th.
22 And he says in the second paragraph:  "As we



1  discussed a few weeks ago, we have not found much in
2  the Podlaski file that one would expect to find and
3  we have not found other information/documents that
4  would support your timeline."
5          So were you having problems with Mr. Peak
6  at that time about his concern that you weren't being
7  forthcoming?
8      A.   Yes.
9      Q.   And then in the very first email in the
10 exhibit, which is from you to him and Mr. Fleming and
11 Solomon Hagedon -- who is Mr. Hagedon, by the way?
12     A.   Mr. Hagedon was an investigator for NCIS
13 who was principally assigned to this -- to the
14 criminal case.
15     Q.   And in that first email, are you
16 expressing, I guess, the frustration at what you had
17 received that was from Mr. Podlaski's file?
18     A.   Let me take a look at it, please.  That's
19 right.
20     Q.   And lastly on this subject, I think you
21 talked in Exhibit 126 about sending a chronology that
22 was annotated with documents?



1      A.   That's correct.  We offered to do that.
2      Q.   Right.  And is 127 that document?
3      A.   This does appear to be the annotated
4  chron.  That's right.
5      Q.   Alright.  And was the annotated chron
6  prepared by your office?
7      A.   It was.
8      Q.   And was the annotated chronology helpful
9  with you for with -- let me strike that.
10         Was the annotated chronology helpful to
11 you in your discussions with the government?
12     A.   Yes, it was.  I mean, it was helpful to us
13 in preparing for discussions with the government and
14 it was helpful in our relationships with the
15 government because I think it facilitated digesting
16 of a very substantial volume of material and then
17 putting it in some coherent chronologically correct
18 form.
19         MR. TOBEY:  If we can take about a
20 five-minute break, I think I'm about to wrap up.
21 I'll go through my notes one more time.
22         MR. PATRIZIA:  Off the record.

1          (A break was taken.)
2          BY MR. TOBEY:
3      Q.    Let me ask you this:  In regard to the
4  file production issue, in your opinion, what should a
5  lawyer do when a client demands a file from the
6  lawyer?
7          MR. FURMAN:  Objection.
8      A.    You know, I think you turn the file over.
9  And I know in DC, DC is a full file state
10  jurisdiction so that if a client asks for a file,
11  even if the client is grotesquely in arrears of his
12  fees, you turn over the file.
13          BY MR. TOBEY:
14      Q.    And you say, "a full file."  Does that
15  mean everything in the file?
16      A.    That's correct.
17      Q.    And are you aware of any basis for a
18  lawyer to withhold portions of the file such as
19  emails, letters, research when a client makes a
20  demand?
21      A.    I am not.
22      Q.    Okay.  Let me ask you this question:



1  After your meetings with the government, do you
2  believe there was anything that's either classified,
3  confidential, or sensitive in, "No Easy Day" that
4  would have jeopardized the safety of the United
5  States?
6          MR. FURMAN:  Objection.
7      A.    I can't answer that question because I
8  can't disclose what the subject matter -- the
9  specific subjects that were raised by the government.
10  And I'm not in a position to make a judgment about
11  what would be potentially harmful.
12          BY MR. TOBEY:
13      Q.    Okay.  Last topic for you, there was a
14  second 60 Minutes story in November of 2014 involving
15  Mr. Bissonnette.
16          Do you recall that?
17      A.    Yes, I do.
18      Q.    And did you appear on the story as well?
19      A.    I did.
20      Q.    In connection with that story, did you
21  ever identify Mr. Podlaski as the -- being the lawyer
22  who gave the advice not to go to a prepublication



1  review?
2      A.    No, I did not.
3      Q.    Do you know of anybody else who may have
4  told 60 Minutes that Mr. Podlaski was the lawyer who
5  gave the advice not to submit to a
6  prepublication review?
7      A.    I know that 60 Minutes was aware of that
8  fact because one of the producers said to me that
9  they were aware that Mr. Podlaski was the attorney.
10  And my response was that I was not going to confirm
11  or deny that.
12      Q.    Do you know from what source 60 Minutes
13  may have obtained that information?
14      A.    I don't and they didn't share it with me.
15          MR. TOBEY:  Pass the witness.
16          EXAMINATION BY COUNSEL FOR DEFENDANTS
17          BY MR. FURMAN:
18      Q.    I just have very limited follow-up to Mr.
19  Tobey's questions.
20          Mr. Tobey asked you about whether it was
21  appropriate for Mr. Bissonnette to provide the
22  manuscript to Kevin Podlaski.



1          My question to you is:  Was it appropriate
2  for Mr. Bissonnette to provide the details of
3  Operation Neptune Spear to Kevin Maurer, the
4  cowriter?
5      A.    Well, again, I think using this same
6  analysis an argument can be made that any disclosure
7  is a disclosure.
8          But I think as a practical matter, the
9  government views the prepublication review process as
10  the firewall, recognizing that in real life if an
11  author writes a manuscript there may be a typist or
12  an editor or other individuals who stand between the
13  author in the moment when you -- and a lawyer, after
14  all, who stand in between the author's creative act
15  and physically being able to hand a manuscript to the
16  office of prepublication security review.
17          So I guess what I'm saying is, there's a
18  theoretical argument to be made that any disclosure
19  violates the SCI agreement.
20          I think in real life the government
21  interprets that to mean any broad disclosure,
22  recognizing that the steps of creating a manuscript



1  that you are then able to submit may entail
2  assistance from other individuals.
3       Q.    Would you apply that same analysis to Mr.
4  Bissonnette's providing details of Operation Neptune
5  Spear to Elyse Cheney, his literary agent?  Would
6  that also apply?
7            In other words, I'll ask you the same
8  question I asked you about Kevin Maurer.  Was it
9  appropriate, in your view, for Mr. Bissonnette to
10 provide the details of operation Neptune Spear to his
11 literary agent at some point in December 2011?
12      A.    I think the same analysis applies.
13      Q.    And just lastly, would that same analysis
14 apply to Mr. Bissonnette's revealing of details of
15 Operation Neptune Spear to the publisher, Mr. Sevier,
16 at Penguin?
17      A.    Again, I think the same analysis.  And I
18 think where the government would draw the line would
19 be any sort of broad dissemination.
20      Q.    Along these lines -- if you can just turn
21 to document number 127 and specifically to documents
22 ending 2892, which is a letter from Mr. Sevier dated



1  December 23rd of 2011 to Mr. Bissonnette, which
2  includes an outline.  And it ends in document ending
3  2897 -- 2898.
4       A.    I see the entry on December the 23rd.
5       Q.    And I'm referring to the actual letter
6  itself.
7            MR. PATRIZIA:  He's looking to the Bates
8  numbers.  So it was 2892 --
9            MR. FURMAN:  2892 -- thank you, Mr.
10 Patrizia -- and it ends in 2898.
11      A.    So you want me to look at the chapter
12 outline?
13           BY MR. FURMAN:
14      Q.    First of all, are you familiar with this
15 letter and the chapter outline?
16      A.    I'm sure I saw it at some point.
17      Q.    Now, if -- I will ask you to turn your
18 attention to the chapter outline itself.
19           And specifically as an example on page
20 ending 896, there was a question about being briefed
21 by the agency chick, as the word appears in the
22 outline by Mr. Sevier.



1            I'm assuming that's a reference to the CIA
2  operative who --
3       A.    Played by Jessica Chastian in the movie.
4       Q.    -- was played by an actress in "Zero Dark
5  Thirty"?
6       A.    Right.
7       Q.    Otherwise known to Mr. Sevier as, "the
8  agency chick."
9            Do you see anything inappropriate about
10 the question being posed to Mr. Bissonnette and Mr.
11 Bissonnette then starting to write a manuscript that
12 responds to questions like the briefing from the CIA
13 before obtaining prepublication approval?
14      A.    There's certainly nothing inappropriate
15 about asking the question, saying essentially, can
16 you write a book about X.
17           And there would be nothing inappropriate
18 about writing a manuscript that responded to that
19 question provided that you didn't publish it without
20 first submitting it for review.
21           So I don't think the government construes
22 the requirements to intrude into the creative

1  process.  But as I said, the firewall was
2  publication.
3       Q.    And I'm just pointing this out as an
4  example and certainly not exhaustive of all of the
5  issues that are addressed in Mr. Sevier's December
6  23rd, 2011 letter and also his outline.
7            But as an example under Section 8 on that
8  very same page, the third question then states:  "Who
9  planned the mission?"  And that is referring to
10 Operation Neptune Spear.
11           Again, same question:  Do you believe that
12 it would -- it was appropriate for that question and
13 that process of preparing information in response to
14 that question -- appropriate without seeking
15 prepublication approval?
16      A.    Again, I see absolutely nothing wrong in
17 asking the question.  I don't see anything wrong in
18 writing the answer provided that you submit it for
19 prepublication review before it's published.
20           And I think you make the fair point, and I
21 said it before, that I think in a completely
22 theoretical sense any act of disclosure theoretically



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
227

```
 1    falls within the four corners of the agreement
 2    because it is a disclosure.
 3         But I think a fair and reasonable reading
 4    of the agreement is that it's intended -- it's not
 5    intended to interfere with the creative process, but
 6    it is intended to stop publication without review.
 7         So editors can ask.  Coauthors can
 8    contribute.  Writers can write.  People can record
 9    their recollections.  And you can build out of that a
10    manuscript, but you don't widely circulate it until
11    you've submitted it.
12         Q.   The follow-up question I have to that is
13    just -- because I want -- and I appreciate your
14    answer.  And I want to understand if there's
15    parameters around what you believe to be the
16    reasonableness of the interpretation of publication.
17         Because here just based on what we know on
18    Exhibit Number 127 and based on your knowledge so far
19    developed in this testimony today, certainly Mr.
20    Podlaski was aware of the manuscript before the
21    government was aware or this book was ever submitted
22    for any kind of review by the Department of Defense.
```



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
228

```
 1         And a publisher, at least one person, Ben
 2    Sevier; a literary agent, at least one person that we
 3    know of, Elyse Cheney; and a co-author, Kevin Maurer
 4    -- at what point -- that's four people.
 5         At what point does publication become
 6    publication in the sense of violating the agreement
 7    that Mr. Bissonnette signed?
 8         A.   You know, it's sort of like asking the
 9    question, you know, when is sunset.  Do you know what
10    I mean?  First it's light.  Then it's dark.  At some
11    point in between, we cross that line.  But when is
12    the exact moment?
13         The only way I think I can answer it is
14    that, to my knowledge, the government has never taken
15    the position that the sort of routine things that go
16    on in the creative process prior to the point where a
17    publishing company like Penguin actually sends -- you
18    know, creates a book and sends it out for review and
19    sends it out to people who are not in any way
20    involved in the creative process.
21         I'm not aware of their ever taking the
22    position that the disclosure among that core group of
```



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
229

```
 1    folks constitutes an improper disclosure for purposes
 2    of the prepublication review requirement.
 3         Q.   Alright.  Thank you.
 4         And one last question:  Are you aware of
 5    any governmental agency confirming, one way or the
 6    other, as to whether, "No Easy Day" contains
 7    classified information?
 8         A.   I am not aware of any such confirmation.
 9    As I said, the only -- what I am aware of is the list
10    that the government prepared in connection with the
11    proffer that Mr. Bissonnette went through.
12         And how exactly that list was prepared and
13    who was consulted, that information was not shared
14    with me.
15         Q.   I understand that about the proffer.  What
16    I'm asking is whether you're aware of whether the
17    government has made any public announcement, one way
18    or the other, as to whether, "No Easy Day" contains
19    classified information?
20         A.   No, except in the negative inferences that
21    can be drawn from the complaint and consent decree
22    that resolved this matter that made no reference to
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
230

```
 1    the improper disclosure of classified information.
 2         Q.   And those are negative inferences that you
 3    make?
 4         A.   I certainly do.
 5         MR. FURMAN:  Okay.  I have no further
 6    questions.
 7         EXAMINATION BY COUNSEL FOR PLAINTIFF
 8         BY MR. TOBEY:
 9         Q.   I just have a couple.  I forgot to mark a
10    couple of documents.  It will take about five minutes
11    and we'll be done.  131.
12         (Exhibit Numbers 128 through 131 were
13    marked for identification and were attached to the
14    deposition.)
15         BY MR. TOBEY:
16         Q.   Mr. Luskin, I've just handed you Exhibit
17    128.  Is this an email exchange that you had with Mr.
18    Parker and Mr. Easton?
19         A.   That's right.
20         Q.   I gave this to you really for one purpose,
21    which was on page number 8 of the email chain -- it
22    actually starts on the bottom of page 7.
```



1       It's an email from you to Mr. Parker dated
2 August 11, 2015.
3       Do you see that?
4    A.    Um-hum.
5    Q.    And you say:  "Brian Fleming shared your
6 contact information with me so that we might begin a
7 discussion about resolving the civil side of Matt's
8 case now that, as Brian relates, DOJ has closed the
9 criminal investigation."
10       So does that kind of put a box in terms of
11 when the criminal investigation was resolved?
12    A.    That's right.  And that's consistent with
13 my recollection that it was August of 2015.
14    Q.    Alright.  And I note attached to this
15 there's -- it looks like a schedule of royalties and
16 also a speaking engagement list?
17    A.    That's right.
18    Q.    And this was information that you provided
19 to the government on behalf of Mr. Bissonnette?
20    A.    That's right, in connection with the
21 proposed settlement.
22    Q.    Alright.  The next exhibit, 129, is that a



1 blank form of the sensitive compartmented information
2 nondisclosure agreement or does it appear to be?
3    A.    It certainly appears to be.
4    Q.    Alright.  And does Exhibit 130 appear to
5 be a blank form of a classified information
6 nondisclosure agreement?
7    A.    It does.
8    Q.    And I take it Exhibits 129 and 130 would
9 be identical to what Mr. Bissonnette signed?
10    A.    That's correct, I mean, assuming that
11 they're the versions that were applicable in 2007.
12    Q.    Okay.  And then lastly, Exhibit 131, is
13 that a form of sensitive compartmented information
14 debriefing memorandum?
15    A.    It is.
16       MR. TOBEY:  Alright.  Pass the witness.
17       MR. FURMAN:  I'll just note for the record
18 that Exhibit 130 and Exhibit 129 both have at the
19 very bottom -- on the bottom an indication that these
20 forms were revised at some point in 2013.
21       For example, document number 129 indicates
22 on the bottom left-hand side that it was revised as



1 of December 2013.  I don't know, one way or the
2 other, what that revisions do, obviously.
3       And document 130 was revised, the standard
4 Form 312, otherwise known as CINA, C-I-N-A, was
5 revised July of 2013.
6       I just had one question -- just give me a
7 moment.
8       (A break was taken.)
9       EXAMINATION BY COUNSEL FOR DEFENDANTS
10       BY MR. FURMAN:
11    Q.    The question I have was triggered by the
12 introduction of the various agreements.
13       The -- in order to connect the acronyms
14 that were contained in the 2007 SCI nondisclosure
15 agreement that Mr. Bissonnette signed and to connect
16 those acronyms to Operation Neptune Spear, would you
17 have to have access to classified information in
18 order to make that connection?
19    A.    I expect that you would.
20    Q.    And when you were briefed on that and
21 shown additional documents on September 20th of 2012
22 by Jeh Johnson that connected the acronyms to

1 Operation Neptune Spear, were you read into any kind
2 of special access program or provided with clearance?
3    A.    I was asked to sign a nondisclosure
4 agreement --
5    Q.    Okay.  And --
6    A.    -- and then subsequently in connection
7 with the criminal investigation formally had my
8 clearance reactivated for the purpose of the
9 investigation and then signed another nondisclosure
10 agreement in connection with that.
11    Q.    If I were to ask you in the context of
12 this civil lawsuit to please explain to me how it is
13 that the 2007 SCI nondisclosure agreement that Mr.
14 Bissonnette signed related to Operation Neptune
15 Spear, would you have to reveal classified
16 information to tell me the answer to that?
17       MR. PATRIZIA:  Object to form.
18    A.    I think to give you a detailed answer to
19 that I think that I would.
20       MR. FURMAN:  I don't think I have any
21 other questions.  Thank you.
22       MR. TOBEY:  Nothing further.



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI

January 18, 2017
235

```
 1          THE REPORTER:  Reading and signing?
 2          MR. PATRIZIA:  Read and sign, yes.
 3          THE REPORTER:  Copy, Mr. Patrizia?
 4          MR. PATRIZIA:  Yes, please.  Rough also,
 5  please.
 6          MR. TOBEY:  Please, and a condensed.  Can
 7  you send, like, an email version, too, and a rough?
 8          THE REPORTER:  Yes.
 9          MR. FURMAN:  Could we have a rough draft
10  by email?
11          THE REPORTER:  Yes.
12          (Signature having not been waived, the
13  deposition of Robert D. Luskin was concluded at 4:12
14  p.m.)
15
16
17
18
19
20
21
22
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI

January 18, 2017
236

```
 1          CERTIFICATE OF NOTARY PUBLIC
 2      I, SHERRY L. BROOKS, a Notary Public in
 3  and for the DISTRICT OF COLUMBIA before whom the
 4  foregoing deposition was taken, do hereby certify
 5  that the witness whose testimony appears in the
 6  foregoing deposition was duly sworn by me; that the
 7  testimony of said witness was taken by me in
 8  Shorthand at the time and place mentioned in the
 9  caption hereof and thereafter transcribed by me; that
10  said deposition is a true record of the testimony
11  given by said witness; that I am neither counsel for,
12  related to, nor employed by any of the parties to the
13  action in which this deposition was taken; and
14  further, that I am not a relative or employee of any
15  counsel or attorney employed by the parties hereto,
16  nor financially or otherwise interested in the
17  outcome of this action.
18
19              SHERRY L. BROOKS
                Notary Public in and for
20              DISTRICT OF COLUMBIA
21  My commission expires:  November 14, 2020
22
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI

January 18, 2017
237

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2
 3  ASSIGNMENT NO.:  J0504403
 4  CASE CAPTION:  MATTHEW BISSONNETTE -V- KEVIN PODLASKI
               AND CARSON BOXBERGER, LLC
 5
 6  DEPONENT:  ROBERT D. LUSKIN
 7
          DECLARATION UNDER PENALTY OF PERJURY
 8
          I declare under penalty of perjury that I
 9  have read the entire transcript of my Deposition
10  taken in the captioned matter or the same has been
11  read to me, and the same is true and accurate, save
12  and except for changes and/or corrections, if any, as
13  indicated by me on the DEPOSITION ERRATA SHEET
14  hereof, with the understanding that I offer these
15  changes as if still under oath.
16
17  Signed on the ____ day of _____, 20___.
18  _____
19          Witness Name
20
21
22
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI

January 18, 2017
238

```
 1          DEPOSITION ERRATA SHEET
 2
 3  Page_____Line No._____Change To:_____
    Reason for change:_____
 4
 5  Page_____Line No._____Change To:_____
    Reason for change:_____
 6
 7  Page_____Line No._____Change To:_____
    Reason for change:_____
 8
 9  Page_____Line No._____Change To:_____
    Reason for change:_____
10
11  Page_____Line No._____Change To:_____
    Reason for change:_____
12
13  Page_____Line No._____Change To:_____
    Reason for change:_____
14
15  Page_____Line No._____Change To:_____
    Reason for change:_____
16
17  Page_____Line No._____Change To:_____
    Reason for change:_____
18
19  Page_____Line No._____Change To:_____
    Reason for change:_____
20
21  SIGNATURE_____  DATE_____
            Witness Name
22
```

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI

January 18, 2017
239

1   DEPOSITION ERRATA SHEET

2   Page_____Line No._____Change To:_____

3   Reason for change:_____

4   Page_____Line No._____Change To:_____

5   Reason for change:_____

6   Page_____Line No._____Change To:_____

7   Reason for change:_____

8   Page_____Line No._____Change To:_____

9   Reason for change:_____

10  Page_____Line No._____Change To:_____

11  Reason for change:_____

12  Page_____Line No._____Change To:_____

13  Reason for change:_____

14  Page_____Line No._____Change To:_____

15  Reason for change:_____

16  Page_____Line No._____Change To:_____

17  Reason for change:_____

18  Page_____Line No._____Change To:_____

19  Reason for change:_____

20  SIGNATURE _____ DATE _____

21           Witness Name

22

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

---

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI

January 18, 2017
240

1   Reference No.: 504403

2

3   Case:  MATTHEW BISSONNETTE V. KEVIN PODLASKI

4

    DECLARATION UNDER PENALTY OF PERJURY

5

        I declare under penalty of perjury that

6   I have read the entire transcript of my Depo-
    sition taken in the captioned matter or the

7   same has been read to me, and the same is
    true and accurate, save and except for

8   changes and/or corrections, if any, as indi-
    cated by me on the DEPOSITION ERRATA SHEET

9   hereof, with the understanding that I offer
    these changes as if still under oath.

10

11

12           _____

             Robert D. Luskin

13

14       NOTARIZATION OF CHANGES

15           (If Required)

16

17  Subscribed and sworn to on the _____ day of

18

19  _____, 20_____ before me,

20

21  (Notary Sign)_____

22

23  (Print Name)              Notary Public,

24

25  in and for the State of _____

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

---

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI

January 18, 2017
241

1   Reference No.: 504403
    Case:  MATTHEW BISSONNETTE V. KEVIN PODLASKI

2

3   Page No._____Line No._____Change to:_____

4

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22

23  Reason for change:_____

24

    SIGNATURE:_____DATE:_____

25  Robert D. Luskin

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI

January 18, 2017
242

1    Reference No.: 504403

     Case:  MATTHEW BISSONNETTE V. KEVIN PODLASKI

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25   Robert D. Luskin

**ESQUIRE**

800.211.DEPO (3376)
EsquireSolutions.com

**Exhibits**

| | |
|---|---|
| 504403 LUSK IN.ROBERT. EXHIBIT113 | 157:1 |
| 504403 LUSK IN.ROBERT. EXHIBIT111 | **0** |
| 504403 LUSK IN.ROBERT. EXHIBIT124 | **0000** 75:14 |
| 504403 LUSK IN.ROBERT. EXHIBIT125 | **1** |
| 504403 LUSK IN.ROBERT. EXHIBIT126 | 21:6 24:18 |
| 504403 LUSK IN.ROBERT. EXHIBIT114 | 27:5 32:7 48:8 79:20 |
| 504403 LUSK IN.ROBERT. EXHIBIT115 | **1/2** |
| 504403 LUSK IN.ROBERT. EXHIBIT116 | **100** 45:11,18 20 46:2 62:10 82:19 88:8 147:16,21 172:15 209:14 |
| 504403 LUSK IN.ROBERT. EXHIBIT117 | |
| 504403 LUSK IN.ROBERT. EXHIBIT118 | **1003** 141:13 |
| 504403 LUSK IN.ROBERT. EXHIBIT119 | **10:00** 55:21 59:18 60:1,2 76:10 |
| 504403 LUSK IN.ROBERT. EXHIBIT120 | **10th** 85:9 103:3 |
| 504403 LUSK IN.ROBERT. EXHIBIT121 | **11** 231:2 |
| 504403 LUSK IN.ROBERT. EXHIBIT122 | **10** 19:12 |
| | **111** |
| $828,000 | |



| | | | |
|---|---|---|---|
| 134:3 | 223:5,11 | 88:22 | 233:12 | alternate |
| 185:2 | 228:2 | 89:7 | | 114:4 |
| 166:8,15, | | 90:18 | agrees | Alternative |
| 17 196:12 | aggravate | 93:15 | 166:18 | 193:7 |
| 197:6 | 48:12 | 94:2 | ahead | |
| 204:8,16 | aggravation | 98:2,5 | 125:17 | ambiguities |
| 205:1 | 50:6 | 100:22 | 147:19 | 153:22 |
| 207:17,19 | aggressivel | 103:21 | | ambiguity |
| 211:21 | y | 105:16 | shold | 103:12 |
| 220:22 | 177:1 | 106:8 | 40:3 | |
| 221:5 | | 112:16 | sid | amend |
| | aggrieved | 124:8 | 87:13 | 92:3 |
| advise | 145:7 | 127:8 | | amended |
| 108:10 | | 129:16 | Alan | 150:9 |
| 111:13 | agree | 131:1,7 | 173:7 | |
| | 27:8 | 146:7 | Alex | amendment |
| advised | 41:12 | 140:5 | 42:13 | 31:2 |
| 12:5 89:9 | 64:11 | 150:19 | 60:6 | 155:17 |
| 93:12 | 137:22 | 151:16 | 76:22 | 171:2 |
| 152:11 | 170:9 | 152:17 | | |
| 176:7 | 175:5 | 153:21 | alive | amicably |
| 196:6 | | 158:4,16 | 9:9 | 110:10 |
| | agreed | 164:11 | allegations | |
| advising | 22:14,15 | 166:6 | 20:10 | amount |
| 48:18 | 26:20 | 167:5 | 210:11 | 148:11,20 |
| 61:15 | 34:18 | 168:10 | | 176:22 |
| 110:9 | 41:5 | 180:4,8 | alleged | |
| | 46:19 | 197:9 | 192:1 | amounts |
| Advocate | 79:2,6,13 | 212:2 | | 143:18 |
| 87:8 | 97:21 | 222:19 | alleging | |
| | 130:2 | 227:1,4 | 162:5 | analysis |
| affect | 160:5 | 228:6 | | 47:2 |
| 65:15 | 206:9 | 232:2,6 | Alright | 62:12 |
| | | 233:15 | 134:1 | 62:3 |
| affected | agreement | 234:4,10, | 194:10,20 | 128:4 |
| 116:2 | 13:5 | 13 | 198:10 | 222:6 |
| | 20:14 | | 199:11 | 223:3,12, |
| afraid | 22:4 27:4 | agreements | | 13,17 |
| 191:17 | 30:21 | 48:13 | alter | |
| 194:2 | 47:3 58:4 | 50:8 | 65:13 | analyzing |
| | 66:1,8,13 | 69:10,19, | | 80:22 |
| afternoon | 68:1,13, | 22 86:20 | | |
| 80:2 | 21 69:18 | 100:16 | | ancillary |
| | 70:9,16 | 113:14 | | 159:15 |
| agency | 71:8 72:2 | 133:14 | | |
| 224:21 | 81:2,7,9, | 134:10, | | and/or |
| 225:8 | 13,15,20 | 15,19 | | 97:17 |
| 229:5 | 82:2,15 | 154:11 | | 176:5 |
| | 87:21 | | | |
| agent | | | | |
| 36:20 | | | | |
| 192:5 | | | | |



| | | | |
|---|---|---|---|
| animated | 232:3 | 226:15 | 155:20 | 167:1 |
| 156:14 | | approved | 171:9,16 | 168:5 |
| | append | 12:11 | 172:11 | |
| annotated | 64:5 | | 202:14 | asks |
| 217:22 | | applicabili | 211:13 | 219:10 |
| 218:3,5, | applicabili | ty | 222:6,18 | |
| 8,10 | ty | 75:17 | | aspect |
| | 106:7 | 88:8 | arguments | 14:7 |
| announcemen | | 157:1 | 67:18 | 33:19 |
| t | applicable | | 104:13 | 46:4 |
| 229:17 | 134:16 | April | | |
| | 232:11 | 37:9 | 151:4,19 | assault |
| answering | | 38:3,6 | 152:7,8 | 197:11 |
| 11:1 | applied | 158:9 | 154:3,4 | |
| | 81:2 | 199:16 | 206:10 | asserting |
| answers | | | | 198:16 |
| 7:18 | applies | archived | arise | |
| 199:7 | 223:12 | 183:7 | 165:21 | assertions |
| | | | | 9:11 |
| antagonize | apply | area | arising | |
| 205:6 | 66:2 72:2 | 28:20 | 167:15 | assessing |
| | 89:7 94:2 | 92:6 | | 86:14 |
| anticorrupt | 150:10 | 109:6 | area | |
| ion | 199:16 | | 178:13 | assessment |
| 193:12 | 223:3,6, | Armstrong | | 44:20 |
| | 14 | 35:3 | Armstrong | 66:20 |
| anybody's | | 153:21 | 35:3 | |
| 177:13 | appreciated | 171:15 | 26:17 | assigned |
| | 105:21 | | 191:20 | 173:6 |
| anymore | | argued | | 217:13 |
| 107:9 | appraised | 192:17 | Army | |
| | 89:4 | 202:18 | 67:8 | assist |
| apologies | 90:15 | | | 62:4 |
| 83:1 | 105:15 | arguing | arrears | 182:1 |
| | 124:21 | 108:14 | 219:11 | |
| apologize | 140:7,19 | | | assistance |
| 93:4 | | argument | article | 223:2 |
| 173:9 | approach | 66:16,19 | 31:6,13 | |
| | 108:18 | 67:15,19 | 183:8 | assistant |
| apology | 109:13 | 88:16 | | 159:8 |
| 137:20 | | 94:1 | articles | 173:1,6 |
| | appropriate | 111:12 | 33:14 | |
| apparently | ness | 113:5 | | assisted |
| 161:8 | 32:14 | 127:13 | artifact | 194:18 |
| | | 144:14 | 161:10 | |
| appeared | Appropriati | 145:11 | | associate |
| 72:7 | on's | 146:15 | artifacts | 62:6 |
| 77:11 | 143:7 | 159:18 | 157:16 | 194:19 |
| | | 160:19,20 | 149:8 | |
| appears | approval | 161:17 | | associates |
| 213:16 | 199:14 | 151:13, | 155:21 | 62:2 |
| 214:2 | 225:13 | 17,19 | | |
| 224:21 | | 152:10 | | assume |
| | | 153:2 | | 60:4 |
| | | | | 64:10 |



| | | | |
|---|---|---|---|
| 174:6 | attachments | 26:7,10, | author's | 16:1,6 |
| 216:1 | 21:7 | 17 27:15 | 222:14 | 18:7 |
| | | 28:7 | | 23:10,11 |
| assumed | attack | 32:13 | authorities | 25:13,19 |
| 130:1 | 154:1 | 34:8 35:1 | 149:18 | 26:14 |
| 215:1 | | 39:5,7,8, | | 37:2 |
| | attend | 19 40:16 | authority | 38:18 |
| assuming | 117:4 | 41:2,20 | 208:6,10 | 44:11 |
| 11:1 | 118:6 | 48:7 | | 48:3 49:3 |
| 225:1 | 158:21 | 51:18,19 | avoid | 51:6 63:4 |
| 232:10 | | 55:14 | 168:22 | 67:6 |
| | attendant | 56:17,18, | | 70:21 |
| assumption | 108:20 | 21 57:1, | avoidable | 89:21 |
| 41:8 | | 10 58:1, | 205:6 | 90:3 |
| 42:5 | attention | 5,11,20 | | 91:18 |
| 58:22 | 37:5 | 60:9 | aware | 105:8 |
| 111:21 | 40:16 | 63:19 | 8:1 11:18 | 112:5,6 |
| 215:16 | 55:16 | 64:0 | 14:8,15 | 126:15 |
| | 56:13 | 68:11 | 15:1 | 139:11 |
| assuredness | 79:16 | 70:17 | 21:3,6,22 | 148:15 |
| 47:19 | 80:1 85:6 | 71:14 72:1 | 26:18 | 149:19 |
| | 103:16 | 73:2 | 27:7,14 | 150:8 |
| attach | 109:5 | 78:11 | 28:12,15, | 151:14 |
| 77:16 | 213:15 | 79:20 | 19 30:8, | 162:16 |
| | 224:18 | 80:15 | 12 31:5,9 | 167:11 |
| attached | | 86:15 | 36:16 | 168:1 |
| 19:17 | attestation | 87:18 | 37:16 | 181:3,10 |
| 22:22 | 20:20 | 89:15 | 51:12,13 | 182:9 |
| 25:4 37:5 | 21:10 | 91:17 | 96:17 | 183:16,22 |
| 40:8 55:9 | | 97:10,13, | 97:8 | 189:10 |
| 73:6 | attorney | 22 104:14 | 107:4 | 199:1 |
| 79:14 | 35:22 | 108:11 | 109:15 | 212:15 |
| 83:7 | 159:8 | 128:17 | 116:11 | 216:21 |
| 99:10 | 165:8 | 134:7,8 | 161:21 | |
| 101:11 | 173:1 | 160:10 | 162:12,17 | back-and- |
| 102:15 | 192:11 | 169:15 | 205:18 | forth |
| 132:10 | 221:9 | 197:8 | 207:3 | 181:2 |
| 141:15 | | 198:4,11, | 219:17 | 183:12 |
| 213:2 | attorney's | 13 199:2 | 221:7,9 | 184:3 |
| 230:13 | 129:22 | 204:5 | 227:20,21 | |
| 231:14 | 130:20 | 206:16,22 | 226:21 | background |
| | 214:4 | 208:2 | 229:4,8, | 46:6,9,14 |
| attaches | | 231:2,13 | 9,16 | 100:4 |
| 41:1 | attributabl | | | 188:17 |
| | e | author | | |
| attaching | 168:4 | 16:16 | B | backup |
| 74:12 | | 222:11,13 | | 67:15,17 |
| | August | | | 88:15 |
| attachment | 18:13,21 | back | | |
| 22:4 | 20:2 21:5 | | | |
| 171:6 | 22:2 23:6 | | | |
| | 25:8 | | | |

| | | | |
|---|---|---|---|
| 89:4 | 219:17 | 228:1 | 12:3 | 117:6 |
| 90:17 | | | 14:12 | 116:9,19 |
| 112:15 | Bates | benchmark | 20:1,3,4, | 120:13 |
| | 101:15 | 125:3 | 12 21:3, | 121:4,9 |
| balance | 132:4 | | 12 23:3, | 122:2,9, |
| 72:16 | 224:7 | benefit | 11 24:9 | 19,22 |
| | | 163:13,14 | 26:10,20 | 123:13 |
| balancing | began | | 28:9 | 125:19 |
| 209:5 | 50:15 | beta | 35:10 | 126:17,21 |
| | 123:12 | 180:14 | 36:10 | 127:4,8 |
| Ball | 162:20 | | 37:9,17, | 128:14 |
| 76:22 | | Biden | 20 38:12, | 129:15 |
| | begin | 146:20 | 12,13 | 130:17 |
| ballpark | 81:5 | 156:5 | 39:5,7 | 131:11 |
| 157:7 | 231:6 | | 39:18:2, | 132:21 |
| | | bill | 12,13 | 137:17 |
| banged | beginning | 87:6,9,15 | 29:5,13 | 140:7 |
| 76:13 | 107:4 | | 45:19 | 141:22 |
| | 141:18 | billed | 46:2,17 | 144:20 |
| barred | 174:13 | 94:11 | 47:14,18 | 149:8 |
| 150:14 | 204:5 | 212:16 | 48:18 | 152:11,17 |
| | 207:22 | | 49:22 | 153:3 |
| based | | billing | 59:22 | |
| 10:7 | behalf | 8:20 | | 152:16 |
| 44:18 | 82:22 | 94:22 | 95:6,11 | 156:16,22 |
| 66:6 69:9 | 84:18 | 84:14 | 16:19 | 157:12,17 |
| 88:1 | 129:9,15 | 87:11 | 51:9 97:3 | 160:13 |
| 89:19 | 114:12 | 95:6,11 | 58:13 | 161:7,8, |
| 105:11 | 35:21 | 96:4 | 60:5 | 163:7,8, |
| 127:1 | 50:19 | 105:12,13 | 62:19 | 13,16,17 |
| 142:19 | 125:9 | 163:18 | 64:1,10 | 162:3,9, |
| 176:15 | 195:14 | 170:4 | 65:6 | 11,13 |
| 202:2 | 166:4 | | 67:12 | 162:2,7 |
| 210:1,13 | behaved | billings | 68:20 | 166:12,20 |
| 227:17,18 | 202:18 | 165:20 | 69:5 | 15 169:19 |
| | | 214:6 | 70:13 | 172:2 |
| basic | behavior | | 71:3,17 | 173:18 |
| 166:5 | 151:12 | bills | 72:17 | 174:1,16 |
| | | 195:11,21 | 77:1 | 175:3,7, |
| basically | believed | | 80:2,16 | 176:16,18 |
| 62:5 | 157:18,19 | bin | 81:16 | 179:21 |
| 121:13 | 159:17 | 161:9,10, | 82:7 | 180:2,12, |
| 134:16 | 54:9 | 13,21,22 | 91:5 93:9 | 184:4,18 |
| | 179:19 | 166:12,2 | 103:21 | 186:6,20 |
| basis | 180:18 | 172:2,6 | 108:22 | 188:16 |
| 23:22 | 181:13 | | 114:20 | 193:16 |
| 44:14 | 186:12 | | 193:11 | 194:7,14 |
| 72:18 | | binding | 108:22 | 196:7,14 |
| 155:16 | believes | 131:1 | 114:13 | 196:7:2,5,7 |
| 169:5 | 84:3 | | 116:21 | |
| 211:1,4 | Ben | Bissonnette | 116:19 | |
| | 160:21 | 7:13,20 | 116:13 | |



```
198:12          159:21          157:19          54:8,10
199:8,12        166:18,19       190:17          59:9,13,
201:1,18        182:4           161:22          15 65:6,
202:10          183:1           162:6           17 65:17
203:6,21        Boggs           104:21          72:8
204:2,7         60:12           111:1,8         box
206:6,18        73:17           135:13          231:10
207:8           82:17           116:15          Boxberger
208:9,19        83:9            128:15          7:12,21
209:5,13,       157:2           142:20          176:5,11
19 210:4,       190:22          144:4,7         183:15
18 211:7        193:16          156:2,4,        212:9
212:13          194:8,13        11,12,13        214:16
214:7           195:12          163:16          215:19
220:15          bolt            185:7,14,       brain
221:5,21        200:15          16              97:18
222:2           bomb            187:11,20       100:4
223:9           47:21           196:19          branch
224:1           bono            199:21          48:12
225:10,11       87:14           200:5           50:7 53:6
228:7           book            201:9           369:32
229:11          9:19,20         202:14          breached
231:19          10:1,5,14       208:1,8         153:3
232:9           11:2,11         209:10,18       177:2
233:15          13:15           225:16          212:2
234:14          15:8,13         227:23          break
Bissonnette     18:20           228:10          55:4,7
's              19:2 22:8       book's          99:11,14
8:3 10:8        32:3,15         209:14          125:21
24:11           33:4,20         books           132:14
35:21           34:3            33:13           172:13,
36:19           35:13           117:21          15,19
42:16           36:11           118:2           179:2
49:5,10         44:2,5,         bootless        187:6
50:7            13,21           151:15          218:20
62:22           45:7,21         Boston          219:1
80:23           48:11           108:21          223:8
87:13           49:4,9          bottle          Brian
91:21           50:6,14,        51:6            78:13
108:17          20              bottom          216:9
109:14          51:2,8,10       73:20           231:5,8
110:16          52:15,20        75:13           bridge
114:10          53:5,11,                        115:17
128:7           13,21
131:10
136:8           body
```

```
briefed         96:16           carry           198:18
224:20          116:5           83:2            cast
223:20          124:9           Carson          42:11
briefing        180:3           7:12,21         43:10
57:20           184:14          173:18          caste
225:12          190:15          191:3           194:1
briefly         225:12          183:15          catch
190:17          233:4           212:9           200:17
bring           calling         214:16          category
119:21          146:19          215:19          161:10
146:7           175:17          Carson's        caused
163:16          Cahill          161:10          171:10
194:21          42:15,17,       case            caveat
209:7           18,22           9:17            201:12
broad           73:21           16:14           cell
68:1            74:4,6          24:18           35:7
107:6           calculate       25:18           136:19,20
222:21          88:6            28:17           160:2
223:19          calendar        29:22           center
broader         54:19           30:4            32:16
86:18           California      36:17           centered
brought         84:2,3          41:18           32:16
35:10           159:21          56:20           43:13
36:9,19         164:22          82:9            118:9
106:12          candor          117:13          137:10
186:14          175:12          171:2           centers
bugging         176:2           139:22          29:14
158:18          177:2           137:8,9         certainty
build           179:22          145:3           45:12,18
197:12          180:6,16        160:12          46:2
building        212:18          181:13          cetera
197:12          capacity        184:12,15       174:18,19
bulk            204:1           190:9           chain
168:3           Captain         192:16          36:14
bunch           201:20          195:7           154:22
56:7 67:8       card            209:12          213:14
bureaucrat      107:8           210:5           216:4,5,6
147:2           175:15,18       217:14          230:21
business        care            231:8
55:1            186:22          called
90:11           carefully       117:18
                44:4            151:8
                carried         184:2
                19:7            190:6
                                191:19
```

```
chairman        charges         choosing        circulating     claimed
193:6           86:11           146:17          53:11           166:12
challenged      charities       Christine       176:12          167:6
177:1           142:20          76:22           circulation     claiming
challenging     143:3           chron           45:15           30:2
65:7            charity         182:17          50:22           claims
chance          130:4           216:14          52:16,19        109:3,16
43:6 55:4       Chastian        218:4,5         53:12           123:16
111:4           225:3           chronologic     102:12          155:3
chances         chats           al              circumstanc     198:15
106:5           49:2            66:14           e               clarificati
change          97:17           67:15           47:3            on
17:10           Cheney          84:22           circumstanc     174:3
152:18          36:20           100:20          es              clarified
153:18          40:19           chronolog       119:18          20:21
215:14          42:3,13         ally            211:22          102:12
changed         46:15           218:17          cite            clarify
131:3           55:17           chronology      145:14          165:5
chapter         57:2            168:7           civil           clarity
169:19          59:11           183:2           8:8             153:22
224:11,         60:6 77:1       217:21          108:19          classificat
15,18           141:22          chros           109:7,16        ion
characteriz     144:1           165:13          110:3           14:16
ation           146:1           181:22          114:16,17       classified
68:7            161:7           CIA             128:3           10:11
110:14          223:5           19:2,4,9        137:5,8,9       13:1,17,
characteris     154:14          192:5           138:10          21 16:12,
*               chick           225:1,12        146:5,21        16,21,22
168:19          224:21          CINA            155:1,6         20:13
characteriz     225:8           20:14           157:9           29:13
ed              chief           233:4           158:5           30:7
202:20          164:20          Circuit         160:6           31:17
characters      choice          193:2           164:12          32:18
42:11           114:2,6         circulate       184:12          33:19
43:10           choices         76:15           191:3           44:3,14,
46:5            114:8           227:10          198:15          21 45:7,
51:18           choose          circulated      231:7           9,16,22
charge          155:2           52:22           234:12          46:20
11:17,19                        75:7            claim           53:16,19
charged                         115:13          155:9           54:11
195:20                                          208:20          138:1
                                                209:14          151:10
                                                210:14          159:13
```

```
160:16          234:2,8         Coauthore       Committee       151:15
163:3           cleared         227:7           193:8           165:4
182:14          10:6,14         code            common          174:16
185:5,15        clearer         177:16          177:7           226:21
200:10          24:20           coherent        communicati     complex
202:13          41:13           218:17          ons             143:12
210:12          clearest        coincide        140:18          complicated
220:2           55:20           171:9           175:6           175:6
229:7,13        clearing        collateral      company         compiled
230:1           140:10          171:9           228:17          49:6
233:15          clerked         200:18          compare         comply
234:15          190:2           colleagues      179:6           37:11
clean           client          203:3           comparison      48:18
146:11          28:13,22        210:13          45:1            50:12
151:5           42:14           collecting      compartment     computer
cleaned         63:15           168:7           ed              61:8
177:3           64:18           college         20:16,18        174:21
215:7           65:2            188:19,20       232:1,13        182:13
clear           71:20           189:5,18        compel          computers
22:12           111:13          65:2            91:16,21        160:2
41:7 44:5       125:8           Collins         compiled        174:18
49:12           219:5,10,       91:13           83:8            concern
51:5            11,19           colorable       complaint       47:9
52:11           clients         72:7            8:4 9:5         81:9,12
62:10           28:2            combat          19:15           113:16
64:13           170:11          55:20           20:1,7,9        186:3,19
66:0            Clinton         comfortable     21:12           209:6
67:17           34:14,16        44:5            24:16           217:6
72:16           192:10          comes           26:15,20        concerned
76:19           closes          20:1,7,9        37:3,7,8        165:10
82:22           56:15           21:12           178:11          165:19,21
92:22           58:15           72:14           210:10          183:8
93:17           61:13           Command         229:21          concerns
95:2            closed          19:6            complete        106:13
110:3           231:8           comment         155:21          123:10
111:10          closely         41:12           175:12,13       147:6
112:9           124:21          commenting      176:3,6,        202:4
123:9           co-author       75:3            21:12           concluded
151:1           228:3           comments        180:15          111:7
204:13                          60:20,22        181:4           235:13
clearance                       62:10                           conclusion
159:3                           74:13           committed       91:4,6
162:10                          committed       206:18
164:18                          206:18          207:2,7
```



## Panel 1

107;20
113;8
169;14
187;15
conclusions
  127;14,16
concrete
  125;7
condensed
  235;6
condition
  175;19
conditioned
  104;18
conduct
  63;1
conducted
  66;14
  112;31
  191;22
conducting
  159;11
  160;4
conference
  55;22
  56;5
  59;18,22
  193;3
conferences
  51;17
confidence
  45;16
confidences
  81;18
confident
  44;13
confidentia
l
  31;1,17
  220;3

confidentia
lity
  200;22
confirm
  158;12
  176;12
  181;4
  221;10
confirmatio
n
  229;8
confirmed
  181;10
  198;3
confirming
  229;5
conflict
  114;5
Congressman
  31;15,21
conjunction
  199;12
  204;12
connect
  233;13,15
connected
  112;16
  151;22
  152;16
  162;9,11
  163;15
  233;22
connecting
  188;5
connection
  15;6 20;7
  24;6
  28;10,13,
  22 30;7
  33;18
  35;2
  37;18

38;20
43;19
43;18
48;6 74;7
123;5
124;16
125;5
127;6
128;1
134;17
159;5,13
160;16
161;15
162;14
164;7
165;12
170;1
176;3
182;6
191;21
203;6
220;20
231;20
233;18
234;6,10
conscious
  14;5
consent
  22;18
  23;3,5
  24;6,15
  25;9
  26;19
  149;11,14
  169;15,21
  19;3
  210;10
  229;21
considerabl
e
  86;9
considerati
on
  81;5

considered
  13;6
  16;22
  29;7 50;7
considers
  13;3
consist
  178;15
consistent
  76;15
  101;8
  103;4,6
  154;6
  163;10
  231;12
constitutes
  229;1
constitutio
nally
  155;11
constructiv
e
  81;22
  82;7
  109;12
  119;11
construes
  225;21
consult
  12;00
  12;13
consultatio
n
  103;22
consulted
  229;1
consulting
  87;16
  117;9
  123;4

127;20
164;20
contact
  35;5
  77;17
  99;19
  231;6
contacted
  12;16
  36;22
  132;15
contacts
  166;19
contained
  22;9
  44;13,21
  55;13
  70;15
  185;15
  233;14
contemporan
eously
  127;16
  134;1
contending
  117;7
content
  12;22
contents
  213;11
contested
  112;21
  128;20
  148;10
context
  11;5
  16;7,9
  22;5
  229;13
  113;22
  115;3,4
  134;13
  144;9

## Panel 2

155;1,21
159;13
177;8
181;21
200;4
234;11
continue
  63;20
  192;6
  195;6
continued
  126;9,13
  130;5
  138;16,22
continues
  160;9
continuing
  37;11
  108;20
  136;12
  147;5,6
context
  148;1
  208;22
  209;1,12
contractual
  81;10
  106;22
  151;19
  152;6,9,
  12,19
  153;16
  154;8
contradict
  177;11
  179;15
contradicte
d
contribute
  227;8
contributed

75;10
control
  49;14
  50;11
controversy
  35;12
  36;10
  174;7,12
  384;5
convening
  55;21
conversatio
n
  39;4,7,9
  42;6
  56;11,14
  57;4,18
  58;7,19
  59;10
  136;12
  69;2,4
  72;10
  92;11
  99;22
  118;21
  121;3,17
  123;18
  146;3
  164;11
  177;8,17
  203;13
conversatio
ns
  8;2 17;21
  18;3,8,11
  39;12
  42;7
  43;9,11,
  13 46;4
  49;1,15,
  17 100;13
  101;2
  121;8
  122;15,20

123;1
139;21
139;20
162;13
203;6
convey
  145;10
conveyed
  48;3
  147;15
conveying
  140;15
  213;11
convincing
  147;11
cooperation
  159;21
  175;19
  176;3
  205;4
copied
  179;8
copies
  9;12
  18;4,15
  22 55;20
  61;5
  82;22
  86;7
  104;21
  205;20
copy
  19;22
  22;3
  23;16
  24;20
  25;12
  40;11
  53;11,17
  58;3
  79;18
  97;14,15

141;17
149;21
176;6
183;2,12
205;14
216;11
235;3
core
  228;22
corner
  65;1
corners
  227;1
corporation
  192;7
corpus
  130;11,
  15,19
  170;5
correct
  8;18
  18;14,15
  24;14
  26;11,12
  35;22
  39;20
  49;19
  50;1,2,3,
  8,9 69;20
  70;1,2
  71;18
  73;10,18
  83;10,13
  88;3
  50;10,31,
  16 94;13
  96;12,13
  106;18,19
  112;12
  115;16
  116;16
  130;22

132;2
153;5
157;14
165;4,6,
12,19
181;6
199;10
214;14
216;19
218;1,17
219;22
232;10
corrected
  83;21
correction
  84;9
correctly
  116;15
costs
  212;12
counsel
  7;4,7
  42;13
  47;19
  50;4
  126;12
  166;18
  173;8
  174;2
  188;13
  204;16
  211;20
  221;16
  230;7
  233;9
counsel's
  14;14
  166;6
  168;10
Counterinte
lligence
  159;7
counting



## Panel 3

205;3
countless
  162;4
couple
  28;8
  93;17
  114;13
  130;7
  176;19
  181;20
  194;21
  216;7
  230;9,10
court
  17;14
  84;13
  110;21
  146;15
  147;4
  146;14
  190;4,16
  192;16,18
court's
  139;5
cover
  98;1
covered
  66;7,15
  163;16
  84;3,4
cowriter
  201;2
  203;7
  222;4
create
  143;8
created
  65;1
creates
  228;18
creating
  222;22

creative
  222;14
  225;22
  227;5
  228;16,20
credentials
  115;19
criminal
  35;17
  47;14
  86;11
  87;2
  88;19
  109;6,17
  110;2,5,
  12
  114;16,17
  155;8,13
  157;10
  158;2,20
  159;11,20
  160;7,12,
  14 162;19
  163;21
  14;17
  175;20
  192;14
  193;10
  198;15
  217;14
  231;9,11
  234;7
crisis
  36;13,15
critical
  114;19,22
  156;4,18
criticism
  14;17
criticized

14;2
cross
  119;22
  226;11
cross-
examination
  119;16
crossed
  115;17
culminated
  68;3
cum
  189;21
cut
  53;15
  132;7
D
D-B-B-C-H-
A-U-E-R
  85;14
damage
  184;9
  196;14
  197;1
  200;18
damaged
  184;4
damages
  166;12
  167;6
  197;4
dangerous
  172;7
dark
  144;5
  154;16
  165;17,18
  166;20
  168;5

225;4
228;10
date
  38;6,8
  51;14,16
  52;1,6
  82;4
  103;2,5
  105;11
  120;10
  158;7
  168;14,
  16,20
  198;19
  208;12
  215;15
dated
  25;7 26;6
  40;18
  41;2
  84;17
  86;9
  103;2
  132;20
  144;2
  213;17
  216;5
  221;22
  231;1
dates
  95;1
day
  9;20,22
  10;2,4
  15;6
  17;7,9
  22;8 32;9
  33;20
  36;4
  39;22
  191;12

59;21
69;17
79;15,21
90;8,11
93;6
134;21
145;17,19
150;1
153;17
159;14
164;8,18
166;18
15;22
166;14
167;9
169;17
170;20
175;4
182;2
196;7
203;11
210;20
211;9
220;3
229;6,18
days
  32;6,7,13
  34;1 96;6
  136;13
  144;2
  156;8
  160;18
  183;12
DC
  190;4
  193;2
  219;9
deal
  35;12
  36;10
  61;3
  120;6
  163;20
dealing
  27;19

## Panel 4

28;14
106;22
127;1
139;6
145;12,15
157;9
163;20
172;22
dealings
  42;21
deals
  151;18
dealt
  74;3
  206;11
Dean
  73;21
debate
  82;14
debriefing
  37;10,17
  38;3
  137;22
  232;14
December
  92;1,3,
  13,17
  131;17
  132;1
  138;14
  139;3,4
  161;6
  216;7,22
  223;11
  224;1,4
  226;5
  233;1
decided
  129;6
  140;2
  204;14

deciding
  15;8
decision
  49;4,8,9,
  14 51;3
  158;17
decision-
maker
  15;8
decision-
making
  50;11
decisions
  65;15
deck
  73;22
  13;16
  28;10
declassifie
d
  29;16,15
declination
  164;14
  180;16
  181;16
decline
  176;1
declined
  180;22
  181;8
  148;13
  160;12
decree
  22;16
  23;4,6
  25;9
  26;19
  149;11,14
  165;15,21
  198;3
  210;10
  229;21

demed
  211;13
default
  152;12
defend
  116;14,17
  186;13
DEFENDANTS
  7;7
  126;12
  146;2
  233;9
defended
  191;19
defense
  17;22
  50;5
  85;16
  89;5
  93;7,14
  95;18
  96;8
  114;22
  116;12
  117;13
  118;5,12,
  13,18
  119;5,7
  120;15
  128;3
  136;17
  142;7
  151;20
  153;2
  155;7
  164;7,13
  188;4
  191;12
  206;6
  227;22
Defense's
  116;22

defenses
  152;6,9,
  13
default
  152;12
defer
  95;5
defiance
  72;18
defies
  147;3
defend
  142;2
delete
  182;12,15
deleted
  183;7
deletions
  10;15
deliberatel
y
  33;12
deliver
  121;16
demand
  219;20
demands
  219;5
deny
  221;11
dep
  171;4
department
  7;20
  21;16
  160;21,22
  161;3,5
  161;16,20
  171;6
department!
a!
  51;7
  52;13
  53;9
depending
  15;21
deposition
  8;21
  19;17
  22;22
  25;4 40;8
  55;9 73;6
  83;7
  91;14
  99;10
  101;11
  102;15
  119;9,15
  132;10
  141;21
  213;3
  230;14
  235;13



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: deputy..distinct

| | | | |
|---|---|---|---|
| deputy | 15:5 | digesting | discouragin |
| 136:22 | 30:11 | 218:15 | g |
| 192:11 | 82:5,11 | direct | 98:8,9 |
| Deschauer | detailed | 199:11 | discovered |
| 85:13 | 234:18 | direction | 207:8 |
| 95:13,14, | details | 82:13 | discovery |
| 15,16 | 44:19 | directive | 9:2 84:14 |
| 96:6 | 47:2 | 15:2 | discreet |
| 194:17 | 145:18 | directly | 129:11 |
| describe | determinati | 15:2 | 130:7 |
| 174:11 | 223:4,10, | 24:13 | discuss |
| describing | 14 | 136:20 | 64:3 |
| 56:1 | determinati | 165:21 | 65:11 |
| 142:1 | on | | 72:14 |
| 157:17 | 13:3 16:5 | disapproval | 89:12 |
| description | 45:2,10, | 171:12 | 93:9 |
| 21:16 | 17:21 | discharge | 104:16 |
| 27:1 | determine | 134:18 | 138:17 |
| 67:11 | 22:8 | discharged | 128:5 |
| 108:18 | 185:15 | 38:9 | 131:11,14 |
| 200:21 | determines | disclose | 156:1 |
| descriptions | 13:30 | 163:4 | 201:13 |
| 84:4 | developed | 176:12 | discussed |
| designated | 227:19 | 202:20 | 16:15 |
| 59:4 | development | 220:8 | 51:16 |
| 101:15 | 40:22 | disclosed | 79:13 |
| designation | dialogue | 10:10 | 80:10 |
| 67:10 | 72:20 | 54:10 | 117:11 |
| designed | 109:2 | 210:12 | 123:13 |
| 151:14 | 138:15,16 | disclosure | 139:15 |
| desire | Diego | 12:12 | 145:16 |
| 137:20,21 | 165:7,9 | 31:3,8,17 | discussions |
| 142:19 | 173:9 | 159:12,22 | 79:4 |
| desktop | difficult | 160:15 | discussing |
| 174:21 | 162:19 | 180:6 | 99:8 |
| desperate | 212:16 | 222:6,7, | 130:6 |
| 168:14 | diffuse | 18,21 | 142:18,22 |
| destroyed | 48:5 | 226:22 | discussion |
| 183:9 | 110:10 | 227:2 | 32:10 |
| detail | diffusing | 228:22 | 33:3,5,11 |
| | 48:6 | 229:1 | 51:15 |
| | | 230:1 | 59:16 92:3 |
| | | | discouragin |
| | | | 102:6 |
| | | | 104:11 |
| | | | 128:11 |
| | | | 138:7 |
| | | | 194:5 |
| | | | 231:7 |
| | | | discussions |
| | | | 49:18 |
| | | | 125:5 |
| | | | 136:12 |
| | | | 137:4 |
| | | | 140:8,14 |
| | | | 145:8 |
| | | | 201:17 |
| | | | 202:9 |
| | | | 218:13,13 |
| | | | disgrace |
| | | | 145:3 |
| | | | disk |
| | | | 176:6 |
| | | | 179:7 |
| | | | disperse |
| | | | 128:18 |
| | | | 129:13 |
| | | | dispute |
| | | | 33:16 |
| | | | 107:10 |
| | | | 108:21 |
| | | | 174:7 |
| | | | 178:9 |
| | | | disseminate |
| | | | d |
| | | | 52:20 |
| | | | disseminati |
| | | | on |
| | | | 48:11,20 |
| | | | 50:6,14 |
| | | | 58:9 |
| | | | 63:17 |
| | | | 223:19 |
| | | | distinct |
| | | | 121:20 |

ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: distinguish..early

| | | | |
|---|---|---|---|
| distinguish | 165:7 | 215:5 | donating | due |
| 164:21 | 141:13,17 | 217:22 | 143:3 | 148:20 |
| distributio | 172:10 | 223:21 | donations | duly |
| n | 219:16 | 230:10 | 130:3 | 7:5 |
| 208:1 | 218:2 | 233:21 | doubt | 126:10 |
| District | 224:2 | DOD | 41:22 | 211:5 |
| 19:22 | 232:21 | 11:14 | dozen | Dutton |
| 159:9 | 233:3 | 12:21 | 28:1,6 | 42:19 |
| 164:22 | documenta- | 72:20 | draft | duty |
| 166:11 | intensive | 79:10 | 8:17 9:5 | 177:2 |
| 167:16 | 184:2 | 85:17 | 60:14,16 | DZA |
| 172:22 | documentati | 88:15 | 63:9,13 | 86:5 |
| 173:4,7 | on | 104:22 | 74:13,20 | |
| 191:3 | 93:13 | 109:18 | 75:3,6 | |
| 192:1,15 | 153:7 | 109:20 | 78:13 | E |
| division | documenting | 117:7,11 | 77:10,17 | |
| 138:18 | 37:10 | 124:2 | 235:9 | E-A-S-T-O-N |
| 159:7 | documents | 125:1 | | 137:1 |
| divulge | 8:13,17 | 133:14 | drafted | E-L-Y-S-E-H |
| 200:13 | 20:12 | 134:13 | 8:12 | 36:20 |
| 21:4 | 13:14 | 136:12 | 26:16 | earlier |
| 24:13 | 146:3 | 60:8 | 27:17 | |
| divulging | 55:5,13 | 107:22 | 87:17 | 52:18 |
| 32:17 | 187:22 | 108:9 | drafting | 56:2,14 |
| doctrine | 108:9 | dogmatic | 158:15 | 74:5 |
| 81:12 | 91:17 | 65:7 | drafts | 75:7 |
| 106:4,18 | 105:1 | 72:19 | 61:2,5 | 86:3 |
| 107:1,5, | 111:5 | DOJ | 89:9 | 100:6 |
| 22 111:4 | 112:15 | 124:21 | draw | 102:6 |
| 112:10 | 127:6,11 | 117:7 | 223:18 | 131:18 |
| 127:1 | 158:15 | 146:5,21 | drawn | 199:2 |
| 151:21 | 173:13 | 159:7 | 229:21 | earliest |
| 152:13 | 16,20 | 231:8 | drill | 198:19 |
| 153:11 | 174:8 | dollar | 143:15 | early |
| 154:7 | 176:4,9, | 149:13 | 62:20 | 30:8 |
| 155:5 | 20 197:5 | dollars | drive | 50:17 |
| 167:15 | 11,19 | 142:16 | 182:14 | 53:4 |
| 168:22 | 178:2,3, | domain | drives | 54:15 |
| 169:6 | 6,9,14 | 145:14,20 | 80:13 | 67:2 76:9 |
| document | 179:4,12, | | 88:13 | 88:13 |
| 15:19 | 15,20 | donated | dropbox | 90:8,16 |
| 24:4 40:4 | 180:19 | 142:20 | 83:19 | 93:7 94:5 |
| 55:16 | 183:14 | | | 114:15 |
| 83:17 | 184:5 | | | |
| 102:1 | 214:3,21 | | | |



ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: earned..ending

| | | | |
|---|---|---|---|
| 118:21 | 157:11 | elements | 100:1 | emerging |
| 120:21 | 159:16 | 167:8 | 101:1 | 35:12 |
| 122:1,16, | 164:8,18 | elicited | 21 102:11 | employ |
| 21 123:15 | 165:11, | 196:21 | 121:17 | 116:20 |
| 158:3 | 15,22 | Elyse | 132:4,17, | employee |
| 160:10 | 166:14 | 36:20 | 20 133:8 | 13:5 |
| 108:10 | 167:9,15, | 41:2 | 135:6,21 | encompassed |
| 199:1 | 21,22 | 42:12 | 140:22 | 67:11 |
| earned | 168:8 | 42:12 | 141:12, | 69:14 |
| 149:3 | 169:17 | 46:11 | 17,20 | 105:36 |
| 150:13 | 170:20 | 54:14 | 142:7,12 | 163:5 |
| eess | 175:4 | 55:17 | 144:2 | encompasses |
| 22:20 | 182:2 | 57:2 | 160:3 | 163:7 |
| easier | 196:7 | 58:11 | 174:17 | encouraging |
| 89:21 | 211:9 | 60:6 77:1 | 181:2 | 33:13 |
| eastern | 220:3 | 141:22 | 182:5,8, | 94:7 |
| 39:22 | 229:6,18 | 144:1,21 | 18,20,23 | encroaching |
| 76:5 | edited | 145:6 | 183:4,10, | 40:16 |
| 165:1 | 177:3 | 148:1 | 20 203:10 | ending |
| 166:11 | editor | 154:14 | end | 42:14 |
| 167:16 | 222:12 | 161:7 | 45:2 | 47:11 |
| 172:22 | Editor-in- | 223:5 | 47:11 | 82:1 |
| 173:6 | chief | 228:3 | 82:1 | 101:18 |
| Easton | 78:10 | Elyse's | 101:18 | 107:14 |
| 137:1 | editors | 144:1 | 214:19 | 109:19 |
| 138:17 | 227:7 | 148:6 | 216:4,5,9 | 113:8 |
| 139:7 | effectively | email | 217:9,15 | 126:17 |
| 146:2 | 79:19 | 25:13,21 | 230:17,21 | 136:10,14 |
| 158:11 | efforts | 16,19 | 231:1 | 139:4 |
| 230:18 | 22:7 | 42:3,4 | 235:7,10 | 169:18 |
| easy | 70:14 | 55:17 | emails | 180:21,22 |
| 9:20,22 | election | 57:11,2 | 25:13,21 | 191:8 |
| 10:2,4 | 33:10 | 58:10 | 39:15 | 196:4 |
| 15:6 22:8 | electronic | 73:11,20 | 40:3,5 | 214:1 |
| 32:9 | 137:22 | 74:12 | 43:7 | endanger |
| 33:20 | 141:16,17 | 75:13,19 | 55:12,14 | 202:21 |
| 34:2 | 161:1 | 76:19 | 56:19 | endangered |
| 48:20 | 168:5 | 77:4,7, | 73:10,16 | 210:13 |
| 69:16 | element | 12,21 | 76:7 | ending |
| 77:16,19 | 18:9 | 78:1,2, | 99:3,5 | |
| 81:14 | 163:22 | 10,15 | 100:4,6 | |
| 145:17,19 | 169:12 | 79:17 | 158:10 | |
| | | 96:11 | 168:7 | |
| | | 97:17 | 177:6 | |
| | | | 182:3 | |
| | | | 214:7,10 | |
| | | | 219:19 | |
| | | | 223:22 | |

ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: ends..expand

| | | | |
|---|---|---|---|
| 224:2,20 | 95:22 | ethics | 100:1 | 17 27:5 |
| ends | 170:19 | 110:6 | 101:13 | 32:7 37:3 |
| 73:9 | entry | evening | 102:3 | 40:7 |
| 101:17 | 85:3 | 39:18 | 135:6 | 44:10 |
| 224:2,10 | 95:13 | 49:13 | 141:18 | 48:8 |
| engage | 96:1,4 | 56:7,8,11 | 158:10 | 55:8,12 |
| 79:9 | 100:13 | event | 230:17 | 60:9 |
| | 102:10 | 154:6 | exchanged | 65:21 |
| engaged | 224:4 | eventually | 141:1,6 | 73:3,5 |
| 49:16 | equitable | 189:6,7, | exchanges | 83:6 |
| 67:13 | 86:21 | 22 192:15 | 101:22 | 95:10 |
| 74:6 | 88:19 | evidence | exchanging | 99:3,9,17 |
| engagement | 69:1 | 14:20 | 73:17 | 101:9,10 |
| 65:8 | 106:6,15, | 16:14 | exclude | 102:14,18 |
| 231:16 | 16 146:8, | 41:17 | 15:15,22 | 103:2 |
| English | 9 151:18 | 162:10 | 185:5 | 132:4,9, |
| 189:3,9 | 152:7 | ex-wife | exclude | 13 141:10, |
| ensure | 206:10 | 130:1 | 165:5 | 12,14 |
| 46:20 | equities | exact | 170:16 | 166:7 |
| entail | 67:19 | 144:20 | excluding | 167:7 |
| 223:1 | 145:21 | 228:12 | 78:1 | 172:15 |
| entailed | Espionage | exam | Excuse | 195:10 |
| 109:17 | 164:16 | 212:3 | 99:6 | 213:1,7, |
| entered | 165:9 | examination | execute | 14,16 |
| 24:2 | 167:10 | 7:4,7 | 79:2 | 215:9 |
| 196:4 | 170:20 | 126:9,12 | executed | 216:3 |
| entire | essentially | 186:13 | 133:16 | 217:10,21 |
| 149:11 | 65:22 | 194:20 | executory | 227:18 |
| | 66:3 | 230:7 | 169:21 | 230:12,16 |
| entities | 67:14 | 233:9 | exercise | 231:22 |
| 12:20 | 68:10 | | 171:13 | 232:4,12, |
| | 96:19 | examined | exercises | 14,21 |
| entitled | 102:5 | 7:5 | 171:13 | exhibits |
| 148:2 | 106:17 | 119:22 | exhaustive | 19:11 |
| entitlement | 107:9 | 126:10 | 226:4 | 73:1 |
| 171:15 | 109:8 | 174:22 | | 212:21 |
| entity | 110:20 | exception | exhibit | 232:8 |
| 11:13 | 183:11 | 129:12 | 19:13,16, | exists |
| 12:1 | 210:11 | | 19 22:15, | 150:14 |
| 16:1 | 225:15 | exceptional | 19,21 | exited |
| | | 191:4 | | 138:15 |
| entries | establish | exchange | 23:5 | expand |
| 87:11 | 155:8,10 | 96:12 | 24:18 | 45:5 |
| | | | 25:2,3,7, | |
| | | | 19 26:5, | |



ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com

**Panel 1**

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: expect..falal

| | | | | |
|---|---|---|---|---|
| expect | explored | face-to- | 121:1,15 | 168:8 |
| 119:12 | 208:17 | face | 122:11 | 202:10 |
| 204:19 | | 79:9 | factual | faith |
| 212:4 | exposed | 88:14 | 9:7,10 | 47:18 |
| 214:4 | 208:20 | 96:12 | 20:10 | 62:19 |
| 217:2 | express | facilitated | 46:6,9,14 | 65:5 |
| 233:19 | 116:12 | 218:15 | 133:21 | 72:17 |
| | 154:17 | facing | factually | 114:18,21 |
| experience | expressing | 124:11 | 134:3 | 116:13 |
| 12:4 | 52:9 | fact | failed | 118:10 |
| 14:11,19 | 105:4 | 14:5 | 178:8 | 120:6 |
| 16:9 17:3 | 217:16 | 46:16 | failing | 121:16 |
| 27:18,22 | | 62:10 | 123:10 | 128:14 |
| 28:9 29:1 | expressly | 89:6 | failure | 131:2 |
| 44:18 | 21:13 | 90:17 | 171:10 | 202:14,19 |
| 69:10 | 100:19 | 93:13 | 210:14 | fall |
| 119:7 | extended | 102:9 | fair | 33:9 |
| 199:8,11 | 203:13 | 104:20 | 39:22 | 37:21 |
| experiences | extent | 109:8 | 63:11 | 181:4 66:6 |
| 33:8 | 64:22 | 114:20 | 68:7 | 161:9 |
| expert | 68:14 | 115:6 | 70:10,11 | falls |
| 117:9 | 115:1 | 117:17 | 92:2 | 227:1 |
| expertise | 142:17 | 118:9,15 | 94:6,15 | familiar |
| 36:12 | extra | 144:3 | 96:1 | 7:20 |
| explain | 63:9 | 145:17 | 109:2 | 131:18 |
| 27:22 | 130:9 | 146:10 | 110:14 | 224:14 |
| 234:12 | | 149:2 | 111:8 | familiarity |
| explained | F | 156:3 | 120:3 | 42:4 |
| 60:8 69:6 | | 175:16 | 123:5 | familiarize |
| 159:10 | Fabiani | 180:7 | 146:9 | 28:18 |
| explaining | 34:11,12 | 193:20 | 168:21 | family |
| 72:6 | 35:22 | 196:17 | filing | 130:10 |
| explanation | 36:18 | 202:10 | 101:20 | famous |
| 44:7,9 | 38:19 | 207:8 | 172:18 | 196:1 |
| explicit | 39:13 | 212:1 | 188:1,10 | fan |
| 47:11 | 42:12 | 215:15,17 | 196:1 | 206:3 |
| explicitly | 55:18 | 221:8 | film | Fare |
| 109:22 | 57:2 | factors | 144:5 | 96:16,19 |
| explore | 58:12 | 13:2,5 | final | Farr |
| 11:9 | 60:5 77:1 | 15:12 | 7:12 | 190:15 |
| 27:18 | 141:22 | 29:5,6 | 60:11 | fashion |
| 163:17 | Fabiani's | 32:16 | 84:18 | 144:10 |
| | 36:6 | facts | 194:1 | fatal |
| | | 43:16 | 202:19 | |
| | | | fairly | |



800.211.DEPO (3376)
EsquireSolutions.com

**Panel 2**

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: favor..Forces

| | | | | |
|---|---|---|---|---|
| 180:12 | figures | finally | 101:15 | 110:16 |
| favor | 149:13 | 51:3 | 112:11 | FOIA |
| 181:14 | file | 143:13 | 173:18 | 118:4 |
| favorable | 87:6 | 148:19 | 176:21 | 124:5,15 |
| 147:8 | 124:5 | 158:18 | 178:7 | 125:4,13, |
| | 129:4 | financial | 179:5 | 15,19 |
| faxed | 148:14 | 138:21 | 185:11 | 131:17, |
| 79:18 | 149:17 | 147:8 | 190:14,20 | 18,21 |
| federal | 173:14 | 149:3 | 212:9,10 | 206:13 |
| 29:21 | 176:4,7, | find | 214:16 | folks |
| 192:13 | 16 177:3, | 91:15 | 215:19 | 42:7 56:7 |
| fee | 4,16 | 94:8 | 216:12 | 60:17,21 |
| 26:2 | 213:11 | 137:8 | firsthand | 61:10 |
| feel | 214:4,17 | 140:22 | 32:4 | 117:20 |
| 111:1 | 215:8,20 | 145:1 | five-minute | 124:2 |
| 129:3 | 216:11, | 214:4,15 | 172:12 | 138:17 |
| 171:22 | 14,15 | 217:2 | flag | 146:3,5, |
| | 217:2 | | 212:4 | 6,21 |
| feeling | 219:4,5, | fine | flip | 159:6 |
| 98:16 | 8,9,10, | 16:17 | 73:8 | 173:4 |
| 106:10 | 12,14,15, | 64:13 | 86:8 | 187:21 |
| fees | 18 | 81:13 | 103:9 | 229:1 |
| 129:12 | filed | 82:1,15 | focus | follow |
| 130:20 | 7:12 | 112:3 | 18:9 | 59:7 |
| 156:20 | 16:14 | 126:1 | 88:18 | 97:1,4 |
| 166:12,19 | 20:1 | 145:2 | 115:8,9 | 130:14 |
| 167:13,15 | 29:21 | 174:3 | 116:6,8 | 154:13 |
| 168:3 | 205:19 | fire | 138:6 | 187:9 |
| 170:6 | files | 203:17 | 160:14 | follow-up |
| 219:12 | 183:14 | 204:1,3 | focused | 171:1 |
| felt | 212:8,9 | fired | 16:9 | 196:11 |
| 62:15 | filing | 68:18 | 177:14 | 221:18 |
| 70:20 | 150:9,17 | firewall | focusing | 227:12 |
| 331:4 | film | 222:10 | 139:3 | food |
| 144:21 | 144:5 | 226:1 | 145:5 | 144:22 |
| 145:6 | final | firm | | 154:21 |
| 181:15 | 7:12 | 7:12 | | force |
| 211:4 | 60:11 | 60:11 | | 47:13 |
| fiduciary | 61:12 | 62:14 | | Forces |
| 81:16 | 84:18 | 73:12,17 | | 33:7 |
| 82:7 | 178:13 | 82:17 | | 47:22 |
| figure | 215:17 | 188:1 | | 117:20 |
| 149:4,5, | finalized | 84:3,6 | | 142:21 |
| 6,8 | 61:3 | 88:9 | | |

800.211.DEPO (3376)
EsquireSolutions.com

**Panel 3**

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: forfeit..Furman

| | | | | |
|---|---|---|---|---|
| forfeit | 21 68:5 | 234:7 | 155:2 | 172:1 |
| 196:18 | 71:5 | formed | 163:1,10 | Furman |
| forfeited | 81:21 | 165:20 | 175:15,18 | 7:8,11 |
| 139:9 | 86:16 | 190:20 | 176:12 | 9:4 13:9 |
| | 88:11 | | 200:9 | 14:21 |
| forfeiture | 108:9 | forms | 203:20 | 18:18,19 |
| 81:10 | 112:22 | 146:1 | freedom | 19:12,14, |
| 86:11 | 113:2 | 232:20 | 205:8 | 18 22:14 |
| 106:12 | 123:6 | formulated | 206:4 | 23:1,16 |
| 110:10 | 127:10 | 89:14 | frequently | 24:0 |
| 129:16 | 129:20 | | 16:9 | 25:1,5, |
| 137:10,17 | 136:10,16 | forthcoming | | 11,17,22 |
| 139:14 | 140:14 | 217:7 | fresh | 26:4 30:6 |
| 140:8,15 | 144:7,13 | forward | 92:20 | 32:21 |
| 141:2 | 147:12 | 105:9 | Friday | 40:4,9,13 |
| 143:21 | 148:18 | 108:15 | 58:11,20 | 41:9 |
| 146:16 | 150:20 | 109:11 | 80:2 | 43:3,4 |
| 147:17 | 153:4,9, | 113:21 | | 52:9 |
| 149:2 | 12 161:3 | 124:4 | friends | 54:12 |
| 157:9 | 168:6 | 130:18 | 190:20 | 55:3,10 |
| 209:7,17 | 170:11,18 | | 203:3 | 57:13 |
| | 173:13,15 | found | | 60:2,7 |
| Forfeitures | 178:17,18 | 16:13 | front | 62:2 |
| 193:7 | 184:6,19 | 178:10 | 26:13 | 63:10 |
| forget | 185:6 | 182:11,13 | 117:11 | 65:18 |
| 37:3 | 196:15 | 217:1,3 | 192:17 | 68:9,18 |
| forgetting | 201:22 | foundation | frustration | 71:11,17, |
| 39:22 | 202:15 | 210:21 | 217:16 | 19 72:22 |
| | 207:10 | | | 73:7,14, |
| Forgive | 210:7 | fourth | fulfill | 76:4,17 |
| 134:6 | 211:10 | 213:16 | 170:1 | 77:14 |
| | 215:4,21 | frame | full | 83:10,13 |
| forgot | 216:15 | 71:8 90:6 | 44:9 84:3 | 84:19 |
| 230:9 | 218:18 | 103:7 | 179:21 | 86:10 |
| form | 232:1,5, | 108:5 | 180:6 | 85:1,6,7 |
| 13:7 14:9 | 13 233:4 | 112:9 | 187:12 | 116:1,10 |
| 21:17 | 234:17 | 204:5 | 219:9,14 | 118:10 |
| 27:5,11 | | 206:22 | | 120:5 |
| 29:18 | formal | 221:15 | fundamental | 121:14 |
| 31:18 | 11:20 | | 174:14 | 125:17 |
| 32:20 | 129:13 | frankly | 175:18 | 128:13 |
| 40:5 | 131:7 | 83:15 | 180:4 | 131:3 |
| 43:14 | 158:16 | 209:4 | funds | 132:1 |
| 52:7 | formally | Frazier | 129:6,11, | 154:5 |
| 53:21 | 29:19 | 170:17 | 17 131:6 | 190:10 |
| 56:21 | 38:9 | | | 191:22, |
| 63:7,13 | 85:15 | free | funny | 14,18 |
| | | | 103:13 | 205:10 |

800.211.DEPO (3376)
EsquireSolutions.com

**Panel 4**

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: Furman's..Gordon

| | | | | |
|---|---|---|---|---|
| 16,22 | 232:17 | 32:14 | genie | 101:5 |
| 111:15, | 233:10 | 33:11 | 51:6 | 149:12 |
| 19 | 234:20 | 42:13 | gentleman | 177:4 |
| 112:4,8 | 235:9 | 50:4 | 136:22 | goals |
| 113:9,13, | | 61:12 | Georgetown | 65:3 |
| 15 123:8 | Furman's | 64:7,9 | 193:12 | Goldsmith |
| 125:21 | 204:22 | 75:4 | get-ready | 96:12,14, |
| 126:14 | 246:14 | 76:15 | 193:10 | 21 97:9, |
| 130:13 | future | 81:5 82:9 | get-ready- | 21 99:7, |
| 132:3,11 | 120:11 | 87:8,9 | by | 19 100:1 |
| 136:5,15 | | 97:2 | 168:16 | 102:12 |
| 141:16 | G | 98:14,16 | ghostwriter | 103:19 |
| 147:14 | | 101:1 | 77:2 | 104:15 |
| 152:21 | Q-A-R-D-H- | 106:11 | | 105:3 |
| 153:5,10 | H-R | 111:21 | gift | 223:19 |
| 165:6,16 | 85:21 | 127:14 | 143:5 | Goldsmith's |
| 166:21 | gained | 144:3 | Gigante | 98:15 |
| 168:13, | 80:11 | 154:15 | 42:13 | 102:3 |
| 16,20 | game | 192:11 | 60:6 | Goldstein |
| 169:10 | 164:2 | 194:17 | 76:22 | 190:17 |
| 170:8 | 166:21 | generalized | | |
| 171:21 | | 81:17 | give | good |
| 172:7,12, | Gardner | generally | 12:3 | 7:9,15,16 |
| 18,20 | 87:18 | 7:22 | 70:10 | 22:16 |
| 174:4,10 | 85:19,20, | 14:16 | 50:21 | 47:18 |
| 178:21 | 22 | 60:10 | 52:4 55:4 | 62:19 |
| 179:11 | 195:2,6 | 90:10 | 114:19,20 | 65:5 |
| 184:10,22 | gave | 95:19 | 113:19,20 | 72:17 |
| 187:1,7 | 29:20 | 59:4,19 | 115:20 | 94:20 |
| 188:11 | 59:7,19 | 103:6 | 120:8 | 100:7 |
| 193:17,19 | 57:9 | 107:4 | 129:23 | 114:18,21 |
| 194:13 | 61:9 | 117:2,12 | 142:10 | 116:13 |
| 196:5,20 | 114:7 | 124:8 | 163:12 | 118:10 |
| 197:1 | 117:2,12 | 131:20 | 125:17 | 120:5 |
| 198:11 | 185:2 | 156:17 | 210:21 | 121:14 |
| 199:5,18 | 205:1 | 195:10 | 234:18 | 128:13 |
| 202:17 | 221:15 | 196:9 | | 131:3 |
| 207:9,21 | 236:10 | 201:19 | give-and- | 132:1 |
| 226:1 | | 205:21 | take | 154:5 |
| 210:19 | gear | 14:6 | 16:9 | 190:10 |
| 219:7 | 197:11 | generic | 17:12 | 192:22, |
| 220:6 | gears | 67:10 | 29:1 | 14,18 |
| 223:17 | 312:7 | 200:21 | | 205:10 |
| 236:5 | general | | giving | Gordon |
| | 27:22 | | 32:18 | 42:15 |



800.211.DEPO (3376)
EsquireSolutions.com

## Panel 1

**governed** 100:21
**governing** 28:16
**government** 9:13 10:7,19 11:4,7 12:11 13:20 16:13,16,19 18:11 21:6 24:6 26:21 27:10 29:17,21 30:2 31:7 53:14,18 54:7 81:6,10,11,15,17 82:10 89:1 106:12 107:5 109:8 110:21 111:11 113:6 115:14 123:16 127:1,12 128:5 129:3,7,17,19 131:1,4,8,10 138:8 140:11,16,18 141:2 142:14 143:2,4,20 144:14,17 145:4,9 146:14 148:9 149:9,20 151:7 154:6,10,18 155:2,15 156:2 157:11 159:19 160:11 161:14,18 162:2,7 163:4 168:19 172:5 173:16,22 174:22 175:5,22 176:8,13,15 177:4 179:5,9 185:5,12 161:11,22 182:7,9,10 183:3 186:14 189:2 190:11 191:3 196:19 197:9 198:3,16 199:14,18 200:4 201:3,10,18 202:2,9 205:2,15 206:11,15 210:6,10 217:20,22 215:1,19 218:11,13,15

**government's** 47:13 109:3 113:18 117:17 152:10 156:14 162:22 171:11
**governmental** 229:5
**graduate** 149:8
**graduated** 189:11,20,22
**graduation** 149:17
**grand** 119:9,15
**granted** 91:16
**great** 31:15 65:1 191:2
**greater** 82:5 209:19
**grotesquely** 219:11

**ground** 137:8 163:9
**group** 56:4,20 60:4 77:12 79:17 163:22 195:10 226:22
**grouping** 167:3
**groups** 143:5
**guess** 9:15 10:19 33:1 106:9 107:14 151:5
**guy** 144:19

190:19

**hall** 211:17
**halt** 48:18 50:14
**hand** 44:13 149:1 187:3 222:15
**handed** 230:16
**handful** 177:21 179:11
**handling** 191:2,12,15
**hands** 146:11 151:5
**handshake** 158:4
**happen** 17:14 184:2
**happened** 17:6,9 69:14 116:7 158:17 187:14 210:5
**happily** 72:18 174:8
**happy** 65:11 72:13 169:7

## Panel 2

**hard** 155:19 160:1 102:14 104:8 185:18
**hardcopy** 40:5 103:1
**harder** 106:4
**harmful** 220:11
**Harvard** 96:15 188:20 189:11,16,22
**hastily** 104:20
**Hastings** 83:9 84:2 157:2 191:1 194:12 195:1,3,7,12
**hat** 161:8,9,13,17 172:3,6
**hate** 107:7
**hateful** 166:2
**head** 85:15
**hear** 80:13 121:4
**heard** 34:2 65:19 66:16 100:9 162:8
**heart** 114:16
**heated** 177:17
**held** 107:10
**hell** 24:22
**helpful** 156:17 167:1
**high** 45:15
**high-profile** 192:8
**higher** 144:22
**hired** 115:19 208:2
**historical** 121:1,15
**historically** 116:7
**hit** 77:16 200:15
**hoe** 155:20
**hold**

**53:17**
**holding** 63:5 65:12
**Hollywood** 149:2,4
**home** 61:8
**Homeland** 138:13,15
**honestly** 34:3 74:2
**Honor** 167:1
**honors** 189:16 192:22 193:3
**hoped** 104:11
**hoping** 98:16
**hour** 59:1 76:13
**hours** 62:17 70:22 75:17 88:6,8 135:14 168:22
**House** 34:14,18,19 36:13 192:10
**identified** 11:4,5 12:16 16:11,16 29:21 66:9,12

**hurry-up-and-wait** 168:20
**hurt** 47:22
**hypothetically** 54:5

**idea** 22:16 76:3 118:4,8 124:5 125:12,17 192:20 205:11
**ideas** 324:9
**identical** 232:9
**identification** 19:17 22:22 25:4 40:8 55:9 73:6 83:7 99:10 101:11 102:15 132:10 141:15 213:2 268:22
**identified** 11:4,5 12:16 16:11,16 29:21 66:9,12

67:16 70:14 194:11
**identifies** 16:2
**identify** 53:18 119:4 167:7 220:21
**identifying** 170:19
**identity** 130:10 192:5
**idiotic** 53:10
**images** 162:15
**imagine** 231:21
**immediately** 32:6,13 33:10 34:1 35:1 76:12
**impact** 151:6
**impeach** 116:5 120:12
**impending** 32:6
**imperative** 62:16
**impermissible** 155:11

## Panel 3

**impermissibly** 155:15
**implicit** 110:8 180:15
**implied** 35:17
**importance** 47:16
**important** 9:10 63:1 70:21 92:5 95:2 115:1,18 119:3 180:17 186:5 204:17
**imposed** 103:21
**impossibility** 100:20
**impressionistic** 101:6
**improper** 17:7 30:15 110:1 155:17 225:1 230:1
**improperly** 10:10 54:10 210:12
**impulsively** 211:4
**inaccurate** 175:12

**inappropriate** 225:9,14,17
**inauguration** 85:4
**include** 150:13 159:22 160:18 175:1 202:13
**included** 21:7 49:17 60:5 68:2 78:12 137:20 165:20 200:6 214:5
**includes** 83:11 224:2
**including** 28:9 30:20 31:12 65:16 81:7 117:20 139:22 157:18 159:16 160:11 163:2 164:2 175:13
**income** 150:12
**inconsistent** 9:11 95:5

117:19 120:1 177:13
**incorporated** 216:13
**incorporates** 215:13
**incorrect** 89:9,16 90:20 91:5 106:1 107:21 115:16
**increase** 110:4 212:12
**independent** 70:14 79:11 81:1 86:9 102:3
**indicating** 215:5
**indication** 232:19
**indicia** 128:13
**indirectly** 15:2
**indistinct** 33:2
**individual** 12:17 17:2 78:13
**individually** 80:3

**individuals** 30:20 31:4 78:12 88:15 222:12 223:2
**indoctrination** 20:18 21:9
**industry** 200:14
**infer** 66:22
**inferences** 229:20 230:2
**inflammatory** 179:16
**information** 20:12 13:1,17,21,22 15:2 20:13,16,18,22 22:9 27:21 29:13,15,18 30:17,19,22 31:17 32:17,18 73:5,13 38:15 44:3,14,21 45:6,9,14,16,22 46:8,21 54:13 14 67:5,

17 71:3 72:12 77:18 80:6 86:15 89:5 90:17 91:17,21 93:13 127:15 138:2 145:13 151:10,22 152:14 158:13 159:13 160:16 163:4 175:2,14 176:13 185:5,15 187:21 188:3,6,7 200:18 205:9 206:4,5 216:13 218:13 221:13 226:13 229:7,13,17 230:1,21,22 231:6,18 232:1,5,7 234:16
**information/documents** 217:3
**informed** 131:4
**initial** 42:6 61:13 70:12 75:13

## Panel 4

97:15 122:7 124:6,22 125:2 203:12
**initially** 97:20 139:15 214:19
**injunctive** 12:21
**input** 12:21
**inquire** 159:16
**inquiries** 31:10 12:14
**inquiry** 31:16,21 167:16
**instance** 13:16 19:5
**instances** 8:20 17:1 28:21
**instruct** 120:19
**instruction** 59:8 14:1 121:17,21
**instructions** 120:13

**intelligible** 24:22
**intended** 129:2 227:4,5,6
**intention** 64:19 88:14
**interactions** 124:19 165:14
**interest** 191:9 28:4 108:17 109:14 148:22 208:16
**interested** 42:0
**interests** 48:1 49:12 80:22 117:17 136:9
**interfere** 227:5
**intermediary** 35:16
**internal** 12:19
**internet** 162:6
**interpretation** 227:16
**interprets** 222:21

**interrogatories** 171:3
**interrogatory** 170:12
**interruption** 193:17
**interruption** 150:4
**intervening** 59:1 106:3
**interview** 214:20 231:9,11 234:7,9
**interviews** 10:8 50:21 126:16
**introduce** 7:10
**introduction** 233:12
**intrude** 225:22
**inventory** 137:22 162:2
**investigation** 31:8
**investigative** 162:6 109:18 157:16 159:2,20 15,20

160:4,7,15 162:10 164:16,20 165:1,3,7,10 186:10 167:10 168:2 170:21 193:16,10 194:4 175:20 191:22 193:4,12 214:9 231:9,11 234:7,9
**investigations** 157:12 191:3
**investigative** 217:12
**invitation** 65:19
**invite** 65:7 72:20
**invited** 114:9,12
**invoice** 85:9 86:8 88:5
**invoices** 82:22 83:9,22 148:13 157:16 159:2,20 95:7,11 166:7 172:16

214:5
**involve** 15:1
**involved** 9:17 14:13 34:5,7 35:20 36:14 39:13 43:11 46:12 73:22 85:22
**involvement** 120:20 122:8,9 132:16
**involving** 28:2 39:12 42:7 220:14
**irrelevant** 115:12
**irrespective** 50:10
**IRS** 148:13 149:18
**issue** 30:1

## Page (top-left) — Index: issued..Johnson's

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: issued..Johnson's

52:14
59:14
62:12
66:22
67:3
72:23
76:2 90:2
92:14,17
93:9
97:10
98:13
99:19
105:2
106:7,14
107:1,3,
10,12,16,
17 111:11
114:19
115:10
121:6
128:6
137:13
139:12
148:21
154:8
156:9
162:7
172:4,10
173:12,16
174:7
175:8
177:14
179:18
181:11,17
182:2
183:22
186:14
203:15
207:17
212:5,8,
12,15,17,
18,19
214:13
215:4
219:4

**issued**

91:33

**issues**
8:10
17:13
20:2
33:17
43:14,18
46:12
62:5,21
63:6,18
86:3,10,
14 97:19
102:7
106:21,22
109:6
117:9
118:5
123:17
130:6,21
137:14,
16,19
138:12
143:11
163:20
166:17
171:10
199:19
201:2,10
202:2
214:8
226:5

**item**
21:9,10
21:18
164:6

**items**
9:3 162:3
167:8,12

**iterations**
141:7

**Izabell**
83:1,16

**J**

**J-A-M-Z-H**
85:21

**J-A-Y**
18:17

**J-E-N-H**
18:17

**Jack**
85:13
96:12

**jail**
175:15,18

**Jamie**
81:18
85:20
86:2
195:2

**Jan**
15:14
18:13,16,
21 24:17
26:8
27:15
39:18
42:20
43:15
49:18
62:5
79:20
93:6
96:3,8
97:14
99:19
104:19
105:9
108:10
114:10
115:4
116:12,21
122:5
126:16
132:22

136:6
139:6
145:17
146:2
152:10,14
233:22

**jeopardised**
220:4

**Jessica**
225:3

**JJD**
85:2

**job**
38:14

**Johnson**
18:13,16
21:5
22:1,7
24:17
27:15
35:14
39:18
42:20
43:15
45:11
48:4
50:18
51:4
54:7,13
58:4
59:5,8
62:16
63:4
64:19,21
65:21
66:1,4
67:10
70:17
72:16
74:13
76:19
86:19

90:7 93:6
94:4,12
95:17
96:1,8
97:14
104:14,19
105:10
108:10
109:1,21
110:9
111:6
112:12
114:10
115:3
116:12,21
122:5
123:19
126:16
132:22
135:5,11
136:7,19
138:12
139:7
140:1
145:17
152:14
153:3,7
181:3
182:16
204:18

**Johnson's**
15:14
18:1,21
21:7 22:5
26:9 27:6
32:6
46:10
47:10
48:7,19
49:19
50:13
53:8 58:1
62:5
63:19
69:18
86:15

## Page (top-right) — Index: Johnston..law

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: Johnston..law

**jump**
97:10
99:20
122:8
139:21
152:11

**Johnston**
8:3 9:1

176:6
179:8

**joined**
146:1
190:14,
17,21
191:1,5

**joint**
189:2

**JSG**
85:18

**judge**
23:14,15,
19 64:7
87:8
111:2
190:2
192:13

**judgment**
10:18
45:7
128:22
133:11
148:11
153:3
220:10

**judgments**
30:14
186:18

**Judicial**
193:3

**July**
233:5

147:19

**jumping**
84:20

**jurisdiction**
219:10

**jury**
115:10
119:10,15

**Justice**
37:21
45:15
91:13
100:5
203:19
138:18
147:3
158:21
164:13,15
165:8
190:4,7
191:5,7,
14
**Justice's**
92:15

**K**

**Karl**
192:3

**keeping**
124:20

**Kevin**
7:11
40:21
44:1 57:14
77:11,10
101:3
116:11,18
115:1
116:1,10
117:3,14

133:9
134:11
207:17
221:22
222:3
228:3

**Kevin's**
115:10
117:8
124:5

**kidding**
38:16

**kill**
144:19

**kind**
15:19
28:11
34:19
101:3
102:12
119:10
123:20
124:9
127:14
131:7
137:15
151:15
170:11
180:14
200:21
201:16
203:14
211:10
234:1

**kinds**
144:15
191:6
206:14
214:3

**King**
31:15,21

**Klein**
190:15

**knew**
21:8 36:8
69:7
137:8

**knowing**
23:22
71:20

**knowledge**
18:22
91:22
109:19
206:2,4
223:13
227:18
228:14

**KP**
101:16

**L**

**labor**
12:17
54:21,22
90:8,11
93:9

**lack**
157:16

**Laden**
157:18
161:10

**Laden's**
157:19
163:9,13,
22 162:6
172:2,6

**Lance**
35:3
191:19,21

**landing**
109:7

**landscape**
133:2
134:3

**language**
98:11
100:16
103:11

**large**
181:12
192:7

**larger**
128:1
177:12
186:12

**lastly**
217:20
223:15
232:12

**late**
30:9
34:17
51:8
53:4,9
155:21
160:9
208:12
210:19

**laude**
189:21

**law**
7:13
28:17
30:20,22
73:17
86:2
96:15,16,
19 172:8
178:7
179:5
181:5

## Page (bottom-left) — Index: lawsuit..limited

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: lawsuit..limited

189:4,11,
17,18,19,
20,22
190:20
193:10,
11,12
211:8
212:3,10

**lawsuit**
7:12,21
8:8
40:14
186:13
188:16
234:12

**lawyer**
28:12,17
34:13
35:19
36:15
42:15
73:20
94:15
110:1
113:19
116:14
119:7
132:1
193:1
197:13,23
203:18
204:3
216:12
219:5,6,
21 221:4
222:13

**lawyers**
8:4
186:17

**layperson**
115:19
154:14

**layperson's**

144:12

**lead**
110:11

**leadership**
12:4
79:10

**leads**
105:8

**leak**
192:4

**leakage**
166:17

**leaked**
16:22
166:14

**leaking**
33:12

**leaks**
31:11
151:9

**learn**
17:17,20
32:1

**learned**
12:2
17:21
33:19
127:6

**leave**
16:17
30:5

**leaving**
209:16

**led**
31:16

**left**
190:11,19
191:11

**left-hand**
232:22

**legal**
8:7,13
57:22
59:12
62:17,21
63:2,10
65:14
72:6
82:12
103:18
114:5,21
115:7
118:10
123:16
128:3
131:1
134:1
136:7
143:6
148:16
151:7
155:3
156:20
157:1
158:16
166:19
170:6
205:10
207:2,7,9
210:13
211:21
212:12

**legible**
55:20

**Lehane**
57:3
58:12

**LEMKEN**
83:19

**length**
203:2

**letter**
15:14,15

18:1,12,
21 21:8
22:1,5,6,
13,19
24:17
25:7,9,
14,18
27:7,6,
16,6,8,3,
22 62:5
62:13,19
64:21
66:21
66:17
68:11
70:16
71:4
72:2,5,6,
11 74:13
78:16
79:13,17,
19 80:4
86:15
87:1,18,
19 89:8
97:11,13,
14,15,22
99:20
102:6
104:14,19
108:12

**letters**
67:8 70:5
177:6
216:7,10
219:19

**leverage**
147:7

**liability**
35:18
82:6
88:19
143:9
209:8

**liable**
31:3

**life**
144:19
222:10,20

**light**
65:10
72:13
105:2
220:10

**lightning**
11 74:13
78:16

**likelihood**
108:21
110:5

**limitations**
91:20
99:20
102:8
104:14,19
108:12

**limited**
30:21
31:12

## Page (bottom-right) — Index: lines..make

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI
January 18, 2017
Index: lines..make

65:15
81:7
170:12
175:6
209:8
221:9

**literally**
167:16

**literary**
223:5,11
228:2

**literature**
189:3,19

**litigated**
111:11

**litigation**
35:16
47:14
116:22
119:1
190:16

**loathed**
197:7

**located**
105:1

**lock**

119:4,8,
13,18
123:21

**logistical**
181:8

**long**
10:22
64:3,12
138:11
205:20

**longer**
45:5
120:21
170:5
190:14

**looked**
123:14,15
160:17
162:21,22

**loop**
54:15

**lose**
108:7

**lost**
89:2
112:21
167:20
211:13

**lot**
89:21
145:21
207:21

**Louis**
190:2

**loyalty**
203:2

**luncheon**

126:3

**LUS**
141:12

**LUS31054**
132:7

**LUS4440**
99:4

**LUS4512**
73:4

**LUS4512**
55:13

**LUS4519**
40:6

**Luskin**
7:3,9
19:19
23:2 25:6
26:6
40:10
41:15
55:11
64:11,20
73:4,8,13
91:18
93:6,16
132:12
141:20
153:1,6
166:11
166:7
169:13
172:8,21
188:15
213:5
230:16
235:3
**Luskin's**
91:14,22
170:15

**M**

**made**
9:7,11,12
10:16
12:14
16:7 17:4
27:17
29:22
35:16,18
43:15
50:18
51:3,5
52:21
60:20
61:17
65:15
67:15
96:7
104:16
109:20
110:3
47:6
56:15
66:18
67:8,21
92:3
138:7
139:7,18
140:2,11
142:14
144:14
152:9,22
157:14
176:4,5,11

**magna**
189:21

**main**
158:21
165:8
168:1

**maintains**
96:21

**major**
67:19
189:2

**majority**
10:13

**make**
16:5
27:13
20:14
38:15
44:20
45:1,6,
10,11,17
45:22
56:15
66:18
67:8,21
83:14
95:2
111:21
114:6
123:17,22
125:19
129:2
130:13
131:21
133:1
141:6
154:5,11
155:1
167:6
168:9



ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                    January 18, 2017
Index: makes..meant

```
197:1        46:19       23:1        114:18,20   128:13
173:8        47:4,8      24:18       115:6,18    137:5
191:6        49:7        25:1,3,7    121:15      148:16
186:17       133:12      26:17       124:7,11    149:3
199:20       185:4       40:3,7      133:11      151:7,9
204:13       209:2       55:8,12     143:2       158:5
211:12       211:8,13,   60:8        144:21      160:6
220:10       20 221:22   73:2,5      145:22      167:15,
226:20       222:11,     83:6        146:17      21,22
230:13       23          99:9,9,17   147:9       180:3
233:18       225:11,18   101:9,10    148:2,12    186:11
             227:10,20   102:14,10   207:16      220:8
makes                    103:2,8                 222:8
45:4         manuscripts 132:9,13    Matt's      229:22
67:17        28:4        141:14      120:5
171:14                   213:2       133:13      mattace
194:1        March       230:13      142:13      10:9
219:19       12:2,9                  143:18      24:13
             15:1        marking     231:7       16:2 28:6
making       158:9       19:10                   65:11
11:8 13:3    199:16                  matte       72:13
62:18                    markings    12:18       117:2
72:16        mark        40:11,12    12:16       159:15
181:6        22:14,18,   19 26:9     15:22       165:19,20
206:8,9      19 26:9     Markowen13  16:10,11,   191:4,13
             34:11,12,   456@gmail.  15 28:22    192:8
malpractice  13,22       com.        30:1        202:5
91:22        35:3,18     41:14       35:10       206:12
206:19       41:5                    36:19
207:2,7      42:12       match       38:21       Matthew
216:11       55:18       180:10,20   40:22       26:10
             56:8 60:5   material    42:8 48:9
management   72:22       13:14       49:16       Maurer
36:13        77:1,4      14:8        53:6        77:12
             82:21       29:2        54:8 56:5   201:1
manager      83:2        183:6       66:14       203:7
36:15        132:3,4     218:16      74:1,8      222:3
             141:10                  81:14       223:8
managing     144:4       materially  86:1        228:3
145:1        197:21      153:19      87:10
             212:20      materials   89:7        meaning
mantra       230:9       174:20      91:22       14:11
115:22                   math        106:16      116:6
116:10       Mark's      88:7        107:15      means
             36:12                   110:10      170:6
manufacture              Matt        112:20
rs           marked      35:9,11,    123:5       meant
166:22       19:16       18 42:12    124:16      29:12
             22:21       60:5        125:6       52:18
manuscript                                       69:13
13:15
44:17
```

ESQUIRE                                          800.211.DEPO (3376)
                                                 EsquireSolutions.com

---

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                    January 18, 2017
Index: mechanically..momentarily

```
71:14,21,   136:6,14    131:18      million     158:7
22 173:9    139:16,20   133:14      148:1,4,
175:16      146:20      145:12      21 149:15   missing
            152:14      154:14      157:9       173:12
mechanicall 158:12,     191:19                  13:21
y           159:2,3,    213:9       mind        178:9
208:11      4,5                     40:15       183:4
            162:2       mentions    51:3 95:1   214:4
Medal       162:2       78:22       96:1
167:1       168:9                   121:5       mission
            168:9       mere                    15:5
media       193:20,22   mere        minds       17:16
32:10,12    meetings    93:18       117:17      19:7 32:2
160:1       93:18       94:4                    201:20
162:1       94:4        124:22      mine        226:9
174:18      124:22      106:12      24:13
            136:17,18   108:14,19   76:8        misstated
mean        138:20      113:4,17    101:17      201:2
135:14      139:21      114:4,7     114:2
            200:1       128:3       114:8       misunderst
meeting     52:11                   180:3       ands
51:5        54:16,13    members     minor       67:15
52:11       90:7,15     33:6 67:1   12:11
54:16,13    194:22      194:22      61:16       mitigate
90:7,15                 146:18      75:5        51:8
93:12,20    memorabile  met                     mix
95:4,8,9,   135:9,7,9   54:17       minute      138:3
10,19       memorandum  66:22       24:22
96:2,8,11   20:19       81:20       82:22       model
105:9       21:9        93:6        213:6       153:21
111:7       37:10,17    161:7
112:12,14   38:3        186:2,21    minutes     modificatio
114:10      55:18       met all     99:12       n
116:6,8     66:12       209:2       128:16      61:14
116:2,9     67:7                    220:14
117:4       158:6       Michael     221:4,7,    moment
118:6       232:14      7:10 87:7   12 230:10   17:15
119:21                              21 230:10   27:18
120:6,9     memory      mid                     45:6
122:5       140:21      34:17       mirrors     94:22
122:16,18   141:11                  211:17      158:8
127:5,17    146:6       middle      miscommunic 197:8
128:6       26:18       43:10       ation       222:13
130:10      41:19       46:17       181:8       233:7
131:10      102:6                   miscontrue
134:13      110:15      military    d           momentarily
135:5,11,   119:19      13:4        174:5       24:16
15,20       123:2                   missed
```

ESQUIRE                                          800.211.DEPO (3376)
                                                 EsquireSolutions.com

---

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                    January 18, 2017
Index: Monday..notable

```
Monday      motions     narrow      24:5        night
54:21       9:16        80:21       29:7,14     34:6 39:1
141:20                  106:7,14                49:2
            motivated   186:12      Neptune     56:19
monetary    14:18                   15:3        197:11
137:12,16               national    17:16,17
136:3,6,8   move        20:21       18:10       nondisolosu
139:14      52:5        159:6       30:7,11     re
142:17      139:1                   31:11,18    20:14,16
197:1                   nature      32:2        21:13
210:3       moved       194:12      44:20       37:12
            52:1                    45:9 66:2   58:3 66:1
money       76:16       Naval       68:3 81:3   67:5,22
143:3,4     108:13      19:6        67:6,22     69:13
148:14,17   194:20                  89:10       69:18,19,
149:19      movie       Navy        90:18       21 70:9,
170:5       13:15       38:10       97:9        16 81:2
            225:3       202:11      98:4        87:20
month                   203:2       100:20      89:6
12:10       movies                  105:17      90:18
143:17      33:14       NCIS        112:17      93:14
150:20,21   moving      217:12      127:9       98:5
            114:1                   145:19      103:20,22
months      193:14      necessarily 146:14      105:16
149:17      Murphy      116:9       152:1,18    112:16
150:20      190:18      175:20      156:16      127:2
182:16                  176:1       162:15      152:17
187:16      myriad                  188:5       188:4
216:7       214:8       needed      201:20      232:2,6
                        12:6        232:3       234:3,9
moot                    35:19       223:14,10   13
52:14       N           16:3 48:3   4,20,15
62:14                   120:11      15 226:10   nonmonetary
107:9       N-A-R-D-O-  154:1       13          137:13,19
            T-T-Z       175:9       233:16      138:4,5
mooted      87:7                    234:1,14
02:14       named       negativa    net         north
108:12      30:9        110:16      148:6,7     76:15
            73:21       106:10      149:8       78:4
morning     76:21       229:20                  north
7:9,15,16   78:13       230:2       none        147:22
39:1 76:9                           76:15
79:3,6      names       negligence  78:9        Northern
80:10       194:15      187:9       none        192:14
186:6       Nardotti    negligent   nice
                        186:17      24:21       notable
mortal      87:7,9      196:13      101:4       190:6
193:21,22   194:17      negotiated  197:20      191:18
                        148:6
motion                  negotiation Nick
91:16                                30:5
```

ESQUIRE                                          800.211.DEPO (3376)
                                                 EsquireSolutions.com

---

ROBERT D. LUSKIN
MATTHEW BISSONNETTE V. KEVIN PODLASKI                    January 18, 2017
Index: Notary..office

```
Notary      34:17       86:16       objective   occasions
7:5         40:7 55:8   88:11       13:12,19    136:21
            73:8 83:6   112:22      14:3,4,6    137:2
none        99:9        113:2       157:9       192:20
10:16       25:12       123:6                   211:3
25:12       102:14      129:12,20   objecte
41:4        132:4,5,9   146:12      159:22      occur
75:12       137:2       152:20                  89:8
78:20       159:6       153:12      objecting   90:19
196:14      137:2       171:15      131:6
231:14      141:12,14   173:15      148:17      occurred
232:17      178:1,6     378:17,10   149:21      91:9
            179:19      184:19
noted       192:6,7     186:19      obligation  October
95:10       198:21      196:15      37:11       84:17
211:5       215:5       201:23      49:6        85:9
            223:21      202:15      86:18       167:17
notes       227:18      207:10      37:14       213:17
67:9 95:6   230:21      210:7,19,   143:2       215:20
216:21      216:21      20 211:10
            234:17      obligations obligation  odd
noting                  126:18      obligations 55:12
25:15       numbers     214:8       72:16       87:11
            136:20      obligations 104:1       159:17
notwithstan 213:1                   152:12
ding        224:8       objected    153:4       offended
52:12       230:12      211:3       152:12      180:8
61:13                               169:22
145:2                   objection   observation offer
            O           163:14      17:4        131:2
Novamber                169:22                  140:15,16
140:22                  observation obtain      offer
141:16,     O-B-E-R-D-  17:4        189:16      offered
19,21       O-R-F-E-R   90:21       171:14      36:17
143:18      190:3       91:7,11     obtained    140:10,11
216:7                   92:3        30:19       171:18
220:14      Obama       135:22      26:2
            136:10      155:15      164:17      offers
number      168:17      156:5,6     221:13      129:2
10:9        216:21                              140:15,16
19:16       155:8,16    obtaining               142:16
20:11                   225:13
21:11       Oberdorfer  obviated                office
25:4        190:2       object      187:20      11:2,15
23:3 24:4               13:7 14:9               34:14
25:17                   22:11       occasion    61:6
36:19,10               22:12       146:5       190:18
33:17                  63:7,21     197:30      216:6
                       68:5,14                 222:16
                       71:5
```

ESQUIRE                                          800.211.DEPO (3376)
                                                 EsquireSolutions.com

**Panel 1**

official 85:17
officials 31:7 34:18 192:9
OLC 100:4
one-on-one 39:6 56:9 140:1 203:14
one-page 141:13
Onek 190:15
opaque 100:16
open 65:12
open-ended 69:18
operating 174:15
operation 15:3 17:16,17 18:10 30:7,11 31:13,18 32:2,4,19 33:14 44:19 45:9 66:2,9,14 67:10 68:2,3 72:3 81:3 87:7 89:7 90:18 93:15

98:3,4 105:17 112:17 127:8 146:14 151:22 152:18 156:16 162:14,16 186:8 201:20 222:3 223:4,10,15 226:10 233:16 234:1,14
operations 67:12 69:12
operative 185:22 225:2
operators 32:2
opinion 52:4,10 102:7 104:7 113:10 167:3 184:17 185:1,6,10 187:13 195:13,18 196:13 198:7,14 201:8 210:22 211:7 219:4
opinions 40:21 185:12,19

196:5
opportunity 8:19 69:17 111:5 179:6 198:14 199:2
opposed 164:8 167:9 209:15
OPSR 11:14,17 12:1 13:2 15:7,12,19 16:1,4 17:7 18:21 19:1 27:19 28:22 29:2,7 30:3 46:3 145:12
optics 145:22 151:6
option 119:1
options 127:22
order 22:17 23:14 33:14 44:20 45:6,10,19 46:1,17 48:4 55:5 70:8 84:22 92:15

93:18,22 155:8 181:22 233:13,18
ordered 64:7,9 84:13
original 61:5,11 173:5
originally 52:1
outed 130:11
outline 224:12,12,15,18,22 226:6
outlined 89:15 151:4 152:10
outsiders 14:3
overriding 47:9
oversee 86:2
oversight 129:8,10 131:8
overtaken 80:19
overtly 32:8
overtook 154:7
overwritten 21:11 26:19 27:3,8
Owen

26:9
41:5,7
58:12
owes 149:15
Oxford 189:9

**P**

p.m. 40:17 41:20 78:11 79:15,20 80:3,7 126:2,6 132:21 133:9 134:21 135:11,16,21 141:21 235:14
pages 103:8
paid 12:3 148:17 149:9,10,14 150:12 156:22
painted 64:22
paper 32:8
papers 134:18
paragraph 21:11 26:19 27:3,8

**Panel 2**

37:5 44:10 48:9,10 49:19,20 87:19 103:12,17 104:12 216:8,22
paragraphs 20:11
parameter 169:11
parameters 70:9 107:6 227:15
paraphrase 27:3 65:21
paraphrases 104:13
paraphrasing 27:9 100:9 120:2
pardon 74:18 104:22
Parker 210:18 231:1
part 44:12 79:12 104:7 128:18 154:9 171:6 181:4 187:9 193:2

participant 56:17
participate 23:8 24:5 50:22 79:1 193:5
participated 165:9 193:5
pertinent 156:14
partner 82:17 87:7
partners 82:5 85:14 94:19 194:18
parts 100:7,8 153:17
party 112:13,22 123:6 135:22 136:10 147:12 149:6 152:20,22 153:6,14 163:14 164:10 165:5 166:4,16,22 168:9,18 169:2 170:17 172:8,10,14 173:15
pat 80:9
path 108:15 109:11 114:1,4 116:6
past 112:2

3:7 14:9 18:16 22:11,16 24:18 25:12,20 26:1 29:8 31:8 41:4 43:6 52:7 54:1 55:6 60:1 61:21 63:7,12,20 64:11 68:5 71:5,15 73:12 75:11,22 76:3 83:3,20 86:16 88:11 90:21 91:7 92:5,8,21 95:7 99:11 101:17 111:14,16 112:1,22 113:12 123:4

178:17,19 Patricia's 41:12 170:9
Patton 60:11 73:17 82:17 157:2 190:21 193:16 194:8,13
Paul 83:9 84:2 157:2 191:1 194:20,22 195:2,7,12
pay 140:20 148:19 149:19 170:6
paying 130:9
payment 148:6,8

payments 130:4,7
PDF 79:18
Peak 173:2,3,11,22 175:11,16 176:19 177:15,22 179:11,10 180:9 183:5
Peak's 180:21
PED 192:1
penalty 138:22
pending 178:20,22
Penguin 42:19 76:21,22 78:10 223:16 228:17
people 62:10 56:1 135:14 144:22 146:13 203:21 202:21 222:1 227:8 226:4,19

**Panel 3**

percent 45:12,18, 21 46:2 62:10 82:19 147:16,21 148:2 151:2 209:14
percentage 138:7 139:6 140:5
percolated 181:11, 18,19
performing 214:1
perilous 163:9
period 9:6 33:9 64:6 88:4 89:17 91:8 92:12 95:18 106:3 107:18 117:1,14 124:4,20 127:19 130:5 138:11 141:7 203:12 207:3
periods 92:22
permissible 15:9
permit 13:8

14:10 17:7,13 29:10 52:8 54:3 61:22 63:8 64:2 68:6 71:6 86:17 88:12 91:1 113:1 123:7 136:2,11 147:13 153:15 184:20 196:16 202:1,16 207:11 210:8 211:11 215:22
permitted 17:11 91:20 148:19
person 11:16 76:21 87:5 96:21 144:18 154:21 211:15 228:1,2
personal 14:19 20:19 21:10
personally 48:4 50:16,18 180:8
perspective

51:7 52:12,14 53:10 78:19 116:6 154:15 161:1 180:2 186:5 210:17
persuade 111:2
persuasive 171:9
pertained 69:22 91:14,18
pessimistic 106:5
Petraeus 144:4
Petraeus's 145:3 154:15
phase 185:22
Phillips 201:20
phone 35:7 38:22 56:17 79:12 96:7 108:9 135:4 136:17, 19,20 139:23
phones 160:2

photograph 157:18 161:21,22
photographic 162:15
photographs 159:17 160:18 162:5
phrase 14:6
physically 222:15
pick 97:19 100:4 155:2
picking 144:18 154:21
piece 13:22 30:10 128:16
pieces 45:14 166:10
pin 95:1
pinpoint 185:18
pitfalls 119:14
place 18:12 46:5,7,10 47:1 57:10 59:16 78:7 94:4

121:3 126:18 135:6,20 136:16 150:2,6 157:22 160:22
PLAINTIFF 188:13 230:7
planned 226:9
planning 32:3 85:15
played 36:16 225:3,4
players 51:17
pleading 16:13 26:2 30:3
pleadings 8:6,12 9:2,15
Podlaski 7:11 39:13 40:21 43:2 42:14 43:19 44:12 45:6,19 143:1 180:11 205:3 208:1 144:20 147:4

**Panel 4**

20 62:9 66:6,16 69:4,7 70:22 76:12 77:6 78:1 79:12 81:1 99:13,22 98:14,15, 22 105:22 108:2 114:9 116:18,19 117:18,17 119:21 120:9,13, 19,22 121:7,16, 21 122:8, 21 123:2,11 124:16 125:19 18 131:14 132:15 134:20 135:2,7 140:13 172:1 173:17 175:7 176:4,12 182:19 186:19 196:10 203:16,17 215:3 17,21 205:10,14 206:18 201:1,6 211:5 214:21 215:2

216:11,12 217:2 219:20 221:4,9, 22 227:20
Podlaski's 47:2 77:17 98:1,10 99:10 91:5,22 101:15 105:16 125:12 135:1 180:21 186:1 204:18 217:17
point 15:14 17:16 23:19 42:16 67:17 49:8 52:36 53:5,12, 62:7,22 63:21 67:4 69:8 69:20 106:18 106:5 115:11 116:17,19 110:1,15 130:9,17 134:8,11

10:12 145:# 146:20 160:6 172:21 179:18 198:10 204:14 206:12 213:16 223:11 224:16 225:10 226:20 228:4,5, 1,16 232:20
pointing 76:1 154:15 226:3
points 81:13 82:1,15 106:1 156:4,19
policy 85:35
political 14:7 33:18 156:15
politically 14:17
portion 129:22 142:19 196:18
portions 219:16
posed 187:19

10:12 145:# 146:20
position 16:20 46:21 72:1 81:1 87:18 88:14 97:21 96:12 105:4 108:10 110:16 19,21 125:14 121:10,13 123:16 133:18 151:8 211:18 220:10 228:15,22
positiva 100:11
possession 138:2 161:13 174:1
possibility 107:6 110:13 118:16 129:18 175:1 180:11 200:8
possibly 90:12,16 113:20 147:4
Post 171:4 92:16
potential 35:17

82:6 86:11 87:1 89:19 95:19 108:19 109:3,16, 17 114:15,21 115:1 116:3 118:11 119:22 120:14 121:10,13 123:16 133:18 151:8 211:18 220:10 228:15,22
PP 79:16
Peak 173:2,3
Powell 190:17
Powerpoint 199:1:13



practical 222:8
practice 9:16
preceded 46:10, 133:9
preceding 32:6,13; 34:1 35:1; 96:6; 143:18
precipitated 133:3
precipitously 129:4
precisely 36:8,22
precision 143:13
precondition 176:2
predate 28:7
prefatory 184:1
prefer 24:19
preferable 210:17
premature 47:13; 64:18
premise 147:20; 151:1,2; 174:15

preparation 21:17; 61:19; 214:6
prepare 62:16
prepared 43:17; 181:22; 214:19; 218:6; 229:10,12
preparing 168:6; 218:13; 226:13
prepublication 10:5; 11:3,15; 12:7; 15:13,20; 21:14,16; 26:21; 28:2,5,14; 44:6 47:5; 52:15; 53:5,12,14 59:13; 62:8 72:9; 103:22; 111:0; 115:15; 116:15; 117:9,18,22 133:12; 144:16; 145:15; 171:11; 175:10; 185:7,17; 187:12; 196:8; 199:6; 210:15

220:22; 221:6; 222:9,16; 225:13; 226:15,19; 229:2
presence 122:9,21
present 41:21; 136:3; 159:6
presented 67:3; 137:15
President 33:15; 146:19; 156:5
press 120:15
pressure 65:1; 180:21
presume 23:18
presuming 58:19; 75:1
pretty 59:11; 67:11; 106:10; 140:2; 145:6; 167:21; 197:14; 202:12
prevail 88:21; 106:11,14

prevent 59:8
prevented 71:2
previous 41:1
previously 24:18; 26:18; 37:13; 126:10; 161:19
primarily 165:10
primary 47:16; 64:20; 65:3; 137:2
principal 136:22
principally 9:9 165:19; 217:13
printed 102:20
prior 19:20; 38:1; 40:22; 58:5; 68:17,19,20 70:16; 92:11; 96:11; 112:11; 132:16; 150:14; 175:7; 220:16
priorities

59:16
priority 78:16; 82:12
privilege 63:22; 64:17,10; 68:16; 84:5,7; 90:1 91:7; 92:9; 175:4,6; 176:8
privileged 27:21; 29:6; 175:2
privileges 176:14
pro 87:14
problem 24:1; 25:15; 92:21; 106:17; 120:6; 122:10; 124:10; 146:22; 169:3; 181:9
problematic 16:3
problems 214:12; 217:5
procedures 10:11,22; 54:11; 199:21; 200:21

proceed 23:21; 81:21; 227:5
proceeded 148:10; 209:6,13
proceeding 116:3; 148:10; 166:13; 209:20
proceedings 183:9
proceeds 81:11; 137:12; 162:20; 147:21,22; 348:12; 149:2; 196:19; 209:9,14,15
process 11:20; 12:14; 17:20; 14:2,4,16,18; 15:1,8; 16:4,8; 212:10; 28:14; 46:3 51:9; 53:7; 115:13; 133:2; 150:17; 160:9; 197:8

199:6; 222:9; 121:12; 226:18,20
process 12:20; 13:12
produce 20:19; 22:10; 84:7,13
produced 27:2 40:6; 73:3,10,12,13; 83:22; 84:1,9,12; 99:1; 101:14; 111:6; 161:6,17; 165:13; 166:7; 171:18; 177:12,15; 179:5,8,20; 215:6
produces 144:5
product 17:3
production 83:18

173:14,17,22; 175:14; 17,22; 212:8; 214:1,11; 17 215:20; 216:18; 219:4
professionally 180:8
professor 96:12,14; 167:1; 170:1; 21 99:7; 101:22; 103:19; 104:15; 105:3
proffer 27:19; 163:6; 166:5; 167:6; 168:9; 169:13; 170:9; 171:3; 176:18; 202:3; 215:4; 229:11,15
proffers 200:4
program 81:21; 100:21; 234:2
programe 66:7,12; 67:12,16; 79:1,4; 104:2,4

155:16
prosecution 87:2; 109:18; 110:2,12; 154:19; 155:6,9; 13 157:10; 191:8
prosecutor 119:7; 192:4
prosecutors 37:20
prospective 98:3
protect 20:21; 45:19; 46:1; 80:21; 81:18; 146:18; 170:1
protective 144:12
prove 146:10
provide 186:7; 221:21; 222:2; 223:8
provided 25:3; 30:16; 58:4; 61:10; 82:22; 153:7; 162:7; 184:18; 188:3

prohibited 201:19
prolonged 180:9; 181:2
promise 216:18; 219:4
promises 180:15
promote 202:20; 128:14
prompted 43:7
promptly 169:3
proof 81:16
proper 30:15; 107:9
proposal 166:4
proposals 143:15
proposed 139:12; 141:8; 202:8; 231:21
proposing 231:6
prosecute 164:15
prosecuted 108:22
prosecuting

225:19; 226:18; 231:18; 234:2
providing 207:19; 223:4
proximate 196:14
public 14:16; 16:21; 17:4; 29:22; 36:10; 45:13; 46:12; 48:11,19; 50:5; 63:1; 65:1; 108:21; 131:21; 145:14,20; 229:17
publication 10:6 13:4; 31:19; 32:9; 33:13; 35:13; 36:11; 50:21; 53:10,14,15 52:1,6; 63:5; 64:17; 157:10; 159:14; 163:16; 165:11,21; 167:9; 169:17; 175:3,8; 208:10,19

209:6; 211:14; 212:1; 221:2; 226:2; 227:6,16; 228:5,6
publicity 156:16
publicize 50:20
publicly 12:13; 34:20; 48:4; 64:21
publicly-filed 16:14
publish 49:9; 65:17; 110:22; 225:19
publishable 209:2
published 29:3,17; 30:13; 32:15; 53:21; 102:10,11; 117:21; 144:15; 226:19
publisher 35:11; 42:14; 49:1,7,17; 50:13; 52:12; 59:15; 60:17,19; 63:16

64:17; 74:7 78:9; 144:6; 208:20; 209:1,11; 223:15; 228:1
publisher's 43:9; 50:11; 78:16,18
publishers 28:3; 208:8
publishing 208:14; 228:17
pull 188:10
purports 21:18; 26:22
purpose 44:4,17; 155:11; 159:1; 160:4; 211:20; 230:6
purposes 186:10; 220:1
pursue 89:1; 147:11; 160:12
pursuing 212:17
pursuit 145:22

push 151:14
pushback 152:8
put 64:15; 66:17,19; 72:4; 94:20; 109:10; 113:3; 116:5; 117:10; 118:1; 125:12; 133:18; 139:11; 140:3,6; 146:13; 169:11; 189:8; 195:11; 231:10
putting 106:21; 115:3; 119:9; 123:6; 152:7; 218:17

13:10,14, 18 23:13
29:15; 32:22; 37:4 43:7; 51:1 53:4; 54:4 62:7; 63:13; 64:16; 65:16; 68:15; 71:16; 77:6 78:3; 81:4,6; 88:16,22; 90:13; 92:4,6; 10,12,20; 93:3 97:3; 103:18; 112:5; 116:9,15; 117:3; 118:6; 122:12; 128:2; 133:19; 137:7; 142:11; 147:17,20; 151:1; 152:3,21; 153:15,16; 164:9; 169:13; 174:6; 178:19; 180:3; 186:12; 187:8; 196:9,11, 21 200:8; 201:17; 210:20; 210:22; 220:7; 222:1

qualified 186:7
qualify 200:1
quantify 184:9; 212:17
quasi 206:10
question 8:15 11:1

questioning 193:20
questions 7:16 9:19; 18:4; 38:14; 85:3; 134:5; 170:10,13; 171:1; 175:22; 178:21; 182:6; 188:11,17; 194:11; 199:1,15; 199,6,18; 206:12; 207:22; 221:19; 225:12; 234:21

140:2
quote 21:12; 199:20; 58:14,15; 103:19; 129:20; 214:11
quoting 100:8

R

race 155:12
radar 34:4
Ragone 43:2 57:3; 58:12; 75:15; 76:20; 77:22
raid 157:18; 161:11
raise 108:21; 155:14; 202:9
raised 35:15; 57:22; 63:18; 86:15; 97:10; 118:7; 162:7; 201:3,10; 202:3; 220:9

Randy 8:3,9
range 65:15
rata 195:20
reach 80:9; 107:20; 110:3; 146:7; 165:14; 185:12
reached 56:9; 97:13; 113:7; 129:16; 133:10; 143:19; 158:6; 197:9; 198:2
reaching 110:4
reacting 156:2
reaction 144:11,12; 156:14
read 23:9,11; 30:13; 31:6; 33:22; 21 200:8; 69:21; 90:3; 104:2,4; 112:5,6; 142:5,6,

recall 23:5; 31:14,15; 20,22; 32:11; 33:22; 36:11; 38:4 39:8; 41:19; 42:17,21; 43:11,19; 44:2; 46:8; 51:20,22; 52:9; 57:18; 58:6,3; 59:10,11; 17 60:3,9; 19,22; 72:5; 74:6,15; 75:7; 78:8,18; 97:20; 98:6,10; 99:17; 100:12; 101:21; 118:20; 121:19; 123:18; 126:10; 131:16; 135:1,19; 139:11; 140:6,19; 141:4; 144:6; 156:10; 157:22; 179:17; 196:9; 198:5; 205:16; 20,21

reason 81:5; 41:22; 42:3; 56:22; 62:14,15; 70:19; 77:8; 84:19; 121:13; 154:9; 163:12; 205:6
reasonable 100:12; 101:21; 118:20; 121:19; 123:18; 126:10
reasonableness 131:16; 135:1,19; 139:11; 140:6,19; 141:4; 144:6; 156:10
reasons 114:13; 119:20; 120:3,4; 121:2; 156:3,15
reassure 65:4



## Panel 1

```
220:16            recess            recollectio       refine
recalled          126:3             ns                15:5
120:10            recharacter       126:10            63:2
receded           ization           reference         reflect
16:16             153:13            9:19 10:1         144:13
30:4              recipients        17:4              reflect
210:11            76:4 78:1         22:12,20          158:16
receipt           recite            27:17             reflected
135:21            214:6             30:1              44:9
receive           recited           103:11            87:19
204:8             149:13            108:5             97:22
206:4             recognizing       182:17            101:22
received          222:10,22         225:1             158:5
35:13             recollectio       229:22            195:21
38:19             n                 referenced        reflects
39:17             15:4 33:2         14:22             78:21
42:1              39:14,16,         54:9              106:17
47:19             17 41:22          163:15            refresh
73:6              56:6,16           182:3             91:3
83:15             57:9,13,          183:1             142:7,13
101:14            19 61:12          187:8             143:10
102:5             74:3,9,           references        refreshes
114:20            17,19,22          11:7              142:16
115:7             75:2,5            144:3             refund
119:10            76:8,16           referencing       149:13
142:2             94:7 95:5         10:2              150:6,10,
178:7             98:11,14,         173:10            15
181:5             19                referral          refunds
192:22            100:14,18         47:15             149:17
193:3             101:1,6           109:20            150:7,17
205:19            102:3             referred          regard
206:1             103:4             86:19             84:15
216:12            105:14            102:19            204:16
217:17            121:20            referring         219:3
receiving         126:19            43:1 59:4         regarded
23:5              133:13            73:19             10:20
41:19             142:7,13,         98:21             53:19
42:3 46:8         16                104:12            87:12
134:22            143:11,19         200:8             112:3
recently          149:12            224:5             regularly
35:11             179:14            226:9             127:20
149:12            231:13            refers            regulations
160:20                              85:18
```

## Panel 2



```
17:13        relationshi    remains       reporter      42:19
28:16        ps             16:21         23:11         117:5
regulatory   218:14         151:10        90:2          176:15,20
209:3        relative       remark        112:6         177:22
reinstated   113:17         184:1         235:1,3,      178:5
159:1        relay          remedies      178:5         179:11
relate       205:1          81:6          179:11        185:4,14
21:19        relaying       86:11,21      reports       191:21
22:10        140:15         88:20         161:20        192:3,6,
27:2         released       193:7         162:1,4       9,10,13
86:10        64:21          remedy        represent     399:8
99:7         relevant       53:6          7:11          representin
165:14       13:13          81:10         28:13         g
166:10,14    15:21          89:2          41:15         20:3,6
related      115:16         remember      74:7          70:12
31:18        146:12         88:22         136:8         179:21
69:12        160:1          98:13         180:2         180:2
86:14        175:14         205:17        189:14        193:15
93:15        183:8          reminded      194:7         194:7
102:7        204:20         37:11         representat
117:9        214:8          reminding     ion           republicati
140:11       reliance       103:13        50:18         on
157:10       62:10          remove        70:13         210:4,22
164:17,18    204:16         25:20         120:16        reputation
165:14       relied         rendered      123:2,17,     210:4,22
166:19       62:8           157:12        22 123:12     reputationa
167:8,13     70:22          195:13        169:18        l
170:20       82:11          rendition     181:7         210:16
201:16       124:13         167:12        186:1,2       request
234:14       186:21         170:18        198:12        48:19
relates      relief         rephrase      219:5         50:13
15:3         129:5          152:4         214:9         110:4
164:6        rely           207:13        representat   124:15
231:8        81:15          reply         ions          125:4,13,
relating     204:8          75:15         9:7,12        15,19
91:21        relying        77:16         20:9          133:17,
175:2,8      133:15         report        205:9         21,22
188:4        remained       34:18         206:5,13      205:9
relationshi  190:16,22      reported      represented   requested
p                           17:8          28:1,3,21
81:17                                     34:17
180:4                                     35:9 36:2
```

## Panel 3

```
requests      resolve       62:16         57:20         117:10,
44:15         44:15         70:16         159:16        16,22
205:15,       137:8         72:20         203:20,22     118:3
20,22         138:8         77:21,22      retracted     127:2
required      158:5         104:20        108:12        133:12
11:7          resolved      122:13        return        144:16
30:20,22      148:21        135:1         43:8          151:20
44:8 47:4     181:14        144:1,8       150:9         152:13
62:8          229:22        147:1         returned      153:10
137:18        231:11        170:9         215:3         161:2
196:18        resolving     221:10        reveal        171:11
requirement   109:6         226:13        234:15        176:10
21:14,22      110:9         responses     revealed      185:4,8,
27:14         137:4         206:1         33:4          14,17
27:19         231:7         responsibil   revealing     187:12,21
219:19        resource      ity           10:21         189:20
requirement   124:13        20:21         29:5          196:8
s             resources     49:21         223:14        199:6
65:14         62:6          158:15        review        208:22
117:10        respect       responsible   117:8         210:13
209:3         91:19         9:12:17       10:5          211:9
225:22        respond       172:2         11:3,6,15     221:1,6
research      39:2          180:14        12:7,18       222:9,16
8:14          47:12         responsive    14:8          225:20
61:19         63:3 80:8     108:12        15:13,20      226:19
63:2,6,18     171:22        rest          19:2          227:6,22
82:12         responded     200:17        21:16         228:18
137:18        80:6          restate       26:22         229:2
196:18        134:20,21     90:13,14      28:3,5,14     reviewed
requirement   225:18        123:20        44:6          8:13
researching   responding    restored      45:13         15:20
62:4          18:12         183:3         46:19         44:4,16
86:10         75:2          Restraints    47:5,8        213:21
resolution    116:21        193:7         52:22         215:6
109:3,13,     120:14        result        53:6,14,      reviewing
15 110:3,     144:9         181:13        22 59:13      9:15
4 114:1       responds      197:6         62:8          81:22
137:9         225:12        resulted      69:18         revised
139:14        response      196:17        72:9 88:9     200:20
140:3         26:8          retained      95:22         215:10
141:20        43:15,17,     46:17         113:1,4,      232:20,22
143:20        53:8 59:5                   5,9           233:3,5
210:9                                     115:15        revising
                                          116:15        154:11
```

## Panel 4



```
revision     7:3 8:2        §             189:4,8,      88:22
215:12       83:4                         11,17,18,     124:8
revisions    126:6         9-C-H-N-I-     19            screaming
214:22       137:1         D-D-L-E        193:11,13     180:9
233:2        108:15        30:10          212:3         screen
revived      235:13                       SCI           34:4
162:21       role          safety         13:5          screenplay
revolved     36:16         220:4          20:17         144:6
33:16        117:6,8       Salsbury       21:13,16,     screenwrite
rewarded     123:4,11      173:7          19 22:10      r
180:16       137:2         San            27:1,2,4,     144:6
Rhodes       162:13        165:7,9        9 30:21       screw
189:13       rolling       173:9          77:9,12,      134:1
RICO         214:1         SAPS           17 47:3       133:2
193:6        room          70:3           58:3          screwed
rights       197:12        sat            66:1,9,13     144:22
141:6        91:22         76:12          69:21         script
Ringel       rough         satisfied      69:10,18,     13:15
73:21,22     235:4,7,9     93:22          19,21         scrupulous
74:20        roughly       satisfy        70:15         154:10
75:2,9       33:20         128:22         72:2          SEAL
77:3,12      179:2         143:2          81:2,7,9,     87:13
ripe         routine       save           13,15,20      SEALS
150:20       226:15        171:19         82:2,15       13:5
ripened      Rove          scale          88:22         secondarily
137:15       192:3         191:9          89:6          65:6
risk         royalties     scant          94:1 98:2     secretary
51:8 87:11   191:9         28:17          100:16,21     138:14
92:8         royalty       schedule       103:11,20     section
108:20       209:15        231:15         104:1,3       159:7
209:20       Schmiddle     Schmiddle      105:15        226:7
risked       30:9,16       30:9,16        106:7,14      security
144:19       31:3,8        31:3,8         107:10,16     13:15,25
risks        32:17         32:17          112:16        20:22
187:19       Schmiddle's   Schmiddle's    116:18        21:16
209:5,16,    31:12         31:12          117:1         30:20
17           Scholarship   Scholarship    135:6,14,     130:10,21
road         189:13        189:13         159:1,7       138:13,15
155:19       school        scope          159:1,7       159:1,7
Robert       96:15         36:5                         162:20
```



```
164:17        228:17,      September      series        199:3
222:16        18,19        51:10          38:22
                           52:2           39:15         settled
seek          senior       54:17          40:4          198:17
81:10         34:17        64:16          55:12         settlement
129:4         67:1         68:15          73:1          128:20
148:12        79:10        84:17          138:20        129:1
210:14        85:16        90:2,10,       139:5         147:8,16
              192:9        16 91:8,       serve         164:12
seeking       194:19       18 92:12,      107:7         198:2,7,
143:20                     13 93:8                      13 210:1,
146:16        sense        94:5           served        3,14
226:14        10:13        95:4,16        202:22        231:21
              13:13        96:3
seemingly     45:4         99:18          service       settlements
77:22         125:16       103:3          193:4         116:2
              171:14       105:9          195:18
segregate     174:16       106:10         services      setup
168:8         177:20       107:19         84:4          55:22
171:17        226:22       108:6,11       157:1
              228:6        109:20         184:17        Sevier
segregated                 111:6,16       195:13        76:21
129:7         sensitive    112:11,                      78:9,22
              10:11,21     14,19          session       160:21
segregating   13:1,17,     114:9          176:18        163:6
128:7         21 20:15,    116:9                        223:15,22
              18 29:13     124:17         sessions      224:22
segregation   33:4         125:2,9        37:19         225:7
171:14        182:12,14    126:16         202:3         228:2
              202:12       127:5,17
select        220:3        128:6          set           Sevier's
155:17        232:1,13     130:18         35:19         226:5
              sentence     131:10         36:15
selective     48:10        132:21         39:2 45:4     share
154:18        72:11        134:6          73:1          60:14
155:6,9       103:10,18    135:11         83:22         81:3 91:4
              separate     136:6,13       93:5 96:8      113:10
selectivity   39:4         137:14         98:20         114:3
155:10        62:11        138:15         122:14        126:21
              158:1        142:13         151:15        127:4,15
send          164:19       145:16         155:22        209:8,15
35:15         168:3        152:15         172:16        221:14
132:20        separately   155:22         179:4,7
216:10        76:11        213:8          181:4         shared
235:7         77:11,18,    216:6                        60:16
              20 214:16    233:21         sets          77:10
sending                    sequence       84:3          88:15
74:19         216:10       76:19          58:10         97:16
211:8                                     settle        105:1
213:20        216:10                      198:15        127:14
217:21
sends
158:11
```

```
136:19        78:11        141:2         236:21        situations
163:6,7       80:6         153:10                      16:19
182:10        107:19       155:6,8       signing       145:13
187:21        127:16       231:7         21:12
200:4         159:4        232:22        68:22         skill
207:3                      234:2         69:1 98:4      35:19
211:14,19     shouting                   235:1         36:14
215:1         180:20       sign          similar
216:16        show         234:3         206:12        skip
229:13        8:21         signature     simple        196:2
231:5         24:17        24:8,12       170:3         slide
              39:14        68:21                       3:16
sharing       43:6 99:2    71:9          simply        28:10
50:15         71:17        235:12        17:4 19:9
101:2,3       102:19                     34:4          slides
124:12        176:11       signed        50:12         12:8,11
211:13                     20:12,15,     81:15         14:12,22
              showed       17,19         214:12        199:13
shed          30:3 47:5    21:4 22:4
105:2         76:10        23:14,15,     singing       slightly
              103:1        18,22         86:9          157:5
sheds         152:15       37:9,13       108:18        182:17
65:10         158:3        103:21        113:17
72:12         198:3        127:8         127:11        slippery
              shown        129:10        129:3         173:7
sheet         55:11        133:14        133:21        slope
141:1,6       232:12       134:10,17     135:3         172:8
142:1         showing      152:17        140:4,20
158:6,12      23:2 25:6    215:15                      small
206:9         102:17       226:7         sir           190:14
              133:10       232:9         119:17        smarter
sheets        134:10,17    152:17        sit           119:17
166:2         55:11        155:2,17      119:9
198:22        232:12       213:15,17     58:21         smoothly
Sharry        sic          234:9,14     180:18         139:2
112:5         35:18                      sitting       SNEPP
shocked       39:2         significanc   100:12        81:12,22
211:17        58:21        e             137:14        86:3
              98:20        38:6          149:10        106:4,18,
short         109:8        significant   192:13        22 107:3,
55:3          189:14       9:6           situation     17,22
82:3          side         116:18        57:22        114:4
93:14,22      109:6,7      142:19        151:20        112:10
207:15        137:9        212:19        152:13        131:22
shortly       139:5        significant   210:17       153:11
58:13         138:9        ly            213:22       154:7
72:16         139:14,15    209:17
52:10                      210:17
```

```
187:19        147:10       98:4          65:8 67:9     spoke
188:2                      100:20        69:11,12      56:6,21
              source       105:17        135:4         57:10,15,
so-called     17:5         112:17        117:3,6       17 95:17
81:12         10:16        114:17        17 95:17      122:8
              214:17       145:19        122:6         134:2
social        221:12       146:15        126:8         135:4
174:18        sources      152:1,18      134:2         136:20
              30:16        156:17        143:6         137:12
sold          32:12,17     162:15        144:4
144:6         45:13        188:5         202:5         spoken
              182:4        201:21        221:22        31:22
solely                     222:3         50:14,22
210:14        Southern     223:5,10,     spoiling      76:11
              159:8        15 226:10     6:15          203:12
Solomon       164:22       233:16        21:15
217:11        165:7        234:1,15      29:22         spring
              173:3,10                   48:9          159:1
somebody's                 special       48:9          158:3
119:14        sort         19:6 33:7     49:8          160:10
              8:14         47:22         51:21         206:8
sort          17:10        66:7,11       158:3
8:14          34:2,19      67:12         160:10        sparsely
17:10         56:10        69:22         223:21        67:3
34:2,19       78:20        70:3          224:19
56:10         107:15       81:21         step          staff
78:20         123:3        100:21        93:5          11:17,20
107:15        140:5        104:2,3
123:3         144:12       117:20        stages        stage
140:5         150:22       142:21        123:15        37:2
144:12        154:7        192:3
150:22        169:11       234:2         stagger       staggering
154:7         231:16                     37:2          94:9
169:11        speaks       specialized
174:14        133:5,7      28:11         staggering    stake
195:22                     190:15        94:9          105:5
223:19        spear        specific      spending
228:8,15      15:3         10:9,15       166:1         stand
              17:16,17     11:16                       70:8 80:9
sought        18:10        15:5 16:2     spent         146:13
47:18         30:8,11      28:9          80:6 98:6     222:12,14
114:20        31:12,18     57:22         94:12
115:6         32:2         specifics     195:17        standard
186:7         44:20        201:13        212:17        29:11
              45:9 66:2                                29:11
sounded       69:3 81:3    split         standard      186:2,22
199:7         87:22        26:2          29:11         233:3
              89:7                       186:2,22
sounding      90:19        split         233:3
85:5          93:16        26:2
              sounds
              40:1
```

```
standpoint    21:13        173:1,3,     79:2,6,7,     subject
210:3         37:12        11           13 113:20     14:16
              188:10                    116:11,20     14:16
start         197:14       stick        15:21         15:21
19:10                      139:6        116:21         54:6 67:4
20:11         statements                124:18        83:20
26:14         120:1        stinks       stretch       84:8 92:4
101:7,13                   110:22       43:6          96:7
146:19        states                    strike        115:20
190:10        20:11        stood        18:3 39:3     129:18
191:2         21:12        68:12        72:15         134:16
              37:8         69:8         94:9
started                    stop         130:15        164:10
12:3          40:19        48:1,10      161:21        166:5
107:11        57:3         48:19        216:9         168:10
109:2         58:13        63:16                      176:14
118:21        78:15        208:10,19    string        186:8
191:14        197:20       227:6        203:11        217:20
191:15        80:3                                    230:8
194:7         87:20        stopped      strings
198:11        101:3        170:4,7      149:16        subjects
214:12        132:22       194:4        strong        220:9
              190:3        209:18       78:16
starting      200:17                    113:5         submission
109:5         220:14       stopping     134:2         12:21
114:14        190:3        208:1        155:5         12:15
138:10        220:14       stor/es      197:14        197:4
193:11        stating      32:8                       submit
197:8         20:20        story        209:12        21:15
198:10        40:20        194:4                      26:21
225:11        50:5         220:14,      stronger      49:7 53:5
              statute      18,20        98:17,21      115:15
stated        91:19        struck       116:15
103:10,17                  64:18        133:11
211:16        statutes     straight     structure     133:11
216:20        17:12        43:17        76:7          196:9
              28:16        141:12       139:13        standard
stated                     171:5        209:2         186:2,22
59:2 76:1     stay         straightfor              233:3
80:7          130:11       ward         structured
91:14,20                   14:14        149:16
statement     step         strange     study
20:16         80:4         172:11       189:1
              steps        197:11       studying     submitted
              59:22        172:11       169:9        10:15
              60:7                                   11:2,12,
              91:14,20     stuff                    13 12:6,
              222:22       144:15                   8,23 13:4
              Steven       strategy     stuff        14:12
                           103:17,19   144:15        14:20
                                                     18:20
```

19:1,4,6
28:4
53:13,22
59:13
72:8
111:8
116:3
175:9
185:7,17
187:12,20
227:11,21

**submitting**
117:21
225:20

**subsequent**
95:9
104:3
116:3
152:13
175:3

**subsequently**
11:4
37:20
84:14
105:6
121:9
128:19
146:2
162:10
178:7
182:16
234:6

**subsidiary**
128:2

**substance**
69:3
87:20
142:1

**substantial**
47:17
61:15
163:18

177:22
178:5
196:18
218:16

**substantially**
179:12

**substantively**
179:16,17

**succeeding**
76:7

**success**
126:22
154:6

**successfully**
89:1
106:15
151:8
186:13
209:7

**suffered**
197:6

**sufficient**
53:11

**sufficiently**
98:2
119:10

**suggest**
49:11
151:14

**suggested**
75:6 96:1
205:10
215:7

**suggesting**
66:5

**suggestion**
162:8

**suggestions**
74:14

**suggests**
190:15
192:16,17

**suit**
108:19
113:4
114:16,17
128:3
129:4

**summer**
33:21
160:10

**sunk**
107:17

**sunset**
228:9

**superiors**
162:16

**supervising**
12:19

**supplied**
83:12

**support**
8:7
100:19
118:18
119:5
144:17
217:4

**supported**
142:21

**supportive**
100:15
101:5
104:10

**suppose**
164:4,21

**supposed**

163:17
**Supreme**
42:4
56:20
95:3 96:5

**surfaced**
215:4

**surprise**
141:5

**surrender**
137:21

**surrogate**
34:19

**surrounding**
36:10

**suspended**
160:7

**switch**
212:7

**sworn**
7:5
126:10
171:7

**system**
61:8
194:2



**T**

**table**
64:18
139:11
140:6

**tactics**
10:11,21
54:10
199:20
200:20

**takes**
121:9
175:1

**takes**
16:19

**taking**
46:7,10
108:17
109:13
110:15
128:21
172:2
228:21

**Taliban**
197:12

**talk**
8:10
83:14
120:20,22
121:11,12
163:1
167:3
200:9
212:7
213:5

**talked**
81:8
46:22
48:21
59:19,20
86:3
117:15
118:14
124:18
127:11
130:8
145:21
156:9
210:2
217:21

**talking**
9:20 12:4
34:20
46:16
80:11
129:18

---

98:13
108:14
109:12
112:20
117:2,12
118:5,22
121:14
122:10,11
127:21
132:22
143:12
177:20
178:10
201:19
202:5

**tamping**
183:22

**tangentially**
160:17

**Text**
78:11

**team**
64:20

**taught**
193:9,10

**tax**
330:4
143:8
148:7,14,
21 149:18
150:6,15,
17

**taxes**
130:20
148:18
150:12

**teach**
119:2

**team**
56:5
151:7
194:12,22

**technical**
81:20
108:2,3
88:21

**telephone**
51:17
58:13
59:17
97:17
100:2
150:3

**telling**
36:21
66:2
110:13
151:6

**temperature**
48:5,7,17

**temporally**
167:21

**ten**
32:7

**tended**
36:13

**tension**
110:11

**tentative**
105:4

**tenure**
202:11
203:2

**term**
9:22
141:1,6
142:1
189:22
206:9

**terms**
15:8
32:14
37:12
62:7

177:13
179:14
198:21
15,16
124:14
134:3
135:1
137:13
138:4,6
139:6
140:14
142:8,15,
17
143:14,20
145:17
151:6
160:5,20
166:18
171:13
174:9
180:15
187:11
198:18
205:22
209:18
231:10

**territory**
7:6

**test**
140:21

**testified**
7:6
126:10
181:18

**testimony**
23:12
87:22
90:4
112:7
119:15
123:10
166:13
188:8,12
189:1

141:3
179:14
146:7,10
147:7
157:15
161:16
162:14
163:5,7
177:7
183:8
184:2
200:5
206:14
228:15

**text**
35:6

**theme**
147:6

**theoretical**
222:18
224:20
226:22

**theoretically**
228:15

**theory**
14:4 82:8
211:12

**thing**
10:10
53:15
59:20
11:4
107:9,15
109:10,11
155:10
157:4,5
76:16
96:15
98:1,7,8,
9 100:15
116:11
117:16
118:8,12
134:17

**thinking**
108:2,3
123:22
133:18
186:4

**Thirty**
144:5
165:17,18
166:20
168:5
225:5

**thought**
10:10
53:15
59:20
11:4
107:9,15
109:10,11
109:10,11
155:10
157:4,5
76:16
96:15
98:1,7,8,
9 100:15
116:11
117:16
118:8,12
134:17

**thoughts**
124:9

**threat**

---

47:11

**threaten**
87:2
110:2

**threatened**
108:4
146:8

**threats**
35:16,17
116:22

**three-year**
150:11

**throw**
65:6
170:8

**thrower**
47:21

**Thursday**
39:21
56:18
57:10

**tied**
90:17
127:7

**tight**
80:7,17

**time**
8:10 9:8
12:5
18:10
20:4
22:5
22:1,6
26:16
33:10,14
31:5,10,
16,22
33:19
36:7,21
38:1,9,18
41:1,16
47:6

48:22
50:15,17
56:21
57:15
62:13,20
63:4,9,17
64:6
68:20
71:7
75:18
76:2,5
78:21
80:21
83:15
86:9
87:6,9,
15,16,17
88:4
89:17
90:6 91:6
92:22
94:11
100:13
101:3
103:6
105:14,
18,20
107:18
108:8
111:14,15
112:9
113:12,13
116:17
117:1,14
124:4,20
126:22
127:19
130:13
134:8
138:11
140:5
141:6
142:6,14,
18,22
150:14
163:19
166:1,2

168:6,12,
16
91:10
92:2,7
169:12,16
170:7,15,
21 171:19
172:21
153:12
185:30
186:4,18,
19 195:17
168:15
178:8
204:5,14
206:21
207:7,16
216:21
218:9
205:2
202:7
203:4
207:12
211:5,6
212:6,20
213:4
216:2
218:19
219:2,13
220:12
221:15,20
230:8,15
232:16
234:22
235:6

**Tobey's**
83:21
84:8
164:10
170:19
221:19

**today**
19:20
133:1
171:19
89:17

90:1
91:10
92:2,7
113:2
36:2,8
44:13,16
66:10
69:9
70:20
71:7
102:2
109:21
128:12
161:3
176:16
197:10
199:13,19
221:4

**tone**
47:10
72:19

**top**
85:10
154:22

**top-secret**
17:18
18:9

**topic**
220:13

**topics**
126:16

**topped**
148:5

**Tort**
172:8

**touch**
130:19

**touches**
63:22

**tour**
128:15

**told**
10:17
35:9
36:2,8

---

**track**
36:15
167:20

**traffic**
212:15

**training**
10:20,21
28:11,15,
18 54:10

**transcript**
161:2

**transitioned**
138:13

**Treasury**
148:18

**trial**
168:14
184:12
192:14

**tricky**
103:18

**Trident**
137:21

**triggers**
141:11

**trouble**
200:14

**troubling**
100:8,11
104:8,10

**trump**
107:8

**trust**
81:22
82:7

**trusting**

119:11

**truthfully**
175:22

**Tuesday**
54:21,22

**turn**
24:15
37:5
40:15

**U.S.**
55:15
85:8
159:8
165:8
173:1

196:2
93:13
174:17
196:2
211:8
219:8,12
223:20
224:12
106:14
106:8
161:18
167:9
170:4
171:14
176:7

**turning**
17:11
17:15
20:10
24:4

58:14
79:16
80:1
131:17
156:20

**turns**
158:19

**two-week**
306:3

**typically**
16:8
17:11,14
70:3

**typist**
222:11

**U**

**U.S.**
24:5
159:8
165:8
173:1

**ultimately**
43:1
147:15
181:13

**Uh-hum**
77:12
78:6
79:22
80:15
231:4

**uncertain**
72:10

**unclassified**
151:11

**undefined**
179:19

**underlying**
43:16
180:18
212:2,10

**understand**
7:17 8:16
9:16 10:3
13:10
32:22
35:3
164:12
158:15
55:20

63:12
67:21
70:6
71:12,14
87:22
90:6
92:18
109:4
110:6
131:20
133:11,10
152:2
157:8
164:3,9
171:16,
18,21
185:22
205:10
198:8

202:4
204:20
207:16
215:18

**understands**
153:14

**understanding**
9:14 10:2
20:20
48:22
123:12
129:21
15,17
134:2
213:11

**undertake**
22:7
62:11
66:20
70:13

**undertaken**
157:11
160:8
185:3

**undertook**
132:16
156:3

**undress**
174:16

**unexception**
**al**
177:10

**unilaterall**
**y**
45:14

**United**
48:1
130:3
22C:4

**universe**
179:12

| | | | |
|---|---|---|---|
| University | 210:4 | 105:4 | wanted | 85:4 |
| 189:9 | 212:10 | 123:15 | 82:11 | 136:13 |
| 193:11 | | 222:9 | 86:20 | 143:17 |
| unredacted | veterans | violate | 87:3 | 158:17,18 |
| 83:22 | 142:21,22 | 211:8 | 97:19 | 217:1 |
| 84:7,10, | viability | violates | 100:4 | whatsoever |
| 13 | 116:2 | 222:19 | 115:7 | 74:11 |
| unsellable | 153:2 | violating | 116:7 | 186:3 |
| 201:9 | viable | 200:22 | 120:5 | White |
| unusual | 119:1 | 228:6 | 121:4 | 34:13,18, |
| 135:13 | 155:3,7 | violation | 123:19,21 | 19 36:12 |
| update | Vice | 48:12 | 133:21,22 | 192:10 |
| 79:1 | 146:19 | 50:8 | 145:10 | Whitewater |
| upside | 156:5 | Virginia | 159:15,20 | 192:11 |
| 120:8 | video | 165:1 | 187:9 | wide |
| | 164:2 | 166:11 | 204:21 | 52:15,18 |
| **v** | 166:21 | 167:16 | Warfare | widely |
| | view | 172:22 | 19:6 | 227:10 |
| vague | 57:21 | 173:7 | Warfighter | wider |
| 98:2 | 82:13 | 193:11 | 167:1 | 102:12 |
| valid | 87:12 | Virtually | wars | widespread |
| 67:20 | 97:9 | 62:1 | 34:16 | 45:14 |
| valuable | 100:7,19 | volume | Washington | wife |
| 170:14 | 101:3 | 218:16 | 17:8 | 130:1 |
| variety | 104:16,18 | volunteered | 145:1 | wife's |
| 206:9 | 106:20 | 71:13 | 190:18 | 174:20 |
| vast | 107:15 | 118:1 | ways | win |
| 10:13 | 114:3,14 | | 154:11 | 108:4 |
| venued | 117:5 | **w** | week | 109:9 |
| 165:7 | 126:22 | | 32:7 | window |
| verbalize | 152:19 | waive | 50:17 | 150:9,11 |
| 7:18 | 153:1 | 154:9,17, | 51:4 | winner |
| | 154:9,17, | 20 158:12 | 54:16 | 88:17 |
| version | 207:4 | 107:17,18 | 67:2 90:8 | winning |
| 102:20 | 209:17 | 175:4 | 107:14 | 94:1 |
| 235:7 | 212:11 | 176:8 | 108:6 | 106:6 |
| versions | 223:9 | waived | 113:8 | 151:17 |
| 61:11 | viewed | 211:3 | 160:11 | withdraw |
| 232:11 | 97:9 | 235:12 | 183:21 | |
| versus | 104:8 | waiver | weekend | |
| 7:21 | views | 64:7,9,12 | 39:22 | |
| | 65:13 | 214:19 | weeks | |
| | | 215:10,17 | | |




| | | | |
|---|---|---|---|
| 51:2 | 190:8 | 37:6 | 189:9 |
| 59:15 | 203:21 | 104:19 | 190:5 |
| 63:17 | | 148:7 | 191:1,16 |
| 208:8 | working | 149:1 | 192:10 |
| withdrawn | 194:12 | 201:2 | 194:21 |
| 209:10 | world's | wrong | 202:11 |
| | 55:19 | 108:3 | yellow |
| withhold | worried | 115:10 | 40:11 |
| 219:18 | 107:2,7 | 116:6 | York |
| witness | | 120:10 | 31:16 |
| 119:4,8 | wrap | 173:8 | Yorker |
| 121:11 | 218:20 | 185:3 | 30:10 |
| wondering | wrestling | 186:15,20 | 31:19 |
| 213:21 | 143:11 | 226:16,17 | |
| word | | wrinkle | **z** |
| 107:8 | write | 159:22 | |
| 137:19 | 32:3 33:7 | 160:15 | Z-A-C-K |
| 224:21 | 98:7 | wrote | 86:7 |
| wording | 176:10 | 22:1 | Zach |
| 27:9 | 199:22 | 30:10 | 86:6 |
| words | 225:11,16 | 61:9 71:3 | 168:6 |
| 32:18 | 227:8 | 80:3 | 194:16,18 |
| 62:21 | writer | 97:12 | zone |
| 70:4 | 30:9 77:2 | 100:13 | 75:18 |
| 131:22 | Writers | 133:9 | 76:5 |
| 133:5 | 227:8 | 193:5 | zones |
| 187:2 | | **Y** | 76:2 |
| 211:19 | writes | | |
| 223:7 | 216:21 | year | |
| work | 222:11 | 86:17 | |
| 8:7 60:12 | writing | 139:1 | |
| 80:8 | 21:5,17 | 150:15 | |
| 165:13 | 26:22 | 168:17 | |
| 171:2 | 66:19 | 190:13 | |
| 172:15,17 | 68:10 | 191:13 | |
| 190:4,6 | 70:16 | 194:4 | |
| 191:9 | 108:9 | | |
| 195:6,11, | 123:20 | years | |
| 12 | 131:6 | 35:4 | |
| worked | 144:4 | 69:15 | |
| 35:2 | 225:18 | 98:4 | |
| 69:11 | 226:18 | 148:22 | |
| 80:10 | written | 149:15 | |
| 87:6 | | 150:14,17 | |




ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com

ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com

ESQUIRE

01-25-2017

Attn:   Charles A. Patrizia
Re:     **MATTHEW BISSONNETTE V. KEVIN PODLASKI**
        Deposition of Robert D. Luskin, taken on 01/18/2017
        Your Case Number 1:15-CV-00334
        Our Reference Number 504403

Dear Sir or Madam:

Please be advised that the transcript in the above-referenced matter is available for reading and signature. Enclosed you will find a condensed copy of the transcript, a Declaration under Penalty of Perjury Certificate and Errata pages to note any necessary changes or corrections to the transcript. The Original transcript has already been released to the custodial party.

The witness should complete the following steps within 30 days of the date of this memorandum:

- Read the enclosed copy of the transcript of your deposition
- Make any corrections necessary on the Errata page only. If you do not wish to make changes, write "No Changes" on the top of the Errata page.
- If you require additional space to list changes, you may use your own paper. Remember to include witness name, deposition date, our reference number, and the page/line location of each change.
- If there are multiple transcript volumes, complete Errata pages separately for each volume.
- Sign the bottom of the Errata page(s)
- Sign and date the Declaration under Penalty of Perjury.
- Return only the Declaration under Penalty of Perjury and signed Errata pages. The condensed transcript is yours to keep.
- Return completed forms to:

  Errata Processing Division
  Esquire Corporate Production Department
  Suite 2700, 101 Marietta Street
  Atlanta, GA 30303

If electronic documents are permissible in the applicable venue for this matter, you may instead submit a scanned copy of the Declaration under Penalty of Perjury and signed Errata pages via E-mail to errata@esquiresolutions.com .

Upon our receipt of completed Errata pages, we will archive and make the changes available in electronic form to all counsel. After archiving we will forward the original Errata pages on to the custodial party, to be reunited with the original transcript.

In the event any of the above instructions differ from a stipulation or contradict a previous agreement between counsel regarding witness signature, please disregard this letter's details and follow the protocol as agreed upon by and between counsel.

If you have any other questions regarding this process, please contact Esquire Client Support at 800.211.DEPO (800.211.3376), or ClientCare@esquiresolutions.com .

Thank you,

Corporate Production Department
Esquire Deposition Solutions

Enclosures

Cc: All Counsel present

Ref: 504403

1    Reference No.: 504403

2

3    Case:  MATTHEW BISSONNETTE V. KEVIN PODLASKI

4

        DECLARATION UNDER PENALTY OF PERJURY

5

        I declare under penalty of perjury that

6    I have read the entire transcript of my Depo-

     sition taken in the captioned matter or the

7    same has been read to me, and the same is

     true and accurate, save and except for

8    changes and/or corrections, if any, as indi-

     cated by me on the DEPOSITION ERRATA SHEET

9    hereof, with the understanding that I offer

     these changes as if still under oath.

10

11   _____

12        Robert D. Luskin

13

14        NOTARIZATION OF CHANGES

15            (If Required)

16

17   Subscribed and sworn to on the 10th day of

18

19   February_____, 20 17 before me,

20

21   (Notary Sign) Alicia A. Smith

22

23   (Print Name) ALICIA A. SMITH        Notary Public
               NOTARY PUBLIC DISTRICT OF COLUMBIA
               My Commission Expires September 14, 2021

24

25   in and for the State of District of Columbia



Robert D. Luskin, ESQUIRE
January 18, 2017
Esquire Deposition Solutions

ERRATA SHEET

Case Name: Matthew Bissonnette v. Kevin Podlaski
Date: January 18, 2017
Witness Name: Robert D. Luskin, Esquire

| Page | Line | Correction | Reason for change |
|------|------|------------|-------------------|
| 09 | 7 | [inconsistent] | Missing word |
| 09 | 7 | Comma after the word "made," | Missing punctuation |
| 09 | 12 | Change the word through to the word to | Incorrect word |
| 10 | 10 | Comma after the word "training" | Missing punctuation |
| 10 | 11 | Comma after the word "procedures" | Missing punctuation |
| 10 | 21 | Comma after the word "training" | Missing punctuation |
| 11 | 2 | Delete the word for | Extra word |
| 11 | 6 | Add "ed" to redact | Correct tense |
| 12 | 7 | Delete the word and | Extra word |
| 13 | 12 | Add "is" to process | Correct plural |
| 13 | 12 | Add comma after the word "objective" | Missing punctuation |
| 17 | 16 | Capitalize "O" in the word operation | Need capitalization |
| 17 | 22 | Capitalize "D" in the word Defense | Need capitalization |
| 17 | 22 | Capitalize "D: in the word Department | Need capitalization |
| 20 | 21 | Change word clarified to classified | Incorrect word |
| 28 | 3 | Comma after the word "review" | Missing punctuation |
| 32 | 9 | Delete comma after the word "of" | Incorrect punctuation |
| 33 | 3 | Add ; after the word "about" | Incorrect punctuation |
| 33 | 5 | Add ; after the word "information" | Incorrect punctuation |

| | | | |
|---|---|---|---|
| 33 | 5 | Capitalize the letter S in the word second | Missing capitalization |
| 33 | 12 | Capitalize the letter A in the word Administration | Missing capitalization |
| 39 | 2 | Replace the word "set" with the words "be said" | Incorrect word |
| 45 | 12 | Capitalize the letter O in the word One | Missing capitalization |
| 46 | 18 | Comma after the word "were" | Missing punctuation |
| 47 | 1 | Comma after the word "done" | Missing punctuation |
| 49 | 2 | Comma after the word "the" | Missing punctuation |
| 49 | 3 | Comma after the word "back" | Missing punctuation |
| 50 | 16 | Period after the word "personally" | Missing punctuation |
| 50 | 16 | Capitalize the letter A in and | Missing capitalization |
| 54 | 10 | Comma after the word "training" | Missing punctuation |
| 54 | 11 | Put the word "that" after the word procedures | Missing word |
| 58 | 13 | Delete comma and quotation marks before the word "You" | Extra punctuation |
| 58 | 14-15 | Add quotation marks before the word "are" and after the comma after the word "page" | Missing punctuation |
| 58 | 15 | Delete quotation mark after the word "quote" | Extra punctuation |
| 81 | 12 | Change SNEPP to Snepp | Correct capitalization |
| 81 | 22 | Change SNEPP to Snepp | Correct Capitalization |
| 86 | 3 | Change SNEPP to Snepp | Correct Capitalization |
| 106 | 4 | Change SNEPP to Snepp | Correct Capitalization |
| 106 | 18 | Change SNEPP to Snepp | Correct Capitalization |
| 106 | 22 | Change SNEPP to Snepp | Correct Capitalization |
| 107 | 3 | Change SNEPP to Snepp | Correct Capitalization |
| 107 | 17 | Change SNEPP to Snepp | Correct Capitalization |
| 107 | 22 | Change SNEPP to Snepp | Correct Capitalization |

| 111 | 1 | Add the letter P to the word "republication" | Correct spelling of word |
|-----|---|---|---|
| 111 | 4 | Change SNEPP to Snepp | Correct Capitalization |
| 112 | 10 | Change SNEPP to Snepp | Correct Capitalization |
| 127 | 2 | Change SNEPP to Snepp | Correct Capitalization |
| 129 | 11 | Change the word "discreet" to discrete | Correct spelling of word |
| 130 | 7 | Change the word "discreet" to discrete | Correct spelling of word |
| 140 | 11 | Change the word "related" to the word relayed | Correct word |
| 143 | 7 | Delete apostrophe in the word Appropriations | Correct punctuation |
| 151 | 20 | Change SNEPP to Snepp | Correct Capitalization |
| 152 | 13 | Change SNEPP to Snepp | Correct Capitalization |
| 153 | 11 | Change SNEPP to Snepp | Correct Capitalization |
| 154 | 7 | Change SNEPP to Snepp | Correct Capitalization |
| 155 | 19 | Replace the word "road" with the word row | Incorrect word |
| 161 | 20 | Change the word "their" to there | Correct spelling |
| 166 | 9 | Change the word "call" to cull | Correct word |
| 181 | 3 | Correct spelling of the name Johnson to Johnston | Correct name spelling |
| 182 | 16 | Correct spelling of the name Johnson to Johnston | Correct name spelling |
| 188 | 2 | Change SNEPP to Snepp | Correct Capitalization |

Robert D. Luskin

District of Columbia:ss

Subscribed and sworn to before me this

10ᵗʰ day of February, ~~2016.~~ 2017

Notary Public



ALICIA A. SMITH
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 14, 2021