# EXHIBIT Q

## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF INDIANA
 3   MATTHEW BISSONNETTE,      )
                               )
 4          Plaintiff,         )
                               )
 5          vs.                ) Case No. 1:15-cv-00334
                               )
 6   KEVIN PODLASKI and CARSON )
     BOXBERGER, LLP,           )
 7                             )
            Defendants.        )
 8   _____
 9              ORAL DEPOSITION OF
10                 ALAN ENSLEN
11               JANUARY 24, 2017
12   _____
13
14          ORAL DEPOSITION of ALAN ENSLEN, produced
15   as a witness at the instance of the Defendants, and
16   duly sworn, was taken in the above-styled and
17   numbered cause on the 24th of January, 2017, from
18   10:35 a.m. to 3:03 p.m., before Karen L. Shelton,
19   RDR/CRR/CSR in and for the State of Texas, reported
20   by machine shorthand at the offices of Johnston
21   Tobey Baruch, 3308 Oak Grove Avenue, Dallas, Texas,
22   pursuant to the Federal Rules of Civil Procedure and
23   the provisions stated on the record or attached
24   hereto.
25
```

## Page 2

```
 1            A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4      Mr. Robert Tobey
        Johnston Tobey Baruch
 5      3308 Oak Grove Avenue
        Dallas, Texas 75204
 6      (214) 741-6260
        robert@jtlaw.com
 7
 8   FOR THE DEFENDANTS:
 9      Mr. A. Michael Furman
        Furman Kornfeld & Brennan, LLP
10      61 Broadway
        26th Floor
11      New York, New York 10006
        (212) 867-4100
12      mfurman@fkblaw.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                 I N D E X
 2                                             Page
```
```
 3   Appearances                                 2
 4   ALAN ENSLEN
 5     Examination By Mr. Furman                 4
 6     Examination By Mr. Tobey                128
 7   Signature and Changes                     139
 8   Reporter's Certificate                    141
 9
                E X H I B I T S
10
     No.        Description                    Page
11
     Exhibit 132  Book Entitled "No Easy Day"     7
12
     Exhibit 133  Book Entitled "No Hero"         7
13
     Exhibit 134  Biography of Alan F. Enslen    29
14
15          PREVIOUSLY MARKED EXHIBITS
16   Exhibit 1    ...........................   111
17   Exhibit 24   ...........................    98
18   Exhibit 27   ...........................    97
19   Exhibit 109  ...........................   114
20          INFORMATION REQUESTED
21          Page        Line
22           48           4
23           71           5
24           73          10
25           76           2
```

## Page 4

```
 1            ALAN ENSLEN,
 2   having been first duly sworn, testified as follows:
 3            E X A M I N A T I O N
 4   BY MR. FURMAN:
 5      Q.  Good morning, Mr. Enslen.
 6      A.  Hi, Mark.  How are you?
 7      Q.  It's Mike, but you can call me Mark.
 8      A.  I'm sorry.
 9      Q.  You can call me anything you like as long
10   as you're not calling me late for dinner.
11      A.  Please call me Alan.
12      Q.  Okay.  Mr. Enslen, I know you know these
13   rules, but before we begin, just a couple of
14   reminders, first that please keep your answers
15   verbal.  The reporter, as you know, is taking down
16   every word that we exchange.  And also, if you could
17   wait until my question is over and then you can
18   respond and we don't talk over each other.  That's
19   essentially the ground rules.  Do you understand?
20      A.  Yes.
21      Q.  Mr. Enslen, could you just let me know
22   what you did to prepare for this deposition today.
23      A.  I met briefly yesterday with Mr. Johnston
24   and Mr. Tobey and reviewed some of the documents
25   that I anticipate are going to come up today,
```



Page 5

1  including documents related to the No Hero
2  prepublication security review.
3      Q.   I want to get to the documents in a
4  moment.  Have you been compensated for your time
5  yesterday and today?
6      A.   No.
7      Q.   Do you plan to be compensated for your
8  time yesterday and today?
9      A.   I anticipate being reimbursed for
10  expenses, for out-of-pocket expenses but not for
11  time.
12      Q.   Are you keeping time in connection with
13  your preparation and your deposition today?
14      A.   Yes.  I mean, I'm aware of what the time
15  is going into, I'm just not billing for it.
16      Q.   Do you anticipate billing at any point?
17      A.   No.
18      Q.   Is there a particular reason why you're
19  not doing that?
20      A.   I think Matt has paid enough money to
21  lawyers and, frankly, trying to -- trying to help
22  him out a little bit.  It's -- you know, we could
23  revisit that issue if it became otherwise, but right
24  now just trying to, you know, just to do this on a
25  pro bono basis.

Page 6

1      Q.   When you refer to Matt, you're obviously
2  referring to Mr. Bissonnette?
3      A.   Mr. Bissonnette, yes.
4      Q.   Understood.  Now, let me know what
5  documents you reviewed in preparation for your
6  deposition today.
7      A.   Again, it was the documents that I
8  provided pursuant to the discovery request earlier
9  in the case.  I briefly looked over those.  I looked
10  at a few documents that I believe you had designated
11  as being at issue today or that you wanted to talk
12  about today.  I looked over those.  I looked over
13  some of the pleadings in this case.  That's
14  predominantly what I looked at.
15      Q.   How much time did you spend doing that?
16      A.   Looking at documents alone?
17      Q.   Yeah.
18      A.   Three hours.
19      Q.   And how much time did you spend speaking
20  with Mr. Johnston and Mr. Tobey?
21      A.   I think we met for close to three hours,
22  maybe a little less than that.
23      Q.   Now, you mentioned documents that were
24  provided in connection with discovery requests.  Can
25  you just give me a description of what those

Page 7

1  documents were?
2      A.   Yeah, they were really all related to the
3  prepublication security review for the manuscript he
4  wrote.
5          MR. FURMAN:  Because we're going to refer
6  to the two books in this deposition, and I'm
7  speaking to Mr. Tobey, I realized that we didn't
8  mark them as exhibits.  I'm going to do that just so
9  that we have them in the record.
10          MR. TOBEY:  Sure.
11          MR. FURMAN:  So these are my two copies.
12  I don't think that they were marked up in any
13  particular way when I read them.  I just want to
14  make sure there's no -- nothing in them that's mine.
15  But these are my books that I bought off of Amazon.
16          So the first one I'd like to mark is the
17  book No Easy Day.  That would be Exhibit 132.  And
18  the exhibit after that would be book No Hero.  It
19  would be Exhibit 133.
20          (Exhibits 132 and 133 marked)
21  BY MR. FURMAN:
22      Q.   I'm going to show you what's been marked
23  as Exhibit 132 and Exhibit 133.  Just let me know if
24  you have seen these two books before.
25      A.   Yes.

Page 8

1      Q.   And did you read them both?
2      A.   Yes.
3      Q.   You assisted Mr. Bissonnette in connection
4  with No Hero, which is Exhibit 133?
5      A.   That's correct.
6      Q.   Did you have any involvement with No Easy
7  Day in terms of its publication?
8      A.   No, I did not.
9      Q.   Okay.  But you had read No Easy Day before
10  or during the time that you worked with
11  Mr. Bissonnette on No Hero?
12      A.   I actually read No Easy Day prior to ever
13  meeting Mr. Bissonnette, just out of interest, so I
14  was familiar with the book.
15      Q.   How did you first learn about the book?
16      A.   I'm a member of the special operations
17  community myself from military service, so this was
18  widely known and anticipated as soon as it came out.
19  So, you know, it was just out of my interest through
20  the military channels.
21      Q.   Did you hear about the book before it was
22  published?
23      A.   I don't recall if I heard about it before
24  it was published.  I just was -- you know, sometime
25  probably shortly after it came out, I was aware of



Page 9

1   it because it was, you know, widely talked about
2   within the channels of, you know, special operations
3   personnel.  It's a fairly tight community, so --
4       Q.   Do you know Kevin Podlaski?
5       A.   I do not.
6       Q.   Have you ever met him?
7       A.   I have not.
8       Q.   Have you ever heard of him before?
9       A.   I have heard of him now, but I had not
10  heard of him before anything related to, you know,
11  the No Easy Day issues.
12      Q.   You're currently a partner at Maynard
13  Cooper Cale?
14      A.   Maynard Cooper and Gale.
15      Q.   And Gale.
16      A.   Uh-huh.
17      Q.   And where is that law firm located?
18      A.   Headquartered in Birmingham, Alabama.
19      Q.   And how long have you been a partner or
20  shareholder at that law firm?
21      A.   Give me a second to do the math.  Eleven
22  years.
23      Q.   So I want to get a short biography of you.
24  Could you tell me the year that you graduated law
25  school and what bars you are admitted to?

Page 10

1       A.   Sure.  Graduated law school from
2   University of Alabama Law School in 1997 and took
3   the bar.  Was admitted in Alabama shortly
4   afterwards.  Then actually went and did an LL.M. in
5   international trade law at Georgetown University in
6   Washington, D.C., for a year and then returned to
7   Birmingham and started as an associate at Maynard
8   Cooper in 1998.  And I believe it was during that
9   year that I was also admitted to the D.C. bar, and
10  those remain the only two bars that I'm, you know,
11  that I'm a member of.
12      Q.   Have you served in the military?
13      A.   Yes.
14      Q.   Can you give me some details about your
15  military service?
16      A.   Sure.  I was an ROTC student at Auburn
17  University and graduated, was given a regular Army
18  commission in 1986.  And then served on active duty
19  from 1986 until 1994, first as an infantry officer
20  and then as a special forces officer.
21       And then exited military service in 1994,
22  became a Alabama national guardsman at that time,
23  serving in the reserve component during law school,
24  and then continued to serve as a national guardsman
25  until early 2001.

Page 11

1       Transferred to the Army Reserve at U.S.
2   Special Operations Command in 2001, I think it was
3   February.  Then later that year, right after 9/11
4   occurred, was recalled to active duty and spent
5   roughly a year and a half back on active duty.
6       Q.   Where did you serve during your time on
7   active duty?
8       A.   On Operation Enduring Freedom.
9       Q.   Were you abroad or here?
10      A.   No, I was deployed.  There were multiple
11  deployments, so it's --
12      Q.   So you were in -- Operation Freedom was
13  Iraq?
14      A.   No.
15      Q.   That was --
16      A.   Operation Enduring Freedom was
17  Afghanistan.
18      Q.   Afghanistan.  Okay.
19      A.   But it's also that region, so there were
20  deployment sites throughout the region.
21      Q.   What was your job?
22      A.   I was an Army special forces officer
23  assigned specifically to Special Operations Command
24  Central during that time.
25      Q.   Who reported to you?

Page 12

1       A.   I'm sorry?
2       Q.   Who reported to you?  What kind of -- what
3   was the chain of command and where did you fit in
4   it?  I just want to get an idea of it.
5       A.   Well, I worked for the commander of
6   Special Operations Command Central is the best way
7   to put it.  And it was -- particularly in those
8   days, you know, the early part of the deployment,
9   there were -- I'm thinking how to describe it --
10  emerging assignments, so, as a joint special forces
11  officer, joint special operations officer, so I
12  could just give you a general sense.
13       I mean, it was -- at the time when the
14  Special Operations Command was locating forward in
15  preparation for the initial operations in
16  Afghanistan, there were, you know, multiple tasks to
17  be done at that time.  And so it was related to
18  that.
19       And as different projects emerged, members
20  of Special Operations Command Central would, you
21  know, form, you know, teams, if you will, not
22  necessarily what they were always called, but, you
23  know, to accomplish certain missions.  And so at
24  that time I deployed probably to, I don't know,
25  seven or eight countries in that region.



ALAN ENSLEN
MATTHEW BISSONNETTE vs KEVIN PODLASKI

January 24, 2017
13—16

Page 13

1    Q.  So was it combat missions?  You weren't
2   performing legal work then at that time.
3    A.  No, I am not a JAG officer, so I am not.
4   Like I said, I had started as an infantry officer,
5   became a Special Forces officer.  So throughout the
6   rest of my career, my branch in the Army was Special
7   Forces.  As you may know, within the Army, unlike
8   the other services, the Army is your branch but then
9   you have something called your branch, you know,
10   within that.
11        And so, for example, infantry, armor,
12   artillery, you know, special forces, aviation,
13   things like that.  So I was a special forces
14   officer, and so found myself at Special Operations
15   Command Central, SOCCENT as it's called.  That's
16   S-O-C-C-E-N-T, all caps.  There -- it's a joint
17   command, so it's Army, Navy, Air Force, Marines, and
18   so it was -- the way I'm portraying it sounds like
19   it's disorganized, but it actually isn't.  You have
20   a joint team that's put together for whatever the
21   mission is, and at that time there were a lot of
22   emerging tasks going on.  So some were more, you
23   know, combative than others would be one way to put
24   it.  It did include Afghanistan, you know, included
25   a lot of other countries there within the region,

Page 14

1   depending on what the task was at the time.  And
2   deployments were back and forth because there were
3   different things going on in the initial stages of
4   Enduring Freedom.
5    Q.  When did that deployment come to an end?
6    A.  I returned, would say, November 2002,
7   somewhere around there.
8    Q.  And did your military career come to an
9   end as far as active duty at that point?
10    A.  No.  Well, yes, as far as active duty,
11   that was -- I had stints of active duty after that,
12   but they were more what would be called TDY or
13   temporary duty rather than actually going back on
14   active duty.  So you're serving in an active status
15   but you're not back on the active rolls.  You're
16   doing it as a reservist, that kind of thing, so --
17        Then I continued, just for completion
18   here, I continued as a reserve officer serving at
19   U.S. Special Operations Command, again as a special
20   forces officer, not -- I've never been a JAG.  I've
21   never been -- you know, I get drug into legal things
22   sometimes because of my civilian side and what I do
23   there on occasion, but I'm not a JAG officer.  So
24   continued serving at USSOCOM up until 2014 and then
25   in 2014 finally retired, so that's --

Page 15

1    Q.  What was your rank at the time of your
2   retirement?
3    A.  Lieutenant colonel.  And I should say also
4   just, you know, for completeness and for the
5   record's sake, at the time of my 9/11 -- I know we
6   started on my legal career first at Maynard Cooper.
7   I actually left Maynard Cooper in 2000 and moved to
8   Washington, D.C., to practice international trade
9   law because, as I mentioned, I had gotten the LL.M.
10   in international trade at Georgetown.  So I was
11   actually living in D.C. practicing with a different
12   firm.  I just wanted to make sure that -- you know,
13   I haven't been at Maynard Cooper continuous all
14   through.
15        And so I was actually practicing at a law
16   firm, King & Spalding, in Washington, D.C., in their
17   international trade group when September 11th
18   occurred when I got recalled to active duty.  And
19   then when I returned from that active duty stint, I
20   went back to King & Spalding and then still
21   practiced in D.C. until the traffic finally drove me
22   away from D.C. and back to Alabama.  And that's when
23   I returned to Maynard Cooper.
24    Q.  What year did you return back to Maynard
25   Cooper?

Page 16

1    A.  It was late 2003.
2    Q.  What -- if you were to describe your
3   day-to-day practice, how would you describe it, what
4   areas of law?
5    A.  My practice is focused on international
6   trade.  And, you know, if I was going to say one
7   thing broader, international trade and global
8   anticorruption, predominantly U.S. export controls,
9   you know, defense exports and then commercial dual
10   use exports, economic sanctions programs that the
11   U.S., you know, Government maintains.
12        And then global anticorruption, U.S.
13   Foreign Corrupt Practices Act, UK Bribery Act,
14   things that U.S. businesses, you know, run into
15   basically in doing business overseas.  My practice
16   is focused, I would say, about half on the defense
17   industry, maybe a little bit more than half, so I
18   work with a lot of, you know, defense contractors,
19   government contractors.  But, you know,
20   predominantly the common thread is there is an
21   international or international trade tie to all the
22   clients that I do work for.
23    Q.  Have you ever been deemed an expert in
24   court on any particular topic?
25    A.  No, I have not.



Page 17

1    Q.   Have you ever prepared an expert report
2    for any particular legal matter?
3    A.   No.
4    Q.   Have you prepared an expert report in
5    connection with this matter?
6    A.   No.
7    Q.   In the course of your military career,
8    have you ever signed a classified information
9    nondisclosure agreement or otherwise known as a
10   CINA, C-I-N-A?
11   A.   Yes.
12   Q.   On how many occasions have you done that?
13   A.   I won't be able to come up with an exact
14   answer because essentially you -- those are -- when
15   you have a permanent change of station, you'll often
16   have to reexecute those documents.  But the
17   classified information nondisclosure statement, the
18   first one I signed, probably signed one as a cadet,
19   ROTC cadet at Auburn, because there was a background
20   investigation that was done there, although no
21   classified information was shown at that time.
22        But 1986 would be the first time that at
23   Fort Bragg, my first assignment was at -- well, let
24   me back up.  Actual first assignment was on the
25   training side at Fort Benning, Georgia.  I'm sure I

Page 18

1    signed one there in 1986.  And then in early 1987
2    upon in-processing 82nd Airborne Division at
3    Fort Bragg as an infantry officer, upon
4    in-processing at Fort Bragg into the 82nd Airborne
5    Division, I would have signed one there.
6        And, you know, again, the tendency is that
7    you would reexecute one of those documents on
8    in-processing in most units.  You know, that tended
9    to be the way it was.  Even though it's a bit
10   redundant, they would want to make sure they had
11   that paperwork in place.  So over my entire career,
12   is that your question, how many times would I have
13   done that?
14   Q.   Yeah.  I don't need an exact number.  Is
15   it more than five, more than ten?
16   A.   It's probably been close to ten, I would
17   say.
18   Q.   What's the process when you signed it?  Is
19   there a formality that's attached to it?
20   A.   You just read it, sign it, because it's,
21   you know, it's really putting you on notice of your
22   obligations on what the standards are and -- but
23   otherwise, there's -- different units will have
24   different, you know, ways of doing it.  Sometimes
25   it's just merely almost a formality like other

Page 19

1    paperwork that's filled out.  Sometimes it's, you
2    know, it's more of a -- I wouldn't say a big deal,
3    but it would be, you know, more isolated as an
4    incident.  Just really depends on administratively
5    how it's put in front of you.
6        And sometimes if you're in-processing into
7    a unit, you know, it's going to be a little bit
8    different than if you're going into a school or
9    something like that, into a training for the next
10   six months or something like that, then, you know --
11   you know, if you're in a classroom of 110 other
12   people, you know, they just hand out the forms and
13   people are signing them and that kind of thing.  But
14   you're always given a chance to review it to make
15   sure that you understand what the obligations are
16   and take it seriously.
17   Q.   How about what's known as a nondisclosure
18   compartmentalized -- sorry.  Take it back.  An SCI
19   nondisclosure agreement, S-C-I capitals,
20   nondisclosure agreement, otherwise known as a
21   DD-1847?  Are you familiar with that?
22   A.   Yes, I am.  Now, I will say that I'm not
23   certain that DD-1847 was used the first time I
24   signed one of those, but there has always been some
25   form of a -- what I know of as a sensitive

Page 20

1    compartmented information nondisclosure statement, I
2    think is usually what they say rather than
3    agreement, but essentially the same type of thing,
4    similar to the CINA that we just talked about except
5    this is for SCI.  This one is taken significantly
6    more seriously, as you would anticipate, because for
7    someone to be executing one of those, that means
8    that they are being put into an SCI billet.  In
9    other words, you know, clearance is one thing and
10   access is another, as I'm sure you know when it
11   comes to classification.  So I am familiar with one
12   of those documents.
13   Q.   Have you ever had occasion to sign one?
14   A.   Yes.
15   Q.   On how many occasions?
16   A.   It would be very similar to the amount of
17   times that I signed the CINA.  I started -- I signed
18   into an SCI billet for the first time in 1986.  So
19   that's the first time.  Again, I don't remember if
20   it was a DD-1847 or not, but that's the first time I
21   signed an SCI nondisclosure statement.  And that
22   would be -- those are done proximate to what's
23   referred to in the field as a read-on.  If you're
24   being read on for SCI, then you're going to execute
25   one of those documents.



Page 21

1    Q.   Now, let me know if I am stating this
2  correctly, but in order to be read on to an SCI,
3  you'd have to have certain clearances, correct?
4    A.   Correct.
5    Q.   And what kind of clearances do you have to
6  have in order to be read on to an SCI program?
7    A.   To my knowledge, the -- and in my
8  experience you have to have a top secret clearance
9  in order to be granted SCI access.  And, you know,
10  my further understanding is the basis for that is
11  the type of security investigation that is done.
12  You know, for example, sometimes people will have a
13  background investigation that's done on them, what's
14  termed a BI, all caps, that will allow you to get a
15  certain level of clearance.
16       You know, you can't -- to my knowledge,
17  you cannot be granted a top secret clearance based
18  on a BI.  Something is required.  A different kind
19  of investigation, a more in-depth investigation is
20  required, you know, a sensitive background
21  investigation usually or a special background
22  investigation.  I've heard both terms used.  But
23  what's termed in the field as an SBI is usually the
24  investigation that's necessary.
25       So there is an interrelationship between,

Page 22

1  you know, the investigation, the clearance, and then
2  again there's a question of access when you start
3  talking about SCI.
4    Q.   Have you been given top secret clearance?
5    A.   Yes.
6    Q.   When did that first happen?
7    A.   1986.
8    Q.   When you're read on a program, is there --
9  without obviously giving me any information about
10  the programs themselves, what's the process?
11    A.   It depends on the program.  The -- and I'm
12  not trying to be -- you know, truly that's the most
13  accurate answer there is because some are more
14  in-depth than others.  Some require more.  Some
15  have -- some programs have, you know, requirements
16  that go along with them, you know, levels of
17  understanding that would be necessary to, you know,
18  to manage and execute the operations within the
19  program.  So there's not a standard answer, but --
20    Q.   I understand.  Also, I'll narrow the
21  question down.  Have you been involved ever in a
22  CIA SAP program?
23    A.   I'm going to defer -- I'm actually -- I'm
24  going to -- I'm not going to be able to answer that
25  question.

Page 23

1    Q.   Okay.  And is that because of certain
2  obligations that you have that you can't answer that
3  question?
4    A.   That's correct.
5    Q.   Understood.  Now, in connection with a
6  CIA SAP program, is there, to your knowledge, any
7  kind of specific process by which you're read on to
8  the program?
9    A.   To make sure I understand, you're asking
10  specifically about a CIA program as opposed to a DOD
11  or other agency --
12    Q.   Correct.
13    A.   -- program?  I don't know.  And I will --
14  to give more context to my answer is that
15  particularly in the world, in the time of
16  interagency operations, the joint interagency task
17  force concept which was -- really gained a lot of
18  traction after 9/11 and, you know, very commonly has
19  been, you know, embraced within Operation Enduring
20  Freedom, Operation Iraqi Freedom and the things that
21  have occurred since then, you know, different
22  organizations working together, you know, commonly
23  happens.
24       In my experience on the DOD side, which is
25  probably the closest relevance I can bring to your

Page 24

1  question, to gain access to a program, you would be
2  read on to that program.  Whether a particular
3  program could involve multiple agencies is another
4  issue.
5    Q.   So let's take a DOD SAP program.  What's
6  the process by which you're read on?
7    A.   Normally the read-on is going to be done
8  by what's termed, all caps, SSO, a special security
9  officer.  That's going to be at an installation.
10  For example, every military installation that, you
11  know, maintains a -- usually you'll hear the term
12  also SCIF.  A lot of acronyms.  All caps S-C-I-F.
13       If an installation maintains a sensitive
14  compartmented information facility, which is
15  obviously something that would, you know, be able to
16  store sensitive compartmented information, there's
17  going to be a responsible SSO involved.
18       And again, different commands will do it
19  different ways because, again, some units might be
20  all one service and they do it that service's way.
21  Other units are joint and therefore are going to --
22  may do it a slightly different way.  But within DOD
23  channels, I'm not aware of any, you know, situation
24  where you would gain access to a program without
25  being read on.



Page 25

1    Q.   Is that a memorable event, being read on?
2    A.   It probably is the first time, but if
3  you're accustomed to always having, you know, a top
4  secret clearance, for example, you're always in an
5  SCI billet, then it becomes fairly routine.
6        I mean, I think everyone knows it's a, you
7  know, it's a serious obligation because it's, you
8  know, it's information that's protected at a very
9  high level and has to be respected as such.  So I've
10  never seen anyone be cavalier about it, but it's,
11  you know, it's also part of the administration and,
12  you know, what you would expect, you know, when
13  in-processing.
14        And that's typically when it's done, when
15  someone would come into a unit.  You know, again,
16  SCI billets are not just thrown out there, you know,
17  at a whim.  They are, you know, they are assigned at
18  particular, you know, particular units, particular
19  slots within units and that types of thing.
20        Within the special operations community,
21  as you would expect, you have quite a few SCI
22  billets within units.  So, read-ons, read-offs
23  become, you know, not uncommon at all.
24    Q.   What do you mean by billets?  Are you
25  referring to people or information when you refer to

Page 26

1  billets?
2    A.   A billet really is -- and again, this
3  is -- I'm not explaining this from the -- I'm not an
4  administrative, you know, administration is not my
5  branch within the Army, so -- but I've had to deal
6  with a lot of it.  So a billet really is more
7  assigned to the position.  And that's how, in my
8  experience, how SCI is assigned is that -- in other
9  words, you might hear someone say they have a top
10  secret clearance.  You know, that means one thing.
11  Somebody with a top secret clearance that has SCI
12  access, that's an entirely another thing.  That's a
13  different thing.
14        Because the -- you can hold the clearance
15  based on the background investigation, the level of
16  investigation that you have, and there are multiple
17  varying levels.  And you may still have that
18  clearance that would travel with you from one unit
19  to the other, but it's very possible that you may be
20  at one unit and you are in a position that requires
21  you to have access to SCI and so you would be read
22  on, you know, because you would be filling an SCI
23  billet.  In other words, it would be assigned to
24  that position.
25        And it's possible you could go to another

Page 27

1  unit that doesn't require SCI.  A good example is if
2  somebody goes to a training assignment or something
3  like that where they're an instructor or something,
4  you know, like that as opposed to being in an
5  operational unit, that would typically be a time.
6  You may still have -- be in an SCI billet, but it
7  would probably be fewer billets and fewer need for
8  it, as you can understand, in that role.
9        So in that way some people are read on,
10  read off.  But generally I'll say in my experience
11  within the special operations community it's, you
12  know, it's frequent and common in, you know, in
13  operational assignments to be in those billets.
14    Q.   Now, are you familiar with Operation
15  Neptune Spear?
16    A.   Yes.
17    Q.   In your mind would Operation Neptune Spear
18  have been considered an SCI billet as you described?
19    A.   Well, I wouldn't -- I wouldn't phrase it
20  that way, with all due respect.  I mean, it's --
21    Q.   That's okay.  I want to know how you would
22  phrase it.
23    A.   Sure.  Well, the billet is assigned to the
24  position within a given unit.
25    Q.   Okay.

Page 28

1    A.   So whether a unit is -- you know, it's
2  just an entirely different thing from a, you know,
3  operation.  Operations are done all the time and,
4  you know, may involve, you know, or be related to,
5  you know, information, things that are SCI
6  potentially.  It's not necessary that an operation
7  in and of itself would be a program, although that's
8  possible.  You know, it's -- that's -- they're
9  not -- I'm sure there are hard and fast rules.  I'm
10  not aware of exactly, you know, what constitutes
11  becoming a program.  I have some ideas, but I don't
12  know that -- it's just a matter of, you know, how
13  things are done.
14        I think I see -- I would say I wouldn't
15  make the assumption that -- I don't know whether
16  Neptune Spear was in and of itself a separate
17  program or not.  I don't have that level.  My level
18  of understanding and knowledge of Neptune Spear is
19  purely as a -- really as a -- in my civilian
20  capacity reading the book and seeing the same, you
21  know, press on it and things like that that you have
22  probably, so --
23    Q.   Then based on your experience, I
24  understand that you would not know or have access to
25  information directly involving Operation Neptune



ALAN ENSLEN
MATTHEW BISSONNETTE vs KEVIN PODLASKI

Page 29

1  Spear, but based on your experience, would you -- do
2  you have a view as to whether or not Operation
3  Neptune Spear was a special access program?
4        MR. TOBEY:  Objection.  Form.
5     A.  I really don't have enough basis in the
6  actual -- since I wasn't involved in the operation,
7  I don't know.  Like I said, operations are done all
8  the time that you, know, some of them necessarily
9  may involve, you know, SCI but not necessarily as a
10  separate program, although I'm sure it could be.  I
11  just -- I just don't know.
12        MR. FURMAN:  I took a bit of your
13  biography off of the Maynard Cooper Gale website, so
14  I'd like to have it marked as an exhibit.  It will
15  be Exhibit 134.
16        (Exhibit 134 marked)
17  BY MR. FURMAN:
18     Q.  Mr. Enslen, I'll represent to you that
19  this is fairly recent that we pulled this
20  information off of the website.  Just want you to
21  take a look at it and let me know if it's current or
22  it would have to be changed in any particular way.
23     A.  At quick glance, it looks to be current,
24  although I can tell you it's on my to-do list to
25  revise it because the substance of it could be

Page 30

1  updated.  But by and large it looks to reflect my
2  practice and background correctly.
3     Q.  Okay.  If I can just have it back.  I'm
4  not going to quiz you on it, but my review of the
5  practice areas, you generally would list the
6  practice areas that you are involved in day to day,
7  generally, in terms of practice areas?
8     A.  Our marketing department probably would do
9  that.  Yes, it's -- the practice's -- the way we are
10  organized as a firm, there is a lot of overlap on
11  matters.  So, for example, I'm sure white collar
12  defense may be on there.  I don't spend every day
13  doing that, but there are a lot of export control
14  sanctions matters that, for example, would overlap
15  with white collar defense.  So, you know, we work
16  together quite a bit, for example.
17        Same thing with, you know, international
18  business, M&A folks, or different practice areas.
19  So that's a broader practice list.  If you're
20  looking at it from the terms of what I actually do
21  on a day-to-day basis, you know, international
22  trade, you know, and global anticorruption would be,
23  like I said, the focus.
24     Q.  Did you know Matthew Bissonnette before
25  you undertook to represent him?

Page 31

1     A.  No.
2     Q.  When did you begin representing Matthew
3  Bissonnette?
4     A.  My recollection, the first call -- I know
5  because it's my wife's birthday -- was the 12th of
6  September of 2013 was the first time that we spoke.
7  I believe the engagement with Maynard Cooper, you
8  know, may have officially occurred, you know, by,
9  you know, maybe a week or two before, sometime
10  within the prior month but sometime proximate to
11  September 2013.
12     Q.  How do you recall that you met
13  Mr. Bissonnette?
14     A.  Through one of my partners at the firm
15  became aware of him.  And, you know, again, I'm not
16  sure exactly what led to their meeting, but I know I
17  was asked by my partner, you know, can you help
18  with -- you know, have you ever done, worked with
19  the Defense Office of Prepublication and Security
20  Review, to which I replied yes, that I had.
21        And so from that my, you know, my
22  engagement or my task that I worked on with Matt was
23  to help with the prepublication security review
24  process for his forthcoming book which, again,
25  became the manuscript for the book known as No Hero.

Page 32

1     Q.  Who was the partner?  What's the name of
2  the partner?
3     A.  Andrew Kitchen.
4     Q.  And do you know how Mr. Kitchen came to
5  connect with Mr. Bissonnette?
6     A.  I believe it was through Cheney Literary
7  and Elyse Cheney.
8     Q.  Now, you mentioned the Office of
9  Prepublication Security and Review?  Is that
10  correct?
11     A.  Their wordy title is Defense Office of
12  Prepublication and Security Review, so they're also
13  called DOPSR.  Or you will see in some of my
14  correspondence OSR, referring to the same entity.
15  And they like to call themselves DOPSR.
16     Q.  Okay.  So it's DOPSR?
17     A.  Correct.
18     Q.  I've also seen it referred to as OPSR.  Is
19  that the same unit?
20     A.  I would assume that's Office of
21  Prepublication and Security Review.  I would -- if
22  you're talking in the DOD context, because you do
23  realize, as you know, other agencies have a similar
24  type of office and may use that same title, but
25  within DOD I think that would be referring to the



ALAN ENSLEN
MATTHEW BISSONNETTE vs KEVIN PODLASKI

January 24, 2017
33–36

Page 33

1  same one.
2      Q.  To your knowledge, does the CIA have a
3  prepublication security review process?
4      A.  Yes.
5      Q.  Do they have an acronym or an office that
6  handles that?
7      A.  They have an office that handles it.  I'm
8  not sure what the acronym is.
9      Q.  Have you ever dealt with them?
10     A.  I have not dealt with them directly.
11     Q.  Now, the DO -- the Department of Defense's
12  office, the DOPSR, you've dealt with them in the
13  past?
14     A.  Yes.
15     Q.  Where is that office located?
16     A.  It's in the Pentagon.
17     Q.  How is it staffed?
18     A.  I'm sorry.  What do you mean?
19     Q.  In other words, is there one person, three
20  people, five people?  What's the -- what's that
21  office comprised of?
22     A.  Based on my understanding, with the caveat
23  that I've not dealt with all aspects of it, it's
24  more than one person I can tell you.  It is an
25  office that is -- that has multiple roles.  I

Page 34

1  know -- for example, I know they have a
2  congressional budget review responsibility.  They
3  have, you know, different areas.  They do things
4  other than just review, you know, review books,
5  review manuscripts and things like that.
6          They have the function to also review
7  things, you know, that are from active service
8  members that are, for example, making presentations
9  or publishing things and like that, you know, within
10  other journals and things like that.  So it's not
11  just a, you know, not just in the context of a
12  private author's review.
13         But again, I do know the congressional
14  budget aspect, and I think they have a technology
15  branch who I've come in contact with also just in
16  the export control context because sometimes there
17  are different overlapping issues between the State
18  Department's Directorate of Defense Trade Controls
19  and the Defense Office of Prepublication and
20  Security Review.  So they have a technical branch.
21  I'm not sure how many different branches they have.
22  Again, I know technical.  I know congressional
23  review.
24         And then as far as the numbers of people,
25  I don't know.  I will say that in my experience

Page 35

1  they're typically overworked and understaffed, like
2  many organizations there.
3      Q.  That depends on your point of view.
4      A.  Yeah.
5      Q.  Tell me about your prior experience before
6  the book No Hero with the DOPSR.
7      A.  I had, I would estimate, two or three
8  times that I had to interface with them over export
9  control related issues for different clients.  And
10  again, without getting into specifics of those
11  issues, it would be generally situations where an
12  export control jurisdiction classification decision
13  would hinge upon the interpretation of the Defense
14  Office of Prepublication and Security Review, or at
15  least they would have significant input to a
16  jurisdiction classification issue that we were
17  trying to resolve.  And so I contacted them and had
18  dealings with them, various roles relating to that.
19     Q.  Did either -- you mentioned that it was
20  either two or three occasions prior to your work on
21  No Hero that you had dealt with the DOPSR, correct?
22     A.  Correct.
23     Q.  Did any of those occasions involve the
24  publication of a book?
25     A.  Not of a book, no.

Page 36

1      Q.  So was your involvement in the book
2  No Hero, was that the first time that you had
3  interfaced with the DOPSR in relation to the
4  publication of a book?
5      A.  Yes.
6      Q.  Who with the DOPSR did you deal with in
7  connection with No Hero?
8      A.  My first call -- let me think about it
9  because there are multiple individuals there.  I
10  believe it was Mr. Wally King is who I first called,
11  K-I-N-G, to really find out which branch would be
12  taking responsibility, you know, for manuscript
13  review, and then also to clarify one issue that, you
14  know, one threshold issue, which was that the DOD
15  directive and instruction, which I'm sure you're
16  familiar with, that relate to prepublication
17  security reviews, and then some internal DOPSR, you
18  know, guidance on, you know, how to file, you know,
19  how to file for a prepublication security review,
20  things like that that they had as tools to help
21  people proceed with manuscript reviews.
22         There was a little discrepancy where I
23  will say there was an inconsistency as to what entry
24  point do you want to use for this.  And really what
25  I'm specifying is that in my mind it was ambiguous



ALAN ENSLEN
MATTHEW BISSONNETTE vs KEVIN PODLASKI

January 24, 2017
37–40

Page 37

1  as to whether they wanted the manuscript submitted
2  at the component or command or agency that, you
3  know, had last employed the individual, because,
4  again, we're talking in the context of a former
5  service member, you know, in terms of the review,
6  and -- or to submit it to DOPSR directly.  And so
7  that was my first entry point was to try to resolve
8  that.
9      Q.  At the time that you -- well, let me just
10  follow up on that.  Did you eventually resolve that
11  issue --
12     A.  Yes.
13     Q.  -- as to what the entry point was?
14     A.  Yes.
15     Q.  And how did you reach a landing on that?
16     A.  Well, after asking the question, I -- you
17  know, we went forward with based on that guidance.
18  And then, of course, that guidance actually got
19  changed.  Then later we wound up submitting it to
20  both, because my concern was because of all the
21  baggage that was still there and still existing from
22  the No Easy Day, you know, experience, which I was
23  not involved with, obviously, but I was aware that
24  things were going on and that, you know, I could
25  certainly see that, you know, anticipate that it was

Page 38

1  going to have effects on what we were about to do
2  for No Hero.
3          I wanted to make sure that it went into
4  the right entry point because, again, the procedures
5  were changing, and they admitted that.  I mean,
6  SOCOM were changing their prepublication review
7  procedures because I know they were getting flooded
8  with books all of a sudden, you know.  I wouldn't
9  say all of a sudden actually.  During that period of
10  time, you know, a lot of people that had been
11  serving in OEF, OIF, and different operations were
12  writing books, so they just had a lot of
13  manuscripts.  So they were in the process of
14  revising their guidelines.  OSR was trying to revise
15  their guidelines.
16         So it was really nothing more than just
17  trying to administratively make sure that we didn't
18  allow this manuscript to, you know, land in a place
19  where it could, you know, be delayed or, you know,
20  run into an unnecessary road block.
21     Q.  And in your prior answer you mentioned
22  during -- you referenced, quote, during that time
23  period, close quote.  Are you referring to the time
24  period around the publication of No Easy Day?
25     A.  Well, in the context of saying the reason

Page 39

1  they were rewriting their regs was because they were
2  getting flooded with manuscripts, if that's -- if
3  that's what you're referring to, yeah, I'm talking
4  about, you know, as OEF, OIF, which had both been
5  underway for a number of years at that point, had a
6  lot of veterans that were writing books, and so my
7  understanding is every single year they were getting
8  more and more manuscripts from service members.
9          So, again, I realize that it was, you
10  know, there was quite a bit of workload in that
11  area.  So that, A, was understandable to me as to
12  why they would be revising their regs and, B, made
13  me realize I wanted to make sure that we did it the
14  most efficient way possible.
15     Q.  I understand.  I just want to know what
16  time period you're referring to that the regs were
17  being revised.
18     A.  Well, the specific time that I was having
19  these conversations would have been December 2013
20  and into January of 2014.
21     Q.  At the time that you submitted No Hero for
22  review, did you have any idea of the time period it
23  would take for the book to be -- for the security
24  review to be completed?
25     A.  Well, I was aware of their guidelines,

Page 40

1  which you can find in some guidelines 30 working
2  days.  I believe you can also find, you know, 45
3  days, unspecified whether working or not.  So I knew
4  that was kind of a target time, but I was also, you
5  know, anticipating -- you know, I was anticipating
6  and, you know, frankly concerned about, you know,
7  the spillover effect from No Easy Day and making
8  sure that that did not in any way, you know,
9  prejudice the process for No Hero.  That really was
10  my, you know, was my focal point.
11     Q.  Since working with Mr. Bissonnette on
12  No Hero in connection with the review process, have
13  you assisted other military authors since that time?
14     A.  Yes.
15     Q.  On how many occasions?
16     A.  Two.
17     Q.  What books?
18     A.  They're not released yet, so they're both
19  through the process but have not -- have not been
20  published, so I don't want to talk about ongoing --
21  I can't talk about ongoing client matters.
22     Q.  That's totally fine.  I won't ask you any
23  specifics, but could you tell me when those two
24  books were submitted to the DOPSR?
25     A.  I'll have to think, this being off the top

Page 41

1  of my head.  I really would like to go -- I might be
2  able to even check, you know, on my system at the
3  next break or something like that and even try to
4  come up with date parameters because I don't want
5  to -- I don't want to give you incorrect answers,
6  but it was definitely after No Hero was -- that we
7  were complete with not only the initial manuscript
8  review but also the appeal, and it was subsequent to
9  the time that No Hero was published.  I realize -- I
10  remember that.
11      Q.   Do you remember what year those two books
12  were --
13      A.   Yes, the next one would have been filed in
14  2015, in mid-2015.
15      Q.   And at this point it has not yet been
16  published?
17      A.   No, it has not.  It's forthcoming soon,
18  but --
19      Q.   Okay.  Has it been through the review
20  process?
21      A.   Yes, it has.
22      Q.   When did the review process -- when was
23  that completed?
24      A.   The initial review?
25      Q.   Yes.

Page 42

1      A.   Well, again, this is --
2      Q.   The final review.  What I'm trying to get
3  at is I just want to understand of these two books
4  when they were submitted to the DOPSR and when each
5  of those books were finally approved in whatever
6  form for publication.
7      A.   Right.  Well, and to give clarity to how
8  I'll wind up responding to that, and again, I want
9  to go check some dates to make sure I don't give you
10  incorrect dates on that, on either of these other
11  two projects, but the process is always there's the
12  initial manuscript review and then there's the
13  decision by the author as to whether -- assuming
14  there are redactions of some sort as to whether they
15  want to challenge those redactions and mount an
16  appeal.  And then it runs through that process
17  really a second time, essentially, during the appeal
18  phase.
19          So the length of time one takes is, you
20  know, largely affected by whether or not there is an
21  appeal.  And then there are, you know, frankly every
22  book is different because it depends on how many
23  other components are involved.  And I should give
24  this also to add some clarity.  You know, the DOPSR
25  reviews a book, a manuscript that they receive

Page 43

1  first, and then they decide what other reviewing
2  components need to see this and what portions do
3  they need to see.  And the submitter is not entitled
4  to know that information because of the, you know,
5  just because of the way that OSR, you know, proceeds
6  with the reviews.
7          And then they will send it out to those
8  reviewing components, and then they may get an
9  answer the next day back from one of them or another
10  reviewing component could take a little bit more
11  time, depending on the complexity, its own personnel
12  status, things like that.  And then OSR will
13  consolidate those answers and that input and
14  presumably deconflict, you know, and things like
15  that.
16          But again, that's not something that the
17  author is going to have any -- or the author's
18  attorney is going to have, you know, visibility over
19  their discussions but not -- it's not pure
20  visibility over that.  So understand that that's why
21  there are so many variables that are in one of
22  those.
23          But I will say that, you know, typically
24  I've found that OSR always -- they always strive to
25  meet their -- the target of their guidelines to try

Page 44

1  to get it as quickly as possible, if nothing more
2  than the fact that they've always got a pretty
3  steady workload of these coming in and want to clear
4  these out as fast as they can.  But again, they're
5  held to the -- they're held to the reviewing
6  component time schedule.
7      Q.   And there comes a point in time after OSR
8  receives the manuscript and after there's an appeal
9  process when the book in one form or another is
10  approved for publication.  Is that fair to say?
11      A.   Well, when you get the -- after the
12  initial manuscript goes into OSR and after that
13  initial review is done, they will send back to you
14  the manuscript which will either be, you know,
15  approved for public release as amended or approved
16  with recommendations, or they can, you know, not
17  approve it.  I've not seen that happen, but -- so
18  there are different ways, but typically what they'll
19  do is presumably there are -- I've never seen a
20  situation where there wasn't some sort of redaction,
21  you know, in there.
22          And so you'll get that back and you get a
23  redacted manuscript back.  It's approved, you know,
24  in my experience, generally approved for public
25  release as amended and you can publish that one if



Page 45

1  you want to.  That's when you hit that decision
2  point of, you know, looking at, you know, what was
3  redacted.  And then the author obviously has the
4  chance of, you know, accepting redactions,
5  proposing -- or appealing.  And then during that
6  appeal you can propose rewrites, you can challenge
7  the basis for, you know, a redaction itself, you
8  know, asking for the redaction to be lifted, you
9  know, or really however you want to do it.
10       I will say the appeal process is a little
11  more amorphus and nonspecific, you know, in terms of
12  how it happens.  What is specific is you've got 60
13  days from the time that you get that initial
14  manuscript to file an appeal or you're barred from
15  being able to appeal it.  So that's generally how
16  their process runs.  And, you know, that's -- the
17  appeal process is -- again, you don't have
18  visibility over it, but depending on what you're
19  appealing, it may or may not have to go back to
20  everybody that looked at the initial one.  You know,
21  it's more of a rifle shot at that point rather than
22  a broad, you know, broad approach, so --
23       Q.  And when you mention amorphus, it's
24  amorphus in the sense that the -- during the appeal
25  process the OPSR or OSR --

Page 46

1       A.  Either one, same place.
2       Q.  The OSR could decide to send the book to
3  various agencies and there's no control over when,
4  if and when it gets a response?  Is that fair to say
5  or --
6       A.  No, that's not what I mean by amorphus.
7  By amorphus meaning that there's not a definitive,
8  you know, if you want to challenge this, do it this
9  way; if you want to challenge that, do it that way.
10  It's more of a, you know, depending on how you want
11  to challenge it because there can't be discussions
12  about particular redactions.  They won't discuss
13  that with you because OSR has to treat this -- they
14  have to treat it as a classified situation to begin
15  with.
16       So, you know, they will -- my
17  understanding and experience has been that they will
18  always do this on, you know, I believe they do it on
19  a, you know, classified system whether it's SIPRNet
20  or whatever system they decide to use.  It's a
21  closed type of thing.  So you won't have a
22  conversation where they say, hey, this agency wants
23  to, you know, doesn't like the way you said this,
24  they want this or whatever.  You don't have that
25  kind of interchange because that would be a

Page 47

1  classified conversation and they're not going to do
2  that with, you know, with a submitter.
3       So that's why I say -- when I say amorphus
4  about the appeal process, it's amorphus in that
5  other than having the right to appeal, you're not
6  told exactly how to appeal certain things.  And
7  frankly, the reason for that is that you don't know
8  why they redacted something and why they didn't or
9  why they, you know, didn't redact something else or
10  that kind of thing.  So you have to assert your
11  arguments that way.  That's really the art of trying
12  to, you know, gain more of the text for the book,
13  you know.  So that's what I mean by amorphus.
14       Q.  If we leave a space in the transcript,
15  would you be able to fill in, and we'll call it
16  books 1 and 2, the dates that books 1 and 2 after No
17  Hero were submitted to the DOPSR and when they were
18  finally in a position to be published, having gone
19  through the process of appeals and the review
20  process?  Would you be able to fill in those dates?
21       MR. TOBEY:  Do you mean the first date
22  when you get the preliminary response by the DOPSR
23  or the date when everybody said we're good with
24  this?
25       MR. FURMAN:  The latter.

Page 48

1       MR. TOBEY:  The latter?
2       MR. FURMAN:  When everyone says they're
3  good with it.
4  Information Requested: _____
5  _____
6  BY MR. FURMAN:
7       Q.  So I don't need the blow-by-blow.  What
8  I'm asking for is when the book, books 1 and 2 were
9  submitted to the DOPSR and when it was finally
10  through the review process and all the various
11  appeals and when it was deemed ready to be
12  published.  I take it that neither book has been
13  released.  Is that correct?
14       A.  That's correct.  I mean, to answer your
15  question, I don't mind giving general parameters.
16  If I'm going to give more specifics, I would need to
17  check with those clients to make sure.  Even though
18  I'm not going to specify who they are, they're -- it
19  wouldn't be too hard to figure out, you know.  You
20  know, if -- so just I would like to get their
21  permission to be able to --
22       Q.  That's fair enough.
23       A.  -- to release that information.
24       Q.  And if it becomes an issue, you can let
25  Mr. Tobey know and we can resolve that issue if we



Page 49

1   need to with the court.
2        A.   Okay.
3        Q.   And I'll close the door on my questions
4   about books 1 and 2, but were either one of them a
5   firsthand account of a military operation?
6        A.   Yes.  Both of them were.
7        Q.   We're going to take a break for Karen's
8   sake.  She's been working very diligently for the
9   past hour and some, but just a few more questions.
10       To the best of your knowledge, have there
11  been any other firsthand accounts published directly
12  by an operator in connection with Operation Neptune
13  Spear other than Mr. Bissonnette's book No Easy Day?
14       A.   I'm sorry.  Can you read back the
15  question, please?
16       MR. FURMAN:  I don't know if I can restate
17  it.
18       THE REPORTER:  Question: "To the best of
19  your knowledge, have there been any other firsthand
20  accounts published directly by an operator in
21  connection with Operation Neptune Spear other than
22  Mr. Bissonnette's book No Easy Day?"
23       A.   Specifically about Neptune Spear, I'm
24  trying to remember the name of the guy.  It's -- I
25  believe it's the last name Mann.  I believe he has a

Page 50

1   book that includes his involvement.  And I may have
2   his name wrong.  But I believe there are a couple of
3   other NAVSPECWARCOM or SEALs that were involved in
4   that operation that have written on it.
5        I'm certainly aware of, you know, the
6   operation being written about by Secretary Gates and
7   Secretary Panetta and General McChrystal and people
8   at that level.
9   BY MR. FURMAN:
10       Q.   I understand that other people that were
11  involved with Operation Neptune Spear have written
12  the various accounts about it, but what I'm
13  referring to is operators that were on the ground in
14  Abbottadad.
15       A.   Abbottabad.
16       Q.   I don't know if I --
17       A.   I know what you mean.
18       Q.   That were on the ground in Abbottabad.  I
19  forgot my question.
20       MR. FURMAN:  Can I have it read back,
21  Karen, just so I can try to polish that up?
22       THE REPORTER:  Question: "I understand
23  that other people that were involved with Operation
24  Neptune Spear have written the various accounts
25  about it, but what I'm referring to is operators

Page 51

1   that were on the ground in Abbottabad."
2        MR. FURMAN:  And you can put a question
3   mark at the end of it, Abbottabad, yeah.
4        A.   Again, I believe that there are operators
5   that were involved in it that have written.  I'm
6   aware that an individual who goes by the name
7   Robert O'Neill has written and spoken fairly
8   extensively about his involvement.
9        But again, I don't -- and it's not
10  something that I necessarily would know.  There very
11  likely could be books out there that -- I mean, I
12  don't peruse every book that comes out, obviously,
13  and have the time to do that, but my general
14  understanding is there are other -- I'd be surprised
15  if there aren't other operators that have at some
16  point written that.
17       But other than Rob O'Neill -- and again, I
18  said the name.  I think it's -- I think Mann is the
19  last name.  And I'm not sure if Howard Wasdin's book
20  included any of that.  So those could include it and
21  I'm not aware of it because I haven't read those
22  books, but I know those were guys in that same unit.
23  BY MR. FURMAN:
24       Q.   I just have a few follow-up questions,
25  then we'll take a quick break.

Page 52

1        In connection with the DOPSR process when
2   you represent a client, is that something you would
3   consider to be a specialized area of law or a
4   particular area of law?
5        A.   I would say it's specialized, you know, in
6   the way, same way that regulatory, you know, matters
7   are specialized. you know, but it's a fairly narrow
8   area too, so there are not a lot of people that
9   exclusively do that.
10       As I said, it's dealing with different
11  government agencies to resolve, you know, regulatory
12  issues and run through regulatory processes.
13  It's -- whether that's considered specialized, I
14  assume.  I consider international trade to be, you
15  know, kind of a specialty niche practice, so I would
16  consider it probably a subset of that, in my
17  context.
18       Q.   Do you need to have any kind of particular
19  training or background in order to represent a
20  client as a lawyer before the DOPSR?
21       A.   No.  There's no special certification or,
22  you know, or requirement that's out there that I'm
23  aware of.
24       Q.   Do you need to have any kind of security
25  clearance in order to represent a military author



Page 53

1   who is writing a firsthand account of a military
2   operation?
3      A.   There's no requirement for that.
4      Q.   What if you have a suspicion or a
5   reasonable basis to believe that the information
6   that's in the manuscript has classified information?
7   What does a lawyer do at that point?
8      A.   Well, there's obviously not a procedure as
9   to what a lawyer would do.  I think that's up to the
10  individual lawyer as to how he would react to that.
11  So I can't speak to others, you know.  I can tell
12  you that, you know -- would you like me to answer
13  that for how I would deal with it or --
14     Q.   Yes.
15     A.   When I will take a, you know, engagement
16  for a former service member, I mean, the starting
17  point obviously is to look at what they've signed,
18  what their obligations are with regard to their
19  clearance and their access and everything like that
20  so that we know, you know, can pinpoint exactly what
21  their responsibilities are to the government.
22         Then when I would go through it, I would
23  be looking for things that, you know, what I might
24  think would be sensitive.  And I can tell you that
25  because at the end of the day it doesn't really

Page 54

1   matter what the attorney thinks is -- would be
2   deemed classified or not.  It's helpful because it
3   shows you how to drill down on certain areas that
4   could be problems, but at the end of the day it's
5   the reviewing components the DOPSR sends the
6   manuscripts to.  It's their opinion that matters
7   exclusively, you know, subject to the appeal
8   process, I would say.
9          And I think that's why there's not a
10  requirement that you take this to someone who has
11  that clearance.  It's obviously helpful in a
12  pragmatic sense and I think it might give the
13  government a little bit of credit or a little bit of
14  comfort, I should say, not credit, but I've never
15  heard that from the government.  That's just my, you
16  know, presumption.
17         So I would be looking for things that if
18  they are, you know, if they're sensitive.  You know,
19  and in all of my experiences, the authors, you know,
20  are not trying to push the envelope.  They're not
21  trying to, you know, say something they know they
22  shouldn't say or anything like that.  So it's
23  usually more of an analysis of, you know, just based
24  on experience, their -- this is going to come close
25  to the line, you know, if you can rewrite this or if

Page 55

1   there's a way to soften this or that or something
2   like that.  That has been done on occasion just to
3   try to make something more likely to, you know, just to
4   not get redacted during the process.  But again,
5   it's an inexact science.
6      Q.   So I'd asked you what does a lawyer need
7   to do when representing an author in connection with
8   a firsthand account of a military operation, and I
9   think -- and I'm going to just highlight two areas.
10  You said first confirm what agreements he signed.
11  Is that job number one?
12     A.   Correct.
13     Q.   And then job number two would be to look
14  for things that you feel that could be sensitive in
15  reviewing the manuscript.
16     A.   I would call the latter, I would call that
17  job number three, and actually job number two is
18  determine, you know, based on your review at step
19  one of the agreements that they've signed what are
20  their obligations to the U.S. Government.  I mean, I
21  think that's -- that's important.
22         And I'll give an example as to why, and
23  that is that if someone has just signed a classified
24  information nondisclosure agreement as opposed to
25  that plus a sensitive compartmented information

Page 56

1   nondisclosure statement, that's going to be two
2   different worlds, you know, in terms of, you know,
3   potentially, from their obligations because one
4   carries, you know, much, you know, a much heavier
5   burden, understandably, as to, you know, as to what
6   your obligations to the government would be.
7          So I would have to have -- I would want
8   to, before getting to what I'll call step three,
9   what I think you've just called step two, before
10  getting to that, I would want to make sure I knew
11  what their obligations are and therefore the
12  parameters that the U.S. Government would be, you
13  know, would be evaluating their submission.
14         And then, yes, correct, I would then look
15  for areas that I would think might create concerns,
16  draw attention or, you know, create a problem during
17  the review process.
18     Q.   And if I understand in your answer in
19  connection with the second point, which is once you
20  get a handle on these obligations, you would have to
21  examine them because you said that there's a
22  difference between, for example, signing a CINA as
23  opposed to an SCI nondisclosure agreement.
24     A.   Right.
25         MR. FURMAN:  So why don't we just take a



Page 57

1   quick break and give Karen's fingers a little bit of
2   a break and then we'll resume.  Is that all right?
3        MR. TOBEY:  Yeah, let's do that.  And what
4   we'll do is bring in lunch for those who want it in,
5   say, an hour.
6        (Recess from 11:52 to 12:26)
7   BY MR. FURMAN:
8        Q.   Mr. Enslen, I just want to follow up on a
9   couple of questions before I go into a new area.
10  Other than Mr. Johnston and Mr. Tobey, have you
11  spoken to other lawyers about the Bissonnette versus
12  Podlaski matter?
13       A.   The only other lawyer that I can think of
14  would be within my own firm.  Is that --
15       Q.   I won't ask you about that.  Is that
16  Mr. Kitchen?
17       A.   Yes.
18       Q.   To the best of your knowledge, is he a
19  witness in this particular case?
20       A.   No.
21       Q.   Have you spoken to Mr. Mark Zaid, Z-A-I-D?
22       A.   I have not.
23       Q.   And when I say spoken, I mean communicated
24  any way, e-mail, fax --
25       A.   No.

Page 58

1        Q.   -- or otherwise verbal communications.
2   Have you spoken to an expert whose last name is
3   Slottjie, and I'll spell it, S-L-O-T-T-J-I-E?
4        A.   I have not.
5        Q.   Have you spoken to -- he's not a lawyer
6   but a witness -- Ben Sevier?
7        A.   I have not spoken to Ben Sevier about this
8   matter at all.  I did have conversations with Ben
9   about No Hero when we were going through that
10  process.
11       Q.   So you didn't have conversations with
12  Mr. Sevier about the lawsuit involving No Easy Day?
13       A.   No, I did not.
14       Q.   And when I say the lawsuit, I'm meaning
15  this particular lawsuit --
16       A.   This matter.
17       Q.   -- that you're testifying in connection
18  with.
19       How about Elyse Cheney, have you spoken to
20  her about this case?
21       A.   No, I have not.
22       Q.   Now, I'm looking at the two books that are
23  in front of you, No Easy Day, Exhibit 132, and
24  No Hero, Exhibit 133.
25       Is it fair to say that No Easy Day, just

Page 59

1   in general terms, is a firsthand account of the
2   killing of Osama bin Laden which was comprised in
3   Operation Neptune Spear.
4        A.   I think it's fair to say that's the
5   predominant operation that's discussed in there.
6   There are obviously other issues that -- other
7   background of Mark Owen that I recall from it, but
8   the gist.
9        Q.   And is No Hero a different book?
10       A.   Yes, in that it's a leadership book but
11  drawn on many of the same -- many of the same
12  parallels from No Easy Day.  But, yes, it's a
13  predominantly, I would call it, a leadership book.
14       Q.   Does No Hero describe in detail any
15  specific operations?
16       A.   I do believe there are -- there are
17  anecdotes, operational anecdotes in there.  It
18  doesn't purport, you know, soup to nuts to cover any
19  particular, you know, operation.  But much of the
20  same subject matter is covered.
21       Q.   What would you describe as being different
22  about No Hero as opposed to No Easy Day?
23       A.   Well, as I said, I think it's an evolution
24  of a story obviously that Mr. Bissonnette wants to
25  tell about to relate his experiences from his

Page 60

1   service as a, you know, as a SEAL and then as a
2   Dev group member and apply it to -- allow other
3   people to apply it to their lives.
4        So in that evolutionary sense, No Hero
5   is -- you know, that's why I keep calling it a
6   leadership book.  Just the way it's organized is,
7   you know, leadership principles and then operational
8   anecdotes, you know, tied to that.
9        Q.   Now, with No Hero, was the book submitted
10  for a prepublication review?
11       A.   Yes.
12       Q.   Did you review the manuscript before it
13  was submitted for a prepublication review?
14       A.   Yes.
15       Q.   Did you obtain any kind of security
16  clearance in order to review the book prior?
17       A.   I did not, no.
18       Q.   Did you --
19       A.   I will say this.
20       Q.   Did you believe it was necessary?
21       A.   No, I did not.  But part of that, part of
22  the reason, one, it's not required.  Two, I did
23  hold -- I was holding a TS/SCI at the time.  Again,
24  that's, you know, not a requirement, but that's, you
25  know, another thing that, you know, as I mentioned



ALAN ENSLEN
MATTHEW BISSONNETTE vs KEVIN PODLASKI

January 24, 2017
61–64

Page 61

1  earlier I think in my testimony is that it's
2  something that while it's not going to change the
3  way that OSR deals with you, it probably does
4  provide a little bit of comfort on the front end to
5  have somebody that's, you know, that is holding a
6  clearance that, you know, does have a clearance to
7  be able to look at it.  But again, it's not a
8  requirement.
9      Q.  Was there any material in No Hero, to the
10  best of your knowledge, that was classified
11  information?
12     A.  No.
13     Q.  How would you know that?
14     A.  Well, that's what I -- again, with what I
15  said before, in my view there wouldn't be anything,
16  but that really doesn't matter because I'm not the
17  reviewer of it.  There were -- just like with any
18  book that I've looked at, there are areas where you
19  could tell that there might be some concerns about
20  it, just -- or it might be closer to a concern.
21      And I will say that that is part of the
22  pre-review process that I think a, you know, an
23  attorney that's assisting or anybody that's
24  assisting somebody in submitting a manuscript is
25  going to do, going to look at it and see this is

Page 62

1  likely to be a problem, because in some cases things
2  can be rewritten or smoothed out.  If someone has
3  not ever submitted a manuscript for prepublication
4  review, if it's the first time for an author doing
5  that, they're not going to be aware of, you know,
6  certain things or may not be aware of certain things
7  that could cause the government more concern.
8      But again, as I mentioned earlier, there
9  are so many variables in the process of the review,
10  you don't know which reviewing components it's going
11  to or what, you know, what the exact parameters of
12  analysis are going to be from there in, so it's, you
13  know, it's really just a preliminary type of thing.
14  I've never had a situation where something jumped
15  out at me as being so, you know, clearly problematic
16  that it had to be redacted before you ever submitted
17  it.
18     Q.  When did you -- you don't have to give me
19  an exact date.  I'd just like to know the month and
20  the year that you submitted the book No Hero for a
21  prepublication review.
22     A.  January 2014.
23     Q.  And if you had to check your records,
24  could you specify the date that you submitted the
25  book for a review?

Page 63

1      A.  Yes.
2      Q.  Okay.
3      A.  It was early -- it was -- I want to say it
4  was like the 7th, 8th or 9th, maybe the 6th.  It was
5  somewhere within that first full week of January, as
6  I recall.
7      Q.  Who did you hear back from?  Or let me
8  strike that.
9      When did you hear back from the DOPSR in
10  relation to No Hero?
11     A.  Well, actually it was first submitted to
12  USSOCOM.  As I believe I mentioned earlier, there
13  was a little bit of a discrepancy or at least enough
14  of a gray area in my view of exactly who the --
15  where the entry point was going to be for this book
16  based upon the guidelines, you know, that existed
17  coming from DOPSR.
18      So the two candidates for submission
19  obviously were USSOCOM or straight DOPSR.  I think I
20  mentioned earlier that my initial call was to
21  Mr. Wally King at DOPSR who confirmed for me that,
22  yes, go ahead and submit it to, you know, to the
23  component first, so which means SOCOM.  Then later
24  that got amended somewhat to say go ahead and send
25  it to us as well.  So they both got it.

Page 64

1      So who I heard from first, to answer your
2  question, I'm sure I heard from the USSOCOM public
3  affairs officer acknowledging receipt.
4      Q.  Did SOCOM then advise you one way or the
5  other about any redactions or concerns they had in
6  connection with the book?
7      A.  My recollection is that SOCOM, you know,
8  immediately or close to the time, within days,
9  realized that it was going to DOPSR as well and
10  therefore they backed off and then just assumed that
11  they were going to receive it, as they did, in due
12  course from DOPSR.
13      So there was no -- no substantive comment
14  back from SOCOM other than the fact that I recall
15  the PAO saying that they've, you know, they had a
16  high volume of, you know, high volume of books to
17  review.
18     Q.  Did you get a substantive response from
19  DOPSR?
20     A.  Yes, as soon as we submitted it to DOPSR,
21  which was within a couple of days of the time it
22  went to SOCOM, so it was still early January, and
23  then started the process of discussions with them.
24      The first step for them is for themselves
25  to review, you know, the book to determine, you



ALAN ENSLEN
MATTHEW BISSONNETTE vs KEVIN PODLASKI

January 24, 2017
65—68

Page 65

1  know, I'm assuming, among other things, probably
2  what reviewing components need to see this and what
3  portions do they need to see. So that's not an
4  instantaneous process, obviously, for DOPSR to do.
5      So I did hear back from DOPSR that they
6  had it. There's always an issue as to how many
7  copies did they need, you know, whether it's hard
8  copy or on a disk. That's kind of a -- you know,
9  sometimes that will change based upon how they're
10  going to do the review, who's going to do the
11  review. At least in my experience it sometimes
12  changes. So most of the response back initially
13  from DOPSR I will say was more administrative.
14      There -- I will say there was an
15  acknowledgment from DOPSR in a conversation, a phone
16  conversation, where, I mean, they knew that this was
17  the same author that was involved in, you know, that
18  had written No Easy Day. So that connection, you
19  know, while it was not made in the submission cover
20  letter, you know, that we sent, they certainly knew
21  it immediately. So that was the -- that was the
22  first feedback we got.
23      Q. When did you hear substantively one way or
24  the other from the DOPSR?
25      A. And when you say that, do you mean when

Page 66

1  did they send back an approved manuscript?
2      Q. Or an edited, any kind of substantive
3  comment on the manuscript.
4      A. Well, it's a continual process. Once they
5  get it, obviously we don't just, you know, wait to
6  hear from them. We try to be proactive, and I think
7  that's what you have to do because you have to keep
8  it in front of them because they're -- again, they
9  have a lot of tasks.
10      And so I would have frequent
11  conversations. Now, they weren't long and they
12  weren't necessarily substantive, but it was usually
13  on status, you know, where is it at, where is it at,
14  is it moving forward, things like that, because, you
15  know, common sense told us that it could lag, you
16  know, if not, you know, if not encouraged to be
17  distributed, potentially. So we didn't want to take
18  that risk.
19      And so there was a -- again, I can't come
20  up with a number as to how many conversations there
21  were, but, you know, definitely every week,
22  sometimes multiple times a week when it was at
23  stages of, you know, being initially evaluated.
24      And then once it was -- I remember getting
25  the word from DOPSR that, okay, it has been

Page 67

1  distributed to the reviewing components, and
2  that's -- that's more of a, okay, it's made it
3  through that next gate. So now you know it's in the
4  hands of the reviewing components, and so at that
5  point the question for OSR is, if you can get them
6  to tell you, is what's your internal suspense to get
7  it back from those reviewing components.
8      And again, I'm just trying to -- because
9  there's expectation management going on. Obviously
10  the publisher is interested in, you know,
11  everything's time sensitive to them. And so I
12  believe that everybody knows the guidelines that OSR
13  is trying to meet, and so it's just trying to
14  constantly have kind of a Sit Rep, as we would say,
15  in terms of what the status is.
16      Q. I appreciate your response, but my
17  question to you is, when did you hear back from the
18  DOPSR?
19      A. Probably within 48 hours of the time that
20  I sent them the first -- the submission, I heard
21  back from them that they had it.
22      Q. What I mean is, I'm not asking about the
23  administrative acknowledgment. That's obvious. But
24  the -- when you heard back from the DOPSR after the
25  various reviewing components had completed their

Page 68

1  review.
2      A. After the final one had come in and DOPSR
3  was then -- and I'm not trying to, you know, play
4  games with you here. I just want to make sure that
5  the process -- let me say this about the process,
6  and then I will answer your question.
7      Once the -- all of the reviewing
8  components get, you know, give their responses back
9  to DOPSR, they then go through a process of, you
10  know, of deconflicting, of seeing if they agree with
11  the redactions, if, you know -- and again, they
12  don't clue you in on that. I know that's what
13  they're doing. So that takes awhile. It's not like
14  they just get a response back and say here it is.
15  They go through that process as well, which they're
16  usually trying to get that done within a week or so.
17      So I would say that I probably heard back
18  from them and my recollection is late March maybe,
19  toward the end of March.
20      Q. That's the March of -- late March of 2014?
21      A. Correct.
22      Q. And what substantively did -- information
23  did you receive from DOPSR about the manuscript that
24  was submitted?
25      A. At that time I was told that we've gotten



Page 69

1   all the responses back, we are going through our
2   process of synthesizing it, and once we have a
3   completed manuscript, redacted manuscript, then it
4   will have to go through the approval chains here for
5   release and then we'll be sending it to you.
6        And so, as I mentioned before, we were
7   obviously in contact with them during that interim
8   period to make sure that that process continues to
9   move along as quickly as possible.
10        And then my recollection is that it was
11   sometime in early April, maybe the 7th of April. I
12   believe we provided documents that would have that
13   in there. We could -- but my recollection is
14   sometime early April that we got the, you know,
15   approved-as-amended manuscript back from DOPSR.
16        Q. And the manuscript that you received back
17   that was reviewed by the DOPSR and I take it to the
18   best of your knowledge one or several reviewing
19   components, was that the form in which that book was
20   published, or was there an appeal process?
21        A. The author elected to file an appeal, so
22   that was not the form that it was -- that was
23   published.
24        Q. When did that appeal take place? You
25   don't have to give me the exact date, but I'd like

Page 70

1   to know, to the best of your knowledge, when that
2   appeal was made.
3        A. My recollection is that it was filed
4   sometime mid-May of 2014. And the reason for the
5   delay, that's probably the most labor intensive time
6   from the attorney's side, frankly, in processing an
7   appeal is, as I think I mentioned earlier, the way
8   the process works, you're not really sure why
9   something was redacted. So if you want to challenge
10   a redaction, you have to be fairly artful in trying
11   to predict what a problem might be and then come up
12   with a potential solution for that. So I recall
13   that that always takes a while to put together.
14        So I may be off a little bit, but those
15   are the months I'm confident about. And so it was
16   resubmitted, you know, the appeal was submitted, I
17   should say, sometime in May of 2014.
18        Q. Do you have a copy of the manuscript that
19   you and the author received as amended in early
20   April?
21        MR. TOBEY: I think wasn't the decision
22   made to withhold that on the basis that there was --
23        THE WITNESS: The --
24        MR. TOBEY: -- that it was confidential?
25   BY MR. FURMAN:

Page 71

1        Q. I'm not asking you about the objection. I
2   just want to know that you have it.
3        A. Yes.
4        MR. FURMAN: Okay. If there is an
5   objection, we'll deal with it. I'm going to ask
6   Karen to put at the end of the transcript a request
7   for the production of the manuscript of No Hero that
8   was received in early April that was approved by the
9   DOPSR as amended pursuant to its review. And I
10   understand that there may be an objection. We'll
11   deal with the objection off the record --
12        MR. TOBEY: Sure.
13        MR. FURMAN: -- just so we can move on.
14   BY MR. FURMAN:
15        Q. You mentioned earlier, Mr. Enslen, that
16   there were various reviewing components. Do you
17   know what components reviewed No Hero?
18        A. I don't know for certain because that's --
19   that's not officially shared.
20        Q. Okay. I just want to know if you know.
21   So it's not -- you would have no way of knowing one
22   way or the other?
23        A. I know there were six. They told there
24   were six components that it went to.
25        Q. Do you know who they are?

Page 72

1        A. I know ones that it would normally go to.
2   I'm positive that it went to SOCOM. The joint staff
3   will normally look at that. If there are any other
4   governmental agencies that are involved in the
5   subject of the manuscript, typically they're going
6   to get it. So, you know, potential service
7   components sometimes will get it. You know, in
8   other words, a service component that the author
9   belonged to ultimately, even if they predominantly
10   operationally belonged to a command as in this case.
11        So all I know is there were six. And I
12   can predict just from having worked in that space
13   where they went. Occasionally you will -- you might
14   hear somebody at OSR say we're still waiting on a
15   response from so-and-so. And that's, you know,
16   that's not them officially telling you that.
17   They're just trying to tell you where the hangup is,
18   frankly. But I do know there were six for No Hero
19   that were looked at.
20        Q. Now, the appeal itself, was that done in
21   writing?
22        A. Yes.
23        MR. FURMAN: And I appreciate that there
24   may be objections, but I'm going to call for the
25   production of that appeal that was filed in mid-May



Page 73

1  of 2014.  And I appreciate that there will be
2  objections to it.  I'm going to call for the
3  production of it, and of course I'll follow up in
4  writing.
5        And also, if we leave a space in the
6  transcript, could you also fill in the date of that
7  appeal?  Regardless of whether or not we succeed in
8  obtaining the production of that appeal.  So I'll
9  ask to fill in that date.
10  Information Requested: _____
11  BY MR. FURMAN:
12     Q.  Now, in terms of that appeal of the --
13  I'll call it the first draft that you received from
14  the DOPSR, when did you hear back on that appeal?
15     A.  Again, I'm assuming you mean when did we
16  get the results back?
17     Q.  Yes.
18     A.  My recollection is it was August of 2014.
19     Q.  Now, let me just walk you backwards.  The
20  appeal was made in mid-May of 2014.  Does the DOPSR
21  or any agency respond and offer you some kind of
22  reply or counterargument to your appeal?
23     A.  Yes.  They will -- in a similar fashion to
24  how they provide you after the initial submission
25  with an approved-as-amended manuscript or approved

Page 74

1  as recommended, with recommendations, whatever
2  they're going to provide you back, they'll do the
3  same thing with an appeal.  And it typically comes
4  in the form of a letter that is itemized by appeal
5  number and -- or the item numbers in the appeal,
6  because obviously there are some security concerns
7  about the appeal document itself which, because it's
8  challenging redactions itself, is obviously going to
9  be much more sensitive than the original manuscript
10  was.  And so therefore, you know, document control
11  and access and things like that are paramount with
12  those documents.
13       So they will send you back essentially
14  that letter that I just described with, you know, an
15  itemized account of, you know, stands by original
16  appeal or, I'm sorry, stands by original redaction,
17  indicating that essentially you lost on that
18  challenge, or they will say alternative language
19  accepted or, you know, redaction withdrawn if you
20  won outright or, you know, anything in the interim.
21       So it'll have you a detailed account of
22  what your results are, but it doesn't spell out this
23  is why we, you know, redacted this or this is why
24  we, you know, we're agreeing with your argument.
25  No explanation is given.  And then, in addition, you

Page 75

1  will receive a -- essentially a new
2  approved-as-amended manuscript.
3     Q.  Now, in connection -- I'm asking you
4  specifically as to No Easy Day.  Was that letter --
5        MR. TOBEY:  You mean No Hero?
6        MR. FURMAN:  I'm sorry.  I meant No Hero.
7  BY MR. FURMAN:
8     Q.  I'm asking you specifically with respect
9  to No Hero.  I actually did point to No Hero when I
10  uttered the name of the other book.  Let me start
11  with a new question.
12        Specifically with respect to No Easy Day,
13  when did you receive that letter with an itemized
14  response to the appeal?
15        MR. TOBEY:  You meant No Hero again.
16        MR. FURMAN:  And I meant No Hero again.
17  So let me strike that.
18  BY MR. FURMAN:
19     Q.  When did you receive a letter with an
20  itemized response to the appeal in connection with
21  No Hero?
22     A.  Again, my recollection is that it was
23  sometime in August of 2014.
24     Q.  And do you have a copy of that, that
25  letter?

Page 76

1     A.  Yes.
2     Q.  Okay.  I'm also going to call for
3  production of that letter.  I take it the letter is
4  from the DOPSR?
5     A.  Yes.
6     Q.  And that letter will identify as the
7  response letter which itemized the response to the
8  appeal made in mid-May of 2014 in respect of the
9  first review of No Hero by the DOPSR and the
10  reviewing components.
11        Mr. Enslen, was the manuscript altered in
12  any particular, significant way in response in
13  August of 2014 by the DOPSR following your appeal?
14     A.  The results of the appeal were we
15  challenged, as I recall, 127 redactions.  And we
16  won, at least I say won, whether outright or with
17  alternative language, somewhere close to a hundred
18  of those, if that gives you any kind of indication.
19        So there were still, as you can see from
20  the book, there were still a number of redactions,
21  you know, that were in there.  And again, some of
22  the redactions the author accepts because, you know,
23  while you can challenge everything, Mr. Bissonnette
24  did not challenge everything.  He accepted, you
25  know, a number of the redactions.  So what remains



Page 77

1  then in the -- now what you see in the book reflects
2  the redactions that were either accepted or that we
3  lost in the appeal.
4      Q.  So, in other words, there was never
5  another round of appeals after the May appeal and
6  the August response --
7      A.  That is correct.
8      Q.  -- of 2014?
9      A.  I'm sorry.  I didn't mean to talk over
10  you.
11      Q.  Now, in connection with No Easy Day, now
12  I'm turning your attention to No Easy Day.  If the
13  book was submitted for a prepublication review, do
14  you know which reviewing components, as you
15  described it, would have reviewed the manuscript?
16      A.  I have no way of knowing for sure.  My
17  educated assumption is it would have been the same
18  reviewing components.  In my experience, those are
19  generally determined by the author's experience and
20  where he was assigned and, you know, I would expect
21  them to be the same for that reason.
22      Q.  In connection with No Easy Day, do you
23  have an understanding one way or the other as to
24  whether the CIA would have been one of the reviewing
25  components?

Page 78

1      A.  I don't have any way of knowing, you know,
2  if they would.  Typically, if an organization is,
3  you know, is mentioned in the book, which I know
4  from having read No Easy Day that that is the case
5  and I know from having worked on No Hero that is the
6  case, I think it -- my guess would be that they
7  probably would, but I don't know that.
8      Q.  Other than speculation on your part, do
9  you have any basis to know what sections of No Easy
10  Day would have been redacted one way or the other if
11  it had been submitted for a prepublication review?
12      A.  Well, I would assume that the -- had it
13  been submitted for prepublication review, while
14  there could have been and likely would have been
15  some redactions here and there, I would not have
16  expected there to be too many of them given the
17  number of other publications, you know, that
18  discussed particularly the main mission discussed in
19  that book.
20      Q.  Now, you had mentioned that in connection
21  with the book No Hero that there were 127 redactions
22  that were made, some of which remain, and there are
23  paragraphs of No Hero that are redacted.
24      Do you think that there would have been
25  less redactions in No Easy Day than there were in No

Page 79

1  Hero?
2      A.  Well, let me clarify one thing.  I said
3  that we challenged approximately 127 redactions.
4  There were more than 127 redactions in No Hero.  And
5  I will say that had No Easy Day been submitted for a
6  prepublication security review, I would not have
7  expected there to be anywhere near as many
8  redactions in No Hero as we got.  I can say that.
9  Because I saw the effects that the, you know, all of
10  the problems caused by No Easy Day created for the
11  situation we were dealing with, you know, in No Hero
12  as much as --
13      Q.  I understand your answer, but it's not
14  answering my question.  My question is about No Easy
15  Day.  And so let me ask the reporter if she could
16  repeat the question, and then if you can answer it,
17  we'll move on.  If not, I can rephrase the question.
18      A.  Okay.
19      THE REPORTER:  Question:  "Now, you had
20  mentioned that in connection with the book No Hero
21  that there were 127 redactions that were made, some
22  of which remain, and there are paragraphs of No Hero
23  that are redacted.  Do you think that there would
24  have been less redactions in No Easy Day than there
25  were in No Hero?"

Page 80

1      A.  Assuming that No Easy Day was submitted
2  for prepublication security review, I would have
3  expected there to be fewer redactions in No Easy Day
4  than we received in No Hero.
5  BY MR. FURMAN:
6      Q.  Now, do you know whether or not there is
7  any classified information in No Easy Day?
8      A.  I do not know whether there is classified
9  information in there or not because, again, I'm not
10  the reviewing component or the classification
11  authority, so --
12      Q.  Is it fair to say, and if it's not, just
13  let me know, that you would have to be read into the
14  special access program that formed a part of
15  Operation Neptune Spear in order to understand
16  whether or not there is classified information in
17  No Easy Day about Operation Neptune Spear?
18      A.  Not necessarily.
19      Q.  And why do you say that?
20      A.  Well, because that assumes that the
21  Operation Neptune Spear had a different special
22  access program, or it suggests that to me, to which
23  it may or it may not have.
24      But I will say that -- well, I don't want
25  to convolute the record any more, but really you



Page 81

1  have to be the classification authority to determine
2  if it's classified information or not.
3      Q.  Do you know whether or not Operation
4  Neptune Spear was a classified operation?  Was it --
5      A.  What do you mean by classified operation?
6      Q.  Was it a top secret operation, to the best
7  of your knowledge?
8      A.  I've never heard an operation necessarily
9  portrayed that way, and I've been on plenty of
10  operations myself.  So, I mean, I'm not trying to
11  play games with you.  It's just that's not the
12  context with which -- I mean, certainly it was a
13  sensitive operation and no doubt it involved, you
14  know, I would assume, multiple programs as most
15  operations do, frankly.  What in particular they
16  were, I don't know.  I wasn't involved in the
17  operation.
18      But, yes, certainly a sensitive operation.
19  Whether I'd say, hey, you know -- again, I've never
20  thought of an operation, including those that I've
21  been on, in the terms of, oh, that's a top secret
22  operation or that's -- there are different
23  parameters of every mission and every operation that
24  are more sensitive than others, so I'm really not --
25  I'm not able to put a blanket, you know,

Page 82

1  classification over an operation, particularly not
2  one that I was, you know, did not participate in.
3      Q.  Now, you referenced that details of
4  Operation Neptune Spear were already in the public
5  domain prior to the publication of No Easy Day.  Is
6  that fair to say?
7      A.  I don't believe I said that I knew that
8  they were in prior to the publication of No Easy Day
9  because, as I've mentioned before, I read No Easy
10  Day as a private citizen in the course of time.  I
11  really hadn't done that analysis.  I know that the
12  details from Operation Neptune Spear that we have,
13  you know, researched and looked for government --
14  government pronouncements on.  I'm aware of a lot of
15  that.  Whether those dates, you know, whether that
16  predates the actual publication of No Easy Day or
17  not, I can't -- I can't tell you.  I mean, it's
18  proximate to, I can say that, for some of them.  And
19  nor do I remember the exact dates of the other books
20  that I'm aware of that have discussed different
21  aspects of Operation Neptune Spear.
22      Q.  There was an article in the magazine The
23  New Yorker written by an author named Nicholas
24  Schmiddle, S-C-H-M-I-D-D-L-E, that had some details
25  about what was taking place both on the ground and

Page 83

1  in the White House in connection with the killing of
2  Osama bin Laden.
3      Did you -- were you aware of that article
4  when it was first published in The New Yorker?
5      A.  No.
6      Q.  Do you believe that the fact that certain
7  details of a classified operation -- I'm sorry.  Let
8  me rephrase that.
9      Do you believe that if details of a
10  certain classified operation are discussed in
11  newspapers and in the public that that means that a
12  book about that classified operation by someone who
13  signs a nondisclosure agreement could be published?
14      A.  No.  The publication, an open source
15  doesn't necessarily -- doesn't change the
16  classification of the information.  That's -- that's
17  my view on it.
18      Q.  Yeah.  In other words, I think we both
19  would agree that a classified -- I'm sorry, that
20  that classified information remains classified
21  information irrespective of whether it's in the
22  public domain or not by other sources.
23      A.  I wouldn't totally agree with that because
24  I believe it does matter about the source, because I
25  can tell you that if, for example, you find yourself

Page 84

1  in a situation of challenging certain things, for
2  example, on an appeal to DOPSR, you're not going to
3  cite New Yorker magazine articles for support.
4      However, you might cite a speech by Barack
5  Hussein Obama or Vice President Biden or Secretary
6  Panetta or Secretary Gates or something or the
7  Congressional Research Service, you know, that is --
8  so while that's in the public domain, it's the U.S.
9  Government's, you know, pronouncement.  So -- and
10  the reason I go into that is that, you know, that's
11  the kind of thing that DOPSR also vets for the U.S.
12  Government before it goes out.
13      So that's why, you know, when you say that
14  it's in the public domain, I think it depends on who
15  put it there as to, you know, as to what value or
16  what importance or, you know, credence you could
17  give it.
18      Q.  Would you say that there is a standard of
19  care -- let me take it back.
20      Have you reviewed any documents that
21  relate to my client Kevin Podlaski's representation
22  of Mr. Bissonnette in connection with the
23  publication of No Easy Day?
24      A.  I don't believe I have.  If I have, I
25  don't recall.  Let me -- let me make sure, I'm



Page 85

1   sorry, let me make sure I understand your question.
2       You're asking me if I've reviewed any
3   documents relating to Mr. Podlaski's representation
4   of Mr. Bissonnette in connection with No Easy Day.
5       Q.   Correct.
6       A.   No, not that I recall.  I've certainly
7   seen mention of, you know, by looking at the
8   pleadings and things like that, you know, within
9   this lawsuit, but documents relating to, you know,
10  to advice or anything like that -- let me think.
11  Just want to make sure I give you a complete answer.
12  I mean, I have seen in connection with this case
13  some e-mail, some e-mail traffic, but it's only been
14  in the context of preparing for this, you know,
15  deposition or, you know, or this case, nothing that
16  was -- I don't recall seeing anything at the time we
17  were working on No Hero, you know.  And I'm sorry.
18  I can't remember the time frame of your question as
19  to whether it was tied to it.
20      Q.   At any point in time.  I just want to know
21  if you have read Mr. Podlaski's file in connection
22  with his representation of Mr. Bissonnette.
23      A.   Wouldn't say I've read the file.  I have
24  seen Mr. Podlaski in an e-mail exchange.  It seems
25  like it was proximate to the time of the Jeh Johnson

Page 86

1   letter that was, I believe, late August 2012.  But
2   again, in the context of this -- of this case,
3   not -- I did not review anything like that at the
4   time we were working on No Hero.
5       Q.   Have you read Mr. Podlaski's deposition
6   transcript in this matter?
7       A.   I have not.
8       Q.   Have you read Mr. Bissonnette's deposition
9   transcript in this matter?
10      A.   I have not.
11      Q.   As of today do you have an opinion one way
12  or the other about Mr. Podlaski's representation of
13  Mr. Bissonnette?
14      A.   In what context?
15      Q.   In any context.
16      A.   I believe that the manuscript for No Easy
17  Day should have been submitted for prepublication
18  security review, so any recommendation to the
19  counter I would disagree with.  Again, I haven't
20  pored over all of the documents to see exactly what,
21  you know, what advice was given when, but --
22      Q.   Based on what you know today and the
23  documents you've read and that you haven't, do you
24  have an opinion as to whether Mr. Podlaski deviated
25  from the standard of care in representing

Page 87

1   Mr. Bissonnette in connection with No Easy Day?
2       A.   I have an opinion, yes.
3       Q.   What is that opinion?
4       A.   My opinion is that Mr. Podlaski should
5   have advised Mr. Bissonnette to submit the
6   manuscript for No Easy Day for prepublication
7   security review to DOD.
8       Q.   Now, do you know one way or the other in
9   connection with that opinion as to what
10  Mr. Bissonnette told Mr. Podlaski and what
11  Mr. Podlaski told Mr. Bissonnette about that issue,
12  about the submission of the book for a
13  prepublication review?
14      A.   No, I do not.
15      Q.   Do you have information one way or the
16  other about what information Mr. Bissonnette told
17  Mr. Podlaski about the nondisclosure agreements he
18  signed in connection with Operation Neptune Spear?
19      A.   No, I do not.
20      Q.   Do you have any information one way or the
21  other about what information Mr. Bissonnette told
22  Mr. Podlaski about the nondisclosure agreements he
23  signed in general in connection with his service as
24  a Navy SEAL?
25      A.   I don't know what Mr. Bissonnette would

Page 88

1   have told Mr. Podlaski.  My assumption is that
2   Mr. Podlaski would have said, you know, show me
3   your, you know, your read-on, your read-off, your
4   SCI, you know, NDS, your classified information NDA,
5   and then assisted him in determining what his
6   actions should be.
7       So, therefore, really what Mr. Bissonnette
8   told Mr. Podlaski, no, I don't know, nor would it
9   affect what I -- my opinion really, because I think
10  that opinion should be grounded in what the, you
11  know, what the requirements are, particularly in the
12  SCI nondisclosure statement.
13      Q.   So you're -- just so I understand your
14  answer, your answer is you don't know what
15  Mr. Bissonnette told Mr. Podlaski about the
16  nondisclosure agreements that he signed in
17  connection with his military career but that it
18  doesn't matter because Mr. Podlaski should have
19  confirmed it or otherwise assisted on it?  Is that
20  what your testimony is?
21      A.   Well, my assumption is that Mr. Podlaski,
22  his first move would be to look at the, you know,
23  the documents that Mr. Bissonnette executed in
24  connection with his read-on, his read-off, you know.
25  And again, we're talking about the CINA, the SCI



Page 89

1  nondisclosure statement, any indoc statements or
2  anything like that, the read-off.  That would be the
3  starting point for any kind of representation
4  relating to a book review so that then the documents
5  speak for themselves.
6        And that's why when I say it doesn't
7  matter what, you know, Mr. Bissonnette said to him,
8  I'm just saying that the documents speak for
9  themselves.  So that's why to me the standard of
10  care would dictate look at those first and determine
11  what the standard is and then take the obligations
12  from that.
13        Q.  Now, do you know one way or the other
14  about Mr. Bissonnette's interest in maintaining
15  secrecy over his work in connection with the
16  preparation and the ultimate publication of the book
17  No Easy Day?
18        A.  I'm sorry.  Can you read that back?
19        Q.  I can rephrase it for you.
20        A.  I just want to make sure I've got it.
21        Q.  I understand.
22        THE REPORTER:  Question:  "Now, do you
23  know one way or the other about Mr. Bissonnette's
24  interest in maintaining secrecy over his work in
25  connection with the preparation and the ultimate

Page 90

1  publication of the book No Easy Day?"
2        THE WITNESS:  I'm sorry.  I'm going to ask
3  you to read it back one more time.
4        THE REPORTER:  Question:  "Now, do you
5  know one way or the other about Mr. Bissonnette's
6  interest in maintaining secrecy over his work in
7  connection with the preparation and the ultimate
8  publication of the book No Easy Day?"
9        MR. TOBEY:  Object to the form.
10        A.  I would assume that Mr. Bissonnette would
11  be concerned about meeting the obligations of his
12  classified information nondisclosure agreement and
13  his SCI nondisclosure, you know, statement and, you
14  know, the obligations that he had to the government
15  in terms of, you know, meeting those.  I think that,
16  you know, Mr. Bissonnette, you know, had no desire
17  to get crosswise with the government and wanted to
18  meet his obligations under that.
19        I mean, my understanding all along is
20  that's frankly why he, you know, he -- I mean,
21  that's certainly why I felt like I was being hired
22  for No Hero was to help him navigate those
23  responsibilities and make sure that he didn't, you
24  know, run into any trouble.  So if that -- if that
25  addresses his desire on the --

Page 91

1  BY MR. FURMAN:
2        Q.  No, I'm asking a different question, so
3  I'm going to rephrase it.
4        A.  Okay.  Yeah, please rephrase it because I
5  don't understand it.
6        Q.  Do you know whether or not Mr. Bissonnette
7  told Mr. Podlaski that he, Mr. Bissonnette, did not
8  want anyone in the military to know that he was
9  preparing to write a book about Operation Neptune
10  Spear?
11        MR. TOBEY:  Object to the form.
12        A.  No, I don't -- I don't know anything about
13  that.
14  BY MR. FURMAN:
15        Q.  Around the time of the publication of
16  No Easy Day going into the late summer, early
17  September of 2012, is that roughly the first time
18  that you learned that the book was being written?
19        A.  Yes.  I mean, I recall, you know, I think
20  it may have been an e-mail from a SEAL buddy of mine
21  or something like that in Tampa or something.
22  Somewhere in an informal, you know, SOF, all caps,
23  S-O-F, special operations forces network or
24  something like that, you know, I heard buzz about
25  the book.  That was the first time I became aware of

Page 92

1  it.
2        Q.  Can you describe what that buzz was?
3        A.  It was just anytime there is a, you know,
4  books that are coming out, which happens frequently
5  within that SOF community, as I said.  And again,
6  I'm saying SOF as an acronym, S-O-F, for special
7  operations forces.  You know, for example, when
8  Lone Survivor came out, there was buzz about it, you
9  know, there's talk about it.  It's something that a
10  lot of people in the community are obviously going
11  to read.
12        So it was something similar to that, but I
13  don't -- I didn't pay special attention to it
14  because -- and again, I wasn't involved in anything
15  at that time.  So, you know, it was more in the, you
16  know, the fall of 2013 when I became involved in
17  anticipation of No Hero that I really looked back,
18  frankly went back and read No Easy Day again.
19        Q.  Would you consider yourself in the SOF
20  community?
21        A.  I would say former SOF since I'm retired
22  now.  So, as much as I'd like to say I still am, I'm
23  not.  But it's a -- it's a -- as I said before, no
24  surprise, it's a fairly small community when you get
25  right down to it and that likes to stay in touch,



Page 93

1  so --
2      Q.  Now, would you say that the publication of
3  No Easy Day was controversial within the SOF
4  community?
5      A.  At the first time I heard about it, no
6  more so than other books.
7      Q.  Well, when you say no more so, what does
8  that mean?  You mean that there was controversy?
9      A.  I'm trying to remember a book that came
10  out from a SOF operator that didn't create
11  controversy within the community, because in
12  general, and I'm -- this is a gross
13  oversimplification, but just about any book that
14  comes out by anybody, there's going to be a segment
15  of the community that doesn't like it because they
16  don't think anybody should write about it that's
17  from the community.
18          In my experience, there's going to be a
19  segment of that community that, you know, likes the
20  fact that it was written as long as it's not just
21  about self-glorification or something like that.
22  They generally want, you know, one of their own to
23  tell a story.  And then there's that group that
24  really could care less.  So every book that comes
25  out, whether it's, you know, a household name or

Page 94

1  whether it's just the latest one to come out, tends
2  to get that treatment within the community.
3      Q.  Were you aware that shortly before the
4  publication of No Easy Day, there was a group of
5  Navy SEALs that actually wrote a piece on the
6  internet that was very condemning of Mr. Bissonnette
7  for writing the book in the first place?
8      A.  Are you asking at the time the book came
9  out was I aware of that or -- I'm sorry.
10      Q.  Well, did you become aware of it at some
11  point?
12      A.  Later I did, once there was obviously a
13  little bit more buzz ultimately about No Easy Day
14  than your standard book, you know, because of the
15  issues that happened with it.  But, yes, I'm
16  generally aware.  I don't think I've ever read that
17  account that you're talking about, but I know there
18  have been a lot of writings and a lot of opinions
19  thrown around about the subject.
20      Q.  Are you aware of there being a rock in
21  the -- at the SEAL headquarters in Virginia Beach
22  that contains the names of certain SEAL members that
23  are no longer considered to be in good standing?
24      A.  No, I'm not aware of that.
25      Q.  Have you ever heard of that concept?

Page 95

1      A.  I mean, I've heard of that concept.  A lot
2  of units will have that, you know, type of thing.
3  It's usually -- but it's not necessarily the same
4  form.  A lot of times it's just more of a -- again,
5  that -- you know, that array of opinions that I said
6  that tend to follow any publication, you know,
7  that's going to exist whether it exists in granite
8  or just in, you know, within the talk and buzz
9  within the community.  I mean, that's not uncommon.
10      Q.  Do you know one way or the other -- well,
11  let me rephrase that.  Have you heard in the SOF
12  community that Mr. Bissonnette has been what's
13  described as, quote, PNG'd, close quote, which I
14  believe stands for persona non grata?
15      A.  I've not -- yes, I've heard that, you
16  know, and I think it's been discussed I think in
17  some of the articles and things like that, you know.
18  But it's -- again, it goes back to which one of
19  those little pockets you fall into as to, you know,
20  there's -- I can think of, you know, other guys that
21  I've served with that had the same type of stigma
22  from some people, and others, you know, they do not
23  attach that.  So, yes, I've heard in general, but I
24  can't cite to you where I heard it or, you know, a
25  particular article or anything.

Page 96

1      Q.  And putting aside the contractual
2  obligations that attach, which are obvious, in
3  relation to the SOF community, do you believe that
4  there is a segment there that believe that it's
5  inappropriate for a Navy SEAL to write a book about
6  an operation?
7      A.  Well, as I said, yes, there's always a
8  segment within every special operations unit I'm
9  aware of that some people are going to feel that
10  way.  And generally, whoever writes is going to be
11  PNG'd to that group.  But I've also never seen a
12  situation where there wasn't a counter group to that
13  that -- you know, again, usually -- usually the
14  issue that I've seen that will cause somebody to,
15  you know, get more grief and less acceptance is if,
16  you know, if it's a self, you know, glorification
17  type of thing.  But if it's -- again, it's just a
18  matter of opinion.
19          But that segment and the aspect that
20  you're talking about to me is fairly common within
21  the SOF community.  It's not unique to, you know,
22  necessarily this situation.  You know, you could
23  find it in others just because some people don't
24  want anybody to write about anything, even if they
25  do it the right way, so --



Page 97

1    Q.  Well, I just -- on this point I want to
2  show you a document that has been marked in this
3  case, just an e-mail.  Just wanted to get your take
4  on it.  It's Exhibit 27.  It's an e-mail from
5  Mr. Bissonnette to Robert Luskin, Christine Ball at
6  Penguin Group, Ben Sevier at Penguin Group,
7  Mr. Ragone, R-A-G-O-N-E, who is a publicist,
8  Mr. Gigante, who is a lawyer at Penguin Group, Elyse
9  Cheney, who is a literary agent, Mark Fabiani, who
10  is a lawyer and also a public relations/crisis
11  manager, and the coauthor of No Easy Day called
12  Kevin Maurer.  And that e-mail is dated
13  September 2nd of 2012.
14       In that e-mail Mr. Bissonnette is
15  describing the fact that he -- I'm sorry, he's
16  describing his reaction to being told in December
17  that he was sent home from a trip and he was treated
18  poorly -- I don't want to quote him there -- and
19  that he denies writing the book because of this
20  event.  Do you see that?
21    A.  Yes.
22    Q.  Now, there's a reference there that he
23  spoke with multiple friends at work before he
24  started the book project and every one of them knew
25  he was doing it for the right reasons.

Page 98

1       Given that you now know that
2  Mr. Bissonnette signed a nondisclosure agreement,
3  was it appropriate for him to talk to his friends
4  about the book Operation Neptune Spear?
5       MR. TOBEY:  Objection.  Form.
6    A.  When you say nondisclosure agreement, I
7  assume you're referring to his --
8  BY MR. FURMAN:
9    Q.  SCI nondisclosure agreement.
10    A.  -- SCI nondisclosure agreement?  Well, my
11  assumption would be that the friends at work that
12  he's referring to are fellow members of that same
13  unit who, you know, I will also assume signed the
14  exact same SCI nondisclosure statement.  But the
15  fact that someone -- but notwithstanding that, the
16  fact that someone is writing a book and just
17  acknowledges the fact that they're writing a book,
18  you know, I don't think that in and of itself, you
19  know, that acknowledgment would be improper or
20  unusual, frankly.
21    Q.  Okay.  If I can refer you to Exhibit 24.
22  And Exhibit 24 is an e-mail dated August 17th of
23  2012 -- this is before the publication of No Easy
24  Day -- from Mr. Bissonnette to his literary agent,
25  Elyse Cheney.  You've had a chance to read it before

Page 99

1  today, correct?
2    A.  I don't recall seeing this e-mail.  If
3  you'd give me a minute.
4    Q.  Yeah, if you could just take a moment to
5  read it.
6    A.  (Witness complies.)  Okay.  I've read it.
7    Q.  Okay.  Now, the -- you mentioned earlier
8  that there's at least one segment of this SOF
9  community that would not be upset if they believed
10  that the author was not self-aggrandizing or
11  otherwise trying to promote himself in connection
12  with writing the book about a particular operation.
13       Having read that e-mail, do you have a
14  different opinion as to whether Mr. Bissonnette was
15  self-promoting or trying to profit off of his
16  involvement in Operation Neptune Spear?
17    A.  No, it doesn't change my view of that.  I
18  mean, every author that writes a book is going to
19  profit from it, you know, presumably.  So it's not a
20  matter of -- I mean, it's also an individual
21  perception issue.  I made a very general statement
22  about those three segments that I referred to, so I
23  don't see anything here that, you know, changes my
24  view of that.
25       I mean, there's clearly an issue of

Page 100

1  wanting to give back some of that money to the
2  community, to the -- you know, I understood, you
3  know, later I understood that some of the -- some of
4  the proceeds were intended to go to Naval Special
5  Warfare Family Foundation or something that's a
6  related type of charitable organization.
7    Q.  Are you aware that the SEAL Foundation
8  turned Mr. Bissonnette down?
9    A.  I believe -- yes, I'm aware.  I'm not sure
10  how I became aware of that.  I think Matt may have
11  mentioned that at some point, but --
12    Q.  And do you know why they turned him down?
13    A.  I have no idea.
14    Q.  And the SEAL Foundation is a charitable
15  organization, correct?
16    A.  As far as I know.  Most of the special
17  operations units have a family support type of
18  foundation that's available.  I know there's plenty
19  of others I could name that are similar, so I'm
20  assuming it's a 501(c)(3) or some sort of a
21  nonprofit.
22    Q.  And yet the SEAL Foundation didn't want
23  any contributions from Mr. Bissonnette?
24    A.  Right, that's my understanding.
25    Q.  Now, in this e-mail there's a reference to



Page 101

1  a person named Warren West.  Do you know who that
2  is?
3      A.  I do not.
4      Q.  You know who Mark Owen is, right?
5      A.  Yes.  I know what that pseudonym means.
6      Q.  If I were to tell you that the pseudonym
7  Warren West is also a reference to -- is a pseudonym
8  for Mr. Bissonnette in connection with his
9  involvement in Hollywood working with HBO and
10  DreamWorks and other movie houses, would that change
11  your view as to whether Mr. Bissonnette was trying
12  to profit off of the -- his involvement with the
13  Navy SEALs?
14      A.  No, it doesn't change my view because I
15  think you may be misunderstanding my view or how
16  that's being expressed.  It's not that -- you know,
17  and again, it's a personal decision.  Somebody may
18  think that, you know, if you make one penny off of
19  your service, then that's -- they don't like that.
20  Other people may have a differing view of it.
21          The predominant -- again, gross
22  generalization, but the predominant beef or, you
23  know, complaint that I think most people that I'm
24  aware of have within the SOF community when somebody
25  does this is not whether or not they make money.

Page 102

1  It's how they tell the story.
2          And there are -- we can see, you know,
3  again, for everybody's individual assessment,
4  different people handle things differently, you
5  know, in the public eye as to what their, you know,
6  their involvement was with the service, so -- but
7  nothing about this e-mail or nothing -- assuming
8  what you're saying, I have no reason to believe what
9  you're saying is not true.  Even if that is another
10  pseudonym, the fact that he's, you know, running
11  down movie deal aspects of it or other books or
12  whatever, you know, it doesn't -- it doesn't bother
13  me and it doesn't -- and I don't think it would
14  change the opinion of, you know, of necessarily
15  everybody in the community or anything like that
16  because, again, it's more how you tell the story
17  than it is exactly what profits you're making.
18      Q.  Now, I want to turn back to Mr. Podlaski.
19  You had earlier said that you felt that he deviated
20  from the standard of care.  I'm paraphrasing your
21  testimony.
22      A.  Yes, I believe I said that I do -- I do
23  believe that Mr. Podlaski should have advised
24  Mr. Bissonnette, you know, to submit, you know, the
25  manuscript for No Easy Day for prepublication

Page 103

1  security review.
2      Q.  Is there any other specific departure from
3  the standard of care that you would attribute to
4  Mr. Podlaski's representation of Mr. Bissonnette?
5      A.  No, because the one I just highlighted
6  really is the only one I'm -- the only aspect I've
7  ever really considered it in.
8      Q.  Do you know the classification level of
9  Operation Neptune Spear?
10      A.  Again, we're back to that whole issue
11  of you're talking classification --
12      Q.  Classification.  Do you know if it's top
13  secret, not top secret, or otherwise?  Do you know?
14      A.  Again, I'm not trying to be nonresponsive,
15  but I will say that I've never heard of an
16  operation, you know, given a particular label like
17  that.  There are -- I would assume that if you were
18  to attribute a label to it, there are only three
19  classifications available.  And, you know, so I
20  would assume that it would be a top secret
21  operation, but more accurately, I would say that
22  there are certainly aspects, different aspects that
23  would be at different classification levels.
24          And as we talked earlier, the issue of,
25  you know, other programs that may or may not be

Page 104

1  involved in certain aspects of an operation have
2  such an effect on classification issues that, you
3  know, again, that's why I would say that it's, you
4  know, if you had to choose between confidential,
5  secret or top secret, which are the only three
6  classifications that exist, yes, I would assume an
7  operation like that would receive the, you know, the
8  highest level.  But I don't know.  I wasn't --
9  didn't participate in the operation and don't know
10  how it was -- how it was portrayed.
11      Q.  Now, I'm bearing in mind I don't know one
12  way or the other in my question.  I just -- I'm
13  going to bear in mind your caveat that there may be
14  aspects of a particular operation that are subject
15  to varying degrees of classification, so I
16  appreciate that.  But with that in mind, do you know
17  one way or the other what aspects of Operation
18  Neptune Spear were top secret or something
19  otherwise?
20      A.  No.
21      Q.  Now, if No Easy Day was submitted for a
22  prepublication review, what in your mind do you
23  think would have happened?
24      A.  Again, I can -- I would assume it would
25  run through the same process.  It would be very



Page 105

1  similar to the process we went through for No Hero.
2  And my assumption is that there, you know, typically
3  there -- haven't seen a manuscript that didn't get
4  some sort of, you know, recommendation or redaction
5  of some sort. But I think it would have been, you
6  know, it would have been reviewed, similar to how
7  the other books that were coming out, you know, at
8  the time, some of which, you know, did discuss the
9  operation.
10     Q.  Which books are those that you're
11  referring to?
12     A.  Again, this is what we referred to
13  earlier. I can't name all the names. I just know
14  that I'm fairly certain that, you know, Secretary
15  Gates, Secretary Panetta, General McChrystal had
16  books, I believe, that -- I don't know if Brandon
17  Webb put out a book or not. Then there was the
18  other SEAL gentleman that I'm not sure of his name.
19     You know, there were other books that came
20  out. Whether they were totally about that operation
21  or whether that operation was just part of their,
22  you know, part of their structure, I don't know.
23  But my assumption is that the book would have gone
24  through the normal prepublication security review
25  process, and I would expect it to, you know, to

Page 106

1  largely survive intact.
2     Q.  Do you know what sections of No Easy Day
3  would have survived intact?
4     A.  I don't know because I'm not the
5  classification authority, so obviously I wouldn't
6  know that, but --
7     Q.  And do you know -- I know I'm asking an
8  obvious question, but the reverse of that is, do you
9  know what sections of the book would have been
10  redacted?
11     A.  No.
12     Q.  Do you know the time frame that if No Easy
13  Day had been submitted for a prepublication review,
14  say in August of 2012, how long the process would
15  have taken from publication to -- appeal process to
16  a publishable book?
17     A.  Obviously I don't know, but my opinion is
18  that it would have taken less time than No Hero took
19  because No Hero is saddled with the baggage from
20  No Easy Day. And so if you want to look at that as
21  a potential model, that's probably the closest thing
22  I would come to.
23     I would assume, you know, something -- I
24  believe the No Hero was we said early January
25  through sometime early April. I believe it would be

Page 107

1  some time less than that in length is what I would
2  expect. But again, this is total speculation
3  because, you know, I don't -- you know, there are a
4  lot of other factors that can go in, but I would
5  have no reason to believe that it would take as long
6  as No Hero did.
7     Q.  Now, I'm just turning to No Hero. I just
8  want to make sure I understood it. I understood
9  that the appeal of the initial redactions were taken
10  in April -- I'm sorry, the first set of redactions
11  were received from the DOPSR in early April.
12     A.  Uh-huh.
13     Q.  There was a mid-May 2014 appeal and that
14  the resolution of that appeal was received by letter
15  in August of 2014.
16     A.  That's correct as to No Hero, but --
17     Q.  As to No Hero.
18     A.  -- the speculation that you asked me to do
19  about No Easy Day, I don't know that there would
20  have been an appeal. I'm talking -- I was talking
21  about the first -- getting, you know, from the time
22  you submit a manuscript until you get an
23  approved-as-admitted manuscript, and ideally you're
24  in a situation where there is no appeal. So --
25     Q.  So is it your -- so I can understand it,

Page 108

1  you're telling me that based on your knowledge and
2  experience, you believe that if No Easy Day was
3  submitted for a prepublication review, it would have
4  been reviewed and in a publishable form within four
5  months of submission?
6     A.  I think that DOPSR would have done their
7  best to meet their target of 30 working days, which,
8  you know, often morphs into 45 days to 60 days,
9  something like that. I think you would have seen
10  something in that time frame.
11     But again, it's, you know, I don't know
12  whether there -- you know, I'm not assuming there
13  would be an appeal after that because, again, a lot
14  of what we dealt with in No Hero and using that as a
15  time frame is a little problematic because the time
16  certainly took longer because of the issues that we
17  had inherited from the No Easy Day situation.
18     Q.  Isn't it fair to say that in giving your
19  answer about what you believe to -- what would have
20  been the time frame had the book No Easy Day had
21  been submitted for prepublication review, that
22  you're -- essentially you speculate as to what the
23  government would have done?
24     MR. TOBEY:  Objection. Form.
25     A.  Yeah, I mean, we're talking about



Page 109

1  something that didn't happen, so it's hard for me to
2  do it any way other than speculating. I think
3  that's what you're asking me to do is assume what if
4  it were submitted.
5  BY MR. FURMAN:
6     Q.  Correct.
7     A.  Yes. And that's --
8     Q.  And if I asked you this question, I'm
9  going to apologize in advance. Have you had
10 experience in dealing with the review process with
11 the CIA?
12    A.  Yes.
13    Q.  And do you believe that No Easy Day would
14 have been submitted to the CIA for a review?
15       MR. TOBEY: Objection. Asked and
16 answered.
17    A.  Again, generally, if an agency is
18 discussed in a book, I will assume that they're
19 probably going to see it. So I would assume that
20 they would.
21 BY MR. FURMAN:
22    Q.  If you were to tell a jury what factors
23 the CIA would consider when they're reviewing a
24 book, what would you tell the jury?
25    A.  Well, the -- my assumption is that they

Page 110

1  would look at similar factors to what, you know, DOD
2  related components would look at, which are going to
3  be, you know, typically things that, you know, like
4  sensitive locations, you know, TTPs, as we call
5  them, tactics, techniques, and procedures. That
6  typically is the thing that, you know, creates the
7  most angst within any review.
8        And then to the extent they had, you know,
9  different considerations or different issues that
10 were important to them about, you know, a particular
11 subject, then those get injected. But those could
12 be -- those could be -- that could exist or could
13 not exist but would be necessarily, you know, at
14 play if applicable.
15       MR. FURMAN: Why don't we take a -- now I
16 smell food.
17       MR. TOBEY: Yeah. Are you getting hungry?
18       MR. FURMAN: Can we take a break, but can
19 we keep it sort of short?
20       MR. TOBEY: Well, we're right here, so we
21 can take 15, 20 minutes.
22       MR. FURMAN: Is that okay? And then what
23 I'm really aiming to do is to be able to wrap up by
24 3:30.
25       Do you anticipate asking questions?

Page 111

1        MR. TOBEY: Just a few minutes.
2        MR. FURMAN: All right. Good. All right.
3  Thank you.
4        (Recess from 1:47 to 2:17)
5  BY MR. FURMAN:
6     Q.  Mr. Enslen, do you know whether or not the
7  book No Easy Day contains classified or sensitive
8  information?
9     A.  No, I don't.
10    Q.  If I can refer you to Exhibit 1, have you
11 seen that letter before, the letter that was written
12 by Mr. Johnson who at the time was general counsel
13 to the Department of Defense on August 30th, 2012,
14 to Mr. Bissonnette care of Penguin Books?
15    A.  Yes, I've seen this before.
16    Q.  When was the first time you saw it?
17    A.  I don't recall specifically, but I assume
18 I would have seen it proximate to the time that I
19 first talked with Mr. Bissonnette in the fall of
20 2013.
21    Q.  In the letter, at the end of the second
22 paragraph of the letter, Mr. Johnson states,
23 quote, "In the judgment of the Department of
24 Defense, you are in material breach and violation of
25 the nondisclosure agreements you signed."

Page 112

1        Do you agree with that statement based on
2  the information that you now know and also the
3  nondisclosure agreement that was attached to
4  Mr. Johnson's letter?
5     A.  In the context of failure to submit for a
6  prepublication security review, yes, I would think
7  that's a correct statement based on what I know.
8     Q.  The last sentence of the second paragraph
9  states, quote, "Further public dissemination of your
10 book will aggravate your breach and violation of
11 your agreements." Do you see that?
12    A.  Yes.
13    Q.  Do you believe that at that point in time
14 the book -- there should have been no further
15 efforts to disseminate No Easy Day based on
16 Mr. Johnson's letter?
17    A.  I can't say there shouldn't have been
18 further efforts. I just think it is what it is.
19 They're -- DOD is firing a shot across the bow, and
20 you're proceeding at your own risk at that point,
21 so --
22    Q.  Do you know one way or the other whether
23 the book was released for publication on the day of
24 that August 30th, 2012, letter?
25    A.  I don't know because, again, I wasn't



Page 113

1   involved at this stage, so --
2       Q.   Are you aware of the publication date of
3   No Easy Day?
4       A.   No.  I know it was -- my recollection is
5   and understanding is that it was sometime not too
6   long after this letter, but I don't know exactly
7   what the date was.
8       Q.   Did you review any materials that relate
9   to Mr. Luskin's representation of Mr. Bissonnette in
10  connection with Mr. Jeh Johnson's letter of
11  August 30, 2012?
12      A.   Ever or at the time of --
13      Q.   Ever.
14      A.   Can you -- I have within -- within the
15  last -- in preparation for this deposition I have,
16  so --
17      Q.   Have you formed an opinion one way or the
18  other as to Mr. Luskin's involvement and work on
19  behalf of Mr. Bissonnette in connection with the
20  response to Jeh Johnson's August 30, 2012, letter?
21      A.   No, I haven't.
22      Q.   Do you believe that Mr. Luskin should have
23  told Mr. Bissonnette and his publishers not to
24  publish No Easy Day in view of Jeh Johnson's
25  August 30th, 2012, letter?

Page 114

1       MR. TOBEY:  Objection.  Form.
2       A.   I really don't know enough of the facts of
3   what was -- what was really going on at that time as
4   to what would have driven Mr. Luskin's guidance and
5   advice on that subject.  So, you know, I don't have
6   an opinion one way or the other based on that.
7   BY MR. FURMAN:
8       Q.   And if you could take a look at
9   Exhibit 109.  Bear with me a moment.  I need to
10  review it myself.  I'm going to focus your attention
11  on paragraph 4, 4(b).  Let me know when you're
12  finished reading 4(b).  I just have a question in
13  relation to that paragraph.
14      A.   Okay.  I've read it.
15      Q.   If in fact the publisher decided to follow
16  the instruction in Jeh Johnson's August 30th letter
17  of 2012 to not further disseminate the book No Easy
18  Day, do you believe that paragraph 4(b) would have
19  rendered such a decision to not be a violation of
20  the contract?
21      MR. TOBEY:  Objection.  Form.
22      A.   And can you identify this -- I know you
23  identified the Exhibit 109.  We're looking at the
24  contract between --
25  BY MR. FURMAN:

Page 115

1       Q.   This -- I'm sorry.  Let me rephrase that.
2   Document Exhibit 109 is a copy of the contract that
3   was between the publisher and Mr. Bissonnette for
4   the book No Easy Day.
5       Q.   Can you repeat the question?
6       A.   Yeah.
7       A.   Or she could read it back.
8       Q.   Yeah, I can rephrase the question.  I want
9   to try to make it easier for you.
10          Based on your reading of paragraph 4(b),
11  do you believe that it would have been contractually
12  possible for the publisher to stop publication of
13  the book No Easy Day in view of Jeh Johnson's
14  August 30th, 2012, letter in order to work out any
15  issues with the Department of Defense?
16      MR. TOBEY:  Objection.  Form.
17      A.   I don't know that it would -- again, with
18  the understanding that this is a long contract and
19  we're zeroing in on one clause and I haven't read
20  all of the other provisions of the contract and
21  therefore don't know if something else within this
22  contract might unseat that.
23          But it's certainly a relevant
24  consideration, but I don't -- again, I wasn't
25  involved at this stage.  I wasn't involved in this

Page 116

1   matter, so I don't know if there were other facts
2   that may, you know, lead the publisher to decide
3   that that wouldn't apply or wouldn't, you know,
4   wouldn't be in effect.
5   BY MR. FURMAN:
6       Q.   Do you have any knowledge one way or the
7   other as to the decision to move the publication
8   date of No Easy Day from September 11th, 2012, to
9   September 4th of 2012?
10      A.   No, I do not.
11      Q.   Did you -- rephrase that.  Start over.
12          Do you have any information about
13  Mr. Bissonnette's activities that were the focus of
14  certain government investigations?
15      THE WITNESS:  Can you read that back?
16      THE REPORTER:  Question:  "Do you have any
17  information about Mr. Bissonnette's activities that
18  were the focus of certain government
19  investigations?"
20  BY MR. FURMAN:
21      Q.   Other than the book No Easy Day.
22      A.   I am aware of other aspects,
23  investigations that I believe clearly stem from
24  No Easy Day that, you know, have gone on since that
25  time.



Page 117

1    Q.   Well, let me ask you some specifics.  Are
2  you aware of the government's investigation of
3  Mr. Bissonnette in connection with certain artifacts
4  that he kept in his possession following Operation
5  Neptune Spear, including but not limited to a
6  photograph of bin Laden's body after he was killed?
7    A.   No, I'm not aware of any of that.
8    Q.   Are you aware of the government's
9  investigation of Mr. Bissonnette as it relates to a
10  business called, quote, Chief Consulting Group,
11  close quote?
12    A.   That name does not ring a bell.  Again,
13  I'm aware that there were -- there had been ongoing
14  investigations as, you know, frankly it seems the
15  federal government has done everything they can to
16  leave no stone unturned within his life.  So I'm
17  aware of it not from representing him in it, but
18  those are the same kinds of things like No Easy Day
19  that have had effects on things such as No Hero and
20  subsequent things that we've been trying to get
21  approved from DOPSR.
22    Q.   For example, Mr. Bissonnette was involved
23  in an enterprise called, quote, The Element Group,
24  close quote.  Have you heard of that enterprise?
25    A.   That name does not ring a bell.

Page 118

1    Q.   Are you aware generally that
2  Mr. Bissonnette was involved in either owning
3  businesses or consulting with businesses that were
4  alleged to have contracts with the Navy?
5    A.   I recall there being some mention of, you
6  know, some kind of consulting, some kind of
7  consulting agreement.  But again, I wasn't handling
8  it.  It was just something that I recall going on in
9  parallel and that I was made aware of because, you
10  know, of the potential for it to have effects on
11  things that we were continuing to try to, you know,
12  get approved through OSR or DOPSR.
13    Q.   And finally, the video game Medal of
14  Honor, are you aware of Mr. Bissonnette's
15  involvement with Medal of Honor, the video game, and
16  the government's investigation of that?
17    A.   That rings a bell that that was part of an
18  investigation.  I'm not specifically aware of
19  anything related to that.  Again, that was really
20  before my time.
21    MR. FURMAN:  I think I'm very close to
22  wrapping up.  Could I just have a quick moment --
23    MR. TOBEY:  Sure.
24    MR. FURMAN:  -- just to review my notes?
25  And we can go off the record.

Page 119

1    (Recess from 2:32 to 2:35)
2  BY MR. FURMAN:
3    Q.   Referring to Exhibit 1 and the attachments
4  to Jeh Johnson's letter, do you have an opinion one
5  way or the other as to whether the DD-1847 that was
6  signed by Mr. Bissonnette in 2007 should have
7  applied to the contents of No Easy Day?
8    A.   Yes, in my view it would, just from the
9  simple standpoint that once you're read on, you're
10  read on until you're read off.  So, yes.
11    Q.   There are acronyms -- and I'm going to
12  point to the section of DD-1847 that is at the very
13  beginning of it.  In the preamble there are some
14  acronyms that are at the very top of the SCI
15  nondisclosure agreement.
16    And I believe the best way to do it is for
17  me to show it to you on the eighth page of
18  Exhibit 1.  And I appreciate that it's very hard to
19  read, and I doubt the government intended for it to
20  be so hard to read, but there are acronyms that
21  relate to what appear to be certain SAP programs.
22    Do you know what those acronyms stand for?
23    A.   Yes, I do.
24    Q.   Could you tell me what they stand for?
25    A.   I cannot tell you what they stand for.

Page 120

1    Q.   And I don't know if you can answer this
2  question, but based on your knowledge of what those
3  acronyms stand for, do you believe that for that
4  reason the DD-1847 that was signed in 2007 relates
5  to the contents of No Easy Day, or is that something
6  that you cannot tell me?
7    A.   Well, it really goes to your last question
8  on this.  To me it's -- in terms of -- this really
9  defines what you're read on for specifically.  I
10  mean, what I can say is that as other programs
11  obviously as you've already identified these as, you
12  know, program acronyms, that's -- that's what you're
13  read on for.  And until you're read off, which is
14  what you would see if you continue on for a read-off
15  sheet, that's what you're read off for.
16    So whether those programs would
17  specifically apply to, you know, the subject matter
18  of No Easy Day, first of all, I wouldn't be
19  qualified to answer that having not been involved in
20  that operation.  And if I was, I wouldn't be able to
21  answer that question, so --
22    MR. FURMAN:  So I want to take that
23  answer, both parts of that answer just to break it
24  down.  Let me just have it read back, the answer,
25  and I'll work off of that.  Thanks.



Page 121

1      (The answer was read)
2  BY MR. FURMAN:
3      Q.  So I'm now working off of that answer.  If
4  you were read on to the program that comprises of
5  this part if not all of Operation Neptune Spear, you
6  wouldn't be able to tell me, because of the
7  classification of that information, whether or not
8  No Easy Day violates that nondisclosure agreement.
9  Is that correct?
10     A.  No, I wouldn't -- I would say that's not
11  correct.  I believe that the -- maybe the reason for
12  reading something on is being taken a little bit out
13  of context maybe.  I mean, individuals are read on
14  for certain programs.  Whether those programs become
15  applicable to particular operations, you would only
16  know if you were involved in the operation.
17         And, you know, the reason I said I
18  wouldn't be able to respond if I was involved in it,
19  I'm only going to be able to discuss that with other
20  people that are similarly read on.  Does that make
21  sense?
22     Q.  Well, the reason I'm asking that is
23  because what I don't understand is if there are
24  elements of the book No Easy Day that would fall
25  within any one of those acronyms that are on the

Page 122

1  DD-1847 that is attached to Exhibit No. 1 that was
2  signed in 2007, by definition Mr. Bissonnette's book
3  would not have been allowed to be published.  At
4  least that's my understanding.
5      A.  In response to that, I would say the
6  concern would not be that if anything in that book
7  related to anything, you know, here, because these
8  programs, the fact that something -- if there was
9  something that was pertinent to one of these
10  programs that went on in the operation, then it
11  wouldn't necessarily render, you know, a portrayal
12  of the operation, you know, invalid or anything like
13  that or problematic.  I mean, in other words, these
14  are -- things are compartmented for a reason,
15  because they want certain things, you know, not to
16  be, you know, widely disseminated.
17         So, you know, but just because -- I mean,
18  most operations, quite frankly, are going to be
19  subject to, in the special operations community, are
20  going to be subject from time to time to different,
21  you know, programs.  But that doesn't -- doesn't
22  render the entire operation, you know, off limits
23  from discussion, or it might.
24         It just depends on what -- that's why
25  it's -- I'm not trying to be evasive.  I'm just

Page 123

1  trying to -- I'm trying to put a round peg into a
2  square hole really is what I feel like, honestly,
3  when we're talking about how being read on for these
4  programs in 2007 and the effect of those on,
5  specifically on an operation in 2011 is a, you know,
6  is a difficult, you know, point to get to.
7      Q.  I understand.  So let me point you from a
8  different angle.  Would you need to know what
9  information is within the compartmented
10  nondisclosure agreement, what information
11  Mr. Bissonnette was read on to, would you need to
12  know that before you can determine what parts, if
13  any, were objectionable in No Easy Day?
14     A.  That's why you have a prepublication
15  security review process, because the classifying
16  authority is how you would know that.  They would
17  determine that.
18     Q.  And without knowing that -- and this is, I
19  guess, the follow-up question to that is without
20  knowing what that information is, how could you, me,
21  or a jury know what aspects of No Easy Day would be
22  publishable or not?
23     A.  Well, in a general sense, anyone who had
24  been read on for SCI before would have a pretty good
25  idea.  You know, again, every operation is

Page 124

1  different.  If you're not involved in an operation,
2  you're not involved in it, so you're not going to
3  have specific knowledge.
4         But the way these programs work, again,
5  you know, these -- if you're read on for these and,
6  you know, just based on experience within, you know,
7  the military and having been, again, holding an SCI
8  billet, read on for SCI programs, you have a pretty
9  good idea.
10         But again, it wouldn't be your call.
11  That's what DOPSR and that process is for.  You
12  know, that's why they're not going to let an author,
13  even if the author says, you know, I am -- I've been
14  read on for these things, I know I can do this
15  myself, that's why there's a process, because that's
16  the oversight and that's why the process is so, you
17  know, so critical.
18     Q.  Just a few follow-up questions, and I
19  think I'm done.
20         Was there a coauthor with No Hero?
21     A.  Yes.
22     Q.  That was Kevin Maurer?
23     A.  Yes.
24     Q.  Was he -- I'm sorry.  Strike that.
25         Did Mr. Maurer receive any kind of



Page 125

1 authority from the government before he became
2 involved in writing the book, prior to the
3 prepublication process?
4 MR. TOBEY: Objection. Form.
5 BY MR. FURMAN:
6 Q. In other words -- strike that. Let me ask
7 a better question.
8 Did Mr. Maurer seek approval or clearance
9 from the DOPSR before he became involved in the
10 preparation of the manuscript with Mr. Bissonnette
11 for No Hero?
12 A. I don't know.
13 Q. Should he have done that?
14 A. In my opinion, there would be nothing
15 to -- I don't know what you would apply for or what
16 you would ask them for. I mean, essentially they're
17 going to say send me a manuscript, we're going to
18 put it through the process and tell you if there's a
19 problem.
20 Q. You mentioned earlier that the DOPSR is
21 more comfortable with someone, say, like you who has
22 security clearance in handling the process. In
23 other words, you would get a copy of the manuscript
24 and then hand it over to the DOPSR, and the
25 confidence that the government has is that since you

Page 126

1 have clearance, you know how to handle that
2 information.
3 A. Well, that's a broad assumption on my part
4 and fairly a self-serving assumption on my part as
5 attorney working on the book, but that's not a
6 requirement. You know, there's coauthors, you know,
7 fairly frequently not going to have, you know,
8 they're not going to have the clearance that
9 somebody might have had.
10 But once you don't have a clearance, the
11 fact that you did have a clearance is nice, but
12 it's -- you don't have a clearance. It is what it
13 is at the time. It's a snapshot. And so that's one
14 of the reasons that OSR relies on their process.
15 They're like, here, give it to us, we'll determine
16 what, you know, what needs to be -- needs to be
17 redacted.
18 Q. In respect of No Easy Day, you're aware
19 that Mr. Maurer also worked on that book as well.
20 Yes?
21 A. Uh-huh.
22 Q. It's the first time in this long day that
23 I've had to ask you to keep your answers verbal.
24 A. I just nodded. I told you I was going to
25 fall asleep.

Page 127

1 Q. Do you know whether or not Mr. Maurer
2 sought clearance from the government prior to his
3 receipt of the manuscript of No Easy Day?
4 A. I don't know.
5 Q. Do you know or have an opinion as to
6 whether he should have gotten clearance before he
7 received the manuscript of No Easy Day before the
8 government did?
9 A. Again, I'm not certain what kind of
10 clearance you're talking about because that really
11 isn't part of their process. So, no. My opinion is
12 that there's nothing he should have sought to get
13 because I'm not aware of a process to get any such
14 clearance.
15 MR. FURMAN: Okay. I don't have any
16 further questions. Thank you very much.
17 THE WITNESS: Thank you.
18 MR. FURMAN: And if I didn't say so
19 before, and I don't mind saying it on the record,
20 thank you for your service to this country. Thank
21 you.
22 THE WITNESS: Thank you for that. Thank
23 you for the support.
24 MR. TOBEY: Absolutely.
25

Page 128

1 EXAMINATION
2 BY MR. TOBEY:
3 Q. Let me follow up -- first let me introduce
4 myself. My name's Robert Tobey. I represent
5 Mr. Bissonnette in this lawsuit. And you and I, I
6 guess, met for the first time in person yesterday?
7 A. Correct.
8 Q. Let me ask you some follow-ups to what
9 Mr. Furman kind of ended with, which is asking you
10 what could be said in a book.
11 To your knowledge, as long as there is no
12 confidential information contained in the book,
13 would there be anything to prevent Mr. Bissonnette
14 from writing the story about Operation Neptune
15 Spear?
16 A. No.
17 Q. And assuming there was no confidential
18 information used, would there be anything to prevent
19 Mr. Bissonnette from writing a story about the
20 Captain Phillips issue?
21 A. No.
22 Q. And I think Mr. Furman asked you this
23 question on direct, but let me make sure I have a
24 clear answer. Do you believe that there was
25 confidential information in No Easy Day?



ALAN ENSLEN
MATTHEW BISSONNETTE vs KEVIN PODLASKI

Page 129

1    A.   Let me clarify.  When you say confidential
2  information, are you --
3    Q.   Classified information --
4    A.   Classified information.
5    Q.   -- is the word I meant to use.  Used the
6  wrong word there.
7    A.   Okay.
8    Q.   Do you believe there was classified
9  information in No Easy Day, just upon your review of
10  it?
11    A.   No, I have no reason to believe there was
12  classified information in it based on my review.
13    Q.   All right.  And assuming that book had
14  been submitted for a prepublication review to the
15  DOPSR, do you anticipate that some redactions would
16  have been made by that agency?
17    A.   Yes, because I've never had one submitted
18  to DOPSR that didn't contain some kind of redaction.
19  I would not have expected there to be much in the
20  way of redaction, but --
21    Q.   Okay.  Do you anticipate that the
22  redactions that would have been made by DOPSR would
23  have been impossible for Mr. Bissonnette and
24  Mr. Maurer to write around?
25    A.   No.  I believe that in my experience with

Page 130

1  the process, redactions -- for one, that's why the
2  appeal process exists, because it gives you the
3  opportunity to suggest an alternate -- alternate
4  language or an alternate way of, you know,
5  portraying something.  So I do believe they would
6  have been able to write around any problems that may
7  have been highlighted by DOPSR during the review
8  process.
9    Q.   Okay.  You indicated, I believe, on a
10  question from Mr. Furman that one of the things that
11  a lawyer should do when they're representing an
12  author is to confirm the documents that the author
13  may have signed with the government.
14    A.   That's correct.  They've got to know
15  what -- you've got to know what standard they're
16  being held to before you can really help them comply
17  with, you know, with that standard.
18    Q.   And do you know what, if anything,
19  Mr. Podlaski did to get that confirmation from
20  Mr. Bissonnette?
21    A.   I do not know.
22    Q.   All right.  In your opinion, is it a good
23  idea for the lawyer to rely on the author's memory
24  of what he or she may have signed with the
25  government?

Page 131

1    A.   No, that would not be a good idea because
2  there are different forms.  I mean, we're looking at
3  the ones attached to Exhibit No. 1, you know, make
4  that clear that there are different form numbers and
5  there are different form versions and things like
6  that.  And in my experience, the different commands,
7  you know, may use different forms, and so therefore
8  the verbiage may be slightly different.
9      So, just to know what the standard is,
10  again, it would be -- I would never rely on, you
11  know, verbal -- you know, there's a document.
12  That's the best evidence of what the standard is, so
13  need to see the documents that were executed by the
14  individual.
15    Q.   And assume with me that the lawyer asked
16  the question to the author "What have you signed"
17  and the author responds "I don't know."  What should
18  the lawyer's next step be in that situation?
19    A.   Well, I would say to the client, well,
20  we've got to find out.  We've got to request those
21  documents.  We've got to get them because one way or
22  the other we've still got to find out what that
23  standard is.
24      You know, the fact that the author says --
25  if the author says, hey, I've never been read on for

Page 132

1  SCI so I've never signed any of that, okay, that
2  whittles it down a little bit.  So you would still
3  want to see whatever it is they executed because,
4  again, I know of no other way of knowing what
5  standard the government is going to hold you to with
6  regard to your, you know, your nondisclosure
7  statements, nondisclosure agreements that you've
8  made with them without seeing those documents.
9    Q.   And is there a procedure that exists so
10  that either the author or the lawyer for the author
11  can go to somebody in the government and say we need
12  to see everything that the author has signed?
13    A.   I think there are various procedures that
14  exist, you know, that whether it's going back to
15  your -- what's called your SSO, to use an acronym
16  that I think came out earlier in the deposition, is
17  to make a request through the, you know, the defense
18  department or the component of the defense
19  department that individual worked for.  There are
20  procedures, and it just depends on which note or
21  which level that you would try to go to.  And a lot
22  of that would be driven by who held that clearance
23  or where were they read on, where was their last
24  SSO, that kind of thing.  So, yes, there is -- there
25  are multiple processes that would allow that to



Page 133

1  happen.
2      Q.   All right.  And in this case do you know
3  what steps, if any, that Mr. Podlaski took to
4  determine what Mr. Bissonnette may have signed with
5  the government?
6      A.   I do not know what steps he took.
7      Q.   Now, you alluded two or three times in
8  questions from Mr. Furman that there were
9  difficulties in going through the review process
10  with No Hero as a result of No Easy Day not having
11  been submitted for a prepublication review.  Do you
12  recall that?
13      A.   Yes.
14      Q.   Can you tell us more specifically what
15  those difficulties were?
16      A.   Well, as I said, obviously when this thing
17  started, when No Hero started, the DOPSR point of
18  contact was well aware of who Mr. Bissonnette was
19  and was aware to some extent, I'm not sure to what
20  extent, but was aware to some extent of the problems
21  associated with No Easy Day.
22          So that was a concern that I discussed
23  with him at the beginning to make sure that they
24  understood, you know, without question that
25  Mr. Bissonnette was, you know, absolutely

Page 134

1  100 percent committed to fulfilling his obligations
2  to the U.S. Government and that, you know,
3  essentially we wanted to cross every T, dot every I,
4  and make sure that there was no question about that
5  intent and then also during the review.
6          So, because my concern was that I didn't
7  want spillover from one situation that, you know, I
8  wasn't involved with, and so therefore I wasn't
9  aware of what all the issues were.  But I just knew
10  I did not want them to taint the process for
11  No Hero.  Unfortunately, I believe it did contribute
12  to a slowdown in the No Hero processing.  You know,
13  I've always found DOPSR, though, to be professional
14  and, you know, to try to keep things in their
15  separate lanes as much as possible, and I think by
16  and large they did.  But there was no doubt that we
17  experienced additional delay in No Hero because of
18  what happened in No Easy Day.
19      Q.   And I think you indicated that you
20  actually challenged 127 redactions in No Hero?
21      A.   That's correct.
22      Q.   And there were more redactions than that,
23  but you only challenged 127 of them.
24      A.   That's correct.
25      Q.   All right.  Do you believe if No Easy Day

Page 135

1  had been submitted for a prepublication review, that
2  you would have received many fewer redactions in
3  response by the DOPSR --
4          MR. FURMAN:  Objection.
5  BY MR. TOBEY:
6      Q.   -- for No Hero?
7      A.   Yes, I do.
8      Q.   And what is the basis for that opinion?
9      A.   Again, I believe it was held to -- I'm not
10  saying by DOPSR, but I do believe there were
11  reviewing components that certainly gave more
12  scrutiny to No Hero because of No Easy Day based on
13  what some of the redactions that we received, some
14  of which we won on challenges after it was called to
15  their attention.
16      Q.   And let me ask you this.  You indicated, I
17  think, an answer just a moment ago that in your
18  experience the DOPSR does their job.
19      A.   Yes.
20      Q.   Do you have any reason to believe that if
21  No Easy Day had been submitted to a prepublication
22  review that the DOPSR would have just sat on it; in
23  other words, never done their job?
24      A.   I don't -- I don't think they would have
25  done that.  I think they would have processed it

Page 136

1  like any other, any other publication they received.
2  They didn't -- you know, frankly, they -- as I said,
3  a concern was to make sure they didn't sit on
4  No Hero, and to their credit they did not.  It was
5  processed despite them knowing what they knew about
6  No Easy Day.
7          But again, once it gets to the reviewing
8  components, that's the part that you're more distal
9  from, from that part of the operation, and therefore
10  really don't have as much visibility over what the
11  intentions are by the reviewing components.
12      Q.   But just to summarize, you don't have any
13  reason to believe that the DOPSR would have just not
14  done their job --
15      A.   I have no reason to --
16      Q.   -- in regard to No Easy Day?
17      A.   That's correct.  I have no reason to
18  believe that they would not have done their job.
19      Q.   You indicated in questions from Mr. Furman
20  that you believe that Mr. Podlaski violated the
21  standard of care by not advising Mr. Bissonnette to
22  get a prepublication review of No Easy Day.  Do you
23  recall that answer?
24      A.   Yes.
25      Q.   Do you also believe that that act was a



## Page 137

1  proximate cause of damage to Mr. Bissonnette?

2  A. Yes, absolutely.

3  Q. Okay. Have you done anything to quantify

4  those damages?

5  A. I have not.

6  Q. Okay. Going back to No Easy Day, do you

7  believe that there's anything in the book that would

8  jeopardize the security of the United States?

9  A. No, I don't.

10  Q. Do you believe there was anything in that

11  book that would jeopardize the safety of any members

12  of the United States military, including Navy SEALs?

13  A. No, I don't. And I can assure you that if

14  I did have anything close to that kind of concern,

15  then my answer would be different, so --

16  MR. TOBEY: Pass the witness.

17  MR. FURMAN: You know I love that.

18  No further questions. Mr. Enslen, thanks for your

19  time. Appreciate it.

20  THE REPORTER: Could I get copy orders on

21  the record?

22  MR. TOBEY: Yes. I'd like a copy. I

23  think we're getting a rough.

24  MR. FURMAN: Yeah.

25  MR. TOBEY: And I'd like the e-transcript.

## Page 138

1  (Deposition concluded at 3:03 p.m.)

2

3  -oOo-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 139

1  CHANGES AND SIGNATURE

2  WITNESS NAME:                    DATE OF DEPOSITION:

3  ALAN ENSLEN                      JANUARY 24, 2017

4  PAGE LINE      CHANGE      REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

## Page 140

1  I, ALAN ENSLEN, have read the foregoing

2  deposition and hereby affix by signature that same

3  is true and correct, except as noted above.

4

5  _____

6  ALAN ENSLEN

7  STATE OF _____ )

8  COUNTY OF _____ )

9  Before me, _____, on this

10  day personally appeared ALAN ENSLEN, known to me (or

11  proved to me under oath or through

12  _____) (description of identity card or

13  other document) to be the person whose name is

14  subscribed to the foregoing instrument and

15  acknowledged to me that they executed the same for

16  the purposes and consideration therein expressed.

17  Given under my hand and seal of office

18  this _____ day of _____, 2017.

19

20  _____

21  NOTARY PUBLIC IN AND FOR

22  THE STATE OF _____

23

24  My Commission Expires: _____

25



Page 141

```
1          IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF INDIANA
3   MATTHEW BISSONNETTE,      )
                              )
4            Plaintiff,       )
                              )
5            vs.              ) Case No. 1:15-cv-00334
                              )
6   KEVIN PODLASKI and CARSON )
    BOXBERGER, LLP,           )
7                             )
             Defendants.      )
8   _____)
9           REPORTER'S CERTIFICATE
         ORAL DEPOSITION OF ALAN ENSLEN
10            JANUARY 24, 2017
11       I, KAREN L. SHELTON, a Certified Shorthand
12  Reporter in and for the State of Texas, hereby
13  certify to the following:
14       That the witness, ALAN ENSLEN, was duly
15  sworn by the officer and that the transcript of the
16  oral deposition is a true record of the testimony
17  given by the witness;
18       I further certify that pursuant to FRCP
19  Rule 30(e) that the signature by the deponent:
20       _X_ was requested by the deponent or a
21  party before the completion of the deposition and is
22  to be returned within 30 days from date of receipt
23  of the transcript.  If returned, the attached Errata
24  contains any changes and the reasons therefor;
25       ____ was not requested by the deponent or a
```

Page 142

```
1   party before the completion of the deposition.
2        I further certify that I am neither
3   counsel for, related to, nor employed by any of the
4   parties in or counsel to this action, nor am I
5   financially or otherwise interested in the outcome
6   of this action.
7        Certified to by me this 1st day of
8   February, 2017.
9
10
11       Karen L. Shelton
         Karen L. Shelton, CSR/RDR/CRR
12       Texas CSR 7050, Exp. 12/31/2018
         Esquire Solutions
13       CRCB Registration No. 286
         1700 Pacific Avenue
14       Suite 1000
         Dallas, Texas 75201
15       (214) 257-1436
16
17
18
19
20
21
22
23
24
25
```



1    I, ALAN ENSLEN, have read the foregoing

2  deposition and hereby affix by signature that same

3  is true and correct, except as noted above.

4

5                            ALAN ENSLEN

6

7  STATE OF  Alabama        )

8  COUNTY OF  Jefferson     )

9       Before me,  Daniel Lowery , on this

10  day personally appeared ALAN ENSLEN, known to me (or

11  proved to me under oath or through

12  _____) (description of identity card or

13  other document) to be the person whose name is

14  subscribed to the foregoing instrument and

15  acknowledged to me that they executed the same for

16  the purposes and consideration therein expressed.

17       Given under my hand and seal of office

18  this  6th  day of  March        , 2017.

19

20

21                            NOTARY PUBLIC IN AND FOR

22                            THE STATE OF  Alabama

23

24  My Commission Expires:    9/21/2020

25



| | | CHANGES AND SIGNATURE | |
|---|---|---|---|

WITNESS NAME:                    DATE OF DEPOSITION:

ALAN ENSLEN                      JANUARY 24, 2017

PAGE   LINE      CHANGE          REASON

7    3     Insert "No Hero" so that testimony reads "...for the No Hero manuscript he" Reason: clarification;

11    5     Delete "and a half" Reason: accuracy;

12    10-11     Delete "joint special forces officer" and word "so" (in Line 11) so that testimony reads "... so, as a joint special operations officer, I" Reason: accuracy/readability;

21    18     Isert "additional" so that testimony reads "Something additional is required." Reason: accuracy;

25    19     Delete Replace "types" with "type" Reason: grammar;

26    4     Replace "administrative" with "administrator" Reason: accuracy;





ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
(Errata 1 of 9)

CHANGES AND SIGNATURE

WITNESS NAME:                          DATE OF DEPOSITION:

ALAN ENSLEN                            JANUARY 24, 2017

PAGE    LINE       CHANGE           REASON

28    6    Replace "necessary" with "necessarily"
           Reason: accuracy;


28    17   Insert "of understanding" so that
           testimony reads "... I don't have that
           level of understanding."
           Reason: accuracy/clarification;


30    13   Insert "and" after word "control"
           Reason: accuracy;


31    14   Insert "who" after word "firm"
           Reason: accuracy/readability;


36    22-23   Delete "where I will say there was"
           Insert "—" after word "discrepancy" so
           that testimony reads "... little discrepancy
           — an inconsistency ...."
           Reason: clarification/readability;




1                        CHANGES AND SIGNATURE

2    WITNESS NAME:                    DATE OF DEPOSITION:

3    ALAN ENSLEN                      JANUARY 24, 2017

4    PAGE   LINE      CHANGE          REASON

5     37    17    Delete "with" Reason: readability;

6

7     38   ~~13~~ 14   Insert " also" so that testimony reads

8              "... OSR was also trying to revise "

9              Reason: accuracy/readability;

10

11    43   18-20   Delete "their discussions but not --

12             it's not pure visibility over that"

13             so that ~~the~~ testimony reads

14             "visibility over. So understand...."

15             Reason: accuracy/readability;

16

17    44    22    Delete "that back and you get"

18             Reason: readability;

19

20    45    5    Delete "proposing --"

21             Reason: accuracy;

22

23    45    20   Replace "one" with "manuscript"

24             Reason: accuracy/clarification;

25




```
 1              CHANGES AND SIGNATURE

 2   WITNESS NAME:            DATE OF DEPOSITION:

 3   ALAN ENSLEN              JANUARY 24, 2017

 4   PAGE  LINE     CHANGE        REASON

 5    46    7     Delete "Meaning"

 6                Insert "I mean" so that testimony

 7                reads "By amorphous I mean that...."

 8                Reason: accuracy/readability;

 9

10    50    3     Insert "personnel" after "NAVSPECWARCOM"

11                Reason: accuracy;

12

13    53   15     Delete "will" Reason: readability;

14

15    53   25     Delete "because" Reason: readability;

16

17    56   13     Replace "evaluating" with "using to

18                evaluate" Reason: accuracy/clarification;

19

20    59    8     Insert "is Operation Neptune Spear"

21                after word "gist"

22                Reason: accuracy/clarification;

23

24    59   25     Replace "about" with "and"

25                Reason: accuracy;
```





```
 1              CHANGES AND SIGNATURE

 2    WITNESS NAME:              DATE OF DEPOSITION:

 3    ALAN ENSLEN                JANUARY 24, 2017

 4    PAGE   LINE    CHANGE         REASON

 5    62     12      Replace "in" with "end"

 6                   Reason: accuracy;

 7

 8    63     19      Insert "to" after "straight"

 9                   Reason: accuracy/readability;

10

11    64     24      Delete "for themselves"

12                   Reason: readability/accuracy;

13

14    70     7       Delete "is" Reason: accuracy;

15

16    70     17      Replace "should" with "would"

17                   Reason: accuracy;

18

19    71     23      Insert "me" after "told"

20                   Reason: accuracy/clarification;

21

22    74     1       Delete "as recommended," Reason: accuracy;

23

24    74     8       Delete "itself" Reason: accuracy;

25
```





ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
(Errata 5 of 9)

```
1              CHANGES AND SIGNATURE
2    WITNESS NAME:           DATE OF DEPOSITION:
3    ALAN ENSLEN             JANUARY 24, 2017
4    PAGE  LINE    CHANGE        REASON
5     74   21   Replace "have" with "give"
6                Reason: accuracy;
7
8     80   20   Delete "the" Reason: accuracy;
9
10    80   22   Delete the word "to" just prior
11               to the word "which"
12               Reason: accuracy/readability;
13
14    80   23   Insert "had" after "have"
15               Reason: accuracy;
16
17    82    8   Insert "the public domain" after
18               the word "in" so that testimony reads
19               "They were in the public domain prior to..."
20               Reason: accuracy/clarification;
21
22    83   14   Insert "in" before the word "an"
23               Reason: accuracy;
24
25
```





(Errata 6 of 9)

ALAN ENSLEN                                      January 24, 2017
MATTHEW BISSONNETTE vs KEVIN PODLASKI                      139

| | |
|---|---|
| 1 | CHANGES AND SIGNATURE |
| 2 | WITNESS NAME:                DATE OF DEPOSITION: |
| 3 | ALAN ENSLEN                  JANUARY 24, 2017 |
| 4 | PAGE  LINE    CHANGE        REASON |

| PAGE | LINE | CHANGE / REASON |
|---|---|---|
| 84 | 6 | Delete "or something" after the name "Gates" Reason: accuracy/readability; |
| 86 | 19 | Replace "counter" with "contrary" Reason: accuracy; |
| 92 | 14 | Delete "and" Reason: Readability; |
| 92 | 25 | Insert "one" after "and" Reason: accuracy; |
| 93 | 15 | Insert "SOF" after "the" Reason: accuracy; |
| 93 | 18 | Insert "also" after "there's" Reason: accuracy/readability; |
| 95 | 15 | Delete: "I've not --" Reason: accuracy/clarification; |





ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

(Errata 7 of 9)

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:                    DATE OF DEPOSITION:

3    ALAN ENSLEN                      JANUARY 24, 2017

4    PAGE   LINE      CHANGE          REASON

5    96    17      Delete  "But if it's--"

6                   Reason: readability;

7

8    106   19      Replace  "is"  with  "was"

9                   Reason: accuracy;

10

11   118   12      Delete  "OSR or "  Reason: accuracy;

12

13   120   15      Replace "that is" with "that remains"

14                  Reason: clarification;

15

16   120   15      Replace  "off"  with  "on"

17                  Reason: accuracy;

18

19   121   10      Delete  "No, I wouldn't --"

20                  Reason: Clarification;

21

22   121   12      Replace  "something" with "someone"

23                  Reason: accuracy;

24

25



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
(Errata B of 9)

ALAN ENSLEN
MATTHEW BISSONNETTE vs KEVIN PODLASKI

```
 1                    CHANGES AND SIGNATURE
 2    WITNESS NAME:              DATE OF DEPOSITION:
 3    ALAN ENSLEN                JANUARY 24, 2017
 4    PAGE   LINE    CHANGE         REASON
 5    126    4     Insert "a" before the word "fairly"
 6                  and Delete "a" after the word "fairly"
 7                  Reason: clarification/accuracy;
 8
 9    131    12    Insert "you" after "so"
10                  Reason: accuracy;
11
12    132    20    Replace "note" with "node"
13                  Reason: accuracy;
14
15    133    23    Replace "him" with "them"
16                  Reason: accuracy;
17
18    135    13    Delete "what"
19                  Reason: accuracy/readability.
20
21
22
23
24
25
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

(Errata 9 of 9)