### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| MATTHEW BISSONNETTE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   **Cause No. 1:15-cv-00334-SLC** |
| KEVIN PODLASKI, *et al.*, | ) |
| | ) |
| Defendants. | ) |

### OPINION AND ORDER

Before the Court is a motion for summary judgment or, in the alternative, for partial summary judgment and a supporting memorandum, together with several exhibits, filed by Defendants Kevin Podlaski ("Podlaski"), an attorney, and Carson Boxberger, LLP ("Carson Boxberger"), a law firm (together "Defendants"), seeking judgment as a matter of law on Plaintiff Matthew Bissonnette's ("Bissonnette") claims for legal malpractice and breach of fiduciary duty under Indiana law.[1]  (DE 137-DE 139).  Bissonnette timely filed a response brief, also submitting several exhibits (DE 140; DE 141; DE 150), and Defendants filed a reply (DE 142).  On February 8, 2018, the Court heard oral argument on the motion.  (DE 147).

Also before the Court is Defendants' motion seeking to preclude Bissonnette's expert, Mark Zaid, Esq. ("Zaid"), pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), filed together with a supporting brief and exhibits.  (DE 76-DE 78).  Bissonnette timely filed a response, also submitting several exhibits (DE 104; DE 105; DE 109), and Defendants filed a reply (DE 121).  The motion is now fully

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1332.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.  (DE 29).

briefed, including the filing of sur-responses and sur-replies.  (DE 124; DE 126; DE 128; DE 129; DE 131; DE 132).

Defendants' motion for summary judgment and motion to preclude are ripe for ruling. For the reasons set forth below, Defendants' motion for summary judgment will be GRANTED in part and DENIED in part, and their motion to preclude expert Zaid will be DENIED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[2]

Bissonnette is a former Navy SEAL who authored the book, "No Easy Day" (the "Book"), under the pseudonym Mark Owen.  (DE 14 ¶ 5; DE 140 at 31).  The Book gives Bissonnette's first-hand account of Operation Neptune Spear, the raid that resulted in the death of Osama Bin Laden.  (DE 14 ¶ 11; DE 140 at 31).

In late 2011, Bissonnette connected with Elyse Cheney ("Cheney"), who was affiliated with Dutton, a division of Penguin Group (USA), Inc., a publishing corporation.  (DE 138-1 at 27-29; DE 138-2 at 22; DE 138-3 at 26-27).  Bissonnette, Cheney, and Benjamin Sevier ("Sevier"), the editor in chief of Dutton, agreed to produce a book that would detail Bissonnette's account of Operation Neptune Spear.  (DE 138-2 at 23; DE 138-3 at 26-27).  The three enlisted the help of a ghost writer, Kevin Maurer ("Maurer").  (DE 138-2 at 27-28).

Cheney began "looking for a lawyer . . . to help [Bissonnette] follow whatever his legal obligations were in regards to the publication [of the Book]," and she was put in touch with Podlaski as somebody who could do so.  (DE 138-3 at 33; *see also* DE 138-2 at 21; DE 138-13 at 6; DE 138-14 at 6).  Podlaski was a partner at Carson Boxberger at the time.  (*See, e.g.*, DE 14 ¶¶ 6-7; DE 150 at 4-8; DE 138-4 at 8).  Podlaski demonstrated a familiarity with the

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Bissonnette, the nonmoving party.  *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 440 (7th Cir. 2011).

government's non-disclosure agreements ("NDA") regarding confidential material, and represented that he had previously assisted a former Special Forces member in publishing a book.  (DE 138-1 at 40, 85; DE 138-3 at 7, 33; DE 138-3 at 54).  Bissonnette believed that Podlaski possessed familiarity with issues he would encounter in writing the Book, and the two began talking on the phone in November or December 2011.[3]  (DE 138-4 at 9; DE 138-13 at 8; DE 138-14 at 8).

By January 11, 2012, Bissonnette agreed to hire Podlaski.  (DE 138-1 at 42).  On January 17, 2012, Defendants and Bissonnette executed an Engagement/Representation Letter ("Engagement Letter").  (*See* DE 150 at 4-8).  In the Engagement Letter, Podlaski agreed to provide the following services:

> Reviewing the publishable manuscript of [Bissonnette's] career to ensure [his] compliance with [his] obligations under any agreements [he] may have signed with the U.S. Government not to release classified or classifiable information or otherwise compromise the national security interests of the United States, as those terms are used, intended or understood in Standard Form 312, Confidential Information Non-Disclosure Agreement (["]CINA"), or any other such agreements.

(DE 150 at 4).  On February 10, 2012, Bissonnette signed an agreement with Dutton to draft the Book.  (DE 138-6).

---

[3] The parties dispute how Podlaski represented Bissonnette's obligation to submit a manuscript for prepublication review in their initial discussions and throughout their relationship.  According to Podlaski, he represented that he could try to vet the manuscript for classified information, but, because it is ultimately up to the government to decide what should not be published, he advised Bissonnette that the safest course of action would be to submit any manuscript for prepublication review.  (DE 138-4 at 9, 10, 20).  According to Bissonnette, Sevier, and Cheney, from the very beginning Podlaski advised that Bissonnette had no obligation to submit any manuscript for prepublication review, and that Bissonnette should not do so.  (DE 138-1 at 44, 48; DE 138-2 at 22; DE 138-3 at 56; DE 138-13 at 6; DE 138-14 at 6, 9).  The parties also dispute what Bissonnette said to Podlaski regarding his status in the military (*compare* DE 138-1 at 64, *with* DE 138-4 at 29, 44), and whether Podlaski requested that Bissonnette obtain DD Form 1847-1 and Standard Form 312 for Podlaski's review (*compare* DE 138-1 at 16, 38, 43, 64, *with* DE 138-4 at 18, 44).  However, because these issues go to the standard of care Podlaski owed Bissonnette and an alleged breach of that standard of care, and because Defendants do not seek summary judgment on those elements of a legal malpractice claim, the Court does not reach these issues in this Opinion and Order.

Bissonnette submitted a manuscript of the Book to Podlaski on or around June 21, 2012, so that Podlaski could screen it for classified information.  (DE 138-14 at 27).  Podlaski and Bissonnette had other communications in June 2012, but Podlaski did not bill Bissonnette for these communications, as it is was not his practice to bill or memorialize every interaction with Bissonnette.  (DE 138-4 at 11, 19).  According to Bissonnette, Podlaski advised him not to submit a manuscript of the Book for prepublication review.  (*See, e.g.*, DE 138-1 at 44, 48; DE 138-14 at 9; DE 150 at 32).  The Book was due to be released for sale on September 11, 2012.  (DE 138-1 at 55).

It is not clear how, but at some point in mid or early August 2012, United States Special Operations Command or SOCOM, and United States Joint Special Operations Command, and perhaps other entities within the military or intelligence community obtained advance copies of the Book.  (DE 138-1 at 14; DE 138-2 at 43).  Beginning in late August, certain media outlets and investigative journalists purported that the government had taken the position that Bissonnette had violated NDAs in publishing the Book and that the Book contained classified information.  (DE 138-1 at 55-56; DE 138-2 at 45; DE 138-3 at 45; DE 150 at 30-31).  At some point, United States Joint Special Operations Command and Maurer discussed the government's concerns.  (DE 138-2 at 43).  On August 29, 2012, a source reported to Sevier that the Department of Defense (the "DoD") would not seek an injunction against releasing the Book.  (DE 138-2 at 46).  Nevertheless, Podlaski insisted that Bissonnette was not required to submit a manuscript of the Book for prepublication review and that the Book did not contain classified material.  (DE 150 at 26-28, 29).  Around that time, Dutton decided to release the Book for sale a week early, on September 4, 2012.  (DE 138-2 at 48).

The rumors and reports of the government's concerns were realized on August 30, 2012,

4

when Jeh Johnson, General Counsel of the DoD, faxed Dutton a letter to the attention of "Mr. Mark Owen" (the "Johnson Letter").  (DE 150 at 17-25; DE 138-9).  The Johnson Letter explained that Bissonnette had signed two NDAs on January 24, 2007, that remained in force after Bissonnette had left active duty because Bissonnette signed a Sensitive Compartmented Information Debriefing Memorandum on April 20, 2012 (the day Bissonnette left active duty), acknowledging the NDAs.  (DE 150 at 18).  In these NDAs, Bissonnette had, among other things:

> (i) acknowledged [his] awareness that disclosure of classified information constitutes a violation of federal criminal law; (ii) agreed to submit [his] manuscript for pre-publication security review, and to obtain permission from the agency before publishing it, and (iii) assigned to the U.S. Government "all royalties, remuneration, and emoluments that have resulted, will result or may result from a disclosure, publication or revelation of classified information not consistent with the terms of [that agreement]."

(DE 150 at 18).  The DoD claimed that Bissonnette was in "material breach and violation" of the NDAs by publishing and releasing the Book for sale.  (DE 150 at 18).  The letter warned that "[f]urther public dissemination" of the Book would aggravate Bissonnette's breach.  (DE 150 at 18).  The DoD was considering "all remedies legally available" in light of Bissonnette's alleged breach of the NDAs.  (DE 150 at 18).

Attached to the Johnson Letter were several documents including:  a personal attestation of Bissonnette's loyalty and duty to maintain the secrecy of classified information; a standard Classified Information Non-Disclosure Agreement ("CINA"), signed by Bissonnette on January 24, 2007; and DD Form 1847-1, signed by Bissonnette on January 24, 2007, and acknowledged again on April 20, 2012.  (DE 150 at 17-25; DE 151).  Under DD Form 1847-1, Bissonnette agreed that he would not publish or disclose in any form, a work containing Special

5

Compartment Information ("SCI") "or description of activities that produce or relate[] to SCI or that [Bissonnette] ha[d] reason to believe [were] derived from SCI . . . ."[4]  (DE 150 at 22; DE 151 at 5).  SCI is defined in DD Form 1847-1 as "information or material protected within Special Access Programs . . . ."  (DE 150 at 22; DE 151 at 5).

The next day, Bissonnette hired attorney Bob Luskin ("Luskin") to handle "the new issue that seemed to have materialized" from the Johnson Letter.  (DE 138-1 at 12).  Luskin took the lead in writing a response to the Johnson Letter (DE 138-1 at 13; DE 138-11) with Podlaski's input (DE 150 at 41-44).  Luskin sent the response to the DoD on August 31, 2012.  (DE 138-11).  In the response, Luskin claimed that Bissonnette "sought legal advice about his responsibilities before agreeing to publish his book and scrupulously reviewed the work to ensure that it did not disclose any material that would breach his agreements or put his former comrades at risk."  (DE 138-11).

Podlaski testified at his deposition that on or around August 30, 2012, Luskin instructed him not to speak to Bissonnette unless Luskin was present; giving Podlaski the sense that he was fired.  (DE 138-4 at 16).  Luskin testified that he instructed Podlaski early on not to speak to Bissonnette about facts involving the events precipitating the Johnson Letter in Luskin's absence, because Podlaski would likely be a witness in any legal proceeding related to issues identified in the Johnson Letter and Luskin did not want Podlaski's or Bissonnette's testimony to be tainted.  (DE 138-12 at 37).  Luskin testified that he had no issue with Bissonnette and Podlaski discussing subjects other than historical facts of the case in Luskin's absence.  (DE 138-12 at 37-38).  In any event, Podlaski communicated with Bissonnette no less than eight times

---

[4] The record lacks evidence or testimony establishing with certainty whether Operation Neptune Spear was or was related to a Special Access Program.  (*See* DE 138-1 at 10; DE 138-4 at 34; DE 138-12 at 29).

between August 31, 2012, and May 9, 2013, without including Luskin.  (*See* DE 138-4 at 55, 56, 59, 62, 63, 64-65).  Podlaski billed Bissonnette for some, but not all, of these interactions.  (DE 138-23 at 24-31).

On September 4, 2012, the Book was released for sale.  (DE 138-2 at 39).  Around that time, Luskin had a couple of meetings with Johnson and the DoD.  (DE 138-12 at 30).  Bissonnette also participated in some of these meetings with the DoD and other government agencies.  (DE 138-1 at 18-19, 61-63).  By Luskin's second meeting, on or around September 20, 2012, he did not think that Bissonnette had a good argument that he complied with his obligations under the NDAs.  (DE 138-12 at 30-33).  As such, Luskin thought that Bissonnette would likely lose if the DoD sued him for breach of contract.[5]  (DE 138-12 at 29-30).

Although Luskin, Bissonnette, and the government discussed what material in the Book the government considered classified or sensitive to national security, the government has prohibited them from identifying with specificity any offending material in the Book.  (DE 138-1 at 18-19, 61-63; DE 138-12 at 47-48, 57).  However, Luskin testified that the DoD was concerned that the Book improperly disclosed specific matters (*e.g.*, tactics and procedures), but that the DoD did not have a problem with "generally talking about the mission."  (DE 138-12 at 57).  Bissonnette also testified that he heard from all the agencies present at the interviews that had a stake in the information revealed in the Book, and "there wasn't anything that [he] couldn't have written around very easily or simply deleted . . . out of the book."  (DE 138-1 at 72).

Podlaski believed that Bissonnette was being unfairly targeted by the government.  (DE

---

[5] Podlaski did not attend these meetings and Luskin did not ask him to.  (*E.g.*, DE 138-12 at 34-35).  Luskin reasoned that if the government sued or prosecuted Bissonnette, Podlaski would likely be a witness regarding Bissonnette's good faith reliance on attorney advice.  (DE 138-12 at 35-36).  Therefore, Luskin did not want to jeopardize Podlaski's viability as a witness or make him vulnerable to impeachment by attending meetings with the DoD.  (DE 138-12 at 35-36).

138-6).  He knew that other people in the military and intelligence communities had published books without being subjected to the same sort of treatment as Bissonnette.  (DE 138-1 at 66; DE 138-4 at 17, 61-62; DE 138-12 at 38).  Thus, around September 18, 2012, Podlaski sent requests to the government pursuant to the Freedom of Information Act, 5 U.S.C. § 552, *et seq*. ("FOIA"), for information on whether other books written on topics that were sensitive to national security similar to the Book had been subjected to similar scrutiny or treatment.[6]  (DE 150 at 97-99; *see also* DE 138-4 at 61).  On November 13, 2012, Podlaski submitted a similar request to the Federal Bureau of Investigation regarding 16 books.  (DE 150 at 97-99; *see also* DE 138-4 at 61).  These requests were Podlaski's idea.  (DE 138-4 at 61-63).

Towards the end of 2012, Podlaski had little to no communication with Bissonnette, Luskin, or anyone at Dutton.  (DE 138-3 at 44-45; DE 138-4 at 17, 64).  On May 8, 2013, an associate of Cheney's reached out to Podlaski regarding the status of the FOIA request.  (DE 150 at 100).  Podlaski responded by emailing Bissonnette directly with an update on the FOIA request and asking that Bissonnette "[c]ontact [Podlaski] at [his] convenience to discuss the status of [his] situation."  (DE 150 at 101).

In September 2013, Cheney put Bissonnette in touch with attorney Alan Enslen ("Enslen") to advise Bissonnette in drafting and publishing his second book, "No Hero."  (DE 138-17 at 9).  Enslen has a background in Special Forces and advised Bissonnette to submit a manuscript of "No Hero" to the Defense Office of Prepublication and Security Review ("DOPSR").[7]  (DE 138-17 at 9, 15-17).  Bissonnette testified that Enslen was the first person

---

[6] On October 5, 2012, Podlaski emailed Bissonnette regarding the status of negotiations with the DoD, and after receiving a reply from Bissonnette, Podlaski wrote back, "I know, Bob Luskin sent me the list of demands [the DoD had made of Bissonnette].  I sent you a blind copy of my thoughts on it.  Bottom line:  I think you should do nothing except apologize and maybe donate some money to charity of DoD's choice!"  (DE 138-4 at 63).

[7] Enslen testified that if the Book had been submitted for prepublication review, it would have been

who advised him that Podlaski had given him bad advice.[8]  (DE 138-1 at 65).

On August 26, 2014, Bissonnette and Defendants entered into the Tolling Agreement. (DE 138-18; DE 150 at 105-10).  Under the Tolling Agreement, the parties agreed that the statute of limitations for any claim Bissonnette could bring against Defendants was tolled from August 26, 2014, until November 30, 2014, or 30 days after any party to the agreement provided written notice of an intention to terminate the agreement.  (DE 150 at 105).  The Tolling Agreement provided that:

> Bissonnette shall make no effort to publicize [any claim he may have against Defendants] or otherwise make or cause to be made any disparaging remarks about [Defendants]. . . .  Any violation of this provision will void this agreement as if it had not existed and the statute of limitations had not been tolled on the date of such violation.

(DE 150 at 106).

On November 2, 2014, the television program 60 Minutes aired a segment featuring interviews with Bissonnette and Luskin.  (*See* DE 138-19).  During this segment, Bissonnette and Luskin stated that Bissonnette did not submit a manuscript of the Book to the government for prepublication review because Bissonnette received bad legal advice from his former attorney.  (*E.g.*, DE 138-19 at 5).

On November 5, 2014, Bissonnette filed a complaint in the United States District Court for the Southern District of New York against Defendants, alleging that Defendants committed legal malpractice in advising Bissonnette that he was not obligated to submit a manuscript of the

---

published with some edits, redactions, or re-writes.  (DE 138-17 at 28).

[8] Cheney claims that she gradually realized that Podlaski gave Bissonnette bad advice, and that Luskin was the first person to tell her this.  (DE 138-4 at 9-10).  Luskin could not identify when he concluded that Podlaski should have advised Bissonnette to submit the Book for prepublication review, but that he came to this conclusion over time.  (DE 138-12 at 53).

Book for prepublication review.  (DE 138-25).  The complaint alleged that the court had personal jurisdiction over Defendants pursuant to New York's long arm statute because Defendants "transacted business within the state, contracted to provide legal services, and did provide legal services within the state . . . ."  (DE 138-25 at 4).  Around this time, Bissonnette's second book, "No Hero," was released.  (DE 138-19 at 7-8; DE 138-27 at 4).

On October 7, 2015, District Judge Jesse Furman dismissed Bissonnette's complaint for lack of personal jurisdiction over Defendants.  (DE 138-24).  Judge Furman observed that "aspects of the underlying transaction in this case took place in New York or involved New York law."  (DE 138-24 at 14).  For example, Bissonnette's contract with Dutton, which Podlaski helped negotiate, was governed by New York law, and Defendants were hired to provide legal advice for Bissonnette's team, which was located in New York.  (DE 138-24 at 14-15). Nevertheless, Judge Furman found that Defendants had not engaged in meaningful activity in New York as to avail themselves to the court's jurisdiction.  (DE 138-24 at 15).

On August 19, 2016, the United States filed a civil complaint against Bissonnette in the United States District Court for the Eastern District of Virginia (DE 138-15) and entered into a Consent Decree with Bissonnette.[9]  (DE 138-16).  The complaint alleged that Bissonnette violated a fiduciary duty he owed to the United States and breached the NDAs by failing to submit the Book for prepublication review.  (DE 138-15).  The complaint does not allege with

---

[9] Around March or April 2014, Bissonnette had a "handshake" agreement with the government in terms of resolving any civil liability resulting from publishing the Book.  (DE 138-12 at 46).  Unfortunately, executing any agreement was put on hold because around that time the government informed Bissonnette that the Main Justice at the Department of Justice and the United States Attorney's office in the Southern District of California were conducting a criminal investigation into whether Bissonnette violated the Espionage Act through publishing the Book.  (DE 138-12 at 46-48).  Bissonnette cooperated in the investigation.  (DE 138-1 at 73; DE 138-12 at 47-48). This investigation concluded around August 2015 with no charges filed.  (DE 138-12 at 46).  However, around that same time, the United States Attorney in the Eastern District of Virginia launched a criminal investigation into similar issues.  (DE 138-13 at 12-13).  This investigation closed in May 2016, again with no charges being filed against Bissonnette.  (DE 138-13 at 12-13).

any specificity that the Book contained classified information or SCI, much less identify what information in the Book references SCI or classified information.  (DE 138-15).

Similarly, the Consent Decree is unclear as to the nature or presence of SCI or classified material in the Book.  (*See* DE 138-16).  Under the Consent Decree, Bissonnette agreed to forfeit "any and all revenues, gains, profits, royalties, and other financial advantages derived by [Bissonnette], or derived by [him] in the future, from the sale, serialization, republication rights in any form, television or movie rights, and other redistribution for profit of the work entitled *No Easy Day*."  (DE 138-16 at 3 (emphasis in original)).  At the time of the Consent Decree, proceeds from the Book totaled $6,664,882.21.  (DE 138-16 at 4).  The government released Bissonnette from civil liability in connection with publishing the Book, apart from any liability for future breaches or liability arising under the Internal Revenue Code.  (DE 138-16 at 5).

On November 9, 2015, Bissonnette filed his complaint in this case alleging that Podlaski committed legal malpractice in advising him not to submit a manuscript of the Book for prepublication review, and that Defendants breached a fiduciary duty to Bissonnette by not producing certain documents in Bissonnette's dealings with the government.  (DE 1; DE 14). Bissonnette alleges that Carson Boxberger is liable for Podlaski's negligence because Podlaski was a partner at Carson Boxberger during the relevant time period.  (DE 14 ¶ 8).

In the instant motion for summary judgment, Defendants argue that they are entitled to judgment as a matter of law on all of Bissonnette's claims because he filed his complaint in this action after the statute of limitations had expired.  In the alternative, Defendants argue that they are entitled to judgment as a matter of law on Bissonnette's claim that they proximately caused $6,664,882.21 (the royalties Bissonnette forfeited to the government) in damages.  Defendants also seek summary judgment as to Bissonnette's claim for breach of fiduciary duty.

11

Bissonnette has not responded to Defendants' motion for summary judgment on his breach of fiduciary duty claim. The law is clear that failure to respond to issues raised in a summary judgment motion constitutes waiver. *See* Fed. R. Civ. P. 56(e); *Gaerte v. Great Lakes Terminal & Transp. Corp.*, No. 3:05 CV 1141, 2007 WL 2461650, at *2 (N.D. Ind. Aug. 27, 2007) ("[I]ssues raised in [a] summary judgment motion that non-moving party does not properly respond to are deemed waived[.]" (citing *E.E.O.C. v. U.S. Bell*, No. 2:03 CV 237, 2005 WL 1683979, at *15 (N.D. Ind. July 19, 2005))); *see also Palmer v. Marion Cty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming a claim abandoned when a party "failed to delineate his . . . claim in his district court brief in opposition to summary judgment " (citations omitted)). Therefore, the Court will grant Defendants' motion for summary judgment as to Bissonnette's claim for breach of fiduciary duty. The Court will address Defendants' statute of limitations and proximate cause arguments in turn.

## II.  MOTION FOR SUMMARY JUDGMENT

### A.  Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 627 (7th Cir. 2016). Courts "view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citing *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 20008)). The Court is tasked only with deciding whether "there is any material dispute of fact that requires a trial" within the "evidence of record[.]" *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). "[I]f the evidence is such that a reasonable factfinder could return a

12

verdict in favor of the nonmoving party[,]" then summary judgment may not be granted.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  However, " a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial."  *Id.* at 771 (citation omitted).

### B. Analysis

1. <u>Statute of Limitations</u>

Under Indiana law, an action for legal malpractice "must be commenced within two (2) years after the cause of action accrues."  Ind. Code. § 34-11-2-4(a).  "[T]he cause . . .  accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained . . . ."  *Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) (citation and internal quotation marks omitted).  The parties do not dispute that Bissonnette's claims against Defendants accrued on August 30, 2012; the day that he received the Johnson Letter.[10]  (DE 138-8).  The parties also do not dispute that Bissonnette filed the complaint in this action on November 9, 2015.  (DE 1; DE 14).

The parties dispute whether the statute of limitations on Bissonnette's claims was tolled, and if so for how long.  Bissonnette asserts that the statute of limitations was tolled on three grounds:  (1) Indiana's continuous representation doctrine; (2) the parties' agreement tolling the statute of limitations; and (3) Indiana's Journey Account Statute.

### a.  *The Continuous Representation Doctrine*

"Under the continuous representation doctrine, the statute of limitations does not commence until the end of an attorney's representation of a client in the same matter in which the alleged malpractice occurred."  *Biomet, Inc. v. Barnes & Thornburg*, 791 N.E.2d 760, 765

---

[10] Bissonnette does not dispute this point but he also does not necessarily agree with it.  (*See* DE 140 at 17).

(Ind. Ct. App. 2003); *see Atl. Credit & Fin., Inc. v. Robertson*, No. 115-CV-00044-MJD-SEB, 2016 WL 81809, at *2 (S.D. Ind. Jan. 7, 2016) (citation omitted); *Bambi's Roofing, Inc. v. Moriarty*, 859 N.E.2d 347, 357 (Ind. Ct. App. 2006) (citation omitted).  "To determine whether the doctrine applies, Indiana courts focus on 'the matter which formed the basis of the alleged professional malpractice.'"  *Morgan v. Fennimore*, 429 F. App'x 606, 609 (7th Cir. 2011) (quoting *Bambi's Roofing, Inc.*, 859 N.E.2d at 356).  The continuous representation doctrine does not toll the statute of limitations if the professional and the client have only "some general, ongoing professional relationship"; their relationship must be related to the "precise matter" that gave rise to the client's claims against the professional.  *Id.* (citation omitted).

First, Defendants argue that after September 4, 2012 (the day the Book was released for sale), Podlaski fulfilled his obligations to Bissonnette under the Engagement Letter.  However, according to Podlaski, neither he nor Bissonnette communicated to the other that their relationship in connection with the Engagement Letter was over.  (DE 138-4 at 17).  In fact, Podlaski submitted the FOIA requests on November 13, 2012, and May 9, 2013, to show that "there were authors who had not submitted their books for review and . . . there was precedence for not submitting [Bissonnette's] book for review . . . ."  (DE 138-4 at 17).  Moreover, on October 3, 2012, while discussing negotiations with the DoD, Podlaski advised Bissonnette to "do nothing except apologize and maybe donate money to charity of DoD's choice!"  (DE 138-4 at 62-63).  And prior to that conversation, Podlaski had apparently sent Bissonnette his thoughts on terms of a proposed settlement with the DoD.  (DE 138-4 at 63).  Defendants' argument that these actions were merely part of an ongoing professional relationship between Podlaski and Bissonnette is not supported by evidence in the record.  The fact that Podlaski did not bill or record any interaction with Bissonnette after September 27, 2012, does not necessarily establish

14

that Podlaski ceased representing Bissonnette in the precise matter giving rise to the alleged malpractice, because Podlaski testified that it was not his practice to bill Bissonnette for every interaction they had.  Podlaski advised Bissonnette and submitted the FOIA requests "in connection with," *Bambi's Roofing, Inc.*, 859 N.E.2d at 357 (citation omitted), his obligation to limit Bissonnette's liability as described in the Engagement Letter through November 13, 2012.[11]

Next, Defendants argue that Bissonnette hiring Luskin was analogous to hiring an attorney on appeal, "which ends any continuous representation tolling."  (DE139 at 16 (citing *Biomet, Inc*., 791 N.E.2d at 766 n.2)).  However, the parties do not dispute that Podlaski assisted Luskin in dealing with the government and that Podlaski continued to bill Bissonnette for work performed under the Engagement Letter, using the same client-matter number, through September 27, 2012.  (DE 138-23 at 2-28).  And, again, from September 28, 2012, through November 13, 2012, Podlaski reviewed and advised Bissonnette on potential settlement terms with the DoD (DE 138-4 at 62-63), and submitted a FOIA request on November 13, 2012, in an attempt to establish that Bissonnette had not violated any NDA with the government (DE 138-4 at 63-64).  Even Podlaski testified that through May 8, 2013, he was "work[ing] for Mr. Owen and then was working with Luskin."  (DE 138-4 at 64).  Thus, a reasonable jury could only conclude that Bissonnette's hiring of Luskin did not cut off Podlaski's representing Bissonnette[12]

---

[11] Bissonnette argues that Podlaski continued to represent him through May 9, 2013, as evidenced by the last follow up on the FOIA request.  Even if Bissonnette is correct, it is dubious that this act alone is sufficient to render Podlaski's representation "continuous" because Podlaski and Bissonnette had no contact between the end of 2012 and May 2013.  However, the Court does not reach this issue because Bissonnette only needs to demonstrate that a reasonable jury could conclude that Podlaski continued to represent him through November 13, 2012, in order to survive summary judgment.

[12] Podlaski testified that Luskin, on August 30, 2012, instructed him not to speak with Bissonnette at all without Luskin present, and gave Podlaski the sense that he no longer represented Bissonnette.  (DE 138-4 at 15, 17).  Luskin testified that he told Podlaski not to discuss the facts or events leading up to the Johnson Letter without Luskin's presence in order to preserve Podlaski's viability as a potential witness in any government action against Bissonnette.  (DE 138-12 at 35-37).  To the extent that Podlaski and Luskin give different accounts of this exchange, Defendants have not addressed it on summary judgment.  Therefore, the Court does not analyze this issue.

"in the same matter in which the alleged malpractice occurred" through November 13, 2012.  *See*

*Biomet, Inc*, 791 N.E2d at 765.

Finally, Defendants argue that policy concerns weigh against applying the continuous

representation doctrine.  In that regard, the court in *Biomet* stated:

> [T]he continuous representation rule avoids disruption of the
> attorney-client relationship and gives attorneys the chance to
> remedy mistakes before being sued.  At the same time, a client is
> not required to constantly second-guess the attorney, and in some
> cases, be forced to obtain other legal opinions regarding the
> attorney's handling of the case.  Furthermore, a client may fully be
> aware that his attorney has erred to his detriment and still be
> willing to place his confidence in the attorney's ability to correct
> the error.

791 N.E.2d at 766 (citations omitted); *see Bambi's Roofing, Inc.*, 859 N.E.2d at 357-58 (citations

omitted).  Regarding the first policy consideration, as discussed *supra*, a reasonable jury could

only conclude that Podlaski continued to represent Bissonnette in connection with the

Engagement Letter after Bissonnette hired Luskin.

Turning to the second policy consideration, Defendants correctly argue that once the

Book was published Podlaski could not vet it for classified or sensitive information.

Unfortunately for Defendants, that does not mean there was "nothing [Podlaski] could have done

in an ongoing professional capacity" to mitigate or reduce the damage resulting from Podlaski's

alleged negligent advice to Bissonnette.  *Bambi's Roofing, Inc.*, 859 N.E.2d at 359.  To the

contrary, Podlaski appears to have advised Bissonnette on how to manage the fallout from the

Johnson Letter by counseling him to "do nothing except apologize and maybe donate money to

charity of DoD's choice" (DE 138-4 at 62-63), and by submitting the FOIA requests.

Finally, Defendants argue that the third policy consideration disfavors applying the

continuous representation doctrine.  Defendants assert that Bissonnette second guessed

16

Podlaski's advice by claiming that Bissonnette relied on Podlaski's advice in Luskin's response to the Johnson Letter.  However, Luskin testified that he made a good-faith reliance argument to preserve, if necessary, a clean-hands defense for Bissonnette in any subsequent legal action with the DoD, not to point the finger at Podlaski.  (DE 138-12 at 35-36).  Furthermore, Bissonnette testified that it was not until 2013 that he began to think that Podlaski gave him bad advice.  (DE 138-1 at 65; *see also* DE 138-3 at 50; DE 138-12 at 53).  Defendants, on the other hand, fail to provide evidence that Bissonnette or Luskin gave the sort of "opinions regarding [Podlaski's] handling of the case" that would bar applying the continuous representation doctrine.  *Biomet, Inc.*, 791 N.E.2d at 766.

In conclusion, even if the Court accepts Defendants' version of the facts, a reasonable factfinder could only conclude that the continuous representation doctrine tolled the statute of limitations from August 30, 2012, to November 13, 2012; a total of 75 days.

### b. The Tolling Agreement

Effective August 26, 2014, the parties agreed under the Tolling Agreement to toll the statute of limitations on any claims that Bissonnette may have related to Defendants' representation in publishing the Book.  (*See* DE 150 at 105-10).  Under the Tolling Agreement, if Bissonnette made any effort to publicize any claim; made any disparaging remarks about Defendants in any media; or made any comment, criticisms, or statement identifying Defendants in their representation of him, the agreement would be "void . . . as if it had not existed and the statute of limitations had not been tolled on the date of such violation."  (DE 150 at 106).  Defendants claim that Bissonnette violated the Tolling Agreement on November 2, 2014, when he and Luskin appeared on the television program 60 Minutes, and stated that Bissonnette had not submitted the manuscript for prepublication review due to bad legal advice.  Defendants

argue that Bissonnette's violation retroactively nullified the Tolling Agreement as if the statute of limitations was never tolled at all.

"Construction of the terms of a written contract is a pure question of law for the court." *Storch v. Provision Living*, LLC, 47 N.E.3d 1270, 1272 (Ind. Ct. App. 2015) (citing *Peoples Bank & Trust Co. v. Price*, 714 N.E.2d 712, 716 (Ind. Ct. App. 1999)).  Courts "give effect to the intent of the parties at the time they entered into the agreement."  *Tender Loving Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014).  Therefore, courts read a contract "in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole."  *Storch*, 47 N.E.3d at 1273.

Bissonnette argues that if he did in fact violate the Tolling Agreement on November 2, 2014, the plain language of the agreement does not retroactively invalidate the time during which the statute of limitations was tolled.[13]  Bissonnette asserts that when he purportedly violated the agreement, the statute of limitations began to run again.  The Court agrees with Bissonnette.  To adopt Defendants' interpretation of the provision would deprive the words "on the date of such violation" of their ordinary meaning.  *See Watson Water Co., Inc. v. Ind.-Am. Water Co*., *Inc*., 85 N.E.3d 840, 848 (Ind. Ct. App. 2017), *reh'g denied* (Feb. 22, 2018) ("When a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning.").

To explain, in their briefs Defendants insist that the words "as if it had not existed" alone are sufficient to retroactively void the contract.  And, in response to Bissonnette's arguments, Defendants neglect to explain the purpose or meaning of the words "on the date of such violation."  But if the words "as if it had not existed" retroactively nullified the Tolling

---

[13] The parties disagree over whether Bissonnette identified Defendants in the interview, and therefore, whether Bissonnette violated the Tolling Agreement.  The Court does not find it necessary to reach this question.

18

Agreement as if the statute of limitations had never been tolled, then adding the words "on the date of such violation" would establish the date which the agreement *never* existed.  Put another way, if the Tolling Agreement was effectively nonexistent, then it makes no sense to establish when its nonexistence began.  The Court must accept "an interpretation of the contract that harmonizes its provisions, rather than one that places the provisions in conflict."  *Ryan v. Lawyers Title Ins. Corp.*, 959 N.E.2d 870, 875 (Ind. Ct. App. 2011) (citing *Whitaker v. Brunner*, 814 N.E.2d 288, 293 (Ind. Ct. App. 2004)).  Because Defendants' interpretation of the Tolling Agreement places terms in conflict or deprives them of meaning, the Court rejects Defendants' proffered interpretation.

The Court assumes *arguendo* that Bissonnette violated the Tolling Agreement once the 60 Minutes segment aired on November 2, 2014.  Because the Tolling Agreement was effective as of August 26, 2014, the statute of limitations was tolled for 67 days.

### c. The Journey Account Statute

The Journey Account Statute revives actions otherwise barred by a statute of limitations. The statute applies where the plaintiff "commences an action" and "the plaintiff fails in the action from any cause except negligence in the prosecution of the action . . . ."  Ind. Code § 34-11-8-1(a).  If the statute applies, then a new action may be brought within the later of:  (1) three years after the determination of the original action; or (2) the last date an account could have been commenced under the statute of limitations governing the original action.  Ind. Code § 34-11-8-1(b); *see Allen v. State*, 30 N.E.3d 1280, 1282-83 (Ind. Ct. App. 2015).  Indiana courts require that the party filing suit act in good faith.  *Eads v. Cmty. Hosp.*, 932 N.E.2d 1239, 1244-45 (Ind. 2010) (citing *Basham v. Penick*, 849 N.E.2d 706, 709 (Ind. Ct. App. 2006)).

Defendants argue that the Journey Account Statute did not toll the statute of limitations

while Bissonnette's suit was pending in the Southern District of New York because he filed suit

there in bad faith.  It is undisputed that Bissonnette filed the complaint in the Southern District of

New York days after his interview on 60 Minutes, and only days before releasing his second

book, "No Hero."  Defendants argue, therefore, that Bissonnette filed suit in the Southern

District of New York to garnish attention for "No Hero" rather than based on a good-faith but

mistaken belief that jurisdiction was proper.

Defendants, however, do not cite any authority supporting their assertion that filing to

garner media attention, by itself, constitutes bad faith.  And Bissonnette contends that "there is

no evidence that [he] filed suit in federal court with intent to abuse judicial process or create

undue delay."  *Munoz v. Woroszylo*, 29 N.E.3d 164, 169 (Ind. Ct. App. 2015).  Indeed, the

Indiana Supreme Court has observed that:

> [B]ad faith is not simply bad judgment or negligence.  Rather, it
> implies the conscious doing of a wrong because of dishonest
> purpose or moral obliquity.  It is different from the negative idea of
> negligence in that it contemplates a state of mind affirmatively
> operating with furtive design or ill will.

*Mitchell v. Mitchell*, 695 N.E.2d 920, 924 (Ind. 1998); *see Munoz*, 29 N.E.3d at 169-70.

Even if Defendants are correct and Bissonnette filed suit in the Southern District of New

York to garner media attention, doing so does not exclude the possibility that he believed that the

court had personal jurisdiction over the parties.  Bissonnette alleged that the court in the

Southern District of New York case had personal jurisdiction over Defendants because they

transacted sufficient business in New York to come under New York's long arm statute.  (DE

150 at 113 (citing New York Civil Practice Law and Rules § 302(a)).  While the district court

noted that Bissonnette had not made a *prima facie* showing of jurisdiction (DE 138-24 at 7-8),

the court agreed with Bissonnette that Defendants transacted some business within the state.

20

(DE 138-24 at 12).  Therefore, while Bissonnette's failure to make a *prima facie* case of personal jurisdiction in the Southern District of New York case is an "elementary mistake," it falls short of a "dishonest purpose or moral obliquity" constituting bad faith.  *Munoz*, 29 N.E.3d at 170.  Accordingly, Defendants' argument that Bissonnette filed suit in the Southern District of New York in bad faith fails.

However, Bissonnette does not get the benefit of the Journey Account Statute unless one of the other exceptions tolled the statute of limitations for at least 67 days.[14]  Because either exception discussed *supra* did toll the statute of limitations for at least 67 days, the Journey Account Statute applies.

Under the Journey Account Statute, Bissonnette had three years from the date of the dismissal of the action in the Southern District of New York—October 7, 2015—to file suit in this Court.  Because Bissonnette filed this case just over a month after the Southern District of New York case was dismissed, his action was timely filed.  Therefore, Defendants' motion for summary judgment based on an expired statute of limitations will be denied.

2.  Partial Summary Judgment on Proximate Cause

To prevail on a legal malpractice claim under Indiana law a plaintiff must show:  "1) employment of the attorney (duty); 2) failure of the attorney to exercise ordinary skill and knowledge (breach); 3) proximate cause (causation); and 4) loss to plaintiff (damages)."  *Price Walcukauski & Riley, LLC v. Murray*, 47 F. Supp. 3d 810, 819 (S.D. Ind. 2014) (internal citations and quotation marks omitted); *see McGrath v. Everest Nat'l Ins. Co.*, No. 2:07 cv 34, 2010 WL 567301, at *7 (N.D. Ind. Feb. 11, 2010) (citing *Hedrick v. Tabbert*, 722 N.E.2d 1269,

---

[14] Bissonnette filed the Southern District of New York case on November 5, 2014, which is 797 days after August 20, 2012.  There are 730 days in two years, which is the statute of limitations for Bissonnette's claim (797 - 730 = 67).

1272-73 (Ind. Ct. App. 2000)).  Defendants argue that to prove proximate cause with regard to

the $6,664.882.21 in royalties Bissonnette forfeited to the government, Bissonnette must present

evidence tending to show what the government would have done with a manuscript of the Book

during a prepublication review.  Absent such proof, Bissonnette cannot show that he would have

been better off "but for" Podlaski's alleged negligent advice.  Defendants argue that Bissonnette

cannot present evidence on this issue without engaging in undue speculation or running afoul of

the political question doctrine.

"One's action or omission is the proximate cause of an injury when the ultimate injury is

one that was foreseen, or reasonably should have been foreseen, as the natural and probable

consequence of the act or omission." *Mundia v. Drendall Law Office, P.C*., 77 N.E.3d 846, 855

(Ind. Ct. App. 2017), transfer denied *sub nom. Mundia v. Drendall Law Office, PC*, 92 N.E.3d

1089 (Ind. 2017) (internal citation and quotation marks omitted).  "Proximate cause is generally

a question of fact and left to the jury." *Id.* (citing *Rhodes v. Wright*, 805 N.E.2d 382, 388 (Ind.

2004)).  In a legal malpractice suit, the malpractice plaintiff must show "that the outcome of the

underlying litigation would have been more favorable but for the attorney's negligence." *Barkal

v. Gouveia & Assocs.*, 65 N.E.3d 1114, 1119 (Ind. Ct. App. 2016).  "This proof typically requires

a 'trial within a trial.'"  *Hedrick*, 722 N.E.2d at 1272 (quoting *Picadilly, Inc. v. Raikos*, 582

N.E.2d 338, 344 (Ind. 1991)); *see Price Walcukauski & Riley, LLC*, 47 F. Supp. 3d at 824-36

(discussing the merits of the plaintiffs' claims in other lawsuits giving rise to the legal

malpractice cause of action); *Thayer v. Vaughan*, 798 N.E.2d 249, 255-57 (Ind. Ct. App. 2003)

(reviewing the merits of the plaintiff's sexual discrimination claim).

Defendants first claimed that Bissonnette would need to prove the outcome of a

hypothetical prepublication review through a trial within a trial analysis in their motion to

dismiss.  In its Opinion and Order on Defendants' motion to dismiss, the Court explained that it did not need to determine what the DOPSR[15] would have done with the Book to determine that Bissonnette would have been better off submitting a manuscript of the Book for prepublication review with regard to certain alleged damages.[16]  However, the Court found that deciding whether Podlaski's alleged negligence caused Bissonnette to forfeit $6,664,882.21 in royalties under the Consent Decree could require the Court to contemplate a hypothetical prepublication review.  (DE 134 at 16).  The Court did not find it necessary at that time to determine whether contemplating a hypothetical prepublication review would present a political question or call for undue speculation.  (DE 134 at 16-17).

Now, Defendants renew their proximate cause arguments on summary judgment in relation to the $6,664,882.21 in royalties Bissonnette forfeited to the government.  Defendants claim that because all of Bissonnette's evidence concerning proximate cause is either too speculative or presents a nonjusticiable political question, no reasonable factfinder could conclude that Podlaski's alleged misconduct satisfies this element of a legal malpractice claim. In the discussion below, the Court assumes for the sake of argument that Podlaski breached a duty of care owed to Bissonnette.

### a. Proximate Cause Analysis

Defendants assume that Bissonnette is required to demonstrate proximate cause through a trial within a trial analysis.  Defendants argue that Bissonnette is required to provide evidence

---

[15] The parties do not agree that the DOPSR would have been the only agency that would have reviewed a manuscript of the Book.  The Court need not decide this issue on summary judgment, but for the sake of argument, the Court will use "DOPSR" to refer to any agency or department within the government that would have been involved in the prepublication review process.

[16] In particular, Bissonnette forfeited the advance that he received from Dutton ($1 million); paid legal fees to Luskin in representing him in dealings with the government (approximately $1 million); suffered a tarnished reputation, loss of security clearance, lost income in the form of consulting jobs, speaking engagements, and future employment (at least $1 million); totaling about $3 million in damages.  (DE 134 at 15).

that the manuscript, if submitted to the DOPSR for prepublication review, would have been published with substantially similar content, and in a reasonable length of time.  It follows, Defendants argue, that Bissonnette must prove "that any changes required by the Government to the manuscript to address sensitive information would not have affected the marketability of 'No Easy Day[.]'"  (DE 139 at 23).  Not only that, but without evidence identifying the DoD's specific concerns, Bissonnette cannot prove whether the manuscript would have been published at all, or so Defendants argue.

After reviewing relevant case law in the Seventh Circuit Court of Appeals and in Indiana, the Court is not persuaded that Defendants have accurately characterized how Bissonnette must prove proximate cause.[17]  The alleged harm in this case did not occur during a stage of trial or as the result of a transaction, and thus, the facts of this case do not fit neatly within the trial within a trial paradigm.  However, the parties have not furnished and the Court has not unearthed any case describing the appropriate analysis for determining whether an attorney's advice not to submit a manuscript for prepublication review proximately caused damages in the form of royalties forfeited to the government.  Thus, the Court will briefly address Bissonnette's burden on proximate cause.

In *Clary v. Lite Machines Corp.*, 850 N.E.2d 423 (Ind. Ct. App. 2006), Lite Machines Corporation ("Lite") asserted that the defendant attorney committed malpractice by not raising a

---

[17] The Court rejects Bissonnette's alternative analyses for proximate cause.  Bissonnette argues that the Court should adopt the position espoused in the Restatement (Third) of the Law Governing Lawyers § 53 (2000), which provides:  "the trier of fact may consider whether the defendant lawyer's misconduct has made it more difficult for the plaintiff to prove what would have been the result in the original trial."  However, this position was considered and rejected by the Southern District of Indiana in *Price Walcukauski & Riley, LLC*, 47 F. Supp. 3d at 824 (applying Indiana legal malpractice law).  Bissonnette fails to meaningfully articulate how his case differs from the plaintiffs' in *Price Walcukauski & Riley, LLC*, and, thus, the Court will not apply the Restatement analysis.

Bissonnette also asserts that he is not required to provide any evidence on the outcome of a hypothetical prepublication review (DE 140 at 20-21), or that Defendants bear the burden of proving the outcome of a hypothetical prepublication review (DE 140 at 21-23 (citing *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011))).  However, the Court is not persuaded that either of these analyses is appropriate in this case.

"failure to mitigate damages" argument in the underlying suit.  Lite's former attorneys argued

that "there was no genuine issue of material fact regarding proximate cause," because Lite's

"alleged basis of malpractice rested on nothing but speculation that a reasonable factfinder would

have awarded a higher verdict had [the attorneys] acted differently."  *Id*. at 431 (internal

quotation marks omitted).  However, the court in the underlying suit cited the attorney's failure

to raise a mitigation of damages argument as a basis for the amount of damages Lite was

obligated to pay.  *Id*.  Therefore, the court did not conduct a trial within a trial analysis because

the attorney's alleged negligence had so "[c]learly" caused "the reduced damages award in that

case."  *Id*.  Similarly, the court in *Solnosky v. Goodwell*, 892 N.E.2d 174, 183 (Ind. Ct. App.

2008), did not conduct a trial within a trial analysis in finding a reason to believe that an

attorney's negligent advice proximately caused some harm to Mr. Solnosky in the underlying

trial.[18]

The Seventh Circuit, applying Indiana legal malpractice law, has stated that proximate

cause may be sufficiently shown where a "malpractice claimant . . . prove[s] that as a result of

the lawyer's incompetence he, the client, *lost his case*, or paid a *larger judgment* than would

have been awarded had the defendant performed competently, or *suffered some other harm*."

*Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark*, 39 F.3d 812, 815 (7th Cir. 1994), *cert.*

---

[18] In *Solnosky*, the plaintiff, Mr. Solnosky, alleged that his attorney's negligent advice caused him to open a business in violation of obligations he had to his employer.  892 N.E.2d at 177-78.  The defendant argued that by the time Mr. Solnosky would have received accurate legal advice, his business already had investors and only a vote by the investors could shut down the business.  *Id*. at 183.  The defendant argued that because Mr. Solnosky could not prove how the investors would have voted, he could not prove that he would have been able to shut down his business even if he received accurate legal advice, which was required to prove proximate cause.  *Id*.

However, Mr. Miller, who had provided the financing and leasing services to Mr. Solnosky's business, testified that he had the ability to shut down the business and that he would have done so if Mr. Solnosky had received accurate legal advice.  *Id*.  Because of this testimony, the court, without inquiring into how the investors would have voted, found that a reasonable factfinder could conclude that the defendant proximately caused some of Mr. Solnosky's damages.  *Id*.

*denied*, 514 U.S. 1123 (1995) (emphasis added) (collecting cases).  Similarly, in a suit governed

by Illinois law, which also utilizes a trial within a trial analysis in legal malpractice suits, the

Seventh Circuit stated:

> A plaintiff in a legal malpractice suit is not required to prove to a
> certainty that he would have won (or lost less) had it not been for
> the negligence of its lawyer, but he must show that *a victory of
> some sort, even if just partial, was more likely than not*.

*Praxair, Inc. v. Hinshaw & Culbertson*, 235 F.3d 1028, 1032 (7th Cir. 2000) (emphasis added)

(collecting cases).

In *McKnight v. Dean*, 270 F.3d 513, 520 (7th Cir. 2001), Mr. McKnight sued his former

attorney, Mr. Dean, claiming that Mr. Dean wrongfully forced him to settle a litigation claim.

The Seventh Circuit found that Mr. McKnight was not injured by the alleged malpractice

because he could not expect to recover more in a settlement of his claim than what Mr. Dean

negotiated on his behalf.  *Id*.  The court explained:

> McKnight argues that to repel summary judgment all he had to
> prove was that Dean's malpractice had caused him some injury,
> however slight—and *that would be true if Dean had obtained no
> money for McKnight*.  But Dean obtained $765,000, so that his
> negligence injured McKnight only if, had it not been for that
> negligence, McKnight could have expected to obtain more than
> that amount in his suit.

*Id*. (emphasis added) (citing *Praxair*, 235 F.3d at 1032; *Transcraft, Inc.*, 39 F.3d at 815;

*Picadilly, Inc.*, 582 N.E.2d at 344; *Glamann v. St. Paul Fire & Marine Ins. Co.*, 424 N.W.2d

924, 926 (Wis. 1988)).

In reviewing these cases, the Court is "left in no real doubt about the appropriate legal

standard.  It is the 'but for' standard . . . ."  *Yusefzadeh v. Ross*, 932 F.2d 1262, 1264 (8th Cir.

1991) (applying Minnesota legal malpractice law to the issue of whether the plaintiff would have

obtained financing to purchase a company but for his attorney's failure to advise him to do so);

*see Price Waicukauski & Riley, LLC*, 47 F. Supp. 3d at 819-23 (rejecting the plaintiffs' proposed alternative burdens of proof for proximate cause and adopting the "but for" standard).

The "but for" standard requires Bissonnette to prove, at a minimum, that if Podlaski had advised him to submit the manuscript for prepublication review, he would have followed that advice and submitted the manuscript to the DOPSR, some version of the Book would have been published, and he would have received *some amount* of royalties from books sales.  *See McKnight*, 270 F.3d at 519 ("For there is no basis for believing that McKnight would have done better by rejecting the settlement and going to trial; and if there is no injury, there is no tort."); *Praxair, Inc*., 235 F.3d at 1032 ("A plaintiff in a legal malpractice suit is not required to prove to a certainty that he would have won (or lost less) had it not been for the negligence of its lawyer, but he must show that a victory of some sort, even if just partial, was more likely than not."); *Transcraft, Inc.*, 39 F.3d at 815 (finding that proximate cause requires the malpractice plaintiff to prove that he "lost his case, or paid a larger judgment than would have been awarded had the defendant performed competently, or suffered some other harm") (collecting cases); *Picadilly, Inc*., 582 N.E.2d at 344-45 (finding evidence of proximate cause where a different closing argument could have affected the finder of fact); *Mundai*, 77 N.E.3d at 856 (finding that evidence connecting the attorney's alleged negligence to the deprivation of settlement negotiations sufficient to create a factual issue as to proximate cause); *Solnosky*, 892 N.E.2d at 183 (finding that a reasonable factfinder could conclude that "Solnosky's damages could have been minimized had [his attorney] given him correct legal advice"); *Clary*, 850 N.E.2d at 431 (finding that the attorney's failure in the underlying trial had clearly resulted in increased damages to the client); *Hedrick*, 722 N.E.2d at 1272-73 ("Proximate cause requires at a minimum that the harm would not have occurred but for the defendant's conduct." (citation

27

omitted)).

By retaining some amount of royalties, Bissonnette would be better off than if he had retained no royalties at all, which is what actually happened (Bissonnette forfeited all of the royalties to the DoD, and therefore netted zero dollars in total royalties).  *See Sleweon v. Burke, Murphy, Constanza & Cuppy*, 712 N.E.2d 517, 521 (Ind. Ct. App. 1999) ("Because the outcome of the underlying litigation would not have been more favorable but for Burke's alleged negligence, Burke's failure to timely file an appellate brief in *Sleweon I* was not the cause of harm to Dr. Sleweon.").  In this Opinion and Order, the Court assumes that if the Book would have been published following prepublication review, it would have generated some not insignificant amount of royalties to Bissonnette.  Therefore, on summary judgment, Bissonnette must only provide evidence from which a reasonable factfinder could conclude that if Bissonnette had submitted a manuscript to the DOPSR, some version of the Book would have been published.  *See Mundia*, 77 N.E.3d at 855 ("Only in plain and indisputable cases, where only a single inference or conclusion can be drawn, are the questions of proximate cause and intervening cause matters of law to be determined by the court." (citing *Peters v. Forster*, 804 N.E.2d 736, 743 (Ind. 2004))); *Solnosky*, 892 N.E.2d at 183.

The Court is mindful that a trial within a trial analysis is typically a necessary tool in connecting the attorney's alleged negligence to the client's injury.  *See, e.g.*, *Picadilly, Inc.*, 582 N.E.2d at 344 ("This proof typically requires a 'trial within a trial.'"); John H. Bauman, *Damages for Legal Malpractice: An Appraisal of the Crumbling Dike and the Threatening Flood*, 61 Temp. L. Rev. 1127, 1130 (1988) ("The trial within a trial method of resolving malpractice litigation is based on the simple premise that the best way to determine a client's loss from the lawyer's misconduct is to litigate the underlying claim against the original defendant as

part of the malpractice action against the attorney.").  However, as the cases above demonstrate, courts are sometimes satisfied that the attorney's negligence did or did not proximately cause the client's injury without engaging in a rigorous trial within a trial analysis.  *See e.g.*, *McKnight*, 270 F.3d at 520 ("McKnight argues that to repel summary judgment all he had to prove was that Dean's malpractice had caused him some injury, however slight—and *that would be true if Dean had obtained no money for McKnight*." (emphasis added)); *Solnosky*, 892 N.E.2d at 183 (concluding that Mr. Miller's statement that he could have shut down Mr. Solnosky's business was sufficient for reasonable minds to differ on the issue of proximate cause); *Clary*, 850 N.E.2d at 431 ("Clearly, the *Techno* court's own words suggest that BB & C's failure to research and argue the mitigation issue contributed to the reduced damages award in that case.").

Any subsequent determination of how the prepublication review process would have affected the substance or release of the resulting book goes to a comparison of royalties (driven by sales) generated by the hypothetical book as compared to the actual published Book.  This calculation in the counterfactual world "provides the benchmark for assessing damages." *Transcraft, Inc.*, 39 F.3d at 819 (citing *Nicolet Instrument Corp. v. Lindquist & Vennum*, 34 F.3d 453, 456-57 (7th Cir. 1994)).  It is a well-established principle that damages are awarded to fairly and adequately compensate an injured party for his loss, and "the proper measure of damages must be flexible enough to fit the circumstances."  *Bader v. Johnson*, 732 N.E.2d 1212, 1220 (Ind. 2000) (citations omitted).  "Once the plaintiff proves injury, broad latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification." *Haslund v. Simon Prop. Grp., Inc.*, 378 F.3d 653, 658 (7th Cir. 2004).  Thus, in quantifying damages, a factfinder is permitted to consider a "purely hypothetical" loss connected by a "long and fragile" "chain of speculation" to the attorney's alleged negligence.  *Transcraft, Inc.*, 39 F.3d

at 820.  Therefore, if a factfinder is required to consider the outcome of a hypothetical

prepublication review in greater detail to determine damages, it *may* be permitted to do so.

However, this is an issue for another day as the parties do not address it on summary judgment.

### b. Speculation

Defendants maintain that all of the evidence Bissonnette relies on to prove proximate

cause is unreasonably speculative.  This assertion is couched in an assumption that the only

acceptable evidence on the issue of proximate cause would be evidence directly from, or

attesting to be informed by, the DoD itself.  Defendants argue that this is because only the DoD

possesses the facts necessary to identify national security concerns in the Book.  Defendants

assert that permitting a jury to consider any other evidence would "give the factfinder carte

blanche to engage in undue speculation."  (DE 139 at 26).

Defendants are correct that Bissonnette cannot carry his burden on proximate cause "with

evidence based merely upon supposition or speculation."  *Palace Bar, Inc. v. Fearnot*, 381

N.E.2d 858, 861 (1978).  "[A]n inference must be drawn from a fact"; merely asserting that "a

certain thing is [p]ossible is no evidence at all."  *Id*. 864-65; *see Brown v. Buchmeier*, 994

N.E.2d 291, 297 (Ind. Ct. App. 2013) ("Brown was clear in her deposition that she did not know

why she fell and we cannot say that her designated evidence creates an issue of fact.").

There is a problem with Defendants' argument:  Even if the DoD is the only entity

capable of articulating with certainty the government's specific national security concerns in

relation to publishing the Book, it does not follow that all non-DoD derived evidence is

unreliable in determining the outcome of a hypothetical prepublication review for the purposes

of a proximate cause analysis.  In legal malpractice suits, "[c]ourts and judges are not

clairvoyant."  *Allied Waste N. Am., Inc. v. Lewis, King, Krieg & Waldrop, P.C.*, 93 F. Supp. 3d

835, 857 (M.D. Tenn. 2015); *see also Cornett*, 571 N.E.2d at 575 (determining proximate cause

based on what a "reasonable judge" would have done, not considering subjective factors).  It is

impossible to determine what specific changes the DOPSR or DoD would have made to the

Book.  *Cf. Allied Waste N. Am., Inc.*, 93 F. Supp. 3d at 857 ("It is impossible to determine what a

trial or appeals judge would decide, or what verdict a jury on retrial might return."); *see Clary*,

850 N.E.2d at 435 (finding that it would be "impractical" and "inefficient" to permit a jury "to

testify in a subsequent malpractice action as to how it would have decided the original action if

the case had been properly presented").  "All that can be made is a best guess."  *Allied Waste N.*

*Am., Inc.*, 93 F. Supp. 3d at 857.  Thus, evidence tending to show the "possibility, or at least [the]

option" that the Book would have been published in some form following prepublication review

is sufficient to create a triable issue of fact.  *Mundia*, 77 N.E.3d at 856.

      To the extent that Defendants demand evidence of the DoD's concerns, they ignore the

following testimony in Luskin's deposition:

> Well based on what the government said to me in the course of Mr.
> Bissonnette's two interviews with them, there were a number of
> specific matters that they thought improperly disclosed training
> tactics and procedures or sensitive or classified information.
>
> So it is my sense that the vast majority of what is said in the book
> would have been cleared, but there would have been specific
> deletions that would have been made.

(DE 138-12 at 9).  Luskin's testimony is not "based merely upon supposition or speculation."

*Palace Bar, Inc.*, 381 N.E.2d at 861.  Rather, it is based on interviews with the DoD, which

Defendants claim is the only reliable source on proximate cause.  Similarly Bissonnette testified

that all the agencies he spoke to about the Book indicated that he could have "written around or

simply deleted" any sensitive or classified material from it.  (DE 138-1 at 72).  Although Luskin

and Bissonnette do not unequivocally identify sensitive information in the Book, their

testimonies provide sufficient evidence from which a factfinder could infer that the Book would have been published.  *See Palace Bar, Inc.*, 381 N.E.2d at 864-65 (finding that a doctor's opinion was too speculative because it merely stated "that a certain thing [was] possible" and not inferred from facts).

Additionally, Enslen, Zaid, and attorney Stephen Ryan stated under oath that the DOPSR would have required some minor changes in the prepublication review process, but that some form of the Book would have been cleared for publication.  (*See* DE 78 ¶ 64; DE 138-17 at 28; DE 140 at 84-87).  Similarly, Podlaski has insisted at all relevant times that the Book contains "no classified information that is of concern to the United States with regard to its national security."  (DE 138-4 at 9; *see* DE 138-4 at 10, 27; DE 150 at 26-28, 49, 62, 69).  All together, the six sources of record with experience regarding sensitive or classified material agree that the Book contains little, minor, or, in Podlaski's case, no sensitive or classified material.  (*See* DE 78 ¶ 24; DE 138-1 at 72; DE 138-12 at 9, 57; DE 138-17 at 28; DE 140 at 84-87; *cf.* DE 138-1 at 20-21).  These sources may lack the credentials to identify *every instance* of sensitive or classified information in the Book, but it does not follow that they lack the ability to identify *any* sensitive or classified information in the Book.

Indeed, the government permitted the publications of other portrayals of Operation Neptune Spear, including "The Operator" in 2017.  (DE 150 at 27; DE 140 at 84-87).  Additionally, Enslen testified that the substance of "No Hero" and the Book are similar.  (DE 138-17 at 16).  Most importantly, prior to the publication and release of the Book, The New Yorker magazine published an "extensive" and "accurate" article describing Operation Neptune Spear.  (DE 138-1 at 46-47; DE 150 at 28).  According to Podlaski, the Book did not reveal any information about the raid that was not in The New Yorker article, other than Bissonnette's

personal observations.  (DE 150 at 28).  The existence of other publications detailing Operation

Neptune Spear could lead a reasonable factfinder to believe that the DoD did not institute a

complete prohibition on the publication of any and all of the information describing the raid.

And while Bissonnette was not entitled to publish classified or SCI-derived material, he

had a First Amendment right to publish all non-sensitive information.  *See McGehee v. Casey*,

718 F.2d 1137, 1148 (D.C. Cir. 1983) ("But while the CIA's tasks include the protection of the

national security and the maintenance of the secrecy of sensitive information, the judiciary's

tasks include the protection of individual rights."); *United States v. Marchetti*, 466 F.2d 1309,

1317 (4th Cir. 1972) ("As we have said, however, Marchetti by accepting employment with the

CIA and by signing a secrecy agreement did not surrender his First Amendment right of free

speech.  The agreement is enforceable only because it is not a violation of those rights.");

*Stillman v. C.I.A.*, 517 F. Supp. 2d 32, 38 (D.D.C. 2007) ("Courts have uniformly held that

current and former government employees have no First Amendment right to publish properly

classified information to which they gain access by virtue of their employment." (collecting

cases)).  Therefore, a factfinder could infer that the prepublication review process would have

called for deletions, redactions, and rewrites of sensitive material in the manuscript, but

ultimately the DOPSR would have allowed the Book to be published.

Finally, Bissonnette signed two NDAs that prohibited him from publishing any

manuscript that either contained classified information (DE 150 at 20-21), or information "that

[he] [had] reason to believe [was] derived from SCI" (DE 150 at 22) without receiving

permission from the government.  Both agreements acknowledged the government's authority to

apply "for a court order prohibiting disclosure of information in breach" of the agreements.  (DE

150 at 20, 22).  It is well established that such prior restraints or injunctions against the

33

publication of sensitive material are enforceable.  *See, e.g.*, *Snepp v. United States*, 444 U.S. 507, 508-09 (1980) (observing that Snepp's agreement not to publish any material without submitting it for government review was enforceable); *McGehee*, 718 F.2d at 1148 ("[P]republication review is designed for the purpose of preventing publication of classified information.").

In fact, evidence in the record indicates that the DoD contemplated enjoining the release of the Book prior to the Johnson Letter.  (DE 138-2 at 46).  There is also evidence that in early September 2012 the government doubted the effectiveness of an injunction because copies of the Book had already been printed.  (DE 138-12 at 19-20).  Nevertheless, the DoD may have been able to prevent the release of the Book, because, in a previous case, the DoD prevented the release of a book after it had been printed.  (*See* DE 140 at 53-54 (describing how the government purchased all the copies of a certain book so that it could be reviewed prior to release)).  Given that the DoD did not attempt to enjoin Bissonnette from releasing the Book after reviewing it, a reasonable factfinder could infer that the DoD's concerns with material in the Book would not have compelled the DoD to deny publication entirely, as a result of a prepublication review.

In light of all of this evidence, the Court is persuaded that a reasonable factfinder could conclude—without engaging in undue speculation—that Podlaski proximately caused Bissonnette to forfeit royalties to the government.  Defendants, by insisting that all the evidence of record is too speculative, are "throwing sand" in the Court's eyes to avert its attention.  *BCS Servs.*, *Inc.*, 637 F.3d at 758; *cf. Transcraft, Inc.*, 39 F.3d at 817.  Therefore, Defendants' speculation arguments fail.

### c.  The Political Question Doctrine

Defendants argue that the Court cannot determine the outcome of a hypothetical

prepublication review without stepping into the shoes of the DOPSR and addressing concerns the DoD would have had regarding material that was classified or sensitive in the Book.  Defendants argue that the Court cannot do so without answering a nonjusticiable political question.

"The political question doctrine 'excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.'"  *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1280 (11th Cir. 2009) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986)); *see Judge v. Quinn*, 624 F.3d 352, 358 (7th Cir. 2010).  It is an exception to the general rule that "the Judiciary has the responsibility to decide cases properly before it, even those it would gladly avoid."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 132 (2012) (citation omitted).  "The doctrine embodies a recognition that 'courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.'"  *Leibovitch v. Islamic Republic of Iran*, No. 08 C 1939, 2018 WL 1072567, at *5 (N.D. Ill. Feb. 27, 2018) (quoting *Japan Whaling Ass'n*, 478 U.S. at 230). The Supreme Court has set forth the following factors to guide courts in identifying a political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department;
>
> [2] a lack of judicially discoverable and manageable standards for resolving it;
>
> [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
>
> [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;
>
> [5] an unusual need for unquestioning adherence to a political

> decision already made; or
>
> [6] the potentiality of embarrassment from multifarious
> pronouncements by various departments on one question.

*Whitaker v. Kellogg Brown & Root, Inc*., 444 F. Supp. 2d 1277, 1280 (M.D. Ga. 2006) (citing

*Baker v. Carr*, 369 U.S. 186, 210 (1962)); *see Kashani v. Nelson*, 793 F.2d 818, 827 (7th Cir.

1986) (citation omitted); *Leibovitch*, 2018 WL 1072567, at *5 (citation omitted).

"However, the Court must make a careful inquiry when deciding if the doctrine applies,

because there is a distinction between 'political questions' and 'political *cases*,' and not 'every

case or controversy which touches foreign relations lies beyond judicial cognizance.'"

*Leibovitch*, 2018 WL 1072567, at *5 (quoting *Baker*, 369 U.S. at 211).  "Put simply, it is

emphatically the province and duty of the judicial department to say what the law is, and the

Court cannot shirk this responsibility merely because [its] decision may have significant political

overtones."  *Id*. (alternation in original) (citations and internal quotation marks omitted).  For

example, the political question doctrine bars courts from deciding cases calling for a

"reexamination of many sensitive judgments and decisions entrusted to the military in a time of

war . . . ."  *Carmichael*, 572 F.3d at 1281.  These sorts of judgments are textually committed to

the Executive Branch, and courts lack the manageable standards to scrutinize them.  *Id*. at 1284.

"Because the doctrine is largely driven by separation of powers concerns, the Court must

employ additional scrutiny when the doctrine is invoked by a private party rather than a

'coordinate branch of the United States government.'"  *Id*. (quoting *McMahon v. Presidential

Airways, Inc.*, 502 F.3d 1331, 1359-60 (11th Cir. 2007)).  In a suit between private parties, a

political question may be present where a court is called upon to reexamine a type of military

judgment that is insulated from judicial review.  *McMahon*, 502 F.3d at 1359-60; *see Smith v.

Halliburton Co.*, No. H-06-0462, 2006 WL 2521326, at *3-4, 5 (S.D. Tex. Aug. 30, 2006);

36

*Whitaker*, 444 F. Supp. 2d at 1227.  Otherwise, the government's lack of interest in the case

supports the conclusion that a political question is not present.  *McMahon*, 502 F.3d at 1365; *see*

*Leibovitch*, 2018 WL 1072567, at \*6.  Consequently, "it is with increasing rarity that a case is

dismissed on political question grounds."  *McMahon v. Presidential Airways, Inc.*, 460 F. Supp.

2d 1315, 1319 (M.D. Fla. 2006), *aff'd*, 502 F.3d 1331 (11th Cir. 2007) (citing *In re Agent*

*Orange Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 65-69 (E.D.N.Y 2005), and noting that the

Supreme Court did not mention the doctrine in *Bush v. Gore*, 531 U.S. 98 (2000)).

The Court recalls that to defeat Defendants' motion for summary judgment, Bissonnette

must present evidence showing that the Book would have been published if it was submitted for

prepublication review.  While such an inquiry may touch upon a political issue, it does not

require the Court to "review the substance of" a prepublication or classification determination.

*Cf. Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988).  Therefore, predicting the outcome of a

hypothetical prepublication review will not require the Court to answer a political question by

predicting or assessing the potential risk in disclosing specific classified information in the Book.

*See Carmichael*, 572 F.3d at 1282.

Defendants' attempts to refute this point are unavailing as they rely almost exclusively on

cases involving military decisions in combat zones or on the field of battle.  (*See, e.g.*, DE 139 at

27-29 (citing *Carmichael*, 572 F.3d at 1271; *Whitaker*, 444 F. Supp. 2d at 1280)).  In these cases,

the government typically has "control over either the conduct at issue" such as performing

service in a convoy traveling through a war zone.  *McMahon*, 460 F. Supp. at 1320; *see*

*Smith*, 2006 WL 2521326, at \*3-5; *Whitaker*, 444 F. Supp. 2d at 1227.  There is no such conduct

or military-type judgment that the Court must question in predicting whether the DOPSR would

have allowed some version of the Book to be published.[19]

Second, the Court notes that the government is likely aware of any potential political question implicated in this suit because Defendants have requested discovery from the DoD regarding what information was sensitive or classified in the Book. (*See* DE 142 at 16 ("Due to national security concerns, the Government will not provide discovery about how it would have evaluated the 'No Easy Day' manuscript had it been submitted for prepublication review in the summer of 2012.")). However, neither the DoD nor any other government agency has appeared in this case to object to the Court's ability to decide any issue on political question grounds. And while the government's absence is not determinative as to whether this case presents a political question, it fortifies the Court's conclusions that it does not. *McMahon*, 502 F.3d at 1365; *see Leibovitch*, 2018 WL 1072567, at *6.

Third, the outcome of a prepublication review is not entrusted solely to the Executive Branch; federal courts are empowered to review prepublication and classification decisions. *See* 5 U.S.C. §§ 701(b)(1)(B) (defining "agency" in this chapter as including "the courts of the United States"), 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."); *Snepp*, 444 U.S. at 511; *Berntsen v. C.I.A.*, 618 F. Supp. 2d 27, 30 (D.D.C. 2009). And while courts grant significant deference to the Executive Branch in these reviews, they are not powerless. *See, e.g.*, *Stillman*, 517 F. Supp. 2d at 39. On the other hand, the Executive Branch is the sole decision maker in cases dismissed because they involve military

---

[19] Similarly, in conducting a "but for" analysis, the Court is not entering a judgment or decision regarding what information was actually classified in the Book. No party has submitted or argued that any specific provision of the Book would or would not have raised national security concerns. Thus, "[n]othing decided in this case will demonstrate a lack of respect for a coordinate branch of government, nor is there any potential for 'multifarious pronouncements' by different branches of government on the same question." *Leibovitch*, 2018 WL 1072567, at *6 (quoting *Baker*, 369 U.S. at 217).

judgments.  *See McMahon*, 502 F.3d at 1359-60 (holding that courts cannot review "institutional

functioning of the military in areas such as personnel, discipline, and training," or decisions to

employ military force (citations and internal quotation marks omitted)).

Finally, the Court notes the reluctance with which federal courts dismiss cases on the

basis of a political question.  Cases are not "barred by the political question doctrine '[u]nless

one of [the *Baker*] formulations is inextricable from the case[.]"  *Lebovitch*, 2018 WL 1072567,

at *5 (first and third alterations in original) (quoting *Baker* 369 U.S. at 217).  Thus, while

deciding the outcome of a hypothetical prepublication review for the purpose of conducting a

"but for" analysis may have "significant political overtones," the Court will not "shirk" its

responsibility to decide this case.  *Japan Whaling Ass'n*, 478 U.S. at 222.

Therefore, Defendants' motion for partial summary judgment on the issue of proximate

cause will be denied.

### III.  MOTION TO EXCLUDE EXPERT[20]

Defendants move to preclude Bissonnette's expert Zaid on the issue of proximate cause.

Similar to Defendants' argument on summary judgment, their arguments to preclude Zaid focus

on the portions of his expert opinion that discuss the results of a hypothetical prepublication

review.  As discussed below, Defendants' arguments are not persuasive.

### A.  Zaid's Expert Report

Zaid graduated from the University of Rochester, New York, with honors in Political

Science and high honors in History and received a Juris Doctor degree from Albany Law School

---

[20] Zaid's expert report also includes a recitation of the facts of this case.  However, the version of the facts in Zaid's expert report is substantially similar to the versions in the parties' briefs on summary judgment and Defendants do not take issue with the version of facts portrayed in Zaid's expert report.  Therefore, the Court does not find it necessary to reiterate the factual background of the case for the purposes of Defendants' motion to preclude expert Zaid.

of Union University.  (DE 78-1 ¶¶ 6-7).  Zaid is currently a member of the Bars of New York,

Connecticut, the District of Columbia, Maryland, and other federal courts.  (DE 78-1 ¶ 7).  Since

1993, Zaid's law practice has been based in Washington, D.C., focusing on cases related to

national security issues and representing members of the intelligence, military, and law

enforcement communities.  (DE 78-1 ¶ 7).  Zaid recently held Top Secret/Special Compartment

Information clearance eligibility.  (DE 78-1 ¶ 7).

Zaid has litigated at least 10 cases, some at the trial and appellate levels, involving

classification or prepublication review determinations by an agency in the Executive Branch (*see*

DE 78-1 ¶ 8), and assisted authors in the prepublication review process in no fewer than 12

books (*see* DE 78-1 ¶ at 9).  Additionally, Zaid's law practice "focuses on cases involving

classified information," and he has handled "several high-profile cases" challenging the

government's use of the State Secret Privilege.  (*See* DE 78-1 ¶ 12).  Although Zaid has not been

recognized as an expert on the issue of prepublication review by any court, he has been

recognized as an expert by the news media on issues of national security (DE 78-1 ¶ 10), he

teaches courses for continuing education credits and for Johns Hopkins University that include

issues of national security law and prepublication review (DE 78-1 ¶¶ 11, 15), and he has

testified before Congress several times on national security matters (DE 78-1 ¶ 13).  His work in

national security law has earned him recognition as a Washington, D.C., "Super Lawyer" every

year since 2009 and other recognitions as well.  (DE 78-1 ¶ 13).  Zaid has also served as the

executive director of the James Madison Project, an organization with the primary purpose of

educating the public on issues related to intelligence gathering operations.  (DE 78-1 ¶ 14).

Based on his experience with similar manuscripts, Zaid opines that if Bissonnette had

submitted a manuscript of the Book for prepublication review, the DOPSR would have

completed that review in approximately four to six months.  (DE 78-1 ¶ 58).  In Zaid's opinion, the DOPSR would have required Bissonnette to make minor redactions and rewrites to the manuscript to clear it of any sensitive information, but would have allowed the Book to be published.  Zaid concludes that Defendants' breach of the standard of care proximately caused Bissonnette to forfeit royalties to the government under the Consent Decree.  (DE 78-1 ¶ 72).

### B.  Standard

Federal Rule of Evidence 702 and *Daubert* and its progeny govern the admissibility of expert testimony.  *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016).  The district court acts "as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand."  *Krik v. Exxon Mobil Corp*., 870 F.3d 669, 674 (7th Cir. 2017) (citing *Daubert*, 509 U.S. at 589); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  This inquiry applies not only to scientific testimony, "but to all kinds of expert testimony."  *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002) (noting that Rule 702 "makes no distinction between 'scientific' knowledge and other forms of specialized knowledge" (citing *Kumho Tire Co., Ltd*., 526 U.S. at 149)).

To determine whether an expert's testimony is admissible, district courts apply a three-part analysis.  *Meyers v. Ill. Cent. R.R. Co*., 629 F.3d 639, 644 (7th Cir. 2010); *see also Costanza v. Vulcan Ladder Co*., No. 1:13-CV-260-TLS, 2017 WL 748426, at *2 (N.D. Ind. Feb. 27, 2017).  "First, the Court must determine whether the proposed witness is qualified as an expert by knowledge, skill, experience, training, or education."  *Costanza*, 2017 WL 748426, at *2.  This includes the expert's "full range of practical experience as well as academic or technical training . . . ."  *Trs. of Chi. Painters & Decorators Pension v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 788 (7th Cir. 2007) (quoting *Smith v. Ford Motor Co*., 215 F.3d 713, 718 (7th Cir.

2000)).

Second, the Court must determine "whether the reasoning or methodology underlying the expert's testimony is reliable." *Id*. Accordingly, "[an] expert['s] work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc*., 217 F.3d 919, 924 (7th Cir. 2000). This is a fact-dependent and flexible inquiry in which the district court has "wide latitude in performing its gatekeeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012).

Third, "the court must assess whether the expert" proposed testimony will assist the trier of fact in understanding the evidence or to determine a factual issue." *Costanza*, WL 748426, at *2 (citation omitted); *see also United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007). The expert's "testimony must 'fit' the issue to which the expert is testifying." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (quoting *Porter v. Whitehall Labs. Inc*., 9 F.3d 607, 614 (7th Cir. 1993)). If the expert's testimony satisfies the threshold requirements, it is put before a jury and tested by cross examination, contrary evidence, and instructions on the burden of proof. *Daubert*, 509 U.S. at 596. "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." *Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 921 (N.D. Ind. 2006) (citation omitted).

### C. Analysis[21]

Defendants argue that Zaid is not qualified to render an opinion on proximate cause because he "has never been employed by or affiliated with the DoD or any Government agency that would have reviewed the manuscript of 'No Easy Day' if it had been submitted for prepublication review."  (DE 77 at 20).

The Court disagrees.  "On its face, [Zaid's] curriculum vitae belies [Defendants'] self-serving assertion that [Zaid] lack[s] the relevant knowledge, experience, or education to proffer an expert evaluation."  *United States v. Jordan*, 813 F.3d 442, 445-46 (1st Cir. 2016), *cert. denied*, 136 S. Ct. 2528 (2016).  Defendants discount Zaid's entire experience advising and litigating on behalf of clients in the prepublication review process solely because Zaid has not represented or worked with the government in prepublication reviews.  For a district court to require such "particular credentials for an expert witness is radically unsound."  *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp*., 223 F.3d 585, 591 (7th Cir. 2000).

Second, Defendants argue that Zaid's opinion on proximate cause is no more than subjective belief.  They contend that Zaid is not aware of the facts (*e.g.*, intelligence and national security concerns) that would have influenced the DOPSR's decision in reviewing the Book.  Defendants maintain, therefore, that Zaid's opinion that the Book would have been published with few changes is unreliable.

Bearing in mind Bissonnette's burden on the issue of proximate cause at trial—that is, he must show evidence that the DOPSR would have reviewed the manuscript and allowed the Book

---

[21] In Defendants' motion to preclude they rehash their speculation and political question arguments. Insofar as these arguments assert that any testimony or evidence, as a matter of law, would be too speculative or run afoul of the political question doctrine, the Court has addressed these arguments *supra*, and will not repeat them here.  It is enough to say that neither argument is sufficient to exclude Zaid's report or testimony as a matter of law.

to be published in some form—the Court finds that Zaid's report exhibits sufficient reliability.

Zaid has articulated the process by which he identifies and refutes the government's designation

of classified material as to receive permission to publish a work.  Zaid represents:

> In the course of my twenty-plus years' experience in this arena, I
> have encountered thousands of instances where my classification
> view differed from that of the Government.  When there is a
> disagreement, the recourse is to persuade the Government
> otherwise, concede and rewrite, or bring the matter before a U.S.
> District Court through a litigation challenge.

(DE 78-1 ¶ 55).  Specifically, Zaid describes how the government objected to a former client

publishing a manuscript in its entirety.  (DE 78-1 ¶ 62).  However, Zaid negotiated with the

government and litigated the issue, and his client was given permission to publish 80% of the

material in the manuscript within a month or less, and ultimately was cleared to publish 90%.

(DE 78-1 ¶ 63).  This use of "professional methods" renders his opinion reliable.  *Zenith Elec.*

*Corp.*, 395 F.3d at 419.

Defendants are correct that if Zaid had worked for the DoD or participated in a

prepublication review decision on behalf of the government, he would have additional facts or

methods to bolster his reliability.  But Zaid's inability to testify about some facts with absolute

certainty "does not render his opinions unreliable or irrelevant."  *Baugh v. Cuprum S.A. de C.V.*,

845 F.3d 838, 847 (7th Cir. 2017).  It is for the jury, not the Court, to evaluate the accuracy of

the factual underpinnings of Zaid's testimony.  *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587

(7th Cir. 2000) (citing *Daubert*, 509 U.S. at 596).  Moreover, the *Daubert* test is flexible as to

reliability, and the Court has wide latitude in performing its gatekeeping function.  *Kirk*, 870

F.3d at 674 (quoting *Smith*, 215 F.3d at 719); *see Lapsley*, 689 F.3d at 810.

Finally, "[w]hen analyzing the relevance of proposed testimony, the district court must

consider whether the testimony will assist the trier of fact with its analysis of any of the issues

involved in the case." *Smith*, 215 F.3d at 718.  "Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies *Daubert*'s relevancy requirement." *Id*. (citation and internal quotation marks omitted). The Supreme Court "has expressed its confidence in the ability of juries to understand complicated material[.]" *Walker*, 208 F.3d at 587 (citing *Daubert*, 509 U.S. at 595-96).  Because Defendants do not dispute that Zaid's opinion relates "directly to [an] ultimate issue that is to be resolved by the trier of fact," their argument that Zaid's opinion will not assist a jury fails. *Smith*, 215 F.3d at 720.  Thus, Defendants' motion to preclude expert Zaid will be denied.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment or, in the alternative, for partial summary judgment (DE 137) is GRANTED as to Bissonnette's claim for breach of fiduciary duty, but is otherwise DENIED.  Additionally, Defendants' motion to preclude expert Zaid (DE 76) is DENIED.  This case is set for a telephonic scheduling conference on June 14, 2018, at 10:00 a.m., the Court will initiate the call.

SO ORDERED.

Dated this 5th day of June 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge